No. 24-3188

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

MI FAMILIA VOTA, *et al.*,

*Plaintiffs-Appellees*,

*v.*

ADRIAN FONTES, *et al.*,

*Defendants-Appellants*,

WARREN PETERSEN, *et al.*,

*Intervenor-Defendant-Appellants*.

---

On Appeal from the United States District Court
for the District of Arizona, No. 2:22-CV-00509 (Bolton, J.)

---

## NON-U.S. PLAINTIFFS' OPPOSITION TO INTERVENOR-DEFENDANTS' EMERGENCY MOTION FOR A STAY PENDING APPEAL

---

BRUCE SAMUELS
JENNIFER LEE-COTA
PAPETTI SAMUELS WEISS
   McKIRGAN LLP
16430 North Scottsdale Road
Suite 290
Scottsdale, Arizona 85254
(480) 800-3530
bsamuels@pswmlaw.com

SETH P. WAXMAN
CHRISTOPHER E. BABBITT
DANIEL S. VOLCHOK
JOSEPH MEYER
BRITANY RILEY-SWANBECK
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
daniel.volchok@wilmerhale.com

*Counsel for the Democratic National Committee and the Arizona Democratic Party*
*(Additional counsel listed in concluding signature blocks)*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................... ii

INTRODUCTION .................................................................. 1

LEGAL STANDARDS ............................................................. 4

ARGUMENT ........................................................................ 4

I.    LIKELIHOOD OF SUCCESS ............................................. 4

      A.    Voting In Presidential Elections ............................. 4

      B.    Mail Voting ...................................................... 11

      C.    *LULAC* Decree ................................................. 13

II.   IRREPARABLE HARM ..................................................... 18

      A.    Legislators ....................................................... 18

      B.    RNC ................................................................ 21

III.  REMAINING STAY FACTORS .......................................... 21

CONCLUSION ..................................................................... 25

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abbott v. Perez*, 585 U.S. 579 (2018) ........................................................19

*ACORN v. Edgar*, 56 F.3d 791 (7th Cir. 1995) ...................................6, 12

*ACORN v. Miller*, 129 F.3d 833 (6th Cir. 1997) .......................................6

*Allen v. Caster*, 2023 WL 3937600 (U.S. June 12, 2023) ........................23

*Arizona Democratic Party v. Hobbs*, 976 F.3d 1081 (9th Cir. 2020) ....................23

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013)........................1

*Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015)................................................20

*Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179 (2022)................................................18, 19

*Buckley v. Valeo*, 424 U.S. 1 (1976)........................................................6, 7

*Burroughs v. United States*, 290 U.S. 534 (1934) .................................5, 6

*Bush v. Gore*, 531 U.S. 98 (2000)...............................................................7

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ....................................9, 10

*Condon v. Reno*, 913 F.Supp. 946 (D.S.C. 1995)......................................8

*Dittman v. California*, 191 F.3d 1020 (9th Cir. 1999) ........................8, 15

*Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020) ..............................19, 20

*EEOC v. Wyoming*, 460 U.S. 226 (1983) ...................................................8

*Ex parte Yarbrough*, 110 U.S. 651 (1884)................................................5

*FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993) ....................10

*First Resort, Inc. v. Herrera*, 860 F.3d 1263 (9th Cir. 2017) ...................................10

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ........................................................14

*Hollingsworth v. Perry*, 570 U.S. 693 (2013)...........................................................16

*Janis v. Nelson*, 2009 WL 5216902 (D.S.D. Dec. 30, 2009)...................................10

*Latta v. Otter*, 771 F.3d 496 (9th Cir. 2014)..........................................................21

*League of Women Voters of North Carolina v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ...........................................................................22

*Lopez v. Monterey County*, 525 U.S. 266 (1999) ......................................................9

*Manrique v. Kolc*, 65 F.4th 1037 (9th Cir. 2023) ......................................................4

*Maryland v. King*, 567 U.S. 1301 (2012) ................................................................19

*McPherson v. Blacker*, 146 U.S. 1 (1892) ..................................................................7

*Mecinas v. Hobbs*, 30 F.4th 890 (9th Cir. 2022) ....................................................21

*Midgett v. Tri-County Metropolitan Transportation District of
    Oregon*, 254 F.3d 846 (9th Cir. 2001)....................................................18, 21

*Moore v. Harper*, 600 U.S. 1 (2023) ........................................................................16

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................19, 21

*NLRB v. SW General, Inc.*, 580 U.S. 288 (2017) .....................................................13

*Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012) .................................22

*Priorities USA v. Nessel*, 978 F.3d 976 (6th Cir. 2020) ..........................................20

*Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir.
    2012) ................................................................................................................11

*Puente Arizona v. Arpaio*, 821 F.3d 1098 (9th Cir. 2016).......................................12

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ..............................................................22, 24

*Republican National Committee v. Democratic National Committee*,
589 U.S. 423 (2020)....................................................................24

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992)..................15

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,
559 U.S. 393 (2010)....................................................................18

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ...........................8, 9

*Taylor v. United States*, 181 F.3d 1017 (9th Cir. 1999) ....................15, 16

*United States v. Blaine County*, 363 F.3d 897 (9th Cir. 2004)................11

*United States v. Mitchell*, 971 F.3d 993 (9th Cir. 2020)...........................4

*Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658 (2019) ...........17, 20, 21

