**Nos. 24-3188, 24-3559 & 24-4029**

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

MI FAMILIA VOTA, et al.,

*Plaintiffs-Appellees*,

vs.

ADRIAN FONTES, et al.,

*Defendants-Appellees*,

and

REPUBLICAN NATIONAL COMMITTEE, et al.,

*Intervenor-Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Arizona
Hon. Susan R. Bolton
Case No. 2:22-cv-00509-SRB (Consolidated)

---

## PRINCIPAL BRIEF OF APPELLANTS
## THE REPUBLICAN NATIONAL COMMITTEE,
## WARREN PETERSEN, AND BEN TOMA

---

Kory Langhofer
Thomas Basile
STATECRAFT PLLC
649 North Fourth Ave., First Floor
Phoenix, Arizona 85003
(602) 382-4078
kory@statecraftlaw.com
tom@statecraftlaw.com

*Counsel for Appellants RNC, Warren
Petersen, and Ben Toma*

July 29, 2024

Tyler R. Green
Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tyler@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Appellant RNC*

## CORPORATE DISCLOSURE STATEMENT

The Republican National Committee is not a subsidiary or affiliate of a publicly owned corporation. No publicly owned corporation not a party to this case has a financial interest in the outcome of this case.

# TABLE OF CONTENTS

Corporate Disclosure Statement ........................................................... i

Table of Authorities ........................................................................ iv

Introduction ................................................................................. 1

Jurisdictional Statement ................................................................... 2

Statement of the Issues Presented for Review ............................................. 2

Constitutional and Statutory Addendum ..................................................... 4

Statement of the Case ...................................................................... 4

Standard of Review ......................................................................... 8

Summary of the Argument ................................................................... 8

Argument .................................................................................. 11

   I.   Arizona's laws requiring documentary proof of citizenship for voter registration do not violate the NVRA. ............................................. 11

      A. The NVRA does not preempt Arizona's rules for mail voting. ............ 12

      B. The NVRA cannot constitutionally apply to Arizona's rules governing presidential elections. ........................................ 14

   II.  A consent decree from a different case does not prohibit the Arizona Legislature from enacting new laws requiring proof of citizenship for state voter-registration forms ............................................... 18

   III. Arizona's citizenship checkbox and birthplace requirement do not violate the Civil Rights Act's materiality provision. ......................... 21

      A. Requiring applicants to check a box indicating whether they are a citizen does not violate the materiality provision. ...................... 22

      B. Requiring applicants to provide their birthplace does not violate the materiality provision. ............................................... 24

      C. The materiality provision does not preempt Arizona laws ............... 26

   IV. Requiring election officials to conduct a standardized citizenship check when they have reason to believe a registered voter is not a U.S. citizen does not violate federal law. ............................................ 29

      A. Standardized citizenship checks do not violate the Civil Rights Act. .... 30

      B. Standardized citizenship checks do not violate the NVRA. ............... 34

V.    Arizona's list maintenance for citizenship status does not violate the NVRA's 90-day blackout period. ........................................................................ 36

VI.   The NVRA permits Arizona to reject state-form applications that lack documentary proof of residency and to distribute the new state form in public assistance agencies. .................................................................... 38

VII.  Legislators do not waive legislative privilege by intervening in a lawsuit. ....... 41

      A.  The district court abused its discretion by allowing discovery of legislative motives. ............................................................................. 42

      B.  The district court abused its discretion by ruling the Legislative Leaders waived the legislative privilege by intervening. ......................... 44

      C.  Alternatively, *Munsingwear* vacatur is appropriate ...................................... 47

Conclusion ........................................................................................................................ 48

Certificate of Compliance .............................................................................................. 49

Certificate of Service ....................................................................................................... 49

## TABLE OF AUTHORITIES

**Cases**

*ACORN v. Miller*,
129 F.3d 833 (6th Cir. 1997) .................................................................15

*Am. Ass'n of People with Disabilities v. Herrera*,
580 F. Supp. 2d 1195 (D.N.M. 2008) ......................................................40

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) .................................................20, 37, 38

*Arizona v. California*,
283 U.S. 423 (1931) ..........................................................................42, 43

*Arizona v. Inter Tribal Council of Ariz.*,
570 U.S. 1 (2013) .......................................................................... passim

*Ballas v. Symm*,
494 F.2d 1167 (5th Cir. 1974) .................................................................31

*Bell v. Marinko*,
367 F.3d 588 (6th Cir. 2004) ...................................................................36

*Berger v. N.C. State Conf. of the NAACP*,
597 U.S. 179 (2022) .................................................................................46

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) .................................................................................21

*Briseno v. Henderson*,
998 F.3d 1014 (9th Cir. 2021) .................................................................42

*Brown & Williamson Tobacco Corp. v. Williams*,
62 F.3d 408 (D.C. Cir. 1995) ..................................................................45

*Buckley v. Valeo*,
424 U.S. 1 (1976) .....................................................................................17

*Burroughs v. United States*,
290 U.S. 534 (1934) .................................................................................17

*Calder v. Michigan*,
218 U.S. 591 (1910) .................................................................................43

*Carson v. Simon*,
978 F.3d 1051 (8th Cir. 2020) .................................................................19

*Cheneau v. Garland*,
997 F.3d 916 (9th Cir. 2021) ...................................................................40

*City of Las Vegas v. Foley,*
    747 F.2d 1294 (9th Cir. 1984) ................................................................ 43, 44

*Collins v. Yellen,*
    141 S. Ct. 1761 (2021) ....................................................................... 17

*Condon v. Reno,*
    913 F. Supp. 946 (D.S.C. 1995) ........................................................ 28

*Davis v. Commonwealth Election Comm'n,* No. 1-14-cv-00002,
    2014 WL 2111065 (D.N.M.I. May 20, 2014) ................................. 32

*Diaz v. Cobb,*
    435 F. Supp. 2d 1206 (S.D. Fla. 2006) ..................................... 20, 23

*Diaz v. Cobb,*
    541 F. Supp. 2d 1319 (S.D. Fla. 2008) ........................................... 40

*Doe v. Pataki,*
    481 F.3d 69 (2d Cir. 2007) ............................................................. 19

*Donovan v. Vance,*
    70 F.4th 1167 (9th Cir. 2023) ......................................................... 47

*Eastland v. U.S. Servicemen's Fund,*
    421 U.S. 491 (1975) ....................................................................... 44

*Ex parte Siebold,*
    100 U.S. 371 (1879) ................................................................. 12, 13

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ....................................................................... 41

*Fish v. Kobach,*
    840 F.3d 710 (10th Cir. 2016) ........................................................ 40

*Fla. State Conf. of N.A.A.C.P. v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) ........................................ 22, 23, 26, 28

*Foster v. Love,*
    522 U.S. 67 (1997) ......................................................................... 12

*Frazier v. Callicutt,*
    383 F. Supp. 15 (N.D. Miss. 1974) ............................................... 32

*Gonzalez v. Arizona,*
    2006 WL 8431038 (D. Ariz. Oct. 12, 2006) ................................. 31

*Gonzalez v. Arizona,*
    435 F. Supp. 2d 997 (D. Ariz. 2006) ......................................... 20, 39

*Gonzalez v. Arizona*,
   677 F.3d 383 (9th Cir. 2012) ...................................................................20

*Hamilton v. Ky. Distilleries & Warehouse Co.*,
   251 U.S. 146 (1919) ...............................................................................42

*In re Hubbard*,
   803 F.3d 1298 (11th Cir. 2015) ..............................................................43

*In re N.D. Legis. Assembly*,
   70 F.4th 460 (8th Cir. 2023) ............................................................ 42, 43

*In re Toma*, No. 23-70179,
   2023 WL 8183568 (9th Cir. Nov. 16, 2023) ......................................... 7, 41

*Ind. Democratic Party v. Rokita*,
   458 F. Supp. 2d 775 (S.D. Ind. 2006) ....................................................25

*La Union Del Pueblo Entero v. Abbott*,
   68 F.4th 228 (5th Cir. 2023) ..................................................................43

*La Union del Pueblo Entero v. Abbott*,
   93 F.4th 310 (5th Cir. 2024) ..................................................................43

*League of United Latin Am. Citizens of Ariz. v. Reagan*,
   No. 2:17-cv-4102 (D. Ariz. 2018) .................................................. 2, 5, 19

*League of Women Voters of Ark. v. Thurston*,
   2021 WL 5312640 (W.D. Ark., Nov. 15, 2021) ......................................23

*League of Women Voters of Ark. v. Thurston*,
   2023 WL 6446015 (W.D. Ark. Sept. 29, 2023) .................................. 23, 25

*League of Women Voters of Fla. v. Browning*,
   863 F. Supp. 2d 1155 (N.D. Fla. 2012) ..................................................40

*Lee v. City of Los Angeles*,
   908 F.3d 1175 (9th Cir. 2018) ........................................................... 8, 43

*Liebert v. Millis*,
   2024 WL 2078216 (W.D. Wis. May 9, 2024) ..........................................28

*McKay v. Altobello*,
   1996 WL 635987 (E.D. La. Oct. 31, 1996) .............................................28

*McKay v. Altobello*,
   1997 WL 266717 (E.D. La. May 16, 1997) .............................................40

*Mi Familia Vota*,
   691 F. Supp. 3d 1105 (D. Ariz. 2023) ......................................... 45, 46, 47

*Mohawk Indus. v. Carpenter,*
558 U.S. 100 (2009) ..................................................................................42

*Moore v. Harper,*
600 U.S. 1 (2023) ............................................................................... 11, 19

*Munoz-Santana v. I.N.S.,*
742 F.2d 561 (9th Cir. 1984) ...................................................................42

*Oklahoma v. Castro-Huerta,*
142 S. Ct. 2486 (2022) .............................................................................18

*Oregon v. Mitchell,*
400 U.S. 112 (1970) .................................................................................16

*Org. for Black Struggle v. Ashcroft,*
493 F. Supp. 3d 790 (W.D. Mo. 2020) ...................................................28

*Penn. State Conf. of NAACP Branches v. Sec'y Commonwealth of Penn.,*
97 F.4th 120 (3d Cir. 2024) ................................................................ 22, 29

*Pernell v. Fla. Bd. of Governors of State Univ.,*
84 F.4th 1339 (11th Cir. 2023)................................................................43

*Pine Grove Twp. v. Talcott,*
86 U.S. 666 (1873) ...................................................................................17

*Project Vote v. Blackwell,*
455 F. Supp. 2d 694 (S.D. Ohio 2006) ................................................ 34, 36

*Purcell v. Gonzalez,*
549 U.S. 1 (2006) .......................................................................................8

*Roosevelt Irr. Dist. v. Salt River Project Agric. Imp. & Power Dist.,*
39 F. Supp. 3d 1051 (D. Ariz. 2014)........................................................19

*Sandifer v. U.S. Steel Corp.,*
571 U.S. 220 (2014) .................................................................................21

*Senate Permanent Subcomm. on Investigations v. Ferrer,*
856 F.3d 1080 (D.C. Cir. 2017) ........................................................ 44, 45

*Shivelhood v. Davis,*
336 F. Supp. 1111 (D. Vt. 1971) .............................................................32

*State v. Prentiss,*
786 P.2d 932 (Ariz. 1989) .......................................................................19

*Taylor v. United States,*
181 F.3d 1017 (9th Cir. 1999)..................................................................19

*Turtle Mountain Band v. N.D. Legis.Assembly*,
-- S. Ct. --, 2024 WL 3259672 (U.S. Jul. 2, 2024) .................................... 42, 47

*U.S. Student Ass'n Found. v. Land*,
585 F. Supp. 2d 925 (E.D. Mich. 2008) ...........................................31

*United States v. Alvarez-Sanchez*,
511 U.S. 350 (1994) ...............................................................37

*United States v. Biaggi*,
853 F.2d 89 (2d Cir. 1988) .......................................................45

*United States v. Des Moines Nav. & Ry.*,
142 U.S. 510 (1892) ...............................................................43

*United States v. Helstoski*,
442 U.S. 477 (1979) ....................................................44, 45, 46

*United States v. Johnson*,
383 U.S. 169 (1966) ...............................................................42

*United States v. Krane*,
625 F.3d 568 (9th Cir. 2010) .....................................................47

*United States v. Munsingwear Inc.*,
340 U.S. 36 (1950) ................................................................47

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ...............................................................44

*Vote.Org v. Callanen*,
89 F.4th 459 (5th Cir. 2023) .....................................................21

*Voting Rts. Coal. v. Wilson*,
60 F.3d 1411 (9th Cir. 1995) ...............................................17, 18

*Yu v. Idaho State Univ.*,
15 F.4th 1236 (9th Cir. 2021) .....................................................8

## Statutes

28 U.S.C. §1331 ......................................................................2

28 U.S.C. §1343 ......................................................................2

52 U.S.C. §10101 .............................................................passim

52 U.S.C. §20501 ...................................................................14

52 U.S.C. §20502 ...................................................................15

52 U.S.C. §20503 ...................................................................12

52 U.S.C. §20504 ...................................................................................40

52 U.S.C. §20505 ............................................................................passim

52 U.S.C. §20506 ...........................................................................2, 7, 41

52 U.S.C. §20507 ............................................................................passim

52 U.S.C. §20508 .............................................................................20, 38

52 U.S.C. §30101 ...................................................................................15

52 U.S.C. §30109 ...................................................................................30

A.R.S. §12-1841 ..............................................................................11, 47

A.R.S. §16-101 .......................................................................................38

A.R.S. §16-121.01 ..........................................................................passim

A.R.S. §16-123 ...........................................................................5, 21, 22

A.R.S. §16-127 ....................................................................................2, 5

A.R.S. §16-165 ...............................................................................passim

A.R.S. §16-166 .........................................................................................4

A.R.S. §16-541 .......................................................................................12

A.R.S. §16-938 .......................................................................................30

A.R.S. §2885 (1913) ..............................................................................24

A.R.S. §41-1080 .......................................................................................4

Conn. Gen. Stat. §9-135 ........................................................................12

## Other Authorities

Ariz. Att'y. Gen. Op. I13-011 .................................................................5

Comm'n on Civil Rights, *Voting: 1961 Commission on Civil Rights Report* (1961),
  perma.cc/WA4A-QEYK .................................................................27

H.R. Rep. No. 88-914 (Nov. 20, 1963),
  *as reprinted in* 1964 U.S.C.C.A.N. 2391 ......................................27

Misc. Proposals Regarding the C.R. of Persons Within the Jurisdiction of the U.S.:
  Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary,
  88 Cong. 915 (May 8, 1963) ............................................................28

Nat'l Conf. of State Legislatures, *Table 2: Excuses to Vote Absentee* (Jan. 3, 2024),
  perma.cc/B4ML-L6KJ .....................................................................13

The Oxford English Dictionary (1961) ...................................................21

Webster's Legal Dictionary (1996) ......................................................... 21, 22

**Rules**

28 U.S.C. §1291 ......................................................................................... 2

Circuit Rule 28-2.7 ................................................................................... 4

Fed. R. App. P. 26 ................................................................................... 2

Fed. R. App. P. 3 ..................................................................................... 2

Fed. R. App. P. 4 ..................................................................................... 2

**Constitutional Provisions**

Ariz. Const. art. VII, §2 ....................................................................... 36, 38

U.S. Const. art II, §1 ............................................................................. 15

U.S. Const. art. I, §4 ........................................................................... 3, 11

## INTRODUCTION

In 2022, Arizona adopted commonsense updates to its election code. The new laws require persons registering to vote to provide their birthplace, documentary proof of residence ("DPOR"), and (in certain circumstances) documentary proof of citizenship ("DPOC"). They also add a checkbox on registration applications to indicate whether the applicant is a U.S. citizen. And they require commonsense voter-roll maintenance, such as obliging election officials to conduct a standardized citizenship check when they suspect a noncitizen is registered to vote. These essential updates were designed to close loopholes in voter registration, rebuild confidence in the system, and ensure the integrity of our elections.

Several interest groups sued. Almost immediately after the Arizona Governor signed House Bills 2492 and 2243, Plaintiffs—consisting of the Justice Department and over a dozen private organizations—filed lawsuits challenging Arizona's election-code amendments. Those lawsuits were consolidated into this case. Plaintiffs brought claims under the National Voter Registration Act, the Civil Rights Act, and the Constitution, among others. The district court entered partial summary judgment on some claims and resolved the rest after a 10-day bench trial. The rulings were mixed, and several parties appealed.

The Republican Appellants filed an emergency motion to stay parts of the district court's injunction. On July 18, this Court's motions panel stayed that part of the injunction prohibiting Arizona from rejecting state forms that lacked DPOC. But it denied the rest of the motion, meaning a large swath of Arizona's election reforms remains enjoined.

## JURISDICTIONAL STATEMENT

Plaintiffs challenge several provisions of Arizona's election laws, *see* A.R.S. §§16-121.01, 16-127, 16-165, under several federal provisions, *see* 52 U.S.C. §§10101, 20505, 20506, 20507. They also challenge Arizona's law rejecting state registration forms that lack DPOC, *see* A.R.S. §16-121.01(C), under a consent decree issued by a federal court, *see League of United Latin Am. Citizens of Ariz. v. Reagan*, Doc. 37, No. 2:17-cv-4102 (D. Ariz. 2018), 7-ER-1599–1614 ("LULAC Consent Decree"). The district court had subject matter jurisdiction over these claims based on 28 U.S.C. §§1331 and 1343(a).

In September 2023, the district court entered summary judgment on some of the claims. 1-ER-0116. The district court also issued an order granting Plaintiffs' motion to compel discovery and denying claims of legislative privilege by Speaker of the Arizona House of Representatives Ben Toma and President of the Arizona Senate Warren Petersen (the "Legislative Leaders"). 1-ER-0151. After a 10-day bench trial in November, the district court issued findings of fact and conclusions of law on the remaining claims in February 2024. 1-ER-0007. Then in May 2024, the district court merged those orders into a final judgment. 1-ER-0002. Appellants filed a notice of appeal on May 17, 2024, which is timely under Fed. R. App. P. 3(a)(1), 4(a)(1)(B), and 26(a)(1)(A)-(C), so this Court has appellate jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

- Whether the district court erred by holding that Arizona's law requiring DPOC to vote by mail violates the National Voter Registration Act, which does not mention mail voting.

- Whether the district court erred by holding that Arizona's law requiring DPOC to vote in *presidential* elections violates the National Voter Registration Act—a statute Congress passed using its Elections Clause power to displace state regulations only for *congressional* elections, *see* U.S. Const. art. I, §4.

- Whether the district court erred by holding that Arizona's new law requiring DPOC for state-form applicants violates a consent decree issued in a case that preceded enactment of that law.

- Whether the district court erred by holding that Arizona's law requiring voter-registration applicants to check a box indicating whether they are a citizen violates the materiality provision of the Civil Rights Act.

- Whether the district court erred by holding that Arizona's law requiring voter-registration applicants to disclose their birthplace violates the materiality provision of the Civil Rights Act.

- Whether the district court erred by holding that Arizona's law requiring election officials to conduct a standardized citizenship check when they have reason to believe a registered voter is not a U.S. citizen violates the National Voter Registration Act and the Civil Rights Act.

- Whether the district court erred by holding that Arizona's list-maintenance procedures violate the National Voter Registration Act's 90-day blackout period before an election.

- Whether the district court erred by holding that Arizona cannot reject state-form submissions that lack DPOR without violating National Voter Registration Act.

- Whether the district court erred by holding that the Legislative Leaders waived legislative privilege by intervening in this case to defend the challenged laws.

## CONSTITUTIONAL AND STATUTORY ADDENDUM

The text of the pertinent constitutional and statutory provisions is reproduced in an accompanying addendum, pursuant to Circuit Rule 28-2.7

## STATEMENT OF THE CASE

An eligible person can register to vote in Arizona by using the federal form promulgated by the U.S. Election Assistance Commission or the state form prescribed by Arizona law. In 2004, the Arizona electorate adopted a statute requiring DPOC to register to vote. *See* A.R.S. §16-166(F). Arizona has since 1996 required proof of lawful presence to obtain a driver's license or other state-issued ID, *see id.* §41-1080, and most applicants satisfy the DPOC requirement by providing their license or ID number, which is cross-checked against data maintained by the Arizona Department of Transportation ("ADOT"). *See id.* §16-166(F)(1); 3-ER-0704–0706, 0709. Other acceptable forms of DPOC include a birth certificate, "pertinent pages" of a U.S. passport, a naturalization certificate or number, and certain tribal documents. A.R.S. §16-166(F)(2)-(6). Before 2022, the state form requested, but did not require, birthplace information from registrants. *See* A.R.S. §16-121.01 (2021); 3-ER-0725. Public assistance agencies that provide voter registration services distribute the state form. *See* 3-ER-0722.

In 2013, the U.S. Supreme Court held that the National Voter Registration Act, 52 U.S.C. §20505 ("NVRA"), prohibited Arizona from requiring federal-form applicants to provide DPOC when registering to vote in federal elections. *See Arizona v. Inter Tribal Council of Ariz.* ("*ITCA*"), 570 U.S. 1 (2013). After *ITCA*, Arizona has registered

federal-form registrants who do not supply DPOC as "federal-only" voters, who are eligible to vote only in federal races. State-form applicants must still provide DPOC. *See* Ariz. Att'y. Gen. Op. I13-011. As of July 2023, Arizona had 19,439 active registered federal-only voters. 1-ER-0008.

In 2018, the then–Secretary of State entered into the LULAC Consent Decree, which provided that when a state-form submission is not accompanied by DPOC, the county recorder must search ADOT records. If citizenship can be confirmed, the applicant is registered as a full-ballot voter; if it cannot be confirmed, the applicant is registered as a "federal only" voter. 1-ER-0010–0011; 7-ER-1599–1614.

In 2022, the Legislature passed and the Governor signed H.B. 2492 and H.B. 2243, which included the following changes to Arizona's voter registration laws:

- Applicants who have not provided DPOC may not vote for president or by mail, A.R.S. §§16-121.01(A), (C), (E), 16-127(A);

- State-form submissions that lack DPOC must be rejected, A.R.S. §16-121.01(C);

- State-form applicants must provide DPOR, disclose their birthplace, and check a box confirming their citizenship, A.R.S. §§16-121.01(A), 16-123;

- The county recorders, who are responsible for maintaining voter registrations, must check the Systematic Alien Verification for Entitlements ("SAVE") program maintained by the U.S. Citizenship and Immigration Services if a voter is registered as federal-only or if they have "reason to believe" a voter is not a citizen, A.R.S. §16-165(I); and

- The county recorders must periodically check available databases, including SAVE, ADOT, the Social Security Administration, and the National Association

for Public Health Statistics and Information Systems ("NAPHSIS"), to research the citizenship status of federal-only voters and, if appropriate, cancel their registrations, A.R.S. §16-165(A)(10), (G), (H), (J), (K).

Various plaintiffs immediately challenged these and other provisions under the NVRA, the Fourteenth and Fifteenth Amendments, the Civil Rights Act of 1964, and the Voting Rights Act of 1965. The district court consolidated the actions. The district court resolved some of the claims on cross-motions for summary judgment in September 2023. 1-ER-0116. After a ten-day bench trial in late 2023, the district court issued rulings in February 2024 that resolved the remaining claims (1-ER-0007), and entered a final judgment in May 2024 (1-ER-0002). The district court concluded that:

- Section 6 of the NVRA, which requires States to "accept and use" either the federal form or a compliant state form to register in federal elections, preempted the provisions of H.B. 2492 prohibiting federal-only voters from voting for president or by mail;

- State-form submissions without DPOC must be processed in accordance with the LULAC Consent Decree;

- The state form's mandatory birthplace field and citizenship confirmation checkbox violate the Civil Rights Act, 52 U.S.C. §10101(a)(2)(B), because they are not "material" in determining a voter's qualifications;

- The use of SAVE if a recorder has "reason to believe" a voter is a non-citizen violates 52 U.S.C. §10101(a)(1), which prohibits discriminatory voting-related "standards, practices, or procedures," and Section 8(b) of the NVRA, which

requires list maintenance programs to be "uniform, [and] nondiscriminatory," 52 U.S.C. §20507(b)(1);

- H.B. 2243's list maintenance programs violate Section 8(c) of the NVRA to the extent they authorize "systematic[]" registration cancelations within 90 days preceding a federal election, *see* 52 U.S.C. §20507(c)(2); and

- Section 6 of the NVRA requires county recorders to register state-form applicants who do not provide DPOR as federal-only voters, and the DPOR requirement renders the state form not "equivalent" to the federal form under Section 7 of NVRA, which provides that States must make available at public assistance agencies either the federal form or an "equivalent," 52 U.S.C. §20506(a)(6)(A)(ii).

1-ER-0007, 0116. The district court enjoined the enforcement of the provisions of H.B. 2492 and H.B. 2243 that are inconsistent with the foregoing findings. *See* 1-ER-0002.

Separately, the district court held that the Legislative Leaders waived legislative privilege by intervening in these proceedings, and compelled their deposition testimony. 1-ER-0151. This Court declined to enter mandamus relief from the discovery order, but did not opine on its merits. *In re Toma*, No. 23-70179, 2023 WL 8183568 (9th Cir. Nov. 16, 2023).

The Appellants and the Attorney General each filed timely notices of appeal. 7-ER-1615, 1617. Certain plaintiffs filed a cross-appeal. Doc. 753. On July 18, 2024, a motions panel granted a stay of the district court's injunction to the extent it blocked enforcement of A.R.S. §16-121.01(C), which requires county recorders to reject state-form applications without DPOC, and expedited briefing so all briefs will be submitted before oral argument on September 10, 2024.

## STANDARD OF REVIEW

This Court reviews de novo a district court's order granting summary judgment. *Lee v. City of Los Angeles*, 908 F.3d 1175, 1182 (9th Cir. 2018). "Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (cleaned up). Likewise, "[t]he district court's conclusions of law following a bench trial are reviewed de novo," but "findings of facts are reviewed for clear error." *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241-42 (9th Cir. 2021) (citation omitted). That means this Court must reject a finding of fact if it is "left with the definite and firm conviction that a mistake has been committed," such as a finding that is "illogical, implausible, or without support in inferences from the record." *Id.* (citations omitted). Finally, the denial of "legislative privilege" is "'essentially a legal matter' that is reviewed de novo." *Lee*, 908 F.3d at 1182 (citation omitted).

## SUMMARY OF THE ARGUMENT

"A State indisputably has a compelling interest in preserving the integrity of its election process," and maintaining "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (cleaned up). To advance those ends, Arizona in 2022 comprehensively reformed its voter-registration system by conjoining safeguards against unlawful enrollments by noncitizens and nonresidents with new channels to collect accurate and current data relating to voters' eligibility. Although the district court rightly rebuffed many of the plaintiffs' attacks on these commonsense measures, its rulings contain seven legal errors.

8

*First*, the NVRA cannot prevent Arizona from requiring DPOC as a condition of voting by mail or participating in the State's selection of its presidential electors. By its plain terms, the NVRA is confined solely to matters of voter *registration*; it does not purport to be a federal regulatory scheme that controls issuing or submitting mail ballots. Nor can the NVRA constitutionally preempt Arizona's laws governing the manner of presidential elections. The Constitution entrusts the States alone with the exclusive power to "direct" the "Manner" of choosing their presidential electors, U.S. Const. art. II, §1—a delegation no federal statute can abridge.

*Second*, while Arizona cannot demand that federal-form applicants provide DPOC, it can require DPOC as a component of a complete and valid state-form registration. *See ITCA*, 570 U.S. at 12. A now-expired consent decree signed unilaterally by the Secretary of State cannot supersede duly enacted statutes mandating the rejection of incomplete state-form registrations.

*Third*, the district court erred by holding that the Civil Rights Act's materiality provision, 52 U.S.C. §10101(A)(2)(B), prohibits Arizona from requiring state-form registrants to disclose their place of birth and to check a box on the registration form confirming their U.S. citizenship. The materiality provision protects against only extra-statutory, *ad hoc* directives by state or local officials that impede eligible voters from registering to vote. It does not displace state laws that themselves prescribe the prerequisites to a valid voter registration. Besides adopting an inappropriately stringent definition of "materiality," the district court erred in assessing the birthplace and citizenship-checkbox fields. The record is replete with evidence of birthplace data's utility in confirming voters' identity, flagging possibly duplicative or false registration

9

submissions, and potentially verifying some federal-only voters' citizenship status. And the district court's invalidation of the citizenship checkbox erroneously conflates redundancy with materiality; nothing in the Civil Rights Act precludes States from eliciting or confirming material information through multiple methods.

*Fourth*, the county recorders' statutory obligation to query the SAVE database if they have "reason to believe" a voter is not a U.S. citizen, *see* A.R.S. §16-165(I), constitutes neither a discriminatory registration procedure nor a discriminatory list-maintenance practice targeted at naturalized citizens. The statutory standard is facially neutral, encompasses all registered voters in the State, and corresponds directly to a substantive qualification for registration (*i.e.*, U.S. citizenship). Further, the interplay between A.R.S. §16-165(I) and other statutes ensures that SAVE checks conducted under this provision will not exact cognizable burdens on qualified electors (whether naturalized or not). The "reason to believe" provision hence comports with the Civil Rights Act, 52 U.S.C. §10101(a)(2)(A), and Section 8(b) of the NVRA.

*Fifth*, the district court misconstrued Section 8(c) of the NVRA when it held that the statute prohibits Arizona from carrying out certain list-maintenance activities relating to potential non-citizen residents during the 90-day period preceding a federal election. Section 8(c) does not address the removal of non-citizens from the rolls at all, and the 90-day blackout period is confined solely to registration cancelations based on the voter's residency status. In any event, the disputed database checks all entail individualized inquiries, and thus are expressly exempted from the 90-day restriction.

*Sixth*, the NVRA allows Arizona to reject state-form registrations that lack documentary proof of residency; the State need not register these applicants as federal-only

voters, as the district court ordered it to do. Because DPOR is necessary to enable the verification of a substantive voting qualification—*i.e.*, Arizona residency—Section 9 of the NVRA authorizes Arizona to include it as a mandatory element of the state form. Arizona accordingly may use the state form (with the DPOR requirement) to register voters in federal elections under Section 6 of the NVRA, and may distribute it in voter registration agencies under Section 7 of the NVRA.

*Finally*, the district court erred in finding that the Legislative Leaders waived their legislative privilege simply by intervening in these proceedings. Intervention, particularly pursuant to an express statutory authorization, *see* A.R.S. §12-1841, does not constitute the "explicit and unequivocal renunciation" necessary to find a waiver of legislative privilege. And because the Legislative Leaders' ostensible motives are irrelevant anyway, the district court erred in compelling disclosures of privileged legislative communications and processes.

## ARGUMENT

## I. Arizona's laws requiring documentary proof of citizenship for voter registration do not violate the NVRA.

The Elections Clause vests state legislatures with broad authority to set rules governing "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, §4. "The Clause 'imposes' on state legislatures the 'duty' to prescribe rules governing federal elections." *Moore v. Harper*, 600 U.S. 1, 10 (2023) (quoting *ITCA*, 570 U.S. at 8). Though Congress can "make or alter" those rules, U.S. Const. art. I, §4, federal law displaces state election rules only "so far as" it "conflicts with the regulations of the State," *Ex parte Siebold*, 100 U.S. 371, 384 (1879).

The Constitution also vests States with power to determine the "Manner" of appointment for presidential electors. U.S. Const. art. II, §1. Under those broad powers, the Arizona Legislature enacted proof-of-citizenship rules for mail voting and for registration in presidential elections. A.R.S. §§16-121.01(E), 16-127(A). The district court held that the NVRA preempts those rules. But that holding cannot be reconciled with the NVRA or the Constitution.

## A.     The NVRA does not preempt Arizona's rules for mail voting.

The National Voter Registration Act governs voter registration—not rules for casting a ballot by mail. Its plain text governs only "procedures to *register to vote* in elections." 52 U.S.C. §20503(a) (emphasis added). And it requires States to "accept and use" the federal registration form "for *the registration of voters* in elections for Federal office." *Id.* §20505(a)(1) (emphasis added). Congress's preemption power extends "no farther" than that plain text. *Siebold*, 100 U.S. at 392. Because the text says nothing about mail-voting rules, the NVRA does not "preempt state legislative choices" on mail voting. *Foster v. Love*, 522 U.S. 67, 69 (1997). So Arizona is free to require proof of citizenship to vote by mail, A.R.S. §16-541, just as the NRVA leaves other States free to enact more restrictive mail-voting rules, *e.g.*, Conn. Gen. Stat. §9-135(a) (permitting voters to vote by absentee ballot only if they are in "active service with the armed forces," experience a "physical disability," or meet other specific qualifications). Nothing in the NVRA "preempt[s]" those "state legislative choices." *Foster*, 522 U.S. at 69.

The district court's contrary view disregards the NVRA's textual limits. Though the NVRA requires States to use the federal registration form "for the registration of voters," 52 U.S.C. §20505(a)(1), the district court announced that States must also use

the federal registration form to qualify voters to vote *using a particular method*—by mail, 1-ER-0127–0130. It inferred this requirement from a provision permitting States to "require a person to vote in person if … the person was registered to vote in a jurisdiction by mail; and … the person has not previously voted in that jurisdiction." 52 U.S.C. §20505(c)(1). The district court read that provision as "implying that a state may not limit absentee voting outside of these prescribed circumstances." 1-ER-0128.

The district court's view that the NVRA requires Arizona to let almost all voters vote by mail finds no support in the statute's text. Subsection (c) addresses only when a narrow class of voters—those who registered by mail and have not previously voted—can vote by mail. Recognizing the default State authority over in-person voting, Paragraph (c)(1) confirms that States "may" require these voters to vote in person. 52 U.S.C. §20505(c)(1). The following paragraph then restricts that authority in certain circumstances: the default rule "does not apply" to voters who are entitled to vote by absentee ballot under other federal laws. *Id.* §20505(c)(2). The district court interpreted Paragraph (c)(1)'s permissive language—which confirms that States can require certain voters to vote in person—to implicitly preempt States' authority to set rules for mail voting. That inference violates the principle that Congress's preemption of state election rules extends "no farther" than the text permits. *Siebold*, 100 U.S. at 392. And it would wipe out the many longstanding state laws that require additional information and excuses to vote by mail. *See* Nat'l Conf. of State Legislatures, *Table 2: Excuses to Vote Absentee* (Jan. 3, 2024), perma.cc/B4ML-L6KJ (detailing the "acceptable excuses" to vote by absentee ballot required by over a dozen States).

13

The district court's remaining reasons were inferences about the NVRA's "purpose," couched in terms of "obstacle preemption." 1-ER-0128–0129. But the Election Clause's preemption test is whether State law "is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form." *ITCA*, 570 U.S. at 15. Whether the state law could be viewed as an obstacle to a vague aim to "increase the number" of registered voters is irrelevant. 1-ER-0128–0129. The NVRA doesn't reflect a congressional desire to increase the number of *absentee* voters, much less to curb the information States can require before allowing voters to vote by mail. Congress did, however, seek to "protect the integrity of the electoral process," 52 U.S.C. §20501(b)(3)—an explicit purpose the district court ignored.

Arizona's proof-of-citizenship rules for mail voting are not "inconsistent with" the NVRA's requirement to "accept and use" the "federal *registration* form." *ITCA*, 570 U.S. at 5, 9 (emphasis added). Mail-voting forms are "state-developed forms," which "may require information the Federal Form does not." *Id.* at 12. Congress did not wipe out all state mail-voting rules by mere implication. This Court should reverse the district court's summary-judgment ruling to the contrary.

### B. The NVRA cannot constitutionally apply to Arizona's rules governing presidential elections.

The NVRA applies to federal congressional elections, not to presidential elections. The district court nevertheless ruled that the NVRA requires States to "accept and use" the federal registration form for presidential elections because the text "reflects an intent to regulate all elections for '[f]ederal office,' including for 'President or

Vice President.'" 1-ER-0125 (quoting 52 U.S.C. §20507(a)). That argument ignores the constitutional limits on Congress's power.

"Congress enacted the National Voter Registration Act under the authority granted it in [the Elections Clause]." *ACORN v. Miller*, 129 F.3d 833, 836 (6th Cir. 1997); *see also ITCA*, 570 U.S. at 8. And the Elections Clause gives Congress power to preempt "Manner" regulations only for congressional elections. When it comes to presidential elections, Congress has authority only to "determine the Time of chusing the Electors, and the Day on which they shall give their Votes." U.S. Const. art II, §1. Neither Congress nor the courts can constitutionally apply the NVRA to presidential elections.

Though the NVRA does not distinguish between presidential and congressional elections, the Constitution does. The NVRA's application to elections for "Federal office," 52 U.S.C. §20502(2), which include "the office of President or Vice President," *id.* §30101(3), must be squared with the Electors Clause, which gives Congress power over only the "Time" of choosing presidential electors. U.S. Const. art II, §1. To the extent the NVRA regulates the "Manner" of presidential elections by imposing registration requirements on States, it violates the Electors Clause.

Arizona's law is consistent with the Constitution's allocation of authority. When an applicant uses the federal registration form, he *need not* provide proof of citizenship. A.R.S. §16-121.01(D). If he doesn't, an election official must verify the applicant's citizenship through other means. *Id.* If the election official cannot verify the applicant's citizenship, the applicant "will not be qualified to vote in a *presidential election* … until satisfactory evidence of citizenship is provided." *Id.* §16-121.01(E) (emphasis added). If

15

the federal registration form is otherwise satisfactory, Arizona does not prevent a federal-form applicant from being registered to vote in congressional elections.

The district court thought that precedent disposed of this constitutional limit. But the Supreme Court has never held that Congress possesses power to regulate the "Places and Manner" of presidential elections. In *Oregon v. Mitchell*, the Supreme Court held that Congress had power to, among other things, lower the federal voting age to 18 in the Voting Rights Act. 400 U.S. 112, 117-18 (1970). Justice Black wrote a solo opinion "expressing his own view of the cases," in which he said he "would hold" that Congress could "oversee the conduct of presidential and vice-presidential elections and … set the qualifications for voters for electors for those offices" under the Electors Clause. *Id.* at 117, 124 (op. of Black, J.). But the four other Justices supporting the judgment said the Voting Rights Act was an exercise of Congress's power under the Fourteenth and Fifteenth Amendments, not the Elections Clause or the Electors Clause. *Id.* at 134-35 (op. of Douglas, J.); *id.* at 231 (joint op. of Brennan, White, and Marshall, JJ.). Thus, "[f]ive Justices took the position that the Elections Clause did *not* confer upon Congress the power to regulate voter qualifications in federal elections." *ITCA*, 570 U.S. at 16 n.8. Only Justice Black would have read that power into the presidential *Electors* Clause.

Justice Harlan had the better reading of the Constitution. "[T]he power to control the 'Manner' of holding elections, given with respect to congressional elections by Art. I, §4, is absent with respect to the selection of presidential electors." *Mitchell*, 400 U.S. at 211 (op. of Harlan, J.). "That omission is telling," because when the Constitution "includes particular language in one section … but omits it in another section," courts

16

"generally presume[]" the drafters acted "intentionally and purposely in the disparate inclusion or exclusion." *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021); *see Pine Grove Twp. v. Talcott*, 86 U.S. 666, 674-75 (1873) (applying the rule to constitutional interpretation). No binding authority has held otherwise. *Cf. Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976) (citing *Burroughs* in passing for the proposition that the Constitution gives "broad congressional power" over presidential elections).

To support his contrary view, Justice Black cited only *Burroughs v. United States*, 290 U.S. 534 (1934). But *Burroughs* did not concern Congress's power to enact legislation under the Electors Clause. Rather, in *Burroughs* the Court held that the Federal Corrupt Practices Act did not *violate* the Electors Clause because "[n]either in purpose nor in effect does [the act] interfere with the power of a state to appoint electors or the manner in which their appointment shall be made." 290 U.S. at 544. That was because the Federal Corrupt Practices Act set rules governing political campaign contributions—it had nothing to do with the appointment of presidential electors. *Id.* at 540-43. Indeed, the Court adopted the premise that if the statute *did* interfere with the "exclusive state power" over presidential elections, it would be unconstitutional. *Id.* at 544-45.

This Court has not considered Congress's limited powers under the Electors Clause. In *Voting Rights Coalition v. Wilson*, this Court upheld the constitutionality of the NVRA against California's refusal to implement the statute. 60 F.3d 1411, 1414 (9th Cir. 1995). In that opinion, this Court "considered" "[t]hree provisions of the Constitution": the Elections Clause (Art. I, §4), the Qualifications Clause (Art. I, §2), and the Tenth Amendment. *Id.* at 1413. But the Court did not cite—let alone discuss and

17

decide—the scope of the Electors Clause. Citing *Burroughs*, the Court briefly noted that the "broad power given to Congress over congressional elections has been extended to presidential elections." *Id.* at 1414. But "[d]icta that does not analyze the relevant statutory provision cannot be said to have resolved the statute's meaning." *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2498 (2022). The half sentence in *Voting Rights Coalition* about presidential elections did not analyze the text of the Electors Clause, was not essential to the judgment, and did not properly interpret *Burroughs*. So it is not binding on this panel.

The district court erred by giving Congress a power that the Constitution reserves to the States. By setting rules that govern voter registration, the NVRA regulates the "Manner" of elections. But because Congress can regulate the "Manner" only of congressional elections, not presidential elections, the NVRA cannot preempt state laws governing registration for presidential elections. Requiring proof of citizenship for registration in presidential elections thus does not violate any valid federal law. The district court's summary-judgment decision to the contrary should be reversed.

## II. A consent decree from a different case does not prohibit the Arizona Legislature from enacting new laws requiring proof of citizenship for state voter-registration forms.

Neither the NVRA nor an expired consent decree in a separate proceeding prevents Arizona from rejecting state-form submissions that lack DPOC. H.B. 2492 directs county recorders to "reject any [state-form] application for registration that is not accompanied by satisfactory evidence of citizenship." A.R.S. §16-121.01(C). The district court held, however, that Arizona must continue processing state-form applications without DPOC in accordance with the LULAC Consent Decree, which requires county

recorders to search ADOT records and register the applicant as either a full-ballot voter (if DPOC can be located) or a federal-only voter (if citizenship cannot be verified).

There are two flaws in this conclusion. First, the LULAC Consent Decree expired on December 31, 2020. *See* 7-ER-1614. It follows that "the judgment … was executed. The case is over." *Taylor v. United States*, 181 F.3d 1017, 1023 (9th Cir. 1999).[1] Second, the Secretary of State cannot via a private contract divest the Arizona Legislature of any portion of its sovereign authority. "The legislature has the exclusive power to declare what the law shall be" in Arizona. *State v. Prentiss*, 786 P.2d 932, 936 (Ariz. 1989). And under the federal Constitution, the "state legislatures" have the "'duty' to prescribe rules governing federal elections." *Moore*, 600 U.S. at 10; *see also Carson v. Simon*, 978 F.3d 1051, 1060 (8th Cir. 2020) ("Simply put, the Secretary [of State] has no power to override the Minnesota Legislature" by stipulating to the tabulation of absentee ballots received after Election Day). Neither the Legislature nor the State of Arizona itself was a party to the LULAC Consent Decree. *See* 7-ER-1599; *see also Roosevelt Irr. Dist. v. Salt River Project Agric. Imp. & Power Dist.*, 39 F. Supp. 3d 1051, 1054-55 (D. Ariz. 2014) (noting that consent decree did not bind all political subdivisions of the state, and emphasizing that "[c]ourts must find the meaning of a consent decree 'within its four corners'" (citation omitted)); *Doe v. Pataki*, 481 F.3d 69, 78 (2d Cir. 2007) (finding that "proper regard for state authority requires a federal court to have a clear indication that a state has intended to surrender its normal authority to amend its statutes"). Thus, the

---

[1] In contrast to *Taylor*, here no party wishes to "reopen," 181 F.3d at 1025, the LULAC Consent Decree or nullify any existing voter registrations predicated on it. Rather, they seek only a recognition that it does not exert any ongoing, judicially enforceable modification of extant Arizona statutes.

LULAC Consent Decree cannot—and does not purport to—preclude the Arizona Legislature from prospectively changing voter-registration laws.

Nor does the NVRA mandate the LULAC Consent Decree's terms. Section 6 requires States when registering individuals to vote in federal elections to "accept and use" either the federal form or a state form "that meets all of the criteria stated in" Section 9. 52 U.S.C. §20505(a)(1)-(2). Section 9, in turn, permits States to require any information "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* §20508(b)(1). The federal form's content thus is not coterminous with the scope of Section 9. While the federal form "provides a backstop," *ITCA*, 570 U.S. at 12, if an applicant cannot or chooses not to provide state-specific information, "state-developed forms may require information that the Federal Form does not," *id.* (citing Arizona's DPOC requirement on its state form); *see also Gonzalez v. Arizona*, 677 F.3d 383, 399 (9th Cir. 2012) (the NVRA "gives a state more options" for its own form). Because "[p]roviding proof of citizenship undoubtedly assists Arizona in assessing the eligibility of applicants," *Gonzalez v. Arizona*, 435 F. Supp. 2d 997, 1002 (D. Ariz. 2006), the DPOC requirement is consistent with Section 9. *See Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1215-16 (S.D. Fla. 2006) (state form that included citizenship attestation and checkbox complied with Section 9); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014) (The NVRA "is premised on the assumption that citizenship is one of the requirements for eligibility to vote."). The NVRA accordingly allows Arizona to reject state-form applications that are missing DPOC. *See* A.R.S. §16-121.01(C).

### III. Arizona's citizenship checkbox and birthplace requirement do not violate the Civil Rights Act's materiality provision.

Arizona requires applicants to check a box indicating whether they are a U.S. citizen. A.R.S. §16-121.01(A). And it requires state-form applicants to list their birthplace on the application. *Id.* §16-123. The district court ruled that these requirements violate the Civil Rights Act's materiality provision, which prohibits state officials from disqualifying voters based on an error or omission that is "not material in determining whether [an] individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). That was error.

The district court's errors began with misinterpreting the word "material." The word is undefined in the statute, so it takes on its "ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014). "[C]ontemporaneous dictionaries" are one way to determine the statute's "ordinary public meaning." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 655 (2020).

Contemporaneous dictionaries show that the word "material" is broad. It means "[o]f serious or substantial import," or, as to legal matters, "likely to influence the determination of a cause." *Material*, The Oxford English Dictionary (1961). Some definitions indicate a fact is "material" if it is simply "of consequence" or "likely to influence" a decision, while others raise the bar to "potentially dispositive." *Material*, Webster's Legal Dictionary (1996). But the Fifth Circuit recently "reject[ed]" the definitions imposing a higher bar for materiality that the district court followed here. *Vote.Org v. Callanen*, 89 F.4th 459, 478 (5th Cir. 2023) ("We reject 'essential' as a reasonable meaning, but the rest of the variations seem about right."). The Eleventh Circuit has observed that "minimal relevance" means that an error is material if it "tends to make it more

likely that the applicant is not a qualified voter than" in the absence of the error. *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008). The district court rejected "*Browning*'s interpretation," too. 1-ER-0142. But the materiality provision fairly incorporates a broader range of relevance: "[t]o say that something is 'material' usually simply means that it matters." *Material*, Webster's Legal Dictionary, *supra*.

Statutory context confirms that "material" connotes a low threshold for relevance. As the Third Circuit observed, "the text does not say the error must be immaterial 'to' whether an individual is qualified to vote. It uses the words 'in determining,' and that choice must mean something." *Penn. State Conf. of NAACP Branches v. Sec'y Commonwealth of Penn.*, 97 F.4th 120, 131 (3d Cir. 2024). "Read naturally," these words "describe a process" of "determining whether an individual is qualified to vote." *Id.* Registration requirements must be material "in" that process, not "to" a given qualification.

Both the citizenship checkbox and the applicant's birthplace are "relevant" or "of consequence" in determining citizenship. *Material*, Webster's Legal Dictionary, *supra*. So they are "material in determining" whether a voter is qualified. 52 U.S.C. §10101(a)(2)(B).

### A. Requiring applicants to check a box indicating whether they are a citizen does not violate the materiality provision.

Arizona requires that applicants check a box indicating whether they are a U.S. citizen. A.R.S. §16-123. "No party disputes that citizenship itself is material to a voter's eligibility to vote." 1-ER-0139. And if an applicant fails to check that she is a U.S. citizen, that is at least "of consequence," if not "potentially dispositive," in determining whether she is qualified to vote. *Material*, Webster's Legal Dictionary, *supra*. That should

have resolved the issue. Indeed, the district court ruled that failing to check the citizenship box *is material* "as applied to individuals who do not provide DPOC." 1-ER-0143–0144. But then the district court added a requirement to the Civil Rights Act, ruling that a State cannot require "additional information probative of an applicant's eligibility to vote" when it has required similar information elsewhere in the application. 1-ER-0142. At most, "additional information" is redundant. But "[e]ven if the check-boxes were duplicative of the oath, failing to check one or more boxes would not be an immaterial omission." *Diaz*, 435 F. Supp. 2d at 1213.

As a result, the district court imposed a uniqueness requirement Congress never enacted. The materiality provision requires only that an error on a registration application be material in determining whether a voter is qualified—not that an error be *uniquely* material in determining whether a voter is qualified. Material information does not "become[] immaterial due solely to its repetition." *Id.* at 1213. The district court relied on a motion-to-dismiss decision from the Western District of Arkansas. 1-ER-0140 (citing *League of Women Voters of Ark. v. Thurston*, 2021 WL 5312640 (W.D. Ark., Nov. 15, 2021)). But on summary judgment, that court reversed course: "a voter's name, address, and date of birth are material to a voter's qualifications even when requested at multiple points in the voting process." *League of Women Voters of Ark. v. Thurston*, 2023 WL 6446015, at *17 (W.D. Ark. Sept. 29, 2023). In short, the "plain text" of the materiality provision "does not establish a least-restrictive-alternative test for voter registration applications." *Browning*, 522 F.3d at 1175. The district court erred in creating one.

**B.    Requiring applicants to provide their birthplace does not violate the materiality provision.**

A registrant's birthplace assists county recorders in verifying that individual's identity, facilitates the prevention of potentially duplicate or falsified registrations, and enables database searches that can verify U.S. citizenship. Birthplace hence is relevant in determining a registrant's qualifications, and has "some probability of actually impacting an official's eligibility determination." 1-ER-0141. Under either rubric of materiality, H.B. 2492's addition of a mandatory birthplace field on the state form does not violate the materiality provision.

Birthplace data serves at least two key functions in Arizona's voter registration infrastructure. First, birthplace is used in conjunction with other information to corroborate a registrant's identity. Arizona's voter registration form has included a field for birthplace for over a century. *See* A.R.S. §2885 (1913). Although its disclosure has not been mandatory in recent years, approximately two-thirds of state-form registrants disclose it, and both the paper registration form and the electronic webform maintained by ADOT include fields for inputting birthplace information. *See* 6-ER-1410, 1559; 4-ER-0773. Collected birthplace data is used in multiple facets of the voting and registration process. For example, the "pertinent pages" of a U.S. passport, when used to establish citizenship, include the holder's "place of birth." 5-ER-1011. Similarly, when a voter provides as DPOC a birth certificate that features a last name that is different from the name provided on the registration form, the recorder may use other items of personal information—including place of birth—to cross-check the individual's identity. 5-ER-1008–1009. County recorders also will sometimes solicit birthplace information to confirm identity when attempting to verify the validity of registration

24

submissions, early ballot affidavit signatures, and provisional ballots. *See* 3-ER-0743, 0762–0763; 4-ER-0824–0826; 6-ER-1492; 7-ER-1594.

The district court discounted the legal significance of birthplace data's utility as an identifier, reasoning that, in these contexts, the "voter has already been identified and found eligible to vote." 1-ER-0078. But the materiality provision allows States to mandate in the registration form information that may be material in the future to ascertaining the individual's ability to "vote" in any "election," 52 U.S.C. §10101(a)(2)(A), (e) ("the word 'vote' includes all action necessary to make a vote effective")—even if that information is not necessarily used at the point of *registration*. Ascertaining a voter's identity is integral to verifying her eligibility at numerous temporal and participatory junctures in the election administration process. *See Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 841 (S.D. Ind. 2006) ("By conceding, as they must, that verifying an individual's identity is a material requirement of voting, Plaintiffs have necessarily also conceded that the state may establish procedures to verify this requirement"); *Thurston*, 2023 WL 6446015, at *17 (explaining that a State may permissibly require information to confirm that voters "remain qualified, and are the same people who have already been qualified").

Second, birthplace information has a direct nexus to confirming the validity of a voter's registration. Aggregating birthplace data facilitates the exposure of potentially duplicative registrations, *see* 3-ER-0740,[2] or discrepancies that could signal potentially

---

[2] Conversely, birthplace data can prevent the erroneous cancellation of non-duplicative registrations. Data analyzed by plaintiffs' expert yielded 684 instances in which two voters shared the same name, birthdate, and last four digits of a Social Security number or ADOT number. In 24 of those instances, however, the registrants had designated

false submissions, *see* 3-ER-0742 (testimony that inconsistent birthplaces on form and passport could warrant rejecting a registration). In addition, H.B. 2243 directs county recorders to use the NAPHSIS database to investigate the citizenship status of federal-only voters. *See* A.R.S. §16-165(J). Because NAPHSIS aggregates birth certificates and other vital records, birthplace data can assist recorders in confirming the citizenship—*i.e.*, eligibility—of these voters. *See* 4-ER-0843–0844. The district court objected that Arizona has for years registered voters without birthplace data and does not independently corroborate a registrant's stated birthplace. *See* 1-ER-0077. But no court has ever found that information can be "material" only if it is cross-checked by elections officials, and, more fundamentally, the materiality provision "does not establish a least-restrictive-alternative test." *Browning*, 522 F.3d at 1175.

In sum, birthplace data assists elections officials in verifying putative voters' identity (and, by extension, qualifications) in multiple election-related contexts, including early and provisional voting. It also makes it more likely that election officials can unearth potentially invalid registration submissions and resolve uncertainty surrounding federal-only voters' citizenship status. Under any construction of the materiality provision, birthplace information accordingly is "material" in determining whether an individual is qualified under Arizona law to vote.

## C.  The materiality provision does not preempt Arizona laws.

Both the citizenship checkbox and birthplace requirement are "material in determining" whether a voter is qualified. This Court can reverse on that basis. But there's

---

incompatible birthplaces, which suggests an incongruity of identity. 7-ER-1598; 4-ER-0783–0784.

another reason the district court erred: the materiality provision does not displace state law. The statute forbids actions by state officials based on an error or omission that is "not material in determining whether [an] individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). That is, it asks whether the error or omission is material "under State law." *Id.* The text does not apply to errors or omissions that state law determines are material.

History confirms that the materiality provision applied only to *ad hoc* requirements by state officials that were not mandated "under State law." *Id.* In 1961, the U.S. Commission on Civil Rights published a report on national civil rights issues. *See* Comm'n on Civil Rights, *Voting: 1961 Commission on Civil Rights Report* (1961), perma.cc/WA4A-QEYK. The Commission discussed "discriminatory practices on the part of registrars" that were "aimed at reducing Negro registration." *Id.* at 43. In Louisiana, for example, some registrars would arbitrarily refuse witnesses or valid government documents as identification. *Id.* at 50-53. Relying on the Commission's findings, Congress passed the Civil Rights Act of 1964.

The House Report found that the "crux of the problem" addressed by the materiality provision was that "registrars [would] overlook minor misspelling errors or mistakes in age or length of residence of white applicants, while rejecting a Negro application for the same or more trivial reasons." H.R. Rep. No. 88-914 (Nov. 20, 1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2491. Relying on the Commission's findings about "the arbitrary or discriminatory application of various registration procedures," one of the bill's sponsors explained that it was "quite clear that this statute would not infringe on the rights of the States to establish voter qualifications." Misc. Proposals Regarding

27

the C.R. of Persons Within the Jurisdiction of the U.S.: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary, 88 Cong. 915 (May 8, 1963) (statement of Rep. Peter W. Rodino, Jr.). Congress enacted the materiality provision "for these reasons." 1964 U.S.C.C.A.N. at 2491.

For decades, courts understood that the materiality provision applied to arbitrary action by state officials. The paradigmatic violation was "disqualifying an applicant who failed to list the exact number of months and days in his age." *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995). After reviewing decades of cases, one court concluded that "the jurisprudence appears to demonstrate that [§10101] is an anti-discrimination statute designed to eliminate the discriminatory practices of registrars through arbitrary enforcement of registration requirements." *McKay v. Altobello*, 1996 WL 635987, at *1 (E.D. La. Oct. 31, 1996); *see also Condon*, 913 F. Supp. at 950; *Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020) (ruling that election officials "may reject applications and ballots that do not clearly indicate the required information required by Missouri statute without offending 52 U.S.C. §10101(a)(2)(B)").

If the materiality provision "were intended to preempt all state laws" that govern voter registration, then courts "would expect to see a more comprehensive regulation of voter registration and identification." *Browning*, 522 F.3d at 1172 (holding that the Help America Vote Act did not preempt Florida's identity verification process for voter registration); *see also Liebert v. Millis*, 2024 WL 2078216, at *16 (W.D. Wis. May 9, 2024) ("If Congress had intended to displace state authority as significantly as plaintiffs suggest, surely there would be clearer indication of that in the text or history of the statute."). Neither HAVA nor the materiality provision, however, enacted "comprehensive

regulation of voter registration and identification." *Browning*, 522 F.3d at 1172. The materiality provision instead targeted—and solved—a narrow problem: discriminatory application of voter registration requirements. It was never intended to forgive noncompliance with neutral laws that ensure security and confidence in the State's elections. That is why, "[u]ntil recently, the Materiality Provision received little attention from federal appellate courts." *Penn. State Conf. of NAACP Branches*, 97 F.4th at 127.

That Arizona law requires applicants to check the citizenship box and provide their birthplace ends the inquiry under the materiality provision.

## IV. Requiring election officials to conduct a standardized citizenship check when they have reason to believe a registered voter is not a U.S. citizen does not violate federal law.

Arizona requires county recorders to search the SAVE system maintained by the U.S. Citizenship and Immigration Services in two situations. A.R.S. §16-165(I). First, if a voter is registered with a federal-only designation, the recorder must check SAVE monthly for updates to that individual's citizenship status. Second, the recorder must initiate a SAVE inquiry whenever she has "reason to believe" a voter is not a U.S. citizen. The district court upheld the former provision but found that the "reason to believe" clause violated the Civil Rights Act, 52 U.S.C. §10101(a)(2)(A), and Section 8(b) of the NVRA, 52 U.S.C. §20507(b)(1). Because the "reason to believe" provision applies in equal terms to all registered voters and does not task voters with satisfying additional eligibility prerequisites or procedures, the district court's conclusion was legal error.

### A. Standardized citizenship checks do not violate the Civil Rights Act.

Requiring county recorders to conduct a SAVE check if they have "reason to believe" a registered voter is not a U.S. citizen, A.R.S. §16-165(I), is not discriminatory. The Civil Rights Act provides that a state or local elections official may not, "in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote." 52 U.S.C. §10101(a)(2)(A). The district court asserted that because SAVE contains data relating only to immigrants and naturalized citizens, A.R.S. §16-165(I) necessarily discriminates against them in violation of §10101(a)(2)(A). But the text of §16-165(I) and the district court's own findings that Arizona's citizenship-verification protocols are reliable belie this conclusion.

Section 16-165(I) does not bear any hallmarks of a discriminatory standard, procedure, or practice. As the district court recognized, nothing pernicious inheres in the "reason to believe" standard. It "is common in statutory drafting," 1-ER-0146 n.20, and is entrenched in numerous areas of the law, including electoral contexts. *See, e.g.*, 52 U.S.C. §30109(a)(2) (Federal Election Commission can investigate persons if "it has reason to believe that a person has committed, or is about to commit," a campaign finance violation); A.R.S. §16-938(C) (campaign finance filing officer may refer a person for an investigation if there is "reasonable cause" to believe a violation has occurred). Further, the district court did not find that the plaintiffs had established that application of the "reason to believe" standard will entail any invidious discrimination or animus

against any protected class. Its judgment that A.R.S. §16-165(I) nevertheless imposes differential standards, practices, or procedures on naturalized citizens is wrong for three reasons.

*First*, the provision is neutral on its face and in its application. A county recorder must run a SAVE check on ***any*** voter who the recorder has "reason to believe" is not a citizen. A.R.S. §16-165(I). That the system cannot yield substantive information without an inputted alien registration number (or similar federally issued immigration number) might underscore SAVE's limited practical utility, but it does not constitute a discriminatory or disparate attribute of the statute itself. As the district court itself acknowledged, if a state "impose[s] unique procedural requirements," it must simply "impose those requirements on *everyone*" who satisfies the prescribed criterion. *U.S. Student Ass'n Found. v. Land*, 585 F. Supp. 2d 925, 949-50 (E.D. Mich. 2008); 1-ER-0079. While a county recorder cannot extract from SAVE information regarding any voter— whether a naturalized citizen or not—without an associated alien registration number, the statutory "reason to believe" trigger is not directly or indirectly conditioned on a voter's naturalization status.

*Second*, the statutory "reason to believe" standard is tethered directly to the verification of an undisputedly valid voting qualification—*i.e.*, U.S. citizenship. Section 10101(a)(2)(A) does not impose an inelastic and unqualified mandate of absolute equality that prohibits election officials from making individualized inquiries to verify voting qualifications. *Cf. Gonzalez v. Arizona*, 2006 WL 8431038, at *8 (D. Ariz. Oct. 12, 2006) ("It is not a violation of subsection (A) for a state to apply different standards to two inherently different procedures."). To the contrary, the statute permits tailored research

31

of specific voters when the investigation is triggered by criteria or information that pertain directly to a voter's qualifications. *Contrast Ballas v. Symm*, 494 F.2d 1167, 1171-72 (5th Cir. 1974) (registrar's policy of issuing a questionnaire to voter when registrar was uncertain of voter's residency status did not violate §10101(a)(2)(A) because "[t]he standard for registration is the same for all applicants") *and Davis v. Commonwealth Election Comm'n*, No. 1-14-cv-00002, 2014 WL 2111065, at *25 (D.N.M.I. May 20, 2014) (requirement that voters seeking to vote in certain elections sign an affidavit attesting that they are native Islanders and hence eligible to vote in that election did not violate §10101(a)(2)(A)), *with Frazier v. Callicutt*, 383 F. Supp. 15, 20 (N.D. Miss. 1974) (finding violation where official consistently rejected registrations only from black students living on college campuses).

*Third*, as the district court acknowledged, "A.R.S. §16-165(I) regulates county recorders, not registered voters." 1-ER-0146. This point merits emphasis, given §10101(a)(2)(A)'s lineage as a mechanism to correct procedures that burdened certain groups with barriers that often conduced a denial of voter registration. *See, e.g.*, *Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vt. 1971) (invalidating supplemental questionnaire required only of college students). A "reason to believe" determination merely induces a search of SAVE by the county recorder, using an alien registration number (or similar immigration identifier provided by the federal government) associated with the voter.

The district court did not find—and the record cannot buttress an inference—that these SAVE checks, if and when they occur, will result in additional encumbrances on **voters**. A recorder would possess a voter's alien registration number only if she had previously provided it on the registration form as a type of DPOC, and—according to

32

testimony from the Maricopa County Recorder's office—"not many" individuals do so. *See* 3-ER-0712-0713.[3] A county recorder's use of the applicant's alien registration number at the time of registration would have resulted in one of three potential outcomes. First, SAVE confirmed the individual's status as a U.S. citizen and she was added to the rolls as a full-ballot voter. *See* 1-ER-0024. The district court recognized that the plaintiffs "failed to adduce evidence that SAVE is unreliable or contains severely inaccurate or outdated citizenship information." 1-ER-0018.[4] There is no factual basis for assuming that a second SAVE check based on a post-registration "reason to believe" inquiry would elicit from SAVE anything other than a reconfirmation of the registrant's naturalized status, which, in turn, would require no action by the voter; indeed, the voter would not even know that the SAVE inquiry had occurred at all.[5] More generally, "Plaintiffs have not adduced evidence that county recorders would ignore a voter's DPOC on file and burden naturalized citizens with requiring new proof of citizenship." 1-ER-0088–0089.

A second possibility is that the SAVE check at the time of registration indicated that the applicant was not a citizen. In that scenario, the registration would have been

---

[3] Data provided by the U.S. Customs and Immigration Services indicate that Arizona's county recorders submitted a collective total of 1,699 inquiries to SAVE in 2022, all or nearly all of which would have occurred during the processing of a voter registration application. In 1,102 of these instances, SAVE located confirmation of the individual's naturalized or acquired citizenship status. *See* 6-ER-1494.

[4] It also found that "[e]ven if SAVE may periodically return stale citizenship information, Plaintiffs have not shown that naturalized citizens will be disproportionately required to submit additional DPOC compared to other voters." 1-ER-0087.

[5] An experienced investigator in the Attorney General's office testified that voters typically are unaware of database searches relating to their eligibility. *See* 4-ER-0861–0862.

placed into suspended status and the applicant would never have been enrolled as an Arizona voter, thereby obviating any possibility of a later SAVE inquiry under A.R.S. §16-165(I). *See* 1-ER-0024.

The final possibility is that the SAVE check at the time of registration returned no match at all, in which case the applicant would have been enrolled as a federal-only voter. *See id.*; 3-ER-0714. But—crucially—federal-only voters are ***already*** subject to monthly SAVE checks under another clause of A.R.S. §16-165(I) and other provisions of H.B. 2243 that the district court properly sustained. *See* 1-ER-0114 (holding that "Arizona may conduct SAVE checks on registered voters who have not provided DPOC"). Thus, in practice, a SAVE inquiry under §16-165(I)'s "reason to believe" facet could return a finding of non-citizenship only with respect to federal-only voters. But the "reason to believe" provision interposes no additional or disparate standards, practices, or procedures with respect to these individuals because they already are the subject of SAVE and other database inquiries under other statutes.

### B. Standardized citizenship checks do not violate the NVRA.

The district court's finding that the "reason to believe" provision in A.R.S. §16-165(I) contravenes Section 8(b) of the NVRA—which requires States' voter list-maintenance programs to be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965," 52 U.S.C. §20507(b)(1)—is infirm for similar reasons. The "reason to believe" standard for triggering SAVE searches applies on a statewide basis and is conditioned on the receipt of information implicating a voter's substantive qualifications. It hence is uniform and non-discriminatory. *Contrast Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (S.D. Ohio 2006) (statute conditioning registration and training

requirements on registration workers' compensation status violated Section 8(b)). Elsewhere, the district court correctly ruled that a list-maintenance protocol complies with Section 8(b) if the statutory trigger for an eligibility determination facially applies to all registered voters in the jurisdiction—even if not every voter actually has an equal chance of being selected for additional inquiries. *See* 1-ER-0086 (finding that lack of DPOC was a uniform and non-discriminatory criterion).

In analyzing A.R.S. §16-165(I)'s "reason to believe" provision, however, the district court misconceived Section 8(b) as incorporating something akin to a "disparate impact" standard. But that construction of Section 8(b) is conceptually unsound and practically unworkable. A list-maintenance program inevitably will not affect every registered voter in the same way at the same time; by definition, these initiatives are designed to identify specific voters whose eligibility is in question. *See* 52 U.S.C. §20507(a)(4) (requiring States to make "a reasonable effort" to remove deceased and non-resident voters from the rolls). As long as the conditions precedent for instigating such inquiries apply uniformly across the jurisdiction and correspond to substantive voting qualifications (such as age, citizenship, or residency), they conform to Section 8(b).

Under this rubric, the "reason to believe" provision is uniform and non-discriminatory. By its terms, it requires county recorders to take further action whenever there is "reason to believe" that ***any*** registered voter is not a U.S. citizen. While SAVE's internal informational limitations may diminish its usefulness, that constraint does not imbue A.R.S. §16-165(I) with a discriminatory cast. Finally, as discussed *supra* section IV.A, A.R.S. §16-165(I)'s interplay with other registration and list maintenance statutes

35

ensures that the "reason to believe" provision will not burden qualified electors with additional prerequisites to establishing their eligibility. *See Project Vote*, 455 F. Supp. 2d at 703 (noting that the NVRA is implicated when a state "erect[s] barriers" to voter registration). It accordingly is fully consistent with Section 8(b).

## V. Arizona's list maintenance for citizenship status does not violate the NVRA's 90-day blackout period.

U.S. citizenship is a basic requirement for voting. Ariz. Const. art. VII, §2. The NVRA prohibits States from removing voters from the rolls "except" at "the request of the registrant," because of "criminal conviction or mental incapacity," or under a "general program" to remove ineligible voters due to "death" or change in "residence." 52 U.S.C. §20507(a)(3)-(4). That "general program" must be completed 90 days before the next federal election. *Id.* §20507(c)(2)(A). The district court ruled that Arizona can't remove noncitizens from the rolls within 90 days before an election. 1-ER-0130–00132; 1-ER-0005. That's wrong for at least three reasons.

*First*, the NVRA does not discuss, let alone limit, a State's authority to remove noncitizens from the voter rolls. The NVRA regulates the removal of voters who were *once* eligible to vote but are no longer eligible due to conviction, death, or change in residence. 52 U.S.C. §20507(a)(3)-(4). Noncitizens were never eligible to vote in the first place, so the NVRA doesn't forbid their removal from the rolls. "In creating a list of justifications for removal, Congress did not intend to bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in the first place." *Bell v. Marinko*, 367 F.3d 588, 591-92 (6th Cir. 2004); *see also* 52 U.S.C. §20507(a)(1) (seeking to ensure that "eligible" voters are registered to vote). In other

words, Arizona's rules permitting the removal of noncitizens from the rolls do not "conflict[] with" any NVRA provision. *ITCA*, 570 U.S. at 9.

*Second*, a program to remove noncitizens from the rolls is not a "general program" to which the 90-day blackout period applies. 52 U.S.C. §20507(A)(4). The district court pointed out that the statute forbids "any program" to remove registrants, and the word "any" has a "broad meaning." 1-ER-0131 (quoting *Arcia*, 772 F.3d at 1344). But a court "errs in placing dispositive weight on the broad statutory reference to 'any' … without considering the rest of the statute." *United States v. Alvarez-Sanchez*, 511 U.S. 350, 357 (1994). Here, the district court ignored statutory context that confirms that the "program" the NVRA requires States to conduct refers to the removal of ineligible voters from the rolls due to "death" or "change in the residence," not lack of citizenship. 52 U.S.C. §20507(a)(4). The NVRA even instructs that the 90-day blackout period "shall not be construed" to prevent States from removing voters because of the voter's request, conviction, or death. *Id.* §20507(c)(2)(B). It applies, in other words, only to a "program" to remove voters due to "a change in the residence of the registrant." *Id.* §20507(a)(4)(B).

*Third*, even if the NVRA protected registration of noncitizens, the provision the district court enjoined is not a systematic removal program. In its summary-judgment order, the district court recognized that "States may continue to implement *individualized* removal programs within this 90-day window." 1-ER-0130 (emphasis added) (citing *Arcia*, 772 F.3d at 1344-45). But the provision the district court enjoined provides for individualized removal. *See* 1-ER-0005 (enjoining A.R.S. §16-165(A)(10)). Paragraph (A)(10) requires election officials who "obtain[] information" that "the person

37

registered is not a United States citizen" to cancel the registration after providing "the person" with notice and opportunity to respond. A.R.S. §16-165(A)(10). That is an "individualized" removal "based on individual correspondence or rigorous individualized inquiry," *Arcia*, 772 F.3d at 1346, not a program that cancels "batches of registrations based on a set procedure," 1-ER-0130 n.15. The district court's final judgment is broader than its summary-judgment opinion permits.

## VI. The NVRA permits Arizona to reject state-form applications that lack documentary proof of residency and to distribute the new state form in public assistance agencies.

The NVRA permits States to require any information necessary to determine eligibility in a state registration form. Section 6 authorizes States to "develop and use a mail voter registration form that meets all of the criteria stated in [Section 9] for the registration of voters in elections for Federal office." 52 U.S.C. §20505(a)(2). Section 9 permits state forms to include required fields for any information "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* §20508(b)(1).

An applicant's location of residence is necessary to determining her eligibility in Arizona. Arizona law limits the franchise to *bona fide* residents of the State. *See* Ariz. Const. art. VII, §2(A); A.R.S. §16-101(A)(3). Documentary proof of residency enables county officials to assess an applicant's compliance with this eligibility criterion. It follows that the NVRA permits Arizona to require DPOR as an element of a valid state-form submission when registering individuals to vote in federal elections. County recorders testified that applicants occasionally will attempt to register at an Arizona address that is not (or may appear not to be) the location of a *bona fide* residence. *See* 4-

38

ER-0829–0830 (citing instances where non-standard addresses were erroneously flagged). While county recorders generally work to confirm the legitimacy and accuracy of a designated address, *see* 3-ER-0700, the DPOR requirement integrates this verification mechanism into the registration form. Indeed, the federal form itself mandates the disclosure of a home address. *See* 6-ER-1414.

The district court erred in holding that Section 6 of the NVRA requires Arizona to register state-form applicants without DPOR as federal-only voters, rather than reject the submissions.

The district court contended that DPOR must not be "necessary" within the meaning of Section 9 because when a county recorder requests confirmation of residency from an existing voter who has obtained an out-of-state license or ID, the voter "must only attest under penalty of perjury that the voter is still a resident of Arizona." 1-ER-0081 (citing A.R.S. §16-165(E)). But this reductionist reasoning—*i.e.*, that if a State requires DPOR at ***any*** point of registration, it must prove its necessity by demanding it in ***every*** registration transaction—is dissonant with Section 9's text and its construction by other courts. "The plain meaning [of Section 9] is if the state deems some information necessary to identify the applicant, the information can be required. The state may require a signature, data relating to prior registration, and such other information that will enable the state to determine eligibility and to administer the registration and election process." *Gonzalez*, 435 F. Supp. 2d at 1002. While there must be some direct nexus between a state-mandated item of information and the registration eligibility, the 'narrowly tailored' or 'least restrictive means' constraint that the district court

implicitly ascribed to Section 9 is absent from its text.[6] *See League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1166 (N.D. Fla. 2012) (holding that "identifying the organization that submits an application is sufficiently 'necessary' to the sound administration of the voter-registration process to pass muster under" Section 9); *Am. Ass'n of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1243 (D.N.M. 2008) ("The requirement that registering agents include their identification number on submitted registration forms" was consistent with Section 9); *McKay v. Altobello*, 1997 WL 266717, at *4 (E.D. La. May 16, 1997) (holding that the required "disclosure of a prospective voter's mother's maiden name does not violate the NVRA," adding that under Section 9, "election officials for each state must determine the need for registration information based on the experience peculiar to that state."). In short, because the DPOR requirement is compliant with Section 9 (and, by extension, Section 6) of the NVRA, H.B. 2492's directive that county recorders must reject state-form applications that lack DPOR is not preempted.[7]

---

[6] In contrast, under Section 5 of the NVRA, a State's so-called "motor voter" registration form—which is not at issue in this case—"may require only the minimum amount of information necessary" to prevent duplicate registrations or enable verification of eligibility. 52 U.S.C. §20504(c)(2)(B); *see also Fish v. Kobach*, 840 F.3d 710, 734 (10th Cir. 2016) (observing that "section 5's 'only the minimum amount of information necessary' is a stricter principle than section 9's 'such identifying information … as is necessary'"). "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Cheneau v. Garland*, 997 F.3d 916, 920 (9th Cir. 2021) (cleaned up).

[7] Certain plaintiffs also challenged the DPOR requirement under Section 8(a) of the NVRA. But that provision is not a freestanding predicate for preemption in this context. Section 8(a) provides that, if a "valid" registration form is submitted within a certain period of time prior to a federal election, the applicant must be registered to vote in that federal election. *See* 52 U.S.C. §20507(a)(1). A corollary, however, is that a State is not required to accept and process a timely submitted registration form that is not

Relatedly, the state registration form with the DPOR component remains "equivalent" to its federal counterpart. Section 7 of the NVRA requires States to make available at public assistance offices and other designated "voter registration agencies" either the federal form or "the office's own form if it is equivalent to the" federal form. 52 U.S.C. §20506(a)(6)(A)(ii). The term "equivalent" is not defined. Accordingly, the court should not examine Section 7 "in isolation," but rather "interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-3 (2000) (cleaned up). To this end, Section 6 provides that either the federal form or Section 9–compliant state form may be used to register individuals in federal elections. 52 U.S.C. §20505(a). It further provides that States must make either or both forms "available for distribution through governmental and private entities." *Id.* §20505(b). In other words, provided that a state form comports with Section 9, it necessarily is equivalent to the federal form; neither Section 6 nor any other NVRA provision evinces any preference for, or distinction between, one or the other.

## VII. Legislators do not waive legislative privilege by intervening in a lawsuit.

The district court ruled that the Legislative Leaders waived their legislative privilege by intervening and ordered them to sit for depositions and produce privileged documents. 1-ER-0151. A panel of this Court declined to intervene under the high bar

---

"valid." *See Diaz v. Cobb*, 541 F. Supp. 2d 1319, 1331 n.10 (S.D. Fla. 2008) (Section 8(a) "recognized the right of states to demand a 'valid' form prior to the registration deadline."). Because the DPOR requirement is consistent with Section 9, a state-form submission that omits DPOR is not "valid" within the meaning of Section 8(a), and hence can be properly rejected.

for mandamus relief. *In re Toma*, 2023 WL 8167206, at *1. After the Legislative Leaders complied with the district court's order, the district court repeatedly relied on the Legislative Leaders' depositions in reaching its findings of fact and conclusions of law. *See* 1-ER-0040–0043, 0112–0113.

Post-judgment appeals protect the rights of litigants and can remedy improper disclosure of privileged material. *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 109 (2009). A district court's discovery orders are reviewed for abuse of discretion. *Munoz-Santana v. I.N.S.*, 742 F.2d 561, 562 (9th Cir. 1984). "A [district] court abuses its discretion when it fails to apply the correct legal standard…." *Briseno v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021) (internal citation omitted).

### A. The district court abused its discretion by allowing discovery of legislative motives.

The law required the district court to reject Plaintiffs' requests for discovery of legislative motives. "Since the Glorious Revolution in Britain, and throughout United States history, the [legislative] privilege has been recognized as an important protection of the independence and integrity of the legislature." *United States v. Johnson*, 383 U.S. 169, 178 (1966) (internal citations omitted). The legislative privilege maintains confidentiality within the legislature and protects the legislative process itself. *See In re N.D. Legis. Assembly*, 70 F.4th 460, 464 (8th Cir. 2023), *vacated on mootness grounds sub nom. Turtle Mountain Band v. N.D. Legis. Assembly*, -- S. Ct. --, 2024 WL 3259672 (U.S. Jul. 2, 2024). "No principle of our constitutional law is more firmly established than that this court may not, in passing upon the validity of a statute, inquire into the motives of Congress." *Hamilton v. Ky. Distilleries & Warehouse Co.*, 251 U.S. 146, 161 (1919).

42

Inquiry into state legislator motives is specifically prohibited. The Supreme Court has been clear: "[N]o inquiry may be made concerning the motives or wisdom of a state Legislature acting within its proper powers." *Arizona v. California*, 283 U.S. 423, 455 n.7 (1931) (citing cases). The Court has "never allowed" inquiry into state legislator motives. *United States v. Des Moines Nav. & Ry.*, 142 U.S. 510, 544-45 (1892) (rejecting challenge to Iowa law based on alleged improper legislative motives). The Court does not inquire into state legislators' "knowledge, negligence, methods, or motives" for legislation. *Calder v. Michigan*, 218 U.S. 591, 598 (1910) (rejecting challenge to Michigan law based on alleged improper legislative motives). "No inquiry," *Arizona*, 283 U.S. at 455 n.7, means no discovery.

*Fletcher* and its progeny bar discovery into legislative motives, which this Court repeatedly confirmed by blocking discovery sought from legislators. *See Lee*, 908 F.3d at 1187-88; *City of Las Vegas v. Foley*, 747 F.2d 1294, 1296, 1299 (9th Cir. 1984). Other circuits also have blocked discovery from legislators. *See La Union del Pueblo Entero v. Abbott*, 93 F.4th 310, 325 (5th Cir. 2024); *N.D. Legis. Assembly*, 70 F.4th at 463; *Pernell v. Fla. Bd. of Governors of State Univ.*, 84 F.4th 1339, 1345 (11th Cir. 2023); *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 240 (5th Cir. 2023); *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015). "Allowing discovery of legislative motives" would "create a major departure from the precedent rejecting the use of legislative motives...." *Foley*, 747 F.2d at 1298.

To justify its "substantial intrusion" into legislative motives, *Lee*, 908 F.3d at 1187, the district court reasoned that the motive information sought from the Legislative Leaders "go[es] to the heart" of Plaintiffs' claims. 1-ER-0154. But this Court already

43

has rejected this basis for discovery. *Lee*, 908 F.3d at 1187-88. Claims alleging discrimination or other constitutional violations that "directly implicate[] the government's intent" are not "'extraordinary instances' that might justify an exception to the [legislative] privilege." *Id.* at 1188 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)); *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 508-09 (1975) ("If the mere allegation that a valid legislative act was undertaken for an unworthy purpose would lift the protection of the [Speech or Debate] Clause, then the Clause simply would not provide the protection historically undergirding it.").

The district court's decision allowing discovery of legislative motives is "a major departure from the precedent rejecting the use of legislative motives." *Foley*, 747 F.2d at 1298. The district court thus abused its discretion by granting discovery of legislative motives.

**B.    The district court abused its discretion by ruling the Legislative Leaders waived the legislative privilege by intervening.**

When it comes to the legislative privilege, "[t]he ordinary rules for determining the appropriate standard of waiver do not apply in this setting." *United States v. Helstoski*, 442 U.S. 477, 491 (1979). The Supreme Court has not decided that an individual legislator may even waive the legislative privilege. *See id.* But assuming it could be waived, the Court held that "waiver can be found only after explicit and unequivocal renunciation of the protection." *Id.*

"Explicit and unequivocal renunciation" is a high bar. In *Helstoski*, the Court ruled that a legislator had not waived his privilege even though he voluntarily testified eight times to a grand jury and produced documents before he asserted the legislative

privilege. *Id.* at 482. Following *Helstoski*, circuit courts in both civil and criminal cases have rejected legislative privilege waiver arguments. *See, e.g.*, *Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1086-87 (D.C. Cir. 2017) (filing lawsuit not waiver); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 421 n.11 (D.C. Cir. 1995) (radio interview not waiver); *United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988) (trial testimony not waiver).

Though required by *Helstoski*, the district court did not identify any "explicit or unequivocal renunciation" of the legislative privilege by the Legislative Leaders. *See Mi Familia Vota*, 691 F. Supp. 3d 1105, 1108-10 (D. Ariz. 2023). Rather, the district court's analysis centered on an implicit waiver by the Legislative Leaders' act of intervention. *See id.*

Voluntarily participating in a judicial action, such as by intervention, is not an "explicit and unequivocal renunciation" of legislative immunity. *See Senate Permanent Subcomm. on Investigations*, 856 F.3d at 1086-87. In an action initiated by a legislative subcommittee, a private party pointed to the lawsuit's filing to argue that "the Subcommittee necessarily accepted an implicit restriction on the Speech or Debate Clause by seeking to enlist the judiciary's assistance in enforcing its subpoena." *Id.* at 1087. This "argument lacks merit," ruled the D.C. Circuit. *Id.* The court reasoned that the subcommittee had not "invite[d] the courts' interference with constitutionally protected legislative activity." *Id.* Similarly, a legislator's voluntary participation before a grand jury on multiple occasions did not waive his legislative privilege. *See Helstoski*, 442 U.S. at 482. Because privileges are always asserted in litigation, the mere fact of engaging in litigation does not raise a plausible inference of waiving any privilege, and certainly not an explicit and

45

unequivocal renunciation of the privilege. A plaintiff does not waive attorney-client privilege by filing a lawsuit, and a legislator does not waive legislative privilege by intervening in a lawsuit.

The district court's order penalizes the legislative branch for defending its interests. *See Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 191 (2022) ("States possess a legitimate interest in the continued enforcement of their own statutes.") (cleaned up). No court decision has been found in which intervention by an executive branch actor—for example, the United States Department of Justice, a state attorney general, a governor, or a government agency—waived the executive privilege or deliberative process privilege. No court decision has been found in which intervention or appellate participation by a judge waived judicial immunity or privilege. The legislative branch is not a lesser branch. *See Helstoski*, 442 U.S. at 491 (the Speech or Debate Clause "preserve[s] the constitutional structure of separate, coequal, and independent branches of government. The English and American history of the privilege suggests that any lesser standard would risk intrusion by the Executive and the Judiciary into the sphere of protected legislative activities.").

The Legislative Leaders also did not make an "explicit and unequivocal renunciation" of legislative privilege by "putting their motives at issue." *Mi Familia Vota*, 691 F. Supp. 3d at 1110. First, the Legislative Leaders did not put their motives at issue, as the district court could only point to a pledge to "fully defend" the law. *Id.* at 1109. Second, the district court determined that motive information "does in fact 'go to the heart' of Plaintiffs claims." *Id.* This ruling runs counter to numerous decisions by the Supreme Court and this Court previously discussed. And none of these issues, even

46

viewed in the light most favorable to the district court, contain an "explicit and une-quivocal renunciation" of the legislative privilege.

Finally, the Arizona law permitting the Legislative Leaders' intervention does not contain an "explicit and unequivocal renunciation" of legislative privilege. Nothing in A.R.S. §12-1841 "provides that the [Arizona legislature] forfeits its constitutional pro-tections by seeking" intervention. *Senate Permanent Subcomm. on Investigations*, 856 F.3d at 1087. Statutory language confirming the Legislative Leaders have discretion to not in-tervene, *Mi Familia Vota*, 691 F. Supp. 3d at 1108, protects them from mandatory in-tervention and does not "explicitly and unequivocally renounce" their legislative privi-lege when they choose to exercise their right to intervene.

The Legislative Leaders retain their legislative privilege when they defend insti-tutional interests and state law. The district court abused its discretion by ruling the Legislative Leaders waived the legislative privilege by intervening.

## C. Alternatively, *Munsingwear* vacatur is appropriate.

As discussed above, the district court's misconception of legislative privilege pre-sents an active and consequential question that the Court should resolve now. In the alternative, however, the Court should vacate the district court's ruling under *United States v. Munsingwear Inc.*, 340 U.S. 36 (1950). Assuming *arguendo* that the Legislative Lead-ers' compelled testimony has mooted this dispute, that development is not the fault of the Legislative Leaders, and so vacatur of the appealed ruling is "automatic." *Donovan v. Vance*, 70 F.4th 1167, 1172-73 (9th Cir. 2023); *see also Turtle Mountain Band*, 2024 WL 3259672 (vacating judgment in legislative privilege dispute under *Munsingwear*); *United States v. Krane*, 625 F.3d 568, 574 (9th Cir. 2010) ("dismiss[ing] this appeal as moot and

instruct[ing] the district court to vacate its order directing compliance with the sub-
poena.").

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district
court enjoining Arizona's laws and denying legislative privilege.

Dated this 29th day of July, 2024

Respectfully submitted,

*/s/ Thomas Basile*

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Appellant Republican National*
*Committee*

Kory Langhofer
Thomas Basile
STATECRAFT PLLC
649 North Fourth Ave., First Floor
Phoenix, Arizona 85003
(602) 382-4078
kory@statecraftlaw.com
tom@statecraftlaw.com

*Counsel for Appellants Republican National*
*Committee, Warren Petersen, and Ben Toma*

## CERTIFICATE OF COMPLIANCE

In compliance with Federal Rules of Appellate Procedure 32(g), I certify that according to the word count feature of the word processing program used to prepare this motion, this motion contains 13,149 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rule 28 and Circuit Rule 28.1-1.

*/s/ Thomas Basile*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing brief on July 29, 2024, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

*/s/ Thomas Basile*

## ADDENDUM OF CONSTITUTIONAL AND STATUTORY PROVISIONS

| Constitutional/Statutory Provision | Page |
|---|---|
| U.S. Const. art. I, §4, cl. 1 | ADD-2 |
| U.S. Const. art. II, §1, cl. 3 | ADD-3 |
| 52 U.S.C. §10101 | ADD-4 |
| 52 U.S.C. §20501 | ADD-10 |
| 52 U.S.C. §20505 | ADD-11 |
| 52 U.S.C. §20506 | ADD-13 |
| 52 U.S.C. §20507 | ADD-17 |
| 52 U.S.C. §20508 | ADD-24 |
| A.R.S. §16-121.01 | ADD-26 |
| A.R.S. §16-123 | ADD-29 |
| A.R.S. §16-127 | ADD-30 |
| A.R.S. §16-165 | ADD-31 |
| A.R.S. §16-166 | ADD-36 |
| A.R.S. §12-1841 | ADD-39 |

**United States Constitution**
**Article I, §4, cl. 1**

The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

### United States Constitution
### Article II, §1, cl. 3

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

## 52 U.S.C. §10101
## Voting Rights

**(a) Race, color, or previous condition not to affect right to vote; uniform standards for voting qualifications; errors or omissions from papers; literacy tests; agreements between Attorney General and State or local authorities; definitions**

(1) All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

(2) No person acting under color of law shall—

(A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote;

(B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election; or

(C) employ any literacy test as a qualification for voting in any election unless (i) such test is administered to each individual and is conducted wholly in writing, and (ii) a certified copy of the test and of the answers given by the individual is furnished to him within twenty-five days of the submission of his request made within the period of time during which records and papers are required to be retained and preserved pursuant to title III of the Civil Rights Act of 1960 [52 U.S.C. 20701 et seq.]: *Provided, however*, That the Attorney General may enter into agreements with appropriate State or local authorities that preparation, conduct, and maintenance of such tests in accordance with the provisions of applicable State or local law, including such special provisions as are necessary in the preparation, conduct, and maintenance of such tests for persons who are blind or otherwise physically handicapped, meet the purposes of this subparagraph and constitute compliance therewith.

(3) For purposes of this subsection—

(A) the term "vote" shall have the same meaning as in subsection (e) of this section;

(B) the phrase "literacy test" includes any test of the ability to read, write, understand, or interpret any matter.

## (b) Intimidation, threats, or coercion

No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives, Delegates or Commissioners from the Territories or possessions, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate.

## (c) Preventive relief; injunction; rebuttable literacy presumption; liability of United States for costs; State as party defendant

Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b), the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order. If in any such proceeding literacy is a relevant fact there shall be a rebuttable presumption that any person who has not been adjudged an incompetent and who has completed the sixth grade in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico where instruction is carried on predominantly in the English language, possesses sufficient literacy, comprehension, and intelligence to vote in any election. In any proceeding hereunder the United States shall be liable for costs the same as a private person. Whenever, in a proceeding instituted under this subsection any official of a State or subdivision thereof is alleged to have committed any act or practice constituting a deprivation of any right or privilege secured by subsection (a), the act or practice shall also be deemed that of the State and the State may be joined as a party defendant and, if, prior to the institution of such proceeding, such official has resigned or has been relieved of his office and no successor has assumed such office, the proceeding may be instituted against the State.

**(d) Jurisdiction; exhaustion of other remedies**

The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law.

**(e) Order qualifying person to vote; application; hearing; voting referees; transmittal of report and order; certificate of qualification; definitions**

In any proceeding instituted pursuant to subsection (c) in the event the court finds that any person has been deprived on account of race or color of any right or privilege secured by subsection (a), the court shall upon request of the Attorney General and after each party has been given notice and the opportunity to be heard make a finding whether such deprivation was or is pursuant to a pattern or practice. If the court finds such pattern or practice, any person of such race or color resident within the affected area shall, for one year and thereafter until the court subsequently finds that such pattern or practice has ceased, be entitled, upon his application therefor, to an order declaring him qualified to vote, upon proof that at any election or elections (1) he is qualified under State law to vote, and (2) he has since such finding by the court been (a) deprived of or denied under color of law the opportunity to register to vote or otherwise to qualify to vote, or (b) found not qualified to vote by any person acting under color of law. Such order shall be effective as to any election held within the longest period for which such applicant could have been registered or otherwise qualified under State law at which the applicant's qualifications would under State law entitle him to vote.

Notwithstanding any inconsistent provision of State law or the action of any State officer or court, an applicant so declared qualified to vote shall be permitted to vote in any such election. The Attorney General shall cause to be transmitted certified copies of such order to the appropriate election officers. The refusal by any such officer with notice of such order to permit any person so declared qualified to vote to vote at an appropriate election shall constitute contempt of court.

An application for an order pursuant to this subsection shall be heard within ten days, and the execution of any order disposing of such application shall not be stayed if the effect of such stay would be to delay the effectiveness of the order beyond the date of any election at which the applicant would otherwise be enabled to vote.

The court may appoint one or more persons who are qualified voters in the judicial district, to be known as voting referees, who shall subscribe to the oath of office required by section 3331 of title 5, to serve for such period as the court shall determine,

to receive such applications and to take evidence and report to the court findings as to whether or not at any election or elections (1) any such applicant is qualified under State law to vote, and (2) he has since the finding by the court heretofore specified been (a) deprived of or denied under color of law the opportunity to register to vote or otherwise to qualify to vote, or (b) found not qualified to vote by any person acting under color of law. In a proceeding before a voting referee, the applicant shall be heard ex parte at such times and places as the court shall direct. His statement under oath shall be prima facie evidence as to his age, residence, and his prior efforts to register or otherwise qualify to vote. Where proof of literacy or an understanding of other subjects is required by valid provisions of State law, the answer of the applicant, if written, shall be included in such report to the court; if oral, it shall be taken down stenographically and a transcription included in such report to the court.

Upon receipt of such report, the court shall cause the Attorney General to transmit a copy thereof to the State attorney general and to each party to such proceeding together with an order to show cause within ten days, or such shorter time as the court may fix, why an order of the court should not be entered in accordance with such report. Upon the expiration of such period, such order shall be entered unless prior to that time there has been filed with the court and served upon all parties a statement of exceptions to such report. Exceptions as to matters of fact shall be considered only if supported by a duly verified copy of a public record or by affidavit of persons having personal knowledge of such facts or by statements or matters contained in such report; those relating to matters of law shall be supported by an appropriate memorandum of law. The issues of fact and law raised by such exceptions shall be determined by the court or, if the due and speedy administration of justice requires, they may be referred to the voting referee to determine in accordance with procedures prescribed by the court. A hearing as to an issue of fact shall be held only in the event that the proof in support of the exception disclose the existence of a genuine issue of material fact. The applicant's literacy and understanding of other subjects shall be determined solely on the basis of answers included in the report of the voting referee.

The court, or at its direction the voting referee, shall issue to each applicant so declared qualified a certificate identifying the holder thereof as a person so qualified.

Any voting referee appointed by the court pursuant to this subsection shall to the extent not inconsistent herewith have all the powers conferred upon a master by rule 53(c) of the Federal Rules of Civil Procedure. The compensation to be allowed to any persons appointed by the court pursuant to this subsection shall be fixed by the court and shall be payable by the United States.

Applications pursuant to this subsection shall be determined expeditiously. In the case of any application filed twenty or more days prior to an election which is undetermined by the time of such election, the court shall issue an order authorizing the applicant to vote provisionally: *Provided, however,* That such applicant shall be qualified to vote under State law. In the case of an application filed within twenty days prior to an election, the court, in its discretion, may make such an order. In either case the order shall make appropriate provision for the impounding of the applicant's ballot pending determination of the application. The court may take any other action, and may authorize such referee or such other person as it may designate to take any other action, appropriate or necessary to carry out the provisions of this subsection and to enforce its decrees. This subsection shall in no way be construed as a limitation upon the existing powers of the court.

When used in the subsection, the word "vote" includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election; the words "affected area" shall mean any subdivision of the State in which the laws of the State relating to voting are or have been to any extent administered by a person found in the proceeding to have violated subsection (a); and the words "qualified under State law" shall mean qualified according to the laws, customs, or usages of the State, and shall not, in any event, imply qualifications more stringent than those used by the persons found in the proceeding to have violated subsection (a) in qualifying persons other than those of the race or color against which the pattern or practice of discrimination was found to exist.

### (f) Contempt; assignment of counsel; witnesses

Any person cited for an alleged contempt under this Act shall be allowed to make his full defense by counsel learned in the law; and the court before which he is cited or tried, or some judge thereof, shall immediately, upon his request, assign to him such counsel, not exceeding two, as he may desire, who shall have free access to him at all reasonable hours. He shall be allowed, in his defense to make any proof that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial or hearing, as is usually granted to compel witnesses to appear on behalf of the prosecution. If such person shall be found by the court to be financially unable to provide for such counsel, it shall be the duty of the court to provide such counsel.

**(g) Three-judge district court: hearing, determination, expedition of action, review by Supreme Court; single-judge district court: hearing, determination, expedition of action**

In any proceeding instituted by the United States in any district court of the United States under this section in which the Attorney General requests a finding of a pattern or practice of discrimination pursuant to subsection (e) of this section the Attorney General, at the time he files the complaint, or any defendant in the proceeding, within twenty days after service upon him of the complaint, may file with the clerk of such court a request that a court of three judges be convened to hear and determine the entire case. A copy of the request for a three-judge court shall be immediately furnished by such clerk to the chief judge of the circuit (or in his absence, the presiding circuit judge of the circuit) in which the case is pending. Upon receipt of the copy of such request it shall be the duty of the chief judge of the circuit or the presiding circuit judge, as the case may be, to designate immediately three judges in such circuit, of whom at least one shall be a circuit judge and another of whom shall be a district judge of the court in which the proceeding was instituted, to hear and determine such case, and it shall be the duty of the judges so designated to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited. An appeal from the final judgment of such court will lie to the Supreme Court.

In any proceeding brought under subsection (c) of this section to enforce subsection (b) of this section, or in the event neither the Attorney General nor any defendant files a request for a three-judge court in any proceeding authorized by this subsection, it shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or, in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case.

It shall be the duty of the judge designated pursuant to this section to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited.

**52 U.S.C. §20501**
**Findings and Purpose**

**(a) Findings**

The Congress finds that-

(1) the right of citizens of the United States to vote is a fundamental right;

(2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

**(b) Purposes**

The purposes of this chapter are-

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

## 52 U.S.C. §20505
## Mail Registration

**(a) Form**

(1) Each State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission pursuant to section 20508(a)(2) of this title for the registration of voters in elections for Federal office.

(2) In addition to accepting and using the form described in paragraph (1), a State may develop and use a mail voter registration form that meets all of the criteria stated in section 20508(b) of this title for the registration of voters in elections for Federal office.

(3) A form described in paragraph (1) or (2) shall be accepted and used for notification of a registrant's change of address.

**(b) Availability of forms**

The chief State election official of a State shall make the forms described in subsection (a) available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs.

**(c) First-time voters**

(1) Subject to paragraph (2), a State may by law require a person to vote in person if-

(A) the person was registered to vote in a jurisdiction by mail; and

(B) the person has not previously voted in that jurisdiction.

(2) Paragraph (1) does not apply in the case of a person-

(A) who is entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act [52 U.S.C. 20301 et seq.];

(B) who is provided the right to vote otherwise than in person under section 20102(b)(2)(B)(ii) of this title; or

(C) who is entitled to vote otherwise than in person under any other Federal law.

ADD-11

**(d) Undelivered notices**

If a notice of the disposition of a mail voter registration application under section 20507(a)(2) of this title is sent by nonforwardable mail and is returned undelivered, the registrar may proceed in accordance with section 20507(d) of this title.

**52 U.S.C. §20506**
**Voter Registration Agencies**

## (a) Designation

(1) Each State shall designate agencies for the registration of voters in elections for Federal office.

(2) Each State shall designate as voter registration agencies-

(A) all offices in the State that provide public assistance; and

(B) all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities.

(3)(A) In addition to voter registration agencies designated under paragraph (2), each State shall designate other offices within the State as voter registration agencies.

(B) Voter registration agencies designated under subparagraph (A) may include-

(i) State or local government offices such as public libraries, public schools, offices of city and county clerks (including marriage license bureaus), fishing and hunting license bureaus, government revenue offices, unemployment compensation offices, and offices not described in paragraph (2)(B) that provide services to persons with disabilities; and

(ii) Federal and nongovernmental offices, with the agreement of such offices.

(4)(A) At each voter registration agency, the following services shall be made available:

(i) Distribution of mail voter registration application forms in accordance with paragraph (6).

(ii) Assistance to applicants in completing voter registration application forms, unless the applicant refuses such assistance.

(iii) Acceptance of completed voter registration application forms for transmittal to the appropriate State election official.

(B) If a voter registration agency designated under paragraph (2)(B) provides services to a person with a disability at the person's home, the agency shall provide the services described in subparagraph (A) at the person's home.

(5) A person who provides service described in paragraph (4) shall not-

(A) seek to influence an applicant's political preference or party registration;

(B) display any such political preference or party allegiance;

(C) make any statement to an applicant or take any action the purpose or effect of which is to discourage the applicant from registering to vote; or

(D) make any statement to an applicant or take any action the purpose or effect of which is to lead the applicant to believe that a decision to register or not to register has any bearing on the availability of services or benefits.

(6) A voter registration agency that is an office that provides service or assistance in addition to conducting voter registration shall-

(A) distribute with each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance-

(i) the mail voter registration application form described in section 20508(a)(2) of this title, including a statement that-

(I) specifies each eligibility requirement (including citizenship);

(II) contains an attestation that the applicant meets each such requirement; and

(III) requires the signature of the applicant, under penalty of perjury; or

(ii) the office's own form if it is equivalent to the form described in section 20508(a)(2) of this title,

unless the applicant, in writing, declines to register to vote;

(B) provide a form that includes-

(i) the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";

(ii) if the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

(iii) boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.";

(iv) the statement, "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private."; and

(v) the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _____.", the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed; and

(C) provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.

(7) No information relating to a declination to register to vote in connection with an application made at an office described in paragraph (6) may be used for any purpose other than voter registration.

**(b) Federal Government and private sector cooperation**

All departments, agencies, and other entities of the executive branch of the Federal Government shall, to the greatest extent practicable, cooperate with the States in carrying out subsection (a), and all nongovernmental entities are encouraged to do so.

ADD-15

**(c) Armed Forces recruitment offices**

(1) Each State and the Secretary of Defense shall jointly develop and implement procedures for persons to apply to register to vote at recruitment offices of the Armed Forces of the United States.

(2) A recruitment office of the Armed Forces of the United States shall be considered to be a voter registration agency designated under subsection (a)(2) for all purposes of this chapter.

**(d) Transmittal deadline**

(1) Subject to paragraph (2), a completed registration application accepted at a voter registration agency shall be transmitted to the appropriate State election official not later than 10 days after the date of acceptance.

(2) If a registration application is accepted within 5 days before the last day for registration to vote in an election, the application shall be transmitted to the appropriate State election official not later than 5 days after the date of acceptance.

**52 U.S.C. §20507**
**Requirements With Respect to Administration of Voter Registration**

**(a) In general**

In the administration of voter registration for elections for Federal office, each State shall-

(1) ensure that any eligible applicant is registered to vote in an election-

(A) in the case of registration with a motor vehicle application under section 20504 of this title, if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(B) in the case of registration by mail under section 20505 of this title, if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(C) in the case of registration at a voter registration agency, if the valid voter registration form of the applicant is accepted at the voter registration agency not later than the lesser of 30 days, or the period provided by State law, before the date of the election; and

(D) in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(2) require the appropriate State election official to send notice to each applicant of the disposition of the application;

(3) provide that the name of a registrant may not be removed from the official list of eligible voters except-

(A) at the request of the registrant;

(B) as provided by State law, by reason of criminal conviction or mental incapacity; or

(C) as provided under paragraph (4);

(4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of-

(A) the death of the registrant; or

(B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d);

(5) inform applicants under sections 20504, 20505, and 20506 of this title of-

(A) voter eligibility requirements; and

(B) penalties provided by law for submission of a false voter registration application; and

(6) ensure that the identity of the voter registration agency through which any particular voter is registered is not disclosed to the public.

## (b) Confirmation of voter registration

Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office-

(1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.) [now 52 U.S.C. 10301 et seq.]; and

(2) shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote, except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual-

(A) has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

(B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

**(c) Voter removal programs**

(1) A State may meet the requirement of subsection (a)(4) by establishing a program under which-

(A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and

(B) if it appears from information provided by the Postal Service that-

(i) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

(ii) the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

(2)(A) A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

(B) Subparagraph (A) shall not be construed to preclude-

(i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); or

(ii) correction of registration records pursuant to this chapter.

**(d) Removal of names from voting rolls**

(1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant-

(A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

(B)(i) has failed to respond to a notice described in paragraph (2); and

ADD-19

(ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

(2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

(A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

(B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

(3) A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection.

## (e) Procedure for voting following failure to return card

(1) A registrant who has moved from an address in the area covered by a polling place to an address in the same area shall, notwithstanding failure to notify the registrar of the change of address prior to the date of an election, be permitted to vote at that polling place upon oral or written affirmation by the registrant of the change of address before an election official at that polling place.

(2)(A) A registrant who has moved from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district and who has failed to notify the registrar of the change of address prior to the date of an election, at the option of the registrant-

(i) shall be permitted to correct the voting records and vote at the registrant's former polling place, upon oral or written affirmation by the registrant of the new address before an election official at that polling place; or

(ii)(I) shall be permitted to correct the voting records and vote at a central location within the same registrar's jurisdiction designated by the registrar where a list of eligible voters is maintained, upon written affirmation by the registrant of the new address on a standard form provided by the registrar at the central location; or

(II) shall be permitted to correct the voting records for purposes of voting in future elections at the appropriate polling place for the current address and, if permitted by State law, shall be permitted to vote in the present election, upon confirmation by the registrant of the new address by such means as are required by law.

(B) If State law permits the registrant to vote in the current election upon oral or written affirmation by the registrant of the new address at a polling place described in subparagraph (A)(i) or (A)(ii)(II), voting at the other locations described in subparagraph (A) need not be provided as options.

(3) If the registration records indicate that a registrant has moved from an address in the area covered by a polling place, the registrant shall, upon oral or written affirmation by the registrant before an election official at that polling place that the registrant continues to reside at the address previously made known to the registrar, be permitted to vote at that polling place.

**(f) Change of voting address within a jurisdiction**

In the case of a change of address, for voting purposes, of a registrant to another address within the same registrar's jurisdiction, the registrar shall correct the voting registration list accordingly, and the registrant's name may not be removed from the official list of eligible voters by reason of such a change of address except as provided in subsection (d).

**(g) Conviction in Federal court**

(1) On the conviction of a person of a felony in a district court of the United States, the United States attorney shall give written notice of the conviction to the chief State election official designated under section 20509 of this title of the State of the person's residence.

(2) A notice given pursuant to paragraph (1) shall include-

(A) the name of the offender;

(B) the offender's age and residence address;

(C) the date of entry of the judgment;

(D) a description of the offenses of which the offender was convicted; and

(E) the sentence imposed by the court.

(3) On request of the chief State election official of a State or other State official with responsibility for determining the effect that a conviction may have on an offender's qualification to vote, the United States attorney shall provide such additional information as the United States attorney may have concerning the offender and the offense of which the offender was convicted.

(4) If a conviction of which notice was given pursuant to paragraph (1) is overturned, the United States attorney shall give the official to whom the notice was given written notice of the vacation of the judgment.

(5) The chief State election official shall notify the voter registration officials of the local jurisdiction in which an offender resides of the information received under this subsection.

**(h) Omitted**

**(i) Public disclosure of voter registration activities**

(1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

**(j) "Registrar's jurisdiction" defined**

For the purposes of this section, the term "registrar's jurisdiction" means-

(1) an incorporated city, town, borough, or other form of municipality;

(2) if voter registration is maintained by a county, parish, or other unit of government that governs a larger geographic area than a municipality, the geographic area governed by that unit of government; or

(3) if voter registration is maintained on a consolidated basis for more than one municipality or other unit of government by an office that performs all of the functions of a voting registrar, the geographic area of the consolidated municipalities or other geographic units.

**52 U.S.C. §20508**
**Federal Coordination and Regulations**

## (a) In general

The Election Assistance Commission-

(1) in consultation with the chief election officers of the States, shall prescribe such regulations as are necessary to carry out paragraphs (2) and (3);

(2) in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office;

(3) not later than June 30 of each odd-numbered year, shall submit to the Congress a report assessing the impact of this chapter on the administration of elections for Federal office during the preceding 2-year period and including recommendations for improvements in Federal and State procedures, forms, and other matters affected by this chapter; and

(4) shall provide information to the States with respect to the responsibilities of the States under this chapter.

## (b) Contents of mail voter registration form

The mail voter registration form developed under subsection (a)(2)-

(1) may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(2) shall include a statement that-

(A) specifies each eligibility requirement (including citizenship);

(B) contains an attestation that the applicant meets each such requirement; and

(C) requires the signature of the applicant, under penalty of perjury;

(3) may not include any requirement for notarization or other formal authentication; and

(4) shall include, in print that is identical to that used in the attestation portion of the application-

(i) the information required in section 20507(a)(5)(A) and (B) of this title;

(ii) a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

(iii) a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

## A.R.S. §16-121.01
## Requirements for Proper Registration; Violation; Classification

**A.** A person is presumed to be properly registered to vote on completion of a registration form as prescribed by section 16-152 that contains at least the name, the residence address or the location, proof of location of residence as prescribed by section 16-123, the date and place of birth and the signature or other statement of the registrant as prescribed by section 16-152, subsection A, paragraph 20 and a checkmark or other appropriate mark in the "yes" box next to the question regarding citizenship. Any application for registration, including an application on a form prescribed by the United States election assistance commission, must contain a checkmark or other appropriate mark in the "yes" box next to the question regarding citizenship as a condition of being properly registered to vote as either a voter who is eligible to vote a full ballot or a voter who is eligible to vote only with a ballot for federal offices. The completed registration form must also contain the person's Arizona driver license number, the nonoperating identification license number issued pursuant to section 28-3165, the last four digits of the person's social security number or the person's affirmation that if an Arizona driver license number, a nonoperating identification license number or the last four digits of the person's social security number is not provided, the person does not possess a valid Arizona driver or nonoperating identification license or a social security number and the person is hereby requesting that a unique identifying number be assigned by the secretary of state pursuant to section 16-152, subsection A, paragraph 12, subdivision (c). Any application that does not include all of the information required to be on the registration form pursuant to section 16-152 and any application that is not signed is incomplete, and the county recorder shall notify the applicant pursuant to section 16-134, subsection B and shall not register the voter until all of the information is returned.

**B.** The presumption in subsection A of this section may be rebutted only by clear and convincing evidence of any of the following:

1. That the registrant is not the person whose name appears on the register.

2. That the registrant has not resided in this state for twenty-nine days next preceding the election or other event for which the registrant's status as properly registered is in question.

3. That the registrant is not properly registered at an address permitted by section 16-121.

4. That the registrant is not a qualified registrant under section 16-101.

**C.** Except for a form produced by the United States election assistance commission, any application for registration shall be accompanied by satisfactory evidence of citizenship as prescribed in section 16-166, subsection F, and the county recorder or other officer in charge of elections shall reject any application for registration that is not accompanied by satisfactory evidence of citizenship. A county recorder or other officer in charge of elections who knowingly fails to reject an application for registration as prescribed by this subsection is guilty of a class 6 felony. The county recorder or other officer in charge of elections shall send a notice to the applicant as prescribed in section 16-134, subsection B.

**D.** Within ten days after receiving an application for registration on a form produced by the United States election assistance commission that is not accompanied by satisfactory evidence of citizenship, the county recorder or other officer in charge of elections shall use all available resources to verify the citizenship status of the applicant and at a minimum shall compare the information available on the application for registration with the following, provided the county has access:

1. The department of transportation databases of Arizona driver licenses or nonoperating identification licenses.

2. The social security administration databases.

3. The United States citizenship and immigration services systematic alien verification for entitlements program, if practicable.

4. A national association for public health statistics and information systems electronic verification of vital events system.

5. Any other state, city, town, county or federal database and any other database relating to voter registration to which the county recorder or officer in charge of elections has access, including an electronic registration information center database.

**E.** After complying with subsection D of this section, if the county recorder or other officer in charge of elections matches the applicant with information that verifies the applicant is a United States citizen, is otherwise qualified as prescribed by section 16-101 and has met the other requirements of this section, the applicant shall be properly registered. If the county recorder or other officer in charge of elections matches the applicant with information that the applicant is not a United States citizen, the county recorder or other officer in charge of elections shall reject the application, notify the applicant that the application was rejected because the applicant is not a United States citizen and forward the application to the county attorney and attorney general for

investigation. If the county recorder or other officer in charge of elections is unable to match the applicant with appropriate citizenship information, the county recorder or other officer in charge of elections shall notify the applicant that the county recorder or other officer in charge of elections could not verify that the applicant is a United States citizen and that the applicant will not be qualified to vote in a presidential election or by mail with an early ballot in any election until satisfactory evidence of citizenship is provided.

**F.** The county recorder or other officer in charge of elections shall record the efforts made to verify an applicant's citizenship status as prescribed in subsections D and E of this section. If the county recorder or other officer in charge of elections fails to attempt to verify the citizenship status of an applicant pursuant to subsections D and E of this section and the county recorder or other officer in charge of elections knowingly causes the applicant to be registered and it is later determined that the applicant was not a United States citizen at the time of registration, the county recorder or other officer in charge of elections is guilty of a class 6 felony.

## A.R.S. §16-123
### Proof of Location of Residence

Except for persons who register pursuant to section 16-103, a person who registers to vote shall provide an identifying document that establishes proof of location of residence. Any of the identifying documents prescribed in section 16-579, subsection A, paragraph 1 constitutes satisfactory proof of location of residence. Compliance with this section does not satisfy the residency requirements in section 16-101 or 16-593 and only constitutes confirmation of the address on the applicant's application at the time of registration. A valid and unexpired Arizona driver license or nonoperating identification number that is properly verified by the county recorder satisfies the requirements of this section.

### A.R.S. §16-127
### Federal Only Voters; Early Ballot Eligibility; Exemption

**A.** Notwithstanding any other law:

1. A person who has registered to vote and who has not provided satisfactory evidence of citizenship as prescribed by section 16-166 is not eligible to vote in presidential elections.

2. A person who has not provided satisfactory evidence of citizenship pursuant to section 16-166 and who is eligible to vote only for federal offices is not eligible to receive an early ballot by mail.

**B.** This section does not apply to an absent uniformed services voter or overseas voter as defined in the uniformed and overseas citizens absentee voting act (P.L. 99-410; 100 Stat. 924; 52 United States Code section 20310), as amended by the Ronald W. Reagan national defense authorization act for fiscal year 2005 (P.L. 108-375).

## A.R.S. §16-165
## Causes for Cancellation; Report

**A.** The county recorder shall cancel a registration:

1. At the request of the person registered.

2. When the county recorder is informed and confirms that the person registered is dead.

3. If the person has been adjudicated an incapacitated person as defined in section 14-5101.

4. When the person registered has been convicted of a felony, and the judgment of conviction has not been reversed or set aside. The county recorder shall cancel the registration on receipt of notice of a felony conviction from the court or from the secretary of state or when reported by the elector on a signed juror questionnaire that is completed pursuant to section 21-314.

5. On production of a certified copy of a judgment directing a cancellation to be made.
6. Promptly after the election if the person registered has applied for a ballot pursuant to section 16-126.

7. When a person has been on the inactive voter list and has not voted during the time periods prescribed in section 16-166, subsection C.

8. When the county recorder receives written information from the person registered that the person has a change of residence within the county and the person does not complete and return a new registration form within twenty-nine days after the county recorder mails notification of the need to complete and return a new registration form with current information.

9. When the county recorder receives written information from the person registered that the person has a change of address outside the county, including when the county recorder either:

(a) Receives a form from the person pursuant to subsection E of this section on which the person has confirmed that the person is not a resident of this state.

(b) Receives a summary report from the jury commissioner or jury manager pursuant to section 21-314 indicating that the person has stated that the person is not a resident

of the county. Before the county recorder cancels a registration pursuant to this subdivision, the county recorder shall send the person notice by forwardable mail and a postage prepaid preaddressed return form requesting the person confirm by signing under penalty of perjury that the person is a resident of the county and is not knowingly registered to vote in another county or another state. The notice shall inform the person that failure to return the form within thirty-five days will result in the person's registration being canceled. If the person fails to return the notice within thirty-five days the county recorder shall cancel the person's registration.

10. When the county recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen, including when the county recorder receives a summary report from the jury commissioner or jury manager pursuant to section 21-314 indicating that a person who is registered to vote has stated that the person is not a United States citizen. Before the county recorder cancels a registration pursuant to this paragraph, the county recorder shall send the person notice by forwardable mail that the person's registration will be canceled in thirty-five days unless the person provides satisfactory evidence of United States citizenship pursuant to section 16-166. The notice shall include a list of documents the person may provide and a postage prepaid preaddressed return envelope. If the person registered does not provide satisfactory evidence within thirty-five days, the county recorder shall cancel the registration and notify the county attorney and attorney general for possible investigation.

11. When the county recorder receives confirmation from another county recorder that the person registered has registered to vote in that other county.

**B.** If the county recorder receives credible information that a person has registered to vote in a different county, the county recorder shall confirm the person's voter registration with that other county and, on confirmation, shall cancel the person's registration pursuant to subsection A, paragraph 11 of this section.

**C.** If the county recorder cancels a registration pursuant to subsection A, paragraph 8 of this section, the county recorder shall send the person notice that the registration has been canceled and a registration form with the information described in section 16-131, subsection C attached to the form.

**D.** When proceedings in the superior court or the United States district court result in a person being declared incapable of taking care of himself and managing his property, and for whom a guardian of the person and estate is appointed, result in such person being committed as an insane person or result in a person being convicted of a felony, the clerk of the superior court in the county in which those proceedings occurred shall file with the secretary of state an official notice of that fact. The secretary of state shall

notify the appropriate county recorder and the recorder shall cancel the name of the person on the register. Such a notice shall name the person covered, shall give the person's date and place of birth if available, the person's social security number, if available, the person's usual place of residence, the person's address and the date of the notice, and shall be filed with the recorder of the county where the person last resided.

**E.** Each month the department of health services shall transmit to the secretary of state without charge a record of the death of every resident of the state reported to the department within the preceding month. This record shall include only the name of the decedent, the decedent's date of birth, the decedent's date of death, the decedent's social security number, if available, the decedent's usual legal residence at the time of death and, if available, the decedent's father's name or mother's maiden name. The secretary of state shall use the record for the sole purpose of canceling the names of deceased persons from the statewide voter registration database. In addition, the department of health services shall annually provide to the secretary of state from the statewide electronic death registration system without charge a record of all deaths of residents of this state that are reported to the department of health services. The records transmitted by the department of health services shall include only the name of the decedent, the decedent's date of birth, the decedent's social security number, if available, the decedent's usual legal residence at the time of death and, if available, the decedent's father's name or mother's maiden name. The secretary of state shall compare the records of deaths with the statewide voter registration database. Public access to the records is prohibited. Use of information from the records for purposes other than those required by this section is prohibited. The name of each deceased person shall promptly be canceled from the statewide voter registration database and the secretary of state shall notify the appropriate county recorder and the recorder shall cancel the name of the person from the register.

**F.** Each month the department of transportation shall furnish to the secretary of state without charge a list of persons who the department has been notified have been issued a driver license or the equivalent of an Arizona nonoperating identification license in another state. Within ten days after receiving the list of persons from the department of transportation, the secretary of state shall provide to the appropriate county recorder a list of registered voters in that county who have been issued a driver license or the equivalent of an Arizona nonoperating identification license in another state. The county recorder shall promptly send notice by forwardable mail to each person who has obtained a driver license or the equivalent of an Arizona nonoperating identification license in another state and a postage prepaid preaddressed return form requesting the person confirm by signing under penalty of perjury that the person is a resident of this state and is not knowingly registered to vote in another state or confirm that the person is not a resident of this state. The notice shall inform the person that failure to return

the form within ninety days will result in the person's registration being placed in inactive status. If the person returns the form within ninety days confirming that the person is a resident of this state, the county recorder shall maintain the registration in active status. If the person fails to return the form within ninety days, the county recorder shall place the person's registration in inactive status.

**G.** Each month the secretary of state shall compare the statewide voter registration database to the driver license database maintained by the department of transportation. The secretary of state shall notify the appropriate county recorder if a person who is registered to vote in that county has changed the person's residence address or is not a United States citizen.

**H.** To the extent practicable, each month the county recorder shall compare the county's voter registration database to the social security administration database.

**I.** To the extent practicable, each month the county recorder shall compare persons who are registered to vote in that county and who the county recorder has reason to believe are not United States citizens and persons who are registered to vote without satisfactory evidence of citizenship as prescribed by section 16-166 with the systematic alien verification for entitlements program maintained by the United States citizenship and immigration services to verify the citizenship status of the persons registered.

**J.** For persons who are registered to vote without satisfactory evidence of citizenship as prescribed in section 16-166, the county recorder shall compare the electronic verification of vital events system maintained by a national association for public health statistics and information systems, if accessible, with the information on the person's voter registration file.

**K.** To the extent practicable, the county recorder shall review relevant city, town, county, state and federal databases to which the county recorder has access to confirm information obtained that requires cancellation of registrations pursuant to this section.

**L.** After canceling a registration pursuant to this section, the county recorder shall send a notice by forwardable mail informing the person that the person's registration has been canceled, the reason for cancellation, the qualifications of electors pursuant to section 16-101 and instructions on registering to vote if the person is qualified.

**M.** The secretary of state shall report the following information to the legislature at the end of each quarter:
1. The number of deaths reported to the secretary of state by the department of health services, the number of voter registration cancellation notices issued by the secretary of

state to the county recorders as a result of those reports and the number of registrations canceled as a result of those notices.

2. The number of persons reported to the secretary of state who have been issued a driver license or the equivalent of an Arizona nonoperating identification license in another state, the number of notices sent pursuant to subsection E of this section and the number of voter registrations that have been placed in inactive status and the number of voter registrations that have been canceled as a result of those notices.

3. The number of persons who have stated on a jury questionnaire that the person is not a United States citizen, the number of notices sent pursuant to subsection A, paragraph 10 of this section and the number of registrations that have been canceled as a result of those notices.

4. The number of persons who have stated on a jury questionnaire that the person is not a resident of the county, the number of notices sent pursuant to subsection A, paragraph 9, subdivision (b) of this section and the number of registrations that have been canceled as a result of those notices.

5. The number of registrations on the inactive voter list that have been canceled pursuant to subsection A, paragraph 7 of this section.

## A.R.S. §16-166
## Verification of Registration

**A.** Except for the mailing of sample ballots, a county recorder who mails an item to any elector shall send the mailing by nonforwardable first class mail marked with the statement required by the postmaster to receive an address correction notification. If the item is returned undelivered, the county recorder shall send a follow-up notice to that elector within three weeks of receipt of the returned notice. The county recorder shall send the follow-up notice to the address that appears in the general county register or to the forwarding address provided by the United States postal service. The follow-up notice shall include an appropriate internet address for revising voter registration information or a registration form and the information prescribed by section 16-131, subsection C and shall state that if the elector does not complete and return a new registration form with current information to the county recorder or make changes to the elector's voter registration information that is maintained online within thirty-five days, the elector's registration status shall be changed from active to inactive.

**B.** If the elector provides the county recorder with a new registration form or otherwise revises the elector's information, the county recorder shall change the general register to reflect the changes indicated on the new registration. If the elector indicates a new residence address outside that county, the county recorder shall forward the voter registration form or revised information to the county recorder of the county in which the elector's address is located. If the elector provides a new residence address that is located outside this state, the county recorder shall cancel the elector's registration.

**C.** The county recorder shall maintain on the inactive voter list the names of electors who have been removed from the general register pursuant to subsection A or E of this section for a period of four years or through the date of the second general election for federal office following the date of the notice from the county recorder that is sent pursuant to subsection E of this section.

**D.** On notice that a government agency has changed the name of any street, route number, post office box number or other address designation, the county recorder shall revise the registration records and shall send a new verification of registration notice to the electors whose records were changed.

**E.** The county recorder on or before May 1 of each year preceding a state primary and general election or more frequently as the recorder deems necessary may use the change of address information supplied by the postal service through its licensees and the information provided by an electronic voter registration information center to identify registrants whose addresses may have changed. If it appears from information provided

by the postal service or an electronic voter registration information center that a registrant has moved to a different residence address, the county recorder shall send the registrant a notice of the change by forwardable mail and a postage prepaid preaddressed return form or an appropriate internet address for revising voter registration information by which the registrant may verify or correct the registration information. If the registrant fails to revise the information or return the form postmarked not later than thirty-five days after the mailing of the notice, the elector's registration status shall be changed from active to inactive. If the notice sent by the recorder is not returned, the registrant may be required to provide affirmation or confirmation of the registrant's address in order to vote. If the registrant does not vote in an election during the period after the date of the notice from the recorder through the date of the second general election for federal office following the date of that notice, the registrant's name shall be removed from the list of inactive voters. If the registrant has changed residence to a new county, the county recorder shall provide information on how the registrant can continue to be eligible to vote.

**F.** The county recorder shall reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship. Satisfactory evidence of citizenship shall include any of the following:

1. The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.

2. A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.

3. A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.

4. A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.

5. Other documents or methods of proof that are established pursuant to the immigration reform and control act of 1986.

6. The applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number.

**G.** Notwithstanding subsection F of this section, any person who is registered in this state on the effective date of this amendment to this section is deemed to have provided satisfactory evidence of citizenship and shall not be required to resubmit evidence of citizenship unless the person is changing voter registration from one county to another.

**H.** For the purposes of this section, proof of voter registration from another state or county is not satisfactory evidence of citizenship.

**I.** A person who modifies voter registration records with a new residence ballot shall not be required to submit evidence of citizenship. After citizenship has been demonstrated to the county recorder, the person is not required to resubmit satisfactory evidence of citizenship in that county.

**J.** After a person has submitted satisfactory evidence of citizenship, the county recorder shall indicate this information in the person's permanent voter file. After two years the county recorder may destroy all documents that were submitted as evidence of citizenship.

## A.R.S. §12-1841
## Parties; Notice of Claim of Unconstitutionality

**A.** When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding. In any proceeding that involves the validity of a municipal ordinance or franchise, such municipality shall be made a party and shall be entitled to be heard. In any proceeding in which a state statute, ordinance, franchise or rule is alleged to be unconstitutional, the attorney general and the speaker of the house of representatives and the president of the senate shall be served with a copy of the pleading, motion or document containing the allegation at the same time the other parties in the action are served and shall be entitled to be heard.

**B.** If a pleading, motion or document containing the allegation is served on the attorney general and the speaker of the house of representatives and the president of the senate pursuant to subsection A, a notice of claim of unconstitutionality shall be attached to the pleading, motion or document as the cover page and shall state the following information:

1. The name, address and telephone number of the attorney for the party alleging that a state law is unconstitutional or the name, address and telephone number of the party if the party is not represented by an attorney.

2. The case name, court name, caption and case number of the proceeding.

3. A brief statement of the basis for the claim of unconstitutionality.

4. A brief description of the proceeding, with copies of any court orders in the proceeding if the claim of unconstitutionality is asserted in a pleading, motion or document other than the pleading, motion or document that initiated the proceeding.

5. The date, time, location, judge and subject of the next hearing in the proceeding, if any.

**C.** If the attorney general or the speaker of the house of representatives and the president of the senate are not served in a timely manner with notice pursuant to subsection A, on motion by the attorney general, the speaker of the house of representatives or the president of the senate the court shall vacate any finding of unconstitutionality and shall give the attorney general, the speaker of the house of representatives or the president of the senate a reasonable opportunity to prepare and be heard.

**D.** This section shall not be construed to compel the attorney general, the speaker of the house of representatives or the president of the senate to intervene as a party in any proceeding or to permit them to be named as defendants in a proceeding.  The attorney general, the speaker of the house of representatives or the president of the senate, in the party's discretion, may intervene as a party, may file briefs in the matter or may choose not to participate in a proceeding that is subject to the notice requirements of this section.