**Nos. 24-3188, 24-3559 & 24-4029**

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

MI FAMILIA VOTA, et al.,

*Plaintiffs-Appellees*,

vs.

ADRIAN FONTES, et al.,

*Defendants-Appellees*,

and

REPUBLICAN NATIONAL COMMITTEE, et al.,

*Intervenor-Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Arizona
Hon. Susan R. Bolton
Case No. 2:22-cv-00509-SRB (Consolidated)

---

APPELLANTS RNC, WARREN PETERSEN, AND BEN TOMA
EXCERPTS OF RECORD VOLUME 1 OF 7

---

Kory Langhofer
Thomas Basile
STATECRAFT PLLC
649 North Fourth Ave., First Floor
Phoenix, Arizona 85003
(602) 382-4078
kory@statecraftlaw.com
tom@statecraftlaw.com

*Counsel for Appellants Republican National Committee, Warren Petersen, and Ben Toma*

July 29, 2024

Tyler R. Green
Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tyler@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Appellant Republican National Committee*

1
2
3
4
5                    **IN THE UNITED STATES DISTRICT COURT**
6                       **FOR THE DISTRICT OF ARIZONA**
7

8    Mi Familia Vota, et al.,                   No. CV-22-00509-PHX-SRB
9                    Plaintiffs,                **FINAL JUDGMENT**
10   v.
11   Adrian Fontes, in his official capacity as
     Arizona Secretary of State, et al.,
12
13                   Defendants.
     _____
14
     **AND CONSOLIDATED CASES**
15

16         This case arose out of eight consolidated lawsuits challenging various provisions of

17   H.B. 2492 and H.B. 2243, enacted in 2022 ("Challenged Laws").  *See Mi Familia Vota v.*

18   *Fontes*, No. 2:22-cv-00509-SRB (D. Ariz. Mar. 31, 2022); *Living United for Change in*

19   *Ariz. v. Fontes*, No. 2:22-cv-00519-SRB (D. Ariz. Mar. 31, 2022); *United States v. Arizona*,

20   No. 2:22-cv-01124-SRB (D. Ariz. July 5, 2022); *Poder Latinx v. Fontes*, No. 2:22-cv-

21   1003-MTL (D. Ariz. June 9, 2022); *Democratic Nat'l Comm. v. Fontes*, No. 2:22-cv-

22   01369-SRB (D. Ariz. Aug. 15, 2022); *Ariz. Asian Am. Native Hawaiian & Pac. Islander*

23   *for Equity Coal. v. Fontes*, No. 2:22-cv-01381-SRB (D. Ariz. Aug. 16, 2022); *Promise*

24   *Ariz. v. Fontes*, No. 2:22-cv-01602-SRB (D. Ariz. Sept. 20, 2022); *Tohono O'odham*

25   *Nation v. Mayes*, No. 2:22-cv-01901-SRB (D. Ariz. Nov. 7, 2022).

26         Defendants in this litigation are the State of Arizona, Adrian Fontes, in his official

27   capacity as Arizona Secretary of State, Attorney General Kris Mayes, in her official

28   capacity, the county recorders for each county in Arizona, Intervenor-Defendant

1  Republican National Committee, and Intervenor-Defendants House Speaker Ben Toma
2  and Senate President Warren Petersen.
3      On September 14, 2023, the Court entered a partial summary judgment order.  (Doc.
4  534.)  On February 29, 2024, after a bench trial, the Court issued findings of fact and
5  conclusions of law.  (Doc. 709.)  In accordance with those rulings, the Court hereby
6  **ORDERS, ADJUDGES, AND DECREES** as follows:
7      1.      **IT IS ORDERED AND DECLARED** that H.B. 2492's restrictions on
8  registration for presidential elections and voting by mail, *see* A.R.S. §§ 16-121.01(E), 16-
9  127(A), are preempted by Section 6 of the National Voter Registration Act, 52 U.S.C. §
10 20505. It is **FURTHER ORDERED** that Defendants, their officers, agents, servants,
11 employees, and attorneys, and anyone else in active concert or participation with them are
12 **PERMANENTLY ENJOINED** from enforcing such restrictions.
13     2.      **IT IS ORDERED AND DECLARED** that H.B. 2492's mandate to reject
14 any State Form without accompanying Documentary Proof of Citizenship ("DPOC"), *see*
15 A.R.S. § 16-121.01(C), may not be enforced given the LULAC Consent Decree.[1]  It is
16 **FURTHER ORDERED** that Defendants, their officers, agents, servants, employees, and
17 attorneys, and anyone else in active concert or participation with them are
18 **PERMANENTLY ENJOINED** from enforcing this mandate and that Arizona must abide
19 by the LULAC Consent Decree and register eligible State Form users without DPOC for
20 federal elections.
21     3.      **IT IS ORDERED AND DECLARED** that H.B. 2492's checkbox
22 requirement, *see* A.R.S. § 16-121.01(A), violates the Materiality Provision of the Civil
23 Rights Act, 52 U.S.C. § 10101(a)(2)(B), when enforced as to a person who provides DPOC
24 and is otherwise eligible to vote. It is **FURTHER ORDERED** that Defendants, their
25 officers, agents, servants, employees, and attorneys, and anyone else in active concert or
26 participation with them are **PERMANENTLY ENJOINED** from enforcing the checkbox
27 requirement when a person provides DPOC and is otherwise eligible to vote.
28

---

[1] *League of United Latin American Citizens of Arizona et al. v. Reagan et al.*, Case No. 2:17-cv-04102-DGC (D. Ariz.), Doc. 37 (6/18/18).

- 2 -

4.     **IT IS ORDERED AND DECLARED** that H.B. 2492's requirement that individuals who register to vote using the State Form must include their place of birth, *see* A.R.S. § 16-121.01(A), violates the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B).  It is **FURTHER ORDERED** that Defendants, their officers, agents, servants, employees, and attorneys, and anyone else in active concert or participation with them are **PERMANENTLY ENJOINED** from enforcing this requirement and may not reject State Form registrations that lack an individual's place of birth and must register an individual if that individual is found eligible to vote.

5.     **IT IS ORDERED AND DECLARED** that, with respect to H.B. 2492's proof of location of residence requirement, *see* A.R.S. § 16-123:

a.     A.R.S. § 16-123 references A.R.S. § 16-579(A)(1) for a list of documents that satisfy the documentary proof of location of residence requirement in A.R.S. § 16-123. The reference to § 16-579(A)(1) provides examples of documents, but is not an exhaustive list of the documents, that can be used to satisfy A.R.S. § 16-123.

b.     A.R.S. § 16-123 does not require tribal members or other Arizona residents to have a standard street address for their home to satisfy A.R.S. § 16-123.

c.     In addition to the documents listed in A.R.S. § 16-579(A)(1), the following documents satisfy the requirement in A.R.S. § 16-123:

o     A valid unexpired Arizona driver license or nonoperating ID ("AZ-issued ID"), regardless of whether the address on the AZ-issued ID matches the address on the ID-holder's voter registration form and even if the AZ-issued ID lists only a P.O. Box.

o     Any Tribal identification document, including but not limited to a census card, an identification card issued by a tribal government, or a tribal enrollment card, regardless of whether the Tribal identification document contains a photo, a physical address, a P.O. Box, or no address.

- 3 -

1                    o      Written confirmation signed by the registrant that they qualify

2            to register pursuant to A.R.S. § 16-121(B), regarding registration of persons

3            who do not reside at a fixed, permanent, or private structure.

4        6.     **IT IS ORDERED AND DECLARED** that H.B. 2492's requirement that

5 individuals registering to vote with the State Form must include documentary proof of

6 location of residence to register for federal elections, *see* A.R.S. § 16-121.01(A), violates

7 Sections 6 and 7 of the NVRA, 52 U.S.C. §§ 20505, 20506.  It is **FURTHER ORDERED**

8 that Defendants, their officers, agents, servants, employees, and attorneys, and anyone else

9 in active concert or participation with them are **PERMANENTLY ENJOINED** from

10 enforcing this requirement and may not reject State Form registrations that lack

11 documentary proof of location of residence but must register an otherwise eligible voter

12 registrant as a Federal-Only Voter.

13        7.     **IT IS ORDERED AND DECLARED** that H.B. 2243's provisions requiring

14 the systematic investigation and removal of registered voters within 90 days of a federal

15 election, *see* A.R.S. § 16-165(A)(10), violate Section 8(c) of the NVRA, 52 U.S.C. §

16 20507(c)(2)(A). It is **FURTHER ORDERED** that Defendants, their officers, agents,

17 servants, employees, and attorneys, and anyone else in active concert or participation with

18 them are **PERMANENTLY ENJOINED** from enforcing these requirements within the

19 90-day period prior to the date of an election for federal office.

20        8.     **IT IS ORDERED AND DECLARED** that H.B. 2243's requirement that

21 county recorders conduct a citizenship check using USCIS's SAVE system when they have

22 reason to believe a registered voter is not a U.S. citizen, *see* A.R.S. § 16-165(I), violates

23 the Different Standards, Practices, or Procedures Provision of the Civil Rights Act, 52

24 U.S.C. § 10101(a)(2)(A), and Section 8(b) of the NVRA, 52 U.S.C. § 20507(b). It is

25 **FURTHER ORDERED** that Defendants, their officers, agents, servants, employees, and

26 attorneys, and anyone else in active concert or participation with them are

27 **PERMANENTLY ENJOINED** from enforcing this requirement and may not conduct

28 citizenship checks using USCIS's SAVE system on registered voters whom county

recorders have reason to believe lack U.S. citizenship.

9.        **IT IS FURTHER ORDERED** that judgment is otherwise entered in favor of Defendants on all other claims addressed in the Court's September 14, 2023 partial summary judgment order (Doc. 534) and February 29, 2024 Amended Order (Doc. 709). The Court does not reach the plaintiffs' alternative claims against the Challenged Laws already declared unlawful in the Court's partial summary judgment order or plaintiffs' constitutional claims for those sections of the Challenged Laws ruled unlawful on statutory grounds. (*See* Doc. 600, Minute Entry for 10/24/23 Pretrial Conference (limiting claims to be presented at trial); Doc. 607, Supplement to the Joint Pretrial Order (identifying claims to be presented at trial); Doc. 608, Order Approving Joint Pretrial Order as Amended by Supplement; Doc. 709, Amended Order (findings of fact and conclusions of law) at 89 n.58 and at 108.)

10.        **IT IS FURTHER ORDERED** that this Court shall retain jurisdiction to enforce the terms of this Final Judgment and to award such other relief as may be appropriate.

Dated this 2nd day of May, 2024.

_Susan R. Bolton_
Susan R. Bolton
United States District Judge

1
2
3
4
5

6       **IN THE UNITED STATES DISTRICT COURT**

7       **FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| 8   Mi Familia Vota, et al., | No. CV-22-00509-PHX-SRB |
| 9        Plaintiffs, | **AMENDED ORDER**[*] |
| 10   v. | |
| 11 | |
| 12   Adrian Fontes, in his official capacity as Arizona Secretary of State, et al., | |
| 13        Defendants. | |
| 14 | |
| 15   **AND CONSOLIDATED CASES** | |

16

17       This case arises out of Plaintiffs' challenge to the Arizona Legislature's passage of

18 H.B. 2492 and H.B. 2243 (collectively, the "Voting Laws"). The Court conducted a 10-

19 day bench trial, which concluded on December 19, 2023. Having considered the evidence

20 and the arguments of counsel, the Court makes the following findings of fact and

21 conclusions of law.

22 **I.     FINDINGS OF FACT**[1]

23

---

24 [*] The Court's Amended Order amends the Court's conclusion at page 108, lines 27 to 28
that "Arizona may conduct SAVE checks on registered voters who have provided DPOC"
25 to instead read that "Arizona may conduct SAVE checks on registered voters who have
**not** provided DPOC."

26 [1] All docket citations refer to *Mi Familia Vota*, 2:22-cv-00509-SRB, unless otherwise
noted. Portions of the Court's findings of fact have been adopted from Plaintiffs' and
27 Defendants' respective Proposed Findings of Fact and Conclusions of Law, without
separate citation. (*See* Doc. 673, Pls.' Proposed Findings of Fact; Doc. 674, Pls.' Proposed
28 Conclusions of Law; Doc. 676, Defs.' Proposed Findings of Fact and Conclusions of Law.)
Citations to exhibits or documents refer to each exhibit's numbering system unless
otherwise indicated. Citations to the trial transcript are denoted by "Tr."

A.     **Arizona Election Law Background**

To be qualified to vote in Arizona, a person must be a United States citizen, a resident of Arizona, and at least eighteen years of age. Ariz. Const. art. VII, § 2.

1.     **Voter Demographics**

As of the 2020 Census, Arizona had a total population of 7,151,502. (Doc. 672, Plaintiffs' Revised Request for Judicial Notice ("Pls.' Judicial Notice") ¶ 1.)[2] The Census Bureau estimates that as of 2022, Arizona's population was 52.9% non-Hispanic White, 32.5% Hispanic or Latino, 5.5% Black or African American, 5.2% American Indian and Alaska Native, 3.9% Asian, and 0.3% Native Hawaiian and Other Pacific Islander. (*Id.* ¶ 20; Doc. 672-2, Ex. 20, at ECF-218.) The Census Bureau's 2017 to 2021 American Community Survey estimates that Arizona's U.S. citizen voting-age population is 5,000,102. (Pls.' Judicial Notice ¶ 3.) Approximately 436,816 of these individuals are naturalized U.S. citizens. (*Id.* ¶ 5.) There are approximately 1.2 million voting-age Latino (Hispanic) citizens, 17.5% of whom are naturalized citizens. (*Id.* ¶ 31; *see* Doc. 672-4, Ex. 31, at ECF-9, -19.) There are approximately 136,607 voting-age Asian-American, Native Hawaiian, and Pacific Islander ("AANHPI") citizens, 61.5% of whom are naturalized citizens. (*See* Doc. 672-1, Ex. 6, at ECF-37; Doc. 672-1, Ex. 7, at ECF-42.)

As of July 2023, there were 4,198,726 registered voters in Arizona. (Doc. 571-1, Pls.' Stipulated Facts ("Pls.' Stip.") No. 26.) This includes 19,439 active voters who have not provided documentary proof of citizenship ("DPOC") and are registered only for federal elections ("Federal-Only Voters"). (Ex. 336.) The remaining are "Full-Ballot Voters" who may vote in Arizona's State and federal elections. Non-Hispanic White citizens are more likely to be registered to vote than Hispanic citizens or citizens of color.[3] (*See* Doc. 672-1, Ex. 8, at ECF-44.) Arizona's 19,439 Federal-Only Voters represent less

---

[2] The Court takes notice of those facts cited from Plaintiffs' Request for Judicial Notice, as the Court finds that these facts are "not subject to reasonable dispute." Fed. R. Evid. 201(b). This includes data from the U.S. Census and the Census Bureau's American Community Survey ("ACS"). *See Evenwell v. Abbott*, 578 U.S. 54, 63–64 (2016) (referring to ACS data to determine compliance with one-person, one-vote rule).

[3] Specifically, the ACS estimates that 80.1% of non-Hispanic White citizens are registered to vote, as compared to 79.2% of Black citizens, 70.2% of Asian citizens, and 66.8% of Hispanic citizens. (*See* Doc. 672-1, Ex. 8, at ECF-44.)

ER - 0008

than half a percent of all the State's registered voters. Dr. Michael McDonald[4] estimated that the racial composition of the Federal-Only Voters is 53.3% non-Hispanic White and 46.7% minority individuals. (Ex. 338; *see* McDonald Tr. 1125:20–1129:22.) According to Dr. McDonald's estimates, approximately one-third of a of non-Hispanic White voters are Federal-Only Voters, while a little more than two-thirds of a percent of minority voters are Federal-Only Voters.[5]

### 2.    Proposition 200 and the LULAC Consent Decree

Arizona residents qualified to vote may register for elections using Arizona's state-created registration form ("State Form") or the form created by the United States Election Assistance Commission ("Federal Form"). *See Gonzales v. Arizona*, 677 F.3d 383, 395 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1 (2013); (*see generally* Ex. 27, ("State Form"); Ex. 28, ("Federal Form").) Public assistance agencies in Arizona typically use the State Form to register individuals to vote. (Petty Tr. 89:9–15.)

In 2004, Arizona voters approved Proposition 200, which required individuals registering to vote to provide one of the following forms of "satisfactory evidence of citizenship," also known as documentary proof of citizenship or "DPOC" ("DPOC Requirement"):

> 1. The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.

---

[4] Plaintiffs offered Dr. McDonald "as an [expert] on political science, voter registration, election registration and quantitative methodologies." (McDonald Tr. 1067:9–12.) The Court found Dr. McDonald credible and affords his analysis considerable weight unless otherwise noted.

[5] Dr. McDonald applied geocoding and surname matching to estimate the percent of voters by ballot-type, race, and ethnicity. (McDonald Tr. 1125:20–1129:22.) Using these estimates, minority voters comprise 28.8% of Arizona's active registered voters, or 1,199,610 voters. (*See* Ex. 338 (minority active registered voter population (0.231 + 0.017 + 0.018 + 0.022) multiplied by 4,165,313 voters).) Minority voters comprise 46.7% of Federal-Only Voters, or 9,078 voters. (*Id.* (minority Federal-Only Voter population (0.378 + 0.052 + 0.012 + 0.025) multiplied by 19,439 voters).) Only 0.76% of all minority voters in Arizona are registered as federal-only (9,078/1,199,610). And 0.35% of White voters are registered as federal-only. (*Id.* ((19,439 x 0.533) / (4,165,313 x 0.712)).)

ER - 0009

2. A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.

3. A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.

4. A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.

5. Other documents or methods of proof that are established pursuant to the immigration reform and control act of 1986.

6. The applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number.

Ariz. Rev. Stat. § 16-166(F). County recorders must document that a voter has submitted DPOC in the voter's "permanent voter file" and store the voter's DPOC for at least two years. § 16-166(J). In 2013, the United States Supreme Court held that the National Voter Registration Act ("NVRA") preempted the DPOC Requirement as applied to persons registering to vote with the Federal Form, requiring Arizona to register Federal Form users without DPOC as Federal-Only Voters. *ITCA*, 570 U.S. at 20. The Supreme Court confirmed, however, that Arizona's State Form "may require information the Federal Form does not" and may "be used to register voters in both state and federal elections." *Id.* at 12.

Following *ITCA*, Arizona continued to reject State Forms that were not accompanied by DPOC. In 2018, the Arizona Secretary of State entered into a consent decree that requires Arizona to treat Federal Form and State Form users the same when registering applicants[6] for federal elections ("LULAC Consent Decree"). (Ex. 24, ("LULAC Consent Decree").)[7] Specifically, the LULAC Consent Decree mandates that for *any* applicant who does not provide DPOC, Arizona must review the motor vehicle

---

[6] The Voting Laws at issue in this case refer to individuals registering to vote as "applicants," but the Court will use the term "applicant" and "registrant" interchangeably.
[7] The LULAC Consent Decree was the result of a lawsuit initiated by the League of United Latin American Citizens of Arizona ("LULAC"), alleging that county recorders were not registering State Form applicants who omitted DPOC for any elections. (*See* LULAC Consent Decree at 1–2.)

1    division ("MVD") database to check for citizenship documentation. (*Id.* at PX 024-8 to -

2    10, -13 to -14.) Arizona must then register an applicant as a Full-Ballot Voter if MVD

3    records show the applicant has provided DPOC, or as a Federal-Only Voter if MVD records

4    show no DPOC or "foreign-type" Arizona credential on file, regardless of whether the

5    applicant used the State Form or Federal Form. (*Id.*)

6                    **3.    H.B. 2492**

7            Under House Bill 2492 § 4 and § 5, "[a] person is presumed to be properly registered

8    to vote" only if she, among other things, provides documentary "proof of location of

9    residence" ("DPOR Requirement"), lists her "place of birth" ("Birthplace Requirement"),

10   and marks "yes" in the checkbox confirming United States citizenship ("Checkbox

11   Requirement").[8] H.B. 2492 §§ 4–5, 55th Leg., 2d Reg. Sess. (Ariz. 2022); A.R.S. § 16-

12   121.01(A); *see* A.R.S. § 16-123; (*see generally* Ex. 1, ("H.B. 2492 Text").) If an applicant

13   fails to include all the information necessary to be presumed properly registered to vote,

14   "the county recorder shall notify the applicant within ten business days of receipt of the

15   registration form" and inform the applicant that her registration cannot be completed until

16   the applicant supplies the missing information.[9] A.R.S. § 16-134(B), *see* § 16-121.01(A).

17           A person seeking to register as a Full-Ballot Voter must also satisfy the DPOC

18   Requirement by providing one of the forms of DPOC enumerated in § 16-166(F).[10] § 16-

19   121.01(C); (LULAC Consent Decree at PX 024-8 to -9, -13.) For applicants who use the

20   Federal Form and do not provide DPOC, H.B. 2492 § 4 requires that county recorders "use

21   all available resources to verify the citizenship status of the applicant" before that applicant

22   may be registered to vote ("Citizenship Verification Procedures"). § 16-121.01(D), (E).

---

[8]  The Federal Form does not include a space for applicants to provide birthplace information. (*See generally* Federal Form.)

[9]  The Court previously ruled that section 6 of the NVRA pre-empted H.B. 2492's requirement that Federal Form users provide DPOR to be registered for federal elections. (Doc. 534, 09/14/2023 Order at 9; *see* H.B. 2492 Text.) The Court did not decide Plaintiffs' claims regarding whether Arizona may reject State Forms that lack DPOR.

[10] The Court previously ruled that Arizona must register any qualified voter who does not complete the Checkbox Requirement but instead satisfies the DPOC Requirement. (09/14/2023 Order at 34.) The Court also found that Arizona must abide by the LULAC Consent Decree and may not reject State Forms not accompanied by DPOC if the registrant is otherwise found qualified to vote. (*Id.*; *see* H.B. 2492 Text at PX 001-4 to -5 (requiring county recorder to reject any State Form not accompanied by DPOC).)

ER - 0011

Specifically:

> [A]t a minimum [the county recorder] shall compare the information available on the application for registration with the following, *provided the county has access*:
> 1.  The department of transportation databases of Arizona driver licenses or nonoperating identification licenses [("MVD database")].
>
> 2.  The social security administration [("SSA")] databases.
>
> 3.  The United States citizenship and immigration services systematic alien verification for entitlements [("SAVE")] program, if practicable.
>
> 4.  A national association for public health statistics and information systems electronic verification of vital events system [("NAPHSIS")].
>
> 5.  Any other state, city, town, county or federal database and any other database relating to voter registration to which the county recorder . . . has access, including an electronic registration information center database.

§ 16-121.01(D) (emphasis added).[11]

H.B. 2492 § 4 mandates different outcomes from these database searches. A county recorder "shall" register as Full-Ballot Voters those registrants who the county recorder verifies are United States citizens and qualified to vote. § 16-121.01(E). But if the county recorder "matches the applicant with information that the applicant is not a United States citizen, the county recorder . . . shall reject the application, notify the applicant that the application was rejected because the applicant is not a United States citizen and forward the application to the county attorney and attorney general for investigation."[12] *Id.* H.B. 2492 does not require county recorders to provide an applicant with an opportunity to submit DPOC before rejecting the applicant's registration and forwarding the registration for investigation. *See id.*

H.B. 2492 § 7 directs county recorders to "make available to the attorney general a

---

[11] As further discussed *infra* Section I(B)(1), the MVD database contains information on all Arizonans who possess an Arizona driver's license or identification. The SSA database contains individuals' social security numbers. The SAVE program is a federal system used to retrieve immigration-related information to determine an immigrant's eligibility for state and federal benefits. NAPHSIS is a nonprofit organization that collects vital records, including birth certificates.

[12] H.B. 2492 also requires Federal Form applicants to provide DPOC to vote in presidential elections or by mail if the county recorder was unable to verify the registrant's citizenship status. § 16-121.01(E). The Court ruled that section 6 of the NVRA preempts H.B. 2492's DPOC Requirement for voting in presidential elections or by mail. (09/14/2023 Order at 33; *see also* H.B. 2492 Text at PX 001-6 to -7.)

- 6 -

1    list of all individuals who are registered to vote and who have not provided [DPOC],"[13] as

2    well as the registrations forms of these voters by October 31, 2022. A.R.S. § 16-143(A).

3    The Attorney General must then use "all available resources to verify the citizenship" of

4    these individuals and "at a minimum" consult the same databases listed in § 16-121.01(D)

5    (collectively, "Attorney General Referral Provision"). § 16-143(B). As of trial, neither the

6    Secretary of State nor any county recorders had furnished these lists or registration forms

7    to the Attorney General. (*See* Petty Tr. 113:20–114:1; Knuth Tr. 2122:7–8.) And without

8    these lists or forms, the Attorney General has not investigated the citizenship status of any

9    registered voters pursuant to the Voting Laws. (*See* Knuth Tr. 2124:4–6; Ex. 285.) H.B.

10   2492 § 7 also directs the Attorney General to "prosecute individuals who are found to not

11   be United States citizens pursuant to § 16-182." § 16-143(D); *see also* A.R.S. § 16-182(A)

12   (stating that a person who "knowingly" registers himself or another person "knowing" that

13   the registrant is not eligible to vote is guilty of a class 6 felony).

14                          **4.    H.B. 2243**

15           House Bill 2243 expanded upon or superseded H.B. 2492 in certain respects. H.B.

16   2243, 55th Leg., 2d Reg. Sess. (Ariz. 2022); (*see generally* Ex. 2, ("H.B. 2243 Text").)

17   Specifically, election officials must regularly consult state and federal databases to identify

18   potential non-citizens (collectively, "List Maintenance Procedures"). For example, the

19   Secretary of State must compare the Arizona Voter Registration Database to the MVD

20   database each month and notify county recorders of voters who have moved residences or

21   are not citizens. § 16-165(G). County recorders must also, "[t]o the extent practicable,"

22   conduct monthly SAVE checks on registered voters "who the county recorder has reason

23   to believe are not United States citizens" ("Reason to Believe Provision") and on voters

24   "who are registered to vote without [DPOC]." § 16-165(I). County recorders must conduct

25   similar checks with the SSA database and NAPHSIS database. § 16-165(H), (J). Under

26   H.B. 2243 § 2's "Cancellation Provision," a county recorder must then cancel a voter

27   registration:

28   _____

[13] Voters who registered before the effective date of Proposition 200 are "deemed to have
provided" DPOC. *See* § 16-166(G).

ER - 0013

> When the county recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen, including when the county recorder receives a summary report from the jury commissioner or jury manager pursuant to § 21-314 indicating that a person who is registered to vote has stated that the person is not a United States citizen. Before the county recorder cancels a registration pursuant to this paragraph, the county recorder shall send the person notice by forwardable mail that the person's registration will be canceled in thirty-five days unless the person provides satisfactory evidence of United States citizenship pursuant to § 16-166. The notice shall include a list of documents the person may provide and a postage prepaid preaddressed return envelope. If the person registered does not provide satisfactory evidence within thirty-five days, the county recorder shall cancel the registration and notify the county attorney and attorney general for possible investigation.

A.R.S. § 16-165(A)(10). H.B. 2243 § 2 directs county recorders to consult "relevant city, town, county, state and federal databases to which the county recorder has access to confirm information obtained that requires cancellation of registrations pursuant to this section." § 16-165(K).

### 5. Sources of Arizona Election Law Guidance

The Elections Procedures Manual ("EPM") is a set of election rules prescribed by the Arizona Secretary of State and approved by the Governor and Attorney General every two years. *See* A.R.S. § 16-452. The EPM is binding on county recorders and "ensure[s] election practices are consistent and efficient throughout Arizona." *McKenna v. Soto*, 481 P.3d 695, 699–700 ¶¶ 20–21 (Ariz. 2021). The EPM serves a "gap-filling function" to address election matters not specifically addressed by statute. (Petty Tr. 25:3–5.) The current operative EPM was approved by the Arizona Secretary of State, Governor, and Attorney General on December 30, 2023 ("2023 EPM"). (Doc. 699, ("2023 EPM").) Colleen Connor is Arizona's Elections Director and oversees the elections division of the Secretary of State's office. (Connor Tr. 305:15–19, 307:9–13.) Ms. Connor guides the development of the EPM. (*Id.* 307:14–25.)

The Voter Registration Advisory Committee ("VRAC") consists of Arizona's 15 county recorders and the Secretary of State's office. (Petty Tr. 26:8–12.) The VRAC addresses voter registration matters not addressed by statute or the EPM. (*Id.* 26:13–18.) Specifically, the VRAC may unanimously approve "VRAC papers," which act as non-

1    binding guidance to maintain uniform election administration practices. (*Id.* 27:11–28:2.)

2    The VRAC has not yet approved any VRAC papers to guide county recorders on the

3    implementation of the Voting Laws.

4        The Court will consider the Voting Laws in the context of the 2023 EPM. Though

5    the parties' arguments at trial relied on the 2019 version of the EPM, the Court finds it

6    appropriate to consider the Voting Laws based on the current and binding 2023 EPM.

7    (*Compare* 2023 EPM, *with* Ex. 6, ("2019 EPM").)

8        **B.     Voter Registration and List Maintenance Procedures**

9        The Arizona Voter Registration Database ("AVID") is Arizona's state-wide voter

10   registration and election management database. (Connor Tr. 333:5–9.) Thirteen counties

11   use AVID directly for voter registration, while Maricopa County and Pima County each

12   operate their own voter registration databases that sync with AVID. (*Id.* 333:15–25.)

13   Maricopa County's system is referred to as "VRAS" and Pima County's system is "Voter."

14   (Petty Tr. 28:7–13; Hiser Tr. 2021:8–14.) The following describes the Voting Laws' impact

15   on Arizona's existing voter registration and list maintenance procedures.

16       **1.     Databases Referenced in the Voting Laws**

17       Before the Voting Laws, Arizona retrieved information from MVD and SAVE to

18   verify the citizenship status of voters, in addition to receiving reports of non-citizenship

19   from juror questionnaires. (*See* 2019 EPM at PX 006-20 to -25, -50 to -51; LULAC

20   Consent Decree at PX 024-8 to -10, -13.) H.B. 2492 and H.B. 2243 supplement these

21   databases with SSA and NAPHSIS checks. §§ 16-121.01(D), 16-165(G)–(J). According to

22   Ms. Petty, county recorders currently do not have access to NAPHSIS or the SSA database.

23   (Petty Tr. 38:16–39:1, 68:19–69:16.) Ms. Petty also testified that the Secretary of State has

24   not offered county recorders any guidance on what criteria to use to match voters to the

25   databases required by the Voting Laws, nor how to address situations where multiple

26   databases return conflicting citizenship information. (*Id.* 79:18–80:10.) The Court

27   addresses the utility and reliability of each database in turn.

28

1

###### i. MVD Database

2          MVD issues two types of "credentials": Arizona driver licenses and Arizona

3   identification cards. United States citizens and non-citizens may obtain an MVD credential,

4   so long as an individual can show proof of "authorized presence" in the United States.

5   (Doc. 679-1, Ex. 2, 30(b)(6) Dep. of ADOT ("ADOT Dep.") 27:21–25, 30:18–31:8.) MVD

6   categorizes credentials as either non-foreign or foreign based on an individual's authorized

7   presence status, as stated in the authorized presence documentation. (Pls.' Stip. No. 88; Ex.

8   231, ("MVD Credential Documents List") at PX 231-4 (listing forms of documentation).)

9   MVD issues non-foreign credentials to U.S. citizens, including naturalized citizens, and

10  foreign-type credentials to non-citizens. A naturalized citizen seeking to obtain a non-

11  foreign credential must show an official copy of their naturalization certificate. (MVD

12  Credential Documents List at PX 231-3; ADOT Dep. 72:25–73:10.)

13         An "original credential" is the first issuance of a specific MVD credential, while a

14  "duplicate credential" is a new version of an existing credential. (Pls.' Stip. No. 84;

15  Jorgensen Tr. 555:22–556:4.) Credentials may be REAL ID-compliant or non-REAL ID.

16  (Jorgensen Tr. 543:1–21 (explaining REAL ID), 553:17–22, 554:16–20 (explaining a non-

17  travel ID or "non-TID" is a non-REAL ID); MVD Credential Documents List at PX 231-

18  2 (listing requirements to obtain a travel ID or non-travel ID).) REAL IDs expire after eight

19  years, whereas non-REAL IDs may not expire for more than ten years. (ADOT Dep. 60:21–

20  61:6.) In addition, a foreign-type credential expires based on the individual's provided

21  foreign authorized presence documentation. (*Id.* 62:24–63:3; Ex. 233 at PX 233-1; Ex. 434,

22  at PX 434-3.) For example, if a non-citizen submits a permanent resident card that is valid

23  for five more years to show authorized presence, that individual will receive a foreign-type

24  credential that expires when the permanent resident card expires. (*See, e.g.*, ADOT Dep.

25  63:4–14.)

26         Naturalized citizens are not required to update authorized presence status with MVD

27  when they become a citizen, meaning some citizens may still possess an unexpired foreign-

28  type credential. (Pls.' Stip. No. 93; Jorgensen Tr. 560:2–14.) An individual with a non-

1    REAL ID, foreign-type credential is also not required to provide proof of authorized
2    presence when they renew that credential or obtain a duplicate credential after a change to
3    the individual's address, name change after marriage, or losing the credential. (Jorgensen
4    Tr. 544:2–18, 545:17–546:1, 556:5–24, 558:1–12, 559:17–560:1.) In these circumstances,
5    MVD may possess outdated authorized presence information for naturalized citizens with
6    a foreign-type credential. Dr. McDonald determined that 6,048 Full-Ballot Voters who
7    provided DPOC have a foreign-type credential and would be identified as non-citizens in
8    the MVD database. (McDonald Tr. 1088:16–1089:5.) In addition, Dr. Jesse Richman[14]
9    found that MVD records indicate that 65 Federal-Only Voters possess a foreign-type
10   credential, with 31 of these voters receiving the credential at the same time or after
11   registering to vote. (Richman Tr. 1927:11–15; Ex. 930, ("MVD Non-Citizen Records").)
12   There are also 112 Federal-Only Voters that MVD records indicate are citizens. (Richman
13   Tr. 1915:24–1916:5.)

14          ADOT reports an overall internal record error rate of approximately 10 to 15%.
15   (Jorgensen Tr. 548:12–21; Pls.' Stip. No. 115.) But an MVD representative "would have
16   to make multiple errors" to mistakenly enter a credential applicant's incorrect citizenship
17   status into the MVD database. (Jorgensen Tr. 584:14–585:1.) While AVID has on at least
18   one occasion experienced system error when retrieving citizenship information from
19   MVD, the parties' experts nevertheless agree that Arizona's MVD data is generally
20   reliable. (McDonald Tr. 1189:24–1190:1; Richman Tr. 1907:2–16; *see* Hiser Tr. 2025:3–
21   2027:13; Exs. 207, 220, 226 (explaining AVID mistakenly identified hundreds of voters as
22   lacking DPOC).) The Court finds that while MVD may possess outdated citizenship
23   information on some Arizonans, MVD typically obtains and maintains accurate
24   information on each Arizona credential-holder.

25                    **ii.    SAVE**

26          The U.S. Citizenship and Immigration Services ("USCIS") administers the SAVE

27   _____
     [14] Dr. Richman is a professor of political science and international studies with a focus on
28   American politics and elections in addition to research methodology, modeling, and
     simulation. (Richman Tr. 1903:1–8.) The Court found Dr. Richman's testimony credible
     and affords his opinions considerable weight.

system, which is used to retrieve immigration and citizenship data from different Department of Homeland Security agencies. (Pls.' Stip. Nos. 116–17; Doc. 679-3, Ex. 19, 30(b)(6) Dep. of USCIS ("USCIS Dep.") 25:1–16, 38:12–13.) Arizona's county recorders and the Secretary of State access SAVE pursuant to a memorandum of agreement between the Secretary of State and USCIS ("SAVE MOA"). (Ex. 266, ("SAVE MOA") at PX 266-2.) The SAVE MOA permits county recorders to verify citizenship information of naturalized and derived U.S. citizens[15] only "when they register to vote." (*Id.*) Arizona currently may not use SAVE for any other purpose. (*Id.* at PX 266-4.) At least one state uses SAVE for "voter list maintenance." (USCIS Dep. 170:15–171:20.) The SAVE system can only verify the citizenship status of naturalized or derived U.S. citizens by searching the individual's immigration number[16] and contains no information on native-born citizens. (*Id.* 27:22, 28:8–11; Pls.' Stip. Nos. 121–122, 131.) Naturalized citizens rarely include their immigration numbers on the State Form, and the Federal Form does not include a space for registrants to provide this information. (Petty Tr. 57:15–58:1; *see generally* Federal Form.)

USCIS considers SAVE to be generally reliable, but recognizes that data integrity issues can arise, including data entry errors. (USCIS Dep. 37:19–25, 112:5–12, 114:5–16, 209:12–23.) While one or two-day delays are possible, SAVE can typically return updated naturalization records within 24 hours of an individual's naturalization. (*Id.* at 37:19–25, 39:20–41:4; *see* 2023 EPM at ECF-25 (cautioning county recorders to be aware of possible delays in SAVE when registering voters close to an election).) USCIS also explained that SAVE may not immediately return updated naturalization records if an individual is naturalized prior to a weekend or a federal holiday. (USCIS Dep. 41:1–19.) Unlike with MVD, which could possess outdated information about naturalized citizens years after naturalization, the Court finds that Plaintiffs have failed to adduce evidence that SAVE is unreliable or contains severely inaccurate or outdated citizenship information. And to the

---

[15] A derived citizen is an individual born abroad who derives U.S. citizenship at birth from a U.S. parent or automatically acquires U.S. citizenship as a minor under specific provisions of U.S. naturalization law. (Ex. 274, at PX 274-1 n.1.)
[16] An immigration number is a numeric identifier from a government-issued immigration document and includes an Alien Number, Certificate of Naturalization Number, or Certificate of Citizenship Number. (Ex. 271, ("SAVE Guide") at PX 271-13.)

extent that SAVE does occasionally contain temporarily outdated citizenship information following an individual's naturalization, the 2023 EPM adequately informs county recorders of how to address these circumstances.

### iii.    SSA

Arizona's county recorders check SSA records to "confirm[] the registrant's identity and help[] ensure integrity of registration rolls." (2023 EPM at ECF-40; Petty Tr. 37:22–38:15.) County recorders may access the SSA database by conducting a "HAVA Check"[17] through MVD but lack direct access to SSA records. (Petty Tr. 38:16–39:1.) According to reports in the 2000s, the error rate for data in the SSA database is approximately six percent. (McDonald Tr. 1093:6–8.) The SSA database returns "soft" record matches based on the last four digits of a social security number, meaning a SSA check could return multiple matches. (*Id.* 1092:16–1093:5.)

Approximately one quarter of SSA records lack citizenship information. (McDonald Tr. 1091:10–13.) An individual who was issued a social security number before obtaining U.S. citizenship has no duty to update her citizenship information with the Social Security Administration. (Pls.' Stip. No. 150.) Setting aside these data issues, the Court finds that it is impracticable for county recorders to obtain citizenship information from the SSA database pursuant to the Voting Laws' Citizenship Verification or List Maintenance Procedures, as the federal government does not allow access to this information. (Petty Tr. 66:19–67:5; McDonald Tr. 1090:13–1091:6.) And Plaintiffs offered no evidence suggesting that Arizona could eventually access additional SSA information for these purposes.

### iv.    NAPHSIS

NAPHSIS is a national nonprofit organization that compiles vital records, including birth certificates, for individuals born in the United States. (McDonald Tr. 1099:16–25, 1100:21–1101:4.) NAPHSIS does not provide information about individuals born outside

---

[17] The Help America Vote Act ("HAVA") requires first-time voters to prove identity before voting in federal elections if the voter registered by mail or through a third-party registration drive. *See* 52 U.S.C. § 21083(b)(1)–(3).

ER - 0019

1    of the United States. (Richman Tr. 1941:11–21 (explaining this is a "key limitation[]" to

2    NAPHSIS).) Arizona's county recorders currently do not have access to NAPHSIS, nor

3    are county recorders familiar with the database. (*See, e.g.*, Petty Tr. 68:19–70:16.) But the

4    evidence indicates Arizona could request access to the NAPHSIS database with relative

5    ease. (McDonald Tr. 1101:2–4; Richman Tr. 1934:1–14.) And according to Dr. Richman,

6    the U.S. Election Systems Commission recommends that states use NAPHSIS for election

7    administration. (Richman Tr. 1914:15–1915:2.) Plaintiffs did not adduce evidence

8    establishing that NAPHSIS is unreliable for the purpose of determining the citizenship

9    status of native-born citizens.

10                    **v.      Jury Summary Reports**

11           H.B. 2243 requires Arizona's jury administrators to provide county recorders and

12   the Secretary of State with jury summary reports that contain the prospective jurors who

13   stated that they were not a U.S. citizen or resident of that county. *See* A.R.S. § 16-314(F).

14   Matthew Martin, the Jury Administrator for the Maricopa County Judicial Branch,

15   described Maricopa County's juror selection procedures. (Ex. 970, ("Martin Decl.") ¶ 2.)

16   Specifically, the jury office maintains a master list of potential jurors that includes names

17   from VRAS and MVD records. (*Id.* ¶¶ 6–9.) The jury office receives the full name, address,

18   and birthdate of the individuals on each list but does not obtain citizenship information.

19   (*Id.* ¶¶ 7–8.) Because non-citizens may obtain a foreign-type credential, the master list

20   includes non-citizens from the MVD database. The jury office randomly selects individuals

21   from the master list to issue summonses for jury duty. (*Id.* ¶ 9.) After receiving a jury

22   summons, a prospective juror can inform the jury office that she is a non-citizen by

23   submitting an online pre-screen questionnaire, or by submitting a written statement directly

24   to the jury office. (*Id.* ¶¶ 12–16.)

25           The jury summary reports may contain only as much information as is necessary for

26   county recorders to identify the prospective juror in the voter registration database. A.R.S.

27   § 21-314(F); (*see* 2023 EPM at ECF-57 (requiring county recorders to match the individual

28   to a registered voter to "confirm" non-citizenship).) Plaintiffs presented no evidence

1   indicating that the jury summary reports would erroneously report jurors' self-attestation

2   of non-citizenship. (*See* Connor Tr. 393:7–394:16.) Moreover, county recorders have

3   historically received reports of non-citizenship from juror questionnaires without issue.

4   (Petty Tr. 104:17–105:11; *see* 2019 EPM at PX 006-50 to -51 (describing past use of jury

5   questionnaires).)

6        H.B. 2243 also mandates the Secretary of State to inform the Legislature each

7   quarter of the number of individuals who stated on a juror questionnaire that the individual

8   is not a United States citizen. § 16-165(M)(3). In the first half of 2023, 1,324 individuals

9   reported that they were not U.S. citizens. (Ex. 805, at AZSOS-563798; Ex. 806, at AZSOS-

10  563800.) The State does not know how many of these individuals are registered to vote,

11  nor how many misrepresented their citizenship status to avoid jury duty. (*See* Connor Tr.

12  393:7–22 (recalling 11 prosecutions where persons falsely stated they were non-citizens

13  on a juror questionnaire); Hiser Tr. 2004:4–2005:1 (recalling instances where registered

14  voters declared themselves as non-citizens on juror questionnaires to avoid jury duty).)

15  And in counties like Maricopa that collect prospective juror information from MVD to

16  include lawfully present non-citizens, these quarterly reports do not correlate to the

17  incidence of non-citizens registered to vote.

18            **2.    HAVA Checks**

19       Election officials conduct a HAVA Check each time an individual submits a new

20  voter registration or updates an existing voter registration. (*See* Morales Tr. 611:16–19,

21  614:17–615:14; *see* 2023 EPM at ECF-42.) A HAVA Check compares the applicant's

22  voter registration in AVID to the information available in the MVD database to validate

23  the applicant's identity and check for DPOC. (Morales Tr. 614:17–615:6, 615:11–14; Petty

24  Tr. 33:15–34:4.) When a voter registration is entered into AVID, the database will first

25  compare the registration to existing records to identify duplicate registrations.[18] (2023 EPM

26

27  _____

[18] When the Maricopa County Recorder's office receives a physical voter registration form,
the county recorder manually enters the registrant's information into VRAS, which first
28  checks for existing records in VRAS before automatically comparing the registrant's
information to AVID. (Petty Tr. 30:8–15, 31:11–32:9; *see also* Pima Dep. 21:11–17,
63:12–64:14, 66:16–67:6 (describing some of the process of using Voter).)

ER - 0021

1    at ECF-40.) Then, to conduct the HAVA Check, AVID submits a request to ADOT to

2    return any MVD records that match the information provided on the voter registration.

3    (Pls.' Stip. Nos. 100, 102–104.) AVID uses matching criteria to return either a "hard"

4    match, "soft" match, or no match with MVD records. These matching criteria include an

5    applicant's last name, first three characters of first name, last four digits of a social security

6    number ("SSN4"), date of birth, and MVD credential number. (Ex. 935, ("MVD

7    Verification Criteria").)

8           A HAVA Check returns a "soft" match in four scenarios: when AVID and MVD

9    records match the registrant's (1) last name, first three characters of first name, and SSN4;

10   (2) last name, first three characters of first name, and date of birth; (3) first name, date of

11   birth, and SSN4; or (4) MVD credential number. (*Id.* at AZSOS-564548; *see* McDonald

12   Tr. 1082:9–1083:1.) A soft match may return up to 50 MVD records, after which county

13   recorders exercise "some level of discretion" to determine which MVD record matches the

14   voter registration. (Petty Tr. 36:5–37:11; Morales Tr. 611:1–4, 611:20–612:10; Jorgensen

15   Tr. 563:5–7.) The HAVA Check returns a "hard" match when a combination of at least

16   four of these datapoints return an exact match between AVID and the MVD database.

17   (MVD Verification Criteria at AZSOS-564548.) AVID will "acquire" a missing MVD

18   credential number upon a match with MVD records. (2023 EPM at ECF-40.) The HAVA

19   Check will return no match if the applicant does not possess an unexpired Arizona

20   credential. (Petty Tr. 34:11–35:12.) In that case, the HAVA Check will compare the

21   registrant's information with the SSA database to verify the individual's identity. (*Id.*

22   37:22–38:5; Ex. 594; 2023 EPM at ECF-40, -42.)

23          **3.      Verifying a Voter Registrant's Citizenship Status**

24          County recorders use MVD and SAVE to verify the citizenship of Arizonans who

25   provide an Arizona credential number or immigration number when registering to vote.

26   Applicants who do not provide an Arizona credential number, immigration number, or

27   tribal identification number must provide a physical copy of another form of DPOC to

28   register as a Full-Ballot Voter. *See generally* § 16-166(F). County recorders must retain

1    copies of a voter's DPOC for two years. (2023 EPM at ECF-26; *see* Petty Tr. 56:4–8.)

2                                    **i.      MVD Records**

3            County recorders also use the HAVA Check to verify the citizenship of applicants

4    who provide an Arizona MVD credential number as DPOC. (2023 EPM at ECF-40;

5    Morales Tr. 611:16–19.) AVID contains a "citizenship verified" field, which identifies

6    whether a voter is a U.S. citizen. (*See* Morales Tr. 613:15–24.) If a HAVA Check returns

7    a match from MVD, the county recorder will obtain a voter's citizenship status as it exists

8    in the MVD records at the time of the check. (*Id.* 612:23–613:3; Petty Tr. 36:15–22; Doc.

9    622-1, Ex. A, ("County Recorder Testimony Stip.") No. 5.) An individual's citizenship

10   status is automatically transmitted from MVD and into AVID's "citizenship verified" field.

11   (Morales Tr. 613:15–19; Petty Tr. 39:7–14.) If AVID returns a match with MVD records

12   that indicate U.S. citizenship, AVID will code that voter's citizenship as verified and the

13   county recorder will register the individual as a Full-Ballot Voter. (Morales Tr. 613:20–24,

14   617:2–7; Petty Tr. 41:7–11.)

15           If the HAVA Check matches the applicant with MVD records indicating that the

16   applicant has a foreign-type credential, AVID will automatically mark the "no" box under

17   the "citizenship verified" field. (Morales Tr. 613:25–614:3.) County recorders must then

18   manually override the citizenship field for voters who provide a different form of DPOC.

19   (*Id.* 613:25–614:3, 616:2–14; *see* Hiser Tr. 2019:24–2020:25 (explaining that separate

20   DPOC "is the controlling factor" to determine citizenship when a citizen has a foreign-type

21   credential).) The parties adduced no evidence of the rate at which county recorders

22   erroneously override or fail to override the citizenship field for registrants with a foreign-

23   type credential. For registrants with a foreign-type credential who *do not* provide a different

24   form of DPOC, the 2023 EPM directs county recorders to indicate in the applicant's

25   registration file that the registrant is "not eligible" due to "invalid citizenship proof," and

26   notify the registrant that she must provide DPOC in order to be eligible to vote. (2023 EPM

27   at ECF-22; *see* Petty Tr. 41:16–42:19 (explaining that a registration may be put in

28

"suspense" status for lack of DPOC).)[19] Arizona's State Form requests individuals who become a citizen after receiving a foreign-type credential to provide a different form of DPOC, such as the individual's immigration number. (State Form at PX 027-3.) If the HAVA Check returns no match with MVD records and the applicant provides no other DPOC, the county recorder must register the individual as a Federal-Only Voter. (2023 EPM at ECF-21; Morales 617:8–13.) County recorders send these voters notice of their federal-only status and explain that the voters must provide DPOC to register for a full ballot. (2023 EPM at ECF-22.)

### ii.    SAVE Verification

The 2023 EPM directs county recorders to use SAVE to verify citizenship information when an applicant provides an immigration number as DPOC, including a citizenship certificate number, naturalization certificate number, or alien registration number. (*Id.* at ECF-23 to -24; *see also* Morales Tr. 616:15–24.) When a county recorder searches the SAVE system, SAVE can return a match with citizenship verified, a match with citizenship not verified, or no match. (Petty Tr. 58:2–8.) SAVE cannot conclusively "confirm" non-citizenship. (USCIS Dep. 152:19–153:6.) A SAVE match with citizenship verified establishes that the applicant is a naturalized or derived U.S. citizen, after which a county recorder will register the applicant as a Full-Ballot Voter. (2023 EPM at ECF-24; Petty Tr. 58:17–59:13.) If SAVE returns a match with citizenship not verified, the applicant must provide DPOC to be registered to vote. (2023 EPM at ECF-24.) If SAVE returns no match, the applicant will be registered as a Federal-Only Voter. (*Id.* at ECF-24 to -25.) In a case of citizenship not verified or no match, the SAVE MOA obligates county recorders to initiate additional verification procedures with SAVE for these individuals unless Arizona "has alternative processes upon which to base its decision." (SAVE MOA at PX 266-4; SAVE Guide at PX 271-10.) Arizona's county recorders do not typically initiate the additional verification procedures, but Plaintiffs adduced no evidence that county recorders

---

[19] A registration is in "suspense" when a county recorder determines that additional information is necessary to confirm that the applicant is qualified to vote in Arizona, such as by verifying citizenship or residency. (*See, e.g.*, Petty Tr. 42:9–15; McDonald Tr. 1110:11–19.)

do not use "alternative processes" to confirm the eligibility of these registrants. (*See* Ex. 268 (county recorders initiating 154 additional verifications of the 2502 SAVE searches requiring additional verification from 2020 to 2022).)

### iii.    Verifying Citizenship without DPOC

For applicants who do not provide any form of DPOC, county recorders must apply H.B. 2492's Citizenship Verification Procedures by consulting the MVD, SAVE, SSA, and NAPHSIS databases to retrieve citizenship information. § 16-121.01(D). However, because SAVE requires an immigration number, county recorders will be unable to search SAVE to verify the citizenship of registrants who do not have or provide an immigration number as DPOC in the first place. (*See* Petty Tr. 57:15–58:1 (testifying few naturalized citizens provide an immigration number).) Nor can county recorders retrieve citizenship information from the SSA database. In cases where county recorders are unable to conduct the relevant database searches or if a county recorder's investigation does not match an applicant to information establishing citizenship or non-citizenship, the county recorder must register that applicant as a Federal-Only Voter. § 16-121.01(E).

The Voting Laws require county recorders to forward registrations of applicants matched to information of non-citizenship to the Attorney General, but the 2023 EPM has interpreted this provision to first require county recorders to provide applicants with an opportunity to provide DPOC. *See id.*; (2023 EPM at ECF-17.) Specifically, for applicants who do not provide DPOC, "[i]f the database checks affirmatively show the applicant is a non-citizen, the County Recorder must (1) not register the applicant, (2) notify the applicant, and (3) *if the applicant does not timely provide DPOC in response*, forward the application to the County Attorney and Attorney General." (2023 EPM at ECF-27 (emphasis added); *see id.* at ECF-22 (describing similar process when a HAVA Check indicates the applicant possesses a foreign-type credential).) Regardless of whether the county recorder matches the applicant to evidence of non-citizenship in the MVD database or SAVE, an applicant has until "the Thursday before the next regular election" to submit DPOC and be registered to vote in that election. (*Id.* at ECF-22, -24.)

- 19 -

1     Taken together, Arizona's voter registration procedures utilize reliable methods to

2   verify the citizenship status of registrants. For registrants who provide an Arizona

3   credential number or an immigration number, the MVD and SAVE checks will generally

4   return accurate citizenship information. The 2023 EPM also provides registrants who

5   county recorders match to affirmative information indicating non-citizenship with

6   sufficient time to provide DPOC to register to vote and avoid potential investigation by the

7   Attorney General. And registrants will be appropriately registered as Federal-Only Voters

8   when county recorders do not identify affirmative information establishing citizenship or

9   non-citizenship.

10                    **4.        Birthplace Information**

11     Arizona has long collected birthplace information from individuals registering to

12   vote. *See* 1913 A.R.S. § 2885. Since 1979, Arizona has required the State Form to include

13   a field for a registrant to include her "state or country of birth." (*See* State Form at PX 027-

14   1); 1979 Ariz. Laws ch. 209, § 3 (adopting A.R.S. § 16-152 to mandate the inclusion of the

15   birthplace field on the State Form). But prior to the Voting Laws, an individual's birthplace

16   was not *mandatory* for an individual to register to vote. *See, e.g.*, 1993 Ariz. Laws ch. 98,

17   § 10 (adopting § 16-121.01, which specifies the minimum information required to be

18   presumed properly registered to vote).

19     An individual's place of birth is not dispositive of citizenship status, as individuals

20   born outside the U.S. may be derived or naturalized citizens. County recorders do not use

21   birthplace information to determine an applicant's eligibility to vote, nor do county

22   recorders need birthplace to verify an applicant's identity. (Connor Tr. 311:22–312:17;

23   Petty Tr. 100:21–101:9, 102:10–103:1 (explaining use in Maricopa County); Hiser Tr.

24   2055:18–2056:8 (Pima County).) Instead, the HAVA Check matches AVID and MVD

25   records to confirm a person's identity for purposes of voter eligibility. (Petty Tr. 32:19–

26   33:14, 103:2–7; *see* MVD Verification Criteria at AZSOS-564548 (listing first and last

27   name, date of birth, Arizona credential number, and SSN4 as matching criteria for duplicate

28   records).) AVID also does not use birthplace as matching criteria to match duplicate

registrations in the MVD database. (*See* MVD Verification Criteria at AZSOS-564547.) However, Ms. Petty and Ms. Hiser testified that a county recorder could use birthplace to identify duplicate registrations in VRAS or Voter if an applicant has the same name and other identifying information as an existing registered voter. (Petty Tr. 132:2–8; Hiser Tr. 2000:19–2002:23.)

County recorders may collect birthplace in some circumstances related to voter registration.[20] Specifically, if a registrant submits a birth certificate as DPOC that lists a different name than the registrant's current legal name but cannot provide supporting documentation verifying the different last name, the 2023 EPM instructs county recorders to accept the birth certificate as DPOC if the registrant's first and middle names, birthplace, date of birth, and parents' names match that on the voter registration. (2023 EPM at ECF-19.) Maricopa County may also send notices requesting additional information to process applicants' registration forms. These notices request personal identifying information that the county recorder can use to "uniquely identify" the applicant's registration, including the applicant's birthplace, occupation, phone number, and father's name or mother's maiden name, though the county recorder will accept notices returned with incomplete information. (Ex. 85, at PX 85-1; Ex. 773, at MC 002990; Petty Tr. 168:1–12.)

County recorders may also use birthplace alongside additional personal identifying information that could be used as a security question to verify a voter's identity over the phone.[21] (Petty Tr. 101:10–14, 102:1–5; Connor Tr. 390:20–391:21; Hiser Tr. 2002:21–2004:3; 2023 EPM at ECF-229 (verifying birthplace when a voter calls to confirm

---

[20] Voters can submit a photocopy of the "pertinent pages" of a U.S. passport as DPOC, which the 2023 EPM states includes "the photo, passport number, name, nationality, date of birth, gender, place of birth, and signature" of the applicant. § 16-166(F)(3); (2023 EPM at ECF-19.) The United States requires birthplace on passport applications because it "is an integral part of establishing an individual's identity. It distinguishes that individual from other persons with similar names and/or dates of birth, and helps identify claimants attempting to use another person's identity." (Ex. 941, at 6.) Defendants ask the Court to take judicial notice of this provision of the U.S. Department of State's Foreign Affairs Manual. But the fact that the United States requires birthplace information for an international travel document is irrelevant to whether birthplace is useful to county recorders when verifying the identity of prospective voters.

[21] Other personal identifying information could include a voter's date of birth or SSN4. (Petty Tr. 102:1–20, 166:10–167:3; Hiser 2003:20–2004:3.)

provisional ballot status).) But birthplace alone is generally not sufficient to distinguish between voters for identity verification. (*See* Hiser Tr. 2056:18–2057:10, 2058:17–21.) In addition, ballot-by-mail request forms must contain a field for the voter's "State or country of birth, *or another piece of information* that, if compared to the voter's record, would confirm the voter's identity (such as the AZDL/ID# or SSN4, father's name, or mother's maiden name)." (2023 EPM at ECF-70 to -71 (emphasis added)); *see* A.R.S. § 16-542(A) (requiring a voter to provide her birthplace "or other information" that can be used to confirm her identity). And county recorders may use birthplace when available to match deceased voters with the correct voter record and cancel registrations. (2023 EPM at ECF-52 ("A County Recorder should match as much information as possible (including first name, last name, maiden name (if applicable), year of birth, place of birth, and city or town of residence) . . . .").)

Dr. Eitan Hersh[22] analyzed the efficacy of birthplace information to uniquely identify voters. (Hersh Tr. 647:2–12, 649:23–650:14.) Dr. Hersh noted several data issues with the birthplace information Arizona possesses for currently registered voters. Specifically, approximately one-third of existing voter registrations in Arizona lack birthplace information. (*Id.* 659:13–21.) Another 200,000 registrations list the United States as the voter's country of birth. (*Id.* 677:23–25.) Moreover, county recorders manually enter an applicant's birthplace (when provided) exactly as it appears on the State Form, resulting in non-uniform birthplace information for existing registered voters. (*Id.* 651:25–652:19, 677:20–22, 678:24–679:2; Petty Tr. 99:4–25; Connor Tr. 313:21–314:15.) Some birthplace designations are unclear, such as "CA," which could refer to either California or Canada. (Hersh Tr. 651:25–652:19.) And despite the State Form's request that applicants include "state or country of birth," applicants occasionally write their city or county instead, which in some cases can refer to multiple locations.[23] (*Id.* 652:20–653:4;

---

[22] Dr. Hersh is a Professor Political Science at Tufts University with a background in U.S. elections and election administration. (Hersh Tr. 642:24–643:18.) The Court credits Dr. Hersh's testimony and affords his opinions significant weight.
[23] For example, Dr. Hersh testified that "San Luis" is a city in Arizona and twelve other countries. (Hersh Tr. 652:20–653:1.)

1   Petty Tr. 100:2–15.)

2        To Ms. Connor's knowledge, county recorders are unable to confirm the accuracy

3   of an applicant's birthplace. (Connor Tr. 316:3–6; *see* Petty Tr. 103:21–104:5 (explaining

4   Maricopa County is unable to confirm birthplace).) There is no evidence that Arizona plans

5   to establish parameters to standardize the collection of birthplace information for new

6   voters or to collect missing birthplace information from currently registered voters. (*See*

7   *generally* 2023 EPM (lacking any guidance about how to collect birthplace information on

8   a voter registration).) And despite county recorders' *potential* uses of birthplace,

9   defendants adduced no evidence that county recorders have ever encountered challenges

10  determining the identity or eligibility of the one-third of voters for whom Arizona lacks

11  this information. Dr. Hersh also opined that standardized birthplace information would still

12  not meaningfully help to identify voters. (Hersh Tr. 677:20–679:7.) Specifically, he

13  determined that of the nearly 4.7 million active and inactive voter records in Arizona, only

14  2,734 records cannot be uniquely identified based on the voter's name and date of birth.[24]

15  (*Id.* 658:20–659:11.) Most of these remaining records can be uniquely identified with the

16  individual's SSN4 or Arizona credential number. (*Id.* 659:13–665:12 (explaining that an

17  ID number can confirm whether two records are for the same or two separate individuals

18  in nearly all ambiguous cases); *see* Ex. 972 (illustrating possible identification scenarios).)

19  And for those records that lack an ID number, Dr. Hersh found that birthplace alone would

20  not sufficiently resolve the identity of two voter records. (Hersh Tr. 665:17–668:1.)

21       The Court finds that while county recorders can sometimes use birthplace in

22  Arizona's voter registration process, birthplace is of little utility in nearly all cases.

23

24  _____

25  [24] Dr. Hersh did not use the matching criteria from the HAVA Check to conduct his
    analysis, but instead treated registration records as identical only if the names matched
26  exactly. (Hersh Tr. 684:12–687:14.) By contrast, Dr. McDonald calculated 12,051
    "instances" of indeterminate record matches from the HAVA Check's soft matching
27  criteria, which Plaintiffs offered as evidence of the unreliability of the MVD database for
    determining citizenship. (McDonald Tr. 1071:14–23, 1084:12–1085:8, 1102:23–1103:1.)
28  The Court finds it unnecessary to ascertain the most likely correct figure, as these analyses
    both indicate that county recorders would seldom have a reason to consult birthplace to
    verify a soft match and identify a voter.

**5.      Registration List Maintenance**

H.B. 2243 § 2's List Maintenance Procedures require county recorders to conduct recurring database checks to verify voters' citizenship status. § 16-165(G)–(J). And pursuant to the Cancellation Provision, county recorder must cancel a voter registration after the county recorder "obtains" and "confirms" information that the voter is a non-citizen, notifies the voter, and that voter fails to provide DPOC within 35 days. § 16-165(A)(10), (K). Except for listing various databases, the Voting Laws do not specifically describe how county recorders are to "obtain" or "confirm" information that a voter is a non-citizen, but the 2023 EPM provides some additional guidance.

**i.      Obtaining Information of Non-Citizenship**

Prior to the Voting Laws, county recorders were required to cancel a voter's registration if that voter had indicated on a juror questionnaire that they were not a U.S. citizen, the county recorder did not find the voter's DPOC on file, and the voter failed to provide DPOC within 35 days. (2019 EPM at PX 006-50 to -51.) The Voting Laws expand on this system by mandating the use of jury summary reports to cancel the registrations of all voters who attest to non-citizenship on a jury questionnaire. §§ 16-165(A)(10), 21-314(F). This is one method for county recorders to "obtain" information of non-citizenship of registered voters. (2023 EPM at ECF-57.)

Since December 2022, ADOT has furnished the Secretary of State a monthly "customer extract" file containing the authorized presence status of all individuals with an MVD credential to comply with H.B. 2243 § 2. (Pls.' Stip. Nos. 101, 105, 107, 108, 112; Ex. 234 at PX 234-1 to -2.) H.B. 2243 § 2 directs the Secretary of State to compare the customer extract file to AVID, identify voters who MVD indicates are not U.S. citizens, and notify county recorders of these individuals.[25] § 16-165(G); (*see also* 2023 EPM at ECF-54 (interpreting § 16-165(G) as requiring the Secretary of State to notify county recorders of individuals who are "not a United States citizen according to the [MVD]

---

[25] Though the Secretary of State has not yet used the customer extract file for any purpose, the court finds it reasonable that the Secretary of State will do so to comply with the Voting Laws. (Jorgensen Tr. 566:24–573:19; Connor Tr. 376:6–15; Morales Tr. 622:5–623:6.)

database").) The customer extract marks a "non-citizen" field with "Y" when an individual's MVD records indicate that the individual possesses a foreign-type credential and leaves the field blank for individuals with a non-foreign-type credential. (Pls.' Stip. No. 106; Ex. 234 at PX 234-1.) Because MVD records reflect only that information provided to MVD when an individual receives a new or duplicate credential, the customer extract file may contain outdated citizenship information for naturalized citizens who still possess an unexpired foreign-type credential or are awaiting SAVE verification to obtain a new credential. (Jorgensen Tr. 571:21–572:15; ADOT Dep. 137:20–138:15.) And because native-born citizens cannot be issued a foreign-type credential, the Secretary of State's use of the customer extract file to conduct monthly MVD checks will only ever misidentify naturalized citizens as non-citizens.

The 2023 EPM states that it is not currently "practicable" for county recorders to obtain information of non-citizenship from SAVE because county recorders lack access to SAVE for list maintenance purposes. (2023 EPM at ECF-24, -57); § 16-165(I). But the evidence suggests that USCIS would consider expanding Arizona's use of SAVE under an amended or new MOA. (USCIS Dep. 59:14–23, 62:20–63:7, 70:8–23, 170:15–171:20 (explaining at least one state is authorized to use SAVE for list maintenance).) Moreover, because the Voting Laws direct county recorders to use SAVE for list maintenance, it is reasonable that Arizona would seek authorization for this purpose.[26] H.B. 2243 § 2 instructs county recorders to consult SAVE each month for voters lacking DPOC and voters who the county recorder has "reason to believe" are non-citizens. § 16-165(I). The Voting Laws do not specify what constitutes a "reason to believe" and Ms. Connor testified that county recorders will likely exercise discretion to make this determination. (Connor Tr. 372:11–23.) Regardless of any county recorder discretion, only naturalized citizens will ever be subject H.B. 2243's SAVE checks under the Reason to Believe Provision because

_____

[26] The Voting Laws also require the Secretary of State to provide the Attorney General access to SAVE to investigate voters lacking DPOC, but the SAVE MOA does not authorize this sort of use. A.R.S. § 16-143(C); (USCIS Dep. 58:13–25 (explaining that the Attorney General's office would need its own MOA to use SAVE); *see generally* SAVE MOA.) The Court finds it similarly probable that Arizona would seek authorization from USCIS to use SAVE for investigative purposes.

SAVE contains no information on native-born citizens.

The Voting Laws and 2023 EPM provide county recorders with well-defined procedures by which county recorders could "obtain" information that a voter is a non-citizen. However, given the limitations of the data accessible from MVD and SAVE, the Court finds that the Voting Laws' List Maintenance Procedures' MVD checks and the Reason to Believe Provision's SAVE checks will cause county recorders to "obtain" information of non-citizenship predominately for naturalized citizens.

### ii.    Confirming Information of Non-Citizenship

If a county recorder obtains information that a voter is a non-citizen, the county recorder must "confirm" this information. § 16-165(A)(10). The county recorder "shall first verify that the person at issue is a true match to a person listed on [AVID]." (2023 EPM at ECF-57.) When there is a "true match" and AVID records indicate that the voter has previously provided DPOC, the county recorder "shall not cancel" the voter's registration. (*Id.*) If AVID indicates that the voter has not provided DPOC (i.e., Federal-Only Voters), county recorders must, when practicable, review databases to which the county recorder has access, and may communicate directly with the voter. (*Id.* (citing § 16-165(K).) If a county recorder "confirms" that a voter not a U.S. citizen, the county recorder must notify the individual by forwardable mail that the individual must provide DPOC within 35 days to avoid having her registration canceled.[27] (*Id.*) "The notice shall include a list of documents the person may provide as DPOC and a postage prepaid pre-addressed return envelope." (*Id.* at ECF-58.) County recorders must complete any systematic cancellation of voter registrations based upon the receipt of a jury summary report or MVD records at least 90 days before an election. (*Id.* at ECF-62; *see* 09/14/2023 Order at 34.)

Dr. McDonald opined that the 6,084 naturalized voters whose MVD records reflect outdated citizenship information could become stuck in a "loop" where MVD will flag the voter as a non-citizen after each monthly check. (McDonald Tr. 1071:24–1072:5, 1089:23–

---

[27] Plaintiffs offered evidence that Arizona counties provide notice letters only in English, Spanish, Native languages, and Braille, and that no county issues notice letters in AANHPI languages. (Petty Tr. 162:2–16.) But Plaintiffs do not claim that Arizona is failing to satisfy the Voting Rights Act's voting materials language requirements. *See* 52 U.S.C. § 10503.

1090:8.) According to Dr. McDonald, these voters must then repeatedly provide DPOC to county recorders to avoid cancellation and referral to the Attorney General. (*Id.* 1075:3–1077:9.) Dr. McDonald's theory is unpersuasive considering the 2023 EPM's directive that county recorders must first check whether the voter has previously submitted DPOC. (2023 EPM at ECF-57.) Dr. McDonald also opined that the "anomalies" in the distribution of Federal-Only Voters and voter registration cancellations and suspensions among counties "suggest" that county recorders do not uniformly implement DPOC procedures. (McDonald Tr. 1107:12–22, 1113:17–25.) For example, Pima County reported zero canceled or suspended registrations for invalid DPOC despite being the second-largest county. (*See* Ex. 334 ("Registration Cancellation Rates"); Ex. 335 ("Registration Suspension Rates").) But Dr. McDonald adduced no explanation of the cause of this discrepancy except that the Pima County Recorder registers applicants without DPOC as Federal-Only Voters, just as the LULAC Consent Decree requires. (McDonald Tr. 1108:23–1109:6; *see also id.* 1111:19–1112:20 (describing Maricopa County's small number of suspended registrations); Doc. 679-1, Ex. 4, 30(b)(6) Dep. of Pima County Recorder ("Pima Dep.") 143:5–12.) These county registration cancellation, suspension, and Federal-Only Voter rates hold little persuasive value.

### 6. Investigation by the Attorney General

As outlined above, the Voting Laws require county recorders to refer for investigation the voter registrations of all (1) Federal-Only Voters as part of the Attorney General Referral Provision; (2) applicants who a county recorder "matches" with information indicating non-citizenship and do not submit DPOC; and (3) registered voters who a county recorder "confirms" are non-citizens and do not submit DPOC (collectively, the "Criminal Investigation Procedures"). *See* §§ 16-121.01(E), 16-143(A), 165(A)(10); (2023 EPM at ECF-17, -22.) County recorders refer these registrations to their respective county attorneys in addition to the Arizona Attorney General.

Bill Knuth, a lead special agent with the Attorney General's office, investigates election integrity matters. (Knuth Tr. 2107:25–2108:11.) Mr. Knuth explained that the

Attorney General's office currently handles election-related referrals from county recorders for further investigation on a case-by-case basis. (*Id.* 2124:4–16, 2130:23–2131:4.) Specifically, the Election Integrity Unit assesses referrals and determines whether allegations of non-citizenship warrant a more thorough investigation. (*Id.* 2134:18–2135:5.) H.B. 2492 § 7 mandates that the Attorney General's office "use all available resources to verify the citizenship status" of Federal-Only Voters. § 16-143(B). At minimum, this includes consulting SAVE, the MVD and SSA databases, and any other databases to which the county recorders have access. *Id.*

Mr. Knuth primarily consults the MVD database and various law enforcement databases for his own investigations and testified that he can retrieve limited information from the SSA database. (Knuth Tr. 2114:4–2117:1, 2117:18–2118:10.) He was unfamiliar with SAVE. (*Id.* 2111:6–12.) An MVD search will yield the subject's credential type, but neither the MVD nor SSA database provide the Attorney General's office with direct citizenship information. (*Id.* 2115:12–21.) The Attorney General's office may also speak directly to the subject of an investigation of illegal voting, but Mr. Knuth has never contacted an alleged non-citizen during an investigation. (*Id.* 2131:5–17, 2138:19–2139:14.) Mr. Knuth testified that he would forward a case to prosecutors upon finding probable cause that a non-citizen had registered to vote or voted but he could not recall ever referring such a case for prosecution. (*Id.* 2132:13–2133:2, 2133:17–2134:3.)

**C.     State Interests in Enacting the Voting Laws**

The State offers two purported interests in the Voting Laws: (1) preventing voter fraud and limiting voting to individuals eligible to vote, and (2) improving public confidence in Arizona's elections.

**1.     Preventing Ineligible Individuals from Registering to Vote or Voting in Arizona**

It is a felony to knowingly register oneself or another person to vote, "knowing"

that the registrant is not eligible to vote. § 16-182. Dr. Lorraine Minnite[28] opined that voter fraud is exceedingly rare nationally and in Arizona. (Minnite Tr. 1578:13–1582:7.) Dr. Minnite and Dr. Mark Hoekstra[29] agreed, however, that voter fraud can be difficult to detect. (Minnite Tr. 1565:23–1566:8, 1567:14–22; Hoekstra Tr. 1747:3–1748:2.) As part of her "mixed methods"[30] approach, Dr. Minnite analyzed prosecution data from the U.S. Attorney General's office. Between 2002 and 2005, 200 million votes were cast in federal elections. (Minnite Tr. 1579:4–13.) During this time, the U.S. Attorney General began its "Ballot Access and Voting Integrity Initiative" to identify voter intimidation and voter fraud. (*Id.* 1578:13–25.) The U.S. Attorney General's office indicted 40 individual voters for voter fraud from 2002 to 2005 through the initiative, with only 15 indictments for non-citizen voting. (Minnite Tr. 1578:13–1580:1.) In addition, nearly one billion votes were cast from 2000 to 2017, but U.S. Attorney offices initiated less than 200 election-related cases. (*Id.* 1580:19–1581:21.)

The Arizona Attorney General's office maintains a list of all election-related prosecutions. According to this list, there have been 38 total prosecutions related to illegal voting by the Attorney General since 2008, none of which involved a charge of non-citizen voting. (Ex. 292 at PX 292-1 to -6; Lawson Tr. 1688:3–1690:7.) The Attorney General's office is aware of two current indictments against alleged non-citizen voters, both which involve individuals who engaged in systematic identity theft. (Lawson Tr. 1691:11–15, 1707:8–1708:4.) These cases are sealed and were not known to the Arizona Legislature at

---

[28] Dr. Minnite is an associate professor at Rutgers University and has studied the incidence of voter fraud in U.S. elections for 20 years. (Minnite Tr. 1555:19–1556:9.) Dr. Minnite is the author of a leading book regarding the incidence of voter fraud, which the United States Government Accountability Office has recognized as scientifically reliable. (*Id.* 1557:13–1559:13.) The Court found Dr. Minnite credible and affords substantial weight to her opinions.

[29] Dr. Hoekstra is a professor of economics at Baylor University. (Hoekstra Tr. 1640:20–21.) Dr. Hoekstra has published one paper on the impact of photo identification laws. (*Id.* 1642:20–24.) Defendants offered Dr. Hoekstra's testimony to rebut Dr. Burch's, Dr. McDonald's, and Dr. Minnite's opinions regarding issues of the Voting Laws' correlation to, among other things, disparate registration and voting outcomes. (*Id.* 1654:7–9.) The Court found Dr. Hoekstra credible and affords his opinions only some weight.

[30] The mixed methods approach combines quantitative data and qualitative sources to identify patterns in the research and infer a conclusion from this information. (Minnite Tr. 1564:6–1565:22, 1570:12–1571:4.)

ER - 0035

the time it enacted the Voting Laws. (Lawson Tr. 1708:14–23.) The Attorney General's office also receives complaints from the public that non-citizens are voting in Arizona, including allegations regarding specific voters, though these allegations have never led to any prosecutions. (Knuth Tr. 2109:6–2110:2, 2120:11–2121:9; Ex. 286, Ex. 287.) Dr. Minnite identified 13 prosecutions for non-citizen voting in Maricopa County between 2007 and 2008. (Minnite Tr. 1588:3–23.)

Aside from prosecutions, Ms. Petty could recall "one or two instances" in which the Maricopa County Recorder's office confirmed that a registered voter was a non-citizen after receiving notice from the jury office that a potential juror self-reported non-citizenship. (Petty Tr. 105:24–107:24.) Other county recorders reported being unaware of the prevalence of non-citizens registering to vote or voting. (*See* Pima Dep. 241:14–242:11; Doc. 679-3, Ex. 17, 30(b)(6) Dep. of Pinal County Recorder ("Pinal Dep.") 114:19–115:1.) In addition, county recorders often receive faulty voter registration forms from third-party registration drives. For example, both Maricopa County and Pima County reported a marked increase in these forms during the 2022 election cycle. (Petty Tr. 137:21–24; Hiser Tr. 1995:7–1996:19.) But Defendants adduced no evidence indicating that these forms were submitted in an attempt to register non-citizens. (*See, e.g.*, Hiser Tr. 1995:21–1998:15 (Pima County receiving registration forms purported to be for deceased voters); Johnston Tr. 2083:6–2085:5 (Yuma County receiving registration forms containing falsified or incorrect birth date, SSN4, or residence information).) Nor is there evidence that any of Arizona's Federal-Only Voters are non-citizens.

The Court finds that though it may occur, non-citizens voting in Arizona is quite rare, and non-citizen voter fraud in Arizona is rarer still. But while the Voting Laws are not likely to meaningfully reduce possible non-citizen voting in Arizona, they could help to *prevent* non-citizens from registering or voting. (*See* Minnite Tr. 1563:3–14 (opining the Voting Laws will not "reduce" voting fraud "further").)

### 2.    Voter Confidence

Evidence at trial indicates that members of the public have expressed concerns about

1    election integrity in Arizona, specifically as it relates to non-citizens voting in federal

2    elections. (Knuth Tr. 2121:12–23; Lawson Tr. 1696:18–25; Quezada Tr. 877:8–878:17.)

3    For example, when drafting the 2023 EPM, the Secretary of State received public

4    comments for two weeks, approximately one-quarter of which were "form" letters

5    commenting that "voters should be citizens" or should prove their citizenship. (Connor Tr.

6    382:12–383:25.)

7    According to Dr. Hoekstra, the Voting Laws could reduce perceptions of voter fraud

8    by persuading voters that Arizona is taking precautions to make it more difficult for non-

9    citizens to vote. (Hoekstra Tr. 1751:18–1752:9, 1870:2–16; *see also* Richman Tr. 1933:10–

10   18, 1934:16–23, 1935:14–17 (opining that the Voting Laws "should" improve voter

11   confidence).) Dr. Hoekstra cited a study that found "a couple percentage points" increase

12   in voter confidence among individuals who were notified before an election that their state

13   had a voter identification law. (*Id.* 1752:15–1753:16.) However, measuring improved voter

14   confidence typically requires voters to be well-informed about the election law, and

15   Defendants adduced no evidence quantifying the likelihood that Arizonans will become

16   aware of the Voting Laws and their purported impacts on preventing voter fraud in Arizona.

17   (*See id.* 1797:18–1800:16, 1866:4–1867:25.)

18   No party offered direct evidence predicting the expected effects of the Voting Laws

19   on Arizonans' confidence in the State's elections.

20       **D.    Intent and Effects of the Voting Laws**

21           **1.    Evidence of Discrimination**

22               **i.    History of Discrimination in Arizona**

23   Plaintiffs offered the expert testimony of Dr. Orville Burton and Dr. Derek Chang

24   to illustrate the Voting Laws in the context of Arizona's history of discrimination. Plaintiffs

25   offered Dr. Burton as "an expert in American history, voting behavior, discrimination,

26   socioeconomic status and equality and historical intent."[31] (Burton Tr. 1403:20–22.)

27   _____

28   [31] Overall, the Court affords Dr. Burton's opinions some weight but questions the reliability
     of some of his testimony regarding Arizona history. For example, Dr. Burton testified that

1    Plaintiffs offered Dr. Chang as an expert on historical patterns between the Voting Laws

2    and other discriminatory laws.[32] (Chang Tr. 1335:17–24.)

3          Before statehood, Arizona banned intermarriage between Asians and White people.

4    (Chang Tr. 1346:19–1347:15, *see id.* 1337:24–1338:19 (describing the "Period of

5    Immigration").) Though Arizona historically banned interracial marriage, an Arizona state

6    court ruled this to be unconstitutional before *Loving v. Virginia*, 388 U.S. 1 (1967); (Burton

7    Tr. 1415:1–21, 1504:6–24.) Arizona also passed an "alien land law" in 1921 that barred

8    immigrants who were ineligible to become U.S. citizens—specifically, people of Asian

9    descent—from owning land. (Chang Tr. 1349:16–1350:5.) In 1953, Arizona courts ordered

10   the full desegregation of schools. (Burton Tr. 1421:19–1422:2, 1507:25–1508:17.)

11   Following desegregation, however, Arizona continued to require English-only classroom

12   instruction, thereby producing disparate educational outcomes particularly for Native

13   Americans and Spanish speakers. (*Id.* 1422:3–7, 1423:5–23.) Arizonans also amended the

14   Arizona Constitution in 1988 to mandate that all political subdivisions of Arizona act only

15   in English, but the Arizona Supreme Court ruled this unconstitutional. *See Ruiz v. Hull*,

16   _____

17   Arizona had been deemed the "twelfth star of the Confederacy," but it was unclear whether
     he understood this to refer to the former territory that encompassed both Arizona and New

18   Mexico at the time, or what would become Arizona following statehood. (Burton Tr.
     1491:16–1493:23, *see also id.* 1496:14–24 (failing to consider Arizona's history of

19   supporting the Union), 1498:17–1500:23 (Arizona's prohibition of slavery).) Dr. Burton
     also lacked a strong understanding of existing Arizona election law. (*See, e.g.*, *id.* 1528:8–

20   1529:20 (incorrectly believing voters removed for non-citizenship were not notified under
     previous Arizona law), 1536:4–16 (unaware if polling locations are open past 5:00 PM).)

21   And Dr. Burton did not consider it necessary to consult the legislative history of the Voting
     Laws in forming his opinions. (*Id.* 1542:12–24.)

22   [32] The Court affords Dr. Chang's opinions little weight. Dr. Chang did not review the
     legislative history of the Voting Laws because he did not believe it would have been

23   particularly useful when comparing the Voting Laws to broader historical patterns of
     discrimination. (Chang Tr. 1342:8–12, 1382:8–19.) Dr. Chang informed most of his

24   opinion by considering the history of the Asian American and Pacific Islander ("AAPI")
     community from a national perspective. (*See id.* 1345:20–1346:3 (discussing the federal

25   Page Act), 1348:1–23 (discussing the Federal Chinese Exclusion Act of 1882).) As for
     some of the history of discrimination against the AAPI community in Arizona, Dr. Chang's

26   opinions were incomplete or misleading. For example, he opined that a recent House Bill
     was like Arizona's 1921 "alien land law," but he had not read the bill in its entirety, which

27   prohibits land sales and leases to specific foreign governments or companies. (*Id.* 1375:14–
     1377:14); H.B. 2376, 56th Leg., 1st Sess. (Ariz. 2023). Dr. Chang also asserted that

28   Phoenix experienced a 50% increase in anti-Asian violence from 2019 to 2020, which
     while correct, was an increase from just two reports of violence in 2019 to three in 2020.
     (Chang Tr. 1383:2–1384:24, 1385:3–9.)

957 P.2d 984, 998, 1000 (Ariz. 1998).

Arizona also has a well-documented history of voting discrimination. For example, the territorial government imposed a literacy test as a prerequisite to voting to limit the "ignorant Mexican vote," which Arizona renewed in 1912 after statehood. (Burton Tr. 1429:1–1431:22.) And while Native Americans were granted citizenship in 1924, Arizona courts only recognized their right to vote in 1948. (*Id.* 1432:16–1434:1, 1513:2–8); *see* Indian Citizenship Act of 1924, Pub. L. No. 68-175, 43 Stat. 253 (codified at 8 U.S.C. § 1401(b)). However, Arizona's literacy requirement stood until 1972, meaning many Native Americans were, for all intents and purposes, still unable to vote. (Burton Tr. 1432:16–1434:1); *see Oregon v. Mitchell*, 400 U.S. 112 (1970) (finding amendment to the Voting Rights Act banning literacy tests constitutional). In the 1970s and 1980s, Arizona conducted "total" voter roll purges that required individuals to re-register to vote, but fewer minority voters would re-register compared to White voters. (Burton Tr. 1435:3–10, 1436:3–11.) Dr. Burton also cited at least one example of a Maricopa County election official requesting DPOC around this time even though DPOC was not required by law. (*Id.* 1435:10–20.) And for forty years, Arizona was subject to section 5 of the Voting Rights Act, which required Arizona to seek "preclearance of changes affecting voting."[33] 28 C.F.R. pt. 51, App. (2012).

Plaintiffs offered evidence that disparate socioeconomic outcomes remain pervasive for communities of color. The median household income for Black, Native Indian and Alaska Native, and Latino individuals is approximately $9,000 to $21,000 less than the household average. (Doc. 672-3, Ex. 28, ("ACS Household Income") at ECF-59.) Non-White Arizonans are also more likely than White Arizonans to live in a household with an income falling below the poverty line. (Pls.' Judicial Notice ¶ 27.) For example, 19.2% of Latino Arizonans live in a household below the poverty line, compared to 9.6% of White Arizonans, although naturalized citizens are less likely than native-born citizens to live in

---

[33] In *Shelby County, Alabama v. Holder*, the Supreme Court held that the formula for determining "covered jurisdictions" that were required to seek preclearance was unconstitutional. 570 U.S. 529, 556–57 (2013).

1    poverty. (Doc. 672-3, Ex. 27, ("ACS Poverty Rates") at ECF-51, -53.) Moreover,

2    approximately 72% of voting-age Latino and 78% of American Indian or Alaska Native

3    Arizonans have earned a high school diploma or equivalent, compared to 95% of White

4    Arizonans. (Doc. 672-3, Ex. 29, ("ACS Educational Attainment") at ECF-71, -74.)

5                    **ii.    The Voting Laws' Legislative History**

6           Arizona's November 2020 presidential election was decided in favor of President

7    Biden by a margin of 10,457 votes. (Pls.' Stip. No. 154.) Former President Trump falsely

8    claimed that non-citizens had illegally cast more than 36,000 ballots in the election.

9    (Minnite Tr. 1597:5–11.) President Trump's attorney Rudolph Giuliani also stated that tens

10   of thousands of "illegal aliens" voted in Arizona, which a New York state appellate court

11   found "false and misleading." *In the Matter of Rudolph W. Guiliani*, 146 N.Y.S. 3d 266,

12   268, 279–80 (N.Y. App. Div. 2021). Against this backdrop, the Arizona Senate established

13   a committee to audit the 2020 election, which revealed no evidence of voter fraud.

14   (Quezada Tr. 824:15–825:9.)

15          Prior to passing the Voting Laws, the Arizona Legislature did not establish that any

16   non-citizens were registered to vote in Arizona. (Doc. 679-1, Ex. 6, ("Toma Dep.") 99:20–

17   22, 100:1–5, 102:7–21; Doc. 679-2, Ex. 7, ("Petersen Dep.") 84:15–85:5.) Neither Speaker

18   Toma nor President Petersen could recall the Legislature being presented with or

19   considering evidence of non-citizen voter fraud in Arizona. (Toma Dep. 99:12–18;

20   Petersen Dep. 95:6–8, 95:11–96:10, 184:18–185:4.)

21          H.B. 2492 was introduced to the Arizona House of Representatives on January 24,

22   2022. (Pls.' Stip. No. 42.) Representative Jake Hoffman was the prime sponsor of H.B.

23   2492 and the Arizona Free Enterprise Club[34] helped draft the substance of the bill. (Toma

24   Dep. 139:19–20; Peterson Dep. 158:7–13, 159:19–160:7; *see* Ex. 54, ("H.B. 2492 House

25   Gov. Comm. Tr.") at PX 054-5 to -7.) In support of H.B. 2492's DPOC Requirement,

26   Representative Hoffman explained during a House Government and Elections Committee

27

28   _____

[34] The Free Enterprise Club is a conservative lobbying group that advocated for the Voting
Laws to address "how more illegals started voting in AZ." (Ex. 602 (email from Arizona
Free Enterprise Club to Senator Petersen).)

meeting that following the LULAC Consent Decree, more than 11,600 individuals had registered to vote in federal elections without DPOC. (H.B. 2492 House Gov. Comm. Tr. at PX 054-3 to -4.) On February 22, 2022, a majority of the House Rules Committee voted in favor of H.B. 2492 over the concerns of the Committee's counsel that the NVRA likely pre-empted the bill's DPOC Requirement for Federal Form applicants. (*See generally* Ex. 57.) The Arizona House of Representatives passed the bill. (*See generally* Exs. 58, 59.)

The Arizona Senate Judiciary Committee met on March 10, 2022 to discuss the bill. (*See generally* Ex. 61.) In explaining his vote against H.B. 2492 during the committee meeting, then-Senator Martin Quezada indicated that the bill would disproportionately "target[]" people of color, leading Senator Petersen to call a recess after the audience began to audibly react. (*Id.* at PX 061-34 to -36.) The Senate passed H.B. 2492 on March 23, 2022, which then-Governor Doug Ducey signed into law.  (Ex. 62, at PX 062-22; Pls.' Stip. No. 43.) H.B. 2492 took effect January 1, 2023. (Pls.' Stip. Nos. 44–45.) The legislative history indicates that the legislators in favor of the bill were concerned specifically with the increase of Federal-Only Voters in Arizona who had not provided DPOC. (*See, e.g.*, H.B. 2492 House Gov. Comm. Tr. at PX 054-3.)

H.B. 2243 was first introduced in the Arizona Legislature in January 2022. (*See generally* Ex. 68.) As originally drafted, H.B. 2243 amended only § 16-152 to require a notice on the State Form informing the voter that her registration would be cancelled if the voter moved permanently to a different state. (*See generally* Exs. 705, 707.) On January 31, 2022, H.B. 2617 was introduced, which would have required county recorders to cancel a voter's registration if the county recorder "confirms" either that the voter is a non-citizen or was issued an out-of-state identification, and the voter failed to furnish "satisfactory evidence that the person is qualified" within 90 days of receiving notice of cancellation.[35]

---

[35] As discussed *supra* Section I(B)(5)(i), county recorders previously provided a voter with 35 days to submit DPOC if that voter had indicated on a juror questionnaire that they were not a U.S. citizen, and voter's registration file lacked DPOC. Also, before the introduction of H.B. 2617, voters were also entitled to a 35-day final notice to update the voter's address and avoid being placed into inactive status if official election mail was returned to county recorders as undeliverable. (2019 EPM at PX 006-52 (describing the process to satisfy the NVRA); *see also id.* at PX 006-52 to -53 (describing similar process when a county recorder receives information from USPS's National Change of Address Service).)

(Ex. 4, ("H.B. 2617 Text") at PX 004-2 to -3; *see generally* Ex. 67, ("H.B. 2617 Bill History").) House Representative Joseph Chaplik was the Primary Sponsor of H.B. 2617, and the Arizona Free Enterprise Club helped draft the bill. (H.B. 2617 Bill History at PX 067-1; Petersen Tr. 238:4–8.) On May 25, 2022, the Arizona Legislature passed H.B. 2617. (*See* H.B. 2617 Bill History at PX 067-3; *see also* Exs. 490, 491, 494, 495, 497, 498.) Governor Ducey vetoed the bill, noting that H.B. 2617 was "vague and lack[ed] any guidance for how a county recorder would" determine whether a person was a "qualified elector." (Ex. 53, ("H.B. 2617 Veto Letter") at PX 053-1; *see* H.B. 2617 Text at PX 004-2 to -3 (requiring county recorder to cancel voter registration when the county recorder confirms that a voter is "not a qualified elector").)

Following Governor Ducey's veto of H.B. 2617, Representative Toma and Representative Chaplik decided to include an amended version of H.B. 2617 into H.B. 2243. (*See* Toma Dep. 235:7–23, 240:2–3, 246:23–247:6, 257:13–17.) Senator Petersen sponsored the amendment in the Senate, and on the last day of the legislative session, proposed a floor amendment[36] in the Committee of the Whole to incorporate H.B. 2617 into H.B. 2243. (Ex. 708; Petersen Dep. 247:10–20, 268:6–22, 269:2–10.) Senators Quezada and Petersen, and Representative Toma all agreed that last-minute amendments commonly occur at the end of the legislative session, though Senator Quezada testified that it was abnormal for "significant" amendments to be introduced so late in the legislative session. (*See* Quezada Tr. 860:9–861:16; Toma Dep. at 237:8–239:3; Petersen Dep. at 319:3–24.)

Senator Petersen characterized the amendments to H.B. 2243 as essentially "identical to" H.B. 2617, except for some "additional notice requirements." (Ex. 499 at PX 499-3.) But H.B. 2243 provides voters with 35 days to furnish DPOC instead of the 90 originally in H.B. 2617. (*Compare* H.B. 2243 Text at PX 002-5 to -6, *with* H.B. 2617 Text at PX 004-3.) H.B. 2243 also differs from H.B. 2617 by requiring county recorders to place

---

[36] A floor amendment allows a legislator to include the substance of a bill that has changed after leaving its assigned committees into a separate "germane" bill within the same section or title of the Arizona Revised Statutes. (Petersen Dep. 270:3–10.)

a voter's registration into inactive status instead of cancelling the registration if the voter fails to attest (instead of providing "satisfactory evidence") that she is an Arizona resident within 90 days. (*Compare* H.B. 2243 Text at PX 002-6, *with* H.B. 2617 Text at PX 004-3.) There is no explanation for these changes in the legislative record except that H.B. 2243 as amended "addresses the [Governor's] veto letter." (Ex. 499 at PX 499-3.) The Committee of the Whole adopted Senator Petersen's floor amendment. (*Id.* at PX 499-6.) The Arizona Legislature then passed H.B. 2243, which Governor Ducey signed into law.[37] (*See* Exs. 68, 500.)

Nothing in the legislative history of H.B. 2492 or H.B. 2243 reflects an intent to suppress voter registrations of members of minority groups or naturalized citizens.[38] (*See generally* H.B. 2492 House Gov. Comm. Tr.; Exs. 57, 58, 61, 490, 491, 494, 495, 497–500.) The evidence indicates that concerns of reinforcing election integrity in response to the increase in Federal-Only Voters drove the Legislature's enactment of the Voting Laws. (*See, e.g.*, H.B. 2492 House Gov. Comm. Tr. at PX 054-3.) Plaintiffs did not adduce evidence challenging the sincerity of some Arizonans' beliefs that non-citizens had voted in the 2020 election. And while there is no evidence that Federal-Only Voters may be non-citizens, the Legislature's decision to scrutinize these voters does not ring of discrimination. In addition, the justification for the Birthplace Requirement came from a representative for the Arizona Free Enterprise Club, who explained that birthplace could help identify voters in the databases enumerated in the Voting Laws, such as NAPHSIS. (Ex. 61 at PX 061-24 to -26.) The legislative record lacks any indicia of a nefarious motive. And despite Dr. Chang and Dr. Burton's account of Arizona's history of discrimination, neither expert articulated a persuasive factual nexus between this history and the Fifty-Fifth Legislature's enactment of the Voting Laws.

---

[37] H.B. 2243 supersedes H.B. 2492 § 8, which would have directed county recorders to cancel the registrations of voters who county recorders "confirm[]" are not U.S. citizens, without first providing notice or an opportunity for voters to furnish DPOC. (*See* H.B. 2492 § 8.)

[38] Plaintiffs make much of ongoing discriminatory comments Senator Borelli purportedly made to Senator Quezada during Senator Quezada's time in the Senate, but regardless of what Senator Borelli may have expressed, Plaintiffs cannot impute his beliefs or motives to the entire Arizona Legislature.

1              **2.      Effect of the Voting Laws on Voters**

2          Most of H.B. 2243 requires no action on the part of voters. Its List Maintenance

3    Procedures impose obligations on county recorders and the Secretary of State to ensure

4    that all registered voters are U.S. citizens. *See* § 16-165(G)–(J). Only if a county recorder

5    "confirms" a voter is a non-citizen must that voter produce DPOC within 35 days to avoid

6    having her registration cancelled and referred to the attorney general for investigation. *Id.*

7    § 16-165(A)(10). H.B. 2492's Citizenship Verification Procedures and Attorney General

8    Referral Provision similarly require county recorders and the attorney general to investigate

9    the citizenship status of registrants and voters without DPOC. §§ 16-121.01(D), 16-143(B).

10         Dr. Traci Burch[39] applied the "rational choice" framework to analyze the burdens

11   the Voting Laws would impose on Arizona voters. The rational-choice framework weighs

12   the perceived probable rewards of an action against the probable corresponding costs to

13   predict the likelihood that an individual will perform the action. (Burch Tr. 931:20–

14   932:11.) The three primary costs are: (1) learning costs, such as learning how to register to

15   vote; (2) compliance costs, such as the cost to obtain the information necessary to register

16   to vote; and (3) psychological costs, or the emotional burdens associated with performing

17   the action and the resulting effects of that action. (*Id.* 933:13–17, 934:10–25, 935:15–

18   936:7.) Individuals of higher socioeconomic status are typically better positioned to bear

19   these costs as compared to individuals of lower socioeconomic status. (*Id.* 940:23–941:24,

20   942:19–944:12.)

21         Dr. Burch opined that requiring DPOC to register to vote and avoid removal from

22   the voter rolls will increase compliance costs for Arizona voters, particularly those who

23   lack ready access to DPOC. (*Id.* 969:5–9.) Plaintiff representatives testified that some

24   citizens residing in Arizona may lack ready access to the information that constitutes

25   DPOC in Arizona. (*See, e.g.*, Nitschke Tr. 469:8–470:3 (explaining out-of-state students

26
_____

27   [39] Dr. Burch is an associate professor of political science at Northwestern University and a
     research professor at the American Bar Foundation. (Burch Tr. 923:23–25.) Dr. Burch
28   testified to the burdens the Voting Laws may impose on individuals in attempting to vote.
     (*Id.* 927:16–18, 928:16–929:3.) The Court found Dr. Burch credible and affords her
     opinions considerable weight.

may keep records with parents); Tiwamangkala Tr. 1273:22–1274:3 (explaining that Equity Coalition's partner organization helps AANHPI individuals obtain citizenship documentation to apply for government benefits).) Estimates suggest that around seven percent of all U.S. citizens lack ready access to proof of citizenship. (Hoekstra Tr. 1838:24–1839:10.) But Plaintiffs adduced no evidence estimating the number of Federal-Only Voters who lack all acceptable forms of DPOC. Nor did Plaintiffs show that naturalized citizens or people of color are more likely than their White counterparts to lack DPOC. And assuming *all* of Arizona's Federal-Only Voters did not possess DPOC at the time of registration, this would account for less than half a percent of the State's registered voters. (*See* Ex. 336; Pls.' Stip. No. 26 (19,439/4,198,726=0.4%).)

Aside from Federal-Only Voters, Dr. McDonald testified that county recorders cancelled 1,290 Arizona voter registrations for "Invalid Citizenship Proof," and suspended 5,555 additional voter registrations for this same reason. (McDonald Tr. 1106:25–11, 1111:13–21; *see* Registration Cancellation Rates; Registration Suspension Rates.) Dr. McDonald did not, however, opine on whether these were citizens who did not possess or could not provide DPOC, but instead offered these figures as evidence that county recorders historically have not uniformly implemented Arizona's election laws. (McDonald Tr. 1107:12–22, 1232:2–1234:13.) For example, Cochise County appears to have placed voter registrations in suspense status for lacking DPOC, rather than registering these registrants as Federal-Only Voters. (*See, e.g.*, Ex. 510.) Dr. Richman noted that most of these voters did not match with any MVD file containing citizenship information, in which case county recorders could not have relied on stale MVD data to cancel or suspend these registrations. (Richman Tr. 1954:12–1956:3; MVD Non-Citizen Records (indicating lack of MVD matches for 858 of 1,290 cancelled registrations and 5,010 of 5,555 suspended registrations but listing 77 cancelled registrations for lack of DPOC and 253 suspended registrations for "Invalid Citizenship Proof" in MVD).) Dr. Richman also explained that AVID's coding system to suspend and cancel voter registrations for "Invalid Citizenship Proof" contained "overlapping codes." (*See, e.g.*, Richman Tr. 1917:11–

1919:11 (explaining citizenship cancellation codes include voluntary and involuntary
cancellation); *see also* Ex. 796, (listing an "Invalid Citizenship Proof" code for registrants
who are "Not Eligible," but lacking any similar code for cancelled or suspended
registrants).) The Court finds that Arizona's cancellation and suspension of approximately
7,000 voter registrations for "Invalid Citizenship Proof" is not probative of the number of
qualified Arizonans unable to provide DPOC when registering to vote.

Plaintiffs did offer evidence that obtaining DPOC could impose a financial burden
on low-income voters. For example, the cost of obtaining a copy of an Arizona birth
certificate is 35 dollars.[40] (Doc. 672-7, Ex. 50.) The fee to replace a naturalization
certificate is significantly greater, costing \$555.[41] (Doc. 672-7, Ex. 53.) However,
naturalized citizens are less likely than native-born citizens to live in a household with
income below the poverty line, and furthermore, naturalized citizens need only provide an
immigration number as DPOC if they do not possess a naturalization certificate. § 16-
166(F)(4). Furthermore, while approximately 19% of Latino individuals live in a household
below the poverty line, 82% of Arizona's Latino citizens are native-born, meaning most
Latinos will not be burdened by the considerably higher costs associated with obtaining
new naturalization documents.

Dr. Burch opined that requiring voters to provide DPOC and subjecting voters who
cannot provide DPOC to potential investigation could also impose psychological costs.
(Burch Tr. 946:12–947:9, 969:5–9, 972:14–23, 993:6–17.) Specifically, Latino and
AANHPI voters may fear drawing attention to their families, particularly voters who live
with non-citizens in mixed-status households. (*Id.* 993:18–994:7; *see also* Tiwamangkala
Tr. 1274:19–1275:3 (chilling effect among AANHPI community); Guzman Tr. 480:9–
481:18 (chilling effect among Latino community).) For instance, pursuant to H.B. 2243's

---

[40] Plaintiffs ask the Court to take judicial notice of the cost of obtaining a passport. But a
U.S. citizen must provide proof of U.S. citizenship to obtain a passport or pay an additional
150-dollar fee for the United States to conduct a search for a previously issued passport.
The Court gives little weight to the burden of obtaining a passport because an individual
may obtain a new birth certificate for substantially less and in less time. (*Compare* Doc.
672-7, Ex. 50, *with* Doc. 672-7, Ex. 51, at ECF-13, 16.)
[41] It can take up to eight months to receive a replacement certificate. (Doc. 672-7, Ex. 54.)

mandate that the Secretary of State compare AVID to the MVD database each month, the MVD customer extract will flag all individuals with a foreign-type credential as non-citizens, despite that this information will be outdated for the 6,084 naturalized Full-Ballot Voters who still possess an unexpired foreign-type credential. And because MVD does not issue foreign-type credentials to native-born citizens, only naturalized citizens will ever be misidentified as non-citizens. H.B. 2243's Reason to Believe Provision will similarly affect only naturalized citizens because SAVE cannot search for native-born citizens. The Latino and AANHPI communities may associate these procedures with Arizona's history of discriminatory treatment against people of color. (*See supra* Section I(D)(1)(i).)

The Court finds that the compliance and psychological costs associated with the Voting Laws' DPOC Requirements[42] and investigative procedures would predominately impact voters of lower socioeconomic status and naturalized citizens. Plaintiffs did not, however, quantify the scope of this impact, given the lack of evidence regarding the distribution of voters who do not possess or would be unable to obtain DPOC. As for the Voting Laws' Birthplace Requirement, Plaintiffs did not adduce any evidence that voters would be unable to include birthplace information. However, the evidence shows that Latino and AANHPI voters could be deterred from registering to vote due to fears of investigation.

### E.      Plaintiffs Sue for Relief

Following the passage of the Voting Laws, the United States and a collection of nonpublic entities (collectively, "Plaintiffs") filed several lawsuits seeking injunctive relief. (*See, e.g.*, Doc. 1, 2:22-cv-00519-SRB; Doc. 1, 2:22-cv-01124-SRB.) The Court consolidated the Plaintiffs' eight lawsuits into the instant case. (*See* Docs. 39, 48, 69, 79, 91, 164, 193.) Together, Plaintiffs claim the Voting Laws, among other things, (1) violate the Civil Rights Act of 1964, the NVRA, and the Voting Rights Act; (2) place an undue burden on the right to vote; and (3) violate the due process and equal protection guarantees

---

[42] The Court uses "DPOC Requirements" to refer to H.B. 2492 § 4's mandate that all voter registrations include DPOC to be registered as a Full-Ballot Voter, as well as H.B. 2492 § 4 and H.B. 2243 § 2's requirement that a registrant or voter provide DPOC if a county recorder matches that individual to information of non-citizenship.

of the U.S. Constitution. (*See* Doc. 304.) The Republican National Committee ("RNC"), Arizona Senate President Warren Petersen, and Arizona House of Representatives Speaker Ben Toma, intervened as defendants. (Doc. 18, 2:22-cv-01369-SRB; Doc. 363.)

The Voting Laws have not yet been enforced, but many non-US Plaintiffs have already shifted their operations to mitigate the anticipated impacts of the laws, while other non-US Plaintiffs anticipate doing so if the Voting Laws take effect. All non-US Plaintiffs assert an interest in maximizing voter turnout among certain communities, including Latinos, Native Americans, AANHPI individuals, Black Americans, students, young people, the elderly, and Democratic voters generally.

### 1.      Mi Familia Vota

Mi Familia Vota is a national, nonprofit civic engagement organization that seeks to increase civic participation in the Latino community and "ensure that as many people as possible can participate in the democratic process, including members of the Latino community." (Rodriguez-Greer Tr. 780:20–25, 781:22–782:2). At trial, Carolina Rodriguez-Greer, Mi Familia Vota's State Director for Arizona, testified that Mi Familia Vota engages in "year-round" voter engagement efforts and has a reputation as a "trusted community resource" on voting and civic participation. (*Id.* 780:14–17, 782:14–18). Mi Familia Vota's voting-related activities include providing election resources in Spanish, hosting voter education workshops, assisting permanent legal residents with the citizenship application process, and registering voters by tabling at events and with paid canvassers. (*Id.* 781:22–782:24, 785:4–17.) Mi Familia Vota provides in-depth training to its canvassers on the voter registration forms and on how to engage with potential voters in the communities that the organization serves. (*Id.* 783:25–784:7.) Mi Familia Vota has registered over 30,000 voters in Arizona since 2021. (*Id.* 780:18–19, 784:12–14.)

Mi Familia Vota claims that the Birthplace Requirement will impact its voter registration efforts because the community members it serves are often hesitant to share personal information with the government, including their place of birth. (*Id.* 786:12–787:3, 787:15–788:8.) Rodriguez-Greer testified that she observed this fear among

1    naturalized citizens growing up in Tucson, Arizona, which is less than 100 miles from the
2    U.S.-Mexico border. (*Id.* 786:12–787:3.) Mi Familia Vota does not have additional
3    resources to devote to mitigate the anticipated effects of the Voting Laws, so it expects that
4    it will need to "go into crisis mode" and redirect existing funds toward new voter education
5    initiatives. (*Id.* 791:16–792:4, 809:24–810:1.) For example, Mi Familia Vota anticipates
6    redirecting staff members from its ambassadors program, which is designed educate voters
7    about basic election issues, to a new effort that addresses community members' confusion
8    about the Voting Laws and educates them about the changes to the registration and voting
9    process. (*Id.* 791:16–792:23.) Mi Familia Vota also expects to adjust its voter registration
10   program and reallocate its staff's efforts to developing a new training program for
11   canvassers. (*Id.* 792:24–793:12.) Mi Familia Vota spent approximately $1.5 million on its
12   voter engagement efforts in 2023, and it expects that its budget for voter engagement will
13   be "significantly higher" in 2024. (Rodriguez-Greer Tr. 781:13–15, 784:19–22.)

### 2.    Voto Latino

15   Voto Latino is a 501(c)(4) nonpartisan, nonprofit social welfare organization that
16   aims to "educate and empower a new generation of Latino voters in Arizona." (Patel Tr.
17   217:4–11.) Voto Latino's voting-related work includes voter registration, increasing voter
18   turnout among low-propensity voters, and advocacy. (*Id.* 216:16–17, 217:12–218:5.) Voto
19   Latino's voter registration efforts include "chase programming," by which Voto Latino
20   follows up with individual voters who did not complete their voter registration or may not
21   have successfully submitted their registration to be placed onto the voter rolls. (*Id.* 221:20–
22   223:14.) Since 2012, Voto Latino has registered over 60,000 voters in Arizona. (*Id.*
23   220:25–221:6.)

24   Voto Latino claims that the Birthplace Requirement will disproportionately impact
25   the Latino community, which is more likely to be born outside of the United States. (*Id.*
26   227:10–25.) Voto Latino's Managing Director Ameer Patel testified that Voto Latino
27   expects to expend additional resources on its chase programming to successfully register
28   the same number of voters as it did in the 2020 election cycle as a result of the Voting

1     Laws. (*Id.* 229:17–231:8.) Voto Latino claims that this will "take away" resources from

2     the organization's advocacy and turnout efforts. (*Id.* 238:17–23.) Voto Latino also claims

3     that H.B. 2492's Citizenship Verification Procedures and Attorney General Referral

4     Provision will have a chilling effect on prospective Latino voters, which will hinder Voto

5     Latino's voter registration and voter turnout efforts and require the organization to

6     reallocate resources to educate voters about the investigation provisions. (*Id.* 236:9–237:8.)

7     After H.B. 2492 was passed, Voto Latino spent resources and devoted staff time to create

8     new content, including videos, infographics, one-pagers, and a press release to educate

9     voters about the impact of the bill. (*Id.* 237:9–19, 253:22–254:22.)

### 3. Southwest Voter Registration Education Project

11     Southwest Voter Registration Education Project ("SVREP") is a 501(c)(3)

12     nonpartisan, nonprofit organization committed to empowering Latino communities

13     through their vote. (Camarillo Tr. 729:10–14, 730:4–13, 732:17–21.) SVREP's voting

14     activities include educating and registering voters, "turning out the vote," and training

15     candidates who run for nonpartisan offices. (*Id.* 727:14–16, 730:7–11.) SVREP has

16     registered 15,000 Latino voters in Arizona since 2022. (*Id.* 736:9–17.) In 2024, SVERP

17     plans to register voters by engaging high schools and community colleges, meeting

18     individuals door-to-door, and conducting voter registration sites. (*Id.* 735:24–736:4.)

19     SVREP is also planning to turn out the vote in 2024 by contacting voters through door-to-

20     door visits, phone banking, and digital messaging, along with continuing its voter education

21     efforts. (*Id.* 737:4–15, 738:5–11.) At trial, SVREP President Lydia Camarillo testified that

22     SVREP anticipates reallocating funding and staff time from its voter registration, voter

23     education, and voter turnout efforts to help voters who receive the 35-day notice letter

24     obtain DPOC and assist voters who are removed from the voter rolls pursuant to H.B. 2243.

25     (*Id.* 740:9–19, 741:6–742:6, 742:21–743:12, 743:21–745:4.)

### 4. Promise Arizona

27     Promise Arizona is a community nonprofit organization that seeks to increase the

28     participation of Latino communities from Maricopa County and throughout Arizona in the

electoral process. (Falcon Tr. 1307:3–7, 1307:24–1308:14.) Promise Arizona is a membership organization with 1,043 dues-paying members as of November 2023. (*Id.* 1306:22–23, 1308:15–23.) Promise Arizona's members include voters who are naturalized citizens. (*Id.* 1321:23–1322:3.) The primary services that Promise Arizona's members receive are adult education and assistance with the naturalization application process. (*Id.* 1306:20–23, 1308:24–1309:4.) Promise Arizona's core activities include registering voters, educating voters, and turning out the vote, all of which are carried out by paid staff members and volunteers. (*Id.* 1308:7–14; 1309:5–23, 1313:15–17, 1314:11–1315:1.) Over the past ten years, Promise Arizona has registered around 63,000 voters in Arizona. (*Id.* 1314:7–10.) In 2024, Promise Arizona expects to continue its voter turnout efforts for the primary and general elections. (*Id.* 1316:18–1317:1.)

At trial, Petra Falcon, Promise Arizona's Founding Executive Director, testified that H.B. 2243 will "undo a lot of the work" the organization has done over the past decade. (*Id.* 1321:8–20.) For example, Promise Arizona claims that H.B. 2243's List Maintenance Procedures will cause some of its members to "feel penalized." (*Id.* 1321:8–1322:14) And if one of its members is removed from the voter rolls pursuant to H.B. 2243, Promise Arizona claims that members "would not have trust in the system." (*Id.* 1322:21–1323:10.) Promise Arizona expects to prepare its field organizers and volunteers for the implementation of H.B. 2243, which it anticipates will require new training on the effects of the law. (*Id.* 1320:21–1321:20, 1328:8–1329:20) Promise Arizona also anticipates redirecting the use of its staff members and volunteers to assist registrants who receive a notice to provide DPOC under H.B. 2243. (*Id.* 1318:24–1319:20, 1320:3–1321:20, 1322:20–1323:3.) In addition, Promise Arizona plans to update its literature and its website to reflect the changes to Arizona's voting laws. (*Id.* 1329:8–20.)

**5.    Arizona Asian American Native Hawaiian Pacific Islander for Equity Coalition**

Arizona Asian American Native Hawaiian Pacific Islander for Equity Coalition ("Equity Coalition") is a statewide, nonprofit, nonpartisan organization that strives for

- 45 -

equity and justice on behalf of its AANHPI constituents. (Tiwamangkala Tr. 1265:11–23.) Equity Coalition pursues its mission by increasing civic engagement, organizing communities, and developing young leaders. (*Id.* 1265:18–23.) Equity Coalition conducts its voting-related activities—which include voter education, registration, and mobilization—through its Civic Engagement Program. (*Id.* 1265:1–2, 1267:21–1268:1.) Equity Coalition registers voters using digital and print advertisements, phone and text banking, and in person at Asian cultural festivals, Asian businesses, and religious organizations. (*Id.* 1269:10–1270:3.) Equity Coalition also provides voter registration instructions in six AANHPI languages on its website. (*Id.* 1270:4–14.)

At trial, Equity Coalition's Advocacy Director Matine Tiwamangkala testified that after the Voting Laws were passed, Equity Coalition "had to take a pause" on its voter registration efforts to discern how the laws would impact the registration process. (*Id.* 1274:12–18.) Equity Coalition hired a new employee to allow its "Democracy Defender Director" to focus on voting rights. (*Id.* 1281:2–17.) Equity Coalition claims the AANHPI community is fearful of H.B. 2243's List Maintenance Procedures and Cancellation Provision because some may be escaping government persecution. (*Id.* 1274:19–1275:3, 1275:15–21.) Equity Coalition expects to retrain its canvassers, volunteers, subgrantees, and fellows on how to register voters and address these fears of the AANHPI community. (*Id.* 1275:15–1276:1) Equity Coalition also plans to expand the services of one of its subgrantees to assist voters who receive the 35-day notice and need to obtain DPOC. (*Id.* 1275:16–23.) In addition, the organization expects to update the voter registration instructions on its website and translate each set of instructions, which costs 25 cents per word. (*Id.* 1270:18–21, 1275:16–1276:1.) Because Equity Coalition does not currently have the resources to complete these tasks, Equity Coalition plans to "shift [its] priorities" toward assisting the AANHPI community to obtain DPOC and educating its community members and volunteers about the effects of the Voting Laws. (*Id.* 1275:16–1276:19.) Equity Coalition claims that this shift in priorities will impact its other initiatives— including the organization's actual collection of voter registration forms—and will harm

1    its mission. (*Id.* 1276:4–18.) Equity Coalition decided to reduce its voter registration goals
2    in response to the Voting Laws, which it claims led to a decrease in the organization's
3    funding since its funding is "tied" to its registration goals. (*Id.* 1274:12–18, 1275:4–8,
4    1278:20–1279:7.)

5                            **6.    Poder Latinx**

6            Poder Latinx is an organization that aims to "engage the Latinx community to be
7    civil participants through their vote." (Herrera Tr. 1285:5–10.) Poder Latinx serves
8    marginalized communities, primarily "Black, Indigenous, people of color," with a focus
9    on the environment, economic justice, and immigration justice. (*Id.* 1285:11–16, 1285:24–
10   1286:5.) The organization's elections-related work promotes voter engagement, voter
11   participation, and voter protection. (*Id.* 1284:11–13, 1285:5–10.) For example, Poder
12   Latinx engages voters by canvassing in communities, translating election information, and
13   conducting campaigns across multiple content mediums. (*Id.* 1286:6–14, 1286:6–1287:4.)
14   Poder Latinx set a goal of registering 4,600 new voters in 2023 and seeks to register 9,000
15   new voters in 2024. (*Id.* 1286:19–23.) Poder Latinx plans to meet its registration goals by
16   conducting outreach with on-the-ground canvassers and through social media, television,
17   and radio. (*Id.* 1286:24–1287:4.) Poder Latinx calculates that it costs around $50 to register
18   each individual voter. (*Id.* 1288:6–8.)

19           Poder Latinx claims that the Citizenship Verification Procedures and List
20   Maintenance Procedures in H.B. 2492 and H.B. 2243 will remove qualified registered
21   voters from the voter rolls and will unlawfully deny new voter applicants. (*Id.* 1290:4–15.)
22   Poder Latinx also claims that naturalized citizens will be fearful of the database checks,
23   which will make them less likely to participate in elections. (*Id.* 1290:16–1291:7.) Nancy
24   Herrera, Poder Latinx's Arizona State Program Director, testified that the Voting Laws'
25   database checks will harm the organization's reputation, as community members who
26   receive support from Poder Latinx and who are later removed from the voting rolls or
27   denied registration will lose trust in the organization. (*Id.* 1300:23–1302:4.) To mitigate
28   these anticipated effects, Poder Latinx claims it will need to "restructure" its "entire

1    program" and allocate additional time and funding to its voter engagement efforts. (*Id.*
2    1290:16–1291:12.) The organization plans to add additional canvassers, translate new
3    voting materials, and contact community members who are removed from the voter rolls
4    or those whose applications are denied. (*Id.* 1291:8–25, 1299:10–1300:20.) Poder Latinx
5    also plans to conduct new campaigns utilizing social, digital, television, and print media,
6    accounting for an anticipated increase in spending. (*Id.* 1300:6–22.) Poder Latinx estimates
7    that these strategies will cost an additional $10 to $20 for each voter it registers or re-
8    registers and expects to reallocate funding from its issue-based campaigns. (*Id.* 1299:10–
9    1300:5, 1302:15–23.) It also anticipates that these additional costs will detract from the
10   organization's ability to register new voters. (*Id.* 1291:20–25.)

11                      **7.      Chicanos Por La Causa**

12            Chicanos Por La Causa, Inc. is a 501(c)(3) community development nonprofit
13   organization with a mission to "empower[] lives" by engaging Latino communities in the
14   political process. (Garcia Tr. 176:16–20, 178:24–179:5; Guzman Tr. 478:2–6, 16–21.)
15   Chicanos Por La Causa Action Fund is a 501(c)(4) nonprofit advocacy organization that
16   aims to support the mission of Chicanos Por La Causa, Inc. (Garcia Tr. 175:19–20, 177:18–
17   22.) The core activities of Chicanos Por La Causa, Inc. and Chicanos Por La Causa Action
18   Fund (collectively, "CPLC") include helping eligible people to register to vote and follow
19   up to make sure they actively vote, in part by targeting "low propensity voters" through its
20   "Latino Loud" initiative. (*Id.* 179:6–22, 180:10–18; Guzman Tr. 478:22–479:17.) Joseph
21   Garcia, vice president of public policy at Chicanos Por La Causa and executive director of
22   Chicanos Por La Causa Action Fund, testified that CPLC has a reputation as "a trusted
23   name within the Latino community." (Garcia Tr. 186:8–19; *see also* Guzman Tr. 485:20–
24   486:3.)

25            CPLC claims that the Voting Laws' Citizenship Verification Procedures and List
26   Maintenance Procedures regarding voters lacking DPOC will have a chilling effect on
27   voters in the Latino community. (Garcia Tr. 190:19–25, 199:14–200:16; Guzman Tr.
28   480:9–481:18.) These new procedures would harm CPLC's reputation if members of the

Latino community attribute the effects of the Voting Laws to CPLC's inability to effectively register individuals to vote. (Garcia Tr. 191:1–7, 194:7–195:4, 206:24–207:15; Guzman Tr. 486:4–487:2.) During the 2022 midterm election cycle, CPLC registered 37,000 new voters and spent $5.7 million on canvassing and registering people to vote. (Garcia Tr. 180:10–18, 203:4–8.) CPLC anticipates reallocating approximately 20 to 30% of its election budget specifically to address the effects of the Voting Laws on its voter programming by increasing its staffing to educate voters about the Voting Laws and assisting those who are removed from the voting rolls. (Garcia Tr. 191:8–194:6, 203:4–23, 204:3–22.)

### 8.      Arizona Coalition for Change

Arizona Coalition for Change is a 501(c)(3) nonprofit organization based in Arizona, and its mission is to empower individuals in underserved communities to impact their community through civic engagement and collaboration. (Bolding Tr. 258:3–25.) Arizona Coalition for Change operates in Maricopa, Pima, and Pinal Counties and primarily serves Black, Brown, and Indigenous communities, women, and young people. (*Id.* 258:16–25.) Arizona Coalition for Change hosts leadership development programs for youth and college students, leads community organizing efforts, and conducts voter registration and voter education programs as part of its civic engagement activities. (*Id.* 259:9–17, 265:8–11.) Arizona Coalition for Change registers voters by tabling at events and at "hot spots," which are high-traffic locations such as grocery stores, libraries, and small businesses. (*Id.* 267:7–268:1, 268:15–25.) The organization staffs its registration drives with paid staff members and volunteers. (*Id.* 261:9–12, 268:2–14.) Arizona Coalition for Change also hosts voter education events to inform individuals about voting, changes to Arizona election law, and the various offices that are up for election. (*Id.* 260:3–261:8, 262:25–263:9.) Organizing, marketing, and hosting each voter education event requires, at a minimum, ten hours of labor. (*Id.* 261:13–25.) Arizona Coalition for Change also pays to advertise its voter education events through social media, digital, and print communications. (*Id.* 262:1–24.)

- 49 -

Arizona Coalition for Change claims that the Voting Laws will pose a "significant challenge" for individuals registering to vote. (*Id.* 265:4–17, 279:11–19.) For example, many individuals will incorrectly believe they are registered to vote when they are not. (*Id.* 272:22–273:3.) Arizona Coalition for Change's President Reginald Bolding testified that Arizona Coalition for Change plans to host new voter education events and create new, paid advertisements about the Voting Laws. (*Id.* 265:4–266:16.) Arizona Coalition for Change also expects to change its voter registration program by hiring additional community organizers, implementing new training for its staff members and volunteers, and hosting "office hours" to assist community members with the registration process. (*Id.* 270:20–273:17, 274:20–275:23.) Arizona Coalition for Change anticipates reallocating time and resources from its civil leadership development program to implement these new voter registration efforts. (*Id.* 273:25–274:18.)

### 9. Arizona Students' Association

Arizona Students' Association ("ASA") is a nonprofit, nonpartisan organization based in Arizona that advocates for affordable and accessible higher education for Arizona university and college students. (Nitschke Tr. 447:18–449:2.) ASA advances its mission by advocating at the state and local level, developing student leaders, and registering students to vote. (*Id.* 445:23–25, 447:18–449:2.) According to ASA, its members include all students at Arizona's public universities, community colleges, and Grand Canyon University, totaling approximately 500,000 students. (*Id.* 446:17–21.) This student population includes Latinos and naturalized citizens. (*Id.* 446:17–447:1.) ASA's primary beneficiaries are its members, and ASA receives input from its members through polling and various on-campus events. (*Id.* 473:15–25.)

ASA conducts its voter registration efforts through online platforms year-round and by tabling at various campus locations during the beginning of every fall semester. (*Id.* 448:14–449:13.) Since the passage of the Voting Laws, ASA has spent time updating its training materials, conducting additional training for its volunteers and paid staff members, and following up with the organization's Federal-Only Voters to ensure they become Full-

1     Ballot Voters. (*Id.* 452:4–23, 453:12–17.) ASA estimates that its regional organizers and

2     executive staff have spent roughly 100 hours conducting the new trainings. (*Id.* 452:14–

3     23, 453:12–17.) ASA also estimates that it has spent between $150 and $210 to provide

4     updated training materials to its staff members and volunteers. (458:17–25, 467:20–467:6.)

5          At trial, Kyle Nitschke, co-Executive Director for ASA, testified that the DPOR

6     Requirement would impact ASA's ability to help Federal-Only Voters on college campuses

7     become Full-Ballot Voters, since many Federal-Only Voters do not have an in-state ID, a

8     utility bill, or another form of DPOR. (*Id.* 453:18–454:8, 462:8–463:2.) ASA further claims

9     that the DPOR requirement would require ASA to spend additional time checking each

10    student's application documents, which would "really slow down the registration process"

11    and may lead to ASA turning away students who do not have readily accessible DPOR.

12    (*Id.* 454:9–24.) ASA expects that it will continue to reallocate resources from its other

13    initiatives, including its youth empowerment summit, to train its staff, pay for upgraded

14    document scanning software to help students upload DPOR and DPOC, and check the voter

15    database to determine the effect the Voting Laws are having on students. (*Id.* 456:8–457:7,

16    458:9–16, 459:1–16., 460:20–461:5.) ASA also claims that students will choose not to

17    register to vote for fear of H.B. 2492's investigation procedures. (*Id.* 461:21–462:7.)

18          **10.    Democratic National Committee and Arizona Democratic Party**

19          The Democratic National Committee ("DNC") is the national arm of the Democratic

20    Party. (Reid Tr. 422:10–12.) The DNC coordinates the Democratic Party's operations

21    across all fifty states with the goal of electing Democrats "up and down the ballot,"

22    including federal, state, and local offices in Arizona. (*Id.* 422:13–19, 24–25.) The DNC is

23    comprised of formal voting members along with grassroots Democratic supporters. (*Id.*

24    434:10–435:5.) The Arizona Democratic Party ("ADP") is the operating arm of the

25    Democratic Party in Arizona. (Dick Tr. 508:1–3.) The ADP also works to elect Democrats

26    in federal, state, and local elections in Arizona. (*Id.*) The ADP's membership is comprised

27    of Democratic voters and supporters. (*Id.* 519:12–520:5.) In Arizona, there are

28    approximately 1.26 million registered Democrats. (*Id.* 508:9–10.) The DNC and the ADP

1    both work to persuade citizens to vote for Democratic candidates and help Democratic

2    supporters register to vote and cast a ballot. (*Id.* 509:13–24; Reid Tr. 423:21–424:10.)

3        At trial, Ramsey Reid, DNC's Director of States, and Morgan Dick, ADP's

4    Executive Director, both testified that H.B. 2492's Criminal Investigation Procedures

5    would deter Democratic supporters from registering to vote for fear of potentially

6    subjecting themselves or a family member to scrutiny by law enforcement or prosecution.

7    (Reid Tr. 421:8–13, 430:1–23; Dick Tr. 506:25–507:4, 516:22–517:11.) As a result, Reid

8    and Dick testified that these provisions would impact the ability of Democratic candidates

9    to successfully compete in Arizona elections. (Reid Tr. 433:9–23, Dick Tr. 518:18–21.) To

10   address the anticipated impact of H.B. 2492, the DNC is planning to reallocate resources

11   from its work in other states to find new potential registrants and further train its staff and

12   volunteers on how to communicate with potential voters about the Voting Laws. (Reid Tr.

13   430:24–432:25.) The ADP is also planning reallocating resources from other endeavors to

14   make up the "lost ground" of voters that the ADP could have registered and mobilized to

15   vote. (Dick Tr. 517:12–518:8.)

16                    **11.    Tribal Plaintiffs**

17       San Carlos Apache Tribe ("Tribe") is a federally recognized Indian Tribe. (Pls.'

18   Stip. No. 1.) The San Carlos Apache Reservation ("Reservation") spans across Gila,

19   Graham, and Pinal Counties in southeastern Arizona and is the tenth largest reservation in

20   the United States. (*Id.* Nos. 2, 4; Rambler Tr. 996:10–17.) Approximately 13,000 to 14,000

21   of the Tribe's 17,300 members live on the Reservation. (Rambler Tr. 996:18–21.) Roughly

22   half of the Tribe members that live on the Reservation are over sixty years old, and many

23   of them speak Apache and are not fluent in English. (*Id.* 1005:16–23.)

24       At trial, Tribe Chairman Terry Rambler testified that voting in federal, state, and

25   local elections is very important to the Tribe and its members. (*Id.* 995:14–18, 1003:22–

26   1004:19.) The Tribe claims that the DPOR Requirement would make it more difficult for

27   Tribe members—especially those who are elderly and not fluent in English—to register to

28   vote because the Reservation does not have a uniform mapping system. (*Id.* 999:24–

1000:5, 1005:12–23, 1008:11–21.) For example, residences on the Reservation typically do not have street names or building numbers, and Tribe members receive mail at post office boxes on the Reservation. (*Id.* 996:22–997:4, 997:7–11.) Tribe identification cards list post office box numbers instead of residential addresses. (*Id.* 998:11–16.) In addition, not all Tribe members have an Arizona credential, and those Tribal members with Arizona credentials may list the nearest highway mile marker on their credential, as opposed to a residential address. (*Id.* 997:12–998:1, 999:10–12.) Some Tribe members, including those who are temporarily living with a family member or those who are experiencing homelessness, do not have a permanent residence.[43] (*Id.* 998:17–22.)

Tohono O'odham Nation is a federally recognized Tribe. (Pls.' Stip. No. 5.) According to the 2020 Census, approximately 6,713 voting-age individuals live on Tohono O'odham lands. (*Id.* No. 6.) Gila River Indian Community is a federally recognized Tribe. (*Id.* No. 7.) According to the 2020 Census, approximately 9,628 voting-age individuals live on the Gila River Reservation.[44] (*Id.* No. 8.)

## II.    CONCLUSIONS OF LAW

The Court previously ruled on several of Plaintiffs' claims in its Order addressing the parties' motions for summary judgment. (*See generally* 09/14/2023 Order.) The parties presented evidence on the following remaining issues at trial:

- Whether the non-US Plaintiffs have standing to bring each of their claims.
- Whether H.B. 2492 § 4's Birthplace Requirement for State Form users violates the Civil Rights Act ("CRA"), 52 U.S.C. § 10101, section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301 et seq., or the Equal Protection Clause, or imposes an undue burden on the right to vote. *See* A.R.S. § 16-121.01(A).

---

[43] The remaining "LUCHA Plaintiffs"—namely, Living United for Change in Arizona, League of United Latin American Citizens, Arizona Democracy Resource Center Action, and Inter Tribal Council of Arizona, Inc.—did not present any evidence at trial regarding their standing to bring this action.
[44] The remaining Tohono O'odham Plaintiffs—namely, Alanna Siquieros, Keanu Stevens, and LaDonna Jacket—did not provide any evidence at trial regarding their standing to bring this action.

ER - 0059

- Whether H.B. 2492 § 4's citizenship verification and criminal investigation referral procedures for registrations lacking DPOC violates section 2 of the VRA, procedural due process, or the Equal Protection Clause, or imposes an undue burden on the right to vote. *See* § 16-121.01(D), (E).

- Whether H.B. 2492 § 5's DPOR requirement for State Form users violates the NVRA or the Equal Protection Clause or imposes an undue burden on the right to vote. *See* § 16-123; *see also* § 16-121.01(A).

- Whether H.B. 2492 § 7's referral, citizenship verification, and prosecution procedures for registered voters without DPOC violate the NVRA, section 2 of the VRA, or the Equal Protection Clause, or imposes an undue burden on the right to vote. *See* § 16-143.

- Whether H.B. 2492 § 8's cancellation of a voter registration upon "confirm[ing]" a person's non-citizenship violates the NVRA, section 2 of the VRA, procedural due process, or the Equal Protection Clause, or imposes an undue burden on the right to vote. *See* § 16-165(A)(10), *amended by* H.B. 2243 § 2.

- Whether H.B. 2243 § 2's citizenship verification, registration cancellation, and criminal investigation referral procedures violate the NVRA, section 2 of the VRA, procedural due process, the Equal Protection Clause, or imposes an undue burden on the right to vote. *See* § 16-165(A)(10), (G)–(K).

- Whether H.B. 2243 § 2's Reason to Believe Provision violates the CRA, the NVRA, section 2 of the VRA, or the Equal Protection Clause *See* § 16-165(I).

- Whether the Voting Laws were enacted with a discriminatory intent.

Under the principles of preemption, "when federal and state law conflict, federal law prevails and state law is preempted." *Knox v. Brnovich*, 907 F.3d 1167, 1173 (9th Cir. 2018) (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018)). Because the Voting Laws have not yet been implemented, Plaintiffs are bringing a facial

challenge to the Voting Laws' legality. To succeed on a facial challenge, Plaintiffs must establish "that 'no set of circumstances exists under which the Act would be valid.'" *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). The Court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).

### A.    Subject Matter Jurisdiction

#### 1.    Standing

Defendants argue that all non-U.S. Plaintiffs lack standing because non-U.S. Plaintiffs have not demonstrated that their organizations, or a specific member of their organizations, will suffer an actual or imminent, concrete, and particularized injury due to any challenged provision of the Voting Laws.

Under Article III of the United States Constitution, a plaintiff has standing if it can show (1) an "injury in fact" that is concrete and particularized and actual or imminent, not hypothetical; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In cases for prospective injunctive relief, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Rather, a plaintiff's "standing to seek the injunction requested depend[s] on whether he [is] likely to suffer future injury." *Id.* at 105. When addressing behavior that is alleged to increase the risk of future injury, the future injury must be "certainly impending." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013); *see also Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014) ("Whether we view injury in fact as a question of standing or ripeness, 'we consider whether the plaintiff[] face[s] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement'" (alterations in original) (citation omitted)); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) ("[O]rganizations may

1   rely on not only actual, but imminent harm for standing, including by challenging laws pre-

2   enforcement if the organization can show a substantial threat of injury.").

3          "Only one plaintiff needs to have standing when only injunctive relief is sought."

4   *DNC v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018) (citing *Crawford v. Marion*

5   *Cnty. Election Bd.* ("*Crawford I*"), 472 F.3d 949, 951 (7th Cir. 2007)) (finding standing

6   where Arizona Democratic Party and additional private plaintiffs requested injunctive and

7   declaratory relief against Arizona election law), *aff'd sub nom. DNC v. Hobbs*, 9 F.4th

8   1218, 1219 (9th Cir. 2021) (Mem.); *Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022)

9   ("In a suit with multiple plaintiffs, generally only one plaintiff need have standing for the

10  suit to proceed."). However, at least one plaintiff must establish standing "for each claim

11  for relief." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct.

12  2367, 2379 n.6 (2020).

13         An organization can have direct standing by "claim[ing] that it suffered an injury in

14  its own right" or representational standing by asserting "standing solely as the

15  representative of its members." *Students for Fair Admissions, Inc. v. President & Fellows*

16  *of Harvard Coll.*, 600 U.S. 181, 199 (2023) (citation omitted). "[A]n organization has direct

17  standing to sue where it establishes that the defendant's behavior has frustrated its mission

18  and caused it to divert resources in response to that frustration of purpose." *E. Bay*

19  *Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) (citing *Fair Hous. of*

20  *Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). Organizations cannot "manufacture

21  the injury by incurring litigation costs," but they can show standing when they "would have

22  suffered some other injury had they not diverted resources to counteracting the problem."

23  *Id.* (internal quotations omitted). "The fact that the added cost has not been estimated and

24  may be slight does not affect standing, which requires only a *minimal showing of injury*."

25  *Crawford I*, 472 F.3d at 951 (emphasis added), *aff'd*, 553 U.S. 181 (2008); *see also See E.*

26  *Bay Sanctuary Covenant*, 993 F.3d at 664 ("Organizations are not required to demonstrate

27  some threshold magnitude of their injuries . . . .").

28         To invoke representational standing, an organization must show that "(a) its

- 56 -

1   members would otherwise have standing to sue in their own right; (b) the interests it seeks

2   to protect are germane to the organization's purpose; and (c) neither the claim asserted nor

3   the relief requested requires the participation of individual members in the lawsuit."

4   *Students for Fair Admissions*, 600 U.S. at 199 (citation omitted). "Implicit in the first prong

5   of this test is the requirement that an organization must generally have 'members' to bring

6   suit on their behalf." *Or. Moms Union v. Brown*, 540 F. Supp. 3d 1008, 1013 (D. Or. May

7   20, 2021). However, a non-membership organization may also have representational

8   standing if it possesses "indicia of membership" such that it is "sufficiently identified with

9   and subject to the influence of those it seeks to represent as to have a 'personal stake in the

10   outcome of the controversy.'" *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th

11   Cir. 2021) (quoting *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003)). For

12   example, in *Oregon Advocacy Center v. Mink*, the Ninth Circuit held that a non-

13   membership organization had associational standing because it served a "specialized

14   segment" of a community, who were the "primary beneficiaries" of the organization's

15   activities. 322 F.3d at 1111.

16          **i.**       **Challenges to the Birthplace Requirement**

17        Mi Familia Vota's testimony demonstrates that the Birthplace Requirement poses a

18   "substantial threat of injury," which frustrates Mi Familia Vota's mission and will require

19   it to divert resources to counteract its effects, constituting an injury-in-fact. *Common*

20   *Cause*, 937 F.3d at 950; s*ee, e.g.*, *Crawford I*, 472 F.3d at 951 ("[T]he new law injures the

21   Democratic Party by compelling the party to devote resources to getting to the polls those

22   of its supporters who would otherwise be discouraged by the new law from bothering to

23   vote."); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) ("[O]rganizations

24   can establish standing to challenge election laws by showing that they will have to divert

25   personnel and time to educating potential voters on compliance with the laws and assisting

26   voters who might be left off the registration rolls on Election Day."); *One Wis. Inst., Inc.*

27   *v. Thomsen*, 198 F. Supp. 3d 896, 909–10 (W.D. Wis. 2016) (finding that nonprofit

28   plaintiffs had suffered an injury-in-fact where plaintiffs presented evidence that they

"devoted money, staff time, and other resources away from their other priorities to educate voters about the new laws"), *rev'd in part on other grounds sub nom. Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020). This injury is traceable to the Birthplace Requirement and redressable by the injunction sought by Mi Familia Vota. *See Common Cause*, 937 F.3d at 950.

Defendants argue that Mi Familia Vota has not identified any individual who is likely to be injured by the Birthplace Requirement. But to have standing based on a future injury, a plaintiff need not identify specific individuals who are likely to be harmed by the challenged conduct, so long as the future injury alleged is "certainly impending." *Clapper*, 568 U.S. at 409. Defendants further argue that Mi Familia Vota "cannot predict the financial impact" of the Birthplace Requirement and that its anticipated expenses to counteract the provision are speculative. However, a plaintiff need not estimate the cost of their injury to demonstrate standing. *See Crawford I*, 472 F.3d at 951. The Court concludes that Mi Familia Vota has direct standing.

###### ii. Challenges to H.B. 2492's Citizenship Verification Procedures and Criminal Investigation Procedures

The Court concludes that the Democratic National Committee and the Arizona Democratic Party have direct standing. The organizations' testimony demonstrates that H.B. 2492's Criminal Investigation Procedures pose a substantial threat of injury, which frustrates the DNC's and the ADP's missions and will require them to divert resources to respond to its effects. *See Common Cause*, 937 F.3d at 950; *Arcia*, 772 F.3d at 1341. The diversion-of-resources constitutes injuries-in-fact, which is traceable to the H.B. 2492's Criminal Investigation Procedures and redressable by the injunctive relief sought by the DNC and the ADP.

The Court also concludes that the Democratic National Committee and the Arizona Democratic Party have representational standing. First, the DNC's and the ADP's members would have standing to sue in their own right. Given the impending enforcement of the Voting Laws, both organizations' members face a "realistic danger of sustaining a direct

injury" due to H.B. 2492's Criminal Investigation Procedures. *Bowen*, 752 F.3d at 839. This constitutes an injury-in-fact, which is traceable to H.B. 2492 and redressable by an injunction preventing their enforcement. Second, the DNC and the ADP seek to protect voting rights of its members, which is germane to the purposes of both organizations. And third, the organizations' claims and requested relief do not require the participation of its members in this litigation. In addition, because it is "relatively clear" that at least one of each organization's members will be impacted by H.B. 2492's Criminal Investigation Procedures, and because defendants need not know the identity of any particular DNC or ADP member to respond to their claims, it is not necessary for the DNC or the ADP to identify any specific member who will be injured by the challenged provisions. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).

In addition, Poder Latinx's testimony demonstrates that H.B. 2492's Citizenship Verification Procedures pose a substantial threat of injury, which frustrates Poder Latinx's mission and will require it to divert resources to counteract its effects. *See Common Cause*, 937 F.3d at 950; *Arcia*, 772 F.3d at 1341. This constitutes an injury-in-fact, which is traceable to H.B. 2492's and H.B. 2243's database checks and redressable by the injunctive relief sought by Poder Latinx. Defendants assert that the costs of increasing its community outreach efforts does not amount to injury-in-fact because informing voters about the electoral process is part of the organization's "regular mission." This argument is also misplaced, as an organization can have standing where it "diverts its resources to achieve its typical goal in a different or *amplified manner*." *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1178 (N.D. Ga. 2022) (emphasis added). The Court concludes that Poder Latinx has direct standing.

Lastly, Voto Latino's testimony demonstrates that H.B. 2492's Citizenship Verification Procedures and Criminal Investigation Procedures frustrate Voto Latino's mission. As a result, Voto Latino has diverted and anticipates further diversion of resources to counteract its effects, which constitutes an injury-in-fact. *See Crawford I*, 472 F.3d at 951. This injury is traceable to H.B. 2492's criminal prosecution procedures and

1    redressable by the injunctive relief sought by Voto Latino. Though Defendants argue that

2    Voto Latino did not adduce evidence that the educational content it has created specifically

3    addresses the bill's prosecution procedures, the standing inquiry does not require such

4    minute specificity. Rather, it is sufficient that Voto Latino presented evidence that it

5    "devoted money, staff time, and other resources away from their other priorities to educate

6    voters about the new laws." *One Wis. Inst., Inc.*, 198 F. Supp. 3d at 909–10. The Court

7    concludes that Voto Latino has direct standing.

8                       **iii.    Challenges to the List Maintenance Procedures and**

9                              **Cancellation Provision**

10           The Court concludes that Promise Arizona has direct standing to challenge H.B.

11   2243's List Maintenance Procedures and Cancellation Provision. H.B. 2243's database

12   checks and notice and investigation procedures pose a substantial threat of injury, which

13   frustrates Promise Arizona's mission and will require it to divert resources to counteract

14   its effects. *See Common Cause*, 937 F.3d at 950; *Arcia*, 772 F.3d at 1341. This constitutes

15   an injury-in-fact, which is traceable to H.B. 2243's database checks and notice and

16   investigation procedures and redressable by the injunctive relief sought by Promise

17   Arizona.

18           Promise Arizona also has representational standing. First, Promise Arizona's

19   members would have standing to sue in their own right. Given the impending enforcement

20   of the Voting Laws, and because H.B. 2243's database checks would apply to all registered

21   voters in Arizona, Promise Arizona's members face a "realistic danger of sustaining a

22   direct injury" due to H.B. 2243. *Bowen*, 752 F.3d at 839 (*see* Connor Tr. 371:15–372:2

23   (testifying the Secretary of State will implement the Voting Laws); Petty Tr. 160:3–15

24   (testifying Maricopa County Recorder's office will implement the Voting Laws).) This

25   threat of future injury constitutes an injury-in-fact that is traceable to H.B. 2243 and

26   redressable by an injunction preventing its enforcement. Second, Promise Arizona seeks to

27   protect voting rights of its members, which is germane to the organization's purpose. And

28   lastly, Promise Arizona's claim and requested relief do not require the participation of its

1    members in this litigation.

2          Defendants argue that Promise Arizona has not identified any specific member who

3    has been or is likely to be injured by H.B. 2243's database checks and notice and

4    investigation procedures. However, to demonstrate representational standing, an

5    organization is not required to identify of any member who is or will be injured "[w]here

6    it is relatively clear, rather than merely speculative, that one or more members have been

7    or will be adversely affected by a defendant's action," and where the defendant does not

8    need to know "the identity of a particular member to understand and respond to an

9    organization's claim of injury." *Nat'l Council of La Raza*, 800 F.3d at 1041; *see also Fla.*

10   *State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) ("When the

11   alleged harm is prospective, we have not required that the organizational plaintiffs name

12   names because every member faces a probability of harm in the near and definite future.").

13         The Court also concludes that Equity Coalition, CPLC, and SVREP, and Poder

14   Latinx have direct standing. Tiwamangkala's, Garcia's, Camarillo's, and Herrera's

15   testimony demonstrates that H.B. 2243's List Maintenance Procedures and Cancellation

16   Provision pose a substantial threat of injury, which frustrates the organizations' missions

17   and will require the diversion of resources to respond to its effects. *See Common Cause*,

18   937 F.3d at 950; *Arcia*, 772 F.3d at 1341. This constitutes an injury-in-fact, which is

19   traceable to H.B. 2243 and is redressable by the injunctive relief.

20                      **iv.    Challenges to the DPOR Requirement**

21         The Court concludes that the San Carlos Apache Tribe has representational standing

22   to challenge the DPOR Requirement. First, the Tribe's members would have standing to

23   sue in their own right. Given the impending enforcement of the Voting Laws, the Tribe's

24   members face a "realistic danger of sustaining a direct injury" due to the DPOR

25   Requirement. *Bowen*, 752 F.3d at 839. This constitutes an injury-in-fact, which is traceable

26   to H.B. 2492 and redressable by an injunction preventing their enforcement. Second, the

27   Tribe seeks to protect voting rights of its members, which is germane to the Tribe's

28   purpose. And third, the Tribe's claim and requested relief do not require the participation

1    of its members in this litigation. In addition, because it is "relatively clear" that at least one

2    of the Tribe's members will be impacted by the DPOR requirement, and because

3    defendants need not know the identity of any particular Tribe member to respond to the

4    Tribe's claims, it is not necessary for the Tribe to identify any specific member who will

5    be injured by the challenged provisions.[45] *Nat'l Council of La Raza*, 800 F.3d at 1041.

6    ### 2.    Ripeness

7    Defendants argue that Plaintiffs' claims regarding the Voting Laws are

8    constitutionally and prudentially unripe because Plaintiffs have not shown whether or how

9    these provisions will be implemented, or how they will be affected by their implementation.

10    "[T]he ripeness inquiry contains both a constitutional and a prudential component."

11    *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en

12    banc) (citation omitted). Like the standing analysis, a claim is constitutionally ripe when

13    "plaintiffs face 'a realistic danger of sustaining a direct injury as a result of the statute's

14    operation or enforcement.'" *Id.* at 1139 (quoting *Babbitt v. United Farm Workers Nat.*

15    *Union*, 442 U.S. 289, 298 (1979)); *see Coons v. Lew*, 762 F.3d 891, 897 (9th Cir. 2014)

16    ("When addressing the sufficiency of a showing of injury-in-fact grounded in potential

17    future harms, . . . . the analysis for both standing and ripeness is essentially the same."

18    (citations omitted)), *as amended* (Sept. 2, 2014). Generally, Courts apply three factors to

19    evaluate whether a pre-enforcement challenge is constitutionally ripe: (1) whether

20    "plaintiffs have articulated a concrete plan to violate the law in question," (2) "whether the

21    prosecuting authorities have communicated a specific warning or threat to initiate

22    proceedings," and (3) "the history of past prosecution or enforcement under the challenged

23    statute." *Thomas*, 220 F.3d at 1138 (internal quotations and citation omitted). However,

24    where the plaintiffs "are not the target of enforcement," the Ninth Circuit has determined

25    that "the familiar pre-enforcement analysis articulated in *Thomas* does not apply," and has

26

27

28    ---
[45] Because the Court finds that a Plaintiff has standing for each claim for relief, the Court
need not determine whether remaining Plaintiffs have standing.

1    limited its ripeness analysis to the prudential component.[46] *San Luis & Delta-Mendota*

2    *Water Auth. v. Salazar*, 638 F.3d 1163, 1173 (9th Cir. 2011). In addition, the Ninth Circuit

3    "appl[ies] the requirements of ripeness and standing less stringently in the context of First

4    Amendment claims." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022).

5        The Court concludes that Plaintiffs' claims are constitutionally ripe. The Voting

6    Laws target individual voters, rendering the *Thomas* pre-enforcement factors inapplicable

7    to nearly all Plaintiffs. *See Salazar*, 638 F.3d at 1173. Regardless, the organizational

8    Plaintiffs have shown that Arizona's enforcement of the Voting Laws will imminently

9    harm their missions and/or their members. (*See supra* Section II(A)(1)); *Bowen*, 752 F.3d

10   at 839 (pre-enforcement action is ripe "if the alleged injury is 'reasonable' and 'imminent,'

11   and not merely 'theoretically possible'" (citation omitted)). Defendants emphasize that the

12   Voting Laws are not currently being enforced, it is unclear how the Voting Laws will be

13   enforced, and that Plaintiffs have not proven that any person will be injured by the Voting

14   Laws. But Ms. Connor testified that the Secretary of State will implement the Voting Laws

15   once the Court determines their legality. (Connor Tr. 371:15–372:2.) And the county

16   recorders have indicated their intent to implement the Voting Laws after receiving

17   guidance from the Secretary of State or the Court.[47] (*See, e.g.*, Petty Tr. 160:3–15; Ex. 111,

18   at PX 111-3 to -5; Ex. 118, at PX 118-4 to -5; Ex. 121, at PX 121-2 to -3; *see also* Exs.

19   123, 127, 136, 146, 151, 156, 174, 175.) Plaintiffs' injuries are not just "theoretically

20   possible," but "imminent." *See Bowen*, 752 F.3d at 839.

21       The Court also finds that Plaintiffs' claims are prudentially ripe. A claim is

22   prudentially ripe when "the fitness of the issues for judicial decision and the hardship to

23   the parties of withholding court consideration" both weigh toward hearing the case. *See*

24   *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021) (citing *Abbott Labs.*

25   *v. Gardner*, 387 U.S. 136, 149 (1967)). First, the issues are fit for review "because further

---

26   [46] The third pre-enforcement factor in *Thomas*—the history of past enforcement—is also
     inapplicable where, as here, the statutes at issue are new. *See Wolfson v. Brammer*, 616

27   F.3d 1045, 1060 (9th Cir. 2010).
     [47] At least one county has already begun implementing certain provisions of the Voting

28   Laws. (Doc. 679-2, Ex. 8, 30(b)(6) Dep. of Cochise County Recorder ("Cochise Dep.") at
     26:16–27:10, 28:12–19, 30:8–18, 80:5–81:24; *see also* Exs. 507–510.)

- 63 -

factual development would not 'significantly advance [the Court's] ability to deal with the legal issues presented.'" *Salazar*, 638 F.3d at 1173 (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 804 (2003)). Second, as the Court previously ruled, "delaying review until after certain Plaintiffs have already been unlawfully removed from Arizona's voting rolls and prevented from voting would make any review 'too late to redress the injuries suffered by [Plaintiffs'] members.'" (Doc. 304, 02/16/2023 Order at 19 (quoting *Ass'n of Irritated Residents*, 10 F.4th at 944).)

### B.    Civil Rights Act

Plaintiffs claim that the Birthplace Requirement and the Reason to Believe Provision violate the Civil Rights Act.

#### 1.    Private Right Under the CRA

Defendants argue that § 10101 does not confer a private right, and alternatively, that non-U.S. Plaintiffs may not enforce § 10101 under § 1983. Section 10101 provides:

> (2) No person acting under color of law shall—
>      (A) in determining whether an individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote;
>      (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

52 U.S.C. § 10101(a)(2)(A)–(B). The statute does not expressly create a private right of action but empowers the U.S. Attorney General to bring "a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order." § 10101(c). The Ninth Circuit has not decided whether private citizens may enforce § 10101, though the Fifth and Eleventh Circuits have found in the affirmative. *Vote.Org v. Callanen*, 89 F.4th 459, 473–76 (5th Cir. 2023) (finding federal right under § 10101(a)(1) and (a)(2)(B)); *Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003) (finding federal right under § 10101(a)(2)(B)); *see also Davis v.*

- 64 -

1    *Commonwealth Election Comm'n*, No.: 1-14-CV-00002, 2014 WL 2111065, at \*9–10 (D.

2    N. Mar. I. May 20, 2014); *but see McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000)

3    (finding no private right of action).

4        To enforce § 10101 under § 1983, non-U.S. Plaintiffs must show that Congress

5    intended to "'unambiguously confer[]' 'individual rights upon a class of beneficiaries' to

6    which [Plaintiffs] belong[]." *Health and Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S.

7    166, 183 (2023) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285–86 (2002)); *see also*

8    *Gonzaga Univ.*, 536 U.S. at 283–84 (applying implied right of action caselaw to analyze

9    whether a statute confers a private federal right enforceable under § 1983). "'[F]all[ing]

10   within the general zone of interest that the statute is intended to protect' is not enough."

11   *All. of Nonprofits for Ins., Risk Retention Grp. v. Kipper*, 712 F.3d 1316, 1326 (9th Cir.

12   2013) (second alteration in original) (quoting *Gonzaga Univ.*, 536 U.S. at 283). If a statute

13   confers a federal right, that right is "presumptively enforceable" under § 1983 because

14   "§ 1983 generally supplies a remedy for the vindication of rights secured by federal

15   statutes." *Gonzaga Univ.*, 536 U.S. at 284; *see* 42 U.S.C. § 1983 (providing remedy for the

16   deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of

17   the United States).

18                **i.**      **Section 10101 Confers a Federal Private Right**

19        When determining whether a statute creates an enforceable federal right, the Court

20   "considers whether the statute: (1) is intended to benefit a class of individuals of which the

21   Plaintiff is a member; (2) sets forth a standard, clarifying the nature of the right, that makes

22   the right capable of enforcement by the judiciary; and (3) is mandatory, rather than

23   precatory in nature." *Crowley v. Nevada ex rel. Nev. Sec'y of State*, 678 F.3d 730, 735 (9th

24   Cir. 2012) (citing *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997)).

25        The Court agrees with the courts that have found a federal right under the

26   "Materiality Provision," under which "[n]o person acting under color of law shall . . . deny

27   *the right of any individual* to vote in any election." § 10101(a)(2)(B) (emphasis added);

28   *see, e.g.*, *Schwier*, 340 F.3d at 1296; *Davis*, 2014 WL 2111065, at \*10. First, "[t]he subject

of the sentence is the person acting under color of state law, but the focus of the text is nonetheless the protection of each individual's right to vote." *Schwier*, 340 F.3d at 1296; *see also Talevski*, 599 U.S. at 185 ("[I]t would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights (and we have never so held)."); *Gonzaga Univ.*, 536 U.S. at 284 (explaining statutes "phrased 'with an unmistakable focus on the benefited class'" have been found to create private rights (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 691 (1979)) (emphasis omitted)). For example, *Gonzaga University* cited Title VI of the Civil Rights Act and Title IX of the Education Amendments as examples of clear rights-creating language, which provide that "[n]o person in the United States shall . . . be subjected to discrimination." 536 U.S. at 284 n.3 (quoting 42 U.S.C. § 2000d and 20 U.S.C. § 1681(a)). The Materiality Provision is similar. Second, the Materiality Provision specifically and unambiguously protects an individual's right to vote notwithstanding an immaterial error or omission on her voter registration, which courts are readily capable of enforcing. *See Schwier*, 340 F.3d at 12696–97. And lastly, the Materiality Provision is mandatory, rather than precatory: "[n]o person acting under color of law *shall . . . deny* the right of any individual to vote." § 10101(a)(2)(B) (emphasis added).

The Court is unaware of any case analyzing whether § 10101(a)(2)(A) also creates a federal right, under which "[n]o person acting under color of law shall . . . in determining whether any individual is qualified under State law or laws to vote" apply any standard or procedure different than those standards or procedures applied to individuals found qualified to vote ("Different Practices Provision"). Like the Materiality Provision, "[t]he subject of the sentence is the person acting under color of state law," but the Different Practices Provision does not contain similarly clear and "paradigmatic rights-creating language." *Schwier*, 340 F.3d at 1296; *Sanchez v. Johnson*, 416 F.3d 1051, 1058 (9th Cir. 2005) (citing *Gonzaga Univ.*, 536 U.S. at 287). However, the Ninth Circuit has instructed that a court "should not be limited to looking for those precise phrases" and may consider "other indicia so unambiguous that [it is] left without any doubt that Congress intended to

1    create an individual, enforceable right." *Ball v. Rodgers*, 492 F.3d 1094, 1106 (9th Cir.

2    2007) (quoting *Sanchez*, 416 F.3d at 1058).

3         Here, by use of the term "shall," the Different Practices Provision mandates that

4    Arizona officials refrain from applying differential standards or procedures to "any

5    individual." Section 10101(a)(2)(A) does not have an "'aggregate' focus" or "speak only

6    in terms of institutional policy and practice," but unambiguously benefits a specific class

7    of individuals. *See Gonzaga Univ.*, 536 U.S. at 288 (first quoting *Blessing*, 520 U.S. at

8    343). And "no gap exists" between the provision's proscribed conduct "and the persons

9    whose interests are at stake": any individual seeking to vote. *Colon-Marrero v. Valez*, 813

10   F.3d 1, 19 (1st Cir. 2016); *compare id.* (finding enforceable right under HAVA

11   § 303(a)(4)(A), because its "proscription—'no registrant may be removed' [from the voter

12   rolls]—directly and explicitly protects individual voters" (quoting 52 U.S.C.

13   § 21083(a)(4)(A))), *with Gonzaga Univ.*, 536 U.S. at 287–91 (finding no private right in

14   the Family Educations Rights and Privacy Act, because the provision's prohibition on

15   providing funds to any educational institution with a policy of releasing education records

16   without parental consent "is two steps removed from the interests of individual students

17   and parents"). Finally, forbidding state actors from applying any different "standard,

18   practice, or procedure" to determine if an individual is qualified to vote is "not so 'vague

19   and amorphous' that its enforcement would strain judicial competence." *Blessing*, 520 U.S.

20   at 340–41) (citation omitted). The Court finds that § 10101(a)(2)(A) creates a private right.

21        Defendants contend that non-U.S. Plaintiffs may not enforce § 10101 because the

22   statute is not intended to benefit organizations, which are unable to vote. A party generally

23   may assert only "his own legal rights and interests, and cannot rest his claim to relief on

24   the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). But

25   so long as the Court has subject matter jurisdiction, there may be circumstances in which

26   a plaintiff may rest its claim on the legal rights of another. *Id.* at 500–01. The Fifth Circuit

27   recently concluded that an organization with organizational standing could assert

28   individual voters' rights under the Materiality Provision. *Vote.Org*, 89 F.4th at 471–73.

Specifically, the organization Vote.org could assert § 10101 claims of voters because "Vote.org's position as a vendor and voting rights organization is sufficient to confer third-party standing." *Id.* at 472; *see also La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 431–32 (W.D. Tex. 2022) ("*LUPE I*") (finding organizational plaintiffs could enforce § 10101); *Tex. Democratic Party v. Hughs*, 474 F. Supp. 3d 849, 858 (W.D. Tex. 2020) (holding that organizational plaintiffs could sue under § 1983 for violations of § 10101 because "[t]he same facts that establish organizational and associational standing . . . also demonstrate standing to sue for voting rights violations under [§ 10101]"), *rev'd and remanded on other grounds*, 860 F. App'x 874 (5th Cir. 2021). The Court concludes that non-U.S. Plaintiffs may similarly assert the rights of Arizona voters under the CRA.

### ii. Plaintiffs May Enforce § 10101 Under § 1983

Because § 10101 creates a federal right, Plaintiffs may presumably enforce the provisions of § 10101 under § 1983. *Gonzaga Univ.*, 536 U.S. at 283–84. Defendants may rebut this presumption by showing that "Congress shut the door to private enforcement either expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 284 n.4 (citations and internal quotations omitted); *see Talevski*, 599 U.S. at 187. The text of § 10101 does not explicitly preclude a § 1983 remedy, so the question is whether Congress created a comprehensive enforcement mechanism incompatible with enforcement under § 1983. *Migliori v. Cohen*, 36 F.4th 153, 160–61 (3d Cir. 2022), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022).[48] A remedy under § 1983 is foreclosed "when Congress creates a right by enacting a statute but at the same time limits enforcement of that right through a specific remedial scheme that is narrower than § 1983." *Stilwell v. City of Williams*, 831 F.3d 1234, 1244 (9th Cir. 2016).

---

[48] A vacated decision may still be considered for its persuasive effect. *See Orhorhaghe v. I.N.S.*, 38 F.3d 488, 493 n.4 (9th Cir. 1994) (citing as persuasive authority a decision vacated by the Supreme Court as moot); *In re Taffi*, 68 F.3d 306, 310 (9th Cir. 1995) (citing as persuasive authority a decision vacated by the Supreme Court on other grounds). Though the Supreme Court vacated *Milgori* as moot, this did not disrupt the Third Circuit's underlying analysis of § 10101.

ER - 0074

Section 10101 does not include a comprehensive enforcement scheme incompatible with enforcement under § 1983. First, district courts have jurisdiction over "proceedings instituted pursuant to [§ 10101] and shall exercise the same without regard to whether the *party aggrieved* shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10101(d) (emphasis added). *Schwier* explained that because private citizens sued to enforce § 10101 before Congress granted the Attorney General authority to initiate an action in 1957, "this language could not have applied to the Attorney General and thus was meant to remove roadblocks for the previously authorized private rights of action."[49] 340 F.3d at 1295–96 (cleaned up); *see also Migliori*, 36 F.4th at 160 (explaining that § 10101(d) "specifically contemplates an aggrieved party (i.e., private plaintiff) bringing this type of claim in court"); H.R. Rep. No. 85-291 (1957). And when Congress amended § 10101 authorizing the Attorney General to enforce the statute, it did so as a "means of *further securing* and protecting the civil rights of persons within the jurisdiction of the United States." H.R. Rep. No. 85-291, at 1966 (1957) (emphasis added). This "demonstrates an intense focus on protecting the right to vote and does not support the conclusion that Congress meant merely to substitute one form of protection for another."[50] *Schwier*, 340 F.3d at 1295 (citing H.R. Rep. No. 85-291).

In addition, § 10101 lacks the "panoply of enforcement options, including

---

[49] Though several district courts and the Sixth Circuit have found no federal right under § 10101, the *Schwier* Court noted that these decisions rely almost exclusively on *Good v. Roy*, which concluded, without elaboration, that the "unambiguous language" of § 10101 precluded the court from implying a private right of action because "subsection (c) provides for enforcement of the statute by the Attorney General with no mention of enforcement by private persons." *Schwier*, 340 F.3d at 1294 (quoting *Good*, 459 F. Supp. 403, 405–06 (D. Kan. 1978)); *see McKay*, 226 F.3d at 756 (citing *Willing v. Lake Orion Cmty. Schs. Bd. of Trs.*, 924 F. Supp. 815, 820 (E.D. Mich. 1996)); *Willing*, 924 F. Supp at 820 (citing *Good*, 459 F. Supp. at 405). Defendants cite to *Northeast Ohio Coalition for the Homeless v. Husted*, for further support, but there a panel of the Sixth Circuit only noted that *McKay* remained binding in the absence of any Sixth Circuit en banc or Supreme Court decision holding to the contrary. 837 F.3d 612, 630 (6th Cir. 2016).

[50] The Attorney General's potential enforcement of § 10101 in and of itself does not foreclose a private remedy. *See Schwier*, 340 F.3d at 1294–95 (citing *Allen v. State Bd. of Elections*, 393 U.S. 544, 556–57 (1969) (holding enforcement by the Attorney General did not preclude private citizens from enforcing section 12(f) of the VRA and noting that the goals of the VRA "could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General")); *Migliori*, 36 F.4th at 162 (noting that § 10101(d) does not *mandate* enforcement by the Attorney General).

1  noncompliance orders, civil suits, . . . criminal penalties," and "several" private

2  enforcement options that are characteristic of statutory remedies found incompatible with

3  § 1983. *Migliori*, 36 F.4th at 161 (quoting *Blessing*, 520 U.S. at 347). And though "any

4  person of such race or color" may apply for "an order declaring him qualified to vote" if

5  the court finds a "pattern or practice" of § 10101 violations, this entitlement to a judicial

6  determination merely "complement[s], rather than supplant[s], § 1983." § 10101(e); *Isabel*

7  *v. Reagan*, 394 F. Supp. 3d 966, 977 (D. Ariz. 2019) (quoting *City of Rancho Palos Verdes*

8  *v. Abrams*, 544 U.S. 113, 122 (2005)) (finding plaintiff must sue directly under the NVRA

9  instead of § 1983 because, among other things, the NVRA creates an express private right

10  of action that requires a plaintiff to first give notice of a violation and explicitly allows only

11  declaratory and injunctive relief, while § 1983 lacks any notice requirement and allows

12  suits for damages). The Court finds that Defendants have failed to rebut the presumption

13  of an enforceable right under § 1983. Non-US Plaintiffs may enforce the rights conferred

14  by § 10101 pursuant to § 1983.

15  ### 2.    H.B. 2492 § 4's Birthplace Requirement

16  Plaintiffs claim that the Birthplace Requirement violates the Materiality Provision

17  of the Civil Rights Act. *See* § 10101(a)(2)(B). The Materiality Provision prohibits the State

18  from denying an individual her right to vote "because of an error or omission on any record

19  or paper relating to any application, registration, or other act requisite to voting, if such

20  error or omission is not material in determining whether such individual is qualified under

21  State law to vote in such election." *Id.* The Materiality Provision was "intended to address

22  the practice of requiring unnecessary information for voter registration with the intent that

23  such requirements would increase the number of errors or omissions on the application

24  forms, thus providing an excuse to disqualify potential voters." *Schwier*, 340 F.3d at 1294.

25  Defendants do not dispute that an applicant's failure to include her birthplace is an

26  "error or omission on any record or paper relating to" a requisite to voting. *See*

27  § 10101(a)(2)(B). And Arizona's refusal to register an individual who omits birthplace is

28  a denial of that individual's right to vote. The question is whether an individual's failure to

1  provide birthplace is material to determining that individual's eligibility to vote. To vote

2  in Arizona, a person must be a United States citizen, a resident of Arizona, and at least

3  eighteen years of age, who has not been adjudicated incapacitated or convicted of a felony.

4  Ariz. Const. art. VII, § 2; *see also* A.R.S. § 16-121. An individual's birthplace cannot be

5  used to directly verify that individual's citizenship or place of residence. (*See, e.g.*, Connor

6  Tr. 311:22–312:17; County Recorder Testimony Stip. No. 1.) Instead, Defendants claim

7  that the Birthplace Requirement can be used to verify an individual's identity, which is an

8  integral component of determining eligibility.

9         Materiality "signifies different degrees of importance in different legal contexts."

10  *Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1173. The Court previously determined that

11  Congress intended materiality to require "some probability of actually impacting an

12  election official's" determination of a person's eligibility to vote. (09/14/2023 Order at 26.)

13  The erroneous or omitted information need not be essential to determining a person's

14  eligibility to vote, but it must be more than useful or minimally relevant. (*See id.* at 25–

15  26).

16         The Court concludes that an individual's birthplace is not material to determining

17  her eligibility to vote. First, H.B. 2492 § 4 is not retroactive, meaning approximately one-

18  third of current voter registrations will lack the voter's birthplace until that voter submits a

19  new registration while an additional 200,000 registrations will continue to identify

20  birthplace generally as the United States. That Arizona has determined these voters are

21  qualified to vote notwithstanding the lack of any meaningful birthplace information

22  strongly indicates birthplace is immaterial. Moreover, the Voting Laws do not mandate

23  county recorders to verify an individual's birthplace or reject State Forms with an incorrect

24  birthplace. *See* § 16-121.01(A); (Petty Tr. 103:21–104:5; Connor Tr. 316:3–6, 326:13–16.)

25  "If the substance of the [birthplace field] does not matter, then it is hard to understand how

26  one could claim that this requirement has any use in determining a voter's qualifications."

27  *Migliori*, 36 F.4th at 164 (finding omitting the date on a ballot immaterial in part because

28  "ballots were only to be set aside if the date was *missing*—not incorrect" (emphasis in

1   original)). And HAVA Checks do not use birthplace as matching criteria for AVID and

2   MVD records to verify an applicant's identity for voter eligibility.  (Petty Tr. 32:19–33:14,

3   103:2–7; *see generally* MVD Verification Criteria.)

4           Nor does the fact that Arizona can use birthplace for other administrative purposes

5   render birthplace material in determining a voter's eligibility.  Specifically, county

6   recorders' use of birthplace as one of several security questions to verify the identity of a

7   *registered voter* does not make birthplace material because that voter has already been

8   identified and found eligible to vote. (*See, e.g.*, 2023 EPM at ECF-70 (including field for

9   birthplace on ballot-by-mail request form,), ECF-229 (using birthplace to verify caller

10  inquiring about status of provisional ballot.)) "Once election officials have determined an

11  applicant or voter's identity, additional requirements that confirm identity are not material

12  to determining whether the applicant or voter is qualified to vote or vote by mail and

13  compounds the chance for error and disenfranchisement." *La Union del Pueblo Entero v.*

14  *Abbott*, 5:21-CV-0844-XR, 2023 WL 8263348, at *18 (W.D. Tex. Nov. 29, 2023) ("*LUPE*

15  *II*"); *see Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1309 (N.D. Ga. 2018) ("[W]ith respect

16  to the absentee ballots rejected solely on a year of birth error or omission . . . the

17  qualifications of the absentee voters are not at issue because . . . election officials have

18  already confirmed such voters' eligibility through the absentee ballot application

19  process."). And the evidence indicates that county recorders can nevertheless reliably

20  verify the identity of registered voters without birthplace when necessary, especially

21  considering the one-third of all voters who have never provided birthplace information

22  when registering to vote. (*See, e.g.*, Petty Tr. 168:1–12 (explaining Maricopa County

23  accepts registration deficiency notices without birthplace information); Hiser Tr. 2056:18–

24  2057:10 (explaining birthplace alone is insufficient to verify a voter's identity via phone).)

25          The Court concludes that the Birthplace Requirement violates the Materiality

26  Provision of the Civil Rights Act.

27              **3.      H.B. 2243 § 2's Reason to Believe Provision**

28          Plaintiffs claim that H.B. 2243's Reason to Believe Provision will cause county

recorders to apply different standards, practices, and procedures to voters who county recorders suspect lack U.S. citizenship than those standards, practices, and procedures applied to voters not suspected of lacking citizenship. *See* § 10101(a)(2)(A). Specifically, H.B. 2243 requires county recorders to search SAVE only for naturalized voters who county recorders suspect are not U.S. citizens. *See* § 16-165(I).

While the Voting Laws purport to confirm the citizenship status of all voters, because SAVE requires an immigration number, county recorders can only ever conduct SAVE checks on naturalized citizens who county recorders have "reason to believe" are non-citizens. Naturalized citizens will always be at risk of county recorders' subjective decision to further investigate these voters' citizenship status, whereas the Reason to Believe Provision will never apply to native-born citizens. This violates the Different Practices Provision. *C.f. U.S. Student Ass'n Found. v. Land*, 585 F. Supp. 2d 925, 949–50 (E.D. Mich. 2008) ("[The Different Practices Provision] simply requires that if Michigan wishes to impose unique procedural requirements on the basis of a registrant's original voter ID being returned as undeliverable, it must impose those requirements on *everyone* whose original ID is returned as undeliverable." (emphasis in original)); *Frazier v. Callicutt*, 383 F. Supp. 15, 18–19 (N.D. Miss. 1974) (finding violation of § 10101 where registrar summarily referred the registration of every Black student whose registration may have indicated lack of residency to the board of election commissioners for appeal but approved nearly all non-student registrations that similarly indicated lack of residency); *Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vmt. 1971) (explaining that "the Board of Civil Authority must use its best efforts to insure that any questionnaire [concerning domicile] is equally relevant to all applicants and not designed only to apply to student applicants" in order to comply with § 10101(a)(2)(A)); *see also Whatley v. Clark*, 482 F.2d 1230, 1232–33 (5th Cir. 1973) (finding equal protection violation where Texas law requiring residency was substantively the same for all voters but applied differently to students by creating a presumption of non-residency for students).

Arizona is entitled to investigate the citizenship status of registered voters to ensure

1    that only qualified individuals are registered to vote. Holding otherwise "would raise

2    serious constitutional doubts if [the Different Practices Provision] precluded a State from

3    obtaining the information necessary to enforce its voter qualifications." *ITCA*, 570 U.S. at

4    17. For example, County recorders must check SAVE and/or NAPHSIS for all voters

5    without DPOC, *i.e.*, Federal-Only Voters. § 16-165(I), (J). But because the application of

6    H.B. 2243's Reason to Believe Provision subjects *only* naturalized citizens to database

7    checks, this provision violates § 10101.

8                C.    **National Voter Registration Act**

9                      1.    **Sections 6 and 7 of the NVRA**

10                           i.    **H.B. 2492 § 5's DPOR Requirement**

11          The Court previously ruled that section 6 of the NVRA preempts H.B. 2492 § 5's

12   requirement that Federal Form users submit DPOR to register for federal elections. (*See*

13   09/14/2023 Order at 9.) Plaintiffs claim that the DPOR Requirement violates section 6 of

14   the NVRA to the extent that Arizona must accept Federal Forms lacking DPOR under the

15   Court's summary judgment ruling but will continue to reject State Forms lacking DPOR

16   and refuse to register otherwise eligible voters for federal elections.

17          Section 6 of the NVRA permits Arizona to register eligible voters for federal

18   elections with a State Form that "meets all of the criteria stated in" section 9 of the NVRA.

19   52 U.S.C. 20505(a)(2). Specifically, as stated in section 9 of the NVRA, the State Form

20   "may require only such identifying information . . . and other information . . . as is

21   necessary to enable the appropriate State election official to assess the eligibility of the

22   applicant and to administer voter registration and other parts of the election process." *Id.*

23   § 20508(b)(1). Though the State Form "may require information the Federal Form does

24   not," Arizona must abide by section 6 and section 9 and show that the information required

25   on the State Form is "necessary" to determine the eligibility of the applicant.[51] *ITCA*, 570

26   ───────────────

27   [51] In *Fish v. Kobach* ("*Fish I*"), the Tenth Circuit analyzed the necessity of information
     under section 5 of the NVRA, which requires states to include a voter registration as part
28   of the application process for state driver's licenses and identifications. 840 F.3d 710, 733–
     39 (10th Cir. 2016). This registration "may require only the *minimum amount* of

- 74 -

U.S. at 12, 18; §§ 20505(a)(2), 20508(b).

Defendants failed to do so. In fact, the Voting Laws indicate otherwise, as voters who obtain an out-of-state license or identification and receive a notice from the county recorder requesting confirmation of residency must only attest under penalty of perjury that the voter is still a resident of Arizona. § 16-165(E). The Court cannot reconcile why DPOR would be *necessary* for new applicants when an attestation is *sufficient* to determine the eligibility of registered voters who subsequently obtain an out-of-state identification. Section 6 of the NVRA preempts the DPOR Requirement as to State Form users for federal elections.

Plaintiffs also claim that Arizona's differential treatment of State Form and Federal Form applications lacking DPOR violates section 7 of the NVRA, which requires public assistance agencies to distribute the Federal Form or an "equivalent" form. 52 U.S.C. § 20506(a)(6) (citing § 20508(a)(2)); *Id.* § 20506(a)(2). The Secretary of State supplies public assistance agencies with the State Form to register individuals. The "plain meaning of a statute controls where that meaning is unambiguous." *Khatib v. County of Orange*, 639 F.3d 898, 902 (9th Cir. 2011) (en banc). Section 7 is clear: if the Secretary of State supplies the State Form to public assistance agencies, the State Form must be "equivalent," or "virtually identical" to the Federal Form. Black's Law Dictionary (11th ed. 2019) (defining equivalent as "equal in value, force, amount, effect, or significance," or "virtually identical").

Moreover, the Court does "not look at individual subsections in isolation" but reads "words in their context and with a view to their place in the overall statutory scheme." *Tovar v. Sessions*, 882 F.3d 895, 901 (9th Cir. 2018); *id.* (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)). As discussed above, states may develop "a *mail voter registration*

_____

information necessary" to determine the applicant's eligibility. 52 U.S.C. § 20504(c) (emphasis added). The *Fish I* Court held "that section 5's 'only the minimum amount of information necessary' is a stricter principle than section 9's 'such identifying information . . . as is necessary'" and that the information enumerated in section 5 is the "presumptive minimum" a state may require. 840 F.3d at 734. Assuming section 9 is an easier standard than section 5, the Court concludes that Defendants must still show the information on the State Form is necessary.

*form* that meets all of the criteria stated in section [9]" which allows states to include

information necessary to determining voter eligibility that may not otherwise be on the

Federal Form. §§ 20505(a)(2) (emphasis added), 20508(b)(1). By its terms, section 7 does

not afford states this same discretion regarding forms made available at public assistance

agencies. § 20506(a)(6). This is buttressed by the fact that Congress required public

assistance agencies to provide voter registration services specifically in an effort to target

the registration of persons with disabilities and low-income individuals who are more likely

to receive public assistance. H.R. Rep. No. 103-66, 19 (1993) (Conf. Rep.). Requiring

public assistance agencies to use an "equivalent" to the Federal Form "guarantees that a

simple means of registering to vote in federal elections will be available" for these

individuals. *ITCA*, 570 U.S. at 12. Because the Voting Laws require a State Form to include

DPOR, the State Form is not "equivalent" to the Federal Form. Arizona may not reject

State Forms lacking DPOR and must register these applicants as Federal-Only Voters.

                **ii.**       **H.B. 2243 § 2's List Maintenance Procedures and Cancellation Provision**

Section 6 of the NVRA also mandates that states "accept and use" the Federal Form

"for the registration of voters" for federal elections. § 20505(a). The Federal Form requires

that applicants attest under penalty of perjury that they are eligible to vote, which includes

being a U.S. citizen. (*See* Federal Form.) The Court previously ruled that section 6

preempts H.B. 2492 § 5, which requires Federal Form users to provide DPOC to vote in

presidential elections and vote by mail. (09/14/2023 Order at 9–14.) Plaintiffs claim that

section 6's "accept and use" mandate also preempts H.B. 2243 § 2. Specifically, the

Secretary of State and county recorders must conduct monthly database checks to verify

the citizenship of voters who do not provide DPOC, namely, Federal-Only Voters. *See*

§ 16-165(I), (J). If the country recorder "confirms" that the voter is a non-citizen, the voter

must then provide DPOC to avoid having her voter registration cancelled. § 16-165(A)(10).

Plaintiffs claim that Arizona is not "using" the Federal Form because this regime requires

county recorders to investigate and confirm a Federal-Only Voter's citizenship status with

1    information not contained on the Federal Form.

2        H.B. 2243 § 2 does not violate section 6 of the NVRA. *ITCA* held that section 6's

3    "accept and use" mandate preempted Arizona's DPOC requirement for Federal Form users.

4    570 U.S. at 4, 15. The Supreme Court rejected Arizona's argument that section 6 only

5    required Arizona to "receive the [Federal Form] willingly and use it *somehow* in its voter

6    registration process." *Id.* at 9–10 (emphasis in original). "[T]he Federal Form provides a

7    backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form

8    guarantees that a simple means of registering to vote in federal elections will be available."

9    *Id.* at 12. But the Supreme Court noted that "while the NVRA forbids States to demand

10   that *an applicant submit additional information* beyond that required by the Federal Form,

11   it does not preclude States from 'deny[ing] registration based on information in their

12   possession establishing the applicant's ineligibility.'" *Id.* at 15 (emphasis added) (quoting

13   § 20508(b)(1), which allows the Federal Form to include only that information "necessary

14   to . . . assess the eligibility of the applicant").

15       Arizona must accept the Federal Form as prima facie proof of an applicant's

16   eligibility to vote but the NVRA does not preclude Arizona from independently

17   determining that an applicant or voter is ineligible. The monthly database checks require

18   county recorders to consult information available to Arizona; applicants do not submit any

19   "additional information." *Id.*; *see* § 16-165(I), (J). And a county recorder may cancel a

20   registration only if the county recorder "confirms" from that information that the voter is

21   not a citizen. § 16-165(A)(10). This is not "'inconsistent with' the NVRA's mandate that

22   States 'accept and use' the Federal Form." *ITCA*, 570 U.S. at 15 (citation omitted); *see id.*

23   ("The NVRA clearly contemplates that not every submitted Federal Form will result in

24   registration.").

25       Nor do the investigation and additional DPOC requirements "create[] an

26   unacceptable obstacle to the accomplishment and execution of the full purpose and

27   objectives of Congress." *Chamber of Com. v. Bonta*, 62 F.4th 473, 482 (9th Cir. 2023)

28   (citation and internal quotations omitted) (describing conflict preemption). "What is a

1    sufficient obstacle is a matter of judgment, to be informed by examining the federal statute

2    as a whole and identifying its purpose and intended effects. . . ." *Crosby v. Nat'l Foreign*

3    *Trade Council*, 530 U.S. 363, 373 (2000). One of the NVRA's purposes is to "enhance[]

4    the participation of *eligible citizens* as voters in elections for Federal office." 52 U.S.C.

5    § 20501(b)(2) (emphasis added); *see id.* § 20507(a)(1) (states must "ensure that any

6    *eligible* applicant is registered to vote" (emphasis added)). Arizona is entitled to cancel the

7    registrations of ineligible voters "based on information in [its] possession establishing the

8    applicant's ineligibility"; it need not take a voter at her word. *ITCA*, 570 U.S. at 15.

9       Were the Court to embrace Plaintiffs' theory that section 6 prohibited a county

10   recorder from requesting information not contained on the Federal Form after confirming

11   non-citizenship, Arizona seems left with no apparent means to request proof of eligibility

12   before cancelling a registration. The Court is unaware of any caselaw interpreting the

13   NVRA in this manner and, considering *ITCA*, declines to do so here. Section 6 does not

14   preempt H.B. 2243's mandate that a voter submit DPOC to avoid cancellation after the

15   county recorder confirms the voter's non-citizenship.

16                   **2.**       **Section 8 of the NVRA**

17       Plaintiffs claim that the Voting Laws' post-registration citizenship investigation

18   provisions violate section 8(b) of the NVRA. Specifically, under H.B. 2492 § 7's Attorney

19   General Referral Provision, the Secretary of State and county recorders "shall" provide the

20   Attorney General with the names of registered voters who have not provided DPOC, who

21   must then investigate these registered voters by, "at a minimum," consulting the MVD,

22   SSA, SAVE, and NAPHSIS databases. § 16-143. Similarly, H.B. 2243's List Maintenance

23   Procedures direct county recorders to investigate the citizenship status of registered voters

24   with a foreign-type license, voters lacking DPOC, and voters who county recorders have

25   "reason to believe" are non-citizens. § 16-165(G)–(J). County recorders must then cancel

26   the registrations of confirmed non-citizens. § 16-165(A)(10), (K). Section 8(b) of the

27   NVRA, in relevant part, provides that "[a]ny State program or activity to protect the

28   integrity of the electoral process by ensuring the maintenance of an accurate and current

voter registration roll for elections for Federal office . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965" ("Uniformity Provision"). 52 U.S.C. § 20507(b)(1). Plaintiffs claim that the Voting Laws are non-uniform and discriminatory specifically as applied to naturalized citizens and voters who do not provide DPOC.

### i. H.B. 2243 § 2's Reason to Believe Provision

For the same reasons that H.B. 2243's Reason to Believe Provision violates the Civil Rights Act, discussed above, the Court concludes that this provision violates section 8(b) of the NVRA. Only naturalized citizens would be subject to scrutiny under the Reason to Believe Provision, who if "confirmed" as non-citizens, would be required to provide DPOC. This would have a non-uniform and discriminatory impact on naturalized citizens. *See United States v. Florida*, 870 F. Supp. 2d 1346, 1350–51 (N.D. Fla. 2012) (finding secretary of state's list maintenance program "probably ran afoul" of section 8 because its "methodology made it likely that the properly registered citizens who would be required to respond and provide documentation would be primarily newly naturalized citizens. The program was likely to have a discriminatory impact on these new citizens.").

### ii. H.B. 2243 § 2's List Maintenance Procedures and H.B. 2492 § 7's Attorney General Referral Provision

Plaintiffs claim that H.B. 2492 § 7 and H.B. 2243 § 2 violate section 8(b) of the NVRA by requiring county recorders to investigate the citizenship status of select groups of voters, specifically, registered voters without DPOC and naturalized citizens. In *Husted v. A. Philip Randolph Institute*, the Supreme Court reviewed a challenge to Ohio's list maintenance procedures to remove voters who became ineligible due to a change in residence. 584 U.S. 756, 764–66 (2018). Specifically, Ohio would send voters who had not voted for two years a notice requesting verification of the voter's address and remove voters who failed to respond to the notice. *Id.* at 765–66. The plaintiffs claimed that this procedure was unlawful under the NVRA in part because Ohio sent notices "without having any 'reliable indicator' that the addressee ha[d] moved." *Id.* at 776. In rejecting this

1  argument, the Supreme Court explained in part that "[s]o long as the trigger for sending

2  such notices is 'uniform, nondiscriminatory, and in compliance with the Voting Rights

3  Act,' § 20507(b)(1), States can use whatever plan they think best." *Id.* at 776–77.

4          Like in *Randolph Institute*,[52] H.B. 2243 § 2 does not violate section 8 of the NVRA

5  because the "trigger" for county recorders to investigate the citizenship status of applicants

6  is uniform and nondiscriminatory: the voter has not submitted DPOC proving her

7  citizenship. The same is true for H.B. 2492 § 7's mandate that county recorders provide

8  the Attorney General with the names of registered voters lacking DPOC. These provisions

9  necessarily require that county recorders first review the registration files of *all* registered

10 voters before further investigating those individuals who have not submitted DPOC.[53] *C.f.*

11 *Florida*, 870 F. Supp. 2d at 1350–51. Regardless of whether Arizona "overestimated the

12 correlation between" not submitting DPOC and non-citizenship, the NVRA does not

13 prohibit the State from using this methodology to ensure that only eligible individuals are

14 registered to vote. *Randolph Institute*, 584 U.S. at 776; 52 U.S.C. § 20507(a)(1). In

15 addition, no party presented evidence of a comprehensive database of all U.S. citizens, and

16 it is not unreasonable for the Voting Laws to mandate consulting multiple sources that may

17 contain citizenship information. Specifically, voters who have not submitted DPOC will

18 be subject to MVD, NAPHSIS, *and* SAVE checks, if practicable.[54] A.R.S. §§ 16-143,

---

[52] While Plaintiffs in *Randolph Institute* did not assert a claim under § 20507(b)(1), the majority noted that the dissent had not identified any evidence that Ohio's program was tarnished by discriminatory intent. 584 U.S. at 779.

[53] Plaintiffs claim that H.B. 2492 § 7 and H.B. 2243 § 2 confer county recorders with discretion to arbitrarily implement these provisions. But the Voting Laws unequivocally *mandate* that county recorders investigate or refer to the Attorney General for investigation all voters lacking DPOC. Additionally, the Voting Laws prescribe the frequency with which county recorders and the Secretary of State must conduct citizenship checks. A.R.S. 16-165(G) (requiring Secretary of State to conduct monthly MVD database comparisons), (I)–(J) (requiring county recorders to conduct monthly checks); *c.f. Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1153 (S.D. Indiana 2018) (concluding that the implementation of a voting law was likely to be non-uniform based on evidence that co-directors of the secretary of state's election division "provid[ed] *differing guidance* to county officials on how to determine whether a particular registered voter is a duplicate registered voter in a different state" (emphasis added)), *aff'd on other grounds*, 937 F.3d 944.

[54] SAVE checks are *not* practicable because SAVE requires an immigration number, meaning neither the Attorney General nor county recorders can conduct these checks on

165(I), (J); *c.f. Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (concluding Ohio's law that required only compensated voter registration workers to pre-register with the Secretary of State and undergo "online-only" training applied to only "a selected class of persons" because, among other things, "they [did] not apply to everyone involved in the process").

Plaintiffs further claim that H.B. 2492 § 7 and H.B. 2243 § 2 violate section 8 because the additional List Maintenance Procedures and Cancellation Provision will discriminatorily impact naturalized voters due to stale citizenship information in SAVE and the MVD database. *See* A.R.S. §§ 16-143(B)(3), 16-165(I). Assuming it were somehow practicable for county recorders or the Attorney General to conduct SAVE checks on Federal-Only Voters (notwithstanding the current limitations of the SAVE MOA and the lack of immigration numbers for these voters), plaintiffs adduced no evidence that SAVE is so unreliable as to erroneously flag naturalized citizens as non-citizens each month. SAVE typically returns an individual's naturalization status within 24 hours of naturalization, except for the occasional one or two-day delay. (*See* USCIS Dep. 39:20–41:19.) Even if SAVE may periodically return stale citizenship information, Plaintiffs have not shown that naturalized citizens will be disproportionality required to submit additional DPOC compared to other voters. Section 8 of the NVRA does not preempt the Voting Laws' SAVE checks.

Nor does the NVRA preempt the Voting Laws' MVD checks. The Attorney General must review the citizenship information of Federal-Only Voters in the MVD database. § 16-143(B)(1). In addition, the Secretary of State must notify county recorders of all registered voters who are "not a United States citizen according to the [MVD] database." (2023 EPM at ECF-54); § 16-165(G). Under the Voting Laws, the only voters who may be flagged as non-citizens in the MVD database are naturalized citizens who still possess a foreign-type credential after naturalization. (2023 EPM at ECF-54; Jorgensen Tr. 560:2–

---

any Federal-Only Voters who have not provided any form of DPOC. A.R.S. § 16-143(A) (citing § 16-166); (*see* 2023 EPM at 26–27; Petty Tr. 57:15–58:1 (explaining most voters do not provide an immigration number).) For this reason, there will be no non-uniform use of SAVE on naturalized, Federal-Only Voters.

1    14; *see* Pls.' Stip. No. 93.)

2        In *United States v. Florida*, the secretary of state compiled a list of voters that

3    included any person who obtained a state license as a non-citizen, became a naturalized

4    citizen, and registered to vote, but had not renewed their driver's license and had not

5    updated motor vehicle records to reflect their new citizenship status. 870 F. Supp. 2d at

6    1347–48. The district court found that this methodology "probably" violated section 8

7    because "the Secretary's program identified many properly registered citizens as potential

8    noncitizens" and discriminatorily burdened naturalized citizens with proving citizenship.

9    *Id.* at 1350. Citing *Florida*, the court in *Texas League of United Latin American Citizens*

10   *v. Whitley* ("*Texas LULAC*"), came to a similar conclusion regarding the Texas Secretary

11   of State's "proactive process using tens of thousands of Department of Public Safety driver

12   license records matched with voter registration records." No. SA-19-CA-074-FB, 2019

13   WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019). There, the court found that the Secretary's

14   program imposed a burden on "perfectly legal naturalized Americans" while "[n]o native

15   born Americans were subjected to such treatment." *Id.* Unlike in *Florida* and *Texas*

16   *LULAC*, however, Arizona requires that *all voters* submit DPOC or be subject to additional

17   citizenship investigation procedures. §§ 16-121.01(D)–(E), 16-165(G).

18       Moreover, for naturalized citizens that provide DPOC when registering to vote

19   (Full-Ballot Voters), MVD's records of non-citizenship will not materially affect these

20   voters' registration status. The 2023 EPM explicitly directs county recorders to "confirm"

21   reports of non-citizenship from the Secretary of State, which includes "deterimin[ing]

22   whether the voter has previously provided DPOC." (2023 EPM at ECF-57; *see id.* at ECF-

23   27 n.10 (warning county recorders that MVD records may return outdated citizenship

24   information for naturalized citizens registering to vote); Morales Tr. 613:25–614:3

25   (explaining the process of overriding a voter's non-citizenship status in AVID when the

26   voter has provided proof of naturalization as DPOC but MVD indicates non-citizenship).)

27   Aside from Dr. McDonald's "loop" theory, which the Court found unpersuasive, Plaintiffs

28   have not adduced evidence that county recorders would ignore a voter's DPOC on file and

burden naturalized citizens with requiring new proof of citizenship. (*See* McDonald Tr. 1071:24–1072:5.) And for those who have not provided DPOC (the 65 Federal-Only Voters with a foreign-type credential), the Court concluded *supra* Section II(C)(2) that Arizona may lawfully request proof of citizenship when it obtains and confirms information in its possession that a Federal-Only Voter is a non-citizen. (*See* 2023 EPM at ECF-57 ("If a person has not previously provided DPOC, confirmation also includes reviewing relevant government databases . . . to the extent practicable" and may include "direct communication with the registrant.")); *ITCA*, 570 U.S. at 17 ("[I]t would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications.").

Except for the Reason to Believe Provision, section 8 of the NVRA does not preempt H.B. 2492 § 7 nor H.B. 2243 § 2.

### D.     Section 2 of the Voting Rights Act

Under section 2 of the VRA, States are prohibited from imposing any law, practice, or procedure "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or language-minority status. 52 U.S.C. §§ 10301(a), 10303(f)(2). A law violates section 2 if:

> [B]ased on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members [protected by section 2] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b). "The essence of a § 2 claim . . . is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities of minority and non-minority voters to elect their preferred representatives." *Brnovich v. Democratic Nat'l Comm.* ("*DNC*"), 141 S. Ct. 2321, 2333 (2021) (cleaned up); *see also Smith v. Salt River Project Agr. Imp. & Power Dist.*, 109 F.3d 586, 594 (9th Cir. 1997) ("Section 2 requires proof only of a discriminatory result, not of discriminatory intent.").

1      The Supreme Court has enumerated a non-exhaustive set of "guideposts" for courts
2  to consider: (1) "the size of the burden imposed by the challenged voting rule"; (2) "the
3  degree to which a voting rule departs from what was standard practice when § 2 was
4  amended in 1982"; (3) "[t]he size of any disparities in a rule's impact on members of
5  different racial or ethnic groups"; (4) "the opportunities provided by a State's entire system
6  of voting"; and (5) "the strength of the state interests served by [the] challenged voting
7  rule." *DNC*, 141 S. Ct. at 2338–39. Courts may also consult the "Senate" factors identified
8  in *Thornburg v. Gingles*, 478 U.S. 30 (1986), though "their relevance is much less direct"
9  when applied outside the vote-dilution context. *DNC*, 141 S. Ct. at 2340.

10     Plaintiffs claim that H.B. 2492 §§ 4 and 7, and H.B. 2243 § 2 violate section 2 of
11 the VRA.

12              **1.      Size of the Burden**

13     Most of the Voting Laws' challenged provisions impose a de minimis burden on
14 voters. The Citizenship Verification Procedures, Attorney General Referral Provision, and
15 List Maintenance Procedures' database checks impose obligations related to election
16 administration on county recorders and the Attorney General to confirm the eligibility of
17 applicants and registered voters. *See DNC*, 141 S. Ct. at 2338 (focusing on the "effort and
18 compliance" required by voters to determine whether a burden exists); § 16-121.01(D)
19 (verifying citizenship of applicants without DPOC); § 16-143 (investigating citizenship of
20 Federal-Only Voters); § 16-165(G)–(K) (investigating citizenship of registered voters).
21 But assuming that the psychological impacts of being referred to the Attorney General for
22 investigation is a burden on voting, Plaintiffs did introduce evidence that Latino and
23 AANHPI voters, particularly those from mixed-status households, may fear exposing their
24 families to increased government oversight.

25     Only if a county recorder establishes that an applicant or registered voter is a non-
26 citizen must that voter then provide DPOC. §§ 16-121.01(E), 16-165(A)(10); (2023 EPM
27 at ECF-27.) For these voters, the Voting Laws' DPOC Requirements may impose a modest
28 burden on a subset of socioeconomically disadvantaged voters because of the potential

monetary and temporal costs associated with obtaining DPOC. Moreover, the money and time necessary to obtain a birth certificate for native-born citizens pales in comparison to the cost of obtaining a naturalization certificate. *C.f. Crawford v. Marion Cnty. Election Bd.* ("*Crawford II*"), 553 U.S. 181, 198–99 (2008) (plurality opinion) (finding that the evidence "indicate[d] that a somewhat heavier burden may be placed on a limited number of persons . . . who because of economic or other personal limitations may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification"); § 16-165(A)(10) (affording 35 days to provide DPOC before registration is cancelled); (*but see* 2023 EPM at ECF-22, -24 (allowing new registrants until the Thursday before election day to supply DPOC to be registered to vote).)

Arizona's election laws mitigate this burden by allowing voters to provide numerous forms of DPOC, ranging from physical documents to writing an identification number on the registration form, which has worked for 99.5% of Arizona's registered voters. *See* § 16-166. And Plaintiffs were unable to provide evidence quantifying the number of Arizonans qualified to vote that may be unable to provide *any* form of DPOC or that have been or will be deterred from registering to vote because of Arizona's DPOC Requirements. Considering the discrete burden on particularly disadvantaged voters who do not possess DPOC however, the Court finds that this guidepost weighs slightly in favor of finding a section 2 violation.

## 2.     Alternative Means of Registering

"[W]here a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means." *DNC*, 141 S. Ct. at 2339. Practically speaking, the Voting Laws do not afford Arizonans "multiple ways" to register to vote. Individuals must provide DPOC when registering to vote or subject themselves to citizenship verification procedures that may later necessitate proof of citizenship. Specifically, while an applicants can register as Federal-Only Voters without DPOC, the Voting Laws' Citizenship Verification and List

1    Maintenance Procedures may eventually require these voters to submit DPOC to remain

2    registered. This guidepost weighs in favor of finding a section 2 violation. *C.f. DNC*, 141

3    S. Ct. at 2344 (citing the various methods Arizona allows voters to vote as mitigating

4    evidence regarding the State's mandate that voters vote in their assigned precinct on

5    election day).

6                        **3.    Disparate Impact**

7            As discussed *supra* Section I(A)(1), Arizona currently lacks DPOC for less than half

8    a percent of its voters. Approximately one-third of a percent of Arizona's White voters are

9    Federal-Only Voters, and a little more than two-thirds of a percent of minority voters are

10   Federal-Only Voters. (*See* Ex. 338.) In *DNC*, the district court had found that

11   approximately one percent of minority voters had cast ballots in the wrong precinct, while

12   a half a percent of White voters did so. *DNC*, 141 S. Ct. at 2345. The Supreme Court

13   rejected the Ninth Circuit's interpretation of these statistics that "minority voters in Arizona

14   cast [out-of-precinct] ballots at twice the rate of White voters," and instead concluded that

15   "[p]roperly understood, the statistics show only a small disparity that provides little support

16   for" finding a disparate impact. *Id.* (first alteration in original). "A policy that appears to

17   work for 98% or more of voters to whom it applies—minority and non-minority alike—is

18   unlikely to render a system unequally open." *Id.* at 2344–45 (concluding the policy's racial

19   disparity was "small in absolute terms"); *see also Fair Fight Action*, 634 F. Supp. 3d at

20   1244 (finding no disparate impact where citizenship checks affected "less than one percent

21   of any minority group"). As in *DNC*, any disparate impact regarding the Voting Laws'

22   Citizenship Verification Procedures and List Maintenance Procedures is markedly small.[55]

23          More precisely for naturalized citizens,[56] 65 Federal-Only Voters, or *one-third of a*

24   *percent* of the 19,439 Federal-Only Voters, possess a foreign-type credential. (MVD Non-

25   ──────────────
     [55] Relatedly, for voters who are called upon to furnish DPOC pursuant to the Voting Laws,

26   economically disadvantaged voters might encounter more financial challenges when
     obtaining DPOC. But the cost of obtaining DPOC alone is insufficient for the Court to

27   measure how the Voting Laws' DPOC Requirements will disproportionately impact
     minority groups without first assuming that these voters in fact lack all forms of DPOC.
     [56] As discussed above, these voters will not be subject to recurring SAVE checks and risk

28   being erroneously flagged as a non-citizen unless they have previously provided county
     recorders with an immigration number.

1   Citizen Records.) The Voting Laws' MVD checks will flag these voters as non-citizens,
2   thereby triggering additional investigation by county recorders or the Attorney General and
3   possibly requiring DPOC, while all other Federal-Only Voters will not be subject to these
4   procedures.[57] §§ 16-143(B)(1), 16-165(A)(10), (G). But given the very few circumstances
5   that a voter will be called upon to provide DPOC, the Voting Laws' impact on naturalized
6   citizens who may not possess DPOC is negligible and weighs against finding a section 2
7   violation.

8                       **3.      Laws and Practices in 1982**

9              United States citizenship has always been a qualification to vote in Arizona. *See*
10  Ariz. Const. art. VII, § 2. While the State Form has included "[a] statement that the
11  registrant is a citizen of the United States" since 1980, no laws analogous to the Voting
12  Laws' DPOC Requirements existed in Arizona in 1982. *See* 1979 Ariz. Sess. Laws ch. 209,
13  § 3 (adopting A.R.S. § 16-152 to require contents of the State Form). Nevertheless, Arizona
14  has already required DPOC for two decades, and the Voting Laws' additional citizenship
15  verification procedures reinforce the State's longstanding limitation of the right to vote to
16  citizens. *See Fair Fight Action*, 634 F. Supp. 3d at 1243 ("The use of a birth certificate as
17  a means of establishing identification—and citizenship—speaks to the State's policy of
18  trying to enforce the citizenship requirement prior to 1982."). This weighs against finding
19  a section 2 violation.

20                      **4.      State Interests**

21             Arizona has a legitimate interest in preventing voter fraud and ensuring that only
22  eligible Arizonans are registered to vote. *See DNC*, 141 S. Ct. at 2340 ("One strong and
23  entirely legitimate state interest is the prevention of fraud."); *Crawford II*, 553 U.S. at 196
24  ("There is no question about the legitimacy or importance of the State's interest in counting
25  only the votes of eligible voters."). "Section 2 does not require a State to show that its
26  chosen policy is absolutely necessary or that a less restrictive means would not adequately

27  _____
28  [57] On the opposite end of the scale, Dr. Richman identified 112 Federal-Only Voters for
    whom MVD has DPOC on record and would be eligible to vote as a Full-Ballot Voter. It
    is unclear, however, whether these voters are naturalized or native-born citizens.

serve the State's objectives." *DNC*, 141 S. Ct. at 2345–46. Consulting government databases that may contain information about a voter's citizenship status, and subsequently requiring DPOC when a voter's citizenship is seriously in question, serves this interest. *Fair Fight Action*, 634 F. Supp. 3d at 1245 (finding state's interest in preventing voter fraud served by the state's "citizenship flag" that is triggered "when there is affirmative evidence that someone who registered has a noncitizen driver's license"). And while voter fraud in Arizona is incredibly rare, the State "may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *DNC*, 141 S. Ct. at 2348 (finding Arizona's justification for third-party ballot-collection restrictions legitimate despite "no evidence that fraud in connection with early ballots had occurred in Arizona"). This weighs against finding a section 2 violation.

### 5.        Senate Factors

The Supreme Court in *DNC* noted that beyond the Senate factors' original purpose in vote-dilution cases, their "only relevance . . . is to show that minority group members suffered discrimination in the past (factor one) and that effects of that discrimination persist (factor five)." 141 S. Ct. at 2340 (citing *Gingles*, 478 U.S. at 36–37).

Plaintiffs' experts established that Arizona has a long history of race-based discrimination against Latino, AANHPI, and Native American individuals. Animus permeated Arizona's legal system, from banning interracial marriage and precluding immigrants from owning land, to mandating that classrooms and political subdivisions act only in English. Specific to voting, Arizona imposed literacy tests for 60 years and conducted regular voter purging practices. And Arizona was subject to the VRA's preclearance requirement until the Supreme Court's ruling in *Shelby County*. The effects of these discriminatory practices continue to linger, particularly as it relates to educational and economic outcomes for people of color. (*See generally* ACS Household Income; ACS Poverty Rates; ACS Educational Attainment.) However, considering the Voting Laws' limited to modest burdens, the small disparate impact on Federal-Only, minority and naturalized voters, and the state's interests, the Court concludes that the Voting Laws'

1   citizenship investigation and additional DPOC Requirements do not "result[] in a denial or

2   abridgment" of citizens' right to vote in Arizona. § 10301(a).

3              E.    *Anderson/Burdick* **Claims**

4         Plaintiffs claim that the Voting Laws impose an undue burden on the right to vote

5   in violation of the First and Fourteenth Amendments.[58] Plaintiffs also claim that the Voting

6   Laws burden voters' equal protection and procedural due process rights. The

7   *Anderson/Burdick* framework applies to these claims. *See Ariz. Democratic Party v.*

8   *Hobbs*, 18 F.4th 1179, 1194–95 (9th Cir. 2021) ("*ADP III*") (holding that due process

9   challenges to election laws should be evaluated under the *Anderson/Burdick* framework);

10  *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 1011) (explaining that the Supreme

11  Court has analyzed due process and equal protection claims under the same framework).

12  Courts evaluate the validity of an election law by balancing the burden the law places on

13  the fundamental right to vote against the state interests served by the law. *See Anderson v.*

14  *Celebrezze*, 460 U.S. 780, 789 (1983). The Court must "consider the character and

15  magnitude of the asserted injury to the rights protected by the First and Fourteenth

16  Amendments that the plaintiff seeks to vindicate"; "identify and evaluate the precise

17  interests put forward by the [s]tate as justifications for the burden imposed by its rule";

18  "determine the legitimacy and strength of each of those interests"; and "consider the extent

19  to which those interests make it necessary to burden the plaintiff's rights." *Id.*; *see ADP*

20  *III*, 18 F.4th at 1187.

21         "[T]he severity of the burden the election law imposes on the plaintiff's rights

22  dictates the level of scrutiny applied by the court." *Nader v. Brewer*, 531 F.3d 1028, 1034

23  (9th Cir. 2008) (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "Regulations

24  imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a

25  compelling state interest. Lesser burdens, however, trigger less exacting review, and a

26  State's important regulatory interests will usually be enough to justify reasonable,

27  nondiscriminatory restrictions." *Pierce v. Jacobsen*, 44 F.4th 853, 859–60 (9th Cir. 2022)

28  _____

[58] The Court declines to decide Plaintiffs' constitutional claims for those sections of the
Voting Laws that the Court has already ruled unlawful under the CRA, NVRA, or VRA.

1    (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)); *see Dudum*,

2    640 F.3d at 1114 ("[W]hen a challenged rule imposes only limited burdens on the right to

3    vote, there is no requirement that the rule is the only or the best way to further the proffered

4    interests."). "This is a sliding scale test, where the more severe the burden, the more

5    compelling the state's interest must be." *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir.

6    2018).

7    ### 1.    Burden on the Right to Vote

8    A restriction is "not severe" when it is "generally applicable, even-handed,

9    politically neutral, and . . . protect[s] the reliability and integrity of the election process."

10   *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1014 (9th Cir. 2002). This balance means

11   that voting regulations are rarely subjected to strict scrutiny. *See Lemons v. Bradbury*, 538

12   F.3d 1098, 1104 (9th Cir. 2008). But in the equal protection context, laws that impose "'a

13   particular burden on an identifiable segment' of voters are more likely to raise

14   constitutional concerns" and demand more exacting review. *ADP III*, 18 F.4th at 1190;

15   *Public Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 n.2 (9th Cir. 2016) (en

16   banc) ("[C]ourts may consider not only a given law's impact on the electorate in general,

17   but also its impact on subgroups, for whom the burden, when considered in context, may

18   be more severe." (citing *Crawford II*, 553 U.S. at 199–203)). Plaintiffs must present

19   sufficient evidence for the Court to quantify the burden imposed on a specific subgroup of

20   voters. *See Crawford II*, 553 U.S. at 199–203 (weighing the evidence plaintiffs presented

21   to the district court to determine burdens imposed by Indiana's photo ID law).

22   As discussed regarding Plaintiffs' VRA claim, the Voting Laws' Citizenship

23   Verification Procedures, Attorney General Referral Provision, and List Maintenance

24   Procedures primarily impose burdens on county recorders and the Attorney General, not

25   voters. *See* §§ 16-121.01(D), 16-143, 16-165(G)–(K). The "burden" of an election law is

26   measured by the cost of compliance, not the "consequence of noncompliance." *ADP III*,

27   18 F.4th at 1188–89 (quoting *Ariz. Democratic Party v. Hobbs* ("*ADP I*"), 485 F. Supp. 3d

28   1073, 1087 (D. Ariz. 2020), *vacated on other grounds*, *ADP III*, 18 F.4th 1179). In *ADP*

- 90 -

1    *III*, the plaintiffs argued that an election-day deadline to correct a ballot with a missing

2    signature imposed a severe burden on voters who submitted a ballot at the last minute and

3    election officials did not discover the missing signature until after the deadline. *Id.* at 1187–

4    88. In rejecting this argument, the Ninth Circuit explained:

5            The relevant burden for constitutional purposes is the small burden of signing
             the affidavit or, if the voter fails to sign, of correcting the missing signature
6            by election day. To the extent that the election-day deadline results in voters'
             not casting a vote in an election, that result "was not caused by the election-
7            day deadline, but by their own failure to take timely steps to effect their vote."

8    *Id.* at 1189 (quoting *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973)) (cleaned up).

9            *ADP III*'s reasoning applies to this case. The relevant burden is the cost of timely

10   complying with the Voting Laws' DPOC Requirements when registering to vote or after

11   receiving a notice of non-citizenship from the county recorder. §§ 16-121.01(C), (E), 16-

12   165(A)(10); (2023 EPM at ECF-17, -22, -24, -27.) The Voting Laws' ongoing database

13   checks, investigations by the Attorney General, and potential rejection or cancellation of a

14   voter's registration are not burdens, but merely the consequences of not providing DPOC.

15   *ADP III* 18 F.4th at 1188; *see also ADP I*, 485 F. Supp. 3d at 1087–88 (explaining that if

16   burdens were measured by the "consequence of noncompliance" and that consequence is

17   disenfranchisement, that all voting pre-requisites would be subject to strict scrutiny). These

18   provisions remain relevant however, as the frequency at which county recorders might

19   reject or cancel registrations under the Citizenship Verification Procedures and List

20   Maintenance Procedures can serve as an indicator of the severity of the burden DPOC

21   imposes. *See, e.g.*, *Crawford II*, 553 U.S. at 202 (reviewing the frequency of individuals

22   unable to obtain a photo ID in part to identify "how common the problem is"); *Obama for*

23   *America v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012) (affirming district court's ruling that

24   Ohio's changes to early voting imposed a "particularly high" burden because "[p]laintiffs

25   introduced extensive evidence that a significant number of Ohio voters will in fact be

26   precluded from voting" as a result of the changes).

27           The Voting Laws DPOC Requirements place a particular burden on individuals for

28   whom, due to socioeconomic factors, the effort required to obtain and provide county

recorders with the appropriate documentation is cost or time prohibitive. The Court concluded this was limited to modest in analyzing Plaintiffs' VRA claim, but *Anderson/Burdick* demands closer scrutiny of the evidence for the Court to determine a more precise magnitude of this burden.[59] Plaintiffs offered no witness testimony or other "concrete evidence" to corroborate that the Voting Laws' DPOC Requirements will in fact impede any qualified voter from registering to vote or staying on the voter rolls. *Crawford II*, 553 U.S. at 201 (reviewing the "limited evidence" presented to the district court and unable to determine "the magnitude of the impact [a voter ID law] will have on indigent voters").

First, while there are more than 19,000 Federal-Only Voters who have not supplied proof of citizenship, Plaintiffs have not estimated the number of these voters that wholly *lack* DPOC, nor quantified whether naturalized voters or voters of color are more likely to lack DPOC. *Id.* at 202 n.20 (noting that "nothing in the record establishe[d] the distribution of voters who lack photo identification" or "even a rough estimate of how many indigent voters lack copies of their birth certificates [in order to obtain an ID]");[60] *c.f. Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 731 (9th Cir. 2015) ("Without some assessment of how many voters actually use the Registration Form [as opposed to registering under one of three alternative means], we cannot even begin to gauge the impact it may have had on party registration rolls."). For those voters who possess DPOC but want to avoid the

---

[59] The Supreme Court's "size of the burden" guidepost in *DNC* blurs the distinction between the burden on voting rights central to an *Anderson/Burdick* claim and the disparate impact of voting laws central to a section 2 VRA claim. Despite the analyses' apparent overlap, the foundation of a section 2 claim remains clear: a plaintiff may demonstrate that elections are not "equally open," *due in part* to the burdens imposed on voters. 52 U.S.C. § 10301(b). By contrast, the crux of an *Anderson/Burdick* claim is the "character and magnitude" of the burden itself. *Burdick*, 504 U.S. at 434.

[60] In *Harper v. Virginia Board of Elections*, the Supreme Court held that Virginia violated the Equal Protection Clause by imposing a poll tax on individuals seeking to vote because the ability to pay the tax was not related to voter qualifications. 383 U.S. 663, 668 (1966). The plurality in *Crawford II* noted that even if "most voters already possess a . . . form of acceptable identification" to satisfy Indiana's photo identification law, this "would not save the statute under *Harper*, if the State required voters to pay a tax or a fee to obtain a new photo identification." 553 U.S. at 198. *Crawford* nevertheless concluded that there was insufficient evidence to quantify the magnitude of the burden on individuals who could not afford a birth certificate, which was required to obtain a photo identification. *Id.* at 200–02. *Crawford's* reasoning applies here.

"inconvenience" of providing it to county recorders, this "does not qualify as a substantial burden on the right to vote." *Crawford II*, 553 U.S. at 198. Second, even assuming some Federal-Only Voters do not possess DPOC, the evidence does not reliably illustrate the likelihood that voters will encounter obstacles to obtaining this information. The monetary and temporal costs of obtaining DPOC, particularly naturalization documents, can be significant for low-income individuals. But naturalized citizens experience lower levels of poverty than other Arizonans, including native-born citizens, and it bears reiterating that naturalized citizens need only provide an immigration number. And 82% of Arizona's Latino citizens are native-born, meaning most Latino voters may need to only obtain a new birth certificate. Though the costs of obtaining DPOC may have a greater impact on low-income Arizonans, this burden is nevertheless slight in the context of all Arizonan's overall ability to register to vote.

Turning to Plaintiffs' related due process claims, the Court's ruling that the Reason to Believe Provision is unlawful under the CRA and the NVRA dispels Plaintiffs' speculation that county recorders will rely on unfounded suspicions of non-citizenship to cancel voter registrations. Pursuant to H.B. 2243's remaining provisions, county recorders may still "obtain" information of non-citizenship from SAVE and NAPHSIS for Federal-Only voters and from the MVD database. A.R.S. § 16-165(G), (I), (J). Regarding the Voting Laws' temporal limitations on the opportunity to cure a voter registration, county recorders must, within ten days of matching an applicant with evidence of non-citizenship, notify the applicant that she has until the Thursday before election day to provide DPOC and be registered to vote.[61] (2023 EPM at ECF-17, -22, -24, -27.) Finding the burden of correcting a missing ballot signature by an election-day deadline to be "limited" in *ADP III*, the Ninth Circuit explained that "[t]he deadline does not prohibit voters from voting in any election; they must either sign the affidavit at the outset or correct a missing signature by the deadline of election day." 18 F.4th at 1189. The Court finds the case instructive here,

---

[61] For this reason alone, Plaintiffs' argument that H.B. 2492 § 4's Citizenship Verification Procedures violate voter registrants' procedural due process rights because registrants are not allowed *any opportunity* to contest a county recorder's finding of non-citizenship fails.

as the 2023 EPM's Thursday deadline may result in some qualified Arizonans not becoming registered to vote. While *ADP III* implicated only a missing signature, the burden of timely obtaining DPOC similarly increases the closer to an election an individual decides to register to vote without proactively proving citizenship. *See Rosario*, 410 U.S. at 758 (concluding New York's election law "merely imposed a time deadline on [voters'] enrollment" and voters who attained voting age before the deadline "clearly could have registered" in time for the election). And based on the evidence at trial, the Court is left to speculate as to whether the occurrence of Arizonans who may lack DPOC and be meaningfully impacted by processing delays when obtaining new citizenship documentation is sufficiently "frequent as to raise [a] question about the constitutionality" of the Voting Laws. *Crawford II*, 553 U.S. at 197.

Finally, county recorders will in fact "obtain" information of non-citizenship from MVD's monthly customer extracts for at least 65 naturalized citizens registered as Federal-Only Voters who possess a foreign-type license.[62] But the Court will not assume without any persuasive evidence that these 65 of Arizona's 19,439 Federal-Only Voters wholly lack DPOC such that they would be burdened by the List Maintenance Procedures' 35-day deadline.[63] Moreover, voters receive notice by forwardable mail that their registration has been cancelled and instructions regarding how to re-register if the voter is qualified. (2023 EPM at ECF-58.)

Plaintiffs cite *Fish v. Schwab* ("*Fish II*"), which held that Kansas' proof of

_____

[62] While the Voting Laws' monthly MVD checks may misidentify naturalized citizens as non-citizens, the evidence indicates that all but 65 naturalized active voters with a foreign-type license have already provided county recorders with DPOC. Because county recorders must confirm evidence of non-citizenship by reviewing an individual's voter file, the Court concludes that naturalized citizens who possess a foreign-type license but have already provided DPOC will not be unduly burdened by the Voting Laws.

[63] Plaintiffs argue that Governor Ducey vetoed H.B. 2617 for lacking "sufficient due process" protections. Plaintiffs point specifically to H.B. 2617's cancellation provision, which would have afforded voters 90 days to provide DPOC and avoid cancellation, instead of the 35 days in H.B. 2243. (*Compare* H.B. 2617 Text, *with* H.B. 2243 Text.) But Governor Ducey found that H.B. 2617's requirement that county recorders cancel registrations after "receiv[ing] information that provides the basis for determining that the person is not a qualified elector" was "vague and lack[ed] any guidance for how a county recorder would confirm such a determination." (H.B. 2617 Veto Letter at PX 053-1.) Governor Ducey did not mention the 90-day cancellation provision.

ER - 0100

1  citizenship requirement imposed an undue burden on the right to vote. 957 F.3d 1105,

2  1127–32 (10th Cir. 2020). The Tenth Circuit found the proof of citizenship requirement

3  imposed a "significant" burden "primarily" because the Kansas Secretary of State had

4  suspended or cancelled 31,000 registrations for the voters' failure to provide proof of

5  citizenship. *Id.* at 1127–28. Here however, Arizona *may not* deny, suspend, or cancel voter

6  registrations when a voter fails to provide DPOC. These individuals will instead be

7  registered as Federal-Only Voters unless county recorders match the registration to

8  information of non-citizenship. A.R.S. § 16-121.01(E). And county recorders may only

9  cancel a registered voter's registration if the voter is confirmed a non-citizen. § 16-

10  165(A)(10). Without any similar quantifiable evidence regarding how many qualified

11  Arizonans' registrations without DPOC might be rejected or cancelled under the Voting

12  Laws' new DPOC Requirements, it would be mere conjecture to conclude that the DPOC

13  Requirements would impose a burden as significant as that in *Fish II*.

14      The Voting Laws do not impose an excessive burden on any specific subgroup of

15  voters raising equal protection concerns. Instead, based on the evidence presented, the

16  Court concludes that the Voting Laws impose only a limited burden on all individuals

17  qualified to vote in Arizona.

18              **2.      The State's Interests**

19      Because the Voting Laws' DPOC Requirement imposes a limited burden on the

20  right to vote, the Court conducts a "less exacting review" of Arizona's interests. *Pierce*, 44

21  F.4th at 859–60. The State offers two justifications for the Voting Laws: preventing non-

22  citizens from voting and promoting voter confidence in Arizona's elections.

23      Arizona has an indisputably legitimate interest "in counting only the votes of

24  eligible voters," and the State is entitled to enact prophylactic legislation to prevent the

25  occurrence of non-citizen voting. *Crawford II*, 553 U.S. at 196; *DNC*, 141 S. Ct. at 2348;

26  *see also League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th

27  Cir. 2023) (rejecting plaintiffs' argument that a voting law designed to prevent voter fraud

28  was a "proverbial solution in search of a problem" and a pretext for discrimination because

1   "[t]he Supreme Court has already held that deterring voter fraud is a legitimate policy on

2   which to enact an election law, even in the absence of any record evidence of voter fraud."

3   (quoting *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299,

4   1334 (11th Cir. 2021))). The State "need not offer 'elaborate, empirical verification'" of

5   non-citizen voting, but it also may not rely on mere "speculative concern[s]" "to justify

6   *any* non-severe voting regulation." *Soltysik*, 910 F.3d at 448–49 (emphasis in original)

7   (quoting *Timmons*, 520 U.S. at 364).

8        While rare, voter fraud in Arizona does exist. The Arizona Attorney General's

9   Office initiated 38 prosecutions for illegal voting between 2010 and 2023, albeit with most

10  of these cases concerning voting in more than one jurisdiction, or "double voting." (Ex.

11  292 at PX 292-1 to -6; Lawson Tr. 1688:3–19, 1689:7–24.) In addition, there are currently

12  two sealed indictments related to non-citizen voting. (Lawson Tr. 1691:11–13, 1692:5–

13  1694:15.) At the local level, Maricopa County initiated 13 prosecutions specifically for

14  non-citizen voting between 2007 and 2008. (Minnite Tr. 1588:3–23.) And to be sure, while

15  deliberate non-citizen voting is but one form of voter fraud, the legislative history indicates

16  that the Legislature was concerned with non-citizen voting more generally. (*See, e.g.*, H.B.

17  2492 House Gov. Comm. Tr. at PX 054-3 to -4; Ex. 61 at PX 061-28 to -30, -39 to -40;

18  Minnite Tr. 1630:13–1632:7.) The State's interests in preventing voter fraud and

19  unintentional non-citizen voting are both legitimate, as both forms of non-citizen voting

20  can undermine the integrity of Arizona's elections.

21       The State has a related justification for the Voting Laws: "safeguarding public

22  confidence by eliminating [fraud and] even appearances of fraud." *Ohio Democratic Party*

23  *v. Husted*, 834 F.3d 620, 633 (6th Cir. 2016) (internal quotations omitted). "[P]ublic

24  confidence in the integrity of the electoral process has independent significance, because

25  it encourages citizen participation in the democratic process." *Crawford II*, 553 U.S. at

26  197. Setting aside the absence of evidence that Arizona's 19,439 Federal-Only Voters are

27  non-citizens, the Court is mindful that the "electoral system cannot inspire public

28  confidence if no safeguards exist to deter or detect fraud or to confirm the identity of

voters." *Id.* Arizona is "permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986); *DNC*, 141 S. Ct. at 2348. While Plaintiffs may disagree with the efficacy of this method, "the propriety of doing so is perfectly clear": it helps ensure that any non-citizens that register to vote, intentionally or mistakenly, do not make it onto or remain on the voter rolls. *Crawford II*, 553 U.S. at 196; *see also Dudum*, 640 F.3d at 1114 ("[W]hen a challenged rule imposes only limited burdens on the right to vote, there is no requirement that the rule is the only or the best way to further the proffered interests.").

Considering the evidence as a whole, the Court concludes that Arizona's interests in preventing non-citizens from voting and promoting public confidence in Arizona's elections outweighs the limited burden voters might encounter when required to provide DPOC.

### F.    Remaining Fourteenth and Fifteenth Amendment Claims

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. There are two aspects to the equal protection doctrine: suspect classifications and fundamental rights. "The first strand bars a state from codifying a preference for one class over another," such as based on race or national origin, while "[t]he second strand bars a state from burdening a fundamental right for some citizens but not for others. Absent some such burden, however, legislative distinctions merit no special scrutiny." *Short v. Brown*, 893 F.3d 671, 678–79 (9th Cir. 2018) (internal citations omitted).

### 1.    *Bush v. Gore* Arbitrary and Disparate Treatment

Non-US Plaintiffs claim that the Voting Laws subject registrants to "arbitrary and disparate treatment," under the equal protection standard articulated in *Bush v. Gore*, 531 U.S. 98, 104–09 (2000) (per curiam). The parties disagree whether *Bush* provides an equal

1    protection analysis independent of the *Anderson/Burdick* framework.

2         *Bush* concerned the application of the one-person, one-vote principle in the context

3    of a court-ordered "statewide recount with minimal procedural safeguards." 531 U.S. at

4    109. Specifically, the Florida Supreme Court directed election officials to discern the intent

5    of voters for whom their "punchcard" ballots were not "perforated with sufficient precision

6    for a machine to register the perforation." *Id.* at 105. But the court did not provide election

7    officials with any standards by which to determine voter "intent," resulting in disparate

8    treatment among similarly situated voters. *Id.* at 105–06. The Supreme Court explained

9    that "[h]aving once granted the right to vote on equal terms, the State may not, by later

10   arbitrary and disparate treatment, value one person's vote over that of another." *Id.* 104–

11   05 (citation omitted).

12        The Ninth Circuit has cast doubt on whether *Bush* is "applicable to more than the

13   one election to which the [Supreme] Court appears to have limited it." *Lemons*, 538 F.3d

14   at 1106; *see Paher v. Cegavske*, 457 F. Supp. 3d 919, 927–28 (D. Nev. 2020) (analyzing

15   claim under *Anderson-Burdick* and rejecting plaintiffs' claim that Nevada's all-mail

16   primary would result in "voter disenfranchisement in the form of vote dilution" such that

17   *Bush* should apply). And those cases where the Ninth Circuit has applied *Bush* have

18   similarly focused on the one-person, one-vote principle. *Idaho Coal. United for Bears v.*

19   *Cenarrusa*, 342 F.3d 1073, 1077–78, 1077 n.7 (9th Cir. 2003) (finding that Idaho's ballot-

20   initiative process violated the one-person, one-vote principle, and citing *Bush*); *Sw. Voter*

21   *Registration Educ. Project v. Shelley*, 344 F.3d 882, 894–95 (9th Cir. 2003) (finding that

22   plaintiffs' claim "mirror[ed]" that in *Bush*, "that is, whether unequal methods of counting

23   votes among counties constitutes a violation of the Equal Protection Clause"), *rev'd on*

24   *other grounds en banc*, 344 F.3d 914 (9th Cir.) (describing *Bush* as "the leading case on

25   *disputed elections*" (emphasis added)). *Bush* itself emphasized that its "consideration [was]

26   limited to the present circumstances." 531 U.S. at 109 (noting "the special instance of a

27   statewide recount under the authority of a single state judicial officer").

28        Assuming *Bush* applied, "[c]ourts have generally found equal protection violations

- 98 -

where a lack of uniform standards and procedures results in arbitrary and disparate treatment of [similarly situated] voters." *Lecky v. Va. State Bd. of Elections*, 285 F. Supp. 3d 908, 920 (E.D. Va. 2018). The Voting Laws are not tainted by "varying" or complete "absence of specific standards" that the Supreme Court found problematic with Florida's recount. *Bush*, 531 U.S. at 106–07. County recorders may reject a voter registration only after matching that registrant to evidence of non-citizenship from the Voting Laws' list of databases. § 16-121.01(D), (E); (2023 EPM at ECF-56.) Whether an applicant's registration information "matches" to information of non-citizenship leaves no guesswork to county recorders. The List Maintenance Procedures and Cancellation Provision likewise mandate county recorders to "obtain" and "confirm" information from these same databases before requesting DPOC from the voter. § 16-165(A)(10). Setting aside the occasional match to outdated MVD citizenship information for naturalized citizens, these databases contain objective and readily verifiable information that in nearly all cases will not require county recorders to request DPOC from a registrant or voter. (*See, e.g.*, 2023 EPM at ECF-57 (requiring county recorders to match a suspected non-citizen to a voter registration, determine whether that voter has already provided DPOC, and review available government databases before requesting DPOC).) Furthermore, Plaintiffs adduced no evidence that county recorders will act arbitrarily when confirming an individual's non-citizenship. This is buttressed by the fact that the Court's ruling prohibits county recorders from investigating the citizenship status of registered voters based on a mere "reason to believe" that a voter is a non-citizen. (*See supra* Sections II(B)(3), (C)(3)(i) (concluding the Reason to Believe Provision is unlawful).)

### 2.    Race & National Origin or Alienage Discrimination

Lastly, Plaintiffs claim that the Voting Laws are facially discriminatory, and in the alternative, were motivated by a discriminatory purpose. Facial unconstitutionality does not require a finding of discriminatory intent. *Mitchell v. Washington*, 818 F.3d 436, 445–46 (9th Cir. 2016) ("When the government expressly classifies persons on the bases of race or national origin . . . its action is 'immediately suspect'. . . . A plaintiff in such a lawsuit

- 99 -

1    need not make an extrinsic showing of discriminatory animus or a discriminatory effect to

2    trigger strict scrutiny." (citation omitted)). But a plaintiff must prove discriminatory intent

3    if the challenged law does not expressly classify persons on the bases of race or national

4    origin. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

5         The Voting Laws require all voters to provide DPOC or be subject to recurring

6    database checks to validate citizenship. *E.g.*, §§ 16-121.01(D), (E), 16-165(G)–(K).

7    Plaintiffs cite a string of cases to argue that the Voting Laws facially discriminate based on

8    national origin because the databases county recorders must use to verify citizenship can

9    contain outdated citizenship information only for naturalized citizens. But Plaintiffs

10   conflate facial discrimination with discriminatory effects. *Compare Florida*, 870 F. Supp.

11   2d at 1350 (finding law's use of MVD data "likely" had a "discriminatory impact" on

12   naturalized citizens), *and Texas LULAC*, 2019 WL 7938511, at *1 (citing *Florida* for

13   similar proposition), *with Boustani v. Blackwell*, 460 F. Supp. 2d 822, 824–25 (N.D. Ohio

14   2006) (concluding election law that allowed election workers to challenge the citizenship

15   status of any voter, question whether the voter was "a native or naturalized citizen," and

16   require naturalized citizens to produce a naturalization certificate, was facially

17   discriminatory). The Voting Laws are facially neutral as to race, ethnicity, and national

18   origin.

19        Because the Voting Laws are facially neutral, Plaintiffs must show that the Voting

20   Laws were "motivated by" a discriminatory purpose. *Vill. of Arlington Heights* 429 U.S.

21   at 265–66; *see Abbott v. Perez*, 585 U.S. 579, 603 (2018) (explaining burden of proof is on

22   the plaintiff). "The central inquiry in any disparate treatment claim under the Equal

23   Protection Clause is whether 'an invidious discriminatory purpose was a motivating factor'

24   in some government action." *Ballou v. McElvain*, 29 F.4th 413, 424 (9th Cir. 2022)

25   (quoting *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016)); *see*

26   *Arce*, 793 F.3d at 977 ("A plaintiff does not have to prove that the discriminatory purpose

27   was the sole purpose of the challenged action, but only that it was a 'motivating factor.'"

28   (quoting *Arlington Heights*, 429 U.S. at 265–66)). The Court considers the following, "non-

1  exhaustive factors" to determine whether the Voting Laws were motivated by a

2  discriminatory purpose:

3      (1) the impact of the official action and whether it bears more heavily on one
        race than another; (2) the historical background of the decision; (3) the
4      specific sequence of events leading to the challenged action; (4) the
        defendant's departures from normal procedures or substantive conclusions;
5      and (5) the relevant legislative or administrative history.

6  *Arce*, 793 F.3d at 977 (citing *Arlington Heights*, 429 U.S. at 266–68). Plaintiffs must

7  overcome the "strong 'presumption of good faith'" the Court affords to the Arizona

8  Legislature. *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023) (quoting

9  *Miller v. Johnson*, 515 U.S. 900, 916 (1995)); *see Abbott*, 585 U.S. at 603.

10                          **i.      Historical Background**

11      Beginning with the second *Arlington Heights* factor, Arizona does have a long

12  history of discriminating against people of color. This includes the State's literacy tests that

13  effectively precluded Native American and Latino voters from voting, in addition to voter

14  roll purges that created barriers for people of color to re-register to vote. But "unless

15  historical evidence is reasonably contemporaneous with the challenged decision, it has

16  little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). Arizona has

17  not employed literacy tests since the 1970s, and Arizona's preclearance requirements under

18  section 5 of the VRA is the most recent evidence of voter discrimination that Plaintiffs'

19  experts cite. Despite these examples of past discrimination, the Court continues to presume

20  good faith on behalf of the 55th Legislature because "[p]ast discrimination cannot, in the

21  manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*,

22  585 U.S. at 603 (citation omitted). More precisely, "[t]he 'historical background' of a

23  *legislative enactment* is 'one evidentiary source' relevant to the question of intent." *Id.* at

24  603–04 (quoting *Arlington Heights*, 429 U.S. at 267) (emphasis added). And neither Dr.

25  Chang nor Dr. Burton identified a persuasive nexus between Arizona's history of animosity

26  toward marginalized communities and the Legislature's enactment of the Voting Laws. *C.f.*

27  *League of Women Voters of Fla.*, 66 F.4th at 923 (disapproving of district court's overt

28  reliance on the state's discriminatory history that was not sufficiently contemporaneous

1    with the legislation at issue).

2                    **ii.      Events Preceding the Voting Laws and Legislative History**

3            Regarding precipitating events, the Legislature enacted the Voting Laws on the

4    heels of unsubstantiated voter fraud claims following a victory for President Biden in

5    Arizona by a margin of 10,457 votes during the 2020 presidential election. (*See, e.g.*, Pls.'

6    Stip. No. 154; Minnite Tr. 1597:5–11.) The Arizona Senate's subsequent audit of the

7    election failed to reveal any voter fraud in Arizona, as did the Attorney General's

8    investigation into allegations of voter fraud. (*See, e.g.*, Minnite Tr. 1589:17–1592:14

9    (recounting the Elections Integrity Unit's efforts to uncover instances of non-citizen voting

10   in the 2020 election); *see* Ex. 401 (letter explaining Elections Integrity Unit's inability to

11   find evidence to substantiate allegations of fraudulent ballots in Pima County).)

12           Turning to the Voting Laws' legislative history, because legislators rarely publicize

13   their discriminatory motives on the record, the Court considers whether legislators have

14   "'camouflaged' their intent." *Arce*, 793 F.3d at 978 (citation omitted). Nothing in the

15   legislative hearings evince a motive to discriminate against voters based on race or national

16   origin. *See Carrillo-Lopez*, 68 F.4th at 1148 (finding no "racist or derogatory language

17   regarding Mexicans or other Central and South Americans" evincing discriminatory intent

18   in a 925-page Senate Report). Instead, the hearings and the substance of the Voting Laws

19   indicate that the Voting Laws are in many ways the progeny of Arizona's prior effort to

20   require DPOC for all Arizona voters through Proposition 200. The Supreme Court's

21   decision in *ITCA* and the LULAC Consent Decree curtailed the State's power to require

22   DPOC for Federal-Only Voters, regardless of whether voters registered with the State Form

23   or Federal Form. *See ITCA*, 570 U.S. at 12; (LULAC Consent Decree at PX 024-8 to -10,

24   -13 to -14.) During the hearings regarding H.B. 2492, legislators supporting the bills

25   vocalized concerns with the marked increase in Federal-Only Voters following the LULAC

26   Consent Decree. (H.B. 2492 House Gov. Comm. Tr. at PX 054-3 to -4.) The Legislature's

27   passage of the bill attempted to revive the DPOC Requirement for State Form users in light

28   of *ITCA*'s pronouncement that "States retain the flexibility to design and use their own

ER - 0108

1    registration forms" and for Federal Form users by first "establishing the applicant's

2    ineligibility" to side-step the NVRA's "accept and use" requirement. *ITCA*, 570 U.S. at 12,

3    16; (*see* H.B. 2492 House Gov. Comm. Tr. at PX 054-9 to -10, -17 to -19.)

4         The Legislature's concern with Federal-Only Voters paralleled some public

5    sentiment that non-citizens were able to vote by falsely attesting to U.S. citizenship.

6    (Connor Tr. 382:12–383:25 (describing public comments regarding 2023 EPM that "voters

7    should be citizens"); Quezada Tr. 877:14–878:17 (explaining the general public's

8    "commentary" was that non-citizens were voting).) The public's concerns regarding non-

9    citizen voting, even if unsubstantiated, does not exhibit "[t]he presence of community

10   animus" for the Court to impute a discriminatory motive to the Legislature. *Ave. 6E Invs.*,

11   818 F.3d at 504; *c.f. SoCal Recovery, LLC v. City of Costa Mesa*, No. SACV 18-1304-

12   JVS(JDEx), 2023 WL 8263377, at *8 (C.D. Cal. Aug. 17, 2023) (noting evidence of

13   community animus where residents cited "mayhem and violence" and "crime and

14   homelessness" to oppose sober living homes, which the city referenced in permit denials).

15        Furthermore, the Free Enterprise Club disseminated lobbying materials by email to

16   Arizona legislators that described how the Voting Laws would prevent "illegals" from

17   voting in Arizona elections. (Ex. 602.) "[T]he use of 'code words' may demonstrate

18   discriminatory intent," and the term "illegals" can evince racial animus for members of the

19   Latino community in Arizona. *Ave. 6E Invs.*, 818 F.3d at 505; (*see* Quezada Tr. 867:18–

20   868:9 (explaining the term "illegals" in the voting context is typically used to refer to non-

21   citizens from Latin descent and that the term "undocumented" is less offensive for

22   individuals who are not lawfully present in the United States); Burton Tr. 1453:17–1454:25

23   (explaining that the term "illegals" in the voting context can refer to non-citizens, or

24   minorities perceived as untrustworthy).) Because Free Enterprise Club helped author the

25   Voting Laws, the Court weighs the organization's coded appeals as some evidence of

26   community animus. *Ave. 6E Invs.*, 818 F.3d at 505. But while community animus "*can*

27   support a finding of discriminatory motives by government officials," Plaintiffs presented

28   no persuasive evidence that the Legislature relied on the Free Enterprise Club's coded

appeals, nor that the Legislature enacted the Voting Laws to prevent anyone other than non-citizens from voting. *Id.* at 504; *c.f. Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 967 (D. Ariz. 2017) (citing officials' use of the terms "'Raza,' 'un-American,' 'radical,' 'communist,' 'Aztlan,' and 'M.E.Ch.a,'" as code words for Mexican Americans and "concepts of foreignness and political radicalism" during public debates of a House bill).

Plaintiffs contend that Senator Borrelli would frequently make derogatory comments about Latino voters to Senator Quezada during Senate Judiciary Committee meetings. Even assuming Senator Borrelli expressed discriminatory remarks, Plaintiffs may not impute his motives to the other individual legislators or the Arizona Legislature as a whole. As the Supreme Court has cautioned:

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

*United States v. O'Brien*, 391 U.S. 367, 383–84 (1968); *see also DNC*, 141 S. Ct. at 2349–50 (agreeing with district court's findings that "no evidence [indicated] the legislature as a whole was imbued with racial motives"). And while Senator Quezada testified as to his reasons for voting against the Voting Laws, "the concerns expressed by political opponents during the legislative process are not reliable evidence of legislative intent." *League of Women Voters of Fla.*, 66 F.4th at 940.

### iv.    Impact on Minority and Naturalized Voters

Evidence of a law's disparate impact is generally insufficient alone to evidence a legislature's discriminatory motive. *Carrillo-Lopez*, 68 F.4th at 1141 (explaining that a court may infer a discriminatory motive from disproportionate impacts in the "rare cases" where the effects of the challenged action are unequivocally related to race). As discussed in the Court's section 2 analysis, Plaintiffs have not shown that the Voting Laws will have

any significant discriminatory impact based on naturalization status, race, or ethnicity. First, the difference in registration rates by race and ethnicity, with one-third of a percent of White voters and two-thirds of a percent of minority voters registered as Federal-Only Voters, is "small in absolute terms." *DNC*, 141 S. Ct. at 2345. Second, while it is possible that SAVE and MVD could return outdated citizenship information for a small number of naturalized citizens, these database checks without more do not materially affect Full-Ballot Voters who have already provided DPOC. Of course, 65 naturalized Federal-Only voters will likely be flagged as non-citizens and may be required to produce DPOC, but considering this accounts for just 0.001% of all voters, the impact of these checks is markedly small. (*See* MVD Non-Citizen Records.) Setting aside the racial, ethnic and nationality composition of Federal-Only Voters, Plaintiffs offered testimony to show that minority voters are more likely to lack, and encounter more barriers to furnishing, DPOC than White voters. (*See, e.g.*, Tiwamangkala Tr. 1273:22–1274:4 (AANHPI community); Nitschke Tr. 469:8–470:3 (out-of-state college students)).) But there is no quantifiable evidence regarding the rate at which minority voters both lack *and* are unable to afford DPOC. The same is true for the number of naturalized citizens who lack both their naturalization certificate *and* their immigration number.

In addition, Plaintiffs did not show that the Arizona Legislature enacted the Voting Laws *because of* any impact on minority voters or naturalized citizens. For example, it is common sense that the Voting Laws' MVD checks would be substantially more likely to return information of non-citizenship for naturalized citizens who possess a foreign-type license, as compared to native-born citizens who are ineligible to receive a foreign-type license at all. This result "does not prove that penalizing such individuals was a purpose of this legislation." *Carrillo-Lopez*, 68 F.4th at 1153 (concluding district court erred in relying on evidence of 8 U.S.C. § 1326's disparate impact on Mexicans, which criminalizes the reentry of a removed alien, without more evidence of animus because "the clear geographic reason for disproportionate impact on Mexicans and other Central and South Americans undermines any inference of discriminatory motive").

Plaintiffs make much of what the Arizona Legislature did not evaluate when passing the Voting Laws, specifically the impact on voters based on national origin, race, ethnicity, age, or socioeconomic status. Community stakeholders had an opportunity to oppose the Voting Laws on the record, most of whom emphasized the DPOC Requirement's disparate impacts on Federal-Only Voters and the DPOR Requirement's impacts on Native American voters. (*See, e.g.*, Ex. 61 at PX 061-8 to -20.) When explaining his vote against H.B. 2492 during the same hearing, Senator Quezada warned the Senators that the bill would have a discriminatory impact on people of color. (*Id.* at PX 061-33 to -35.) But Plaintiffs must show that the Arizona Legislature enacted the Voting Laws "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Carrillo-Lopez*, 68 F.4th at 1139 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). The Legislature's failure to adequately consider the Voting Laws' impact on people of color or naturalized citizens or decision to pass the Voting Laws *notwithstanding* the potential impact on these voters is insufficient to show a discriminatory motive. *Id.*

### v.      Procedural and Substantive Departures

Finally, Plaintiffs adduced no persuasive evidence of procedural departures during the Arizona Legislature's enactment of H.B. 2492. Plaintiffs contend that the House Rules Committee knowingly passed the bill after the Committee's attorney opined that the bill was likely unconstitutional and preempted by the NVRA. But the Rules Committee was not bound by this opinion, nor did the Rules Committee attorney indicate that H.B. 2492 was unconstitutionally discriminatory as relevant to Plaintiffs' Fourteenth and Fifteenth Amendment claims. (*See, e.g.*, Toma Dep. 174:3–174:10 (explaining the Rules Committee ultimately decides whether a bill "moves forward")); *c.f. Ave. 6E Invs.*, 818 F.3d at 507 (finding city's plausible departure from normal procedures by ignoring "the unanimous recommendation" of the city's Planning and Zoning Commission could evince discriminatory intent "particularly when, as here, that recommendation is consonant with the municipality's general zoning requirements and plaintiffs proffer additional evidence of animus" (emphasis added)).

1    Regarding H.B. 2243, Governor Ducey vetoed the bill for lacking "sufficient due

2    process" protections. Legislators collaborated with the Governor's office specifically to

3    address the Governor's due process concerns. (Toma Dep. 232:19–233:18, 234:14–21,

4    235:7–20.) Senator Petersen then introduced the language of H.B. 2617 into H.B. 2243,

5    albeit with several substantive changes, such as reducing the opportunity to provide DPOC

6    from 90 to 35 days. And while the legislators could not name a separate *voting* bill during

7    their depositions that was successfully amended in a similar manner to HB. 2243,

8    amendments to existing bills are common at the close of a legislative session. (Toma Dep.

9    237:8–239:3 (explaining unsuccessful attempt to pass a different vetoed voting bill through

10    a separate germane bill on the last day of the legislative session); Petersen Dep. 319:3–24,

11    333:17–334:2.) The speed with which the Legislature passed H.B. 2243 as amended was

12    not so abrupt as to infer an improper motive, considering the Legislature had previously

13    passed H.B. 2617 through the ordinary legislative process. *Abbott*, 585 U.S. at 610 & n.23

14    ("[W]e do not see how the brevity of the legislative process can give rise to an inference

15    of bad faith—and certainly not an inference that is strong enough to overcome the

16    presumption of legislative good faith.").

17    Substantively, Arizona has required DPOC since 2005, and the Voting Laws

18    supplement this requirement to ensure that non-citizens do not register to vote or remain

19    on the voter rolls. This includes expanding county recorders' existing use of SAVE and the

20    MVD database to also identify existing registered non-citizens. Similarly, H.B. 2243's 35-

21    day notice procedure is not a departure from prior Arizona law, as it adopts the 2019 EPM's

22    35-day period for a voter to prove citizenship after attesting to non-citizenship on a juror

23    questionnaire. (2019 EPM at PX 006-50 to -51.) And while the Court concluded above that

24    the Birthplace Requirement violates the Materiality Provision, the Legislature's decision

25    to mandate birthplace on the State Form is consistent with Arizona's existing practice of

26    collecting this information from voters, even if providing birthplace was historically

27    optional.

28    Having considered the totality of these factors, the Court concludes that Plaintiffs

1    failed to show that the Voting Laws were enacted with a discriminatory purpose.

2    **III.    CONCLUSION**

3          Non-US Plaintiffs may enforce § 10101 of the Civil Rights Act. Requiring

4    individuals who register to vote using the State Form to include the individual's state or

5    country of birth violates the Materiality Provision of the Civil Rights Act. H.B. 2243's

6    Reason to Believe Provision also violates the Civil Rights Act, as well as section 8(b) of

7    the NVRA because the provision will result in the investigation of only naturalized citizens

8    based on county recorders' subjective beliefs that a naturalized individual is a non-citizen.

9    In addition, requiring individuals registering to vote with the State Form to include

10   documentary proof of residence to register for federal elections violates sections 6 and 7 of

11   the NVRA. However, Plaintiffs have not carried their burden to show that the Voting Laws'

12   remaining citizenship investigation procedures, DPOC requirements, and registration

13   cancellation procedures violate the NVRA or the VRA. Nor do these provisions impose an

14   undue burden on the right to vote or violate the equal protection and due process guarantees

15   of the U.S. constitution. Finally, the Court concludes that Plaintiffs failed to show that the

16   Voting Laws were enacted with any discriminatory purpose.

17         **IT IS ORDERED** declaring that A.R.S. § 16-121.01(A) violates § 10101(a)(2)(B)

18   of the Civil Rights Act by denying Arizonans the right to vote based on errors or omissions

19   that are not material to determining Arizonan's eligibility to vote. Arizona may not reject

20   State Form registrations that lack an individual's state or country of birth and must register

21   an individual if that individual is found eligible to vote.

22         **IT IS FURTHER ORDERED** declaring that A.R.S. § 16-165(I) violates

23   § 10101(a)(2)(A) of the Civil Rights Act and section 8(b) of the NVRA by subjecting

24   naturalized citizens whom county recorders have reason to believe are non-citizens to

25   SAVE checks, which is a different standard, practice, or procedure than that applied to

26   native-born citizens. Arizona may not conduct SAVE checks on any registered voter whom

27   county recorders have reason to believe are a non-citizen. But Arizona may conduct SAVE

28   checks on registered voters who have not provided DPOC. *See* A.R.S. § 16-165(I).

**IT IS FURTHER ORDERED** declaring that A.R.S. § 16-121.01(A) violates sections 6 and 7 of the NVRA by requiring Arizonans who register with the State Form to provide documentary proof of residence. Arizona may not reject State Form registrations that are not accompanied by documentary proof of residence but must register an individual without proof of residence as a Federal-Only Voter if that individual is otherwise eligible to vote.

Dated this 29th day of February, 2024.


_____
Susan R. Bolton
United States District Judge

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., | No. CV-22-00509-PHX-SRB |
| Plaintiffs, | **ORDER** |
| v. | |
| Adrian Fontes, et al., | |
| Defendants. | |

The Court now considers the Motions for Partial Summary Judgment of Defendants State of Arizona (the "State") (Doc. 364, State Mot.), Defendant Republican National Committee ("RNC") (Doc. 367, RNC Mot.), and Plaintiff United States of America ("United States") (Doc. 391, USA Mot.), in addition to Motions and Cross-Motions for Partial Summary Judgment by several non-profit organizations ("Private Plaintiffs").

**I.     BACKGROUND**

The facts of this case were summarized in the Court's prior Order regarding the State's Motion to Dismiss. (*See generally* Doc. 304, 02/16/2023 Order.) This case addresses the legality of two Arizona laws, H.B. 2243 and H.B. 2492 ("the Voting Laws"), which amended provisions regulating voter registration under Title 16 of the Arizona Revised Statutes. (Doc. 388, Non-US SOF ¶¶ 4–5.) The Voting Laws, effective January 1, 2023, enable State officials to require heightened proof of citizenship and residency from Arizona applicants and registrants and mandate certain consequences if a

registrant does not provide such proof. (*Id.* ¶¶ 2–5, 31, 35–50.) The Voting Laws also provide for monthly comparisons of certain registered voters to several databases and cancellation of registrations after those database comparisons. (*Id.* ¶¶ 3–4, 48–50.)

**A.    Substance of the Voting Laws**

An individual seeking to register to vote in Arizona state elections must provide one of the following forms of "satisfactory evidence of citizenship," also known as documentary proof of citizenship or "DPOC":

1. The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.

2. A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.

3. A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.

4. A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.

5. Other documents or methods of proof that are established pursuant to the Immigration Reform and Control Act of 1986.

6. The applicant's Bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number.

Ariz. Rev. Stat. § 16-166(F).

In addition to providing applicants a State Form to register for state and federal elections, Arizona also provides a form created by the United States Election Assistance Commission, known as the Federal Form, to register for federal elections. *See Gonzales v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012); (*see generally* Doc. 365-1, Ex. C, Federal Form at 26; *see* Doc. 365-1, Ex. D, State Form.) Subject to certain limitations, states may require additional information from applicants seeking to vote in both state and federal

1   elections. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 12–13 (2013).

2   In 2018, the Arizona Secretary of State entered into a Consent Decree with

3   Plaintiff League of United Latin American Citizens ("LULAC") after the nonprofit sued

4   Arizona for allegedly discriminating against individuals who submitted the State Form

5   without providing DPOC. (Non-US SOF ¶¶ 24–25.) The LULAC Consent Decree

6   mandates that Arizona may not entirely reject an otherwise valid State Form submitted

7   without DPOC, but rather must register that State Form applicant for federal elections.

8   (*Id.*; Doc. 388-4, Ex. 12, LULAC Consent Decree at 8–9.) In short, the LULAC Consent

9   Decree requires Arizona to treat Federal and State Form users the same when registering

10  applicants for federal elections. The Federal Form and State Form both include a

11  checkbox for applicants to indicate under penalty of perjury that they are citizens of the

12  United States. (*See* Federal Form; State Form.)

13          **1.      H.B. 2492**

14  H.B. 2492 created additional requirements for individuals using either the Federal

15  or State Form to show citizenship and Arizona residence. Specifically, "[a] person is

16  presumed to be properly registered to vote," only if she, *inter alia*, provides documentary

17  "proof of location of residence" ("DPOR"), lists her place of birth[1] ("Birthplace

18  Requirement"), and marks "yes" in the checkbox confirming United States citizenship

19  ("Checkbox Requirement"). A.R.S. § 16-121.01(A);  *see id.* § 16-123. Unlike preexisting

20  Arizona law, H.B. 2492 contains no exceptions to the DPOR requirement for applicants

21  who do not have numbered street addresses, but the Secretary of State has since provided

22  a chart recognizing that certain voters may provide DPOR without a traditional street

23  address or any address at all. (*See* Non-US SOF ¶¶ 27–34.)

24  H.B. 2492 also provides different DPOC requirements for applicants using the

25  Federal or State Form:

26          Except for a form produced by the United States Election Assistance
            Commission, any application for registration shall be accompanied by
27          satisfactory evidence of citizenship as prescribed in Section 16-166,

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [1] The Federal Form does not include a space to collect an applicant's birthplace
    information. (*See* Federal Form at 26.)

ER - 0118

Subsection F, and the county recorder . . . shall reject any application for registration that is not accompanied by satisfactory evidence of citizenship.

A.R.S. § 16-121.01(C)

Federal only voters; early ballot; eligibility
Notwithstanding any other law:
1. A person who has registered to vote and who has not provided satisfactory evidence of citizenship as prescribed by Section 16-166, Subsection F is not eligible to vote in presidential elections.
2. A person who has not provided satisfactory evidence of citizenship pursuant to Section 16-166, Subsection F and who is eligible to vote only for federal offices is not eligible to receive an early ballot by mail.

*Id.* § 16-127(A).

The statute places the burden on county recorders to enforce the standards of H.B. 2492. "Within ten days after receiving an application for registration [through the Federal Form] that is not accompanied by [DPOC], the county recorder or other officer in charge of elections shall use all available resources to verify the citizenship status of the applicant." *Id.* § 16-121.01(D). The statute prescribes a specific verification process:

[A]t a minimum, [the election official] shall compare the information available on the application for registration with the following, provided the county has access:
1. The Department of Transportation databases of Arizona driver licenses or nonoperating identification licenses.

2. The Social Security Administration databases.

3. The United States Citizenship and Immigration Services Systematic Alien Verification for Entitlements program, if practicable.

4. A National Association for Public Health statistics and information systems electronic verification of vital events system.

5. Any other state, city, town, county or federal database and any other database relating to voter registration to which the County Recorder . . . has access, including an electronic registration information center database.

*Id.*

The statute provides for three different outcomes from this verification. First, if the election official "matches the applicant with information that verifies the applicant is a United States citizen . . . the applicant shall be properly registered." *Id.* § 16-121.01(E). Second, if the election official "matches the applicant with information that the applicant

- 4 -

is not a United States citizen, the county recorder . . . shall reject the application, notify the applicant that the applicant was rejected because the applicant is not a United States citizen and forward the application to the county attorney and attorney general for investigation." *Id.* Third, if the election official "is unable to match the applicant with appropriate citizenship information, the [official] shall notify the applicant that [her citizenship could not be verified] and that the applicant will not be qualified to vote in a presidential election or by mail with an early ballot in any election until [DPOC] is provided." *Id.*

Lastly, the statute mandates prosecution of certain registrants referred for investigation. Election officials must "make available to the attorney general a list of all individuals who are registered to vote and who have not provided satisfactory evidence of citizenship pursuant to Section 16-166." *Id.* § 16-143(A). The attorney general must then use "all available resources to verify the citizenship" of the referred applicants and "at a minimum shall compare the information available on the application for registration" with the same databases listed in § 16-121.01(D) of the statute. *Id.* § 16-143(B). "The attorney general shall prosecute individuals who are found to not be United States citizens pursuant to § 16-182." *Id.* § 16-143(D).

### 2.     H.B. 2243

H.B. 2243 expands the requirements imposed by H.B. 2492 for the cancellation of registrations for persons suspected of being non-citizens. Specifically, a county recorder must cancel a voter registration:

> When the county recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen . . . . Before the county recorder cancels a registration pursuant to this paragraph, the county recorder shall send the person notice by forwardable mail that the person's registration will be canceled in thirty-five days unless the person provides satisfactory evidence of United States citizenship pursuant to § 16-166. The notice shall include a list of documents that person may provide and a postage prepaid preaddressed returned envelope. If the person registered does not provide satisfactory evidence within thirty-five days, the county recorder shall cancel the registration and notify the county attorney and attorney general for possible investigation.

*Id.* § 16-165(A)(10). H.B. 2243 also mandates monthly review of voter rolls:

To the extent practicable, each month the county recorder shall compare persons who are registered to vote in that county and who the county recorder has reason to believe are not United States citizens and persons who are registered to vote without satisfactory evidence of citizenship as prescribed by § 16-166 with the systematic alien verification for entitlements program maintained by the United States citizenship and immigration services to verify the citizenship status of the persons registered.

*Id.* § 16-165(I). County recorders must conduct similar checks with the Social Security Administration Database, Verification of Vital Events System, and "relevant city, town, county, state and federal databases to which the county recorder has access to confirm information obtained that requires cancellation of registrations pursuant to this section." *See id.* § 16-165(G)–(K).

## B. Procedural History

On March 31, 2022, Mi Familia Vota Plaintiffs[2] filed their Complaint in this Court. (Doc. 1, 03/31/2022 Mi Familia Vota Compl.) The United States and additional Private Plaintiffs subsequently filed lawsuits attacking the legality of the Voting Laws and these lawsuits were consolidated into the instant case. (*E.g.*, Doc. 164, 11/10/2022 Order re: Consolidation.) On March 23, 2023, the parties agreed to brief motions for summary judgment only regarding issues that could be adjudicated without discovery. (*See* Doc. 337, Sched. Min. Entry; Doc. 338, Sched. Order.) On May 8, 2023, the State filed its Motion, moving for partial summary judgment on several of Plaintiffs' claims that the Voting Laws are unlawful under the National Voter Registration Act ("NVRA") and the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2) (the "Materiality Provision"). (*See generally* State Mot.)

Specifically, the State asserts that Section 6 of the NVRA, 52 U.S.C. § 20505 ("Section 6"), preempts H.B. 2492's requirement that voters provide DPOC to vote in presidential elections. (*Id.* at 2–3.) The State also concedes that Section 6 precludes Arizona from requiring DPOR to register for federal elections. (*Id.* at 4, 16–17.) But the

---

[2] The Court references organizational Plaintiffs that have filed collectively under the name of one organization. "LUCHA Plaintiffs," for example, includes all additional Plaintiffs that are named on the briefing with LUCHA.

State argues that the Voting Laws' restriction on mail-in voting is "likely" lawful under Section 6. (*Id.* at 3–4.) The State further argues that it is entitled to summary judgment on Plaintiffs' claims that the Voting Laws violate Section 8 of the NVRA, 52 U.S.C. § 20507 ("Section 8") by unlawfully cancelling voter registrations and unlawfully purging voter rolls. (*Id.* at 5–10.) Regarding Plaintiffs' claims under the Materiality Provision, the State contends that the Voting Laws do not run afoul of its prohibition of denying the right to vote based on immaterial errors or omissions in a person's registration. (*Id.* at 10–14.) The State additionally moves for summary judgment on Plaintiff Promise Arizona's claim that the Voting Laws are unconstitutionally vague. (*Id.* at 15–16.)

The RNC then filed its Motion on May 15, 2023, cross-moving for summary judgment regarding Arizona's power to regulate voting in presidential elections and arguing additional issues unaddressed by the State. (*See generally* RNC Mot.) Asserting that the NVRA cannot lawfully regulate presidential elections, the RNC argues that H.B. 2492's DPOC requirement for presidential elections does not run afoul of Section 6. (*Id.* at 2–8.) The RNC also underscores that Arizona may require DPOC from mail-in voters. (*Id.* at 8–9.) Additionally, the RNC moves for summary judgment on Plaintiffs' claims that, *inter alia*, Section 8 requires Arizona to register State Form users who register without DPOC for federal elections.

On June 5, 2023, the United States and Private Plaintiffs either cross-moved for summary judgment or opposed summary judgment on all issues addressed by the State and the RNC, except that Plaintiffs agreed with the State's conclusion regarding the Voting Laws' DPOR requirement. (*E.g.*, Doc. 391, USA Mot.) Specifically, Plaintiffs cross-move for summary judgment on all Section 6 claims, arguing that the NVRA preempts H.B. 2492's limitations on presidential and mail-in voting, as well as H.B. 2492's DPOR requirement. (*E.g.*, Doc. 393, DNC Mot. at 5–15; Doc. 390, Tohono O'odham Mot. at 4–10.) Plaintiffs also argue that the Court should grant summary judgment to Plaintiffs on their claim that the Voting Laws contravene Section 8 by

- 7 -

1    enabling cancellation of registrations within 90 days of an election.[3] (Doc. 396,

2    AAANHPI Mot. at 3–7; DNC Mot. at 16.) Mi Familia Vota cross-moves for summary

3    judgment on its Materiality Provision claims, while the United States and LUCHA argue

4    that issues of fact preclude summary judgment. (USA Mot. at 16–25; Doc. 394, LUCHA

5    Mot. at 5–7; Doc. 399, Mi Familia Vota Mot. at 1–9.) Poder Latinx also moves for

6    summary judgment on its § 10101 claim. (Doc. 397, Poder Latinx Mot. at 1–8.) But

7    Plaintiffs contend that fact issues preclude summary judgment on their claims that the

8    Voting Laws violate Section 8 by mandating cancellation for reasons not permitted by the

9    NVRA; subjecting registrants to nonuniform and discriminatory voter roll maintenance

10   programs; and failing to ensure all eligible applicants to vote are registered to vote within

11   30 days of an election. (LUCHA Mot. at 13–15; AAANHPI Mot. at 8–13; Poder Latinx

12   Mot. at 8–16.) Promise Arizona also opposes summary judgment on its void-for-

13   vagueness claim. (*See generally* Doc. 395, Promise Arizona Resp.)

14        The State and the RNC responded and replied to Plaintiffs' filings on July 5, 2023,

15   to which Plaintiffs replied on July 19, 2023. (Doc. 436, State Reply; Doc. 442, RNC

16   Reply; Doc. 473, Tohono O'odham Reply; Doc. 474, Poder Latinx Reply; Doc. 475,

17   DNC Reply; Doc. 476, USA Reply; Doc. 477, AAANHPI Reply; Doc. 478, Mi Familia

18   Vota Reply.) The Court heard oral argument on all Motions and Cross-Motions on July

19   25, 2023. (Doc. 479, Min. Entry.)

20   **II.    LEGAL STANDARDS & ANALYSIS**

21        Under Federal Rule of Civil Procedure 56, summary judgment is properly granted

22   when: (1) there is no genuine dispute as to any material fact; and (2) after viewing the

23   evidence most favorably to the non-moving party, the movant is clearly entitled to prevail

24   as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

25   (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). A fact

26   is "material" when, under the governing substantive law, it could affect the outcome of

27

28   _____
     [3] Plaintiffs also move for summary judgment on their claim that Section 8(a) of the
     NVRA prevents Arizona for requiring DPOC to vote in presidential elections, but the
     Court will not reach this claim.

1  the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

2  **A.    NVRA**

3  For the following reasons, the Court concludes that Section 6 preempts H.B.

4  2492's (1) DPOR requirement; (2) restriction on voting in presential elections; and (3)

5  restriction on mail-in voting. The Court also concludes that Section 8(c) of the NVRA

6  forecloses enforcement of the Voting Laws' systematic purge provisions within 90 days

7  of any federal elections. However, with the exception of Plaintiffs' argument that Section

8  8(b) applies to pre-registration oversight and the parties' arguments regarding registering

9  State Form users for federal elections, the Court finds that there are genuine issues of

10  material fact precluding summary judgment regarding whether certain provisions of the

11  Voting Laws contravene Sections 8(a) and (b) of the NVRA.

12  **1.    Section 6**

13  Section 6 of the NVRA requires that states "accept and use" the Federal Form to

14  register voters in federal elections. 52 U.S.C. § 20505(a)(1); *Inter Tribal*, 570 U.S. at 9.

15  Certain Plaintiffs and the State contend that H.B. 2492 violates Section 6 by requiring

16  Federal Form users to submit DPOR. (*See* Doc. 390, Tohono O'odham Mot. at 3–5.) All

17  parties who briefed this issue agree that Section 6 preempts H.B. 2492's DPOR

18  requirement. The Court will grant summary judgment on this issue.[4] (*Id.*; State Reply at

19  14; *see* Doc. 502, Hr'g Tr. at 40:18–41:18.) The parties dispute whether H.B. 2492's

20  requirements that registrants provide DPOC to vote (1) in presidential elections and (2)

21  by mail are legal under the NVRA. (*E.g.*, DNC Mot. at 5; RNC Mot. at 2–9.)

22  A state law may be preempted if, *inter alia*, Congress makes an express statement

23  to displace state law, "it is impossible for a private party to comply with both state and

24  federal requirements," or a state law "creates an unacceptable obstacle to the

25  accomplishment and execution of the full purposes and objectives of Congress."

26  *Chamber of Commerce v. Bonta*, 62 F.4th 473, 482 (9th Cir. 2023) (internal citation and

27  quotation marks omitted). The Court finds that Section 6 preempts both H.B. 2492's

28  ─────────────────────
[4] The State also agrees with Tohono O'odham Plaintiffs' requested clarifications about the DPOR requirement. (State Reply at 46–50.)

Case: 24-3188, 07/29/2024, DktEntry: 102.2, Page 125 of 194
Case 2:22-cv-00509-SRB   Document 534   Filed 09/14/23   Page 10 of 35

(125 of 194)

1  requirement that registrants provide DPOC to vote in presidential elections and its

2  restriction on mail-in voting.[5]

3  ### a.  Presidential Elections

4  All Plaintiffs and the State contend that Section 6 preempts H.B. 2492's

5  requirement that Federal Form users provide DPOC in order to vote in presidential

6  elections. (State Mot. at 2; *e.g.*, USA Mot. at 7–10; DNC Mot. at 5–6.) The RNC counters

7  that such preemption arguments "ignore[] the constitutional constraints on Congress's

8  power to regulate presidential elections," and "applying the NVRA only to congressional

9  elections gives proper effect to Elections Clause, the Electors Clause, the NVRA, and

10 H.B. 2492." (RNC Mot. at 2–6); *see also* U.S. Const. art. II, § 1, cl. 2 ("Electors Clause")

11 ("Each State shall appoint, in such Manner as the Legislature thereof may direct,"

12 presidential electors). The Court agrees with Plaintiffs and the State that Section 6

13 preempts H.B. 2492's limitation on voting in presidential elections.

14 The plain language of the NVRA reflects an intent to regulate all elections for

15 "[f]ederal office," including for "President or Vice President." 52 U.S.C. §§ 20507(a),

16 30101(3); *California Restaurant Ass'n v. City of Berkeley*, 65 F.4th 1045, 1050 (9th Cir.

17 2023) ("As with any express preemption case, our focus is on the plain meaning of [the

18 statute]."). And binding precedent indicates that Congress has the power to control

19 registration for presidential elections. *See* 52 U.S.C. §§ 20502(a), 30101(3) (NVRA sets

20 criteria for registering for "[f]ederal office"; defining "[f]ederal office" to include office

21 of the president). In 1934, the United States Supreme Court rejected a narrow framing of

22 Congress's power over presidential elections, writing:

23 The only point of the constitutional objection necessary to be considered is
   that the power of appointment of presidential electors and the manner of
24 their appointment are expressly committed by section 1, art. 2, of the
   Constitution to the states, and that the congressional authority is thereby
25 limited to determining 'the Time of chusing the Electors, and the Day on
   which they shall give their Votes; which Day shall be the same throughout
26 the United States.' So narrow a view of the powers of Congress in respect
   of the matter is without warrant.

27

28 ---
   [5] The Court will not reach Mi Familia Vota Plaintiffs' related Section 8(a) claim as it
   applies to Federal Form users. (*See* Mi Familia Vota Mot. at 15 n.12.)

1    *Burroughs v. United States*, 290 U.S. 534, 544 (1934). While *Burroughs* specifically

2    addressed the constitutionality of a federal statute regulating campaign contributions in

3    presidential elections, the Supreme Court later wrote that the decision more generally

4    "recognized broad congressional power to legislate in connection with the elections of the

5    President and Vice President." *Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976).

6            Drawing on this authority, the Ninth Circuit has recognized Congress's power to

7    regulate all federal elections under the NVRA. In *Voting Rights Coalition v. Wilson*, the

8    Ninth Circuit rejected a challenge to the constitutionality of the NVRA, holding that

9    because Congress has power under the Elections Clause to "alter state laws pertaining to

10   the 'Times, Places and Manner' of electing Representatives and Senators," the NVRA

11   may constitutionally "conscript state agencies to carry out voter registration for the

12   election of Representatives and Senators. The exercise of that power by Congress is by its

13   terms intended to be borne by the states without compensation." 60 F.3d 1411, 1413–15

14   (9th Cir. 1995) (citing U.S. Const. art. I, § 4, cl. 1 ("Elections Clause")). And

15   acknowledging that "the Supreme Court has read the grant of power to Congress in

16   Article I, section 4 as quite broad," the Ninth Circuit added that "the broad power given

17   to Congress over congressional elections has been extended to presidential elections." *Id.*

18   at 1414 (citing *Burroughs*, 290 U.S. at 545). The DNC and RNC dispute whether the

19   latter rationale is dicta. (RNC Reply at 5; DNC Reply at 7–8.) But the DNC persuasively

20   raises that this "broad" reading of the Elections Clause must have been essential to the

21   Ninth Circuit's decision to deem the NVRA constitutional, as the NVRA plainly

22   regulates congressional and presidential elections. (*See* DNC Reply at 8.)

23           The parties also dispute the impact of *Inter Tribal Council* on whether the NVRA

24   constitutionally regulates presidential elections. (DNC Mot. at 5–7; RNC Mot. at 2–7;

25   RNC Reply at 3–4.) Contrary to the RNC's arguments, *Inter Tribal Council* underscores

26   that the Elections Clause gives Congress the power to regulate all federal elections, and

27   that Congress intended to exercise this power through the NVRA to preempt conflicting

28   state laws. The *Inter Tribal* Court affirmed the states' power to "establish qualifications

ER - 0126

1   (such as citizenship) for voting" on the basis that "the Elections Clause empowers

2   Congress to regulate *how* federal elections are held, but not *who* may vote in them." 570

3   U.S. at 16 (emphasis original).[6] And the Court described the full preemptive impact of

4   the NVRA:

5       The assumption that Congress is reluctant to pre-empt does not hold when
        Congress acts under that constitutional provision, which empowers
6       Congress to "make or alter" state election regulations. Art. I, § 4, cl. 1.
        When Congress legislates with respect to the "Times, Places and Manner"
7       of holding congressional elections, it necessarily displaces some element of
        a pre-existing legal regime erected by the States. Because the power the
8       Elections Clause confers is none other than the power to pre-empt, the
        reasonable assumption is that the [NVRA's] text accurately communicates
9       the scope of Congress's pre-emptive intent.

10  *Id.* at 14. The Supreme Court also foreclosed the Tenth Amendment argument offered by

11  the RNC, reasoning that "[u]nlike the States' historic police powers, States' role in

12  regulating congressional elections—while weighty and worthy of respect—has always

13  existed subject to the express qualification that it terminates according to federal law." *Id.*

14  at 15 (internal quotation marks and citations omitted); *see also* 1 Story § 627 ("It is no

15  original prerogative of state power to appoint a representative, a senator, or president for

16  the union"); (USA Mot. at 14 (citing *Cook v. Gralike*, 531 U.S. 510, 522 (2001)); RNC

17  Mot. at 4.) *Inter Tribal Council* and additional controlling authority indicate that H.B.

18  2492's restriction on Federal Form users voting in presidential elections is expressly

19  preempted by Section 6.[7]

20                    **b.      Voting by Mail**

21      Plaintiffs also contend that Section 6 preempts H.B. 2492's requirement that

22  Federal Form users provide DPOC in order to vote by mail. (*E.g.*, DNC Mot. at 7.) The

23

24  ―――――――――――――
    [6] The RNC argues that in *Oregon v. Mitchell*, 400 U.S. 112 (1970), "[f]ive Justices took
    the position that the Elections Clause did not confer upon Congress the power to regulate
25  voter qualifications in federal elections." (RNC Mot. at 5 (quoting *Inter Tribal Council*,
    570 U.S. at 16 n.8).) But this assertion has no impact on any Motion, as Section 6 does
26  not regulate voter qualifications.
    [7] Contending that the Elections Clause was not the only source of congressional power
27  behind the NVRA, the DNC argues that the Fourteenth and Fifteenth Amendments also
    legitimize the statute's regulation of presidential elections. (DNC Mot. at 2.) Because the
28  Court concludes that the Elections Clause gives Congress power to regulate presidential
    elections under the NVRA, it need not reach any argument regarding the Fourteenth and
    Fifteenth Amendments.

RNC counters that the NVRA does not apply to *voting* by mail or the "mechanisms for . . . voting," but only to registering to vote. (RNC Mot. at 4, 4 n.2, 8.) The State similarly asserts that H.B. 2492's mail-in voting restriction is "likely not" preempted, as Section 6 pertains to "what states must do 'for the *registration*' of voters." (State Mot. at 3–4 (quoting § 20505(a)(1)) (emphasis in original).) But both the text and purpose of the NVRA contradict Defendants' narrow framing of the statute.

The text of the NVRA provides for circumstances where a state may limit voting by mail, implying that a state may not limit absentee voting outside of these prescribed circumstances. 52 U.S.C. § 20505(c)(1) (permitting states to require first-time voters to vote in person if those voters registered to vote by mail), (c)(2) (clarifying that paragraph (c)(1) does not apply to individuals who are otherwise entitled to an absentee ballot under federal law); (*see also* DNC Mot. at 9.) Had Congress intended to permit states that allow absentee voting to require in-person voting under additional circumstances—including when an registrant fails to provide DPOC—it could have said so in the NVRA. *See N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 940 (2017) (explaining that the interpretive canon *expressio unius est exclusio alterius* applies when "circumstances support a sensible inference that the term left out must have been meant to be excluded") (internal citation and quotation marks omitted). Not only does the statute exclude failure to provide DPOC among the reasons a state may require an individual to vote in person, but as explained below, the purpose of the NVRA supports an inference that Congress meant to limit the number of circumstances in which a state could prevent an individual from voting by mail.

Regarding the purpose of the NVRA, Congress recorded that it enacted the NVRA not just to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," but also to "to make it possible for Federal, State, and local governments to implement this chapter in a manner that *enhances the participation of eligible citizens as voters* in elections for Federal office." 52 U.S.C. § 20501(b)(1)–(2) (emphasis added). Further, Congress found that

- 13 -

"discriminatory and unfair registration laws and procedures can have a direct and damaging effect on *voter participation in elections* for Federal office and disproportionately harm voter participation by various groups, including racial minorities" and it is the duty of "Federal, *State, and local governments* to promote the exercise of the [fundamental] right" to vote. *Id.* § 20501(a) (emphasis added).

Given Congress's purpose behind the NVRA, the DNC correctly raises not only that the statute's DPOC requirement to vote by mail is directly preempted by Section 6, but also that obstacle preemption bars the statute's enforcement. (DNC Reply at 2.) "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* (citation omitted). No party contests that Congress at least has the power to regulate congressional elections, and the findings and purposes included in the NVRA reflect an intent to increase voter turnout, largely but not exclusively through diminishing barriers to registration. Roughly 89 percent of Arizona voters cast ballots by mail in the 2020 election, indicating that most eligible Arizonans choose to vote by mail. (Non-US SOF ¶ 60.) By offering mail-in voting to registrants who provided DPOC but not to Federal Form registrants who omitted such documentation, H.B. 2492's mail-in voting restriction disadvantages Federal Form users by placing an additional burden—which is not required by the Federal Form—on federal-only voters to exercise Arizona's preferred method of casting a ballot. *See Inter Tribal*, 570 U.S. at 15 ("[A] state-imposed requirement of evidence of citizenship not required by the Federal Form is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form.") H.B. 2492's limitation on voting by mail frustrates the purpose of the NVRA, as it impedes Arizona's "promot[ion] of the right" to vote. 52 U.S.C. § 20501(a). This limitation presents an

"obstacle to the accomplishment of Congress's full objectives under the" NVRA, and the Court "find[s] that the state law undermines the intended purpose and 'natural effect'" of the NVRA. *Crosby*, 530 U.S. at 373 (citation omitted).

### 2.  Section 8

Section 8 of the NVRA mandates that states respect additional requirements when administering registration and roll maintenance programs. *See generally* 52 U.S.C. § 20507. The State and the RNC move for summary judgment on Plaintiffs' claims that (1) H.B. 2243 unlawfully allows for cancellation of registration within 90 days of an election; (2) H.B. 2243 allows cancellation for reasons unsanctioned by the NVRA; (3) the Voting Laws enable nonuniform and discriminatory maintenance procedures; and (4) H.B. 2492 fails to ensure that all eligible State Form users are registered to vote in federal elections. (State Mot. at 5–10; RNC Reply at 9–12.) Plaintiffs also move for summary judgment on H.B. 2243's cancellation of registration within 90 days of an election, but oppose summary judgment on all other issues.

### a.  Cancellation Within 90 Days of Election

Section 8(c)(2) mandates that States "shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" ("90-day Provision"). 52 U.S.C. § 20507(c)(2)(A). While states must pause any such systematic purge within 90 days of a federal election, States may continue to implement individualized[8] removal programs within this 90-day window. *See Arcia*, 772 F.3d at 1344–45 (discussing whether a program to remove noncitizens from the voter rolls within 90 days of an election by, *inter alia*, running registrants through the Systematic Alien Verification for Entitlements system is a systematic program contravening Section 8). The NVRA enumerates certain exceptions to the prohibition on removals before an election, which are "criminal conviction or mental incapacity," "the

---

[8] An "individualized" removal program means one in which a state determines eligibility to vote with "individualized information or investigation" rather than cancelling batches of registrations based on a set procedure. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014).

1   death of a registrant," "a change in the residence of the registrant," or "correction of

2   registration records pursuant to this chapter." 52 U.S.C. § 20507(a)(3)–(4), (c)(2)(B).

3          Plaintiffs assert that the Voting Laws violate Section 8(c) because they allow

4   systematic cancellation of registrations within 90 days of federal elections. (*E.g.*,

5   AAANHPI Mot. at 8–10.) The Court agrees. The Voting Laws contain no provision

6   limiting systematic roll review and registration cancellation to at least 90 days prior to a

7   federal election.[9] (*See id.*); A.R.S. § 16-165(G)–(K). The State acknowledges that the

8   Voting Laws fail to limit systematic purges within 90 days of an election, but claims that

9   Section 8 does not prevent states from cancelling registrations of voters found to be

10  noncitizens within this 90-day window. (State Mot. at 9.) Though all parties agree that

11  citizenship is a requirement for voting, the State ignores the text and purpose of the 90-

12  day provision.

13         The 90-day Provision prohibits systematic cancellation of registrations within 90

14  days of an election. First, Section 8 plainly forbids "any program" to routinely remove

15  registrants, subject to enumerated exceptions, and "the phrase 'any program' suggests

16  that the 90 Day Provision has a broad meaning. . . . [R]ead naturally, the word 'any' has

17  an expansive meaning, that is 'one or some indiscriminately of whatever kind.'" *Arcia*,

18  772 F.3d at 1344 (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). And "[w]here

19  Congress explicitly enumerates certain exceptions to a general prohibition, additional

20  exceptions are not to be implied, in the absence of evidence of a contrary legislative

21  intent." *Id.* at 1345 (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980)).

22  Second, the Court agrees with the Eleventh Circuit that the 90-day provision "is designed

23  to carefully balance [the] . . . purposes in the NVRA," which include protecting the

24  integrity of the electoral process and ensuring that accurate rolls are maintained, yet also

25  fostering procedures that will "enhance[] the participation of eligible citizens as voters in

---

26  [9] The DNC seeks summary judgment on its claim that H.B. 2492 violates Section 8
27  because "it places no time limit on the direction to county recorders to cancel
    registrations when they 'receive[] and confirm[] information that [a] person registered is
    not' a U.S. citizen." (DNC Mot. at 16 (quoting H.B. 2492) (alterations in original).) This
28  provision of H.B. 2492 was superseded by H.B. 2243. *Compare* H.B. 2492, § 8, *with*
    H.B. 2243, § 2.

elections for Federal office." *Id.* at 1346. It makes sense that Congress "decided to be more cautious" leading up to an election cycle, as systematic cancellation programs can cause inaccurate removal and "[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote." *Id.*; (*see* Non-US SOF ¶¶ 48–49.) But individualized removals, not expressly forbidden within the 90-day window, are based on more "rigorous" registrant-specific inquiries "leading to a smaller chance for mistakes." *Arcia*, 772 F.3d at 1346.

The State's arguments to the contrary do not persuade the Court. Relying heavily on *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (D. Fla. 2012), the State argues that the 90-day Provision does not "apply to removing noncitizens who were not properly registered in the first place." (State Mot. at 9 (quoting *Florida*, 870 F. Supp. 2d at 1350).) Yet the State ignores that the Eleventh Circuit rejected *Florida*'s reasoning in *Arcia*. *See Arcia v. Detzner*, NO. 12–22282–CIV–ZLOCH, 2015 WL 11198230, at *1 n.1 (S.D. Fla. Feb. 12, 2015) (describing conclusion reversed in *Arcia* as the same one reached in *United States v. Florida*). The State also relies on *Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004), in which the Sixth Circuit upheld a state statute enabling purges of precinct nonresidents within the 90-day window. But the *Bell* Court did not expressly consider the effect of individualized purges, the dual purposes of Section 8, or the plain meaning of "any" in Section 8(c)(2)(A). *Bell*, 367 F.3d at 591–92. Further, the facts of *Bell* are distinguishable from the Voting Laws. The statute at issue in *Bell* provided for individual "challenge hearings," which were "devoted to investigating each [registrant's] residence," before an alleged nonresident was purged from the voter roll. *Id.* at 590.

The State alternatively asks the Court to read the 90-day Provision into the Voting Laws, "harmoniz[ing]" the statutes with another Arizona law that mandates compliance with the NVRA, while Equity Coalition requests a declaration that Section 2 of H.B. 2243 violates the 90-day Provision. (State Mot. at 10; AAANHPI Mot. at 7–8, 10.) While the Court agrees with Plaintiffs that the State may still conduct individualized voter removals within the 90-day window, the systematic removal program mandated by H.B.

1    2243 violates Section 8(c)(2) of the NVRA.

2            **b.**      **Grounds for Cancellation**

3          As described above, Section 8(a) lists the grounds upon which a State can cancel

4    registrations for federal elections. 52 U.S.C. § 20507(a)(3)–(4). According to Defendant

5    Fontes, "H.B. 2243 do[es] not specify what type, set, or combination of 'information'

6    establishes that a registered voter 'is not a United States citizen' or what information is

7    sufficient to match an individual in a database with the registered voter or applicant, and .

8    . . some United States citizens may be erroneously flagged as non-citizens based on

9    potentially outdated and inaccurate data." (Non-US SOF ¶ 49 (quoting Doc. 189, Sec'y of

10   State Ans. ¶ 44).) Additionally, "if a county recorder obtains information and confirms

11   that a registered voter is not a United States citizen, which may be based on potentially

12   unreliable and outdated sources, and if, after receiving a notice, the voter does not

13   provide proof of citizenship within 35 days, the recorder must cancel the registration and

14   notify the county attorney and Attorney General for possible investigation." (*Id.* ¶ 50

15   (quoting Ex. 21, Doc. 63, 22-cv-1381, Sec'y of State Ans. ¶ 12).) The State argues that

16   because "citizenship is a basic requirement for voting," the Voting Laws' cancellation

17   provision cannot violate Section 8 as a matter of law, otherwise the NVRA "would

18   effectively grant, and then protect, the franchise of persons not eligible to vote." (State

19   Mot. at 8.)

20         Plaintiffs correctly counter that "[t]he very real fact questions about voters'

21   citizenship status and how successful the removal scheme will be in identifying truly

22   ineligible voters make summary judgment inappropriate here." (AAANHPI Mot. at 12.)

23   The State admits that only registrants suspected of being noncitizens are subjected to

24   arguably unreliable database checks, which Plaintiffs may be able to prove result in

25   inaccurate identification of noncitizens, cancellation of registration for reasons not

26   permitted by the NVRA, and wrongful referral for prosecution. (Non-US SOF ¶¶ 45–50.)

27   And again, the Court is not persuaded by the State's sparsely substantiated argument that

28   Arizona may freely cancel voter registrations of those individuals suspected of being

noncitizens merely because some such individuals might actually be noncitizens, nor does this outcome raise constitutional concerns. *Supra* Section II(A)(2)(a); *Arcia*, 772 F.3d at 1347–48 (Section 8 would raise constitutional concerns if it entirely prohibited states from removing noncitizens from voter rolls, but case did not present that question). The Court concludes that there remains an issue of fact as to whether the purge procedures mandated by H.B. 2243 will likely result in unlawful cancellation of legitimate voter registrations.

### c.  Discriminatory Maintenance Procedures

The State seeks summary judgment on Plaintiffs' claim that the Voting Laws violate Section 8(b) of the NVRA, titled "Confirmation of voter registration," which mandates that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b). Plaintiffs claim that the Voting Laws violate Section 8(b) by treating federal-only and full-ballot voters differently and imposing "disparate treatment as between naturalized citizens and U.S.-born citizens, as well as within and between Arizona counties." (*E.g.*, Poder Latinx Mot. at 8–9.) Specifically, Plaintiffs oppose summary judgment on the grounds that there remain factual issues regarding the effects of the allegedly discriminatory verification procedures mandated by the Voting Laws. (*Id.* at 9.)

As a threshold issue, the State argues that Section 8(b) only applies to post-registration voter roll maintenance, namely purges, and the State is entitled to judgment as a matter of law on any claim that the State treats *applicants* to vote in a nonuniform or discriminatory way. (State Mot. at 5–6.) Based on the plain language of the NVRA, the Court agrees with the State only to the extent the State argues that Section 8(b) does not apply to state programs regarding individuals not yet registered to vote. Section 8(b), which expressly addresses confirming rather than soliciting voter registration, speaks to ensuring the *maintenance*, not the enlargement, of current voter registration rolls. *See* 52

- 19 -

1  U.S.C. § 20507(b); (*see also* State Mot. at 5–6 (discussing legislative history indicating

2  that Section 8(b) was intended "to prohibit selective or discriminatory purge programs").)

3  Binding authority supports this interpretation, and Plaintiffs cite no case or make no

4  argument to otherwise persuade the Court. *See, e.g.*, *Husted v. A. Philip Randolph Inst.*,

5  138 S.Ct. 1833, 1840 (2018) (referencing § 20507(b)(1) as a "limitation applicable to

6  state removal programs").

7       The Court will deny summary judgment on Plaintiffs' remaining claims that

8  Section 8(b) forbids the State from (1) cancelling existing voter registrations of

9  individuals identified as noncitizens after running certain individuals through (an)

10  unreliable database(s) and (2) referring certain individuals for investigation based on such

11  unreliable data. The Secretary of State admitted that H.B. 2243 "requires a different

12  'standard, practice, or procedure' for determining a voter's qualifications for voters who a

13  county recorder 'has reason to believe are not United States citizens' than for voters who

14  a county recorder does not have reason to believe are not United States citizens." [10] (Non-

15  US SOF ¶ 44 (citing Sec'y of State Ans. ¶ 102)); A.R.S. § 16-165(I). And the Secretary

16  specifically admitted that H.B. 2243 mandates that county recorders distinguish between

17  those registrants who will be subjected to the additional Systematic Alien Verification

18  Entitlements program screens and those who "are not suspected of lacking U.S.

19  citizenship [and] will not be subjected to the investigation and potential cancellations

20  [sic] provisions set forth in H.B. 2243." (*Id.* ¶ 45 (citing Sec'y of State Ans. ¶¶ 102–03).);

21  § 16-165(I). As the Court concludes that there are outstanding issues of fact as to how

22  this purging will be executed and whether it causes nonuniform and discriminatory

23  registration investigation and cancellation, the Court denies summary judgment on these

---

[10] Poder Latinx seeks summary judgment on its claim that the verification procedures' "reason to believe" standard violates 52 U.S.C. § 10101(a)(2)(A), which prohibits the State from "apply[ing] any standard, practice, or procedure" to determine an individual's qualification to vote that is "different from the standards, practices, or procedures applied" to other individuals "found by State officials to be qualified to vote." Because there remain issues of fact of when and how a county recorder will have "reason to believe" that a registered voter is a non-citizen and use the Systematic Alien Verification for Entitlements program to verify citizenship, the Court denies as moot Poder Latinx Plaintiffs' Motion on its 52 U.S.C. § 10101(a)(2)(A) claim. (*See* Poder Latinx Mot. at 1–5.)

1    Section 8(b) claims.[11]

2                    **d.**       **State Form Users Registering for Federal Elections**

3           Section 8(a) of the NVRA mandates that States "ensure that any eligible applicant

4    is registered to vote in an election" when an applicant submits registration materials at

5    least 30 days before an election. 52 U.S.C. § 20507(a)(1); *see also* A.R.S. § 16-120(A) (a

6    registrant "shall not vote in an election called pursuant to the laws of this state unless the .

7    . . [individual's] registration has been received by the county recorder . . . before

8    midnight of the twenty-ninth day preceding the date of the election"). Plaintiffs argue,

9    *inter alia*, that the Voting Laws contravene Section 8(a) by mandating that applicants

10   who submit a State Form by mail or at public assistance agencies must provide DPOC in

11   order to be registered for any election.[12] (LUCHA Mot. at 14.) Countering that the

12   NVRA does not require states to register applicants not actually eligible to vote under

13   state criteria, namely "known noncitizens," the RNC seeks summary judgment on

14   Plaintiffs' claim that H.B. 2492 contravenes Section 8(a)'s requirement that states ensure

15   all eligible applicants to vote are actually registered to vote. (RNC Mot. at 2, 9–11;

16   LUCHA Mot. at 13–14.)

17          This claim is resolved by the existing LULAC Consent Decree, which requires

18   Arizona "County Recorders to accept State Form applications submitted without DPOC .

19   . . [and] to immediately register the applicants for federal elections, provided the

20   applicant is otherwise qualified and the voter registration form is sufficiently complete."

---

21   [11] The State "takes no position" on whether the Voting Laws "*as applied*, result in a non-
22   uniform or discriminatory program for maintaining accurate registration lists." (State
     Mot. at 6 n.12 (emphasis in original).) Offering an expansive definition of the term "non-
23   uniform" as "apply[ing] to less than an entire jurisdiction," the State argues that the
     Voting Laws still facially pass muster under Section 8(b). (*Id.* at 6.) But the State does
24   not address that even the text of the Voting Laws mandates purges that apply to "less than
     an entire jurisdiction," as only those registrants whom recorders have "reason to believe"
25   are noncitizens will be subject to heightened scrutiny through, *inter alia*, the Systematic
     Alien Verification for Entitlements program. The Court need not endorse a specific
26   definition of uniformity or parse Plaintiffs' facial and as-applied arguments to deny
     summary judgment on the Section 8(b) claim.
27   [12] The Court has already explained that Section 6 precludes Arizona from requiring
     DPOC from Federal Form users and will grant summary judgment regarding the Voting
28   Laws' DPOR requirement, so the Court need not address the parties' arguments
     regarding the effect of Section 8(a) in these respects. (*See* RNC Mot. at 9–11, RNC Reply
     at 7–8.)

1    (LULAC Consent Decree at 8.) The LULAC Consent Decree, which Judge Campbell has

2    never set aside, makes no carve-out for mail-in registrations or individuals who register at

3    public assistance agencies. (*See* Doc. 388-4, Ex. 15, Sec'y of State Voting Laws

4    Implementation Email ("[Q]uestions remained as to whether we could implement [the

5    Voting Laws'] requirements that would conflict with . . . federal settlements and court

6    cases. Having thoroughly analyzed the changes that both bills require, the Secretary of

7    State's Office believes that there is no way to implement certain requirements without

8    conflicting with federal law . . . including *Documentary Proof of Citizenship for federal*

9    *elections*." (emphasis added)).) Rather, it reflects that Arizona agreed to refrain from

10   precisely the conduct that the RNC would have Arizona participate in. *C.f. Taylor v.*

11   *United States*, 181 F.3d 1017, 1024 (9th Cir. 1999) ("Congress may change the law and,

12   in light of changes in the law or facts, a *court* may decide in its discretion to reopen and

13   set aside a consent decree under [Rule] 60(b) . . . but Congress may not direct a court to

14   do so with respect to a final judgment (whether or not based on consent) without running

15   afoul of the separation of powers doctrine." (internal citations omitted) (emphasis

16   added)).[13]

17        **B.    Section 10101 of the Civil Rights Act**

18        Plaintiffs argue that the Checkbox Requirement and the Birthplace Requirement

---

19   [13] Even if the Court were to accept the parties' position that the Voting Laws "roll[ed]
20   back" the LULAC Consent Decree, the RNC's arguments are unpersuasive in light of the
     Court's Section 6 analysis. (Doc. 196, MTD Hr'g Tr. at 62:3–4; *see also* Doc. 67,
21   LUCHA Compl. ¶ 90 (requiring DPOC for State Form user to register for federal
     elections "requires the Secretary to violate a federal consent decree"); *but see* Doc. 388-4,
22   Ex. 19, Veto Letter from Recorder Cazares-Kelly at 1 (automatic State form rejection
     "had been eliminated by the consent decree in the LULAC case so that currently all
23   voters are treated the same"). The State Form elicits the same information for federal-
     only voters as the Federal Form. (*Compare* State Form (federal-only information shaded
24   red) *with* Federal Form at 26.) The State Form informs applicants that they will only be
     registered for "full ballot" elections if they provide proof of citizenship, but absent DPOC
25   and the Birthplace Requirement discussed below, the State Form's requirements are
     substantively indistinguishable from the Federal Form. As long as Arizona has chosen to
26   produce a State Form that offers registration for federal elections, it must abide by the
     requirements outlined in Section 6, cross-referenced to Section 8. *See* § 20505(a)(2) ("In
27   addition to accepting and using the [Federal Form], a State may develop and use a mail
     voter registration form that meets all of the criteria stated in section 20508(b) of this title
28   for the registration of voters in elections for Federal office."). And as above explained,
     the NVRA precludes states from requiring DPOC to register applicants for federal
     elections.

Case: 24-3188, 07/29/2024, DktEntry: 102.2, Page 138 of 194
Case 2:22-cv-00509-SRB   Document 534   Filed 09/14/23   Page 23 of 35

(138 of 194)

1  violate the Materiality Provision, which prohibits the State from denying an individual

2  her right to vote "because of an error or omission on any record or paper relating to any

3  application, registration, or other act requisite to voting, if such error or omission is not

4  material in determining whether such individual is qualified under State law to vote in

5  such election."[14] 52 U.S.C. § 10101(a)(2)(B). The Materiality Provision was "intended to

6  address the practice of requiring unnecessary information for voter registration with the

7  intent that such requirements would increase the number of errors or omissions on the

8  application forms, thus providing an excuse to disqualify potential voters." *Schwier v.*

9  *Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). To be qualified to vote in Arizona, a person

10  must be at least eighteen years old, a current United States citizen, and a current resident

11  of Arizona. Ariz. Const. art. VII § 2.

12  The State asserts that the Checkbox Requirement and Birthplace Requirement do

13  not violate the Materiality Provision because citizenship is material in determining a

14  person's eligibility to vote and birthplace is material in determining a person's identity.

15  (State Mot. at 10–14.) The Court concludes that the Checkbox Requirement violates the

16  Materiality Provision when a person provides Arizona with DPOC. But the Court finds

17  that there are genuine issues of fact precluding summary judgment on whether the

18  Birthplace Requirement contravenes the Materiality Provision.

19  ## 1.      The Checkbox Requirement

20  The State contends that the Checkbox Requirement does not violate the

21  Materiality Provision because "citizenship is a requirement for voting in Arizona." (*Id.* at

22  11–13.) The United States counters that whether the Checkbox Requirement violates the

23  Materiality Provision is question of fact inappropriate for summary judgment. (USA Mot.

24  at 17–20.) Specifically, the United States contends that further discovery is necessary

25  ----

26  [14] Plaintiffs do not dispute that the State can require DPOC to vote in state elections, but Plaintiffs do claim that requiring federal-only voters to provide DPOC to vote in

27  presidential elections and by mail violates the Materiality Provision. (*E.g.*, Doc. 1, 22-cv-1124, USA Compl. ¶¶ 69–70; *see generally* USA Mot.; Mi Familia Vota Mot.; LUCHA Mot.) Because requiring DPOC for federal-only voters to vote in presidential elections

28  and by mail violates Section 6, the Court need not address the parties' arguments as they relate to the Materiality Provision. (*See* State Mot. at 13.)

1    because the State posits without any "record evidence supporting its assertions," that the

2    Checkbox Requirement is "useful." (*Id.* at 19.)

3          No party disputes that citizenship itself is material to a voter's eligibility to vote.

4    (*E.g.*, *id.* at 18.) And the Court finds persuasive those circumstances under which the

5    materiality of omitted information is an issue of law. *See Chism v. Washington State*, 661

6    F.3d 380, 389 (9th Cir. 2011) (noting the "inquiry into whether the false statements and

7    omissions [in an affidavit for a search warrant application] were material is a purely legal

8    question . . . . [and] were material if 'the affidavit, once corrected and supplemented,'

9    would not have provided a magistrate judge with a substantial basis for finding probable

10   cause" (citation omitted)); *S.E.C. v. Reys*, 712 F. Supp. 2d 1170, 1177 (W.D. Wash.

11   2010) (noting that, in the shareholder context, the materiality of an omission is an issue of

12   law "[o]nly when the disclosures or omissions are so clearly unimportant that reasonable

13   minds could not differ" (quoting *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 (3d Cir.

14   1989))). The materiality of an applicant's failure to complete the checkbox on the State

15   Form or Federal Form is a question of law.

16                    **a.    The Checkbox Requirement With DPOC**

17         The United States contends that an incomplete checkbox on a voter registration

18   form is immaterial when an applicant provides the State with DPOC. (USA Mot. at 21.)

19   The State cites *Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006), as "the most

20   analogous case" to the Checkbox Requirement in asserting that it does not violate the

21   Materiality Provision. (State Reply at 31; *see* State Mot. at 11–13.) The plaintiffs in *Diaz*

22   argued that a voting law violated the Materiality Provision by requiring applicants to (1)

23   check boxes affirming that they are citizens, have not been convicted of a felony, and

24   have not been adjudicated mentally incompetent, and (2) sign an oath affirming, *inter*

25   *alia*, that they are "qualified to register as an elector under the Constitution and laws of

26   the State of Florida." 435 F. Supp. 2d at 1212–13. The *Diaz* court held that checking the

27   boxes was not "duplicative" of signing the oath because the oath did not require an

28   applicant to specifically affirm her citizenship, and even if it were duplicative, material

ER - 0139

1    information does not "become[] immaterial due solely to its repetition." *Id.* at 1212–13.

2             Though an applicant registering for Arizona elections must similarly affirm her

3    citizenship both by specifically marking "yes" in the checkbox and signing an oath, *Diaz*

4    is inapposite, as an applicant must also provide DPOC. A.R.S. § 16-121.01(A), (C).

5    Instead, the Court finds the reasoning in *League of Women Voters of Arkansas v.*

6    *Thurston*, No. 5:20-cv-05174, 2021 WL 5312640 (W.D. Ark., Nov. 15, 2021), more

7    persuasive. There, the court found that plaintiffs stated a claim that a voting law violated

8    the Materiality Provision because it required absentee voters to provide information about

9    their eligibility to vote "several times," and voters "correctly provided that information at

10   least once," but had their ballots "rejected on the basis of a mismatch or omission in one

11   of the multiple documents they ha[d] provided." 2021 WL 5312640, at *4. The Voting

12   Laws similarly permit Arizona to reject an applicant's registration based on a "mismatch"

13   between documents, specifically an incomplete checkbox on a registration form

14   notwithstanding the applicant's accompanying documentary proof of citizenship. *See*

15   § 16-121.01(A), (C).

16            The State contends that the checkbox is still "useful" in determining an applicant's

17   citizenship.[15] Materiality "signifies different degrees of importance in different legal

18   contexts." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir.

19   2008). The Eleventh Circuit observed in *Browning* that if "material" under the

20   Materiality Provision "means minimal relevance," then an error is material if it "tends to

21   make it more likely that the applicant is not a qualified voter than" in the absence of the

22   error. *Id.* at 1174. The *Browning* court cited to the "criminal mail and wire fraud

23   context," where "a false statement is material if it has a natural tendency to influence, or

24   is capable of influencing, the decision of the decisionmaking body to which it was

25   addressed." *Id.* at 1173 (quoting *United States v. Gray*, 367 F.3d 1263, 1272 n.19 (11th

26   _____

27   [15] The State also argues more generally that "[t]he [checkbox] is 'material in
     determining' the voter's eligibility because U.S. citizenship is a requirement for voting in

28   Arizona." (State Mot. at 12 (internal citations omitted).) But this conclusory argument
     conflates materiality of an applicant's citizenship with the materiality of an incomplete
     checkbox in *determining* an applicant's citizenship. (*See* USA Mot. at 18.)

Cir. 2004)). However, "'capable of influencing' is an objective test, which looks at 'the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end.'" *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008). The Court does not accept that information must only meet such a low bar to be material. Because Arizona may not deny an individual the right to vote due to an error or omission that "is not material *in determining*" her eligibility to vote, the Court infers that Congress intended[16] materiality to require some probability of actually impacting an election official's eligibility determination.[17] § 10101(a)(2)(B) (emphasis added); *c.f. TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (explaining that under the Securities Exchange Act, an omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"); *United States v. Bagley*, 473 U.S. 667, 682 (1985) (in criminal procedure, exculpatory "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine the confidence in the outcome"); *Bruton v. Massanari*, 268 F.3d 824, 827 (9th Cir. 2001) (in social security benefits cases, "new evidence is material . . . if there is a reasonable possibility that the new evidence would have changed the outcome of the determination" (citation and internal quotation

---

[16] "Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Kungys v. United States*, 485 U.S. 759, 770 (1988) (citation omitted) (applying meaning of materiality of false statements to public officials to the denaturalization context).

[17] At least one court has interpreted "material" to mean something akin to necessary. *See La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 542 (W.D. Tex. 2022) (plaintiffs plausibly alleged that a voting law "may require information that is *unnecessary and therefore not material* to determining an individual's qualifications to vote under Texas law" (internal citations omitted) (emphasis added)). Whatever the appropriate definition of "material" in this context, it means something more than "useful" or "minimal[ly] relevan[t]." (*See* USA Mot. at 18); *compare Material*, Black's Law Dictionary (11th ed. 2019) ("Having some logical connection with the consequential facts" or being "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential"), *with Relevant*, Black's Law Dictionary ("Logically connected and tending to prove or disprove a matter in issue; having appreciable probative value—that is, rationally tending to persuade people of the probability or possibility of some alleged fact").

1    marks omitted) (cleaned up))).

2          The State asserts that "if a prospective voter is presented with a clear yes-or-no

3    question about whether the voter is a citizen and does not mark 'Yes,' that information is

4    material." (State Reply at 30.) The State cites *Browning*, which interpreted the

5    Materiality Provision as "ask[ing] whether, accepting the error *as true and correct*, the

6    information contained in the error is material to determining the eligibility of the

7    applicant." 522 F.3d at 1175 (emphasis in original). The *Browning* court explained that

8    with additional and accurate information:

9          [an] election official will *always* be able to verify identity of the applicant.
           It is this additional information exclusively—and not the degree to which
10         that new information deviates from the information on the registration
           application form, or the "nature of the error"—that enables the election
11         official to ascertain the identity of the voter.

12   *Id.* at 1175 n.23 (emphasis in original). This suggests that no error could be material

13   unless the erroneous information were considered in isolation from other additional

14   information probative of an applicant's eligibility to vote. But the materiality of an error

15   or omission is determined by the other information available to the State. So when an

16   applicant includes DPOC, it makes little sense to accept an incomplete citizenship

17   checkbox on her registration form as "true and correct" when it is clearly not, and that

18   incomplete checkbox should not alter any determination of her eligibility to vote. *C.f.

19   TSC Indus.*, 426 U.S. at 449 (focusing on "the 'total mix' of information made

20   available"). Applying *Browning*'s interpretation of materiality would allow Arizona to

21   disregard documentation that, under Arizona law, constitutes "*satisfactory evidence* of

22   citizenship" and disenfranchise eligible voters. A.R.S. § 16-166(F) (emphasis added).

23   The Checkbox Requirement violates the Materiality Provision when an applicant

24   provides satisfactory evidence of citizenship.

25                    **b.    The Checkbox Requirement Without DPOC**

26         As discussed above, the State must register both State Form and Federal Form

27   users for federal elections without requiring DPOC. (*Supra* Part II.A.) The Checkbox

28   Requirement as applied to these voters does not violate the Materiality Provision.

Specifically, the Federal Form "may require only such [information] as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1); *see id.* § 20505(a)(1). Congress further specified that the Federal Form "shall include," *inter alia*, a checkbox for the applicant to indicate whether she is a citizen and requires that an applicant who fails to check the box be given "an opportunity to complete the form" before the next federal election. *Id.* § 21083(b)(4)(A)(i), (B); (*see* State Mot. at 12; State Reply at 29.) This statutory scheme indicates that the checkbox is "necessary" to determine an applicant's eligibility, and it is doubtful "that Congress would mandate the gathering of information . . . that it also deems immaterial." *Browning*, 522 F.3d at 1174.

The Court also agrees with the State that even assuming the checkbox on the Federal Form is duplicative of the oath, an applicant's failure to complete the checkbox is not an immaterial omission. (State Reply at 29 (citing *Diaz*, 435 F. Supp. 2d at 1213); *see* Federal Form at 26 (requiring applicant to affirm "under penalty of perjury and threat of deportation" that she is a United States citizen).) Though an applicant must affirm her citizenship twice, it is effectively an applicant's only opportunity to provide this information when registering for federal elections. *See League of Women Voters of Ark.*, 2021 WL 5312640, at *4 (indicating that it would not violate the Materiality Provision to reject a ballot due to an error or omission "[w]here absentee voters have only one opportunity to provide information" about their qualifications to vote). As for State Form users, they must specifically affirm their citizenship only once, and the United States concedes that the Checkbox Requirement on the State Form is permissible in the absence of DPOC.[18] (USA Mot. at 21; State Form.) The Checkbox Requirement does not violate

---

[18] Unlike the checkbox and the signature box on the Federal Form, which both inquire specifically into whether an applicant is a citizen, the oath on the State Form requires an applicant to affirm that the information in the registration is true, that she is a resident of Arizona, and has not been convicted of a felony or adjudged incapacitated. (*See* Federal Form at 26; State Form at 51.) The checkbox on the State Form is not duplicative of this "general" oath. *See Diaz*, 435 F. Supp. 2d at 1213.

1    the Materiality Provision as applied to individuals who do not provide DPOC.[19]

2                        **2.      The Birthplace Requirement**

3            The State argues that the Birthplace Requirement does not violate the Materiality

4    Provision because an applicant's place of birth "can help confirm [a] voter's identity."

5    (State Mot. at 14 (noting that "verifying an individual's identity is a material requirement

6    of voting" (quoting *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 841 (S.D. Ind.

7    2006)))) The Court agrees with the United States that there is a dispute of material fact

8    about whether an applicant's failure to include her birthplace is material in determining

9    her eligibility to vote. (*See* USA Mot. at 21–23.) The State cites the United States

10   Department of State's Foreign Affairs Manual, which requires passport applicants to

11   provide their birthplace because birthplace is an "integral part of establishing an

12   individual's identity." (State Mot. at 14 (quoting Doc. 365-1, Ex. H, at 107).) But as the

13   State recognizes, it began offering voters the *option* to include their "state or country of

14   birth" in 1979, and there is no indication that this information—or lack thereof—has ever

15   been material in determining an applicant's eligibility to vote. (State Mot. at 13 (citing

16   Doc. 365-1, Ex. G, A.R.S § 16-152(A) (1979)).)

17           The State argues that how election officials use a person's birthplace is beside the

18   point because "[t]he question is whether a person's state or country of birth is,

19   objectively, 'material to determining the eligibility of the applicant.'" (State Reply at 33

20   (quoting *Browning*, 522 F.3d at 1175).) The State also contends that "[w]hether

21   [birthplace] is material in determining voter eligibility depends on its relevance to

22   eligibility." *Id.* But if, as the State argues, a person's state or country of birth is

23   "objectively relevant" to a person's identity, so too are her father's and mother's names,

24   or her occupation. (*See* State Form at 51 (providing applicants the *option* to include

25   occupation and parents' names).) Whether the Birthplace Requirement violates the

26   Materiality Provision is an issue of fact inappropriate for summary judgment.

27   _____

28   [19] Mi Familia Vota's Cross-Motion on the materiality of the Checkbox Requirement is
     moot. The Court need not address the parties' arguments regarding Private Plaintiffs'
     standing. (*See, e.g.*, RNC Mot. at 11–15.)

C. **Vagueness of the Purge Provisions**

The State seeks summary judgment on Promise Arizona's claims that the purge provisions of the Voting Laws, A.R.S. § 16-165(a)(10) and (I), are void for vagueness because they do "not provide an election official any guidance to determine whether a person is not a United States citizen" and allow the Attorney General to open a criminal investigation into any person whose voter registration is cancelled. (Doc. 1, 22-cv-1602, Compl. ¶ 139; State Mot. at 15–16.) Specifically, the State contends that the void-for-vagueness doctrine is inapplicable because the Voting Laws do not regulate voter conduct, and that even if the doctrine does apply, the purge provisions are not vague. (State Mot. at 15–16; State Reply at 39–42.)

"The void-for-vagueness doctrine . . . guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). Promise Arizona attempts to frame § 16-165 as a penal statute and asserts that "in order to avoid the punishment of being compared with the [Systematic Alien Verification for Entitlements] program, and subsequently, voter registration cancellation and criminal investigation, the voter is *prohibited* from giving county recorders *any* reason to believe that they are not a United States citizen." (Promise Arizona Resp. at 4–5 (emphasis in original).) A penal law must "provide a reasonable opportunity to know what conduct is prohibited," or be sufficiently definite as to not "allow arbitrary and discriminatory enforcement." *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1019 (9th Cir. 2010) (citation omitted); *see City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). As the Voting Laws are not penal in nature and do not address individual conduct, the Court will grant the State's Motion on this claim.

First, § 16-165(I) is not penal, as "[i]t does not define the elements of an offense, fix any mandatory penalty, or threaten people with punishment if they violate its terms." *United States v. Christie*, 825 F.3d 1048, 1064–65 (9th Cir. 2016); (*see* State Reply at 40). Because the provision "is not a penal statute or anything like one," it cannot be unconstitutionally vague. *Christie*, 825 F.3d at 1064 ("Justice Thomas, in his history of

1   the void-for-vagueness doctrine, cites one case in which the Supreme Court voided a

2   vague statute that he classifies as non-penal." *Id.* at 1064 n.5 (citing *Johnson v. United*

3   *States*, 576 U.S. 591, 612 (2015) (Thomas, J., concurring in the judgment))).

4          Second, § 16-165(I) regulates county recorders, not registered voters. (State Reply

5   at 39.) If a law "imposes neither regulation of nor sanction for *conduct*," then "no

6   necessity exists for guidance so that one may avoid the applicability of the law." *Boutilier*

7   *v. INS*, 387 U.S. 118, 123 (1967) (emphasis added). The void-for-vagueness doctrine is

8   inapplicable to the fact of whether a voter is a citizen. *See Martinez-de Ryan v. Whitaker*,

9   909 F.3d 247, 251 (9th Cir. 2018) (citing *Boutilier* to distinguish between conduct and a

10  "status or condition"); *c.f. Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d

11  1176, 1184 (9th Cir. 1988) (rejecting argument that a county charter's grant of

12  "unbounded discretion to schedule special elections in 'appropriate circumstances'" was

13  void for vagueness because "Appellants are not at risk of being punished for engaging in

14  ill-defined *proscribed conduct*" (emphasis added)). And a statute "is not vague because it

15  may at times be difficult to prove [a] . . . fact but rather because it is unclear as to what

16  fact must be proved." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)

17  (citing *United States v. Williams*, 553 U.S. 285, 306 (2008)); *c.f. Kay v. Mills*, 490 F.

18  Supp. 844, 850–52 (E.D. Ky. 1980) (finding statute void for vagueness because it did not

19  notify a presidential candidate of what it meant to be "generally advocated and nationally

20  recognized" in order to be placed on the preferential primary ballot). The void-for-

21  vagueness doctrine is inapplicable, as the Voting Laws clearly require county recorders to

22  investigate a registered voter's citizenship status.[20]

23         Promise Arizona's void-for-vagueness argument about § 16-165(A) fails for

24  similar reasons. The county recorder must cancel a voter's registration and refer the

---

[20] Even if the void-for-vagueness doctrine applies, § 16-165(I) is not unconstitutionally vague. The "reason to believe" standard in § 16-165(I) is not "so indefinite as to allow arbitrary and discriminatory enforcement," but is common in statutory drafting. *See, e.g.*, 15 U.S.C. § 56(b) ("Whenever the Commission has reason to believe that any person, partnership, or corporation is liable for a criminal penalty under this subchapter, the Commission shall certify the facts to the Attorney General . . . ."); 25 U.S.C. § 3206 (permitting examinations and interviews of children whom law enforcement officials "have reason to believe" were abused).

matter for investigation only after (1) the county recorder "confirms"[21] that the voter is not a citizen, (2) the county recorder notifies the voter that her registration will be cancelled in 35 days unless the voter provides DPOC, and (3) the voter fails to provide DPOC. § 16-165(A)(10). The first two requirements do not regulate or sanction a voter's conduct, while the third unambiguously informs voters that they must confirm their citizenship status within 35 days to avoid being de-registered and referred for criminal investigation.[22] (*See* State Reply at 39 (arguing § 16-165 regulates county recorders)); *Boutilier*, 387 U.S. at 123.

The Court grants the State's Motion on Promise Arizona's void-for-vagueness claim.

## III.   CONCLUSION

The NVRA was designed to enhance eligible voter participation in federal elections and lawfully regulates presidential elections. The Court finds Section 6 preempts H.B. 2492's restrictions on presidential elections and mail-in voting. The Court also concludes that H.B. 2243's systematic removal provisions violate the NVRA's 90-day Provision. The Court also finds that the Voting Laws' purge provisions are not unconstitutionally vague, yet there remain genuine issues of material fact as to whether the purge provisions violate the Civil Rights Act or enable Arizona to contravene Section 8. Lastly, the Court finds that the LULAC Consent Decree precludes Arizona from enforcing H.B. 2492's mandate to reject any State Form without accompanying DPOC.

The Checkbox Requirement does not violate the Materiality Provision as applied to individuals who submit a registration without DPOC. But the Court finds that Arizona

---

[21] Promise Arizona argues that § 16-165(A)(10) does not specify when a county recorder "'confirms', i.e., *believes*, that a registered voter is not a U.S. citizen." (Promise Arizona Resp. at 6.) But the provision clearly sets forth the sources of information that may confirm a registrant's non-citizenship.

[22] Promise Arizona's argument that these provisions empower county recorders to "decide" when to subject voters to "criminal liability" is unpersuasive. (Promise Arizona Resp. at 5.) County recorders only notify the attorney general of cancelled voter registrations for "*possible* investigation." § 16-165(A)(10) (emphasis added). It is the attorney general who investigates and must subsequently "prosecute individuals who are found not to be United States citizens" and who registered to vote "knowing" that they are "not entitled to such registration." *See* A.R.S. §§ 16-143(D), 16-182(A).

may not reject a voter registration that does not contain a checkmark in the box next to the question regarding citizenship when the person provides DPOC and is otherwise eligible to vote. There remain genuine issues of material fact as to the materiality of a person's place of birth in determining eligibility to vote and whether the Birthplace Requirement violates the Materiality Provision.

**IT IS ORDERED** granting Plaintiffs' Cross-Motion for Summary Judgment that Section 6 of the NVRA preempts H.B. 2492's restriction on registration for presidential elections and voting by mail (Doc. 391; Doc. 393);

**IT IS FURTHER ORDERED** granting Tohono O'odham Plaintiffs' Motion for Summary Judgment (Doc. 390) and declaring that A.R.S. § 16-123 references A.R.S. § 16-579(A)(1) for a list of documents that satisfy the documentary proof of location of residence requirement in A.R.S. § 16-123. The reference to § 16-579(a)(1) provides examples of documents, but is not an exhaustive list of the documents, that can be used to satisfy A.R.S. § 16-123.

**IT IS FURTHER ORDERED** declaring that A.R.S. § 16-123 does not require tribal members or other Arizona residents to have a standard street address for their home to satisfy A.R.S. § 16-123.

**IT IS FURTHER ORDERED** declaring that in addition to the documents listed in A.R.S. § 16-579(A)(1), the following documents satisfy the requirement in A.R.S. § 16-123:

o A valid unexpired Arizona driver license or nonoperating ID ("AZ-issued ID"), regardless of whether the address on the AZ-issued ID matches the address on the ID-holder's voter registration form and even if the AZ-issued ID lists only a P.O. Box.

o Any Tribal identification document, including but not limited to a census card, an identification card issued by a tribal government, or a tribal enrollment card, regardless of whether the Tribal identification document contains a photo, a physical address, a P.O. Box, or no address.

o Written confirmation signed by the registrant that they qualify to register

1    pursuant to A.R.S. § 16-121(B), regarding registration of persons who do not reside at a

2    fixed, permanent, or private structure.

3         **IT IS FURTHER ORDERED** granting Plaintiffs' Cross-Motion for Summary

4    Judgment that the Voting Laws violate Section 8(c) of the NVRA by allowing systematic

5    cancellation of registrations within 90 days of an election (Doc. 393; Doc. 396);

6         **IT IS FURTHER ORDERED** declaring that Arizona must abide by the LULAC

7    Consent Decree and register otherwise eligible State Form users without DPOC for

8    federal elections;

9         **IT IS FURTHER ORDERED** denying the RNC's Motion for Summary

10   Judgment as to whether Arizona can reject any State Form without accompanying DPOC

11   (Doc. 397);

12        **IT IS FURTHER ORDERED** denying the State's Motion for Summary

13   Judgment as to whether H.B. 2243 violates Section 8(a) by allowing unlawful

14   cancellation of registrations (Doc. 364);

15        **IT IS FURTHER ORDERED** granting in part and denying in part the State's

16   Motion for Summary Judgment as to whether the Voting Laws violate Section 8(b) by

17   mandating nonuniform and discriminatory list maintenance procedures (Doc. 364);

18        **IT IS FURTHER ORDERED** denying as moot LUCHA's Cross-Motion for

19   Summary Judgment under Sections 6 and 8(a) of the NVRA (Doc. 394);

20        **IT IS FURTHER ORDERED** granting in part and denying in part the State's

21   Motion for Summary Judgment as to whether the Voting Laws violate the Materiality

22   Provision of the Civil Rights Act by rejecting voter registrations that do not satisfy the

23   Checkbox Requirement (Doc. 364);

24        **IT IS FURTHER ORDERED** declaring that Arizona may not reject a voter

25   registration solely on the basis that the registration does not contain a checkmark in the

26   box next to the question regarding citizenship, if the applicant provides DPOC and is

27   otherwise eligible to vote;

28        **IT IS FURHTER ORDERED** denying the State's Motion for Summary

Judgment as to whether the Voting Laws' Birthplace Requirement violates the Materiality Provision of the Civil Rights Act (Doc. 364);

**IT IS FURTHER ORDERED** granting the State's Motion for Summary Judgment that the Voting Laws' purge provisions are not unconstitutionally vague (Doc. 364);

**IT IS FURTHER ORDERED** denying as moot Poder Latinx's Motion for Summary Judgment as to whether the Voting Laws violate § 10101(a)(2)(A) of the Civil Rights Act by applying different standards or procedures to voters that the county recorder has reason to believe are non-citizens (Doc. 397);

**IT IS FURTHER ORDERED** denying as moot the parties' Motions and Cross-Motions for Summary Judgment as to whether there is a private right of action under § 10101 of the Civil Rights Act (Doc. 367; Doc. 397; Doc. 399).

Dated this 13th day of September, 2023.

Susan R. Bolton
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Mi Familia Vota, et al., | No. CV-22-00509-PHX-SRB |
| Plaintiffs, | **ORDER** |
| v. | |
| Adrian Fontes, et al., | |
| Defendants. | |

In April 2023, the Speaker of the Arizona House of Representatives Ben Toma and President of the Arizona Senate Warren Petersen (collectively, the "Legislators") moved and were granted leave to intervene as defendants in this case. (Doc. 348, Mot. to Intervene; Doc. 363, 04/26/2023 Order.) The Legislators then invoked legislative privilege in response to Plaintiffs' discovery requests. (*See, e.g.*, Doc. 500-1, Ex. D.) Non-US Plaintiffs sought to compel discovery. (Doc. 502, Hr'g. Tr. at 87:7–88:9.) The Court ordered the parties to submit simultaneous briefs on the issue of whether the legislative privilege applies, which the parties filed on August 2, 2023. (Doc. 499, Defs.' Br.; Doc. 500, Pls.' Br.; Hr'g. Tr. at 87:7–88:20.)

**I.     PROCEDURAL HISTORY**

The history of this litigation is set out in the Court's previous Orders. (*E.g.*, Doc. 304, 02/15/2023 Order.) Plaintiffs claim that two recently enacted laws, H.B. 2243 and H.B. 2492 (the "Voting Laws"), are unlawful because they violate multiple federal laws and provisions of the Constitution. (*E.g.*, Doc. 67, LUCHA Compl. ¶¶ 329–35; Doc. 1,

22-cv-1381, AAANHPI Compl. ¶¶ 143–50.) No Plaintiff named the Legislators as defendants. (Pls.' Br. at 1.) However, under Arizona law, both the Speaker and President are "entitled to be heard" "[i]n any proceeding in which a state statute . . . is alleged to be unconstitutional." A.R.S. § 12-1841(A). The Speaker and the President may in their discretion either (1) intervene as a party, (2) file briefs in the lawsuit, or (3) choose not to participate in the lawsuit. *Id.* § 12-1841(D). The Legislators moved to intervene "in their official capacities, and on behalf of their respective legislative chambers." (Mot. to Intervene at 4.) Plaintiffs assert that the Legislators have since invoked the legislative privilege to "refuse to answer deposition questions regarding the enactment of the [Voting Laws], and . . . have objected to designating anyone to testify on behalf of their respective chambers under [Rule] 30(b)(6)" despite intervening to defend the Voting Laws on the merits. (Pls.' Br. at 1–3.)

## II.   LEGAL STANDARD & ANALYSIS

Legislative immunity grants state legislators "protection from criminal, civil, or evidentiary process that interferes with their 'legitimate legislative activity.'" *Puente Ariz. v. Arpaio*, 314 F.R.D. 664, 669 (D. Ariz. 2016) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)); *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732 (1980) (explaining that the legislative immunity of state legislators is "similar in origin and rationale" to that of Congresspeople). The legislative privilege, a corollary to legislative immunity, is a qualified privilege that shields legislators from compulsory evidentiary process. *Mi Familia Vota v. Hobbs*, -- F. Supp. 3d --, 2023 WL 4595824, at *4 (D. Ariz. July 18, 2023); *see United States v. Gillock*, 445 U.S. 360, 370–73 (1980) (limiting the scope of the legislative privilege for state legislators "where important federal interests are at stake, as in the enforcement of federal criminal statutes"). The legislative privilege is personal to each legislator. *Puente Ariz.*, 314 F.R.D. at 671.

### A.   The Legislators Waived the Legislative Privilege

Plaintiffs argue that the Legislators have waived their legislative privilege by voluntarily intervening in this lawsuit and putting their intent at issue. (Pls.' Br. at 5–7.)

Plaintiffs direct the Court to *Powell v. Ridge*, in which plaintiffs sued the Pennsylvania governor and state officials claiming that the public education funding system was racially discriminatory. 247 F.3d 520, 522 (3d Cir. 2001). Leaders of the state legislature intervened in the lawsuit, "citing their financial and legal interests in the litigation and the need to 'articulate to the Court the unique perspective of the legislative branch of the Pennsylvania government.'" *Id.* at 522–23. The legislators "explicitly concurred" in the other defendants' motion to dismiss but asserted the legislative privilege after the plaintiffs sought discovery. *Id.* at 523. The district court compelled discovery, after which the legislators appealed. *Id.* In dismissing the legislators' interlocutory appeal for lack of jurisdiction, the Third Circuit explained that the legislators "stray[ed] far beyond the bounds of traditional legislative immunity" by fashioning a "privilege which would allow them to continue to actively participate in [the] litigation by submitting briefs, motions, and discovery requests of their own, yet allow them to refuse to comply with, and most likely, appeal from every adverse order." *Id.* at 525.

The Legislators argue that *Powell* is distinguishable because the intervening defendants "had no statutory authority to intervene," whereas the Legislators "intervened in their official capacities pursuant to A.R.S. § 12-1841(D) to present their views on the State's interests." (Defs.' Br. at 7.) This argument would allow the Arizona Legislature to exercise its self-created right to intervene yet shield its leaders from ever waiving the legislative privilege. Like the defendants in *Powell*, the Legislators "are not seeking immunity from this suit," but instead seek to "actively participate in this litigation" yet avoid the burden of discovery regarding their legislative activities. *Powell*, 247 F.3d at 525. Plaintiffs did not seek discovery from the Legislators until the Legislators sought to "fully defend the laws passed by the legislature." (Mot. to Intervene at 4, 11.) The Legislators also specifically put their own motives for passing the Voting Laws at issue when denying Plaintiffs' allegations that the Arizona Legislature enacted the Voting Laws with discriminatory intent. (Pls.' Br. at 6; *see, e.g.*, Doc. 348-1, Ex. A, Ans. to AAANHPI Compl. at 16–18 ¶¶ 131, 147–50, (denying allegations that the Voting Laws are

1   intentionally discriminatory); Doc. 348-1, Ex. A, Ans. to LUCHA Compl. at 98 ¶¶ 337–38

2   (same).)

3          The Legislators contend that they have not waived the privilege because their

4   defense relies "solely upon the publicly available legislative history materials" instead of

5   any privileged information or the testimony of any legislator "regarding his or her

6   consideration of or passage of" the Voting Laws. (Defs.' Br. at 4–6.) The Legislators cite

7   *Democratic National Committee v. Arizona Secretary of State's Office*, which considered

8   whether political party and civic organization plaintiffs waived their First Amendment

9   privilege by challenging state election laws. No. CV-16-01065-PHX-DLR, 2017 WL

10  3149914, at *4 (D. Ariz. July 25, 2017). In finding that the plaintiffs had not waived the

11  privilege, the court noted that the plaintiffs used only publicly available information to

12  support their claims and that "[t]he privileged information that the State Defendants

13  [sought] evidently include[d] a substantial amount of proprietary predictive modeling and

14  strategic communications, none of which *go to the heart of the case* or to the State

15  Defendants' defense." *Id.* at *4–5 (emphasis added).

16         The Court is not persuaded by the Legislators' argument. Though the Legislators

17  "avow[] to the Court" that they will not rely on privileged information in support of their

18  defense, the information sought in discovery does in fact "go to the heart" of Plaintiffs'

19  claims and the constitutionality of the Voting Laws. *Id.* at 5; (Defs.' Br. at 6; *see* Plfs.' Br.

20  at 6.) "Motive is often most easily discovered by examining the unguarded acts and

21  statements of those who would otherwise attempt to conceal evidence of discriminatory

22  intent." *Harris v. Ariz. Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1071 (D. Ariz.

23  2014) (quoting *Cano v. Davis*, 193 F. Supp. 2d 1177, 1181–82 (C.D. Cal. 2002) (Reinhardt,

24  J., concurring in part and dissenting in part)). And contrary to the Legislators' argument,

25  the Court is not "[a]pplying a blanket waiver of legislative privilege" whenever Arizona's

26  legislative leaders intervene under § 12-1841(D), but instead finds that the Speaker and

27  President each waived their privilege by intervening to "fully defend" the Voting Laws and

28  putting their motives at issue. (*See* Defs.' Br. at 3.)

- 4 -

The Legislators assert that finding waiver would undermine the purpose of allowing for legislative participation in federal lawsuits, specifically, that "[p]ermitting the participation of lawfully authorized state agents promotes informed federal-court decisionmaking and avoids the risk of setting aside duly enacted state law based on an incomplete understanding of relevant state interests." (*Id.* at 2–3 (quoting *Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2202 (2022)). However, the *Berger* Court analyzed only whether legislative leaders possessed a legitimate interest to intervene in the lawsuit under Rule 24; the legislative privilege was not at issue. 142 S. Ct. at 2201–03 ("[F]ederal courts should rarely question that a State's interests will be practically impaired or impeded if its duly authorized representatives are excluded from participating in federal litigation challenging state law."). But the legislative privilege's animating purpose is "to allow duly elected legislators to discharge their public duties without concern of adverse consequences outside the ballot box," and "minimize[e] the distraction of diverting their time, energy, and attention from their legislative tasks to defend the litigation." *Lee v. City of Los Angeles*, 908 F.3d 1175, 1187 (9th Cir. 2018) (citation and internal quotation marks omitted) (cleaned up); *Kay v. City of Rancho Palos Verdes*, No. CV 02–03922 MMM RZ, 2003 WL 25294710, at *11 (C.D. Cal. Oct. 10, 2003) (indicating that the "underlying policy goal" of the privilege is to "protect[] legislators from interference with their legislative duties" (citation omitted)). "[T]he only reasonable inference from the Legislators' litigation conduct is that they have decided to forego that 'protection' in pursuit of an opportunity to defend in court their decisions as legislators . . . ." *Singleton v. Merrill*, 576 F. Supp. 3d 931, 941 (N.D. Ala. 2021) (cleaned up) (observing that the intervening legislator defendants "put in issue the very facts that they now assert their immunity covers").

The Court finds that the Legislators have waived their legislative privilege.[1] The Legislators must produce communications sent or received by either the Speaker or the

---

[1] Because the Court finds that the Speaker and President have waived the legislative privilege, it need not consider Plaintiffs' argument that the balance of factors favor overcoming the privilege. (*See* Pls.' Br. at 7–9.)

President which have been withheld on legislative privilege grounds. Plaintiffs may also depose the Legislators about their personal perspectives of the Voting Laws' legislative process. (*See* Pls.' Br. at 2–3.) However, "[t]he legislative privilege 'is a personal one,'" and the Speaker or President could not waive the privilege for their fellow legislators. *Puente Ariz.*, 314 F.R.D. at 671 (quoting *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 298 (D. Md. 1992)). To the extent Plaintiffs seek information held by other members of the Arizona Legislature, it remains protected by the legislative privilege.

### B. Plaintiffs May Not Depose the Arizona Legislature as an Entity

Federal Rule of Civil Procedure 30(b)(6) permits a party to depose a "public or private corporation, a partnership, an association, a governmental agency, or other entity," which then "must designate one or more officers, directors, or managing agents . . . to testify on its behalf." Plaintiffs seek to depose the Arizona House of Representatives and the Arizona Senate and assert that the Speaker and the President "have necessitated deposition testimony with respect to the legislature as an entity" by intervening "on behalf of their respective legislative chambers." (Pls.' Br. at 9–10.) Specifically, Plaintiffs seek to depose the Arizona Legislature about (1) the Legislature's "drafting, introduction, amendment, passage, and enactment" of the Voting Laws, (2) the Legislature's objectives, motives, and information considered when drafting and passing the Voting Laws, and (3) individual legislators' communications with other legislators or third parties. (*See* Doc. 499-1, Ex. 1, at 5–7.) The Legislators counter that Plaintiffs seek information protected by the legislative privilege and that a 30(b)(6) deposition is "unworkable in terms of preparing and identifying a single witness who can present binding testimony on behalf of the" Arizona Legislature. (Defs.' Br. at 8.)

The Court agrees with the Legislators that a 30(b)(6) deposition of the Arizona Legislature "would effectively force a waiver of every single legislator's individual legislative privilege. (Defs.' Br. at 8.) In *Alliance for Global Justice v. District of Columbia*, plaintiffs sought to compel the District of Columbia to produce a Rule 30(b)(6)

deponent to testify about the District Council's "collective knowledge" of its investigation into the District's "policing of mass demonstrations." 437 F. Supp. 2d 32, 34–35 (D.D.C. 2006). The District asserted that the Council's investigative activities were protected by the District's speech and debate statute.[2] *Id.* at 36. In declining to compel the District to produce a Rule 30(b)(6) deponent, the court explained:

> [T]he [District's] speech and debate statute shields from discovery the Council's knowledge and views of the report and of District policies. Plaintiffs are seeking testimony relating to a Council investigation, which was conducted as part of the Council's deliberative and legislative process. They also appear to be seeking testimony about the Council's understanding and interpretation of its own statutes. Both areas of testimony clearly fall within the "legislative sphere" and are shielded by the District's speech and debate statute. Therefore, to the extent that plaintiffs are arguing that the "collective knowledge" of the District includes the knowledge of and views of the Council, plaintiffs are not entitled to such testimony. *The fact that plaintiffs seek to obtain the Council's knowledge and views via a Rule 30(b)(6) deponent and disclaim any intention of directly questioning any Council member or staff is irrelevant.* By its very nature, a Rule 30(b)(6) deposition notice requires the responding party to prepare a designated representative [to testify] . . . on matters reasonably known by the responding entity. *That preparation would require the very type of intrusion into the Council's legislative activities that the speech and debate statute was intended to prevent.*

*Id.* at 37 (emphasis added).

Here, Plaintiffs similarly seek to compel the Arizona Legislature to designate (a) deponent(s) who "can testify as to the collective knowledge" of the Legislature.[3] (*See* Pls.'

---

[2] Though the court in *Alliance for Global Justice* considered the Council's evidentiary privilege in the context of the District's speech and debate statute, this does not change this Court's analysis. Legislative immunity for state legislators derives from the "interpretation of federal law" and does "not depend on the presence of a speech or debate clause in the constitution of any State." *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 404 (1979) (citing *Tenney*, 341 U.S. at 377); *Consumers Union of U.S., Inc.*, 446 U.S. at 732 (1980). And the logic underscoring legislative immunity "supports extending the corollary legislative privilege" to state legislators as well. *Lee*, 908 F.3d at 1187; *see Mi Familia Vota*, 2023 WL 4595824, at *7 (explaining that "both the legislative privilege and legislative immunity 'involve the core question whether a lawmaker may be made to answer—either in terms of questions or in terms of defending from prosecution'" (quoting *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 237 (5th Cir. 2023))).

[3] The parties dispute whether the appropriate defendants are the Speaker and the President or the Arizona House of Representatives and the Arizona Senate. (Doc. 500-1, Ex. C, at 45–46; Doc. 500-1, Ex. D, at 50.) The Court need not decide who is the appropriate defendant, as the legislative privilege shields the Arizona Legislature's legislative activities regardless. *See All. for Glob. Justice*, 437 F. Supp. 2d at 37 ("Regardless of who is the defendant, the speech and debate statute shields from discovery the Council's knowledge . . . .").

Br. at 9–10 (asserting that the Legislators "have necessitated deposition testimony with respect to the legislature as an entity").) And Plaintiffs' proposed deposition topics concern "legitimate legislative activities" that fall within the scope of the legislative privilege. *Tenney*, 341 U.S. at 376; *see Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983) ("Obtaining information pertinent to potential legislation or investigation is one of the things generally done in a session of the House, concerning matters within the legitimate legislative sphere." (internal citations and quotation marks omitted)); *Puente Ariz.*, 314 F.R.D. at 670–71 (finding the legislative privilege protects "a legislator's communications that bear on potential legislation" (citation and internal quotation marks omitted)); *Mi Familia Vota*, 2023 WL 4595824, at *8 (same); (Doc. 499-1, Ex. 1, at 5–7 (listing deposition topics).) The Court denies Plaintiffs' request to compel the Arizona House of Representatives and Senate to prepare a 30(b)(6) deponent to testify as to these topics because doing so would intrude upon the protections afforded by the legislative privilege. *All. for Glob. Justice*, 437 F. Supp. 2d at 37; *Puente Ariz.* 314 F.R.D. at 671 (analyzing the Arizona Legislature's waiver of the legislative privilege as an entity); *see also Marylanders for Fair Representation*, 144 F.R.D. at 299 (finding Maryland legislators' preparation and consideration of a legislative redistricting plan fell "within the sphere of legitimate legislative activity" and "*any* inquiry into the *Maryland Legislature's consideration* of [the plan] . . . [was] entirely barred" (second emphasis added)).

Plaintiffs alternatively ask the Court to prevent the Legislators from presenting arguments on behalf of the Arizona Legislature and require the Legislators to instead participate as defendants in their individual capacities. (Pls.' Br. at 10.) But the Speaker and the President are authorized to defend Arizona's statutes and the Court declines to limit their right to represent the Arizona Legislature's interests. A.R.S. § 12-1841(D); *N.C. State Conf. of the NAACP*, 142 S. Ct. at 2201 (explaining that "[s]tates possess 'a legitimate interest in the continued enforcement of their own statutes,'" which may "be practically impaired or impeded if [their] duly authorized *representatives* are excluded from participating in federal litigation challenging state law" (quoting *Cameron v. EMW*

- 8 -

*Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1011 (2022)) (cleaned up) (emphasis added)).

**III.    CONCLUSION**

The Speaker and the President have waived their legislative privilege as to information about their motives for the Voting Laws. The Speaker and President must produce communications that they have sent or received relating to the Voting Laws' legislative process and have withheld on legislative privilege grounds. They may also be deposed about their personal involvement in the Voting Laws' legislative process. Plaintiffs may not however conduct a 30(b)(6) deposition of the Arizona Legislature.

**IT IS ORDERED** granting in part and denying in part Plaintiffs' Motion to Compel (Doc. 500).

**IT IS FURTHER ORDERED** that the Speaker and the President must produce communications relating to the Voting Laws legislative process that they have sent or received and have withheld on legislative privilege grounds.

Dated this 14th day of September, 2023.

Susan R. Bolton
United States District Judge

1
2
3
4
5
6
7
8

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., | No. CV-22-00509-PHX-SRB |
| Plaintiffs, | **ORDER** |
| v. | |
| Adrian Fontes, in his official capacity as Arizona Secretary of State, et al., | |
| Defendants. | |
| **AND CONSOLIDATED CASES** | |

The Court now considers Defendants Mark Brnovich and the State of Arizona's (collectively, "Defendants") Consolidated Motion to Dismiss ("Motion") Plaintiffs' Complaints. (Doc. 127, "Mot.") For the following reasons, Defendants' Motion is denied except as to Plaintiffs' freestanding procedural due process claims.

I.      **BACKGROUND**

This case arises out of two Arizona laws regulating voting registration, H.B. 2243 and H.B. 2492 ("the Voting Laws"). The Voting Laws, effective January 1, 2023, enable government officials to require heightened proof of citizenship from Arizona registrants and mandate certain consequences if a registrant does not provide such proof. (*See generally* Doc. 169, Poder Latinx Compl.) Plaintiffs, the United States of America ("United States") and a collection of nonpublic entities ("Private Plaintiffs"), allege that

the Voting Laws are both statutorily and constitutionally unsound.[1] (*See, e.g.*, *id.* at ¶¶ 86–152.)

## A.    Recent History of Arizona Voting Laws

Arizona has required documentary proof of citizenship ("DPOC") from in-state voters since 2004. (Doc. 1, 22-cv-1124, USA Compl. ¶ 41.) An individual seeking to register to vote in Arizona state elections must provide one of the following forms of "evidence of citizenship":

> 1.  The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.
>
> 2.  A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.
>
> 3.  A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.
>
> 4.  A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.
>
> 5.  Other documents or methods of proof that are established pursuant to the Immigration Reform and Control Act of 1986.

---

[1] Plaintiff Mi Familia Vota describes itself as "a national, non-profit civic engagement organization with a mission of uniting Latino, immigrant, and allied communities to promote social and economic justice through increased civic participation by encouraging leadership development, citizenship, and issue organizing." (Doc. 65, Mi Familia Vota Compl. ¶ 16.) It "encourages non-partisan voter registration and voter participation and has challenged voter suppression around the nation." (*Id.*) Similarly, Plaintiff Voto Latino "is a 501(c)(4) nonprofit, social welfare organization that engages, educates, and empowers Latinx communities across the United States, working to ensure that Latinx voters are enfranchised and included in the democratic process. In furtherance of its mission, Voto Latino expends significant resources to register and mobilize thousands of Latinx voters each election cycle." (*Id.* ¶ 19.) "Voto Latino considers eligible Latinx voters in Arizona to be the core of its constituency." (*Id.*) Apart from the United States, the remaining Plaintiffs allege similar interests in maximizing voter turnout among certain communities, including Native Americans, Asian Americans, and Democratic voters in general. (*See, e.g.*, Doc. 1, 22-cv-1381, AZ AANHPI For Equity Coalition Compl. ("AAANHPI Compl.") ¶¶ 30–31; Doc. 67, Living United for Change in Arizona Am. Compl. ("LUCHA Compl.") ¶¶ 254–60.)

ER - 0161

6. The applicant's Bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number.

Ariz. Rev. Stat. § 16-166(F).

In addition to providing applicants a State Form to register for state and federal elections, Arizona also provides a form created by the United States Election Assistance Commission, known as the Federal Form, to register for federal elections only. *See Gonzales v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012). The Federal Form requires applicants to check a box under penalty of perjury indicating that they are citizens of the United States ("Check Box Requirement"). (AAANHPI Compl. ¶ 42.)

Arizona had previously imposed a DPOC requirement on applicants using the Federal Form. In 2004, Arizona passed a law requiring all applicants for voter registration, regardless of whether they used the Federal or State Form, to provide DPOC in order to register. (USA Compl. ¶ 41.) In 2013, the United States Supreme Court held that the National Voter Registration Act ("NVRA") preempted Arizona's requirement as applied to applicants using the Federal Form. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 20 (2013). The Federal Form contains "only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1). Because the NVRA mandates that states "accept and use" the Federal Form—which does not require applicants to provide DPOC—the *Inter Tribal* Court held that Arizona could not "requir[e] a Federal Form applicant to submit information beyond that required by the form itself," including DPOC. 570 U.S. at 12, 20 ("States retain the flexibility to design and use their own registration forms, but the Federal Form provides a backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be

- 3 -

available."); (AAANHPI Compl. ¶ 42.)[2]

Plaintiffs allege that ever since *Inter Tribal Council*, Arizona has attempted to disenfranchise certain voters. In 2018, the Arizona Secretary of State entered into a Consent Decree with Plaintiff League of United Latin American Citizens ("LULAC") after the nonprofit sued the state for allegedly discriminating against registrants who used the State Form without providing DPOC. (*See* Doc. 37, 2:17-cv-04102-DGC, LULAC Consent Decree; AAANHPI Compl. ¶ 46.) Plaintiffs explain that under the LULAC Consent Decree, Arizona must "(1) treat all registrants the same regardless of whether they use the state form or Federal Form, registering all voters for federal elections regardless of provided evidence of citizenship; and (2) check the motor vehicles database for citizenship documentation before limiting voters to federal-only elections." (Mi Familia Vota Compl. ¶¶ 44–45.)

### B.   The Voting Laws Passed in 2022

#### 1.   H.B. 2492

Former Arizona Governor Doug Ducey signed H.B. 2492 into law on March 30, 2022. (*See id.* ¶ 3.) H.B. 2492 created additional requirements for individuals using either the Federal or State Form. Specifically, the statute mandates registrants show DPOC and Documentary Proof of Residence ("DPOR") through the following provisions:

> Requirements for proper registration
> A person is presumed to be properly registered to vote on completion of a registration form . . . that contains at least the name, the residence address or the location, proof of location of residence as prescribed by Section 16-123, the date and place of birth and the signature . . . of the registrant . . . and a checkmark or other appropriate mark in the "yes" box next to the question regarding citizenship. Any application for registration, including an application on a form prescribed by the United States Election Assistance Commission, must contain a checkmark or other appropriate

---

[2] The differences between Arizona's state and federal voting registration create different voter rolls depending on when a voter registered. As described by Plaintiffs:
> Arizona has three classes of voters: (1) those who registered pre-2005 and did not have to show documentary proof of citizenship (because Arizona did not yet require it), who can vote in all elections; (2) those who registered post-2005 using the [Federal Form] . . . and did not show documentary proof of citizenship, who can vote only in federal elections; and (3) those who registered post-2005 and showed adequate proof of citizenship, who can vote in all elections.
(Mi Familia Vota Compl. ¶¶ 2, 43.)

mark in the "yes" box next to the question regarding citizenship as a condition of being properly registered to vote as either a voter who is eligible to vote a full ballot or a voter who is eligible to vote only with a ballot for federal offices. . . .

Proof of location of residence
Except for persons who register pursuant to Section 16-103, a person who registers to vote shall provide an identifying document that establishes proof of location of residence. Any of the identifying documents prescribed in Section 16-579, Subsection A, Paragraph 1 constitutes satisfactory proof of residence.

H.B. 2492 §§ 4(A), 5. The Federal Form does not require an applicant to list her place of birth ("the Birthplace Requirement"). (*See* AAANHPI Compl. ¶ 63; DNC Compl. ¶ 41.)

The documents with which an individual can show DPOR are:

(a) A valid form of identification that bears the photograph, name and address of the elector that reasonably appear to be the same as the name and address in the precinct register, including an Arizona driver license, an Arizona nonoperating identification license, a tribal enrollment card or other form of tribal identification or a United States federal, state or local government issued identification. Identification is deemed valid unless it can be determined on its face that it has expired.

(b) Two different items that contain the name and address of the elector that reasonably appear to be the same as the name and address in the precinct register, including a utility bill, a bank or credit union statement that is dated within ninety days of the date of the election, a valid Arizona vehicle registration, an Arizona vehicle insurance card, an Indian census card, tribal enrollment card or other form of tribal identification, a property tax statement, a recorder's certificate, a voter registration card, a valid United States federal, state or local government issued identification or any mailing that is labeled as "official election material". Identification is deemed valid unless it can be determined on its face that it has expired.

(c) A valid form of identification that bears the photograph, name and address of the elector except that if the address on the identification does not reasonably appear to be the same as the address in the precinct register or the identification is a valid United States military identification card or a valid United States passport and does not bear an address, the identification must be accompanied by one of the items listed in subdivision (b) of this paragraph.

Ariz. Rev. Stat. § 16-579(A)(1). Unlike preexisting Arizona law, H.B. 2492 contains no exceptions to the DPOR requirement for applicants who do not have numbered street addresses. (LUCHA Compl. ¶¶ 28, 40.)

The statute also mandates different requirements for applicants using the Federal or State Form:

Except for a form produced by the United States Election Assistance Commission, any application for registration shall be accompanied by

satisfactory evidence of citizenship as prescribed in Section 16-166, Subsection F, and the County Recorder . . . shall reject any application for registration that is not accompanied by satisfactory evidence of citizenship.

H.B. 2492 § 4(C).

Federal only voters; early ballot; eligibility
1.  A person who has registered to vote and who has not provided satisfactory evidence of citizenship as prescribed by Section 16-166, Subsection F is not eligible to vote in presidential elections.
2.  A person who has not provided satisfactory evidence of citizenship pursuant to Section 16-166, Subsection F and who is eligible to vote only for federal offices is not eligible to receive an early ballot by mail.

*Id.* § 5(A).

The statute places the burden on County Recorders to implement the provisions of H.B. 2492. A County Recorder "shall cancel a registration" when "the County Recorder receives and confirms information that the person registered is not a United States citizen." *Id.* § 8(A)(10). Election officials also have duties to verify registrants' citizenship. "Within ten days after receiving an application for registration [through the Federal Form] that is not accompanied by [DPOC], the county recorder or other officer in charge of elections shall use all available resources to verify the citizenship status of the applicant." *Id.* § 4(D). The statute prescribes a specific verification process:

. . . [A]t a minimum, [the election official] shall compare the information available on the application for registration with the following, provided the county has access:
1.  The Department of Transportation databases of Arizona diver licenses or nonoperating identification licenses.

2.  The Social Security Administration databases.

3.  The United States Citizenship and Immigration Services Systemic Alien Verification for Entitlements program, if practicable.

4.  A National Association for Public Health statistics and information systems electronic verification of vital events system.

5.  Any other state, city, town, county or federal database and any other database relating to voter registration to which the County Recorder . . . has access, including an electronic registration information center database.

*Id.*

The statute provides for three different outcomes from this verification. First, if the election official "matches the applicant with information that verifies the applicant is a United States citizen . . . the applicant shall be properly registered." *Id.* § 4(E). Second, if

- 6 -

the election official "matches the applicant with information that the applicant is not a United States citizen, the County Recorder . . . shall reject the application, notify the applicant that the applicant was rejected because the applicant is not a United States citizen and forward the application to the county attorney and Attorney General for investigation." *Id.* Third, if the election official "is unable to match the applicant with appropriate citizenship information, the [official] shall notify the applicant that [her citizenship could not be verified] and that the applicant will not be qualified to vote in a presidential election or by mail with an early ballot in any election until satisfactory evidence of citizenship is provided." *Id.*

Lastly, the statute provides for prosecution of certain registrants referred for investigation. Election officials must "make available to the Attorney General a list of all individuals who are registered to vote and who have not provided satisfactory evidence of citizenship pursuant to Section 16-166." *Id.* § 7(A). The Attorney General must then use "all available resources to verify the citizenship" of the referred applicants and "at a minimum shall compare the information available on the application for registration" with the same databases listed in § 4(D) of the statute. *Id.* § 7(B). "The Attorney General shall prosecute individuals who are found to not be United States citizens pursuant to Section 16-182." *Id.* § 7(D).

Both parties detail the application and impact of H.B. 2492. Plaintiffs allege that absent such proof of citizenship as described in H.B. 2492, (1) new registrants cannot use the Federal Form to vote in presidential elections or vote by mail in elections for any office unless they provide additional documentation; (2) currently registered voters who registered using the Federal Form without proof of citizenship cannot vote in presidential elections or vote by mail for any office; and (3) approximately 200,000 Arizona voters who never had to provide proof of citizenship upon registration cannot vote in presidential elections, unless they provide additional documentation of citizenship. (*See* Mi Familia Vota Compl. ¶¶ 3, 43, 63.) In Defendants' words, "if you file the Federal Form, you will be registered for congressional elections. And if, in the course of . . .

- 7 -

subsequent list maintenance they discover not the absence of evidence of citizenship, but proof that you are not a citizen, you will be deregistered. [I]f you file the State Form . . . [y]ou need to provide documentary proof of citizenship or you won't be registered." (Hr'g Tr. at 30:14–21.)

Plaintiffs further describe that "[t]he law provides no details concerning how long-registered voters will be notified that they must provide new documents, or how they will be given an opportunity to do so." (Mi Familia Vota Compl. ¶¶ 3, 65.) Plaintiffs also allege that there is no cutoff date in the statute by which a registration must be cancelled, meaning "nothing prevent[s] the county recorder or other election official from removing a voter from the rolls, or otherwise blocking them from voting by mail or in presidential elections, weeks or even days before an election, when it is too late for the affected voters to correct any error." (Doc. 1, 22-cv-1369, Democratic National Committee Compl. ("DNC Compl.") ¶ 39.)

### 2.   H.B. 2243

On July 6, 2022, Governor Ducey signed H.B. 2243 into law. (LUCHA Compl. ¶ 18.) According to Plaintiffs, H.B. 2243 reenforces and extends several of the requirements imposed by H.B. 2492. Like H.B. 2492, H.B. 2243 provides for cancellation of registration and investigation of registrants should they fail to meet certain requirements. (AAANHPI Compl. ¶ 84 (citing H.B. 2243 § 2).) H.B. 2243 also adds verification deadlines for registrants and mandates that election officials perform additional verification procedures. Specifically,

> When the County Recorder obtains information pursuant to this Section and confirms that the person registered is not a United States citizen . . . [b]efore the County Recorder cancels a registration pursuant to this paragraph, the County Recorder shall send the person notice by forwardable mail that the person's registration will be canceled in thirty five days unless the person provides satisfactory evidence of United States citizenship pursuant to Section 16-166. The notice shall include a list of documents that person may provide and a postage prepaid preaddressed returned envelop. If the person registered does not provide satisfactory evidence within thirty five days, the County Recorder shall cancel the registration and notify the county attorney and Attorney General for possible investigation.

H.B. 2243 § 2(A)(10).

Plaintiffs point out that not all registrants suspected of being ineligible to vote in Arizona are subject to a 35-day deadline[3] to provide documentation. (*See* AAANHPI Compl. ¶¶ 16–18, 60.) Certain registrants suspected of lacking Arizona residency are subject to a more lenient response deadline under the statute:

> Each month the Department of Transportation shall furnish to the Secretary of State . . . a list of persons who the Department has been notified have been issued a driver license . . . in another state. [After receiving this list from the Secretary of State,] [t]he County Recorder shall promptly send notice by forwardable mail to each person who has obtained a driver license . . . in another state and a postage prepaid preaddressed return form requesting the person confirm by signing under penalty of perjury that the person is a resident of this state and is not knowingly registered to vote in another state . . . . If the person returns the form within ninety days confirming that the person is a resident of this state, the County Recorder shall maintain the registration in active status. If the person fails to return the form within ninety days, the County Recorder shall place the person's registration in inactive status.

H.B. 2243 § 2(E).

H.B. 2243 also mandates monthly review and potential purging of voter rolls. Specifically,

> To the extent practicable, each month the County Recorder shall compare persons who are registered to vote in that county and who the county recorder has reason to believe are not United States citizens and persons who are registered to vote without satisfactory evidence of citizenship as prescribed by Section 16-166 with the Systemic Alien Verification for Entitlements program maintained by the United States Citizenship and Immigration Services to verify the citizenship status of the persons registered.

*Id.* § 2(H). County Recorders must conduct similar checks with the Social Security Administration Database, Verification of Vital Events System, and "relevant city, town, county, state and federal databases to which the County Recorder has access to confirm information obtained that requires cancellation of registrations pursuant to this Section." *Id.* § 2(G), (I)–(J).

Lastly, "[a]fter cancelling a registration pursuant to this Section, the County Recorder shall send a notice by forwardable mail informing the person that the person's

---

[3] Plaintiffs add that Governor Ducey vetoed a previous version of H.B. 2243, expressing his concerns that the previous bill risked "disturb[ing]" the right to vote "without sufficient due process." (*See* AAANHPI Compl. ¶¶ 57–58.) The previous bill gave individuals suspected of lacking United States citizenship 90 days to provide DPOC. (*Id.* ¶ 60.) H.B. 2243, as enacted, reduced that response period to 35 days. (*Id.*)

registration has been cancelled, the reason for cancellation, the qualifications of electors pursuant to Section 16-101 and instructions on registering to vote . . . ." *Id.* § 2(K).

### C.   Legality of the Voting Laws

Plaintiffs claim that the Voting Laws are illegal in multiple respects.

#### 1.   Preemption Under *Inter Tribal Council*

Plaintiffs allege that "[i]n essence, H.B. 2492 creates three distinct voter rolls in Arizona—one for all local, state, and federal elections, one for U.S. House and Senate elections, and one for Presidential elections." (AAANHPI Compl. ¶ 72.) Under *Inter Tribal Council*, as interpreted by Plaintiffs, the NVRA preempts Arizona's requirement that Federal Form users provide DPOC in order to vote for President. (*E.g.* Mi Familia Vota Compl. ¶¶ 97–99.) The United States details that during legislative hearings on H.B. 2492, legislative counsel warned that the NVRA would preempt the statute's DPOC requirement for Federal Form users. (USA Compl. ¶ 45 (referencing *Inter Tribal Council*, 570 U.S. at 20).) House Speaker Pro Tempore Travis Grantham responded that defending H.B. 2492 would be a "fight worth having" in court. (*Id.* ¶ 46; LUCHA Compl. ¶ 209.)

#### 2.   Arbitrary & Discriminatory Verification of Citizenship

Plaintiffs also contend that the citizenship verification requirements in the Voting Laws threaten to illegally disenfranchise thousands of Arizonans.

After attempting to verify a registrant's citizenship, County Recorders must "cancel a registration . . . when the [Recorder] receives and confirms information that the person registered is not a United States citizen," but the statute does not define what "confirms information" means in this context. (AAANHPI Compl. ¶ 82.) Plaintiffs add that the databases used to "confirm" citizenship are "outdated and inaccurate," which subjects naturalized citizens who might erroneously appear in those databases to disproportionate scrutiny.[4] (*Id.* ¶¶ 73, 86; Poder Latinx Compl. ¶ 127.) Plaintiffs allege on

---

[4] Plaintiffs posit that the DPOC requirement "disproportionately affect[s] . . . not only Arizona voters who are naturalized citizens . . . but also those who are racial minorities, elderly, or recently turned 18 years old, because the law singles out for disparate treatment 'federal only' voters, who disproportionately have these characteristics." (DNC Compl. ¶ 40.)

1    information and belief that the Systemic Alien Verification for Entitlements database
2    only contains information on naturalized and derived citizens, not citizens born in the
3    United States. (Poder Latinx Compl. ¶ 53.) Compounding the alleged risk of arbitrary and
4    inaccurate enforcement of the verification requirements, "[certain] of these databases
5    were [not] designed to capture or reflect current citizenship status." (DNC Compl. ¶¶ 36–
6    37.) Plaintiffs relatedly allege that H.B. 2243's "reason to believe" investigation criterion
7    "essentially allows anyone, without evidence, to simply give a list of names of people
8    who are purportedly not citizens to the county recorders, thus triggering a check that can
9    lead to improperly cancelled voter registrations and potential investigation and
10   prosecution of eligible and registered Arizonans." (AAANHPI Compl. ¶ 86.)

11         Further, Plaintiffs assert that the Voting Laws intentionally target protected groups
12   for investigation, registration cancellation, and prosecution. "AANHPIs and other ethnic
13   groups. . . are disproportionately likely to lack the forms of identification required under
14   H.B. 2492 and H.B. 2243 to register to vote and remain on the voter rolls." (*Id.* ¶ 90.)
15   And because AANHPIs and Latinos "comprise a large proportion of naturalized citizens
16   in Arizona and the population of AANHPIs and other ethnic groups in Arizona is rapidly
17   increasing, the birthplace, DPOC, and DPOR requirements imposed by [the Voting
18   Laws] on naturalized citizens has a disproportionate impact" on these protected groups.
19   (*See id.* ¶ 91 (11,000 Arizona residents naturalized each year between 2014 and 2020,
20   with the largest proportion from Mexico, followed by "Asiatic countries"); LUCHA
21   Compl. ¶ 156 (Voting Laws burden "eligible Latino and language minority voters").) To
22   support their claim that this disparate impact is deliberate, Plaintiffs point to the allegedly
23   unsubstantiated statements of Representative Jake Hoffman, H.B. 2492's sponsor, that
24   Arizona's elections are compromised by fraud and count the votes of "non-U.S. citizen
25   voters." (LUCHA Compl. ¶¶ 201–02.) Plaintiffs also allege that H.B. 2243's criterion for
26   enhanced scrutiny of a registrant—"reason to believe" that a registrant is not a United
27   States citizen—invites racial and national origin discrimination. (Poder Latinx Compl.
28   ¶¶ 7, 41; *see* AAANHPI Compl. ¶¶ 85–86, 88.)

- 11 -

### 3.    Discriminatory Affirmation of Citizenship

Plaintiffs also take issue with the Check Box and Birthplace Requirements. (*E.g.* LUCHA Compl. ¶ 273; USA Compl. ¶¶ 57–61.) The United States alleges that by requiring election officials to reject a registration form without the requisite check mark when an applicant has already affirmed citizenship under penalty of perjury and provided DPOC, H.B. 2492 denies "qualified individuals the right to vote" based on an immaterial "technical[ity]." (USA Compl. ¶¶ 57–61.) Private Plaintiffs allege "on information and belief, the birthplace requirement will only be used to identify naturalized citizens for differential, unequal treatment by the state and will act to chill voter registration of AANHPIs, naturalized citizens, and other voters of color in a disproportionate manner." (AAANHPI Compl. ¶ 94.) Relatedly, Plaintiffs contend that such added complexities of properly registering to vote risk disenfranchising "language minority" groups in Arizona, including Arizona's naturalized Latino population. (LUCHA Compl. ¶¶ 186–91.)

### 4.    Discriminatory Documentary Proof of Residence

Plaintiffs assert that "because many residences on Indian reservations in Arizona lack a numbered street address or residential address, many enrolled members of tribes are likely to be prevented from voting by the DPOR requirement." (*Id.* ¶ 29.) Indeed, Plaintiff San Carlos Apache Tribe alleges that on the San Carlos Apache Reservation, "many residences are not assigned a physical numbered street address. Instead, members of the Tribe commonly describe where they live using . . . mile markers on Route 70, Bureau of Indian Affairs' Indian Routes, or other landmarks and distances." (*Id.* ¶ 32.) The Tribe's members often lack documents bearing their name and residential address and will be unable to satisfy H.B. 2492's DPOR requirement. (*Id.* ¶ 35.) Plaintiffs add that the "experience for citizens of the San Carlos Apache is also the norm for many other Tribal citizens residing on the reservations of . . . other . . . Tribes in Arizona."[5] (*Id.* ¶ 38.)

---

[5] In addition to specific protected groups that risk disenfranchisement under the Voting Laws, Plaintiffs claim that the DPOR requirement will prevent other Arizonans from voting. For example, students living and eligible to vote in Arizona often carry out of state drivers' licenses and cannot pay to obtain an additional Arizona state identification. (LUCHA Compl. ¶ 241.) These would-be voters will be unable to meet the DPOR requirement. (*Id.*)

The DPOR requirement will consequently "burden a substantial portion of the Native population in Arizona, and this burden will be unique when compared to other eligible Arizona voters."[6] (*Id.* ¶ 139.)

### 5. The Parties' Interests

Plaintiffs claim that Arizona has no legitimate reason for the Birthplace Requirement when individuals must already provide DPOC to vote in state elections, and such unnecessary emphasis on national origin evidences the discriminatory intent behind the Birthplace Requirement. (*See* AAANHPI Compl. ¶ 94.) Relatedly, Plaintiffs argue that there is "no evidence of widespread voter fraud or non-U.S. citizen voting in Arizona." (LUCHA Compl. ¶¶ 198–99.) Arizona cannot, according to Plaintiffs, identify even a rational state interest served by "the DPOC requirement, Birthplace Requirement, Checkmark Requirement, or the mandated use of outdated and incorrect citizenship data to reject voter registration applications and purge eligible voters from the rolls." (*Id.* ¶ 197; *see* USA Compl. ¶¶ 49, 53–54.) Plaintiffs forecast that "the restrictions imposed by HB 2492 and HB 2243 will not enhance electoral security. Instead, they will make voter registration rolls less reliable, and will undermine the public's confidence in Arizona's elections." (LUCHA Compl. ¶ 204.)

All Plaintiffs have asserted interests against the enforcement of the Voting Laws. Specifically, several Private Plaintiffs allege that implementation of the Voting Laws will harm both the entities and their respective constituents. (*See, e.g.*, AAANHPI Compl. ¶¶ 101–12.) These Plaintiffs claim that the Voting Laws have forced and will force them to divert organizational resources to "train [their] staff and volunteers on the new regulations and educate potential voters, who often have limited English proficiency, on the additional documentation required to register to vote." (*Id.* ¶¶ 101–02.) Without the alleged barriers to voting imposed by the Voting Laws, "Plaintiff[s] would have the ability to use [their] limited resources in reaching out to more voters through . . . voter

---

[6] Plaintiffs also claim that H.B. 2492's disproportionate impact on Native Americans is intentional, in that the Arizona Legislature aims to repress the "increased political mobilization by Native voters" seen in the 2020 presidential election. (LUCHA Compl. ¶¶ 149–50.)

registration, mobilization, and participation efforts." (*Id.* ¶ 102.) Further, certain Private Plaintiffs assert that the Voting Laws will diminish the impact of their work, as some of their constituents will be removed from voter rolls and deterred from voting or registering. (*Id.* ¶¶ 101–05, 112.)

As for Defendants, they assert that the Voting Laws advance Arizona's interest in "reducing administrative burdens," "securing its elections," and "maintaining voter confidence." (Mot. at 16.)

### D.      Procedural History

On March 31, 2022, Mi Familia Vota Plaintiffs[7] filed their Complaint in this Court. (Doc. 1, 03/31/2022 Mi Familia Vota Compl.) The United States and additional Private Plaintiffs subsequently filed lawsuits attacking the legality of the Voting Laws. These lawsuits have been consolidated into the instant case. (*E.g.* Doc. 164, 11/10/2022 Order re: Consolidation.) All Plaintiffs make at least one of the following claims: the Voting Laws (1) place an undue burden on the right to vote, violating the First and Fourteenth Amendments of the United States Constitution; (2) enable arbitrary and disparate treatment of voters, violating the Equal Protection Clause of the Fourteenth Amendment ("Equal Protection Clause"); (3) enable national origin discrimination in violation of the Fourteenth Amendment; (4) discriminate based on race, violating the Fourteenth and Fifteenth Amendments; (5) deprive procedural due process (6) violate § 10101 of the Civil Rights Act of 1964; (7) violate Sections 5, 6, and 8 of the NVRA; and (8) violate the Voting Rights Act.

On September 16, 2022, Defendants[8] filed the Motion, to which Plaintiffs filed their Oppositions on October 17, 2022. (Mot.; Doc. 150, Mi Familia Opp'n; Doc. 151, Democratic National Committee Opp'n ("DNC Opp'n"); Doc. 152, United States Opp'n; Doc. 153, Living United for Change in Arizona Opp'n ("LUCHA Opp'n"); Doc. 154,

---

[7] The Court references organizational Plaintiffs that have filed collectively under the name of one organization. "LUCHA Plaintiffs," for example, includes all additional Plaintiffs that are named on the briefing with LUCHA.

[8] Plaintiffs also sued the Arizona Secretary of State and all Arizona County Recorders in their official capacities. (*E.g.*, Mi Familia Vota Compl. ¶¶ 22, 24–39.) These Defendants did not join the Motion. (*See* Mot.)

1    Poder Latinx Opp'n; Doc. 89, 22-cv-1381, AAANHPI Opp'n.) Defendants filed their

2    Consolidated Reply on November 23, 2022. (Doc. 180, Reply.) The Court held oral

3    argument on the Motion on December 15, 2022. (Doc. 187, Min. Entry.)

4    **II.    LEGAL STANDARDS & ANALYSIS**

5           Defendants argue that Plaintiffs lack standing to sue and bring unripe claims.

6    (Mot. at 9–13.) Defendants alternatively argue that Plaintiffs have failed to state claims

7    that the Voting Laws are unlawful. (*Id.* at 14–30.) The Court addresses each argument in

8    turn.

9           **A.    Rule 12(b)(1)**

10          Rule 12(b)(1) allows parties to move to dismiss for lack of subject matter

11   jurisdiction. As courts of limited jurisdiction, federal courts may only hear cases as

12   permitted by Congress and the U.S. Constitution. *See Kokkonen v. Guardian Life Ins.*

13   *Co.*, 511 U.S. 375, 377 (1994). Federal jurisdiction is therefore presumed absent until the

14   claimant demonstrates otherwise. *Id.* "A Rule 12(b)(1) jurisdictional attack may be facial

15   or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial

16   attack "assert[s] that the allegations contained in a complaint are insufficient on their face

17   to invoke federal jurisdiction." *Id.* The court accepts the plaintiff's allegations as true and

18   draws all reasonable inferences in the plaintiff's favor. *Leite v. Crane Co.*, 749 F.3d 1117,

19   1121 (9th Cir. 2014). From there, the court "determines whether the allegations are

20   sufficient as a legal matter to invoke the court's jurisdiction." *Id.* A factual attack

21   challenges the underlying factual allegations by introducing evidence beyond the

22   pleadings. *Id.* In either instance, the party asserting jurisdiction bears the burden of proof.

23   *Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990).

24          **1.    Standing**

25          Under Article III of the United States Constitution, a plaintiff does not have

26   standing unless it can show (1) an "injury in fact" that is concrete and particularized and

27   actual or imminent, not hypothetical; (2) that the injury is fairly traceable to the

28   challenged action of the defendant; and (3) that it is likely, as opposed to merely

- 15 -

speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Id.* at 561. In cases for prospective injunctive relief, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Rather, a plaintiff's "standing to seek the injunction requested depend[s] on whether he [is] likely to suffer future injury." *Id.* at 105. When addressing behavior that is alleged to increase the risk of future injury, the future injury must be "certainly impending." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013). Plaintiffs must establish standing "for each claim for relief." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020).

"[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). Organizations cannot "manufacture the injury by incurring litigation costs," but they can show standing when they "would have suffered some other injury had they not diverted resources to counteracting the problem." *Id.* (internal quotations omitted). And even if the diversion-of-resources injury is "broadly alleged," such allegations are still "sufficient to establish organizational standing at the pleading stage." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (citation omitted). Moreover, "[o]nly one plaintiff needs to have standing when only injunctive relief is sought." *DNC v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018) (citing *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007)) (finding standing where Arizona Democratic Party and additional private plaintiffs requested injunctive and declaratory relief against Arizona election law), *aff'd sub nom. DNC v. Hobbs*, 9 F.4th 1218, 1219 (9th Cir. 2021) (Mem.); *Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022) ("In a suit with multiple plaintiffs, generally only one plaintiff need have standing for the

Case: 24-3188, 07/29/2024, DktEntry: 102.2, Page 176 of 194
Case 2:22-cv-00509-SRB   Document 304   Filed 02/16/23   Page 17 of 35

(176 of 194)

1    suit to proceed."); *c.f. We Are America/Somos America, Coal. of Arizona v. Maricopa*
2    *Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1091 (D. Ariz. 2011) (district court is not
3    "strictly prohibit[ed]" from considering multiple plaintiffs' standing, despite "general
4    rule" on appeal that only one plaintiff need have standing).

5              Plaintiffs have standing to sue.[9] Defendants concede that the United States has
6    standing to bring its claims. (*See* Hr'g Tr. at 6:22–7:3.) Private Plaintiffs have also
7    established organizational standing. LUCHA Plaintiffs plausibly allege that the Voting
8    Laws will force LUCHA, which has previously conducted voter registration and
9    education activities and plans to continue these activities in the future, to "divert money,
10   personnel, time, and resources away from other activities" as a result of the requirements
11   imposed by the Voting Laws. (LUCHA Compl. ¶¶ 214–16, 223–24.) LUCHA also serves
12   naturalized citizens, and as explained below Plaintiffs have plausibly alleged that this
13   group will be disproportionately disenfranchised under the Voting Laws. (*Id.* ¶¶ 211–13;
14   *infra* II(B)(1)(a), (2)(a).) LUCHA anticipates not only that some its "assisted voters" will
15   be prevented from voting by the Voting Laws' DPOC and DPOR requirements, but also
16   that many of the individuals it seeks to mobilize will be "intimidated and discouraged
17   from registering to vote, even though they are eligible, because of the unconstitutional
18   limits imposed on the exercise of their franchise by H.B. 2492 and H.B. 2243." (LUCHA
19   Compl. ¶¶ 218–19.) LUCHA has standing to sue. *See Reagan*, 329 F. Supp. 3d at 841
20   (finding standing where "the new law injures the [organizational plaintiff] by compelling
21   [it] to devote resources to getting to the polls those of its supporters who would otherwise
22   be discouraged by the new law from bothering to vote." (citation omitted)). The Court
23   need not assess whether additional Plaintiffs have standing.

24                          **2.    Ripeness**

25             Defendants also argue that Plaintiffs' claims are constitutionally and prudentially
26   unripe. (Mot. at 12–14.) A claim is constitutionally ripe when a plaintiff's injury is

---

[9] Defendants argue that Plaintiffs' claims are not redressable through the instant suit, as
Plaintiffs have not named any County Recorders as Defendants. (Mot. at 2, 11–12.) All
Arizona County Recorders are now named as Defendants in this action.

1    "definite and concrete, not hypothetical or abstract." *Thomas v. Anchorage Equal Rights*

2    *Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (citation omitted). When

3    evaluating the existence of a definite injury, courts consider whether "plaintiffs have

4    articulated a concrete plan to violate the law in question, whether the prosecuting

5    authorities have communicated a specific warning or threat to initiate proceedings, and

6    the history of past prosecution or enforcement under the challenged statute." *Id.* (internal

7    quotation marks and citation omitted). Under the last prong, "the government's active

8    enforcement of a statute [may] render . . . the plaintiff's fear [of injury] . . . reasonable."

9    *Id.* at 1140. To minimize any chilling effect from an unwarranted First Amendment

10   restriction, the Ninth Circuit has "applied the requirements of ripeness and standing less

11   stringently in the context of First Amendment claims." *Wolfson v. Brammer*, 616 F.3d

12   1045, 1058 (9th Cir. 2010).

13           Plaintiffs' claims are constitutionally ripe. Though Plaintiffs do not *per se* plan to

14   violate the Voting Laws, certain Plaintiffs plausibly allege that their members risk

15   violating the Voting Laws as an incident of inadequate access to DPOR or DPOC.[10]

16   (LUCHA Compl. ¶¶ 274–85.) Further, as detailed in the surrounding analysis, Plaintiffs

17   plausibly allege that enforcement of the Voting Laws will "imminently" harm their

18   organizational missions. *C.f. Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839

19   (9th Cir. 2014) (citation omitted) (even preenforcement claim may be ripe where

20   plaintiffs "confront a realistic danger of sustaining direct injury as a result of the statute's

21   operation or enforcement"); (*see* Poder Latinx Opp'n at 4.) And contrary to Defendants'

22   claims, the Court has no reason believe that the Voting Laws will not be enforced. (*See*

23   Mot. at 12–13 ("Plaintiffs have not alleged any 'genuine threat of imminent

24   enforcement'").) Plaintiffs' injuries are at least reasonably anticipated, not just

25   hypothetical or "theoretically possible." *See Bowen*, 752 F.3d at 839–40.

26           Plaintiff's claims are also prudentially ripe. A claim is prudentially ripe when "the

27   _____

[10] AAANHPI raises that the ripeness inquiry is limited to its prudential component when
28   a plaintiff is not "the target of enforcement." (AAANHPI Opp'n at 4 (citing *San Luis &
     Delta-Mendoza Water Auth. v. Salazar*, 638 F.3d 1163, 1173 (9th Cir. 2011)).) This only
     underscores the Court's conclusion that Plaintiffs' claims are ripe.

1    fitness of the issues for judicial decision and the hardship to the parties of withholding

2    court consideration" both weigh toward hearing the case. *See Ass'n of Irritated Residents*

3    *v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136,

4    149 (1967)). This case primarily hinges on legal issues—preemption under the NVRA,

5    the ability of Congress to regulate presidential elections, the relative burden of Arizona's

6    citizenship verification requirements vis-à-vis other requirements previously evaluated by

7    the Supreme Court—and discovery will provide any factual development necessary to

8    fully evaluate the merits of the case. *See id.* (challenge prudentially ripe where issue was

9    "purely [a] legal question"); (Poder Latinx Opp'n at 4–6). Moreover, delaying review

10   until after certain Plaintiffs have already been unlawfully removed from Arizona's voting

11   rolls and prevented from voting would make any review "too late to redress the injuries

12   suffered by [Plaintiffs'] members." *Ass'n of Irritated Residents*, 10 F.4th at 944. The

13   Court concludes that Plaintiffs' claims are ripe for review.

14   **B.    Rule 12(b)(6)**

15   A Rule 12(b)(6) dismissal for failure to state a claim can be based on either (1) a

16   lack of cognizable legal theory or (2) insufficient facts to support a cognizable legal

17   claim. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011). In

18   determining whether an asserted claim can be sustained, "[a]ll of the facts alleged in the

19   complaint are presumed true, and the pleadings are construed in the light most favorable

20   to the nonmoving party." *Bates v. Mortg. Elec. Registration Sys., Inc.*, 694 F.3d 1076,

21   1080 (9th Cir. 2012). At this early stage of the litigation, the standard does not mandate

22   that "plaintiff's explanation . . . be true or even probable." *Starr v. Baca*, 652 F.3d 1202,

23   1216–17 (9th Cir. 2011). However, "for a complaint to survive a motion to dismiss, the

24   nonconclusory 'factual content,' and reasonable inferences from that content, must be

25   plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*,

26   572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

27   In other words, the complaint must contain enough factual content "to raise a reasonable

28   expectation that discovery will reveal evidence" of the claim. *Bell Atl. Corp. v. Twombly*,

ER - 0178

550 U.S. 544, 556 (2007).

Defendants argue that Plaintiffs have failed to plausibly allege that the Voting Laws are unlawful under either constitutional or statutory frameworks. (Mot. at 14–30.)

### 1.  *Anderson-Burdick* Claims

Under the *Anderson-Burdick* framework, courts evaluate the validity of an election law by balancing the burden the law places on the fundamental right to vote against the state interests served by the law. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Specifically, courts must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; "identify and evaluate the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule"; "determine the legitimacy and strength of each of those interests"; and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

"[T]he severity of the burden the election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the court." *Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008) (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Pierce v. Jacobsen*, 44 F.4th 853, 859–60 (9th Cir. 2022) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). A restriction is "not severe" when it is "generally applicable, even-handed, politically neutral, and . . . protect[s] the reliability and integrity of the election process." *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1014 (9th Cir. 2002). This balance means that voting regulations are rarely subjected to strict scrutiny. *See Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008).

Plaintiffs assert that the Voting Laws place an undue burden on the right to vote in several ways. Defendants counter that Plaintiffs have failed to state claims under the

1  *Anderson-Burdick* doctrine because "the burdens involved [in complying with the Voting

2  Laws] are not significant" and are "justified by the State's compelling interests." (Mot. at

3  14.) The Court disagrees with Defendants.

a.      <strong>Burden on Identifiable Segment of Voters</strong>

5        Plaintiffs make several plausible claims that the Voting Laws "place a particular

6  burden on an identifiable segment of voters [which is] more likely to raise constitutional

7  concerns." *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1190 (9th Cir. 2021) (Mem)

8  ("*Hobbs III*") (citing *Anderson*, 460 U.S. at 792). For example, the San Carlos Apache

9  Tribe alleges that a significant number of its 11,000 members in Arizona "are likely to be

10  unable to obtain [DPOR], as required by H.B. 2492, either because their residence lacks a

11  numbered street address entirely, or because they are not officially listed as a resident of

12  the home where they stay." (LUCHA Compl. ¶¶ 284, 312; LUCHA Opp'n at 2–4.) The

13  alleged effect of the DPOR requirement on Tribal members "will be unique when

14  compared to other eligible Arizona voters . . . giving [Tribal members] less opportunity

15  than other eligible Arizona voters to participate in the political process and elect

16  representatives of their choice." (LUCHA Compl. ¶¶ 137, 139; *see also* AAANHPI

17  Compl. ¶¶ 117–18 (Voting Laws' DPOC requirement and verification particularly burden

18  "AANHPIs, naturalized citizens, and other voters of color."); Mi Familia Vota Compl.

19  ¶ 79.) Plaintiffs additionally allege that the Voting Laws undermine public confidence in

20  Arizona's elections and draw upon legislative history to claim that the Voting Laws were

21  intended to discriminate against certain protected groups. (*E.g.*, LUCHA Compl. ¶ 326;

22  AAANHPI Compl. ¶¶ 53–54.) Relatedly, Plaintiffs allege that Arizona has no legitimate

23  interest in the mandates underlying the Voting Laws. (AAANHPI Compl. ¶¶ 116–17;

24  LUCHA Compl. ¶¶ 195–97, 325; DNC Compl. ¶ 46.) Plaintiffs have stated a claim that

25  the Voting Laws impose a burden on the right to vote without a corresponding

26  justification.

b.      <strong>Arbitrary State and Federal Form Distinction</strong>

28        Plaintiffs also plausibly allege, both within the *Anderson-Burdick* framework and

- 21 -

1    under the traditional Equal Protection framework,[11] that H.B. 2492 arbitrarily treats

2    registrants differently depending on whether they used the Federal or State Form.

3    (LUCHA Opp'n at 7–8; LUCHA Compl. ¶¶ 309, 313; *e.g.*, Mi Familia Vota Compl.

4    ¶¶ 89–90.) In other words, Plaintiffs have stated a claim that the Voting Laws are not

5    "generally applicable." *See Rubin*, 308 F.3d at 1014.

6        LUCHA Plaintiffs detail that the Voting Laws violate the LULAC Consent Decree

7    and arbitrarily prevent State Form users who did not provide DPOC from voting in any

8    election, while Federal Form users who did not provide DPOC may still vote in

9    congressional elections. (LUCHA Opp'n. at 8.) Federal and State Form users are not

10   suspect classes, so the State need only show that there is a rational basis for

11   discriminating against State Form users. *See McDonald v. Bd. of Election Com'rs of

12   Chicago*, 394 U.S. 802, 808–09 (1969) ("The [race- and wealth-neutral] distinctions

13   drawn by a challenged statute must bear some rational relationship to a legitimate state

14   end and will be set aside as violative of the Equal Protection Clause only if based on

15   reasons totally unrelated to the pursuit of that goal."); *Weber v. Shelley*, 347 F.3d 1101,

16   1107 n.2 (9th Cir. 2003). It is undisputed that a State Form applicant who did not provide

17   DPOC will be barred from voting at all, whereas a Federal Form registrant will be

18   allowed to vote in certain federal elections.  (LUCHA Opp'n at 7.) Both Federal and

19   State Form users have affirmed citizenship under penalty of perjury. (*Id.* at 8.)

20   Defendants counter that requiring DPOC and DPOR from State Form users increases

21   "confiden[ce]" that registrants "are indeed U.S. citizens and reside in the districts in

---

[11] Poder Latinx Plaintiffs similarly claim that the Voting Laws subject registrants to "arbitrary and disparate treatment," but they rely on the Equal Protection standard articulated in *Bush v. Gore*, 531 U.S. 98, 104–09 (2000) to assert this claim. (Poder Latinx Compl. ¶¶ 120–29.) The Motion does not directly address this claim. (*See* Mot.; Poder Latinx Opp'n at 9.) Instead, Defendants generally assert that any Equal Protection challenges to the Voting Laws pled outside of the *Anderson-Burdick* framework are improperly presented to the Court. (Mot. at 17.) However, the authority Defendants cite for this assertion does not foreclose constitutional claims pled outside of the *Anderson-Burdick* framework. (*See id.* at 17–18 (citing *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) (observing that the Supreme Court "has addressed [First Amendment, Due Process, and Equal Protection claims] collectively using a single analytic framework" but noting that plaintiff did not suggest separate analyses for his claims beyond *Anderson-Burdick*)).)

- 22 -

1  which they intend to cast a vote." (See Mot. at 18–19.) But Defendants do not offer any

2  basis for preventing State Form applicants from voting at all without DPOC. (*See id.*)

3  Plaintiffs seem to disagree regarding whether this discrimination claim is analyzed

4  under the *Anderson-Burdick* framework. (*Compare* MFV Opp'n at 5–6 (analyzing

5  disparate treatment of Federal and State Form users under *Anderson-Burdick*) *with*

6  LUCHA Opp'n at 7 (separately analyzing disparate treatment claim).) The Court

7  concludes that Plaintiffs have stated a claim that the Voting Laws arbitrarily discriminate

8  based on use of Federal or State Forms under either framework.[12]

9  ### c.    Fact-Sensitive Inquiry

10  The procedural posture of this case also weighs against granting the Motion.

11  Plaintiffs correctly note that because *Anderson-Burdick* claims are particularly fact-

12  sensitive, dismissal under Rule 12(b)(6) is disfavored. (LUCHA Opp'n at 4; MFV Opp'n

13  at 2–3); *see, e.g.*, *Soltysik v. Padilla*, 910 F.3d 438, 447, 450 (9th Cir. 2018) (reversing

14  "premature" grant of dismissal, as court could not determine "without any factual record .

15  . . [whether the state's] justifications outweigh the constitutional burdens"); *Mecinas*, 30

16  F.4th at 905 ("[T]he magnitude of the asserted injury [under *Anderson-Burdick*]. . .

17  present[s] factual questions that cannot be resolved on a motion to dismiss."). Defendants

18  also cite *Crawford v. Marion County* to argue that requiring voter identification to vote is

19  not an undue burden as a matter of law. (*See* Mot. at 15–16 (citing 553 U.S. 181, 185,

20  199 (2008)).) Plaintiffs counter not only that the law upheld in *Crawford* provided for

21  alternative ways to vote without the requisite identification, but also that *Crawford*

22  addressed *Anderson-Burdick* claims on summary judgment. (LUCHA Opp'n at 4 n.6; *see*

23  *also* AAANHPI Opp'n at 8); 553 U.S. at 185, 187, 201. Defendants have not brought any

24  identical state laws upheld under *Anderson-Burdick* to the Court's attention, nor is the

25  Court aware of any. The Court will not dismiss Plaintiffs' *Anderson-Burdick* claims.

26  ### 2.    Additional Constitutional Claims

27
28
[12] Applying a traditional Equal Protection analysis, Plaintiffs must plausibly allege that there is no rational basis for Arizona's distinction between Federal and State Form users voting in federal elections. (*See* LUCHA Compl. ¶¶ 86, 328.) Plaintiffs have met their burden to do so. (*See* LUCHA Opp'n at 8.)

ER - 0182

1

### a. National Origin & Race Discrimination

2  Several Plaintiffs claim that the Voting Laws discriminate based on national origin

3  and race, both allegedly violating the Equal Protection Clause. (*See, e.g.*, LUCHA

4  Compl. ¶¶ 329–35; AAANHPI Compl. ¶¶ 143–50.) There are two "strands of equal

5  protection doctrine: suspect classifications and fundamental rights. The first strand bars a

6  state from codifying a preference for one class over another, but it prescribes heightened

7  scrutiny only where the classification is drawn from . . . race, gender, alienage, [or]

8  national origin. The second strand bars a state from burdening a fundamental right for

9  some citizens but not for others. Absent some such burden, however, legislative

10  distinctions merit no special scrutiny." *Short v. Brown*, 893 F.3d 671, 678–79 (9th Cir.

11  2018) (internal citations omitted). The Court addresses each alleged constitutional

12  violation in turn.

13  First, Plaintiffs allege the Voting Laws facially discriminate based on national

14  origin. (LUCHA Compl. ¶¶ 100–01, 110–16.) LUCHA details that by requiring

15  applicants to list their place of birth and "subject[ing] voters to additional burdensome

16  procedures to verify their eligibility to vote, as well as mandatory criminal investigation,

17  only if they were born outside the United States," the Voting Laws unconstitutionally

18  discriminate against naturalized citizens. (LUCHA Opp'n at 6.) Plaintiffs have plausibly

19  alleged a scenario where a naturalized citizen who lawfully obtained state identification

20  in Arizona before obtaining citizenship would be flagged as a noncitizen under the

21  verification provisions of the Voting Laws. (LUCHA Compl. ¶¶ 100–33.) Considering

22  Plaintiffs' detailed allegations regarding the unreliable "data-matching process"

23  mandated by the Voting Laws, the Birthplace Requirement—particularly combined with

24  the Check Box Requirement—and H.B. 2243's "reason to believe" criterion for

25  investigating citizenship status, the Court finds that Plaintiffs have stated a claim that the

26  Voting Laws are facially discriminatory based on national origin. (*See id.* ¶¶ 113, 116;

27  AAANHPI Compl. ¶ 87.) Alternatively, even under *Anderson-Burdick*, total deprivation

28  of the opportunity to vote is a severe burden and burdening voters based on foreign

national origin separately demands strict scrutiny. *Short*, 893 F.3d at 678–79 (applying *Anderson-Burdick*). Plaintiffs have stated a claim that naturalized citizens will incur such a burden solely by virtue of their birthplace.

Defendants attempt to counter Plaintiffs' claims of national origin discrimination by arguing that Plaintiffs have not adequately alleged discriminatory intent. (Mot. at 20–22.) As above explained, Plaintiffs have stated a claim that the Voting Laws are facially unconstitutional, which does not require a finding of discriminatory intent. (*See* LUCHA Opp'n at 6–7); *Mitchell v. Washington*, 818 F.3d 436, 445–46 (9th Cir. 2016) ("When the government expressly classifies persons on the bases of race or national origin . . . its action is 'immediately suspect'. . . . A plaintiff in such a lawsuit need not make an extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict scrutiny.") (alterations in original) (citation omitted)); *Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004) (plaintiff need not prove discriminatory intent or impact when policy is suspect on its face) (citing *Loving v. Virginia*, 388 U.S. 1, 8–9 (1967)).

In any event, the Court alternatively finds that Plaintiffs have adequately alleged discriminatory intent such that they have stated a claim that the Voting Laws were "motivated by" a discriminatory purpose. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66, 269 (1977); (AAANHPI Opp'n at 13–15). "The central inquiry in any disparate treatment claim under the Equal Protection Clause is whether an invidious discriminatory purpose was a motivating factor in some government action." *Ballou v. McElvain*, 29 F.4th 413, 424 (9th Cir. 2022) (cleaned up). "'[A]ny indication of discriminatory motive may suffice' to allow a disparate treatment claim to survive summary judgment." *Id.* (emphasis and alteration in original) (quoting *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015)).

> The Supreme Court articulated the following, non-exhaustive factors that a court should consider in assessing whether a defendant acted with discriminatory purpose: (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) the defendant's departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history.

*Arce*, 973 F.3d at 977.

Plaintiffs point to the reduction in response time to provide DPOC between the previous version of H.B. 2243 (90 days) and H.B. 2243 as enacted (35 days) as evidence of the legislature's intention to target naturalized citizens. (*See* AAANHPI Compl. ¶¶ 17–18, 60.) Plaintiffs also raise the comments made by H.B. 2942's sponsor regarding immigrant voters, as well as the bill's passage over advice of legislative counsel that the statute would be preempted by the NVRA, as evidence of discriminatory intent in legislation. (Poder Latinx Compl. ¶ 48 (detailing statements from bill sponsors that intention of the Voting Laws was to overrule LULAC Consent Decree and ensure noncitizens are not voting in Arizona elections).) Plaintiffs have stated a claim that the Voting Laws intentionally subject naturalized citizens to increased burdens, up to and including complete disenfranchisement, violating the Equal Protection Clause.[13]

Second, Plaintiffs allege that the Voting Laws discriminate based on race, violating both the Equal Protection Clause and the Fifteenth Amendment.[14] (*See* AAANHPI Compl. ¶¶ 143–50; Poder Latinx Compl. ¶¶ 107–18.) The Fifteenth Amendment establishes that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend XV. A plaintiff must allege "actual interference in the voting or registration processes" on account of race to state a claim for Fifteenth Amendment violation. *See Skorepa v. City of Chula* Vista, 723 F. Supp. 1384, 1393 (S.D. Cal. 1989) (citation omitted).

---

[13] Amicus curiae Immigration Reform Law Institute raises that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence as may be available." (Doc. 131-1, IRLI Amicus Br. at 15 (quoting *Arlington Heights*, 429 U.S. at 266).) The fact-sensitive nature of invidious discrimination claims further weighs against granting the Motion.

[14] Poder Latinx Plaintiffs correctly note that the Motion does not address their claim that the Voting Laws violate the Fifteenth Amendment under *Louisiana v. United States*, 380 U.S. 145 (1965). (Poder Latinx Opp'n at 10.) Defendants argue in Reply that the unconstitutional action in *Louisiana* is distinguishable from the Voting Laws, in that *Louisiana* struck down a voting requirement administered "without any controls on official discretion, placing arbitrary power in the hands of election officials." (Reply at 17 n.9.) But Plaintiffs have plausibly alleged that, *inter alia*, H.B. 2243's "reason to believe" investigation criterion similarly gives election officials "arbitrary power" to purge registered voters. *See Louisiana*, 380 U.S. at 153; (Poder Latinx Compl. ¶ 111.)

Plaintiffs' claims survive the Motion. LUCHA Plaintiffs describe Arizona's extended history of denying the franchise to Native Americans and plausibly connect this history to H.B. 2492's DPOR requirement. (*See* LUCHA Compl. ¶¶ 164–69, 176–77.) AAANHPI asserts that by imposing the DPOR, DPOC, and Birthplace Requirements, "and removing voters from the rolls if such information is not provided or is questioned, Sections 1, 3, 4, 5, 7, and 8 of H.B. 2492 intentionally discriminate against AANHPIs, naturalized citizens from those communities, and other voters of color, in violation of the Fourteenth and Fifteenth Amendments." (AAANHPI Compl. ¶ 148.) AAANHPI makes similar allegations regarding H.B. 2243. (*Id.* ¶ 150.) Poder Latinx asserts that H.B. 2243 is "in essence, a redeployment of [Jim Crow-era] unconstitutional registration practices involving the unfettered discretion of officials to revoke voting rights and arbitrarily allocate the right to vote, with particular harm falling on naturalized voters and, in particular, Latinx voters throughout Arizona." (Poder Latinx Compl. ¶ 116.) The Court finds that Plaintiffs have stated a claim that the Voting Laws are racially discriminatory in violation of the Fourteenth and Fifteenth Amendments.

### b.  Procedural Due Process

Multiple Private Plaintiffs claim that the Voting Laws deny procedural due process. (*See, e.g.*, AAANHPI Compl. ¶¶ 135–41; Poder Latinx Compl. ¶¶ 133–44; Poder Latinx Opp'n at 7–9.) Defendants counter that any "freestanding" procedural due process claims are "squarely foreclosed by Ninth Circuit precedent." (Mot. at 16–17 (citing *Hobbs III*, 18 F.4th at 1195).) Defendants are correct. *See Hobbs III*, 18 F.4th at 1195 (holding that the *Anderson-Burdick* framework is "better suited to the context of election laws than is the more general *Eldridge* test"); *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 n.1 (9th Cir. 2020) (observing that district court likely erred in accepting "plaintiffs' novel procedural due process argument" when *Anderson-Burdick* should supersede any other framework). To the extent Plaintiffs assert procedural due process claims distinct from their *Anderson-Burdick* claims, the Court grants the Motion as to these "freestanding" claims. However, certain Plaintiffs' procedural due process

claims survive the Motion, as they are included in allegations that the Voting Laws impose an undue burden under *Anderson-Burdick*. (*See, e.g.*, MFV Compl. ¶¶ 3, 62–69, 79 (alleging that H.B. 2492 severely burdens the right to vote by, *inter alia*, threatening voters with registration cancellation and criminal investigation without adequate notice and time to respond); AAANHPI Compl. ¶ 136; AAANHPI Opp'n at 10 (explaining that its procedural due process claim is alleged within the *Anderson-Burdick* framework).)

### 3.    National Voter Registration Act

Plaintiffs allege that the Voting Laws violate multiple sections of the NVRA. The NVRA sets parameters for the federal election process and bars states "from requiring a Federal Form applicant to submit information beyond that required by the form itself." *Inter-Tribal Council*, 570 U.S. at 20 (striking down under the NVRA Arizona's requirement that Federal Form applicants submit DPOC).

As a general argument for dismissal of all Plaintiffs' NVRA claims, Defendants assert that because the Voting Laws only regulate presidential elections rather than all federal elections, the NVRA does not apply. (*See* Mot. at 3, 23.) Citing Article I Section 4 of the United States Constitution, Defendants argue that the NVRA "can [only] apply constitutionally to 'Elections for Senators and Representatives.'" (*Id.* at 23.) But Plaintiffs point out that there is no "carve-out" in H.B. 2243 for Federal Form users—on its face, H.B. 2243 allows election officials to purge individuals lawfully registered to vote using the Federal Form. (*See* AAANHPI Opp'n at 6.) And further, contrary to Defendants' suggestions, Plaintiffs have at least plausibly alleged that the NVRA applies to presidential elections.[15] *C.f. Mattioda v. Bridenstine*, No. 20-cv-03662-SVK, 2021 WL 75665, at *18 (N.D. Cal. Jan. 8, 2021) (assuming without deciding that a claim exists, where case is on motion to dismiss and Ninth Circuit has not spoken to the issue); *see also Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995) ("The broad power given to Congress over congressional elections has been extended to presidential

---

[15] The United States details the history surrounding the Elections Clause to explain why Presidential elections may have been omitted but why the NVRA still applies to presidential elections. (USA Opp'n at 8.)

1   elections"); (USA Opp'n at 5 ("An unbroken line of precedent confirms Congress's

2   power to regulate all federal elections, including those for president."); AAANHPI Opp'n

3   at 6 (citing *Oregon v. Mitchell*, 400 U.S. 112, 124 & n.6 (1970) ("It cannot be seriously

4   contended that Congress has less power over the conduct of presidential elections than it

5   has over congressional elections.")), n.6 (detailing codified finding accompanying the

6   NVRA regarding "discriminatory and unfair registration [harming] racial minorities.").)

7               **a.      Section 5**

8               Section 5 of the NVRA mandates that voter registration applications included with

9   driver's license applications "may only require the minimum amount of information

10  necessary to enable State election officials to assess eligibility of the applicant . . . ." 52

11  U.S.C. § 20504(c)(2)(B). This "minimum" means an "an attestation that the applicant

12  meets each such requirement [of citizenship]," with "signature of the applicant, under

13  penalty of perjury." *Id.* § 20504(c)(2)(C)(i)–(iii). The DNC alleges that by requiring

14  Federal Form users to submit DPOC in order to vote in presidential elections, H.B. 2492

15  violates Section 5 of the NVRA. (*See* DNC Compl. ¶¶ 80–83.) The DNC argues that

16  Defendants failed to address this specific claim in the Motion. (DNC Opp'n at 8.) The

17  Court finds no indication otherwise. (*See* Mot.) Plaintiffs have stated a claim that the

18  Voting Laws are preempted by Section 5 of the NVRA.

19              **b.      Section 6**

20              Plaintiffs allege that H.B. 2492's DPOC requirement violates the mandate of

21  Section 6 of the NVRA that states "accept and use" the Federal Form to register

22  individuals for all federal elections. *See* 52 U.S.C. § 20505(a); (*e.g.*, DNC Compl. ¶¶ 70–

23  72; DNC Opp'n at 5.)

24              Plaintiffs have plausibly alleged that the Voting Laws are preempted by Section 6.

25  (*See* AAANHPI Compl. ¶¶ 160, 168.) Plaintiffs argue that under *Inter Tribal Council*,

26  "[f]ederal-only voters must be permitted to vote in *all* federal elections, including

27  presidential elections, so long as those voters submit a complete and valid Federal Form."

28  (USA Opp'n at 6) (emphasis in original). Like the law found preempted in *Inter Tribal*

ER - 0188

1    *Council*, Plaintiffs allege that the Voting Laws require Federal Form users to provide
2    "every additional piece of information the State requires on its state-specific form. If that
3    is so, the Federal Form ceases to perform any meaningful function, and would be a feeble
4    means of 'increas[ing] the number of eligible citizens who register to vote in elections for
5    Federal office.'" *Inter Tribal Council*, 570 U.S. at 13 (alteration in original) (citing
6    § 1973gg(b)). Plaintiffs have stated a claim that the Voting Laws are preempted by
7    Section 6 of the NVRA.

8                              **c.      Section 8**

9          Section 8 of the NVRA, in relevant part, requires that any state program to
10   "protect the integrity of the electoral process" by maintaining an accurate registration roll
11   for federal elections "be uniform, nondiscriminatory, and in compliance with the Voting
12   Rights Act of 1965" ("Uniformity Provision"). 52 U.S.C. § 20507(b)(1). It also mandates
13   that States "complete, not later than 90 days prior to the date of a primary or general
14   election for Federal office, any program the purpose of which is to systematically remove
15   the names of ineligible voters from the official lists of eligible voters" ("Purge
16   Provision"). *Id.* § 20507(c)(2)(A).

17         The DNC alleges that H.B. 2492 violates the Uniformity Provision by excluding
18   Federal Form users who did not provide DPOC from voting by mail or in Presidential
19   elections. (*See* DNC Compl. ¶¶ 73–78.) LUCHA Plaintiffs make the same allegation
20   regarding H.B. 2492's DPOR requirement. (LUCHA Compl. ¶¶ 356, 358; *see also* DNC
21   Opp'n at 9.) Taking the allegations in the Complaints as true, the Court finds that
22   Plaintiffs have stated a claim that the Voting Laws violate the Uniformity Provision. (*See*
23   DNC Opp'n at 9–10.) And though Defendants counter that the Voting Laws have no
24   mandate that registrants shall continue to be purged from the rolls through the 90-period
25   preceding an election, the Voting Laws do not qualify when election officials can and
26   cannot purge registrants from the rolls. (*See* H.B. 2492 § 8; H.B. 2243 § 2; AAANHPI
27   Compl. ¶¶ 171–72.) At this stage of litigation, the statutes' broad directive to purge
28   registrants, without any limit as to when this purge should cease, suffices to state a claim

1    for violation of the Purge Provision. (*See* DNC Opp'n at 10.)

2              **4.      Section 10101**

3          The Materiality Provision of Section 10101 ("Materiality Provision") forbids

4    states from denying "the right of any individual to vote in any election because of an

5    error or omission on any record or paper relating to any application, registration, or other

6    act requisite to voting, if such error or omission is not material in determining whether

7    such individual is qualified under State law to vote in such election." 52 U.S.C.

8    § 10101(a)(2)(B). The United States explains that "[t]he Materiality Provision

9    specifically covers registration." (USA Opp'n at 4 (citing §§ 10101(a)(3)(A), (e)).) In

10   Arizona, such qualifications are age of majority, citizenship, residency, ability to write

11   one's name or make one's mark, and lack of criminal convictions or adjudications

12   rendering the voter incapacitated.  Ariz. Rev. Stat. § 16-101.

13         The United States argues that multiple provisions of H.B. 2492 mandate voter

14   purges due to immaterial omissions or errors by registrants. The Birthplace Requirement,

15   the United States asserts, is immaterial to a voter's eligibility, as naturalized citizens are

16   born outside of the United States and still carry the citizenship necessary to vote in

17   Arizona. (USA Opp'n at 18–19.) Conversely, individuals born in the United States might

18   not be American citizens, whether through foreign diplomatic parentage or expatriation.

19   (*Id.* at 19.) Failure to comply with the Check Box Requirement would similarly

20   disqualify applicants who have previously provided DPOC and met every other

21   requirement for verification of citizenship. (*Id.* at 19; USA Compl. ¶ 59.)

22         Defendants counter that there is no private right of action under § 10101 and that,

23   in any event, the information solicited under the Voting Laws is "material to ascertaining

24   eligibility to vote and thus cannot run afoul of Section 10101." (Mot. at 3, 25, 28.)

25   Specifically, Defendants assert that a cause of action under § 1983 "is not available if

26   Congress 'did not intend that remedy' for the statutory right in question." (*Id.* at 25

27   (citing *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)).) Defendants

28   also argue that the Materiality Provision does not "dictate the substance of state law," as

Congress's concerns in the Provision "c[a]me not from discriminatory laws," but "'from the discriminatory application and administration of apparently nondiscriminatory laws.'" (*See id.* at 26 (citing H.R. Rep. No. 88914 (Nov. 20, 1963), 1964 U.S.C. § 2391, 2491).)

As this stage of litigation, the Court disagrees with Defendants. Before the passage of the Voting Laws, the state of Arizona used other methods to verify a registrant's citizenship, suggesting that the Voting Laws' "confirmation" measures are not necessary. (*See* USA Opp'n at 19; USA Compl. ¶ 49.) And the United States points out that the Materiality Provision forbids "election officials from denying the right to vote based on errors and omissions not material to voter qualifications," "target[ing] *all* state conduct that denies the right to vote based on immaterial errors or omissions." (USA Opp'n at 14) (emphasis in original). No party disputes that citizenship itself is material to a voter's qualifications, but the United States persuasively argues that materiality may mean more than relevance in this context. (*Id.* at 17, 17 n.6.) The United States has plausibly alleged that H.B. 2492 requires duplicative information from registrants that is "unnecessary and therefore not material to determining an individual's qualifications to vote" under Arizona law.[16] *See La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 542 (W.D. Tex. 2022). The United States has stated a claim that H.B. 2492 violates the Materiality Provision.[17] (*See* USA Opp'n at 11–20.)

The Court also finds that Private Plaintiffs have stated a claim that the Voting Laws violate § 10101. Similar to the application of the NVRA to presidential elections, the Court need not decide whether there is a private right of action under § 10101 on a motion to dismiss. While the Ninth Circuit has not spoken to this issue, Plaintiffs have cited persuasive authority from within this Circuit indicating that there is such a private

---

[16] The Court agrees with the United States that the text of the Materiality Provision does not indicate the Provision only concerns "ad hoc executive actions that exceed state law." (USA Opp'n at 13–14; *see* Mot. at 26.) Nor do the cases Defendants cite for this argument support their reading of the Materiality Provision.

[17] Defendants also argue that because Arizona voters may cure any error in their registrations before H.B. 2492 would mandate cancelling their registrations, H.B. 2492 does not run afoul of § 10101. (Mot. at 27.) Defendants cite no authority for this assertion. The Court agrees with Plaintiffs that the cure provision of H.B. 2492 does not warrant dismissing the § 10101 claim. (*See* USA Opp'n at 15–16.)

right of action, rendering their claims at least plausible. (*See* AAANHPI Opp'n at 16 n.14 (citing *Davis v. Commonwealth Election Comm'n*, No.: 1–14–CV–00002, 2014 WL 2111065, at *10 (D. N. Mar. I. May 20, 2014)).) While the United States addresses Private Plaintiffs' allegations regarding H.B. 2492, Poder Latinx additionally alleges that H.B. 2243 violates § 10101(a)(2)(A), which prohibits election officials from "apply[ing] any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county . . . who have been found by State officials to be qualified to vote[.]" (Poder Latinx Compl. ¶¶ 100–06.) Poder Latinx has plausibly alleged that County Recorders are "instructed" to apply a different "standard, practice, or procedure" to verify the eligibility of voters suspected of being noncitizens. (*Id.* ¶ 102.) Only suspected noncitizens, investigated under broad, potentially discriminatory criteria, will be subjected to allegedly unreliable database checks and risk erroneous cancellation of their registrations. (*Id.* ¶ 103.)

### 5.    Voting Rights Act

Section 2 of the Voting Rights Act ("Section 2") prohibits states from enacting voting rules that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). In evaluating an alleged Section 2 violation, courts must consider "the totality of circumstances" in each case and whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members" of a protected class "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). "The essence of a § 2 claim . . . is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities of minority and non-minority voters to elect their preferred representatives." *Brnovich v. DNC*, 141 S. Ct. 2321, 2333 (2021) (cleaned up). "[T]he judiciary provides the only meaningful review of legislation that may violate the Voting Rights Act." *Feldman v. Arizona Sec. of State's Office*, 843 F.3d 366, 369 (9th Cir.

ER - 0192

1    2016).

2         When assessing a claim of discriminatory results under Section 2, courts consider

3    the extent of any historical discrimination burdening the right to vote, the degree of

4    racially polarized voting, and the severity with which discrimination restricts the class

5    from voting. *See Thornburg v. Gingles*, 478 U.S. 30, 36–37 (1986). LUCHA Plaintiffs

6    allege that the Voting Laws disparately burden Native American, Latino, and language-

7    minority voters by placing "barriers to registration [causing] impacted individuals to be

8    wholly barred from voting." (LUCHA Compl. ¶¶ 367–69.) For example, as above

9    detailed, LUCHA Plaintiffs assert that a disproportionate number of San Carlos Apache

10   Tribal members will be unable to provide DPOR not because obtaining adequate proof is

11   a "mere inconvenience," but because many Tribal members do not live in a residence

12   with one address recognized by the State. (*Id.* ¶¶ 28–40); *c.f. Brnovich*, 141 S. Ct. at 2338

13   ("Mere inconvenience cannot be enough to demonstrate a violation of [Section] 2.")

14   Arizona also has a history of disenfranchising Native American citizens. (*Id.* ¶¶ 164–69,

15   176–77.) LUCHA Plaintiffs additionally allege that naturalized citizens, a

16   disproportionate number of whom are members of protected racial classes, will be subject

17   to unwarranted disenfranchisement and criminal prosecution due to the Birthplace

18   Requirement and the State's use of faulty databases to verify citizenship. (*Id.* ¶¶ 367–70.)

19        Defendants respond that LUCHA's Section 2 claim does not plausibly detail any

20   "meaningful disparate racial impacts" and "depends enormously on speculative racial

21   disparities that may not occur as anticipated, or indeed may not occur at all." (Mot. at 4,

22   29 (internal quotation marks and citation omitted).) But Defendants' attacks on the

23   Section 2 claim depend on evaluating the merits of the claim, which the Court will not do

24   at this stage of litigation. And Plaintiffs need not plead any "specific set of factors" to

25   state a claim of Section 2 violation. *Sixth Dist. Of African Methodist Episcopal Church v.*

26   *Kemp*, 574 F. Supp. 3d 1260, 1277 (N.D. Ga. 2021) (citing *Brnovich*, 141 S. Ct. at 2336,

27   2340). Plaintiffs have met their burden to plausibly allege that Arizona's voting process is

28   not "equally open to participation" from, *inter alia*, Native American voters who will not

1    be able to obtain DPOR. LUCHA Plaintiffs have stated a claim that the Voting Laws
2    violate Section 2.

3    **III.    CONCLUSION**

4           The Court concludes that Plaintiffs have standing to bring this action. Further, the
5    Court finds that Plaintiffs have stated plausible claims for relief, apart from any alleged
6    "freestanding" procedural due process violation.

7           **IT IS ORDERED** denying Defendants State of Arizona and the Arizona Attorney
8    General's Motion to Dismiss except as to Plaintiffs' freestanding procedural due process
9    claims (Doc. 127).

10
11          Dated this 16th day of February, 2023.
12
13
14
15                                              _____
16                                                      Susan R. Bolton
                                                   United States District Judge
17
18
19
20
21
22
23
24
25
26
27
28