**Nos. 24-3188 24-3559, 24-4029**
(Consolidated)

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

_____

MI FAMILIA VOTA, *et al.*,

*Plaintiff-Appellees*,

v.

ADRIAN FONTES, *et al.*,

*Defendant-Appellants*.

WARREN PETERSEN, *et al.*,

*Intervenor-Defendant-
Appellant*.

On Appeal from the United States District Court
for the District of Arizona
No. 2:22-CV-00509
Hon. Susan R. Bolton

_____

### INTERVENOR REPUBLICAN PARTY OF ARIZONA'S PRINCIPAL BRIEF, OR, IN THE ALTERNATIVE, AMICUS BRIEF IF INTERVENTION IS DENIED

_____

DHILLON LAW GROUP INC.
A CALIFORNIA PROFESSIONAL CORPORATION

Harmeet K. Dhillon
Michael A. Columbo
Mark P. Meuser
177 Post Street, Suite 700, San Francisco, CA 94108
Tel. (415) 433-1700
harmeet@dhillonlaw.com
mcolumbo@dhillonlaw.com     *Attorneys for Proposed Intervenor*
mmeuser@dhillonlaw.com     *Republican Party of Arizona*

## CORPORATE DISCLOSURE STATEMENT

The Republican Party of Arizona is not a subsidiary or affiliate of a publicly owned corporation. No publicly owned corporation not a party to this case has a financial interest in the outcome of this case.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................. 1

JURISDICTIONAL STATEMENT ..................................... 2

ISSUES PRESENTED ............................................................ 3

STATEMENT OF THE CASE ............................................... 4

SUMMARY OF THE ARGUMENT ..................................... 4

STANDARD OF REVIEW ................................................... 4

ARGUMENT ......................................................................... 5

    I.    THE NVRA DOES NOT PREEMPT H.B. 2492'S PROOF OF CITIZENSHIP REQUIREMENT FOR VOTING IN PRESIDENTIAL ELECTIONS. ......................................... 5

        A.    Neither the Supremacy Clause Nor the Elections Clause Supersede State Power to Determine Voting Eligibility. ......... 5

        B.    There Is No Express Provision of the NVRA that Preempts States' Constitutional Power to Limit Voting to Citizens. ................................................................. 12

        C.    The Supreme Court's Decision in *Inter Tribal* Has Been Undermined by Subsequent Events and a New Consideration. ......................................................... 13

    II.    THE NVRA DOES NOT PREEMPT H.B. 2492'S DPOC REQUIREMENTS FOR VOTING BY MAIL IN PRESIDENTIAL ELECTIONS. ......................................... 21

        A.    The NVRA Does Not Expressly Preempt Arizona's Regulation of Eligibility for Voting by Mail. ......................... 21

        B.    The NVRA Does Not Preempt Arizona's Regulation of Voting by Mail Due to Obstacle Preemption. ........................ 22

III.   H.B. 2243'S REQUIREMENT THAT COUNTY
       RECORDERS CONDUCT A CITIZENSHIP CHECK USING
       USCIS'S SAVE SYSTEM WHEN THEY HAVE "REASON
       TO BELIEVE" A REGISTERED VOTER IS NOT A U.S.
       CITIZEN DOES NOT VIOLATE THE CRA OR THE NVRA. ..... 25

       A.   The "Reason to Believe" Provision of H.B. 2243 Does
            Not Violate the "Different Practices" Provision of the
            CRA ........................................................................ 25

       B.   The "Reason to Believe" Provision of H.B. 2243 Does
            Not Violate Section 8(b) of the NVRA. ................................ 30

CONCLUSION ..................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) ..................................................... 1, 7, 8, 10, 11, 13, 14, 15, 16

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) .................................................................................6

*Ballas v. Symm*,
351 F. Supp. 876 (S.D. Tex. 1972) ....................................................27

*Ballas v. Symm*,
494 F.2d 1167 (5th Cir. 1974) ................................................... 28, 29

*Barrientos v. 1801-1825 Morton LLC*,
583 F.3d 1197 (9th Cir. 2009) ............................................................12

*Branch Banking & Tr. Co. v. D.M.S.I., LLC*,
871 F.3d 751 (9th Cir. 2017) ...............................................................4

*Brooks v. Nacrelli*,
331 F. Supp. 1350 (E.D. Pa. 1971) ....................................................27

*Buckley v. Valeo*,
424 U.S. 1 (1976) ............................................................... 8, 9, 10

*Burdick v. Takushi*,
504 U.S. 428 (1992) ...............................................................................23

*Burroughs v. United States*,
290 U.S. 534 (1934) .............................................................................8, 9

*Bush v. Gore*,
531 U.S. 98 (2000) ................................................................................17

*Chamber of Commerce U.S. v. Whiting*,
563 U.S. 582 (2011) ...............................................................................6

iv

*Chaudhry v. Aragon*,
  68 F.4th 1161 (9th Cir. 2023) ........................................................................5

*Ex parte Siebold*,
  100 U.S. 371 (1879)......................................................................................10

*Fitzgerald v. Green*,
  134 U.S. 377 (1890).......................................................................................17

*Frazier v. Callicutt*,
  383 F. Supp. 15 (N.D. Miss. 1974)................................................................26

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992)........................................................................................22

*Gade v. National Solid Wastes Management Assn.*,
  505 U.S. 88 (1992)..........................................................................................7

*Gremillion v. Rinaudo*,
  325 F. Supp. 375 (E.D. La. 1971)..................................................................27

*Hillsborough County, Fla. v. Automated Med. Labs., Inc.*,
  471 U.S. 707 (1985).......................................................................................12

*Kansas v. Garcia*,
  589 U.S. 191 (2020)....................................................................................6, 12

*Kobach v. U.S. Election Assistance Comm'n*,
  772 F.3d 1183 (10th Cir. 2014),
  *cert. denied* 576 U.S. 1055 (2015).................................................................15

*Lentini v. Cal. Ctr. for the Arts*,
  370 F.3d 837 (9th Cir. 2004) ...........................................................................5

*McPherson v. Blacker*,
  146 U.S. 1 (1892).............................................................................. 16, 17, 18

*N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018)....................................................................................6, 12

*O'Neal v. Gresham*,
  519 F.2d 803 (4th Cir. 1975) .........................................................................26

*Oregon v. Mitchell,*
    400 U.S. 112 (1970)..........................................................................18

*Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.,*
    485 U.S. 495 (1988)......................................................................6, 7

*Ray v. Blair,*
    343 U.S. 214 (1952)........................................................................17

*Savage v. Jones,*
    225 U.S. 501 (1912)........................................................................22

*Shivelhood v. Davis,*
    336 F. Supp. 1111 (D. Vt. 1971) ...................................................26

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966)........................................................................27

*Stein v. Wood,*
    127 F.3d 1187 (9th Cir. 1997) .......................................................26

*U.S. Term Limits v. Thornton,*
    514 U.S. 779 (1995)..........................................................................8

*United States v. Jackson,*
    697 F.3d 1141 (9th Cir. 2012) .......................................................26

*Virginia Uranium, Inc. v. Warren,*
    587 U.S. 761 (2019)............................................................ 6, 7, 12

*Williams v. Rhodes,*
    393 U.S. 23 (1968)..........................................................................16

*Yu v. Idaho State Univ.,*
    15 F.4th 1236 (9th Cir. 2021) ..........................................................5

## **Statutes**

A.R.S. § 16-165(I)............................................................... 29, 30, 31

A.R.S. § 16-166(F)..................................................................................29

vi

## U.S. Constitution

Const. Art. II § 1, cl. 2 ...................................................................9, 17

## United States Code

52 U.S.C. § 10101(a)(1)................................................................27

52 U.S.C. § 10101(a)(2)(A) .........................................................26

52 U.S.C. § 20501(b)(1)–(2).........................................................23

52 U.S.C. § 20507(b)(1) ...............................................................30

6 U.S.C. § 1507(k)(1)...................................................................12

## Other

10 Annals of Cong. 29 (1800)........................................................18

Commentaries on the Constitution of the United States § 1831,
    3 J. Story,  (1st ed. 1833) .......................................................7

National Conference of State Legislatures,
    "Voting Outside the Polling Place: Absentee, All-Mail and Other Voting at
    Home Options," Mar. 7, 2024,
    https://www.ncsl.org/elections-and-campaigns/voting-outside-the-polling-place
    ....................................................................................................23

The Federalist No. 60 (A. Hamilton)......................................................14

# INTRODUCTION

States have the power under the Constitution to determine who is qualified to register to vote, and many states, including Arizona, limit voting to United States citizens. Just eleven years ago, the Supreme Court therefore held in *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) that Congress, through the National Voter Registration Act ("NVRA"), may not have the authority to stop Arizona from obtaining information it needs to verify a person's citizenship when they register to vote using a federal registration form ("Federal Form"), as required by a new law at the time.

The Court's preferred reading of the NVRA implicated this conflict, but the Court landed upon a delicate solution: it simultaneously concluded that the NVRA's requirement that states "accept and use" the Federal Form conflicted with and preempted the Arizona citizenship information requirement but—to avoid the constitutional issue—also held that the Election Assistance Commission ("EAC") may be required to customize the Federal Form at Arizona's request to demand the information Arizona desired—or else be compelled by a court to do so.

The Supreme Court's carefully calibrated solution in *Inter Tribal* has been undone by the EAC's refusal to modify the Federal Form to accommodate Arizona's voter eligibility requirements and the courts' refusal to compel it to do so. The district court below nevertheless erroneously held that the NVRA preempted

1

Arizona's new law, H.B. 2492, which requires, among other things, proof of citizenship to register to vote in presidential elections using the Federal Form. For the reasons explained here, to avoid a larger constitutional issue as the Supreme Court intended, this Court should hold that the NVRA does not preempt the power of states to require information to enforce their constitutional authority to determine voter qualifications, especially with respect to presidential elections, which states have added constitutional authority to regulate.

The district court also erroneously concluded that the NVRA preempted proof of citizenship as a condition for voting by mail, even though the NVRA does not regulate voting by mail.

Finally, the district court also erroneously held that H.B. 2492's provision allowing officials to check a database to try to verify citizenship violated the NVRA and the Civil Rights Act of 1964 ("CRA"), even though this provision is non-discriminatory and is permissible even under the strictest interpretation of the law.

## JURISDICTIONAL STATEMENT

The district court entered its Amended Order following a bench trial on February 29, 2024. 1-ER-0007. Final judgment issued on May 2, 2024. 1-ER-0007. Defendant-Intervenor Republican National Committee and other appellants filed their Notice of Appeal on May 8, 2024. 7-ER-1617. After its second motion to intervene in the district court proceedings was denied on June 28, 2024, 7-ER-1721,

the Republican Party of Arizona filed its motion to intervene in this Court on July 4, 2024, which motion remains pending. The Court therefore has jurisdiction over this appeal under 28 U.S.C. § 1291.

## ISSUES PRESENTED[1]

1. Did the district court err in holding the NVRA preempts H.B. 2492's requirement that applicants present documentary proof of citizenship to vote in presidential elections?

2. Did the district court err in holding the NVRA preempts H.B. 2492's requirement that applicants present documentary proof of citizenship to vote by mail in presidential elections?

3. Did the district court err in concluding that H.B. 2243's requirement that county recorders conduct a citizenship check using USCIS's SAVE system when they have "reason to believe" a registered voter is not a U.S. citizen violates the CRA and the NVRA?

---

[1] The Republican Party of Arizona also adopts the issues presented in each of the other defendant-intervenors and their amici's principal briefs

## STATEMENT OF THE CASE

The Republican Party of Arizona adopts and incorporates by reference the Statement of the Case as set forth in the Republican National Committee's Principal Brief.

## SUMMARY OF THE ARGUMENT

While the Republican Party of Arizona adopts the arguments made by the Republican National Committee and the other defendant-intervenors and their amici, its focus is on three critical errors the district court made below that this Court must reverse. First, the district court erred when it ruled that the NVRA preempted H.B. 2492's requirement that applicants provide documentary proof of citizenship to vote in presidential elections. Second, the district court erred in ruling that the NVRA preempted H.B. 2492's requirement that applicants provide documentary proof of citizenship to vote by mail in presidential elections. Third, the district court erred in concluding that H.B. 2243's requirement that county recorders conduct citizenship checks on voters whom they have "reason to believe" are not U.S. citizens using USCIS's SAVE system violates the CRA and the NVRA.

## STANDARD OF REVIEW

Grants and partial grants of summary judgment are reviewed *de novo*. *Branch Banking & Tr. Co. v. D.M.S.I., LLC*, 871 F.3d 751, 759 (9th Cir. 2017).

4

"'Following a bench trial, the judge's findings of facts are reviewed for clear error.'" *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241 (9th Cir. 2021) (quoting *Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 843 (9th Cir. 2004)). The court "review[s] a district court's conclusions of law *de novo.*" *Chaudhry v. Aragon*, 68 F.4th 1161, 1171 (9th Cir. 2023) (citing *Yu*, 15 F.4th at 1242).

## ARGUMENT

## I. THE NVRA DOES NOT PREEMPT H.B. 2492'S PROOF OF CITIZENSHIP REQUIREMENT FOR VOTING IN PRESIDENTIAL ELECTIONS.

The district court erred when it held that Section 6 of the NVRA expressly preempted H.B. 2492's requirement for documentary proof of citizenship ("DPOC") to vote in presidential elections. 1-ER-0124. In enacting the NVRA, Congress neither expressly nor impliedly limited states' authority to limit the franchise to citizens. Absent such a limitation, states remain free to enact legislation consistent with this constitutional prerogative, including the authority to require proof of eligibility.

### A. Neither the Supremacy Clause Nor the Elections Clause Supersede State Power to Determine Voting Eligibility.

The Supremacy Clause, standing alone, does not vest the federal government with the ability to displace states' exercise of their constitutional legislative authority. "The Supremacy Clause . . . provides that the 'Constitution, and the Laws

of the United States which shall be made in Pursuance thereof,' are 'the supreme Law of the Land ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (quoting Const., Art. VI, cl. 2.). However, "the Supremacy Clause . . . is not an independent grant of legislative power to Congress. Instead, it simply provides 'a rule of decision.'" *N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (quoting *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015)). "The legislative powers granted to Congress are sizable, but they are not unlimited. The Constitution confers on Congress not plenary legislative power but only certain enumerated powers. Therefore, all other legislative power is reserved for the States, as the Tenth Amendment confirms." *Id.* at 471.

While the Supremacy Clause "specifies that federal law is supreme in case of a conflict with state law," the federal law must first "represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do." *Id.* at 477; *see also Kansas v. Garcia*, 589 U.S. 191, 202 (2020) ("'There is no federal preemption *in vacuo*,' without a constitutional text, federal statute, or treaty made under the authority of the United States." (quoting *Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988))); *Chamber of Commerce U.S. v. Whiting*, 563 U.S. 582, 599 (2011) (preemption cannot be based on "a 'freewheeling judicial inquiry into whether a state statute is in tension with

6

federal objectives.'" (quoting *Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and dissenting in part))); *Virginia Uranium, Inc.*, 587 U.S. at 767 ("Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." (quoting *Puerto Rico Dept. of Consumer Affairs*, 485 U. S. at 503)); *see also* 3 J. Story, Commentaries on the Constitution of the United States § 1831, p. 694 (1st ed. 1833) ("[T]he supremacy of the laws is attached to those only, which are made in pursuance of the constitution").

In order to invalidate a state law, a court thus cannot simply point to the Supremacy Clause and a federal law that addresses a similar subject or impose the court's policy preferences. Here, the Constitution expressly and precisely gives states, and not the federal government, the power to determine who is qualified to vote. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 17 (2013) ("*Inter Tribal*").[2] Madison said in Federalist No. 52 that "[t]he definition of the right of suffrage is very justly regarded as a fundamental article of republican government. It was incumbent on the convention, therefore, to define and establish this right in

---

[2] The district court did not reach the argument by Plaintiffs that the NVRA drew authority from the 14th and 15th Amendments.

the Constitution. To have left it open for the occasional regulation of the Congress would have been improper." The Supreme Court recognized that Madison's Federalist No. 52 "explicitly contrasted the state control over the qualifications of electors [*i.e.*, voters] with the lack of state control over the qualifications of the elected[.]" *U.S. Term Limits v. Thornton*, 514 U.S. 779, 806 (1995).

To support its conclusion that NVRA "Section 6 preempts H.B. 2492's limitation on voting in presidential elections," 1-ER-0125, the district court first concluded that Congress has the power to regulate the time, place, and manner of all federal elections, including presidential elections, and that the NVRA's provisions applied to all such elections. 1-ER-0125–0127.

"This grant of congressional power [as to the time, place and manner of congressional elections] was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress." *Inter Tribal at* 8. This power extends to creating "regulations relating to 'registration.'" *Id.* at 9. "In practice, the Clause functions as a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices." *Id.* (internal quotation omitted).

The district court cited *Burroughs v. United States*, 290 U.S. 534 (1934) and *Buckley v. Valeo*, 424 U.S. 1 (1976) for the proposition that Congress has broad

8

powers to regulate presidential elections. However, while Congress certainly has authority over the time, place, and manner of congressional elections, both of these cases dealt with Congress's ability to regulate the raising and spending of money in connection with federal elections to avoid the corruption of federal officials, a decidedly federal prerogative. These cases had nothing to do with a state's unique and exclusive constitutional prerogative to decide how it will appoint its presidential Electors "in such Manner as the Legislature thereof may direct." Const. Art. II § 1, cl. 2. Neither *Burroughs* nor *Buckley* resolves the conflict between the Presidential Electors Clause and the power of Congress over the time, place, and manner of congressional elections based on the Elections Clause.

In fact, in *Burroughs*, the Court determined that while Congress has the power to pass legislation to safeguard the presidential election from the "improper use of money to influence the result" of the election, "[n]either in purpose nor in effect does [the congressional act under review] interfere with the power of a state to appoint electors or the manner in which their appointment shall be made." *Burroughs*, 290 U.S. at 544–45. And in *Buckley*, the Court highlighted that no party was challenging Congress's ability to regulate federal elections; the decision instead focused on "whether the specific legislation that Congress has enacted interferes with First Amendment freedoms or invidiously discriminates against nonincumbent candidates." *Buckley*, 424 U.S. at 13–14. The Court's stray reference to Congress's

general authority regarding federal elections in a footnote relies only on *Burroughs*. *Id.* at 13 n.16. Therefore, neither *Burroughs* nor *Buckley* establishes that Congress could use its power over the time, place, and manner of congressional elections to enact a statute like the NVRA to preempt a state's specific and unique constitutional power to determine how it will appoint its presidential electors, as Arizona has with H.B. 2492.

The Supreme Court in *Inter Tribal* favored a textual interpretation of the NVRA that would preempt Arizona's prior proof of citizenship requirement. *Id*. at 15 ("[T]he fairest reading of the statute is that a state-imposed requirement of evidence of citizenship not required by the Federal Form is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form." (quoting *Ex parte Siebold*, 100 U.S. 371, 397 (1879))). However, the Court recognized this creates a constitutional conundrum: under its power over the time, place, and manner of a congressional elections, Congress may not be able to supersede a state's constitutional power to determine the qualifications of its voters. *Id.* at 17 ("Arizona is correct that it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications.").

To avoid this "constitutional doubt"—*i.e.*, to avoid determining that it could be unconstitutional for Congress, through the NVRA, to preclude Arizona from

10

obtaining information needed to enforce its undisputed power to set voter qualifications—the Supreme Court relied on a speculative proposition that has since not turned out as expected. The Court: (a) interpreted the NVRA's requirement that states "accept and use" the Federal Form as precluding Arizona from asking for more information to corroborate citizenship to be submitted with that form, but (b) only did so on the understanding that Arizona could seek relief in court if the EAC refused to modify the Federal Form to allow Arizona to ask for proof of citizenship—to avoid putting the constitutionality of the NVRA in doubt and to avoid an arbitrary outcome (as the EAC had previously accepted one such request by Louisiana). *Id*. at 19–20.

Accordingly, in the wake of the EAC's subsequent refusal to modify the Federal Form for Arizona and the refusal of the courts to force it to do so, as discussed in section I.C, *infra*, as well as additional state authority not weighed in the *Inter Tribal* majority opinion, discussed in section I.C.2, *infra*, the "constitutional doubt" identified in *Inter Tribal* has been revivified. The Court in *Inter Tribal* presciently recognized that if Arizona were to be "precluded from obtaining information necessary for enforcement," the Court's decision finding preemption would have to be reconsidered. *Id.* at 18.

11

## B. There Is No Express Provision of the NVRA that Preempts States' Constitutional Power to Limit Voting to Citizens.

The district court held that Arizona's requirement that voters provide proof of their citizenship when registering to vote was "expressly preempted by" NVRA Section 6's requirement that states "'accept and use' the Federal Form when registering voters to vote in presidential elections." 1-ER-0124, 0127. A federal statute expressly preempts a state statute when it explicitly states that it preempts state law. *N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018); *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761 (2019); *Kansas v. Garcia*, 589 U.S. 191 (2020). Examples of express preemption abound elsewhere in the U.S. Code. For example, "[t]his subchapter supersedes any statute or other provision of law of a State." 6 U.S.C. § 1507(k)(1).

However, there is no express preemption language in the NVRA. The mere fact that a federal law exists and regulates a subject is not enough to establish preemption of any state regulation of a related subject. *See Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1208 (9th Cir. 2009) ("As the Supreme Court stated, 'merely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress did not mean that States and localities were barred from identifying additional needs or imposing further requirements in the field.'" (quoting *Hillsborough County, Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 717 (1985))). If that were the case, courts would not employ multiple implied preemption

12

doctrines, such as field preemption and obstacle preemption, as all federal statutes touching upon a subject would be deemed to "expressly" preempt any state regulation arguably on the same subject.

Indeed, the district court acknowledged in a footnote that NVRA "Section 6 does not regulate voter qualifications." 1-ER-0127. The district court thus appears to have concluded that the NVRA "expressly" preempted Arizona from imposing a requirement that the NVRA does not regulate *at all*. Indeed, Congress does not have any power under the Elections Clause to prescribe voting qualifications. *Inter Tribal*, 570 U.S. at 17.

The district court cited *Inter Tribal* in its preemption analysis*, see* 1-ER0124, 0127, but as demonstrated below, *Inter Tribal*'s interpretation of the NVRA to avoid a constitutional issue has foundered on subsequent developments and an additional consideration.

### C. The Supreme Court's Decision in *Inter Tribal* Has Been Undermined by Subsequent Events and a New Consideration.

#### 1. *Inter Tribal* attempted to avoid a constitutional conflict by offering states an administrative and judicial process to exercise their constitutional prerogative to set the qualifications of their voters.

The Supreme Court in *Inter Tribal* sought to avoid a constitutional clash between the NVRA and state power over voter qualifications by identifying an alternate avenue within the provisions of the NVRA for states to exercise their

13

constitutional authority. As the Court held, prescribing voting qualifications "'forms no part of the power to be conferred upon the national government' by the Elections Clause, which is 'expressly restricted to the regulation of the *times,* the *places,* and the *manner* of elections.'" *Inter Tribal*, 570 U.S. at 17 (quoting The Federalist No. 60, at 371 (A. Hamilton)). If a federal statute like the NVRA "precluded a State from obtaining the information necessary to enforce its voter qualifications," like DPOC, it would, in the words of the Supreme Court, "raise serious constitutional doubts." *Id.* The Supreme Court avoided this constitutional question by relying on one fact: "the statute provides another means *by which Arizona may obtain information needed for enforcement*." *Id.* at 18 (emphasis added). And notably, the Court stated that if Arizona were "precluded from obtaining the information necessary for enforcement," the Court may have to reconsider its decision. *Id.* This scenario has now materialized.

> **2. *Inter Tribal*'s presumed administrative and judicial paths for States to vindicate their constitutional prerogative have been closed, thus destroying the Supreme Court's means of avoiding a constitutional issue and necessitating reconsideration of its interpretation.**

To avoid an apparent constitutional issue with the NVRA, the Supreme Court relied on there being an "alternative means" by which Arizona could exercise its constitutional power to set voter qualifications. *Inter Tribal*, 570 U.S. at 19. It concluded that Arizona could petition the EAC to modify the National Voter

14

Registration form and seek relief in the courts if the EAC refused. *Id.* But the Supreme Court's path away from invalidating the NVRA proved to be a dead end.

Ignoring the Supreme Court's suggestion for an administrative escape hatch to accommodate the NVRA, the EAC has repeatedly denied Arizona's request to obtain the information needed to enforce its voter qualifications by refusing to modify the Federal Voter Registration form to accommodate Arizona's requests. *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1188–89 (10th Cir. 2014), *cert. denied* 576 U.S. 1055 (2015). Despite the Supreme Court's assurance of relief if the EAC refused, and litigation by Arizona and Kansas to vindicate their constitutional powers, the 10th Circuit held that the EAC has discretion to deny Arizona's requests, and the Supreme Court shut the door by denying certiorari. *Id.* at 1197–98; 576 U.S. 1055.

Arizona's recognized constitutional prerogative to require proof of citizenship is thus caught between the Scylla of the Supreme Court's holding that that the EAC must permit it to require DPOC or face litigation compelling it to do so, and the Charybdis of the 10th Circuit's holding, left intact by the Supreme Court, that the EAC has the discretion to deny Arizona's request to require DPOC.

Arizona is thus unable to "obtain[] the information necessary to enforce its voter qualifications." *Inter Tribal*, 570 U.S. at 17. With Arizona "precluded from obtaining information necessary for enforcement," the constitutional question *Inter*

15

*Tribal* avoided must be addressed, or avoided again with an interpretation that the NVRA does not preempt H.B. 2492's voter qualification provisions. *Id.* at 18.

### 3. *Inter Tribal* did not specifically address Arizona's additional state power over presidential elections.

The Elections Clause "empowers Congress to pre-empt state regulations governing the 'Times, Places and Manner' of holding *congressional* elections," *Inter Tribal*, 570 U.S. at 8 (emphasis added), but the Constitution provides "extensive power to the States to pass laws regulating the selection of electors [voters]." *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968). Even further, states have an additional constitutional prerogative to choose their electors *for president*, which the challenged provisions of H.B. 2492 at issue in this case addresses, further undermining the holding in *Inter Tribal*.

It is understandably tempting to treat all elections for federal office alike, assuming they share a common constitutional foundation. However, the constitutional provisions governing authority over congressional and presidential elections are very different. Members of Congress are chosen directly by the citizens of the States. Const. Art. 1, § 2, cl. 1. But, as a constitutional matter, presidents are instead chosen by a small number of electors—the electoral college. "The constitution does not provide that the appointment of [presidential] electors shall be by popular vote[.]" *McPherson v. Blacker*, 146 U.S. 1, 27 (1892). Instead, it provides that for a presidential election, each state "shall appoint, in such Manner as the

16

Legislature thereof may direct, a Number of Electors." Const. Art. II, § 1, cl. 2. Under Art. II, §1, the States are given the power to appoint electors. *See Fitzgerald v. Green*, 134 U.S. 377, 379 (1890); *McPherson*, 146 U.S. at 27–28; *Ray v. Blair*, 343 U.S. 214, 224–25 (1952). As a historical matter, state legislatures have chosen statewide elections as the means to exercise their power to appoint members of the Electoral College. *Bush v. Gore*, 531 U.S. 98, 104 (2000).

Further illustrating the difference between congressional and presidential elections: in a congressional election, citizens vote for members of Congress, and therefore it is clearly an election for federal office, but in a presidential election, citizens vote for presidential electors who, though they "are appointed and act under and pursuant to the constitution of the United States," "are no more officers or agents of the United States than are the members of the state legislatures when acting as electors of federal senators, or the people of the states when acting as electors of representatives in congress." *Fitzgerald*, 134 U.S. at 379; *see also Ray*, 343 U.S. at 224–225 (presidential electors are not federal officers or agents; a presidential election is not an election to elect a federal officer because it is an election to select state officials to exercise state official duties as required by the Constitution).

Thirteen years after the Constitutional Convention, Charles Pickney, a signer of the U.S. Constitution, on the floor of the U.S. Senate:

> remembered very well that in the Federal Convention great care was
> used to provide for the election of the President of the United States,

17

independently of Congress; to take the business as far as possible out of their hands. The votes are to be given by Electors appointed for that express purpose, the Electors are to be *appointed* by each State, and the whole direction as to the manner of their appointment is given to the State Legislatures. Nothing was more clear to him than that Congress had no right to meddle with it at all; as the whole was entrusted to the State Legislatures, they must make provision for all questions arising on the occasion.

10 Annals of Cong. 29 (1800). "In short, the appointment and mode of appointment of [presidential] electors belong exclusively to the states under the constitution of the United States." *McPherson*, 146 U.S. at 35.[3]

---

[3] In Federalist 45, Madison wrote that "[w]ithout the intervention of the State legislatures, the President of the United States cannot be elected at all. They must in all cases have a great share in his appointment, and will, perhaps, in most cases, of themselves determine it." While Congress has power to regulate the "Times, Places and Manner of holding Elections for Senator and Representatives" under Art. I, § 4, cl. 1, they only have the power to regulate the "Time of chusing the Electors" under Art. II, § 1, cl. 4.

Despite the text of the Constitution and the history of its drafting, it has been presumed that Congress has the same power to review state time, place, and manner regulations over presidential elections as congressional elections. *See Oregon v. Mitchell*, 400 U.S. 112, 124 (1970) ("It cannot be seriously contended that Congress has less power over the conduct of presidential elections than it has over congressional elections."). But, even assuming some congressional power over a state's presidential elections, a state's separate and specific constitutional power over the choice of its presidential electors presents an additional problematic consideration that has not yet been addressed, to add to the Supreme Court's existing concern with the NVRA as it pertains to state power to set the qualifications of voters.

The district court's holding therefore also prevents Arizona from exercising its authority under Art. II, § 1 to determine who is eligible to vote for the state's presidential electors.

The district court relied on the Supreme Court's holding in *Inter Tribal* and assumed that it addressed and resolved states' authority to regulate presidential elections. However, as noted above, *Inter Tribal* recognized a constitutional conflict and sought to avoid it, but, unfortunately, the Court's interpretation depended on an erroneous assumption that states had alternative administrative and judicial means to exercise their power, which in fact was not available to them, and there is an additional issue of a state's constitutional power over the selection of presidential electors that was not resolved in *Inter Tribal*.

4. **The Court should interpret the NVRA as not preempting a State's choice of eligibility to vote in presidential elections, including the documentation to establish that eligibility.**

The Arizona Republican Party respectfully requests this Court adopt an interpretation of the NVRA that avoids the constitutional issues the district court's decision raised. To avoid this constitutional issue, the Supreme Court previously presumed in *Inter Tribal* that the EAC would incorporate states' voter qualifications into the Federal Form, as the NVRA provides, or else states could litigate to force the EAC to do so. However, the EAC and the courts have since closed that path, reviving the constitutional question.

Arizona undoubtedly has the constitutional power to require citizenship to vote in federal elections. Further, presidential elections are in fact elections for a state's presidential electors, who are *state* officials. The power of states over voter qualifications is superior to Congress's power to merely regulate the *time, place, and manner* of *congressional elections*, and, by extension, the NVRA's creation of a federal voter registration form. Indeed, the text of the NVRA expressly contemplates state-specific alterations to the Federal Form in some circumstances rather than mandating a uniform federal qualification, so there is no irreconcilable conflict between the purpose of the NVRA and Arizona's (or any state's) voter qualifications.

For these reasons, the Court should hold that the district court erred when it concluded that the NVRA preempts Arizona's choice to require proof of citizenship to vote in presidential elections. This can be done with an interpretation of the NVRA that to "accept and use" the federal from does not preclude a state from requiring additional information in connection with a Federal Form to support its constitutional power to set and enforce voter qualifications.

///

///

///

///

20

## II.     THE NVRA DOES NOT PREEMPT H.B. 2492'S DPOC REQUIREMENTS FOR VOTING BY MAIL IN PRESIDENTIAL ELECTIONS.

The district court held that Section 6 directly preempts H.B. 2492's DPOC requirement to vote by mail and that "obstacle preemption bars the statute's enforcement." 1-ER-0128, 0129.

### A. The NVRA Does Not Expressly Preempt Arizona's Regulation of Eligibility for Voting by Mail.

Express preemption occurs when a state statute explicitly states that it preempts state law. *See* Section I.B, *supra*. There is no statement in the NVRA, or in the single, short provision of the NVRA at issue concerning certain first-time voters, which indicates Congress intended that the NVRA would supplant the states' regulation of voting by mail.

The NVRA is principally a statue about voter registration, not about how votes may be cast. The provision the district court asserted had preemptive effect, 52 U.S.C. § 20505(c), merely states that people who registered to vote by mail, but have never voted, *can* be required to cast their first ballot in person. It says nothing about a state's power to generally determine when a registered voter can enjoy the privilege of voting by mail. The availability of and eligibility for voting by mail varies widely from state-to-state. Unsurprisingly, there is nothing in the text or purpose of the NVRA indicating that Congress intended to reserve regulation of vote by mail eligibility solely for itself.

21

The district court's finding of *express* preemption therefore constitutes error.

## B. The NVRA Does Not Preempt Arizona's Regulation of Voting by Mail Due to Obstacle Preemption.

The district court held that H.B. 2492 was preempted by the NVRA under the doctrine of obstacle preemption. Specifically, the Court concluded that "H.B. 2492's limitation on voting by mail frustrates the purpose of the NVRA, as it impedes Arizona's 'promot[ion] of the right' to vote. 52 U.S.C. § 20501(a)." 1-ER-0129 (brackets in original).

"Absent explicit pre-emptive language," courts have recognized "implied pre-emption . . . where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (cleaned up); *Savage v. Jones*, 225 U.S. 501, 533 (1912) ("If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.").

The NVRA, at 52 U.S.C. § 20505(c), permits states to compel an in-person vote by persons who registered to vote by mail and have never voted before. The purpose of H.B. 2492's requirement that a person provide DPOC to vote by mail in the first place, which is also an election security measure, in no way poses an obstacle to the security measure in Section 20505(c). That provision of the NVRA

22

does not establish an individual right that H.B. 2492 impedes because there is no federal right of all persons to vote by mail, and access to this privilege has significantly varied across states and across time while the NVRA has been in effect. *See Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (finding "that the right to vote in any manner" is not absolute); *see also* National Conference of State Legislatures, "Voting Outside the Polling Place: Absentee, All-Mail and Other Voting at Home Options," Mar. 7, 2024, https://www.ncsl.org/elections-and-campaigns/voting-outside-the-polling-place (describing state-by-state variations in the use of mail-in voting).

The district court quoted one of the NVRA's goals, "to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office," 52 U.S.C. § 20501(b)(1)–(2), as a basis for concluding the NVRA wholly restricted states from determining who can vote by mail. 1-ER-0128. This would, *sub silentio*, create a federal right to vote by mail without any textual support in the legislation for that outcome. This is an unreasonable interpretation and application of section 20501(b), which in no way suggests a prohibition against state determinations of eligibility for voting by mail.

The district court also relied on Congress's statement in Section 20501(a) that "discriminatory and unfair registration laws and procedures can have a direct and

23

damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities" and that it is the duty of "Federal, State, and local governments to promote the exercise of the [fundamental] right" to vote. 1-ER-0129. This too misses the mark. H.B. 2492's vote by mail qualification provision does not discriminate unfairly against any group. Asking *everyone* who wishes to vote by mail to provide proof of citizenship is not discriminatory. The general statement that all American governments should promote voting is true, but it does not establish that H.B. 2492's DPOC requirement for mail voting "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of" the NVRA such that the DPOC requirement is preempted.

The district court also found that "the findings and purposes included in the NVRA reflect an intent to increase voter turnout, largely but not exclusively through diminishing barriers to registration." 1-ER-0129. Nothing in H.B. 2492 prevents a person from registering to vote, and there is no basis in the doctrine of obstacle preemption to conclude that a statement of a general congressional desire for greater voter turnout supplants, through the Constitution's Supremacy Clause, any state regulation regarding who has the privilege of voting *by mail* or what any voter must provide to the state to satisfy its election security concerns for mail voting.

24

The constitutional rule effectively enunciated in the district court's opinion, but found nowhere in the Constitution, the NVRA, or the decision of any court, and not compelled by the obstacle preemption doctrine, is that no state may enact any measure for any purpose that arguably could reduce the number of people in that state who vote *by mail*.[4] This boundless and arbitrary expansion of the obstacle preemption doctrine is error.

### III. H.B. 2243'S REQUIREMENT THAT COUNTY RECORDERS CONDUCT A CITIZENSHIP CHECK USING USCIS'S SAVE SYSTEM WHEN THEY HAVE "REASON TO BELIEVE" A REGISTERED VOTER IS NOT A U.S. CITIZEN DOES NOT VIOLATE THE CRA OR THE NVRA.

#### A. The "Reason to Believe" Provision of H.B. 2243 Does Not Violate the "Different Practices" Provision of the CRA.

The district court erred in concluding that H.B. 2243's requirement that county recorders check registered voters' citizenship status using USCIS's SAVE

---

[4] The district court also seemingly conflated registration by mail with voting by mail when it found:

> By offering mail-in voting to registrants who provided DPOC but not to Federal Form registrants who omitted such documentation, H.B. 2492's mail-in voting restriction disadvantages Federal Form users by placing an additional burden—which is not required by the Federal Form—on federal-only voters to exercise Arizona's preferred method of casting a ballot.

1-ER-0129. There is no federal entitlement to voting by mail, but Federal Form users are not prohibited from submitting DPOC to enjoy voting by mail in Arizona. Whatever the precise source of the district court's concern, it is not a matter of obstacle preemption.

system when they have "reason to believe" such voters are not citizens violates the CRA. 1-ER-0079–0080.

The "Different Practices Provision" of the CRA (52 U.S.C. § 10101(a)(2)(A)) prohibits any official, in determining whether a voting registrant is qualified to vote, from applying to that registrant "any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or other similar political subdivision who have been found by State officials to be qualified to vote." Neither the Ninth Circuit nor its district courts have issued a determinative ruling concerning the proper scope of the Different Practices Provision. Accordingly, this Court must "look to other circuits for guidance." *See Stein v. Wood*, 127 F.3d 1187, 1189 (9th Cir. 1997); *United States v. Jackson*, 697 F.3d 1141, 1145 (9th Cir. 2012).

The proper scope of the Different Practices Provision has been the subject of significant disagreement among the Circuits. While several courts, as referenced by the district court, have construed the Different Practices Provision to be so broad that it covers discrimination on the basis of all characteristics, *see* 1-ER-0079 (citing *Frazier v. Callicutt*, 383 F. Supp. 15, 18–19 (N.D. Miss. 1974) and *Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vt. 1971)), the weight of the authority suggests the Different Practices Provision only concerns cases involving *racial* discrimination. *See O'Neal v. Gresham*, 519 F.2d 803, 805 n.2 (4th Cir. 1975);

*Ballas v. Symm*, 351 F. Supp. 876, 888–89 (S.D. Tex. 1972); *see also Brooks v. Nacrelli*, 331 F. Supp. 1350, 1352 (E.D. Pa. 1971) ("Because the purpose of § 1971 [now 52 U.S.C. § 10101] is to prevent racial discrimination at the polls, the Courts have held that the Section is applicable only where voter intimidation is racially motivated." (citing cases)); *cf. Gremillion v. Rinaudo*, 325 F. Supp. 375, 378 (E.D. La. 1971) (discussing the Voting Rights Act provisions of § 1971 in relation to racial discrimination exclusively). *See generally South Carolina v. Katzenbach*, 383 U.S. 301, 314–16 (1966) (discussing the history of the Civil Rights and Voting Rights Acts insofar as they were meant to cure the effects of discrimination against African American voters).

Even discounting the decisions supporting the latter interpretation, the text of § 10101 illustrates its narrow scope. 52 U.S.C. § 10101(a)(1) specifically provides that "[a]ll citizens of the United States who are otherwise qualified by law to vote at any election . . . shall be entitled and allowed to vote at all such elections, without distinction of *race, color, or previous condition of servitude . . . .*" (emphasis added).

A similar reference in another section of the CRA further indicates that the CRA is intended to address racial discrimination. The term "qualified under State law," as used in § 10101(e), is meant to include qualifications no more stringent than "those used by the persons found . . . to have violated subsection (a) *in qualifying persons other than those of the race or color against which the pattern or practice*

27

*of discrimination was found to exist*." (emphasis added). By specifying "race and color" as the characteristics upon which discrimination may not be based, Congress limited the scope of Section 10101 to those cases dealing exclusively with racial discrimination.

The Reason to Believe Provision does not conflict with the Different Practices Provision as it has nothing to do with any differential treatment based on race. However, assuming, *arguendo*, the minority view—that the Different Practices Provision applies to non-racial and racial discrimination—the question then becomes whether the "practice, policy, or procedure" in question does, in fact, subject certain individuals to a different requirement. It does not.

The Fifth Circuit's decision in *Ballas v. Symm*, 494 F.2d 1167 (5th Cir. 1974) is instructive. In *Ballas*, the court addressed whether a voter registrar's use of a questionnaire to assist in residency determination violated the Different Practices Provision because only a subset of registrants was required to complete the questionnaire. In determining a voter's residency, the registrar used a three-step process, beginning with personal knowledge of a registrant's residency and, if unsatisfactory, moving onto a cross-referencing the registrant's information with the tax roll and, finally, issuing a questionnaire to the registrant. *Id.* at 1172. The court in *Ballas* reasoned that this process did not violate the Different Practices Provision because, despite the varying degrees of investigation, "[t]he standard for registration

28

[wa]s the same for all applicants in [the] County: they must be residents of the state and county." *Id.* The registrar was permitted to conduct deeper and distinct inquiries into those individuals whom the registrar had reason to believe were not residents for registration.

The same reasoning permits Arizona to enforce the Reason to Believe Provision even under the more expansive view of the Different Practices Provision. In its Amended Order, the district court determined that the Reason to Believe Provision violated the Different Practices Provision "because SAVE requires an immigration number, [and, therefore,] county recorders can only ever conduct SAVE checks on naturalized citizens who county recorders have 'reason to believe' are non-citizens." 1-ER-0079. This analysis misses the mark because Arizona's voting requirements apply equally.

The standard required under Arizona's voter registration laws is uniform: Arizona requires that *all* registered voters be United States citizens. *See* A.R.S. § 16-166(F). If a registrant fails to satisfy this standard, either by failing to provide DPOC or by otherwise indicating a lack of citizenship to the county recorder, recorders must then cross-reference that registrant's information with SAVE. A.R.S. § 16-165(I). The district court hangs its hat on its determination that using SAVE to verify citizen status only affects naturalized voters. Whether that determination accurately characterizes A.R.S. § 16-165(I) is irrelevant to the analysis under the Different

29

Practices Provision. Arizona would not be conducting SAVE cross-checks based on a given voter's "naturalized status." Rather, a county recorder's "reason to believe" that a given voter is not a United States citizen triggers this inquiry. *See* A.R.S. § 16-165(I). Such a basis for further investigation was sufficient for the Fifth Circuit in *Ballas*, and the district court should have applied the same reasoning below.

### B. The "Reason to Believe" Provision of H.B. 2243 Does Not Violate Section 8(b) of the NVRA.

Section 8(b) of the NVRA provides, in relevant part, "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for election for Federal office . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 . . . ." 52 U.S.C. § 20507(b)(1).The Reason to Believe Provision does not violate Section 8(b) of the NVRA for largely the same reasons it does not violate the CRA. The Reason to Believe Provision is uniform, nondiscriminatory, and complies with the NVRA in how it governs all voter registrations in Arizona.

The district court determined that the Reason to Believe Provision's perceived unequal effects on naturalized citizens render the Provision non-uniform and discriminatory. 1-ER-0079. This logic is unsound. The Reason to Believe Provision subjects all prospective voters, both naturalized and native citizens alike, to the same citizenship requirement and the county recorder's scrutiny when the recorder has "reason to believe" that an applicant is not a United States citizen. *See* A.R.S. § 16-

30

165(I) (making no distinction between naturalized and native citizens). For compliance with Section 8(b), the relevant question for the district court should have been whether the procedures are uniform and applied without discrimination. Because they are uniform and non-discriminatory, applying equally to all prospective voters, the policy does not violate Section 8(b).

## CONCLUSION

For the foregoing reasons, Proposed Intervenor Republican Party of Arizona respectfully requests that the Court REVERSE the trial court's grant of partial summary judgment and judgment following a bench trial as to the issues raised herein and REMAND the case for amendment of its judgment consistent with the Court's ruling.

Date: July 29, 2024                          Respectfully submitted,
                                             DHILLON LAW GROUP INC.

                                             */s/ Michael A. Columbo*
                                             Harmeet K. Dhillon
                                             Michael A. Columbo
                                             Mark P. Meuser

                                             *Attorneys for Proposed Intervenor*
                                             *Republican Party of Arizona*

31

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(1–2) and Circuit Rule 27-1(1)(d) because this motion contains 7,224 words spanning 31 pages, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 27(a)(2)(B) and 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman size 14-point font with Microsoft Word.

Date: July 29, 2024

                              */s/ Michael A. Columbo*
                              Harmeet K. Dhillon
                              Michael A. Columbo
                              Mark P. Meuser

                              *Attorneys for Proposed Intervenor*
                              *Republican Party of Arizona*

# CERTIFICATE OF SERVICE

I, Michael A. Columbo, counsel for Proposed Intervenor Republican Party of Arizona, hereby certify that I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

Date: July 29, 2024

*/s/ Michael A. Columbo*
Harmeet K. Dhillon
Michael A. Columbo
Mark P. Meuser

*Attorneys for Proposed Intervenor Republican Party of Arizona*