**No. 24-3188, 24-3559 & 24-4029**

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT
_____

MI FAMILIA VOTA, et al.,
*Plaintiffs-Appellees,*

vs.

ADRIAN FONTES, et al.,
*Defendants-Appellees.*

and

REPUBLICAN NATIONAL COMMITTEE, et al.,
*Intervenor-Defendants-Appellants.*
_____

On Appeal from the United States District Court
for the District of Arizona
Hon. Susan R. Bolton
Case No. 22-cv-00509-SRB (Consolidated)

---

### BRIEF OF THE CENTER FOR ELECTION CONFIDENCE, INC.
### AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS

---

Jonathon P. Hauenschild
California Bar No. 249615
**Center for Election Confidence**
4201 Wilson Blvd., Ste. 110-315
Arlington, VA 22203
jhauenschild@electionconfidence.org

August 5, 2024                    *Counsel for* Amicus Curiae

---

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rules of Appellate Procedure 29(a)(4)(A) and 26.1, the Center for Election Confidence, Inc. states that it has no parent corporation and that no publicly held company owns 10 percent or more of its stock.

No publicly held corporation not a party to this case has a financial interest in the outcome of this case.

*/s/ Jonathon P. Hauenschild*
Jonathon P. Hauenschild

*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF CONTENTS ................................................................. ii

INTEREST OF AMICUS CURIAE .................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW...........................2

SUMMARY OF ARGUMENT ......................................................2

ARGUMENT........................................................................4

**I.      The Materiality Provision of the Civil Rights Act Does Not Preempt or Prohibit Arizona's Birthplace Provision.** ......................................4

**II.      Congress Intended for States to Make Eligibility Determinations and the Birthplace Requirement Provides Officials Critical Information to Assist Them in Determining Eligibility Under State Law.**...........................15

CONCLUSION..........................................................................19

CERTIFICATE OF COMPLIANCE ............................................21

CERTIFICATE OF SERVICE.......................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ................................................................4

*Arizona v. Inter Tribal Council of Arizona,*
  570 U.S. 1 (2013) ...........................................................2, 12, 15

*Bostock v. Clayton Cnty.,*
  590 U.S. 644 (2020) ................................................................5

*Brnovich v. Democratic National Committee,*
  594 U.S. 647 (2021) ..............................................................13

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ................................................................4

*Crawford v. Marion County Election Bd.,*
  553 U.S. 181 (2008) ...........................................................4, 13

*Florida State Conf. of the NAACP v. Browning,*
  522 F.3d 1153 (11th Cir. 2008) ................................................9

*New Prime Inc. v. Oliveira,*
  586 U.S. 105 (2019) .............................................................5, 9

*Penn. State Conf. of NAACP Branches v. Sec'y Commonwealth of
  Penn.,*
  97 F.4th 120 (3rd Cir. 2024) ................................................8, 10

*Perrin v. United States,*
  444 U.S. 37 (1979) ..................................................................5

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) ...............................................................4, 13

*United States v. Wong Kim Ark,*
  169 U.S. 649 (1898) ................................................................3

*Vote.org v. Callanen*,
    89 F.4th 459 (5th Cir. 2023) ....................................................................9, 11, 13

**Statutes**

52 U.S.C. § 10101 ...................................................................................................5, 7

52 U.S.C. § 20501 .............................................................................................3, 15, 16

52 U.S.C. § 20503 .......................................................................................................15

52 U.S.C. § 20504 ...................................................................................................8, 15

52 U.S.C. § 20505 .................................................................................................14, 15

52 U.S.C. § 20506 .......................................................................................................16

52 U.S.C. § 20507 .......................................................................................................16

52 U.S.C. § 20511 .......................................................................................................19

Ariz. Rev. Stat. § 16-101 ...........................................................................................13

Ariz. Rev. Stat. § 16-121.01 ..........................................................................3, 8, 12, 14

Ariz. Rev. Stat. § 16-166 ...........................................................................................14

Ariz. Rev. Stat. § 16-182 ...........................................................................................19

Ariz. Rev. Stat. § 16-1016 .........................................................................................19

Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241......................................7

Illegal Immigration Reform and Immigrant Responsibility Act of
    1996, Pub. L. No. 104-208, 110 Stat. 3009 ..........................................................3

Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 ...................................7

**Constitutional Provisions**

Ala. Const. art. VIII, § 177 ..........................................................................................6

Ariz. Const. art. VII, § 2 ..........................................................................................3, 6, 13, 18

Colo. Const. art. VII, § 1.............................................................................................6

iv

Fla. Const. art. VI, § 2 ................................................................6

Ind. Const. art. II, § 2 ................................................................6

La. Const. art. 1, § 10 ................................................................6

Minn. Const. art. VII, § 1 ...........................................................6

Ohio Const. art. V, § 1 ...............................................................6

Penn. Const. art. VII, § 1 .......................................................6, 18

Tenn. Const. art. IV, § 1 .............................................................6

Tex. Const. art. VI, § 2 ...............................................................6

U.S. Const. amend. XII ..............................................................12

U.S. Const. amend. XV ...............................................................7

U.S. Const. amend. XVII .............................................................7

U.S. Const. amend. XIX ..............................................................7

U.S. Const. amend. XXVI ...........................................................7

U.S. Const. art. I, § 2 .................................................................7

U.S. Const. art. I, § 4 .............................................................2, 12

Va. Const. art. II, § 1 .........................................................6, 12, 18

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .............................................................5

Derek T. Muller, *What's Old is New Again: The Nineteenth Century Voter Registration Debates and Lessons About Voter Identification Disputes*, 56 Washburn L.J. 109 (2017) .............................................10

Election Assistance Commission, National Voter Registration Application Form for U.S. Citizens (last updated Jan. 22, 2024), https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf ...........................................................6

Former U.S. Rep. Rodney Davis, U.S. H. of Reps., Comm. On H.
    Admin., *Report: The Elections Clause: States' Primary
    Constitutional Authority Over Elections*, U.S. H. of Reps., Comm.
    on H. Admin. (Aug. 12, 2021),
    https://cha.house.gov/_cache/files/8/b/8b7e408f-b0b8-427f-85af-
    261bab2666cc/0620A081A2ADA15BF06CD47CB190DC13.repor
    t-the-elections-clause-states-primary-constitutional-authority-over-
    elections-aug-11-2021-.pdf .................................................................12

Frank H. Easterbrook, *The Role of Original Intent in Statutory
    Construction*, 11 Harv. J. Law & Pub. Policy 59 (1988) ....................................9

H.B. 2492, 55th Leg., 2d Reg. Sess. (Ariz. 2022) ........................................3

H.R. Rep. No. 88-914 (1963)..................................................................11

H.R. Rep. No. 103-9 (1993)...................................................................16

H.R. Rep. No. 118-386 (2024),
    https://www.congress.gov/118/crpt/hrpt386/CRPT-118hrpt386.pdf ..........12, 16

S. Rep. No. 103-6 (1993) .................................................................17, 18

Vanessa M. Perez, *America's First Voter Identification Laws: The
    Effects of Personal Registration and Declining Political Party
    Competition on Presidential Election Turnout, 1880-1916*, 69
    Electoral Studies (Feb. 2021),
    https://www.sciencedirect.com/science/article/pii/S026137942030
    1426..................................................................................................10

## INTEREST OF AMICUS CURIAE[1]

Center for Election Confidence, Inc. ("CEC") is a non-profit organization that promotes ethics, integrity, and professionalism in the electoral process. CEC works to ensure that all citizens can vote freely within an election system of reasonable procedures that promote election integrity, prevent vote dilution and disenfranchisement, and instill public confidence in election systems and outcomes. To accomplish this, CEC conducts, funds, and publishes research and analysis regarding the effectiveness of current and proposed election methods. CEC is a resource for lawyers, journalists, policymakers, courts, and others interested in the electoral process. CEC also periodically engages in public-interest litigation to uphold the rule of law and election integrity and files *amicus* briefs in cases where its background, expertise, and national perspective may illuminate the issues under consideration.

With respect to the intersection of election integrity laws and the Materiality Provision of the Civil Rights Act, CEC submitted *amicus* briefs to the U.S. Court of Appeals for the Eleventh Circuit in *Disability Rights Florida v. Secretary, State of Florida*, No. 23-13727 (11th Cir. May 22, 2024) and *In re: Georgia Senate Bill 202*,

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than the *amicus* and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

1

No 23-13085 (11th Cir. July 8, 2024). Additionally, CEC (when previously known as Lawyers Democracy Fund) submitted an *amicus* brief to the U.S. Supreme Court in *Ritter v. Migliori*, advocating for vacatur of the Third Circuit's unprecedented opinion in *Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *judgment vacated sub nom Ritter v. Migliori*, 143 S. Ct. 297 (2022). CEC also submitted an *amicus* brief to the Supreme Court of Pennsylvania in *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023), advocating that the state high court respect the policy judgments of the state's General Assembly and enforce the signature and date requirement for absentee ballots. Both courts ruled in favor of the positions advocated by CEC.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

This brief focuses on whether the district court erred in holding that the Materiality Provision of the Civil Rights Act of 1964 prohibits Arizona from requiring citizens to state their country of birth in order to register to vote.

## SUMMARY OF ARGUMENT

Congress never intended the Materiality Provision or the National Voter Registration Act ("NVRA") to preempt state election registration or administration laws. Indeed, the Constitution limits Congress's authority over elections, cabining it to the "time, manner, and place" of federal congressional elections—a limitation that both the Provision and NVRA recognize expressly. *See* U.S. Const. art. I, § 4, cl. 1; *Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1, 16 (2013). The Provision

2

preempts certain *practices* states employed to deny individuals the right to vote where those practices were unconnected to state eligibility standards. Similarly, Congress intended the NVRA to increase voter participation by establishing "procedures that will increase the number of eligible citizens who register to vote in elections for *Federal office*." 52 U.S.C. § 20501(b)(1) (emphasis added).

Federal law requires voters in federal elections to be United States citizens.[2] Arizona, through its constitution and law, has long required voters to be United States citizens.[3]  Accordingly, Arizona has legal authority and responsibility to determine the citizenship of each individual who seeks to register to vote.  The federal voter registration form requires each individual applying to register to attest whether or not he or she is a U.S. citizen, which Arizona considers.  In addition, Arizona asks each individual who applies to register to state the place of his or her birth.  If the person claims to have been born in the United States, U.S. citizenship is presumed.[4]  If the person claims to have been born in another country, then Arizona knows to check the individual's naturalization status.  The information requested is

---

[2] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, 3009-546.

[3] Ariz. Const. art. VII, § 2(A); H.B. 2492, 55th Leg., 2d Reg. Sess. (Ariz. 2022) (codified in Ariz. Rev. Stat. § 16-121.01(A)).

[4] *See United States v. Wong Kim Ark*, 169 U.S. 649 (1898) (holding that birth in the United States subject to the jurisdiction of domestic laws establishes a person's natural born citizenship).

3

relevant and material to determining the individual's substantive qualification to register and vote in both federal and state elections.

In addition to aiding officials' determination of voter eligibility, the birthplace requirement serves an important public policy function of preventing fraud and, thus, increasing public participation in elections. States have a "compelling interest in preserving the integrity of [their] elections process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). Laws designed to instill public confidence in the electoral process fulfill a critical public policy objective: encouraging public participation. *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 197 (2008). So long as the laws enacted are adequately tailored to serve this important government interest, courts will sustain them. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

Accordingly, the question regarding birthplace does not violate the Materiality Provision of the Civil Rights Act of 1964.

## ARGUMENT

## I.    The Materiality Provision of the Civil Rights Act Does Not Preempt or Prohibit Arizona's Birthplace Provision.

The Materiality Provision forbids state officials from denying a prospective voter's registration based on an "error or omission" that is "not material in determining whether such individual is qualified *under State law* to vote in such

4

election." 52 U.S.C. § 10101(a)(2)(B) (emphasis added).[5]  For the Provision to apply, the "error or omission" must not be material "under State law."  It does not apply to errors or omissions that State law determines are material.  In short, the Provision by its text does not, and cannot, preempt state law.

When seeking to interpret a statute, such as the Provision, courts must do so "in accord with the ordinary public meaning of its terms at the time of enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020); *see also New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019).  This means, unless Congress specifically defines a term, "words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citations omitted). And courts should construe the entire text, giving effect to "every word and every provision."[6]

———————————

[5] The relevant text of the Materiality Provision provides,

> No person acting under color of law shall … deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).

[6] Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174-79 (Ch. 26, Surplusage Canon), 167-69 (Ch. 24, Whole-Text Canon) (2012).

All states currently require voters to be U.S. citizens to vote in state elections.[7] Many state constitutions, including the Arizona Constitution, expressly requires all voters to be citizens of the United States.[8]  Arizona's birthplace requirement can help officials assess whether a prospective voter satisfies the state's citizenship requirement. When a prospective voter swears that he was born in the United States, Arizona can verify the information by asking the state listed as the place of birth if it has a record of a person with X name being born on Y date.  Further, if an applicant lists a foreign birthplace, Arizona can look to the federal government as the proper entity to confirm citizenship.[9]

---

[7] "All States require that you be a United States citizen by birth or naturalization to register to vote in federal and State elections.  Federal law makes it illegal to falsely claim U.S. citizenship to register to vote in any federal, State, or local election." Election Assistance Commission, National Voter Registration Application Form for U.S. Citizens (last updated Jan. 22, 2024), https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf.  A handful of localities permit noncitizens to vote in local elections. States could require actual proof of U.S. citizenship as a condition of registration, but Arizona requires only information about country of birth to assist it in conducting further research about the voter's qualifications.

[8] Ariz. Const. art. VII, § 2(A). *See also*, *e.g.*, Ala. Const. art. VIII, § 177(a); Colo. Const. art. VII, § 1; Fla. Const. art. VI, § 2; Ind. Const. art. II, § 2(a); La. Const. art. 1, § 10(a); Minn. Const. art. VII, § 1; Ohio Const. art. V, § 1; Penn. Const. art. VII, § 1; Tenn. Const. art. IV, § 1; Tex. Const. art. VI, § 2, Va. Const. art. II, § 1.

[9] *See also* First Brief on Cross-Appeal of State of Arizona and Arizona Attorney General at 16-25.

Finally, there is the possibility of discrepancies. If a prospective voter says he was born domestically, but includes a naturalization number, it suggests something is wrong with the application. Similarly, something may be wrong with an application if a prospective voter says he was born in Canada but includes a copy of a domestic birth certificate. Even the United States, for example, requires birthplace on passport applications because it "is an integral part of establishing an individual's identity. It distinguishes that individual from other persons with similar names and/or dates of birth and helps identify claimants attempting to use another person's identity." 8 FAM 403.4-6(A) (U.S. Dept. of State Foreign Affairs Manual).

Subject only to certain limitations, Congress cannot preempt state authority to determine eligibility of voters prior to registration.[10] Federal laws, like the National Voter Registration Act ("NVRA") require the transmission of "the minimum amount

---

[10] *See* U.S. Const. amends. XV, XIX, and XXVI. Congress exercised some of the authorities granted by them when enacting the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241; 52 U.S.C. § 10101(a)(1) and (2) (providing that all citizens of the United States "who are otherwise qualified by law at any election by the people in any State" and referencing qualifications under state law); and Voting Rights Act of 1965, Pub. L. No. 89-110, § 7(b), 79 Stat. 437, 440 (barring voter qualification laws "imposed or applied … on account of race or color" while referencing qualifications prescribed by State law not "inconsistent with the Constitution and laws of the United States"). Other than these provisions, the Constitution deprives the federal government of the authority to preempt state voter eligibility laws. *See* U.S. Const. art. I, § 2, cl. 1; *id.* amend. XVII, cl. 2 (collectively the "Qualifications Clauses").

of information necessary to… enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20504(c)(2)(B)(ii). Accepting Plaintiff-Appellees' arguments would force states to accept, without question, the information prospective voters include on registration forms, a result contrary to the Provision's text and Constitutional limitations on Congressional authority.

The requirement that an applicant list his or her place of birth is an essential tool for Arizona election officials who are charged with determining whether additional scrutiny is necessary for any registrant. The law at the heart of this dispute not only requires voters using the state form to include their place of birth when registering to vote; it also directs county recorders to reject any application using the state form that lacks proof of citizenship. *See* 2022 Ariz. Sess. Laws Ch. 99, § 4 (amending Ariz. Rev. Stat. § 16-121.01(A)) (hereafter Ariz. Rev. Stat. § 16-121.01(A)).

Meanwhile, the Materiality Provision prevents states from denying a prospective voter the right to participate "based on an error or omission in paperwork involving his application if that mistake is immaterial in determining whether he is qualified to vote." *Penn. State Conf. of NAACP Branches v. Sec'y Commonwealth of Penn.*, 97 F.4th 120, 131 (3rd Cir. 2024). If, under state law, information is relevant to determining whether a voter is qualified, it is material.

8

Congress did not specially define the term "material" in the Provision. Courts must, therefore, apply the accepted rules of statutory construction and look to the dictionary definition of the term. *New Prime Inc.*, 586 U.S. at 113. The definition of "material" has not significantly changed since 1965. Modern definitions indicate that the term means "[o]f such a nature that knowledge of the item would affect a person's decision-making: significant; essential" and "[o]f serious or substantial import; significant, important, of consequence." *Vote.org v. Callanen*, 89 F.4th 459, 478 (5th Cir. 2023) (citations omitted); *see also Florida State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1172-1175 (11th Cir. 2008) (opining on the different definitions of "material" and finding photo identification or social security numbers are material for voter registration because Congress deemed them to be).

To understand what the authors of the statute may have considered to be material, or immaterial, it is useful to look at the "sort of problem [Congress] was trying to address," along with examining the brief history of voter registration and the state registration practices Congress wanted to eliminate.[11] While this type of examination can never supplant a textual analysis of the Provision, it can help elucidate why Congress used certain terms.

---

[11] Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 Harv. J. Law & Pub. Policy 59, 61 (1988).

9

Voter registration laws arose in the late 19th Century as a response to allegations of mass voter fraud.[12]  Early versions of voter registration required individuals to register in person with the relevant board, mandated publication of registration details in newspapers, and set preliminary deadlines by which voters had to be registered to participate in an election.[13]  The registration processes included, as ways to reduce fraud, general descriptions of state voter eligibility requirements.[14] Over the course of time, registration processes moved from in-person to registration through affidavit and, eventually, to the mail-in process popular through the mid-1990s.[15]

During the early to mid-1960s, registrars rejected applicants "for failing to calculate their age to the day, misspelling Louisiana, underlining Mr. when it should have been circled, or the Catch-22 of identifying their skin color as Negro instead of brown, or brown instead of Negro." *Penn. State Conf. of NAACP Branches*, 97 F.4th

---

[12] Vanessa M. Perez, *America's First Voter Identification Laws: The Effects of Personal Registration and Declining Political Party Competition on Presidential Election Turnout, 1880-1916*, 69 Electoral Studies (Feb. 2021), https://www.sciencedirect.com/science/article/pii/S0261379420301426.

[13] *Id.*

[14] *Id.*

[15] Derek T. Muller, *What's Old is New Again: The Nineteenth Century Voter Registration Debates and Lessons About Voter Identification Disputes*, 56 Washburn L.J. 109, 109-15 (2017), https://ssrn.com/abstract=3107326.

at 126 (citing Report of the U.S. Commission on Civil Rights (1963)) (cleaned up).

Other registrars required applicants to "analyze long sections of the Constitution" in

addition to rejecting registrations for "simple misspellings." *Callanen*, 89 F.4th at

487 (citing H.R. Rep. No. 88-914 (1963)).  Not only are these factors unrelated to

state eligibility requirements, but the registrars also applied the standards differently

depending on the prospective voter's race.  Because of variances in how individual

registrars applied state standards, Congress wanted state and local election officials

to

> (1) apply standards, practices, and procedures equally among individuals seeking to register to vote; (2) disregard minor errors or omissions if they are not material in determining whether an individual is qualified to vote; (3) administer literacy tests in writing.

H.R. Rep. No. 88-914.

Election-related laws enacted after the Civil Rights Act, such as the NVRA

and Help America Vote Act ("HAVA"), confirm Congress' understanding that states

maintain the authority to make establish voter qualifications and laws to protect the

integrity of elections.  Congress enacted the broader Civil Rights Act and Voting

Rights Act under its authority granted by the Fifteenth Amendment to ensure that

states cannot discriminate because of race.  Meanwhile, the Nineteenth, Twenty-

Fourth, and Twenty-Sixth Amendments ensure states cannot discriminate based on

gender, prohibit poll taxes, and establish the minimum age for voting.  Congress

enacted the NVRA and HAVA under its limited authority granted by the

Constitution's Elections Clause, which, subject to restrictions, "empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 16 (2013).[16]  With the limitations just listed, "who may vote" is the province of states.

State laws, such as Ariz. Rev. Stat. §16-121.01, play an important role not just with providing material information for election officials, but also ensuring the integrity of the registration process—by ensuring that noncitizens are not accidentally registered.  The Supreme Court has repeatedly recognized the interest states have in ensuring public confidence in elections.  States "indisputably [have] a

---

[16] As ably discussed in other briefs, the Constitution's Elections Clause empowers Congress to alter state "time, place and manner" regulations related only to "elections for Senators and Representatives."  U.S. Const. art. I, § 4, cl. 1.  Br. of Appellants Republican National Committee, Warren Petersen, and Ben Toma, at 14-18, ECF No. 101.1; Br. of Proposed Intervenor Republican Party of Arizona, at 16-19, ECF No. 107.1.  The Constitution separately lays out election standards for President and strictly limits what authority Congress possess with respect to Presidential elections. *See*, U.S. Const. art. II, § 1 ("Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors… The Congress may determine the Time of [choosing] the Electors, and the Day on which they shall give their votes"); *id.* amend. XII. *See also* H. R. Rep. No. 118-386, at 6 (2024), https://www.congress.gov/118/crpt/hrpt386/CRPT-118hrpt386.pdf; Former U.S. Rep. Rodney Davis, U.S. H. of Reps., Comm. On H. Admin., *Report: The Elections Clause: States' Primary Constitutional Authority Over Elections*, U.S. H. of Reps., Comm. on H. Admin. (Aug. 12, 2021), https://cha.house.gov/_cache/files/8/b/8b7e408f-b0b8-427f-85af-261bab2666cc/0620A081A2ADA15BF06CD47CB190DC13.report-the-elections-clause-states-primary-constitutional-authority-over-elections-aug-11-2021-.pdf.

compelling interest in preserving the integrity of [their] election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (citation omitted).  Importantly, laws designed to protect the integrity of the election, at any stage in the process, fulfill a critical policy goal: instilling public confidence in the electoral process "because it encourages citizen participation in the democratic process."  *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 197 (2008).[17]

Since materiality turns on eligibility, it is necessary to examine state eligibility standards and how the challenged law relates to those standards. The Arizona Constitution requires voters to be citizens of the United States.

> No person shall be entitled to vote at any general election, or for any office that now is, or hereafter may be, elective by the people, or upon any question which may be submitted to a vote of the people, unless such person be a citizen of the United States of the age of eighteen years or over.

Ariz. Const. art. VII, § 2(A).  The Legislature repeated the qualification standards found in the constitution within state law.  Ariz. Rev. Stat. § 16-101.

When an individual attempts to register in the state, he may do so using a form produced by the United States Election Assistance Commission (the "Federal

---

[17] *See also Brnovich v. Democratic National Committee*, 594 U.S. 647, 686 (2021) (recognizing, in the context of absentee ballots, that a "State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders"); *Callanen*, 89 F.4th at 487-89 (acknowledging that states have wide latitude when establishing voter qualification laws).

Form") or by using a state form.[18]  Ariz. Rev. Stat. § 16-121.01(C).  When the prospective voter utilizes a state form, he must provide "satisfactory evidence of citizenship" as prescribed by law. Satisfactory evidence of citizenship, in turn, includes a driver's license or nonoperating identification number "if the agency indicates… that the person has provided satisfactory proof of United States citizenship," a copy of a birth certificate, a copy of a United States passport, naturalization documents, and Bureau of Indian Affairs card numbers.  Ariz. Rev. Stat. § 16-166(F).

The Materiality Provision does not preempt state law including Ariz. Rev. Stat. § 16-121.01(A).  Through later election and voting legislation, Congress clearly left state laws governing the registration and electoral processes in place, ensuring that state could still establish eligibility standards and determine whether prospective voters satisfied those standards.

---

[18] The NVRA permits states to develop and use their own forms. "In addition to accepting and using [the federal form], a State *may develop and use* a mail voter registration form that meets all of the criteria stated in section 20508(b) of this title for the registration of voters in elections *for Federal office*."  52 U.S.C. §20505(a)(2) (emphasis added).  The plain text of the NVRA, thus, both permits states ("may" is indicative of permission rather than mandatory language) and limits the application of the NVRA only to elections for federal office.

14

## II. Congress Intended for States to Make Eligibility Determinations and the Birthplace Requirement Provides Officials Critical Information to Assist Them in Determining Eligibility Under State Law.

In addition to the Provision hinging on state law, Arizona's birthplace requirement is material because Congress presumed states would maintain eligibility standards when enacting both the NVRA and HAVA and because Congress lacks the authority under the Voting Rights Amendments and Elections Clause to preempt state eligibility laws and determinations. "Prescribing voting qualifications, therefore, 'forms no part of the power to be conferred upon the national government' by the Elections Clause, which is 'expressly restricted to the regulations of the *times*, the *places*, and the *manner* of elections.'" *Inter Tribal Council of Arizona*, 570 U.S. at 17 (citation omitted).

Because of constitutional limitations on its authority, Congress necessarily restricted the NVRA to elections for federal office, leaving states free to develop and use registration forms for their elections for state offices. Congress noted in the Act's purposes that it wanted to "establish procedures that will increase the number of eligible citizens who register to vote in elections for *Federal office*." 52 U.S.C. § 20501(b)(1) (emphasis added); *see also id.* §§ 20503(a) (establishing "procedures to register to vote in elections for Federal office"), 20504(a)(1), 20504(c)(1) (Department of Motor Vehicle ("DMV") forms to "serve as an application for voter registration with respect to elections for Federal office"), 20505(a)(1) (use of mail

15

forms "for the registration of voters in elections for Federal office"), 20506(a)(1) (designation of agencies "for the registration of voters in elections for Federal office"), and 20507(a)(1) (establishing procedures in "the administration of voter registration for elections for Federal office"). It also frequently used the term "eligible" without attaching any special meaning to the term, thus leaving the standards to the states.[19]

Committee reports from the House and Senate confirm that Congress intended for state officials to continue the practice of determining voter eligibility. The Report from the Committee on House Administration stated that it was "particularly interested in ensuring that election officials continue to make determinations as to applicant's eligibility, such as citizenship, as are made under current law and practice." H.R. Rep. No. 103-9, at 8 (1993).[20]

---

[19] *See, e.g.*, 52 U.S.C. §§ 20501(b) (increasing the "number of eligible citizens" who register and participate as voters), 20507(a)(1) (requiring states to "ensure that any eligible applicant is registered to vote"), 20507(a)(3) (preventing a state from removing eligible voters from the registration lists absent certain conditions), 20507(a)(4) (requiring states to have a program designed to remove ineligible voters from the official lists of eligible voters).

[20] *See also* H.R. Rep. No. 118-386 (2024), https://www.congress.gov/118/crpt/hrpt386/CRPT-118hrpt386.pdf (offering a more recent look at the Committee's view of how the NVRA's language applies to voter eligibility).

Similarly, the Report from the Senate Committee on Rules and Administration provided that

> "Under [the NVRA], the role of the motor vehicle registrar is to provide forms to applicants and receive completed voter applications for transmittal to the appropriate State voting registration official. It is that official who determines whether or not to accept the application and place the name on the voting roll for the appropriate voting jurisdiction… Nowhere does the [law] suggest that that determination be made by anyone other than the appropriate voting registrar under State law."

S. Rep. No. 103-6, at 7 (1993).

During the debate, some senators were concerned that the NVRA transferred registration authority away from election officials to state DMVs and agencies. The Committee on Rules and Administration expressly disclaimed any such transfer, confirming its intent that state election officials make eligibility decisions. The transfer of registration authority

> is not the intent of this bill. This bill provides only that the role of the agency-based registration program is to provide forms to applicants and receive completed voter applications for transmittal to the appropriate State voting registration official. *It is the voter registration official who determines whether or not to accept the application* and place the name on the voting roll for the appropriate voting jurisdiction… There is no provision in this bill which would require or suggest that determination be made by anyone other than the appropriate voting registrar under State law.

S. Rep. No. 103-6, at 17 (emphasis added).

The Senate Committee also recognized that many states required citizenship as a criterion for voter registration and expressly disclaimed any language in the

17

NVRA that would supplant state officials' authority to make such decisions. "Election officials should continue to make determinations as to an applicants [sic] eligibility, *such as citizenship, as are made under current law and practice*." S. Rep No. 103-6, at 25 (emphasis added).

In 1993, several states, including Arizona, had constitutional provisions limiting voter eligibility to U.S. citizens. Arizona's elector qualification provision was originally enacted in 1912 and amended only twice: once in 1962 and again in 2000, with the 2000 amendment only adding subparagraph B (lowering the voting age to eighteen) and subparagraph C (disqualifying felons). *See* Ariz. Const. Ann. art. VII, § 2.[21] Virginia's Constitution, effective in 1971, requires each voter to "be a citizen of the United States," and has only been amended four times, none of which altered the citizenship qualification. Va. Const. Ann. art. II, § 1. Similarly, Pennsylvania requires a voter to be "a citizen of the United States at least one month" in order to both register and vote. Penn. Const. art. VII, § 1. The people of Pennsylvania adopted the state constitution in 1901 and the voter qualification provision was last amended in 1967. *Id.*

---

[21] *See* First Brief on Cross-Appeal of State of Arizona and Arizona Attorney General at 4-8 (describing history of Arizona's birthplace requirement).

Finally, Congress itself provided criminal penalties for the knowing and willful deprivation of the

> residents of a State of a fair and impartially conducted election process, by . . . the procurement or submission of voter registration applications that are known by the person to be materially false, fictitious, or fraudulent *under the laws of the State* in which the election is held; or . . . the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent *under the laws of the State* in which the election is held . . . .

52 U.S.C. § 20511(2) (emphasis added).

Arizona law, in turn, makes it a crime for a person "who knowingly causes, procures or allows himself to be registered as an elector . . . knowing that he is not entitled to such registration" and makes it a felony for anyone who "not being entitled to vote, knowingly votes." Ariz. Rev. Stat. §§ 16-182(A), 16-1016(1).

Requiring prospective voters to use the state form to list their birthplace is material, as it is essential for election officials' eligibility determinations under state law. Neither the Materiality Provision nor the NVRA preempt state voter eligibility laws or determinations. Rather, Congress intended for states to continue making eligibility determinations. Arizona is free to add documentary requirements essential for officials to make those eligibility determinations.

## CONCLUSION

Arizona has a profound responsibility to ensure that only U.S. citizens vote in its elections and has tailored a material, relevant, and straightforward question on its

registration form to assist election officials in fulfilling that responsibility.  For the reasons set forth above, this Court should reverse the decision of the lower court finding that Arizona's request for each applicant's birthplace is immaterial under the Civil Rights Act of 1964.

Dated: August 5, 2024                    Respectfully submitted,

                                         */s/ Jonathon P. Hauenschild*
                                         Jonathon P. Hauenschild

                                         *Counsel for* Amicus Curiae

20

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of FED. R. APP. P. 27(d)(2)(A) and Circuit Rule 27-1(1)(d) because the motion contains 4,706 words and 20 pages, including footnotes, but excluding the parts of the motion exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface and type style requirements of FED. R. APP. P. 27(d)(1)(E) because the motion has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

Dated: August 5, 2024                    Respectfully submitted,

*/s/ Jonathon P. Hauenschild*
Jonathon P. Hauenschild
California Bar No. 249615
**Center for Election Confidence**
4201 Wilson Blvd., Ste. 110-315
Arlington, VA 22203
jhauenschild@electionconfidence.org

*Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

I certify that on August 5, 2024, I electronically filed the foregoing brief with the Clerk for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

Dated: August 5, 2024                    */s/ Jonathon P. Hauenschild*
                                         Jonathon P. Hauenschild

                                         *Counsel for* Amicus Curiae