Nos. 24-3188, 24-3559 & 24-4029

_____

In the United States Court of Appeals
for the Ninth Circuit
_____

MI FAMILIA VOTA, et al.,

*Plaintiff-Appellees,*

v.

ADRIAN FONTES, et al.,

*Defendants-Appellants,*

and

REPUBLICAN NATIONAL COMMITTEE, et al.,

*Intervenor-Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the District of Arizona
Hon. Susan R. Bolton
Case No. 2:22-cv-00509-SRB (Consolidated)

_____

## BRIEF OF AMICUS CURIAE ARIZONA FREE ENTERPRISE CLUB

Dominic E. Draye
GREENBERG TRAURIG, LLP
2375 E. Camelback Rd. Ste. 800
Phoenix, AZ 85016
(602) 445-8000
drayed@gtlaw.com

Nick Peterson
GREENBERG TRAURIG, LLP
222 S. Main Street, Ste. 1730
Salt Lake City, UT 84101
(801) 478-6923
nick.peterson@gtlaw.com

*Counsel for Amicus Curiae Arizona Free Enterprise Club*

## DISCLOSURE STATEMENT

Arizona Free Enterprise Club ("AZFEC") is a non-profit corporation organized under Section 501(c) of the Internal Revenue Code.  It does not have any shareholders.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ............................................................. i

TABLE OF CONTENTS .................................................................. ii

INTEREST OF AMICUS CURIAE ...................................................... 1

INTRODUCTION ......................................................................... 2

ARGUMENT ............................................................................... 6

    I.    Arizona Adopted the Voting Laws to Serve Legitimate
          Purposes, Free from Discriminatory Animus ........................ 6

          A.    Legitimate Purposes Undergird Arizona's
               Exercise of its Sovereign Authority to Regulate
               and Enforce Election Qualifications via the
               Voting Laws ............................................................. 6

          B.    Plaintiffs Failed to Demonstrate Any
               Discriminatory Animus ............................................. 10

    II.   Constitutional Text and the Cannon of Constitutional
          Avoidance Demand Enforcement of the Voting Laws .......... 15

CONCLUSION ............................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

*Abbott v. Perez,*
585 U.S. 579 (2018)..............................................................................15

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
570 U.S. 1 (2013)......................................................... *passim*

*Arizona v. United States,*
567 U.S. 387 (2012)..............................................................................13

*Bush v. Gore,*
531 U.S. 98 (2000) .................................................................................7

*Crawford v. Marion Cnty. Election Bd.,*
553 U.S. 181 (2006)................................................................................8

*Ex parte Siebold,*
100 U.S. 371 (1879)................................................................................7

*Fitzgerald v. Green,*
134 U.S. 377 (1890)................................................................................8

*McPherson v. Blacker,*
146 U.S. 1 (1892).....................................................................................6

*Texas v. United States,*
328 F. Supp. 3d 662 (S.D. Tex. 2018) .................................................13

*United States v. Michigan,*
68 F.4th 1021 (6th Cir. 2023) .............................................................19

### State Cases

*Cadet-Legros v. N.Y. Univ. Hosp. Ctr.,*
21 N.Y.S.3d 221 (2015) ........................................................................13

Statutes

The Illegal Immigration Reform and Immigration
   Responsibility Act of 1996, Pub. L. No. 104-208 ............................... 13

Other Authorities

Adriana Gomez Locon, *Biden's reference to 'an illegal'
   rankles some Democrats who argue he's still preferable to
   Trump*, APNews (Mar. 8, 2024),
   https://apnews.com/article/illegal-biden-backlash-laken-
   riley-41819b01c3942435f0f862789cd1d0f0 ....................................... 13

Civil Litigating Components United States Att'ys, *Principles
   and Proc. for Civil Consent Decrees and Settlement
   Agreements with State and Local Governmental Entities*
   (Nov. 7, 2018), https://www.justice.gov/opa/press-
   release/file/1109681/dl ............................................................... 19

Daniel Stefanski, *Panel Rejects Hobbs' Nominee as RoC
   Head*, AZ Free News (June 3, 2023),
   https://azfreenews.com/2023/06/panel-rejects-hobbs-
   nominee-quezada-as-roc-head/ ........................................................ 12

Fed. R. App. P. 29 ................................................................................. 1

ARIZ. CONST. art. VII, § 2 ..................................................................... 7

U.S. CONST. art. I, § 2 ..................................................................... 2, 16

U.S. CONST. art. I, § 4 ............................................................. 4, 7, 15, 17

U.S. CONST. art. II, § 1 ............................................................. 4, 15, 18

## INTEREST OF AMICUS CURIAE[1]

The Arizona Free Enterprise Club ("AZFEC") is a public policy think tank and advocacy organization dedicated to free markets, limited government, and the rule of law. It was instrumental in the drafting and adoption of the statutes at issue in this case, as the district court noted. AZFEC is therefore invested in the outcome of this litigation and brings a unique perspective on the sole motivation behind the laws' adoption— ensuring election integrity and restoring voters' confidence in Arizona elections.

None of the parties to this litigation oppose AZFEC's participation as amicus curiae, though a number of nominal defendants as well as the Arizona Democratic Party and Democratic National Committee declined to affirmatively consent, thus requiring the accompanying motion for leave to file. Fed. R. App. P. 29(a)(2).

---

[1] No party or party's counsel authored this brief in whole or part, nor did they contribute any money to fund the preparation of this brief. Only Amicus and its members paid for the preparation of this brief. Fed. R. App. P. 29(a)(4)(E).

1

## INTRODUCTION

Arizona has plenary authority under the United States Constitution to establish and enforce qualifications for federal elections, provided they mirror the qualifications for electing the "most numerous branch of the state legislature." U.S. CONST. art. I, § 2, cl. 1; amend. XVII. Those qualifications include U.S. citizenship. Ideally, Arizona would be able to enforce that qualification in the same way for state and federal elections regardless of the form used: documented proof of citizenship at the time of registration. The Supreme Court foreclosed that approach as preempted by the National Voter Registration Act ("NVRA") in *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ("*Inter Tribal Council*"). But the Court noted that the State could continue to require proof of citizenship to vote in state elections.

Arizona did just that until 2018, when the then-Secretary of State entered a consent decree agreeing that her office would adopt a different approach. That decree has now expired, and even if it had not, the Secretary was powerless to bind the county recorders, who administer voter registration. Thus, the Arizona Legislature adopted H.B. 2492, which restored the proof-of-citizenship rules that existed both before ***and***

2

*after* Inter Tribal Council. The law also added additional protections to ensure that individuals who had already established their citizenship through another means (*e.g.,* when applying for a driver's license) and those for whom the county recorders obtain evidence of citizenship on their behalf, are fully registered to vote in all elections.

Simply put, the Voting Laws require county recorders to reject *state forms* that are not accompanied by proof of citizenship. "States retain the flexibility to design and use their own registration forms." *Inter Tribal Council of Ariz., Inc.*, 570 U.S. at 12. The Voting Laws require county recorders to utilize several databases to obtain evidence of citizenship when an applicant uses a Federal Form without proof of citizenship. If evidence is obtained that the applicant is a citizen, the applicant is fully registered and may vote in all elections. If the county recorder cannot determine whether the applicant is or is not a citizen, the applicant is still registered as a Federal Only Voter. "The NVRA forbids States to demand that an applicant submit additional information beyond that required by the Federal Form." *Id.* at 15. If, however, the county recorder obtains evidence that the applicant is *not* a citizen, only then is the application rejected. "[The NVRA] does not preclude States from

3

"deny[ing] registration based on information in their possession establishing the applicant's ineligibility." *Id.*

In short, the Supreme Court spoke in 2013 on the primary proof of citizenship provisions of the Voting Laws. These provisions do precisely what the *Inter Tribal Counsel* court said is permissible, and should therefore be immediately enforced.

Moreover, also consistent with *Inter Tribal Council*, Arizona took steps to remove voters from the rolls for whom it possesses information that the person is ineligible. 570 U.S. at 15. And it concluded that federal-only voters must vote in person, which has the added benefit of instantly qualifying any federal-only voter who provides a qualifying identification—a measure that actually expands the franchise. More importantly, the NVRA says nothing about voting by mail. And it does not and cannot regulate the election of presidential electors, which the Constitution assigns exclusively to the States in a separate constitutional provision without the preemption clause in the Elections Clause. *Compare* U.S. CONST. art. II, § 1 *with id.* art. I, § 4.

Although the lower court in the instant case nodded to Arizona's authority in this area, it nevertheless construed the NVRA to require

4

invalidation of key provisions of H.B. 2492 and H.B. 2243 (the "Voting Laws").

Importantly, the district court accurately identified the State's prerogative to adopt constitutional voter qualifications. It rejected Plaintiffs' baseless theory of racial animus that would indict every State in the nation based on long-past misdeeds in which the current legislature had no part. The district court's only error regarding legislative intent was citing AZFEC's advocacy for the Voting Laws as an example of "community animus," notwithstanding AZFEC's reliance on the exact same legitimate objectives that the court blessed for the Legislature.

The district court's injunction against three enforcement provisions—the citizenship-investigation procedures, documentary proof of citizenship ("DPOC") requirements, and registration-cancellation procedures—is another matter entirely. By construing the NVRA to forbid these provisions, the district court neutered the States' ability to establish voter qualifications. After all, without enforcement or even information, the ability to announce qualifications is an empty shell. More importantly, the district court's construction of the NVRA violates

the Constitution. It rewrites the constitutional rule that States may set the procedures for voting in both federal and state elections, provided they do so on the same terms. And it obliterates the distinction between offices—U.S Senate and House of Representatives—for which the federal government has regulatory power and those—state offices and presidential electors—for which it has none. Constitutional text and the canon of constitutional avoidance foreclose the district court's construction of the NVRA. This Court should reverse the injunction and permit the Voting Laws to take full effect.

## ARGUMENT

### I. Arizona Adopted the Voting Laws to Serve Legitimate Purposes, Free from Discriminatory Animus.

#### A. Legitimate Purposes Undergird Arizona's Exercise of its Sovereign Authority to Regulate and Enforce Election Qualifications via the Voting Laws

The Constitution assigns to the States—and not the federal government—plenary authority to establish the qualifications for electors. *See Inter Tribal Council*, 570 U.S. at 17. This principle is woven into the fabric of this nation's federalism, and has been recognized by the Supreme Court for well over a century. *See, e.g.*, *McPherson v. Blacker*, 146 U.S. 1, 35 (1892) ("[F]rom the formation of the government until now

6

the practical construction of the clause has conceded plenary power to the state legislatures in the matter of the appointment of electors."); *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam) ("[T]he state legislature's power to select the manner for appointing electors is plenary; it may, if it chooses, select the electors itself."). Although the decision below hints at this principle, *see, e.g.*, 1-ER-25, 1-ER-77, 1-ER-79–80, 1-ER-89, 1-ER-93, the district court never directly engaged with Arizona's ability to determine the "Times, Places and Manner of holding Elections for Senators and Representatives," U.S. CONST. art. I, § 4, cl. 1, or asked whether specific provisions in the NVRA "conflict" with Arizona law, *Ex parte Siebold*, 100 U.S. 371, 384 (1879). As a result, its decision striking down key provisions of the Voting Laws fails to account for Arizona's interest in enforcing constitutional qualifications for voting.

To vote in Arizona, a person must be a United States citizen, a resident of Arizona, and at least eighteen years of age. ARIZ. CONST. art. VII, § 2. No party to the instant suit disputes the legitimacy of these qualifications. And as the district court observed, it is a class 6 felony to register oneself or another person to vote knowing of that person's ineligibility to vote. 1-ER-13. Arizona has a compelling interest in

enforcing and proactively preventing the violation of this law. *See id.* at 101 ("Arizona has an indisputably legitimate interest 'in counting only the votes of eligible voters,' and the State is entitled to enact prophylactic legislation to prevent the occurrence of non-citizen voting."); *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2006) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters.").

But while the district court paid lip service to Arizona's authority to set voter qualifications, it drained that authority of meaning by preventing enforcement. Arizona's ability to enforce its voting qualifications is inherent in its ability to establish those qualifications. *See Fitzgerald v. Green*, 134 U.S. 377, 380 (1890) ("Congress has never undertaken to interfere with the manner of appointing electors . . . , to regulate the conduct of such election, or to punish any fraud in voting for electors, but has left these matters to the control of the states."). Without adequate enforcement, the qualifications standing sentinel around the integrity of the vote are reduced to paper tigers.

And, in the context of citizenship, age, residency, and criminal background, the cornerstone of enforcement is information. The district

8

court correctly acknowledged that "[i]t would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications." 1-ER-89 (quoting *Inter Tribal Council*, 570 U.S. at 17). The court considered Arizona's asserted interests—(1) preventing voter fraud and limiting voting to eligible individuals, and (2) improving public confidence in Arizona's elections—and acknowledged that "Arizona has a legitimate interest in preventing voter fraud and ensuring that only eligible Arizonans are registered to vote," *id.* at 93. The court further "conclude[d] that Arizona's interests in preventing non-citizens from voting and promoting public confidence in Arizona's elections outweighs the limited burden voters might encounter when required to provide DPOC." *Id.* at 103. This finding is entirely correct, and this Court should affirm it.

But the district court erred in striking down the Voting Laws' citizenship investigation procedures, DPOC requirements, and registration-cancellation procedures. That makes little sense when these enforcement provisions give life to the qualifications that the court conceded were valid. For all of the reasons stated in the Intervenor-Defendant-Appellants' principal brief, these provisions are legitimate

exercises of Arizona's broad powers to establish and enforce laws regarding voter qualifications. Insisting on constitutional prerequisites for voting is a legitimate exercise of a State's authority, as are measures that implement those prerequisites by confirming they are satisfied. AZFEC is proud to have supported legislation ensuring election integrity in Arizona.

### B.  Plaintiffs Failed to Demonstrate Any Discriminatory Animus.

In supporting the district court's finding of no discriminatory animus, AZFEC anticipates that plaintiffs' cross-appeal will challenge that very fact finding. Because the legitimate purposes traced above supported the Voting Laws' adoption, any such challenges must fail.

There was simply no showing of improper motives in this case. The legislative record and AZFEC's work drafting and advocating for the bills focused exclusively on the legitimate reasons of improving election integrity and inspiring voter confidence. The district court therefore determined that "[n]othing in the legislative history of H.B. 2492 or H.B. 2243 reflects an intent to suppress voter registrations of members of minority groups or naturalized citizens." 1-ER-43. Rather, "[t]he evidence indicates that concerns of reinforcing election integrity in response to the

increase in Federal-Only Voters drove the Legislature's enactment of the Voting Laws." *Id.* The court noted that "Plaintiffs did not adduce evidence challenging the sincerity of some Arizonans' beliefs that non-citizens had voted in the 2020 election. And while there is no evidence that Federal-Only Voters may be non-citizens, the Legislature's decision to scrutinize these voters ***does not ring of discrimination***." *Id.* (emphasis added). The court further observed that "neither expert articulated a persuasive factual nexus between [prior discrimination in Arizona's] history and the Fifty-Fifth Legislature's enactment of the Voting Laws." *Id.* Accordingly, the court succinctly found that "[t]he legislative record ***lacks any indicia*** of a nefarious motive." *Id.* (emphasis added).

In a footnote, the court also observed that "Plaintiffs make much of ongoing discriminatory comments Senator Borelli purportedly made to Senator Quezada during Senator Quezada's time in the Senate, but regardless of what Senator Borelli may have expressed, Plaintiffs cannot impute his beliefs or motives to the entire Arizona Legislature." *Id.* The district court was also justified in doubting the credibility of the plaintiffs' fact witness, former Sen. Quezada, whose nomination to the Registrar of Contractors was rejected (and then rescinded) on astonishing findings by

the Senate Committee on Director Nominations: "Mr. Quezada has a history at the Arizona Legislature of spreading antisemitism . . . . What's equally disturbing are his continual, on-the-record comments made while serving as a legislator regarding hiring and firing practices. According to Mr. Quezada, qualifications for a job are determined by skin color, gender, religion and political affiliation." *See* Daniel Stefanski, *Panel Rejects Hobbs' Nominee as RoC Head*, AZ Free News (June 3, 2023), https://azfreenews.com/2023/06/panel-rejects-hobbs-nominee-quezada-as-roc-head/.

Indeed, the only conclusion in the district court's analysis that is without basis is the gratuitous passage improperly characterizing AZFEC as essentially a racist organization, all on the basis of a single word: "illegals." 1-ER-109–110. Based on the appearance of this one word in lobbying materials provided to the Arizona Legislature—in a description that expressly referenced the legitimate purposes of the bill to prevent people from illegally voting—the court drew the broad conclusion that this constituted "evidence of community animus." *Id.* Not so.

To begin with, there is no consensus that the term "illegal" is inherently racist. Variations of that term appear in federal law,[2] in court opinions (including the Supreme Court),[3] and in President Biden's 2024 state of the union address.[4] Nor is it the case that only members of a certain race are capable of being illegally present in the United States. Moreover, other cases have recognized that context is essential to identifying the rare cases of "racially coded" language. *See, e.g., Cadet-Legros v. N.Y. Univ. Hosp. Ctr.*, 21 N.Y.S.3d 221, 230 (2015) (holding that "a leopard does not change its spots" was not racially coded in the context of an employee that would not accept criticism or discipline). Here, there are no allegations of any derogatory references regarding race or national origin anywhere in AZFEC's materials. Nor does the court identify a single episode in AZFEC's history of advocacy on hot-button issues in

---

[2] *See, e.g.*, The Illegal Immigration Reform and Immigration Responsibility Act of 1996, Pub. L. No. 104–208.

[3] *See, e.g., Texas v. United States*, 328 F. Supp. 3d 662, 675 (S.D. Tex. 2018) ("The Court understands that some people find the phrase 'illegal alien' offensive. The Court uses this term because it is the term used by the Supreme Court in its latest pronouncement pertaining to this area of law.") (citing *Arizona v. United States*, 567 U.S. 387, 397 (2012)).

[4] *See* Adriana Gomez Locon, *Biden's reference to 'an illegal' rankles some Democrats who argue he's still preferable to Trump*, APNews (Mar. 8, 2024), https://apnews.com/article/illegal-biden-backlash-laken-riley-41819b01c3942435f0f862789cd1d0f0.

which it allegedly spoke or acted with racial animus. Rather, AZFEC's stated purpose—as borne out in the race-neutral Voting Laws themselves—was to ensure non-citizens and other unqualified individuals are prevented from voting illegally, regardless of race.

Taken in this proper context, the court's leap to a conclusion of "community animus" is internally inconsistent with its other, better-reasoned findings. The legitimate purposes identified by the court are the very purposes asserted by AZFEC itself. If anything, branding as a bigot the entire organization and anyone else that may use the shorthand "illegal" without a shred of racial animus is itself an act of prejudice and impermissible generalization—especially coming from a court that simultaneously recognized the legitimate purposes behind the bill. It is utterly unfair to tarnish an organization's spotless reputation with an unfounded and inconsistent statement about "community animus."

And in terms of the court's discussion of historical discrimination, again the court found that plaintiffs failed to demonstrate any "nexus between [prior discrimination in Arizona's] history and the Fifty-Fifth Legislature's enactment of the Voting Laws." 1-ER-43. The Court further noted that, "[d]espite these examples of past discrimination"—most of

which the court concluded are 40 years or longer in the past—"the Court continues to presume good faith on behalf of the 55th Legislature because '[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.'" *Id.* at 107 (quoting *Abbott v. Perez*, 585 U.S. 579, 603 (2018)). The court found legitimate purposes and no discriminatory animus—period, full stop. It need not go fishing for other speculative motives when legitimate purposes are so clear.

## II. Constitutional Text and the Cannon of Constitutional Avoidance Demand Enforcement of the Voting Laws.

It is not this Court's role to correct the errors in *Inter Tribal Council*, but it certainly should not permit the court below to compound them. Even a cursory review of the NVRA confirms that it does not require States to provide any form of absentee voting, meaning that even for federal elections governed by Article I, § 4, cl. 4, the NVRA does not conflict with Arizona's rule that federal-only voters cast their ballots in person. And a similarly quick glance at the Electors Clause, U.S. CONST. art. II, § 1, shows that States alone regulate the election of presidential electors. Even if the NVRA could be construed, as the district court did,

to conflict with the text of the Constitution, the cannon of constitutional avoidance counsels in favor of enforcing the Voting Laws as written.

The dissent in *Inter Tribal Council* presaged the errors in the decision below. In that opinion, Justice Thomas explained that "both the plain text and the history of the Voter Qualifications Clause, U.S. Const., Art. I, §2, cl. 1, and the Seventeenth Amendment authorize States to determine the qualifications of voters in federal elections, which necessarily includes the related power to determine whether those qualifications are satisfied." 570 U.S. at 23 (Thomas, J., dissenting). Justice Thomas's textual recounting of the meaning of these provisions— along with Justice Alito's in his separate dissent—illustrate the errors in the decision below. In summing up this analysis, Justice Thomas stated:

> The Voter Qualifications Clause, U.S. Const., Art. I, §2, cl. 1, provides that "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature" in elections for the federal House of Representatives. The Seventeenth Amendment, which provides for direct election of Senators, contains an identical clause. That language is susceptible of only one interpretation: States have the authority "to control who may vote in congressional elections" so long as they do not "establish special requirements that do not apply in elections for the state legislature."

*Id.* at 25–26. The respondents in *Inter Tribal Council* "appear[ed] to concede that States have the sole authority to establish voter qualifications . . . but nevertheless argue[d] that Congress can determine whether those qualifications are satisfied." *Id.* at 28. Justice Thomas reasoned, however, that "[t]he practical effect of respondents' position is to read Article I, §2, out of the Constitution. As the majority correctly recognize[d], 'the power to establish voting requirements is of little value without the power to enforce those requirements.'" *Id.*

This case crystalizes the threat to States' ability to set qualifications from judicial over-reading of federal election laws. There is no dispute that Arizona's qualifications for voting, specifically the requirement that the voter be a U.S. citizen, are constitutional. And there is no dispute that the NVRA is silent on both mail-in voting and the selection of presidential electors. Yet, the district court concluded that Arizona cannot fix the "manner" of congressional elections to require in-person voting for federal-only forms. U.S. CONST. art. I, § 4, cl. 1. If the NVRA does not require States to provide mail-in voting, it certainly cannot preempt a state law that regulates the practice.

17

Likewise, the NVRA's silence on presidential electors is necessary to comply with the Constitution's express assignment of that field to the States, without the preemption language that applies to federal congressional elections. U.S. CONST. art. II, § 1. The district court erred in expanding the NVRA to address presidential elections, thus creating a constitutional defect in the NVRA that does not exist. As Justice Thomas succinctly noted, "[c]onstitutional avoidance is especially appropriate in this area because the NVRA purports to regulate presidential elections, an area over which the Constitution *gives Congress no authority whatsoever.*" *Inter Tribal Counsel*, 570 U.S. at 35 n.2. Few cases have engaged the issue of States' ability to regulate presidential as compared to congressional elections; this case provides a worthy vehicle to draw the distinctions that appear on the face of the Constitution itself.

A second error in the district court's decision that threatens the constitutional order is deference to an expired consent decree that should have no bearing here. The consent decree at issue expired on December 31, 2020. *See* 7-ER-1614. The fact that the court gave it any weight at all—let alone controlling deference—is deeply troubling. By its own

terms, an expired consent decree is a nullity. If the law were otherwise—
*i.e.,* if the district court was correct to continue enforcing an expired
consent decree—it would extend the power of an earlier officeholder in
the executive branch to bind the hands of the present-day legislature.
This concern has been recognized both by the federal executive branch[5]
as well as by some among the judiciary,[6] and it is another area ripe for
guidance from this Court.

\*     \*     \*

More than a decade has passed since *Inter Tribal Council*, and
States are still dealing with the naked overreach of a federally mandated
form that "was meant to facilitate voter registration drives, not to take
away the States' traditional authority to decide what information

---

[5] The prior presidential administration rolled back the use of consent
decrees at the DOJ because of this very concern. *See, e.g.*, Office of Att'y
Gen., Memorandum for Heads of Civil Litigating Components United
States Att'ys, *Principles and Proc. for Civil Consent Decrees and
Settlement Agreements with State and Local Governmental Entities*
(Nov. 7, 2018), https://www.justice.gov/opa/press-release/file/1109681/dl.
[6] *See, e.g.*, *United States v. Michigan*, 68 F.4th 1021, 1023 (6th Cir. 2023)
(discussing an expired consent decree that was extended indefinitely by
a court, and noting that "[m]uch has been written about the
perniciousness of consent decrees," which "provide[] the legitimacy of a
judicial decision without the reality of a judicial decision") (citations
omitted).

registrants must supply." *Inter Tribal Counsel*, 570 U.S. at 46 (Alito, J., dissenting). Whatever the merits of that decision, the district court construed the NVRA to deepen this constitutional rift. That was erroneous on its own, but it is especially egregious in light of the canon of constitutional avoidance. No Supreme Court precedent has construed the NVRA to require a State to surrender its ability to enforce constitutional voter qualifications for the offices over which it has plenary authority. This Court should reverse the district court's injunctions that break new and constitutionally dangerous ground.

## CONCLUSION

This Court should reverse the trial court's grant of partial summary judgment and judgment following the bench trial to the extent they prohibit the full enforcement of the Voting Laws.

August 5, 2024

Respectfully submitted,

*/s/ Dominic E. Draye*
Dominic E. Draye
GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Ste. 800
Phoenix, AZ 85016
(602) 445-8000
drayed@gtlaw.com

Nick Peterson
GREENBERG TRAURIG, LLP

222 S. Main Street, Ste. 1730
Salt Lake City, UT  84101
(801) 478-6923
nick.peterson@gtlaw.com

*Counsel for Amicus Curiae Arizona
Free Enterprise Club*

21

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App.
    P. 29(a)(5) because this brief contains 3,918 words, excluding the
    parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App.
    P. 32(a)(5) and the type style requirements of Fed. R. App. P.
    32(a)(6) because this brief has been prepared in a proportionally
    spaced typeface using Microsoft Word 2010 in 14-point Century
    type.

/s/ *Dominic E. Draye*
Dominic E. Draye

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 5, 2024. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Dominic E. Draye*
Dominic E. Draye