Nos. 24-3188, 24-3559, 24-4029

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

―――――――――――

MI FAMILIA VOTA, *et al.*,

Plaintiffs-Appellees

v.

ADRIAN FONTES, *et al.*,

Defendants-Appellees

WARREN PETERSEN, *et al.*,

Intervenors-Defendants-
Appellants/Cross-Appellees

―――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

―――――――――――

BRIEF FOR THE UNITED STATES AS APPELLEE

―――――――――――

KRISTEN CLARKE
  Assistant Attorney General

BONNIE I. ROBIN-VERGEER
JONATHAN L. BACKER
MATTHEW N. DRECUN
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 532-3528

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION ...................................... 4

STATEMENT OF THE ISSUES ........................................... 4

STATEMENT OF THE CASE.................................................. 5

    A.    Statutory Background........................................... 5

        1.    NVRA ......................................................... 5

        2.    Materiality Provision ................................. 6

    B.    Factual Background................................................ 7

        1.    H.B. 2492's Documentary-Proof-Of-Citizenship Requirements .............................................. 8

        2.    H.B. 2492's Birthplace and Citizenship-Checkbox Requirements for the State Form ............... 8

    C.    Procedural Background ...................................... 9

STANDARD OF REVIEW .................................................. 17

SUMMARY OF ARGUMENT............................................. 18

ARGUMENT

    I.    The NVRA preempts H.B. 2492's requirement that federal-only voters provide documentary proof of citizenship to vote in presidential elections. ..................................... 21

        A.    Congress possesses power to regulate presidential elections................................................. 22

**TABLE OF CONTENTS (continued):**                           **PAGE**

B.    The NVRA also is a valid exercise of Congress's power to enforce the Fourteenth and Fifteenth Amendments. .......................................................................... 27

II.    Because Arizona uses the Federal Form to determine eligibility to vote by mail, it must accept that Form for that purpose...................................................................... 33

III.    The State Form's birthplace and citizenship-checkbox requirements violate the Materiality Provision. .................................. 35

A.    Arizona's birthplace requirement violates the Materiality Provision. ............................................................. 36

B.    Appellants' defenses of the birthplace requirement lack merit...................................................................... 43

1.    Appellants misinterpret the term "material.".................. 43

2.    The State's "legislative judgment" does not warrant additional deference. ......................................... 45

3.    The birthplace requirement is not material in determining identity................................................... 46

4.    The birthplace requirement is not material in determining citizenship................................................. 54

C.    The citizenship-checkbox requirement is not material in determining the qualifications of Arizona voters. ............... 56

D.    Intervenors' attempt to narrow the Materiality Provision to *ad hoc* voting procedures is unfounded.............. 59

CONCLUSION ...................................................................... 63

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                                    **PAGE**

*Allen v. Milligan*, 599 U.S. 1 (2023) ........................................................30

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................37

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ................... *passim*

*Association of Cmty. Orgs. for Reform Now* (*ACORN*) *v. Edgar*,
    56 F.3d 791 (7th Cir. 1995) ...............................................................26

*Association of Cmty. Orgs. for Reform Now* (*ACORN*) *v. Edgar*,
    880 F. Supp. 1215 (N.D. Ill.), *aff'd in relevant part*,
    56 F.3d 791 (7th Cir. 1995) ...............................................................32

*Association of Cmty. Orgs. for Reform Now v. Miller*,
    129 F.3d 833 (6th Cir. 1997) .............................................................26

*Association of Cmty. Orgs. for Reform Now v. Miller*,
    912 F. Supp. 976 (W.D. Mich. 1995),
    *aff'd*, 129 F.3d 833 (6th Cir. 1997) ..................................................32

*Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977 (9th Cir. 2015) ....................27

*Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam) ...................................... 13, 23-24

*Burroughs v. United States*, 290 U.S. 534 (1934) .......................................... *passim*

*Chiafalo v. Washington*, 591 U.S. 578 (2020) ...........................................25

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ..........................................30

*City of Rome v. United States*, 446 U.S. 156 (1980) ........................................ 29-30

*Condon v. Reno*, 913 F. Supp. 946 (D.S.C. 1995) .....................................32

*Cone v. Bell*, 556 U.S. 449 (2009) ........................................................ 37-38

**CASES (continued):**                                                      **PAGE**

*County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165 (2020)..............................52

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008)................................32

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000).........................13

*DeFries v. Union Pac. R.R.*, 104 F.4th 1091 (9th Cir. 2024) ........................... 17, 33

*Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006)................................. 48, 58-59

*EEOC v. Wyoming*, 460 U.S. 226 (1983) ...............................................................28

*Ex Parte Yarbrough*, 110 U.S. 651 (1884) ............................................. 2, 18, 21-22

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016)......................................................26

*Florida State Conf. of NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ............................................................. *passim*

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) .........................................................29

*In re Quarles*, 158 U.S. 532 (1895) .......................................................................32

*Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775 (S.D. Ind. 2006) .........49

*Katzenbach v. Morgan*, 384 U.S. 641 (1966) .........................................................29

*Kobach v. EAC*, 772 F.3d 1183 (10th Cir. 2014), *cert. denied*,
    576 U.S. 1055 (2015)......................................................................................27

*La Unión del Pueblo Entero v. Abbott*,
    604 F. Supp. 3d 512, 541 (W.D. Tex. 2022) ........................................... 53-54

*League of Women Voters of Ark. v. Thurston*, No. 5:20-cv-5174,
    2023 WL 6446015 (W.D. Ark. Sept. 29, 2023) ................................ 49-50, 59

*Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018)................................49

**CASES (continued):** PAGE

*McConnell v. FEC*, 540 U.S. 93 (2003),
   *overruled on other grounds by Citizens United v. FEC*,
   *558 U.S. 310 (2010)*.....................................................23

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) .......................................29

*McKinney-Drobnis v. Oreshack*, 16 F.4th 594 (9th Cir. 2021) .................. 17-18, 36

*McPherson v. Blacker*, 146 U.S. 1 (1892) ......................................... 24-25

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) ...........................61

*Oregon v. Mitchell*, 400 U.S. 112 (1970) .......................................................21

*Pennsylvania State Conf. of NAACP Branches v.
   Secretary Commonwealth of Pa.*,
   *97 F.4th 120 (3d Cir. 2024)* ................................... 44-45

*Republic of Sudan v. Harrison*, 587 U.S. 1 (2019)....................................61

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ......................................... 7, 45, 60

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ....................................30

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ..............................29

*Trump v. Kemp*, 511 F. Supp. 3d 1325 (N.D. Ga. 2021) .......................................25

*TSC Indus. v. Northway, Inc.*, 426 U.S. 438 (1976) ......................................... 37-38

*U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC*,
   *583 U.S. 387 (2018)*............................................. 17-18, 36

*United States v. Comstock*, 560 U.S. 126 (2010).....................................26

*Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023)........................................ *passim*

*Voting Rts. Coal. v. Wilson*, 60 F.3d 1411 (9th Cir. 1995).............................. *passim*

- v -

**CASES (continued):**                                              **PAGE**

*Woods v. Cloyd W. Miller Co.*, 333 U.S. 138 (1948) ..............................................28

*Young v. Fordice*, 520 U.S. 273 (1997) ...................................................................5

*Yu v. Idaho State Univ.*, 15 F.4th 1236 (9th Cir. 2021) ..........................................17

*Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ...................................................................32

**CONSTITUTIONS:**

U.S. Const. Art. I, § 4, Cl. 1 ...................................................................................25

U.S. Const. Art. I, § 8, Cl. 18 .................................................................................22

U.S. Const. Art. II, § 1, Cl. 2 .................................................................................24

U.S. Const. Amend. XII .........................................................................................26

U.S. Const. Amend. XIV, § 1 ......................................................................... 26, 32

U.S. Const. Amend. XIV, § 2 .................................................................................26

U.S. Const. Amend. XIV, § 5 .................................................................................28

U.S. Const. Amend. XV, § 2 ...................................................................................28

U.S. Const. Amend. XXIV, § 1 ..............................................................................26

Ariz. Const. Art. VII, § 2 .......................................................................................38

**STATUTES:**

Civil Rights Act of 1957
      52 U.S.C. 10101(b).........................................................................................6
      52 U.S.C. 10101(c).........................................................................................6
      52 U.S.C. 10101(d).........................................................................................6
      52 U.S.C. 10101(f).........................................................................................6
      Pub. L. No. 85-315, § 131(c), 71 Stat. 637.................................................6

**STATUTES (continued):** **PAGE**

Civil Rights Act of 1960
  52 U.S.C. 10101(e) ................................................................6
  Pub. L. No. 86-449, § 601, 74 Stat. 90-92 ...........................6

Civil Rigths Act of 1964
  52 U.S.C. 10101 ...................................................................6
  52 U.S.C. 10101(a)(2)(A) ....................................................61
  52 U.S.C. 10101(a)(2)(B) ........................................... *passim*
  Pub. L. No. 88-352, § 101, 78 Stat. 241-242 ........................7

Enforcement Act of 1870
  52 U.S.C. 10101(a)(1) ..........................................................6
  Act of May 31, 1870, ch. 114, § 1, 16 Stat. 140...................6

National Voter Registration Act
  52 U.S.C. 20501(a)(1) ..........................................................5
  52 U.S.C. 20501(a)(3) .....................................................5, 30
  52 U.S.C. 20501(b)(2) .........................................................13
  52 U.S.C. 20502(2) ...............................................................5
  52 U.S.C. 20505 ...................................................................1
  52 U.S.C. 20505(a)(1) ................................................ *passim*
  52 U.S.C. 20505(a)(3) ..........................................................5
  52 U.S.C. 20505(c) ..............................................................33
  52 U.S.C. 20505(c)(1) .........................................................13
  52 U.S.C. 20505(c)(2) .........................................................13
  52 U.S.C. 20507(a) ..............................................................12
  52 U.S.C. 20508(a)(2) ..........................................................5
  52 U.S.C. 20508(b)(2) .....................................................6, 13

Voting Rights Act of 1965
  52 U.S.C. 10301 ..................................................................30
  52 U.S.C. 10502(a) ..............................................................29

8 U.S.C. 1401 .............................................................................38

52 U.S.C. 30101(3) ...............................................................5, 12

**STATUTES (continued):**                                                           **PAGE**

2022 Ariz. Sess. Laws 568 .................................................................... 7

Ariz. Rev. Stat. Ann.
    § 16-101(A) (2023) .......................................................... 38
    § 16-121.01(A) (2023) ........................................... 9, 36, 56
    § 16-121.01(C) (2023) ...................................... 8, 38, 57-58
    § 16-121.01(D) (2023) ............................................... 8, 56
    § 16-121.01(E) (2023) ...................................................... 8
    § 16-127(A) (2023) .......................................................... 8
    § 16-152 (2022) .............................................................. 8
    § 16-152(A)(7) (2022) ............................................... 9, 36
    § 16-152(A)(14) (2022) ............................................. 9, 56
    § 16-166(F) (2022) .................................................... 8, 14

**REGULATIONS:**

59 Fed. Reg. 32,311 (June 23, 1994) ................................................. 51

**RULES:**

Fed. R. Civ. P. 52(a)(6) ..................................................................... 17

**LEGISLATIVE HISTORY:**

*Equal Access to Voting Act of 1989:  Hearing on S.675 Before Subcomm.
    on the Const. of the S. Comm. on the Judiciary*,
    101st Cong., 1st Sess. (1989) ...................................................... 31

H.R. Rep. No. 914, 88th Cong., 1st Sess. (1963) ................................. 6-7

H.R. Rep. No. 9, 103d Cong., 1st Sess. (1993) ..................................... 30

S. Rep. No. 6, 103d Cong., 1st Sess. (1993) ......................................... 28

Staff of Subcomm. on Civ. & Const. Rts. of the H. Comm. on the Judiciary,
    98th Cong., *After the Voting Rights Act:  Registration Barriers*
    (Comm. Print 1984) .................................................................... 31

**MISCELLANEOUS:**                                        **PAGE**

8 Foreign Affs. Manual 403.4-7(A) ................................................................50

8 Foreign Affs. Manual 403.4-7(B) ................................................................50

8 Foreign Affs. Manual 403.4-7(C) ................................................................50

Black's Law Dictionary (4th rev. ed., 1968) ...............................................37

U.S. Comm'n on C.R., *Voting:  1961 United States Commission on Civil Rights Report* (1961), perma.cc/WA4A-QEYK ............................. 61-62

## INTRODUCTION

Arizona House Bill (H.B.) 2492 increases the difficulty for Arizona citizens to register to vote generally and particularly in federal elections. In 2013, the Supreme Court held that Section 6 of the National Voter Registration Act (NVRA), 52 U.S.C. 20505, precludes Arizona from requiring an applicant using the federal mail voter-registration form (the Federal Form) to provide information—*i.e.*, documentary proof of citizenship—beyond what the form itself requires. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15, 20 (2013) (*ITCA*). Instead, the NVRA requires that States "accept and use," 52 U.S.C. 20505(a)(1), the Federal Form "*as sufficient*" to register to vote in federal elections, *ITCA*, 570 U.S. at 10. Attempting to circumvent that precedent, H.B. 2492 requires applicants using the Federal Form to provide documentary proof of citizenship to vote in presidential elections or by mail.

The district court correctly issued a permanent injunction enjoining enforcement of these aspects of H.B. 2492. The State no longer defends them. Instead, intervenors Republican National Committee (RNC), Arizona Speaker of the House Ben Toma, and Arizona Senate President Warren Petersen (collectively, intervenors) attempt to defend H.B. 2492's presidential-voting provisions by arguing that Congress lacks power to regulate presidential elections. But that argument is foreclosed by Supreme Court precedent dating back more than a

century. *See Burroughs v. United States*, 290 U.S. 534, 545 (1934); *Ex Parte Yarbrough*, 110 U.S. 651, 662 (1884); *accord Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995). And H.B. 2492's mail-voting provisions cannot be reconciled with the NVRA's mandate that States "accept and use" the Federal Form to register for federal elections. 52 U.S.C. 20505(a)(1). Under H.B. 2492, Arizona would "use" that form to determine applicants' eligibility to vote by mail but then impermissibly would not "accept" it as sufficient for that purpose.

The district court also correctly enjoined provisions of H.B. 2492 that violate the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. 10101(a)(2)(B). The Materiality Provision prohibits denying the right to vote based on errors or omissions in voting-related papers that are immaterial in determining a person's eligibility to vote. It ensures that States cannot encumber applications and other papers with trivial hurdles and thereby disqualify otherwise-eligible voters.

H.B. 2492 violates the Materiality Provision by requiring applicants using the state voter-registration form (the State Form) to identify their state or country of birth. The birthplace requirement violates the Materiality Provision because birthplace itself is not a qualification, nor do election officials use it to determine the qualifications that the State and intervenors urge here—applicants' citizenship status or identity. Applicants born abroad may well be citizens; their birthplace

- 2 -

does not determine that. And Arizona makes applicants born in the U.S. provide documentary proof of citizenship with the State Form, demonstrating that the State itself does not regard an attestation of American birthplace as material. A robust trial record likewise shows birthplace's poor utility as a means of identifying voters—most of whom, unsurprisingly, give their birthplace as Arizona, Mexico, or the United States. Birthplace information thus is not likely to have an actual impact on an election official's identity determinations either.

H.B. 2492 also violates the Materiality Provision by requiring applicants using the State Form to complete a checkbox affirming their citizenship, even though such applicants are also required to provide documentation *proving* their citizenship. No reasonable official would treat a blank checkbox as effectively overriding the documentation that state law elsewhere deems sufficient to prove citizenship.

This Court should affirm the district court's injunction against enforcement of these preempted and immaterial provisions of H.B. 2492.

## STATEMENT OF JURISDICTION

The United States agrees with the State's and intervenors' Statements of Jurisdiction.

## STATEMENT OF THE ISSUES

1.  Whether Congress has authority to apply the NVRA to presidential elections.

2.  Whether H.B. 2492 violates Section 6 of the NVRA by requiring applicants using the Federal Form as part of the voter-registration process to provide documentary proof of their United States citizenship as a prerequisite to voting by mail in federal elections.

3.  Whether H.B. 2492 violates the Materiality Provision—

    a.  by requiring election officials to reject state voter-registration applications that do not include the applicant's state or country of birth; and

    b.  by requiring election officials to reject state voter-registration applications accompanied by documentary proof of the applicant's citizenship if the applicant fails to complete a checkbox on the application attesting that they are a United States citizen.

## STATEMENT OF THE CASE

**A.     Statutory Background**

    **1.      NVRA**

The NVRA "requires States to provide simplified systems for registering to vote in *federal* elections."  *Young v. Fordice*, 520 U.S. 273, 275 (1997).  Congress enacted the statute in recognition that voting is a "fundamental right," and in response to concerns that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities."  52 U.S.C. 20501(a)(1) and (3).

    Among other things, the NVRA provides that the Election Assistance Commission (EAC or Commission) "shall develop a mail voter registration application form for elections for Federal office," 52 U.S.C. 20508(a)(2), including presidential elections, 52 U.S.C. 30101(3) (incorporated by 52 U.S.C. 20502(2)). Section 6 of the NVRA provides that States must "accept and use" this form, known as the Federal Form, in registering voters for federal elections. 52 U.S.C. 20505(a)(1).

    The NVRA specifies certain elements that the Federal Form must contain, and otherwise limits the information that applicants must furnish.  To confirm the citizenship status of individuals registering to vote in federal elections, the Form

requires applicants to sign, under penalty of perjury, an attestation that they are United States citizens. 52 U.S.C. 20508(b)(2). In 2013, the Supreme Court held that Arizona could not—consistent with Section 6 of the NVRA—reject Federal Form applications unaccompanied by documentary proof of citizenship. *Arizona v. ITCA*, 570 U.S. 1, 15 (2013).

### 2. Materiality Provision

The statute containing the Materiality Provision, 52 U.S.C. 10101, traces its lineage to the Enforcement Act of 1870. The 1870 Act entitled qualified persons to vote "without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State . . . to the contrary notwithstanding." Act of May 31, 1870, ch. 114, § 1, 16 Stat. 140 (52 U.S.C. 10101(a)(1)). The Civil Rights Act of 1957 enlarged the statute's protections and gave the Attorney General power to enforce it through civil suits. Pub. L. No. 85-315, § 131(c), 71 Stat. 637 (52 U.S.C. 10101(b)-(d) and (f)); *see also* Civil Rights Act of 1960, Pub. L. No. 86-449, § 601, 74 Stat. 90-92 (52 U.S.C. 10101(e)) (authorizing Attorney General to enforce through pattern-or-practice suits).

The Civil Rights Act of 1964 amended the statute again to "provide specific protections to the right to vote," including the Materiality Provision. H.R. Rep.

No. 914, 88th Cong., 1st Sess. 19 (1963); *see* Pub. L. No. 88-352, § 101, 78 Stat. 241-242.  It states:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. 10101(a)(2)(B).  The Materiality Provision "forbids the practice of disqualifying potential voters for their failure to provide information irrelevant to determining their eligibility to vote."  *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003).

### B.    Factual Background

In March 2022, Arizona enacted H.B. 2492.  2022 Ariz. Sess. Laws 568. The law took effect on January 1, 2023 (1-ER-41), but it was never implemented (1-ER-15, 60, 69; *see also* State Br. 16).[1]

---

[1]  "__-ER-__" refers to the volume and page numbers of the intervenors' Excerpts of Record.  "__-SER-__" refers to the volume and page numbers in the Supplemental Excerpts of Record filed with the Mi Familia Vota plaintiffs' brief.  "Doc. __, at __" refers to the docket entry number and relevant pages of documents filed in the district court, *Mi Familia Vota v. Fontes*, No. 2:22-cv-509 (D. Ariz.).  "C.A. Dkt. __, at __" refers to the docket entry number and relevant pages of documents filed in this appeal.  "Intervenors' Br. __" refers to the page numbers in the RNC's and legislative leaders' principal brief.  "State Br. __" refers to the page numbers in the State's principal brief.

### 1. H.B. 2492's Documentary-Proof-Of-Citizenship Requirements

H.B. 2492 requires election officials to check certain databases to confirm whether individuals registering to vote using the Federal Form are United States citizens. Ariz. Rev. Stat. Ann. § 16-121.01(D) (2023). If officials cannot verify an applicant's citizenship, they must notify the applicant, who must then provide documentary proof of citizenship—for example, a driver's license meeting certain conditions or a United States passport. *See id.* §§ 16-121.01(E), 16-166(F). H.B. 2492 prohibits notified applicants who fail to provide documentary proof of citizenship from voting in presidential elections or by mail. *Id.* § 16-121.01(E). The statute also requires individuals who have already registered to vote using the Federal Form to provide documentary proof of citizenship to vote in presidential elections or by mail. *Id.* § 16-127(A).

### 2. H.B. 2492's Birthplace and Citizenship-Checkbox Requirements for the State Form

Arizona provides its own voter-registration application, known as the State Form, that allows individuals to register to vote for State and local elections, as well as federal elections. *See* Ariz. Rev. Stat. Ann. § 16-152 (2022). When registering to vote using the State Form, applicants must provide documentary proof of citizenship. *Id.* § 16-121.01(C). The State Form also requires applicants to attest to their citizenship by checking a box confirming that the applicant is a

- 8 -

United States citizen (the citizenship checkbox). *Id.* § 16-152(A)(14). H.B. 2492 requires election officials to reject applications without the checkbox marked— *even if* the applicant has provided sufficient documentation to prove their citizenship. *Id.* § 16-121.01(A).

H.B. 2492 also requires election officials to reject any State Forms that do not include the applicant's birthplace. Ariz. Rev. Stat. Ann. § 16-121.01(A) (2023). Since at least 1979, Arizona's State Form has contained a space for prospective voters to write their "state or country of birth" (*i.e.*, birthplace). State Br. 4-5; 2-SER-239 (stipulation #3); Ariz. Rev. Stat. Ann. § 16-152(A)(7) (2022). Until H.B. 2492's enactment, however, filling out that field was optional. State Br. 5-6; 2-SER-239 (stipulation #3). Approximately one-third of active and inactive voter records in Arizona's voter-registration database thus lack birthplace information. 4-SER-664. And Arizona election officials do not use birthplace information to determine whether an individual is a U.S. citizen and otherwise qualified to vote. *See* 4-SER-598-600, 622-623, 627, 754-755. Despite this, H.B. 2492 requires election officials to reject any State Forms that omit the applicant's birthplace. Ariz. Rev. Stat. Ann. § 16-121.01(A) (2023).

### C. Procedural Background

1. After H.B. 2492's enactment, the United States and several private plaintiffs filed suit challenging various aspects of the legislation, as well as the

concurrently enacted H.B. 2243. *E.g.*, 3-SER-561-577 (U.S. Complaint). The district court consolidated the eight lawsuits. Docs. 39, 69, 79, 88, 91, 93, 164, 193. Arizona Speaker of the House Ben Toma, Arizona Senate President Warren Petersen, and the RNC intervened. Doc. 363; Order, *Democratic Nat'l Comm. v. Hobbs*, No. 2:22-cv-1369 Docket Entry No. 18 (D. Ariz. Aug. 24, 2022).

As relevant here, the United States, along with private plaintiffs, alleged that H.B. 2492's presidential- and mail-voting provisions were preempted by Section 6 of the NVRA. *E.g.*, 3-SER-574. In addition, the United States, along with private plaintiffs, alleged that H.B. 2492's citizenship-checkbox and birthplace requirements violate the Materiality Provision. *E.g.*, 3-SER-575. Finally, the United States also alleged that H.B. 2492 violates the Materiality Provision by requiring applicants registering to vote using the Federal Form or who had previously registered using that Form (*i.e.*, federal-only voters) to provide documentary proof of citizenship to vote in presidential elections or by mail. 3-SER-575-576.

The district court instructed the parties to move for summary judgment on claims that involve "legal issues that do not require discovery." Doc. 340, at 36. In moving for partial summary judgment, the United States argued that Section 6 of the NVRA preempts H.B. 2492 to the extent that it requires voters using the Federal Form to provide documentary proof of citizenship to vote in presidential

elections. Doc. 391-1, at 1, 6-7. The State and its Attorney General conceded that Section 6 preempts that aspect of H.B. 2492. 3-SER-448. The RNC argued in favor of its validity, however, because, in its view, Congress lacks power to regulate presidential elections. 3-SER-427-432; Doc. 369, at 1-2 (legislative leaders' joinder).

Regarding H.B. 2492's mail-voting provisions, the United States urged the district court to defer ruling on whether those provisions are preempted by Section 6 because its Materiality Provision claim challenging those same provisions would benefit from discovery. Doc. 391-1, at 15-16. Private plaintiffs contended, however, that their identical challenge to H.B. 2492's mail-voting provisions could be resolved at summary judgment. *E.g.*, Doc. 393, at 5-6. The RNC argued that Section 6 does not preempt H.B. 2492's mail-voting provisions because the NVRA sets only "registration rules" and does not regulate "*mechanisms*" for voting. 3-SER-432-433; Doc. 369, at 1-2. The State more equivocally argued that the mail-voting provisions are "likely not preempted." 3-SER-449-450.

The United States also urged the district court to defer resolving its Materiality Provision claims challenging H.B. 2492's citizenship-checkbox and birthplace requirements because discovery would aid the adjudication of those claims, as well as its Materiality Provision claim concerning the documentary-

- 11 -

proof-of-citizenship requirement. Doc. 391-1, at 16. Private plaintiffs contended that their identical Materiality Provision claims could be resolved at summary judgment. *E.g.*, Doc. 399, at 1.

The State contended that all three aspects of H.B. 2492 challenged under the Materiality Provision are material to determining voter qualifications. First, the State argued that the citizenship checkbox and documentary proof of citizenship are material because they help confirm that applicants are United States citizens. 2-SER-268-273. According to the State, those aspects of H.B. 2492 are material even though other parts of the State and Federal Forms establish applicants' citizenship because, in the State's view, the Materiality Provision does not bar seeking duplicative information pertaining to voter qualifications. 2-SER-269-272. Second, the State contended that H.B. 2492's birthplace requirement is material to voting qualifications because it helps confirm a voter's identity and citizenship. 2-SER-273-275.

2. In resolving the parties' summary-judgment motions, the district court held that Section 6 of the NVRA preempts both H.B. 2492's presidential- and mail-voting provisions. 1-ER-124. The court found that the "plain language of the NVRA reflects an intent to regulate all elections for '[f]ederal office,' including for 'President or Vice President.'" 1-ER-125 (quoting 52 U.S.C. 20507(a), 30101(3)). And, contrary to the RNC's arguments, the court held that "binding precedent

- 12 -

indicates that Congress has the power to control registration for presidential elections." 1-ER-125-127 (citing *Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976) (per curiam); *Burroughs v. United States*, 290 U.S. 534, 544 (1934); *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1413-1415 (9th Cir. 1995)).

The district court also held that H.B. 2492's mail-voting provisions not only were directly preempted by Section 6 but that they also present an "obstacle to the accomplishment of Congress's full objectives under the" NVRA (1-ER-129-130 (quoting *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000))), which include "enhanc[ing] the participation of eligible citizens as voters in elections for Federal office" (1-ER-128 (emphasis omitted) (quoting 52 U.S.C. 20501(b)(2))). In addition, the court held that because the NVRA enumerates specific "circumstances where a State may limit voting by mail," the statute implicitly prohibits other limitations on mail voting in federal elections. 1-ER-128 (citing 52 U.S.C. 20505(c)(1) and (2)).

As to the Materiality Provision claims, the district court granted summary judgment to plaintiffs on the citizenship-checkbox requirement. 1-ER-142. The court first determined that "material" in the statute means more than "useful" or of "minimal relevance": "Congress intended materiality to require some probability of actually impacting an election official's eligibility determination." 1-ER-140-141. The court also ruled that the materiality of an error or omission

- 13 -

must be determined in light of "the other information available to the State."

1-ER-142.

By that standard, the district court held that the citizenship checkbox is immaterial "when an applicant provides satisfactory evidence of citizenship." 1-ER-142. Because an Arizonan registering to vote with the State Form must provide documentary proof of citizenship, "it makes little sense to accept an incomplete citizenship checkbox on her registration form as 'true and correct' when," in light of the documentary proof, "it is clearly not." 1-ER-142. Treating the checkbox as material "would allow Arizona to disregard documentation that, under Arizona law, constitutes '*satisfactory evidence* of citizenship' and disenfranchise eligible voters." 1-ER-142 (citing Ariz. Rev. Stat. Ann. § 16-166(F) (2022)). The court denied summary judgment on the Materiality Provision claim challenging the birthplace requirement, however, holding that there was a dispute of material fact about whether that information is material in determining voter qualifications. 1-ER-144.

Finally, the district court declined to address the United States' Materiality Provision claim challenging the documentary-proof-of-citizenship requirements for federal-only voters because it had invalidated those same provisions under Section 6 of the NVRA. 1-ER-138 n.14.

3.  The case proceeded to a ten-day bench trial on the remaining claims. Among the United States' claims, only its Materiality Provision challenge to H.B. 2492's birthplace requirement remained unresolved.  As at summary judgment, the district court assessed materiality by considering whether the requirement had "'some probability of actually impacting an election official's' determination of a person's eligibility to vote."  1-ER-77 (quoting 1-ER-141).

The district court found that election officials "do not use birthplace information to determine an applicant's eligibility to vote" or "to verify an applicant's identity."  1-ER-26.  As to citizenship, the court noted that "[a]n individual's place of birth is not dispositive of citizenship status, as individuals born outside the U.S. may be derived or naturalized citizens."  1-ER-26.  The court further observed that election officials confirm voters' identities by cross-referencing databases that "do not use birthplace as matching criteria."  1-ER-78. Although election officials testified concerning some "*potential* uses of birthplace" information (1-ER-29; *see also* 1-ER-27-28), the court found no evidence that election officials "have ever encountered challenges determining the identity or eligibility of the one-third of voters for whom Arizona lacks this information." 1-ER-29.

Indeed, even if Arizona wished to use birthplace information to identify applicants, the district court credited the expert testimony of Dr. Eitan Hersh on its

serious shortcomings for that purpose. 1-ER-28-29 & n.22. Dr. Hersh showed that Arizona's records concerning voters' birthplace information contain "several data issues" and that, even if such data were standardized, it "would still not meaningfully help to identify voters." 1-ER-28-29. Accordingly, the court found that "while [election officials] can sometimes use birthplace in Arizona's voter registration process, birthplace is of little utility in nearly all cases." 1-ER-29.

The district court thus "conclude[d] that an individual's birthplace is not material to determining her eligibility to vote." 1-ER-77. In addition to birthplace information's limited utility as an identifier, the court noted that H.B. 2492 did not make the birthplace requirement retroactive, so one-third of registration records would continue to lack it, and H.B. 2492 also did not require election officials "to verify an individual's birthplace or reject State Forms with an incorrect birthplace." 1-ER-77. "If the substance of the birthplace field does not matter, then it is hard to understand how one could claim that this requirement has any use in determining a voter's qualifications." 1-ER-77 (alteration and citation omitted). The court also rejected the use of birthplace for "administrative purposes" as irrelevant to whether birthplace is "material in determining" voters' eligibility. 1-ER-78.

After trial, the district court entered final judgment, permanently enjoining enforcement of H.B. 2492's presidential- and mail-voting provisions, as well as its

citizenship-checkbox and birthplace requirements. 1-ER-3-4. The court denied the intervenors' motion for a partial stay of its injunction as to H.B. 2492's presidential- and mail-voting provisions. Doc. 752, at 11-12. The intervenors filed a similar stay motion with this Court, which a motions panel likewise denied as to those claims. *See* C.A. Dkt. 76, at 3.

## STANDARD OF REVIEW

This Court "review[s] a district court's grant of summary judgment *de novo*," limiting its review "to the record presented to the district court at the time of summary judgment." *DeFries v. Union Pac. R.R.*, 104 F.4th 1091, 1105 (9th Cir. 2024).

After a bench trial, the district court's findings of fact are reviewed for clear error, and its legal conclusions are reviewed *de novo*. *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241-1242 (9th Cir. 2021); Fed. R. Civ. P. 52(a)(6). For mixed questions of law and fact, the standard of review varies, because "[m]ixed questions are not all alike." *U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC*, 583 U.S. 387, 395-396 (2018) (*U.S. Bank*). "'[W]hen applying the law involves developing auxiliary legal principles of use in other cases,' appellate courts should use *de novo* review, but when questions 'immerse courts in case-specific factual issues' such as weighing evidence and making credibility judgments, appellate courts should typically review with deference." *McKinney-Drobnis v. Oreshack*,

16 F.4th 594, 604 (9th Cir. 2021) (alteration in original) (quoting *U.S. Bank*,

583 U.S. at 396).

## SUMMARY OF ARGUMENT

This Court should affirm the district court's permanent injunction against

enforcement of H.B. 2492's presidential- and mail-voting provisions with respect

to the Federal Form and its birthplace and citizenship-checkbox requirements with

respect to the State Form.

1. Congress has power to regulate presidential elections; therefore,

Section 6 of the NVRA preempts H.B. 2492's presidential-voting provisions.

Intervenors' arguments to the contrary are without merit.  Supreme Court

precedent dating back more than a century recognizes Congress's power to

regulate presidential elections.  *See Burroughs v. United States*, 290 U.S. 534, 545

(1934); *Ex Parte Yarbrough*, 110 U.S. 651, 662 (1884); *accord Voting Rts. Coal. v.*

*Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995).  The NVRA also is valid legislation to

enforce the Fourteenth and Fifteenth Amendments' prohibition against racial

discrimination in voting.  Congress had a sound basis for concluding that uniform

procedures would help combat documented racial disparities in voter registration.

2. H.B. 2492's mail-voting provisions cannot be reconciled with the

NVRA's text.  Section 6 of the NVRA requires States to "accept and use" the

Federal Form.  *Arizona v. ITCA*, 570 U.S. 1 (2013).  Under that mandate, the

- 18 -

Federal Form must "be accepted *as sufficient* for the requirement it is meant to satisfy." *Id.* at 10. Under H.B. 2492, Arizona would "use" the Federal Form to determine whether or not to register applicants as eligible to vote in federal elections by mail. But it would not "accept" the Form as sufficient for that purpose. Instead, the only way for federal-only voters to cast their ballots by mail is to provide as part of the registration process information beyond what the Federal Form requires.

3. H.B. 2492's requirements that applicants using the State Form provide their birthplace and complete a checkbox to confirm their citizenship violate the Materiality Provision.

As the district court correctly held, "materiality" requires some probability that an error or omission would actually affect eligibility determinations. The birthplace requirement thus violates the Materiality Provision because birthplace is not itself a qualification; nor is it material in determining qualifications. Individuals born abroad can be citizens through their parents or through naturalization. And Arizona still requires those born in the U.S. to provide documentary proof of citizenship, demonstrating the State itself does not regard birthplace as material.

Birthplace likewise is immaterial in determining identity. Arizona has sophisticated means available to identify applicants, so its election officials rarely

rely on birthplace. Unrebutted expert testimony established that birthplace is a poor identifier as well. Most Arizonans give the same few answers—Arizona, Mexico, or the United States—and the State has much better identifiers at its disposal, including birthdate and personal identification numbers. In defense, the State and intervenors offer only speculative or anecdotal uses of birthplace to identify applicants and irrelevant uses of birthplace to identify those already registered. The Materiality Provision does not bar using voluntarily provided birthplace information this way. But it does bar denying the right to vote because an applicant did not provide this immaterial information.

For similar reasons, H.B. 2492's citizenship-checkbox requirement violates the Materiality Provision for voters who provide documentary proof of citizenship. When applicants prove their citizenship with documents deemed sufficient under state law, a blank checkbox could not reasonably be interpreted as an attestation that the person who has just proven citizenship in fact lacks it. Consequently, the State no longer defends the requirement, while intervenors offer defenses ignoring that the district court's ruling is limited to applicants who provide documentary proof of citizenship.

Finally, the State's and intervenors' efforts to water down the Materiality Provision's legal effect lack merit. Their attempts to diminish the meaning of

"materiality," seek deference to "legislative judgments," and limit the Provision's

reach to *ad hoc* actions by election officials are unfounded and should be rejected.

## ARGUMENT

I.   **The NVRA preempts H.B. 2492's requirement that federal-only voters provide documentary proof of citizenship to vote in presidential elections.**

As the district court correctly held, H.B. 2492's requirement that federal-

only voters provide documentary proof of citizenship to vote in presidential

elections squarely conflicts with Section 6 of the NVRA.  Thus, to prevail in

defending that requirement, intervenors must establish that Congress is uniquely

powerless to regulate presidential elections among all federal elections.  Not only

is that view counterintuitive—and not urged by the State—but for well over a

century, the Supreme Court has recognized Congress's power to regulate

presidential elections.  *See, e.g.*, *Burroughs v. United States*, 290 U.S. 534,

547-548 (1934); *Ex Parte Yarbrough*, 110 U.S. 651, 662 (1884); *see also Oregon

v. Mitchell*, 400 U.S. 112, 134 (1970) (opinion of Black, J.) ("Congress

unquestionably has power under the Constitution to regulate federal elections.");

*id.* at 125 n.7.  This Court has followed suit in affirming the constitutionality of the

very statute at issue here.  *See Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th

Cir. 1995).  Because controlling precedent precludes this Court from embracing

intervenors' cramped view of Congress's power, they cannot prevail in defending

- 21 -

H.B. 2492's presidential-voting provisions. And in addition to this longstanding precedent, the NVRA is a valid exercise of Congress's power to enforce the Fourteenth and Fifteenth Amendments.

### A. Congress possesses power to regulate presidential elections.

Congress's power to regulate presidential elections is beyond serious dispute. For 140 years, the Supreme Court has recognized that Congress possesses broad power to regulate presidential elections. In *Ex Parte Yarbrough*, the Court held that Congress had power to protect the right to vote in presidential elections against both state and private interference. 110 U.S. at 662, 666. Both "the interest of the party concerned" and "the necessity of the government itself," the Court said, require "that the votes by which its members of congress *and its president* are elected shall be the *free* votes of the electors, and the officers thus chosen the free and uncorrupted choice of those who have the right to take part in that choice." *Id.* at 662 (first emphasis added). The Court pointed directly to the Necessary and Proper Clause, U.S. Const. Art. I, § 8, Cl. 18, to refute the argument that Congress has "no *express* power to provide for preventing violence exercised on the voter as a means of controlling his vote." *Ex Parte Yarbrough*, 110 U.S. at 658.

Fifty years later, the Supreme Court upheld a federal disclosure law for presidential campaigns. *Burroughs*, 290 U.S. at 547-548. Two individuals

challenged their convictions under the law, asserting—as intervenors do here (Intervenors' Br. 15)—that Congress has no power to regulate presidential elections beyond setting the time for selecting presidential electors. *Burroughs*, 290 U.S. at 544. But the Court held that "[s]o narrow a view of the powers of Congress . . . is without warrant." *Ibid.* Relying on *Ex Parte Yarbrough*, the Court determined that Congress possesses power to regulate presidential-campaign financing for the same reasons "it possesses every other power essential to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption." *Id.* at 545, 547. The Court held that "[t]he power of Congress to protect the election of President and Vice President from corruption being clear, the choice of means to that end presents a question primarily addressed to the judgment of Congress." *Id.* at 547.

More recently, while assessing whether certain campaign-finance regulations violated First Amendment rights, the Court has reaffirmed Congress's power to enact such laws for presidential races. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 187 (2003) (plurality opinion), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010); *Buckley v. Valeo*, 424 U.S. 1, 13 & n.16, 90 (1976) (per curiam) (reaffirming Congress's "broad . . . power to legislate in connection with the elections of the President and Vice President").

- 23 -

Intervenors attempt to distinguish *Burroughs* by noting that that case concerned a campaign-finance law, not legislation to safeguard the right to vote in presidential elections. Intervenors' Br. 17. But they do not explain how Congress's "power . . . to preserve the departments and institutions of the general government from impairment or destruction," *Burroughs*, 290 U.S. at 545, is simultaneously capacious enough to encompass campaign-finance laws regulating presidential elections but too narrow to encompass the NVRA, which safeguards participation in those same elections. The uniform floor that the NVRA sets for registration procedures is just as much a "means to reform the electoral process" as is campaign-finance regulation. *Buckley*, 424 U.S. at 90 (recognizing that campaign-finance laws are "clearly a choice within" Congress's power to regulate presidential elections). If anything, the NVRA's reforms are more integral to "the electoral process" than campaign-finance regulation because they address suffrage itself.

Despite what *Burroughs* and its progeny held, intervenors argue that Congress lacks power to regulate presidential elections because, in their view, the Electors Clause, U.S. Const. Art. II, § 1, Cl. 2, reserves to States the authority to select the "manner" of appointing presidential electors. Intervenors' Br. 15. But the Supreme Court has made clear that the Electors Clause refers only to the power to "define the *method*" of choosing presidential electors. *McPherson v. Blacker*,

146 U.S. 1, 27 (1892) (emphasis added); *accord Trump v. Kemp*, 511 F. Supp. 3d 1325, 1337 (N.D. Ga. 2021) ("As used in the Electors Clause, the word 'manner' refers to the '[f]orm' or 'method' of selection of the Presidential Electors." (alteration in original; citation omitted)).  States therefore possess authority to choose among popular election, appointment, or any other *method* for selecting presidential electors.  But once a State chooses popular elections—as all States have—those elections are subject to Congress's recognized regulatory authority.

That the Elections Clause specifically authorizes Congress to regulate the "Time, Places, and Manner" of congressional elections, U.S. Const. Art. I, § 4, Cl. 1, does not imply that Congress lacks power to regulate presidential elections. The Constitution's assignment of the task to States of selecting a method of appointing presidential electors was an "eleventh-hour compromise" that resolved a conflict among the Constitution's framers over that issue.  *Chiafalo v. Washington*, 591 U.S. 578, 581-582 (2020); *see also McPherson*, 146 U.S. at 28. But by 1832, "all States but one had introduced popular presidential elections." *Chiafalo*, 591 U.S. at 584.  Certain constitutional amendments reflect this entrenchment of the popular election of the President within our system of government and give Congress authority to effectuate the provisions through

legislation under the Necessary and Proper Clause.[2]  Regulation of presidential

elections under the NVRA also is a necessary and proper extension of Congress's

Elections Clause authority because disparate procedures for elections for different

federal offices would be confusing for voters and difficult to implement.  *Cf.*

*United States v. Comstock*, 560 U.S. 126, 133-134 (2010).

This Court—like all of its sibling courts that have considered the issue—has

likewise recognized Congress's power to regulate presidential elections.  Indeed, in

upholding the very law at issue here, this Court held, citing *Burroughs*, that

Congress's "broad power . . . over congressional elections" under the Elections

Clause "has been extended to presidential elections."  *Wilson*, 60 F.3d at 1414.[3]

The intervenors dismiss that language as dicta.  Intervenors' Br. 18.  But *Wilson*

addressed a wholesale challenge to the NVRA—including its regulation of both

congressional and presidential elections—as an invalid exercise of congressional

---

[2]  *E.g.*, U.S. Const. Amend. XXIV, § 1 (prohibiting denial or abridgement of
the right to vote in any "election for President or Vice President" and other federal
offices based on failure to pay a poll tax); *id.* Amend. XIV, § 2 (setting forth a
process for penalizing States for denial of "the right to vote at any election for the
choice of electors for President and Vice President of the United States" and other
federal offices); *see also id.* Amend. XII (vesting in Congress important powers
and duties in connection with the election of the President and Vice President).

[3]  *Accord Association of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d
833, 836 (6th Cir. 1997); *Association of Cmty. Orgs. for Reform Now* (*ACORN*) *v.
Edgar*, 56 F.3d 791, 793 (7th Cir. 1995); *see also Fish v. Kobach*, 840 F.3d 710,
719 n.7 (10th Cir. 2016).

power.  60 F.3d at 1412.  *Wilson*'s recognition of Congress's power to regulate presidential elections was thus essential to its upholding the statute.  That the *Wilson* defendants did not invoke the Electors Clause, as intervenors here do, is therefore of no moment.  *See* Intervenors' Br. 17-18.  Because *Wilson* held that Congress possesses broad power to regulate presidential elections on par with its power to regulate congressional elections, that is the law of this Circuit unless and until it is overturned en banc or by the Supreme Court.  *See Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 994 (9th Cir. 2015).[4]

### B.  The NVRA also is a valid exercise of Congress's power to enforce the Fourteenth and Fifteenth Amendments.

As the United States argued below and in its opposition to the RNC's stay motion (Doc. 152, at 9-11; Doc. 391-1, at 11-12; C.A. Dkt. 65, at 13-14), the

---

[4]  Amicus Republican Party of Arizona fares no better in defending H.B. 2492's presidential-voting provisions.  It misreads *ITCA* as holding that the EAC was required to acquiesce to any request by Arizona to require documentary proof of citizenship.  AZ GOP Amicus Br. 15.  Instead, *ITCA* held that, upon a State's request to amend the Federal Form to require additional information, the Commission must determine, subject to judicial review, whether such information is necessary to enforce a State's voter qualifications.  570 U.S. at 19.  And that is precisely what happened when, post-*ITCA*, the Tenth Circuit agreed with the Commission that Arizona had failed to carry its burden to establish that documentary proof of citizenship is necessary to enforce the State's voting qualifications, and the Supreme Court denied review.  *Kobach v. EAC*, 772 F.3d 1183, 1196-1197 (10th Cir. 2014), *cert. denied*, 576 U.S. 1055 (2015).  The process worked exactly as the Supreme Court envisioned in *ITCA*.  There is no lingering constitutional doubt.

NVRA also is a valid exercise of Congress's power to enforce the Fourteenth and Fifteenth Amendments. *See* U.S. Const. Amend. XIV, § 5; *id.* Amend. XV, § 2. Tellingly, intervenors completely ignore this alternative argument.

In enacting the NVRA, Congress expressly invoked its power under the Fourteenth Amendment in addition to its power to regulate federal elections. S. Rep. No. 6, 103d Cong., 1st Sess. 3-4 (1993) ("This Act seeks to remove the barriers to voter registration and participation under Congress' power to enforce the equal protection guarantees of the 14th Amendment to the Constitution."). And although Congress did not expressly invoke the Fifteenth Amendment, "[t]he question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948); *see also EEOC v. Wyoming*, 460 U.S. 226, 243 n.18 (1983) (stating that "Congress need [not] anywhere recite the words 'section 5' or 'Fourteenth Amendment' or 'equal protection'" so long as "some legislative purpose or factual predicate that supports the exercise of that power" can be discerned).

As an initial matter, in seeking a partial stay, intervenors disputed that the NVRA is legislation to enforce the Fourteenth and Fifteenth Amendments because the Supreme Court has previously identified the statute as "Elections Clause legislation." C.A. Dkt. 71, at 2 (quoting *Arizona v. ITCA*, 570 U.S. 1, 15 (2013)).

- 28 -

To be sure, the Elections Clause is *among* the *multiple* sources of congressional power underlying the NVRA—specifically its regulation of congressional elections. But Congress need not pick a lane. Congress frequently invokes more than one of its powers in enacting legislation. *See, e.g.*, 52 U.S.C. 10502(a) (invoking numerous sources of congressional power as supporting Section 202 of the Voting Rights Act of 1965). And by upholding a statute under a particular "source[] of congressional power," the Supreme Court does not "imply the absence of any other." *Griffin v. Breckenridge*, 403 U.S. 88, 105-107 (1971).

Under the Fourteenth and Fifteenth Amendments, Congress may "use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966); *see also Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966). Congress's power to enforce those amendments' prohibition against racial discrimination in voting is "no less broad than its authority under the Necessary and Proper Clause." *City of Rome v. United States*, 446 U.S. 156, 175 (1980) (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819)). Thus, Congress may prohibit practices that do not themselves violate the Fourteenth or Fifteenth Amendments, including "voting

practices that are discriminatory in effect." *Allen v. Milligan*, 599 U.S. 1, 41 (2023) (quoting *City of Rome*, 446 U.S. at 173).[5]

Congress enacted the NVRA to combat "discriminatory and unfair registration laws" that "disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. 20501(a)(3). As the NVRA's legislative history documents, "[r]estrictive registration laws and administrative procedures were introduced in the United States in the late nineteenth and early twentieth centuries to keep certain groups of citizens from voting; in the North, the wave of immigrants pouring into the industrial cities; in the South, blacks and the rural poor." H.R. Rep. No. 9, 103d Cong., 1st Sess. 2 (1993). Significant racial disparities in voter registration persisted into the modern era. The legislative history cites a 1988 Census Bureau survey of the States for which the agency maintained separate data by race showing that "in 20 of 28 States . . . , black

---

[5] Intervenors argued in seeking a partial stay that the congruence-and-proportionality test set forth in *City of Boerne v. Flores*, 521 U.S. 507 (1997), has replaced the test set forth in *Katzenbach*. C.A. Dkt. 71, at 2-3. But that test does not apply to legislation to enforce the Reconstruction Amendments' prohibition against racial discrimination in voting. Post-*Boerne*, the Supreme Court has continued to evaluate laws that combat voting discrimination under the rationality standard. *See Allen*, 599 U.S. at 41 (upholding Section 2 of the Voting Rights Act of 1965 (VRA), 52 U.S.C. 10301, as "appropriate" legislation based on cases applying the *McCulloch* standard (citation omitted)); *Shelby Cnty. v. Holder*, 570 U.S. 529, 556 (2013) (invalidating the VRA's coverage formula after finding Congress's justification for it "irrational").

registration trail[ed] white registration by an average of almost 9 percentage points." *Equal Access to Voting Act of 1989: Hearing on S.675 Before Subcomm. on the Const. of the S. Comm. on the Judiciary*, 101st Cong., 1st Sess. 21 (1989) (*Equal Access Hearing*) (statement of Sen. Kennedy). The same survey showed "even worse disparities between white and Hispanic voter registration rates." *Id.* at 109 (statement of Frank. R. Parker, Director, Voting Rights Project, Lawyers' Committee for Civil Rights Under Law).

The statute's legislative history also identifies several laws, policies, and practices that contributed to those racial disparities. For example, some States centralized registration within each county at a single courthouse typically located outside the minority community that oftentimes had limited business hours. Staff of Subcomm. on Civ. & Const. Rts. of the H. Comm. on the Judiciary, 98th Cong., *After the Voting Rights Act: Registration Barriers* 2-3 (Comm. Print 1984). As a method for increasing voter registration, some States allowed local registrars to deputize local volunteers to assist in voter-registration efforts, but registrars' discretion over deputization meant that such efforts did not reach all voters equally. *Id.* at 3-4. And some States required individuals to register twice before they were fully qualified to vote, raising barriers to accessing the polls. *Equal Access Hearing* 92.

In light of this evidence, several courts have concluded that Congress had a sound basis for its view that uniform procedures for registration in federal elections would prevent racial discrimination in voting. *See Condon v. Reno*, 913 F. Supp. 946, 967 (D.S.C. 1995); *Association of Cmty. Orgs. for Reform Now* (*ACORN*) *v. Edgar*, 880 F. Supp. 1215, 1221-1222 (N.D. Ill.), *aff'd in relevant part*, 56 F.3d 791 (7th Cir. 1995); *Association of Cmty. Orgs. for Reform Now v. Miller*, 912 F. Supp. 976, 984 (W.D. Mich. 1995), *aff'd*, 129 F.3d 833 (6th Cir. 1997).[6]

---

[6] In addition to the Fourteenth Amendment's prohibition against racial discrimination in voting, its Privileges or Immunities Clause, U.S. Const. Amend. XIV, § 1, guarantees the right to vote in presidential elections as a right and privilege of national citizenship. *In re Quarles*, 158 U.S. 532, 535 (1895). Under what is known as the *Anderson-Burdick* doctrine, the First and Fourteenth Amendments together also prohibit regulations that unjustifiably restrict the right to vote. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189-191 (2008) (plurality opinion). The NVRA is a valid exercise of Congress's power to enforce these aspects of the Fourteenth Amendment as well. In requiring States to "accept and use" the Federal Form, 52 U.S.C. 20505(a)(1)—a form which, as discussed above, allows a person to prove her citizenship by attestation under penalty of perjury rather than by documentary proof—the NVRA is also a valid exercise of Congress's "power to enforce the Fourteenth Amendment's guarantee that '[a]ll persons born or naturalized in the United States . . . are citizens of the United States.'" *Zivotofsky v. Kerry*, 576 U.S. 1, 80-81 (2015) (Scalia, J., dissenting) (quoting U.S. Const. Amend. XIV, § 1).

**II.    Because Arizona uses the Federal Form to determine eligibility to vote by mail, it must accept that Form for that purpose.**

The district court correctly held that Section 6 of the NVRA preempts H.B. 2492's mail-voting provisions.  1-ER-128-129.  The State does not challenge this ruling on appeal.

Intervenors quarrel (Intervenors' Br. 12-13) with the district court's citation of 52 U.S.C. 20505(c), which permits States to limit voting by mail for first-time voters, to support the inference that because the NVRA enumerates specific "circumstances where a State may limit voting by mail," the statute implicitly prohibits other limitations on mail voting.  1-ER-128.  Besides that sensible inference, the NVRA's plain language also confirms that the court's conclusion was correct and its injunction barring enforcement of Arizona's mail-voting provisions appropriate.  *See DeFries v. Union Pac. R.R.*, 104 F.4th 1091, 1109 (9th Cir. 2024) ("We can affirm on any ground supported by the record.").

Section 6 requires States to "accept and use" the Federal Form.  52 U.S.C. 20505(a)(1).  In *Arizona v. ITCA*, 570 U.S. 1 (2013), the Supreme Court held that this mandate requires more of States than merely to "receive the [Federal] form willingly and use it *somehow* in its voter registration process."  *Id.* at 9-10.  Instead, Section 6 requires that the Federal Form "be accepted *as sufficient* for the requirement it is meant to satisfy."  *Id.* at 10.

- 33 -

Under H.B. 2492, Arizona election officials would "use" the Federal Form to determine whether individuals are eligible to vote by mail in federal elections but then "accept" it for that purpose only if voters provide information as part of the registration process—documentary proof of citizenship—*beyond* what that Form requires. In this way, H.B. 2492's mail-voting provisions impermissibly create a two-tiered registration system: Individuals who provide documentary proof of citizenship are registered as eligible to vote by mail; those who do not are not eligible to vote by mail. That *Congress* did not mandate that the Federal Form determine eligibility to vote by mail is therefore beside the point. Intervenors' Br. 12. Under H.B. 2492, *Arizona* would use it for that purpose. Arizona must therefore accept the Federal Form "*as sufficient* for" that purpose. *ITCA*, 570 U.S. at 10. By demanding that federal-only voters provide documentary proof of citizenship as part of the registration process to be eligible to vote by mail, H.B. 2492 makes an end-run around Section 6 of the NVRA.

Intervenors' contrary conception of the NVRA proves too much. If, as they argue (Intervenors' Br. 12), the NVRA regulates "registration" in total isolation from the rest of the voting process, then States could "accept" the Federal Form solely to place individuals' names on the voting rolls but then preclude those who do not provide documentary proof of citizenship from actually casting ballots in federal elections. But *ITCA* rejected such a self-defeating interpretation of

- 34 -

Section 6. *See* 570 U.S. at 13 (refusing to adopt Arizona's interpretation of Section 6 under which the provision would "cease[] to perform any meaningful function").

Accordingly, the district court correctly held that H.B. 2492's mail-voting provisions are preempted by Section 6 of the NVRA.[7]

## III. The State Form's birthplace and citizenship-checkbox requirements violate the Materiality Provision.

The district court correctly held that H.B. 2492's requirements that applicants using the State Form provide their birthplace and check a box to confirm their citizenship violate the Materiality Provision. 1-ER-76-78, 142-144. Omitted birthplaces and blank citizenship checkboxes are immaterial in determining whether applicants are eligible to vote in Arizona. Birthplace is not itself a qualification to vote, and the evidence at trial established it is not useful, much less material, in determining an applicant's identity or citizenship either. A blank citizenship checkbox is likewise immaterial when applicants have provided the very documents deemed sufficient under state law to *prove* their citizenship.

---

[7] If this Court holds that either H.B. 2492's presidential- or mail-voting provisions are not preempted by Section 6 of the NVRA, then it should remand for the district court to consider in the first instance the United States' claim that requiring federal-only voters to provide documentary proof of citizenship to vote in presidential elections or by mail violates the Materiality Provision. *See* 3-SER-575-576; 1-ER-138 n.14 (declining to resolve that claim at summary judgment).

- 35 -

The district court reached these conclusions after wide-ranging litigation over H.B. 2492 and H.B. 2243 that "immersed" the court "in case-specific factual issues" regarding election administration in Arizona. *See McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 604 (9th Cir. 2021) (quoting *U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC*, 583 U.S. 387, 396 (2018)). Accordingly, this Court should "review with deference," *ibid.*, and affirm.

### A. Arizona's birthplace requirement violates the Materiality Provision.

1. The district court correctly held that Arizona violates the Materiality Provision by denying the right to vote to applicants who do not indicate their birthplace on the State Form. 1-ER-77; Ariz. Rev. Stat. Ann. §§ 16-121.01(A) (2023), 16-152(A)(7) (2022). After trial, it found that "defendants adduced no evidence that county recorders"—the Arizona officials chiefly responsible for voter registration—"have ever encountered challenges determining the identity or eligibility" of voters who do not provide their birthplace. 1-ER-29. Because the birthplace requirement is not "material in determining" eligibility to vote, enforcing the requirement is little more than "a means of inducing voter-generated errors that [can] be used to justify rejecting applicants." *Florida State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008).

As the district court recognized, "material" means more than "useful" or of "minimal relevance." 1-ER-140-141. Instead, materiality is understood across a

- 36 -

range of contexts "to require some probability of actually impacting" the decision in question—here, "an election official's eligibility determination." 1-ER-141.[8] For instance, under the summary-judgment standard, materiality means that "[o]nly disputes over facts that *might affect the outcome of the suit*" will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis added). In the securities context, an omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). In the *Brady* context, withheld evidence is material "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-470 (2009).

Birthplace information is immaterial because it is not reasonably likely to affect the determination that an applicant is qualified to vote. Under Arizona law, neither birth in the State nor in the United States is a qualification. Voter qualifications are limited to age, U.S. citizenship, residence, the ability to write

---

[8] The Fifth Circuit, consulting dictionary definitions, arrived at the comparable understanding that information is "material" when it is important and likely to affect the decision in question. *See Vote.Org v. Callanen*, 89 F.4th 459, 478 (5th Cir. 2023) (favoring the definitions "Of such a nature that knowledge of the item would affect a person's decision-making" and "Of serious or substantial import; significant, important, of consequence"); *see also Material*, Black's Law Dictionary (4th rev. ed., 1968) ("Important; more or less necessary; having influence or effect.").

one's name or mark, an absence of felony convictions (or, if convicted, restoration of civil rights), and no adjudicated incapacity.  Ariz. Const. Art. VII, § 2; Ariz. Rev. Stat. Ann. § 16-101(A) (2023).

Of those qualifications, just citizenship is at issue here.  Birthplace offers no more than a possible sign that an applicant is—or is not—a citizen.  1-ER-26.  Individuals born abroad can be citizens through their parents or through naturalization.  1-ER-26; 8 U.S.C. 1401 (conferring citizenship on persons born abroad to citizen parents).  Approximately 436,000 naturalized citizens reside in Arizona.  1-ER-8.  If election officials relied on birthplace to determine their citizenship, it would yield mistake after mistake.

Moreover, "materiality" typically is assessed in light of "the 'total mix' of information made available" to the relevant decisionmaker.  *TSC Indus.*, 426 U.S. at 449; *Cone*, 556 U.S. at 470-475 (comparing materiality of withheld evidence to evidence presented at trial).  Thus, the district court rightly recognized that the materiality of an error or omission is "determined by the . . . information available to the State."  1-ER-142.  The court reviewed the numerous direct means Arizona already employs to determine an applicant's citizenship.  Applicants using the State Form to register are required to provide documentary proof of citizenship.  Ariz. Rev. Stat. Ann. § 16-121.01(C) (2023).  The statewide Arizona Voter Registration Database (AVID), used by every Arizona county, connects to the

State's motor-vehicle division (MVD) database to check for proof of citizenship. 1-ER-16, 21. The MVD database tracks individuals' "authorized presence status" in the U.S. 1-ER-16. The State also can search U.S. Customs and Immigration Services' SAVE database to verify the citizenship of those born abroad. 1-ER-17-18 & n.15. With these direct means to determine citizenship available, it would be all the more unreasonable to determine an applicant's citizenship instead based on their birthplace.

Accordingly, the district court found that Arizona's county recorders do not use birthplace to determine that an applicant is qualified to vote. 1-ER-26; 4-SER-598-600, 754-755; 5-SER-905, 916, 927-928, 938-939, 959-960, 977-978; 6-SER-1053. The Secretary of State admitted that an applicant's "failure to provide their place of birth . . . is not material to their eligibility to vote." 3-SER-528 (Answer to U.S. Complaint). And its State Elections Director, Mary Colleen Connor, testified that birthplace is not used to determine citizenship. 1-ER-14, 26; 4-SER-622-623.

2. As the district court also found, birthplace is not material in determining an applicant's identity either. As with citizenship, the State has sophisticated means to identify applicants that do not depend on the applicant's birthplace. As noted, every county uses AVID, and for each new application, AVID compares the applicant's information to existing registrations to flag duplicates. 1-ER-21.

- 39 -

AVID also compares the applicant's information to the MVD database, which is connected to the Social Security Administration. 1-ER-19-21. None of this identity matching depends on the applicant's birthplace. 1-ER-26-27, 78. Unsurprisingly then, no county recorders indicated that they actually use birthplace to identify applicants for voter registration. 4-SER-600-601, 610-611; 5-SER-905, 916, 927-928, 938-939, 959-960, 977-978; 6-SER-1070-1072.

The way the State has implemented the birthplace requirement demonstrates its poor utility as an identifier and thus its immateriality in determining qualifications. Because providing birthplace was voluntary for so many years, the district court found that "approximately one-third of existing voter registrations" lack a birthplace. 1-ER-28-29, 78. Yet the State did not make the birthplace requirement retroactive, so birthplace information will continue to be missing for that multitude of voters. 1-ER-77. As the court held, the fact "[t]hat Arizona has determined these voters are qualified to vote notwithstanding the lack of any meaningful birthplace information strongly indicates birthplace is immaterial." 1-ER-77.

The State Form also has never provided clear instruction to applicants to ensure that they enter their birthplaces in a standard way. 4-SER-598. Consequently, as the district court found, the birthplace information the State collects is riddled with improper answers (such as an applicant's city of birth,

- 40 -

rather than state or country), as well as inconsistent abbreviations, typos, countries that no longer exist, and other ambiguities.  1-ER-28-29; 4-SER-652-653, 656-658.  Despite these deficiencies, the State offered no plans to improve the quality of the birthplace information it collects.  1-ER-29.  That further evinces birthplace's immateriality.

Even if the State seriously attempted to use birthplace information to identify applicants and distinguish them from already-registered voters, unrebutted expert testimony established to the district court's satisfaction that the birthplace requirement would have "little utility in nearly all cases."  1-ER-29.  The court accorded "significant weight" to the opinions of Dr. Eitan Hersh, a Tufts University political science professor specializing in election administration.  1-ER-28 & n.22.  Dr. Hersh detailed significant shortcomings in birthplace information as a means of identification, both because of Arizona's poor data collection and because of birthplace's inherent inferiority to other, better identifiers.

Dr. Hersh testified that Arizona has approximately 4.7 million active and inactive registered voters.  Birthplace is a weak differentiator among this group, and not only because one-third never indicated a birthplace.  1-ER-28.  Of the two-thirds that did, many gave the same answers:  Arizona, unsurprisingly, or else

Mexico or the United States. 1-ER-28; 4-ER-771-772. Mandating that applicants give their birthplace would not change that reality.

By contrast, Dr. Hersh testified that name and birthdate uniquely identify more than 99.9% of voters—that is, all 4.7 million except 2734. 1-ER-29; 4-SER-663-664. To identify the remainder, personal identification numbers are far superior to birthplace. The State has an Arizona identification number, such as a driver's license number, or the last four digits of a Social Security number, for 99.6% of voters, in contrast to the one-third of voters for whom it lacks birthplace. 1-ER-29; 4-SER-664. Using these numbers along with name and birthdate uniquely identifies all but 720 registered voters, more than 99.98% of the total. 4-SER-664-667.

Even to distinguish among this infinitesimal remainder, birthplace is of little use. Dr. Hersh testified that nearly all—660 of the 720—show either the same birthplace (*e.g.*, Arizona) or different but compatible entries (*e.g.*, Arizona in one record, United States in the other). 4-SER-667-668. Birthplace would at best provide some indication that these reflect duplicative records. But an election official looking at two records with matching names, birthdates, and identification numbers already would conclude they are duplicates without using birthplace information. Ultimately, birthplace information might help distinguish possibly duplicative records in vanishingly few instances. 1-ER-29. And in light of its

- 42 -

inconsistent, incomplete collection, and the fact many Arizona applicants were born in the same places, the district court did not clearly err in finding that birthplace is likely to prove unreliable and unhelpful even then.  1-ER-29.

**B.    Appellants' defenses of the birthplace requirement lack merit.**

The State and intervenors show no clear error in the district court's findings of fact or error in its holding that the birthplace requirement violates the Materiality Provision.  Their defenses of the requirement demonstrate that no problem existed in Arizona election administration that the requirement's adoption in H.B. 2492 would solve.  Their defenses likewise lack foundation in Arizona election officials' actual practices, instead relying on hypothetical or anecdotal uses of birthplace information that were already possible before the State passed a law requiring birthplace information in 2022.

**1.    Appellants misinterpret the term "material."**

The State and intervenors begin by urging alternatives to the district court's well-founded understanding that materiality requires some probability of actually impacting an election official's eligibility determination.  State Br. 42-43; Intervenors' Br. 21-22.  The State takes "material" to mean simply "significant" but not "essential," paraphrasing *Vote.Org v. Callanen*, 89 F.4th 459, 478 (5th Cir. 2023), but it does not specify what "significant" means.  State Br. 42-43. The State uses "significant" throughout its brief, in contrast to "essential," to mean

- 43 -

little more than that birthplace may possibly be useful or loosely relevant in various registration-related processes. *See* State Br. 56, 61, 65-66. As the district court correctly held, the statute's use of "material" entails significance specifically in terms of the "probability of actually impacting an official's *eligibility determination*." 1-ER-77, 141 (emphasis added); *see* pp. 36-37, *supra*. The State must show significance in that respect, not merely that election officials might find it useful in ways a step removed from determining eligibility.

Intervenors argue that "material" means "a low threshold for relevance" (Intervenors' Br. 21-22), but they misread precedent. In *Browning*, the Eleventh Circuit did not rule that the statute's use of "material" denotes "minimal relevance." *Contra* Intervenors' Br. 21-22 (quoting *Browning*, 522 F.3d at 1174). That was dicta, discussing various formulations of materiality in other contexts. *Browning*, 522 F.3d at 1173-1174. This Court need not decide whether that discussion was correct. Because *Browning* held that federal law made the information at issue "automatically material," it did not actually decide which formulation of materiality to adopt. *Id.* at 1174. Intervenors likewise misread (Br. 22) the emphasis that *Pennsylvania State Conference of NAACP Branches v. Secretary Commonwealth of Pennsylvania*, 97 F.4th 120 (3d Cir. 2024), placed on the statute's phrase "*in determining* whether such individual was qualified." *Id.* at 131 (quoting 52 U.S.C. 10101(a)(2)(B)). The Third Circuit emphasized that phrase

to decide a question not posed here: whether mail-ballot envelopes, which are used only *after* a voter's qualifications have been determined, are papers subject to the Materiality Provision. *Id.* at 131-132. Like the Eleventh Circuit, it did not hold that "materiality" means minimal relevance.

### 2. The State's "legislative judgment" does not warrant additional deference.

Next, the State asks for deference to its legislative judgments, which it says the district court failed to afford. State Br. 43, 56. The Materiality Provision's text already defers to States by looking to the voter qualifications they set "under State law." 52 U.S.C. 10101(a)(2)(B). The statute generally lets States decide how to determine that a voter meets their qualifications; to add a requirement to a voting-related paper, it must merely be material in determining qualifications. The statute otherwise does not make detailed provision for voter-registration processes as, for instance, the NVRA does. The Materiality Provision's function is to ensure voting-related papers are not laden with requirements immaterial to determining voters' qualifications. *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). In this one respect, it "expressly limits" States' discretion to craft voting rules. *Vote.Org*, 89 F.4th at 492 (Higginson, J., dissenting). To defer to the State on the meaning of materiality, as the State asks, is to negate the specific effect this otherwise-deferential statute has.

- 45 -

The State does not demonstrate that it deserves deference to the legislative judgment at issue here anyway. The State scarcely explains its decision to mandate birthplace in voter-registration applications after so many decades of making it optional. State Br. 4-5. It identifies no recurring problem in election administration that requiring birthplace information would solve. The State's only evidence on the "legislative judgment" to which it requests deference is the testimony of a lone witness from an advocacy organization, with no role in election administration, speculating about the possible "useful[ness]" of birthplace information in certain database searches. State Br. 11 (quoting 6-ER-1465); *see* pp. 55-56, *infra*.

The State suggests its long history of asking about birthplace makes birthplace information "significant." State Br. 56. This history shows the opposite: H.B. 2492's birthplace requirement is a solution in search of a problem. The State administered elections for decades without any apparent difficulty while treating birthplace as optional information, even with a third of registered voters opting not to provide it. *See* p. 40, *supra*. That history counsels against deference to the State's largely unexplained legislative judgment to change course in 2022.

### 3. The birthplace requirement is not material in determining identity.

The State concedes that "birth place information often does not distinguish voters" because "self-reported birth places [are] often either Arizona or Mexico."

State Br. 22. The State also does not appear to contest the district court's finding that election officials have no trouble determining the qualifications of applicants who do not provide their birthplaces. State Br. 36; 1-ER-29. Nor does it call into serious question Dr. Hersh's unrebutted criticisms of birthplace's utility as an identifier. State Br. 20-21. The State also acknowledges that its proposed uses of birthplace for identification are largely speculative or anecdotal because "county recorders have not regularly relied on it during registration" (State Br. 32), contradicting intervenors' claim that "birthplace *is used* . . . to corroborate a registrant's identity" (Intervenors' Br. 24 (emphasis added)). Against these concessions, the State's and intervenors' speculative points do not establish the materiality of the birthplace requirement.

a. The State defends the birthplace requirement with reference to various anecdotal or hypothetical scenarios in which election officials are trying to confirm the identity of an applicant, such as a "soft match" or an applicant whose name varies between their birth certificate and their application. State Br. 19, 22-23, 52-54; Intervenors' Br. 24-25 (similar). But birthplace need not be mandatory on the State Form for the State to use it in these ways. The State largely draws these possible uses of birthplace information from the 2019 edition of Arizona's Election Procedures Manual (2019 EPM). State Br. 16-17 & n.8; *see id.* at 19 (citing 4-ER-899, from 2019 EPM), 23-25 (citing 2019 EPM). But in 2019, birthplace was

optional on the State Form.  Thus, these uses of birthplace information were already possible before the State required the denial of registration applications that omit it.  And the EPM did not state that birthplace in particular could be used this way to confirm identity; it said "any information in the voter's record" would do.  4-ER-899.

The Materiality Provision does not bar these ancillary uses of birthplace information for identification, as long as omitting the birthplace from an application does not trigger its denial.  *See Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1211 n.3 (S.D. Fla. 2006) ("[T]he Materiality Provision prohibits denying the right to vote on the basis of an immaterial error or omission, but does not prohibit a state from *requesting* immaterial information." (emphasis added)).  It would allow a county recorder to send a follow-up if it genuinely cannot identify an applicant who omitted their birthplace.  *See* State Br. 23.  The Materiality Provision also would not stop the State from improving the quality of voluntary birthplace information by developing "standard instructions" for applicants, which it has not done.  State Br. 31, 36.

The State concedes birthplace's limited utility as an identifier anyway, acknowledging Dr. Hersh's analysis that birthplace distinguished only "a tiny percentage of overall records" compared to name, birthdate, and personal

identification numbers.  State Br. 53.  A datum that helps with as few as "eight pairs" (State Br. 53) out of 4.7 million epitomizes immateriality.

Reliance on ancillary uses of birthplace information as an identifier has another problem:  numerous examples the State and intervenors offer come after the eligibility determination.  State Br. 54, 60; Intervenors' Br. 24-25.  To repeat, for errors or omissions to warrant denial of a registration application, they must be "material in determining" an applicant's qualifications to vote.  52 U.S.C. 10101(a)(2)(B).  The birthplace requirement rises or falls by that standard.  Uses of birthplace *after* that determination are not sufficient on their own to satisfy the Materiality Provision.  For instance, the State suggests birthplace is "useful after registration . . . as a security question to be asked over the phone."  State Br. 60.  The district court correctly rejected these "administrative" uses of birthplace information because such voters have "already been identified and found eligible to vote."  1-ER-78; *cf. Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-1309 (N.D. Ga. 2018) (holding post-application uses of "year of birth" immaterial because "election[] officials have already confirmed such voters' eligibility").  Potential post-registration administrative utility does not justify denying applications in the first instance.

The rulings in *Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775 (S.D. Ind. 2006), and *League of Women Voters of Arkansas v. Thurston*,

- 49 -

No. 5:20-cv-5174, 2023 WL 6446015 (W.D. Ark. Sept. 29, 2023), do not indicate otherwise. *Contra* State Br. 60-61; Intervenors' Br. 25. Those cases involved materiality challenges to State requests for information at later stages, not during the registration process itself, as here. They held only that States may require voters to show identification at the polling place (*Rokita*) or provide basic identifying information when submitting an absentee ballot (*Thurston*), not that States may encumber registration forms with inconsequential information requests and deny registration to those who provide the information improperly.

b. The State's references to the practices of the U.S. Department of State and other States likewise fail. The district court appropriately regarded the State Department's use of birthplace in passport applications as "irrelevant." 1-ER-27 n.20. Neither the Materiality Provision nor any equivalent law applies to the passport-application process. Because applicants for U.S. passports are not concentrated in a single State, birthplace information from that universe of people is more likely to be a useful identifier than the birthplace information that Arizona collects. *See* 8 Foreign Affs. Manual 403.4-7(A)-(C) (Doc. 365-1, at 112-126) (listing as places of birth U.S. States, possessions, and hundreds of foreign countries and territories). This contrasts with the fact, noted above, that most Arizona applicants for voter registration write the same few answers: Arizona, Mexico, or the United States.

If any federal agency's decisions are pertinent, it is the Federal Election Commission's decision in 1994, implementing the NVRA, to *not* include birthplace on the Federal Form. *See* 59 Fed. Reg. 32,311, 32,316 (June 23, 1994). It found that "duplicate registrations can effectively be distinguished" with other "required information," including "date of birth" and "numerical identifier[s]." 59 Fed. Reg. at 32,316. It also sought to avoid "inviting unequal scrutiny of applications from citizens born outside the United States, such as those born of parents serving overseas in the Armed Forces." *Ibid.*

The State's reference to the election practices of other States is no stronger. It claims "at least nine other states" ask applicants for birthplace. State Br. 50. But the question is whether any States *require* it. The State earlier asserted that only four States "appear to require" birthplace information, and even this is doubtful. Doc. 365, at 3 (claiming Alabama, Nevada, Tennessee, and Vermont require birthplace); *see* Doc. 392, at 2-3 (U.S. Rule 56.1 Statement) (disputing State's assertion given lack of evidence). These facts, undeveloped by the State at trial, undercut the State's materiality argument. They show that all, or nearly all, other States administer elections without requiring birthplace information, evidently encountering no problems that the State has adduced. To use the State's own logic in reverse: "[T]he fact that other decision makers have [not] sought the same kind

- 51 -

of information for similar decisions, either contemporaneously or historically, is evidence that the information is [not] significant."  State Br. 44.

c.  Finally, the State proposes a specious presumption that applicants who omit their birthplace information are intentionally deceiving election officials, "rais[ing] doubts about [their] identity."  State Br. 46, 51, 57-58.  This presumption would render the Materiality Provision a dead letter.  If States could treat any omission in a voting-related paper as intentional, and thus a sign of fraud or deceit, all omissions would thereby become material in determining the identity of prospective voters.  It is doubtful that Congress "could have intended to create such a large and obvious loophole in one of the key regulatory innovations" of the Civil Rights Act.  *See County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165, 178-179 (2020).

Furthermore, the State's proposed presumption is unfounded.  It rests (State Br. 46, 51) on misreading the Eleventh Circuit's *Browning* decision.  *Browning* said only that errors should be accepted "*as true and correct*" when deciding which information is material in determining voter qualifications.  522 F.3d at 1175.  That is, if the erroneous information would make a difference to the eligibility determination, then it is material.  *Ibid.  Browning* did not say that an applicant's errors should be viewed as *intentional*.

The State's presumption that omissions are intentional would call into question the third of Arizona registered voters who omitted their birthplace. This is at odds with the State's own "legislative judgment" (State Br. 56) in H.B. 2492 that the birthplace requirement did not need to be retroactively applied to all those people. 1-ER-77. The State's presumption also is at odds with the trial record. None of its cited testimony (State Br. 52) indicates that county recorders view omissions of information as intentional efforts at deceit. The cited testimony spoke, at most, of registration applications completed haphazardly by third-party groups. The State offers only hypothetical examples (State Br. 45-46), not any evidence of the intentional deceit it presumes is lurking behind every omitted birthplace.

Having a notice-and-cure process (State Br. 46-48, 51) does not bolster the State's presumption that omissions are intentional. When an omission goes uncured, it may signify only that prospective voters are busy people, juggling obligations from work, family, and much else. The idea that an uncured omission most likely indicates a foiled fraud scheme reflects rank speculation, not evidence.

Nor does a cure process insulate the birthplace requirement writ large from the Materiality Provision. The statute "does not say that state actors may initially deny the right to vote based on errors or omissions that are not material as long as they institute cure processes." *La Unión del Pueblo Entero v. Abbott*, 604 F. Supp.

3d 512, 541 (W.D. Tex. 2022). Notwithstanding a cure process, the requirement "creates a hurdle" for applicants and prevents them from voting until they clear it. *Vote.Org*, 89 F.4th at 487. If the option to cure an omission with a corrected form could negate the Materiality Provision, no barrier would ever violate the Provision. Voters could always be made to provide immaterial information on a corrected form later.

### 4. The birthplace requirement is not material in determining citizenship.

The State and intervenors' adherence to the rationale that birthplace is material in determining citizenship has waxed and waned throughout this litigation. The State's motion to dismiss urged the birthplace requirement's utility in determining citizenship. Doc. 127, at 26-29. But, as the State acknowledges, its summary-judgment motion mainly argued for the requirement's utility in identifying applicants, alluding to citizenship only in passing on reply. State Br. 14; 2-SER-275; 3-SER-460. The citizenship rationale got scant attention in intervenors' trial brief, which focused instead on identification. Doc. 586, at 9. But intervenors then suggested in closing arguments that "the real purpose" of the birthplace requirement was "to prove citizenship," not to use birthplace as "a unique identifier." 3-ER-598.

The citizenship rationale is inadequate in any case. The State acknowledges—as it must—that birth abroad does not mean a person is a non-

citizen.  State Br. 62.  As the district court found, birthplace thus does not determine a person's citizenship.  1-ER-26.  The State offers that birthplace can indicate "the potential basis for a person's citizenship."  State Br. 62.  But that is not a voter qualification either.  Citizenship is the qualification, regardless of the basis.

The most the State can say is that birthplace might indicate the "types of proof" of citizenship an applicant might submit.  State Br. 62.  But requiring birthplace on the registration form is not necessary for that.  If one applicant supplies a U.S. birth certificate, while another supplies a certificate of naturalization, they have conveyed the same information directly.  The difference between the document types is insignificant anyway, because both applicants are eligible.  The State's suggestion (State Br. 66) that birth in the U.S. is "generally dispositive" of citizenship is a red herring.  The State does not accept an attestation of U.S. birthplace as sufficient to determine a voter is a citizen.  The State still requires documentary proof of citizenship no matter what birthplace an applicant enters, demonstrating that the birthplace entry is fundamentally immaterial.

This leaves the State's misplaced justification that knowing an applicant's birthplace would help election officials use two databases, NAPHSIS and SAVE, to verify their citizenship.  State Br. 27-30, 63, 66-67.  Under H.B. 2492, such verification procedures are used for applicants who submit the Federal Form and

do not provide documentary proof of citizenship. State Br. 9-10; Ariz. Rev. Stat. Ann. § 16-121.01(D) (2023). The birthplace requirement is on the State Form, whose users must provide documentary proof. Election officials can consult such applicants' citizenship documents directly. Adding the birthplace requirement to the State Form thus has no bearing whatsoever on the State's procedures for verifying the citizenship of Federal Form applicants. Similarly, the possible utility of birthplace to "the back-end process" of verifying the citizenship of "voters who previously registered without proof of citizenship" (State Br. 64) is irrelevant. That has nothing to do with requiring new applicants to provide their birthplaces.

### C. The citizenship-checkbox requirement is not material in determining the qualifications of Arizona voters.

1. Despite requiring documentary proof of citizenship for applicants using the State Form, Arizona also requires such applicants to affirm the same by checking a box on that form. Ariz. Rev. Stat. Ann. § 16-152(A)(14) (2022). Election officials must reject applications in which the box is not checked, even when applicants have provided sufficient documentation to prove they are citizens. *Id.* § 16-121.01(A). An unchecked box is an error or omission under the Materiality Provision. 1-ER-142. The district court correctly held that it violates the Materiality Provision to deny the registration of an applicant who has supplied documentary proof of citizenship but does not also check the citizenship box. 1-ER-139-142.

- 56 -

As noted, the district court properly understood "materiality" "to require some probability of actually impacting" the decision at issue—here, determining an applicant's eligibility to vote. 1-ER-141; *see*, pp. 36-37, *supra*. No reasonable election official, determining whether an applicant is a citizen, would treat a blank checkbox as overriding documentary proof of citizenship. When applicants prove their citizenship with the documents deemed sufficient under state law, a blank checkbox cannot reasonably be interpreted as an attestation that the person who has just proven citizenship in fact lacks it. The overwhelmingly likely explanation for the blank checkbox is simple mistake. It would be counterintuitive and unreasonable to determine the applicant's citizenship by favoring either a marked or blank checkbox over the documentary proof the applicant supplied.

Indeed, the State provided no evidence at summary judgment that, if Arizona law left election officials free to consider the significance of a blank citizenship checkbox, they actually would view it as superseding the documents held sufficient under state law to prove citizenship. Quite the opposite. The Secretary of State admitted that the citizenship checkbox is immaterial when voters provide documentary proof of citizenship. 3-SER-525 (admitting in Answer that rejecting applicant who "does not check the citizenship box on the registration form where election officials already have adequate evidence of the applicant's citizenship" violates the Materiality Provision).

- 57 -

The fate of applicants who check the citizenship checkbox but fail to provide documentary proof of citizenship confirms the checkbox's immateriality: election officials "shall reject" their applications. *See* Ariz. Rev. Stat. Ann. § 16-121.01(C) (2023). When an element of an application makes no difference to the outcome one way or the other, it is immaterial.

2. The State no longer defends the materiality of the citizenship-checkbox requirement. Intervenors, for their part, maintain that a blank checkbox would be "of consequence, if not potentially dispositive," in determining an applicant's citizenship. Intervenors' Br. 22 (citation and internal quotation marks omitted). Intervenors' argument overlooks that the district court found the citizenship checkbox immaterial as to applicants who have provided documentary proof of citizenship. Intervenors offer no reason why a blank checkbox would countermand an applicant's proof of citizenship. Documentary proof is far more compelling evidence of citizenship than a blank checkbox is of non-citizenship.

The strength of documentary proof compared to the checkbox defeats intervenors' analogies to dissimilar cases. Intervenors' Br. 23. No such disparity in informational value was present in *Diaz*, which concerned alleged duplication between checkboxes for specific qualifications—citizenship, felony status, and incapacitation—and a general signature affirming an applicant meets the qualifications to vote. 435 F. Supp. 2d at 1211-1212. The court upheld the

checkboxes against a materiality challenge as "specific affirmations of specific qualifications" that were only generally encompassed by the signature and thus not truly duplicated by it. *Id.* at 1212-1213. *Diaz* recognized that seeking information "twice in the same way" would pose a more serious materiality problem. *Id.* at 1213. Seeking the same information again in a form that would not be dispositive on its own, as the citizenship checkbox does, naturally poses an even more serious problem under the Materiality Provision.

For the same reason, *Thurston*, does not support finding the citizenship-checkbox requirement material. *Thurston* concerned the repetition of basic identifying information—name, address, and date of birth—on both an absentee-ballot application and then, later, on a "voter statement" submitted along with the absentee ballot. 2023 WL 6446015, at *1-2. It did not concern seeking the same information concurrently by much stronger and much weaker means. It is "the nature of the underlying information requested" that matters. *Browning*, 522 F.3d at 1175. Here, the district court correctly deemed the information obtained through the citizenship checkbox immaterial for voters who provided documentary proof of citizenship.

**D.    Intervenors' attempt to narrow the Materiality Provision to *ad hoc* voting procedures is unfounded.**

Intervenors argue (Br. 26-27) that the Materiality Provision "does not displace state law" and instead deals only with "*ad hoc* requirements by state

- 59 -

officials that were not mandated 'under State law.'"  Intervenors never advanced

this interpretation themselves in district court, only joining the State's motion to

dismiss that did so in passing.  *See* Doc. 127, at 26-27; Doc. 179, at 2.  The district

court correctly rejected this unfounded interpretation (1-ER-191 n.16), and the

State has since abandoned it.  No other court has embraced it either.

Intervenors are incorrect that the statute "asks whether the error or omission

is material 'under State law,'" while it "does not apply to errors or omissions that

state law determines are material."  Intervenors' Br. 27 (citation omitted).  The

phrase "under State law" modifies "qualified," not "material":  The statute's

concern is whether errors or omissions are "material in determining whether [an]

individual is *qualified under State law*."  52 U.S.C. 10101(a)(2)(B) (emphasis

added).  Intervenors would make surplusage of every word from "in determining"

to "qualified."

Read in full, the statute takes State-law *qualifications* as a given, asking

whether a given requirement is material in determining those qualifications.  *See

Schwier*, 340 F.3d at 1297 (rejecting Georgia's argument that Social Security

numbers were material because state law required them).  Intervenors' reading, by

contrast, would leave no function for the Materiality Provision.  If anything

required by state law were necessarily material, the statute would serve little

purpose.  *See Vote.Org*, 89 F.4th at 487 ("We reject that States may circumvent the

- 60 -

Materiality Provision by defining all manner of requirements, no matter how trivial, as being a qualification to vote and therefore 'material.'").

Intervenors' narrowing of the statute to "*ad hoc* requirements by state officials" not mandated by state law (Intervenors' Br. 27) is likewise meritless. The preceding subsection of the statute, 52 U.S.C. 10101(a)(2)(A), already addresses officials' inconsistent application of election standards, prohibiting the "different" application of such rules to voters in the same county or other subdivision. This Court should not "adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Republic of Sudan v. Harrison*, 587 U.S. 1, 12 (2019) (citation omitted).

Intervenors mistakenly assume that the reach of a statute can be defined by the salient examples of wrongdoing that motivated its enactment. Intervenors' Br. 27 (citing U.S. Comm'n on C.R., *Voting: 1961 United States Commission on Civil Rights Report* (1961), perma.cc/WA4A-QEYK (1961 Comm'n on C.R. Report)). But "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). "The text of the resulting statute, and not the historically motivating examples of intentional and overt racial discrimination, is thus the appropriate starting point" for interpreting the

- 61 -

Materiality Provision. *Browning*, 522 F.3d at 1173. That text reaches well beyond the rogue registrars intervenors envision.

Intervenors are wrong on the history anyway. On the very page they cite of the U.S. Commission on Civil Rights' 1961 report, the Commission faulted "agencies of the State government, including the legislature," not just the "practices of particular registration officials." *See* 1961 U.S. Comm'n on C.R. Report 43. It thus is fully consonant with the Materiality Provision's history and purpose, as well as its text, to apply it here.

## CONCLUSION

This Court should affirm the district court's permanent injunction against enforcement of H.B. 2492's presidential- and mail-voting provisions and its citizenship-checkbox and birthplace requirements.

<div style="margin-left: 40%">

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Jonathan L. Backer
BONNIE I. ROBIN-VERGEER
JONATHAN L. BACKER
MATTHEW N. DRECUN
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 532-3528

</div>

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____ .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                      **Date**
*(use* "s/[typed name]" *to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                              *Rev. 12/01/22*