Nos. 24-3188, 24-3559, 24-4029

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MI FAMILIA VOTA, *et al.*,

*Plaintiffs-Appellees*,

*v.*

ADRIAN FONTES, *et al.*,

*Defendants-Appellants*,

WARREN PETERSEN, *et al.*,

*Intervenor-Defendant-Appellants*.

On Appeal from the United States District Court
for the District of Arizona, No. 2:22-cv-00509 (lead) (Bolton, J.)

**RESPONSE BRIEF OF THE DEMOCRATIC NATIONAL COMMITTEE, ARIZONA DEMOCRATIC PARTY, AND ARIZONA ASIAN AMERICAN NATIVE HAWAIIAN AND PACIFIC ISLANDER FOR EQUITY COALITION ADDRESSING NVRA CLAIMS AND THE LEGISLATORS' DISCOVERY CHALLENGE**

BRUCE SAMUELS
JENNIFER LEE-COTA
PAPETTI SAMUELS WEISS
  MCKIRGAN LLP
16430 North Scottsdale Road
Suite 290
Scottsdale, Arizona 85254
(480) 800-3530
bsamuels@pswmlaw.com

SETH P. WAXMAN
CHRISTOPHER E. BABBITT
DANIEL S. VOLCHOK
JOSEPH M. MEYER
BRITANY RILEY-SWANBECK
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
daniel.volchok@wilmerhale.com

*Counsel for the Democratic National Committee and the Arizona Democratic Party*
*(Additional counsel listed in concluding signature blocks)*

## CORPORATE DISCLOSURE STATEMENT

Neither the Democratic National Committee nor the Arizona Democratic Party has a parent corporation, and no publicly held corporation owns 10 percent or more of either organization's stock.

Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition does not have a parent corporation, and no publicly held corporation owns 10 percent or more of the organization's stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES .................................................................v

INTRODUCTION ...........................................................................1

ISSUES ADDRESSED IN THIS BRIEF ...................................................3

STATUTORY PROVISIONS ................................................................4

STATEMENT ...............................................................................4

    A.    The NVRA ......................................................................4

    B.    *ITCA* And *Kobach* ...........................................................5

    C.    The Challenged Laws ..........................................................6

    D.    Relevant Proceedings Below ...................................................7

        1.    Plaintiffs' Claims ......................................................7

        2.    Relevant Summary-Judgment Rulings ......................................8

        3.    The Legislators' Discovery Dispute .........................................10

SUMMARY OF ARGUMENT.............................................................12

STANDARDS OF REVIEW ...............................................................14

ARGUMENT ...............................................................................15

I.    THE DISTRICT COURT'S INVALIDATION OF H.B. 2492'S DPOC
    REQUIREMENT SHOULD BE AFFIRMED ...........................................15

    A.    The NVRA Preempts H.B. 2492's Requirement That
        Federal-Form Registrants Provide DPOC In Order To
        Vote In Presidential Elections Or By Mail In Any Federal
        Election...........................................................................15

    B.    Intervenors' Contrary Arguments Lack Merit ....................................16

1.     Congress Has Constitutional Authority To Regulate The Manner Of Presidential Elections.......................16

2.     The Text And Purposes Of The NVRA Foreclose Intervenors' Mail-Voting Arguments, Which Would Gut Both The Statute And *ITCA* ...................................24

3.     *ITCA* Is Binding And Not "Undermined"................................29

II.   THE DISTRICT COURT'S RULING THAT H.B. 2243 VIOLATES THE 90-DAY PROVISION SHOULD BE AFFIRMED ....................................31

    A.    H.B. 2243 Violates The 90-Day Provision .........................31

    B.    Intervenors' Counterarguments Fail ................................34

         1.     Systematic Non-Citizen Removals Are No Exception To The 90-Day Provision .........................34

         2.     The 90-Day Provision Is Not Limited To Programs Involving Changes in Residence...............................38

         3.     H.B. 2243's Removal Program Is Not Individualized................................................................39

III.  THE DISTRICT COURT'S CHALLENGED DISCOVERY RULING SHOULD BE AFFIRMED ....................................................40

    A.    The District Court Correctly Ruled That The Legislators Waived Legislative Privilege ..............................41

    B.    The Legislators Have Forfeited Their Relevance Challenge To The Discovery, And In Any Event The Discovery Was Proper.........................................................47

    C.    Vacatur Is Unwarranted ..................................................50

CONCLUSION.......................................................................................52

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*ACORN v. Edgar*, 56 F.3d 791 (7th Cir. 1995) .................................................17, 25

*ACORN v. Miller*, 129 F.3d 833 (6th Cir. 1997) ......................................................17

*Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190 (9th Cir. 2007) .........................................................................14

*Andrus v. Glover Construction Co.*, 446 U.S. 608 (1980)........................................35

*Arcia v. Detzner*, 2015 WL 11198230 (S.D. Fla. Feb. 12, 2015)......................36, 37

*Arcia v. Florida Secretary of State*, 772 F.3d 1335 (11th Cir. 2014) ............................................................. 31, 32, 33, 34, 35, 36, 37, 39, 40

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013)............................................ 1, 4, 5, 6, 12, 15, 16, 19, 20, 24, 28, 29, 30

*Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004) .....................................10, 37, 38, 40

*Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam)............................................18, 20

*Burroughs v. United States*, 290 U.S. 534 (1934) .......................................17, 18, 20

*Chamber of Commerce v. Bonta*, 62 F.4th 473 (9th Cir. 2023) .............................25

*Cheneau v. Garland,* 997 F.3d 916 (9th Cir. 2021)................................................39

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ........................................................23

*Cruz v. National Steel & Shipbuilding Co.*, 910 F.3d 1263 (9th Cir. 2018) .........................................................................14

*Csutoras v. Paradise High School*, 12 F.4th 960 (9th Cir. 2021) ..........................14

*Donovan v. Vance*, 70 F.4th 1167 (9th Cir. 2023)..................................................51

*EEOC v. Wyoming*, 460 U.S. 226 (1983) ...............................................................22

*Ex parte Yarbrough*, 110 U.S. 651 (1884)...............................................................18

*Federal Insurance Co. v. Maine Yankee Atomic Power Co.*, 311 F.3d 79 (1st Cir. 2002) ...................................................... 51

*Forward v. Ben Hill County Board of Elections*, 509 F.Supp.3d 1348 (M.D. Ga. 2020) ................................................... 33, 40

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc) ................................. 24

*Hallett v. Morgan*, 296 F.3d 732 (9th Cir. 2002) .................................................. 50

*In re Grand Jury*, 821 F.2d 946 (3d Cir. 1987) ..................................................... 45

*In re Toma*, 2023 WL 8167206 (9th Cir. Nov. 16, 2023) ....................................... 11

*Janis v. Nelson*, 2009 WL 5216902 (D.S.D. Dec. 30, 2009) ................................... 23

*Jefferson Community Health Care Centers, Inc. v. Jefferson Parish Government*, 849 F.3d 615 (5th Cir. 2017) ................................... 45

*Jeldness v. Pearce*, 30 F.3d 1220 (9th Cir. 1994) ................................................. 35

*Kingman Reef Atoll Investments, LLC v. United States*, 541 F.3d 1189 (9th Cir. 2008) ...................................................... 29

*Kobach v. U.S. Election Assistance Commission*, 772 F.3d 1183 (10th Cir. 2014) ............................................... 5, 6, 30

*Lopez v. Monterey County*, 525 U.S. 266 (1999) .................................................. 23

*M'Culloch v. State*, 17 U.S. 316 (1819) .............................................................. 21

*McPherson v. Blacker*, 146 U.S. 1 (1892) ...................................................... 19, 20

*Mitchell v. Wall*, 808 F.3d 1174 (7th Cir. 2015) ................................................... 50

*Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009) ............................ 50, 51

*Newton v. National Broadcasting Co.*, 726 F.2d 591 (9th Cir. 1984) (per curiam) ................................................... 51

*NLRB v. SW General, Inc.*, 580 U.S. 288 (2017) .................................................. 27

*North Carolina State Conference of NAACP v. Bipartisan Board of Elections & Ethics Enforcement*, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) ...................................................................................33, 40

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ................................................19

*Padilla-Ramirez v. Bible*, 882 F.3d 826 (9th Cir. 2017)..........................46

*Powell v. Ridge*, 247 F.3d 520 (3d Cir. 2001) .............................42, 43, 46

*Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) ....................................................................................................25

*Puente Arizona v. Arpaio*, 821 F.3d 1098 (9th Cir. 2016).................16, 25

*Shoen v. Shoen*, 5 F.3d 1289 (9th Cir. 1993) ..........................................49

*Singleton v. Merrill*, 576 F.Supp.3d 931 (N.D. Ala. 2021) ...............43, 44

*Smiley v. Holm*, 285 U.S. 355 (1932) .....................................................21

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) .........................22, 23

*Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625 (9th Cir. 2005) ....................................................................................................14

*Tarpey v. United States*, 78 F.4th 1119 (9th Cir. 2023)......................38, 39

*U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994)..................................................................................................51

*U.S. Student Association Foundation v. Land*, 546 F.3d 373 (6th Cir. 2008) ..............................................................................................37, 38

*United States v. Blaine County*, 363 F.3d 897 (9th Cir. 2004) ................24

*United States v. Comstock*, 560 U.S. 126 (2010)....................................21

*United States v. Florida*, 870 F.Supp.2d 1346 (N.D. Fla. 2012)............36

*United States v. Gillock*, 445 U.S. 360 (1980).......................................45

*United States v. Gonzalez*, 520 U.S. 1 (1997)........................................32

*United States v. Helstoski*, 442 U.S. 477 (1979).....................................45

*United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950) ........................................50

*United States v. Ryan*, 402 U.S. 530 (1971) ............................................51

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) ........................................8, 49

*Voting Rights Coalition v. Wilson*, 60 F.3d 1411 (9th Cir. 1995) ....................8, 17

## DOCKETED CASES

*Arizona Asian American Native Hawaiian And Pacific Islander For Equity Coalition v. Hobbs*, No. 2:22-cv-01381 (D. Ariz.) .............................8

*DNC v. Hobbs*, No. 2:22-cv-01369 (D. Ariz.) ........................................7

*Mi Familia Vota v. Hobbs*, No. 2:22-cv-00509 (D. Ariz.) .......................................8

*Toma v. United States District Court for the District of Arizona*, No. 23A452 (U.S.) ........................................11

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const.
    art. I, §4 ........................................17, 21
    art. I, §8 ........................................21
    art. II, §1 ........................................18, 21

2 U.S.C. §7 ........................................21

3 U.S.C. §1 ........................................21

52 U.S.C.
    §20501 ........................................1, 4, 16, 22, 25, 26
    §20502 ........................................17
    §20503 ........................................26
    §20505 ........................................1, 4, 27, 29
    §20507 ........................................1, 5, 32, 34, 36, 38
    §20508 ........................................4, 5, 20, 29
    §30101 ........................................17

Ariz. Rev. Stat.
　　§16-121.01 ....................................................................6, 7
　　§16-127 .................................................................................7
　　§16-165 ..............................................................................7, 32
　　§16-166 ..............................................................................7, 26

## RULES AND LEGISLATIVE MATERIALS

Federal Rule of Civil Procedure 26 ..........................................49

H.Rep. No. 103-9 (1993) ..........................................................23

S.Rep. No. 103-6 (1993) ...........................................................23

## INTRODUCTION

Congress enacted the National Voter Registration Act ("NVRA") to "enhance[] the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. §20501(b)(2). To further that goal, the statute (1) required the creation of a federal voter-registration form for federal elections, (2) mandated that all states "accept and use" that form, and (3) barred states from systematically removing voters from the rolls within 90 days of any federal election. *Id.* §§20505(a)(1)-(2), 20507(c)(2).

In *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) ("*ITCA*"), the Supreme Court held that Congress intended the federal voter-registration form to serve as a "backstop" protecting the right to vote, "guarantee[ing] that a simple means of registering to vote in federal elections will be available," *id.* at 13. And the Court rejected, as preempted by the NVRA, Arizona's attempt to require (in addition to an attestation under penalty of perjury that the applicant is a U.S. citizen) the submission of documentary proof of citizenship ("DPOC") to register. *Id.* at 9. States, the Court held, must treat the federal form—which does not require DPOC—as a "complete and sufficient" application. *Id.* at 9.

Flouting *ITCA*, Arizona has attempted to re-impose the same barrier to registration that the Supreme Court proscribed, enacting statutes that again require

people who register to vote using the federal form to submit DPOC. Those who do not are barred from voting for president or by mail in any federal election, and can be investigated by law enforcement. The same statutes (H.B. 2492 and H.B. 2243) also require that certain individuals be removed from the rolls, even within 90 days of a federal election. The district court correctly held that each of these provisions conflicts with the NVRA and thus is preempted.

Those tasked with administering elections in Arizona—the state, the secretary of state, the attorney general, and the 15 county recorders—have not asked this Court to review those holdings. Only intervenors, the Republican National Committee ("RNC") and Arizona House President Ben Toma and Senate President Warren Peterson ("legislators"), have done so. But their challenges all lack merit. For example, binding precedent from the Supreme Court and this Court forecloses intervenors' argument that the NVRA is unconstitutional as applied to presidential elections. In fact, multiple constitutional provisions permit the NVRA's regulation of such elections. Similarly, the NVRA's text forecloses intervenors' claim that the statute covers only registration and thus cannot preempt Arizona's bar on mail voting in any federal election for those who do not submit DPOC. That argument would gut the NVRA, allowing states to register people but then prevent them from actually voting—the only purpose of registering. Finally, intervenors' argument that Arizona can operate a program to systematically

remove people from the rolls in the run-up to federal elections flouts the NVRA's prohibition on exactly that, as well as case law interpreting that prohibition.

The legislators also seek reversal of the district court's ruling that the legislators—having voluntarily intervened as parties in this litigation—had to respond to the same basic discovery as every other litigant, including regarding their assertions on a core factual dispute, and could not use claims of legislative privilege to block that discovery. That ruling likewise comports with precedent (as well as fundamental notions of fairness in our adversarial system of litigation) and should stand.

On each of these issues, this Court should affirm.[1]

## ISSUES ADDRESSED IN THIS BRIEF

Whether the district court correctly ruled that:

1.      the NVRA's mandate that states "accept and use" the federal voter-registration form, which does not require DPOC, preempts H.B. 2492's requirement that federal-form registrants provide DPOC in order to vote by mail in any federal election or in presidential elections at all;

2.      H.B. 2243's provision mandating the removal of certain individuals from the voting rolls within 90 days before a federal election is

---

[1] The amendments H.B. 2243 made to Arizona law supersede those H.B. 2492 made, although both house bills require voter-registration cancellation upon obtaining information of non-citizenship, *see infra* p.7. Although this brief often refers to H.B. 2243, the arguments apply equally to H.B. 2492 as to the two laws' violation of the NVRA's prohibition on states operating a systematic voter-removal program within 90 days of a federal election.

preempted by the NVRA's ban on systematic removal during that
period; and

3.     plaintiffs were entitled to take the discovery they sought from the
legislators on an element of one of plaintiffs' claims—or, if that issue
is moot, whether the legislators have demonstrated entitlement to
vacatur of the district court's ruling.

## STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the addendum at the end of
this brief.

## STATEMENT

### A.    The NVRA

Congress enacted the NVRA in 1993, finding that "discriminatory and unfair
registration laws and procedures can have a direct and damaging effect on voter
participation." 52 U.S.C. §20501(a)(3). To prevent that "damaging effect on voter
participation," *id.*, Congress "require[d] States to provide simplified systems for
registering to vote in federal elections," *ITCA*, 570 U.S. at 5.

Several NVRA provisions bear on the issues addressed in this brief.

First, the NVRA provides that "[e]ach State" must "accept and use" a
federally created form to register "voters in elections for Federal office." 52
U.S.C. §20505(a). That form, the law instructs, must specify each eligibility
requirement (including U.S. citizenship) and require an attestation under penalty of
perjury from the applicant that he or she meets each requirement. *Id.*
§20508(b)(2). The law also prohibits requiring other information that is not

- 4 -

"necessary … to assess … eligibility." *Id*. §20508(b)(1). Beyond those mandates, the NVRA leaves it to federal officials to develop the form's contents. *Id*. §20508(a). While those officials are obliged to consult with state election officials in preparing the form, *id*. they are "not compulsorily mandated to approve state-requested changes," *Kobach v. U.S. Election Assistance Commission*, 772 F.3d 1183, 1194 (10th Cir. 2014), *cert. denied*, 576 U.S. 1055 (2015).

Second, the NVRA provides that during the 90 days before any federal election, no state may operate a program "to systematically remove the names of ineligible voters from the official lists of eligible voters," save for removals due to the request, death, or conviction or mental incapacitation of the registrant. *Id.* §20507(c)(2) (the "90-day provision").

**B.   *ITCA* And *Kobach***

In *ITCA*, the Supreme Court held that the NVRA preempted Arizona's attempt to make the provision of DPOC a requirement to register to vote using the federal form. *See* 570 U.S. at 4-5. "[A] state-imposed requirement of evidence of citizenship not required by the Federal Form," the Court held, "is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form," and therefore is preempted. *Id*. at 15. The "accept and use" language, the Court explained, does not mean that "the State is merely required to receive the form willingly and use it *somehow* in its voter registration process." *Id*. at 9-10. It

- 5 -

"mean[s] that a State must accept the Federal Form as a complete and sufficient registration application." *Id*. at 9.

*ITCA* also noted that Arizona was free to ask the federal Election Assistance Commission ("EAC") to add a state-specific DPOC requirement to the federal form. *See* 570 U.S. at 20. Arizona did so (along with Kansas), and when the EAC rejected the request, the states sued. *Kobach*, 772 F.3d at 1187-1188. The Tenth Circuit upheld the rejection, holding that the states had not "advance[d] proof that registration fraud in the use of the Federal Form prevented Arizona and Kansas from enforcing their voter qualifications." *Id.* at 1188.

### C. The Challenged Laws

Enacted in 2022, H.B. 2492 is another attempt by Arizona to require DPOC in order to register to vote in federal elections. Specifically, if a person submits a federal form without DPOC (as the form allows), H.B. 2492 limits that person's right to vote in two ways, unless election officials happen to verify his or her U.S. citizenship. First, the person is barred from voting in presidential elections. Arizona Revised Statutes ("A.R.S.") §16-121.01(E). Second, the person is barred from voting in *any* federal election by mail—the way most Arizonans have voted in every election for decades. *Id*.; 1-ER-129.

H.B. 2492 does not apply only to new registrants. It also applies retroactively to those who had already registered using the federal form without

- 6 -

providing DPOC prior to the law's enactment. A.R.S. §16-127(A); *see* DE-SER-120. If election officials decide that a federal-form registrant who did not submit DPOC is not a U.S. citizen, moreover, they must refer the person to law enforcement for possible prosecution. A.R.S. §16-121.01(E). At the same time, the law exempts voters who registered before Arizona began to require DPOC as a condition of registering in 2004; they are categorically "deemed to have provided satisfactory evidence of citizenship," and are "not … required to resubmit evidence of citizenship" unless they move from one county to another. A.R.S. §16-166(G).

H.B. 2243 also requires county recorders to conduct monthly citizenship checks of all registered voters (using certain database information), send notices to suspected non-U.S. citizens on the basis of those checks, and cancel any suspected non-U.S. citizen's registration 35 days after sending notice unless the voter produces DPOC. *See* A.R.S. §16-165(A)(10). Despite the NVRA's 90-day provision (discussed above), H.B. 2243 includes no temporal limitation on such removals.

### D. Relevant Proceedings Below

#### 1. *Plaintiffs' Claims*

The United States and seven other plaintiff groups sued, challenging H.B. 2492 and 2433 as violating federal law. *See, e.g.*, Complaint (Dkt.1), *DNC v. Hobbs*, No. 2:22-cv-01369 (D. Ariz. Aug. 15, 2022) ("DNC Complaint");

Complaint (Dkt.1) (DE-SER-133–136), *Arizona Asian American Native Hawaiian And Pacific Islander For Equity Coalition v. Hobbs*, No. 2:22-cv-01381 (D. Ariz. Aug. 16, 2022) ("AAANHPI Complaint") (DE-SER-129–131); Amended Complaint (Dkt.106), *Mi Familia Vota v. Hobbs*, No. 2:22-cv-00509 (D. Ariz. Sept. 6, 2022) ("Poder Am. Complaint"). Plaintiffs' claims included (as relevant here) that the NVRA was violated by: (a) the ban on presidential and mail voting for those who register using the federal form without providing DPOC and (b) H.B. 2492's provision for removing voters from the rolls without temporal limitation. *See* DNC Complaint ¶¶69-77, 84-86; AAANHPI Complaint ¶¶163, 171-172 (DE-SER-133–136); Poder Am. Complaint ¶¶30, 146-153. Plaintiffs also alleged that H.B. 2492 violates the Equal Protection Clause. *See, e.g.*, AAANHPI Complaint ¶¶125-133 (DE-SER-124–126). That claim put at issue the legislature's intent in enacting the legislation. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977).

> ### 2.    *Relevant Summary-Judgment Rulings*

a.    Resolving cross-motions for summary judgment, the district court ruled that the NVRA preempts H.B. 2492's provision barring those who register using the federal form and without providing DPOC from voting in presidential elections or by mail in any federal election.

With respect to presidential elections, the court agreed with plaintiffs (and the state) that the NVRA constitutionally regulates *all* federal elections, including for president. 1-ER-125–127. The court rejected intervenors' argument that the NVRA's regulation of presidential elections exceeds Congress's constitutional authority, as inconsistent with binding precedent from both this Court and the Supreme Court. 1-ER-125. Because the district court held that the Constitution's "Elections Clause gives Congress power to regulate presidential elections under the NVRA," it did not reach plaintiffs' separate argument that the Fourteenth and Fifteenth Amendments also supply that power. 1-ER-127 n.7.

With respect to mail voting, the district court agreed with plaintiffs that H.B. 2492's DPOC requirement is both expressly preempted by the NVRA and preempted as an obstacle to the accomplishment of the NVRA's purpose. 1-ER-127–130. The requirement is "directly preempted" by the "text of the NVRA," the court explained, because Congress "exclude[d] failure to provide DPOC among" the NVRA's enumerated "reasons a state may require an individual to vote in person." 1-ER-128–129. In any event, the court continued, "obstacle preemption bars [H.B. 2492's] enforcement" because requiring DPOC in order to vote by mail "frustrates the purpose of the NVRA" to "increase voter turnout." 1-ER-129. The court rejected the argument that the NVRA applies only to registration, not voting, as inconsistent with "the findings and purposes included in the NVRA." *Id*.

b.      The district court ruled that H.B. 2243 also violates the NVRA by "allow[ing] systematic cancellation of registrations within 90 days of federal elections."  1-ER-131.  The court rejected contrary arguments—including one based on *Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004)—as "ignor[ing] the text and purpose of the [NVRA's] 90-day provision."  1-ER-131.  The court also explained that the statute at issue in *Bell*, unlike H.B. 2243, provided for individual challenge hearings before any registrant was purged.  1-ER-132.

### 3.      *The Legislators' Discovery Dispute*

Prior to summary judgment, the legislators intervened "on behalf of their respective legislative chambers" to "fully defend" the challenged legislation and to offer "a unique perspective that is important to a full understanding of the State's interests."  DE-SER-105, 112.  After repeatedly taking a position on a key factual dispute in the case—asserting that the legislation was "not intended to [unlawfully] discriminate," DE-SER-37—the legislators invoked legislative privilege to prevent plaintiffs from testing that assertion or exploring their "unique perspective" via the same discovery to which every other defendant (and plaintiffs) had submitted, 1-ER-153.  The district court found that the information plaintiffs sought "go[es] to the heart" of this case, ruled that the legislators "waived their privilege by intervening" voluntarily "and putting their motives at issue," and ordered the

legislators to produce "communications [they] sent or received" and to answer deposition questions. 1-ER-154–156.

The legislators sought mandamus relief from the district court's order, which this Court denied. *In re Toma*, 2023 WL 8167206, at *1 (9th Cir. Nov. 24, 2023). They then sought a stay from the Supreme Court pending their supposedly forthcoming petition for mandamus from that Court. Stay Application, *Toma v. United States District Court for the District of Arizona*, No. 23A452 (U.S. Nov. 20, 2023). The full Court denied a stay without noted dissent. Order, *Toma*, No. 23A452 (Nov. 27, 2023). The legislators never filed the promised petition, instead producing the requested documents and providing deposition testimony.

\* \* \*

Intervenors alone appeal the foregoing rulings. ECF.8.1. They sought a stay of the DPOC ruling pending appeal, first from the district court and then from this Court—relief that the state, the attorney general, and the secretary of state all opposed, ECF.52.1, 62.1. The district court (Dkt.752) and this Court (ECF.76.1) each denied a stay of that ruling.[2]

---

[2] Unless otherwise noted, citations to the district-court docket refer to case number 2:22-cv-00509.

## SUMMARY OF ARGUMENT

I.     By requiring federal-form registrants to provide DPOC in order to vote for president or by mail in any federal election, H.B. 2492 does precisely what the Supreme Court in *ITCA* held preempted by the NVRA. Intervenors' proposed carveout for presidential elections, based on the notion that the NVRA's regulation of such elections exceeds Congress's constitutional authority, runs headlong into a wall of binding precedent. It also fails as a matter of first principles, as multiple constitutional provisions support the NVRA's regulation of presidential elections, including the Elections Clause, the Electors Clause, the Necessary-and-Proper Clause, and the Fourteenth and Fifteenth Amendments. Intervenors' argument as to mail voting—premised on their theory that the NVRA concerns only *registration*, not actual voting—is likewise incorrect. It is at odds with both the text and purpose of the NVRA, and accepting it would gut the statute's protections.

II.     The district court correctly held that H.B. 2243 violates the NVRA's 90-day provision. The law does so, the court explained, by implementing a program: (1) the purpose and effect of which is to systematically remove the names of ineligible voters within 90 days of a federal election, and (2) as to which none of exceptions to the 90-day ban—i.e., the three enumerated circumstances in which the NVRA *permits* removals within 90 days of federal elections—applies.

Intervenors' challenges to this ruling flout the NVRA's plain text and ignore on-point case law rejecting those same challenges.

III.     The district court correctly refused to allow the legislators to fully litigate this case—including repeatedly making assertions about a core disputed issue of fact (the state legislature's intent)—but then block plaintiffs from exploring those assertions in discovery.  As relevant precedent confirms, the limited legislative privilege that state legislators enjoy did not entitle the legislators to fully present their case yet prevent plaintiffs from doing likewise (including by challenging the legislators' case).  The cases the legislators cited not only involved federal legislators (who enjoy a much more expansive privilege than state legislators), but also did not involve legislators who had participated in litigation to nearly the extent the legislators have here.

The legislators' alternative argument, that the discovery at issue was irrelevant, is forfeited and in any event meritless.  The argument mischaracterizes the relevant discovery (which concerned the state *legislature's* intent rather than individual *legislators'* motives).  It also ignores Supreme Court precedent making discriminatory legislative intent an element of plaintiffs' equal-protection claim.  Evidence bearing on an element of a claim is assuredly relevant, meaning plaintiffs' discovery regarding such evidence was proper.  Intervenors cite no case

supporting their view that discovery into evidence bearing on an element of a claim is irrelevant.

Finally, vacatur is unwarranted both because the claim is not moot and because any mootness would have been caused by the legislators' decision to comply with the discovery order rather than take what the Supreme Court has called an established way of obtaining prompt appellate review of an adverse privilege ruling without disclosing the alleged privileged material: decline to comply with the district court's discovery order and appeal any resulting sanctions or contempt order.

## STANDARDS OF REVIEW

A grant of summary judgment is reviewed de novo, *Csutoras v. Paradise High School*, 12 F.4th 960, 965 (9th Cir. 2021), and may be affirmed on any ground the record supports, *Cruz v. National Steel & Shipbuilding Co.*, 910 F.3d 1263, 1270 (9th Cir. 2018).

A "determination of privilege is essentially a legal matter based on the underlying facts." *Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190, 1196 (9th Cir. 2007). This Court applies "[d]e novo review as to the legal application of the privilege and clear error review as to factual findings." *Id.* A ruling that evidence is relevant is reviewed for abuse of discretion. *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 630 (9th Cir. 2005).

# ARGUMENT

## I. THE DISTRICT COURT'S INVALIDATION OF H.B. 2492'S DPOC REQUIREMENT SHOULD BE AFFIRMED

### A. The NVRA Preempts H.B. 2492's Requirement That Federal-Form Registrants Provide DPOC In Order To Vote In Presidential Elections Or By Mail In Any Federal Election

H.B. 2492 does exactly what the Supreme Court has deemed preempted by the NVRA. As explained, *ITCA* held that Arizona could not require those who register using the federal form to submit DPOC; in the Court's words, "requir[ing] state officials to 'reject' a Federal Form unaccompanied by documentary evidence of citizenship[] conflicts with the NVRA's mandate that Arizona 'accept and use' the Federal Form." 570 U.S. at 9. *ITCA* forecloses Arizona's latest effort to deny voters who do not submit DPOC with the federal form the right to vote in presidential elections, or by mail in *any* federal election. As the Supreme Court emphasized, "accept and use" "mean[s] that a State must accept the Federal Form as a *complete and sufficient* registration application." *Id*. (emphasis added). Arizona is not treating federal forms submitted without DPOC as "complete and sufficient" if it bars those who submit such forms (and no one else) from voting in certain ways or in certain federal elections. To the contrary, Arizona treats such forms as *in*complete (because DPOC is absent) and *in*sufficient (because applicants are not entitled to the same voting rights as those who submit DPOC).

If anything, this is an even stronger case for preemption than *ITCA*, because H.B. 2492 does more than limit the voting rights of those who submit a federal form without DPOC. It also threatens such people with investigation and even prosecution. *See supra* p.7. That is directly contrary to Congress's goals in enacting the NVRA: "increas[ing] the number of eligible citizens who register to vote" and "enhanc[ing] the participation of eligible citizens as voters," 52 U.S.C. §20501(b)(1)-(2). The district court thus correctly held (1-ER-129) that H.B. 2492's DPOC requirement not only conflicts directly with the NVRA's "accept and use" mandate but also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016). It is therefore doubly preempted.

### B. Intervenors' Contrary Arguments Lack Merit

#### 1. The NVRA's Regulation Of Presidential Elections Is Constitutional

Intervenors' argument (Br.14-18) that the NVRA cannot preempt H.B. 2492's DPOC requirement for voting in presidential elections—echoed by the Arizona Republican Party ("ARP") (Br.5-20)—rests on the premise that the NVRA's regulation of such elections exceeds Congress's constitutional authority. That is wrong; multiple constitutional provisions back the NVRA's regulation of presidential elections. And this Court, relying on decades of consistent Supreme Court precedent, has squarely rejected intervenors' contrary premise.

a.      This Court has approved the NVRA's regulation of presidential elections, explaining in a challenge to the NVRA's constitutionality that "[t]he broad power given to Congress over congressional elections" by the Elections Clause (U.S. Const. art. I, §4) "has been extended to presidential elections." *Voting Rights Coalition v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995).  Sister circuits agree.  *See ACORN v. Miller*, 129 F.3d 833, 836 n.1 (6th Cir. 1997); *ACORN v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995).  And *Wilson*'s recognition of Congress's power under the Elections Clause to regulate presidential elections through the NVRA was not "[d]icta," as intervenors say (Br.18); it was essential to *Wilson*'s upholding of the NVRA, as the NVRA expressly regulates presidential elections, *see* 52 U.S.C. §20502(2) (citing *id*. §30101(3)).  *Wilson* is thus binding precedent that forecloses intervenors' argument.

*Wilson* is rooted in decades of Supreme Court precedent recognizing Congress's power to regulate presidential elections, including with respect to the appointment of presidential electors.  For example, in *Burroughs v. United States*, 290 U.S. 534 (1934), the Supreme Court held that "Congress, undoubtedly, possesses" the "power to pass appropriate legislation to safeguard [presidential] election[s]," *id*. at 545.  In so holding, the Court rejected the exact same "narrow … view of the powers of Congress" that intervenors here espouse, *id*. at 544, namely that "the power of appointment of presidential electors and the manner of

their appointment are expressly committed by … the Constitution to the states, and that the congressional authority is thereby limited to determining 'the Time of chusing the Electors, and the Day on which they shall … Vote[],'" *id*. The Court called this "'a proposition so startling as to arrest attention.'" *Id.* at 546 (quoting *Ex parte Yarbrough*, 110 U.S. 651, 657 (1884)).

Intervenors and the ARP claim *Burroughs* "had nothing to do with the appointment of presidential electors," Int.Br.17, or "with a state's unique and exclusive constitutional prerogative to decide how it will appoint its presidential Electors," ARP Br.9. That is wrong: The Court in *Burroughs* stated that "the constitutional objection *necessary to be considered*" was the one quoted above about who has the constitutional "power of appointment of presidential electors and the manner of their appointment." 290 U.S. at 544 (emphasis added). And if more were needed, the Supreme Court subsequently confirmed that *Burroughs* recognized "broad congressional power to legislate in connection with the election[] of the President." *Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976) (per curiam).

The Supreme Court's recognition in *Burroughs* and *Buckley* of Congress's authority to regulate presidential elections is consistent with the Court's longstanding interpretation of state legislatures' Electors Clause authority over the "Manner" of appointing presidential electors, U.S. Const. art. II, §1, cl. 2. The

Supreme Court has defined "Manner" in that clause as the "method" or "mode" of appointing electors, *McPherson v. Blacker*, 146 U.S. 1, 17 (1892), meaning the clause empowers legislatures to select which organ of the state ("the people," "the legislature," "the governor," "the supreme court of the state," or some "other agent," *id*. at 10) will appoint its electors. The Electors Clause does *not*, that is, give states an exclusive power over every aspect of presidential-election administration, one that applies even once a state selects popular election as its method for appointing electors (as all states have).

  b. In contrast to the precedent just discussed uniformly rejecting intervenors' position, no case supports their position.

  Intervenors highlight (Br.16) *ITCA*'s recognition that, in *Oregon v. Mitchell*, 400 U.S. 112 (1970), "[f]ive Justices took the position that the Elections Clause did *not* confer upon Congress the power to regulate voter qualifications in federal elections," 570 U.S. at 16 n.8, while the ARP leans heavily (Br.7, 13, 14) on *ITCA*'s agreement with those five justices that "[p]rescribing voting qualifications … forms no part of the power to be conferred upon the national government by the Elections Clause," 570 U.S. at 17 (quotation marks omitted). These are red herrings: As the district court explained, the NVRA "does not regulate voter qualifications." 1-ER-127 n.6. It does not, for example, disturb Arizona's choice to require U.S. citizenship as a qualification for voting in federal elections. (As

noted, the NVRA requires federal-form registrants to attest to their citizenship. 52 U.S.C. §20508(b)(2).) The NVRA simply regulates the proof of qualification that states may require from federal-form registrants. And *ITCA* confirms that that is constitutional, recognizing that "the Elections Clause empowers Congress to regulate *how* federal elections are held." 570 U.S. at 16.

The ARP also points (Br.18) to the Supreme Court's statement that "the appointment and mode of appointment of [presidential] electors belong exclusively to the states," *McPherson*, 146 U.S. at 35, suggesting that this means Congress lacks authority to regulate registration for presidential elections. That ignores *McPherson*'s limited construction of the Electors Clause, *see supra* pp.18-19. In any event, *McPherson* includes no holding about congressional authority to regulate presidential elections; the case was about whether the *Michigan* legislature acted unconstitutionally, *id.* at 24-25, so the Court did not have to address the scope of *Congress's* constitutional power. The holding the ARP assigns to *McPherson*, moreover, would conflict with the Court's later rulings in *Burroughs* and *Buckley*, *see supra* pp.17-18.

c.     Intervenors' and the ARP's argument regarding Congress's authority to regulate presidential elections also fails on first principles. Congress's constitutional power to regulate those elections has several sources.

- 20 -

First, the NVRA's regulation of presidential elections is a "Necessary and Proper" exercise, U.S. Const. art. I, §8, cl. 18, of Congress's powers under the Elections and Electors Clauses.  The Supreme Court has long described the Elections Clause as "comprehensive," "embrac[ing] authority to … enact the numerous requirements … necessary … to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932).  And under its Electors Clause power to "determine the Time of ch[oo]sing" presidential electors, U.S. Const. art. II, §1, cl. 4, and to "count" those electors' votes, *id*. cl. 3, Congress has chosen to hold presidential and congressional elections simultaneously, 2 U.S.C. §7; 3 U.S.C. §1.  Given that simultaneity, applying the NVRA to presidential elections is a necessary and proper way both to regulate the "manner" of congressional elections, U.S. Const. art. I, §4, and to ensure that the "count" of presidential electors' votes, *id*. cl. 3, is "beneficial[ly]" carried out, *M'Culloch v. State*, 17 U.S. 316, 409 (1819).  Congress's determination that one voter-registration process should apply to all federal elections is certainly "rationally related"—i.e., "convenient," "useful," or "conducive"—"to the implementation of" Congress's Elections and Electors Clause powers, *United States v. Comstock*, 560 U.S. 126, 134 (2010).

Second, the NVRA's regulation of registration for presidential elections is independently a valid exercise of Congress's power under the Fourteenth and

Fifteenth Amendments. Those amendments authorize Congress to "use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966). Mandating a simplified system for registering to vote in presidential elections and restricting states' ability to purge voters from the rolls are assuredly "rational means," *id.*, of preventing "discriminatory and unfair registration laws and procedures," 52 U.S.C. §20501(a)(3).

Accordingly, the RNC conceded below that the Fourteenth and Fifteenth Amendments "could have been a valid source for the NVRA had Congress invoked them." DE-SER-70. That concession is fatal, because (contrary to the RNC's assumption) Congress need not invoke its power under the amendments when legislating; there need only be "some legislative purpose or factual predicate" to support the exercise of that power, *EEOC v. Wyoming*, 460 U.S. 226, 243 n.18 (1983). In any event, Congress *did* invoke its power under the Reconstruction Amendments in enacting the NVRA. Congress's express findings—enshrined in the statutory text—include that "discriminatory and unfair registration laws and procedures … disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. §20501(a)(3). And the Senate report accompanying the law stated that the law sought "to remove the barriers to voter registration and participation under Congress' power to enforce

the equal protection guarantees of the 14th Amendment." S.Rep. No. 103-6, at 3 (1993); *see also* H.Rep. No. 103-9, at 3 (1993) (deeming the NVRA necessary to complete the work of the Voting Rights Act ("VRA")).

Notwithstanding its concession, the RNC argued below (DE-SER-100) that legislation under the Fourteenth and Fifteenth Amendments must be "congruen[t] and proportional[]" to the problem it addresses, *City of Boerne v. Flores*, 521 U.S. 507, 508 (1997)—rather than merely a "rational means" to address the problem, *Katzenbach*, 383 U.S. at 324—and that the NVRA fails the congruence-and-proportionality test. Both claims were wrong. Even after *City of Boerne*, the Supreme Court has applied *Katzenbach* when Congress sought to remedy racial discrimination or protect voting rights. *See Lopez v. Monterey County*, 525 U.S. 266, 283 (1999). Courts have thus recognized that *Katzenbach*'s "rational means" standard governs in cases involving the Fifteenth Amendment. *Janis v. Nelson*, 2009 WL 5216902, at *8 (D.S.D. Dec. 30, 2009). Regardless, the NVRA *is* congruent and proportional. In enacting the NVRA, Congress relied on an extensive record of discrimination in voting registration, similar to that underlying the VRA. *See* S.Rep. No. 103-6, at 3; H.Rep. No. 103-9, at 3-4. This Court has held, based on the law's extensive legislative record, that the VRA's prophylactic elements are a congruent and proportional means of addressing voter

discrimination. *See United States v. Blaine County*, 363 F.3d 897, 904-909 (9th Cir. 2004). The same is thus true of the NVRA.

> 2. *The Text And Purposes Of The NVRA Foreclose Intervenors' Mail-Voting Arguments, Which Would Gut Both The Statute And* ITCA

The district court correctly held that H.B. 2492's prohibition on mail voting by federal-form registrants is preempted because it conflicts with the NVRA's aim to provide a "backstop" that "guarantees that a simple means of registering to vote in federal elections will be available," *ITCA*, 570 U.S. at 12. Intervenors (again echoed by the ARP) argue that the NVRA cannot preempt state laws concerning mail voting because the statute concerns only *registration*, not the actual casting of ballots. Int.Br.12; ARP Br.21. That narrow view of preemption is at odds with the Supreme Court's broad view of Congress's "power to pre-empt" through Elections Clause legislation. *See ITCA*, 570 U.S. at 14; *see also Gonzalez v. Arizona*, 677 F.3d 383, 392 (9th Cir. 2012) (en banc). Moreover, intervenors' and the ARP's proposed dichotomy between registration and voting is belied by both the text and purpose of the NVRA. And accepting it would gut the statute's protections, allowing states to evade the law simply by placing voting restrictions on those who register pursuant to the NVRA's protections, rather than directly restricting registration itself.

The NVRA's text covers both registration *and* voting. The law declares that the right "to vote" (not "to register") is "fundamental," and that states must "promote the exercise of that right." 52 U.S.C. §20501(a). Indeed, the law's textually stated purposes include "enhanc[ing] the participation of eligible citizens *as voters*." *Id.* §20501(b)(2) (emphasis added).

Accordingly, courts recognize that the NVRA's purpose is to ensure that the "right to *exercise the[] franchise* … not be sacrificed." *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) (emphasis added). That purpose cannot be served by protecting registration alone: Because "[r]egistration is indivisible from election," states may not, "by separating registration from voting, … undermine the power that Article I section 4 grants to Congress." *Edgar*, 56 F.3d at 793. Registration, that is, is not an end in itself; it exists entirely so that people can cast a ballot that will be counted. States thus cannot circumvent Congress's mandates in the NVRA by imposing prerequisites to voting that effectively deny the protections the statute provides. Indeed, intervenors' and the ARP's contrary position would all but destroy the statute. Because H.B. 2492's requirement that federal-form registrants provide DPOC in order to vote by mail "stands as an obstacle to the accomplishment … of the full purposes … of Congress" in the NVRA, *Puente Arizona*, 821 F.3d at 1103, it is preempted; *see also Chamber of Commerce v. Bonta*, 62 F.4th 473, 483-485 (9th Cir. 2023).

Intervenors point, however (Br.14), to the NVRA's additional purpose of "protect[ing] the integrity of the electoral process," 52 U.S.C. §20501(b)(3), which they construe as being about voter fraud. Voting by non-U.S. citizens in Arizona, however, is exceedingly rare. 1-ER-35–36. Nor is it clear how banning those who do not provide DPOC from voting by mail would do anything to prevent or detect fraud. And it strains credulity to assert that preventing fraud was even the objective of H.B. 2492, given that the law exempts from the DPOC requirement huge swathes of the population, namely everyone who registered before 2004; all those people are "deemed," simply by fiat, "to have provided satisfactory evidence of citizenship," and are "not … required to resubmit evidence of citizenship" unless they move from one county to another. A.R.S. §16-166(G). Put simply, the district court's injunction of H.B. 2492's restriction on mail voting does not— unlike the restriction itself—prevent the accomplishment of Congress's purposes.

Intervenors also say (Br.12) that the NRVA's "plain text governs only 'procedures to *register to vote* in elections.'" But the provision they quote in making this assertion, 52 U.S.C. §20503(a) does not support their registration-voting dichotomy. It mandates specific opportunities each state must offer for voter registration. In particular, it provides that every state must "establish procedures" for people in that state to register (1) when applying for a driver's license, (2) by mail, and (3) in person at certain specified locations. *Id.* That

mandate for certain enumerated registration procedures does nothing to show that, as applicants argue, the entire NVRA covers *only* registration, such that the NVRA can never preempt state voting rules.

Intervenors also fail to rebut the district court's textual analysis. Section 20505(c)(1) enumerates specific circumstances in which states *may* limit mail voting. As the court recognized, 1-ER-128, it is a "sensible inference" that Congress "must have … meant" to *prevent* states from limiting mail voting in *other* circumstances, *NLRB v. SW General, Inc.*, 580 U.S. 288, 302 (2017). Intervenors respond that section 20505(c)(1) "addresses only when a narrow class of voters"—"those who registered by mail and have not previously voted"—may be required to vote in person, and contend that the "default" rule is that states can enact any restriction on federal-form registrants' ability to vote by mail. Int.Br.13; *see also* ARP Br.21. But if that were the "default" rule, section 20505(c)(1) would be superfluous. The better reading, therefore, under both *expressio unius* and the canon against superfluity, is the district court's.

Intervenors' and the ARP's remaining arguments likewise lack merit. For example, the district court's interpretation of the NVRA would not "wipe out all state mail-voting rules," Int.Br.14, nor create "a prohibition against state determinations of eligibility for voting by mail," ARP Br.23. The court's ruling simply prevents states from eviscerating the NVRA's protections (and

circumventing *ITCA*) by requiring federal-form registrants who wish to vote by mail to submit proof of their eligibility beyond what the federal form requires. That does not mean the NVRA necessarily preempts generally applicable mail-voting rules, only that the NVRA does not permit states to circumvent its protections by cutting off voting access *because* a voter registered pursuant to those protections.

Finally, intervenors fare no better in claiming that "[m]ail-voting forms are 'state-developed forms,' which 'may require information the Federal Form does not.'" Br.14 (quoting *ITCA*, 570 U.S. at 12). The "state-developed forms" *ITCA* referred to are "state-specific *voter-registration* forms," *ITCA*, 570 U.S. at 12 (emphasis added), not forms for requesting a mail ballot, or mail ballots themselves, or whatever else the RNC and legislators mean by "[m]ail-voting forms." In any event, H.B. 2492 does not regulate "[m]ail voting forms." It requires DPOC to accompany *registration* forms and then restricts access to mail ballots accordingly. If the RNC and legislators were correct that that is permissible—if states could require federal-form registrants who wish to vote by mail to submit documentation beyond what the federal form requires—"the

Federal Form [would] cease[] to perform any meaningful function," *id*. at 13.  That notion, again, is directly contrary to *ITCA*.[3]

> 3.     ITCA *Is Binding And Not "Undermined"*

The ARP argues (Br.20) that the NVRA's requirement "to 'accept and use' the federal [form] does not preclude a state from requiring additional information in connection with a Federal Form."  That is *directly* contrary to *ITCA*'s "hold[ing] that [the NVRA] precludes Arizona from requiring a Federal Form applicant to submit information beyond that required by the form."  570 U.S. at 20.  In effect, then, the ARP asks this Court to overrule *ITCA*, which the ARP contends (Br.13) "[h]as [b]een [u]ndermined."  To start, this argument is not properly before this Court, as no party raised it below.  But even if this Court entertains the argument *and* if *ITCA* had been undermined, the Court "must follow the Supreme Court precedent that directly controls, leaving to th[at] Court the prerogative of overruling its own prior decisions," *Kingman Reef Atoll Investments, LLC v. United States*, 541 F.3d 1189, 1196 (9th Cir. 2008).

That aside, *ITCA* has not been undermined.  The ARP seizes on the Court's statement in *ITCA* that its interpretation of the NVRA's "accept and use" provision *would* have raised "constitutional doubts *if* [the NVRA] precluded a State from

---

[3] State-specific voter-registration forms still must comply with the NVRA, which limits those forms to requiring only what is necessary to assess eligibility.  *See* 52 U.S.C. §§20505(a)(2), 20508(a)(2); LUCHA Brief.

obtaining … information necessary to enforce its voter qualifications." 570 U.S. at 17-18 (emphasis added). But "no doubt [wa]s raised," the Court explained, because states are not precluded; the NVRA provides that "a State may request that the EAC alter the Federal Form to include information the State deems necessary, … and may challenge the EAC's rejection of that request in a suit under the Administrative Procedure Act." *Id*. at 19. Contrary to the ARP's contention (Br.10-11, 13-16), Arizona's "fail[ure] to carry the burden *ITCA* establishes"—i.e., failure "to convince a court conducting APA review that the denial of [its] request" to require DPOC "precluded [it] from obtaining information that [was] 'necessary' to enforce [its] voter qualifications"—does nothing to call *ITCA* into question. *Kobach*, 772 F.3d at 1196-1197. Again, *ITCA* said it would be constitutionally problematic if states were barred "from obtaining … information *necessary to enforce its voter qualifications*." 570 U.S. at 17 (emphasis added). The EAC's refusal to allow Arizona to demand information that the state could *not* prove was "necessary to enforce its voter qualifications" raises no constitutional concerns under *ITCA*.[4]

Finally, the ARP contends (Br.16) that *ITCA* is "further undermine[d]" by its failure to "specifically address [states'] power over presidential elections" under

_____

[4] The district court here found that intervenors likewise failed to prove that requiring DPOC is necessary to enforce Arizona's voter qualifications. 1-ER-26.

the Electors Clause. But as explained, binding precedent confirms that the Electors Clause does not preclude the NVRA's regulation of presidential elections.

## II. THE DISTRICT COURT'S RULING THAT H.B. 2243 VIOLATES THE 90-DAY PROVISION SHOULD BE AFFIRMED

### A. H.B. 2243 Violates The 90-Day Provision

The NVRA's ban on systematic removals of voters from the rolls within 90 days of any federal election "'is designed to carefully balance [the] … purposes of the NVRA,' which include protecting the integrity of the electoral process and ensuring that accurate rolls are maintained, yet also fostering procedures that will 'enhance[] the participation of eligible citizens as voters in elections for Federal office.'" 1-ER-0131–0132 (quoting *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1346 (11th Cir. 2014)). Congress thus gave states wide swathes of time in which to systematically remove voters, but barred such removals shortly before elections because of the risk that *erroneous* removals would not be corrected in time, resulting in eligible Americans losing their fundamental right to vote. *See id.*; *Arcia*, 772 F.3d at 1346. The district court correctly held that the removal program H.B. 2243 creates is precisely what the 90-day provision was enacted to protect against.

*First*, the court correctly concluded that—as intervenors never dispute—H.B. 2243's cancellation provisions operate within 90 days of a federal election,

and none of the NVRA's enumerated exceptions to the 90-day provision applies.
1-ER-0131 (citing A.R.S. § 16-165(G)–(K)).

*Second*, the court found that H.B. 2243 implements a program subject to the 90-day provision. That provision forbids "any" program the purpose of which is the systematic removal of voters rolls. 52 U.S.C. §20507(c)(2)(A). The Supreme Court has observed that "'any' has an expansive meaning," namely, "one or some indiscriminately of whatever kind." *United States v. Gonzalez*, 520 U.S. 1, 5 (1997) (quotation marks omitted). And as a sister circuit has explained, "Congress [did] not add any language limiting the breadth" of "any" in the 90-day provision. *Arcia*, 772 F.3d at 1344. The district court correctly agreed, and correctly held that a program the purpose of which is the systematic removal of voters rolls is precisely what H.B. 2243 implements. *See* 1-ER-0131 (citing *Arcia* and *Gonzalez*).

*Third*, the district court correctly held that H.B. 2243 implements a *systematic* removal program. *See* 1-ER-0132–0133. Multiple courts have held that removal programs that, like H.B. 2243's, compare voter-registration databases to other data sources and use those sources to cancel registrations are systematic programs under the NVRA. For example, just like H.B. 2243 here, the program in *Arcia* involved citizenship-based removals driven by comparisons of voter rolls with state and federal databases. *Arcia*, 772 F.3d at 1339-1340. The Eleventh

Circuit characterized that program as "systematic" because it "used a mass computerized data-matching process." *Id.* at 1344. Indeed, the court noted, one of the key databases used was a federal one entitled *Systematic* Alien Verification for Entitlements, or SAVE—the same one used by H.B. 2243. *Id.* Other courts have likewise held that such removals based on data-matching runs afoul of the NVRA. *See, e.g.*, *North Carolina State Conference of NAACP v. Bipartisan Board of Elections & Ethics Enforcement*, 2018 WL 3748172, at *6-7 (M.D.N.C. Aug. 7, 2018) ("*NAACP*"); *Forward v. Ben Hill County Board of Elections*, 509 F.Supp.3d 1348, 1352, 1354-1355 (M.D. Ga. 2020).

That H.B. 2243 authorizes removals based on a single piece of generic evidence (one database record failing to match with another) is further evidence of the program's systematic nature. *See NAACP*, 2018 WL 3748172, at *7-8 ("*en masse* cancellation of voter registrations" and removals based on "generic evidence" are systematic); Dkt.101-1 at 5-6 (noting purge provisions apply to all federal-only voters). Finally, the lack of any individualized investigation before a removal notice is sent, the short response time following notices, and the burden-shifting removal process confirm that H.B. 2243 is a systematic, purge-first-ask-questions-later program. *See NAACP*, 2018 WL 3748172, at *7-9.

### B.    Intervenors' Counterarguments Fail

Intervenors' three arguments regarding the 90-day provision rest on mischaracterization of the district court's ruling and a misreading of the NVRA. Intervenors say, for example (Br.36), that "[t]he district court ruled that Arizona can't remove noncitizens from the rolls within 90 days before an election." The district court held only that removing voters via H.B. 2243's *systematic program* violated the 90-day provision. 1-ER-0132-0133. Likewise, intervenors assert (Br.36) that the 90-day provision applies only to the "general program" discussed in 52 U.S.C. §20507(a). But by its terms, the 90-day provision (§20507(c)(2)) covers "any" program, *not* the "general program" discussed in §20507(a). Courts cannot read in a limitation Congress did not include.

Even apart from this mischaracterization and misreading, intervenors' three arguments lack merit.

#### 1.    *Systematic Non-Citizen Removals Are No Exception To The 90-Day Provision*

Intervenors' lead argument (Br.36-37) obfuscates the district court's ruling. The court did not rule that the NVRA prohibits removal of non-citizens from the rolls.[5] Rather, as explained, *see* p.32, the 90-day provision applies to "any program" whose purpose is the systematic removal of voters. In evaluating a law

---

[5] Intervenors notably do not address the district court's reasoning, or *Arcia*'s.

similar to H.B. 2243, *Arcia* explained that "Congress expressly allowed for a number of exceptions to the 90 Day Provision, and an exception for removals of non-citizens is not one of them." 772 F.3d at 1345. *Arcia* laid out the correct reading of the 90-day provision, that "the NVRA expressly allows states to conduct three types of removals during the final 90 days before a federal election. They are removals (1) at the request of the registrant; (2) as provided by State law, by reason of criminal conviction or mental incapacity; and (3) upon death of the registrant." *Id.* That Congress omitted an exception for citizenship-based systematic removals is "good evidence" that such removals are prohibited. *Id.* That is because "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Andrus v. Glover Construction Co.*, 446 U.S. 608, 616-617 (1980); *accord Jeldness v. Pearce*, 30 F.3d 1220, 1225 (9th Cir. 1994) (applying *Andrus*).

Intervenors, rather than addressing this straightforward interpretation of the statute, read a limitation into the NVRA that does not exist. They argue (Br.36) that the NVRA only "regulates the removal of voters who were *once* eligible to vote but are no longer eligible due to conviction, death, or change in residence," but cite no authority for their interpretation. The Eleventh Circuit expressly rejected the contention that the NVRA "only contemplated the removal of people

- 35 -

who were once entitled to vote, not the removal of people who never had eligibility (like non-citizens)" because "while some voters lose their eligibility to vote after they register … other voters may have been ineligible for the same reasons at the time of their registration." *Arcia*, 772 F.3d at 1347-1348. Systematically canceling registrations due to conviction, death, or mental incapacity are enumerated *exceptions* to the 90-day provision. *See* 52 U.S.C. §20507(c)(2)(A). They are not *limitations* on the types of removals covered by the broad provision or even the NVRA. Tellingly, intervenors do not cite the 90-day provision in making their argument. Regardless, the *Arcia* court addressed this exact argument, finding it was incorrect in light of "the broad statutory language in the 90 Day Provision, which unambiguously covers programs like" the one at issue. 772 F.3d at 1346-1347. The district court correctly agreed with *Arcia*. 1-ER-0132.[6]

Intervenors' position also rests on the incorrect assumption that H.B. 2243's removal program would remove only voters who *are* non-U.S. citizens. In fact, H.B. 2243 is similar to the program rejected in *Arcia* that "identified many properly registered citizens as potential noncitizens" and resulted in citizens being improperly removed (as many as 180,000). *United States v. Florida*, 870 F.Supp.2d 1346, 1350 (N.D. Fla. 2012), *abrogation recognized by Arcia v.*

---

[6] Intervenors' argument appears to follow the reasoning of *United States v. Florida*, 870 F.Supp.2d 1346 (N.D. Fla. 2012), although intervenors do not cite the case—no doubt because *Arcia* rejected it. *See, e.g.*, 1-ER-0131-0132.

*Detzner*, 2015 WL 11198230 (S.D. Fla. Feb. 12, 2015). As the *Arcia* court found there, and the district court found here, the NVRA's 90-day provision "is designed to carefully balance [the] … purposes in the NVRA" of maintaining accurate rolls yet also fostering the participation of eligible citizens as voters in elections for federal office. *Arcia*, 772 F.3d at 1346; *see* 1-ER-0132. It therefore makes sense that Congress "decided to be more cautious" leading up to an election cycle, as systematic cancellation programs can cause inaccurate removal and "[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote." *Arcia*, 772 F.3d at 1346; *see* 1-ER-0132. H.B. 2243 operates very similarly to the rejected program in *Arcia* and could lead to registration cancellations of eligible voters within 90 days of an election—the exact result that the NVRA is meant to protect against.

Appellants' reliance (Br.36) on *Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004), is misplaced. *Marinko* was not about the 90-day provision and in any event the removals there were not systematic. Rather, *Marinko* involved *individualized* hearings regarding eligibility. *Id.* at 589-591. The Sixth Circuit itself recognized this in *U.S. Student Association Foundation v. Land*, 546 F.3d 373 (6th Cir. 2008), noting that the removals in *Marinko* were permissible because they followed investigations and hearings in which ineligibility was *individually* determined— unlike the program in *Land*, which removed all voters whose voter ID cards were

returned as undeliverable mail, *id.* at 386. There are no individualized hearings under H.B. 2243.

      2.    *The 90-Day Provision Is Not Limited To Programs Involving Changes in Residence*

    Intervenors argue (Br.37) that the 90-day provision applies only to removals due to a change in the voter's residence. That argument was not made below and is therefore waived. *See Tarpey v. United States*, 78 F.4th 1119, 1126 (9th Cir. 2023). Regardless, the argument is wrong.[7]

    Intervenors start from the flawed premise (Br.37) that the 90-day provision applies only to the "general program" described in §20507(a). But that program is the one that states *must* conduct to "remove names of ineligible voters" by reason of death or a change of address. The NVRA does not (outside the 90-day period) prohibit states from conducting other removal programs, though states may choose to do so, including on the basis of criminal conviction or mental incapacity. *See* 52 U.S.C. §20507(a)(3); *see also Marinko*, 367 F.3d at 591-592 (permitting removals of voters registered at seasonal residences). That is why the 90-day provision refers to "any program," not the "general program" referred to in the earlier subsection. As explained, intervenors (and the courts) cannot ignore the difference

---

[7] In making this argument, intervenors cite "52 U.S.C. §20507(A)(4)." There is no such provision.

between those two phrases.  Had "Congress wanted [the] limited result" intervenors espouse, "it could have said so."  *Arcia*, 772 F.3d at 1348.

Here too, intervenors are making an argument the Eleventh Circuit rejected. *Arcia* recognized that "[s]uch an interpretation … would functionally eviscerate the … phrase 'any program' in the 90 Day Provision."  772 F.3d at 1348; *see also Cheneau v. Garland*, 997 F.3d 916, 921 (9th Cir. 2021) (noting the canon against superfluity).  Once again, intervenors do not acknowledge much less confront *Arcia*'s rejection of their argument.  That silence is telling, and it confirms that this Court should reject the argument as well, rather than creating a circuit conflict.

### 3.    *H.B. 2243's Removal Program Is Not Individualized*

Intervenors' final argument (Br.37) is that H.B. 2243 is not a systematic removal program but instead "provides for individualized removal."  This argument was also not presented to the district court and is therefore waived.  *See Tarpey*, 78 F.4th at 1126.  Regardless, it too is wrong on its merits.

As explained, *see* pp.32-33, H.B. 2243's database-matching and cancellation provisions implement a systematic removal program.  Intervenors suggest that because the program involves individual *cancellation notices*, that renders it an individualized *program*.  But if that were right, then only removal schemes effectuated through broad circulation, like newspapers, would fall within the 90-day provision.  Congress did not enact such a virtually meaningless provision—as

courts have recognized in deeming programs like the one here, i.e., involving some form of individualized *notice* to nonetheless be systematic. *Arcia*, for example, explained that the program there was systematic because it "did not rely upon individualized *information or investigation* to determine which names from the voter registry to remove." 772 F.3d at 1344 (emphasis added); *see also Forward*, 509 F.Supp.3d at 1353, 1355 (requiring certain voters identified from database checks to "present additional evidence … to vote" did not equal "the individualized inquiry required by the NVRA"); *NAACP*, 2016 WL 6581284, at *6-7 (program based on mass mailing to individual voter registrants was not "individualized" even where a county conducted its own research before sending written notice of removal unless voters reproved their eligibility). Contrast this with *Marinko*, where individual hearings took place, evidence was presented, and determinations were made *before* removals were executed. 367 F.3d at 589-591. Under intervenors' argument, *any* removal program could become individualized through the mailing of a notice after the fact. The NVRA is not so easily side-stepped.

## III. THE DISTRICT COURT'S CHALLENGED DISCOVERY RULING SHOULD BE AFFIRMED

Having voluntarily intervened, the legislators repeatedly made assertions below about a key disputed factual issue: the Arizona legislature's motive in enacting the challenged laws. *E.g.*, DE-SER-116. But the legislators then invoked

legislative privilege to try to block plaintiffs from testing those assertions via discovery to the full extent authorized by the Federal Rules of Civil Procedure. The district court rejected that stymieing effort, ruling that by voluntarily intervening in the case and taking positions on a central dispute of fact, the legislators had waived legislative privilege regarding that fact. 1-ER-152–156. The legislators' two challenges to that ruling are meritless and (as to one) forfeited.

### A. The District Court Correctly Ruled That The Legislators Waived Legislative Privilege

1. None of the plaintiffs in the eight consolidated district-court cases that give rise to these appeals sued the legislators. The legislators injected themselves into the case, moving to intervene as defendants to, in their words, "fully defend the [two] laws" and to offer "a unique perspective that is important to a full understanding of the State's interests," DE-SER-112. They then participated actively throughout the litigation: They filed an answer in which they denied plaintiffs' assertion that the state legislature had acted with a discriminatory intent in enacting the challenged laws. DE-SER-116. They filed briefs (or joined those of other parties) at summary judgment and before trial. Dkts.443, 583, 609. They attended depositions, where they regularly objected to plaintiffs' questioning of witnesses. They attended every minute of trial, sitting at defense counsel table, cross-examining plaintiffs' witnesses, filing a trial brief (Dkt.583), objecting to plaintiffs' questions (of both sides' witnesses), moving to strike a witness's

- 41 -

testimony (Dkt.665), and presenting their own evidence. That evidence included testimony from an expert (half of whose fees the legislators paid) that he had not seen evidence of discriminatory intent by the legislature, i.e., testimony directly bearing on a key disputed issue of fact. DE-SER-29. And after trial, the legislators joined other defendants' proposed findings of fact and conclusions of law—again weighing in on a key factual dispute by denying that the state legislature had enacted with discriminatory intent in enacting the challenged laws. *E.g.*, Dkt.676 at 128-142.

In short, the legislators have litigated here just like the other defendants—with one exception. Unlike every other defendant (and every plaintiff), the legislators have taken the position that while they are free to fully present *their* case to the courts, they can use privilege to block plaintiffs from having a fair chance to present their own, including by challenging through discovery the legislators' assertions and evidence on a key disputed factual issue. That position is grossly inequitable (and wholly foreign to foundational principles of our adversarial judicial system), and the district court rightly held that the legislators could not abuse legislative privilege in this way and thereby sharply tilt the litigation playing field in their favor.

Relevant precedent confirms that the court was correct. In perhaps the most similar case, *Powell v. Ridge*, 247 F.3d 520 (3d Cir. 2001), the Third Circuit held

that Pennsylvania state legislators could not do what the legislators here did:
(1) intervene in litigation, "citing … the need to articulate to the Court the unique
perspective of the [state] legislative branch"; (2) "concur[]" in other defendants'
dispositive motions and otherwise participate in the litigation; and then (3) assert
legislative privilege when plaintiffs sought discovery, *id.* at 522-523, 525
(quotation marks omitted).  The legislators there, *Powell* observed, "failed to come
up with even one case which hints at the existence of [such a] privilege."  *Id.* at
525.  The same is true here.

Nor is *Powell* the only case supporting the district court's ruling.  A three-
judge district court reached the same conclusion in *Singleton v. Merrill*, 576
F.Supp.3d 931 (N.D. Ala. 2021) (subsequent history omitted), which involved
challenges to Alabama's congressional-redistricting plan.  The state legislators
who intervened there argued (much as the legislators did here) that they were
"uniquely positioned" to defend the plan, by virtue of their role on the Alabama
legislature's reapportionment committee.  *Id.* at 934.  And just like the legislators
here, the *Singleton* legislators filed answers denying any discriminatory legislative
intent.  *See id.* at 937.  When they then moved for a protective order to block their
depositions and written discovery, the three-judge court denied the motion, holding
that the legislators had waived the privilege:

> The Legislators here have the same sword/shield problem [as in
> *Powell*].  The Legislators seek to use their unique position as [the

> redistricting plan]'s principal drafters as a sword to defend the law …,
> but intermittently seek to retreat behind the shield of legislative
> privilege when it suits them.

*Id.* at 940. Again, the same is true here: The legislators brought themselves into this case voluntarily and brandished a "sword" by disputing—before, during, and after trial—plaintiffs' claim that the laws were enacted with discriminatory intent. *E.g.*, DE-SER-6–19, 116. The legislators then raised a "shield … when it suit[ed] them," asserting that plaintiffs could not test (and rebut) their position through discovery. That, again, is not a regime that the federal rules, or any case, endorse. The district court was right to reject it.

2. Although *Powell* was pervasively discussed both below—the district-court ruling the legislators challenge relied extensively on it—and in the mandamus proceedings, the legislators never even cite it here. (Should they belatedly do so in reply, plaintiffs refer this Court to the responses in their mandamus opposition and Supreme Court stay opposition.) Instead, the legislators' challenge to the waiver ruling (Br.44-47) rests entirely on the new argument that waiver of legislative privilege requires an "explicit and unequivocal renunciation" (Br.44). That is not an argument the legislators have ever made before in this case. They never made it to the district court—and so it is quite unfair for them to criticize the court (Br.45) for not identifying an "explicit and unequivocal renunciation" by the legislators. Nor did they make the argument

- 44 -

during the mandamus proceedings in this Court or the stay proceedings in the
Supreme Court.

In any event, the legislators' new argument fails for two independent
reasons.

First, all four cases the legislators cite for the proposition that waiver of
legislative privilege requires an "explicit and unequivocal renunciation" (Br.44-45)
involved a *federal* legislator, i.e., involved legislative privilege under the
Constitution's Speech and Debate Clause. State legislators do not enjoy that same
privilege. *E.g.*, *United States v. Gillock*, 445 U.S. 360, 366-374 (1980)
(distinguishing *United States v. Helstoski*, 442 U.S. 477 (1979), on which the
legislators rely). They enjoy a much more limited, qualified privilege. *E.g.*,
*Jefferson Community Health Care Centers, Inc. v. Jefferson Parish Government*,
849 F.3d 615, 624 (5th Cir. 2017); *In re Grand Jury*, 821 F.2d 946, 957 (3d Cir.
1987). No case holds that waiver of *that* privilege requires an "explicit and
unequivocal renunciation."

Second, no case the legislators cite involved a legislator who did anything
remotely comparable to what the legislators have done here. The legislators
persistently argue as though all they did was intervene. *E.g.*, Br.11 ("simply by
intervening"), 41 (header), 44 (sub-header). As detailed above, they did *far* more
than that, injecting themselves into this case and litigating it as fully as other

- 45 -

defendants at every stage of the district-court proceedings—including through a two-week trial, and including repeatedly making assertions about a core disputed issue of fact. The legislators' active, fulsome participation in years of litigation here assuredly constitutes a waiver of the qualified privilege state legislators enjoy.

Finally, the legislators argue (Br.46) that the district court's waiver ruling "penalizes the legislative branch for defending its interests." That is wrong. If the legislators wanted to "defend[]" their "interests" without any waiver of legislative privilege, they could have filed one or more amicus briefs making whatever legal arguments they wanted. What the court's ruling prevents is what *Powell* and the other similar caselaw cited above recognized: the fundamental unfairness of allowing a party to fully put its side of a case forward while preventing the other side from doing so by blocking it from using the discovery tools the Federal Rules of Civil Procedure authorize.

This Court generally "decline[s] to create a circuit split unless there is a compelling reason to do so." *Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017). There is no compelling reason to split with *Powell* here. The district court's waiver ruling should be affirmed.

### B.   The Legislators Have Forfeited Their Relevance Challenge To The Discovery, And In Any Event The Discovery Was Proper

The legislators alternatively argue (Br.42) that the district court "abused its discretion by allowing discovery of legislative motives." That argument is both forfeited and meritless.

1.   Two important points bear mention at the outset.

First, the legislators never even cite the discovery requests they say the district court erroneously allowed. The reason, no doubt, is that those requests belie the legislators' repeated assertion (Br.42) that the court allowed discovery into "state legislator motives." The relevant document requests, interrogatories, and proposed deposition topics addressed the *legislature's* intent in enacting the challenged statutes. DE-SER-47, 72-97. The legislators cannot prevail by mischaracterizing the discovery at issue.

Second, although the legislators present this argument separately from their privilege argument, they repeatedly inject privilege in making it. Indeed, the opening paragraph of this purportedly distinct challenge (Br.42) mentions privilege twice. And privilege is the legislators' *only* response (Br.44) to the district court's reasoning for the challenged ruling. If this Court agrees with the legislators' privilege argument, it will have no occasion to address this separate challenge. But if the Court rejects the privilege argument, then the legislators cannot slip privilege into this supposedly distinct argument in order to bolster it. The separate challenge

is simply whether, if privilege was waived, plaintiffs' discovery requests were relevant and therefore properly allowed.

2.      The legislators' relevance challenge is forfeited.  Their brief below on this issue (DE-SER-58–68) never asserted that the discovery at issue was irrelevant.  Indeed, the brief implicitly conceded the opposite, arguing that there was other *better* evidence of legislative intent.  *See id.* at 10.  Nor did the legislators object to plaintiffs' discovery requests on relevance grounds.  To the contrary, in response to plaintiffs' interrogatory asking about "the purposes of the Challenged Laws," DE-SER-36, the legislators averred that they (and their colleagues who voted on the laws) "may have knowledge relevant to the above interrogatory," DE-SER-37–38—i.e., "knowledge relevant to" "the purposes of the Challenged Laws," DE-SER-36, 38.  The legislators also separately confirmed that they were "not withholding" documents on relevance grounds.  DE-SER-44.

When plaintiffs argued to this Court during the mandamus proceedings that the legislators' relevance challenge was forfeited, the legislators replied by citing (DE-SER-31–32) a letter they sent to plaintiffs and their argument to the district court (noted above) that there was other, better evidence of legislative intent, DE-SER-68.  (The legislators have never argued that they preserved the challenge by making it in seeking a stay from the district court after the court ruled—rightly so, as that argument came too late.)  A letter to *plaintiffs* obviously does not preserve

- 48 -

the issue with the court. And as mentioned, an argument that there was *better* evidence of legislative intent implicitly concedes that the discovery plaintiffs sought was relevant to that topic. The legislators' argument that evidence regarding the legislature's intent in passing the challenged laws is irrelevant is thoroughly forfeited.

3. The argument is also meritless. One of plaintiffs' claims is that the challenged laws violate equal protection. *See supra* p.8. And Supreme Court precedent holds that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 265. The Arizona legislature's "intent or purpose" in enacting the challenged laws (*id.*) is thus an element of plaintiffs' equal-protection claim. Evidence bearing on an element of a claim is unquestionably relevant—certainly under the "broad right of discovery" conferred by the federal rules, *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993); *see also* Fed. R. Civ. P. 26(b)(1).

The legislators cite no case holding otherwise. Every case they cite in making this argument (Br.42-44) instead (1) predates *Arlington Heights* (in many instances by several decades), (2) did not involve an equal-protection claim, (3) involved discovery into individual legislators' motives rather than the legislature's purpose, and/or (4) was about privilege rather than relevance. Indeed, as noted, the legislators' *only* response to the district court's reasoning for its ruling

- 49 -

is citing a case about "privilege" (Br.43). The legislators cite no case embracing their argument that evidence of a legislature's intent is irrelevant to a claim that a law that legislature enacted violated equal protection, such that discovery about that intent is improper. Their inability to cite any such case is unsurprising because, again, under Supreme Court precedent, intent or purpose is an element of such a claim. The district court did not abuse its "broad discretion … to permit or deny discovery" in rejecting the legislators' argument, *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002).[8]

### C.   Vacatur Is Unwarranted

Intervenors briefly argue (Br.47) that if the Court holds their discovery challenge moot, then the Court should vacate the district court's ruling under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950). But as intervenors say elsewhere (Br.42 (citing *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 109 (2009))), the challenge is not moot. Even if it were, vacatur would not be appropriate.

For starters, intervenors never asked the district court to vacate, even though any mootness would have occurred months before final judgment. Having failed

---

[8] The legislators claim (Br.43) that "*Fletcher* and its progeny" support their relevance argument. That claim is difficult to evaluate because they cite no case named *Fletcher*.

to raise the issue below, intervenors have forfeited it. *See Mitchell v. Wall*, 808 F.3d 1174, 1177 (7th Cir. 2015) (vacatur requests can be waived).

Moreover, intervenors "caused [any] mootness by voluntary action," so they cannot carry their burden of demonstrating "equitable entitlement to the extraordinary remedy of vacatur." *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 24, 26 (1994); *accord Donovan v. Vance*, 70 F.4th 1167, 1173 (9th Cir. 2023), *cited in* Int.Br.47. As discussed repeatedly during the mandamus proceedings, intervenors could have used what the Supreme Court has called an "established mechanism[]" to obtain prompt appellate review of an adverse privilege ruling: decline to comply with the district court's discovery order and then appeal any resulting sanctions or contempt order. *Mohawk*, 558 U.S. at 111-112; *accord United States v. Ryan*, 402 U.S. 530, 533 (1971) (citing cases); *Newton v. National Broadcasting Co.*, 726 F.2d 591, 594 (9th Cir. 1984) (per curiam) (declining to hold that government officials need not avail themselves of this option). Instead, intervenors produced the requested documents and sat for depositions. That "voluntary action," *U.S. Bancorp*, 513 U.S. at 24, precludes vacatur, *see Federal Insurance Co. v. Maine Yankee Atomic Power Co.*, 311 F.3d 79, 82 (1st Cir. 2002).

# CONCLUSION

The district court's rulings discussed herein should be affirmed.[9]

August 12, 2024

Respectfully submitted,

/s/ Daniel S. Volchok

BRUCE SAMUELS
JENNIFER LEE-COTA
PAPETTI SAMUELS WEISS
    MCKIRGAN LLP
16430 North Scottsdale Road
Suite 290
Scottsdale, Arizona 85254
(480) 800-3530
bsamuels@pswmlaw.com

SETH P. WAXMAN
CHRISTOPHER E. BABBITT
DANIEL S. VOLCHOK
JOSEPH M. MEYER
BRITANY RILEY-SWANBECK
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
daniel.volchok@wilmerhale.com

*Counsel for the Democratic National Committee and the Arizona Democratic Party*

NIYATI SHAH
TERRY AO MINNIS
ASIAN AMERICANS ADVANCING
    JUSTICE-AAJC
1620 L Street N.W.
Suite 1050
Washington, D.C. 20036
(202) 296-2300
nshah@advancingjustice-aajc.org
tminnis@advancingjustice-aajc.org

SADIK HUSENY
AMIT MAKKER
EVAN OMI
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
(415) 391-0600
sadik.huseny@lw.com
amit.makker@lw.com

*Counsel for Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition*

---

[9] The signatories to this brief join the arguments in the other response briefs that bear on the signatories' claims.

## STATEMENT OF RELATED CASES

Plaintiffs are not aware of any related cases pending in this Court.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-3188, 24-3559, 24-4029

I am the attorney or self-represented party.

**This brief contains** 11,398 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated                    .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Daniel S. Volchok **Date** Aug. 12, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

Page

52 U.S.C. §20501 ................................................................Add.1

52 U.S.C. §20505 ................................................................Add.3

52 U.S.C. §20507 ................................................................Add.5

52 U.S.C. §20508 ................................................................Add.12

Ariz. Rev. Stat. §16-121.01 .................................................Add.14

Ariz. Rev. Stat. §16-127 .....................................................Add.17

Ariz. Rev. Stat. §16-165 .....................................................Add.18

Ariz. Rev. Stat. §16-166 .....................................................Add.22

United States Code Annotated
 Title 52. Voting and Elections (Refs & Annos)
  Subtitle II. Voting Assistance and Election Administration (Refs & Annos)
   Chapter 205. National Voter Registration

52 U.S.C.A. § 20501
Formerly cited as 42 USCA § 1973gg

§ 20501. Findings and purposes

Currentness

**(a) Findings**

The Congress finds that--

**(1)** the right of citizens of the United States to vote is a fundamental right;

**(2)** it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

**(3)** discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

**(b) Purposes**

The purposes of this chapter are--

**(1)** to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

**(2)** to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

**(3)** to protect the integrity of the electoral process; and

**(4)** to ensure that accurate and current voter registration rolls are maintained.

**CREDIT(S)**

(Pub.L. 103-31, § 2, May 20, 1993, 107 Stat. 77.)

**Add.1**

52 U.S.C.A. § 20501, 52 USCA § 20501

Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Add.2**

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

<div style="border:1px solid black; padding:10px;">

United States Code Annotated

  Title 52. Voting and Elections (Refs & Annos)

    Subtitle II. Voting Assistance and Election Administration (Refs & Annos)

      Chapter 205. National Voter Registration

</div>

52 U.S.C.A. § 20505

Formerly cited as 42 USCA § 1973gg-4

§ 20505. Mail registration

Currentness

**(a) Form**

**(1)** Each State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission pursuant to section 20508(a)(2) of this title for the registration of voters in elections for Federal office.

**(2)** In addition to accepting and using the form described in paragraph (1), a State may develop and use a mail voter registration form that meets all of the criteria stated in section 20508(b) of this title for the registration of voters in elections for Federal office.

**(3)** A form described in paragraph (1) or (2) shall be accepted and used for notification of a registrant's change of address.

**(b) Availability of forms**

The chief State election official of a State shall make the forms described in subsection (a) available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs.

**(c) First-time voters**

**(1)** Subject to paragraph (2), a State may by law require a person to vote in person if--

  **(A)** the person was registered to vote in a jurisdiction by mail; and

  **(B)** the person has not previously voted in that jurisdiction.

**(2)** Paragraph (1) does not apply in the case of a person--

  **(A)** who is entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act;

**Add.3**

**(B)** who is provided the right to vote otherwise than in person under section 20102(b)(2)(B)(ii) of this title; or

**(C)** who is entitled to vote otherwise than in person under any other Federal law.

**(d) Undelivered notices**

If a notice of the disposition of a mail voter registration application under section 20507(a)(2) of this title is sent by nonforwardable mail and is returned undelivered, the registrar may proceed in accordance with section 20507(d) of this title.

**CREDIT(S)**

(Pub.L. 103-31, § 6, May 20, 1993, 107 Stat. 79.)

52 U.S.C.A. § 20505, 52 USCA § 20505
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Add.4**

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 52. Voting and Elections (Refs & Annos)
    Subtitle II. Voting Assistance and Election Administration (Refs & Annos)
      Chapter 205. National Voter Registration

52 U.S.C.A. § 20507

Formerly cited as 42 USCA § 1973gg-6

§ 20507. Requirements with respect to administration of voter registration

Currentness

**(a) In general**

In the administration of voter registration for elections for Federal office, each State shall--

**(1)** ensure that any eligible applicant is registered to vote in an election--

**(A)** in the case of registration with a motor vehicle application under section 20504 of this title, if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

**(B)** in the case of registration by mail under section 20505 of this title, if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

**(C)** in the case of registration at a voter registration agency, if the valid voter registration form of the applicant is accepted at the voter registration agency not later than the lesser of 30 days, or the period provided by State law, before the date of the election; and

**(D)** in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

**(2)** require the appropriate State election official to send notice to each applicant of the disposition of the application;

**(3)** provide that the name of a registrant may not be removed from the official list of eligible voters except--

**(A)** at the request of the registrant;

**Add.5**

**(B)** as provided by State law, by reason of criminal conviction or mental incapacity; or

**(C)** as provided under paragraph (4);

**(4)** conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of--

**(A)** the death of the registrant; or

**(B)** a change in the residence of the registrant, in accordance with subsections (b), (c), and (d);

**(5)** inform applicants under sections 20504, 20505, and 20506 of this title of--

**(A)** voter eligibility requirements; and

**(B)** penalties provided by law for submission of a false voter registration application; and

**(6)** ensure that the identity of the voter registration agency through which any particular voter is registered is not disclosed to the public.

**(b) Confirmation of voter registration**

Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office--

**(1)** shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.) [1] ; and

**(2)** shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote, except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual--

**(A)** has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

**(B)** has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

**(c) Voter removal programs**

<div align="center">

**Add.6**

</div>

**(1)** A State may meet the requirement of subsection (a)(4) by establishing a program under which--

   **(A)** change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and

   **(B)** if it appears from information provided by the Postal Service that--

      **(i)** a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

      **(ii)** the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

**(2)(A)** A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

**(B)** Subparagraph (A) shall not be construed to preclude--

   **(i)** the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); or

   **(ii)** correction of registration records pursuant to this chapter.

**(d) Removal of names from voting rolls**

**(1)** A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant--

   **(A)** confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

   **(B)(i)** has failed to respond to a notice described in paragraph (2); and

   **(ii)** has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

**Add.7**

**(2)** A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

**(A)** If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

**(B)** If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

**(3)** A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection.

**(e) Procedure for voting following failure to return card**

**(1)** A registrant who has moved from an address in the area covered by a polling place to an address in the same area shall, notwithstanding failure to notify the registrar of the change of address prior to the date of an election, be permitted to vote at that polling place upon oral or written affirmation by the registrant of the change of address before an election official at that polling place.

**(2)(A)** A registrant who has moved from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district and who has failed to notify the registrar of the change of address prior to the date of an election, at the option of the registrant--

**(i)** shall be permitted to correct the voting records and vote at the registrant's former polling place, upon oral or written affirmation by the registrant of the new address before an election official at that polling place; or

**(ii)(I)** shall be permitted to correct the voting records and vote at a central location within the same registrar's jurisdiction designated by the registrar where a list of eligible voters is maintained, upon written affirmation by the registrant of the new address on a standard form provided by the registrar at the central location; or

**(II)** shall be permitted to correct the voting records for purposes of voting in future elections at the appropriate polling place for the current address and, if permitted by State law, shall be permitted to vote in the present election, upon confirmation by the registrant of the new address by such means as are required by law.

**Add.8**

**(B)** If State law permits the registrant to vote in the current election upon oral or written affirmation by the registrant of the new address at a polling place described in subparagraph (A)(i) or (A)(ii)(II), voting at the other locations described in subparagraph (A) need not be provided as options.

**(3)** If the registration records indicate that a registrant has moved from an address in the area covered by a polling place, the registrant shall, upon oral or written affirmation by the registrant before an election official at that polling place that the registrant continues to reside at the address previously made known to the registrar, be permitted to vote at that polling place.

**(f) Change of voting address within a jurisdiction**

In the case of a change of address, for voting purposes, of a registrant to another address within the same registrar's jurisdiction, the registrar shall correct the voting registration list accordingly, and the registrant's name may not be removed from the official list of eligible voters by reason of such a change of address except as provided in subsection (d).

**(g) Conviction in Federal court**

**(1)** On the conviction of a person of a felony in a district court of the United States, the United States attorney shall give written notice of the conviction to the chief State election official designated under section 20509 of this title of the State of the person's residence.

**(2)** A notice given pursuant to paragraph (1) shall include--

    **(A)** the name of the offender;

    **(B)** the offender's age and residence address;

    **(C)** the date of entry of the judgment;

    **(D)** a description of the offenses of which the offender was convicted; and

    **(E)** the sentence imposed by the court.

**(3)** On request of the chief State election official of a State or other State official with responsibility for determining the effect that a conviction may have on an offender's qualification to vote, the United States attorney shall provide such additional information as the United States attorney may have concerning the offender and the offense of which the offender was convicted.

**(4)** If a conviction of which notice was given pursuant to paragraph (1) is overturned, the United States attorney shall give the official to whom the notice was given written notice of the vacation of the judgment.

**Add.9**

**(5)** The chief State election official shall notify the voter registration officials of the local jurisdiction in which an offender resides of the information received under this subsection.

**(h) Omitted**

**(i) Public disclosure of voter registration activities**

**(1)** Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

**(2)** The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

**(j) "Registrar's jurisdiction" defined**

For the purposes of this section, the term "registrar's jurisdiction" means--

  **(1)** an incorporated city, town, borough, or other form of municipality;

  **(2)** if voter registration is maintained by a county, parish, or other unit of government that governs a larger geographic area than a municipality, the geographic area governed by that unit of government; or

  **(3)** if voter registration is maintained on a consolidated basis for more than one municipality or other unit of government by an office that performs all of the functions of a voting registrar, the geographic area of the consolidated municipalities or other geographic units.

<div align="center">

**CREDIT(S)**

</div>

(Pub.L. 103-31, § 8, May 20, 1993, 107 Stat. 82; Pub.L. 107-252, Title IX, § 903, Oct. 29, 2002, 116 Stat. 1728.)

Notes of Decisions (120)

<div align="center">

**Footnotes**

**Add.10**

</div>

1    Redesignated as 52 U.S.C.A. § 10301 et seq.

52 U.S.C.A. § 20507, 52 USCA § 20507
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Add.11**

---

United States Code Annotated
  Title 52. Voting and Elections (Refs & Annos)
    Subtitle II. Voting Assistance and Election Administration (Refs & Annos)
      Chapter 205. National Voter Registration

52 U.S.C.A. § 20508
Formerly cited as 42 USCA § 1973gg-7

§ 20508. Federal coordination and regulations

Currentness

**(a) In general**

The Election Assistance Commission--

**(1)** in consultation with the chief election officers of the States, shall prescribe such regulations as are necessary to carry out paragraphs (2) and (3);

**(2)** in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office;

**(3)** not later than June 30 of each odd-numbered year, shall submit to the Congress a report assessing the impact of this chapter on the administration of elections for Federal office during the preceding 2-year period and including recommendations for improvements in Federal and State procedures, forms, and other matters affected by this chapter; and

**(4)** shall provide information to the States with respect to the responsibilities of the States under this chapter.

**(b) Contents of mail voter registration form**

The mail voter registration form developed under subsection (a)(2)--

**(1)** may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

**(2)** shall include a statement that--

**(A)** specifies each eligibility requirement (including citizenship);

**(B)** contains an attestation that the applicant meets each such requirement; and

### Add.12

**(C)** requires the signature of the applicant, under penalty of perjury;

**(3)** may not include any requirement for notarization or other formal authentication; and

**(4)** shall include, in print that is identical to that used in the attestation portion of the application--

**(i)** the information required in section 20507(a)(5)(A) and (B) of this title;

**(ii)** a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

**(iii)** a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

<div align="center">

**CREDIT(S)**

</div>

(Pub.L. 103-31, § 9, May 20, 1993, 107 Stat. 87; Pub.L. 107-252, Title VIII, § 802(b), Oct. 29, 2002, 116 Stat. 1726.)

52 U.S.C.A. § 20508, 52 USCA § 20508
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

<div align="center">

**Add.13**

</div>

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Preempted by  Mi Familia Vota v. Fontes,  D.Ariz.,  Feb. 29, 2024

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

> Arizona Revised Statutes Annotated
>   Title 16. Elections and Electors (Refs & Annos)
>     Chapter 1. Qualification and Registration of Electors (Refs & Annos)
>       Article 2. Qualifications for Voting (Refs & Annos)

A.R.S. § 16-121.01

§ 16-121.01. Requirements for proper registration; violation; classification

Effective: January 1, 2023

Currentness

**A.** A person is presumed to be properly registered to vote on completion of a registration form as prescribed by § 16-152 that contains at least the name, the residence address or the location, proof of location of residence as prescribed by § 16-123, the date and place of birth and the signature or other statement of the registrant as prescribed by § 16-152, subsection A, paragraph 20 and a checkmark or other appropriate mark in the "yes" box next to the question regarding citizenship. Any application for registration, including an application on a form prescribed by the United States election assistance commission, must contain a checkmark or other appropriate mark in the "yes" box next to the question regarding citizenship as a condition of being properly registered to vote as either a voter who is eligible to vote a full ballot or a voter who is eligible to vote only with a ballot for federal offices. The completed registration form must also contain the person's Arizona driver license number, the nonoperating identification license number issued pursuant to § 28-3165, the last four digits of the person's social security number or the person's affirmation that if an Arizona driver license number, a nonoperating identification license number or the last four digits of the person's social security number is not provided, the person does not possess a valid Arizona driver or nonoperating identification license or a social security number and the person is hereby requesting that a unique identifying number be assigned by the secretary of state pursuant to § 16-152, subsection A, paragraph 12, subdivision (c). Any application that does not include all of the information required to be on the registration form pursuant to § 16-152 and any application that is not signed is incomplete, and the county recorder shall notify the applicant pursuant to § 16-134, subsection B and shall not register the voter until all of the information is returned.

**B.** The presumption in subsection A of this section may be rebutted only by clear and convincing evidence of any of the following:

1. That the registrant is not the person whose name appears on the register.

2. That the registrant has not resided in this state for twenty-nine days next preceding the election or other event for which the registrant's status as properly registered is in question.

3. That the registrant is not properly registered at an address permitted by § 16-121.

**Add.14**

4. That the registrant is not a qualified registrant under § 16-101.

**C.** Except for a form produced by the United States election assistance commission, any application for registration shall be accompanied by satisfactory evidence of citizenship as prescribed in § 16-166, subsection F, and the county recorder or other officer in charge of elections shall reject any application for registration that is not accompanied by satisfactory evidence of citizenship. A county recorder or other officer in charge of elections who knowingly fails to reject an application for registration as prescribed by this subsection is guilty of a class 6 felony. The county recorder or other officer in charge of elections shall send a notice to the applicant as prescribed in § 16-134, subsection B.

**D.** Within ten days after receiving an application for registration on a form produced by the United States election assistance commission that is not accompanied by satisfactory evidence of citizenship, the county recorder or other officer in charge of elections shall use all available resources to verify the citizenship status of the applicant and at a minimum shall compare the information available on the application for registration with the following, provided the county has access:

1. The department of transportation databases of Arizona driver licenses or nonoperating identification licenses.

2. The social security administration databases.

3. The United States citizenship and immigration services systematic alien verification for entitlements program, if practicable.

4. A national association for public health statistics and information systems electronic verification of vital events system.

5. Any other state, city, town, county or federal database and any other database relating to voter registration to which the county recorder or officer in charge of elections has access, including an electronic registration information center database.

**E.** After complying with subsection D of this section, if the county recorder or other officer in charge of elections matches the applicant with information that verifies the applicant is a United States citizen, is otherwise qualified as prescribed by § 16-101 and has met the other requirements of this section, the applicant shall be properly registered. If the county recorder or other officer in charge of elections matches the applicant with information that the applicant is not a United States citizen, the county recorder or other officer in charge of elections shall reject the application, notify the applicant that the application was rejected because the applicant is not a United States citizen and forward the application to the county attorney and attorney general for investigation. If the county recorder or other officer in charge of elections is unable to match the applicant with appropriate citizenship information, the county recorder or other officer in charge of elections shall notify the applicant that the county recorder or other officer in charge of elections could not verify that the applicant is a United States citizen and that the applicant will not be qualified to vote in a presidential election or by mail with an early ballot in any election until satisfactory evidence of citizenship is provided.

**F.** The county recorder or other officer in charge of elections shall record the efforts made to verify an applicant's citizenship status as prescribed in subsections D and E of this section. If the county recorder or other officer in charge of elections fails to attempt to verify the citizenship status of an applicant pursuant to subsections D and E of this section and the county recorder or other officer in charge of elections knowingly causes the applicant to be registered and it is later determined that the applicant

**Add.15**

was not a United States citizen at the time of registration, the county recorder or other officer in charge of elections is guilty of a class 6 felony.

**Credits**

Added by Laws 1993, Ch. 98, § 10, eff. Jan. 1, 1994. Amended by Laws 1994, Ch. 378, § 2, eff. Jan. 1, 1995; Laws 2003, Ch. 260, § 1, eff. Dec. 1, 2003; Laws 2004, Ch. 184, § 1; Laws 2022, Ch. 99, § 4, eff. Jan. 1, 2023.

<For disposition of the subject matter or derivation of sections repealed, added, or transferred and renumbered by Laws 1979, Ch. 209, §§ 2 to 5, effective January 1, 1980, see Disposition and Derivation Tables preceding Chapter 1.>

Notes of Decisions (25)

A. R. S. § 16-121.01, AZ ST § 16-121.01
Current through legislation of the Second Regular Session of the Fifty-Sixth Legislature (2024), effective as of June 21, 2024.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Add.16**

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Preempted by   Mi Familia Vota v. Fontes,   D.Ariz.,   Sep. 14, 2023

Arizona Revised Statutes Annotated
   Title 16. Elections and Electors (Refs & Annos)
      Chapter 1. Qualification and Registration of Electors (Refs & Annos)
      Article 2. Qualifications for Voting (Refs & Annos)

A.R.S. § 16-127

§ 16-127. Federal only voters; early ballot; eligibility; exemption

Effective: January 1, 2023

Currentness

**A.** Notwithstanding any other law:

1. A person who has registered to vote and who has not provided satisfactory evidence of citizenship as prescribed by § 16-166 is not eligible to vote in presidential elections.

2. A person who has not provided satisfactory evidence of citizenship pursuant to § 16-166 and who is eligible to vote only for federal offices is not eligible to receive an early ballot by mail.

**B.** This section does not apply to an absent uniformed services voter or overseas voter as defined in the uniformed and overseas citizens absentee voting act (P.L. 99-410; 100 Stat. 924; 52 United States Code § 20310), as amended by the Ronald W. Reagan national defense authorization act for fiscal year 2005 (P.L. 108-375).

**Credits**

Added by Laws 2022, Ch. 99, § 5, eff. Jan. 1, 2023. Amended by Laws 2022, Ch. 174, § 1, eff. Jan. 1, 2023.

   <For disposition of the subject matter or derivation of sections repealed, added, or transferred and renumbered by Laws 1979, Ch. 209, §§ 2 to 5, effective January 1, 1980, see Disposition and Derivation Tables preceding Chapter 1.>

Notes of Decisions (2)

A. R. S. § 16-127, AZ ST § 16-127
Current through legislation of the Second Regular Session of the Fifty-Sixth Legislature (2024), effective as of June 21, 2024.

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Add.17**

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted  Preempted by   Mi Familia Vota v. Fontes,   D.Ariz.,   Feb. 29, 2024

Arizona Revised Statutes Annotated
  Title 16. Elections and Electors (Refs & Annos)
    Chapter 1. Qualification and Registration of Electors (Refs & Annos)
      Article 5. Registration Rolls

A.R.S. § 16-165

§ 16-165. Causes for cancellation; report

Effective: January 1, 2023
Currentness

**A.** The county recorder shall cancel a registration:

1. At the request of the person registered.

2. When the county recorder is informed and confirms that the person registered is dead.

3. If the person has been adjudicated an incapacitated person as defined in § 14-5101.

4. When the person registered has been convicted of a felony, and the judgment of conviction has not been reversed or set aside. The county recorder shall cancel the registration on receipt of notice of a felony conviction from the court or from the secretary of state or when reported by the elector on a signed juror questionnaire that is completed pursuant to § 21-314.

5. On production of a certified copy of a judgment directing a cancellation to be made.

6. Promptly after the election if the person registered has applied for a ballot pursuant to § 16-126.

7. When a person has been on the inactive voter list and has not voted during the time periods prescribed in § 16-166, subsection C.

8. When the county recorder receives written information from the person registered that the person has a change of residence within the county and the person does not complete and return a new registration form within twenty-nine days after the county recorder mails notification of the need to complete and return a new registration form with current information.

9. When the county recorder receives written information from the person registered that the person has a change of address outside the county, including when the county recorder either:

**Add.18**

(a) Receives a form from the person pursuant to subsection E of this section on which the person has confirmed that the person is not a resident of this state.

(b) Receives a summary report from the jury commissioner or jury manager pursuant to § 21-314 indicating that the person has stated that the person is not a resident of the county. Before the county recorder cancels a registration pursuant to this subdivision, the county recorder shall send the person notice by forwardable mail and a postage prepaid preaddressed return form requesting the person confirm by signing under penalty of perjury that the person is a resident of the county and is not knowingly registered to vote in another county or another state. The notice shall inform the person that failure to return the form within thirty-five days will result in the person's registration being canceled. If the person fails to return the notice within thirty-five days the county recorder shall cancel the person's registration.

10. When the county recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen, including when the county recorder receives a summary report from the jury commissioner or jury manager pursuant to § 21-314 indicating that a person who is registered to vote has stated that the person is not a United States citizen. Before the county recorder cancels a registration pursuant to this paragraph, the county recorder shall send the person notice by forwardable mail that the person's registration will be canceled in thirty-five days unless the person provides satisfactory evidence of United States citizenship pursuant to § 16-166. The notice shall include a list of documents the person may provide and a postage prepaid preaddressed return envelope. If the person registered does not provide satisfactory evidence within thirty-five days, the county recorder shall cancel the registration and notify the county attorney and attorney general for possible investigation.

11. When the county recorder receives confirmation from another county recorder that the person registered has registered to vote in that other county.

**B.** If the county recorder receives credible information that a person has registered to vote in a different county, the county recorder shall confirm the person's voter registration with that other county and, on confirmation, shall cancel the person's registration pursuant to subsection A, paragraph 11 of this section.

**C.** If the county recorder cancels a registration pursuant to subsection A, paragraph 8 of this section, the county recorder shall send the person notice that the registration has been canceled and a registration form with the information described in § 16-131, subsection C attached to the form.

**D.** When proceedings in the superior court or the United States district court result in a person being declared incapable of taking care of himself and managing his property, and for whom a guardian of the person and estate is appointed, result in such person being committed as an insane person or result in a person being convicted of a felony, the clerk of the superior court in the county in which those proceedings occurred shall file with the secretary of state an official notice of that fact. The secretary of state shall notify the appropriate county recorder and the recorder shall cancel the name of the person on the register. Such a notice shall name the person covered, shall give the person's date and place of birth if available, the person's social security number, if available, the person's usual place of residence, the person's address and the date of the notice, and shall be filed with the recorder of the county where the person last resided.

**E.** Each month the department of health services shall transmit to the secretary of state without charge a record of the death of every resident of the state reported to the department within the preceding month. This record shall include only the name of

<div align="center">Add.19</div>

the decedent, the decedent's date of birth, the decedent's date of death, the decedent's social security number, if available, the decedent's usual legal residence at the time of death and, if available, the decedent's father's name or mother's maiden name. The secretary of state shall use the record for the sole purpose of canceling the names of deceased persons from the statewide voter registration database. In addition, the department of health services shall annually provide to the secretary of state from the statewide electronic death registration system without charge a record of all deaths of residents of this state that are reported to the department of health services. The records transmitted by the department of health services shall include only the name of the decedent, the decedent's date of birth, the decedent's social security number, if available, the decedent's usual legal residence at the time of death and, if available, the decedent's father's name or mother's maiden name. The secretary of state shall compare the records of deaths with the statewide voter registration database. Public access to the records is prohibited. Use of information from the records for purposes other than those required by this section is prohibited. The name of each deceased person shall promptly be canceled from the statewide voter registration database and the secretary of state shall notify the appropriate county recorder and the recorder shall cancel the name of the person from the register.

**F.** Each month the department of transportation shall furnish to the secretary of state without charge a list of persons who the department has been notified have been issued a driver license or the equivalent of an Arizona nonoperating identification license in another state. Within ten days after receiving the list of persons from the department of transportation, the secretary of state shall provide to the appropriate county recorder a list of registered voters in that county who have been issued a driver license or the equivalent of an Arizona nonoperating identification license in another state. The county recorder shall promptly send notice by forwardable mail to each person who has obtained a driver license or the equivalent of an Arizona nonoperating identification license in another state and a postage prepaid preaddressed return form requesting the person confirm by signing under penalty of perjury that the person is a resident of this state and is not knowingly registered to vote in another state or confirm that the person is not a resident of this state. The notice shall inform the person that failure to return the form within ninety days will result in the person's registration being placed in inactive status. If the person returns the form within ninety days confirming that the person is a resident of this state, the county recorder shall maintain the registration in active status. If the person fails to return the form within ninety days, the county recorder shall place the person's registration in inactive status.

**G.** Each month the secretary of state shall compare the statewide voter registration database to the driver license database maintained by the department of transportation. The secretary of state shall notify the appropriate county recorder if a person who is registered to vote in that county has changed the person's residence address or is not a United States citizen.

**H.** To the extent practicable, each month the county recorder shall compare the county's voter registration database to the social security administration database.

**I.** To the extent practicable, each month the county recorder shall compare persons who are registered to vote in that county and who the county recorder has reason to believe are not United States citizens and persons who are registered to vote without satisfactory evidence of citizenship as prescribed by § 16-166 with the systematic alien verification for entitlements program maintained by the United States citizenship and immigration services to verify the citizenship status of the persons registered.

**J.** For persons who are registered to vote without satisfactory evidence of citizenship as prescribed in § 16-166, the county recorder shall compare the electronic verification of vital events system maintained by a national association for public health statistics and information systems, if accessible, with the information on the person's voter registration file.

**K.** To the extent practicable, the county recorder shall review relevant city, town, county, state and federal databases to which the county recorder has access to confirm information obtained that requires cancellation of registrations pursuant to this section.

**Add.20**

**L.** After canceling a registration pursuant to this section, the county recorder shall send a notice by forwardable mail informing the person that the person's registration has been canceled, the reason for cancellation, the qualifications of electors pursuant to § 16-101 and instructions on registering to vote if the person is qualified.

**M.** The secretary of state shall report the following information to the legislature at the end of each quarter:

1. The number of deaths reported to the secretary of state by the department of health services, the number of voter registration cancellation notices issued by the secretary of state to the county recorders as a result of those reports and the number of registrations canceled as a result of those notices.

2. The number of persons reported to the secretary of state who have been issued a driver license or the equivalent of an Arizona nonoperating identification license in another state, the number of notices sent pursuant to subsection E of this section and the number of voter registrations that have been placed in inactive status and the number of voter registrations that have been canceled as a result of those notices.

3. The number of persons who have stated on a jury questionnaire that the person is not a United States citizen, the number of notices sent pursuant to subsection A, paragraph 10 of this section and the number of registrations that have been canceled as a result of those notices.

4. The number of persons who have stated on a jury questionnaire that the person is not a resident of the county, the number of notices sent pursuant to subsection A, paragraph 9, subdivision (b) of this section and the number of registrations that have been canceled as a result of those notices.

5. The number of registrations on the inactive voter list that have been canceled pursuant to subsection A, paragraph 7 of this section.

**Credits**

Added by Laws 1979, Ch. 209, § 3, eff. Jan. 1, 1980. Amended by Laws 1987, Ch. 172, § 1; Laws 1988, Ch. 33, § 1, eff. Jan. 1, 1989; Laws 1991, Ch. 310, § 17, eff. Jan. 1, 1992; Laws 1993, Ch. 98, § 13, eff. Jan. 1, 1994; Laws 2000, Ch. 249, § 10, eff. Sept. 1, 2000; Laws 2004, Ch. 184, § 3; Laws 2016, Ch. 50, § 1; Laws 2017, Ch. 126, § 1, eff. Oct. 1, 2017; Laws 2021, Ch. 49, § 1; Laws 2022, Ch. 99, § 8, eff. Jan. 1, 2023; Laws 2022, Ch. 270, § 1; Laws 2022, Ch. 370, § 2.

<For disposition of the subject matter or derivation of sections repealed, added, or transferred and renumbered by Laws 1979, Ch. 209, §§ 2 to 5, effective January 1, 1980, see Disposition and Derivation Tables preceding Chapter 1.>

Notes of Decisions (32)

A. R. S. § 16-165, AZ ST § 16-165
Current through legislation of the Second Regular Session of the Fifty-Sixth Legislature (2024), effective as of June 21, 2024.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Preempted by   Arizona v. Inter Tribal Council of Arizona, Inc.,   U.S.,   June 17, 2013

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

---

Arizona Revised Statutes Annotated
  Title 16. Elections and Electors (Refs & Annos)
    Chapter 1. Qualification and Registration of Electors (Refs & Annos)
      Article 5. Registration Rolls

---

A.R.S. § 16-166

§ 16-166. Verification of registration

Effective: September 24, 2022
Currentness

**A.** Except for the mailing of sample ballots, a county recorder who mails an item to any elector shall send the mailing by nonforwardable first class mail marked with the statement required by the postmaster to receive an address correction notification. If the item is returned undelivered, the county recorder shall send a follow-up notice to that elector within three weeks of receipt of the returned notice. The county recorder shall send the follow-up notice to the address that appears in the general county register or to the forwarding address provided by the United States postal service. The follow-up notice shall include an appropriate internet address for revising voter registration information or a registration form and the information prescribed by § 16-131, subsection C and shall state that if the elector does not complete and return a new registration form with current information to the county recorder or make changes to the elector's voter registration information that is maintained online within thirty-five days, the elector's registration status shall be changed from active to inactive.

**B.** If the elector provides the county recorder with a new registration form or otherwise revises the elector's information, the county recorder shall change the general register to reflect the changes indicated on the new registration. If the elector indicates a new residence address outside that county, the county recorder shall forward the voter registration form or revised information to the county recorder of the county in which the elector's address is located. If the elector provides a new residence address that is located outside this state, the county recorder shall cancel the elector's registration.

**C.** The county recorder shall maintain on the inactive voter list the names of electors who have been removed from the general register pursuant to subsection A or E of this section for a period of four years or through the date of the second general election for federal office following the date of the notice from the county recorder that is sent pursuant to subsection E of this section.

**D.** On notice that a government agency has changed the name of any street, route number, post office box number or other address designation, the county recorder shall revise the registration records and shall send a new verification of registration notice to the electors whose records were changed.

**E.** The county recorder on or before May 1 of each year preceding a state primary and general election or more frequently as the recorder deems necessary may use the change of address information supplied by the postal service through its licensees and the information provided by an electronic voter registration information center to identify registrants whose addresses may

<div align="center">**Add.22**</div>

have changed. If it appears from information provided by the postal service or an electronic voter registration information center that a registrant has moved to a different residence address, the county recorder shall send the registrant a notice of the change by forwardable mail and a postage prepaid preaddressed return form or an appropriate internet address for revising voter registration information by which the registrant may verify or correct the registration information. If the registrant fails to revise the information or return the form postmarked not later than thirty-five days after the mailing of the notice, the elector's registration status shall be changed from active to inactive. If the notice sent by the recorder is not returned, the registrant may be required to provide affirmation or confirmation of the registrant's address in order to vote. If the registrant does not vote in an election during the period after the date of the notice from the recorder through the date of the second general election for federal office following the date of that notice, the registrant's name shall be removed from the list of inactive voters. If the registrant has changed residence to a new county, the county recorder shall provide information on how the registrant can continue to be eligible to vote.

**F.** The county recorder shall reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship. Satisfactory evidence of citizenship shall include any of the following:

1. The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.

2. A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.

3. A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.

4. A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.

5. Other documents or methods of proof that are established pursuant to the immigration reform and control act of 1986.

6. The applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number.

**G.** Notwithstanding subsection F of this section, any person who is registered in this state on the effective date of this amendment to this section is deemed to have provided satisfactory evidence of citizenship and shall not be required to resubmit evidence of citizenship unless the person is changing voter registration from one county to another.

**H.** For the purposes of this section, proof of voter registration from another state or county is not satisfactory evidence of citizenship.

**Add.23**

**I.** A person who modifies voter registration records with a new residence ballot shall not be required to submit evidence of citizenship. After citizenship has been demonstrated to the county recorder, the person is not required to resubmit satisfactory evidence of citizenship in that county.

**J.** After a person has submitted satisfactory evidence of citizenship, the county recorder shall indicate this information in the person's permanent voter file. After two years the county recorder may destroy all documents that were submitted as evidence of citizenship.

**Credits**

Added by Laws 1994, Ch. 378, § 16, eff. Jan. 1, 1995. Amended by Laws 2000, Ch. 249, § 11, eff. Sept. 1, 2000; Laws 2001, Ch. 169, § 1. Approved election Nov. 2, 2004, eff. Dec. 8, 2004; Laws 2008, Ch. 273, § 5, eff. June 19, 2008. Amended by Laws 2010, Ch. 209, § 3, eff. April 28, 2010; Laws 2019, Ch. 242, § 1; Laws 2022, Ch. 277, § 3.

<For disposition of the subject matter or derivation of sections repealed, added, or transferred and renumbered by Laws 1979, Ch. 209, §§ 2 to 5, effective January 1, 1980, see Disposition and Derivation Tables preceding Chapter 1.>

**Editors' Notes**

**VALIDITY**

<Subsection F held preempted in the case of Arizona v. Inter Tribal Council of Arizona, 133 S.Ct. 2247 (2013). >

Notes of Decisions (11)

A. R. S. § 16-166, AZ ST § 16-166
Current through legislation of the Second Regular Session of the Fifty-Sixth Legislature (2024), effective as of June 21, 2024.

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Add.24**

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF SERVICE

On this 12th day of August, 2024, I electronically filed the foregoing with the Court using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK