**Nos. 24-3188, 24-3559, 24-4029**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MI FAMILIA VOTA, *et al.*,

*Plaintiffs-Appellees*,

*v.*

ADRIAN FONTES, *et al.*,

*Defendants-Appellants*,

WARREN PETERSEN, *et al.*,

*Intervenor-Defendant-Appellants*.

On Appeal from the United States District Court
for the District of Arizona, No. 2:22-cv-00509 (lead) (Bolton, J.)

**SUPPLEMENTAL EXCERPTS OF RECORD FOR THE DEMOCRATIC NATIONAL COMMITTEE, ARIZONA DEMOCRATIC PARTY, AND ARIZONA ASIAN AMERICAN NATIVE HAWAIIAN AND PACIFIC ISLANDER FOR EQUITY COALITION**

BRUCE SAMUELS
JENNIFER LEE-COTA
PAPETTI SAMUELS WEISS
   MCKIRGAN LLP
16430 North Scottsdale Road
Suite 290
Scottsdale, Arizona 85254
(480) 800-3530
bsamuels@pswmlaw.com

SETH P. WAXMAN
CHRISTOPHER E. BABBITT
DANIEL S. VOLCHOK
JOSEPH M. MEYER
BRITANY RILEY-SWANBECK
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
daniel.volchok@wilmerhale.com

*Counsel for the Democratic National Committee and the Arizona Democratic Party*
*(Additional counsel listed on inside cover)*

NIYATI SHAH
TERRY AO MINNIS
ASIAN AMERICANS ADVANCING
    JUSTICE-AAJC
1620 L Street N.W.
Suite 1050
Washington, D.C. 20036
(202) 296-2300
nshah@advancingjustice-aajc.org
tminnis@advancingjustice-aajc.org

SADIK HUSENY
AMIT MAKKER
EVAN OMI
LATHAM & WATKINS LLP 505
Montgomery Street Suite 2000
San Francisco, CA 94111-6538
(415) 391-0600
sadik.huseny@lw.com
amit.makker@lw.com

*Counsel for Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition*

# TABLE OF CONTENTS

Page

Defendants' Proposed Findings of Fact and Conclusions of Law,
dated December 12, 2023 (Dkt. 676) ...................................................... DE-SER-5

Excerpt of Transcript of Proceedings held November 15, 2023, Bench
Trial Day 7 P.M. (pp. 1791-1792) ......................................................... DE-SER-27

Excerpt of Reply in Support of Petition for Writ of Mandamus, filed
October 25, 2023 in *In re Ben Toma*, No. 23-70179 (9th Cir.),
Dkt. 20 (pp. 19-20) ................................................................................ DE-SER-30

Declaration of Christopher E. Babbitt in Support of Consolidated
Non-U.S. Plaintiffs' Motion to Compel Discovery as to Speaker
Ben Toma and President Warren Petersen, dated August 2,
2023 (Dkt. 500-1)

  EXHIBIT A: Intervenor-Defendants Speaker of the House Ben
  Toma and Senate President Warren Petersen's Answers to
  Consolidated Plaintiffs' First Set of Interrogatories.............................. DE-SER-33

  EXHIBIT C: Correspondence from Christopher E. Babbitt to
  Hannah Porter re Legislative Intervenors' Discovery
  Obligations............................................................................................. DE-SER-43

  EXHIBIT F: Proposed Draft re Plaintiffs' Notice of Deposition
  of Speaker Ben Toma and President Warren Peterson Under
  Rules 30(b)(1) and 30(b)(6)................................................................... DE-SER-47

Intervenor-Defendants Speaker Toma and President Petersen's Brief
re Legislative Privilege Discovery Dispute, dated August 2,
2023 (Dkt. 499)....................................................................................... DE-SER-58

Intervenor Republican National Committee's Cross-Response and
Reply in Support of Partial Summary Judgment, dated July 5,
2023 (Dkt. 442)....................................................................................... DE-SER-69

**DE-SER-3**

Consolidated Plaintiffs' First Set of Requests for Production to
Intervenor-Defendants Speaker of the House Ben Toma and
Senate President Warren Petersen, dated May 17, 2023 ...................... DE-SER-72

Consolidated Plaintiffs' First Set of Interrogatories to Intervenor-
Defendants Speaker of the House Ben Toma and Senate
President Warren Petersen, dated May 17, 2023................................... DE-SER-87

Intervenor Republican National Committee's Motion for Partial
Summary Judgment, dated May 15, 2023 (Dkt. 367) ........................... DE-SER-98

Speaker of the House Ben Toma and Senate President Warren
Petersen's Motion to Intervene as Defendants, dated April 4,
2023 (Dkt. 348)................................................................................... DE-SER-102

EXHIBIT A: Intervenor-Defendants Ben Toma and Warren
Petersen's Answer to Living United for Change in Arizona,
League of United Latin American Citizens, Arizona Students'
Assocation, ADRC Action Inter-Tribal Council of Arizona,
Inc., San Carlos Apache Tribe, and Arizona Coalition for
Change's First Amended Complaint (Dkt. 348-1) .............................. DE-SER-115

Defendant Secretary of State Katie Hobbs' Answer to Plaintiffs
Democratic National Committee and Arizona Democratic
Party's Complaint, dated September 16, 2022 (Dkt. 121) ................. DE-SER-118

Excerpt of Complaint for Declaratory and Injunctive Relief, filed
August 16, 2022 in *Arizona Asian American Native Hawaiian
And Pacific Islander For Equity Coalition v. Hobbs*, No. 2:22-
cv-1381 (D. Ariz.), Dkt. 1 (pp. 40-49) ................................................. DE-SER-122

Excerpt of Complaint for Declaratory and Injunctive Relief, filed
August 15, 2022 in *Democratic National Committee v. Hobbs*,
No. 2:22-cv-1369 (D. Ariz.), Dkt. 1 (pp. 17-20)................................. DE-SER-132

CERTIFICATE OF SERVICE ................................................................... DE-SER-137

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., | No. CV-22-00509-PHX-SRB (Lead) |
| Plaintiffs, | **DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| Adrian Fontes, et al., | |
| Defendants. | |
| AND CONSOLIDATED CASES. | No. CV-22-00519-PHX-SRB<br>No. CV-22-01003-PHX-SRB<br>No. CV-22-01124-PHX-SRB<br>No. CV-22-01369-PHX-SRB<br>No. CV-22-01381-PHX-SRB<br>No. CV-22-01602-PHX-SRB<br>No. CV-22-01901-PHX-SRB |

### 6.    Equity Coalition Plaintiff

648.    Equity Coalition presented no evidence that it, or any individuals it provides services to have been or will be injured due to HB 2492's proof of location of residence requirement, nor that its mission will be perceptibly impaired due to the requirement. *See* Trial Tr. 1281:24–1282:2, 1278:20-23 (Day 5, testimony of M. Tiwamangkala, Equity Coalition).

649.    Equity Coalition presented no evidence that any individual that it serves would be unable to provide proof of location of residence as construed by the Court.

### 7.    Promise Arizona Plaintiffs

650.    Promise Arizona Plaintiffs are not challenging HB 2492's proof of location of residence requirement. *See* Promise Arizona Complaint, No. 2:22-cv-01602-SRB, Doc. 1.

### 8.    United States

651.    The United States challenged HB 2492's proof of location of residence requirement under NVRA § 6. *See* United States Complaint, No. 2:22-cv-01124-SRB, Doc. 1. The Court has already resolved this claim. *See* Doc. 534 at 34.

## XI.    Lack of Discriminatory Intent

652.    There is no persuasive evidence that, in adopting the challenged laws, the Arizona Legislature was motived by racial animus.

653.    HB 2492 and HB 2243 do not on their face distinguish between or discriminate among individuals based on race, ethnicity, national origin, or any other constitutionally protected classification.

654.    Moreover, the Plaintiffs have not supplied sufficient evidence to satisfy any of the *Arlington Heights* factors (listed and analyzed *infra* in the Conclusions of Law) and have fallen short of an aggregate evidentiary showing sufficient to overcome a presumption of legislative good faith.

## A.    Disparate Impact

655.    At this juncture, the evidence does not establish that HB 2492 or HB 2243 will disproportionately affect any racial or ethnic minority group.

656.    With respect to HB 2492's pre-registration documentary proof of citizenship requirement, although Arizona has maintained a documentary proof of citizenship requirement continuously since 2005, Plaintiffs have not identified a single individual who is eligible to register as a full-ballot voter but cannot provide documentary proof of citizenship.  By extension, the Plaintiffs have not established that the citizenship database checks disproportionately burden a racial or ethnic group.

657.    The weight of the expert testimony supports a finding that the pre-registration documentary proof of citizenship requirement has had—and will continue to have—no statistically significant impact on turnout by eligible members of racial and ethnic minority groups.  *See generally* Trial Tr. 1660:6–1670:25 (Day 7, testimony of M. Hoekstra). Professor McDonald, who maintains a voluminous set of turnout data, testified that analyzing the effect of Arizona's documentary proof of citizenship requirement would likely show no effect.  *See* Trial Tr. 1245:6-1246:18 (Day 5, testimony of M. McDonald). Similarly, quantitative research, published in well regarded journals by accomplished academic professionals, supports the hypothesis that documentary proof of citizenship requirements have no statistically significant effect on citizens.  *See* Trial Tr. 1660:6–1667:19 (Day 7 PM, testimony of M. Hoekstra) (documentary proof of citizenship requirement for Medicaid beneficiaries).  Similar research indicates that voter ID requirements and notice letters *increase* turnout for Latino voters without reducing turnout for any other racial and ethnic groups.  *See id.* at 1667:25–1670:25 (summarizing a study, based on 1.6 billion observations, re: the effect of voter ID laws on turnout based on ethnicity); *id.* 1716:8–1723:20 (analyzing marginal turnout differences pre- and post-*Shelby County*).

658.    New evidence may emerge in connection with any expansion of Arizona's database checks, but given the state's history of relying on such processes without apparent

disparate burdens based on race or ethnicity, it would be premature for the Court to conclude that continued reliance on and the proposed expansion of such database checks will be unreliable or have a disparate impact against protected minority groups.

659.   Similarly, Plaintiffs have not identified any eligible person who will use the State Form to register to vote but will be unwilling or unable to provide his or her place of birth.

660.   There is no evidence that the list maintenance programs created by the challenged laws will inflict an adverse and disproportionate impact on minority groups. The trial testimony suggests the list maintenance practices and related investigations, if any, will be largely if not entirely conducted through database checks without the voters' knowledge.  *See* Trial Tr. 2138:19-2141:12 (Day 9, testimony of B. Knuth).  Moreover, there is credible academic research indicating that, to the extent registered voters are informed of an official inquiry concerning their citizenship, their turnout rates increase rather than decrease.  *See* Trial Tr. at 1736:3–1737:19 (Day 7 PM, testimony of M. Hoekstra) (discussing notice letters sent to Florida voters).

661.   Generally speaking, there are three main triggers that will cause the county recorder (or, in some instances, the Attorney General) to conduct additional inquiries to confirm a registrant's eligibility.

662.   First, data periodically transmitted or made available by ADOT, the Social Security Administration or juror questionnaires indicates that the registrant is not a U.S. citizen or not a resident of Arizona.  *See* A.R.S. § 16-165(A)(9), (G), (H).  Plaintiffs have provided no evidence that members of minority groups are more likely than others to be identified erroneously as a non-citizen or non-resident by any of the foregoing databases, and both Plaintiffs' and Defendants' expert agreed that ADOT data is generally reliable. *See* Trial Tr. 1189:24–1190:1 (Day 5 AM, testimony of M. McDonald); Trial Tr. 1907:2–16 (Day 8 AM, testimony of J. Richman).

663.   Second, a county recorder must query SAVE if the recorder has "reason to believe" a registrant is not a U.S. citizen.  *See* A.R.S. § 16-165(I).  Plaintiffs have presented

no evidence that any county recorder will use this discretion in a manner that targets individuals in whole or in part on the basis of their race, ethnicity, or other protected classification.

664.    Third, the county recorder must, for all Federal Only voters, search SAVE and, if available, the vital events system of the National Association for Public Health Statistics and Information Systems.  As an initial matter, using Arizona's total population as the appropriate benchmark, the predicted demographic composition of Federal Only voters is approximately proportionate to minority groups' representation in the population as a whole.  *See* Trial Ex. 907, 908, 909; Trial Tr. 1755:16–1760:3 (Day 7 PM, testimony of M. Hoekstra).  Further, the evidence establishes that both databases are generally reliable, *see* Trial Tr. 1189:24–1190:1 (Day 5, testimony of M. McDonald); Trial Tr. 1907:2–16 (Day 8, testimony of J. Richman), and Plaintiffs have failed to show that any processing delays are substantial or have caused or will cause otherwise eligible voters to be erroneously removed from the voter rolls.

665.    Plaintiffs accordingly have not shown that any of the challenged provisions will exert a disparate impact on any minority group.

## B.    Historical Background

666.    Although Plaintiffs' experts recounted various instances of official discrimination committed since Arizona's territorial days, they fail to link any of those wrongs to any legislator or stakeholder who participated in the drafting, debate and passage of these bills.  Similarly, Plaintiffs have failed to draw any factual nexus between discriminatory enactments of prior legislatures and the specific legislators who voted to adopt H.B. 2492 and H.B. 2243.

667.    Although Arizona's history undisputedly is blemished by wrongs committed against its Hispanic, black, and Native American citizens, the Plaintiffs' selective historical evidence elides the complexity, nuance and diversity of the state's evolution, and, in any event, fails to forge any articulable direct or even circumstantial factual link to the motives animating these particular bills.

### C.     Events Preceding Passage

668.    The events that preceded, and may have precipitated, the passage of H.B. 2492 and H.B. 2243 do not evince any discriminatory purpose.

669.    The evidence indicates that HB 2492 and HB 2243 were propelled primarily by concerns or beliefs that Arizona's election system is vulnerable to illegal votes cast by ineligible individuals.   Irrespective of whether this premise is factually sound, such concerns do not manifest discriminatory animus on the basis of race.

### D.     Procedural Departures

670.    There is no evidence that the Fifty-Fifth Legislature violated or substantially departed from its internal rules or procedures in adopting HB 2492 and HB 2243.

671.    HB 2243 was the successor to HB 2617, which Governor Ducey had vetoed. H.B. 2243, which modified specific features of HB 2617 to which the Governor had objected, was reintroduced as a floor amendment adopted in the waning days of the legislative session.   These procedural attributes of the bill's creation and passage are not aberrant or suspect.

672.    First, it is undisputed that HB 2617 itself was introduced, debated and passed through customary legislative channels, and that the Governor's veto was not predicated on a belief that the bill was discriminatory.  *See* Trial Ex. 53.

673.    The use of floor amendments to revive moribund bills is neither unusual nor traditionally associated with the adoption of discriminatory laws and practices.  Rather, the evidence indicates the process is normal in the Arizona Legislature, including during the closing days of a legislative session.   B. Toma Dep. at 264:21-265:9; W. Petersen Dep. at 319:3-24, 333:17-334:2.

674.    In arguing for procedural irregularity, the Plaintiffs emphasize that a staff attorney advised the House Rules Committee that H.B. 2492 "likely presents a preemption issue with the National Voter Registration Act as well as a conflict with fairly recent U.S. Supreme Court case law."  *See* Trial Ex. 57 at 2:11-14.  After some discussion, a majority of the House Rules Committee voted to approve the bill notwithstanding the staff attorney's

analysis. *See id.* at 7:15-17. There is no evidence that House staff attorneys expressed similar concerns as to HB 2243 or 2617, or that Senate staff attorneys raised such concerns as to any of the three bills. When legal staff raise concerns for the House Rules Committee, members may vote against the recommendations of staff attorneys for varied reasons unrelated to race, including disagreement on substantive legal questions, an interest in amending a bill at a later stage of proceedings, or an interest in developing the relevant case law. *See* B. Toma Dep. at 174:3-175:10, 177:5-11; Trial Ex. 57 at 7:3-15. Even if the legal analysis of the House staff attorney was substantively correct as to HB 2492, such concerns were expressed by only one staff attorney in only one legislative chamber concerning only one of the three bills at issue here. There is no evidence that such concerns transgress the ordinary bounds of legislative process, discussion, or approvals.

675. The fact that the floor amendment's introduction and adoption was hurried is not the type of procedural irregularity that bespeaks improper motives, particularly when the underlying policy (as originally presented in HB 2617) had been the subject of extensive consideration.

### E.    Substantive Departures

676. HB 2492 is consistent with Arizona's longstanding election law infrastructure, which since 2005 has included a documentary proof of citizenship requirement for State Form registrants. While H.B. 2492 seeks to (1) restore the protocols for processing Federal Form and State Form registrants that existed prior to the 2018 *LULAC* Consent Decree, and (2) attach additional consequences to failure to establish U.S. citizenship (namely, an inability to vote by mail or in presidential elections), it does not alter the basic contours of the documentary proof of citizenship requirement itself, or limit the means by which registrants can satisfy it.

677. Similarly, Arizona law has long relied on databases and other official information repositories, such as ADOT, the Department of Health, juror records, the U.S. Postal Service and the Electronic Registration Information Center, to identify and contact

potentially ineligible voters.  *See* Trial Ex. 6 at 36–39.  HB 2243 merely supplements this roster with other reliable sources of government records (namely, SAVE and NAPHSIS).

678.    The substantive changes to HB 2617, when it was amended into HB 2243, were likewise reflective of pre-existing law.  After Governor Ducey concluded that HB 2617 did not adequately protect potentially qualified voters from undue cancellations, *see* Trial Ex. 53, the substance of the bill was amended to incorporate content and timing requirements in the EPM and the NVRA.  The EPM has long provided a 35-day period for responding to a notice of potential cancellation.  *See* Trial Ex. 6 at 36-40.  And the NVRA contemplates delivering to a voter "a postage prepaid and pre-addressed return card, sent by forwardable mail" before cancellation.  *See* 52 U.S.C. § 20507(d)(2).  Accordingly, the portion of HB 2617 requiring only "notice that the registration will be cancelled in ninety days unless the person provides satisfactory evidence that the person is qualified," *see* Trial Ex. 4 at § 1, was modified when amended into HB 2243 to track these EPM and NVRA precedents, *see* W. Petersen Dep. at 299:18-24, 303:24-304:2, 306:3-10.

    **F.    Legislative History**

679.    Nothing in the legislative history reflects an intent to suppress voter registration or turnout among eligible individuals who are members of minority groups.

680.    Statements by HB 2492 and HB 2243's sponsors and supporters consistently articulated a desire to protect Arizona elections from the perceived risk of unlawful voting by non-citizens and/or non-residents.

681.    Although the Plaintiffs urge this Court to infer from former Senator Quezada's testimony that Senator Borrelli acted with racial animus, the evidence in this case does not support such an inference.  Senator Quezada was unable to specify the words allegedly spoken by Senator Borrelli, *see* Trial Tr. 903:23-904:12, 909:5-8 (Day 4, testimony of M. Quezada); where or when they were alleged spoken, *id.* 905:17-907:11; the bill(s) under consideration at the time, *id.* 905:11-16, 911:3-4; or whether the alleged comment was made in the context of a hearing concerning the challenged laws or more generally during the session but concerning voting rights more broadly, *id.* 907:2-23.

Moreover, Senator Quezada produced no notes, emails, or text messages contemporaneously documenting the alleged incident, 914:6-20; although he stated on the record all his reasons for opposing the challenged laws, Senator Quezada never raised the alleged comment contemporaneously on the record, 914:21-915:20; and although the Senate has an ethics process for punishing members for racially insensitive remarks with which he is familiar, Senator Quezada never filed an ethics complaint concerning the alleged incident, 911:23-913:2.  Instead, Senator Quezada did not disclose the alleged comment to the Plaintiffs for more than a year, waiting until after the prime sponsor of the challenged laws presided over a confirmation hearing that ultimately recommended against Senator Quezada's confirmation to statewide office, leading to Senator Quezada's withdrawal from consideration.  *Id.* 889:25-897:22, 916:9-917:3.  The failure of Senator Quezada's nomination was based at least in part on his history of accusing Republican colleague of racism, Trial Ex. 975 at 62:15-73:23, 123:19-124:14, and indeed, Senator Quezada has a history of making comments that invite such an interpretation, *see* Trial Tr. 895:16-897:13, 897:23-898:21; Trial Ex. 974.  Together, these circumstances prevent this Court from attributing to Senator Quezada's testimony the weight and significance urged by the Plaintiffs.

682.   Even if Senator Borrelli had used the phrase "your people" in the context of a discussion of the challenged laws, *see* Trial Tr. 911:5-9 (Day 4, testimony of M. Quezada), such words are consistent with political rather than racial tensions—particularly given the context of interference by public attendees with legislative proceedings, which forced an adjournment of the hearing while Senator Quezada was arguing against voting rights laws from the dais, *see id.* 831:12-833:24. In these circumstances, Senator Borrelli's alleged use of the phrase "your people" is insufficient to overcome a presumption of legislative good faith.

683.   Moreover, there is no reason to believe Senator Borrelli was competent to relay the subjective motivations of the forty-five other legislators who voted for the challenged laws and who, as a matter of law, are not the agents or puppets of Senator

Borrelli.  Even if Plaintiffs had proven isolated statements by a specific legislator that evinced a suspect motive, any such intention could not—absent substantial additional evidence—be imputed to the Legislature as whole.

684.    The Court concludes that Plaintiffs have failed to demonstrate that a discriminatory purpose was a motivating factor in the enactment of HB 2492 or HB 2243 and have not overcome the presumption of legislative good faith.

## G.    Unpersuasive Evidence from Plaintiffs' Expert Derek Chang

685.    Plaintiffs offered the testimony of Professor Chang on historical patterns and similarities between the passage of HB 2492 and HB 2243 and other discriminatory laws. Trial Tr. 1335:17- 19 (Day 6, testimony of D. Chang).

686.    Professor Chang's analysis is not useful to the Court's fact-finding role because it ignores specific, contemporaneous facts in favor of "broad historical patterns" without regard for the applicability of the historical patterns to the laws at issue and overlooks relevant information that contradicts his conclusions.

687.    For example, Professor Chang opined that HB 2376 was similar to a 1921 Arizona "alien land law," which barred Asian-born individuals from owning land. *See* Trial Tr. 1349:16-22, 1375:14-17, 1349:24-1350:2. HB 2367 is not an "alien land law," but restricts state land sales and leases to foreign governments or companies affiliated with countries such as Cuba, Iran, Russia, Saudi Arabia, Syria, and Venezuela.  HB 2376, 56th Leg., 1st Sess. (Ariz. 2023); *see* Trial Tr. 1376:5-7, 22-24.

688.    Professor Chang did not read HB 2376 in its entirety before concluding it restricted land ownership based on Asian country of origin and thus, was similar to the 1921 alien land law.  Trial Tr. 1375:14-21.  He did not watch the hearings about this bill before describing it as a modern-day alien land law. Trial Tr. 1376:25-1377:2. Nor did he familiarize himself with the issue of foreign governments leasing Arizona's land before offering an opinion on the allegedly discriminatory nature of the law.  Trial Tr. 1378:1-5.

689.    Professor Chang took a substantively similar approach to opining on HB 2492 and HB 2243. Professor Chang did not review the legislative history for either law, stating

that he did not think the legislative history would contain anything "particularly damning." Trial Tr. 1342:9-12, 1382:8-16

690.    In reaching his conclusions, Professor Chang also overlooked historical information that might controvert his opinions. For example, Professor Chang based his opinions in part on Arizona's 1865 anti-miscegenation law, Trial Tr. 1347:6-12, but did not acknowledge that Arizona repealed such laws before the U.S. Supreme Court declared them unconstitutional in *Loving v. Virginia*, even though Professor Chang was aware of that Arizona's repeal pre-dated *Loving*.   Trial Tr. 1382:20-1383:1. A methodology which reviews incomplete information to confirm preselected opinions, rather than a neutral review of all relevant information, lacks credibility.

691.    In addition, Professor Chang generally lacks familiarity with Arizona history, raising questions about his ability to credibly opine about the nexus between the challenged laws and the history of Asian American treatment in Arizona. *See, e.g.*, Trial Tr. 1333:18-1335:13, 1364:3-25.

692.    Professor Chang is "a qualitative historian" who uses "census data broadly in sort of very general terms" but does not do "fine-grained statistical analysis of that data." Trial Tr. 1362:14-23. This raises questions about the credibility of his presentation of statistical data.  *See id.* 1353:14-1360:4, 1362:3-13.

693.    Professor Chang also presented statistical data in a misleading manner, asserting that there was a 50 percent increase in anti-Asian violence in Phoenix between 2019 and 2020. Trial Tr. 1383:2-1384:24. That figure, though accurate, constituted an increase in reports of anti-Asian violence in Phoenix from two in 2019 to three in 2020.  *Id.* 1385:3-9.

694.    Trial testimony also indicates that Professor Chang advocates unorthodox views on racial issues and may not have reviewed relevant information in an unbiased manner. For example, in September 2020 Professor Chang signed a letter accusing his employer, Cornell University, of being complicit in white supremacy. Trial Tr. 1366:14-

1367:2. In the letter, Professor Chang called for race-conscious undergraduate admissions and race-based student funding. *Id.* 1369:3-8, 1369:24-1370:16.

695.   These facts and Professor Chang's decision to ignore specific contemporaneous information about the challenged laws in favor of "broad" comparisons to inapposite decades- or century-old laws when assessing HB 2492 and HB 2243 prevent this Court from basing a finding of racial animus on Professor Chang's analysis.  Trial Tr. 1377:3-8; *see id.* 1343:11-24.

696.   Aside from his historical analysis, Professor Chang opined regarding the effects of the challenged laws on voters with limited English proficiency.  Trial Tr. 1359:2-1360:4. Professor Chang is not a predictive social scientist and, prior to this case, had never written about the effects of English language proficiency on political participation.  Trial Tr. 1361:20-23, 1363:12-13. Professor Chang's views on the possible effects of the challenged laws are not related to his training as a historian, and do not provide an adequate evidentiary basis for a finding of disparate impact, or for this Court to impose language assistance requirements that go beyond Section 203 of the Voting Rights Act.

**H.   Unpersuasive Evidence from Plaintiffs' Expert Orville Vernon Burton**

697.   Plaintiffs offered the testimony of Professor Burton as "an expert in American history, voting behavior, discrimination, socioeconomic status and equality and historical intent."  Trial Tr. 1403:20-22 (Day 6, testimony of O. Burton).

698.   Professor Burton has provided expert testimony in as many as thirty voting rights cases, always on behalf of the party challenging the laws.  *See* Trial Tr. 1395:8-1396:7, 1505:4-8, 1543:15-1544:15. In every case where Professor Burton has been asked to consider whether a jurisdiction has a history of racism, he has concluded that it does.  Trial Tr. 1481:2-6.

699.   Professor Burton lacks extensive familiarity with Arizona history, and relied to an unusual degree on his prepared written report rather than his own command of the facts. *See, e.g.,* Trial Tr. 1457:16-23.

700.    During trial testimony, Professor Burton conflated New Mexico and Arizona. *See* Trial Tr. 1491:16-1493:23. And twice confused Arizona with other states. *Id.* 1471:17-23, 1510:2-9.

701.    Professor Burton also overstated his publication record on Arizona history. *See* Trial Tr. 1393:24-1394:20, 1466:16-1476:8. For example, Professor Burton stated his book *Age of Lincoln*, which discusses history from about 1820 to the early 20th century, addressed Arizona history. *Id.* 1468:5-7, 1468:13-21.  The word "Arizona" appears once in the book and once in the index. *Id.* 1469:2-1470:23. Rather than acknowledging that the book does not prominently address Arizona history, Professor Burton contended that it discussed Arizona-related topics.  *See id.* 1469:2-1470:23 (claiming that the book's discussions on railroads constituted addressing Arizona history because "railroads are central to Arizona . . . .").

702.    In another instance, Professor Burton claimed that a book regarding Supreme Court history constituted past work regarding Arizona history because it discussed cases that originated in Arizona and individuals with Arizona connections like Chief Justice William Rehnquist and Justice Sandra Day O'Connor.  Trial Tr. 1467:4-13, 1467:14-21.

703.    This misleading characterization of his publication history regarding Arizona raises questions regarding of Professor Burton's candor and fluency in Arizona historical matters.

704.    Professor Burton's testimony also reflected that his opinions omit relevant, contradictory facts. For example, Professor Burton's opined that Arizona "has similarities" with former Confederate states, "particularly in the laws of discrimination, the laws of voting, the laws of Jim Crow," and "miscegenation laws."  Trial Tr. 1486:15-22.  But this opinion wholly failed to address Arizona's history of fealty to the Union. *See, e.g.*, *id.* 1496:14-24 (failure to include portions of governor's speech supporting the Union), 1498:17-1499:23 (failure to acknowledge Article II of Arizona territorial Bill of Rights "clearly" committed Arizona to the Union); 1499:24-1500:25 (failure to acknowledge Arizona laws prohibiting slavery). Professor Burton either lacked a full understanding of

Arizona history, or chose not to include relevant context that would challenge his opinion that Arizona was similar to Confederate states.

705.    Professor Burton also testified that Arizona politicians had made racial appeals in political campaigns.  Trial Tr. 1455:18-1456:22. But nearly all the examples offered by Professor Burton involved politicians who subsequently suffered adverse consequences in the wake of such comments. Professor Burton's testimony failed to acknowledge the consequences suffered by the speakers until pressed in cross-examination. *See, e.g.*, *id.* 1462:10-19 (politician lost election after racially charged comments in 2014); 1463:5-14. (politician censured after racially insensitive comments). Again, this lack of candor and failure to provide context raises questions regarding the reliability of Professor Burton's opinions.

706.    Professor Burton failed to consider relevant information before offering an opinion on Arizona's voting practices and relied on inaccurate sources. *See, e.g.*, Trial Tr. 1534:24-1535:23 (did not consider Arizona's 27-day in-person early voting period, widespread vote-by-mail practices, emergency voting period, or special elections boards); Trial Day 6 at 1536:12-16 (not aware that Arizona's early voting enters are open after 5:00 p.m.); 1528:1-14, 1529:4-1531:16, 1532:13-1534:3. (discussing reliance on Demos report that contained inaccurate information regarding cancellation notice procedures). This renders Professor Burton's opinions on Arizona's voting procedures unreliable.

707.    Professor Burton's lack of candor, lack of familiarity with Arizona history and voting procedures, and failure to consider relevant facts render his testimony unpersuasive on the salient issues.

708.    Professor Burton's failure to consider relevant facts also makes his testimony not probative. For example, Professor Burton's analogy between Arizona and the former Confederacy is central to his opinions.  *See, e.g.*, Trial Tr. 1412:12-1415:24, 1420:18-1422:2, 1426:20-1428:21.  But that analogy is fatally flawed by Professor Burton's failure to acknowledge key facts and context that undercut it.  *See* ¶ 704 above.

709.     Similarly, Professor Burton's testimony largely failed to address the passage of the challenged laws.  *See* Trial Tr. 1479:13-1480:6, 1542:8-24 (testimony that Professor Burton looked at only "a little bit of legislative history" regarding the challenged laws). And though Professor Burton testified conclusorily that the laws had discriminatory intent, he provided no basis for that conclusion that related directly to the political figures involved. *Id.* 1400:9-16, 1441:17-23. Professor Burton's generic assertion of discriminatory intent is unsupported and therefore does not assist the Court in its fact-finding role.

399.    Similarly, because Arizona residency is a prerequisite to qualified elector status, *see* A.R.S. § 16-101(A)(3), H.B. 2492's documentary proof of residency requirement likewise is "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1); *cf. Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1275 (D. Colo. 2010) (rejecting challenge to law requiring new registrants to confirm addresses, reasoning that "'eligibility' is the linchpin of a state's obligations regarding voter registration and list maintenance programs").

400.    The pre-registration documentary proof of residency requirement accordingly does not render the State Form not "equivalent" to the Federal Form, for purposes of NVRA Section 7.

## VIII.    Discriminatory Intent

392.    Discrimination on the basis of citizenship is not discrimination on the basis of race. The latter is undisputedly unlawful in this context, *see* U.S. Const. amend. XIV, while the former is both contemplated by the U.S. Constitution and has always been required by the Arizona Constitution, *see* U.S. Const. amends. XV, XIX, XXIV, XXVI; Ariz. const. art. VII, § 2.

393.    Because H.B. 2492 and H.B. 2243 are facially neutral, Plaintiffs must prove that "a discriminatory purpose was a motivating factor for the legislation." *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023).

394.    "Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

395.    Any evidence adduced in support of an intentional discrimination claim "must be considered in light of the strong 'presumption of good faith' on the part of legislators." *Carrillo-Lopez*, 68 F.4th at 1140 (quoting *Miller v. Johnson*, 515 U.S. 900 (1995)).

396.    Discriminatory impact is one element in a discriminatory intent analysis. But "[a] court may not infer a discriminatory motive based solely on evidence of a

disproportionate impact except in rare cases where 'a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action.'" *Carillo-Lopez*, 68 F.4th at 1141 (quoting *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977))).

397.   In addition to discriminatory impact, "[t]he Court considers factors such as (1) the 'historical background of the decision,' (2) the 'specific sequence of events leading up to the challenged decision,' (3) '[d]epartures from the normal procedural sequence,' (4) '[s]ubstantive departures,' and (5) 'legislative or administrative history.'" *Carillo-Lopez*, 68 F.4th at 1140 (quoting *Arlington Heights*, 429 U.S. 252).

398.   Plaintiffs have not supplied sufficient evidence to satisfy any of the *Arlington Heights* factors, and have fallen far short of an aggregate evidentiary showing sufficient to overcome the presumption of legislative good faith.

399.   First, as discussed above, the Plaintiffs cannot at this juncture prove that the challenged laws will have a discriminatory impact based on income, naturalization status, race, ethnicity, or any other protected class.  The history of Arizona's DPOC requirement has produced no apparent evidence of disparate impact.  Meanwhile, there are methodologically rigorous studies demonstrating that the implementation of a DPOC requirement, voter ID requirements, and list maintenance programs have not resulted in disparate impacts.  Although a different result may follow after data is gathered following the implementation of the laws, at present the disparate impact factor therefore favors the Defendants.

400.   Second, "[t]he allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Abbott*, 138 S. Ct. at 2324.

401.   Discriminatory laws or policies enacted decades in the past are not a proxy for the intentions of the Fifty-Fifth Arizona Legislature in 2022. *See Abbott*, 138 S. Ct. at 2324 ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." (citation omitted)); *Carrillo-Lopez*, 68 F.4th at 1150

(discriminatory law enacted 23 years earlier by "a legislature with 'a substantially different composition'" was not probative of contemporaneous legislative intent); *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023) ("[A] federal court must remain 'mindful of the danger of allowing the old, outdated intentions of previous generations to taint [the state]'s legislative action forevermore on certain topics." (citation omitted)).

402.    Plaintiffs have failed to draw any factual nexus between discriminatory enactments of prior legislatures and the specific legislators who voted to adopt H.B. 2492 and H.B. 2243.  *See Abbott*, 138 S. Ct. at 2327 (actions of past legislature are relevant only "to the extent that they naturally give rise to—or tend to refute—inferences regarding the intent of the" legislature that passed the challenged laws).

403.    The historical background factor from *Arlington Heights* therefore favors the Defendants.

404.    Third, H.B. 2492 and H.B. 2243 were seemingly propelled primarily by concerns or beliefs that Arizona's election system is vulnerable to illegal votes cast by ineligible individuals.  Irrespective of whether this premise is factually sound, it does not manifest discriminatory animus.  *See Brnovich*, 141 S. Ct. at 2349 (noting that while "enflamed partisanship" may have been the impetus for the challenged law, "partisan motives are not the same as racial motives"); *Democratic Nat'l. Comm. v. Reagan*, 329 F. Supp. 3d 824, 880 (D. Ariz. 2018) (finding that, while bill sponsor's efforts "were marked by unfounded and often farfetched allegations of ballot collection fraud," they "spurred a larger debate in the legislature about the security" of voting processes, and that other "proponents appear to have been sincere in their beliefs that this [third party ballot collection] was a potential problem that needed to be addressed");[36] *League of Women Voters*, 66 F.4th at 925 (lack of evidence of extant voter fraud did not mean that legislators'

---

[36] Although the Ninth Circuit reversed the judgment, *see* 948 F.3d 989 (9th Cir. 2020), the Supreme Court subsequently found that "[t]he District Court's finding on the question of discriminatory intent had ample support in the record."  *Brnovich*, 141 S. Ct. at 2349.

professed anti-fraud motivation was suspect).  The sequence of events factor from *Arlington Heights* therefore favors the Defendants.

405.    Fourth, because the path of the challenged laws through the Arizona Legislature did not rely on extraordinary legislative procedures or approvals, as discussed above, it cannot be said that any departures from the ordinary course are "unexplainable on grounds other than race."  *Carillo-Lopez*, 68 F.4th at 1141 (quoting *Arlington Heights*, 429 U.S. at 266)).

406.    The fact that the floor amendment's introduction and adoption was hurried is not the type of procedural irregularity that bespeaks improper motives, particularly when the underlying policy (as originally presented in H.B. 2617) had been the subject of extensive consideration.  *See Abbott*, 138 S. Ct. at 2328–29 & n.23 ("[W]e do not see how the brevity of the legislative process can give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith," and noting the "significant time and effort that went into consideration of the" challenged enactment).

407.    The procedural departures factor from *Arlington Heights* therefore favors the Defendants.

408.    Fifth, H.B. 2492 is substantively consistent with Arizona's longstanding election law infrastructure, not altering the basic contours of the DPOC requirement itself or substantially limiting the means by which it may be satisfied.  Similarly, the substantive changes to H.B. 2617, when it was amended into H.B. 2243, were likewise reflective of pre-existing law.  Specifically, the portion of H.B. 2617 requiring only "notice that the registration will be cancelled in ninety days unless the person provides satisfactory evidence that the person is qualified," *see* Trial Ex. 4 at § 1, was modified when amended into H.B. 2243 to track substantive provisions in the EPM and the NVRA.  *See* 52 U.S.C. § 20507(d)(2); Trial Ex. 6 at 36-40.  *See Arlington Heights*, 429 U.S. at 267 (substantive departures are evident when "the factors usually considered important by the decisonmaker strongly favor a decision contrary to the one reached"); *Democratic Nat'l. Comm.*, 329 F.

Supp. 3d at 881 (differences between enacted bill and prior iterations in earlier legislative sessions, including the addition of harsher penalties, was insufficient to show a substantive departure).  The substantive departures factor from *Arlington Heights* therefore favors the Defendants.

409.   Sixth, whether or to what extent the sentiments of Arizona legislators were factually supported or were premised on partisan considerations is irrelevant to the *Arlington Heights* analysis.  *See Brnovich*, 141 S. Ct. at 2349 (sponsor's "enflamed partisanship" was not tantamount to a racial motive).

410.   When presented with statements or actions by a given legislator that are alleged to manifest a discriminatory intent, courts cannot rely on a "cat's paw theory"—*i.e.*, the notion that another legislator "is a 'dupe' who is 'used by another to accomplish his purposes'"—as a mechanism to impute that intent to the legislative body as a whole. *Brnovich v. Democratic Nat'l. Comm.*, 141 S. Ct. 2321, 2350 (2021).

411.   Moreover, even if Plaintiffs had proven isolated statements by a specific legislator that evinced a suspect motive, any such intention could not—absent substantial additional evidence—be imputed to the Legislature as whole.  *See Brnovich*, 141 S. Ct. at 2350 (repudiating the "cat's paw" theory of legislative intent); *League of Women Voters*, 66 F.4th at 932 (criticizing district court's reliance "on a single statement by the sponsor that, in context, offers no evidence of discriminatory intent. And in any event, the explanatory value of an isolated statement would be limited"); *N.C. State Conference of the NAACP v. Raymond*, 981 F.3d 295, 307 (4th Cir. 2020) (rejecting finding of discriminatory intent that "stemmed from the comments of a few individual legislators and relied too heavily on comments made by the bill's opponents").

412.   The legislative history factor from *Arlington Heights* therefore favors the Defendants.

413.   Although the challenged laws may be subject to legal challenges for other reasons, the application of law to the evidence in this case persuades the Court, both

doctrinally under the *Arlington Heights* standard and subjectively as the trier of fact, that the challenged laws were not provably borne of racial animus.

DATED this 12th day of December, 2023.

KRISTIN K. MAYES
ATTORNEY GENERAL

By: /s/Joshua M. Whitaker

Joshua D. Bendor (No. 031908)
Hayleigh S. Crawford (No. 032326)
Joshua M. Whitaker (No. 032724)
Kathryn E. Boughton (No. 036105)
Timothy E.D. Horley (No. 038021)

*Attorneys for Defendants*
*Attorney General Kris Mayes,*
*ADOT Director Jennifer Toth,*
*and State of Arizona*

COUNSEL FOR REPUBLICAN
NATIONAL COMMITTEE

By: /s/Kory Langhofer

Kory Langhofer, AZ Bar 024722
Thomas Basile, AZ Bar 031150
Statecraft PLLC
649 N. Fourth Avenue, First Floor
Phoenix, Arizona 85003
(602) 382-4078
kory@statecraftlaw.com
tom@statecraftlaw.com

Tyler Green*
Cameron T. Norris*
James P. McGlone*
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423

**DE-SER-25**

tyler@consovoymccarthy.com
cam@consovoymccarthy.com
jim@consovoymccarthy.com

*admitted pro hac vice*

*Counsel for Intervenor-Defendant*
*Republican National Committee*


**GALLAGHER & KENNEDY, P.A.**

By:  /s/Hannah H. Porter

Kevin E. O'Malley
Hannah H. Porter
Ashley E. Fitzgibbons
2575 East Camelback Road
Phoenix, Arizona 85016-9225

*Attorneys for Intervenor-Defendants Toma*
*and Petersen*

1677

2:22-cv-00509-SRB - November 15, 2023 P.M.

1      **UNITED STATES DISTRICT COURT**

2      **FOR THE DISTRICT OF ARIZONA**

3      _____

4
**Mi Familia Vota, et al.,**              )
5                                           )
                        Plaintiffs,      )
6                                           )
            vs.                          ) 2:22-cv-00509-SRB
7                                           )
**Adrian Fontes, et al.,**                )
8                                           ) Phoenix, Arizona
                        Defendants.     ) November 15, 2023
9      _____) 1:05 P.M.

10

11

12      **BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE**

13      <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

14      <u>**BENCH TRIAL - DAY 7 P.M.**</u>

15      (Pages 1677 through 1842)

16

17

18

19

20
Official Court Reporter:
21      **Elaine Cropper, RDR, CRR, CCP**
Sandra Day O'Connor U.S. Courthouse
22      401 West Washington Street
Suite 312, SPC 35
23      Phoenix, Arizona  85003-2150
(602) 322-7245
24
Proceedings Reported by Stenographic Court Reporter
25      Transcript Prepared by Computer-Aided Transcription

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1　about the people who supported this and I'm pointing out that　03:46:36
2　she has no evidence of that.
3　Q.　I'm just trying to understand the scope of what you looked
4　at for your report and I think you answered my question which
5　is that you didn't comprehensively look at the record it when　03:46:48
6　came to the legislative debates over this bill?
7　A.　That's correct.  I looked at the things that she cited as
8　evidence of essentially discriminatory intent by the supporters
9　and I pointed out that it doesn't actually have any evidence of
10　that.　03:47:05
11　Q.　A moment ago you said something I think very closely to
12　the effect of the kind of fraud -- the kind of behavior
13　legislators were intending to prevent with this law.  Do you
14　recall that?
15　A.　Sure.  I think so.　03:47:17
16　Q.　But you're not offering an opinion on what the legislators
17　who voted for these laws, what their actual legislative intent
18　was in enacting them?
19　A.　I'm pointing out that if you take them at their word as
20　quoted in Professor Minnite's report, they seem to be　03:47:33
21　interested in preventing voting by non-citizens and they didn't
22　seem to make any claim in what she quoted at least that they
23　were only interested in stopping this if there was criminal
24　intent or intent to corrupt the process.
25　Q.　Fair to say, though, that your opinion is limited to your　03:47:55

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  review of those particular quotes cited in your report?          03:47:59

2  A.   Yeah.  I was responding to, again, these accusations by

3  Professor Minnite about essentially the discriminatory intent

4  of those legislators and that's -- yeah.  So that's the

5  evidence that I evaluated and I didn't see any evidence of       03:48:16

6  discriminatory intent in there.

7  Q.   You make no claim in your report that County Recorders in

8  Arizona are themselves participating in any kind of electoral

9  fraud.  Fair?

10 A.   I certainly hope not.  I didn't make any accusations        03:48:30

11 there.  I didn't say anything about that.  I hope they are not

12 doing that.

13 Q.   Let's briefly hopefully talk about some of the

14 peer-reviewed literature that Dr. Minnite discusses in her

15 report and that you respond to.  You're aware of an article on  03:48:44

16 the prevalence of voter fraud by Professor Jesse Richman.  Is

17 that fair to say?

18 A.   I'm aware of it in the sense that I -- yeah, I looked

19 through it briefly.  I didn't spend lots of time thinking about

20 it.                                                              03:48:59

21 Q.   And as a general matter, you're aware that it purported to

22 find fairly substantial evidence of non-citizen voting in the

23 2008 presidential election?

24 A.   That's right.

25 Q.   And you're aware that there was a fair amount of criticism 03:49:12

United States District Court

**No. 23-70179**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re BEN TOMA, Speaker of the Arizona House of Representatives, in his official capacity; WARREN PETERSEN, President of the Arizona Senate, in his official capacity.

BEN TOMA, Speaker of the Arizona House of Representatives, in his official capacity; WARREN PETERSEN, President of the Arizona Senate, in his official capacity,

Intervenor-Defendants-Petitioners,

v.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA, PHOENIX,

Respondent,

MI FAMILIA VOTA; et al.,

Real Parties in Interest.

On Petition for a Writ of Mandamus to the United States District Court, District of Arizona-Phoenix
Case No. 2:22-CV-00509-SRB

## REPLY IN SUPPORT OF PETITION FOR WRIT OF MANDAMUS

Kevin E. O'Malley (Bar No. 006420)
Hannah H. Porter (Bar No. 029842)
Mark C. Dangerfield (Bar No. 010832)

interference with the legislative process). In addition, the Legislators, as state officials, have sought to uphold the validity of the Voting Laws (the State has also defended against most of Plaintiffs' challenges), and that weighs against disclosure. *See Puente Arizona v. Arpaio*, 314 F.R.D. 664, 672 (D. Ariz. 2016).

The mere fact that this case involves election laws does not itself overcome the legislative privilege. *Lee* involved allegations of racial motivations in redistricting, yet this Court found that did not justify intrusion into the legislative process. 908 F.3d at 1188 (refusing to create a "categorical exception" to the legislative privilege for constitutional claims that directly implicate intent because such a decision would "render the privilege of little value"). The Fifth Circuit held likewise in a case involving voter registration laws. *Abbott*, 68 F.4th at 238.

In sum, non-U.S. Plaintiffs have not shown that the facts of this case constitute exceptional circumstances meriting judicial intervention into the Legislators' subjective motives and intent.

### C.  The Legislators Have Consistently Asserted that They Could Not Offer Testimony Relevant to the Legislature's Collective Intent.

Plaintiffs' other waiver argument also fails because the Legislators have consistently taken the position that an individual legislator's motive is not relevant to collective legislative intent. See Doc. 500-1, Ex. C at 50 ("The Speaker and the President do not believe that any single legislator's motive for his or her votes on the challenged bills is relevant to this case."); Doc. 499 at 10 (arguing that because

individual legislators have differing motives, "the language of the bill itself and the public legislative history are the best methods to determine the collective legislative intent" and citing *Va. Uranium, Inc. v. Warren*, ___ U.S. ___, 139 S. Ct. 1894, 1907-08 (2019)); Doc. 499-2 at 5-7 (stating in response to interrogatory regarding the "purposes" of the Voting Laws that Legislators did not respond on behalf of the "Legislature as a whole" or any other legislators and quoting from the legislative fact sheets). That the Legislators did not withhold responsive non-privileged documents from production on relevance grounds is not a waiver as to the lack of relevance of the privileged documents or the Legislators' depositions.[6]

### D. The Legislators' Statutory Authority to Intervene Applies in Federal Court as Well as State Court.

As noted in the Legislators' motion to intervene (Doc. 348 at 9) and not challenged in Plaintiffs' response to that motion (Doc. 354), another district court has recently rejected Plaintiffs' new argument that A.R.S. § 12-1841 only applies to state court actions: "[N]othing in the language of § 12-1841 imposes such a limitation. To the contrary, § 12-1841(A) says it applies 'in *any* proceeding in which a state statute, ordinance, franchise or rule is alleged to be unconstitutional[.]' (Emphasis added.) Any means any." *Isaacson v. Mayes,* No. CV-21-01417-PHX-DLR, 2023 WL 2403519 (D. Ariz. Mar. 8, 2023).

---

[6] Plaintiffs also cannot rely upon their own letter to establish a waiver by the Legislators. *See* Opp. p. 16 (citing Doc. 500-1 Ex. C).

20

Kevin E. O'Malley (Bar No. 006420)
Hannah H. Porter (Bar No. 029842)
Ashley E. Fitzgibbons (Bar No. 036295)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:    (602) 530-8000
Facsimile:    (602) 530-8500
kevin.omalley@gknet.com
hannah.porter@gknet.com
ashley.fitzgibbons@gknet.com
*Attorneys for Intervenor-Defendants Speaker
Toma and President Petersen*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, | No. 2:22-cv-00509-SRB (Lead) |
| Plaintiff, | **INTERVENOR-DEFENDANTS SPEAKER OF THE HOUSE BEN TOMA AND SENATE PRESIDENT WARREN PETERSEN'S ANSWERS TO CONSOLIDATED PLAINTIFFS' FIRST SET OF INTERROGA-TORIES** |
| v. | |
| Adrian Fontes, in his official capacity as Arizona Secretary of State, et al., | |
| Defendant. | |
| AND CONSOLIDATED CASES | |

Pursuant to Federal Rules of Civil Procedure 26 and 33, Intervenor-Defendants Speaker of the House Ben Toma and Senate President Warren Petersen (the "Speaker" and "President," respectively), by and through counsel undersigned, hereby answer Consolidated Plaintiffs' First Set of Interrogatories as follows:

## **GENERAL OBJECTIONS**

The Speaker and President generally object to the interrogatories as follows:

1.     The Speaker and President object to each interrogatory to the extent such interrogatory seeks information beyond the scope of discovery as contemplated by the Federal Rules of Civil Procedure.  Specifically, the Speaker and President object to the extent such interrogatory seeks information that is not relevant to the parties' claims or defenses and not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

2.     The Speaker and President object to each interrogatory to the extent such interrogatory is compound, describing more than one item or distinct category of items, and therefore should count as multiple requests under Federal Rule of Civil Procedure 33.

3.     The Speaker and President object to all instructions, definitions, and interrogatories to the extent they seek information not known or reasonably accessible to the Speaker and President on the grounds that such instructions, definitions, and requests seek to require more from the Speaker and President than any obligation imposed by law would subject the Speaker and President to unreasonable and undue oppression, and would seek to impose upon the Speaker and President an obligation to investigate or discover information equally accessible to Plaintiffs.

4.     The Speaker and President object to Definition 2, to the extent it defines "Arizona Legislature" to exceed the scope of Federal Rule of Civil Procedure 33. The Speaker and President cannot answer on behalf of every member and staff of the Arizona House of Representatives and Arizona Senate.

5.     The Speaker and President object to Definition 5, to the extent it defines "document" to exceed the scope of Federal Rule of Civil Procedure 34.

**DE-SER-34**

6.      The Speaker and President object to Definition 7 regarding "Nonstandard Address." This definition is vague, subjective, ambiguous and unclear. As defined in Definition 7, "Nonstandard Address" includes <u>but is not limited to</u> certain types of addresses such as addresses that "are not typically geocoded."

7.      The Speaker and President object to Definition 9, to the extent it defines "You" or "your" to include "any" successors and predecessors since January 1, 2020, "any past and present employees, staff, agents, assigns, and representatives of the Speaker of the House or Senate President" at any time, and "any other persons or entities that, at any time, acted on behalf or for the benefit of the Speaker of the House or the Senate President." This definition is vague, ambiguous, overbroad, seeks information not reasonably accessible to the Speaker and President, and exceeds the scope of the Federal Rules of Civil Procedure. The Speaker and the President cannot answer on behalf of any person or entity that has ever, at any point in time, acted on behalf of or for the benefit of someone holding the position of the Speaker of the House or the Senate President.

8.      The Speaker and President object generally to the interrogatories to the extent they seek information, at least some of which is protected by the legislative privilege, attorney-client privilege, work product doctrine, and/or any other form of protection from disclosure.

9.      The Speaker and President expressly incorporate each of the foregoing General Objections into each specific response to the interrogatories set forth below as if set forth in full therein.  Responses to the interrogatories are not intended to be a waiver of any applicable specific or general objection to such request.

Subject to and without waiving its General Objections, and incorporating each of them as warranted, the Speaker and President responds as follows:

### INTERROGATORIES

**<u>INTERROGATORY NO. 1</u>:**

1    Identify and describe the purposes of the Challenged Laws, including but not

2 limited to what they were aimed at accomplishing and their anticipated or likely impact or

3 effect.  Your answer should also identify by name any witnesses who have or are likely to

4 have knowledge or information related to the purposes or anticipated effects of the

5 Challenged Laws, or evidence thereof.

6    **OBJECTIONS:**

7    The Speaker and President object that this request is vague and ambiguous.

8    The Speaker and President further object that the interrogatory is compound, as it

9 seeks more than one category of information.

10    Furthermore, to the extent this request seeks to compel the Speaker and the

11 President to discuss their legislative activity in connection with the Challenged Laws,

12 such information is protected by the legislative privilege.  *See Puente Arizona v. Arpaio*,

13 314 F.R.D. 664 (D. Ariz. 2016); *see also League of Women Voters of Florida, Inc. v. Lee*,

14 2021 WL 5283949 (N.D. Fla. 2021); *Jackson Municip. Airport Auth. v. Harkins,* 67 F.4th

15 678, 2023 WL 3333607 (5th Cir. 2023); *La Union Del Pueblo Entero v. Abbott,* 68 F.4th

16 228, 2023 WL 3494770 (5th Cir. 2023); *In re N. Dakota Legislative Assembly*, No. 23-

17 1600, 2023 WL 3831550 (8th Cir. June 6, 2023).

18    Furthermore, the legislative privilege is individual to each legislator, and therefore

19 the Speaker and President cannot waive the privilege for any other individual legislators.

20    **ANSWER:**

21    Subject to and without waiving the foregoing objections, the Speaker and President

22 respond as follows:

23    The Speaker and the President can only respond to this interrogatory on their own

24 behalf and not on behalf of the Arizona Legislature as a whole or on behalf of any other

25 legislator. It is the Speaker and the President's position that the Challenged Laws allow

26 for the government to ensure that persons who have registered to vote are eligible to vote,

1    i.e. that they meet the residence and citizenship requirements to vote under Arizona law. It

2    is the Speaker and the President's position that the Challenged Laws were not intended to

3    discriminate against any individual on the basis of race or national origin.

4         H.B. 2243 "[r]equires a county recorder to cancel the voter registration of a person

5    from whom the county recorder receives and confirms information that the person is not a

6    U.S. citizen, is not an Arizona resident or has been issued a driver's license or

7    nonoperating license in another state. [H.B. 2243] outlines notice requirements prior to

8    cancelling a person's voter registration. [H.B. 2243] requires the Secretary of State (SOS)

9    and a county recorder to compare the voter registration database with prescribed

10   databases." Amended Fact Sheet for H.B. 2243, Arizona State Senate, Fifty-Fifth

11   Legislature, Second Regular Session, July 22, 2022.

12        H.B. 2617 "[r]equires a county recorder to cancel the voter registration of a person

13   for whom the county recorder receives and confirms information that the person is not a

14   U.S. citizen, has been issued a driver license or nonoperating license in another state or is

15   otherwise not a qualified elector. [H.B. 2617] outlines notice requirements prior to

16   canceling a person's voter registration. [H.B. 2617] requires the Secretary of State (SOS)

17   and a county recorder to compare the voter registration database with prescribed

18   databases." Amended Fact Sheet for H.B. 2617, Arizona State Senate, Fifty-Fifth

19   Legislature, Second Regular Session, May 23, 2022.

20        H.B. 2492 "[r]equires a person to provide satisfactory evidence of citizenship in

21   order to be deemed a qualified elector. [H.B. 2492] requires a person to provide proof of

22   location of residence in order to be presumed to be properly registered to vote. [H.B.

23   2492] outlines requirements for verification of citizenship by a counter recorder and the

24   Attorney General (AG)." Fact Sheet for H.B. 2492, Arizona State Senate, Fifty-Fifth

25   Legislature, Second Regular Session, March 8, 2022.

26        Upon information and belief, the members of the Fifty-Fifth Legislature, Second

1   Regular Session of the Arizona Legislature may have knowledge relevant to the above

2   interrogatory; however, the legislative privilege may bar discovery into this topic and the

3   legislative process.

4

5   **INTERROGATORY NO. 2:**

6       Identify each instance in which the Arizona Legislature has established that a non-

7   U.S. citizen has registered to vote in Arizona since January 1, 2016, including any

8   supporting evidence thereof.  Your answer should identify by name any witnesses who

9   have or are likely to have knowledge or information related to non-U.S. citizens

10  registering to vote in Arizona or evidence thereof.

11      **OBJECTIONS:**

12      The Speaker and President object that this interrogatory is overbroad, unduly

13  burdensome and disproportional to the needs of the case.

14      The Speaker and President further object that this interrogatory is vague and

15  ambiguous. The Speaker and President further object that the interrogatory is compound,

16  as it seeks more than one category of information.

17      The Speaker and President further object to the extent that this interrogatory seeks

18  information related to the entire Arizona Legislature and all of its members, which is

19  therefore outside the scope of the Speaker and President's knowledge. This request could

20  also call for information protected by the legislative privilege.

21      **ANSWER:**

22      Subject to and without waiving the foregoing objections, the Speaker and President

23  respond as follows:

24

25

26

1   It is not the role of the Arizona Legislature, as a legislative body, to "establish"

2   whether a non-U.S. citizen has registered to vote in Arizona. Enforcement of Arizona's

3   voting laws is a duty of the executive branch.

4   Upon information and belief, current and former members of the Arizona Attorney

5   General's office may have information related to the enforcement of Arizona's voting

6   laws and whether any individual has violated said laws.  Upon information and belief,

7   county officials may also have information related to the enforcement of Arizona's voting

8   laws and whether any individual has violated said laws.

9

10  **INTERROGATORY NO. 3:**

11  Identify each instance in which the Arizona Legislature has established that a non-

12  U.S. citizen has voted in Arizona since January 1, 2016, including any supporting

13  evidence thereof.  Your answer should identify by name any witnesses who have or are

14  likely to have knowledge or information related to non-U.S. citizens registering to vote in

15  Arizona or evidence thereof.

16  **OBJECTIONS:**

17  The Speaker and President object that this interrogatory is overbroad, unduly

18  burdensome and disproportional to the needs of the case.

19  The Speaker and President further object that this interrogatory is vague and

20  ambiguous. The Speaker and President further object that the interrogatory is compound,

21  as it seeks more than one category of information.

22  The Speaker and President further object to the extent that this interrogatory seeks

23  information related to the entire Arizona Legislature and all of its members, and which is

24  therefore outside the scope of the Speaker and President's knowledge. This request could

25  also call for information protected by the legislative privilege.

26  **ANSWER:**

1    Subject to and without waiving the foregoing objections, the Speaker and President

2    respond as follows:

3    It is not the role of the Arizona Legislature, as a legislative body, to "establish"

4    whether a non-U.S. citizen has voted in Arizona. Enforcement of Arizona's voting laws is

5    a duty of the executive branch.

6    Upon information and belief, current and former members of the Arizona Attorney

7    General's office may have information related to the enforcement of Arizona's voting

8    laws and whether any individual has violated said laws.  Upon information and belief,

9    county officials may also have information related to the enforcement of Arizona's voting

10   laws and whether any individual has violated said laws.

11

12   **INTERROGATORY NO. 4:**

13   Identify every type of document a person who resides in a location with only a

14   Nonstandard Address can use to prove the location of their residence under A.R.S. § 16-

15   123, including a description of all the elements each document must contain to satisfy the

16   proof of location of residence requirement and an explanation of the basis of Your belief

17   that persons who reside in locations with only Nonstandard Addresses have such

18   documents available to them.  Your answer should identify by name any witnesses who

19   have or are likely to have knowledge or information about the availability of satisfactory

20   documents for persons residing in locations with only Nonstandard Addresses.

21   **OBJECTIONS:**

22   The Speaker and President object that this interrogatory is vague and ambiguous.

23   The definition of a "Nonstandard Address" is vague, subjective, and is not a limited

24   definition.

25   The Speaker and President further object to this interrogatory to the extent it seeks

26   information outside the scope of the Speaker and President's knowledge, especially as it

asks for "Your belief" regarding whether unidentified persons have documents available to them. As noted above, Plaintiffs' definition of "Your" includes "any" successors and predecessors since January 1, 2020, "any past and present employees, staff, agents, assigns, and representatives of the Speaker of the House or Senate President" at any time, and "any other persons or entities that, at any time, acted on behalf or for the benefit of the Speaker of the House or the Senate President." The Speaker and President cannot answer whether these other individuals have or do not have a belief about whether unidentified persons have certain documents available to them.

The Speaker and President further object that the interrogatory is compound, as it seeks more than one category of information.

**ANSWER:**

Subject to and without waiving the foregoing objections, the Speaker and President respond as follows:

It is the Speaker and the President's position that A.R.S. § 16-123 does not provide an exhaustive list of permissible documentation for proof of location of residence. Section 16-123 states that "[a]ny" of the identifying documents prescribed in § 16-579(A)(1) "constitutes satisfactory proof of location of residence." The statute does not specify that such documents are the only acceptable proof of location of residence.

The remainder of the request is overbroad and premature. The Speaker and the President cannot identify "every type of document" any person may use to prove location of residence absent a specific factual context.

Upon information and belief, the Secretary of State may have knowledge or information relevant to this request. Furthermore, to the extent that any of the individual members of the non-U.S. Plaintiffs' groups "reside in a location with only Nonstandard Addresses," they may have knowledge or information regarding which documents are available to them.

9

RESPECTFULLY SUBMITTED this 23rd day of June, 2023.

GALLAGHER & KENNEDY, P.A.


By: ___*/s/ Hannah H. Porter*_____
    Kevin E. O'Malley
    Hannah H. Porter
    Ashley E. Fitzgibbons
    2575 East Camelback Road
    Phoenix, Arizona 85016-9225
    *Attorneys for Intervenor-Defendants*
    *Speaker Toma and President Petersen*


## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2023, I transmitted via electronic mail a copy of the foregoing to all parties, c/o their respective counsel.


        ___*/s/ Hannah H. Porter*_____
        *Attorneys for Intervenor-Defendants*
        *Speaker Toma and President Petersen*

9554512v1/40847-0004

WILMERHALE

July 5, 2023

**Christopher E. Babbitt**

+1 202 663 6681 (t)
+1 202 663 6363 (f)
christopher.babbitt@wilmerhale.com

**By E-mail**

Hannah Porter
Kevin O'Malley
Gallagher & Kennedy
2575 E. Camelback Rd, Suite 1100
Phoenix, AZ 85016
hannah.porter@gknet.com

Re: *Mi Familia Vota v. Mayes*, No. 22-CV-509-SRB – Legislative Intervenors' Discovery
    Obligations

Dear Ms. Porter:

This letter memorializes our June 29 meet-and-confer discussion regarding: (1) the May 17
discovery requests to your clients and (2) the format and scope of their depositions in light of
your assertion of legislative privilege as a shield to such discovery. We appreciate the
opportunity to work with you in good faith to narrow the issues in dispute. As explained below,
our understanding from the call is that any remaining areas of disagreement are subsumed within
the parties' threshold disagreement over the availability and application of the legislative
privilege.

## I.     Intervenor-Defendants' Participation in this Case

**June 29 discussion.** As noted in advance of the call, your clients' motion to intervene expressly
states: "The Speaker and the President seek to intervene in their official capacities, *and on behalf
of their respective legislative chambers, which together comprise the Fifty-Sixth Legislature of
Arizona.*" ECF 348 at p. 4 (emphasis added). You stated by email, however, that you "do not
agree with [the] premise that the Speaker and the President intervened on behalf of their
respective chambers." Porter email (June 23, 2023). Accordingly, I started our substantive
discussion on June 29 by asking for an explanation of your clients' role in the case.

You stated that Speaker Toma and President Petersen intervened "to vindicate an interest shared
by the Legislature to defend the bills" challenged in the litigation; that they are designated by
statute (i.e., A.R.S. §12-1841.D) as having an interest in the validity of state laws; and that the
purpose of their intervention was "to assert a legal defense" to the challenged legislation.

In turn, I asked whether your reference to "a legal defense" meant that your clients do not intend
to offer any factual evidence or testimony, particularly in light of your response to Interrogatory
No. 1, which response states: "It is the Speaker and the President's position that the Challenged
Laws *were not intended* to discriminate against any individual on the basis of race or national

WILMERHALE

Hannah Porter
July 5, 2023
Page 2

origin." You said that you answered the interrogatory only because it was asked, but that you do not intend to call your clients—or any other witness—at trial, or to offer any evidence or testimony from witnesses via affidavit, declaration, or otherwise. However, you also said that that was your intent "at this time," and that you would disclose any change of plans "in sufficient time" for any witnesses to be deposed. [1]

You also confirmed that you did not intend to rely on any legislative materials other than what is publicly available from the Arizona Legislature website, www.azleg.gov, to defend the legislation. In contrast to witness testimony, moreover, you did not seek to leave open the possibility that your position could change.

**Plaintiffs' position.** The non-US plaintiffs' position is that your clients have waived any legislative privilege by: (i) affirmatively intervening as parties, not just for themselves but "on behalf of their respective legislative chambers"; (ii) purporting to offer evidence regarding the legislative intent of the challenged legislation; and (iii) leaving open the possibility that your clients or other legislative witnesses might offer evidence in defense of the legislation. *See, e.g., Powell v. Ridge*, 247 F.3d 520, 525 (3d Cir. 2001). Absent a resolution of this critical issue among the parties, we believe the availability and application of the legislative privilege is appropriate to present to Judge Bolton promptly for decision.

## II.  Requests for Production of Documents

**June 29 discussion.** You confirmed on our call that you were applying the parties' previously agreed-upon search terms and time limitations (Nov. 1, 2021 to July 15, 2022) to your clients' documents and that you were not withholding any materials from review or production on the basis of any of the objections stated in your initial responses to our May 17 requests for production other than privilege (i.e., vagueness, overbreadth, undue burden, or relevance). You further confirmed that you are on track to complete production of non-privileged documents and provide a privilege log by July 10.

We understand from the call that, out of the more than 10,000 documents that you are reviewing, only a very small number will be produced on July 10 because you intend to assert legislative privilege over any materials related to the legislative process, including communications among legislators, legislative staff, or with third parties, because your position is that "legislative privilege covers … the legislative process as a whole," meaning that communications reflecting "legitimate legislative activity" are not subject to discovery and will not be produced.

---

[1] As I noted on our call, your clients' initial disclosures do not identify *any* legislative witnesses (including Speaker Toma or President Peterson). Those initial disclosures were untimely when served on June 27 (they were due May 26, 30 days after the motion to intervene was granted), and we expressly reserve all objections to any potential amendments to add additional witnesses in the future.

**DE-SER-44**

WILMERHALE

Hannah Porter
July 5, 2023
Page 3

**Plaintiffs' position.** As noted, the non-US plaintiffs' position is that under *Powell* and similar cases, the legislative privilege does not apply where, as here, legislators voluntarily intervene in ongoing litigation against other state officials. Our expectation, therefore, is that your July 10 production will not fulfill our view of your clients' obligations to produce documents in response to our May 17 requests. You stated that you would review the Third Circuit's *Powell* decision in light of our discussion to see if any resolution is possible before the issue is presented to Judge Bolton.

### III.  Interrogatories

**June 29 discussion.** As with the requests for production, you confirmed that your clients are not limiting their answers on the basis of any objections other than privilege. With respect to Interrogatories 2 and 3, which concern any instance in which the Legislature has established that non-citizens have either registered or voted in Arizona elections (and any evidence thereof), you reiterated the point made in your June 23 written interrogatory responses—i.e., that "[i]t is not the role of the Arizona Legislature, as a legislative body, to 'establish'" whether non-U.S. citizens have registered to vote, or voted, in Arizona—and you confirmed that your clients would not be offering any legislative evidence regarding non-citizen registration or voting as a basis for the enactment of the challenged legislation.

**Plaintiffs' position.** We will review your interrogatory responses in light of our discussion and any resolution of other open issues to determine whether any additional action is needed.

### IV.  Depositions

**June 29 discussion.** You outlined your objections to a potential 30(b)(6) deposition of the Legislature, because (in your view) it would be impossible for Speaker Toma or Senate President Peterson (or any other designee) to testify "on behalf" of the Legislature as a whole, particularly with respect to legislative intent, as the question of what any specific legislator intended is individualized. In turn, I noted that, whatever issues there may be with respect to individual legislators' intent, Rule 30(b)(6) provides a well-established mechanism to take discovery of organizations and that your clients intervened "on behalf of their respective legislative chambers."

We agreed that, if the non-U.S. plaintiffs press forward with a 30(b)(6) deposition notice, we will send you our proposed topics for the deposition so that the parties can meet and confer further in that regard.

We also discussed the likelihood that the same disagreement over the application of legislative privilege summarized above would arise during depositions of your clients, whether in a 30(b)(6) or 30(b)(1) deposition. Both sides agreed that, in the event our dispute regarding the application

WILMERHALE

Hannah Porter
July 5, 2023
Page 4

of legislative privilege cannot be resolved by the parties, we should seek guidance from Judge
Bolton before any depositions of your clients proceed.

**Plaintiffs' position.**  The non-U.S. plaintiffs' position is that a 30(b)(6) deposition is appropriate
because your clients have intervened on behalf of their respective chambers.  However, we
believe that the scope of any deposition—whether under 30(b)(1) or 30(b)(6)—will
fundamentally be determined by the availability and applicability of any legislative privilege.
Accordingly, we believe it is appropriate to resolve that issue in the first instance, either among
the parties or with the assistance of the court in short order.

### V.      Conclusion

Given the short time remaining for discovery, please let us know **by July 10** whether you have
any corrections or modifications to the positions stated in this letter, and whether you intend to
stand on your assertion of legislative privilege in response to the pending discovery requests and
in any deposition of your clients.  Assuming the parties' positions have not changed, we can
proceed to present the privilege question to the court promptly for resolution.

Sincerely,

Christopher E. Babbitt

cc:
Molly Danahy, Campaign Legal Center
Christopher Dodge, Elias Law Group
Ernest Herrera, MALDEF
Leah Novak, Arnold & Porter
Amit Makker, Latham & Watkins
Cat Rizzoni, Latham & Watkins

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

|  |  |
|---|---|
| Mi Familia Vota, et al., | Case No. 2:22-cv-00509-PHX-SRB |
| Plaintiffs, | (Lead) |
| v. |  |
| Adrian Fontes, in his official capacity as Arizona Secretary of State, et al., Defendants. |  |
| AND CONSOLIDATED CASES. | No. CV-22-00519-PHX-SRB<br>No. CV-22-01003-PHX-SRB<br>No. CV-22-01124-PHX-SRB<br>No. CV-22-01369-PHX-SRB<br>No. CV-22-01381-PHX-SRB<br>No. CV-22-01602-PHX-SRB<br>No. CV-22-01901-PHX-SRB |

## PLAINTIFFS' NOTICE OF DEPOSITION OF SPEAKER BEN TOMA AND PRESIDENT WARREN PETERSON UNDER RULES 30(b)(1) AND 30(b)(6)

PLEASE TAKE NOTICE that pursuant to Rules 30(b)(1), and 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs in the above-captioned action, by their counsel, will take the deposition(s) of Intervenor-Defendants Ben Toma, Speaker of the Arizona House of Representatives, Warren Petersen, President of the Arizona Senate (collectively "Intervening Legislator Defendants"), and/or person(s) designated by Intervening Legislator Defendants to testify on the behalf of the Arizona House of Representatives and the Arizona Senate, respectively.

Pursuant to Rule 30(b)(1) of the Federal Rules of Civil Procedure, Plaintiffs, by their counsel, will take the deposition of Intervening Legislator Defendants.

**DE-SER-47**

In addition, because Intervening Legislator Defendants have intervened "in their official capacities, and on behalf of their respective legislative chambers," Dkt. 348 at 4, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs will take the deposition of Intervening Legislator Defendants or person(s) designated by Intervening Legislator Defendants to testify on the behalf of the Arizona House of Representatives and the Arizona Senate, respectively, regarding the topics described in Exhibit A, attached hereto.

The depositions will be taken upon oral examination before an official authorized by law to administer oaths under the Federal Rules of Civil Procedure and will be recorded by stenographic and videographic means.  The deposition will be conducted no later than August 4, 2023, at a time and place agreed among the parties.

Dated: July 17, 2023 [DRAFT FOR DISCUSSION ON JULY 18 MEET & CONFER]

## EXHIBIT A

Pursuant to Federal Rule of Procedure 30(b)(6), Plaintiffs provide the following description of topics for examination at the deposition of the Intervening Legislator Defendants or person(s) designated by Intervening Legislator Defendants to testify on the behalf of the Arizona House of Representatives and the Arizona Senate, respectively.

### DEFINITIONS

Except as specifically defined below, the following terms shall be construed and defined in accordance with the Federal Rules of Civil Procedure, wherever applicable. Any terms not defined shall be given their ordinary meaning.

1.      "Arizona Legislature" means the members and staff of the Arizona Senate and Arizona House of Representatives.

2.      "Attorney General" means the Arizona Attorney General's Office and includes the Arizona Attorney General Kris Mayes and her predecessors and successors in their official capacities as Arizona Attorney General, as well as the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, and consultants of the Arizona Attorney General's Office.

3.      "Challenged Laws" means Arizona House Bill 2492 signed into law by the Governor on March 30, 2022, Chapter 99 to Session Laws from the Fifty-fifth Legislature Second Regular Session 2022, and Arizona House Bill 2243 signed into law by the Governor on July 6, 2022, Chapter 370 to Session Laws from the Fifty-fifth Legislature Second Regular Session 2022.

4.      "H.B. 2617" means House Bill 2617 introduced into the Arizona House of Representatives on January 31, 2022 from Fifty-Fifth Legislature Second Regular Session 2022.

5.      "Governor" means the Office of the Arizona Governor and includes the Arizona Governor Katie Hobbs and her predecessors and successors in their official capacities as Arizona Governor, as well as the current and former employees, officers,

attorneys, agents, trustees, investigators, representatives, contractors, and consultants of the Office of the Arizona Governor.

6.  "Secretary of State" means the Arizona Secretary of State's Office and includes the Arizona Secretary of State Adrian Fontes and his predecessors and successors in their official capacities as Arizona Secretary of State, as well as the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, and consultants of the Arizona Secretary of State's Office.

7.  "Senate President" means the position and office of the President of the Arizona Senate, including all members and staff of that office.

8.  "Speaker of the House" means the position and office of the Speaker of the Arizona House of Representatives, including all members and staff of that office.

9.  "You" and "your" mean Intervening Legislator Defendants Speaker of the House Ben Toma and Senate President Warren Petersen, and include any successors to the positions of Speaker of the House or the Senate President; any predecessors occupying those offices since January 1, 2020; any past and present employees, staff, agents, assigns, and representatives of the Speaker of the House or the Senate President; and any other persons or entities that, at any time, acted on behalf or for the benefit of the Speaker of the House or the Senate President.

**DEPOSITION TOPICS**

1.  The Arizona Legislature's drafting, introduction, amendment, passage, and enactment of the Challenged Laws, including the committee and procedural process for the Challenged Laws, as well as the attempted passage of H.B. 2617.

2.  The Arizona Legislature's concerns, if any, about misconduct, fraud, election security, or a lack of voter confidence in election integrity related to citizenship, voters' residences, or proof of citizenship or residential addresses in voter registration, and any evidence considered by or provided to the Legislature purporting to substantiate such

concerns, which supported the introduction, passage, and/or enactment of the Challenged Laws.

3.      Instances in which the Arizona Legislature has identified, was aware of, or was provided evidence of a non-U.S. citizen having registered to vote in Arizona, which supported the introduction, passage, and/or enactment of the Challenged Laws.

4.      Instances in which the Arizona Legislature has identified, was aware of, or was provided evidence of a non-U.S. citizen having voted in Arizona, which supported the introduction, passage, and/or enactment of the Challenged Laws.

5.      The Arizona Legislature's consideration (if any) of whether the Challenged Laws would impact particular groups of voters more than others, such as particular racial or ethnic groups (including Native Americans), naturalized citizens, disabled voters, or voters of particular age groups.

6.      Communications (if any) between members of the Arizona Legislature and Executive Branch officials (including without limitation the Governor, Secretary of State, and Attorney General), their employees or campaign staff, federal or state legislators, county election officials, or any other public officials discussing the purpose or potential effects of the Challenged Laws.

7.      Communications (if any) between members of the Arizona Legislature and non-public officials, including individual constituents and third-party organizations (including but not limited to the Arizona Free Enterprise Club), regarding the purpose or potential effects of the Challenged Laws.

8.      Opinions, guidance, or testimony provided to the Arizona Legislature regarding the legality of the Challenged Laws, including, but not limited to, preemption of the Challenged Laws by the National Voter Registration Act (NVRA), excluding those protected by the attorney-client privilege.

9.      The objectives motivating the Arizona Legislature's introduction, passage, and enactment of the Challenged Laws, as well as any state interest believed to be advanced by the Challenged Laws.

/s/ *Christopher Dodge*
**HERRERA ARELLANO LLP**
Roy Herrera (AZ Bar No. 032901)
Daniel A. Arellano (AZ Bar. No. 032304)
Jillian L. Andrews (AZ Bar No. 034611)
530 East McDowell Road
Suite 107-150
Phoenix, Arizona 85004-1500
Phone: (602) 567-4820
roy@ha-firm.com
daniel@ha-firm.com
jillian@ha-firm.com

**ELIAS LAW GROUP LLP**
Marc E. Elias*
Elisabeth C. Frost*
Christopher D. Dodge*
Mollie DiBrell*
Alexander F. Atkins*
Daniela Lorenzo*
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Phone: (202) 968-4513
Facsimile: (202) 968-4498
melias@elias.law
efrost@elias.law
cdodge@elias.law
mdibrell@elias.law
aatkins@elias.law
dlorenzo@elias.law

*Attorneys for Mi Familia Vota and Voto Latino*

/s/ *Danielle Lang*
**BARTON MENDEZ SOTO**
James Barton (AZ Bar No. 023888)
401 W. Baseline Road
Suite 205
Tempe, AZ 85283
480-418-0668
james@bartonmendezsoto.com

**DEPARTMENT OF JUSTICE
SAN CARLOS APACHE TRIBE**
Alexander B. Ritchie
(AZ Bar No. 019579)
Attorney General

**CAMPAIGN LEGAL CENTER**
Danielle Lang*
Jonathan Diaz*
Molly Danahy*
Hayden Johnson*
Nicole Hansen*
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org

Chase A. Velasquez*
NM Bar No. 019148
Assistant Attorney General
Post Office Box 40
16 San Carlos Ave.
San Carlos, AZ 85550
Alex.Ritchie@scat-nsn.gov
Chase.Velasquez@scat-nsn.gov

**FREE SPEECH FOR PEOPLE**
Courtney Hostetler* (MA# 683307)
John Bonifaz* (MA# 562478)
Ben Clements* (MA# 555082)
Ronald Fein* (MA# 657930)
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org

nhansen@campaignlegalcenter.org

**MAYER BROWN LLP**
Lee H. Rubin* (CA# 141331)
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

Gary A. Isaac* (IL# 6192407)
Daniel T. Fenske* (IL# 6296360)
Jed W. Glickstein* (IL# 6315387)
William J. McElhaney, III*
(IL# 6336357)
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
dfenske@mayerbrown.com
gisaac@mayerbrown.com
jglickstein@mayerbrown.com

Rachel J. Lamorte* (NY# 5380019)
1999 K Street NW
Washington, DC 20006
(202) 362-3000
rlamorte@mayerbrown.com

*Attorneys for Living United for Change in Arizona, League of United Latin American Citizens, Arizona Students' Association, ADRC Action, Inter Tribal Council of Arizona, Inc., San Carlos Apache Tribe, and Arizona Coalition for Change*

/s/ Jon Sherman
**ARIZONA CENTER FOR LAW
IN THE PUBLIC INTEREST**
Daniel J. Adelman
352 E. Camelback Rd., Suite 200
Phoenix, AZ  85012
danny@aclpi.org
(602) 258-8850

**ARNOLD & PORTER
KAYE SCHOLER, LLP**

**FAIR ELECTIONS CENTER**
Jon Sherman*
Michelle Kanter Cohen*
1825 K St. NW, Ste. 450
Washington, D.C. 20006
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
(202) 331-0114

**ARNOLD & PORTER**

Steven L. Mayer*
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Steve.Mayer@arnoldporter.com
(415) 471-3100

**ARNOLD & PORTER
KAYE SCHOLER, LLP**
Leah R. Novak*
250 West 55th Street
New York, NY 10019
Leah.Novak@arnoldporter.com
(212) 836-8000

**KAYE SCHOLER, LLP**
Jeremy Karpatkin*
John A. Freedman*
Erica McCabe*
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Jeremy.Karpatkin@arnoldporter.com
John.Freedman@arnoldporter.com
Erica.McCabe@arnoldporter.com
(202) 942-5000

*Attorneys for Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund*

/s/ *Bruce Samuels*
**PAPETTI SAMUELS
WEISS MCKIRGAN LLP**
Bruce Samuels (AZ Bar No. 015996)
Jennifer Lee-Cota (AZ Bar No. 033190)
bsamuels@pswmlaw.com
jleecota@pswmlaw.com
Scottsdale Quarter
15169 North Scottsdale Road
Suite 205
Scottsdale, AZ 85254
+1 480 800 3530

**WILMER    CUTLER    PICKERING
HALE AND DORR LLP**
Seth P. Waxman*
Daniel S. Volchok*
Christopher E. Babbitt*
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
+1 202 663 6000 (telephone)
+1 202 663 6363 (facsimile)

*Attorneys for the Democratic National Committee and Arizona Democratic Party*

/s/ *Amit Makker*
**LATHAM & WATKINS LLP**
Sadik Huseny\*
*sadik.huseny@lw.com*
Amit Makker\*
*amit.makker@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

**SPENCER FANE**
Andrew M. Federhar
(AZ Bar No. 006567)
*afederhar@spencerfane.com*
2415 East Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 333-5430
Facsimile: (602) 333-5431

**ASIAN AMERICANS ADVANCING
JUSTICE-AAJC**
Niyati Shah\*
*nshah@advancingjustice-aajc.org*
Terry Ao Minnis\*
*tminnis@advancingjustice-aajc.org*
1620 L Street NW, Suite 1050
Washington, DC 20036
Telephone: (202) 296-2300
Facsimile: (202) 296-2318

*Attorneys for Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander
for Equity Coalition*

/s/ *Ernest Herrera*
**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND**
Ernest Herrera\*
Erika Cervantes\*
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266
eherrera@maldef.org
ecervantes@maldef.org

**ORTEGA LAW FIRM**
Daniel R. Ortega Jr.
361 East Coronado Road, Suite 101
Phoenix, AZ 85004-1525
Telephone: (602) 386-4455
Email: danny@ortegalaw.com

*Attorneys for Promise Arizona Plaintiffs*

/s/ *Allison Neswood*
**OSBORN MALEDON, P.A.**
David B. Rosenbaum
AZ No. 009819
Joshua J. Messer

**NATIVE AMERICAN RIGHTS FUND**
Allison A. Neswood\*
CO No. 49846
neswood@narf.org

AZ No. 035101
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
jmesser@omlaw.com

**LAWYERS COMMITTEE FOR
CIVIL RIGHTS UNDER LAW**
Ezra Rosenberg*
DC No. 360927, NJ No. 012671974
Jim Tucker**
AZ No. 019341
Ryan Snow*
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600 (main)
erosenberg@lawyerscommittee.org
jtucker@lawyerscommittee.org
rsnow@lawyerscommittee.org

**\*\*Admitted in Arizona, D.C. and Nevada.*

Michael S. Carter
AZ No. 028704, OK No. 31961
carter@narf.org
Matthew Campbell*
NM No. 138207, CO No. 40808
mcampbell@narf.org
Jacqueline D. DeLeon*
CA No. 288192
jdeleon@narf.org
1506 Broadway
Boulder, CO 80301
(303) 447-8760 (main)

Samantha B. Kelty
AZ No. 024110, TX No. 24085074
kelty@narf.org
950 F Street NW, Suite 1050,
Washington, D.C. 20004
(202) 785-4166 (direct)

**GILA RIVER INDIAN COMMUNITY**
Thomas L. Murphy
AZ No. 022953
Javier G. Ramos
AZ No. 017442
Post Office Box 97
Sacaton, Arizona 85147
(520) 562-9760
thomas.murphy@gric.nsn.us
javier.ramos@gric.nsn.us
*Representing Gila River Indian
Community Only*

**TOHONO O'ODHAM NATION**
Howard M. Shanker (AZ Bar 015547)
Attorney General, Tohono O'odham
Nation
Marissa L. Sites (AZ Bar 027390)
Assistant Attorney General, Tohono
O'odham Nation
P.O. Box 830
Sells, Arizona  85634
(520) 383-3410
Howard.Shanker@tonation-nsn.gov
Marissa.Sites@tonation-nsn.gov
*Representing Tohono O'odham Nation
Only*

*Attorneys for Tohono O'odham Nation, Gila River Indian Community,
Keanu Stevens, Alanna Siquieros, and LaDonna Jacket*

*\* Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on July XX, 2023, I served the foregoing **PLAINTIFFS'
NOTICE OF DEPOSITION OF SPEAKER BEN TOMA AND PRESIDENT
WARREN PETERSON UNDER RULE 30(b)(1) AND 30(b)(6)** on counsel of record
for all parties by email.

Dated: July XX, 2023

1   Kevin E. O'Malley (Bar No. 006420)
    Hannah H. Porter (Bar No. 029842)
2   Ashley E. Fitzgibbons (Bar No. 036295)
    GALLAGHER & KENNEDY, P.A.
3   2575 East Camelback Road
    Phoenix, Arizona 85016-9225
4   Telephone:   (602) 530-8000
    Facsimile:   (602) 530-8500
5   kevin.omalley@gknet.com
    hannah.porter@gknet.com
6   ashley.fitzgibbons@gknet.com
    *Attorneys for Intervenor-Defendants Speaker*
7   *Toma and President Petersen*

8

9                  UNITED STATES DISTRICT COURT

10                     DISTRICT OF ARIZONA

11   Mi Familia Vota,                      No. 2:22-cv-00509-SRB (Lead)

12                Plaintiff,               **INTERVENOR-DEFENDANTS
                                           SPEAKER TOMA AND PRESIDENT
13   v.                                    PETERSEN'S BRIEF RE
                                           LEGISLATIVE PRIVILEGE
14   Adrian Fontes, in his official capacity as   DISCOVERY DISPUTE**
     Arizona Secretary of State, et al.,
15
                 Defendant.
16

17   AND CONSOLIDATED CASES

18

19

20

21

22

23

24

25

26

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

1    Pursuant to the Court's July 26, 2023 Order (Doc. 479), Intervenor-Defendants

2    Speaker of the House Ben Toma and Senate President Warren Petersen (the "Speaker" and

3    "President" respectively) hereby submit their brief regarding the legislative privilege.

4    Contrary to the Consolidated Plaintiffs'[1] claim, the Speaker and President did not

5    implicitly waive their personal legislative privilege by intervening to defend the

6    constitutionality of the challenged bills pursuant to A.R.S. § 12-1841(D). The Speaker and

7    President have not affirmatively introduced or used privileged information to support their

8    defenses. In addition, a 30(b)(6) deposition is inappropriate, unduly burdensome, and barred

9    by the legislative privilege.

10   **I.    Background of the Dispute.**

11   On May 17, 2023, the Consolidated Plaintiffs issued requests for production and

12   non-uniform interrogatories to the Speaker and President. Pursuant to the parties'

13   agreement, the Speaker and President produced their initial responses to the discovery

14   requests on June 23, 2023, and produced over 5,000 pages of documents and a privilege log

15   on July 10, 2023. The privilege log was separated into categories for ease of reference: (1)

16   internal legislative emails (137 emails, not counting attachments); (2) emails with third

17   parties (48 emails, not counting attachments); (3) calendar appointments (~ 10,500 entries

18   including all attachments); and (4) attorney-client documents, which are not at issue.[2]

19   Counsel participated in multiple meet-and-confer discussions both before and after

20   the July 10 production. During those discussions, the Consolidated Plaintiffs asserted that

21   the Speaker and President waived any legislative privilege by affirmatively intervening as

22   parties. To be clear, Consolidated Plaintiffs have not individually challenged any documents

23   in the privilege log, nor have they challenged the scope or applicability of the legislative

24

25   [1] "Consolidated Plaintiffs" refers to all Plaintiffs other than the United States of America.

26   [2] On July 26, pursuant to the parties' agreement, the Speaker and President produced over 86,000 pages of documents that had initially been withheld on privilege grounds.

privilege to this case. Thus, as described to the Court at the July 25 hearing, the only question presented concerning the legislative privilege is one of waiver.

In addition, in discussions regarding scheduling of depositions, Consolidated Plaintiffs have taken the position that a Rule 30(b)(6) deposition of the Speaker and the President is appropriate. Consolidated Plaintiffs circulated a draft Rule 30(b)(6) Notice of proposed topics for such a deposition, which is attached as **Exhibit 1**.

## II.    Intervention Pursuant to A.R.S. § 12-1841(D) Does Not Waive the Speaker and the President's Individual Legislative Privilege.

Consolidated Plaintiffs' argument that the Speaker and the President have implicitly waived their individual legislative privileges by intervening in their official capacities pursuant to A.R.S. § 12-1841(D) does not accord with the doctrine of implied waiver and would chill participation by legislative leaders in cases such as this.

### A.    Implied Waiver Would Chill Participation in Lawsuits by Statutorily-Authorized Legislative Leaders.

Here, the Speaker and President intervened in their official capacities as the officials with authority in their respective legislative chambers to intervene pursuant to A.R.S. § 12-1841(D) after learning that the Attorney General's Office intended to take a different position with respect to some of the defenses raised in support of the challenged bills. *See* Doc. 348 at 2, 6. Essentially, the Speaker and President intervened to offer a different perspective of the State's interests, which the Supreme Court has found not only permissible, but useful.

"[W]hen a State chooses to allocate authority among different officials who do not answer to one another, different interests and perspectives, all important to the administration of state government, may emerge." *Berger v. N. Carolina State Conf. of the NAACP*, 142 S. Ct. 2191, 2201 (2022). "Permitting the participation of lawfully authorized state agents promotes informed federal-court decisionmaking and avoids the risk of setting

2        **DE-SER-60**

aside duly enacted state law based on an incomplete understanding of relevant state interests. . . . [A] full consideration of the State's practical interests may require the involvement of different voices with different perspectives." *Id.* at 2202-03.

Applying a blanket waiver of legislative privilege any time that the Speaker or President exercised their authority under A.R.S. § 12-1841(D) would necessarily chill participation by legislative leaders in such lawsuits and thus deprive federal courts of a full understanding or consideration of the State's interests.

In a similar situation involving the Democratic National Committee (DNC), Judge Rayes found that the DNC and other plaintiffs had not impliedly waived their First Amendment privilege by filing a lawsuit challenging Arizona's election regime. *Democratic Nat'l Comm. v. Arizona Sec'y of State's Off.*, No. CV-16-01065-PHX-DLR, 2017 WL 3149914 (D. Ariz. July 25, 2017). Judge Rayes noted that requiring the DNC or other civic organizations "to forfeit their First Amendment associational rights in order to challenge suspect voting practices could have a chilling effect on such litigation and on the vindication of voting rights." *Id.* at *4.

Judge Rayes cautioned that if the plaintiffs had relied on privileged information to support their claims, he may have found an implied waiver. But accepting the plaintiffs' assurance that they had not relied upon any privileged information or provided such information to their experts, the court found there was no implicit waiver. *Id.* at *4-5.[3]

The same holds true here for the other side of the "v." The Speaker and President should be allowed to intervene in their official capacities and exercise their statutory authority to defend the constitutionality of bills without forfeiting their individual legislative privilege. To be clear, the Speaker and the President did not hold those offices at the time the bills at issue were passed. They acted in their capacity as normal legislators.

---

[3] The court noted that an intervenor-defendant, the Arizona Republican Party, continued to assert the First Amendment privilege in response to discovery requests. *Id.* at *5.

**DE-SER-61**

But under Plaintiffs' implied waiver theory, the Speaker and President's participation in this case in their official capacities would waive their individual legislative privilege. The Court should avoid such an unjust result.

Furthermore, applying the legislative privilege in this case would further the purposes behind the privilege, including encouraging candid communications between legislators and promoting legislative independence. *See Lee v. City of Los Angeles*, 908 F.3d 1175, 1187 (9th Cir. 2018) ("The rationale for the privilege—to allow duly elected legislators to discharge their public duties without concern of adverse consequences outside the ballot box—applies equally to federal, state, and local officials."); *Mi Familia Vota v. Hobbs*, No. CV-21-01423-PHX-DWL, 2023 WL 4595824, at *12 (D. Ariz. July 18, 2023) ("It is self-evident that '[o]pen dialogue between lawmakers and their staff would be chilled if their subjective, preliminary opinions and considerations are potentially subject to public disclosure and critique.'") (quoting *Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.,* 269 F. Supp. 3d 124, 170 (S.D.N.Y. 2017)).

### B. The Speaker and President Have Not Used Privileged Information.

Furthermore, the Speaker and President have not impliedly waived their legislative privilege by putting privileged information at issue in this case.

The doctrine of implied waiver rests on the "fairness principle" "in terms of preventing a party from using the privilege as both a shield and a sword." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003). "In practical terms, this means that parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials." *Id.* As a result, an implied waiver should be "closely tailored" to the needs of the opposing party and should be "no broader than needed to ensure the fairness of the proceedings before it." *Id.*

Here, the Speaker and President have not asserted a defense based upon privileged materials or information that Plaintiffs cannot defend without access to that same privileged

**DE-SER-62**

1    information. To the contrary, the Speaker and President's defense with respect to legislative

2    intent relies solely upon the publicly available legislative history materials from the Arizona

3    Legislature's website. This position was noted both in the Speaker and the President's

4    answers to the interrogatories, as well as correspondence between counsel for the parties.

5         Consolidated Plaintiffs' NUI No. 1 asked the Speaker and the President to "[i]dentify

6    and describe the purposes of the Challenged Laws." The Speaker and President objected on

7    the grounds of legislative privilege to the extent that this interrogatory sought "to compel

8    the Speaker and the President to discuss their legislative activity." *See* Responses to NUI's,

9    attached as **Exhibit 2**, at 4. The Speaker and President further noted that they could not

10   "waive the privilege for any other individual legislators." *Id.*; *see Favors v. Cuomo,* 285

11   F.R.D. 187, 211 (E.D.N.Y. 2012) ("[A] legislator cannot assert or waive the privilege on

12   behalf of another legislator.").

13        Subject to and without waiving their objections, the Speaker and President then

14   outlined their legal position that they are taking as intervenors in their official capacities in

15   this case (as opposed to some type of binding statement on behalf of the entire Arizona

16   Legislature). Exhibit 2, at 4. Specifically, the Speaker and President explained:

17            The Speaker and the President can only respond to this interrogatory on their
             own behalf and not on behalf of the Arizona Legislature as a whole or on
18            behalf of any other legislator. It is the Speaker and the President's position
             that the Challenged Laws allow for the government to ensure that persons
19            who have registered to vote are eligible to vote, i.e. that they meet the
             residence and citizenship requirements to vote under Arizona law. It is the
20            Speaker and the President's position that the Challenged Laws were not
             intended to discriminate against any individual on the basis of race or
21            national origin.

22   *Id.* at 4-5. The rest of the response then quoted from the publicly available fact sheets

23   describing the challenged laws. *Id.* In response to the request to identify individuals who

24   may have knowledge regarding the interrogatory, the Response stated that members of the

25

26

Arizona legislature could have knowledge regarding the interrogatory, "however, the legislative privilege may bar discovery into this topic and the legislative process." *Id.* at 5.

Thus, while the Speaker and the President have taken a legal position that the bills do not unconstitutionally discriminate on the basis of race or national origin, neither the Speaker nor the President intend to personally offer testimony (either oral or via affidavit) regarding their personal motives for voting on the challenged bills. Indeed, the Speaker and the President have not identified any individual legislators as persons with knowledge that they may use to support their defenses. *See* Intervenor-Defendants' Initial Disclosure Statement, attached as **Exhibit 3**.

Undersigned counsel has affirmed in writing to the Consolidated Plaintiffs that the Speaker and the President will not put on testimony from *any legislators* regarding information protected by the legislative privilege. For any avoidance of doubt, the Speaker and the President make the same avowal to the Court:  the Speaker and the President will not rely upon any withheld documents, nor will they present testimony from any state legislator (including themselves) regarding his or her consideration of or passage of the challenged bills.

For this reason, the fact that the Speaker and the President have denied Plaintiffs' allegations of discriminatory intent in their answers to Plaintiffs' complaint, did not put privileged information at issue. Rather, they will rely upon publicly available information to defend Plaintiffs' claims regarding motivation.

Theoretically, the Speaker and President could have gone beyond the public record and offered testimony of their personal knowledge and motives with respect to the challenged bills to defend against Plaintiffs' claims. If the Speaker and President had selectively relied upon privileged information outside of the public record while foreclosing Plaintiffs' ability to take discovery into that information, arguably that would be an

improper use of the privilege as a sword and shield, but that has not happened here. Because there has been no unfair use of privileged information, there is no need to imply a waiver.

### C. *Powell v. Ridge* Is Distinguishable.

For these same reasons, Consolidated Plaintiffs' reliance upon *Powell v. Ridge*, 247 F.3d 520, 525 (3d Cir. 2001) is misplaced.

The legislators who intervened in *Powell* did not intervene pursuant to a state statute similar to A.R.S. § 12-1841(D), but instead intervened in a challenge to the state's formula for allocation of federal education monies to assert "their financial and legal interests in the litigation." 247 F.3d at 522. In other words, the intervenors in *Powell* had no statutory authority to intervene and did so in their personal capacities. Furthermore, the intervenors in *Powell* sought to "testify at trial, but not be cross-examined." *Id.* at 525. The Third Circuit held that this novel position was not sufficiently well-founded in case law to provide jurisdiction for an interlocutory appeal. *Id.*

In contrast, as noted above, the Speaker and the President intervened in their official capacities pursuant to A.R.S. § 12-1841(D) to present their views on the State's interests, when they learned that the Attorney General's office was changing its position on some of the issues in this case. And, unlike the intervenor legislators in *Powell*, the Speaker and the President do not seek to testify at trial or otherwise put on evidence of their individual motives with respect to the challenged bills. Because the Speaker and the President are not testifying on privileged topics yet seeking to avoid cross-examination, *Powell* is not on point.

### III. A 30(b)(6) Deposition Is Not Appropriate and Barred By the Privilege.

Consolidated Plaintiffs' draft deposition notice, which seeks individual testimony from the Speaker and President as well as a 30(b)(6) representative from the House and the Senate to testify on a wide variety of topics, is inappropriate and unworkable.

The proposed topics can be summarized as following:

- The Legislature's concerns, considerations, motives or objectives in passing the bills (Topics 2, 5, 9);
- Evidence presented to or considered by the Legislature regarding the bills' effects, legality of the bills, or non-citizens voting (Topics 3, 4, 5, 8);
- Communications with other legislators or individuals outside the legislature regarding the bills (Topics 6, 7); and
- The process of drafting, amending, and passage of the bills (Topic 1).

All of these topics seek information regarding legislative activities, and thus are covered by the legislative privilege. *Puente Arizona v. Arpaio*, 314 F.R.D. 664, 670 (D. Ariz. 2016). The Supreme Court has warned that even in "extraordinary instances" where legislative history may be "highly relevant," testimony from legislative members concerning legislative intent "frequently will be barred by privilege." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977). Despite not contesting the applicability of the legislative privilege to this case, Consolidated Plaintiffs appear to ignore the fact that putting forth an individual to testify on these topics would effectively force a waiver of every single legislator's individual legislative privilege.

In any event, the Speaker and President are not entities subject to Rule 30(b)(6). Recognizing this, Consolidated Plaintiffs claim that the Senate and the House are the true intervenor-defendants. But even the Consolidated Plaintiffs' Response to the Speaker and President's motion to intervene identified "Representative Ben Toma, Speaker of the Arizona House of Representatives, and Senator Warren Petersen, President of the Arizona Senate" as the "Movants." Doc. 354, p. 2. Regardless, A.R.S. § 12-1841(D) authorizes the Speaker of the House and the Senate President to intervene, not the House and the Senate.

Moreover, the notice of deposition would allow Plaintiffs to exceed the agreed-upon deposition limits. Pursuant to the Court's July 11, 2023 Order, Plaintiffs can take ten non-County Recorder fact depositions, which includes "single-day depositions of the two Legislative Intervenor-Defendants." Yet, the proposed notice combines a 30(b)(1) deposition for the Speaker and President's individual testimony with 30(b)(6) depositions

1    of the House and Senate. *See* Exh. 1. Thus, Plaintiffs' proposal would allow Plaintiffs to

2    take 12 non-County Recorder fact depositions, not 10.

3          Even beyond these issues, a 30(b)(6) deposition on the topics proposed by the

4    Consolidated Plaintiffs is unworkable in terms of preparing and identifying a single witness

5    who can present binding testimony on behalf of the Fifty-Fifth Legislature, Second Regular

6    Session of the Arizona Legislature, which consists of 90 individual members (some of

7    whom are no longer serving as legislators).

8          In order to adequately prepare for a 30(b)(6) deposition on these topics, the House

9    and the Senate would have to search emails from every member of the Fifty-Fifth

10   Legislature, Second Regular Session for communications regarding the bills (including with

11   individual constituents) and for any evidence or opinions provided to the individual

12   legislators. The Consolidated Plaintiffs' search terms on just the Speaker and President's

13   emails produced approximately 17,000 hits. Assuming those are averages, together, the

14   Senate and House representatives may need to review 765,000 emails to prepare for the

15   deposition. This step alone is unduly burdensome and disproportional.

16         Then, after reviewing the documents, the representatives would have to interview all

17   90 members regarding their privileged written and oral communications and their individual

18   reasons for their vote on the challenged bills. The 30(b)(6) witness must then somehow

19   distill that information down into a single unifying answer that can bind the House and

20   Senate regarding the Legislature's overall intent in passing the bills.

21         It is questionable whether this could even be done. Unlike a government agency with

22   a single, head elected official who makes final policy decisions on behalf of the agency, the

23   legislature's passage of legislation is by majority rule. And each individual legislator may

24   have a unique reason for his or her vote. For these reasons, the language of the bill itself

25   and the public legislative history are the best methods to determine the collective legislative

26   intent. *Cf. Va. Uranium, Inc. v. Warren*, ___ U.S. ___, 139 S. Ct. 1894, 1907-08 (2019)

9                                                                          **DE-SER-67**

(plurality opinion) ("Trying to discern what motivates legislators individually and collectively invites speculation and risks overlooking the reality that individual Members of Congress often pursue multiple and competing purposes, many of which are compromised to secure a law's passage and few of which are fully realized in the final product.").

**IV.     Conclusion.**

The Speaker and President respectfully request the Court find that there has been no implied waiver of the legislative privilege and that a 30(b)(6) deposition of the House and Senate on the topics proposed by Consolidated Plaintiffs is barred by the legislative privilege and is unduly burdensome.

RESPECTFULLY  SUBMITTED this 2nd day of August, 2023.

GALLAGHER & KENNEDY, P.A.

By:*/s/ Hannah H. Porter*
Kevin E. O'Malley
Hannah H. Porter
Ashley E. Fitzgibbons
2575 East Camelback Road
Phoenix, Arizona 85016-9225
*Attorneys for Intervenor-Defendants*
*Toma and Petersen*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 2, 2023, I electronically transmitted a PDF version of this document to the Clerk of Court, using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing.

*/s/D. Ochoa*

1   Tyler Green*
2   Cameron T. Norris*
    Gilbert C. Dickey*
3   CONSOVOY MCCARTHY PLLC
    1600 Wilson Blvd., Ste. 700
4   Arlington, VA 22209
5   (703) 243-9423
    tyler@consovoymccarthy.com
6   cam@consovoymccarthy.com
    gilbert@consovoymccarthy.com
7
8   Kory Langhofer, Ariz. Bar No. 024722
    Thomas Basile, Ariz. Bar. No. 031150
9   STATECRAFT PLLC
    649 North Fourth Avenue, First Floor
10  Phoenix, Arizona 85003
11  (602) 382-4078
    kory@statecraftlaw.com
12  tom@statecraftlaw.com
13
    *Attorneys for Intervenor-Defendant*
14
15  *admitted pro hac vice
16
17          **UNITED STATES DISTRICT COURT**
            **DISTRICT OF ARIZONA**
18
19  Mi Familia Vota, et al.,
                        Plaintiffs,          Case No: 2:22-cv-00509-SRB (Lead)
20  v.
                                             **INTERVENOR REPUBLICAN**
21  Adrian Fontes, et al.,                   **NATIONAL COMMITTEE'S**
                                             **CROSS-RESPONSE AND**
22                                           **REPLY IN SUPPORT OF**
                        Defendants.          **PARTIAL SUMMARY**
23  _____         **JUDGMENT**
24
25  **AND CONSOLIDATED CASES**
26
27

presidential electors. The FCPA dealt only with "political committees organized for the purpose of influencing elections in two or more states, and with branches or subsidiaries of national committees, and excludes from its operation state or local committees." *Burroughs*, 290 U.S. at 544. The Court thus held that "[n]either in purpose nor in effect does it interfere with the power of a state to appoint electors or the manner in which their appointment shall be made." *Id.* The Court had no occasion to decide the scope of the Electors Clause as a *source* of congressional power, and it recognized that a statute that interfered with the "exclusive state power" over presidential elections would be unconstitutional. *Id.* at 544-45. Thus, "*Burroughs* … reinforce[s] the principle that the manner of appointment is exclusive to the states." *In re Guerra*, 441 P.3d 807, 814 (Wash. 2019), *aff'd sub nom. Chiafalo v. Washington*, 140 S. Ct. 2316 (2020).

Left with no Supreme Court precedent supporting their arguments, Plaintiffs point to half a sentence of dicta in *Voting Rights Coalition v. Wilson*. In that case, the Ninth Circuit considered a challenge to the NVRA based on "[t]hree provisions of the Constitution"—the Electors Clause of Article II was not one of them. *Wilson*, 60 F.3d at 1413 (citing U.S. Const. article I, §4; article I, §2; and the Tenth Amendment). The Ninth Circuit did not cite—let alone discuss and *decide*—the scope of the Electors Clause. *Cf. Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2498 (2022) ("Dicta that does not analyze the relevant statutory provision cannot be said to have resolved the statute's meaning."). The half of a sentence the panel included about presidential elections was neither essential to the judgment nor a proper interpretation of *Burroughs*. *See id.* at 1414.

Finally, the NVRA is not remedial legislation under the Fourteenth or Fifteenth Amendments. Those amendments could have been a valid source for the NVRA had Congress invoked them. But it did not. Plaintiffs' bold claim that three pages from congressional committee reports forms an "extensive record of discrimination in voting registration" disproves itself. Doc. 393 at 15 (citing S.Rep. No. 103-6, at 3; H.Rep. No. 103-9, at 3-4). And Plaintiffs rely on *South Carolina v. Katzenbach* to their peril. In

**DE-SER-70**

*Katzenbach*, the Supreme Court upheld the 1965 Voting Rights Act (VRA), "explaining that it was justified to address 'voting discrimination where it persists on a pervasive scale.'" *Shelby Cnty. v. Holder*, 570 U.S. 529, 538 (2013) (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966)). After months of hearings and volumes of findings, Congress had tailored the VRA to apply "where Congress found 'evidence of actual voting discrimination.'" *Id.* at 546. "Multiple decisions since have reaffirmed the [VRA]'s 'extraordinary' nature." *Id.* at 555. *Katzenbach* proves that the NVRA doesn't come close to the legislative findings necessary to enact remedial legislation.

In sum, "Article II and the Twelfth Amendment give States broad power over electors…." *Chiafalo*, 140 S. Ct. at 2328. Plaintiffs' reading of the Elections Clause "evade[s] important constitutional restraints" in Article II by nullifying States' authority over presidential elections. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995). Because Congress has no authority to regulate the "Manner" of choosing presidential electors, Defendants are entitled to summary judgment on Plaintiffs' claims that the NVRA preempts H.B. 2492's citizenship requirements as applied to registration for presidential elections.

## II. Nothing in the NVRA's text discusses early mail-in voting rules.

Plaintiffs cite no authority applying the NVRA to early mail-in voting rules. Perhaps Congress could pass a statute like the NVRA that unifies registration for early mail-in voting. Indeed, the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) does something similar (on a much smaller scale) by requiring States to allow certain overseas voters to register and vote absentee in elections for federal office. 52 U.S.C. §§20302-20310. But there, Congress covered both "voter registration application[s]" and "absentee ballot application[s]," repeatedly distinguishing between the two. *Id.* §20302. In the NVRA, however, Congress only set "procedures to register to vote in elections." *Id.* §20503(a). Congress said nothing about absentee ballots, mail-in ballots, or early voting. States can require, condition, or prohibit those privileges as they

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

Mi Familia Vota, et al.,

      Plaintiffs,

    v.

Adrian Fontes, in his official capacity as
Arizona Secretary of State, et al.,

      Defendants.

---

AND CONSOLIDATED CASES.

Case No. 2:22-cv-00509-SRB
(Lead)

**CONSOLIDATED PLAINTIFFS'
FIRST SET OF REQUESTS FOR
PRODUCTION TO INTERVENOR-
DEFENDANTS SPEAKER OF THE
HOUSE BEN TOMA AND SENATE
PRESIDENT WARREN PETERSEN**

No. CV-22-00519-PHX-SRB
No. CV-22-01003-PHX-SRB
No. CV-22-01124-PHX-SRB
No. CV-22-01369-PHX-SRB
No. CV-22-01381-PHX-SRB
No. CV-22-01602-PHX-SRB
No. CV-22-01901-PHX-SRB

**PROPOUNDING PARTY:**    Consolidated Plaintiffs

**RESPONDING PARTY:**    Intervenor-Defendants Speaker of the House Ben
Toma and Senate President Warren Petersen

**SET NUMBER:**    ONE (1)

Pursuant to Federal Rules of Civil Procedure 26 and 34, consolidated Plaintiffs, by and through counsel, serve the following requests for production upon Intervenor-Defendants Speaker of the House Ben Toma and Senate President Warren Petersen.

Responses to these requests must be produced within thirty (30) days after service in accordance with Rule 34. As agreed among the parties, all discovery responses and documents shall be produced to all counsel of record. Each request for production is subject to the Definitions and Instructions set forth below.

## DEFINITIONS

Except as specifically defined below, the terms used in these requests shall be construed and defined in accordance with the Federal Rules of Civil Procedure, wherever applicable. Any terms not defined shall be given their ordinary meaning.

1.     "Any" or "all" means "any and all."

2.     "Arizona Legislature" means the members and staff of the Arizona Senate and Arizona House of Representatives.

3.     "Attorney General" means the Arizona Attorney General's Office and includes the Arizona Attorney General and her predecessors and successors in their official capacities as Arizona Attorney General, including but not limited to former Arizona Attorney General Mark Brnovich, as well as the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, and consultants of the Arizona Attorney General's Office.

4.     "Challenged Laws" means Arizona House Bill 2492 ("H.B. 2492") signed into law by the Governor on March 30, 2022, Chapter 99 to Session Laws from the Fifty-Fifth Legislature Second Regular Session 2022, and Arizona House Bill 2243 ("H.B. 2243") signed into law by the Governor on July 6, 2022, Chapter 370 to Session Laws from the Fifty-Fifth Legislature Second Regular Session 2022.

5.     "Communication" means any transfer of information of any type, whether written, oral, electronic, or otherwise, and includes transfers of information via email, report, letter, text message, voicemail message, written memorandum, note, summary, and other means. It includes communications entirely internal to the Arizona Legislature, as

well as communications that include or are with entities and individuals outside of the Arizona Legislature.

6.       "County Recorders" means the County Recorders of Arizona's fifteen counties and their predecessors and successors, as well as the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, and consultants of the County Recorders.

7.       "Document" is synonymous in meaning and scope to the term "document" as used under Federal Rule of Civil Procedure 34 and "writings" and "recordings" as defined in Federal Rules of Evidence 1001, and it includes, but is not limited to, records, reports, lists, data, statistics, summaries, analyses, communications (as defined above), any computer discs, tapes, printouts, emails, databases, and any handwritten, typewritten, printed, electronically recorded, taped, graphic, machine-readable, or other material, of whatever nature and in whatever form, including all non-identical copies and drafts thereof, and all copies bearing any notation or mark not found on the original.

8.       "Governor" means the Office of the Arizona Governor and includes the Arizona Governor and her predecessors and successors in their official capacities as Arizona Governor, as well as the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, and consultants of the Office of the Arizona Governor.

9.       "H.B. 2617" means House Bill 2617 introduced into the Arizona House of Representatives on January 31, 2022 from Fifty-Fifth Legislature Second Regular Session 2022.

10.       "Including" means "including but not limited to."

11.       "Nonstandard Address" means, but is not limited to, residential addresses that do not include a complete address number and/or a street name; addresses that appear to be directions (such as "between mile markers x and y" or "the second house on the left"); addresses that include a complete address number and street name or otherwise resemble a standard address, but are not listed in nontribal governmental databases; and other addresses that lack address coordinators or are not typically geocoded.

12.    "Person" means not only natural persons, but also firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, trust groups, and organizations; federal, state, or local governments or government agencies, offices, bureaus, departments, or entities; other legal, business, or government entities; and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof or any combination thereof.

13.    "Relating to," "regarding," or "concurring" and their cognates are to be understood in their broadest sense and shall be construed to include pertaining to, commenting on, memorializing, reflecting, recording, setting forth, describing, evidencing, or constituting.

14.    "Secretary of State" means the Arizona Secretary of State's Office and includes the Arizona Secretary of State and his predecessors and successors in their official capacities as Arizona Secretary of State, as well as the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, and consultants of the Arizona Secretary of State's Office.

15.    "Senate President" means the position and office of the President of the Arizona Senate, including all members and staff of that office.

16.    "Speaker of the House" means the position and office of the Speaker of the Arizona House of Representatives, including all members and staff of that office.

17.    "You" and "your" mean Intervenor-Defendants Speaker of the House Ben Toma and Senate President Warren Petersen, and include any successors to the positions of Speaker of the House or the Senate President; any predecessors occupying those offices since January 1, 2020; any past and present employees, staff, agents, assigns, and representatives of the Speaker of the House or the Senate President; and any other persons or entities that, at any time, acted on behalf or for the benefit of the Speaker of the House or the Senate President.

## INSTRUCTIONS

You are to follow the instructions set forth below in responding to these requests.

1.      You shall produce materials and serve responses and any objections on Plaintiffs' counsel within 30 days after service of these requests for production.

2.      Pursuant to Federal Rule of Civil Procedure 34(b)(2)(B) and (C), if you object to any part of a request, set forth the basis for your objection and respond to all parts of the request to which you do not object. All objections must be noted with specificity. Any ground not stated in a timely objection is waived.

3.      If, in responding to these requests, you encounter any ambiguities when construing a request or definition, set forth in your response what you find to be vague, overbroad, or ambiguous and the construction you used in responding. Where you, in good faith, doubt the meaning or intended scope of a request, and the sole objection would be to its vagueness, overbreadth, or ambiguity, please contact Plaintiffs' counsel for clarification in advance of asserting an objection.

4.      With respect to any document withheld on a claim of privilege or work product protection, provide a written privilege log identifying each document individually and containing all information required by Federal Rule of Civil Procedure 26(b)(5), including a description of the basis of the claimed privilege and all information necessary for Plaintiffs to assess the claim of privilege.

5.      In accordance with the Federal Rules of Civil Procedure, the scope of discovery sought through these requests for production extends to all relevant and non-privileged materials that might reasonably lead to the discovery of admissible evidence. You should produce all documents available to you or subject to your access or control that are responsive to the following requests for production. This includes documents in your actual or constructive possession or control, as well as any non-privileged information in the actual or constructive possession or control of your attorneys, investigators, experts, agents, and any other persons acting on your behalf.

6.      Documents are to be produced as they are kept in the ordinary course of business. Accordingly, documents should be produced in their entirety, without abbreviation, redaction, or expurgation; file folders with tabs or labels identifying

documents responsive to this request should be produced intact with the documents; and documents attached to each other should not be separated.

7.      Subject to any Electronically Stored Information ("ESI") order subsequently entered in this case, all documents are to be produced in electronic form pursuant to these instructions. All documents, including emails, should be produced in single page TIFF format, showing comments and track changes where applicable, with text extract and database load files containing standard fielded information and metadata. TIFF images shall be placed in an Images folder with any given subfolder not to exceed 5,000 images per folder and accompanied by an .opt placed in a Data folder. Each page of a document should be assigned a unique production number (aka Bates number) electronically "burned" onto the image at a location that does not unreasonably conceal or interfere with information on the document. The number should be consistent across the production, contain no special characters, and be numerically sequential within a given document. Attachments to documents should be assigned numbers that directly follow in sequential order the Bates numbers on the documents to which they were attached. If a number or set of numbers is skipped, the skipped number or set of numbers should be noted, for example with a placeholder.

8.      If there are no documents responsive to a particular request, so indicate in your response. Similarly, to the extent that you do not have any means of recording the information requested herein, please so indicate in your responses to the specific production request.

9.      If any otherwise responsive document was, but is no longer, in existence or in your possession, custody, or control, identify the type of information contained in the document, its current or last known custodian, the location/address of such document, and the identity of all persons having knowledge or who had knowledge of the document, as well as describe in full the circumstances surrounding its destruction, loss, or other disposition from your possession or control.

10.      These requests for production are continuing in nature, up to and during trial. Materials sought by these requests for production that become available after you serve

your responses must be disclosed to counsel for Plaintiffs by supplementary response or responses.

11.     Pursuant to Federal Rule of Civil Procedure 26(e), you are under a duty to promptly supplement or correct your responses to these requests for production if you learn that an answer is in some material respect incomplete or incorrect. If you expect to obtain further information or expect the accuracy of a response given to change between the time responses are served and the time of trial, you should state this fact in each response. Supplementary answers are to be served upon Plaintiffs' counsel as soon as practicable after you receive this new information, but, in any event, no later than 14 days after its receipt.

12.     If you contend that it would be unreasonably burdensome to obtain and provide all of the documents called for in response to any document request or any subsection thereof, then in response to the appropriate document request: (a) produce all such documents as are available to you without undertaking what you contend to be an unreasonably burdensome effort; (b) describe with particularity the efforts made by you or on your behalf to produce such documents, including identification of persons consulted, description of files, records and documents reviewed, and identification of each person who participated in the gathering of such documents, with specification of the amount of time spent and the nature of work done by such person; and (c) state with particularity the grounds upon which you contend the additional efforts to produce such documents would be unreasonably burdensome.

13.     The past-tense forms of verbs in these requests include their present-tense forms, and vice versa.

14.     The singular form of a noun or pronoun includes the plural form, and the plural form indicates the singular.

15.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a document production topic all responses that otherwise might be construed to be outside its scope.

16.     A reference to an entity, agency, department, or board in this request shall be construed to include its officers, directors, partners, members, managers, employees, representatives, agents, consultants, or anyone acting on its behalf.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

All Documents and Communications regarding the introduction, passage, and enactment of the Challenged Laws, as well as the attempted passage of H.B. 2617, including but not limited to all such Documents and Communications with the Governor, the Secretary of State, the Attorney General, any County Recorder, the Arizona Legislature, the Arizona Free Enterprise Club, the Republican National Committee, the Arizona Republican Party, the Republican State Leadership Committee, the Republican Legislative Campaign Committee, or any other Person. This Request includes, but is not limited to, all Documents and Communications relied upon to draft the Challenged Laws and H.B. 2617.

**REQUEST FOR PRODUCTION NO. 2:**

All Documents and Communications regarding the purposes of the Challenged Laws, including but not limited to Documents and Communications regarding what they were aimed at accomplishing and their anticipated or likely impact or effect. This includes, but is not limited to, any Documents and Communications cited or relied upon in preparing your response to Interrogatory No. 1.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents and Communications regarding misconduct, fraud, election security, or a lack of voter confidence in election integrity related to citizenship, voters' residences, or proof of citizenship or residential addresses in voter registration, including but not limited to all such Documents and Communications with the Governor, the Secretary of State, the Attorney General, any County Recorder, the Arizona Legislature, the Arizona Free Enterprise Club, the Republican National Committee, the Arizona

Republican Party, the Republican State Leadership Committee, the Republican Legislative Campaign Committee, or any other Person.

**REQUEST FOR PRODUCTION NO. 4:**

All Documents and Communications regarding Nonstandard Addresses, including but not limited to the types of documents a person who resides in a location with only a Nonstandard Address can use to prove the location of their residence under A.R.S. § 16-123 or any previous or draft version of the Challenged Laws; the availability of such documentation to people residing at a location with only a Nonstandard Address; the process by which a person residing at a location with only a Nonstandard Address may obtain such documentation; the process by which a person residing at a location with only a Nonstandard Address may obtain a standard address, such as a house number and/or street name; the geographic location and distribution of persons residing at a location with only a Nonstandard Address; and the demographic characteristics of persons residing at a location with only a Nonstandard Address, including but not limited to race or ethnicity, tribal membership, or location on tribal land.

/s/ *Christopher Dodge (with permission)*

**HERRERA ARELLANO LLP**
Roy Herrera (AZ Bar No. 032901)
Daniel A. Arellano (AZ Bar. No. 032304)
Jillian L. Andrews (AZ Bar No. 034611)
530 East McDowell Road
Suite 107-150
Phoenix, Arizona 85004-1500
Phone: (602) 567-4820
roy@ha-firm.com
daniel@ha-firm.com
jillian@ha-firm.com

**ELIAS LAW GROUP LLP**
Marc E. Elias*
Elisabeth C. Frost*
Christopher D. Dodge*
Mollie DiBrell*
Alexander F. Atkins*
Daniela Lorenzo*
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Phone: (202) 968-4513
Facsimile: (202) 968-4498
melias@elias.law
efrost@elias.law
cdodge@elias.law
mdibrell@elias.law
aatkins@elias.law
dlorenzo@elias.law

*Attorneys for Mi Familia Vota and Voto Latino*

/s/ *Christopher Dodge (with permission)*

**BARTON MENDEZ SOTO**
James Barton (AZ Bar No. 023888)
401 W. Baseline Road
Suite 205
Tempe, AZ 85283
480-418-0668
james@bartonmendezsoto.com

**DEPARTMENT OF JUSTICE**
**SAN CARLOS APACHE TRIBE**
Alexander B. Ritchie
(AZ Bar No. 019579)
Attorney General
Chase A. Velasquez*
NM Bar No. 019148
Assistant Attorney General
Post Office Box 40
16 San Carlos Ave.
San Carlos, AZ 85550
Alex.Ritchie@scat-nsn.gov
Chase.Velasquez@scat-nsn.gov

**CAMPAIGN LEGAL CENTER**
Danielle Lang*
Jonathan Diaz*
Molly Danahy*
Hayden Johnson*
Nicole Hansen*
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org
nhansen@campaignlegalcenter.org

**MAYER BROWN LLP**
Lee H. Rubin* (CA# 141331)
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

**FREE SPEECH FOR PEOPLE**

Courtney Hostetler* (MA# 683307)
John Bonifaz* (MA# 562478)
Ben Clements* (MA# 555082)
Ronald Fein* (MA# 657930)
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org

Gary A. Isaac* (IL# 6192407)
Daniel T. Fenske* (IL# 6296360)
Jed W. Glickstein* (IL# 6315387)
William J. McElhaney, III*
(IL# 6336357)
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
dfenske@mayerbrown.com
gisaac@mayerbrown.com
jglickstein@mayerbrown.com

Rachel J. Lamorte* (NY# 5380019)
1999 K Street NW
Washington, DC 20006
(202) 362-3000
rlamorte@mayerbrown.com

*Attorneys for Living United for Change in Arizona, League of United Latin American Citizens, Arizona Students' Association, ADRC Action, Inter Tribal Council of Arizona, Inc., San Carlos Apache Tribe, and Arizona Coalition for Change*

/s/ *Christopher Dodge (with permission)*

**ARIZONA CENTER FOR LAW
IN THE PUBLIC INTEREST**
Daniel J. Adelman
352 E. Camelback Rd., Suite 200
Phoenix, AZ 85012
danny@aclpi.org
(602) 258-8850

**ARNOLD & PORTER
KAYE SCHOLER, LLP**
Steven L. Mayer*
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Steve.Mayer@arnoldporter.com
(415) 471-3100

**ARNOLD & PORTER
KAYE SCHOLER, LLP**
Leah R. Novak*
250 West 55th Street

**FAIR ELECTIONS CENTER**
Jon Sherman*
Michelle Kanter Cohen*
1825 K St. NW, Ste. 450
Washington, D.C. 20006
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
(202) 331-0114

**ARNOLD & PORTER
KAYE SCHOLER, LLP**
Jeremy Karpatkin*
John A. Freedman*
Erica McCabe*
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Jeremy.Karpatkin@arnoldporter.com
John.Freedman@arnoldporter.com
Erica.McCabe@arnoldporter.com
(202) 942-5000

New York, NY 10019
Leah.Novak@arnoldporter.com
(212) 836-8000

*Attorneys for Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund*

/s/ *Christopher Dodge (with permission)*
**PAPETTI SAMUELS WEISS MCKIRGAN LLP**
Bruce Samuels (AZ Bar No. 015996)
Jennifer Lee-Cota (AZ Bar No. 033190)
bsamuels@pswmlaw.com
jleecota@pswmlaw.com
Scottsdale Quarter
15169 North Scottsdale Road
Suite 205
Scottsdale, AZ 85254
+1 480 800 3530

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Seth P. Waxman*
Daniel S. Volchok*
Christopher E. Babbitt*
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
+1 202 663 6000 (telephone)
+1 202 663 6363 (facsimile)

*Attorneys for the Democratic National Committee and Arizona Democratic Party*

/s/ *Christopher Dodge (with permission)*
**LATHAM & WATKINS LLP**
Sadik Huseny*
*sadik.huseny@lw.com*
Amit Makker*
*amit.makker@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

**SPENCER FANE**
Andrew M. Federhar
(AZ Bar No. 006567)
*afederhar@spencerfane.com*
2415 East Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 333-5430
Facsimile: (602) 333-5431

**ASIAN AMERICANS ADVANCING JUSTICE-AAJC**
Niyati Shah*
*nshah@advancingjustice-aajc.org*
Terry Ao Minnis*
*tminnis@advancingjustice-aajc.org*
1620 L Street NW, Suite 1050
Washington, DC 20036
Telephone: (202) 296-2300
Facsimile: (202) 296-2318

*Attorneys for Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition*

<u>/s/ Christopher Dodge (with permission)</u>

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
Ernest Herrera*
Erika Cervantes*
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266
eherrera@maldef.org
ecervantes@maldef.org

**ORTEGA LAW FIRM**
Daniel R. Ortega Jr.
361 East Coronado Road, Suite 101
Phoenix, AZ 85004-1525
Telephone: (602) 386-4455
Email: danny@ortegalaw.com

*Attorneys for Promise Arizona Plaintiffs*

<u>/s/ Christopher Dodge (with permission)</u>

**OSBORN MALEDON, P.A.**
David B. Rosenbaum
AZ No. 009819
Joshua J. Messer
AZ No. 035101
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
jmesser@omlaw.com

**LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
Ezra Rosenberg*
DC No. 360927, NJ No. 012671974
Jim Tucker**
AZ No. 019341
Ryan Snow*
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600 (main)
erosenberg@lawyerscommittee.org
jtucker@lawyerscommittee.org
rsnow@lawyerscommittee.org

**NATIVE AMERICAN RIGHTS FUND**
Allison A. Neswood*
CO No. 49846
neswood@narf.org
Michael S. Carter
AZ No. 028704, OK No. 31961
carter@narf.org
Matthew Campbell*
NM No. 138207, CO No. 40808
mcampbell@narf.org
Jacqueline D. DeLeon*
CA No. 288192
jdeleon@narf.org
1506 Broadway
Boulder, CO 80301
(303) 447-8760 (main)

Samantha B. Kelty
AZ No. 024110, TX No. 24085074
kelty@narf.org
950 F Street NW, Suite 1050,
Washington, D.C. 20004
(202) 785-4166 (direct)

**Admitted in Arizona, D.C. and Nevada.*

**GILA RIVER INDIAN COMMUNITY**
Thomas L. Murphy
AZ No. 022953
Javier G. Ramos
AZ No. 017442
Post Office Box 97
Sacaton, Arizona 85147
(520) 562-9760
thomas.murphy@gric.nsn.us
javier.ramos@gric.nsn.us
*Representing Gila River Indian
Community Only*

**TOHONO O'ODHAM NATION**
Howard M. Shanker (AZ Bar 015547)
Attorney General, Tohono O'odham
Nation
Marissa L. Sites (AZ Bar 027390)
Assistant Attorney General, Tohono
O'odham Nation
P.O. Box 830
Sells, Arizona 85634
(520) 383-3410
Howard.Shanker@tonation-nsn.gov
Marissa.Sites@tonation-nsn.gov
*Representing Tohono O'odham Nation
Only*

*Attorneys for Tohono O'odham Nation, Gila River Indian Community,
Keanu Stevens, Alanna Siquieros, and LaDonna Jacket*

* Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2023, I served the foregoing **CONSOLIDATED PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO INTERVENOR-DEFENDANTS SPEAKER OF THE HOUSE BEN TOMA AND SENATE PRESIDENT WARREN PETERSEN** on counsel of record for all parties by email.

Dated: May 17, 2023                    */s/ Daniel Arellano*

Daniel Arellano

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

|  |  |
|---|---|
| Mi Familia Vota, et al., | Case No. 2:22-cv-00509-SRB |
| Plaintiffs, | (Lead) |
| v. | **CONSOLIDATED PLAINTIFFS'** |
| Adrian Fontes, in his official capacity as | **FIRST SET OF** |
| Arizona Secretary of State, et al., | **INTERROGATORIES TO** |
| | **INTERVENOR-DEFENDANTS** |
| Defendants. | **SPEAKER OF THE HOUSE BEN** |
| | **TOMA AND SENATE PRESIDENT** |
| | **WARREN PETERSEN** |
| AND CONSOLIDATED CASES. | No. CV-22-00519-PHX-SRB |
| | No. CV-22-01003-PHX-SRB |
| | No. CV-22-01124-PHX-SRB |
| | No. CV-22-01369-PHX-SRB |
| | No. CV-22-01381-PHX-SRB |
| | No. CV-22-01602-PHX-SRB |
| | No. CV-22-01901-PHX-SRB |

**PROPOUNDING PARTY:**     Consolidated Plaintiffs

**RESPONDING PARTY:**     Intervenor-Defendants Speaker of the House Ben
Toma and Senate President Warren Petersen

**SET NUMBER:**     ONE (1)

Pursuant to Federal Rules of Civil Procedure 26 and 33, consolidated Plaintiffs, by and through counsel, serve the following Interrogatories upon Intervenor-Defendants Speaker of the House Ben Toma and Senate President Warren Petersen.

Responses to these Interrogatories must be produced within thirty (30) days after service in accordance with Rule 33. As agreed among the parties, all discovery responses shall be produced to all counsel of record. Each Interrogatory is subject to the Definitions and Instructions set forth below.

### DEFINITIONS

Except as specifically defined below, the terms used in these requests shall be construed and defined in accordance with the Federal Rules of Civil Procedure, wherever applicable. Any terms not defined shall be given their ordinary meaning.

1. "Any" or "all" means "any and all."

2. "Arizona Legislature" means the members and staff of the Arizona Senate and Arizona House of Representatives.

3. "Challenged Laws" means Arizona House Bill 2492 ("H.B. 2492") signed into law by the Governor on March 30, 2022, Chapter 99 to Session Laws from the Fifty-Fifth Legislature Second Regular Session 2022, and Arizona House Bill 2243 ("H.B. 2243") signed into law by the Governor on July 6, 2022, Chapter 370 to Session Laws from the Fifty-Fifth Legislature Second Regular Session 2022.

4. "Communication" means any transfer of information of any type, whether written, oral, electronic, or otherwise, and includes transfers of information via email, report, letter, text message, voicemail message, written memorandum, note, summary, and other means. It includes communications entirely internal to the Arizona Legislature, as well as communications that include or are with entities and individuals outside of the Arizona Legislature.

5. "Document" is synonymous in meaning and scope to the term "document" as used under Federal Rule of Civil Procedure 34 and "writings" and "recordings" as defined in Federal Rules of Evidence 1001, and it includes, but is not limited to, records, reports, lists, data, statistics, summaries, analyses, communications (as defined above), any

computer discs, tapes, printouts, emails, databases, and any handwritten, typewritten, printed, electronically recorded, taped, graphic, machine-readable, or other material, of whatever nature and in whatever form, including all non-identical copies and drafts thereof, and all copies bearing any notation or mark not found on the original.

6.      "Including" means "including but not limited to."

7.      "Nonstandard Address" means, but is not limited to, residential addresses that do not include a complete address number and/or a street name; addresses that appear to be directions (such as "between mile markers x and y" or "the second house on the left"); addresses that include a complete address number and street name or otherwise resemble a standard address, but are not listed in nontribal governmental databases; and other addresses that lack address coordinators or are not typically geocoded.

8.      "Relating to," "regarding," or "concurring" and their cognates are to be understood in their broadest sense and shall be construed to include pertaining to, commenting on, memorializing, reflecting, recording, setting forth, describing, evidencing, or constituting.

9.      "You" and "your" mean Intervenor-Defendants Speaker of the House Ben Toma and Senate President Warren Petersen, and include any successors to the positions of Speaker of the House or the Senate President; any predecessors occupying those offices since January 1, 2020; any past and present employees, staff, agents, assigns, and representatives of the Speaker of the House or the Senate President; and any other persons or entities that, at any time, acted on behalf or for the benefit of the Speaker of the House or the Senate President.

## INSTRUCTIONS

You are to follow the instructions set forth below in responding to these Interrogatories.

1.      Pursuant to Federal Rule of Civil Procedure 33(b)(4), if you object to any part of an Interrogatory, set forth the basis of your objection and respond to all parts of the interrogatory to which you do not object. Any ground not stated in a timely objection is waived.

**DE-SER-89**

2.      Where you, in good faith, doubt the meaning or intended scope of an Interrogatory, before objecting to the Interrogatory based on its vagueness, overbreadth, or ambiguity, contact Plaintiffs' counsel in advance of asserting an objection. Plaintiffs' counsel will provide whatever additional clarification or explanation may be needed. If you still believe the Interrogatory to be vague, overbroad, or ambiguous, set forth in your response what you find to be vague, overbroad, or ambiguous and the construction you used in responding.

3.      If any objection is raised to these Interrogatories on the basis of an assertion of privilege, you shall provide both a description of the basis of the privilege and all information necessary for Plaintiff to assess the claim of privilege.

4.      If, after a reasonable inquiry, you do not know the answer to any Interrogatory, or if there are limitations to your knowledge about the answer to any Interrogatory, provide whatever answer you can including the limitations to your knowledge. If there are other people or entities that you believe may know the answer to any Interrogatory or may be able to provide additional information in response to any Interrogatory, identify those people or entities in your response.

5.      Pursuant to Federal Rule of Civil Procedure 26(e), you are under a duty to promptly supplement or correct your responses to these Interrogatories if you learn that a response is in some material respect incomplete or incorrect. If you expect to obtain further information or expect the accuracy of a response given to change between the time responses are served and the time of trial, you are requested to state this fact in each response. Supplementary answers are to be served upon Plaintiffs' counsel as soon as practicable after you receive this new information, but, in any event, no later than 14 days after its receipt.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Identify and describe the purposes of the Challenged Laws, including but not limited to what they were aimed at accomplishing and their anticipated or likely impact or effect. Your answer should also identify by name any witnesses who have or are likely to have

knowledge or information related to the purposes or anticipated effects of the Challenged Laws, or evidence thereof.

**INTERROGATORY NO. 2:**

Identify each instance in which the Arizona Legislature has established that a non-U.S. citizen has registered to vote in Arizona since January 1, 2016, including any supporting evidence thereof. Your answer should identify by name any witnesses who have or are likely to have knowledge or information related to non-U.S. citizens registering to vote in Arizona or evidence thereof.

**INTERROGATORY NO. 3:**

Identify each instance in which the Arizona Legislature has established that a non-U.S. citizen has voted in Arizona since January 1, 2016, including any supporting evidence thereof. Your answer should identify by name any witnesses who have or are likely to have knowledge or information related to non-U.S. citizens registering to vote in Arizona or evidence thereof.

**INTERROGATORY NO. 4:**

Identify every type of document a person who resides in a location with only a Nonstandard Address can use to prove the location of their residence under A.R.S. § 16-123, including a description of all the elements each document must contain to satisfy the proof of location of residence requirement and an explanation of the basis of Your belief that persons who reside in locations with only Nonstandard Addresses have such documents available to them. Your answer should identify by name any witnesses who have or are likely to have knowledge or information about the availability of satisfactory documents for persons residing in locations with only Nonstandard Addresses.

/s/ *Christopher Dodge (with permission)*

**HERRERA ARELLANO LLP**
Roy Herrera (AZ Bar No. 032901)
Daniel A. Arellano (AZ Bar. No. 032304)
Jillian L. Andrews (AZ Bar No. 034611)
530 East McDowell Road
Suite 107-150
Phoenix, Arizona 85004-1500
Phone: (602) 567-4820
roy@ha-firm.com
daniel@ha-firm.com
jillian@ha-firm.com

**ELIAS LAW GROUP LLP**
Marc E. Elias*
Elisabeth C. Frost*
Christopher D. Dodge*
Mollie DiBrell*
Alexander F. Atkins*
Daniela Lorenzo*
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Phone: (202) 968-4513
Facsimile: (202) 968-4498
melias@elias.law
efrost@elias.law
cdodge@elias.law
mdibrell@elias.law
aatkins@elias.law
dlorenzo@elias.law

*Attorneys for Mi Familia Vota and Voto Latino*

/s/ *Christopher Dodge (with permission)*

**BARTON MENDEZ SOTO**
James Barton (AZ Bar No. 023888)
401 W. Baseline Road
Suite 205
Tempe, AZ 85283
480-418-0668
james@bartonmendezsoto.com

**DEPARTMENT OF JUSTICE**
**SAN CARLOS APACHE TRIBE**
Alexander B. Ritchie
(AZ Bar No. 019579)
Attorney General
Chase A. Velasquez*
NM Bar No. 019148
Assistant Attorney General
Post Office Box 40
16 San Carlos Ave.
San Carlos, AZ 85550
Alex.Ritchie@scat-nsn.gov
Chase.Velasquez@scat-nsn.gov

**CAMPAIGN LEGAL CENTER**
Danielle Lang*
Jonathan Diaz*
Molly Danahy*
Hayden Johnson*
Nicole Hansen*
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org
nhansen@campaignlegalcenter.org

**MAYER BROWN LLP**
Lee H. Rubin* (CA# 141331)
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

**FREE SPEECH FOR PEOPLE**
Courtney Hostetler* (MA# 683307)
John Bonifaz* (MA# 562478)
Ben Clements* (MA# 555082)
Ronald Fein* (MA# 657930)
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org

Gary A. Isaac* (IL# 6192407)
Daniel T. Fenske* (IL# 6296360)
Jed W. Glickstein* (IL# 6315387)
William J. McElhaney, III*
(IL# 6336357)
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
dfenske@mayerbrown.com
gisaac@mayerbrown.com
jglickstein@mayerbrown.com

Rachel J. Lamorte* (NY# 5380019)
1999 K Street NW
Washington, DC 20006
(202) 362-3000
rlamorte@mayerbrown.com

*Attorneys for Living United for Change in Arizona, League of United Latin American Citizens, Arizona Students' Association, ADRC Action, Inter Tribal Council of Arizona, Inc., San Carlos Apache Tribe, and Arizona Coalition for Change*

/s/ *Christopher Dodge (with permission)*
**ARIZONA CENTER FOR LAW
IN THE PUBLIC INTEREST**
Daniel J. Adelman
352 E. Camelback Rd., Suite 200
Phoenix, AZ 85012
danny@aclpi.org
(602) 258-8850

**ARNOLD & PORTER
KAYE SCHOLER, LLP**
Steven L. Mayer*
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Steve.Mayer@arnoldporter.com
(415) 471-3100

**ARNOLD & PORTER
KAYE SCHOLER, LLP**
Leah R. Novak*
250 West 55th Street

**FAIR ELECTIONS CENTER**
Jon Sherman*
Michelle Kanter Cohen*
1825 K St. NW, Ste. 450
Washington, D.C. 20006
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
(202) 331-0114

**ARNOLD & PORTER
KAYE SCHOLER, LLP**
Jeremy Karpatkin*
John A. Freedman*
Erica McCabe*
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Jeremy.Karpatkin@arnoldporter.com
John.Freedman@arnoldporter.com
Erica.McCabe@arnoldporter.com
(202) 942-5000

New York, NY 10019
Leah.Novak@arnoldporter.com
(212) 836-8000

*Attorneys for Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund*

/s/ *Christopher Dodge (with permission)*
**PAPETTI SAMUELS WEISS MCKIRGAN LLP**
Bruce Samuels (AZ Bar No. 015996)
Jennifer Lee-Cota (AZ Bar No. 033190)
bsamuels@pswmlaw.com
jleecota@pswmlaw.com
Scottsdale Quarter
15169 North Scottsdale Road
Suite 205
Scottsdale, AZ 85254
+1 480 800 3530

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Seth P. Waxman*
Daniel S. Volchok*
Christopher E. Babbitt*
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
+1 202 663 6000 (telephone)
+1 202 663 6363 (facsimile)

*Attorneys for the Democratic National Committee and Arizona Democratic Party*

/s/ *Christopher Dodge (with permission)*
**LATHAM & WATKINS LLP**
Sadik Huseny*
*sadik.huseny@lw.com*
Amit Makker*
*amit.makker@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

**SPENCER FANE**
Andrew M. Federhar
(AZ Bar No. 006567)
*afederhar@spencerfane.com*
2415 East Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 333-5430
Facsimile: (602) 333-5431

**ASIAN AMERICANS ADVANCING JUSTICE-AAJC**
Niyati Shah*
*nshah@advancingjustice-aajc.org*
Terry Ao Minnis*
*tminnis@advancingjustice-aajc.org*
1620 L Street NW, Suite 1050
Washington, DC 20036
Telephone: (202) 296-2300
Facsimile: (202) 296-2318

**DE-SER-94**

*Attorneys for Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition*

/s/ *Christopher Dodge (with permission)*

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
Ernest Herrera*
Erika Cervantes*
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266
eherrera@maldef.org
ecervantes@maldef.org

**ORTEGA LAW FIRM**
Daniel R. Ortega Jr.
361 East Coronado Road, Suite 101
Phoenix, AZ 85004-1525
Telephone: (602) 386-4455
Email: danny@ortegalaw.com

*Attorneys for Promise Arizona Plaintiffs*

/s/ *Christopher Dodge (with permission)*

**OSBORN MALEDON, P.A.**
David B. Rosenbaum
AZ No. 009819
Joshua J. Messer
AZ No. 035101
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
jmesser@omlaw.com

**LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
Ezra Rosenberg*
DC No. 360927, NJ No. 012671974
Jim Tucker**
AZ No. 019341
Ryan Snow*
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600 (main)
erosenberg@lawyerscommittee.org
jtucker@lawyerscommittee.org
rsnow@lawyerscommittee.org

**NATIVE AMERICAN RIGHTS FUND**
Allison A. Neswood*
CO No. 49846
neswood@narf.org
Michael S. Carter
AZ No. 028704, OK No. 31961
carter@narf.org
Matthew Campbell*
NM No. 138207, CO No. 40808
mcampbell@narf.org
Jacqueline D. DeLeon*
CA No. 288192
jdeleon@narf.org
1506 Broadway
Boulder, CO 80301
(303) 447-8760 (main)

Samantha B. Kelty
AZ No. 024110, TX No. 24085074
kelty@narf.org
950 F Street NW, Suite 1050,
Washington, D.C. 20004
(202) 785-4166 (direct)

**Admitted in Arizona, D.C. and Nevada.*

**GILA RIVER INDIAN COMMUNITY**
Thomas L. Murphy
AZ No. 022953
Javier G. Ramos
AZ No. 017442
Post Office Box 97
Sacaton, Arizona 85147
(520) 562-9760
thomas.murphy@gric.nsn.us
javier.ramos@gric.nsn.us
*Representing Gila River Indian Community Only*

**TOHONO O'ODHAM NATION**
Howard M. Shanker (AZ Bar 015547)
Attorney General, Tohono O'odham Nation
Marissa L. Sites (AZ Bar 027390)
Assistant Attorney General, Tohono O'odham Nation
P.O. Box 830
Sells, Arizona  85634
(520) 383-3410
Howard.Shanker@tonation-nsn.gov
Marissa.Sites@tonation-nsn.gov
*Representing Tohono O'odham Nation Only*

*Attorneys for Tohono O'odham Nation, Gila River Indian Community, Keanu Stevens, Alanna Siquieros, and LaDonna Jacket*

* *Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2023, I served the foregoing **CONSOLIDATED PLAINTIFFS' FIRST SET OF INTERROGATORIES TO INTERVENOR-DEFENDANTS SPEAKER OF THE HOUSE BEN TOMA AND SENATE PRESIDENT WARREN PETERSEN** on counsel of record for all parties by email.


Dated: May 17, 2023                     _/s/ Daniel Arellano_

                                        Daniel Arellano

Tyler Green*
Cameron T. Norris*
Gilbert C. Dickey†
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tyler@consovoymccarthy.com
cam@consovoymccarthy.com
gilbert@consovoymccarthy.com

Kory Langhofer, Ariz. Bar No. 024722
Thomas Basile, Ariz. Bar. No. 031150
STATECRAFT PLLC
649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003
(602) 382-4078
kory@statecraftlaw.com
tom@statecraftlaw.com

*Attorneys for Intervenor-Defendant*

*admitted pro hac vice
†pro hac vice forthcoming

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., | |
| Plaintiffs, | Case No: 2:22-cv-00509-SRB (Lead) |
| v. | |
| | **INTERVENOR REPUBLICAN** |
| Adrian Fontes, et al., | **NATIONAL COMMITTEE'S** |
| | **MOTION FOR PARTIAL** |
| Defendants. | **SUMMARY JUDGMENT** |
| _____ | |
| **AND CONSOLIDATED CASES** | |

1    was because the Federal Corrupt Practices Act set rules governing political campaign

2    contributions—it had nothing to do with the appointment of presidential electors. *Id.* at

3    540-43. Indeed, the Court adopted the premise that if the statute *did* interfere with the

4    "exclusive state power" over presidential elections, it would be unconstitutional. *Id.* at

5    544-45. That premise applies here: to the extent the NVRA interferes with Arizona's

6    authority to regulate the manner of presidential elections, it is unconstitutional.

7            Justice Black also failed to address the textual differences between the Elections

8    Clause and the Electors Clause. Justice Harlan, however, observed that "the power to

9    control the 'Manner' of holding elections, given with respect to congressional elections

10   by Art. I, §4, is absent with respect to the selection of presidential electors." *Mitchell*,

11   400 U.S. at 211 (Harlan, J., concurring in part and dissenting in part). And "the fact that

12   it was deemed necessary to provide separately for congressional power to regulate the

13   time of choosing presidential electors and the President himself demonstrates that the

14   power over 'Times, Places and Manner' given by Art. I, §4, does not refer to presidential

15   elections, but only to the elections for Congressmen." *Id.* at 211-12. No binding authority

16   has held otherwise. *Cf. Buckley v. Valeo*, 424 U.S. 1, 14 n.16 (1976) (citing *Burroughs*

17   in passing for the proposition that the Constitution gives "broad congressional power"

18   over presidential elections); *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th Cir.

19   1995) (same).

20           *Second*, the NVRA is not an exercise of Congress's remedial power under the

21   Fourteenth and Fifteenth Amendments. *Inter Tribal Council of Arizona* forecloses any

22   argument to the contrary. There, the Court analyzed the NVRA as "Elections Clause

23   legislation," not Fourteenth Amendment legislation. *Inter Tribal Council*, 570 U.S. at 15.

24   That is why even before the Court decided *Inter Tribal Council* courts recognized that

25   "Congress enacted the National Voter Registration Act under the authority granted it in

26   [the Elections Clause]." *Ass'n of Cmty. Orgs. for Reform Now*, 129 F.3d at 836.

27

**DE-SER-99**

1   Even if *Inter Tribal Council* hadn't resolved the constitutional basis for the

2   NVRA, Plaintiffs would have to show that Congress enacted the NVRA to combat racial

3   discrimination under its remedial power to enforce the Fourteenth and Fifteenth

4   Amendments. To do so, Plaintiffs must demonstrate "congruence and proportionality

5   between the injury to be prevented or remedied and the means adopted to that end." *City*

6   *of Boerne v. Flores*, 521 U.S. 507, 520 (1997). Congress must make legislative findings

7   of past and present discrimination to justify its remedial authority. *Id.* at 530-31. Plaintiffs

8   cannot make that showing. The only textual support in the NVRA for an exercise of

9   remedial authority is a brief mention that "discriminatory and unfair registration laws and

10  procedures can … disproportionately harm voter participation by various groups,

11  including racial minorities." 52 U.S.C. §20501(a)(3). And the NVRA's "legislative

12  record lacks examples of modern instances" of discrimination on account of proof of

13  citizenship required for registration. *City of Boerne*, 521 U.S. at 530. An exercise of

14  Congress's remedial authority requires more than the mere recitation of a few words. *See*

15  *id.* at 530-31. The absence of anything approaching adequate findings confirms that the

16  NVRA was not an exercise of that authority.

17      Even if Congress had purported to pass the NVRA as an exercise of its remedial

18  power, the NVRA is not tailored to remedying discrimination. Besides the inadequacy of

19  the statutory text and findings discussed above, the NVRA ignores the "dramatic

20  improvements" to racial disparities in voter registration and dismisses the "historic

21  accomplishments of the Voting Rights Act." *Nw. Austin Mun. Util. Dist. No. One v.*

22  *Holder*, 557 U.S. 193, 201-02 (2009); *see* S. Rep. 103-6, at 3, 17-18 (1993); H. Rep. 103-

23  9, at 105, 106-07 (1993). Also, unlike the Voting Rights Act, the NVRA does not apply

24  to state elections, indicating that Congress was not trying to remedy discrimination in

25  voter registration—it was simply trying to regulate federal elections. The NVRA "is so

26  out of proportion to a supposed remedial or preventive object that it cannot be understood

27  as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521

**DE-SER-100**

1  U.S. at 532. Defendants are thus entitled to summary judgment on Plaintiffs' claims that

2  the NVRA preempts H.B. 2492's citizenship requirements.

3  **II.    The NVRA sets voter registration rules, not early mail-in voting rules.**

4         The NVRA sets rules governing "procedures to register to vote in elections." 52

5  U.S.C. §20503(a). One of those rules is that States must "accept and use" the federal

6  registration form "for the registration of voters in elections for Federal office." *Id.*

7  §20505(a). The NVRA says nothing about the *mechanisms* for early voting, absentee

8  voting, or mail-in voting. Several Plaintiffs nevertheless allege that H.B. 2492 violates

9  the NVRA by disqualifying from early mail-in voting those applicants who fail to provide

10 documentary proof of citizenship.[3] *See, e.g.*, LUFC Compl., ¶360; DOJ Compl. ¶64. But

11 that argument adds words to the NVRA that Congress did not write.

12        Congress enacted the NVRA to ensure uniform voter registration for federal

13 elections. The essential qualifications to vote in federal elections are the same throughout

14 the country: the voter must be a citizen, over eighteen years of age, a resident of the State,

15 and not a felon. The NVRA provides uniform registration for those uniform

16 qualifications. But an array of different rules governs early and mail-in voting throughout

17 the States. Some States, such as New York and Connecticut, permit voters to submit

18 absentee ballots by mail only if the voter has a qualifying reason to do so. *See* N.Y. Elec.

19 Law §8-400(1); Conn. Gen. Stat. §9-135(a). Other States, such as Arizona, have no-

20 excuse absentee voting and do not require anything more to vote by mail. *See* Ariz. Rev.

21 Stat. §16-541. The details of those systems—applications, required documents, deadlines,

22 record handling, active early voter lists—differ wildly from State to State. Demanding

23 uniformity among mail-in ballot applications would be a fool's errand. If Congress meant

24 to upset each State's individual, carefully tailored mail-in voting rules in the NVRA, it

25 would have said so.

26

27

---

[3] The State agrees that the mail-in voting provisions "are likely not preempted" by the
NVRA. *See* Doc. 364 at 3-4.

DE-SER-101

Kevin E. O'Malley (Bar No. 006420)
Hannah H. Porter (Bar No. 029842)
Ashley E. Fitzgibbons (Bar No. 036295)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:    (602) 530-8000
Facsimile:    (602) 530-8500
kevin.omalley@gknet.com
hannah.porter@gknet.com
ashley.fitzgibbons@gknet.com
*Attorneys for Proposed Intervenor-Defendants*
*Speaker Toma and President Petersen*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, | No. 2:22-cv-00509-SRB (Lead) |
| Plaintiff, | **SPEAKER OF THE HOUSE BEN TOMA AND SENATE PRESIDENT WARREN PETERSEN'S MOTION TO INTERVENE AS DEFENDANTS** |
| v. | |
| Adrian Fontes, in his official capacity as Arizona Secretary of State, et al., | |
| Defendant. | |
| AND CONSOLIDATED CASES | |

Pursuant to Fed. R. Civ. P. 24, Proposed Intervenor-Defendants Ben Toma, Speaker of the Arizona House of Representatives, and Warren Petersen, President of the Arizona Senate (the "Speaker" and "President," respectively) move to intervene as defendants in this consolidated action.

Counsel for Defendants Attorney General Kris Mayes and the State of Arizona and counsel for Intervenor-Defendant Republican National Committee ("RNC") have indicated that they do not oppose the filing of this motion and consent to the Speaker and President's participation in this action as Intervenor-Defendants.

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

Arizona law recognizes that the Speaker and President have a unique interest in defending the constitutionality of laws duly enacted by the Arizona Legislature and gives them authority to intervene and file briefs in any case challenging the constitutionality of state laws. *See* A.R.S. § 12-1841. Because it appears that Attorney General Mayes may not fully defend the constitutionality of the two state statutes at issue in this case and thus will not adequately represent the Speaker and President's interests, the Speaker and President should be allowed to intervene.

## I.     FACTUAL AND PROCEDURAL BACKGROUND.

This is a consolidated case which involves eight matters brought by the United States of America as well as numerous private entities, such as Mi Familia Vota, Promise Arizona, and the Democratic National Committee (the "Plaintiffs"). Though the Plaintiffs filed eight different lawsuits, the core allegations of each lawsuit challenge the constitutionality of two Arizona laws regarding voting regulations, H.B. 2492 and H.B. 2243 (the "Voting Laws"). The Court granted orders to consolidate all eight cases. [*See* Doc. 193.] *Mi Familia Vota v. Adrian Fontes et al.*, 2:22-CV-00509, became the lead case.

### A.     The Challenged Laws

The Voting Laws became effective on January 1, 2023. They require certain proof of citizenship and proof of residence from Arizonans seeking to register to vote and implement certain consequences if a registrant fails to provide this proof of citizenship. These laws also implement additional authority for election officials to regulate Arizona voter rolls.

More specifically, under H.B. 2492, when registering to vote in Arizona, registrants are required to provide proof of citizenship and proof of residence in the State of Arizona. H.B. 2492 §§ 4(A),5. For proof of residence, registrants are required to provide one of the acceptable forms of documents enumerated by A.R.S. § 16-579(A)(1). If an election official is unable to match the appropriate citizenship information, the election official will notify

the registrant that they will not be qualified to vote. H.B. 2492 § 4(E). Further, election officials will provide the Attorney General with a list of all those who did not provide satisfactory evidence of citizenship. *Id.* § 7(B).

H.B. 2243 requires the County Recorder provide notice to registrants who have not provided satisfactory proof of citizenship. H.B. 2243 § 2(A)(10). If the County Recorder does not receive satisfactory proof of citizenship from the registrant within thirty-five days of the notice, the County Recorder must notify the County Attorney and Attorney General for possible investigation. *Id.* H.B. 2243 also requires the County Recorder to review the voter rolls each month and purge persons who the County Recorder believes are not citizens. *Id.* § 2(H). The County Recorder is to conduct checks among other databases, like the Social Security Administration, Verification of Vital Events System, and other state and federal databases the County Recorder has access to. *Id.* § 2(G), (I)-(J).

**B.    The Consolidated Lawsuit**

On September 16, 2022, the State filed a motion to dismiss, alleging lack of standing, ripeness, and failure to state viable claims. [Doc. 127.] The motion was briefed and the Court held oral argument on December 15, 2022. [Doc. 187.] On February 16, 2023, the Court denied Defendants' Motion to Dismiss, finding the Plaintiffs have proper standing to bring their claims and stated plausible claims for relief. [Doc. 304.] The State and the RNC filed answers to most of the complaints on or about March 17, 2023. [Doc. 317-329.]

On March 23, 2023, the Court held a Rule 16 Scheduling Conference. At the Conference, the Court informed the parties this case would be on a fast track for discovery. The Court ordered dispositive motions due by May 1, 2023 and discovery be due by July 14, 2023. [Doc. 338.]

**DE-SER-104**

1

    **C.**    **Proposed Intervenors**

2       Ben Toma is the Speaker of the Arizona House of Representatives and Warren

3  Petersen is the President of the Arizona Senate. The Speaker and the President seek to

4  intervene in their official capacities, and on behalf of their respective legislative chambers,

5  which together comprise the Fifty-Sixth Legislature of Arizona. Each chamber has passed

6  rules authorizing its presiding officer to raise and defend "any claim or right arising out of

7  any injury to the [chamber]'s powers or duties under the constitution or laws of this state."[1]

8  Arizona    House    of    Representatives    Rule    4(K),    *available*    *at*

9  https://www.azhouse.gov/alispdfs/AdoptedRulesofthe56thLegislature.pdf; Arizona State

10  Senate  Rule  2(N),  available  at  https://www.azsenate.gov/alispdfs/SenateRules2023-

11  2024.pdf. Speaker Toma was a Co-Sponsor of H.B. 2492, and both Speaker Toma and

12  President Petersen voted for H.B. 2492 and H.B. 2243.

13  **II.**    **THE PRESIDENT AND SPEAKER ARE ENTITLED TO INTERVENE AS A**

14          **MATTER OF RIGHT.**

15       Pursuant to Fed. R. Civ. P. 24 (a)(2), intervention as a matter of right is available to

16  a party who "claims an interest relating to the property or transaction that is the subject of

17  the action, and is so situated that disposing of the action may as a practical matter impair or

18  impede the movant's ability to protect its interest, unless existing parties adequately

19  represent that interest."

20       The Ninth Circuit employs a four-factor test to analyze intervention of right: (1) the

21  motion must be timely; (2) the applicant must claim a significantly protectable interest

22  relating to the property or transaction which is the subject of the action; (3) the applicant

23  must be so situated that the disposition of the action may as a practical matter impair or

24  impede its ability to protect that interest; and (4) the applicant's interest must be

25

26  
---
[1] *See* Ariz. Const. art. 4, pt. 2 § 8 (authorizing each house of the Legislature to "determine its own rules of procedure").

inadequately represented by the parties to the action." *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011) (internal quotation omitted).

Courts broadly construe these requirements because "a liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *Id.* Furthermore, the Court's intervention analysis is "'guided primarily by practical considerations,' not technical distinctions." *Sw. Ctr. for Biological Diversity v. Berg,* 268 F.3d 810, 818 (9th Cir. 2001). "Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene . . . and declarations supporting the motion as true absent sham, frivolity or other objections." *Id.* at 820.

### A.     The Motion Is Timely.

Whether a motion to intervene is timely is based on three primary considerations: "(1) the stage of the proceeding at which the applicant seeks to intervene; (2) the prejudice to the other parties; and (3) the reason for and length of delay." *See U.S. ex rel. McGough v. Covington Techs. Co.,* 967 F.2d 1391, 1394 (9th Cir. 1992). "[T]he crucial date for assessing the timeliness of a motion to intervene is when proposed intervenors should have been aware that their interest would not be adequately protected by the existing parties." *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016) (quotation omitted). However, "hasty intervention" is not required. *Kalbers v. United States Dep't of Justice*, 22 F.4th 816, 823 (9th Cir. 2021).

Here, the Speaker and President first learned that Kris Mayes would become the Attorney General of Arizona on December 29, 2022, when the results of the recount were released.[2] But this change in the administration did not necessarily mean that the State would take different positions with respect to the bills at issue in the lawsuit, especially given that the State's motion to dismiss had been fully briefed and argued

---

[2] *See* Democrat wins Arizona attorney general race after recount, Politico, https://www.politico.com/news/2022/12/29/kris-mayes-arizona-attorney-general-recount-00075815..

**DE-SER-106**

1  by that point. It is the Speaker and President's understanding that within the last few

2  weeks, however, outside counsel for the State indicated to the other parties that the

3  State would soon issue a letter to all counsel addressing what positions the Attorney

4  General's Office would take going forward. That letter has not yet been sent, and thus

5  we do not know the exact parameters of the State's position. But as a logical matter, if

6  the State simply intended to continue all the positions taken by the previous Attorney

7  General, there would be no need for such a letter.

8      In that correspondence, outside counsel for the State also offered to stipulate to

9  a stay of the enforcement of the Voting Laws pending a combined preliminary

10  injunction hearing and trial on the merits on all claims that could be decided as a matter

11  of law. The State reaffirmed this position to the Court at the March 23 Rule 16

12  Scheduling Conference. The Speaker and President would not agree to such an

13  injunction, and therefore move to intervene in order to protect their interests.

14      Based on these considerations, this motion satisfies the timeliness requirement.

15      **1.    Stage of the Proceedings.**

16      First, the case is still in its early stages. The Court issued its orders on the State's

17  motions to dismiss on February 16, 2023 and March 17, 2023. [Doc. 304 and 316.] The

18  State and the RNC filed answers to many of the various complaints on or about March

19  17, 2023. The Court held its Rule 16 Scheduling Conference approximately one week

20  ago, on March 23, and issued its order setting discovery and dispositive motion

21  deadlines the following day. [Doc. 338.]

22      Undersigned counsel attended the Rule 16 Scheduling Conference via Zoom and

23  is aware of the deadlines, including the upcoming deadline for motions for summary

24  judgment on May 1. The Speaker and President will certainly abide by the scheduling

25  deadlines imposed in the Court's March 24 order.

26

1   Accordingly, this consideration supports intervention. *See, e.g., Safari Club Int'l*

2   *v. Jewell,* No. CV-16-00094-TUC-JGZ, 2016 WL 7786478, at *1 (D. Ariz. May 13, 2016)

3   (holding motion to intervene filed after issuance of a scheduling order and within three

4   months of scheduled merits briefing was timely).

5   **2.     Prejudice to the Other Parties.**

6   Second, the existing parties will not suffer any prejudice from the Speaker and

7   President's intervention. To be clear, the only relevant "prejudice" in an intervention

8   analysis is that which arises from the intervenor's failure to timely intervene after he

9   should have known that his interests were not adequately represented. *Kalbers*, 22

10   F.4th at 825. The mere fact that adding another party might make resolution of the case

11   "more difficult does not constitute prejudice." *Id.*

12   Again, this case is still in its early stages and summary judgment briefing has

13   not yet started. The Speaker and President are willing to comply with the existing case

14   deadlines set by the court, which militates against a finding of prejudice. *See id.* at 826

15   (finding that there was no prejudice where intervenor "offered to comply with this

16   existing summary judgment briefing schedule).

17   **3.     Reason for and Length of Delay**

18   Lastly, there was no delay. The Speaker and the President contacted counsel and

19   began work to intervene upon learning that the State had offered to stipulate to an

20   injunction enjoining the enforcement of the Voting Laws pending a preliminary

21   injunction hearing and final trial on the merits. In these circumstances, the motion is

22   timely. *See Kalbers*, 22 F.4th at 825 (intervention motion filed "just a few weeks" after

23   notice of inadequate representation was timely); *Smith*, 830 F.3d at 853, 856 (intervention

24   motions filed more than two months after learning of inadequate representation were

25   timely).

26   **B.     The President and Speaker Have Protectable Interests in the Litigation.**

1    The second Rule 24 factor concerns whether the intervenor has a significantly

2    protectable interest in the action. The Ninth Circuit has held that "Rule 24(a)(2) does not

3    require a specific legal or equitable interest." *Wilderness Soc.*, 630 F.3d at 1179. Rather, the

4    "'interest' test is primarily a practical guide to disposing of lawsuits by involving as many

5    apparently concerned persons as is compatible with efficiency and due process." *Id.*

6    (citation omitted). "[I]t is generally enough that the interest is protectable under some law,

7    and that there is a relationship between the legally protected interest and the claims at issue."

8    *Id.* (quotation omitted). In sum, an intervenor has a sufficient interest "if it will suffer a

9    practical impairment of its interests as a result of the pending litigation." *Id.* (quotation

10   omitted). Here, the Speaker and President easily meet this standard.

11    Pursuant to A.R.S. 12-1841(A), the Speaker and the President "shall be entitled

12   to be heard" "[i]n any proceeding in which a state statute . . . is alleged to be

13   unconstitutional." Section 12-1841(D) further authorizes the Speaker and the President

14   to "intervene as a party" and file briefs in any such case. To that end, Section 12-1841

15   requires notice to be served upon the Speaker and President when constitutional

16   challenges are made. In addition, the Arizona State Senate and the Arizona House of

17   Representatives have authorized the Speaker and President to bring claims on behalf

18   of their respective bodies as a whole. Arizona House of Representatives Rule 4(K);

19   Arizona State Senate Rule 2(N). In short, Arizona law and the rules of the House and

20   Senate expressly empower the Speaker and the President to defend duly enacted

21   Arizona laws against constitutional claims.

22    In *Berger v. N.C. State Conference of the NAACP*, 142 S. Ct. 2191, 2197 (2022), the

23   U.S. Supreme Court recently reaffirmed that legislative leaders may be empowered under

24   state law to "participate in litigation on the State's behalf . . . with counsel of their own

25   choosing." Although some states have chosen to organize themselves to allow for a defense

26   through the attorney general alone, others have "chosen to authorize multiple officials to

**DE-SER-109**

1   defend their practical interest in cases like these." *Id.* at 2197. In short, a State must be

2   allowed to designate its agents and may authorize its legislature to litigate on the State's

3   behalf; the choice belongs to the State. *Id.* at 2202 (citing *Va. House of Delegates v.*

4   *Bethune-Hill,* 139 S. Ct. 1945, 1951–52 (2019); *Cameron v. EMW Women's Surgical Ctr.*,

5   142 S. Ct. 1002, 1011 (2022); *Hollingsworth v. Perry*, 570 U.S. 693, 710 (2013); *Karcher*

6   *v. May*, 484 U.S. 72, 75, 81–82 (1987)). This makes sense as a practical approach given

7   that, as here, an attorney general may "oppose[] laws enacted by the [state legislature] and

8   decline[d] to defend them fully in federal litigation." *Id.* at 2197.

9          Judge Rayes recently granted a motion to intervene filed by the President and

10   Speaker involving similar circumstances. *Isaacson v. Mayes*, No. CV-21-01417-PHX-

11   DLR, 2023 WL 2403519 (D. Ariz. Mar. 8, 2023). In *Isaacson*, the President and Speaker

12   sought to intervene to defend a challenge to the constitutionality of two state statutes

13   regarding abortions. *Id.* The plaintiffs opposed the intervention and argued that the

14   President and Speaker did not have a significantly protectable interest in the case. *Id.*

15          The court disagreed, holding that A.R.S. § 12-1841 "demonstrates Arizona has made

16   a policy decision to vest in its legislative leaders an interest in defending the

17   constitutionality of the legislature's enactments." *Id.* The court also rejected the plaintiffs'

18   contention that A.R.S. § 12-1841 applied only to actions in state court: "[N]othing in the

19   language of § 12-1841 imposes such a limitation. To the contrary, § 12-1841(A) says it

20   applies 'in *any* proceeding in which a state statute, ordinance, franchise or rule is alleged to

21   be unconstitutional[.]' (Emphasis added.) Any means any." *Id.* at *2. Accordingly, the court

22   held that the President and Speaker met all of the requirements for intervention as of right

23   under Rule 24. *Id.*

24          The same result is warranted here. A State "clearly has a legitimate interest in the

25   continued enforceability of its own statutes…." *Cameron,* 142 S. Ct. at 1011. (internal

26   quotation marks omitted). This means "that a State's opportunity to defend its laws in

1   federal court should not be lightly cut off." *Id.* This applies with special force to a state's

2   election laws, since Art. I, § 4, cl. 1 of the Constitution commits to state legislatures the

3   right to determine the "Times, Places and Manner" of holding congressional elections. Here,

4   Arizona has authorized the Speaker and President "to defend the State's practical interests

5   in litigation" involving constitutional challenges to state statutes. *See Berger*, 142 S. Ct. at

6   2202. Thus, the Speaker and President should be allowed to exercise their statutory

7   authority under A.R.S. § 12-1841 to intervene and defend the laws at issue in this case.

8       **C.     The Speaker and President's Interests May Be Practically Impaired
            Without Their Participation**.

9
10      Once the other Rule 24 factors are met, courts often "have little difficulty concluding

11  that the disposition of [a] case may, as a practical matter, affect" an intervenor's interests.

12  *California ex rel. Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006).

13      Furthermore, because different officials may have "different interests and

14  perspectives, all important to the administration of state government," the Supreme Court

15  in *Berger* cautioned that "federal courts should rarely question that a State's interests will

16  be practically impaired or impeded if its duly authorized representatives are excluded from

17  participating in federal litigation challenging state law." 142 S. Ct. at 2201.

18          To hold otherwise would not only evince disrespect for a State's chosen
            means of diffusing its sovereign powers among various branches and
19          officials. It would not only risk turning a deaf federal ear to voices the State
            has deemed crucial to understanding the full range of its interests. It would
20          encourage plaintiffs to make strategic choices to control which state agents
            they will face across the aisle in federal court. It would tempt litigants to
21          select as their defendants those individual officials they consider most
            sympathetic to their cause or most inclined to settle favorably and quickly.
22          All of which would risk a hobbled litigation rather than a full and fair
            adversarial testing of the State's interests and arguments.
23
24  *Id.*

25      As discussed above, the Speaker and President have been authorized to intervene

26  and file briefs in cases challenging the constitutionality of an Arizona statute. The Speaker

1   and President, on behalf of their chambers, represent a unique perspective that is important

2   to a full understanding of the State's interests.

3         **D.**    **The Existing Parties Will Not Adequately Represent the Proposed**

4               **Intervenors' Interests.**

5       Under the general standard articulated by the Supreme Court and adopted by the

6   Ninth Circuit, the burden of showing inadequate representation by an existing party "is

7   'minimal' and satisfied if the applicant can demonstrate that representation of its interests

8   'may be inadequate." *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d

9   893, 898 (9th Cir. 2011) (quoting *Arakaki v. Cayetano,* 324 F.3d 1078, 1086 (9th Cir.

10   2003)). Courts consider three factors: "(1) whether the interest of a present party is such

11   that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the

12   present party is capable and willing to make such arguments; and (3) whether a proposed

13   intervenor would offer any necessary elements to the proceeding that other parties would

14   neglect." *Perry v. Proposition 8 Official Proponents,* 587 F.3d 947, 952 (9th Cir. 2009).

15       Here, the Speaker and President have a significant protectable interest in

16   defending the constitutionality of Arizona statutes regarding voting and elections, and

17   that interest may be impaired if they are not allowed to intervene. For example, at the

18   Rule 16 Scheduling Conference, the State was in favor of a stay of the enforcement of

19   the bills pending a combined preliminary injunction hearing and final trial on the

20   merits. The Speaker and President would not stipulate to such an injunction and seek

21   to fully defend the laws passed by the legislature.

22       For these reasons, the Speaker and President are entitled to intervene as a matter

23   of right.

24   **III.**   **ALTERNATIVELY, PERMISSIVE INTERVENTION IS MERITED.**

25       Even if this Court were to find that the Speaker and President are not entitled to

26   intervene in this action as a matter of right, it should still permit the Speaker and President

1  to intervene because they satisfy the requirements for permissive intervention under Fed.

2  R. Civ. P. 24(b).

3      The Court may grant permissive intervention under Fed. R. Civ. P. 24(b)(1)(B) to

4  anyone who "has a claim or defense that shares with the main action a common question of

5  law or fact." "[A] court may grant permissive intervention where the applicant for

6  intervention shows (1) independent grounds for jurisdiction; (2) the motion is timely; and

7  (3) the applicant's claim or defense, and the main action, have a question of law or a

8  question of fact in common." *United States v. City of Los Angeles*, 288 F.3d 391, 403 (9th

9  Cir. 2002) (citation omitted). "The district court is given broad discretion to make this

10  determination." *Perry v. Schwarzenegger*, 630 F.3d 898, 905 (9th Cir. 2011).

11      When determining whether to grant permissive intervention, courts examine many

12  factors similar to those for intervention as a matter of right, including: "[T]he nature and

13  extent of the intervenors' interest, their standing to raise relevant legal issues, the legal

14  position they seek to advance, and its probable relation to the merits of the case, . . . whether

15  the intervenors' interests are adequately represented by other parties, whether intervention

16  will prolong or unduly delay the litigation, and whether parties seeking intervention will

17  significantly contribute to full development of the underlying factual issues in the suit and

18  to the just and equitable adjudication of the legal questions presented." *Spangler v.*

19  *Pasadena Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977).

20      The Court should permit the Speaker and President to intervene in this action. As

21  discussed above, this motion is timely. The jurisdictional prong of the Rule 24(b) test is met

22  because the Speaker and President seek to defend federal constitutional challenges to the

23  Voting Laws. *See, e.g., Venegas v. Skaggs*, 867 F.2d 527, 529 (9th Cir. 1989). Finally,

24  common questions of law and fact abound, given that the Speaker and President are

25  interested in defending the constitutionality of the Voting Laws.

26

Accordingly, this Court should allow the Speaker and President to intervene here, if not as of right, then by permission.

**IV.   CONCLUSION.**

For the foregoing reasons, the Speaker and President respectfully request the Court grant this Motion to Intervene and allow them to participate as Defendants to protect their unique interests in defending the challenged state statutes.

Pursuant to Fed. R. Civ. P. 24(c), the Speaker and President have attached their joint Answers to the eight complaints that are part of this consolidated action as Exhibit A, which set out the claims and defenses for which intervention is sought.

RESPECTFULLY SUBMITTED this 4th day of April 2023.

GALLAGHER & KENNEDY, P.A.

By: */s/Hannah H. Porter*
Kevin E. O'Malley
Hannah H. Porter
Ashley E. Fitzgibbons
2575 East Camelback Road
Phoenix, Arizona 85016-9225
*Attorneys for Proposed Intervenor-Defendants Speaker Toma and President Petersen*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of April 2023, I electronically transmitted a PDF version of this document to the Clerk of Court, using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing.

*/s/ D. Ochoa*

13

**DE-SER-114**

Kevin E. O'Malley (Bar No. 006420)
Hannah H. Porter (Bar No. 029842)
Ashley E. Fitzgibbons (Bar No. 036295)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:   (602) 530-8000
Facsimile:    (602) 530-8500
kevin.omalley@gknet.com
hannah.porter@gknet.com
ashley.fitzgibbons@gknet.com
*Attorneys for Intervenor-Defendants Toma and Petersen*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| Mi Familia Vota, | No. 2:22-cv-00509-SRB (Lead) |
|---|---|
| Plaintiff, | **INTERVENOR-DEFENDANTS BEN TOMA AND WARREN PETERSEN'S ANSWER TO LIVING UNITED FOR CHANGE IN ARIZONA, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, ARIZONA STUDENTS' ASSOCATION, ADRC ACTION INTER-TRIBAL COUNCIL OF ARIZONA, INC., SAN CARLOS APACHE TRIBE, AND ARIZONA COALITION FOR CHANGE'S FIRST AMENDED COMPLAINT** |
| v. | |
| Adrian Fontes, in his official capacity as Arizona Secretary of State, et al., | |
| Defendant. | |
| AND CONSOLIDATED CASES | |

Intervenor-Defendants Ben Toma, Speaker of the Arizona House of

Representatives, and Warren Petersen, President of the Arizona Senate ("Intervenors"),

answers to the First Amended Complaint (Doc. 67) filed on July 18, 2022, by Plaintiffs

Living United for Change in Arizona, League of United Latin American Citizens, Arizona

Students' Association, ADRC Action Inter-Tribal Council of Arizona, Inc., San Carlos

Apache Tribe, and Arizona Coalition for Change ("Plaintiffs") as follows:

**Count 2:  National Origin Discrimination Fourteenth Amendment
(48 U.S.C. § 1983)**

329.   Intervenors incorporate by reference all proceeding paragraphs as if fully set forth herein.

330.   Deny.

331.   Deny.

332.   Deny.

333.   Deny.

334.   Deny.

335.   Deny.

**Count 3: Unlawful Discrimination Fourteenth Amendment
(48 U.S.C. § 1983)**

336.   Intervenors incorporate by reference all proceeding paragraphs as if fully set forth herein.

337.   Deny.

338.   Deny.

339.   Deny.

340.   Deny.

341.   Deny.

**Count 4:  Immaterial Omission on Voter Registration Form
(42 U.S.C. § 1983; 52 U.S.C. § 10101)**

342.   Intervenors incorporate by reference all proceeding paragraphs as if fully set forth herein.

343.   This paragraph includes legal conclusions that require no response.  If a response is required, Intervenors admit the quoted language is accurately reproduced.

**DE-SER-116**

1    RESPECTFULLY dated this 4th day of April 2023.

2                                        GALLAGHER & KENNEDY, P.A.

3

4                                        By:/s/ Hannah H. Porter

5                                           Kevin E. O'Malley
                                            Hannah H. Porter
6                                           Ashley E. Fitzgibbons
                                            2575 East Camelback Road
7                                           Phoenix, Arizona  85016-9225
                                            *Attorneys for Intervenor-Defendants*
8                                           *Toma and Petersen*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

D. Andrew Gaona (028414)
Kristen Yost (034052)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
T: (602) 381-5478
agaona@cblawyers.com
kyost@cblawyers.com

Sambo (Bo) Dul (030313)
**STATES UNITED DEMOCRACY CENTER**
8205 South Priest Drive, #10312
Tempe, Arizona 85284
T:  (480) 253-9651
bo@stateuniteddemocracy.org

Christine Bass *
**STATES UNITED DEMOCRACY CENTER**
506 S. Spring Street, Suite #13308
Los Angeles, California 90013
T:  (309) 242-8511
christinebass@stateuniteddemocracy.org
*\* Admitted Pro Hac Vice*

*Attorneys for Defendant*
*Arizona Secretary of State Katie Hobbs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., | ) No. 2:22-cv-00509-SRB |
| | ) |
| Plaintiffs, | ) |
| | ) **DEFENDANT SECRETARY OF** |
| | ) **STATE KATIE HOBBS' ANSWER** |
| v. | ) **TO PLAINTIFFS DEMOCRATIC** |
| | ) **NATIONAL COMMITTEE AND** |
| | ) **ARIZONA DEMOCRATIC** |
| Katie Hobbs, in her official capacity as | ) **PARTY'S COMPLAINT** |
| Arizona Secretary of State, et al., | ) |
| | ) |
| Defendants. | ) |

**DE-SER-118**

Living United for Change in Arizona, et al.,    )
                                                )
                    Plaintiffs,                 )
                                                )
            v.                                  )
                                                )
Katie Hobbs, in her official capacity as        )
Arizona Secretary of State, et al.,             )
                                                )
                    Defendants.                 )
                                                )
_____
Poder Latinx, et al.,                           )
                                                )
                    Plaintiffs,                 )
                                                )
            v.                                  )
                                                )
Katie Hobbs, in her official capacity as        )
Arizona Secretary of State, et al.,             )
                                                )
                    Defendants.                 )
                                                )
_____
United States of America,                       )
                                                )
                    Plaintiff,                  )
                                                )
            v.                                  )
                                                )
Katie Hobbs, in her official capacity as        )
Arizona Secretary of State, et al.,             )
                                                )
                    Defendants.                 )
                                                )
_____
Democratic National Committee, et al.,          )
                                                )
                    Plaintiffs,                 )
                                                )
            v.                                  )
                                                )
Katie Hobbs, in her official capacity as        )
Arizona Secretary of State, et al.,             )
                                                )
                    Defendants.                 )
                                                )
_____

elections.

25.     Responding to Paragraph 25 of the Complaint, the Secretary admits that Arizona voters passed Proposition 200 in 2004, which required voters to present DPOC when they register to vote and to present identification to vote in person on election day, and required county recorders to reject voter registration applications that were not accompanied by DPOC no matter which voter registration form the applicant used.

26.     Responding to Paragraph 26 of the Complaint, the Secretary admits that the U.S. Supreme Court struck down Arizona's DPOC requirement for voters who apply to register to vote using the Federal Form, but Arizona continued to enforce the requirement for those who registered using the State Form; that those who register using the Federal Form and do not provide DPOC (known as "federal-only" voters) are ineligible to vote in state and local elections; and that Arizona's bifurcated voter registration system as implemented by then-Secretary of State Ken Bennett was in place from 2013 until it was modified pursuant to the *LULAC* consent decree in 2018.

27.     Responding to Paragraph 27 of the Complaint, the Secretary admits that, as of August 2, 2022, approximately 35,000 Arizonans are registered to vote as "federal-only" voters (including active and inactive registered voters), and that the Secretary maintains voter registration records for these voters. The Secretary denies the remaining allegations in Paragraph 27.

28.     Responding to Paragraph 28 of the Complaint, the Secretary admits the allegations in the first two sentences. The Secretary lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 28.

29.     The Secretary admits the allegations in Paragraph 29.

30.     The Secretary lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 30.

31.     The Secretary lacks knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 31.

32.     The Secretary admits the allegations in Paragraph 32.

33.     The Secretary admits the allegations in Paragraph 33.

34.     Responding to Paragraph 34 of the Complaint, the Secretary admits that HB 2492 provides that voters who have not submitted DPOC will no longer be eligible to vote in presidential elections or to receive an early ballot by mail, and that HB 2492 will take effect on January 1, 2023. Responding to footnote 5, the Secretary denies the allegations based on Section 1 of SB 1638, which amended A.R.S. § 16-127 "as added by" HB 2492 to clarify that only those persons who have not provided DPOC "as prescribed by section 16-166" (as opposed to section 16-166(F) specifically) are not eligible to vote in presidential elections or to receive an early ballot by mail. SB 1638 therefore clarifies that A.R.S. 16-166(G)'s safe harbor, which provided that any person who registered before December 2004 is deemed to have provided satisfactory evidence of citizenship under Arizona law, was incorporated into HB 2492.

35.     Responding to Paragraph 35 of the Complaint, the Secretary admits that HB 2492 directs the Secretary and county recorders to give access to the Attorney General a list of all individuals who applied or are registered to vote but have not provided proof of citizenship, and directs the Attorney General to use all available resources to investigate the citizenship status of those individuals. The Secretary denies that this list includes voters who registered before December 2004, because HB 2492 provides that the list includes only individuals "who have not provided satisfactory evidence of citizenship pursuant to section 16-166," and A.R.S. § 16-166(G) provides that any person who registered before December 2004 is "deemed to have provided satisfactory evidence of citizenship." The Secretary lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 35.

36.     Responding to Paragraph 36 of the Complaint, the Secretary admits the

LATHAM & WATKINS LLP
  Sadik Huseny (pro hac vice)
  *sadik.huseny@lw.com*
  Amit Makker (pro hac vice)
  *amit.makker@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 395-0600
Facsimile: (415) 395-8095

ASIAN AMERICANS ADVANCING JUSTICE-
AAJC
  Niyati Shah (pro hac vice forthcoming)
  *nshah@advancingjustice-aajc.org*
  Terry Ao Minnis (pro hac vice forthcoming)
  *tminnis@advancingjustice-aajc.org*
1620 L Street NW, Suite 1050
Washington, DC 20036
Telephone: (202) 296-2300
Facsimile: (202) 296-2318

SPENCER FANE
  Andrew M. Federhar
  *afederhar@spencerfane.com*
2415 East Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 333-5430
Facsimile: (602) 333-5431

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Asian American Native Hawaiian And Pacific Islander For Equity Coalition, Plaintiff, vs.<br><br>Katie Hobbs, in her official capacity as Arizona Secretary of State; Mark Brnovich, in his official capacity as Arizona Attorney General; and the County Recorder Defendants, Apache County Recorder Larry Noble; Cochise County Recorder David W. Stevens; Coconino County Recorder Patty Hansen; Gila County Recorder Sadie Jo Bingham; Graham County Recorder Wendy John; Greenlee County Recorder Sharie Milheiro; La Paz County Recorder Richard Garcia; Maricopa County Recorder Stephen Richer; Mohave County Recorder Kristi | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1    Blair; Navajo County Recorder Michael
Sample; Pima County Recorder Gabriella
2    Cázares-Kelly; Pinal County Recorder
Virginia Ross; Santa Cruz County Recorder
3    Suzanne Sainz; Yavapai County Recorder
Michelle M. Burchill; and Yuma County
4    Recorder Richard Colwell, in their official
capacities,

5

                     Defendants.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment. That is to say, the right of suffrage is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress, acting pursuant to its constitutional powers, has imposed." *Harper*, 383 U.S. at 665.

122.    By treating voters who register with the Federal Form differently from voters who register with the state form, Sections 1, 3, 4, 5, and 7 of H.B. 2492 and Defendants' enforcement of those sections impermissibly subject state form applicants to disparate treatment by rejecting their applications completely, rather than registering them to vote in congressional and/or federal elections.  Defendants' pretextual justifications do not survive strict scrutiny or even rational basis review.

123.    By treating voters who register with the Federal Form differently from voters who register with the state form, Sections 1, 3, 4, 5, and 7 of H.B. 2492 and Defendants' enforcement of those sections impermissibly subject state form applicants to disparate treatment by requiring additional information on the state form, including requiring an applicant's place of birth.  Because Arizona law expressly does not use this information to verify state form applicants' citizenship, it does not advance any proffered or possible State interest.  Defendants' pretextual justifications do not survive strict scrutiny or even rational basis review.

124.    Accordingly, Plaintiff is entitled to a declaration that Sections 1, 3, 4, 5, and 7 of H.B. 2492 are unconstitutional and an order permanently enjoining their enforcement.

### THIRD CLAIM FOR RELIEF

**(National Origin Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution)**

125.    Plaintiff incorporates by reference all foregoing paragraphs as if set forth here.

126.    The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

**DE-SER-124**

U.S. Const. amend. XIV, § 1.  The Equal Protection Clause is violated when the government treats a person disparately as compared to similarly situated persons where the disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.

127.   Laws that classify based on national origin are inherently suspect and subject to strict scrutiny.  Where a law does not facially classify by a suspect class, an Equal Protection claim alleging disparate treatment that targets a suspect class is analyzed under the discriminatory intent test.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

128.   By classifying and subjecting naturalized U.S. citizens to disfavored treatment through the imposition of burdensome voting registration requirements (i.e., the DPOC and birth place requirements), Sections 1, 3, 4, 5, and 7 of H.B. 2492 and Defendants' enforcement of those sections violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Moreover, because the voters most likely to lack DPOC include AANHPIs, naturalized citizens, and other voters of color, Sections 1, 3, 4, 5, and 7 of H.B. 2492 discriminate against those citizens.

129.   By subjecting naturalized U.S. citizens to disfavored treatment through the imposition of burdensome voting registration requirements (i.e., the DPOC requirement), Section 2 of H.B. 2243 and Defendants' enforcement of that section violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Moreover, because the voters most likely to lack DPOC include AANHPIs, naturalized citizens, and other voters of color, Section 2 of H.B. 2243 discriminates against those citizens.

130.   By requiring county recorders to only consult the SAVE database when the county recorder has reason to believe a voter is not a citizen, or when a voter has not provided DPOC, H.B. 2243 impermissibly targets voters by national origin for disparate treatment in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

DE-SER-125

131.    As alleged above, H.B. 2492 and H.B. 2243 were enacted with discriminatory intent and the intent to suppress the voting rights of AANHPIs, naturalized citizens, and/or other voters of color.

132.    Accordingly, Plaintiff is entitled to a declaration that Sections 1, 3, 4, 5, and 7 of H.B. 2492 are unconstitutional and an order permanently enjoining their enforcement.

133.    Accordingly, Plaintiff is entitled to a declaration that Section 2 of H.B. 2243 is unconstitutional and an order permanently enjoining its enforcement.

### FOURTH CLAIM FOR RELIEF

**(Violation of Procedural Due Process Rights**
**under the Fourteenth Amendment to the U.S. Constitution)**

134.    Plaintiff incorporates by reference all foregoing paragraphs as if set forth here.

135.    The Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.

136.    Voting is a fundamental right subject to the protections of the Fourteenth Amendment.  Furthermore, because Arizona voters have been able to vote in presidential elections and Arizona has afforded its voters the ability to vote by mail, these aspects are subject to due process guarantees as well and voters cannot be deprived of them without adequate procedures.  Laws related to voting regulations that place burdens on these rights are subject to the sliding scale *Anderson*/*Burdick* balancing test.  Defendants' pretextual justifications for H.B. 2492 and H.B. 2243 do not survive strict scrutiny or even rational basis review.

137.    By stripping already-registered voters who have not provided DPOC of their eligibility to vote in presidential elections and to use early ballots by mail without providing notice or an opportunity to contest or cure, Section 5 of H.B. 2492 and Defendants' enforcement of that section violate voters' procedural due process rights.

COMPLAINT

provided or is questioned, Section 2 of H.B. 2243 and Defendants' enforcement of that section intentionally discriminate against AANHPIs, naturalized citizens from those communities, and other voters of color, in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution.

151.    Accordingly, Plaintiff is entitled to a declaration that Section 2 of H.B. 2243 is unconstitutional and an order permanently enjoining its enforcement.

## SIXTH CLAIM FOR RELIEF

**(Denial of Right to Vote Based on Immaterial Omission on Voter Registration Form in Violation of the Civil Rights Act, 52 U.S.C. § 10101)**

152.    Plaintiff incorporates by reference all foregoing paragraphs as if set forth here.

153.    The Materiality Provision of the Civil Rights Act of 1964 prohibits individuals "acting under color of law" from denying anyone the right "to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."  52 U.S.C. § 10101(a)(2)(B).

154.    H.B. 2492 violates Subsection (a)(2)(B) of Section 10101 of the Civil Rights Act by requiring registrants to provide their place of birth, which is not material to determine whether a registrant is qualified to vote.

155.    Accordingly, Plaintiff is entitled to a declaration that Defendants' implementation of Section 4 of H.B. 2492 violates Plaintiff's rights under 52 U.S.C. § 10101(a)(2)(B) and an order permanently enjoining its enforcement.

## SEVENTH CLAIM FOR RELIEF

### (Violation of the National Voter Registration Act of 1993)

156.    Plaintiff incorporates by reference all foregoing paragraphs as if set forth here.

DE-SER-127

157. On July 22, 2022, Plaintiff provided written notice of the NVRA violations created by H.B. 2492 and H.B. 2243 and described in this Complaint (*See* Appendix 1).

158. Defendants have already been notified of the NVRA violations created by H.B. 2492 described in this Complaint by other persons who, for purposes of 52 U.S.C. § 20510's notice provisions, are similarly situated to Plaintiff.  No additional notice to Defendants is required to effectuate the purpose of 52 U.S.C. § 20510 because, on information and belief, Defendants have not and will not take any ameliorative actions to comply with the NVRA.  NVRA violations as a result of H.B. 2243 if implemented in any way prior to November 8, 2022 are subject to 20-day notice under 52 U.S.C. § 20510 as they are within 120 days of a federal election.  Despite believing that no further notice under the NVRA is required for H.B. 2492, Plaintiff will seek to amend and/or supplement this Complaint upon the expiration of the respective notice periods under the NVRA for H.B. 2492 and H.B. 2243 to re-allege these claims.

159. Section 5 of the NVRA requires that (most) states register voters "simultaneously" when they apply for a state driver's license or ID.  52 U.S.C. § 20504. In doing so, a state "may not require any information that duplicates information required on the driver's license portion of the form" and "may require only the minimum amount of information necessary to prevent duplicate voter registrations[] and enable State election officials to assess the eligibility of the applicant . . . ." 52 U.S.C. § 20504(c)(2). Moreover, Section 5 of the NVRA requires that state officials provide applicants with a statement setting forth each eligibility requirement to register to vote and requires applicants to attest under penalty of perjury to meeting such eligibility requirements.  *See* 52 U.S.C. § 20504(c)(2)(C).

160. Section 6 of the NVRA requires states to "accept and use" the Federal Form.  52 U.S.C. § 20505(a)(1).  The Federal Form requires that an applicant attest under penalty of perjury that they meet the voter eligibility requirements of the applicant's state. 52 U.S.C. § 20508(b)(2).

**DE-SER-128**

161.    Section 8 of the NVRA requires that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office" be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b)(1).  The statute's uniformity requirement is violated where a voter-roll maintenance program singles out one group of voters for different treatment.  The statute's nondiscrimination requirement is violated when a voter-roll maintenance program targets specified classes of people.

162.    Section 8 of the NVRA also limits the reasons that a state or political subdivision may remove a registered voter from the voter registration rolls.  52 U.S.C. § 20507(a)(3)-(4).  Specifically, a voter can be removed at the voter's request, by reason of criminal conviction or mental incapacity, by the voter's death, or by a change in the residence of the voter.  *Id.*  The statute also establishes that, before any voter is removed, they must be given notice, in writing, and can be removed only if they fail both to respond to the notice and to vote in "2 or more consecutive general elections for Federal office." 52 U.S.C. § 20507(b)(2), (d).

163.    Section 8 of the NVRA also requires states to "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A).

164.    Defendants' implementation of Section 2 of H.B. 2492 violates Section 5 of the NVRA, which prohibits states from collecting information that is duplicative of the driver's license application and only allows for the collection of information necessary to assess eligibility or to prevent voter roll duplications.

165.    Defendants' implementation of Sections 1, 3, 4, 5, and 7 of H.B. 2492 violates Section 6 of the NVRA, which requires the State of Arizona to accept and use the mail voter registration application form prescribed by the U.S. Election Assistance

**DE-SER-129**

COMPLAINT

Commission under 52 U.S.C. § 20508(a)(2) for the registration of voters in elections for Federal office.

166. Defendants' implementation of Sections 4 and 5 of H.B. 2492 violates Section 8 of the NVRA, which requires uniformity and nondiscrimination in any voter-roll maintenance program and requires that voters only be removed from voter rolls at the voter's request, by reason of criminal conviction or mental incapacity, by the voter's death, or by a change in the residence of the voter.

167. Accordingly, Plaintiff is entitled to a declaration that Defendants' implementation of Sections 1, 3, 4, 5, and 7 of H.B. 2492 violates Plaintiff's rights under the NVRA and an order permanently enjoining their enforcement.

168. Defendants' implementation of Section 2 of H.B. 2243 violates Section 6 of the NVRA, which requires the State of Arizona to accept and use the mail voter registration application form prescribed by the U.S. Election Assistance Commission under 52 U.S.C. § 20508(a)(2) for the registration of voters in elections for Federal office.

169. Defendants' implementation of Section 2 of H.B. 2243 violates Section 8 of the NVRA, which requires uniformity and nondiscrimination in any voter-roll maintenance program and requires that voters only be removed from voter rolls at the voter's request, by reason of criminal conviction or mental incapacity, by the voter's death, or by a change in the residence of the voter.

170. Defendants' implementation of Section 8 of H.B. 2492 violates Section 8 of the NVRA, which requires uniformity and nondiscrimination in any voter-roll maintenance program and requires that voters only be removed from voter rolls at the voter's request, by reason of criminal conviction or mental incapacity, by the voter's death, or by a change in the residence of the voter.

171. H.B. 2243 violates Section 8 of the NVRA by systematically removing voters from voter rolls within 90 days of a federal election. As discussed above, Section 2 of H.B. 2243 requires county recorders to cancel an individual's voter registration if

DE-SER-130

they obtain and confirm information that the individual is not a U.S. citizen and that individual does not provide DPOC within 35 days.  County recorders are to obtain such information each month from, *inter alia*, the Secretary of State's comparison of registered voters to the driver license database, the comparison of properly registered voters who the county recorder "believes" are not U.S. citizens to the SAVE database, and the comparison between properly registered voters who do not have DPOC on file to the myriad of other government databases.  If such voters are matched to records indicating that they may not be U.S. citizens, then H.B. 2243 requires county recorders to send such voters a cancellation notice and cancel their registration if DPOC is not provided within 35 days.  H.B. 2243 requires such voter roll maintenance each month without exception.

172.    Defendants' implementation of Section 2 of H.B. 2243 violates Section 8 of the NVRA, which requires that any program to systematically remove the names of allegedly ineligible voters from official lists of eligible voters be completed not later than 90 days prior to a primary or general election for Federal office.

173.    Accordingly, Plaintiff is entitled to a declaration that Defendants' implementation of Section 2 of H.B. 2243 violates Plaintiff's rights under the NVRA and an order permanently enjoining its enforcement.

174.    Likewise, Plaintiff is entitled to a declaration that Defendants' implementation of Section 8 of H.B. 2492 violates Plaintiff's rights under the NVRA and an order permanently enjoining its enforcement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

i.      Issue a declaration that Sections 1, 3, 4, 5, 7, and 8 of H.B. 2492 and Section 2 of H.B. 2243 are unconstitutional, illegal, and of no force or effect;

ii.     Enter an order enjoining Defendants and their agents and successors in office from implementing Sections 1, 3, 4, 5, 7, and 8 or any subpart thereof of H.B. 2492 and Section 2 or any subpart thereof of H.B. 2243;

**DE-SER-131**

1   **Papetti Samuels Weiss McKirgan LLP**
    **Bruce Samuels (State Bar No. 015996)**
2   **bsamuels@pswmlaw.com**
    **Jennifer Lee-Cota (State Bar No. 033190)**
3   **jleecota@pswmlaw.com**
    **Scottsdale Quarter**
4   **15169 North Scottsdale Road**
    **Suite 205**
5   **Scottsdale, AZ 85254**
    **+1 480 800 3530**
6

7   **Wilmer Cutler Pickering Hale and Dorr LLP**
    **Seth P. Waxman, (*pro hac vice application forthcoming*)**
8   **seth.waxman@wilmerhale.com**
    **Daniel Volchok, (*pro hac vice application forthcoming*)**
8   **daniel.volchok@wilmerhale.com**
    **Christopher E. Babbitt, (*pro hac vice application forthcoming*)**
9   **christopher.babbitt@wilmerhale.com**
    **Edward Williams (*pro hac vice application forthcoming*)**
10  **ed.williams@wilmerhale.com**
    **Susan M. Pelletier (*pro hac vice application forthcoming*)**
11  **susan.pelletier@wilmerhale.com**
    **1875 Pennsylvania Avenue NW**
12  **Washington, DC 20006**
    **+1 202 663 6000**
13  **+1 202 663 6363**

14  *Attorneys for Plaintiffs*

15

16              **UNITED STATES DISTRICT COURT**

17                  **DISTRICT OF ARIZONA**

18  Democratic National Committee; Arizona
    Democratic Party,                              Case No.
19
                            Plaintiffs,
20                                                  COMPLAINT FOR DECLARATORY
                                                    AND INJUNCTIVE RELIEF
21          v.

22  Katie Hobbs, *in her official capacity as Arizona
    Secretary of State*; Mark Brnovich, *in his official
    capacity as Arizona Attorney General*,          JURY TRIAL DEMANDED
23
                            Defendants.
24

25                      **INTRODUCTION**

26          1.      In *Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1 (2013), the Supreme

27  Court struck down Arizona's attempt to restrict voting rights by requiring individuals who

28  registered to vote using the federally approved registration process to submit documentary

                                                            **DE-SER-132**

"granted the right to vote on equal terms," the state "may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush v. Gore*, 531 U.S. 98, 104-105 (2000) (per curiam).

65.    H.B. 2492 disproportionately impacts Arizona voters who are racial minorities, naturalized citizens, elderly, or recently turned 18 years old, by singling out for disparate treatment "federal only" voters who disproportionately have these characteristics.  The law also targets older voters, who are more likely than younger voters to have registered before 2004 (when, as noted, documentary proof of citizenship was first required) and not updated their driver's license since 1996.

66.    Laws that impose burdens based on race or type of citizenship are subject to heightened scrutiny.  *See Miller v. Johnson*, 515 U.S. 900, 904 (1995) ("Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination."); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977) ("The impact of the official action [that] 'bears more heavily on one race than another," can be evidence of actionable discrimination); *Olagues v. Russoniello*, 770 F.2d 791, 801 (9th Cir. 1985) (national-origin classification triggers strict scrutiny); *Graham v. Richardson*, 403 U.S. 365, 371-372 (1971) ("[T]he Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny.").

67.    No legitimate state interest justifies H.B. 2492's disparate treatment of Arizona voters based on demographic characteristics.

68.    Absent relief, the DNC and ADP, along with their members and constituents, will be denied an equal opportunity as other eligible voters to participate in Arizona's elections.

**Count IV: Violation of Section 6 of the NVRA, 52 U.S.C. §20505(a)(1) – Acceptance Of The Federal Form And Registration Of Federal Form Applicants**

69.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

70.    Section 6 of the NVRA requires Arizona "to accept and use" the federal form (i.e., "the mail voter registration application form prescribed by the Federal Election Commission pursuant to [52 U.S.C.] 20508(a)(2)"), and to register for all "elections for Federal office" any qualified elector who completes and timely submits that form  52 U.S.C. §20505(a)(1); *see also id.* §20507(a)(1)(A)-(D).  That requirement encompasses registering such applicants to vote in presidential elections and allowing them to so vote.

71.    The federal form does not require voters to submit proof of citizenship and therefore precludes Arizona from requiring such proof as a prerequisite for voting in elections for federal office, including presidential elections.

72.    H.B. 2492 violates section 6 of the NVRA because it requires applicants for registration who use the federal form to provide documentary proof of citizenship, and because it directs state and county officials to exclude such voters from the rolls of persons eligible to vote in presidential elections.

**Count V: Violation of Section 8 of the NVRA, 52 U.S.C. §20507(b)(1)**
**– Uniformity and Non-discrimination**

73.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

74.    Section 8 of the NVRA provides that "[a]ny State program to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office …  shall be uniform [and] nondiscriminatory."  52 U.S.C. §20507(b)(1).  H.B. 2492 is both discriminatory and non-uniform.

75.    H.B. 2492 discriminates against federal only voters in several ways.  Section 5 makes only those voters ineligible to receive an early ballot, and it excludes them from voting in presidential elections.  Section 7 singles out those voters for investigation and refers them for potential prosecution by the Attorney General.  And, applied in concert with section 7, section 8 singles them out for removal from voter rolls.

76.    The state appears to extend this discrimination to voters that registered using the Arizona form before 2004 without providing documentary proof of citizenship.  By

excluding voters who have not provided such documentation from voting in presidential elections, and by directing that their citizenship status be investigated by the Attorney General, the law treats those voters differently from voters who registered in the state after 2004. Even more confusing, the law does not appear to exclude these voters from voting by mail. Failing to treat all voters who have not provided documentary proof of citizenship alike is yet another way in which the law discriminates.

77.    For essentially the same reasons, Arizona law, as amended by H.B. 2492, is non-uniform. H.B. 2492 prescribes one set of rules for voters eligible to vote in both federal and Arizona elections. These voters are not systematically made ineligible to vote early by mail or singled out for investigation and prosecution by the Arizona Attorney General.

78.    The other set of rules—those enacted by H.B. 2492—apply solely to "federal only" voters and, in some instances, those who registered without providing documentary proof of citizenship. H.B. 2492 makes federal only voters who have not provided documentary proof of citizenship and voters who registered without such proof before 2004 ineligible to vote in presidential elections (section 5), and singles out those voters for investigation, potential prosecution by the Arizona Attorney General (section 7), and removal from the voter rolls, (section 8). It also excludes federal only voters, and only those voters, from voting by mail (section 5).

**Count VI: Violation of the NVRA, 52 U.S.C. §20504(c)(2)(B)(i)-(ii) – Minimum-Information-Necessary Requirement**

79.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

80.    The NVRA mandates that states "require only [the] minimum amount of information necessary to … enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. §20504(c)(2)(B)(i)-(ii).

81.    That provision also makes clear what constitutes the "minimum amount of information necessary" for such purposes with respect to citizenship, by providing that the NVRA registration form "shall include a statement that (i) states each eligibility requirement

(including citizenship); (ii) contains an attestation that the applicant meets each such requirement; and (iii) requires the signature of the applicant, under penalty of perjury." 52 U.S.C. §20504(c)(2)(C)(i)-(iii).

82.    H.B. 2492's demand for documentary proof of citizenship goes beyond the federal "minimum … necessary" to establish citizenship, 52 U.S.C. §20504(c)(2)(B)(i)-(ii). In particular, H.B. 2492 requires documentary proof of citizenship in place of the attestation under penalty of perjury that the NVRA requires.

83.    Accordingly, H.B. 2492 violates the "minimum information" requirement of the NVRA with respect to federal only voters who register using the NVRA registration form—which, as noted, the NVRA requires states to "accept and use," 52 U.S.C. §20505.

**Count VII: Violation of Section 8 of the NVRA, 52 U.S.C. §20507(c)(2)(A) –**

**Removing Voters from the Rolls Shortly Before an Election**

84.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

85.    Section 8 of the NVRA prohibits states from operating "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" at any point within "90 days" of the "date of a primary or general election for Federal office." 52 U.S.C. §20507(c)(2)(A).

86.    H.B. 2492 (specifically section 8) does not comply with this provision. The law provisions regarding removing voters from the rolls plainly has "the purpose of remov[ing] the names of ineligible voters from the official lists of eligible voters," *id.* Yet the statute places no time limit on county recorders' or other election officials' identification of voters for removal from the rolls with respect to the temporal proximity of a federal election. H.B. 2492, §8. Likewise, section 5's process for barring a voter from voting in presidential elections functions as a removal from the voter rolls (for those elections) and should be subject to the same procedural requirements. H.B. 2492, §5.

**Count VIII: Violation Of Section 101 Of The Civil Rights Act, 52 U.S.C.**

**§10101(a)(2)(B) – Materiality Provision**

87.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

## CERTIFICATE OF SERVICE

On this 12th day of August, 2024, I electronically filed the foregoing with the Court using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Daniel S. Volchok
DANIEL S. VOLCHOK