Nos. 24-3188, 24-3559 & 24-4029

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MI FAMILIA VOTA, ET AL.,

*Plaintiffs-Appellees*,

v.

ADRIAN FONTES, ET AL.,

*Defendants-Appellees*,

WARREN PETERSEN, ET AL.,

*Intervenor-Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Arizona, No. 2:22-CV-00509 (Bolton, J.)

## LUCHA APPELLEES' BRIEF ON INTERVENORS' STANDING AND ON DOCUMENTARY PROOF OF CITIZENSHIP AND RESIDENCE REQUIREMENTS FOR STATE FORM APPLICANTS

Danielle Lang
Jonathan Diaz
Brent Ferguson
Kathryn Huddleston
**CAMPAIGN LEGAL CENTER**
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
bferguson@campaignlegelcenter.org
khuddleston@campaignlegalcenter.org

Lee H. Rubin (CA# 141331)
**MAYER BROWN LLP**
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

Gary A. Isaac (IL# 6192407)
Daniel T. Fenske (IL# 6296360)
Anastasiya K. Lobacheva (IL# 6336273)
William J. McElhaney, III (IL #6336357)

i

Courtney Hostetler
John Bonifaz
**FREE SPEECH FOR PEOPLE**
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org

**MAYER BROWN LLP**
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
dfenske@mayerbrown.com
gisaac@mayerbrown.com
alobacheva@mayerbrown.com
wmcelhaney@mayerbrown.com

Rachel J. Lamorte (NY# 5380019)
**MAYER BROWN LLP**
1999 K Street NW
Washington, DC 20006
(202) 362-3000
rlamorte@mayerbrown.com

*Counsel for Plaintiffs Living United for Change in Arizona, League of United Latin American Citizens, Arizona Students' Association, ADRC Action, Inter Tribal Council of Arizona, Inc., San Carlos Apache Tribe, and Arizona Coalition for Change*

## DISCLOSURE STATEMENT

Plaintiffs-Appellees Living United for Change in Arizona (LUCHA), League of United Latin American Citizens (LULAC), Arizona Students' Association (ASA), ADRC Action, Inter Tribal Council of Arizona (ITCA), and Arizona Coalition for Change (AZC4C) are nonprofit entities that do not have parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in Plaintiffs-Appellees.

Plaintiff-Appellee San Carlos Apache Tribe is a federally recognized Indian tribe organized pursuant to Section 16 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................vi

INTRODUCTION ...........................................................................1

STATEMENT OF JURISDICTION .......................................................5

STATEMENT OF ISSUES ................................................................6

STATEMENT OF THE CASE.............................................................7

    1. History of the DPOC Requirement .............................................7

    2. H.B. 2492's DPOR Requirement ...........................................10

    3. DPOC and DPOR are Not Necessary to Determining Voter Eligibility and Impose Serious Burdens on Arizona Voters ............................................10

    4. Proceedings Below .............................................................14

STANDARDS OF REVIEW ..............................................................14

SUMMARY OF ARGUMENT............................................................16

ARGUMENT .............................................................................18

I. Intervenors Lack Standing On Appeal .................................................18

    A. Legislator Intervenors Lack Standing on Appeal .....................................20

        1. The Legislator Intervenors Do Not Have Standing to Represent the State's Interests..............................................................20

        2. The Legislator Intervenors Do Not Have Standing Based on Any Alleged Injury to the Legislature ..................................................26

    B. Intervenor RNC Lacks Standing on Appeal ...........................................29

II. The *LULAC* Decree Remains Enforceable........................................32

III. The DPOC and DPOR Requirements for State Form Applicants Violate the NVRA as Applied to Federal Elections ...................................................37

    A. The DPOC and DPOR Requirements for State Form Applicants Violate Sections 6, 8, and 9 of the NVRA ...................................................37

iv

1. Defendants Failed to Show DPOC is "Necessary" to Assess Voter Eligibility. ..............................................................39

2. Defendants Failed to Show DPOR is "Necessary" to Assess Voter Eligibility ...........................................................44

B. The DPOC and DPOR Requirements for State Form Applicants Violate Section 7 of the NVRA ...............................................47

IV. The DPOC and DPOR Requirements Violate the Equal Protection Clause ......48

A. The DPOC Requirement Violates the Equal Protection Clause by Imposing Arbitrary and Unreasonable Burdens on State Form Voters .........50

1. The DPOC Requirement Creates a Serious Burden .................52

2. Arizona Put Forth No Precise Interest That Would Justify the Burden the DPOC Requirement Creates........................................53

B. The DPOR Requirement Violates the Equal Protection Clause ...............56

CONCLUSION ....................................................................57

CERTIFICATE OF COMPLIANCE........................................................59

CERTIFICATE OF SERVICE ............................................................59

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*American Association of People with Disabilities v. Herrera*,
  580 F. Supp. 2d 1195 (D. N.M. 2008) ...............................................46

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ...........................51, 53, 56

*Arcia v. Florida Secretary of State*, 772 F.3d 1335 (11th Cir. 2014) ......42

*Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1 (2013)
  (*"ITCA"*)...............................................................7, 16, 37, 41, 42, 43

*Arizona Democratic Party v. Hobbs*, 18 F.4th 1179 (9th Cir. 2021) ...............50, 55

*Arizona State Legislature v. Arizona Independent Redistricting Commission*,
  576 U.S. 787 (2015) (*"AIRC"*) .................................................26, 27

*BedRoc Limited, LLC v. United States*, 541 U.S. 176 (2004).................................38

*Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179 (2022)..............24, 25

*Brown v. Arizona*, 82 F.4th 863 (9th Cir. 2023) ......................................15

*Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health
  & Human Resources*, 532 U.S. 598 (2001) ........................................34

*Burdick v. Takushi*, 504 U.S. 428 (1994) ................................49, 50, 51

*Bush v. Gore*, 531 U.S. 98 (2000) ...................................................49, 51

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020)..................................35

*Chabner v. United of Omaha Life Insurance Company*, 225 F.3d 1042
  (9th Cir. 2000)................................................................38

*City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432 (1985) ..............49

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013)................................31

*Diamond v. Charles*, 476 U.S. 54 (1986)................................................19

*Diaz v. Cobb*, 435 F. Supp.2d 1206 (D. Ariz. 2006) ................................42

*Doe v. Pataki*, 481 F.3d 69 (2d Cir. 2007) ..............................................35

*Drake v. Obama*, 664 F.3d 774 (9th Cir. 2011)....................................29, 30

*Dudum v. Arntz*, 640 F.3d 1098 (9th Cir. 2011) ...............................49, 50, 51, 52, 54

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ...................................................49

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ...................................39, 40, 43, 44

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024)...................................................................31

*Green Party of Tennessee v. Hargett*, 767 F.3d 533 (6th Cir. 2014) .......................30

*Gonzalez v. Arizona*, 435 F. Sup. 2d 997 (D. Ariz. 2007)...................................42

*Gonzalez v. Arizona*, 485 F.3d 1041 (9th Cir. 2007)........................................42

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012)...................................16, 41, 42

*Government of Guam v. Guerrero*, 11 F.4th 1052 (9th Cir. 2021)....................15, 16

*Hollingsworth v. Perry*, 570 U.S. 693 (2013).......................... 15, 18, 19, 20, 31, 32

*Hook v. Arizona, Department of Corrections*, 107 F.3d 1397 (9th Cir. 1997), *as
    amended on denial of reh'g and reh'g en banc* (Apr. 22, 1997) .......................34

*Hook v. State of Arizona, Department of Corrections*, 972 F.2d 1012
    (9th Cir. 1992).................................................................33, 36, 37

*Horne v. Flores*, 557 U.S. 433 (2009)....................................................36

*Idaho Coalition United for Bears v. Cenarrusa*, 342 F.3d 1073
    (9th Cir. 2003)..............................................................49

*Isaacson v. Mayes*, No. 2:21-cv-1417, 2023 WL 2403519
    (D. Ariz. Mar. 8, 2023)..........................................................24

*Khatib v. County of Orange*, 639 F.3d 898 (9th Cir. 2011).................................47

*Kobach v. U.S. Election Assistance Commission*, 772 F.3d 1183
    (10th Cir. 2014)..............................................................7, 40

*Kobach v. U.S. Election Assistance Commission*, 135 S. Ct. 2891 (2015)...............7

*Koonwaiyou v. Blinken*, 69 F.4th 1004 (9th Cir. 2023)...........................................43

*League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155
    (N.D. Fla. 2012).................................................................46

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)........................................19, 20

*Martin v. Pierce County*, 34 F.4th 1125 (9th Cir. 2022) ...................................22, 23

*McKay v. Altobello*, No. 96-3458, 1997 WL 266717 (E.D. La. May 16, 1997)......46

*Mecinas v. Hobbs*, 30 F.4th 890 (9th Cir. 2022) .................................................29

*Michigan State A. Philip Randolph Institute v. Johnson*, 833 F.3d 656
    (6th Cir. 2016) .................................................................................................53

*Miracle v. Hobbs*, 333 F.R.D. 151 (D. Ariz. 2019)..............................................21

*Moore v. Harper*, 600 U.S. 1 (2023) ...............................................................34, 35

*Nicaise v. Sundaram*, 432 P.3d 925 (Ariz. 2019)..................................................24

*Obama for America v. Husted,* 697 F.3d 423, 435 (6th Cir. 2012)....................50, 52

*Priorities USA v. Nessel*, 978 F.3d 976 (6th Cir. 2020) ...........................................28

*Priorities USA v. Nessel*, 860 F. App'x 419 (6th Cir. 2021) ....................................28

*Public Integrity Alliance, Inc. v. City of Tucson*, 836 F.3d 1019
    (9th Cir. 2016)................................................................................49, 50, 51, 52

*Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th Cir. 2015).................................................48

*Republican National Committee v. Common Cause Rhode Island*,
    141 S. Ct. 206 (2020)...............................................................................2, 19, 29

*Roberts v. St. Regis Paper Company*, 653 F.2d 166 (5th Cir. 1981).......................32

*Roosevelt Irrigation District v. Salt River Project Agricultural Improvement &*
    *Power District*, 39 F. Supp. 3d 1051 (D. Ariz. 2014)....................................35, 36

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) .................................35

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,
    559 U.S. 393 (2010)....................................................................................22, 23

*Soltysik v. Padilla*, 910 F.3d 438 (9th Cir. 2018) ..................................................51

*Stavrianoudakis v. United States Fish & Wildlife Service*, No. 22-16788,
    2024 WL 3515564 (9th Cir. July 24, 2024).......................................................15

*Taylor v. United States*, 181 F.3d 1017 (9th Cir. 1999)...........................................32

*Tedards v. Ducey*, 951 F.3d 1041 (9th Cir. 2020).....................................................51

*Thompson v. U.S. Department of Housing & Urban Development*,
404 F.3d 821 (4th Cir. 2005) .................................................................32

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ...............................15

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) ....................16

*Vega v. Morris*, 910 P.2d 6 (Ariz. 1996) ..............................................23

*Virginia House of Delegates v. Bethune-Hill*,
587 U.S. 658 (2019) ........................... 14, 15, 20, 21, 27, 30, 34

*Wittman v. Personhuballah*, 136 S. Ct. 1732 (2016) ......................18, 19

**Statutes and Rules**                                                    **Page**

28 U.S.C. § 1291 ....................................................................................5

28 U.S.C. § 1331 ....................................................................................5

28 U.S.C. § 1343 ....................................................................................5

52 U.S.C. §20504(c)(2)(C) ..............................................................11, 39

52 U.S.C. §20505(a)(2) ........................................................................38

52 U.S.C. §20506(a)(6) ........................................................................47

52 U.S.C. §20507(a)(1) ........................................................................38

52 U.S.C. §20508(b)(1) ........................................................................38

A.R.S. § 12-1841 .............................................................20, 21, 22, 23, 24

A.R.S. § 12-1841(D) ......................................................21, 22, 23, 24

A.R.S. § 16-121.01(A) .........................................................................10

A.R.S. § 16-121.01(C)-(E) .............................................9, 35, 51, 55

A.R.S. § 16-121.01(F) .........................................................................10

A.R.S. § 16-123 ...................................................................................10

A.R.S. §16-152(A)(3) ..........................................................................44

A.R.S. § 16-152(A)(14) ...........................................................11, 39, 55

A.R.S. §16-152(A)(17-18) ...................................................................44

A.R.S. § 16-166(F) ....................................................................7

A.R.S. § 16-166(F)(1) ..............................................................9

A.R.S. § 16-452 ........................................................................9

A.R.S. § 41-192(B)(4) ............................................................34

A.R.S. § 41-193(A)(3) ......................................................20, 34

Ariz. Const. art. II, §3(A) .......................................................34

Ariz. Const. art. II, §3(B) ..................................................25, 26

Ariz. Const. art. II, §3(C) .......................................................26

Fed. R. Civ. P. 1 ......................................................................22

Fed. R. Civ. P. 5.1(a) ..............................................................22

Fed. R. App. P. 44 ...................................................................22

N. C. Gen. Stat. Ann. §1-72.2(b) ............................................24

Supreme Court Rule 29.4(c) ...................................................22

**Other Authorities**                                          **Page**

Ariz. Op. Atty. Gen. No. I13-011 (2013) ..................................7

Arizona Senate Fact Sheet, 2006 Reg. Sess. H.B. 2868 ..........24

Complaint, *Arizona State Legislature et al. v. Biden et al.*, No. 3:24-cv-08026 (D. Ariz. Feb. 12, 2024), ECF No. 1 .......................................26, 27

Senate Report 103-6 (1993) ....................................................43

# INTRODUCTION

This brief addresses Intervenors' standing to bring this appeal and H.B. 2492's command that election officials reject registrants submitting State Form applications lacking documentary proof of citizenship ("DPOC") or documentary proof of residence ("DPOR")[1] while accepting similarly situated registrants submitting Federal Form applications for the Federal-Only registration list in violation of (1) the consent decree entered in 2018 in the District of Arizona case *LULAC v. Reagan* (the "*LULAC* decree"), (2) the National Voter Registration Act ("NVRA)", and (3) the Equal Protection Clause.[2]

---

[1] Lack of DPOC can have numerous consequences under H.B. 2492's complex bifurcated registration system, including prohibitions on mail, presidential, and state and local voting. For purposes of this brief, unless otherwise noted, "DPOC requirement" and "DPOR requirement" refer only to H.B. 2492's differential treatment of State and Federal Forms such that State Form applicants who do not submit DPOC and DPOR with their applications are rejected outright rather than placed on the list of voters who may vote only in federal elections. LUCHA Plaintiffs do not challenge H.B. 2492's restriction of applications lacking DPOC or DPOR to voting in federal elections only.

[2] This is the brief of Living United for Change in Arizona; League of United Latin American Citizens; Arizona Students' Association; ADRC Action; Inter Tribal Council of Arizona, Inc.; San Carlos Apache Tribe, a federally recognized tribe; and Arizona Coalition for Change (collectively, "LUCHA Plaintiffs"). LUCHA Plaintiffs join the brief of Mi Familia Vota Plaintiffs addressing Plaintiffs' claims under the Materiality Clause of the Civil Rights Act; the brief of the DNC, ADP, and Equity Coalition addressing Plaintiffs' NVRA claims challenging H.B. 2492's DPOC restrictions on presidential and mail voting and the district court's order compelling discovery from Intervenors; and the brief of Poder Latinx Plaintiffs addressing Plaintiffs' claims challenging the "reason to believe" provision under Section 8 of the NVRA.

The Arizona Attorney General, the Arizona Secretary of State, the State of Arizona, and all 15 county recorders were defendants in these consolidated actions. At trial, the Attorney General vigorously defended the challenged laws, except where they were explicitly preempted by binding precedent addressing the same DPOC requirement. But, except as to the Materiality Provision challenge to the Birthplace Requirement, *none* of these official Defendants appeal the district court's sound judgment enjoining certain portions of H.B. 2492 and 2243. Meanwhile, Intervenors seek to appeal most of the district court's adverse holdings. But the Legislator and RNC Intervenors lack standing to pursue their appeals because the Attorney General, not the Legislators, is the authorized representative for the State's interests here. Thus, Intervenors "lack a cognizable interest in the State's ability to 'enforce its duly enacted' laws." *RNC v. Common Cause Rhode Island*, 141 S. Ct. 206 (2020). This Court should not allow Intervenors to pursue their appeals solely to vindicate their values and policy judgments.

As in many states, eligible Arizona voters may register to vote using either a form created by the State of Arizona (the "State Form") or a form created by the United States Election Assistance Commission (the "Federal Form"). Intervenors seek to enforce provisions of H.B. 2492 that would reject the registrations of Arizona voters solely because of what piece of paper they happen to fill out—i.e., the State Form or the Federal Form. If a voter submits a Federal Form without DPOC or

DPOR, they may only vote in federal elections (they become "Federal-Only" voters), and they can later submit DPOC or DPOR to vote in all elections (becoming "full ballot" voters). But Intervenors argue that if that *same* voter submits a State Form without DPOC or DPOR, their application should be rejected outright. Indeed, Intervenors even argue that election officials must reject State Form applications without DPOC even when "documentary proof of citizenship is already on file with the State and is instantly accessible by state elections officials." ECF 116.1 at 17.[3]

Such a system creates a trap for the unwary, particularly since election officials, public assistance agencies, and most civic participation organizations rely on the State Form rather than the Federal Form to register voters. After all, who would suspect such an arbitrary loophole to the NVRA's protections against requiring DPOC or DPOR for federal elections? There is no rational reason for such an arbitrary distinction between voters who have provided the same substantive eligibility data and attestations of their eligibility. It is a system tailor-made to confuse voters and election officials alike.

Precisely because such a system is unlawful, Arizona was sued for implementing it, and six years ago the Arizona Secretary of State agreed to a federal

---

[3] Citations to ECF herein are to the Ninth Circuit Court of Appeals docket for this matter (No. 24-3188). Pin cites for documents filed on this Court's docket correspond to the page numbers printed on the bottom of each page of the cited document.

consent decree barring such discriminatory treatment. Since then, Arizona election officials have treated State and Federal Forms equally, and the record establishes that this system works well. H.B. 2492 and Intervenors' attempts to reinstate such arbitrary treatment fail for at least three reasons. First, the *LULAC* decree directly bars such treatment as to DPOC. That final judgment is binding on the Secretary of State, who is a defendant in this action, and no party (or intervenor) has ever sought to set it aside. Second, the NVRA only allows State Forms to require information that is "necessary" to determine a voter's eligibility for federal elections. But the record establishes that neither DPOC nor DPOR are necessary to determining eligibility, and Intervenors do not even attempt to argue that the district court's factual findings on this score are clearly erroneous. Likewise, the NVRA requires public assistance agencies to offer voters a form "equivalent" to the Federal Form, and a State Form is obviously not "equivalent" to the Federal Form when its mere use can trigger rejection. Finally, under any applicable standard, the Constitution simply does not permit States to dole out the fundamental right to vote based on such arbitrary distinctions. This Court should affirm the district court's holdings enjoining H.B. 2492's differential treatment of State and Federal Forms where registrants do not submit DPOC and/or DPOR.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 and entered final judgment on May 2, 2024. 1-ER-2-6. The State timely appealed on June 3, 2024. 7-ER-1615. This Court has appellate jurisdiction over the State's appeal under 28 U.S.C. §1291. Intervenors appealed on May 8, 2024. 7-ER-1617. As outlined below, this Court lacks appellate jurisdiction as to Intervenors' appeal because Intervenors lack standing.

## STATEMENT OF ISSUES

1. Whether Intervenors have standing to pursue their appeals;

2. Whether the *LULAC* decree bars Arizona election officials from enforcing H.B. 2492's provision requiring rejection of State Form applications lacking DPOC;

3. Whether the DPOC and DPOR requirements for State Form applicants under H.B. 2492 violate Sections 6, 8, and/or 9 of the NVRA because Defendants failed to demonstrate DPOC and DPOR are "necessary" to determine voters' eligibility and the district court's factual findings to the contrary are not clearly erroneous;

4. Whether the DPOC and DPOR requirements for State Form applicants violate Section 7 of the NVRA as applied to registrations from public assistance agencies because they render the State Form not "equivalent" to the Federal Form;

5. Whether the differential treatment of otherwise similarly situated State Form and Federal Form applications lacking DPOC and DPOR violates the Equal Protection Clause.

## STATEMENT OF THE CASE

### 1. History of the DPOC Requirement

In 2004, Arizona enacted Proposition 200, which, among other things, adopted a DPOC requirement to register to vote. *See* A.R.S. §16-166(F). After Proposition 200's passage, the U.S. Election Assistance Commission (EAC) denied Arizona's request to include its DPOC requirement in the state-specific instructions for voter registration in Arizona on the Federal Form. *See Arizona v. Inter Tribal Council of Ariz.* ("*ITCA*"), 570 U.S. 1, 6 (2013). In 2013, the U.S. Supreme Court held that, pursuant to the NVRA's mandate that states "accept and use" the Federal Form, Arizona could not reject Federal Form applications that were not accompanied by DPOC. *See id.* Immediately thereafter, Arizona asked the EAC again to add the DPOC requirement to the state-specific instruction for Arizona on the Federal Form, and again the EAC denied the request. *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1188-89 (10th Cir. 2014). Arizona challenged the EAC's denial of its request in federal court, and the Tenth Circuit upheld the EAC action. *Id.* at 1199. The Supreme Court denied certiorari. 135 S. Ct. 2891 (2015).

After *ITCA*, rather than abandoning the DPOC requirement, Arizona implemented a dual voter registration system allowing it to enforce its DPOC requirement only for state and local elections. Ariz. Op. Atty. Gen. No. I13-011 (2013). From 2014 to 2018, election officials in Arizona rejected State Form

applications unaccompanied by DPOC while accepting Federal Form applications unaccompanied by DPOC for federal elections only, creating Federal-Only voters. 1-ER-0010. Further, for Federal Form applications unaccompanied by DPOC, election officials determined if the Arizona Department of Transportation ("ADOT") had DPOC on file for the registrant. 7-ER-1599-1600. If the ADOT database confirmed DPOC, those registrants became full ballot voters. *Id.* State Form applications unaccompanied by DPOC did not undergo the same ADOT check for DPOC. *Id.*

In 2017, the League of United Latin American Citizens of Arizona ("LULAC") and Arizona Students' Association ("ASA") challenged this disparate treatment of Federal and State Form applicants. *Id.* In 2018, the Arizona Secretary of State and Maricopa County Recorder agreed to the *LULAC* decree to resolve that litigation. *Id.* The *LULAC* decree requires election officials to treat State and Federal Form applicants without DPOC the same. Specifically, it requires that all such applications are subjected to the ADOT check and, if DPOC is confirmed, the registrant becomes a full ballot voter; if DPOC is not confirmed, the registrant becomes a Federal-Only voter.[4] 7-ER-1606-1608.

---

[4] If the ADOT check shows a "foreign-type" license, the application is rejected, and the applicant is sent a notice requesting DPOC. 7-ER-1607; 1-ER-23-24. Absent DPOC, in this circumstance, the voter is not registered for any elections. *Id.*

The *LULAC* decree has governed since it was agreed to. The procedures required by the decree were incorporated into a 2018 addendum to the state Election Procedures Manual ("EPM"), the 2019 EPM, and the now-operative 2023 EPM. 2-ER-216-222 (2023 EPM); 4-ER-880-885 (2019 EPM). The EPM is binding on county recorders, and anyone who violates it "is guilty of a class 2 misdemeanor." *See* A.R.S. §16-452.

In 2022, the Arizona legislature enacted H.B. 2492, which—among other things—requires the rejection of State Form applications that lack DPOC. For Federal Form applications that lack DPOC, the law requires that election officials ascertain DPOC from ADOT. If DPOC is not available, election officials must place those registrants on a Federal-Only registration list. A.R.S. §16-121.01(C)-(E). H.B. 2492 makes it a felony for a county recorder to fail to reject a State Form application that is unaccompanied by DPOC. A.R.S. §16-121.01(C).

Most Arizona voter registration applicants who provide DPOC do so by providing their Arizona license or ID number, which is cross-checked against the ADOT database. *See* A.R.S. §16-166(F)(1); 3-ER-702–703, 709. ADOT verification is automated and occurs for all voter registration applications that are entered into the voter registration database. It can be performed without an Arizona driver's license or ID number. 1-ER-21; 1-LUCHA-SER-159-65 (Morales); 1-LUCHA-SER-120-23 (Petty). Yet, pursuant to A.R.S. §16-121.01(C), county recorders

commit a felony if they use this automated process to ascertain DPOC for individuals who use the State Form and do not write their license or ID number on that form. Meanwhile, county recorders also commit a felony if they do *not* use this automated process to ascertain DPOC for individuals who use the Federal Form and do not write their license or ID number on that form. A.R.S. §16-121.01(F).

### 2. H.B. 2492's DPOR Requirement

H.B. 2492 also added a documentary proof of residence ("DPOR") requirement for voter registration. A.R.S. §16-123; 16-121.01(A). The Federal Form does not contain any DPOR requirement. 6-ER-1414. Arizona has never requested that the EAC add a DPOR requirement to the Arizona state-specific instructions on the Federal Form. 1-LUCHA-SER-76. At the summary judgment stage, the district court held that, consistent with *ITCA*, the DPOR requirement is preempted by Section 6 of the NVRA as applied to Federal Form applications for registration in federal elections. 1-ER-124. No party has appealed that decision. *See* ECF 101.1;104.1 (Opening Briefs of Defendants).

### 3. DPOC and DPOR are Not Necessary to Determining Voter Eligibility and Impose Serious Burdens on Arizona Voters

During the ten-day trial, neither Defendants nor Intervenors presented any direct evidence of voter fraud in Arizona, including either noncitizen or non-resident voting. Nor did they present "evidence that any of Arizona's Federal-Only voters are non-citizens." 1-ER-36. Rather, the expert and fact witness testimony presented at

trial established that voter fraud is "exceedingly rare nationally and in Arizona." 1-ER-35; *see, e.g.,* 1-LUCHA-SER-222-27 (Minnite); 2-LUCHA-SER-238 (Lawson); *see also* 1-LUCHA-SER-88, 91 (Thomas).

Arizona already has robust protections to enforce its voter qualifications. Every method of voter registration in Arizona requires attestation under penalty of perjury of a registrant's qualifications, including U.S. citizenship and residency in Arizona. *See* 52 U.S.C. §20504(c)(2)(C); A.R.S. §16-152(A)(14). Six election officials testified at trial. 3-ER-698, 754; 4-ER-802, 815, 835; 2-LUCHA-SER-256 (Shreeve). But no election official testified that they needed DPOC or DPOR to reliably identify eligible voters.

Further, the County Recorders have robust systems in place to verify residential addresses with GIS software and precinct voters appropriately without any DPOR requirement. *See, e.g.*, 1-LUCHA-SER-99-110 (Petty); 2-LUCHA-SER-305-06. These systems account for individuals with nontraditional residential street addresses. *Id.* Where a residential address cannot be verified, the application is held in suspense and the voter is unable to vote until it can be verified. 1-LUCHA-SER-95, 104-07 (Petty). At trial, no election official who testified could identify any election administration purpose for treating State and Federal Form applicants without DPOR differently. *See, e.g.,* 3-ER-721; 2-LUCHA-SER-252-53 (Hiser). To the contrary, former Chief Deputy Recorder of Pima County Hilary Hiser testified

that such a bifurcated system would "make [voter registration] really difficult", be "very time consuming," cause confusion, and not "make operational sense from the terms of effective use of resources." 2-LUCHA-SER-254-55 (Hiser).

Most voters who register with paper form applications use the State Form, not the Federal Form. 3-ER-721-22. Community voter registration groups, including Plaintiffs, largely rely on State Forms, which are provided to them by county election officials. 3-ER-722. Public assistance agencies required to provide voter registration services under the NVRA rely on the State Form to provide those services. 1-ER-9, 81; 3-ER-722. The Secretary of State's office provides those agencies with specially coded versions of the State Form to enable tracking of the source of applications. 1-LUCHA-SER-79-80 (Connor).

Finally, the evidence at trial established that the DPOC and DPOR requirements impose substantial barriers to registration, particularly for underrepresented groups of voters. For example, there are a total of 19,439 Federal-Only voters among the active registered voters in Arizona—i.e., 19,439 individuals who have not managed to submit DPOC with their registration—and those voters are disproportionately voters of color, young voters, and voters with no party affiliation. 2-LUCHA-SER-313-16; 1-LUCHA-SER-193-203 (McDonald).

Many citizens residing in Arizona who are eligible to vote do not have copies of or ready access to documents that can establish their citizenship or residency. 1-

12

LUCHA-SER-145-47 (Nitschke); 1-LUCHA-SER-211-13 (Tiwamangkala). This can be particularly true for many students and young people who are less likely to have driver's licenses and who are more likely to move more frequently, have less established residences (such as student dormitories), and not have ready access to documents kept with their parents. 1-LUCHA-SER-145-47, 150-52 (Nitschke); 2-LUCHA-SER-269-71 (Knuth); 1-LUCHA-SER-128 (Petty) (noting students have "lots of problems with documentary proof of residency and citizenship" because "[m]ost of their documents are with their moms and dads"). Many Arizona residents, including those who live in rural areas or on Native American reservations, lack standard addresses, rely on P.O. Boxes, and are less likely to have traditional forms of DPOR. 2-LUCHA-SER-261 (Shreeve); 3-ER-752-53; 4-ER-830-31. There are financial, time, and logistical costs associated with obtaining the types of documentation that satisfy the DPOC requirement. *See*, *e.g.*, 1-ER-46-47; *id.* at 99 ("The monetary and temporal costs of obtaining DPOC . . . can be significant for low-income individuals"); 1-LUCHA-SER-173, 179-87 (Burch); 3-ER-689 (Stipulated Facts 69-70); 1-LUCHA-SER-16-18 at ¶¶ 37-50. All those costs fall more heavily on voters with fewer economic resources, who are disproportionately voters of color. 1-LUCHA-SER-175-80 (Burch).

**4. Proceedings Below**

At the summary judgment stage, the district court held that State Form applications without DPOC must be processed in an equivalent manner as Federal Form applications without DPOC in accordance with the undisturbed *LULAC* decree. 1-ER-136-37. In the same order, the district court noted that the outcome would be the same under the NVRA even absent the *LULAC* decree. 1-ER-137 at n. 13. After trial, the district court held that the DPOR requirement cannot be enforced against State Form applicants with respect to federal elections because Defendants failed to show that DPOR is "necessary to enable the appropriate State election official to assess the eligibility of the applicant." 1-ER-81. Likewise, the district court held that Arizona's differential treatment of State Form and Federal Form applications lacking DPOR violates section 7 of the NVRA because Arizona's public assistance agencies rely on the State Form and the differential treatment would make the State Form not "equivalent" to the Federal Form. 1-ER-81-82.

The RNC and Legislator Intervenors alone appeal the foregoing rulings. ECF 8.1.

**STANDARDS OF REVIEW**

Standing is a jurisdictional requirement, "[a]nd when standing is questioned by a court or an opposing party, the litigant invoking the court's jurisdiction must do more than simply allege a nonobvious harm" but rather "must explain how the

elements essential to standing are met." *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019). "'The party invoking federal jurisdiction bears the burden of establishing' the elements of standing, and 'each element must be supported in the same way as any other matter on which the [relevant party] bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Stavrianoudakis v. United States Fish & Wildlife Serv.*, _ F.4th _, 2024 WL 3515564 (9th Cir. July 24, 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "[S]tanding 'must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance.'" *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997)). Further, "standing is not dispensed in gross" but rather is necessary "for each claim" and "each form of relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

This Court "review[s] the district court's grant of summary judgment de novo" and may "'affirm on any ground supported by the record,' including a ground upon which the district court did not rely." *Brown v. Arizona*, 82 F.4th 863, 874 (9th Cir. 2023) (quoting *Olson v. Morris*, 188 F.3d 1083, 1085 (9th Cir. 1999)).

This Court reviews "factual findings during a bench trial for clear error" and "legal conclusions de novo." *Government of Guam v. Guerrero*, 11 F.4th 1052, 1055 (9th Cir. 2021). "The clear error standard is significantly deferential." *Id.* at 1059.

Clear error requires that "the reviewing court is left with the definite and firm conviction that a mistake has been committed" because the district court's determination was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* (internal quotation marks omitted); *see also United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009).

Finally, in analyzing the district court's legal conclusions, the presumption against preemption does not apply to the NVRA, which was enacted pursuant to Congress' power under the Elections Clause. "Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent . . . . Unlike the States' historic police powers, the States' role in regulating congressional elections . . . has always existed subject to the express qualification that it terminates according to federal law." *ITCA*, 570 U.S. at 14-15 (citations and internal quotation marks omitted). *See also Gonzalez v. Arizona*, 677 F.3d 383, 392 (9th Cir. 2012), *aff'd sub nom. ITCA*, 570 U.S. 1 (2013) ("[T]he 'presumption against preemption' and 'plain statement rule' that guide Supremacy Clause analysis are not transferable to the Elections Clause context.").

## SUMMARY OF ARGUMENT

Intervenors' appeal should be dismissed for lack of standing. All Intervenors are bystanders with generalized grievances regarding the district court's judgment,

16

insufficient to confer standing. Arizona is a party to the appeal, as is the Arizona Attorney General—the State's duly authorized representative in these proceedings. Legislator Intervenors are *not* authorized to represent the State's interests on appeal. While they attempt to assert injury on behalf of the legislature, they did not intervene on behalf of the legislature and, what's more, the legislature suffers no institutional injury when a federal court enjoins enforcement of a state law. Intervenor RNC, a private party attempting to pursue appeal contrary to the litigation decisions of the State, also lacks standing. This Court should not countenance Intervenor RNC's anti-democratic argument that a political party has a cognizable interest in excluding eligible Americans from the electorate.

On the merits, the district court's injunction should be affirmed. The district court correctly held that the *LULAC* decree, which is a binding and final judgment, bars Arizona officials' enforcement of the new state law requiring rejection of State Form applications lacking DPOC. Intervenors cannot effectuate an end run around that binding judgment without even seeking to set it aside.

Further, the district court correctly held that the DPOR requirement's application to federal elections violates the NVRA, and the same logic applies to the DPOC requirement even were the *LULAC* decree not in force. Defendants failed to show that either DPOC or DPOR is necessary to assess voter eligibility. The DPOC and DPOR requirements also violate the NVRA because they render State Forms not

17

equivalent to the Federal Form, and thus cannot be applied to applications originating from Arizona public assistance agencies.

Finally, the DPOC and DPOR requirements violate the Equal Protection Clause of the United States Constitution. They arbitrarily treat State Form and Federal Form applicants differently: though the information provided on State Forms is substantively indistinguishable from that provided on Federal Forms, State Form applicants who do not provide DPOC cannot vote at all, while all Federal Form applicants who do not provide DPOC are registered as Federal-Only voters, and those whose citizenship is confirmed through ADOT records are registered as full ballot voters. This arbitrary disparate treatment of applicants based on whether they happen to use the State or Federal Form imposes serious burdens on applicants, lacks justification, and violates the Equal Protection Clause.

Thus, the *LULAC* decree (for DPOC), the NVRA (for DPOC and DPOR), and the Equal Protection Clause (for DPOC and DPOR) all require affirmance of the district court's injunction—particularly considering the deference required to the district court's factual findings.

## ARGUMENT

### I.    Intervenors Lack Standing On Appeal.

Intervenors lack standing to prosecute their appeal. *Hollingsworth*, 570 U.S. at 705 ("[S]tanding must be met by persons seeking appellate review."); *Wittman v. Personhuballah*, 136 S. Ct. 1732, 1736 (2016) ("[A]n intervenor cannot step into the

shoes of the original party . . . unless the intervenor independently fulfills the requirements of Article III") (internal citations and quotations omitted). Intervenors have not demonstrated "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent," much less traceability or redressability. *See Lujan*, 504 U.S. at 560. "[T]he decision to seek review . . . is not to be placed in the hands of 'concerned bystanders,' who will use it simply as a 'vehicle for the vindication of value interests.'" *Diamond v. Charles*, 476 U.S. 54, 62 (1986) (citation omitted) (intervenor at the district court lacked standing to appeal where state did not).

Intervenors here are just such bystanders. Most fundamentally, the district court has not ordered Intervenors "to do or refrain from doing anything." *Hollingsworth*, 570 U.S. at 705 (holding that defendants who sponsored challenged referendum and intervened in litigation lacked Article III standing to appeal). An interest in "vindicat[ing] the . . . validity of a generally applicable [state] law" is the kind of "generalized grievance" that "is insufficient to confer standing." *Id.* at 706; *see also RNC v. Common Cause Rhode Island*, 141 S. Ct. 206 (2020) (denying RNC's request for a stay of an election law consent decree because "the state election officials support[ed] the challenged decree" and RNC applicants "lack[ed] a cognizable interest in the State's ability to 'enforce its duly enacted' laws"). Intervenors have no role in enforcing state statutes, and they cannot rely on values-

19

based injuries to support standing. By contrast, the State of Arizona (a defendant below) and the Attorney General (a defendant and also the State's representative) are enjoined from acting pursuant to the district court's order and have appealed a discrete set of determinations they take issue with; the Intervenors have no independent standing to pursue their appeal. *Hollingsworth*, 570 U.S. 693.

### A. Legislator Intervenors Lack Standing on Appeal.

Intervenors Petersen and Toma (the Legislator Intervenors) lack standing because they have not shown, nor can they show, injury in fact. *See Lujan*, 504 U.S. at 560.

### 1. The Legislator Intervenors Do Not Have Standing to Represent the State's Interests.

"[A] State must be able to designate agents to represent it in federal court." *Bethune-Hill*, 587 U.S. at 663 (quotation marks omitted). The State has designated the Attorney General, not Legislator Intervenors, as its agent here. Under Arizona law, the Attorney General "shall . . . [r]epresent this state in any action in a federal court"—and engage in a variety of other duties—"[u]nless otherwise provided by law." A.R.S. §41-193(A)(3). Despite the Legislator Intervenors' arguments, A.R.S. §12-1841 is not an exception to this general rule and does not authorize the Legislator Intervenors to represent the State's interests or otherwise provide a basis for standing here. Nor does the Arizona Constitution provide authority. Further, the Supreme Court has recognized that state executives have the power to make

20

litigation decisions different from those the legislature would make, and that state executives' exercise of that power does not confer legislative standing. *See Bethune-Hill*, 587 U.S. at 663-64 (explaining that Virginia law made state attorney general responsible for representing state in civil litigation and holding that chamber of state legislature had no standing to appeal).

The Legislator Intervenors have consistently relied on A.R.S. §12-1841 as a basis for standing on appeal, ECF 47.1 at 15; ECF 71.1 at 7; ECF 100.1 at 16, suggesting that the State has permitted them to intervene and thus also conferred upon them a cognizable interest in asserting the State's interests that satisfies Article III standing requirements. But that state statute cannot form a basis for Article III standing in federal court because in fact, it does not authorize the Legislator Intervenors to intervene to defend state statutes or otherwise represent the State's interests in *federal* litigation.

As the District of Arizona has recognized, "A.R.S. §12-1841 does not confer blanket authority upon Proposed Intervenors to defend the constitutionality of a state law—particularly where the attorney general is already defending the law." *Miracle v. Hobbs*, 333 F.R.D. 151, 155 (D. Ariz. 2019). Section 12-1841 only authorizes the Legislator Intervenors to intervene in state court—not federal—proceedings, because it only authorizes intervention to defend the constitutionality of a state statute in proceedings *subject to its notice requirements*. A.R.S. §12-1841(D) ("[T]he

21

speaker of the house of representatives or the president of the senate, in the party's discretion, may intervene as a party, may file briefs in the matter or may choose not to *participate in a proceeding that is subject to the notice requirements of this section*.") (emphasis added).

However, this litigation, in federal court, is not "subject to the notice requirements of" §12-1841(A)-(B), or any other state law—so the grant of permissive intervention in §12-1841 does not apply. This litigation is governed by the notice procedures in the Federal Rules of Civil Procedure and Appellate Procedure for federal actions that challenge the constitutionality of state statutes. *See* Fed. R. Civ. P. 5.1(a) (requiring notice solely to the state attorney general and only if the state, a state agency, and a state officer or employee in official capacity are all not a party); Fed. R. Civ. P. 1; Fed. R. App. P. 44 (directing notice to the circuit clerk and certification by the clerk to the state attorney general where the state, a state agency, or a state officer or employee in official capacity are all not a party); Supreme Court Rule 29.4(c) (similarly providing for service on the state attorney general in such circumstances). Because federal rules of procedure "answer the same question" as state law, the federal rule "control[s]" so long as it is within Congress's power to issue. *Martin v. Pierce County*, 34 F.4th 1125, 1128-29 (9th Cir. 2022). As the Supreme Court has explained, "Congress has . . . undoubted power to prescribe rules for the courts it has created, so long as those rules regulate matters 'rationally

capable of classification' as procedure." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 406 (2010). There is "no reason to doubt the validity of the Federal Rules at issue here": a notice requirement "is procedural in the ordinary use of the term." *Martin*, 34 F.4th at 1129, 1132 (internal citations omitted). So, this case is subject to federal, not state-law, notice requirements.

The plain language of §12-1841 makes clear that because this federal case is not subject to state-law notice requirements, the Legislator Intervenors lack state-law authorization to intervene on behalf of the state. Section 12-1841(D) restricts legislative leaders' authority to "intervene as a party" to "a proceeding *that is subject to the notice requirements of this section*." A.R.S. §12-1841(D) (emphasis added). This language would be superfluous if the legislature meant to grant intervention authority in proceedings not subject to the notice requirements of §12-1841. And the Arizona "legislature does not include" "trivial" or "superfluous" words or phrases in statutes. *Vega v. Morris*, 910 P.2d 6, 8 (Ariz. 1996) (en banc). The statute's plain text does not provide authority for the Legislator Intervenors' intervention in federal proceedings not subject to state-law notice requirements.[5]

---

[5] Section 12-1841(D) specifically limits intervention authorization, by its terms, to proceedings "subject to the notice requirements of this section." Section 12-1841(A) states that "[i]n any proceeding in which a state statute . . . is alleged to be unconstitutional," the Attorney General and legislative leaders "shall be served with a copy of [the relevant court document] and shall be entitled to be heard." As established, this notice requirement does not apply in federal proceedings, so "any

Intervenors' assertion that §12-1841(D) is "substantively identical" to the North Carolina statute at issue in *Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179 (2022), is inaccurate. *Compare* A.R.S. § 12-1841(D) *with* N. C. Gen. Stat. Ann. §1-72.2(b). Unlike A.R.S. §12-841(D), the North Carolina statute designates legislative leaders "as agents of the State" and provides *no* limitation on their ability to intervene. N. C. Gen. Stat. Ann. §1-72.2(b) (leaders of the state legislature "as agents of the State . . . shall jointly have standing to intervene on behalf of the General Assembly . . . in *any* judicial proceeding challenging" a state statute or constitutional provision, with *no* notice limitation). These distinctions are

---

proceeding" in §12-1841(A) thus cannot encompass federal proceedings with respect to notice. Because the notice and opportunity to be heard requirements are coupled in §12-1841(A)—in "any proceeding," certain state officials both "shall be served" and "shall be entitled to be heard"—the statute is best read as a whole to require notice and an opportunity to be heard in "any proceeding" *subject to state notice requirements*. *See, e.g.*, *Nicaise v. Sundaram*, 432 P.3d 925, 927 (Ariz. 2019) (explaining "we interpret statutory language in view of the entire text, considering the context"). Legislative history of the bill amending §12-1841 to add legislative leaders alongside the Attorney General supports this interpretation. Arizona Senate Fact Sheet, 2006 Reg. Sess. H.B. 2868 (characterizing amendments to §12-1841 as requiring notice and permitting action by the legislative leaders "*if not timely served*" (emphasis added)) (available on Westlaw). Alternatively, entitlement to be heard need not mean intervention but rather may be limited to an amicus role—which likewise would harmonize subsections (A) and (D).

Intervenors have previously relied on *Isaacson v. Mayes*, No. 2:21-cv-1417, 2023 WL 2403519 (D. Ariz. Mar. 8, 2023), ECF 47.1 at 16, to argue that §12-841 confers standing here. In that case, though, the parties opposing intervention did not argue that the specific text of §12-841(D), and the need to read §12-841(A) in view of the text of §12-841(D) to construe the statute as a whole, makes §12-841 inapplicable in federal litigation—as Appellees set forth here. *Compare Isaacson*, No. 2:21-CV-1417, ECF 159 at 12-13.

24

crucial. As the Supreme Court emphasized in *Berger*, "not every State has structured itself" the same way. 597 U.S. at 184. In contrast to North Carolina, Arizona has *not* "expressly authorized" legislative leaders "to defend the State's practical interests in [election-related] litigation." *Berger*, 597 U.S. at 193. Moreover, in *Berger*, the State itself was not a named party, and the Attorney General had only appeared to defend one state agency's narrow interests. *Id.* at 186, 194-95. Here, Arizona is a named defendant and, per state law, represented by the Attorney General. Unlike in *Berger*, Arizona has not "cho[sen] to divide its sovereign authority among different officials" in federal litigation. *See id.* at 195.[6]

Nor does the Arizona Constitution authorize legislative leaders to appeal to defend the State's interests in this case. Legislator Intervenors' argument that Ariz. Const. art. II, §3 authorizes their intervention to represent the State's interests misinterprets that provision. *See* ECF 47.1 at 16-17. First, this constitutional provision only permits "th[e] state" "to restrict the actions of its personnel and the use of its financial resources to purposes that are consistent with the [federal] constitution." Ariz. Const. art. II, §3(B). As discussed above, the Attorney General is Arizona's chosen default representative for the State for this purpose. *See supra*. Second, this provision is plainly intended to keep the state from "enforc[ing],

---

[6] Further, *Berger* analyzed the North Carolina statute in light of the standard for intervention under Fed. R. Civ. P. 24(a)(2), not under the requirements for Article III standing. *Berger*, 597 U.S. at 190-91.

administer[ing] or cooperat[ing] with" a "federal action or program" that is unconstitutional. *Id.* §3(C). Thus, it creates a shield for the state to avoid participation in unconstitutional activity, but not a sword to independently empower any and all state officials to engage in affirmative litigation (or other affirmative actions) on behalf of the State. Finally, the provision allows the "state" to "pursu[e] any" "available legal remedy," but it does not say "the people or their representatives" may do so without regard to other legal constraints. *Compare id.* §3(B) *with id.* §3(C). And as described, intervention is not an "available" legal remedy to Legislator Intervenors here. Legislator Intervenors' interpretation would mean that this constitutional provision allegedly gives not only Legislator Intervenors but any individual in Arizona ("the people") authority to represent the state's interests in any proceeding involving "perceived unconstitutional federal overreach." ECF 47.1 at 16. They have provided no authority for this sweeping interpretation that would throw any litigation involving constitutional issues in Arizona into chaos and create the kind of "generalized grievance" standing that federal courts have never permitted.

### 2. The Legislator Intervenors Do Not Have Standing Based on Any Alleged Injury to the Legislature.

Further, the Legislator Intervenors cannot assert Article III standing by claiming injury on behalf of the legislature here. Most fundamentally, the legislature is not an intervenor in this case. *Compare Arizona State Legislature v. Arizona Indep.*

*Redistricting Comm'n*, 576 U.S. 787 (2015) ("*AIRC*"); Complaint at 4, *Arizona State Legislature et al. v. Biden et al.*, No. 3:24-cv-08026 (D. Ariz. Feb. 12, 2024), ECF No. 1 (complaint describing "Plaintiff Arizona State Legislature" and explaining that "President Petersen and Speaker Toma have exercised this authority [under state legislative chambers' rules] and bring this lawsuit on behalf of" the legislature) *with* 1-LUCHA-SER-56 (Legislator Intervenors intervening "as the Speaker and President," in light of §12-841 and "the Speaker and President's interests," and predicating their argument on the basis that "the Speaker and President should be allowed to exercise their statutory authority under A.R.S. §12-841"). Here the individual Legislator Intervenors, not their Houses and not the Arizona legislature as a whole, have intervened. *Bethune-Hill*, 587 U.S. at 666 ("[A] party may not wear on appeal a hat different from the one it wore at trial"). The Supreme Court has never held that legislators have Article III standing to appeal merely because a federal court enjoined a state statute. *Cf. id.* ("This Court has never held that a judicial decision invalidating a state law as unconstitutional inflicts a discrete, cognizable injury on each organ of government that participated in the law's passage.").

Even if the Legislator Intervenors *could* assert injury on behalf of the entirety of the Arizona legislature despite its lack of intervention, Legislator Intervenors have shown no Article III injury-in-fact here. *AIRC* involved "*permanently* depriv[ing] the legislative plaintiffs of their role in the [legislative] process." *Bethune-Hill*, 587

U.S. at 668. *Priorities USA v. Nessel*, 978 F.3d 976 (6th Cir. 2020), an out-of-circuit decision in a stay posture on which the Legislator Intervenors have previously relied, *e.g.*, ECF 71.1 at 8, does not support injury-in-fact here. *Priorities USA* described the law at issue as "disrupting [the legislature's] specific powers" by categorically prohibiting the legislature from "even *regulat[ing]* hired voter transportation for federal elections"—removing any ability to act in an entire sphere of election regulation. 978 F.3d at 982. The district court's injunction here, by contrast, does not prevent the legislature from enacting laws regulating voting eligibility, including voter citizenship and residence questions: for example, it does not affect citizenship attestation. *See* 1-ER-2-6.

Moreover, in *Priorities USA*, the Sixth Circuit motions panel retained the case for the merits and characterized its prior determination that the legislature had standing very narrowly. *Priorities USA v. Nessel*, 860 F. App'x 419, 420 (6th Cir. 2021) (unpub. op.). In its merits decision, the panel made clear that the fact that the state attorney general did not appeal was essential to the motions panel's decision. *Id.* ("As we decided before, the Michigan Legislature has standing to appeal the injunction because the state attorney general has not done so."). It did not even mention its prior statements regarding disruption of the legislature's specific powers. *Id.* There is thus significant reason to doubt that the *Priorities USA* motions panel opinion stands for a broader, outlier theory of legislative injury that could open the

floodgates to legislative standing on appeal any time a federal district court enjoins a state statute. To the extent it does, it is out of step with Supreme Court precedent, and this Court should not follow its reasoning.

In any event, even on the broadest theory of legislative standing, the Legislator Intervenors lack standing here—where the district court's narrow injunction does not permanently deprive them of any role in the legislative process.

### B. Intervenor RNC Lacks Standing on Appeal.

The RNC lacks appellate standing. Just like in *RNC v. Common Cause RI*, the RNC does not have standing here to appeal the enjoining or altering of voting procedures where the State does not. 141 S. Ct. 206 (2020) (holding that RNC "lack[ed] a cognizable interest" in asserting the State's interests in the election procedures).

The RNC does not have "competitive injury," the only basis for injury it has asserted in this appeal. *See* ECF 47.1 at 19-20; ECF 100.1 at 15. Competitive standing is based on injury due to "the inability to compete on an even playing field." *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (internal quotations and citations omitted). This Court has accordingly found competitive standing for challenges to an unfair electoral *process* disadvantaging a candidate—*e.g.*, to candidate order on ballots, *id.* at 900, different postal charges for different candidates, *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011) (describing *Owen v.*

29

*Mulligan*, 640 F.2d 1130, 1132-33 (9th Cir. 1981)), and an ineligible candidate's inclusion on the ballot, *Drake*, 664 F.3d at 783.

But this Court has never suggested that a more inclusive voter pool creates an injury for competitive standing, nor has any court ever held that a litigant has a cognizable interest in effectively keeping eligible Americans from voting. The RNC has provided no legal support for this novel and anti-democratic theory. The district court's order is not a threat to "diversity and competition in the marketplace of ideas." *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 554 (6th Cir. 2014). Instead of restructuring the marketplace—consistently giving some merchants' stalls prime real estate (better ballot position) or requiring some to pay more for advertising (postage charges)—it is expanding the number of shoppers. The available remedy for the RNC is to appeal to the new voters, not to block them from political participation. *Cf. Bethune-Hill*, 587 U.S. at 670 ("Changes to [the House's] membership brought about by the voting public . . . inflict no cognizable injury on the House.").

And even if "competitive" standing were possible due to a larger number of registered voters, the RNC did not present evidence in the record that demonstrated injury-in-fact, causation, or redressability. To the contrary, the RNC's own evidence shows that there are in fact Republican voters who do not provide DPOC and that 52.5% (more than half) of existing Federal-Only voters are unaffiliated. ECF 50.5.

The RNC has provided no evidence to support the speculative assertion that those registering without DPOC will necessarily vote against Republican candidates. *See Clapper v. Amnesty Int'l*, 568 U.S. 398, 410-11 (2013).[7]

The Supreme Court has "never . . . upheld the standing of a private party to defend the constitutionality of a state statute when state officials have chosen not to." *Hollingsworth*, 570 U.S. at 715. To permit the RNC to pursue this appeal, contrary to the litigation decisions of the State of Arizona and state officials who are named defendants in this litigation, would give rise not only to Article III case or controversy concerns, but federalism concerns as well. The RNC, like the Legislator Intervenors, has no basis for appellate standing. Article III's standing requirement prevents "concerned bystanders" such as Intervenors from using the federal courts

---

[7] Amicus Curiae Immigration Reform Law Institute ("IRLI") cursorily asserts that Appellees lack standing based on an inaccurate characterization of the district court's well-reasoned decisions. ECF 117.2 at 13. For example, the district court held, in denying Defendants' motion to dismiss, that LUCHA had alleged standing on the basis that the challenged laws impair LUCHA's voter registration, education, and mobilization activities and disproportionately interfere with voting by the naturalized citizens that LUCHA serves. 1-ER-0176. *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), does not change this analysis: the laws have "perceptibly impaired [LUCHA's] ability to provide" voting assistance "services"—"directly affect[ing] and interfer[ing] with" its "core" activities. *Id.* at 395. Extensive findings support standing for each of Appellees' claims. 1-ER 47-68. While IRLI's passing, one-page argument does nothing to undercut the district court's sound standing analysis—made after a ten-day bench trial that featured extensive standing testimony—Appellees will submit supplemental briefing on this point at the Court's request.

"as a vehicle for the vindication of value interests." *Hollingsworth*, 570 U.S. at 707 (quoting *Diamond*, 476 U.S. at 62).

## II.    The *LULAC* Decree Remains Enforceable.

The district court correctly held that "the LULAC Consent Decree precludes Arizona from enforcing H.B. 2492's mandate to reject any State Form without accompanying DPOC." 1-ER-0147. That is because the *LULAC* decree is a binding final judgment that has not been modified or set aside.

Intervenors maintain that "the LULAC Consent Decree expired on December 31, 2020." Intervenors' Principal Brief, ECF 101.1 ("Br.") at 19. But as this Court correctly concluded just two weeks ago, the *LULAC* court's decision to retain jurisdiction for a limited period of time "does not suggest that the preclusive effect of the final judgment disappeared or 'expired' after the docket was closed." ECF 116.1 at 12. This Court and other federal courts have consistently held that consent decrees are binding final judgments and that those judgments remain in force permanently even if the entering court explicitly retains jurisdiction only for a limited period. *See Taylor v. United States*, 181 F.3d 1017, 1024 (9th Cir. 1999); *see also, e.g., Thompson v. HUD*, 404 F.3d 821, 828, 833 (4th Cir. 2005) (court retained authority to enforce terms of decree beyond seven-year period during which it retained jurisdiction); *Roberts v. St. Regis Paper Co.*, 653 F.2d 166, 171 (5th Cir. 1981) (clause retaining jurisdiction for five years did not "refer[] to the life of the

decree itself," and decree's injunction was permanent); *Hook v. Ariz. Dep't of Corrs.*, 972 F.2d 1012, 1013, 1017 (9th Cir. 1992). Intervenors have offered no case law or other support for their cursory assertion that the opposite is true. *See* Br. at 19.[8]

Intervenors next contend that the "Secretary of State cannot via a private contract divest the Arizona Legislature of any portion of its sovereign authority." Br. at 19. But as this Court pointed out, the *LULAC* decree "has no such effect"—"[i]t cabins the authority of the parties to the Decree," who are the Secretary and the Maricopa County Recorder. ECF 116.1 at 11.[9] To hold that a state legislature could at any time "nullify a final judgment entered by an Article III court" without even attempting to have a consent decree modified or set aside would render the Supremacy Clause meaningless. *Id*. at 11. Indeed, this Court has previously explained that, "consistent with the Supremacy Clause," a consent decree entered by a department of Arizona government "preclude[s] the application of" an Arizona statute enacted after entry of the decree. *Hook v. Arizona Dep't of Corr.*, 107 F.3d 1397, 1403 (9th Cir. 1997), *as amended on denial of reh'g and reh'g en banc* (Apr.

---

[8] Intervenors seek to distinguish *Taylor* by arguing that they do not "wish[] to 'reopen'" the *LULAC* decree. Br. at 19 n.1. But that misses the point. *Taylor*'s concern was not just that a new statute could require a final judgment to be reopened, but that the statute would "direct reversal of a final determination of the Judicial Department." 181 F.3d at 1025. The same is true here.

[9] *See* Part I.A.1., *supra* (citing *Bethune-Hill*, 587 U.S. 658, to demonstrate that state executives may have power to make different litigation choices than the legislature would make).

22, 1997). *Cf. Buckhannon Bd. & Care Home, Inc. v. West Va. Dep't of Health & Human Resources*, 532 U.S. 598, 604 (2001) (explaining, in the context of attorney's fees, that a consent decree "is a court-ordered change in the legal relationship between the plaintiff and the defendant" and "create[s] . . . material alteration of the legal relationship between the parties") (citations omitted, cleaned up).

Intervenors also invoke *Moore v. Harper*, 600 U.S. 1 (2023), for the proposition that "state legislatures have the duty to prescribe rules governing federal elections." Br. at 19 (quotation marks omitted). But in *Moore*, the Supreme Court reiterated "that the Elections Clause does not exempt state legislatures from the ordinary constraints imposed by state law." 600 U.S. at 34.[10] Despite that, Intervenors ask this Court to hold that the Elections Clause gives the Arizona legislature unchecked power to override *both* a decision of a federal court *and* a decision of the state executive who is required by Arizona statutes—enacted by the legislature—to represent the State in court. *See* A.R.S. §§41-193(A)(3) (requiring attorney general and department of law to represent Arizona "in any action in a federal court"); 41-192(B)(4) (granting attorney general power to settle claims against state departments with department's approval); *see also Bethune-Hill*, 587 U.S. at 663-64. Such a holding would be inconsistent with *Moore* and other Supreme

---

[10] Further, the Arizona Constitution provides that "[t]he Constitution of the United States is the supreme law of the land to which all government, state and federal, is subject." Ariz. Const. Art. II, §3(A).

Court cases that have "each rejected the contention that the Elections Clause vests state legislatures with exclusive and independent authority when setting the rules governing federal elections." 600 U.S. at 26.[11]

No other case law cited by Intervenors provides them any help. In *Doe v. Pataki*, 481 F.3d 69, 76 (2d Cir. 2007), the parties included references to existing state law in the terms of a consent decree, and the Court needed to determine whether those references were included for clarity or "as binding commitments precluding application of subsequent legislative changes to the Plaintiff class." The Court concluded that "[t]here was no indication . . . that the Plaintiffs sought to have [the contested statutory provisions] remain unaltered by subsequent state legislation." *Id.* at 77. Here, by contrast, the parties to the *LULAC* decree "agreed to refrain from precisely the conduct" that is required by the subsequent state legislation—A.R.S. §16-121.01(C). 1-ER-137.[12] And *Roosevelt Irrigation District v. Salt River Project*

---

[11] This Court should assign no weight to the Eighth Circuit's opinion in *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020). *See* Br. at 19. The *Carson* majority held that under the Elections Clause, "a legislature's power [to regulate federal elections] is such that it cannot be taken from them or modified even through their state constitutions." *Id*. at 1060 (quotation marks omitted). After *Carson* was decided, the Supreme Court in *Moore* unequivocally rejected that understanding of the Elections Clause, holding instead that state constitutions "restrain the legislature's exercise of power." 600 U.S. at 27.

[12] Likewise, while a consent decree should be modified if federal law "has changed to make legal what the decree was designed to prevent," *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992); *see* ECF 116.1, Dissent at 9-10 (Bumatay, J., dissenting), Intervenors do not even assert that the relevant *federal* law—the First

*Agricultural Improvement & Power District*, 39 F. Supp. 3d 1051 (D. Ariz. 2014), is irrelevant. There, the court simply held that when the State entered a consent decree resolving claims against a defendant, it did not prevent a political subdivision from later filing suit against that defendant. Here, there is no claim that the *LULAC* decree binds the legislature or any other non-party—it "has no such effect." ECF 116.1 at 11.

Moreover, while the Supreme Court has suggested in *dicta* that if a consent decree is "not limited to reasonable and necessary implementations of federal law, it may improperly deprive future officials of their designated legislative and executive powers," *Horne v. Flores*, 557 U.S. 433, 450 (2009) (quotation marks omitted); *see* ECF 116.1, Dissent at 8 (Bumatay, J., dissenting), its solution in such a circumstance was that lower courts should "take a flexible approach to Rule 60(b)(5) motions addressing such decrees." 557 U.S. at 450 (quotation marks omitted). Here, neither Intervenors nor any other party have filed a Rule 60(b) motion seeking to modify the *LULAC* decree—Intervenors instead intervened in *this* case as defendants, and they now attempt to use this case, which seeks to *enforce* the decree, to evade the proper

---

and Fourteenth Amendments to the U.S. Constitution, which the complaint in *LULAC* was based upon—has changed. *See Hook*, 972 F.2d at 1015-16 (addressing whether consent decree should be modified if "the *constitutional* law underlying [it] no longer appear[ed] to support the decree" (emphasis added). In any event, state law has not meaningfully changed: the *LULAC* decree was entered to enjoin the state practice of rejecting State Forms without DPOC, and A.R.S. §16-121.01(C) would simply reinstate that same enjoined practice.

procedural method for modification. Having failed to file a Rule 60(b) motion, Intervenors cannot succeed here. *See Hook*, 972 F.2d at 1016 (refusing to address party's constitutional argument "until it ha[d] been raised in a Rule 60(b)(5)-(6) motion").

## III.  The DPOC and DPOR Requirements for State Form Applicants Violate the NVRA as Applied to Federal Elections.

The district court correctly held that the NVRA only allows States to require on State Forms what is "necessary" to assess a voter's eligibility to vote in federal elections and requires States to use forms "equivalent" to the Federal Form when providing voter registration services at public assistance agencies. 1-ER-80-82. The district court's factual findings demonstrate that the DPOC and DPOR requirements for State Forms cannot satisfy either requirement. Intervenors' only arguments that they meet these standards hinge on interpreting both terms—"necessary" and "equivalent"—as hollow requirements. Particularly given that the presumption against preemption does not apply in interpreting Elections Clause statutes, "there is no compelling reason not to read Elections Clause legislation simply to mean what it says." *ITCA*, 570 U.S. at 15.

### A. The DPOC and DPOR Requirements for State Form Applicants Violate Sections 6, 8, and 9 of the NVRA.

The district court correctly held that the DPOR requirement for State Form Applications violates the NVRA. 1-ER-80-81. And, by the same reasoning, even

absent the *LULAC* decree, H.B. 2492's treatment of State Forms lacking DPOC is unlawful. *See* 1-ER-137 at n. 13 ("As long as Arizona has chosen to produce a State Form that offers registration for federal elections, it must abide by the requirements outlined in Section 6, cross-referenced to Section [9].").[13]

This Court's inquiry must "begin[] with the statutory text, and end[] there as well if the text is unambiguous." *BedRoc Ltd. v. U.S.*, 541 U.S. 176, 177 (2004). The NVRA unambiguously protects applicants using the State Form to register for federal elections: Section 8 requires that Arizona "ensure that any eligible applicant is registered to vote" if their "valid voter registration form" is received at least 30 days before an election. 52 U.S.C. §20507(a)(1). And while NVRA Section 6 allows states to use their own state forms for federal elections, 52 U.S.C. §20505(a)(2), those forms must comply with NVRA Section 9. Pursuant to NVRA Sections 6 and 9, a state form "may require only such identifying information … and other information … as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration." 52 U.S.C. §20508(b)(1).

---

[13] This Court may "'affirm the district court on a ground not selected by the district judge so long as the record fairly supports such an alternative disposition.'" *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1050 (9th Cir. 2000) (quoting *Fidelity Fin. Corp. v. Fed. Home Loan Bank*, 792 F.2d 1432, 1437 (9th Cir.1986)). Plaintiffs' NVRA challenges to the differential treatment of State and Federal Forms as to DPOC and DPOR were fully briefed below and amenable to resolution before this Court.

Therefore, as the district court held (and as Intervenors agree, Br. at 38), Arizona may only require additional information that is "necessary" to assess the applicant's eligibility. *See* 1-ER-80-81; 1-ER-137 at n. 13. Defendants failed to make *any* evidentiary showing as to the necessity for DPOC or DPOR to assess voter eligibility under any plausible definition of "necessary." To the contrary, the evidentiary record establishes not only that DPOC and DPOR are *not* necessary but the requirements would wreak havoc on orderly election administration. *See supra* Statement of the Case at 10-12. The district court held that Intervenors failed to make any showing that DPOR is "necessary," 1-ER-81, and likewise held that DPOC is not likely to "meaningfully reduce possible non-citizen voting in Arizona." 1-ER-36. These findings are not clearly erroneous (indeed Intervenors do not ever argue otherwise).

### 1. Defendants Failed to Show DPOC is "Necessary" to Assess Voter Eligibility.

The district court made clear that, even setting aside the *LULAC* decree, the NVRA bars Arizona from refusing to register State Form applicants to vote for federal offices because they do not provide DPOC. 1-ER-137 n.13. The district court's conclusion to that effect is well-founded for several reasons.

First, the NVRA and Arizona law both already provide for proof of citizenship in the form of an attestation, *see* 52 U.S.C. §20504(c)(2)(C); A.R.S. §16-152(A)(14), and "Congress has historically relied on an attestation requirement 'under penalty of

39

perjury' as a gate-keeping requirement for access to a wide variety of important federal benefits," *Fish v. Kobach*, 840 F.3d 710, 716-17, 737 (10th Cir. 2016) (holding that attestation "is the *presumptive* minimum amount of information necessary for state election officials to carry out their eligibility-assessment and registration duties" and DPOC could not be required for voter registration at motor vehicle agencies under the NVRA).[14]

Second, the EAC already denied Arizona's request to include DPOC as "necessary" under NVRA Section 9. *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1196-97 (10th Cir. 2014) (holding that Kansas and Arizona "failed to carry the burden *ITCA* establishes for them: to convince a court conducting APA review that the denial of their request precluded them from obtaining information that is 'necessary' to enforce their respective states' voter qualifications"). And no Defendant has ever provided any rationale for why DPOC is "necessary" for processing State Forms but not Federal Forms.

---

[14] Intervenors correctly identify some distinctions between *Fish v. Kobach*, *Kobach v. EAC*, and this case—i.e., that *Fish* dealt with Section 5 of the NVRA, which limits states to requiring only the "*minimum amount* of information necessary," and *Kobach* was assessed under the APA. 840 F.3d at 717 (emphasis added). However, those cases demonstrate that parties, including Arizona, in other litigation, like Intervenors here, have failed to make an evidentiary showing that DPOC is necessary for assessing eligibility.

Third, after a ten-day bench trial, the district court held that non-citizen registration and voting in Arizona, if it occurs at all, is extremely rare. 1-ER-36 (noting lack of cases involving non-citizen voting since 2008 or any registrant who did not provide DPOC and was identified as non-citizen); *see supra* Statement of the Case at 10-11. These unrebutted findings are not clearly erroneous.

Intervenors acknowledge the NVRA only allows States to seek the information "necessary" to assess an applicant's eligibility. Br. at 20. Yet they cite *no evidence* establishing that DPOC is necessary to assess voter eligibility. *Id.*[15] That should be the end of the inquiry.

Instead, Intervenors rely heavily on dicta in *ITCA* and *Gonzalez v. Arizona* recognizing that under NVRA Section 6, states may create their own registration forms that "may require information the Federal Form does not." *ITCA*, 570 U.S. at 12; *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012); Br. at 20. True enough. But those requirements still must satisfy Section 9's necessity requirement. Nothing in *ITCA* or *Gonzalez*—neither of which addressed whether a DPOC requirement complied with Section 9—suggests otherwise. To the contrary, *Gonzalez* explicitly

---

[15] Remarkably, as this Court has noted, Intervenors argue that election officials must reject "applicants whose documentary proof of citizenship is already on file with the State and is instantly accessible by state elections officials . . . on the incredible basis that they have not provided the State with documentary proof of citizenship." ECF 116.1 at 17. It is hard to imagine how such a procedure squares with the NVRA's demand that States only require that information that is "necessary" to assess eligibility.

noted that "states may (but are not required to) create their own state mail voter registration forms for federal elections . . . *so long as these forms meet certain criteria in the NVRA*." 677 F.3d at 395 (emphasis added).

Intervenors also hang their hat on an interim temporary restraining order opinion in *Gonzalez v. Arizona*, 435 F. Sup. 2d 997 (D. Ariz. 2007); Br. at 20. But that court's reasoning was directly overruled by *ITCA*. 570 U.S. at 7, 15, 19-20. And its bare assertion that DPOC "undoubtedly assists Arizona in assessing the eligibility of applicants" neither addressed the necessity standard nor relied on any record evidence. Br. at 20. Likewise, this Court's decision in *Gonzalez v. Arizona*, 485 F.3d 1041 (9th Cir. 2007) at the preliminary injunction stage based on a "limited record," was superseded by both this Court's en banc ruling in *Gonzalez* and by *ITCA*.

Intervenors' citations to *Diaz v. Cobb* and *Arcia v. Florida Secretary of State*, Br. at 20, are similarly unavailing. In *Diaz*, the district court was addressing the appropriateness of a citizenship checkbox on a State Form absent DPOC and found that the Help America Vote Act "direct[ed] states to design their forms" to include such checkboxes. 435 F. Supp.2d 1206 (D. Ariz. 2006). In *Arcia*, while the Eleventh Circuit acknowledged the uncontroversial fact that "citizenship is one of the requirements for eligibility to vote," it went on to hold that the NVRA can govern *how* states go about enforcing that requirement. 772 F.3d 1335 (11th Cir. 2014)

42

(holding that Florida's program for removing alleged non-citizens from the voter registration rolls was barred by the 90-day provision of the NVRA).

Intervenors do not explain what they believe Section 9's necessity requirement demands. Rather, their position appears to be that NVRA Section 9 imposes no restriction on what states may deem necessary to determining voter eligibility.[16] Such a reading would not only be at odds with the plain meaning of "necessary" but render that requirement mere surplusage. *See Koonwaiyou v. Blinken*, 69 F.4th 1004 (9th Cir. 2023) (applying the "well-established canon against surplusage"). And such an interpretation would be bizarre considering the purpose of the NVRA, which was to "increase registration of eligible citizens," in part to address Congress's findings that some states were employing "discriminatory and restrictive [registration] practices that deter potential voters." S. Rep. 103-6 (1993). Intervenors simply adopt the dissent's reasoning in *ITCA*, *see ITCA*, 570 U.S. at 46 (Alito, J., dissenting), but the dissent "clearly tells [this Court] what the law is not." *Fish*, 840 F.3d at 743. And "[a]llowing the states to freely add burdensome and unnecessary requirements by giving them the power to determine what is

---

[16] Amicus IRLI similarly argues that because the NVRA does not specifically prohibit documentation requirements, any such requirement is permissible. ECF 117.2 at 18-19. But the fact that the NVRA does not categorically prohibit documentation requirements does not mean it categorically allows them either. Instead, Section 9 imposes a necessity standard that gives states some flexibility but only to require information it *actually needs*. The district court did not clearly err in finding that election officials do not need DPOC or DPOR.

['necessary'] would undo the very purpose for which Congress enacted the NVRA."
*Id.*

### 2. Defendants Failed to Show DPOR is "Necessary" to Assess Voter Eligibility.

The district court held that Defendants failed to meet their burden to show that DPOR is "necessary" to assess voter eligibility. 1-ER-81. Intervenors do not even attempt to argue that this factual finding was clearly erroneous. It is not.

Like citizenship, Arizona law already provides for proof of residence in the form of attestation under penalty of perjury. A.R.S. §§16-152(A)(3), (17)-(18). Given that the Federal Form relies upon attestation for proof of residency, that is presumptively sufficient to assess eligibility. *Fish*, 840 F.3d at 716-17. Further, both the State and Federal Forms not only require an attestation of residency but the provision of a specific location of residence that is then verified by election officials. *See infra.*

At trial, Intervenors adduced no evidence to rebut that presumption or show that DPOR is necessary to assessing voter eligibility. Neither of their experts addressed DPOR at all. And the expert and unrefuted fact witness testimony from Arizona officials presented at trial established that voter fraud is "exceedingly rare nationally and in Arizona." 1-ER-35; *see supra* Statement of the Case at 10-11. Moreover, the election official testimony established that in addition to relying on voters' attestations of residence, every voter address is verified with GIS software

and, where there is any irregularity, the voter must resolve it before they can vote. *See supra* Statement of the Case at 11. These address verification procedures are sophisticated and account for the many nonstandard addresses in Arizona among rural and Native voters, which the DPOR requirement does not.

Remarkably, Intervenors provide a *single* record cite to support their contention that DPOR is "necessary" to assessing eligibility. Br. at 38.[17] But that testimony, from an election official in Pima County, does not support their position. While Intervenors say this testimony shows that some registrants "will attempt to register at an Arizona address that is not (or may appear not to be) the location of a bona fide residence," Br. at 38, it is actually testimony about self-proclaimed investigators *incorrectly* flagging registrations of RV residents as fraudulent because they did "not understand[] the nuances of voter registration in Arizona." 4-ER-828-30 (Hiser). These are precisely the types of voters living at nonstandard addresses that Arizona's current systems are built to accommodate but who will struggle to provide DPOR. 4-ER-831 (Hiser) (identifying RV residents as a group unlikely to have DPOR).

---

[17] Intervenors themselves acknowledge that Arizona already has systems to verify nonstandard addresses, Br. at 39, but claim "the DPOR requirement integrates this verification mechanism into the registration form." *Id.* The DPOR requirement does no such thing. Instead, it attempts to replace a system built to accommodate voters of all stripes with a documentation requirement that overlooks voters with nonstandard addresses.

Intervenors cite a district court opinion in *Gonzalez* stating that "the plain meaning [of Section 9] is if the state deems some information necessary to identify the applicant, the information can be required." Br. at 39. Again, that was the position of the dissent in *ITCA. See supra.* While Intervenors claim that the district court and Plaintiffs are imposing a "narrowly tailored" or "least restrictive means" test, in fact, the district court imposed the standard of Section 9: a showing that the requirement information is necessary to assess voter eligibility.[18] The district court did not clearly err in finding that the evidence did not establish any necessity for DPOR.[19]

---

[18] Intervenors' string of district court citations, Br. at 40, provides them no support. Both *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155 (N.D. Fla. 2012) and *Am. Ass'n of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195 (D. N.M. 2008), concerned requests for information from voter registration organizations rather than voters (and the district court in *Browning* doubted whether Section 9 applied to such requests), and the district courts made factual findings that the information was reasonably necessary to election administration. *Browning*, 863 F. Supp. 2d at 1166; *Herrera*, 580 F. Supp. 2d at 1243. The district court found otherwise here, and those factual findings are subject to clear-error review. *Supra* Standards of Review at 15-16. Likewise, in *McKay v. Altobello*, No. 96-3458, 1997 WL 266717, *3-4 (E.D. La. May 16, 1997), the district court based its finding that maiden name was "necessary" to election administration on specific record evidence that it was "an essential identifying factor," "based on the experience peculiar to that state." Intervenors failed to make such a record here, and election officials' testimony was contrary to Intervenors' position.

[19] That finding was based on the dearth of evidence, but the district court was correct to note the dissonance between requiring DPOR for all new registrations while relying solely on attestation of residency when the State has affirmative evidence of non-residency in the form of an application for an out-of-state license. 1-ER-81 Such a contradiction unfortunately suggests a motive more focused on making new registrations more difficult rather than ferreting out fraud.

## B. The DPOC and DPOR Requirements for State Form Applicants Violate Section 7 of the NVRA.

Arizona public assistance agencies required to conduct voter registration services under NVRA Section 7 rely on the State Form, provided to them by the Secretary. 1-ER-81; 3-ER-722. NVRA Section 7 requires public assistance agencies to distribute the Federal Form or an "equivalent" form. 52 U.S.C. §20506(a)(6) (citing §§20508(a)(2)), 20506(a)(2)). As the district court held, "Section 7 is clear: if the Secretary of State supplies the State Form to public assistance agencies, the State Form must be 'equivalent,' or 'virtually identical' to the Federal Form." 1-ER-81. Thus, states have no discretion in what they require for registration at public assistance agencies: they must only require what the Federal Form requires and nothing more. *Id.* Since both the DPOC and DPOR requirements demand that State Forms require information that Federal Forms do not, they are not "equivalent." Therefore, they cannot be applied to applications originating from public assistance agencies. 1-ER-82.

Intervenors' only response to the statute's straightforward text is nonsensical. They argue that Section 9 allows states' flexibility for their form to differ from the Federal Form but at the same time compliance with this flexible Section 9 standard makes a State Form "equivalent" to the Federal Form. Br. at 41. But the "plain meaning of a statute controls where that meaning is unambiguous." *Khatib v. County of Orange*, 639 F.3d 898, 902 (9th Cir. 2011) (en banc). And here, equivalent means

equivalent, not "similar" or "close enough." *See* 1-ER-81 (citing Black's Law Dictionary defining equivalent as "virtually identical"). Moreover, as the district court noted, Intervenors' appeal to the broader statutory context, Br. at 41, cuts against them:

> By its terms, section 7 does not afford states this same discretion [given to State Forms] regarding forms made available at public assistance agencies. § 20506(a)(6). This is buttressed by the fact that Congress required public assistance agencies to provide voter registration services specifically in an effort to target the registration of persons with disabilities and low-income individuals who are more likely to receive public assistance. H.R. Rep. No. 103-66, 19 (1993) (Conf. Rep.). Requiring public assistance agencies to use an "equivalent" to the Federal Form "guarantees that a simple means of registering to vote in federal elections will be available" for these individuals. *ITCA*, 570 U.S. at 12.

1-ER-82. Because the DPOR and DPOC State Form requirements make it not "equivalent" to the Federal Form, those requirements cannot be applied to applications from public assistance agencies.

## IV.    The DPOC and DPOR Requirements Violate the Equal Protection Clause.

Trial evidence established that the DPOC and DPOR requirements for the State Form are unlawful for another reason: they violate the Equal Protection Clause. As Plaintiffs argued below, *see* 1-LUCHA-SER-39-42, and showed at trial, the DPOC and DPOR requirements unconstitutionally treat similarly situated voters differently without justification. *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1076 (9th

Cir. 2015) (an appellate court "may affirm . . . on any ground raised below and fairly supported by the record") (citation omitted).

The DPOC and DPOR requirements violate the Equal Protection Clause's mandate that "all persons similarly situated . . . be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."). "Voting is a fundamental right subject to equal protection guarantees under the Fourteenth Amendment." *Idaho Coalition United for Bears v. Cenarrusa*, 342 F.3d 1073, 1076 (9th Cir. 2003). "One source of [the right to vote's] fundamental nature lies in the . . . equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (holding that recount procedures violated the Equal Protection Clause). This Court has held that "[r]estrictions on voting can burden equal protection rights." *Dudum v. Arntz*, 640 F.3d 1098, 1105-06 (9th Cir. 2011). "[A]rbitrary and disparate treatment" in either the "allocation of the franchise" or "the manner of its exercise" is therefore unlawful. *Bush*, 531 U.S. at 104-05.

The principles of *Bush v. Gore* apply here, and in any event the DPOC and DPOR requirements fail under the *Anderson-Burdick* framework. *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) (en banc). Under that framework, only "reasonable, *nondiscriminatory* restrictions" are subject to a more

relaxed standard of review. *Burdick v. Takushi*, 504 U.S. 428, 434 (1994) (citations omitted). Moreover, *Anderson-Burdick* imposes a "means-end fit framework," *Pub. Integrity All.*, 836 F.3d at 1024, that necessarily requires states to justify decisions to treat similarly situated voters differently. *See Obama for Am. v. Husted,* 697 F.3d 423, 435 (6th Cir. 2012) (holding a voting restriction unlawful because it differentiated among groups of voters where "there [wa]s no relevant distinction between the two groups").

The *Anderson-Burdick* analysis is the result of the judiciary's "recogni[tion]" of "the need of States and municipalities" to administer elections alongside the importance of individual rights in the election context. *Dudum*, 640 F.3d at 1106. Further, "because Arizona's law applies to all elections, including elections for President, the 'state-imposed restriction implicates a uniquely important national interest.'" *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1187 (9th Cir. 2021) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 794-95 (1983)).

## A. The DPOC Requirement Violates the Equal Protection Clause by Imposing Arbitrary and Unreasonable Burdens on State Form Voters.

The DPOC requirement's arbitrary and disparate treatment of State Form voters violates the Equal Protection Clause for an obvious reason: it treats identically situated applicants differently based on the piece of paper they happen to use when trying to register.

50

The DPOC requirement burdens State Form applicants by treating them differently from identically situated Federal Form applicants. State Form applicants without DPOC may not vote at all, while Federal Form applicants without DPOC are registered as Federal-Only voters, *see, e.g.*, 2-ER-217, or as full ballot voters if their citizenship is confirmed through ADOT records, *see* A.R.S. §16-121.01(C)-(E); 1-ER-21-22. That is so even though the State Forms and Federal Forms are "substantively indistinguishable" in the information they elicit. 1-ER-137 n.13. The DPOC requirement thus results in "arbitrary and disparate" treatment in "allocation of the franchise" in violation of the Equal Protection Clause. *Bush*, 531 U.S. at 104.

"[T]he burdening of the right to vote always triggers a higher level of scrutiny than rational basis review." *Tedards v. Ducey*, 951 F.3d 1041, 1066 (9th Cir. 2020). While a state may justify "*reasonable, nondiscriminatory* restrictions" by asserting "important regulatory interests," *Burdick*, 504 U.S. at 434 (emphasis added), courts must still scrutinize the "legitimacy," "strength," and "necessi[ty]" of election restrictions. *Anderson*, 460 U.S. at 789. And if the burden imposed by a restriction is more "serious," the court must inquire whether the state's proffered interests are sufficiently tailored to the restriction. *Soltysik v. Padilla*, 910 F.3d 438, 445 (9th Cir. 2018); *see also Dudum*, 640 F.3d at 1114. This Court, sitting en banc, has emphasized that "[r]estrictions that block access to the ballot or impede individual voters or subgroups of voters in exercising their right to vote"—such as the DPOC and DPOR

requirements at issue here—require greater scrutiny in this framework than "rules establishing an overall, generally applicable electoral system." *Pub. Integrity All.*, 836 F.3d at 1024 n.2.

### 1. The DPOC Requirement Creates a Serious Burden.

Here, the DPOC requirement for State Form but not Federal Form applicants creates "serious" burdens for State Form applicants and, as described above, is neither reasonable nor nondiscriminatory. *Dudum* 640 F.3d at 1114. At trial, Plaintiffs showed that (1) many eligible Arizona voters, especially younger and older ones, lack DPOC such as a driver's license or state ID, 2- LUCHA-SER-270-71 (Knuth), (2) many voters do not have ready access to copies of DPOC, 1-LUCHA-SER-147 (Nitschke); 1-LUCHA-SER-212-13 (Tiwamangkala), and (3) Arizonans face significant financial and time-based challenges to obtaining DPOC like birth certificates and U.S. passports, 1- LUCHA-SER-180-83 (Burch); 1- LUCHA-SER-66-67(Petersen); 1-LUCHA-SER-17-18. *See Obama for America*, 697 F.3d at 431 (burden requiring scrutiny of state justification under *Anderson-Burdick* analysis, and "particularly high" burden on certain groups that disproportionately voted in early voting period, where state limited in-person early voting period for non-military voters).

Most Arizonans who use a paper form use the State Form. 3-ER-721-22. Third-party voter registration groups and public assistance agencies largely rely on

State Forms that county elections officials give them. 3-ER-722. Empirical evidence indicates that the DPOC requirement disenfranchises voters: after the *LULAC* decree was implemented and eliminated the DPOC requirement for State Form voters, the number of registered federal only voters increased from 1,700 to 11,600. 2-LUCHA-SER-278-79.

The DPOC requirement also burdens elections officials, and those burdens trickle down to voters. As a Pima County voting official testified, a bifurcated system using the DPOC Requirement would "make [voter registration] really difficult," be "very time consuming," cause confusion, and would not "make operational sense from the terms of effective use of resources." 2-LUCHA-SER-254-55 (Hiser). *See Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 666 (6th Cir. 2016) (a restriction that was likely to cause voter confusion imposed a burden that was "not slight").

### 2. Arizona Put Forth No Precise Interest That Would Justify the Burden the DPOC Requirement Creates.

Intervenors have not identified any "precise interest" that would make it "necessary to burden the plaintiffs' rights" to equal treatment and justify the burdens described—and so, even under the *Anderson-Burdick* analysis for a "reasonable, nondiscriminatory restriction," much less the more serious burden on voters' rights here, the DPOC requirement cannot survive. *Anderson*, 460 U.S. at 788-89.

Defendants' justifications proffered before the district court—preventing voter fraud and increasing voter confidence in elections—do not meet this standard. Most importantly, no Defendant ever offered any reason why *treating voters differently* based on the forms they use prevents fraud or instills voter confidence in elections. To the contrary, common sense dictates that such nonsensical behavior by election officials could only undermine voter confidence. Thus, even if Defendants had established at trial that requiring DPOC for *all* voters would prevent fraud or increase voter confidence—which they unquestionably failed to do—they certainly established no "precise interest[]" in requiring *only* State Form voters to provide DPOC. *Dudum*, 640 F.3d at 1106 (quoting *Burdick*, 504 U.S. at 434). And it is plain that such arbitrary treatment will not increase voter confidence or prevent fraud.

In any event, no evidence indicates that requiring DPOC for any voters reduces or prevents non-citizen voting. The district court found that "there is no evidence that Federal-Only Voters may be non-citizens," 1-ER-43, and that "[p]rior to passing the Voting Laws, the Arizona Legislature did not establish that any non-citizens were registered to vote in Arizona," 1-ER-40. These findings, again, receive significant deference on review under the clear-error standard. *See supra* Standards of Review at 15-16.

Nor is there any evidence that requiring DPOC increases voter confidence. The district court found that Intervenors "adduced no evidence quantifying the

likelihood that Arizonans will become aware of the Voting Laws and their purported impacts on preventing voter fraud in Arizona," and that there was no "direct evidence predicting the expected effects of the Voting Laws on Arizonans' confidence in the State's elections." 1-ER-37. Indeed, the Attorney General's lead prosecutor for election-related offenses admitted that the ability of the Voting Laws to address those concerns was speculative. 2-LUCHA-SER-241-42 (Lawson). These findings too receive significant deference on review under the clear error standard.

For these reasons, Defendants' proffered interests in preventing fraud and increasing voter conference do not pass muster. The unjustified difference in treatment between State Form and Federal Form registrants renders the DPOC requirement unlawful and supports an alternative ground for enjoining the DPOC requirement in A.R.S. §16-121.01(C).[20]

---

[20] *Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1190 (9th Cir. 2021), does not compel a different conclusion. As this Court emphasized in *Hobbs*, the lack of "an equal-protection component" in Plaintiffs' claims was "[i]mportant" to its analysis there. *Id.* Further, in that case "[t]he relevant burden for constitutional purposes [wa]s the small burden of signing [an] affidavit" or, if a voter negligently failed to, "correcting the missing signature by election day." *Id.* at 1189. The burden to provide DPOC is plainly greater than the burden of signing a single form—indeed, DPOC is intended to add to an existing attestation requirement. *See* A.R.S. §16-152(A)(14). Moreover, in *Hobbs*—unlike here—record evidence supported the importance of Arizona's asserted interest. 18 F.4th at 1192.

**B. The DPOR Requirement Violates the Equal Protection Clause.**

The DPOR requirement also violates the Equal Protection Clause. Like the DPOC requirement, preventing State Form voters without DPOR from voting at all would unlawfully discriminate by imposing serious burdens on State Form, but not Federal Form, applicants without justification.

As demonstrated at trial, many Arizona residents, including those who live in rural areas, live on Tribal reservations, or are experiencing homelessness, lack standard addresses. 1-LUCHA-SER-126-27 (Petty); 1-LUCHA-SER-138 (Connor); 2-LUCHA-SER-261 (Shreeve). Elections officials in Maricopa and Pima Counties testified that such voters struggle to provide DPOR. 1-LUCHA-SER-112-13 (Petty); 4-ER-829-30. Students and Arizonans who do not speak English as a first language also struggle with finding or securing DPOR. 1-LUCHA-SER-127-28 (Petty). A DPOR requirement for State but not Federal Form applicants would mean that State Form applicants would face the additional burden of surmounting the DPOR barrier to vote, while Federal Form applicants would not.

As with DPOC, such differential treatment is arbitrary and in no way rationally related to legitimate state interests. *See Anderson*, 460 U.S. at 789. At trial, no testifying elected official could identify any rational purpose for treating State and Federal Form applicants without DPOR differently. 3-ER-721; 2-LUCHA-SER-

252-53 (Hiser). Accordingly, the DPOR requirement violates the Equal Protection

Clause for exactly the same reasons as the DPOC requirement.

## CONCLUSION

For these reasons, this Court should affirm.


Respectfully submitted this 12th day of August, 2024.

*/s/ Danielle Lang*
**CAMPAIGN LEGAL CENTER**
Danielle Lang
Jonathan Diaz
Brent Ferguson
Kathryn Huddleston
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
bferguson@campaignlegelcenter.org
khuddleston@campaignlegelcenter.org

**MAYER BROWN LLP**
Lee H. Rubin (CA# 141331)
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

Gary A. Isaac* (IL# 6192407)
Daniel T. Fenske* (IL# 6296360)
Anastasiya K. Lobacheva (IL# 6336273)
William J. McElhaney, III* (IL #6336357)
71 S. Wacker Drive
Chicago, IL 60606

(312) 782-0600
dfenske@mayerbrown.com
gisaac@mayerbrown.com
alobacheva@mayerbrown.com
wmcelhaney@mayerbrown.com

Rachel J. Lamorte (NY# 5380019)
1999 K Street NW
Washington, DC 20006
(202) 362-3000
rlamorte@mayerbrown.com

**FREE SPEECH FOR PEOPLE**
Courtney Hostetler
John Bonifaz
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org

*Counsel for Plaintiffs Living United for Change in Arizona, League of United Latin American Citizens, Arizona Students' Association, ADRC Action, Inter Tribal Council of Arizona, Inc., San Carlos Apache Tribe, and Arizona Coalition for Change*

## CERTIFICATE OF COMPLIANCE

In compliance with Federal Rule of Appellate Procedure 32(g), I certify that according to the word count feature of the word processing program used to prepare this brief, this brief contains 13,686 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limitations of Rule 28 and Circuit Rule 28.1-1.

/s/ *Danielle Lang*
Danielle Lang

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing brief on August 12, 2024 with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

/s/ *Danielle Lang*
Danielle Lang