**Nos. 24-3188, 24-3559 & 24-4029**

---

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

**MI FAMILIA VOTA**, *et al.*,
*Plaintiffs–Appellees,*

v.

**ADRIAN FONTES**, *et al.*,
*Defendants-Appellees,*

and

**WARREN PETERSEN,** *et al.*,
*Intervenor-Defendants-Appellants*

---

On Appeal from the United States District Court
For the District of Arizona
Hon. Susan R. Bolton
Case No. 2:22-cv-00509 (Consolidated)

---

**PRINCIPAL BRIEF OF CROSS-APPELLANTS-APPELLEES
PROMISE ARIZONA AND SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT**

---

Ernest Herrera
Denise Hulett
Erika Cervantes
Mexican American Legal
Defense and Educational Fund
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
(213) 629-2512

Daniel R. Ortega Jr.
Ortega Law Firm
361 East Coronado Road, Suite 101
Phoenix, AZ 85004-1525
(602) 386-4455
(602) 386-4455

*Counsel for Cross-Appellants Promise Arizona
and Southwest Voter Registration Education Project*

## CORPORATE DISCLOSURE STATEMENT

No corporate disclosure by Promise Arizona Plaintiffs is required under Federal Rules of Appellate Procedure, Rule 26.1.

Dated: August 12, 2024                Ernest I. Herrera
MALDEF

By: /s/ *Ernest I. Herrera*
      Ernest I. Herrera

# TABLE OF CONTENTS

**Page**

JURISDICTION AND TIMELINESS……………………………...…………1

STATEMENT OF THE ISSUES……………………………………………..1

STATUTORY AUTHORITIES……………..……………………………………1

STATEMENT OF THE CASE………………………………………………….2

    A. **Events in Arizona Preceding the Enactment of House Bill 2492 and House Bill 2243**……………………………………………….................2

    B. **The Legislative History and Enactment of the Voting Laws**……...........4

    C. **The Motor Vehicle Division Database Matching and SAVE Reason to Believe Provisions of H.B. 2243 Target Naturalized Citizen and Latino Voters**………………………………………………………16

    **D. 20**

SUMMARY OF THE ARGUMENT…………………………………………..10

ARGUMENT………………………………………………………………...12

STANDARD OF REVIEW……………………………………………………12

DISCUSSION………………………………………………………………..27

    I.    The District Court Erred in Finding That the Arizona Legislature Lacked Discriminatory Intent in Enacting the Voting Laws, including HB 2243……………………………………………………………….27

        A. The District Court Erroneously Disregarded and Devalued Evidence of Discriminatory Intent in the Legislative History Leading to the Voting Laws' Enactment. …………………29

i

      i.   The legislative history leading to the passage of the Voting Laws was characterized by a climate of stereotyping of and false accusations against Latinos and naturalized U.S. citizen voters following the 2020 election……………………………..29

      ii.   The District Court erroneously ignored the Legislature's reliance on the Arizona Free Enterprise Club in the passage of both Voting Laws…………………………………………………36

     iii.   Statements of Legislators around voters' presumed immigration or citizenship status were the driving force of the enactment of 2243, not an isolated incident as the District Court found….40

     iv.   The District Court Abused its Discretion by Excluding Testimony and Exhibits Regarding the Legislative History Without Any Evidentiary Basis………………………………44

B.  The District Court ignored evidence of the Arizona Legislature's substantive departures in the passage of HB 2243 [Sequence of events}…………………………………………………………48

C.  Arizona's More Recent Treatment of Latino and Immigrant Voters Evinced a Historical Background Indicative of Discriminatory Intent in HB 2243's Passage …………………………………………….50

D.  The Evidence of the Probable Impact of H.B. 2243 on Voters Proves Discriminatory Intent Rather Than Absolving the Legislature of Such Intent.

**II.**    **House Bill 2243's Voter Registration Provisions Related To Citizenship Are Invalid Because They Were Enacted With Discriminatory Intent…………………………………………..59**

CONCLUSION…………………………………………………………..61

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anderson v. City of Bessemer City, N.C.*,
  470 U.S. 564 (1985) ...................................................................... 25
*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015) ................................... 29, 43, 54, 56
*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013) .......................................................................... 7
*Ave. 6 E Invs. v. City of Yuma*,
  2018 WL 2446482 (D. Ariz. May 31, 2018) .................................. 36
*Ave. 6E Invs., LLC v. City of Yuma, Ariz.*,
  818 F.3d 493 (9th Cir. 2016) ................................................. Passim
*Brinkman v. Gillian*,
  583 F.2d 243 (6th Cir. 1978) ........................................................ 59
*C.B. v. City of Sonora*,
  769 F.3d 1005 (9th Cir.2014) ....................................................... 27
*CASA de Maryland, Inc. v. Trump*,
  355 F. Supp. 3d 307 (D. Md. 2018) .............................................. 31
*City of Richmond v. United States*,
  422 U.S. 358 (1975) ..................................................................... 59
*Crawford v. City of Bakersfield*,
  944 F.3d 1070 (9th Cir. 2019) ...................................................... 45
*Crittenden v. Chappell*,
  804 F.3d 998 (9th Cir. 2015) ........................................................ 33
*Dayton Bd. of Ed. v. Brinkman*,
  443 U.S. 526 (1979) ..................................................................... 26
*Democratic Nat'l Comm. v. Hobbs*,
  948 F.3d 989 (9th Cir. 2020) .................................................. 51, 52
*Easley v. Cromartie*,
  532 U.S. 234 (2001) ................................................................ 26, 59
*Freeman v. Arpaio*,
  125 F.3d 732 (9th Cir. 1997) ........................................................ 41
*Garza v. Cnty. of Los Angeles*,
  918 F.2d 763 (9th Cir. 1990) ........................................................ 35
*Gonzalez v. Douglas*,
  269 F. Supp. 3d 948 (D. Ariz. 2017) ............................................ 36

*Hayden v. Paterson*,
  594 F.3d 150 (2d Cir. 2010) ............................................................ 41
*Henderson v. George Wash. Univ.*,
  449 F.3d 127 (D.C. Cir. 2006).......................................................... 47
*Hunt v. Cromartie*,
  526 U.S. 541 (1999) ............................................................... 26, 28
*Hunter v. Underwood*,
  471 U.S. 222 (1985) ......................................................... 26, 59, 60
*In the Matter of Rudolph W. Giuliani*,
  146 N.Y.S.3d 266 (2021)................................................................ 3
*La Union Del Pueblo Entero v. Ross*,
  771 Fed.App'x 323 (4th Cir. 2019)................................................... 28
*La Union del Pueblo Entero*,
  353 F. Supp. 3d ........................................................................ 40
*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016) ........................................................... 27
*N. Carolina State Conf. of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ..................................................... Passim
*Pineda v. United States*,
  1994 WL 684542 (9th Cir. Dec. 7, 1994)............................................ 59
*Pullman-Standard v. Swint*,
  456 U.S. 273 (1982) ................................................................ 25, 59
*Ramos v. Nielsen*,
  336 F. Supp. 3d 1075 (N.D. Cal. 2018)............................................. 31
*Rogers v. Lodge*,
  458 U.S. 613 (1982) .................................................................... 28
*Shakur v. Schriro*,
  514 F.3d 878 (9th Cir. 2008) ......................................................... 41
*Sidibe v. Sutter Health*,
  103 F.4th 675 (9th Cir. 2024) ......................................................... 47
*Sischo-Nownejad v. Merced Cmty. Coll. Dist.*,
  934 F.2d 1104 (9th Cir. 1991) ........................................................ 41
*Smith & Lee Assocs., Inc. v. City of Taylor*,
  13 F.3d 920 (6th Cir. 1993) ........................................................... 51
*Smith v. Town of Clarkton, N.C.*,
  682 F.2d 1055 (4th Cir. 1982) .................................................... 28, 41
*Soto Palmer v. Hobbs*,
  686 F. Supp. 3d 1213 (W.D. Wash. 2023) ........................................ 43
*U.S. v. U.S. Gypsum Co.*,
  333 U.S. 364 (1948) ................................................................... 25

iv

*U.S. v. Windsor,*
570 U.S. 744 (2013) .................................................................... 28
*United States v. Carrillo-Lopez,*
68 F.4th 1133 (9th Cir. 2023) ......................................... 56, 57, 58
*United States v. Hinkson,*
585 F.3d 1247 (9th Cir.2009) .................................................. 33
*United States v. Orozco-Acosta,*
607 F.3d 1156 (9th Cir. 2010) ................................................ 21
*Velazquez v. City of Long Beach,*
793 F.3d 1010 (9th Cir. 2015) .......................................... 26, 47
*Village of Arlington Heights v. Metro. Housing Dev. Corp.,*
429 U.S. 252 (1977) ........................................................... Passim
*Washington v. Davis,*
426 U.S. 229 (1976) ................................................................ 53

Statutes

28 U.S.C §1291 .............................................................................. 1
A.R.S. § 16-602 .............................................................................. 3
A.R.S. § 16-165(A)(10) ............................................................ 16, 19
Arizona Revised Statutes ("A.R.S.") § 16-152 ........................... 9
U.S. Constitution. 1 ................................................................. 2, 3
§ 16-165(G) ............................................................................ 19, 20

Rules

Federal Rule of Civil Procedure 52(a) ....................................... 25
Federal Rules of Appellate Procedure 32(a)(5) ......................... 63
Federal Rules of Appellate Procedure 32(a)(7) ......................... 63
Federal Rules of Appellate Procedure, Rule 26.1 ....................... 1
Ninth Circuit Rule 32-1 ............................................................. 63
Ninth Circuit Rule 32-1(a) ........................................................ 63
Rule 32(f) .................................................................................. 63

Other Authorities

H.B. 2243 ............................................................................ Passim
H.B. 2492 ............................................................................ Passim
H.B. 2617 ............................................................................ Passim

## JURISDICTION AND TIMELINESS

This Court has jurisdiction to review the district court's final judgment, 1-ER-0002, under 28 U.S.C §1291.

The district court entered its order containing its findings of fact and conclusions of law on February 29, 2024, and its final judgment on May 2, 2024. The United States is a party in this matter.

On June 28, 2024, Promise Arizona and Southwest Voter Registration and Education Project timely filed this cross-appeal. 6-PromiseSER-1137–1140

## STATEMENT OF THE ISSUES

Did the district court clearly err in declining to find that Arizona enacted House Bill 2243 with intent to discriminate against Latino voters in Arizona?

## STATUTORY AUTHORITIES

The text of the pertinent statutory and regulatory authorities is contained in Appellant's Principal Brief (hereafter "Appellants' Br.") and Addendum, *see* ECF 101.1 at 61.

1

## STATEMENT OF THE CASE

Promise Arizona and Southwest Voter Registration Education Project ("Plaintiffs") challenge the 2022 enactment of House Bill 2243 by the State of Arizona.

This case arose from eight consolidated lawsuits challenging House Bills 2492 and 2243. Plaintiffs' claims arose under the National Voter Registration Act, the Equal Protection Clause of the Fourteenth Amendment to the Constitution, and the Fifteenth Amendment. Promise Arizona Plaintiffs, along with other Plaintiffs, brought claims against the State of Arizona asserting that H.B. 2243 was enacted in violation of the Fourteenth Amendment of the U.S. Constitution. 1-ER-0105.

The district court held a 10-day bench trial that ended on December 19, 2023. 1-ER-0007. On February 29, 2024, the district court issued its final Findings of Fact and Conclusions of Law. 1-ER-0007–0115. In its order, the district court concluded that the Voting Laws, including HB 2243, did not violate the Fourteenth Amendment, *inter alia*, because the laws were not enacted with discriminatory purpose. 1-ER-0113–0115. On May 2, 2024, the District Court issued its final judgment. 1-ER-0002–0006.

### A. Events in Arizona Preceding the Enactment of House Bill 2492 and House Bill 2243

In Arizona, President Joseph Biden defeated former President Donald Trump

in the 2020 presidential election by a margin of 10,457 votes. 1-ER-0040. President Trump claimed after the election that non-U.S. citizens had illegally cast more than 36,000 votes in that election. Id. President Trump's attorney Rudolph Giuliani also stated that tens of thousands of "illegal aliens" voted in Arizona, which a New York state appellate court found "false and misleading." *In the Matter of Rudolph W. Giuliani*, 146 N.Y.S.3d 266, 268, 279–80 (2021); 1-ER-0040. Prior to the enactment of the Voting Laws at issue in this case, members of the Arizona Legislature repeated the false claims that President Trump and Mr. Giuliani made. 5-PromiseSER-706–707; 5-PromiseSER-753; 5-PromiseSER-810. In 2021, against the backdrop of these accusations about the 2020 election, the Arizona Senate convened a committee on election fraud to audit the 2020 election separate from the regular audit processes established in state law. *See, e.g.*, A.R.S. § 16-602; 1-ER-040. The committee subpoenaed election materials. 5-PromiseSER-707–708.

Ultimately, the committee published a report that concluded there was no evidence of voter fraud. 5-PromiseSER-707–710. Former Senator Martín Quezada—who had served in the Arizona Legislature at the time of the passage of the Voting Laws for 10 years—testified that he had never before seen such a committee formed during his tenure. 5-PromiseSER-694; 5-PromiseSER-697; 5-PromiseSER-708.

3

**B. The Legislative History and Enactment of the Voting Laws**

In early 2022, the Arizona Legislature began the process of introducing and passing the Voting Laws hand-in-hand with a lobbying organization called the Arizona Free Enterprise Club. Representative Jake Hoffman was the prime sponsor of House Bill ("H.B.") 2492, which was introduced in the Arizona House of Representatives on January 24, 2022. 1-ER-0040. The substance of HB 2492 was authored by the Arizona Free Enterprise Club. 2-PromiseSER-165–167; 5-PromiseSER-858–860.

In its lobbying activities for HB 2492, the Arizona Free Enterprise Club disseminated materials echoing President Trump's words regarding non-citizens casting ballots to legislators that falsely claimed "How More Illegals Started Voting in AZ Elections and How House Bill 2492 Is Going to Fix It." 5-PromiseSER-955; 1-ER-0040 n.34. On February 16, 2022, the House Government and Elections Committee held a hearing to discuss H.B. 2492, during which Rep. Hoffman testified. 5-PromiseSER-854; After Hoffman finished speaking, the Chairman opened the floor to questions for the speaker. 5-PromiseSER-857; Representative Sarah Liguori asked the first question about the bill. 5-PromiseSER-857–858. Instead of responding to Liguori's question, however, Hoffman asked Greg Blackie, a lobbyist working for the Arizona Free Enterprise Club, the conservative lobbying group that authored the bill, to respond. 5-PromiseSER-858; 2-PromiseSER-207; 2-

4

PromiseSER-208; 2-PromiseSER-169; 4-PromiseSER-690. Hoffman told the committee, "I've been working with the Free Enterprise Club on this bill, and they've spent hundreds of hours digging into this." 5-PromiseSER-858.

The bill was later discussed by the Arizona Senate Judiciary Committee on March 10, 2022, with Senate President Warren Petersen serving as the Chairman of the Committee and Quezada and Senator Sonny Borelli also present. 5-PromiseSER-709–710; 5-PromiseSER-712; 6-ER-1442.

Without giving any evidentiary basis, the district court excluded relevant evidence about legislators consulting with the Arizona Free Enterprise Club by not including them in its final order setting forth findings of fact and conclusions of law.[1] 1-PromiseSER-2–3; 1-ER-0007. Before the Senate Judiciary Committee met, Greg Blackie of the Free Enterprise Club sent the Republican members of the committee, including Petersen, an email urging them to support H.B. 2492. 2-PromiseSER-172; 5-PromiseSER-959–961. Among other assertions in the email, Mr. Blackie wrote that "currently there are more than 36,000 individuals registered to vote who have never proven their citizenship status." 5-PromiseSER-959–961. He also wrote, referring to the purported constitutionality of H.B. 2492, that "Arizona has the Plenary Power" and "Power Over Our Own Registration Form." 5-PromiseSER-

---

[1] Promise Arizona Cross-Appellants-Appellees set forth their legal argument regarding the exclusion of this evidence below.

959–961; 2-PromiseSER-172–174. Petersen did nothing to verify these assertions, which seemed "reliable," though Petersen did not know whether Greg Blackie was a constitutional scholar or even a lawyer. 2-PromiseSER-173–175. Nonetheless, Petersen "felt confident" in repeating each of these claims during the March 10, 2022 Senate Judiciary Committee hearing. 2-PromiseSER-172–175; 6-ER-1480–1481. While Petersen testified that he may have seen the 36,000 figure on the Secretary of State's website too, he admitted that he relied on the Free Enterprise Club's email for the case law. 2-PromiseSER-171; 2-PromiseSER-174–175. Speaker Toma also could identify no expertise for Mr. Blackie in election or voter registration administration, which the district court did not acknowledge. 2-PromiseSER-209. The district court included none of these facts in its findings of fact or conclusions of law.

During the March 10, 2022 Senate Judiciary Committee hearing, a number of constituents and interest groups, including representatives from the American Civil Liberties Union, League of Women Voters, and others, spoke in opposition to H.B. 2492, including making assertions that the bill would disparately affect their own constituents. 6-ER-1442–1482. Greg Blackie of the Arizona Free Enterprise Club was the sole speaker who advocated for the bill. 6-ER-1442–1482. Each speaker was given 90 seconds to speak. 6-ER-1446. Greg Blackie spoke first, and was originally limited to 90 seconds, like the other speakers. But when the other speakers finished,

6

the Chairman called Greg Blackie back up to respond to the allegations made by the other speakers, including the claim that HB 2492 violates *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013). He was not subject to any further time limitations. 6-ER-1442–1482.

During the March 10 and other Senate Judiciary Committee meetings, Quezada sat next to Borrelli, then Senate Republican Whip. 5-PromiseSER-757–758. Borrelli would consistently mute his microphone and lean over to Quezada to share his commentary on Arizona's 2022 election bills, including during the March 10, 2022 Judiciary Committee meeting. 5-PromiseSER-757–758; 5-PromiseSER-784 Borrelli would often make comments to Quezada such as "It's your people over there in your neighborhood that are doing this and that's why . . . we are bringing these bills forward." 5-PromiseSER-758–759.

Borrelli was quite vocal in his belief that people who should not be voting were voting. Borrelli believed that such persons came from District 29, i.e., Quezada's constituents. 5-PromiseSER-758–759. District 29 has the highest percentage of Latino population in Arizona and has one of the highest percentages of lower-income communities, refugees, and monolingual Spanish-speaking members of the population. 5-PromiseSER-696–697. Over the years, there has been an increase of Latino voter turnout in District 29. 5-PromiseSER-697.

Borrelli often shared such disparaging comments in other committees that

7

Quezada sat on, the Senate floor, the Senate gallery, the Senate lobby, and the members' lounge. 5-PromiseSER-785.During the March 10, 2022, Senate Judiciary Committee hearing, Quezada stated "look at the room, look at the people you're sitting next to in this room" to point out that the impacts of HB 2492 would have a disproportionate impact on the crowd of people of color who were in attendance of the hearing. 5-PromiseSER-713; 6-ER-1476. The audience audibly reacted in agreement to Quezada's comments. 5-PromiseSER-715; 6-ER-1476–1477.Petersen found Quezada's comments to be ridiculous. 6-ER-1476. Because of this, Quezada was not permitted to finish explaining his position on HB 2492. In the middle of Quezada's vote explanation, Petersen interrupted him and recessed the committee. 5-PromiseSER-714–715; 6-ER-1476–1477.  Quezada was cut off frequently when other bills, similar to HB 2492 and HB 2243, came up. The interruptions became one of the strategies within the Arizona Legislature to always call a point of order whenever Quezada raised any issues of race. 5-PromiseSER-793.

After recessing the committee, Quezada got up to leave the dais and went into a hallway. Later, Petersen approached Quezada in the hallway, got in his face, and told Quezada "[l]ike why are you riling up to crowd?" and "[t]his is your fault that we have to recess[.]" During the confrontation, the Sergeant at Arms had to physically separate Senators Petersen and Quezada. 5-PromiseSER-714–715

H.B. 2243 was first introduced in the Arizona Legislature in January 2022 and

originally only dealt with amending Arizona Revised Statutes ("A.R.S.") § 16-152 to require a notice on the State Form informing the voter that her registration would be canceled if the voter moved permanently to a different state. 1-ER-0041. Shortly after, on January 31, 2022, H.B. 2617 was introduced, which would have required county recorders to cancel a voter's registration if the county recorder "confirms" either that the voter is a non-citizen or was issued an out-of-state identification, and the voter failed to furnish "satisfactory evidence that the person is qualified" within 90 days of receiving notice of cancellation. 1-ER-0041. Yet, the Arizona Legislature had found no evidence of non-citizen voting. *See* 1-ER-0040.

The district court also excluded relevant facts about the lack of response to groups that raised potential problems with the laws. During the legislative process, constituents and other interest groups including the Arizona Association of Counties, a lobbying group advocating on behalf of County Recorders, raised concerns to legislators about potential negative consequences of the Challenged Laws, including that they might chill eligible voters or erect barriers to voting for certain types of voters and that HB 2492 was likely unconstitutional and in violation of the NVRA. 2-PromiseSER-210–211; 2-PromiseSER-213–214; 2-PromiseSER-176; 6-ER-1442–1482. Speaker of the House Ben Toma did not recall responding to these constituents or the Arizona Association of Counties, though he agreed the constituents' concerns were generally legitimate and that he generally takes

9

seriously concerns raised by the Arizona Association of Counties. 2-PromiseSER-205–206; 2-PromiseSER-211; 2-PromiseSER-213–214. Sen. Petersen did not respond to similar constituent emails expressing similar concern about the bill. 2-PromiseSER-176–178. Speaker Toma was not aware of any member of the legislature investigating the Arizona Association of Counties' concerns. 2-PromiseSER-212

Like H.B. 2492, H.B. 2617 and the enacted H.B. 2243 were authored by the Arizona Free Enterprise Club. 2-PromiseSER-165–167; 2-PromiseSER-180. In fact, the Free Enterprise Club authored "most of it." 2-PromiseSER-180. H.B. 2617 was assigned to the Senate Government Committee in 2022. 5-PromiseSER-719; 5-PromiseSER-885–886. Quezada was a member of the Senate Government Committee and attended the Government Committee Hearing on H.B. 2617 on March 14, 2022. 5-PromiseSER-720–721; 5-PromiseSER-748. Greg Blackie of the Arizona Free Enterprise Club testified to all of the detailed aspects of H.B. 2617 and was viewed as the expert witness by the Senate Government Committee on March 14, 2022. Through his testimony, there was a well-known implication that Greg Blackie was involved in helping create H.B. 2617 and putting it forward before the Arizona Legislature. 5-PromiseSER-748–749; 5-PromiseSER-896–897.

On May 25, 2022, the Arizona Legislature passed H.B. 2617. 3-ER-0687 On May 27, 2022, then-Governor Ducey vetoed H.B. 2617. 3-ER-0687.

After Governor Ducey vetoed H.B. 2617, Chaplik reached out to Toma to help him figure out a way to address the Governor's concerns and get the substance of H.B. 2617 into another bill and onto the Governor's desk. 2-PromiseSER-216. Toma advised Chaplik to work with the Governor's staff to come to an agreement on the content of the bill, and once that was agreed on, Toma assured him that they would find a way to get it done. 2-PromiseSER-216. After Chaplik came to an agreement with the Governor's staff, he approached Toma and House leadership again on how to get the bill passed. 2-PromiseSER-217.

The district court also excluded another fact relating to coordination between Arizona Free Enterprise Club and the Legislature on H.B. 2243. On or around June 17, 2022, Aimee Rigler (also known as Aimee Yentes, 2-PromiseSER-168), of the Free Enterprise Club, texted Toma to ask him whether the Speaker of the House— then Russell Bowers—had approved H.B. 2617 for late introduction. 2-PromiseSER-202; 2-PromiseSER-218–219; 5-PromiseSER-950.

At this point in the Legislative Session, committee hearings were done. 2-PromiseSER-217. Chaplik could have waited to reintroduce the bill during the next session, which was commonly done, so that the bill could go through the normal procedure of review by the full committee. 2-PromiseSER-217–218. Instead, it was decided to drop the substance of HB 2617 into HB 2243, a bill dealing with the same section of law. 2-PromiseSER-217–218. (when asked whether he advised Chaplik

to wait until the next session, Toma testified "I don't recall. I don't recall. Probably not."). In response to Aimee Rigler's text message, Toma provided the Arizona Free Enterprise Club with a plan forward for the bill: to drop HB 2617's content into HB 2243. 2-PromiseSER-220; 5-PromiseSER-950.

Toma considered this the best course of action, and the easiest way for Arizona Free Enterprise Club to get its bill through in this session rather than wait for the next session to go through the normal legislative procedure. 2-PromiseSER-220; 2-PromiseSER-222; 5-PromiseSER-952–953. The district court did not admit evidence that, after the text exchange between Free Enterprise Club and Toma about the plan for late introduction, their bill was sent to the Senate where it was attached to HB 2243, as discussed. 2-PromiseSER-220. Toma did not share this plan with House Democrats, and he was unaware of anyone else doing so. 2-PromiseSER-222.

On the last day of the legislative session, Petersen introduced a floor amendment to H.B. 2243 in the Committee of the Whole, that was meant to reintroduce H.B. 2617. 5-PromiseSER-733; 2-PromiseSER-185–186; 5-PromiseSER-977–982. But this floor amendment drastically changed the substance of H.B. 2243 and H.B. 2617. 5-PromiseSER-742; 5-PromiseSER-835–836; 5-PromiseSER-840–841; 5-PromiseSER-974–976; 5-PromiseSER-977–982

The changes made to the provisions from the vetoed H.B. 2617 and added into H.B. 2243 include, (1) the 90-day notice period for suspected non-citizens (but not

non-residents) going down to 35 days; (2) mandating voter registration cancellation for suspected non-citizens who did not provide of documentary proof of citizenship (whereas potential non-residents are only placed on inactive status for failure to return a form attesting to their residency); and (3) subjecting federal-only voters to matching with the Systematic Alien Verification for Entitlements Program ("SAVE") system. 5-PromiseSER-733–734; 5-PromiseSER-835–837; 5-PromiseSER-840–843; 5-PromiseSER-974–976; 5-PromiseSER-977–982. Notwithstanding these key changes, Petersen falsely represented to the Committee of the Whole that his Amendment is "basically what was House Bill 2617." 5-PromiseSER-907; 2-PromiseSER-192. Petersen told the Committee that his Amendment was meant to address the Governor's veto letter on HB 2617, and that his Amendment "adds additional notice requirements, but besides that, it's identical to the prior bill." 5-PromiseSER-907. Free Enterprise Club was working directly with Senate staff on this amendment, but again, the district court arbitrarily excluded these facts. 2-PromiseSER-184; 5-PromiseSER-963–969. Petersen testified that he believed that 35 days was a "reasonable" time to provide DPOC. 2-PromiseSER-179; 2-PromiseSER-196–199.

But he could not give any explanation as to why, simply stating that he believed Chaplik worked with Governor Ducey to address his concerns and that 35 days was "reasonable" because these were important documents that everyone "should" have.

13

2-PromiseSER-179; 2-PromiseSER-188–189.  Yet, Petersen also believed that the 90-day period to provide DPOC in H.B. 2617 was "reasonable." 2-PromiseSER-181–182. However, Petersen did not make any effort to find out how many Arizonans did in fact readily have available DPOC and how many Arizonans did not, nor did he know of anyone in the Arizona Legislature who did. 2-PromiseSER-159–164; 2-PromiseSER-200.

During the June 22, 2022, Committee of the Whole session on HB 2243, Quezada pointed out that Petersen's explanation of his amendment was not entirely accurate. The point of Quezada's comments was that there were some significant differences that Senator Petersen left out in his amendment explanation such as the differing notice requirements between HB 2617 and HB 2243. 5-PromiseSER-742–743; 5-PromiseSER-907–909; 5-PromiseSER-835–837; 5-PromiseSER-840–843.

The district court also declined to admit relevant evidence about what Sen. Petersen knew about this late amendment and how Arizona Free Enterprise Club was involved.  Petersen himself did not seem to know or care about the changes between H.B. 2617 and his amendment to H.B. 2243 because he did not write the substance nor negotiate it with the Governor's office.2-PromiseSER-183; 2-PromiseSER-191–192. In fact, Toma himself, the Speaker of the House, was not aware that the notice period for suspected noncitizens to cure had been shortened from 90 days to 35 in the revised bill until the date of his deposition, November 28,

2023. 2-PromiseSER-221; 2-PromiseSER-223   According to Petersen, Chaplik wrote the amendment and negotiated it with the Governor.  2-PromiseSER-188–194. On the last day of the session, Petersen received an email from Greg Blackie with talking points about the amendment. 2-PromiseSER-195; 5-PromiseSER-971–973.


In a significant departure from normal procedure, Senators first received Petersen's amendment within minutes of actually voting on the amendment on the floor. 5-PromiseSER-743; see also 2-PromiseSER-187.  Senators did not have the opportunity to thoroughly read Petersen's amendment or the opportunity to check in with stakeholders to review the amendment with staff. 5-PromiseSER-743; 2-PromiseSER-185. Nor was there time to do a full analysis of the amendment, including a Rules Committee review. 5-PromiseSER-916–917.There was no opportunity to delay the vote on Petersen's amendment. 5-PromiseSER-745. It was not common to receive significant amendments, like Petersen's amendment on HB 2243, with such little notice late in the legislative process. 5-PromiseSER-743–744, 5-PromiseSER-765;  Toma could not recall another example of a vetoed voting bill whose substance was dropped into the shell of another bill late in the same session and passed. 2-PromiseSER-218. After Petersen's amendment was adopted on June 22, 2022, during the Committee of Whole, the amended version of HB 2243 did not

go through any Rules Committee. 5-PromiseSER-916–917. HB 2243 was signed into law during the 2022 55th Legislature, Second Regular Session. 3-ER-0687.

Arizona enacted the two laws challenged in this litigation, House Bills ("HB") 2492 and 2243 (the "Challenged Laws"), on March 30, 2022, and July 6, 2022, respectively.  1-ER-0163, -0167.

## C. The Motor Vehicle Division Database Matching and SAVE Reason to Believe Provisions of H.B. 2243 Target Naturalized Citizen and Latino Voters.

H.B. 2243 amends Arizona Revised Statutes Section Sections 16-152, 16-165, and 21-314 concerning voter registration and cancellations, and jury questionnaires. 1-ER-0013–0014. Section 2 of HB 2243 added A.R.S. § 16-165(A)(10) which states that "the county recorder shall cancel a registration: . . . When the county recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen, including when the county recorder receives a summary report from the Jury Commissioner or Jury Manager Pursuant to Section 21-314 that the person is not a United States citizen." 1-ER-0014.

Before the County Recorder cancels the registration under the section, they must "send the person notice by forwardable mail that the person's registration will

16

be canceled in thirty-five days unless the person provides satisfactory evidence of United States citizenship pursuant to Section 16-166 . . . If the person registered does not provide satisfactory evidence within thirty five days, the county recorder shall cancel the registration and notify the county attorney and Attorney General for possible investigation." 1-ER-0014.

In stark contrast to the shorter time frames afforded voters canceled for suspected non-citizenship, H.B. 2243 keeps in place the notice period of 90 days from H.B. 2617 for registrants suspected of having been issued a license or identification in another state. 5-PromiseSER-836; 5-PromiseSER-841. However, for registrants suspected of being noncitizens, H.B. 2243 shortens the notice period from 90 days, as originally provided in H.B. 2617, to 35 days. 5-PromiseSER-835; 5-PromiseSER-840. Section 2 of H.B. 2243 requires that the Secretary of State and/or County Recorders engage in a number of database checks, in most cases monthly, to re-confirm the registration status of already-registered voters. This includes checking for U.S. citizenship information in the driver license database, the Social Security Administration database, the SAVE system maintained by the United States Citizenship and Immigration Services, the Electronic Verification of Vital Events System maintained by a National Association for Public Health Statistics and Information Systems, and other city, town, county, state, and federal databases. 1-ER-13.

17

In particular, as added by HB 2243, A.R.S. § 16- 165(H) provides that, "to the extent practicable, each month the County Recorder shall compare persons who are registered to vote in that county and who the County Recorder has reason to believe are not United States citizens and persons who are registered to vote without satisfactory evidence of citizenship as prescribed by section 16-166 with the Systematic Alien Verification for Entitlements Program ["SAVE"] maintained by the United States Citizenship and Immigration Services to verify the citizenship status of the persons registered." 1-ER-0031.

DHS USCIS administers the SAVE system. 1-ER-0017–0018. The SAVE system is a web-based, point-in-time data retrieval system that enables federal, state, and local benefit-granting agencies to access immigration and citizenship status information for a benefits applicant in order to determine that applicant's eligibility for the benefit. 1-ER-0017–0018. The SAVE system is not a database or a system of record origin, but rather relies on source record systems that are maintained by different DHS agencies, including. 1-ER-0017–0018. The SAVE system can only verify the citizenship status of naturalized or derived U.S. citizens by searching the individual's immigration number and contains no information on native-born citizens. 1-ER-0018. Naturalized citizens rarely include their immigration numbers on the State Form, and the Federal Form does not include a space for registrants to provide this information. 1-ER-0018.

18

Since December 2022, ADOT has furnished the Secretary of State a monthly "customer extract" file containing the authorized presence status of all individuals with an MVD credential to comply with H.B. 2243 § 2. 1-ER-0030. H.B. 2243 § 2 directs the Secretary of State to compare the customer extract file to AVID, identify voters who MVD indicates are not U.S. citizens, and notify county recorders of these individuals. § 16-165(G). 1-ER-0030. The district court found that because MVD records reflect only that information provided to MVD when an individual receives a new or duplicate credential, the customer extract file may contain outdated citizenship information for naturalized citizens who still possess an unexpired foreign-type credential or are awaiting SAVE verification to obtain a new credential. 1-ER-0031. And because native-born citizens cannot be issued a foreign-type credential, the Secretary of State's use of the customer extract file to conduct monthly MVD checks will only ever misidentify naturalized citizens as non-citizens. 1-ER-0031.

Accordingly, the district court found that the Reason to Believe provision and the monthly MVD checks of H.B. 2243 will cause county recorders to "obtain" information of non-citizenship predominately for naturalized citizens. 1-ER-0032.

If a county recorder obtains information that a voter is a non-citizen, the county recorder must "confirm" this information. § 16-165(A)(10). If a county recorder "confirms" that a voter is not a U.S. citizen, the county recorder must notify

19

the individual by forwardable mail that the individual must provide DPOC within 35 days to avoid having her registration canceled. *Id.* "The notice shall include a list of documents the person may provide as DPOC and a postage prepaid pre-addressed return envelope." *Id.*

The district court held that "because the application of H.B. 2243's Reason to Believe Provision subjects *only* naturalized citizens to database checks, that provision" violates the Civil Rights Act Materiality Provision, § 10101. 1-ER-0082

Dr. McDonald testified that the 6,084 naturalized voters whose MVD records reflect outdated citizenship information could become stuck in a "loop" where MVD will flag the voter as a non-citizen after each monthly check. 1-ER-0032. According to Dr. McDonald, these voters must then repeatedly provide DPOC to county recorders to avoid cancellation and referral to the Attorney General. 1-ER-0033.

### D. Naturalized Citizen and Latino Voters in Arizona

Arizona had a population of 7,151,502 as of the 2020 Census. 1-ER-0008. The Census. Bureau estimates that as of 2022, Arizona's population was 52.9% non-Hispanic White, 32.5% Hispanic or Latino, 5.5% Black or African American, 5.2% American Indian and Alaska Native, 3.9% Asian, and 0.3% Native Hawaiian and Other Pacific Islander. 1-ER-0008. The Census Bureau's 2017 to 2021 American Community Survey estimates that Arizona's U.S. citizen voting-age population is

5,000,102. Approximately 436,816 of these individuals are naturalized U.S. citizens. 1-ER-0008.

There are approximately 1.2 million voting-age Latino (Hispanic) citizens, 17.5% of whom are naturalized citizens. 1-ER-0008. Even though Latinos only comprise 32.5% of Arizona's total population, individuals whose country of origin is Mexico, Cuba, Guatemala, or Colombia made up approximately 40-50% of Arizona residents who naturalized as U.S. citizens every year from 2013 to 2022, as illustrated in the table below.[23]

| FY | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Arizona (Total)** | **13,165** | **11,268** | **13,748** | **11,374** | **12,462** | **12,072** | **14,277** | **13,672** | **17,512** | **16,396** |
| Asia | 3,579 | 3,173 | 4,043 | 3,314 | 3,206 | 3,170 | 4,469 | 4,570 | 5,471 | 4,923 |
| Mexico | 5,813 | 5,172 | 5,912 | 4,943 | 6,375 | 6,052 | 6,132 | 5,362 | 7,102 | 6,623 |

---

[2] This is based on Department of Homeland Security data, of which the district court took judicial notice. DHS does not provide a single combined number for "Hispanic or Latino." According to the Federal Register, the definition of "Hispanic or Latino" is: A person of Cuban, Mexican, Puerto Rican, Cuban, South or Central American, or other Spanish culture or origin, regardless of race. 4-PromiseSER-677.

[3] Plaintiffs moved for Judicial Notice of Department of Homeland Security annual data regarding the country of origin for individuals who naturalize as U.S. citizens in Arizona. *See* 4-PromiseSER-0664–689. The district court did not take judicial notice of these facts, but took judicial notice of Census Bureau and other data. 1-ER-0008–0009. Plaintiffs respectfully request that this Court take judicial notice of these data. *See* U.S. Department Of Homeland Security, Yearbook of Immigration Statistics (2022), https://ohss.dhs.gov/topics/immigration/yearbook (last visited August 9, 2024). Courts similarly recognize data compiled by other government agencies as public records. *See, e.g.*, *United States v. Orozco-Acosta*, 607 F.3d 1156, 1164 n.5 (9th Cir. 2010) (taking judicial notice of statistics compiled by the U.S. Department of Homeland Security).

| Cuba | 130 | 104 | 133 | 158 | 143 | 109 | 180 | 194 | 420 | 368 |
| Guatemala | 139 | 105 | 168 | 99 | 117 | 113 | 120 | 110 | 140 | 159 |
| Colombia | 110 | 86 | 109 | 70 | 94 | 63 | 121 | 95 | 161 | 109 |

As of July 2023, there were 4,198,726 registered voters in Arizona.

### E. The Impact of House Bill 2243

Plaintiffs' expert Traci Burch testified that requiring voters to provide DPOC and subjecting voters who cannot provide DPOC to potential investigation could also impose psychological costs. 1-ER-0046. Specifically, Latino and AANHPI voters may fear drawing attention to their families, particularly voters who live with non-citizens in mixed-status households. 1-ER-0046.

The district court found that because of the H.B. 2243 MVD database matching on a monthly basis, MVD customer extract will flag all individuals with a foreign-type credential as noncitizens, despite that this information will be outdated for the 6,084 naturalized Full-Ballot Voters who still possess an unexpired foreign-type credential. 1-ER-0047. And because MVD does not issue foreign-type credentials to native-born citizens, only naturalized citizens will ever be misidentified as non-citizens. H.B. 2243's Reason to Believe Provision will similarly affect only naturalized citizens because SAVE cannot search for native-born citizens. The Latino and AANHPI communities may associate these procedures

22

with Arizona's history of discriminatory treatment against people of color.

The district court found that that the compliance and psychological costs associated with the Voting Laws' DPOC Requirements and investigative procedures would predominantly impact voters of lower socioeconomic status and naturalized citizens, and that the evidence shows that Latino and AANHPI voters could be deterred from registering to vote due to fears of investigation. 1-ER-0047.

## SUMMARY OF THE ARGUMENT

The district court clearly erred by denying Plaintiffs' equal protection claim because the court improperly applied the totality of the circumstances analysis required by *Village of Arlington Heights v. Metro. Housing Dev. Corp. (Arlington Heights)*, 429 U.S. 252, 264–68 (1977). Rather than analyze relevant facts as circumstantial evidence of Arizona's discriminatory intent to enact H.B. 2243, the district court added requirements to the *Arlington Heights* framework and required Plaintiffs to present direct evidence of racial animus as part of every prong of the test. The district court ignored its findings and other evidence that it admitted when it examined each of the *Arlington Heights* factors, instead compartmentalizing evidence within its analysis of each of the factors and requiring, *for each of the factors*, direct evidence that Arizona legislators had the nefarious intent to harm Latino and naturalized citizen voters.

The district court's requirement that there be direct evidence of nefarious

23

intent by some number of legislators blinded it to the throughline of baseless stereotyping from President Trump to the formation of the Arizona Legislature's rationale for H.B. 2243, which was based on the same set of lies. Similarly, the district court's dismissal of a statement by one senator because that senator's motives could not be imputed to the entire legislature ignores *Arlington Heights*'s requirement that such statements be viewed in the context of the totality of the circumstances. Here, that senator's statements echoed the stereotypes and baseless fears directed at naturalized citizens, and therefore predominantly non-white, voters.

Laws already existed in Arizona to prevent voter fraud, including fraud involving non-U.S. citizens voting. There were also extensive law enforcement efforts in Arizona directed at that same perceived problem, yet prosecutions of non-citizen voting was practically non-existent compared to other forms of voter misconduct. *See* 1-ER-0035.

The intent of H.B. 2243, when viewed in the context of the obsession by some political actors with false accusations of voter fraud that immediately preceded the enactment, cannot therefore be absolved by later administrative fixes. The district court erred by dismissing the evidence of impact on naturalized citizen voters and voters of color simply by assuming that post-trial-issued, unimplemented guidance from the Secretary of State will prevent such impact entirely.

Unless this Court reverses the finding of the district court regarding

24

discriminatory intent, naturalized citizen voters, and therefore disproportionately Latino and AANHPI voters, may be indefinitely subject to an extra layer of scrutiny in the exercise of their right to vote. A contrary result will leave these proud naturalized citizen voters as second-class citizens.

## ARGUMENT

### Standard of Review

The applicable standard of review for this cross-appeal is clear error. "Because a finding of intentional discrimination is a finding of fact, the standard governing appellate review of a district court's finding of discrimination is that set forth in Federal Rule of Civil Procedure 52(a)," the clearly erroneous standard. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). A court of appeals "may only reverse a district court's finding on discriminatory intent if it concludes that the finding is clearly erroneous." *Pullman-Standard v. Swint*, 456 U.S. 273, 290 (1982). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

A finding of whether or not an action was motivated by intentional

discrimination is a "factual question." *See Hunt v. Cromartie*, 526 U.S. 541, 549 (1999).

An appellate court may reverse a district court's ultimate finding regarding discriminatory intent if such a determination was clearly erroneous. *See Dayton Bd. of Ed. v. Brinkman*, 443 U.S. 526, 541 (1979) (affirming the court of appeals' conclusion that the district court's failure to find the intentional operation of a dual school system was clearly erroneous.)  A finding on the question of intentional discrimination is clearly erroneous when, as here, the district court reaches its finding by misapplying the applicable law or standard. *See Hunter v. Underwood*, 471 U.S. 222, 228–32 (1985) (affirming the appellate court's reversal of the lower court's finding that state constitutional provision was not enacted on the basis of racial animus after the district court failed to apply *Arlington Heights*).  In addition to the district court's findings that would support a different determination of discriminatory intent had the test been properly applied, an appellate court's extensive review of the district court's findings for clear error is warranted when the additional record to be reviewed is not lengthy and credibility evaluations play a minor role. *See Easley v. Cromartie*, 532 U.S. 234, 243 (2001).

"A district court's evidentiary rulings are reviewed for abuse of discretion and the district court will be reversed on the basis of an erroneous evidentiary ruling only if any error was prejudicial." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1017

(9th Cir. 2015) (citing *C.B. v. City of Sonora*, 769 F.3d 1005, 1021 (9th Cir.2014) (en banc)).

## Discussion

### III.    The District Court Erred in Finding That the Arizona Legislature Lacked Discriminatory Intent in Enacting the Voting Laws, including HB 2243.

The district court's insistence that every piece of evidence in each of the four *Arlington Heights* categories must directly and explicitly link to the expressed motive of legislators has the cumulative effect of undermining the purpose of the *Arlington Heights* analysis, which is, after all, a mandate to make a "sensitive inquiry into such circumstantial and direct evidence" precisely because "discriminatory intent is rarely susceptible to direct proof." *See Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016). Requiring, as the district court did, that Promise Arizona Plaintiffs and other Plaintiffs with intentional discrimination claims demonstrate direct evidence of discriminatory motives of legislators with regard to impact and history and events surrounding the enactment undermines the purpose of the *Arlington Heights* analysis by confusing the weight and relevance of the Arlington Heights evidentiary factors with the ultimate conclusion to be reached by careful examination of those factors. Promise Arizona Plaintiffs request that this Court reverse the district court's finding that Arizona did not enact the citizenship-

27

related provisions of House Bill 2243 with intent to discriminate against Latino voters.

Determining governmental motivation requires careful consideration in order to ensure that "a bare [] desire to harm a politically unpopular group" is not the basis for the decision." *U.S. v. Windsor*, 570 U.S. 744, 770 (2013).

Courts examining the machinations of governmental actors recognize that officials acting in their official capacities "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority" and that "it is rare that these statements can be captured for purposes of proving racial discrimination in a case such as this." *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1064 (4th Cir. 1982).

Remand on appeal follows a district court's failure to keep in mind that "discriminatory intent *need not be proved by direct evidence." La Union Del Pueblo Entero v. Ross*, 771 Fed.App'x 323, 324 (4th Cir. 2019) (Wynn, J., concurring) (citing *Rogers v. Lodge*, 458 U.S. 613, 618 (1982) (emphasis added) and *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977)). The Supreme Court has explicitly acknowledged that "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt*, 526 U.S. at 553 (1999); *see also N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016) (same).

And where the totality of the evidence demonstrates that at least one of the purposes of the legislation was discriminatory, judicial deference to good faith presumed to have motivated the Arizona Legislature is "no longer justified." *See Arlington Heights*, 429 U.S. at 265–66; *see also Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266) ("A plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a 'motivating factor.'"). "[R]acial discrimination is not just another competing [legislative] consideration." *Arlington Heights*, 429 U.S. at 265.

### A. The District Court Erroneously Disregarded and Devalued Evidence of Discriminatory Intent in the Legislative History Leading to the Voting Laws' Enactment.

The district court devalued the evidence related to the legislative history leading to the passage of the Voting Laws. This evidence included animus reflected in the public discourse and a climate of stereotyping and false accusations directed at naturalized U.S. citizen voters, who are disproportionately Latino in Arizona.

> i. The legislative history leading to the passage of the Voting Laws was characterized by a climate of stereotyping of and false accusations against Latinos and naturalized U.S. citizen voters following the 2020 election.

The district court clearly erred by adding direct evidentiary state-of-mind requirements that the *Arlington Heights* factors do not mandate in order to infer

legislative intent. First, the district court clearly erred by requiring that baseless accusations and stereotypes rise to the level of "nefarious motive" when analyzing the legislative history of an enactment for discriminatory intent. *See* 1-ER-0043. Rather, under the *Arlington Heights* factors, "presence of community animus can support a finding of discriminatory motives by government officials, even if the officials do not personally hold such views." *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016). Plaintiffs succeeded in showing that a climate of stereotyping and false accusations leveled at Latinos and naturalized U.S. citizens—who are disproportionately Latino in Arizona—was connected to and indeed precipitated the legislative history leading to the passage of the voting laws.

Second, the district court also erred in requiring that the public beliefs about many voters lack "sincerity" in order to find that they evinced discriminatory intent. Statements by national figures, which members of the public and legislative officials echoed in Arizona, are no less discriminatory simply because Plaintiffs failed to challenge the "sincerity" of such beliefs. *See* 1-ER-0043. That such statements are less discriminatory because the speakers are "sincere" ignores the fact that such accusations are entirely baseless and imply stereotypes about certain voters.

The district court's own findings included how the 2020 presidential election result led to false accusations of election fraud that included accusations that "illegal aliens" voted in the 2020 elections in Arizona. 1-ER-0040. These included

30

statements by national political figures such as former President Donald Trump and Rudolph Guiliani, who served as legal counsel to the former president in presenting legal challenges to the election. *Id.* The district court found that the 2020 presidential election in Arizona was decided by 10,457 votes, and that President Trump claimed after the election that non-citizens had illegally cast more than 36,000 votes in the election. 1-ER-0040. President Trump had also made other comments regarding immigrants and minority groups leading up to the 2020 election. As one court recounted his language, the former president launched his first presidential campaign in 2015 by "characterizing Mexican immigrants as drug dealers or users, criminals, and rapists;" "called for 'a total and complete shutdown of Muslims entering the United States;'" "stated that '15,000 recent immigrants from Haiti 'all have AIDS' and that 40,000 Nigerians, once seeing the United States, would never 'go back to their huts'' in Africa;" referred to immigrants from Haiti, El Salvador, and African countries as coming from "shithole countries" and "suggested that the United States should instead bring more people from countries such as Norway;" and characterized undocumented immigrants as "animals." *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1100 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023); *see also CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 325 (D. Md. 2018) (finding, regarding

President Trump's statements, that "[o]ne could hardly find more direct evidence of discriminatory intent towards Latino immigrants.").

Even though the district court recognized some of the climate in which the legislative history unfolded in its findings, it refused to connect the breadth of the false accusations to the actions of the legislature. The district court credited the testimony of Senator Martín Quezada that "[a]gainst this backdrop, the Arizona Senate established a committee to audit the 2020 election, which revealed no evidence of voter fraud." 1-ER-0040. Sen. Quezada also testified that he had never before seen such a committee formed during his legislative tenure. 5-PromiseSER-708. The Arizona Legislature, as the district court found, adduced no evidence of non-U.S. citizens voting in the 2020 election. 1-ER-0040. However, the district court dismissed the significance of this climate of false and discriminatory accusations by stating that the Legislature's enactment of the Voting Laws dealt more with the concern around requiring documentary proof of citizenship ("DPOC") in the wake of the *LULAC* consent decree and only "paralleled some public sentiment that non-citizens were able to vote by falsely attesting to U.S. citizenship." 1-ER-0108–109.

Contrary to the idea that the legislative concerns only "paralleled" the public sentiment, the district court heard and admitted expert and lay testimony that Arizona legislators echoed the false accusations made by public figures and other

members of the public. *See* 5-PromiseSER-706; 5-PromiseSER-753; 5-PromiseSER-810. By finding that the public climate of false accusations against those perceived to be non-citizens only "paralleled" legislative concerns about requiring DPOC, rather than informing the intent of the legislature in passing the Voting Laws, the district court clearly erred in its finding of lack of discriminatory intent without making such a well-supported inference. *See Crittenden v. Chappell*, 804 F.3d 998, 1012 (9th Cir. 2015) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir.2009) (en banc)) (internal citation omitted) (discussing a finding as clearly erroneous if it is "without 'support in inferences that may be drawn from the facts in the record.'").

The district court acknowledged the climate leading to these events, finding that there was "some evidence" of community animus, [1-ER-0115], but erred by finding that such evidence did "not exhibit '[t]he presence of community animus' for the Court to impute a discriminatory motive to the Legislature." 1-ER-0115 (citing *Ave. 6E Invs.*, 818 F.3d at 504). The district court cited testimony from one senator opposed to the legislation and some public comments yet declined to find that statements from others in the public, such as those of national figures, precipitated the legislative hearings in 2021 and then the legislation in 2022.

In *Ave. 6E Invs.*, this Court described how it was plausible, based on circumstantial evidence, that a city council's denial of a developer's requested

rezoning was motivated in part by animus because it was "fully aware" of stereotypical language regarding Latino residents. 818 F.3d at 506–507. The city council in that case was fully aware of the language and stereotyping because of public comment that it heard and letter commentary that it received. *Id*. at 505–507.

Here, the Arizona Legislature not only heard such comments presented to it but also had members in its own body who echoed such sentiment and formed investigative committees around the baseless accusations. 5-PromiseSER-706; 5-PromiseSER-753; 5-PromiseSER-810. Additionally, as explained further below, the Arizona Legislature adopted such stereotypical logic by relying heavily on the legislative drafting and "expert" advice of an outside organization—the Arizona Free Enterprise Club. 2-PromiseSER-172; 5-PromiseSER-959–961.

Given the evidence of the climate of xenophobic and racist commentary, the district court's requirement that Plaintiffs present evidence challenging the sincerity of the public's and legislators' belief that non-citizens were voting in Arizona elections is particularly erroneous on this record. Such an "insincerity" requirement is not only absent from, but also contrary to, the *Arlington Heights* framework. The Arizona Legislature undertook an effort to root out supposedly massive voter fraud, including non-citizen voting, and found no evidence of it; yet it passed these Voting Laws anyway. The legislative history involving the Arizona Legislature's investigation and then enactment of laws as if the investigation had produced actual

evidence of widespread non-citizen voter fraud takes sincerity out of the equation. This legislative history shows that legislators, even if they did not harbor particular hatred toward Latinos or naturalized citizen voters, acted in a way that they knew would harm naturalized citizen voters and therefore Latinos because of what they believed about these kinds of voters. As one judge's example illustrates, such a scenario is still based in discriminatory intent:

> The lay reader might wonder if there can be intentional discrimination without an invidious motive. Indeed there can. A simple example may help illustrate the point. Assume you are an anglo homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination? Of course you have. Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

*Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring in part, dissenting in part). The district court therefore clearly erred by disregarding and undervaluing evidence in the record and its own findings regarding the climate in which H.B. 2243 was enacted and that H.B. 2243's provisions only targeted naturalized citizen voters, who are disproportionately Latino in Arizona.

ii. The District Court erroneously ignored the Legislature's reliance on the Arizona Free Enterprise Club in the passage of both Voting Laws.

"The presence of community animus can support a finding of discriminatory motives by government officials, even if the officials do not personally hold such views" *Ave. 6E Invs.*, 818 F.3d at 504.[4] The use of "code words" in conjunction with "mischaracterizations" of certain facts can also be relevant legislative historical evidence that indicates discriminatory intent. *See Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 968 (D. Ariz. 2017) (use of "code words was done in conjunction with mischaracterizations of" an ethnic studies program that the legislature banned).

The Arizona Legislature relied heavily on the assistance of the Arizona Free Enterprise Club ("AZ FEC") in the drafting, debate, amendment, and final passage of the Voting Laws. The district court found that AZ FEC advocated for the Voting Laws and sent an email to Senator Petersen with a heading that said "how more illegals started voting in AZ." 1-ER-0040 n.34. The district court also found that the organization "helped draft the substance of the bill" and that the birthplace requirement in HB 2492 had come from the organization. 1-ER-0040, -0043. The Free Enterprise Club itself claims that it was not just helpful, but "instrumental in

---

[4] The District Court denied Defendants' request to limit evidence to those statements which were "specifically called to the attention of the City Council." *Ave. 6 E Invs. v. City of Yuma*, No. 2:09-CV-000297 JWS, 2018 WL 2446482, at *2 (D. Ariz. May 31, 2018).

the drafting and adoption of the statutes at issue in this case." *See* Amicus Brief for Arizona Free Enterprise Club at 1.

The district court excluded from its findings, and therefore from evidence, relevant testimony and exhibits showing that during legislative committee hearings on H.B. 2492, legislators deferred to the Arizona Free Enterprise Club for expertise. For example, the district court excluded evidence of legislators' reliance on Greg Blackie from the Free Enterprise Club. *See* 2-PromiseSER-169; 2-PromiseSER-207; 2-PromiseSER-208; 4-PromiseSER-690; 5-PromiseSER-858 (Hoffman told a legislative committee, "I've been working with the Free Enterprise Club on this bill, and they've spent hundreds of hours digging into this."). Plaintiffs address the district court's exclusion of this evidence in this brief. *See* Section I.A.iv.

Also not included in the district court's findings and excluded from evidence were testimony and exhibits showing that legislators adopted the same 36,000-illegal-voter accusation that President Trump and Mr. Guiliani had pushed forward, but disguised with the supposed expertise of Mr. Blackie discussing the federal-only voter list. *See* 6-ER-1480–1481. The district court did not take into account how Mr. Blackie from the Arizona Free Enterprise Club put the same 36,000 figure in an email and said it in an the Arizona Senate Judiciary Committee on March 10, 2022, with Petersen serving as the Chairman of the Committee and Quezada and Senator Sonny Borelli also present. *See* supra (Statement of Case Facts).

Similarly, the district court excluded and appears to have not taken into account admitted evidence regarding the Free Enterprise Club's involvement in the passage of H.B. 2243. The district court did not find that Free Enterprise Club authored "most of" HB 2617, the predecessor bill to H.B. 2243, 2-PromiseSER-180, or that the Free Enterprise Club's Mr. Blackie testified to all of the detailed aspects of H.B. 2617 and was viewed as the expert witness by the Senate Government Committee on March 14, 2022. 5-PromiseSER-748–749; 5-PromiseSER-896–897. The district court also appeared to ignore admitted evidence about how H.B. 2243 passed following the veto of HB 2617. After Governor Ducey vetoed H.B. 2617, House Speaker Toma shared a plan with Free Enterprise Club's lobbyist Aimee Rigler, who had sent a text message to Speaker Toma about any plans for the late re-introduction of H.B. 2617, to drop the substance of H.B. 2617 into H.B. 2243 so that it could pass in the same session, even though all committee hearings had ended. 2-PromiseSER-202; 2-PromiseSER-218–219; 5-PromiseSER-950; 2-PromiseSER-217; 2-PromiseSER-217–218; 2-PromiseSER-220; 5-PromiseSER-950. Speaker Toma referred to H.B. 2243 as "their"—meaning Free Enterprise Club's—bill when discussing how the plan to pass H.B. 2243 unfolded. 2-PromiseSER-220; 2-PromiseSER-222; 5-PromiseSER-952–953. The majority in the Arizona Senate introduced the amended version of H.B. 2617 in the form of H.B. 2243 minutes before senators had a chance to review it. 5-PromiseSER-743; see also 2-

PromiseSER-187. The amended version included some significant changes, including shortening the notice period for providing DPOC from 90 to 35 days versus still having a notice period of 90 days for in-state proof of residence. 5-PromiseSER-733–734; 5-PromiseSER-835–837; 5-PromiseSER-840–843; 5-PromiseSER-974–976; 5-PromiseSER-977–982. Free Enterprise Club worked directly with Arizona Senate staff on the amendment resulting in the enacted H.B. 2243.

The district court's requirement that Plaintiffs prove that legislators relied on the logic of the exact racial appeals that Arizona Free Enterprise Club used goes beyond what this Court required under *Arlington Heights* in *Ave 6E*. In that case, it was enough that decisionmakers were aware of coded language regarding Latinos, were aware of the assumptions made about Latinos in the community, and then made decisions consistent with the opinions of the members of the public who used such language; there was no direct evidence that the city council members adopted or based their decision on coded language used by members of the public at hearings and in letters. *See Ave. 6E Invs.*, 818 F.3d at 505–507 (finding city council was aware of coded language regarding Latinos, which was circumstantial evidence of community animus, and made decision against advice of commission and staff, but no evidence of adopting language directly in its decision).

Here, plaintiffs not only proved that Arizona legislators were aware of

Arizona Free Enterprise Club's appeals, but also made the additional showing that the very group that used these coded words also was instrumental in the legislative process. Therefore, there was substantial circumstantial evidence that the Arizona Legislature adopted the discriminatory rationale for passage of the laws that Arizona Free Enterprise Club held. The district court's minimization of the Arizona Free Enterprise Club's role in the legislation beyond "some evidence of community animus" was clearly erroneous because the court ignored facts showing the Legislature's reliance on the outside group.

     iii.  Statements of Legislators around voters' presumed immigration or citizenship status were the driving force of the enactment of 2243, not an isolated incident as the District Court found.

The district court diminished the significance of its own factual findings regarding statements made by legislators and failed to cite other unrebutted evidence of the animus of both the public and legislators toward Latino and naturalized U.S. citizen voters. The district court's insistence that Plaintiffs must prove that the legislation was passed in in *reliance on*, rather than exposure to and awareness of racist statements and lobbying materials, and that community outrage re "illegals" voting actually motivated the legislators similarly undercuts the entire purpose of the *Arlington Heights* analysis. *See La Union del Pueblo Entero,* 353 F. Supp. 3d at 395 (finding that racist and inflammatory statements that were not made specifically in relation to the administrative action challenged were "nonetheless relevant to

40

understanding the administration's motivations" because "discriminatory intent is rarely susceptible to direct proof.") (citing *Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010)).[5]

Legislators acting in their official capacities "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority[,]" and "it is rare that these statements can be captured for purposes of proving racial discrimination in a case such as this." *Smith*, 682 F.2d at 1064.

As an initial matter, the legislative statements that comprise circumstantial evidence of discriminatory intent were not isolated to one legislator, as the district court's opinion implies. *See* 1-ER-0043 n.38. In its opinion, the district court acknowledges testimony regarding Senator Sonny Borrelli's "ongoing discriminatory comments" made to Senator Martin Quezada, but dismissed them because "Plaintiffs cannot impute [Sen. Borrelli's] beliefs or motives to the entire Arizona Legislature." *Id*. The comments to which the district court referred

---

[5] *See Freeman v. Arpaio*, 125 F.3d 732, 738 n.6 (9th Cir. 1997) (finding in a case brought under the First Amendment right to free exercise of religion, prison officials' evidence of abusive language directed at inmates may be evidence of intentional discrimination), *overruled in part on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008); *see also Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991) (holding in a employment discrimination claim, stereotyped remarks made at the same time as the imposition of unfavorable working conditions were sufficient to raise an inference of discriminatory intent).

included Sen. Borrelli saying to then-Sen. Quezada during committee hearings, while leaning away from his microphone, that in reference to the laws, "[i]t's people over there in your neighborhood that are doing this and that's why we are bringing these bills forward." 5-PromiseSER-758–759. When asked what Sen. Quezada took Sen. Borrelli to mean by "your neighborhood," Quezada testified that Sen. Borrelli would say "[t]hat's your district[...][t]he people in your district." 5-PromiseSER-758–759. Sen. Quezada is from a legislative district that he testified has the highest percentage of Latino residents in Arizona. 5-PromiseSER-696–697. Sen. Borrelli may only be one legislator, but his comments also demonstrated that Sen. Borrelli effectively repeated the baseless stereotypes of Latinos and naturalized citizens as non-citizen voters.

The statements of legislators involved coded language that is evidence of discriminatory intent. Sen. Borrelli echoed the language of Arizona Free Enterprise Club in the assumption that "illegals" were voting and him "using language indicating animus toward a protected class, provides circumstantial evidence of discriminatory intent by [Arizona]." *See Ave. 6E Invs.*, 818 F.3d at 505. Sen. Quezada, whose parents are Mexican, testified about how the term "illegals" can be offensive, describing how the term "takes away the humanity" of immigrants and "is used to scare people and to imply criminality," and said that other terms can be used individuals who lack lawful immigration status. *See* 5-PromiseSER-750 –752.

The term "illegals" is distinctly indicative of discriminatory intent here because it was used in the post-2020 climate of unfounded accusations against naturalized citizens, and therefore disproportionately Latino, voters. As one district court described it in relation to analyzing racial appeals in a recent Voting Rights Act, Section 2 redistricting case:

> Assertions that "non-citizens" are voting in and affecting the outcome of elections […] and that the Democratic Party is promoting immigration as a means of winning elections are all race-based appeals […] Political messages such as this that avoid naming race directly but manipulate racial concepts and stereotypes to invoke negative reactions in and garner support from the audience are commonly referred to as dog-whistles. The impact of these appeals is heightened by the speakers' tendencies to equate "immigrant" or "non-citizen" with the derogatory term "illegal" and then use those terms to describe the entire Latino community without regard to actual facts regarding citizenship and/or immigration status.

*Soto Palmer v. Hobbs*, 686 F. Supp. 3d 1213, 1230 (W.D. Wash. 2023), *cert. denied before judgment sub nom. Trevino v. Palmer*, 144 S. Ct. 873, 218 L. Ed. 2d 58 (2024). The district court should have analyzed Sen. Borelli's statements and the statements of other legislators "coupled with the [legislative] history [...] that immediately preceded the enactment" of the Voting Laws, namely the involvement of Arizona Free Enterprise Club and the climate of false accusations and stereotyping of naturalized citizen voters. *See Arce v. Douglas*, 793 F.3d 968, 979 (9th Cir. 2015) (finding statements coupled with history raised plausible inference

of racial animus).

The district court admitted additional evidence of other statements by legislators who either adopted or said similar comments that indicate intent. Senator Warren Petersen said that he has probably used the word "illegals" himself to refer to undocumented immigrants. Arizona House Representative Jake Hoffman, one of the primary sponsors of H.B. 2243 in the House, said in a majority caucus meeting discussing the related H.B. 2492 that he wanted to make sure that voters were "documented," a term generally referring to immigrants and not United States citizens. 5-PromiseSER-934. Rep. Hoffman also, less than a year after the passage of H.B. 2243, said the word "illegals" to then-former Sen. Quezada during a confirmation hearing for a gubernatorial appointment. 6-PromiseSER-984–1112.

Plaintiffs were not required to provide evidence of such statements for every legislator who voted for the Voting Laws. Nor does an *Arlington Heights* analysis require state-of-mind testimony about the motives of all legislators who voted in favor of the challenged legislation. The district court therefore clearly erred when it cast aside the statements of legislators by finding that Plaintiffs could not "impute [Sen. Borelli's] beliefs or motives to the entire Arizona Legislature." 1-ER-0043.

> iv. The District Court Abused its Discretion by Excluding Testimony and Exhibits Regarding the Legislative History Without Any Evidentiary Basis

The district court abused its discretion by excluding, with no evidentiary basis,

44

testimony and exhibits relevant to the requisite *Arlington Heights* analysis of Plaintiffs' equal protection claim. As explained in Plaintiffs' Statement of the Case and Section I.A of this brief, the district court did not discuss testimony and exhibits relevant to the Arizona Legislature's reliance on the Arizona Free Enterprise Club. "Evidentiary rulings are reviewed for abuse of discretion." *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1077 (9th Cir. 2019) (internal quotation marks omitted).

One district court order entered a week after its final order in this case stated that it "grants Plaintiffs' Motion to Overrule Defendants' Objections to Deposition Designations and overrules Defendants' global objection to Plaintiffs' use of deposition testimony to the extent that the Court relied on such testimony in its Findings of Fact and Conclusions of Law." 1-PromiseSER-0002. Then the order stated that the district court "denies Plaintiffs' Motion to Overrule Defendants' Specific Objections to Deposition Designations as moot." 1-PromiseSER-0002–0003. Both motions regarding deposition designation objections preceded the depositions of President of the Senate Petersen and Speaker Toma, which took place in November and December of 2023, after trial. Plaintiffs submitted designations of testimony from the Toma and Petersen depositions on December 13, 2023. *See* 2-PromiseSER-158–227. The district court admitted one of the exhibits associated with the Toma and Petersen depositions—PX 602 (5-PromiseSER-954–957)—that Plaintiffs submitted, but the district court did not state a basis for exclusion of the

45

other exhibits. *See* 1-PromiseSER-0002–0003. Before the March 7, 2024, order, Plaintiffs submitted responses to Defendants' objections to the legislator deposition exhibits, which included, among other issues, explanations about why the exhibits were relevant and not hearsay. *See* 3-PromiseSER-316–318.

The district court prejudiced Plaintiffs by excluding from evidence various portions of designated deposition testimony by Sen. Petersen and Speaker Toma and certain exhibits that Plaintiffs submitted. 2-PromiseSER-158–227; 3-PromiseSER-316–325. The district court, in its order regarding deposition designation and exhibit objections, effectively stated that it was excluding evidence based only on what it chose to include in its findings of fact and conclusions of law. *See* 1-PromiseSER-0002; 1-ER-0007. Neither the findings order nor the order on objections and designations offered any evidentiary basis for excluding such testimony and exhibits.

The testimony and exhibits from the Toma and Petersen depositions were essential to proving Plaintiffs' equal protection claim because they were directly relevant to the legislative history and sequence of events factors of analysis under *Arlington Heights*. The district court's consideration of Arizona Free Enterprise Club's—a group that used offensive terms and spurious allegations of voter fraud—involvement with the passage of the Voting Laws was substantially altered by the exclusion of the testimony and exhibits. The district court admitted other testimony

submitted from the Toma and Petersen depositions, as well as one deposition exhibit, as shown in the district court's findings of fact and conclusions of law. 1-ER-0040–0043. However, the district court arbitrarily excluded other information related to the Legislature's and Free Enterprise Club's cooperation on the Voting Laws that was equally relevant to the *Arlington Heights* analysis, but gave no explanation for the exclusion. *See Velazquez*, 793 F.3d at 1028 (holding court abused discretion by excluding all essential *Monell* claim evidence based on lack of relevance where ruling was "without any explanation for its decision."). The evidence about Free Enterprise Club's involvement went to the "heart of [Plaintiffs'] case," and such an exclusion was an abuse of discretion because it "deprive[d] Plaintiffs of the evidence essential to proving their allegations." *See Sidibe v. Sutter Health*, 103 F.4th 675, 704 (9th Cir. 2024) (citing *Henderson v. George Wash. Univ.*, 449 F.3d 127, 141 (D.C. Cir. 2006)).

Plaintiffs respectfully request that the Court reverse the district court's exclusion of legislator deposition exhibits and legislator deposition designation testimony that the district court did not include in its findings of facts and conclusions of law relating to Arizona Free Enterprise Club and the legislative history of the Voting Laws. *See* 2-PromiseSER-158–227 (designations from depositions of Toma and Petersen); 5-PromiseSER-923–973 (exhibits).

B. The District Court ignored evidence of the Arizona Legislature's substantive departures in the passage of HB 2243 [Sequence of events]

*Arlington Heights* requires an examination of the "specific sequence of events leading up to the challenged decision," with a critical eye toward "[d]epartures from the normal procedural sequence," which may demonstrate "that improper purposes are playing a role." 429 U.S. at 267. "[A] legislature need not break its own rules to engage in unusual procedures." *NAACP*, 831 F.3d at 228.

In its examination of the route taken by legislators to pass election laws in North Carolina, for example, the Fourth Circuit adopted district court findings that the bill was rushed through the process to avoid in-depth scrutiny, that it was afforded far less debate than was normally offered. *See NAACP*, 831 F.3d at 227–29. Finding error in the district court's "accepting the State's efforts to cast this suspicious narrative in an innocuous light," the Fourth Circuit held that such departures, even as other procedural rules were adhered to, provided "another compelling piece of the [motivation] puzzle." *Id.* at 228–29.

The sequence of events in this case involved the Arizona Legislature's hurried passage of HB 2243 at the end of the legislative session, a lack of analysis of the impact of the bill, a disregard for analysis of the legality of the bill, and the irregular introduction of a crucial amendment. The district court acknowledged that HB 2243 was the amended version of a bill that had already been heard by the legislature and

48

vetoed. 1-ER-0113. The district court also acknowledged that the amendment reduced the notice period for those who had to provide documentary proof of citizenship from 90 to 35 days. However, the district court did not compare this reduction in notice period to the 90 days that would still be available for someone to provide proof of residency under the same bill. 1-ER-0113.

The district court deemphasized the fact that legislators who were not speaking with Rep. Chaplik or the Free Enterprise Club received the revised bill within minutes of when it was brought to the floor for debate and final vote. *See* 1-ER-0113; 5-PromiseSER-743; *see also* 2-PromiseSER-187. Senators did not have the opportunity to thoroughly read Petersen's amendment or the opportunity to check in with stakeholders to review the amendment with staff. 5-PromiseSER-743; 2-PromiseSER-185. The district court ignored Sen. Quezada's unrebutted testimony that such a significant amendment with such little notice on the final day of the session was uncommon. 5-PromiseSER-743–744, 5-PromiseSER-765. The district court excused the reduced notice periods for those who had to provide DPOC before their registration was canceled by saying that such was the law under the 2019 EPM. 1-ER-0113. However, this requirement under Arizona law applied to individuals who affirmatively said on a juror questionnaire that they were not U.S. citizens—not individuals who might be inaccurately flagged as non-citizens with outdated data under HB 2243. Also, under the 2019 EPM, county recorders would have to confirm

49

"that the registrant does not already have valid proof of citizenship documented in the statewide voter registration database." 4-ER-913–914. This was not what HB 2243 said—no such verification procedure is required in the statute if a voter is found in an MVD data match.

The district court also ignored other substantive departures from normal procedure, such as failing to put time limits on the Free Enterprise Club's lobbyist, Greg Blackie, and ignoring warnings from a trusted lobbying group advocating on behalf of county recorders.

The district court ignored significant and unrebutted facts about substantive departures from normal procedure and downplayed others. For this reason, the district court clearly erred in weighing this *Arlington Heights* factor.

### C. Arizona's More Recent Treatment of Latino and Immigrant Voters Evinced a Historical Background Indicative of Discriminatory Intent in HB 2243's Passage

*Arlington Heights* requires not just an intense examination of the history of the citizenship question and the anti-immigrant environment from which it emerged, but an understanding that such evidence is relevant to determining the motivation for the decision. A full *Arlington Heights* analysis requires the court to engage in analysis of the "history of race discrimination and recent patterns of official discrimination." *NAACP*, 831 F.3d at 223. Instead, the district court was erroneously dismissive of relevant voting-related historical discrimination in Arizona as too old,

ignored evidence of more recent voting-related discrimination, and required that Plaintiffs prove a "nexus between Arizona's history of animosity toward marginalized communities and the Legislature's enactment of the Voting Laws." 1-ER-0043, 1-ER-0107. Again, the district court misapplied *Arlington Heights*'s mandate for a review of voting-related history. It is difficult to contemplate what such a "nexus," would entail short of admissions by the legislators that they sought to perpetuate that history.

In *NAACP*, the Fourth Circuit reversed a lower court *Arlington Heights* analysis in part because it ignored or minimized the relevance of discrimination in North Carolina's long history of discrimination, including pre-1965 history. *See* 831 F.3d at 223. Although the court initially recognized its normally "limited weight," it found that early history was more relevant than it might otherwise be because of the timing of the legislation. *Id.*[6]

Among the evidence of recent voting related discrimination in the record are determination letters sent to Arizona by the United States Department of Justice. 3-PromiseSER-393 (citing *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1025 (9th Cir. 2020), *rev'd and remanded sub nom. Brnovich v. Democratic Nat'l Comm.*, 594

---

[6] *See also Smith & Lee Assocs., Inc. v. City of Taylor*, 13 F.3d 920, 928 (6th Cir. 1993) (declining to "interpret *Arlington Heights* as limiting the admission of historical evidence to the historical background of the action at issue.").

U.S. 647 (2021). These letters include objections to voting law changes by the State of Arizona and counties, which are charged with administering the provisions of the challenged Voting Laws in this case. These letters are not just part of Arizona's "preclearance requirements," but rather actual preclearance objections sent by the DOJ to Arizona and Arizona counties objecting to redistricting plans and, for one county, voter purge practices as retrogressive to Latino voting rights. Therefore, there was evidence of discrimination in Arizona in voting practices beyond the 1970s. *See Hobbs*, 948 F.3d at 1025 ("Three of these objections were for statewide redistricting plans, one in the 1980s and two in the 1990s […] Other objections concerned plans for seven of Arizona's fifteen counties.").

Additionally, given the context of the Legislature's obsession with baseless accusations of fraud following the 2020 presidential election, other incidents of discrimination outside of the voting context relating to attitudes toward individuals assumed to be immigrants should have been considered relevant. The other xenophobic and anti-Latino statements of President Trump should have been considered as a part of this analysis. In addition, the district court did not consider comments from other Arizona legislators such as one in 2018 saying that non-native English speaking children were a burden and that there were not "enough white kids to go around." 5-PromiseSER-0800–806. There were also examples in 1997 and 2010 of law enforcement and legislative efforts targeting immigrants and people of

color. 5-PromiseSER-0800–806. These facts, combined with the rancor following the 2020 presidential election, "mak[e] clear that the historical origin of the challenged provisions […] [are] not the innocuous back-and-forth of routine partisan struggle […] that the district court accepted." *See NAACP*, 831 F.3d at 226. Because the district court did not weigh the older history of anti-Latino discrimination more heavily in light of these facts, the district court clearly erred.

> D. The Evidence of the Probable Impact of H.B. 2243 on Voters Proves Discriminatory Intent Rather Than Absolving the Legislature of Such Intent.

Decided a year before the issuance of *Arlington Heights*, *Washington v. Davis*, 426 U.S. 229, 242 (1976), provided the underpinnings of the Supreme Court's view that sensitive and broad evidentiary assessment illuminates an *inference of* discriminatory purpose from a broad overview of the totality of the facts, including "a clear pattern" that emerges from the impact of the legislation. *Arlington Heights,* 429 U.S. at 266. "Showing disproportionate impact, even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent." *NAACP*, 831 F.3d at 231 (emphasis in original).

Applying an *Arlington Heights* analysis to a statute that eliminated the Mexican American Studies program in Tucson public schools, the Ninth Circuit viewed the history of the enactment and the impact of its subsequent application together to infer a genuine issue of material fact as to discriminatory intent. *See*

*Arce*, 793 F.3d at 977–78.

The district court's own findings provide circumstantial evidence that HB 2243's drafters and proponents intended to target registered voters who are naturalized U.S. citizens, and therefore predominantly Latino or non-white voters. Despite these findings, the district court erred by not considering the "reason to believe" provision in its final *Arlington Heights* impact assessment. Furthermore, the district court erroneously required Plaintiffs to prove that the Arizona Legislature was motivated in its enactment of HB 2243 by how it would impact naturalized citizen and Latino voters. The district court also clearly erred in its finding regarding the MVD database checks because it dismissed its own findings of disparate impact based on degree of impact, and relied on untested evidence of likely enforcement that was introduced after the laws were passed and after the trial in this case closed.

The district court found that HB 2243's registration cancellation provisions related to citizenship as written would affect predominantly naturalized citizens. The district court found that under HB 2243's Motor Vehicle Division driver license database matching requirement, "the Secretary of State's use of the customer extract file to conduct monthly MVD checks will only ever misidentify naturalized citizens as non-citizens." 1-ER-0031. The district court also found that "only naturalized citizens will ever be subject [to] H.B. 2243's SAVE checks under the Reason to Believe Provision because SAVE contains no information on native-born citizens."

54

1-ER-0031–0032. Furthermore, according to the district court, "given the limitations of the data accessible from MVD and SAVE, […] the Voting Laws' List Maintenance Procedures' MVD checks and the Reason to Believe Provision's SAVE checks will cause county recorders to 'obtain' information of non-citizenship predominately for naturalized citizens." 1-ER-0031. The district court also found that "the compliance and psychological costs associated with the Voting Laws' DPOC Requirements and investigative procedures would predominately impact voters of lower socioeconomic status and naturalized citizens." 1-ER-0047. Despite these findings, the district court did not weight the "impact of" HB 2243 in favor of a finding of discriminatory intent.

*First*, by not taking into account its findings and holding regarding the SAVE "reason to believe" provision of HB 2243, the district court set aside some of the most crucial impact-related evidence of discriminatory intent. In holding that HB 2243's Reason to Believe Provision violates section 8(b) of the National Voter Registration Act, the district court found that "[o]nly naturalized citizens would be subject to scrutiny under" the provision, and that its application "would have a non-uniform and discriminatory impact on naturalized citizens." 1-ER-0085.[7] However,

---

[7] The district court also held that "because the application of H.B. 2243's Reason to Believe Provision subjects only naturalized citizens to database checks, this provision violates [the Materiality Provision of the Civil Rights Act,] § 10101." 1-ER-0076.

in its discussion of the "impact of the official action" under its *Arlington Heights* analysis, the district court does not mention its findings regarding the Reason to Believe Provision. The fact that only naturalized citizens would be subject to that provision means that naturalized citizens were "the sole target of the legislative effort." *See Arce*, 793 F.3d at 978 (finding impact factor in favor of plaintiffs, where Mexican American Studies program was sole target). Naturalized citizens are disproportionately and predominantly Latino or Asian in Arizona. *See* Naturalized Citizens in Arizona, *supra*. Therefore, the district court ignored clear evidence of disproportionate impact on non-white voters, particularly Latino voters.

*Second*, by requiring direct evidence of legislative intent to pass the law *because* of the impact runs counter to the purpose of *Arlington Heights*, which is to carefully review all direct and circumstantial evidence to determine whether it creates an inference of discriminatory intent. The district court held that "Plaintiffs must show that the Arizona Legislature enacted the Voting Laws at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." 1-ER-0112 (citing *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023*), cert. denied*, 144 S. Ct. 703, 217 L. Ed. 2d 394 (2024). That portion of *Carrillo* that the district court cited was from the discussion of equal protection cases broadly, not with regard to the *Arlington Heights* circumstantial evidence assessment of impact. *See Carrillo-Lopez*, 68 F.4th at 1139 (discussing the proper analysis of

facially neutral statutes). This Court in *Carrillo* also stated in its analysis of the impact factor that while "[d]isproportionate impact is not irrelevant, it is generally not dispositive, and there must be other evidence of a discriminatory purpose." *Id*. at 1141 (internal citation omitted). This is the proper contextualization of such impact evidence. *See id*. ("A court may not infer a discriminatory motive based solely on evidence of a disproportionate impact."). Plaintiffs do not rely on evidence of disproportionate impact as "dispositive" of their claim. The district court therefore expanded consideration of this single *Arlington Heights* factor into a threshold test, which would require direct evidence of legislators' motives, and thereby defeat the purpose of *Arlington Heights*.

*Third*, the district court erred by discarding entirely evidence that more than 6,000 Arizona voters who are naturalized U.S. citizens would be affected by the MVD database-matching provision because of guidance that the Secretary of State issued after the trial in this case. The district court entered findings based on Plaintiff's expert's testimony that "6,084 naturalized voters whose MVD records reflect outdated citizenship information could become stuck in a 'loop' where MVD will flag the voter as a non-citizen after each monthly check [and such voters] must then repeatedly provide DPOC to county recorders to avoid cancellation and referral to the Attorney General." *See* 1-ER-0032—0033. Even though the district court did not doubt the figure presented by Dr. McDonald, it then found that such testimony

was unpersuasive given the EPM 2023 guidance issued after the close of trial in which county recorders would have to check whether voters had previously submitted DPOC before canceling a voter's registration under this provision. Id. This finding was clearly erroneous because the guidance was post hoc—it was released after trial, and therefore well after the passage of HB 2243. *See* 2-ER-0196–197.

Even if the district court's suppositions about how county recorders will use such guidance are true, those are not suppositions that the Arizona Legislature assumed at the time of the passage of HB 2243. In fact, since the passage of HB 2243, Arizona Legislature's leadership has sought to enjoin portions of the 2023 EPM's guidance on H.B. 2243, seeking to curtail precautionary measures that the district court cited. 2-PromiseSER-0005–0054. In addition, such guidance assumes that county recorders will implement it uniformly. Additionally, such assumptions cannot be made without more information regarding whether the county recorders have begun to record whether voters previously submitted DPOC. The new EPM has the same 2-year retention policy for DPOC records, and county recorder testimony showed that even though they record that someone has been confirmed as a citizen, it does not necessarily show that they have submitted DPOC. *See generally* 2-ER-0198.

For these reasons, the district court clearly erred with regard to its consideration of impact evidence in determining whether HB 2243 was enacted with discriminatory intent.

### IV. House Bill 2243's Voter Registration Provisions Related To Citizenship Are Invalid Because They Were Enacted With Discriminatory Intent.

"Where the record permits only one resolution of a factual issue, we need not remand but may conclude the issue on appeal." *See Pineda v. United States*, No. 93-15004, 1994 WL 684542, at *4 (9th Cir. Dec. 7, 1994) (citing *Pullman–Standard v. Swint*, 456 U.S. 273, 291–92 (1982)); *see also Easley v. Cromartie*, 532 U.S. 234, 257 (2001) (reversing, without remanding, three-judge court's factual finding that racial considerations predominated in the drawing of the challenged redistricting plan); *Hunter*, 471 U.S. at 229–30, 233 (affirming appellate court reversal without remand where district court's finding of no discriminatory purpose was clearly erroneous); *Brinkman v. Gillian*, 583 F.2d 243, 258 (6th Cir. 1978) (reversing district court's finding of no intentional discrimination with remand only to enter remedy order), *affirmed by Dayton Bd. of Educ.*, 443 U.S. at 534, 542. If, as the evidence shows, the genesis of H.B. 2243 was discriminatory, then the statute's provisions have no legitimacy under the Constitution and this Court should invalidate the citizenship-related provisions and enjoin Defendants from further enforcement of them. *NAACP*, 831 F.3d at 239, 241 (citing *City of Richmond v. United States,* 422

U.S. 358, 378–79 (1975)).

If found to be in violation of the United States Constitution as intentionally discriminatory, there is no argument that saves H.B. 2243 as a valid enactment. The other grounds that this Court considers in this consolidated appeal in relation to H.B. 2243 are statutory. No reversal of the district court's injunctions of H.B. 2243 on those grounds can save HB 2243 from being enjoined as a whole based on a violation of the Fourteenth Amendment.

This Court has the equitable power to enter an order invalidating the addition of the citizenship-related provisions of H.B. 2243 without remand to the district court, with remand only for consideration of whether any non-citizenship-related portion of the law can be enforced. *See Hunter*, 471 U.S. at 232–33; *see also NAACP*, 831 F.3d at 239.

In the alternative, Plaintiffs respectfully request that this case be remanded to the district court for consideration of whether Arizona can prove that the law would have been enacted without intentional discrimination. *See Hunter*, 471 U.S. at 228. (holding that once plaintiffs have established that race was a factor that influenced the legislation, the burden shifts to the Defendants to demonstrate that the legislation would have been enacted absent discrimination). Plaintiffs contend that Arizona cannot prove that H.B. 2243 would have been enacted without discriminatory intent because of the context in which the bills were introduced and because of the laws

that existed in Arizona prior to H.B. 2243 for ensuring that only qualified individuals are registered to vote for race-neutral reasons *See* Minnite Testimony. There was no voter fraud, there was not widespread voting by "illegals."  Election integrity laws were in place and functioning.  There was no non-discriminatory motive for passing legislation to address a non-existent problem.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court reverse the judgment of the district court with respect to Plaintiffs' claim under the Equal Protection Clause, invalidate the citizenship-related provisions of H.B. 2243, and enjoin those provisions' enforcement.

Dated: August 12, 2024

Respectfully submitted,

Ernest I. Herrera
Denise Hulett
Erika Cervantes
Mexican American Legal
Defense And Educational Fund

By: /s/ Ernest I. Herrera
Ernest I. Herrera

## STATEMENT OF RELATED CASES

Promise Arizona Plaintiffs are not aware of any related cases pending in this Court.

Dated: August 12, 2024

Ernest I. Herrera
MALDEF

By: /s/ *Ernest I. Herrera*
Ernest I. Herrera

## CERTIFICATE OF COMPLIANCE

I certify pursuant to Federal Rules of Appellate Procedure 32(a)(5) and Ninth Circuit Rule 32-1 that the foregoing Principal Brief of Promise Arizona Plaintiffs-Appellees-Cross-Appellants is proportionately spaced and has a typeface of 14 points.

I further certify that pursuant to Federal Rules of Appellate Procedure 32(a)(7) and Ninth Circuit Rule 32-1(a) the attached foregoing Principal Brief of Plaintiffs-Appellees-Cross-Appellants Promise Arizona and Southwest Voter Registration Education Project meets the volume limitation of 14,000 words (being 13,540 words in length, not including those portions of the Brief exempted by Rule 32(f)).

Dated: August 12, 2024

Ernest I. Herrera
MALDEF

By: /s/ *Ernest I. Herrera*
Ernest I. Herrera