No. 24-3188 (consolidated with Nos. 24-3559 and 24-4029)

_____

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

MI FAMILIA VOTA, *et al.*,

*Plaintiffs-Appellees*,

v.

ADRIAN FONTES, *et al.*,

*Defendants-Appellants*,

REPUBLICAN NATIONAL COMMITTEE, *et al.*,

*Intervenor-Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the District of Arizona
Case No. 2:22-cv-00509-SRB (Consolidated)
Hon. Susan R. Bolton

_____

**MI FAMILIA VOTA PLAINTIFFS-APPELLEES' RESPONSE BRIEF ON
MATERIALITY PROVISION CLAIMS**

_____

ROY HERRERA
DANIEL A. ARELLANO
JILLIAN L. ANDREWS
Herrera Arellano LLP
1001 N. Central Ave, Ste. 404
Phoenix, Arizona 85004
roy@ha-firm.com
(602) 567-4820

ELISABETH C. FROST
CHRISTOPHER D. DODGE
QIZHOU GE
Elias Law Group LLP
250 Massachusetts Ave NW, Ste. 400
Washington, D.C. 20001
efrost@elias.law
(202) 968-4490

*Counsel for Mi Familia Vota
Plaintiffs-Appellees*

August 13, 2024

i

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellees Mi Familia Vota and Voto Latino, respectively, state that they have no parent corporations and that there is no corporation that holds 10% of more of their stock. A supplemental disclosure statement will be filed upon any change in the information provided herein.

## TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ...................................... ii

INTRODUCTION ................................................................................................1

JURISDICTIONAL STATEMENT ..........................................................................3

STATEMENT OF THE ISSUE PRESENTED ...........................................................3

STATEMENT OF THE CASE................................................................................4

    I.    The Birthplace Requirement...............................................................4

        A. Until HB2492, birthplace was an optional field for State Form
           applicants. ................................................................................4

        B. Arizona does not use birthplace to determine if an applicant is
           qualified to vote. ......................................................................5

        C. Expert testimony further confirmed that birthplace cannot reliably
           be used to confirm voter identity...........................................11

        D. Birthplace is unnecessary and of only limited use for administrative
           tasks unrelated to determining a voter's qualifications............................15

    II.   The Checkbox Requirement ..............................................................18

    III.  The district court held that the Birthplace and Checkbox Requirements
        violate the Materiality Provision and permanently enjoined them. ..............19

        A. The district court held that birthplace is immaterial to determining
           a voter's qualifications. ...........................................................20

         B. The district court held that enforcing the Checkbox Requirement
           where the applicant has DPOC violates the Materiality Provision. .........22

STANDARD OF REVIEW .................................................................................23

SUMMARY OF THE ARGUMENT ....................................................................24

ARGUMENT ...................................................................................................26

I.    The Materiality Provision prohibits States from imposing immaterial registration requirements on voters. ................................................26

II.   The district court correctly held that the Birthplace and Checkbox Requirements violate the Materiality Provision. ...........................................32

    A. Birthplace is immaterial to determining whether an applicant is qualified to vote in Arizona. ....................................................................32

    B. The citizenship checkbox is immaterial when an applicant provides "satisfactory evidence" of citizenship through DPOC. ...........................44

    C. Appellants' remaining arguments misread the Civil Rights Act. .............47

CONCLUSION ........................................................................................................56

CERTIFICATE OF COMPLIANCE .......................................................................58

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................29

*Bostock v. Clayton County*,
590 U.S. 644 (2020)....................................................................55

*Chrisman v. Sisters of St. Joseph of Peace*,
506 F.2d 308 (9th Cir. 1974) ......................................................55

*Cone v. Bell*,
556 U.S. 449 (2009)....................................................................29

*Dawson v. Entek Int'l*,
630 F.3d 928 (9th Cir. 2011) ......................................................23

*Diaz v. Cobb*,
435 F. Supp. 2d 1206 (S.D. Fla. 2006) ................................45, 46

*Fla. State Conf. of NAACP v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ............................................52, 55

*Ford v. Tenn. Senate*,
No. 06-2031, 2006 WL 8435145 (W.D. Tenn. Feb. 1, 2006) ...............34, 41, 43

*Hart v. Massanari*,
266 F.3d 1155 (9th Cir. 2001) ....................................................30

*Kungys v. United States*,
485 U.S. 759 (1988)....................................................................29

*La Unión del Pueblo Entero v. Abbott*,
No. 5:21-cv-0844-XR, 2023 WL 8263348
(W.D. Tex. Nov. 29, 2023)...................... 34, 40, 42, 45, 48, 49, 53, 56

*League of Women Voters of Arkansas v. Thurston*,
No. 5:20-cv-05174, 2023 WL 6446015
(W.D. Ark. Sept. 29, 2023).....................................................46, 47

*Martin v. Crittenden*,
347 F. Supp. 3d 1302 (N.D. Ga. 2018).............. 30, 31, 32, 34, 35, 36, 40, 41, 45

*Migliori v. Cohen*,
36 F.4th 153 (3d Cir.), *cert. granted, judgment
vacated as moot sub nom. Ritter v. Migliori*,
143 S. Ct. 297 (2022) ................................... 28, 29, 30, 32, 35, 39, 49

*In re Mortg. Elec. Registration Sys., Inc.*,
754 F.3d 772 (9th Cir. 2014) ............................................. 54

*Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024) ................................................ 30

*Ritter v. Migliori*,
143 S. Ct. 297 (2022) ........................................................ 30

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003) ......................... 26, 27, 29, 36, 42, 45

*Schwier v. Cox*,
412 F. Supp. 2d 1266 (N.D. Ga. 2005), *aff'd*,
439 F.3d 1285 (11th Cir. 2006) ......................................... 49

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*,
574 F. Supp. 3d 1260 (N.D. Ga. 2021) ................................. 53

*United States v. Uchimura*,
125 F.3d 1282 (9th Cir. 1997) ............................................ 29

*Vote.org v. Byrd*,
700 F. Supp. 3d 1047 (N.D. Fla.), *appeal docketed*
No. 23-13727 (11th Cir. Nov. 13, 2023) ............................... 51

*Vote.Org v. Callanen*,
89 F.4th 459 (5th Cir. 2023) ............................... 49, 50, 53, 56

*Vote.org v. Ga. State Election Bd.*,
661 F. Supp. 3d 1329 (N.D. Ga. 2023) ........................... 49, 53

*Wash. Ass'n of Churches v. Reed*,
492 F. Supp. 2d 1264 (W.D. Wash. 2006) ........................... 49

*Yu v. Idaho State Univ.*,
15 F.4th 1236 (9th Cir. 2021) ............................................ 23

**Statutes**

A.R.S. §16-121.................................................................................39

A.R.S. §16-121.01(A).....................................................................5, 18

A.R.S. §16-121.01(C)........................................................................34

A.R.S. §16-121.01(D)........................................................................37

A.R.S. §16-142...................................................................................8

A.R.S. §16-152(A)(7)..........................................................................5

A.R.S. §16-165(I)..............................................................................38

A.R.S. §16-166(F)...........................................................2, 6, 18, 19, 25, 33

8 U.S.C. §1481.................................................................................35

28 U.S.C §1291...................................................................................3

52 U.S.C. §10101(a)(1)..................................................................54, 55

52 U.S.C. §10101(a)(2).................................... 1, 25, 26, 28, 36, 41, 42, 48, 53, 55

52 U.S.C. §10101(e) ....................................................................26, 53

52 U.S.C. §20508...............................................................................18

**Other Authorities**

8 C.F.R. §101.3(a)(1)........................................................................35

110 Cong. Rec. 6715 (Mar. 30, 1964) ..................................................28

1993 Ariz. Laws ch. 98, §10 ..............................................................4

*Hearings on H.R. 7152 Before the Comm. on the Judiciary*, 88th
  Cong. (1963) ...............................................................................27

*Hearings on S. 1731 & S. 1750 Before the S. Comm. on the Judiciary*,
  88th Cong. (1963) ..........................................................1, 27, 28, 55

# INTRODUCTION

Congress enacted the Civil Rights Act of 1964 to protect "the very foundation of our form of government—the right to vote." *Hearings on S. 1731 & S. 1750 Before the S. Comm. on the Judiciary*, 88th Cong. 99 (1963) (Statement of Att'y Gen. Robert F. Kennedy). Central among its protections is the Materiality Provision, which guarantees that no one shall have their voter registration application rejected "because of an error or omission" on the application that "is not material in determining whether [the applicant] is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). Arizona House Bill 2492 ("HB2492") imposes two requirements that the district court found violated the Materiality Provision.

First, HB2492's Birthplace Requirement requires county recorders to reject state voter registration applications if the applicant fails to disclose where they were born—even when the recorder determines the applicant meets all of Arizona's qualifications to vote. Uniform testimony from election officials—including the Secretary of State and county recorders—confirmed that birthplace is irrelevant "in determining whether" a person is qualified to vote. Not one Arizona election official appeals the district court's holding that the Birthplace Requirement violates the Materiality Provision. The appeal is brought only by the Attorney General, the

1

Republican National Committee, and the Republican leaders of the Arizona legislature.[1]

Appellants fail to establish that the district court clearly erred in determining that birthplace is not material in determining a voter's qualifications in Arizona. At most, they argue that birthplace can at times be minimally helpful for *other* administrative tasks. But that does not insulate the statute from the Materiality Provision. As the district court held, and as no party disputes, Arizona remains free to *ask* applicants for their birthplace—as it long has on a *voluntary* and *optional* basis—but it may not *reject* a voter's registration form for failure to provide that information. The district court's sound holding on this issue—well supported by extensive record evidence that Appellants elide—should be affirmed.

Second, HB2492's Checkbox Requirement mandates that county recorders reject a registration application where an applicant fails to check a box affirming that they are a U.S. citizen—even when they *also* provide documentary proof of citizenship ("DPOC") that, as a matter of Arizona law, constitutes "satisfactory evidence of United States citizenship." A.R.S. §16-166(F). As the district court found, and as the Secretary agrees, applying the Checkbox Requirement to reject applications even when the applicant provides "satisfactory evidence" that they are

---

[1] The Attorney General, who also represents the State of Arizona, is referred to herein as "AG." The Republican-affiliated intervenors are referred to as "Intervenors." The AG and Intervenors are referred to collectively as "Appellants."

a citizen leads to an absurd result, requiring county recorders to reject demonstrably qualified applicants. In such circumstances, failure to check that box is clearly an error or omission that is immaterial to determining a voter's qualifications, as they have already proven those qualifications to the satisfaction of Arizona law. The district court enjoined the Checkbox Requirement solely as it applies to this application. Only Intervenors appeal this ruling but, as the district court put it, their position "makes little sense." 1-ER-0142. The district court's ruling on this issue, too, should be affirmed.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C §1291 to review the district court's final judgment as appealed by the AG, including as to the Birthplace Requirement. *See* 1-ER-0004 ¶4. As explained by the LUCHA Appellees, this Court lacks appellate jurisdiction over the Intervenors' appeal because they lack standing. *See* LUCHA Appellees' Br., Argument §I . This includes over Intervenors' appeal on the Checkbox Requirement, which no state official joins. *See* 1-ER-0003¶3.

## STATEMENT OF THE ISSUE PRESENTED

**1.** Whether the district court clearly erred in determining that the Birthplace Requirement violates the Materiality Provision.

**2.** Whether the district court properly held the Checkbox Requirement violates the Materiality Provision.

## STATEMENT OF THE CASE

### I.    The Birthplace Requirement

#### A.    Until HB2492, birthplace was an optional field for State Form applicants.

Since 1979, Arizona's state-created voter registration form ("State Form") has included a field for applicants to include their "state or country of birth." 1-ER-0026; *see also* 5-MFV-SER-0849.[2] But during this nearly half-century span, providing birthplace was entirely *optional* and election officials readily accepted registration forms even when the field was not completed. 5-MFV-SER-0795; *see also* 1993 Ariz. Laws ch. 98, §10 (expressly making birthplace optional).[3] Consistent with that longstanding rule, the Arizona's 2019 Election Procedures Manual ("2019 EPM") stated that "[f]ailure to provide state or country of birth . . . does not invalidate the State Form." 5-MFV-SER-0795. As a result, millions of Arizonans registered to vote without providing their birthplace and "approximately one-third of existing voter registrations in Arizona lack birthplace information." 1-ER-0028.

HB2492 changed this longstanding rule. Now, a State Form application is "incomplete" unless it "include[s] all of the information required to be on the

---

[2] All MFV-SER references herein are to Plaintiffs-Appellees' Supplemental Excerpts of Record on Materiality Provision Issues.

[3] The AG insinuates birthplace may have been required before 1993, when it was made expressly optional by statute, but no record evidence supports that theory. *See* 1-ER-0026.

registration form pursuant to section 16-152." A.R.S. §16-121.01(A) ("Birthplace Requirement"). Section 16-152 specifies that the State Form "shall contain" space to disclose "[t]he registrant's state or country of birth." *Id.* §16-152(A)(7). Accordingly, under HB2492, a State Form applicant who does not disclose their birthplace will not be registered to vote.

HB2492's Birthplace Requirement does not apply to Federal Form applicants because A.R.S. §16-152(A)(7) only governs the contents of the State Form. Nor is there a field for birthplace on the Federal Form. 5-MFV-SER-0856–59. Accordingly, under HB2492, a Federal Form applicant with DPOC will be registered as a full-ballot voter without disclosing birthplace, while an otherwise identical State Form applicant with DPOC will have their form rejected unless they provide that information. *See* 2-MFV-SER-0337; 5-MFV-SER-0779; 5-MFV-SER-0782; 5-MFV-SER-0784; *see also* LUCHA Appellees' Br., Statement of the Case §1 (discussing the history of the DPOC requirement and Arizona's bifurcated registration system).

### B. Arizona does not use birthplace to determine if an applicant is qualified to vote.

The record overwhelmingly confirmed that Arizona election officials do not—and in fact *cannot*—use an applicant's provision of birthplace on a State Form to determine their qualifications to vote.

5

### 1. Arizona's existing procedures for determining voter qualifications do not use birthplace.

Since 2004, State Form applicants have been required to provide DPOC to become a full-ballot voter in Arizona. *See* A.R.S. §16-166(F). Voters may satisfy the DPOC requirement in several ways, any one of which verifies their identity and constitutes "satisfactory evidence of United States citizenship" under Arizona law. *Id.*; 4-MFV-SER-0601; 4-MFV-SER-0626–27.

*First*, applicants may provide county recorders an acceptable form of DPOC when registering to vote. "Satisfactory evidence of United States citizenship" includes a driver's license issued after October 1, 1996; a legible photocopy of the applicant's birth certificate (if it confirms U.S. citizenship); a photocopy of a U.S. passport; certain naturalization documents; a Bureau of Indian Affairs card, tribal treaty card number, or tribal enrollment number; and certain other documents or methods prescribed by federal law. A.R.S. §16-166(F)(1)–(6).

*Second*, the most common way the DPOC requirement is satisfied is through a "HAVA Check," a process by which county recorders compare a registrant's application information with a records database maintained by the Arizona Department of Transportation's Motor Vehicle Division ("MVD"). 4-MFV-SER-0581; 4-MFV-SER-0589; 6-MFV-SER-1099–1103; 4-MFV-SER-0638. If a HAVA Check confirms DPOC, the voter satisfies their obligation to show citizenship under A.R.S. §16-166(F). *See* 1-MFV-SER-0220; 4-MFV-SER-0639–40; 4-MFV-SER-

6

0644.[4] Although county recorders may use a variety of data from the State Form to locate a match within the MVD system, they do *not* use birthplace for this purpose. 5-MFV-SER-1045; 4-MFV-SER-0601. Indeed, they *cannot* do so: the MVD database does not store birthplace information. 4-MFV-SER-0635–36.

*Third*, under very specific circumstances, county recorders may also confirm a person's citizenship by searching the SAVE system maintained by U.S. Citizenship and Immigration Services ("USCIS").[5] A match within SAVE can confirm a person's citizenship, entitling them to registration as a full-ballot voter. 6-MFV-SER-1057; 5-MFV-SER-1011; 5-MFV-SER-1029; 4-MFV-SER-0751; 4-MFV-SER-0759–6. But to query the SAVE system, a recorder must have a Naturalization Certificate Number, Citizenship Certificate Number, or Alien Registration Number. 5-MFV-SER-0781; 2-MFV-SER-0232; 4-MFV-SER-0643. This means that SAVE can only provide confirmation of naturalized or derived U.S. citizenship and only if the applicant provides one of those numbers; under no circumstances can SAVE confirm a natural born citizen's citizenship status. 6-MFV-SER-1059–60; 5-MFV-SER-

---

[4] If a recorder is not able to find a match through a HAVA Check, the voter must provide documentary proof of identity to be registered at all, *see* 4-MFV-SER-0585–88, and must provide DPOC to be registered as a full-ballot voter. 4-MFV-SER-0586. A voter with no HAVA Check match who provides documentary proof of identity but not DPOC is designated as a "federal-only" voter. 4-MFV-SER-0644.

[5] The SAVE system is not itself a database, but rather a retrieval system that allows users to pull data from various record systems maintained by the Department of Homeland Security. 6-MFV-SER-1058–59; 6-MFV-SER-1061; 2-MFV-SER-0232.

1023; 2-MFV-SER-0233. County recorders *cannot* use a person's birthplace to query the SAVE system. 2-MFV-SER-0233. Because applicants rarely provide the identification numbers that county recorders need to query the SAVE system, it is rarely used to determine citizenship. 4-MFV-SER-590–91.

### 2. Arizona's election officials confirmed that birthplace is immaterial to determining voter qualifications.

At the outset of this litigation, the Secretary of State—Arizona's chief state election officer, A.R.S. §16-142—agreed that "a voter's place of birth is immaterial to their qualifications to register and vote" and it "has no bearing on their eligibility to vote." 3-MFV-SER-0472; 3-MFV-SER-0468; 3-MFV-SER-0528; *see also* 2-MFV-SER-0298.

Former State Election Director Colleen Connor (the Secretary's designee), testified to the same, confirming that birthplace is not used to determine citizenship or any other voter qualification. 4-MFV-SER-0622–23. Moreover, Ms. Connor testified that the Secretary's office does not use birthplace for *any purpose* related to voter registration, confirming "there's no use for that information." 4-MFV-SER-0627. Ms. Connor further testified that she was not aware of any recorder ever saying that birthplace could be useful in determining voter qualifications. 4-MFV-SER-0625.

And, indeed, throughout these proceedings, not a single county recorder testified that they used birthplace for any reason related to determining whether an

applicant is qualified to vote under Arizona law. The Maricopa County Recorder's designee, Senior Director of Voter Registration Janine Petty, agreed that her office "does not use birthplace information to verify someone's eligibility to vote," including to determine whether they are a U.S. citizen for registration purposes. 4-MFV-SER-0598–99. The Pima County Recorder's designee similarly agreed that "Pima County [does not] use a person's birthplace for any [] reason related to voter registration," 4-MFV-SER-0754–55, and "wouldn't use that information to determine eligibility," 4-MFV-SER-0752. Prior to trial, recorder after recorder conceded the same through deposition testimony or written interrogatory responses admitted at trial. *E.g.*, 5-MFV-SER-0905 (Coconino County); 5-MFV-SER-0916 (Gila County); 5-MFV-SER-0928 (Greenlee County); 5-MFV-SER-0939 (Maricopa County); 5-MFV-SER-0960 (Santa Cruz); 5-MFV-SER-0977 (Yuma County); 6-MFV-SER-1053 (Yuma County).

The record showed instead that county recorders rely upon HAVA Checks to confirm a person's identity and eligibility, and sometimes use the SAVE system or physical DPOC to confirm citizenship. 4-MFV-SER-0582–83; 4-MFV-SER-0601; 5-MFV-SER-0779–87; *see also* 4-MFV-SER-0583 (testifying that a successful HAVA Check confirms identity); 4-MFV-SER-0641–42 (similar). Birthplace plays no role in these processes. 5-MFV-SER-1045 (HAVA Check); 2-MFV-SER-0232–33; 5-MFV-SER-0795; 4-MFV-SER-0625 (SAVE).

9

The record also repeatedly confirmed not only that county recorders *do not* use birthplace to determine eligibility, but also that they *cannot*, for several reasons. To start, a person's place of birth is not determinative of their citizenship, as the record proved and the district court found. *E.g.*, 4-MFV-SER-0599. County recorders also have no way of determining whether a person's claimed birthplace is correct. *See, e.g.*, 4-MFV-SER-0601 (Maricopa County); *see also* 4-MFV-SER-0753 (Pima County); 6-MFV-SER-1094 (Pinal County); 6-MFV-SER-1049 (Apache County); 6-MFV-SER-1110 (Navajo County). The Secretary's designee confirmed that "it is not possible for county election officials to confirm a registrant's birthplace information" and that she was not aware of any "database that the state can use to automatically acquire that information." 4-MFV-SER-0627–28.

The AG suggests (AG Br.66–67) that recorders could use the National Association for Public Health Statistics and Information Systems database ("NAPHSIS") to confirm citizenship using birthplace, but this assertion has no support in the record. County recorders uniformly testified that they do not have access to NAPHSIS, nor are they even familiar with it. *E.g.*, 4-MFV-SER-0593–95; *see also* 6-MFV-SER-1080–81. For example, when asked if she had access to NAPHSIS, Senior Director Petty responded: "I don't even know what that is, so no." 4-MFV-SER-0603; *see also* 4-MFV-SER-0593–94; 4-MFV-SER-0604. Not only had she never even heard of NAPHSIS, but Ms. Petty also never heard any other

10

Arizona election official mention it, including at meetings where they discuss registration policies. 4-MFV-SER-0594–95.[6]

Defendants' own expert, Dr. Jesse Richman, acknowledged that counties lack access to NAPHSIS, 4-MFV-SER-0744, and further admitted that it would "not . . . be particularly useful" with respect to naturalized citizens because one of its "key limitations" is that it does not have birthplace data for those born outside the U.S. 4-MFV-SER-0745. Another limitation, according to Richman, is that data within NAPHSIS "is not completely uniform." 4-MFV-SER-0741. Furthermore, Richman could not answer the court's questions about whether NAPHSIS is a private or public entity; whether it is for-profit or a non-profit; or how it is funded. 4-MFV-SER-0741–42. Defendants even admitted below that "NAPHSIS data is not a statutorily recognized form of documentary proof of citizenship" under Arizona law. 1-MFV-SER-0117.

### C. Expert testimony further confirmed that birthplace cannot reliably be used to confirm voter identity.

The district court also heard unrefuted expert testimony explaining how birthplace cannot be used to confirm a voter's identity during the voter registration process. *See* 4-MFV-SER-0647–0730. Political scientist Dr. Eitan Hersch analyzed

---

[6] This was so persistently evident from the record that, when a witness was later asked a question about NAPHSIS, the district court referred to it as "the database that the County Recorders said they had no access to." 4-MFV-SER-0736–37.

Arizona's voter registration records to assess whether, as a practical matter, birthplace could be useful in identifying, or distinguishing between, voters.[7] Dr. Hersh identified three reasons why birthplace is not fit for this purpose.

*First*, to the extent that Arizona's voter registration database contains any data about birthplace at all, that data is riddled with errors, typos, and ambiguous entries that render it unusable for confirming identity. 4-MFV-SER-0652–53; 4-MFV-SER-0656–58. The State Form provides no instruction or guidance to registrants on how to input birthplace in a standardized way, and there are many "birthplaces" that may be described in ways that are not unique to a single place. 4-MFV-SER-0598; 5-MFV-SER-0849.

County recorders input birthplace exactly as the applicant provides it, without any standardized method of encoding it. 4-MFV-SER-0597; 6-MFV-SER-1104–06. Thus, a registrant who writes "CA" as their "state or country of birth," has "CA" recorded in their voter registration file, with no way of discerning whether it means California or Canada. 4-MFV-SER-0597–98; 4-MFV-SER-0624–25; *see also* 6-MFV-SER-1076. Likewise, despite the State Form's direction that applicants provide their "state or country of birth," many provide the name of a town, city, or county, which is input into the voter registration system as written, although many

---

[7] Dr. Hersch was recognized as an expert without objection and the district court "credit[ed] [his] testimony and afford[ed] his opinions significant weight." 1-ER-0028 n.22.

other towns, cities, or counties may have the same name. 4-MFV-SER-0598; 4-MFV-SER-0657–58. No evidence was presented at trial that Arizona's 4.7 million existing voter registration records—one third of which lack birthplace information altogether—could be overhauled or revised to render such data reliable for identifying voters. And officials testified that they have no plans to change how they record or collect birthplace. 4-MFV-SER-0615. HB2492 itself requires no such changes.

*Second*, even if the data was perfectly collected, Dr. Hersh testified that birthplace is not a useful identifier compared to more unique information like name and birthdate—both of which applicants already provide when they register to vote. 4-MFV-SER-0659; 4-MFV-SER-0663–64; 5-MFV-SER-1032; 5-MFV-SER-0849. As Dr. Hersh demonstrated, 99.94 percent of Arizona registration records are uniquely identified based on name and birthdate alone; all but 2,734 records out of more than 4.7 million. 5-MFV-SER-1032; 4-MFV-SER-0663–64. In combination with an Arizona ID number and the last four digits of an SSN, all but 720 voter records out of 4.7 million are uniquely identifiable without birthplace. 4-MFV-SER-0664–67; 5-MFV-SER-1034–35. And in these 720 cases, the fact that the registrants share identical names, birthdates, and ID numbers provides election officials sufficient information to confirm when they find duplicate records. 4-MFV-SER-0667–68; 4-MFV-SER-0707.

The remaining records consists of 24 records (or just 12 pairs of records) where voters shared identical names, birthdates, and ID numbers, but had different birthplaces. 4-MFV-SER-0668. As Dr. Hersh explained, these scenarios almost certainly represent "erroneous piece[s] of data" because driver's license numbers and SSNs are unique; two people with different places of birth cannot share an SSN or driver's license number. 4-MFV-SER-0724–25; 4-MFV-SER-0669–70. He further pointed out that several of these entries included nonsensical birthplace information—such as a state or country of birth listed as "GW"—not readily associated with any state or country. 4-MFV-SER-0669–70; 4-MFV-SER-0652–53.

*Third*, Dr. Hersh explained that birthplace is fundamentally a weak differentiator because so many people share the same birthplace, and the law only requires state or country of birth. For example, nearly 200,000 voter registration records in Arizona simply list "U.S." as a birthplace. 4-MFV-SER-0708; *see also* 6-MFV-SER-1065–66. Dr. Hersh took common names in the voter file to see if birthplace could distinguish them. Using Maria Garcia—the most common female name in Arizona—as an example, Dr. Hersh noted nearly all such persons "are born predominantly in two places, Arizona or Mexico." 4-MFV-SER-0662–63. Birthplace is not helpful for distinguishing between such voters given how many share the same state or country of birth. 4-MFV-SER-0662–63; 4-MFV-SER-0674–75.

14

As Dr. Hersh summarized, even if Arizona could hypothetically achieve *perfect* data collection, birthplace cannot "serve the purpose of helping to identify voters." 4-MFV-SER-0683.

### D. Birthplace is unnecessary and of only limited use for administrative tasks unrelated to determining a voter's qualifications.

Appellants repeatedly tried to elicit testimony that birthplace was useful in *some* way to election officials, but such officials repeatedly confirmed that birthplace is not in fact necessary for *any* purpose and is, at most, of extremely limited utility for certain tasks unrelated to assessing an applicant's qualification to vote.

***Security question.*** Testimony below showed that while birthplace can, in theory, be used as a "security question" when a registrant calls the recorder's office, it is not well-suited for that purpose and that recorders prefer to use other kinds of information. *E.g.*, 4-MFV-SER-0754. This is because, as Dr. Hersch noted, many Arizona voters share the same state or country of birth (*i.e.*, "Arizona" or "United States" or "Mexico"). The Pima County Recorder's designee testified her office "would ask a follow-up" question if someone called in and tried to use "Arizona" to confirm their birthplace, "because the State of Arizona would be such a common birthplace for Arizona registered voters that it would not distinguish them for security purposes." 4-MFV-SER-0755–57. Several other recorders similarly confirmed that more personalized information—such as date of birth or last four digits of the voter's SSN—can be used for this purpose, *e.g.*, 4-MFV-SER-0600; 4-

MFV-SER-0611–12; 4-MFV-SER-0749–50, and is preferable, 4-MFV-SER–0753–54. Each confirmed that they can confirm a caller's identity without birthplace. *E.g.*, 4-MFV-SER-0596; 4-MFV-SER-0613–15. No county recorder testified that birthplace is necessary to perform a security check. And, even where birthplace is used, the person is *already* registered to vote; the recorder is not using that information to determine their qualification to vote, as Ms. Petty testified. 4-MFV-SER-0599–0601.

**EPM Procedures.** The record below further established that, while certain EPM procedures reference birthplace as an optional field or consideration, birthplace is not necessary for any of these procedures. To the contrary, election officials consistently testified that they can perform each of these procedures without birthplace information, which more than 1.5 million existing Arizona voters have never provided. 4-MFV-SER-0613–15. And none of these procedures have anything to do with determining whether a person is qualified to vote in Arizona.

For example, the 2019 EPM states that a person requesting a ballot-by-mail *can* use birthplace to satisfy a requirement for personal identifying information, but it also states they may use their driver's license number, last four digits of their SSN, their father's name, or their mother's maiden name. *See* 5-MFV-SER-0824; *see also* 4-MFV-SER-0610 (Senior Director Petty confirming that "it is not a requirement that a ballot by mail request form have place of birth on it"). Likewise, while

birthplace *can* be used to confirm that a registered voter has died, it "is not a required field for matching" a voter registration with a death notice. 4-MFV-SER-0613–14 (Senior Director Petty); *see also* 4-MFV-SER-0612–13 (identifying other forms with *optional* requests for birthplace information).

Finally, the EPM refers to birthplace on documents such as birth certificates and U.S. passports, both of which can be used as DPOC. 5-MFV-SER-0780–81. But in neither instance is the birthplace information on those documents used by county recorders to determine whether the DPOC proves the applicant's qualification to vote. 4-MFV-SER-0607–08; 4-MFV-SER-0629–31.

***Registration maintenance.*** Testimony confirmed that birthplace is—at best—only of extremely limited usefulness in maintaining voter registration files, yet another distinct issue from determining an applicant's qualifications. For example, election officials do *not* use birthplace when checking for duplicate registrations across Arizona's counties. 4-MFV-SER-0626–27; *see also* 5-MFV-SER-0799. Nor does Arizona's automatic process for determining whether a new voter record matches an existing record use birthplace as a matching criterion; it relies upon name, date of birth, SSN, and any Arizona-issued identification number. 4-MFV-SER-0642; 5-MFV-SER-1044. Arizona election officials also do not use birthplace to identify duplicate registrations *within* a county. 4-MFV-SER-0600; 6-MFV-SER-1093–95; 6-MFV-SER-1082–84. In sum, the testimony below showed that *no*

17

county recorder uses birthplace to identify a voter within the voter registration database. 4-MFV-SER-0600–01; 4-MFV-SER-0610–11; 6-MFV-SER-1070–72.

## II. The Checkbox Requirement

HB2492 also imposed a new requirement that voter registration applicants complete a citizenship checkbox to be registered—even when they provide actual *proof* of citizenship. Both the State and Federal Forms have long had a checkbox where a voter may check a box confirming that they are a U.S. citizen, but Arizona never previously conditioned accepting a registration application on completion of the checkbox. Instead, a person who provided satisfactory DPOC—as required under Arizona law, A.R.S. §16-166(F)—did not have their application rejected simply because they failed to check the box.[8]

This changed with HB2492, which requires that any voter registration application "must contain a checkmark or other appropriate mark in the 'yes' box next to the question regarding citizenship as a condition of being properly registered to vote[.]" *Id.* §16-121.01(A). There are no exceptions. As a result, a person who omits a checkmark in the "yes" box of the citizenship checkbox will not be registered

---

[8] Under the National Voter Registration Act, the Federal Form must "specif[y] each eligibility requirement (including citizenship)," 52 U.S.C. §20508, and it, too, includes a citizenship checkbox. 5-MFV-SER-0856. But the NVRA does not condition a state official's acceptance of the Federal Form on completing the citizenship checkbox.

18

to vote, even if they provide DPOC, *i.e.*, "satisfactory evidence of United States citizenship" under Arizona law. *Id.* §16-166(F).

On December 30, 2022, then-State Elections Director Kori Lorick sent an email to each county recorder regarding "implementation of HB 2492 and HB 2243," 5-MFV-SER-0881, to which she attached a "policy document" stating the Secretary of State's view that the Checkbox Requirement "conflict[ed] with federal law," *id.*, and directing county recorders that, "if an applicant provides DPOC, or DPOC can be acquired based on the provided information," they "should accept the form" even if the applicant "accidentally omit[s] the checkmark from their voter registration application." 5-MFV-SER-0892. As the Secretary's office explained, "[t]he checkbox is immaterial" where an applicant has DPOC. *Id*.

### III. The district court held that the Birthplace and Checkbox Requirements violate the Materiality Provision and permanently enjoined them.

Four sets of private plaintiffs, alongside the United States, filed suit alleging that the Birthplace Requirement and Checkbox Requirement violated the Materiality Provision of the Civil Rights Act.[9] At summary judgment, the district court held that the Checkbox Requirement violates the Materiality Provision when an applicant provides DPOC, but not when an applicant lacks DPOC. 1-ER-0138–44. The court declined to issue summary judgment on the Birthplace Requirement, concluding that

---

[9] *See, e.g.*, 3-MFV-SER-0558–59;*see also* 3-MFV-SER-0575–76.

whether birthplace is material in determining an applicant's qualifications "is an issue of fact inappropriate for summary judgment." 1-ER-0144. After a ten-day bench trial, and carefully reviewing an extensive factual record, the district court granted Plaintiffs judgment on their Materiality Provision claim against the Birthplace Requirement. *See* 1-ER-0076–78.

## A. The district court held that birthplace is immaterial to determining a voter's qualifications.

The district court "conclude[d] that the Birthplace Requirement violates the Materiality Provision of the Civil Rights Act." 1-ER-0078. This decision was based on detailed findings of fact from the extensive trial record before it. 1-ER-0026–30. It first found, as a matter of fact, that an "individual's place of birth is not dispositive of citizenship status." 1-ER-0026. It next found, based on county recorder testimony, that recorders "do not use birthplace information to determine an applicant's eligibility to vote, nor do county recorders need birthplace to verify an applicant's identity." *Id.* They instead rely upon HAVA checks, or other documentary evidence, "to confirm a person's identity for purposes of voter eligibility," a process that does not involve using birthplace. 1-ER-0026–27. After detailing the testimony regarding birthplace's theoretical administrative uses, the district court concluded that "birthplace alone is generally not sufficient to distinguish between voters for identity verification." 1-ER-0028. In doing so, the court credited Dr. Hersh's testimony, "afford[ing] his opinions significant weight." 1-ER-0028 n.20.

Turning to its legal conclusions, the district court noted at the outset that Defendants did not dispute most elements of Plaintiffs' Materiality Provision claims, including that "an applicant's failure to include her birthplace is an 'error or omission on any record or paper relating to' a requisite to voting," and that "refusal to register an individual who omits birthplace is a denial of that individual's right to vote." 1-ER-0076 (quoting 52 U.S.C. §10101(a)(2)(B)). Instead, the sole issue was "whether an individual's failure to provide birthplace is material to determining that individual's eligibility to vote." 1-ER-0076–78.

After reviewing Arizona's eligibility requirements for voting, the court concluded—based on county recorder testimony, as well as stipulated facts—that an individual's birthplace cannot be used to directly verify citizenship or place of residence. 1-ER-0077; *see also* 1-ER-0026. It found that Arizona had long confirmed a person's qualifications, including U.S. citizenship, without birthplace, which "strongly indicates birthplace is immaterial." 1-ER-0077; *see also* 1-ER-0026. It further found that, under HB2492, county recorders are not instructed to reject State Forms even "with an incorrect birthplace," confirming that the *omission* of such information is immaterial. 1-ER-0077 (citation omitted). Finally, the court found that "HAVA Checks do not use birthplace . . . to verify an applicant's identity for voter eligibility." 1-ER-0078.

21

The court found that "Arizona can use birthplace for other administrative purposes" but held that such uses do not "render birthplace material in determining a voter's eligibility." 1-ER-0078. For example, using a person's listed birthplace "as one of several security questions to verify the identity of a *registered voter* does not make birthplace material because that voter has already been identified and found eligible to vote." *Id.* And the court found that the record showed that recorders can reliably verify the identity of registered voters without birthplace. *Id.* Accordingly, while Arizona remains free to request birthplace (as it long has), the Materiality Provision does not permit it to refuse to register an applicant based on the omission of that information. *Id.*

## B. The district court held that enforcing the Checkbox Requirement where the applicant has DPOC violates the Materiality Provision.

Prior to trial, the district court granted summary judgment to Plaintiffs in part on the Checkbox Requirement, holding that it violates the Materiality Provision when an applicant provides DPOC. 1-ER-0138–44. The court found that, under the text of the Materiality Provision, it not enough for a requirement to abstractly relate to a qualification—"materiality" requires at least "some probability of actually impacting an election official's eligibility determination." 1-ER-0141 (citing 52 U.S.C. §10101(a)(2)(B)). The district court noted that, as a matter of Arizona law, DPOC constitutes "*satisfactory evidence* of citizenship." 1-ER-0142 (quoting A.R.S. §16-166(F)). Thus, once an applicant provides such "satisfactory evidence" that they

22

are a U.S. citizen, whether they also complete the checkbox becomes a ministerial task that is immaterial to determining whether they are qualified to vote. 1-ER-0142.

The court held, however, that this was not true when an applicant does *not* provide DPOC. 1-ER-0142–44. It thus granted summary judgment to Defendants in part, finding that county recorders may enforce the Checkbox Requirement in the absence of DPOC. *Id.*

## STANDARD OF REVIEW

Findings of fact following a bench trial "are reviewed for clear error." *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241 (9th Cir. 2021) (quoting *Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 843 (9th Cir. 2004) (citation omitted)). This is a "'significantly deferential' standard," under which the Court accepts those findings "unless [it is] left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *N. Queen Inc. v. Kinnear*, 298 F.3d 1090, 1095 (9th Cir. 2002)). Reversal is only proper if the Court concludes that the finding of facts "are clearly erroneous to the point of being illogical, implausible, or without support in inferences from the record." *Id.* at 1241–42 (quoting *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 613 (9th Cir. 2020)).

The district court's conclusions of law are reviewed *de novo*, *id.* at 1242 (quoting *Lentini*, 370 F.3d at 843), as is its grant of summary judgment, *Dawson v. Entek Int'l*, 630 F.3d 928, 934 (9th Cir. 2011).

## SUMMARY OF THE ARGUMENT

**1.** The district court did not clearly err in holding that the Birthplace Requirement violates the Materiality Provision. Birthplace is not, and cannot be, used to determine whether an applicant is qualified to vote in Arizona. Recorders instead rely upon DPOC—which State Form applicants must provide to be fully-registered—both to confirm an applicant's citizenship and identity. Birthplace plays no role in this process. Demanding that applicants provide birthplace—or else have their application rejected—imposes a pointless redundancy, requiring officials to turn away applicants who have *proven* their citizenship. The fact that Federal Form applicants—who do not provide birthplace—are fully registered if they provide DPOC confirms the point: birthplace is immaterial to determining if an applicant is a U.S. citizen or otherwise qualified to vote.

Appellants cannot salvage the Birthplace Requirement by pointing to unrelated administrative tasks for which birthplace is only marginally useful. If that were true, states could require any kind of trivial information on registration forms—hair color, shoe size, grandmother's middle name—on the theory that it may later be used to link the applicant to their voter registration record. Congress enacted the Materiality Provision to eliminate such pointless hurdles to voter registration. And the district court did not clearly err in finding that the record established that birthplace is not material to these tasks either.

24

**2.** The district court also correctly held that the Checkbox Provision violates the Materiality Provision when an applicant has DPOC. The court's logic is simple and compelling: officials may not reject an applicant who *proves*, with "satisfactory evidence" as a matter of Arizona law, A.R.S. §16-166(F), that they are a U.S. citizen, simply because they forget to separately check a box. That is paradigmatically an immaterial omission. Under the Materiality Provision, states may not serially demand applicants prove the same qualification again and again on their registration form, particularly where the applicant provides satisfactory *proof* of that qualification under state law.

**3.** Appellants' remaining arguments misread the Civil Rights Act. Under its plain text, States may not reject a registration application for any immaterial error or omission. *See* 52 U.S.C. §10101(a)(2)(B). Contrary to the AG's argument, this inquiry does not involve weighing a legislature's motivations for imposing the requirement. Nor does historical practice or an opportunity to cure somehow immunize immaterial requirements from the Materiality Provision's reach. Finally, Intervenors ignore the text of the Civil Rights Act in making their (forfeited) claim that the Materiality Provision cannot preempt state statutes. Statutory text, legislative history, and case law confirms that states may not force immaterial requirements on applicants simply by embedding them in law; such a novel theory would nullify a key provision of the Civil Rights Act.

## ARGUMENT

**I.     The Materiality Provision prohibits States from imposing immaterial registration requirements on voters.**

The Materiality Provision of the Civil Rights Act states:

> No person acting under color of law shall[] . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. §10101(a)(2)(B). A state law violates this Provision if it: (1) denies any individual's right to vote; (2) because of an error or omission on any paper relating to an application or other act requisite to voting; (3) where such error or omission is not material in determining whether they are qualified to vote under state law. *Id.*

The Civil Rights Act defines the word "vote" broadly to include "all action necessary to make a vote effective including, but not limited to, *registration or other action required by State law prerequisite to voting*, casting a ballot, and having such ballot counted and included in the appropriate totals." *Id.* §10101(e) (emphasis added). Accordingly, rejecting a voter registration application because of an error or omission on the form constitutes a denial of the right to vote. *See Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003) (explaining Materiality Provision "was intended to address the practice of requiring unnecessary information for voter registration").

26

Congress enacted the Materiality Provision to "address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Id.* (citing *Condon v. Reno*, 913 F. Supp. 946, 949–50 (D.S.C. 1995)). "For example, one 'such tactic[ ] [was to] disqualify[ ] an applicant who failed to list the exact number of months and days in his age.'" *Id.* Others included rejecting an applicant for misspelling "Louisiana" or identifying their skin color as "Negro" instead of "brown, or "brown" instead of "Negro." *See Hearings on S. 1731 and S. 1750 Before the S. Comm. on the Judiciary*, 88th Cong. 101 (1963) (Statement of Att'y Gen. Robert F. Kennedy).

The "unnecessary information" targeted by the Provision also included employing pointless redundancies as a way to reject clearly qualified applicants. For example, Attorney General Robert Kennedy, testifying before the Senate Judiciary Committee in support of the law, noted that one Black schoolteacher in Alabama had her voter registration form "rejected because she omitted a date in one question— even though she gave the same information elsewhere on the form." *Id.* at 101, 102; *see also Hearings on H.R. 7152 Before the Comm. on the Judiciary*, 88th Cong. 2720 (1963) (Statement of Att'y Gen. Robert F. Kennedy) (giving similar examples of applicants rejected for failing to supply duplicative information where they "ha[d] already put it elsewhere" on their application). Senator Keating, another supporter

27

of the Act, recounted numerous similar examples. 110 Cong. Rec. 6715 (Mar. 30, 1964) (Statement of Sen. Kenneth Keating). In one such case, an applicant in Louisiana left a portion of the form blank but "answered other portions of the form" providing the same information. *Id.* The registrar rejected the applicant even though it was apparent from the form that the applicant qualified to vote. Senator Keating explained that, under the Materiality Provision, such "immaterial errors and omissions cannot be used to disqualify a person [from] becoming registered." *Id.* at 6716; *see also* 88th Cong. at 102 (Attorney General Kennedy similarly testifying the Materiality Provision "would forbid rejection because of [such] immaterial errors or omissions on registration applications").

This legislative history thus confirms the plain import of the Materiality Provision's text: state election officials may not reject an application form because of an "error or omission [that] is not material *in determining* whether such individual is qualified" to vote. 52 U.S.C. §10101(a)(2)(B) (emphasis added). The inquiry is practical; as the district court held, "Congress intended materiality to require 'some probability of actually impacting an election official's' determination of a person's eligibility to vote." 1-ER-0077 (quoting 1-ER-0141). Where a requirement has "nothing to do with determining one's qualifications to vote," the Materiality Provision bars enforcing it to disenfranchise otherwise "qualified voters." *Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir.), *cert. granted, judgment vacated as moot sub*

28

*nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022); *see also Schwier*, 340 F.3d at 1294. As the examples provided by Attorney General Kennedy and Senator Keating illustrated, this includes errors or omissions where the applicant's qualifications are already apparent. As the district court put it, in such a case, "the materiality of an error or omission is determined by the other information available to the State," which is particularly important where "an applicant includes DPOC." 1-ER-0142.[10]

Several cases illustrate these simple principles. In *Migliori*, the Third Circuit determined that a Pennsylvania law requiring absentee voters to record the date on their absentee ballot return envelope violated the Materiality Provision. *See* 36 F.4th at 162–64. The requirement was immaterial because "it in no way help[ed] the Commonwealth determine whether a voter's age, residence, citizenship, or felony status qualifies them to vote." *Id.* at 163. As the court observed, Pennsylvania officials "counted ballots with obviously incorrect dates," making clear the

---

[10] This understanding of the term "material" is consistent with its construction in other statutory contexts, which make clear that term contemplates having an *actual* effect on the inquiry at hand. *E.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (defining "material fact" for the purposes of summary-judgment motions as facts that "might affect the outcome" of the case); *Cone v. Bell*, 556 U.S. 449, 469–70 (2009) (defining materiality for purposes of *Brady* violations as "a reasonable probability that . . . the result of the proceeding would have been different"); *Kungys v. United States*, 485 U.S. 759, 771–72 (1988) (defining materiality for purposes of the Immigration and Nationality Act as "predictably capable of affecting" an official decision); *United States v. Uchimura*, 125 F.3d 1282, 1285 (9th Cir. 1997) (defining materiality for purposes of tax fraud cases as "necessary to a determination of whether" tax is owed).

information conveyed was irrelevant. *Id.*[11] The same is true here—the record established that Arizona's county recorders accept State Form applications even where the birthplace field is wrong or nonsensical. 4-MFV-SER-0620–21; 4-MFV-SER-0623-25; 4-MFV-SER-0656–58. Moreover, Federal Form applicants are registered as full-ballot voters if they have DPOC, despite never being asked for birthplace. HB2492 changes none of this; it simply requires rejection of State Form applicants if the field is left blank. This inconsistent treatment proves the information it requests is immaterial.

*Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018), is also informative. There, the district court held that "a voter's ability to correctly recite his or her year of birth" on paperwork "is not material to determining" their "qualifications under Georgia law." *Id.* at 1308–09. To be sure, a voter's year of birth has facial relevance to whether they are over 18—which *is* a requirement to vote in Georgia—but the facts established that Georgia "already confirmed such voters'

---

[11] The Supreme Court later vacated *Migliori* as moot. *See Ritter*, 143 S. Ct. at 298. Two years later, a divided panel of the Third Circuit concluded that the Materiality Provision applies only to "paperwork used in the voter qualification process," such as registration applications, but not "records or papers provided during the *vote-casting* stage." *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 133 (3d Cir. 2024) ("*Pa. NAACP*") (emphasis added). Neither casts doubt on *Migliori's* discussion of materiality itself and the decision "continues to have persuasive force" on that point. *Hart v. Massanari*, 266 F.3d 1155, 1159 (9th Cir. 2001). And there is no dispute that this case concerns a law governing "paperwork used for voter qualification determinations," *Pa. NAACP*, 97 F.4th at 132, as HB2492 governs requirements for registration applications.

eligibility" through other means. *Id.* at 1309. And the record further showed that most Georgia counties "d[id] not require" voters "to furnish such information *at all*" when determining eligibility. *Id.* The same is true here—State Form applicants *must* establish their citizenship through DPOC to be fully registered and the record evidence confirmed that election officials do not require birthplace to determine citizenship or any other aspect of eligibility. 4-MFV-SER-0598–99; 4-MFV-SER-0622–23; 4-MFV-SER-0752; 4-MFV-SER-0754–55.

To avoid the same conclusion here, Appellants ask the Court to apply a different statute than the one adopted by Congress. The Intervenors cast about for different definitions of the term "material," suggesting it means anything from "[o]f serious or substantial import," "likely to influence the determination of a cause," "of consequence," "likely to influence," or "tends to make it more likely that the applicant is not a qualified voter[.]" Int. Br.21–22. But they never land on a precise definition, nor do they explain the consequences of their myriad proposals. The AG engages in a similar exercise, *see* AG Br.42–43, and proposes "significant" as a fair definition for "material."

Nevertheless, fixing the precise meaning of "material" is unnecessary here—the Birthplace Requirement and Checkbox Requirement as applied to applicants with DPOC violate *any* of these definitions because they are of no use "in

31

determining" a person's qualification to vote and are not even "significant" to any administrative use.

## II. The district court correctly held that the Birthplace and Checkbox Requirements violate the Materiality Provision.

### A. Birthplace is immaterial to determining whether an applicant is qualified to vote in Arizona.

The materiality analysis begins by looking to the state's substantive voter qualifications. *See Migliori*, 36 F.4th at 162–63; *Martin*, 347 F. Supp. 3d at 1308–09; 1-ER-0077. "To vote in Arizona, a person must be a United States citizen, a resident of Arizona, and at least eighteen years of age, who has not been adjudicated incapacitated or convicted of a felony." 1-ER-0077 (first citing Ariz. Const. art. VII, §2; then citing A.R.S. §16-121). As the district court stressed, whether a person's birthplace is "material" to their qualification to vote "is an issue of fact." 1-ER-0144. And record evidence overwhelmingly proved that an applicant's birthplace is not just immaterial "in determining" whether they are qualified to vote in Arizona; it is entirely useless as a practical matter.

Appellants make only a half-hearted effort to suggest birthplace is material, or even relevant, to determining U.S. citizenship. *See* AG Br.61–64; Int. Br.26. Instead, they largely argue that it can be helpful in confirming an applicant's "identity." AG.Br.48–61; Int. Br.24–26. The record belies any claim that birthplace is material to either exercise.

### 1.    Birthplace is not material in determining U.S. citizenship.

The extensive record below shows that Arizona's county recorders do not, and cannot, use birthplace to confirm whether an applicant is a U.S. citizen. *See supra* Background §I; 1-ER-0029. Given these facts, it is not surprising that the Secretary of State—the state's chief election officer—repeatedly agreed that "a person's birthplace [is] immaterial to verifying a person's qualifications to register and vote." *E.g.*, 2-MFV-SER-0298 (citing 3-MFV-SER-0520); *see also* 4-MFV-SER-0622–23; 4-MFV-SER-0627. The district court's findings to this effect were amply supported and were in no way clearly erroneous. *See* 1-ER-0026 (recorders do not use birthplace to determine eligibility); 1-ER-0029 (recorders cannot confirm accuracy of birthplace).

The record established instead that Arizona's election officials rely on DPOC to confirm an applicant's citizenship, largely through HAVA Checks and, in some instances, the SAVE system. 4-MFV-SER-0582–84; 4-MFV-SER-0601; 5-MFV-SER-0779–87. Birthplace is not necessary and plays no part in this process. *See, e.g.*, 4-MFV-SER-0582–83; 4-MFV-SER-0601; *see also* 1-ER-0026–27.

The Birthplace Requirement is thus fundamentally duplicative; a State Form applicant *must* have DPOC to be registered as a full-ballot voter under Arizona law. A.R.S. §16-166(F). And Federal Form applicants do not need to provide birthplace at all—yet still are registered as full-ballot voters if they have DPOC. 2-MFV-SER-

0337, 5-MFV-SER-0779, 5-MFV-SER-0782, 5-MFV-SER-0784.[12] Nowhere in their extensive briefing on the issue do Appellants explain how birthplace is of any use in confirming citizenship. They cannot. It is a deadweight requirement that only serves to reject demonstrably qualified applicants. Courts have repeatedly held that under the Materiality Provision, once an applicant establishes their qualification to vote, states may not reject their registration applications for omitting gratuitous information. *E.g.*, *See La Unión del Pueblo Entero v. Abbott*, No. 5:21-cv-0844-XR, 2023 WL 8263348, at *18 (W.D. Tex. Nov. 29, 2023) ("*LUPE*"); *Martin*, 347 F. Supp. 3d at 1308–09; *Ford v. Tenn. Senate*, No. 06-2031, 2006 WL 8435145, at *10–11 (W.D. Tenn. Feb. 1, 2006); *see also infra* §II.B (discussing how duplicative requirements violate the Materiality Provision).

Experience further proves the point. Birthplace has long been an optional field on the State Form. As a result, more than 1.5 *million* current Arizona voters never provided birthplace to their county recorder, yet no election official testified to any doubts about their citizenship. 4-MFV-SER-0625. Nor did any election official testify that they could even use such information to confirm citizenship moving forward. That Arizona "in the past treated the failure" to include birthplace "immaterial" provides strong evidence that it remains so. *Ford*, 2006 WL 8435145,

---

[12] Nor can the Birthplace Requirement be rationalized as material to determining the qualifications of State Form applicants who lack DPOC—HB2492 requires recorders to *reject* such applications outright, A.R.S. §16-121.01(C).

34

at *11; *cf. Martin*, 347 F. Supp. 3d at 1309 (finding county's requirement to provide birthdate immaterial "in light of the fact that other Georgia counties do not require [] voters to furnish such information *at all*"); *see also* 1-ER-0077.

The immateriality of the Birthplace Requirement is further confirmed by the fact that the *substance* of the field is irrelevant: an applicant can supply any answer—even gibberish—and it is simply copied into the voter file as written. 4-MFV-SER-0597–98; 4-MFV-SER-0624–25. If that voter then presents DPOC, or their DPOC is confirmed through a HAVA Check, they have proven their qualification to vote, even if their birthplace answer is nonsensical or somehow inaccurate—it has no bearing on determining if they are qualified. In contrast, under the Birthplace Requirement, an applicant who simply *misses* the birthplace field will be rejected—*even if they too provide DPOC*. "If the substance of the [birthplace field] does not matter, then it is hard to understand how one could claim that this requirement has any use in determining a voter's qualifications." *Migliori*, 36 F.4th at 164.

Appellants' arguments to the contrary are grasping. The AG claims that birthplace is material because "[p]eople born in the United States are thereby citizens." AG Br.62. That is not always true. *See, e.g.*, 8 U.S.C. §1481 (creating procedures for U.S.-born persons to relinquish citizenship); 8 C.F.R. §101.3(a)(1) (persons born within the United States to diplomat parents are not citizens). But it is also irrelevant. A law does not pass muster under the Materiality Provision simply

because, at an abstract level, it seeks information conceivably relevant to voter qualification. *See Martin*, 347 F. Supp. 3d at 1309. The information must in fact be material *in determining* whether a person is qualified to vote. *See* 52 U.S.C. §10101(a)(2)(B).

Indeed, an animating concern for the Materiality Provision was requiring applicants to give their age—a valid voter qualification—in months or days. *See Schwier*, 340 F.3d at 1294 (citing *Condon*, 913 F. Supp. at 949–50). The idle fact that most people born in the United States are U.S. citizens cannot be "material" where Arizona's election officials have no way of using that information to actually confirm a person's qualification. To the extent the AG suggests that officials rely on an applicant's attestation of U.S birthplace as confirmation of U.S. citizenship, there is no good reason why officials would not similarly trust an attestation of citizenship from a naturalized citizen born outside the U.S. And, as the AG concedes, many American citizens were born outside of the United States; their birthplace accordingly says *nothing* about whether they are a U.S. citizen. 2-MFV-SER-0275.

Rather than grappling with the mountain of evidence on this point, the AG feints, speculating that, "[i]n the modern world, there are databases with citizenship-related information," offering two examples: NAPHSIS and SAVE. AG Br.63; *see also id.* at 66–67. But as even the AG acknowledges, this argument is not grounded in the record. Uniform testimony confirmed that Arizona's county recorders do not

36

have access to NAPHSIS and are not familiar with it. Defendants' own expert conceded NAPHSIS "is not currently used in Arizona's voter registration process," 4-MFV-SER-0741; and even the AG *concedes in her brief* that "county recorders in Arizona did not have access to NAPHSIS data at the time of trial." AG Br.27. Yet she argues that they could obtain access based on her assertion that "the organization makes the data available to those who sign a contract." *Id.* This is simply rank speculation—the AG cites no record or legal support for the prospect that county recorders have the means or authority to enter such contracts. On top of that, the AG previously conceded that "NAPHSIS data is not a statutorily recognized form of documentary proof of citizenship." 1-MFV-SER-0117.

The AG's claim that HB2492 "directs county recorders" to use NAPHSIS is also misplaced. AG Br.26. The provision to which the AG refers only instructs recorders to use NAPHSIS to try to confirm the citizenship of Federal Form applicants and the Federal Form does not have a space for birthplace information. *See* A.R.S. §16-121.01(D). Even then, county recorders are only required to consult NAPHSIS "provided the county has access," *id.*, and the record here shows none do. HB2492 says *nothing* about using *birthplace* information provided by *State Form* applicants to confirm citizenship. *See id.* The AG's argument is again nothing but an idle suggestion, divorced from the text of HB2492—even the Arizona Legislature

did not propose that county recorders use NAPHSIS in conjunction with birthplace information. The AG invents that argument for this appeal.

The AG's argument as to the SAVE system fares no better. While county recorders have access to SAVE, there is no dispute that they *cannot* use birthplace to query the SAVE system. 2-MFV-SER-0233. They can only access records in SAVE if they have an applicant's unique immigration identifier, 5-MFV-SER-0781; 2-MFV-SER-0232; 4-MFV-SER-0643, and once they have that information and the applicant's name, they have all the information they need to access the applicant's records in SAVE. 4-MFV-SER-0590–91; 4-MFV-SER-0604; 4-MFV-SER-0616. Birthplace information adds nothing to this process, and the AG does not even attempt to argue otherwise.

The Intervenors add little to the AG's already feeble arguments on citizenship. They note that *House Bill 2243* directs County Recorders to use NAPHSIS, but once again for an unrelated purpose.[13] They also contend that no court has held "that information can be 'material' only if it is cross-checked by elections officials." Int. Br.26. That half-baked argument gives up the game, conceding that the *substance* of the birthplace field is irrelevant; applicants simply must put something—*anything*—

---

[13] Specifically, HB2243 instructs county recorders to use NAPHSIS to periodically try to confirm the citizenship of *long registered* voters who did not supply DPOC. *See* A.R.S. §16-165(I). It also provides no instruction to use birthplace in NAPHSIS for new State Form applicants.

38

there to satisfy the law, even if it is accidentally inaccurate or indecipherable. *Migliori*, 36 F.4th at 164. But the Materiality Provision does not tolerate using such arbitrary box-checking exercises as a basis to disenfranchise voters, much less where applicants must already provide "satisfactory evidence" of citizenship through other means under state law.

In sum, Appellants fail to show how birthplace can even theoretically be material "in determining" whether an applicant in Arizona meets the requirements of A.R.S. §16-121. Nor do they ever map the Birthplace Requirement onto their own preferred definitions of materiality. What is "significant" or "of consequence" about where a person says they were born once they establish they are a citizen with DPOC? How is it "likely to influence the determination of a cause" when a recorder cannot even confirm its accuracy? Appellants nowhere say. That dooms the Birthplace Requirement under the Materiality Provision.

### 2. Birthplace is not material in determining identity.

Appellants try to salvage their position by arguing that birthplace is material to determining an applicant's identity. *See* AG Br.48–61; Int. Br.24–25. But, in support, Appellants point to instances where it may be possible to use birthplace to confirm identity in administrative interactions *after* the applicant's qualifications have already been determined and the voter has been registered. *See* 1-ER-0078. None show that birthplace is used "in determining" a voter qualification. The record

also confirms that birthplace is similarly unnecessary for these administrative tasks, as well. 4-MFV-SER-0583–84; 4-MFV-SER-0596; 4-MFV-SER-0601; 4-MFV-SER-0613–15; 4-MFV-SER-0626–27; 4-MFV-SER-0641–42; 4-MFV-SER-0753; 5-MFV-SER-0928; 5-MFV-SER-1045. But, in any event, because existing requirements are sufficient for recorders to confirm identity, "additional requirements that confirm identity are not material to determining whether the applicant … is qualified." *LUPE*, 2023 WL 8263348, at *18; *cf. Martin*, 347 F. Supp. 3d at 1308–09.

Appellants' arguments to the contrary once more run headlong into the record (or simply miss the point). The AG first claims that the U.S. State Department—a federal agency—uses birthplace to determine identity. *See* AG Br.49–0. But that says *nothing* about whether *state and county officials in Arizona* can use such information, as the district court recognized. *See* 1-ER-0027 n.20. The AG cites nothing suggesting they can, and testimony from election officials confirms they have no reliable means of confirming such information. 4-MFV-SER-0601–02; 4-MFV-SER-0627–28; 4-MFV-SER-0753. The AG next claims that at least nine other states besides Arizona "*ask* for birth place information on voter registration forms." AG Br.50 (emphasis added). That point is irrelevant—the AG does not claim that any other state *rejects* applications that omit birthplace—the issue in contention here. There is no dispute that Arizona may *ask* applicants for their birthplace, as it long

40

has. But the Materiality Provision forbids them from *rejecting* an applicant who does not supply it, even where their qualifications are otherwise established. If anything, the fact that a few states make providing birthplace optional—while most do not request it all—is only further evidence that such information is immaterial in determining qualification to vote. *See Martin*, 347 F. Supp. 3d at 1309; *cf. Ford*, 2006 WL 8435145, at *10. As the record stands, Arizona is the *only* state in the nation where registrars must *reject* voter registration forms that do not include birthplace.[14]

Next, the AG argues that Arizona is entitled to presume that the omission of birthplace is intentional. AG Br.51. That argument is nonsensical and, if accepted, would turn the Materiality Provision on its head. Under such logic, any "omission on any record or paper relating to any application," 52 U.S.C. §10101(a)(2)(B), would *ipso facto* be presumed "intentional" and thus apparently "material"— precisely what the law was intended to avoid. Such an argument also cannot be squared with the record, which shows that roughly a third of current Arizona voters did not provide birthplace. The AG points to *no evidence* that there are any doubts about the identity of *any* of these 1.5 million voters. Nor could she: as the district

---

[14] The AG argued at summary judgment that a small number of these states *do* require birthplace information, but later abandoned the argument after Plaintiffs pointed to contrary authority. *See* 2-MFV-SER-0274 n.7 (explaining AG "no longer relies on [that claim] for the present motion").

court found, based on the repeated testimony of Arizona's election officials, those officials are well-able to confirm identity through DPOC or HAVA Checks and have absolutely no need (or even use) for birthplace. 4-MFV-SER-0601.

The AG's remaining arguments are irrelevant. *See* AG Br.52–54. They concern whether birthplace can be used for administrative purposes, such as figuring out if an applicant is a new or existing voter. But such an administrative use— whether as a security question or to de-duplicate registrations—has no bearing on "whether such individual is qualified under State law to vote," and thus cannot justify rejecting an application. 52 U.S.C. §10101(a)(2)(B); *see also LUPE*, 2023 WL 8263348, at *18. Under such a theory, states could require a host of trivial information—eye color, height, or ancestry—on the basis it might later help confirm whether an applicant is a new or existing voter. The purpose of the Materiality Provision is to protect against rejecting applicants for failing to disclose such inconsequential information. *See Schwier*, 340 F.3d at 1294.

The AG resorts to noting that one country recorder designee finds birthplace "helpful" for "her office's election functions." AG Br.33. But the fact that something is "helpful" for administrative tasks does not make it material for determining qualification, and thus a valid basis for rejecting an application. *See* 1-ER-0076. The same witness confirmed that using birthplace for record maintenance "wouldn't be using birthplace to determine that voter's eligibility to vote." 4-MFV-SER-0610–11.

She further agreed that her "office does not use birthplace information to verify a voter's identity to determine their eligibility." 4-MFV-SER-0600–01. And she further testified that birthplace is not actually necessary for *any* of the administrative tasks the AG points to. *E.g.*, 4-MFV-SER-0600 (recorders do not use birthplace to determine whether an applicant has existing registration); 4-MFV-SER-0610 (birthplace not necessary for recorder to review ballot-by-mail request form); 4-MFV-SER-0613–14 (birthplace not necessary to remove deceased registrant from rolls); 4-MFV-SER-0614–15 (birthplace not necessary to use birth certificate as DPOC where applicant has changed last name). Even if these tasks did concern determining qualification, the mere fact that information is "helpful but not essential to determining whether an individual was qualified to vote" means "its absence cannot justify disenfranchisement under [the Materiality Provision]." *Ford*, 2006 WL 8435145, at *10.

Finally, the AG misconstrues the import of Dr. Hersh's testimony, claiming he identified several pairs of voter records where birthplace distinguished voters with otherwise identical names, birthdates, and ID numbers. AG Br.53. Those examples represent an infinitesimally small share of Arizona's 4.7 million records—less than one ten-thousandth of a percent. And as Dr. Hersh explained, they are almost surely the result of data errors. 4-MFV-SER-0669–70; 4-MFV-SER-0724–25. The AG does not meaningfully dispute that point, and the district court did not clearly error in

crediting Dr. Hersh's testimony that birthplace is not valuable for confirming identity. 1-ER-0028–29.

The Intervenors again add little argument. They suggest birthplace is useful in reviewing a U.S. passport when offered as DPOC. Int. Br.24. But testimony soundly rebuffs that claim. 4-MFV-SER-0607–08. Senior Director Petty testified that Maricopa County would accept a passport as DPOC *even if birthplace did not match*. *Id.* Conversely, she testified she would reject a passport as DPOC if birthplace was the only field that matched. *Id.* The point is clear: birthplace is immaterial.

### B. The citizenship checkbox is immaterial when an applicant provides "satisfactory evidence" of citizenship through DPOC.

The district court's holding that the citizenship checkbox is immaterial when an applicant provides DPOC should also be affirmed. No Arizona official challenges this ruling; Intervenors stand alone. But the cursory arguments raised in their one-page argument on this issue are quickly set aside. *See* Int. Br.22–23.

The logic in the district court's ruling is clear: failing to complete the checkbox is, by definition, immaterial when an applicant provides DPOC because DPOC is "satisfactory evidence" of citizenship. 1-ER-0139–42. To hold otherwise would lead to the outlandish result of requiring county recorders to reject an applicant—with "satisfactory evidence" of citizenship in hand—because the checkbox is incomplete. *Id.* Intervenors have no response to that simple point.

To resist this logic, Intervenors insist failure to complete the checkbox is "of consequence" and thus material. Int. Br.22–23. Yet nowhere do Intervenors explain what "consequence" should ensue from an incomplete checkbox when the applicant *proves* citizenship as a matter of Arizona law. The evidence from actual Arizona election officials shows that "[t]he checkbox is immaterial" when "an applicant provides DPOC, or DPOC can be acquired based on the provided information." 5-MFV-SER-0892.

Intervenors resort to claiming that States may request "redundant" information from applicants at their leisure. Int. Br.23. But Congress enacted the Materiality Provision to stamp out that very practice, which serves only to arbitrarily reject applicants. Courts have also overwhelmingly rejected the theory that states may lard duplicative requests for information on voters. *E.g.*, *LUPE*, 2023 WL 8263348, at *18; *Martin*, 347 F. Supp. 3d at 1308–09; *accord Schwier*, 340 F.3d at 1294.

The cases Intervenors cite in support of their "redundancy" argument do not help them. In *Diaz v. Cobb*, the district court held it did not violate the Materiality Provision for Florida to require applicants to check boxes indicating that they were not felons and had not been adjudged mentally incapacitated, while also signing an oath generally affirming that they are "qualified to register as an elector under the Constitution and laws of the State of Florida." 435 F. Supp. 2d 1206, 1211 (S.D. Fla.

2006). The court concluded these requirements were *not* duplicative, stressing "that the oath" does not "encompass[] the *information* conveyed by the check-boxes." *Id.* at 1212. Whereas the "check-boxes contain specific affirmations of specific qualifications, [] the oath contains a general affirmation of eligibility." *Id.* The checkboxes were material precisely because they were "not duplicative of signing the oath." *Id.* at 1213. *Diaz* thus *rejects* Intervenors' novel legal theory.

This case is the inverse of *Diaz*: DPOC provides exactly the same "information conveyed by the [citizenship] check-box." *Id.* at 1212. The State Form reflects that both speak to the same "specific qualification[]"—U.S. citizenship. *See* 5-MFV-SER-0849–51 (asking for "proof of citizenship" for DPOC and "Are you a citizen of the United States of America?" in the checkbox). Unlike in *Diaz*, the purpose of each requirement is unambiguously to establish U.S. citizenship.[15]

Intervenors' reliance on *League of Women Voters of Arkansas v. Thurston*, No. 5:20-cv-05174, 2023 WL 6446015, at *17 (W.D. Ark. Sept. 29, 2023), is equally infirm. *Thurston* concerned "an Arkansas law which forbids counting an absentee

---

[15] *Diaz* went on to consider in dicta "whether a material question becomes immaterial due solely to its repetition." 435 F. Supp. 2d at 1213. But it specifically left "aside" the issue here: whether the Materiality Provision permits rejection where "an applicant[] fail[s] to re-answer a question that is asked twice in the same way." *Id.* Instead, it explained that, in the case before it, "the information conveyed by check-boxes and the oath is not the same," thus excusing any theoretical overlap. *Id.* Intervenors do not argue that DPOC and the citizenship checkbox "convey[]" different information here. Nor could they—both expressly speak to the "same" issue of whether an applicant is a U.S. citizen. *See* 5-MFV-SER-0849.

ballot if the enclosed name, address, birthdate, and signature of the voter do not match those provided on the voter's absentee ballot application." *Id.* at *1. The court held "in the context of absentee ballots" that requiring this information "at multiple points in the voting process" did not offend the Materiality Provision. *Id.* at *17. It reasoned that states "may permissibly require voters to reassert their qualifications at multiple stages in the absentee voting process" to confirm their identity at each stage. *Id.* This case is different in an obvious and key respect: HB2492 requires applicants to repeatedly show citizenship at the same "stage"—registration. Regardless of its merits—which Plaintiffs do not concede—the rationale in *Thurston* is simply irrelevant here.

At bottom, Intervenors fail to cite any authority for the idea that a state may reject an applicant for not serially confirming what she has already proven with "satisfactory evidence" at the exact same stage of registration. Nor do they even try to map the checkbox onto their hodgepodge set of definitions for "materiality." The district court correctly concluded their theory "makes little sense." 1-ER-0142.

### C.    Appellants' remaining arguments misread the Civil Rights Act.

Appellants advance several additional legal arguments that do not directly bear on the straightforward question of whether the challenged requirements are "material in determining" voter qualifications. None find support in the text of the Materiality Provision.

### 1. The Court should decline to adopt the AG's proposed modifications to the Materiality Provision.

The AG suggests several caveats to graft onto the text of the Materiality Provision. *See* AG Br.43–45. These include claims that (1) courts must give "weight" to state legislative judgments about materiality; (2) historical practice can support a finding of materiality; and (3) states may presume that omissions are intentional so long as they offer the right to cure. The Court should decline to adopt these atextual revisions to the Civil Rights Act.

*1.* The AG contends that federal courts "should give weight to State legislative judgments" about materiality. AG Br.43. But nothing in the text of the Materiality Provision calls for "weigh[ing]" the state's judgment relative to other interests. Its text is categorical: state officials may *not* "deny the right of any individual to vote . . . because of an [immaterial] error or omission" on a registration form. 52 U.S.C. §10101(a)(2)(B). A requirement does not become material based on the legislature's say-so, particularly in the face of uniformly contrary testimony from election officials. Such a rule would eviscerate the Materiality Provision, permitting states to enforce immaterial requirements merely by encoding them in statute. *See LUPE*, 2023 WL 8263348, at *14, 18. The AG also offers no guidance about *how* courts should "weigh" this judgment—it merely requests a thumb on the scale.

Equally infirm is the AG's related suggestion that the Materiality Provision accounts for the legislature's "justification for [a rule]," including with respect to

48

concerns about "voter integrity." AG Br.43 (quoting *Vote.Org v. Callanen*, 89 F.4th 459, 485 (5th Cir. 2023)). The Materiality Provision prohibits rejecting paperwork requisite to voting for *any* immaterial error or omission; "the plain language of the statute itself says nothing about [legislative] intent." *Vote.org v. Ga. State Election Bd.*, 661 F. Supp. 3d 1329, 1341 (N.D. Ga. 2023). Numerous courts have recognized the same. *E.g.*, *Migliori*, 36 F.4th at 163 ("[W]hatever sort of fraud deterrence or prevention [a] requirement may serve," it is irrelevant under Materiality Provision if it is not material to determining voter qualifications); *Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) (holding preventing "fraud" did not render mandatory disclosure of social security number "material"); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1270–71 (W.D. Wash. 2006) (similar); *LUPE*, 2023 WL 8263348, at *18 (similar).

The AG derives her contrary rule exclusively from a divided panel of the Fifth Circuit, two members of which concluded some amount of "weight" must be given to legislative judgment about election rules. *See Callanen*, 89 F.4th at 480–85. But as the dissent there observed, the majority imported this principle into the Civil Rights Act by "invok[ing] a line of constitutional vote-denial cases." *Id.* at 491 (Higgenson, J., dissenting). Such *constitutional* cases—which typically turn on the *Anderson-Burdick* balancing standard—"involve[] a different analytical framework than what we use for [statutory] claims." *Id.* at 492 (quoting *Veasey v. Abbott*, 830

49

F.3d 216, 249 (5th Cir. 2016) (en banc)). Any deference afforded legislatures under that separate constitutional framework "has no place in a materiality analysis." *Id.*

Similarly, the *Callanen* majority erroneously injected "the multifactorial test in *Thornburg v. Gingles*—which applies to section 2 claims under the Voting Rights Act—in its materiality analysis." *Id.* (citing 478 U.S. 30 (1986)). But "reliance on the *Gingles* factors is inapposite in the materiality context" because plaintiffs bringing a claim under the Civil Rights Act "need only demonstrate that the state's procedural requirement 'is not material in determining whether' they are 'qualified' to vote." *Id.* (quoting 52 U.S.C. §10101(a)(2)(B)). Without any reference to the Materiality Provision's text, the majority transplanted considerations from constitutional and Voting Rights Act cases into the Civil Rights Act. This Court should decline to repeat that error.

**2.** The AG next says courts must consider whether "other decision makers have sought the same kind of information for similar decisions, either contemporaneously or historically." AG Br.44. But—by sheer coincidence—the converse does not hold under the AG's invented rule: "If a State decides to be the first State to start seeking certain information on a voter registration form, that does not necessarily mean the information is immaterial." *Id.*

This so-called rule is baseless and irrelevant. It is baseless because it finds no support in the statute's text or history. And it is irrelevant because the AG points to

no widespread practice—contemporaneous or historic—of states *requiring* birthplace to register voters. So far as the record shows, Arizona stands alone in this regard. As the district court reasoned, and as other courts have held, the fact that many other "decisionmakers" have no need for birthplace to determine a voter's eligibility supports affirmance. *See* 1-ER-0077; *see also supra* pp. 34–35.

Against this authority, the AG cites a single flawed district court decision currently subject to appeal. AG Br.44 (citing *Vote.org v. Byrd*, 700 F. Supp. 3d 1047 (N.D. Fla.), *appeal docketed* No. 23-13727 (11th Cir. Nov. 13, 2023)). *Byrd* concluded that a Florida requirement for handwritten signatures on a registration form—as compared to electronic or digital signatures—was material because "everyone has encountered" such a requirement. *Byrd*, 700 F. Supp. 3d at 1056. But *Byrd* failed to consider whether or how Florida officials even could use a requirement for handwritten signatures to determine eligibility—the core factual inquiry under the Materiality Provision.

**3.**     Lastly, the AG asserts election officials should be permitted to simply assume an omission is purposeful, at least so long as they offer an opportunity to cure the omission. AG Br.44–48. As explained above, the Materiality Provision calls for no such presumption. *See supra* pp. 41–42. And the AG's lengthy set of hypotheticals misses the point: officials are not required to register applicants who

omit *material* information, such as their age or address. *See* AG Br.44–45 (proposing a series of hypotheticals about an applicant who omits address).

*Florida State Conference of NAACP v. Browning* does not help the AG here. *See* 522 F.3d 1153, 1174–75 (11th Cir. 2008). Plaintiffs there challenged a requirement to provide certain ID numbers as immaterial, but that claim failed because federal law made such "information automatically material." *Id.* Plaintiffs insisted that a *typo* inputting such material information would nevertheless be an immaterial error, but the court explained the question in that situation was appropriately whether the "information contained *in the error*" is material, assuming that it is "*true and correct*." *Id.* (first emphasis added). In contrast, birthplace is not material in determining a voter's qualifications to begin with; thus, an error or omission in the birthplace field does not implicate the same concerns as when a typo renders information that election officials *actually require and use* inaccurate or unreliable for that purpose. There is no dispute that county recorders accept erroneous birthplace information and for decades registered millions of Arizona voters without it, illustrating that the information conveyed by the requirement is entirely *irrelevant* to registering voters. 4-MFV-SER-0620–21; 4-MFV-SER-0623–25; 4-MFV-SER-0656–58; 4-MFV-SER-0597–98. Accordingly, the *Browning* court's observation is an ill-fit to this case. And as the district court explained in its

summary judgment order, the standard in *Browning* "makes little sense" as applied to State Form applicants when the "applicant includes DPOC." 1-ER-0142.

Further flawed is the AG's suggestion that states may demand immaterial information from applicants so long as they give them the right to cure later. The Civil Rights Act forecloses this argument. It defines the term "vote" to "include[]all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting[.]" 52 U.S.C. §10101(e). A state therefore "den[ies] the right of any individual to vote" when they deny a registration application for an immaterial error or omission. *Id.* §10101(a)(2)(B). Every court addressing this issue has recognized the same. *E.g.*, *Ga. State Election Bd.*, 661 F. Supp. 3d at 1339 (explaining "the opportunity to cure an error" does not "rehabilitate[] any potential violation of the Materiality Provision"); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282 (N.D. Ga. 2021) (same); *LUPE*, 2023 WL 8263348, at *22 (same). The AG's only contravening authority is a motions panel decision that was "set aside" by the merits panel on this exact point. *Callanen*, 89 F.4th at 487. While the panel majority agreed to leave the issue "for a later case," it cast "doubt" that the opportunity to cure remedied a Materiality Provision violation. *Id.* at 487. The dissent stated plainly (and correctly) "that a chance to cure rejected applications does not render an immaterial provision material." *Id.* at 491 (Higginson, J., dissenting).

### 2. Intervenors' forfeited argument that the Materiality Provision may not preempt state laws is wrong.

Finally, Intervenors contend that the Materiality Provision cannot preempt *any* state registration requirement—no matter how egregious or immaterial—so long as it is embedded in statute. *See* Int. Br.26–29. They say the provision applies only to rogue state officials who act arbitrarily. *Id.* at 28. This argument is clearly forfeited and badly wrong.

It is forfeited because no party—including Intervenors—ever raised this argument below; it appears for the first time in Intervenors' brief here. *See* 3-MFV-SER-0442–64; 3-MFV-SER-0420–441; 1-MFV-SER-0002–218. "Generally, arguments not raised in the district court will not be considered for the first time on appeal." *In re Mortg. Elec. Registration Sys., Inc.*, 754 F.3d 772, 780 (9th Cir. 2014) (collecting authority). Intervenors offer "no reason to depart from [that] general practice here." *Id.*

The Court should reject the argument in any event. Start with the text of the Civil Rights Act, which Intervenors ignore. The very first subsection states:

> All citizens of the United States who are otherwise qualified by law to vote . . . shall be entitled and allowed to vote at all such elections . . . *any constitution, law,* custom, usage, *or regulation* of any State or Territory, *or by or under its authority*, to the contrary notwithstanding.

52 U.S.C. §10101(a)(1) (emphases added). Congress made plain that the Civil Rights Act preempts any state constitution, law, regulation, or authority that

contravenes its guarantees. The Materiality Provision confirms the same. It provides that "[n]o person acting under color of law" shall deny the right to vote. *Id.* §10101(a)(2). On its face, and particularly in conjunction with §10101(a)(1), such language reaches state legislation. *Cf. Chrisman v. Sisters of St. Joseph of Peace*, 506 F.2d 308, 313 (9th Cir. 1974) (explaining that acting "under color of law" includes "pursuant" to "a State law [or] statute").

Intervenors contend that many of the examples motivating Congress to pass the Materiality Provision concerned individual registrars, rather than statewide laws. Int. Br.27–28. But "legislative history can never defeat unambiguous statutory text." *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020). And the legislative history also shows Congress intended to prohibit disenfranchisement of any sort, state-sanctioned or otherwise. *See Hearings on S. 1731 and S. 1750 Before the S. Comm. on the Judiciary*, 88th Cong. 98 (1963)

None of Appellants' authority supports their radical position. Most puzzling is their citation to *Browning*, which expressly rejects their theory: "The text of the resulting statute, and not the historically motivating examples of intentional and overt racial discrimination, is [] the appropriate starting point of inquiry in discerning congressional intent." 522 F.3d at 1173 (explaining that "in combating specific evils [Congress] might choose a broader remedy"). The Fifth Circuit also "reject[ed] that States may circumvent the Materiality Provision by defining all manner of

requirements, no matter how trivial, as being a qualification to vote and therefore 'material.'" *Callanen*, 89 F.4th at 487. As other courts have observed, Intervenors' theory would "erase the Materiality Provision from existence." *See LUPE*, 2023 WL 8263348, at \*14. Not one of Intervenors' remaining cases even addresses, never mind endorses, their radical attack on civil rights laws.

## CONCLUSION

The Court should affirm the district court's final judgment permanently enjoining the Birthplace Requirement and Checkbox Requirement.[16]

Date: August 13, 2024                     Respectfully Submitted,

                                          ELISABETH C. FROST
                                          Elias Law Group LLP

                                          /s/*Elisabeth C. Frost*
                                          ELISABETH C. FROST
                                          CHRISTOPHER D. DODGE
                                          QIZHOU GE
                                          Elias Law Group LLP
                                          250 Massachusetts Avenue NW,
                                          Suite 400
                                          Washington, D.C. 20001
                                          efrost@elias.law
                                          (202) 968-4490

                                          ROY HERRERA
                                          DANIEL A. ARELLANO

---

[16] The Mi Familia Vota Plaintiffs join §I of the DNC/Equity Plaintiffs' Brief, as well as §§ I-II, III (as applied to DPOC), and IV.A of the LUCHA Plaintiffs' Brief.

JILLIAN L. ANDREWS
Herrera Arellano LLP
1001 N. Central Ave, Ste. 404
Phoenix, Arizona 85004
roy@ha-firm.com
(602) 567-4820

*Counsel for the Mi Familia Vota
Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that according to the word count feature of the word processing program used to prepare this brief, this brief contains 12,997 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rules 27(d)(2)(A) and 32(c), and Circuit Rule 27-3.

 s/*Elisabeth C. Frost*
Elisabeth C. Frost