*Voting Rights Coalition v. Wilson*, 60 F.3d 1411 (9th Cir. 1995) ............6

*Whole Woman's Health v. Jackson*, 141 S.Ct. 2494 (2021) ....................5

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Constitution art. I, §1, cl. 4 ...............................................13

52 U.S.C.
    §20501 ..............................................................9, 11, 12
    §20502 ......................................................................7
    §20505 .....................................................................12
    §20507 .....................................................................14
    §20508 .....................................................................14
    §30101 ......................................................................7

Arizona Revised Statutes
    §12-1841 ...............................................................18, 19
    §16-121.01 .....................................................13, 14, 15, 17
    §16-541 ....................................................................13
    §16-1021 ...................................................................19
    §41-192 ................................................................16, 17
    §41-193 .............................................................16, 17, 18

North Carolina General Statutes §1-72.2..................................................................19

## RULES

Federal Rule of Civil Procedure 5.1 ........................................................................18

Ninth Circuit Rule 27-3...........................................................................................3

## LEGISLATIVE MATERIALS

H.R. Rep. No. 103-9 (1993).................................................................................9, 10

S. Rep. No. 103-6 (1993) ....................................................................................9, 10

# INTRODUCTION

In 2022, Arizona enacted two voting laws (H.B. 2492 and 2243) that make it harder to register, harder to stay registered, and harder to cast a ballot. For example, the laws penalize people who do not provide documentary proof of U.S. citizenship ("DPOC") when they register, including by barring them from voting in presidential elections and denying them the option to vote by mail in congressional elections. These restrictions conflict with (and seek to circumvent) *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) ("*ITCA*"), which held that the National Voter Registration Act ("NVRA") preempted an Arizona law requiring people to provide DPOC to register to vote in federal elections, *id.* at 10.

Plaintiffs in these eight consolidated cases sued to challenge H.B. 2492 and 2243 as violating federal law. Based on *ITCA* and other binding precedent, the district court held that the NVRA precludes enforcement of the provisions of H.B. 2492 that prohibit people who have not provided DPOC from voting in presidential elections or in congressional elections by mail. The court also held that the consent decree entered in *League of United Latin American Citizens of Arizona v. Reagan*, No. 2:17-cv-04102-DGC (D. Ariz. June 18, 2018), ("*LULAC* decree")— which no party has ever sought to set aside—precludes enforcement of H.B. 2492's provision mandating that election officials reject state-form applications

submitted without DPOC, even though identically situated federal-form applicants are registered for federal elections.

Intervenors seek to stay those rulings pending appeal—relief that the state, the attorney general, and the secretary of state all oppose. But intervenors do not satisfy any of the factors required to obtain a stay.

First, intervenors cannot demonstrate they will likely succeed on appeal. Their argument that, under the Constitution's Electors Clause, the NVRA cannot apply to presidential elections is foreclosed by binding precedent. Their contention that the NVRA does not govern the "mechanisms" and "procedures" of voting, meanwhile, is belied by the law's text and purpose, and would gut the statute. And their assertion that Arizona may fully reject state-form applications lacking DPOC is, as the district court found, inconsistent not only with the *LULAC* decree but also federal law—a point intervenors' motion ignores.

A stay at this juncture, moreover, would be profoundly disruptive and contrary to the public interest. Arizona's primary is later this month—and early voting has already begun. A stay would thus, as the secretary of state explains, "create confusion and chaos for voters and election officials alike." ECF 52.1 at 4; *accord* ECF 62.1 at 5-6 (state/attorney general opposition). That is in addition to the harm to Arizonans' interest in exercising their fundamental right to vote. The

injuries asserted by intervenors—who speak for neither the state nor the public—do not remotely outweigh these important interests.

That is particularly true given intervenors showed no urgency in securing enforcement of the challenged laws. Despite knowing for over a *year* that the laws were voluntarily not being implemented, intervenors took no action (such as a state-court mandamus lawsuit) to compel implementation. Had the issue been urgent, intervenors would have pressed to finalize the final judgment earlier. Instead, they waited *two months* after the district court issued its final findings and conclusions of law, waited another two weeks to submit their stay application to the district court, and waited over a month after that to file with this Court. *See* D.Ct. Dkt.707, 711, 713, 719, 720, 730. All told, the district court resolved the legal issues in this case on February 29, yet intervenors' "emergency" motion was not filed with this Court until June 25. That delay is incompatible with this Court's requirement that parties "make every practicable effort" to serve emergency motions "at the earliest possible time." Cir. Rule 27-3(a). And given their conduct, intervenors cannot evade Supreme Court precedent (with which they are certainly familiar) generally precluding federal-court disruption of state election law close to an election.

The district court properly denied a stay. This Court should do the same so that Arizona's July 30 primary and November 5 general elections may proceed without disruption.

## LEGAL STANDARDS

A stay pending appeal is an "extraordinary remedy." *United States v. Mitchell*, 971 F.3d 993, 999 (9th Cir. 2020). Whether to grant a stay turns on four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434.

This Court employs a sliding-scale approach to these factors, under which "the required degree of irreparable harm increases as the probability of success decreases." *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023). But "[e]ven with a high degree of irreparable injury"—which is absent here—a stay applicant "must show 'serious legal questions' going to the merits." *Id.*

## ARGUMENT

### I. LIKELIHOOD OF SUCCESS

#### A. Voting In Presidential Elections

1.    Intervenors' argument that the NVRA cannot preempt H.B. 2492's bar on voting in presidential elections by those who have not provided DPOC

(Mot.6-10) rests on the premise that Congress lacks constitutional authority to regulate the manner of those elections. The Supreme Court and this Court have each rejected that premise. Intervenors thus have no prospect of prevailing on appeal, because whether a party is "likely to succeed on the merits" must be determined "under existing precedent," *Whole Woman's Health v. Jackson*, 141 S.Ct. 2494, 2495 (2021).

Contrary to intervenors' claim that "no court has decided this issue" (Mot.8), the Supreme Court has repeatedly affirmed congressional authority to regulate presidential elections. In *Burroughs v. United States*, 290 U.S. 534 (1934), the Court held that Congress "undoubtedly" has the power to "pass appropriate legislation to safeguard [presidential] elections," *id*. at 545. The Court rejected the "narrow [] view of the powers of Congress" intervenors here espouse, *id*. at 544—calling it "'a proposition so startling as to arrest attention and demand the gravest consideration,'" *id*. at 546 (quoting *Ex parte Yarbrough*, 110 U.S. 651, 657 (1884)). That rejection was a holding; the Court stated that "the constitutional objection *necessary to be considered* [was] that the power of appointment of presidential electors and the manner of their appointment are expressly committed by section 1, art. 2, of the Constitution to the states, and that [] congressional authority is thereby limited." 290 U.S. at 544 (emphasis added). The Court later reaffirmed this holding, citing *Burroughs*'s recognition of "broad congressional

- 5 -

power to legislate in connection with the elections of the President." *Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976) (per curiam).

This Court, too, has recognized Congress's constitutional authority to regulate presidential elections. Citing *Burroughs*, this Court explained in a challenge to the NVRA's constitutionality that "[t]he broad power given to Congress over congressional elections has been extended to presidential elections." *Voting Rights Coalition v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995). Other circuits are in accord. *See ACORN v. Miller*, 129 F.3d 833, 836 n.1 (6th Cir. 1997); *ACORN v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995). Intervenors, in contrast, cite *no case* holding that Congress cannot regulate the places and manner of presidential elections. That alone precludes finding that they are likely to succeed on appeal.

Intervenors try to wave away *Burroughs*—a case that by itself defeats their argument—by asserting that it "rested on the premise that if the challenged statute *did* interfere with the 'exclusive state power' over presidential elections, it would be unconstitutional." Mot.9. In reality, the Court opined only that the statute at issue "in no sense invade[d] any exclusive state power." 290 U.S. at 545.

Intervenors' attempts to distinguish other binding precedent likewise fail. For example, intervenors argue (Mot.9) that *Buckley* "says nothing about the scope of Congress's power to regulate presidential elections," ignoring that *Buckley* twice

explained that "Congress has power to regulate Presidential elections and primaries," 424 U.S. at 90; *see also id.* at 13 n.16. As for *Wilson*, intervenors contend (Mot.6-7) that this Court's recognition of broad congressional power to regulate presidential elections is dicta—but that recognition plainly was essential to *Wilson*'s upholding of the NVRA, which explicitly regulates presidential elections, *see* 52 U.S.C. §20502(2) (citing *id.* §30101(3)).

Intervenors' reliance on other cases (Mot.6) is misplaced. First, *McPherson v. Blacker*, 146 U.S. 1 (1892), includes no holding about congressional authority to regulate the place and manner of presidential elections. The case was about whether the *Michigan* legislature acted unconstitutionally, *id.* at 24-25, so the Court did not have to address the scope of Congress's constitutional power. The holding intervenors assign to *McPherson*, moreover, would conflict with the Court's later rulings in *Burroughs* and *Buckley*. And *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam), was about constitutional limits on *state* authority over elections, not Congress's. Specifically, *Bush* explained that once a "state legislature chooses a statewide election as the means" by which presidential electors are selected, the state may not arbitrarily deny such a right to voters. *Id.* at 104-105. That is what H.B. 2492 would do, and what the NVRA prevents.

2. Intervenors also ignore Congress's power to enact the NVRA under the Fourteenth and Fifteenth Amendments—perhaps because intervenor the

Republican National Committee ("RNC") admitted below that "[t]hose amendments could have been a valid source for the NVRA had Congress invoked them," D.Ct. Dkt.442 at 5. (Congress in fact did so. *See infra* pp.8-9.) Intervenors' failure to address the Reconstruction Amendments is notable given that plaintiffs' opposition to intervenors' stay motion below addressed them. And that failure suffices to conclude they have not shown a likelihood of success on the merits; plaintiffs invoked those amendments below, so the merits panel could affirm based on them, *Dittman v. California*, 191 F.3d 1020, 1027 n.3 (9th Cir. 1999).

In any event, the amendments independently defeat intervenors' likelihood-of-success argument. "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966). Congress need not invoke its power under the amendments when legislating; there need only be "some legislative purpose or factual predicate" to support the exercise of that power. *EEOC v. Wyoming*, 460 U.S. 226, 243 n.18 (1983). Even so, Congress *did* invoke that power in the NVRA. Indeed, both "the legislative history and the text … are clear" that Congress relied on that power to enact the NVRA. *Condon v. Reno*, 913 F.Supp. 946, 962 (D.S.C. 1995). Congress's express findings include that "discriminatory and unfair registration laws and procedures … disproportionately harm voter

participation by various groups, including racial minorities." 52 U.S.C. §20501(a)(3). And the Senate report accompanying the law stated that the law sought "to remove the barriers to voter registration and participation under Congress' power to enforce the equal protection guarantees of the 14th Amendment." S. Rep. No. 103-6, at 3 (1993); *see also* H.R. Rep. No. 103-9, at 3 (1993) (deeming the NVRA necessary to complete the work of the Voting Rights Act ("VRA")).

The RNC argued below (D.Ct. Dkt.367 at 7)—but does not argue here—that the NVRA is not reasonably tailored to preventing race discrimination. That is wrong. Mandating a simplified system for registering to vote in federal elections and restricting states' ability to purge voters from the rolls are assuredly "rational means," *Katzenbach*, 383 U.S. at 324, of preventing "discriminatory and unfair registration laws and procedures," 52 U.S.C. §20501(a)(3). The RNC further asserted (D.Ct. Dkt.367 at 7) that the proper standard is not rational means but rather "congruence and proportionality," *City of Boerne v. Flores*, 521 U.S. 507, 508 (1997). That too is incorrect; even after *City of Boerne*, the Supreme Court has applied *Katzenbach* when Congress sought to remedy racial discrimination or protect voting rights. *See Lopez v. Monterey County*, 525 U.S. 266, 283 (1999). Courts have thus recognized that "*Katzenbach* has yet … to be overruled or otherwise … modified by the Supreme Court," and hence that its "rational means"

- 9 -

standard governs in cases involving the Fifteenth Amendment. *Janis v. Nelson*, 2009 WL 5216902, at *8 (D.S.D. Dec. 30, 2009).

Regardless, the NVRA *is* congruent and proportional. Disputing this, the RNC claimed below (D.Ct. Dkt.367 at 7) that the NVRA is under-inclusive because it does not address state elections. But Congress need not address every aspect of a problem at once. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 316 (1993); *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1279 (9th Cir. 2017).[1]

Lastly, the RNC argued below (D.Ct. Dkt.367 at 7) that "the NVRA's 'legislative record lacks examples of modern instances' of discrimination on account of proof of citizenship required for registration." But the case it quoted in making this argument contrasted the record underlying the statute in that case with "the record which confronted Congress … in the voting rights cases." *City of Boerne*, 521 U.S. at 530. And in enacting the NVRA, Congress relied on an extensive record of discrimination in voting registration, similar to that underlying the VRA. *See* S. Rep. No. 103-6, at 3; H.R. Rep. No. 103-9, at 3-4. This Court has held, based on the law's extensive legislative record, that the VRA's prophylactic elements are a congruent and proportional means of addressing voter

---

[1] While faulting Congress for failing to include state elections, the RNC simultaneously argued that Congress *cannot* constitutionally regulate state elections. D.Ct. Dkt.367 at 4. That too is wrong, as the VRA's and Civil Rights Act's coverage of all elections demonstrates.

discrimination.  *See United States v. Blaine County*, 363 F.3d 897, 904-909 (9th Cir. 2004).  The same is thus true of the NVRA.

### B.    Mail Voting

Intervenors argue that the NVRA cannot preempt state laws concerning mail voting because the NVRA concerns only *registration*, not the actual casting of ballots.  That proposed dichotomy is belied by both the text and purpose of the NVRA.  And accepting it would gut the statute's protections, allowing states to evade the law simply by placing voting restrictions on those who register pursuant to the NVRA's protections, rather than directly restricting registration itself.

The NVRA's text covers both registration *and* voting.  The law declares that the right "to vote" (not "to register") is "fundamental," and that states must "promote the exercise of that right."  52 U.S.C. §20501(a).  Indeed, the law's enumerated purposes include "enhanc[ing] the participation of eligible citizens *as voters*."  *Id.* §20501(b) (emphasis added).

Accordingly, courts recognize that the NVRA's purpose is to ensure that the "right to *exercise the[] franchise* … not be sacrificed."  *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) (emphasis added).  That purpose cannot be served by protecting registration alone:  Because "[r]egistration is indivisible from election," states may not, "by separating registration from voting, … undermine the power that Article I section 4 grants to Congress."

*Edgar*, 56 F.3d at 793. Registration, that is, is not an end in itself; it exists entirely in service of being able to cast a ballot. Thus, states cannot circumvent Congress's mandates in the NVRA by imposing prerequisites to voting that effectively deny the protections the statute provides. Indeed, intervenors' position that the NVRA has no effect on the "procedures" and *mechanisms*" of voting (Mot.10) would all but destroy the statute. Because that position "stands as an obstacle to the accomplishment … of the full purposes … of Congress" in the NVRA, *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016), it is preempted. Notably, intervenors never address obstacle preemption, even though it was key to the district court's NVRA ruling, D.Ct. Dkt.534 at 14-15; *see also* D.Ct. Dkt.752 at 7 (noting a similar failure below).

Instead, intervenors point (Mot.11) to the NVRA's additional purpose of "protect[ing] the integrity of the electoral process," 52 U.S.C. §20501(b)(3), which they construe (based on legislative history) as being about voter fraud (Mot.11-12). Voting by non-U.S. citizens in Arizona, however, is exceedingly rare. D.Ct. Dkt.709 at 29-30. Enjoining H.B. 2492's restriction on mail voting thus does not—unlike the restriction itself—prevent the accomplishment of Congress's purposes.

Intervenors also wrongly argue (Mot.10-11) that the NVRA's treatment of mail voting supports their argument. The opposite is true: Section 20505(c)(1)

enumerates specific circumstances in which a state may limit mail voting. And as the district court recognized (D.Ct. Dkt.534 at 13), it is a "sensible inference" that Congress "must have … meant" to *prevent* states from limiting mail voting in *other* circumstances, *NLRB v. SW General, Inc.*, 580 U.S. 288, 302 (2017). Intervenors deride this as a "novel interpretation" (Mot.10-11), but it is a straightforward application of the *expressio unius* canon. And it does not "eliminate[] States' … authority over mail voting" (Mot.11). Again, it merely prevents states from imposing voting restrictions that effectively deny the protections the NVRA provides.

Finally, intervenors' attempt to distinguish mail voting as a "privilege" rather than a right (Mot.11) is unavailing. Mail voting is a "manner" of voting, U.S. Const. art. I, §4, cl. 1, so under the Elections Clause Congress has *plenary* power to regulate it. In any event, Arizona has—for decades—guaranteed that "[a]ny qualified elector may vote by early ballot," Ariz. Rev. Stat. ("A.R.S.") §16-541, and mail voting is (and has long been) how the vast majority of Arizonans now vote, D.Ct. Dkts.388 ¶60, 732 at 3.

### C.   *LULAC* Decree

The district court properly enjoined A.R.S. §16-121.01(C), which required election officials to reject state-form applications submitted without DPOC even though otherwise-identical registrants who submit federal forms must, under *ITCA*,

be registered for federal elections. *See* D.Ct. Dkt.534 at 21-22. Intervenors will not likely succeed in challenging this ruling.

Intervenors attack the *LULAC* decree's continued enforceability (Mot.12-14) but make no attempt to show that A.R.S. §16-121.01(C) complies with federal law apart from the decree. It does not. As the district court found, its treatment of state-form applicants without DPOC violates the NVRA. That law requires that Arizona "ensure that any eligible applicant is registered to vote" if their "valid voter registration form" is received at least 30 days before an election. 52 U.S.C. §20507(a)(1). And it provides that state voter-registration forms "may require only such identifying … and other information … necessary to enable the … State … to assess the eligibility of the applicant and to administer voter registration." *Id.* §20508(b)(1); *see also Fish v. Kobach*, 840 F.3d 710, 737-738 (10th Cir. 2016) (construing an "analogous" NVRA provision). Because the federal form does not require DPOC—making clear that DPOC is *not* "necessary" to evaluate voter eligibility (52 U.S.C. §20508(b)(1))—and because intervenors do not explain why DPOC is needed to process state forms, they cannot show likely success in overturning the district court's conclusion that H.B. 2492's treatment of state-form applicants violates the NVRA. D.Ct. Dkt.534 at 22 n.13; *see also* D.Ct. Dkt.709 at 74-75 (invalidating documentary-proof-of-residence requirement for state-form registrations for federal elections under the NVRA). Because the merits panel

could affirm on this alternate ground, *Dittman*, 191 F.3d at 1027 n.3, intervenors'
failure to address it means they cannot show a likelihood of success.

Similarly, intervenors fail to address plaintiffs' constitutional challenges to
A.R.S. §16-121.01(C). Those include that H.B. 2492's DPOC requirement
violates equal protection by forcing election officials to reject applications from
citizens seeking to register without DPOC using the state form, even though
identically situated citizens using the federal form may register for federal
elections. *E.g.*, D.Ct. Dkt.65, ¶¶86-92. Intervenors are unlikely to show that
A.R.S. §16-121.01(C) survives Fourteenth Amendment scrutiny, because they
have "not offer[ed] any basis for preventing State Form applicants from voting at
all without DPOC," D.Ct. Dkt.304 at 23.

Nor will intervenors likely succeed in challenging the district court's holding
(D.Ct. Dkt.534 at 21-22) that the *LULAC* decree bars enforcement of A.R.S. §16-
121.01(C). A consent decree is a "final judgment," "subject to the rules generally
applicable to other judgments and decrees," *Rufo v. Inmates of Suffolk County Jail*,
502 U.S. 367, 378, 391 (1992). Thus, the decree's command that election officials
"accept State Form applications submitted without DPOC" remains the law,
because "once court decisions achieve finality they may not lawfully be revised,
overturned or refused faith and credit by another Department of Government,"
*Taylor v. United States*, 181 F.3d 1017, 1024 (9th Cir. 1999) (quotation marks

- 15 -

omitted).  And by its terms, the decree "govern[s] all voter registrations submitted after entry of [the] Consent Decree."  *LULAC* decree 8, 12.[2]

Intervenors invoke *Moore v. Harper*, 600 U.S. 1 (2023), claiming (Mot.13) that enforcing the *LULAC* decree would impermissibly transfer the legislature's lawmaking power to the secretary of state.  But the decree does not "irrevocably forfeit any portion of the [Arizona legislature's] lawmaking power," *id.*; it affects whether new legislation may be lawfully *enforced* by officials such as the secretary of state.  *See Hollingsworth v. Perry*, 570 U.S. 693, 705-706 (2013).  Moreover, intervenors cannot complain that the decree "perpetually constrain[s] the Legislature's exercise of its sovereign powers" (Mot.12 (capitalization altered)) when they have *never* sought to have the decree modified or vacated.

Nor was there anything improper about Arizona's secretary of state entering into the consent decree.  *Contra* Mot.13.  Under Arizona law, the attorney general had a mandate to litigate the enforceability of Arizona law on behalf of the secretary, *see* A.R.S. §41-193(A)(3), and the authority to settle claims against the state and its departments with approval of the relevant department, *id.* §41-192(B)(4).

---

[2] Intervenors cite *Taylor* (Mot.14) as holding that a "case is over" after a consent decree is entered and a court's continuing jurisdiction has expired.  But they wrongly assume that when a "case is over," its final judgment is *dissolved*.  *Taylor* holds otherwise.  *See* 181 F.3d at 1020, 1023-1024.

- 16 -

This arrangement of responsibility is commonplace—and in representing states in litigation, state executives have the prerogative to make litigation decisions different from what a state legislature would have chosen. The Supreme Court made that clear in *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658 (2019), which held that the Virginia House lacked standing to defend a redistricting plan after the state attorney general declined to appeal an order requiring the state to adopt a new plan. Such a litigation decision by a state executive does not, as intervenors claim (Mot.13), "forfeit … the lawmaking power" of the legislative branch.

The district court's reliance on the *LULAC* decree was proper and unremarkable. Intervenors' position—that legislatures may nullify consent decrees at their leisure, rather than seeking relief from the courts that entered them — would subvert the separation of powers, eviscerating judicial finality and precluding the attorney general from exercising her authority under A.R.S. §§41-193(A)(3) and 41-192(B)(4). Regardless, intervenors' motion should be denied because they have failed to make any showing—never mind a strong one—that A.R.S. §16-121.01(C) complies with the NVRA and Fourteenth Amendment.

## II.    IRREPARABLE HARM

### A.    Legislators

The legislators assert two irreparable injuries (Mot.14), "one to the State" and one to its legislature.  Neither supports a stay.

1.    The legislators claim (Mot.14-17) that a state is harmed whenever it cannot enforce its laws.  But their argument on this point is almost entirely about whether they have "standing," Mot.15, i.e., whether they can "defend[] the constitutionality of Arizona's voting laws," Mot.16; *see also* Mot.17-18.  That is irrelevant because standing and irreparable injury are two different things.  *Midgett v. Tri-County Metropolitan Transportation District of Oregon*, 254 F.3d 846, 850 (9th Cir. 2001).[3]

---

[3] Whether they go to standing or irreparable injury, the legislators' claims about their authority to assert sovereign injury are mistaken.  Under Arizona law, the attorney general "[r]epresent[s] this state in any … federal court" "[u]nless otherwise provided by law."  A.R.S. §41-193(A).  The legislators contend (Mot.15-16) that A.R.S. §12-1841 creates an exception to this rule.  Not so.  It simply gives the legislators state-law authority to intervene (or, in federal court, ask to intervene) to defend the constitutionality of a state statute—but only, by its terms, in proceedings "subject to [§12-1841's] notice requirements," *id.* §12-1841(D).  This federal litigation is not subject to those requirements.  *See* Fed. R. Civ. P. 5.1 (providing notice requirements for federal cases challenging state laws' constitutionality); *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 406 (2010) (Federal Rules govern procedural matters, like notice, in federal cases).  Thus, even if §12-1841's state-law authorization conferred an interest sufficient to establish standing or irreparable harm when it applied, that would not help the legislators because it does not apply here.

Intervenors' argument (Mot.15) that §12-1841 is "substantively identical" to the North Carolina statute at issue in *Berger v. North Carolina State Conference of*

Even if the little that intervenors say about harm to the state sufficed to properly present the argument, it would fail. The legislators must establish that *they*—not the state or any other party—will be irreparably harmed; "the [Supreme Court's] irreparable harm standard is 'whether the *applicant* will be irreparably injured absent a stay,'" *Doe #1 v. Trump*, 957 F.3d 1050, 1060 (9th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)) (emphasis added). The legislators are not the state. *See* ECF 62.1 at 7-9. And Arizona law vests responsibility to implement state statutes in the *executive*. *See* A.R.S. §16-1021. That is why the cases the legislators cite (Mot.14-15) involved executive officials' claims of harm. *See Abbott v. Perez*, 585 U.S. 579 (2018) (governor); *Maryland v. King*, 567 U.S. 1301 (2012) (attorney general). *See generally* D.Ct. Dkt.752 at 3-5. Here, the executive-branch parties do not agree that a stay is necessary to prevent irreparable harm. In fact, the secretary of state explains that a stay would *inflict* harm, causing "voters to harbor doubts about [Arizona's] election procedures, [] election officials, and … elections." ECF 52.1 at 5; *see also* ECF 62.1 at 2 (state/attorney general stay opposition). That harm is exacerbated by the

---

*the NAACP*, 597 U.S. 179 (2022), is inaccurate. Unlike §12-1841(D), the North Carolina statute designates legislative leaders "as agents of the State," N.C. Gen. Stat. §1-72.2(B), and imposes no limitation on their ability to intervene. Unlike North Carolina, in other words, Arizona has not "divide[d] its sovereign authority among different officials," nor "expressly authorized" legislative leaders "to defend the State's practical interests in [election-related] litigation," *Berger*, 597 U.S. at 193, 195-196.

intervenors' delay in trying to ensure enforcement of the challenged laws, *see supra* p.3.

2.     Likewise infirm is the legislators' argument (Mot.17-18) that the injunction inflicts irreparable injury by imposing "an extrinsic constraint" on their "lawmaking functions" and "disrupt[ing]" the legislature's "specific powers." The injunction does no such thing. It blocks the *enforcement* of the preempted provisions of state law. That does not constrain any lawmaking function, let alone irreparably, because the legislators "may yet pursue and vindicate [their] interests in the full course of this litigation." D.Ct. Dkt.752 at 5 (quoting *Doe #1*, 957 F.3d at 1059). By contrast, in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015) ("*AIRC*"), which intervenors cite (Mot.17), the Supreme Court held that a law "strip[ping] the Legislature of its" power to initiate redistricting, *id.* at 800, injured the legislature because the law "would 'completely nullif[y]' any vote by the Legislature, now or 'in the future,'" *id.* at 804 (alteration in original); *accord Priorities USA v. Nessel*, 978 F.3d 976, 982 (6th Cir. 2020), *cited in* Mot.18. This case is instead like *Bethune-Hill*. There, the Supreme Court distinguished *AIRC* on the ground that, whereas the law challenged in *AIRC* "permanently deprived the legislative plaintiffs of their role in the redistricting process," the order challenged in *Bethune-Hill* "d[id] not alter the General Assembly's dominant … redistricting role." 587 U.S. at 659.

More generally, neither the Supreme Court nor this Court has held that a state suffers irreparable injury any time its laws are enjoined. *Bethune-Hill*, in fact, explained that the Supreme Court "has never held that a judicial decision invalidating a state law as unconstitutional inflicts a discrete, cognizable injury on each organ of government that participated in the law's passage." 587 U.S. at 666; *see also Latta v. Otter*, 771 F.3d 496, 500 n.1 (9th Cir. 2014).

## B. RNC

The RNC's "competitive injury" argument (Mot.19-20) is meritless. It relies on cases addressing political-party *standing* to challenge election laws that would create an "illegally structure[d] competitive environment," *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022). Again, standing and irreparable injury are distinct. *Midgett*, 254 F.3d at 850. The RNC does not explain how the relevant provisions of H.B. 2492—which have never been in effect during an Arizona election— impact its competitive prospects. Indeed, the RNC never asserts that it would suffer irreparable injury absent a stay. That is dispositive.

## III. REMAINING STAY FACTORS

The balance of equities and public interest, which "merge" here, *Nken*, 556 U.S. at 435, counsel strongly against a stay because a stay would cause severe harm.

- 21 -

To start, a stay would curtail many thousands of Arizonans' right to vote. D.Ct. Dkt.732-1 ¶5. The public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). The "public interest" thus "favors permitting as many qualified voters to vote as possible." *Obama for America v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012). Indeed, although this factor does not require a showing of *irreparable* injury, courts frequently "deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases). Curtailing tens of thousands of Arizonans' ability to vote, D.Ct. Dkt.732-1 ¶5, is undoubtedly against the public interest, especially given that, as noted, there is *no* meaningful history of non-citizen voter fraud in Arizona, *see supra* p.12.

Intervenors say there would be no harm to voting rights from a stay because the district court found that "Plaintiffs offered no witness testimony or other concrete evidence … that the Voting Laws[] … will … impede any qualified elector from registering … or staying on the voter rolls." Mot.20 (quotation marks omitted). This is misleading. As intervenors acknowledge (Mot.13), the *LULAC* decree prohibits enforcement of H.B. 2492's provision requiring election officials to reject *state*-form registration applications submitted without DPOC. Absent the district court's injunction, those voters would be blocked from registering. And as

- 22 -

to those who register using the federal form, the relevant harm is being denied the right to vote in presidential elections, or by mail in any election. The district court certainly did not deny that the challenged laws cause *those* harms, including to thousands of currently registered Arizona voters. They unquestionably do.

A stay would be especially harmful because, as discussed, election season is already underway: Arizona's primary will occur in under a month, and mail voting has already begun. ECF 52.1 at 3-4. As the district court found, "entering a stay will sow confusion for election officials and voters on the eve of election." D.Ct. Dkt.752 at 10. Indeed, Arizona's chief elections official warned weeks ago that altering election rules via a stay *then* would "drastically impact how affected votes are collected and processed." D.Ct. Dkt.732-1 at 2. The disruption would be even greater now. Put simply, the "public interest" would not be served by "sending the State scrambling to implement and to administer [] new procedure[s]," *Arizona Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 (9th Cir. 2020)—particularly when the scrambling would be exacerbated because of intervenors' delay in seeking relief, *see supra* p.3.

Intervenors argue, however (Mot.21-22), that "the Supreme Court's admonition against last-minute judicially imposed alterations to a state's election procedures does not apply here." Their only authority for that claim is a single-Justice concurrence to a stay order that was later vacated, *see Allen v. Caster*, 2023

- 23 -

WL 3937600 (U.S. June 12, 2023).  And the only authority the concurrence cited were two cases in which the Court stayed a district-court ruling that *itself* violated *Purcell*.

Intervenors' authority is thin because their argument is wrong.  At bottom, the "*Purcell* principle" is that "lower federal courts should ordinarily not alter the election rules on the eve of an election."  *Republican National Committee v. Democratic National Committee*, 589 U.S. 423, 424 (2020) (per curiam).  That is *exactly* what intervenors seek.

Perhaps recognizing this, intervenors assert (Mot.21) that "it is the district court's injunction … that implicates *Purcell*."  That too is wrong; the injunction did not "alter the election rules," *Republican National Committee*, 589 U.S. at 424, and thus does not threaten "voter confusion and consequent incentive to remain away from the polls," *Purcell*, 549 U.S. at 4-5.  The injunction did not alter election rules because Arizona election officials chose—without any mandate from the court—not to implement the challenged laws pending the district court's resolution of plaintiffs' claims.

Intervenors respond that "the state and county parties cannot contrive a putative *Purcell* problem by willfully refusing for more than a year to implement duly enacted state laws."  Mot.21-22.  But here again, intervenors' only authority is a single-Justice concurrence—which cited no authority for the relevant

proposition—to an emergency-docket order. And authority aside, intervenors' argument is again untenable: If the non-implementation of the challenged laws was unlawful, intervenors could have brought a state-court mandamus action to compel implementation. Having failed to do so (or to challenge the non-implementation in any other way), they cannot complain about it now. Regardless, the critical point remains that *Purcell* is about preventing voter confusion caused by federal-court orders that cause last-minute *changes* to state election laws. A stay would cause such changes; the district court's injunction did not.

## CONCLUSION

A stay should be denied.

July 5, 2024                                      Respectfully submitted,

/s/ Daniel S. Volchok

BRUCE SAMUELS                          SETH P. WAXMAN
JENNIFER LEE-COTA                     CHRISTOPHER E. BABBITT
PAPETTI SAMUELS WEISS              DANIEL S. VOLCHOK
   MCKIRGAN LLP                    JOSEPH MEYER
16430 North Scottsdale Road       BRITANY RILEY-SWANBECK
Suite 290                                     WILMER CUTLER PICKERING
Scottsdale, Arizona 85254            HALE AND DORR LLP
(480) 800-3530                            2100 Pennsylvania Avenue N.W.
bsamuels@pswmlaw.com              Washington, D.C. 20037
                                                  (202) 663-6000
                                                  daniel.volchok@wilmerhale.com

*Counsel for the Democratic National Committee and the Arizona Democratic Party*

NIYATI SHAH
TERRY AO MINNIS
ASIAN AMERICANS ADVANCING
   JUSTICE-AAJC
1620 L Street N.W.
Suite 1050
Washington, D.C. 20036
(202) 296-2300
nshah@advancingjustice-aajc.org
tminnis@advancingjustice-aajc.org

SADIK HUSENY
AMIT MAKKER
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
(415) 391-0600
sadik.huseny@lw.com
amit.makker@lw.com

SPENCER FANE
ANDREW M. FEDERHAR
2415 East Camelback Road
Suite 600
Phoenix, AZ 85016
(602) 333-5430
afederhar@spencerfane.com

*Counsel for Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition*

MARC E. ELIAS
ELISABETH C. FROST
CHRISTOPHER D. DODGE
DANIELA LORENZO
QIZHOU GE
ELIAS LAW GROUP LLP
250 Massachusetts Ave N.W.
Suite 400
Washington, D.C. 20001
(202) 968-4513
melias@elias.law
efrost@elias.law
cdodge@elias.law
dlorenzo@elias.law
age@elias.law

ROY HERRERA
DANIEL A. ARELLANO
JILLIAN L. ANDREWS
HERRERA ARELLANO LLP
1001 North Central Avenue
Suite 404
Phoenix, AZ 85004-1935
(602) 567-4820
roy@ha-firm.com
daniel@ha-firm.com
jillian@ha-firm.com

*Counsel for Mi Familia Vota and Voto Latino*

DANIELLE LANG
JONATHAN DIAZ
BRENT FERGUSON
KATHRYN HUDDLESTON
CAMPAIGN LEGAL CENTER
1101 14th Street N.W.
Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
bferguson@campaignlegelcenter.org
khuddleston@campaignlegalcenter.org

RACHEL J. LAMORTE
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C. 20006
(202) 362-3000
rlamorte@mayerbrown.com

LEE H. RUBIN
MAYER BROWN LLP
Two Palo Alto Square
Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

GARY A. ISAAC
DANIEL T. FENSKE
WILLIAM J. MCELHANEY, III
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
dfenske@mayerbrown.com
gisaac@mayerbrown.com
jglickstein@mayerbrown.com

*Counsel for Living United for Change in Arizona; League of United Latin American Citizens Arizona; Arizona Students' Association; ADRC Action; Inter Tribal Council of Arizona, Inc.; San Carlos Apache Tribe; and Arizona Coalition for Change*

## CERTIFICATE OF COMPLIANCE

This opposition complies with the applicable provisions of both the Federal Rules of Appellate Procedure and this Court's rules in that: (1) according to the word-count feature of the word-processing system used to generate the opposition (Microsoft Word), the opposition contains 5,600 words, excluding the portions exempted from the count by the rules, and (2) the opposition has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK