No. 24-3188 (consolidated with Nos. 24-3559 and 24-4029)

# In the United States Court of Appeals for the Ninth Circuit

MI FAMILIA VOTA, *et al.*,

*Plaintiffs-Appellees*,

v.

ADRIAN FONTES, *et al.*,

*Defendants-Appellees*,

WARREN PETERSEN, *et al.*,

*Intervenor-Defendants-Appellants*.

*On Appeal from the United States District Court
for the District of Arizona*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
Anna K. Jessurun
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICUS CURIAE*........................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ........................................................................................

    I.     The Fifteenth Amendment Created an Expansive Prohibition on All
         Racial Discrimination in Voting............................................................ 6

    II.    The Text and History of the Civil Rights Act of 1964 Sweeps
         Broadly to Prohibit Arbitrary Denials of the Right to Vote ................ 12

    III.   The Birthplace Requirement Violates the Materiality Provision ........ 18

CONCLUSION .................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Allen v. Milligan*,
  599 U.S. 1 (2023) ............................................................ 12

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ........................................................ 23

*Animal Legal Def. Fund v. U.S. Dep't of Agric.*,
  933 F.3d 1088 (9th Cir. 2019) ........................................ 19

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021) .................................................... 13, 23

*Cal. All. of Child & Family Servs. v. Allenby*,
  589 F.3d 1017 (9th Cir. 2009) ........................................ 19

*City of Rome v. United States*,
  446 U.S. 156 (1980) ........................................................ 10

*CVS Health Corp. v. Vividus, LLC*,
  878 F.3d 703 (9th Cir. 2017) .......................................... 19

*FCC v. AT&T, Inc.*,
  562 U.S. 397 (2011) ........................................................ 19

*Fla. State Conf. of NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ...................................... 24

*Fli-Lo Falcon, LLC v. Amazon.com, Inc.*,
  97 F.4th 1190 (9th Cir. 2024) ........................................ 18

*Kungys v. United States*,
  485 U.S. 759 (1988) ........................................................ 26

*Lane v. Wilson*,
  307 U.S. 268 (1939) .......................................................... 6

# TABLE OF AUTHORITIES — cont'd

**Page(s)**

*McCulloch v. Maryland*,
 17 U.S. (4 Wheat.) 316 (1819) .............................................................. 10

*Migliori v. Cohen*,
 36 F.4th 153 (3d Cir. 2022) ................................................................... 26

*Nev. Dep't of Hum. Res. v. Hibbs*,
 538 U.S. 721 (2003)................................................................................ 16

*Perrin v. United States*,
 444 U.S. 37 (1979).................................................................................. 5

*Reno v. Bossier Par. Sch. Bd.*,
 528 U.S. 320 (2000)................................................................................ 7

*Rice v. Cayetano*,
 528 U.S. 495 (2000)................................................................................ 6, 7

*Ritter v. Migliori*,
 143 S. Ct. 297 (2022).............................................................................. 26

*Ross v. Blake*,
 578 U.S. 632 (2016)................................................................................ 18

*South Carolina v. Katzenbach*,
 383 U.S. 301 (1966)................................................................................ 8, 10, 13

*United States ex rel. Hartpence v. Kinetic Concepts, Inc.*,
 792 F.3d 1121 (9th Cir. 2015) .............................................................. 19

*Vote.org v. Callanen*,
 89 F.4th 459 (5th Cir. 2023) ................................................ 2, 16, 17, 21, 23, 25

*Weinstock v. United States*,
 231 F.2d 699 (D.C. Cir. 1956)............................................................... 20

*Wesberry v. Sanders*,
 376 U.S. 1 (1964)................................................................................... 7

# TABLE OF AUTHORITIES — cont'd

**Page(s)**

*Wis. Cent. Ltd. v. United States*,
　585 U.S. 274 (2018) .............................................................. 5

*Yick Wo v. Hopkins*,
　118 U.S. 356 (1886) .............................................................. 7


<u>LEGISLATIVE AND CONSTITUTIONAL MATERIALS</u>

Ariz. Rev. Stat. Ann. § 16-121.01 (2024) .................................. 2

Civil Rights '63: 1963 Report of the United States Commission on Civil
　Rights (1963) ...................................................................... 15

Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634 ..................... 13

Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 86 ........................ 14

Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241 ...................... 2

Cong. Globe, 39th Cong., 1st Sess. (1866) ................................... 7

Cong. Globe, 40th Cong., 3d Sess. (1869) .................................. 7, 8, 9

Cong. Globe, 41st Cong., 2d Sess. (1870) ........................... 4, 10, 11, 12

Cong. Globe, 42d Cong., 2d Sess. (1872) .................................... 8

2 Cong. Rec. (1874) ............................................................ 11

110 Cong. Rec. (1964) ...................................... 12, 16, 17, 18, 22, 24

H.R. Rep. No. 88-914 (1963) ............................................... 15, 18

Report of the U.S. Commission on Civil Rights, 1959 (1959) .................. 13, 14, 15

52 U.S.C. § 10101(a)(2)(B) .............................. 2, 5, 18, 19, 21, 24

52 U.S.C. § 10101(e) ......................................................... 18

v

## TABLE OF AUTHORITIES — cont'd

**Page(s)**

52 U.S.C. § 10301(a) ..................................................................    23

U.S. Const. amend. XV..................................................................    6, 8, 9

Voting: 1961 United States Commission on Civil Rights Report (1961) ..    14, 15

## BOOKS, ARTICLES, AND OTHER AUTHORITIES

Vikram David Amar & Alan Brownstein, *The Hybrid Nature of Political Rights*, 50 Stan. L. Rev. 915 (1998) ......................................................    4

Jack M. Balkin, *The Reconstruction Power*, 85 N.Y.U. L. Rev. 1801 (2010) ..................................................................................................    10

Douglas Laycock, *Conceptual Gulfs in* City of Boerne v. Flores, 39 Wm. & Mary L. Rev. 743 (1998) ....................................................................    9

Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. & Mary L. Rev. 83 (2012) ....................................    20, 21

Michael W. McConnell, Comment, *Institutions and Interpretation: A Critique of* City of Boerne v. Flores, 111 Harv. L. Rev. 153 (1997) ....    9, 10

*The New Merriam-Webster Pocket Dictionary* (1964)................................    5, 19

John T. Noonan, Jr., *Narrowing the Nation's Power: The Supreme Court Sides with the States* (2002) ....................................................................    10

Official Journal of the Constitutional Convention of the State of Louisiana, 1898 (1898)..............................................................................    13

*The Oxford English Dictionary* (1961) .......................................................    5, 20

Michael Stokes Paulsen, *A Government of Adequate Powers*, 31 Harv. J.L. & Pub. Pol'y 991 (2008) ..........................................................................    10

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ................................................................................    19

## TABLE OF AUTHORITIES — cont'd

**Page(s)**

*Webster's New World Dictionary of the American Language* (1958)........ 19

*Webster's Seventh New Collegiate Dictionary* (1963) .............................. 20

*The World Book Encyclopedia Dictionary* (1963) .................................... 20

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus* Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to preserve the rights, freedoms, and structural safeguards that our nation's charter guarantees. CAC has a strong interest in the scope of the Fifteenth Amendment's protections, Congress's power to enforce those protections, and the Civil Rights Act of 1964 and accordingly has an interest in this case.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

In 1964, Congress was faced, yet again, with continued state resistance to the Fifteenth Amendment's promise of a multiracial democracy. Congress's previous attempts to enforce federal civil rights laws against the states and safeguard the voting rights of Black people had failed. Slow-paced litigation targeting deprivations of the right to vote could not keep up with the novel tactics state and local officials employed to disenfranchise Black voters. Congress

---

[1] *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission. State Appellants and RNC and Legislative Appellants consent to the filing of this brief. Several Plaintiff-Appellees consent, but others did not respond as of the time of this filing. Defendant-Appellee Adrian Fontes took no position.

1

understood that to curb states' persistent efforts to evade the Fifteenth Amendment it would need to address these voter suppression methods head on.

The Civil Rights Act of 1964 did just that by barring states from using arbitrary hurdles to deny Black citizens access to the ballot box. Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241 ("Civil Rights Act" or the "Act"). Critical to achieving the Act's goals was its Materiality Provision, *see Vote.org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023), which prohibits states from denying the "right to . . . vote" due to "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified . . . to vote," 52 U.S.C. § 10101(a)(2)(B). Simply put, so long as any error or omission in election paperwork is immaterial to determining whether the voter is, in fact, qualified to vote, that error or omission cannot be grounds for prohibiting the voter from voting.

Starting in 1979, Arizona asked, but did not require, prospective voters to include their birthplace on voter registration forms. 1-ER-27.[2] In 2022, however, Arizona passed House Bill 2492 and made completing the birthplace field mandatory ("Birthplace Requirement"). 1-ER-11 (citing Ariz. Rev. Stat. Ann.

---

[2] "__-ER-__" refers to the volume and page numbers of the RNC and Legislative Appellants' Excerpts of Record.

2

§ 16-121.01(A) (2024)).  If a voter does not include her birthplace on a form, then she will not be registered to vote.  1-ER-11.  Plaintiffs challenged the Birthplace Requirement and, following a ten-day trial, the district court held that it violates the Materiality Provision because "an individual's birthplace is not material to determining her eligibility to vote."  1-ER-76-77.

Appellants disagree.  Arizona and its attorney general ("State Appellants") argue, among other things, that the district court erred in concluding that "an individual's birthplace is not material to determining her eligibility to vote" because, they say, the court did not give sufficient "weight" to the state's justifications for the Birthplace Requirement.  State Appellants Br. 43.  Separately, the Republican National Committee, Warren Petersen, and Ben Toma ("RNC and Legislative Appellants") claim that the Materiality Provision does not apply here because, they say, a state can make the Materiality Provision inapplicable to certain information requested from voters simply by making that information necessary to register to vote.  RNC & Legislative Appellants Br. 27.  These arguments are all at odds with the text and history of the Materiality Provision, and this Court should reject them.

Ratified in 1870, the Fifteenth Amendment gave Congress the "power of conferring upon the colored man the full enjoyment of his right" and "enable[d] Congress to take every step that might be necessary to secure the colored man in

3

the enjoyment of these rights." Cong. Globe, 41st Cong., 2d Sess. 3670 (1870).

Against the backdrop of a political system divided by race, the Framers of the

Fifteenth Amendment recognized that "the black populations in the South would

be under siege" and that "political influence and voting power would be their sole

means of defense." Vikram David Amar & Alan Brownstein, *The Hybrid Nature

of Political Rights*, 50 Stan. L. Rev. 915, 939 (1998). They drafted the Fifteenth

Amendment to give Congress broad power—no less sweeping than Congress's

Article I powers—to stamp out every conceivable attempt by the states to deny or

abridge the right to vote on account of race and to ensure "the colored man the full

enjoyment of his right." Cong. Globe, 41st Cong., 2d Sess. 3670 (1870).

Congress used this power to pass the Civil Rights Act. By 1964, Congress

had twice endeavored to enforce the Fifteenth Amendment's guarantee of voting

equality and ban on racial discrimination. State and local officials, however,

continued to use the discriminatory application of voting rules to deny Black

citizens the right to vote. The Act sought to stamp out these efforts once and for

all by targeting states' use of laws and policies that, although race-neutral on their

face, worked to disenfranchise voters.

The Materiality Provision addressed these practices by prohibiting states

from denying the "right . . . to vote" due to "an error or omission on any record or

paper relating to any application, registration, or other act requisite to voting, if

4

such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). In 1964, as today, "material" meant "highly important," *The New Merriam-Webster Pocket Dictionary* 308 (1964), and "[o]f serious or substantial import; of much consequence," 6 *The Oxford English Dictionary* 230 (1961); *cf. Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) (describing the "'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute'" (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Under the Provision, then, a state may not deny the right to vote because of an error or omission on a registration form if that error or omission is not important to the state's determination of that voter's qualifications.

In Arizona, U.S. citizens may register to vote, regardless of where they were born. That point bears repeating: in Arizona, an individual's place of birth is irrelevant to the question whether they are qualified to vote. As the district court explained it, in Arizona, "[c]ounty recorders do not use birthplace information to determine an applicant's eligibility to vote, nor do county recorders need birthplace to verify an applicant's identity." 1-ER-26. Because one's birthplace is not important to Arizona's determination of that voter's qualifications—and is, in fact,

not relevant at all—denying someone the right to vote for failing to fill out the

birthplace field on their voter registration form violates the Materiality Provision.

Appellants' arguments that this Court should rule otherwise and limit the

Materiality Provision's scope are not only at odds with the Provision's text and

history, they would also undermine Congress's ability to help realize the

Constitution's promise of voting equality. This Court should reject them and

affirm the judgment of the district court.

## ARGUMENT

### I.  The Fifteenth Amendment Created an Expansive Prohibition on All Racial Discrimination in Voting.

In language "as simple in command as it [is] comprehensive in reach," *Rice*

*v. Cayetano*, 528 U.S. 495, 512 (2000), the Fifteenth Amendment provides that

"[t]he right of citizens of the United States to vote shall not be denied or abridged

by the United States or by any State on account of race, color, or previous

condition of servitude."  U.S. Const. amend. XV, § 1.  "Fundamental in purpose

and effect . . . , the Amendment prohibits all provisions denying or abridging the

voting franchise of any citizen or class of citizens on the basis of race," *Rice*, 528

U.S. at 512, and "nullifies sophisticated as well as simple-minded modes of

discrimination," *Lane v. Wilson*, 307 U.S. 268, 275 (1939).

Recognizing that "[i]t is difficult by any language to provide against every

imaginary wrong or evil which may arise in the administration of the law of

suffrage in the several States," Cong. Globe, 40th Cong., 3d Sess. 725 (1869), the Framers of the Fifteenth Amendment chose sweeping language requiring "the equality of races at the most basic level of the democratic process, the exercise of the voting franchise," *Rice*, 528 U.S. at 512. The Fifteenth Amendment equally forbids laws that deny the right to vote outright on account of race and those that abridge the right by diluting the voting strength of citizens of color and nullifying the effectiveness of their votes. *See Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 333-34 (2000).

A constitutional prohibition on state denial and abridgement of the right to vote on account of race was necessary because "[t]he ballot is as much the bulwark of liberty to the black man as it is to the white," Cong. Globe, 40th Cong., 3d Sess. 983 (1869), and because "[n]o man is safe in his person or his property in a community where he has no voice in the protection of either," *id.* at 693. The right to vote, the Framers of the Fifteenth Amendment understood, was "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined."). In this respect, the Framers viewed the right to vote as "kindred to that which belongs under natural law to the right of self-defense." Cong. Globe, 39th Cong., 1st Sess. 174 (1866). The Fifteenth Amendment thus

7

gave Black citizens a critical weapon to protect themselves from white-dominated legislatures seeking to roll back their rights.

To make the Fifteenth Amendment's guarantee a reality, the Framers explicitly invested Congress with a central role in protecting the right to vote against all forms of racial discrimination. They did so by providing that "Congress shall have power to enforce this article by appropriate legislation." U.S. Const. amend. XV, § 2. This Enforcement Clause gives Congress a broad "affirmative power" to secure the right to vote, Cong. Globe, 40th Cong., 3d Sess. 727 (1869); *see id.* at 1625 ("Congress . . . under the second clause of this amendment" has the power to "impart by direct congressional legislation to the colored man his right to vote. No one can dispute this."), and makes clear that "Congress was to be chiefly responsible for implementing the rights created" by the Amendment and that Congress would have "full remedial powers to effectuate the constitutional prohibition against racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 326 (1966). As the Framers of the Fifteenth Amendment recognized, "the remedy for the violation" of the Fifteenth Amendment, like the remedies for the violation of the other Reconstruction Amendments, "was expressly not left to the courts. The remedy was legislative, because . . . the amendment itself provided that it shall be enforced by legislation on the part of Congress." Cong. Globe, 42d Cong., 2d Sess. 525 (1872).

8

The enforcement power "was born of the conviction that Congress—no less than the courts—has the duty and the authority to interpret the Constitution." Michael W. McConnell, Comment, *Institutions and Interpretation: A Critique of City of Boerne v. Flores*, 111 Harv. L. Rev. 153, 183 (1997). And Congress refused to leave the right to vote "to the unchecked discretion of the Supreme Court that decided *Dred Scott v. Sandford*," Douglas Laycock, *Conceptual Gulfs in City of Boerne v. Flores*, 39 Wm. & Mary L. Rev. 743, 765 (1998), fearing that without a broad enforcement power the constitutional guarantee of equal voting rights would not be fully realized. "Who is to stand as the champion of the individual and enforce the guarantees of the Constitution in his behalf as against the so-called sovereignty of the States? Clearly no power but that of the central Government is or can be competent for their adjustment . . . ." Cong. Globe, 40th Cong., 3d Sess. 984 (1869).

The Fifteenth Amendment's express grant of power to enact "appropriate legislation" gives Congress wide discretion to enact whatever measures it deems "appropriate" for achieving the Amendment's objective of ensuring that "[t]he right of citizens of the United States to vote shall not be denied or abridged . . . by any State on account of race." U.S. Const. amend. XV. By authorizing Congress to enact "appropriate legislation," the Framers granted Congress the sweeping authority of Article I's "necessary and proper" powers as interpreted by the

Supreme Court in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), a seminal case well known to the Reconstruction Framers. *See, e.g.*, John T. Noonan, Jr., *Narrowing the Nation's Power: The Supreme Court Sides with the States* 29-31 (2002); Jack M. Balkin, *The Reconstruction Power*, 85 N.Y.U. L. Rev. 1801, 1810-15 (2010); Michael Stokes Paulsen, *A Government of Adequate Powers*, 31 Harv. J.L. & Pub. Pol'y 991, 1002-03 (2008); McConnell, *supra*, at 188. As history shows, "Congress' authority under § 2 of the Fifteenth Amendment . . . [is] no less broad than its authority under the Necessary and Proper Clause." *City of Rome v. United States*, 446 U.S. 156, 175 (1980); *see Katzenbach*, 383 U.S. at 326 (*McCulloch*'s "classic formulation" provides "[t]he basic test to be applied in a case involving [Section] 2 of the Fifteenth Amendment").

In 1870, the same year the Fifteenth Amendment was ratified, Congress employed the Amendment's Enforcement Clause to enact voting rights legislation. The debates over that legislation underscore the Reconstruction Framers' understanding that the Fifteenth Amendment "clothe[d] Congress with all power to secure the end which it declares shall be accomplished." Cong. Globe, 41st Cong., 2d Sess. 3563 (1870). The Amendment's Enforcement Clause, Senator Oliver Morton explained, was "intended to give to Congress the power of conferring upon the colored man the full enjoyment of his right. We so understood it when we

10

passed it." *Id.* at 3670. "[T]he second section was put there," he went on, "for the purpose of enabling Congress to take every step that might be necessary to secure the colored man in the enjoyment of these rights." *Id.* Thus, "the colored man, so far as voting is concerned, shall be placed on the same level and footing with the white man and . . . Congress shall have the power to secure him that right." *Id.*; *see id.* at 3655 (the "intention and purpose" of the Fifteenth Amendment's Enforcement Clause was to "secure to the colored man by proper legislation the right to go to the polls and quietly and peacefully deposit his ballot there"); *id.* at 3663 ("Congress has a right by appropriate legislation to prevent any State from discriminating against a voter on account of his race . . . ."); *see also* 2 Cong. Rec. 4085 (1874) (the Enforcement Clause of the Fifteenth Amendment was added to allow Congress "to act affirmatively" and ensure that "the right to vote, should be enjoyed").

Recognizing that "[t]he States can invent just as many requirements [for voting] as you have fingers and toes," the Fifteenth Amendment's Framers understood that it was essential to provide "proper machinery . . . for enforcing the fifteenth amendment," including a broad legislative power to protect the right to vote against all forms of racial discrimination, in order to ensure "the colored man the full enjoyment of his right." Cong. Globe, 41st Cong., 2d Sess. 3658, 3670 (1870). Members of Congress insisted that "it is our imperative duty . . . to pass

11

suitable laws to enforce the fifteenth amendment" because, without them, "the fifteenth amendment will be practically disregarded in every community where there is a strong prejudice against negro voting." *Id.* at 3568. The only means to safeguard equal political opportunities and ensure the multiracial democracy the Fifteenth Amendment promised, they insisted, "are to be found in national legislation. This security cannot be obtained through State legislation," where "the laws are made by an oppressing race." *Id.* at app. 392. Stringent national safeguards were needed to "neutralize the deep-rooted prejudice of the white race there against the negro" and "secure his dearest privileges" at the ballot box. *Id.*

The Fifteenth Amendment thus gave Congress a significant new power. As the next Section shows, Congress used this power to pass the Civil Rights Act of 1964 and thereby prohibit practices that states used to disenfranchise Black voters.

## II. The Text and History of the Civil Rights Act of 1964 Sweeps Broadly to Prohibit Arbitrary Denials of the Right to Vote.

Tragically, "[i]n the century that followed" its ratification, the Fifteenth Amendment "proved little more than a parchment promise." *Allen v. Milligan*, 599 U.S. 1, 10 (2023). State and local officials employed "devious and wrongful methods" to flout the Fifteenth Amendment's guarantee of voting equality and deny Black citizens the right to vote. 110 Cong. Rec. 1631 (1964). Congress enacted the Civil Rights Act of 1964 "to eliminate consistent, determined abuses of law" and fulfill the Fifteenth Amendment's aspirations of a multiracial democracy

12

free from discrimination.  *Id.* at 5996.

Despite the Fifteenth Amendment's broad prohibition of racial discrimination in voting, states devised novel procedures "specifically designed to prevent [Black citizens] from voting," *Katzenbach*, 383 U.S. at 310, such as poll taxes, grandfather clauses, literacy tests, and white primaries, *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 655 (2021).  Proponents of these tactics were explicit about their desire to "evad[e] the clear intent of the Fifteenth Amendment."  Report of the U.S. Commission on Civil Rights, 1959, at 33 (1959) ("1959 Report").  As the President of the Louisiana Constitutional Convention explained in 1898 in support of enshrining these sorts of devices into the state's constitution, "Doesn't it let the white man vote, and doesn't it stop the Negro from voting, and isn't that what we came here for?"  *Id.* (quoting Official Journal of the Constitutional Convention of the State of Louisiana, 1898, at 380 (1898)).

States' persistent efforts to disenfranchise Black voters led Congress to enact the Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634 ("1957 Act"), which created the Commission on Civil Rights ("Commission"), *id.* § 101(a), 71 Stat. at 634, and authorized the Attorney General to seek injunctive relief against local officials who deprived citizens of their right to vote, *id.* § 131, 71 Stat. at 637.  But as the Commission noted two years later, the 1957 Act was not enough to protect Black voters from rampant discrimination.  State and local officials used various

13

tactics to evade federal enforcement of the 1957 Act. Officials, for example, prevented the Department of Justice and the Commission from accessing local registration records. 1959 Report, *supra*, at 133. Registrars would avoid liability in civil suits by resigning from their positions, resulting in the cases' dismissal because there were no defendants. *Id.* at 132.

Congress addressed these methods of evasion in the Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 86 ("1960 Act"). *See* § 301, 74 Stat. at 88 (requiring states to preserve voting records); *id.* § 601(b), 74 Stat. at 92 (authorizing the Attorney General to sue states in addition to registrars). The 1960 Act also gave the Attorney General additional tools to enforce the right to vote, such as seeking the appointment of voting referees, *see id.* § 601(a), 74 Stat. at 90, and in so doing, defined "vote" broadly as "all action necessary to make a vote effective," *id.* § 601(a), 74 Stat. at 91.

But state and local officials still eluded federal civil rights enforcement. In 1961, the Commission observed that "[t]he most prevalent form of discrimination . . . occurs in arbitrary registration procedures." 1 Voting: 1961 United States Commission on Civil Rights Report 133 (1961). Local officials would reject registration applicants or remove "voters from the rolls[] on grounds of minor technical errors in the completion of required forms." *Id.* at 137. While the Department of Justice could challenge these tactics under the Fifteenth

14

Amendment, "the very nature of the practices" made it difficult to prove that they involved racial discrimination. *Id.* at 138. The Commission recommended that Congress enact legislation to "prohibit any arbitrary action or . . . inaction, which deprives or threatens to deprive any person of the right to register, vote, and have that vote counted," *id.* at 141, but no action was taken that year.

By 1963, little had changed. *See* Civil Rights '63: 1963 Report of the United States Commission on Civil Rights 24 (1963) ("[S]o long as prejudiced registrars have access to a variety of discretionary registration criteria . . . they can practice discrimination in a variety of forms."). Indeed, in its 1959 report, the Commission had foreshadowed that discrimination would persist in the absence of new measures to eliminate it:

> [W]here there is will and opportunity to discriminate against potential voters, ways to discriminate will be found. . . . If any State were to pass a law forthrightly declaring colored citizens ineligible to vote, the Supreme Court would strike it down forthwith as in flagrant violation of the Fifteenth Amendment. The trouble, however, comes not from discriminatory laws, but from the discriminatory application and administration of apparently non-discriminatory laws.

1959 Report, *supra*, at 133.

Spurred by the Commission's reports on ongoing voting discrimination and abysmal registration numbers for Black voters and recognizing that "no right is more essential to citizenship than the right to vote," H.R. Rep. No. 88-914, pt. 2, at 2 (1963), Congress once again sought to strengthen federal civil rights protections

with the Civil Rights Act of 1964. *See* 110 Cong. Rec. 1600 ("To deny the right to vote to any American citizen on the basis of race, color, creed, or nationality is an act which is not only unconstitutional, but also inimical to the political well-being of our society."); *id.* at 1642 ("In a democracy the right to vote is fundamental."). Relying in part on its authority under the Fifteenth Amendment, Congress took action to end states' widespread and persistent resistance to Black citizens exercising their right to vote by passing "prophylactic legislation that proscribe[d] facially constitutional conduct in order to prevent and deter unconstitutional conduct." *Vote.org*, 89 F.4th at 486 (quoting *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 721-22 (2003)).

Congress was particularly concerned with the "specific practices by means of which voting officials have denied Negroes the right to register and vote." 110 Cong. Rec. 1642. As Senator Humphrey explained, the Act "is the result of an explicit investigation which revealed the incontrovertible fact that an effort is made to deny citizens of the United States the right to vote, through denying them the opportunity to register." *Id.* at 5996. Proponents of the Act detailed the many ways that state and local officials disenfranchised Black voters and the inability of current federal remedies to address those tactics. *See, e.g.*, *id.* at 6714-15 (describing several incidents of tests and rules working to deny Black voters the right to vote); *id.* at 6529 ("[P]resent procedures do not provide adequate remedies

16

for the loss of voting rights on account of race or color.").  Congress repeatedly

called the tactics it sought to outlaw "arbitrary," *id.* at 6555; "irrelevantly strict,"

*id.* at 6530; "determined abuses of the law," *id.* at 5996; "devious and wrongful,"

*id.* at 1631; and a "façade to mask acts of racial discrimination," *id.* at 1600.

The Civil Rights Act addressed these rampant discriminatory practices head

on.  Among other things, the Act mandated that state and local officials apply the

same standards to everyone when determining qualifications to vote and limited

the use of literacy tests.  *See* § 101(a), 78 Stat. at 241.

On top of that, the Act also targeted states' use of "trivial" mistakes to deny

the franchise by "broadly 'prohibiting the disqualification of an individual because

of immaterial errors or omissions.'"  *Vote.org*, 89 F.4th at 486 (quoting H.R. Rep.

No. 88-914, pt. 1, at 19 (1963)); *see also* 110 Cong. Rec. 1694 ("We provide in

[the Act] that immaterial errors in an application shall not be deemed fatal.").

Congress sought to address a common state practice of "ask[ing] questions that

have nothing to do with the applicant's qualifications to vote."  110 Cong. Rec.

6530.  When explaining what makes an error "not material," the Materiality

Provision's drafters described it as "errors [that] have no real bearing on the

question of whether or not the registrant is qualified to vote in any Federal

election."  *Id.* at 1642.  Other Congressmen equated immaterial errors to

17

"insignificant errors," *id.* at 6555, and "excuse[s] that [are] not germane to the point whether [a voter] is qualified" to vote, *id.* at 1547.

As the text and history of the Civil Rights Act make clear, the Act was one in a series of congressional attempts to target the ways in which state and local discrimination against Black voters persisted despite federal civil rights protections. The Materiality Provision and its accompanying protections were passed to "close many loopholes in existing laws," H.R. Rep. No. 88-914, pt. 2, at 5, and fulfill the promise of the Fifteenth Amendment almost a hundred years after its ratification.

## III. The Birthplace Requirement Violates the Materiality Provision.

The Materiality Provision prohibits state and local officials from denying any citizen the "right . . . to vote" due to any "error or omission" on "any record or paper relating to any . . . registration . . . if such error or omission is not material in determining whether such individual is qualified . . . to vote." 52 U.S.C. § 10101(a)(2)(B), (e). Here, because any "error or omission" with respect to birthplace is not material in determining whether an individual is qualified to vote under Arizona law, the Birthplace Requirement violates the Materiality Provision.

A. "Statutory interpretation . . . begins with the text[.]" *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1195 (9th Cir. 2024) (quoting *Ross v. Blake*, 578 U.S. 632, 638 (2016)). Courts must "look[] at the language of the statute to

18

determine whether it has a plain meaning." *CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703, 706 (9th Cir. 2017) (quoting *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1128 (9th Cir. 2015) (en banc)).

The Materiality Provision provides:

> No person acting under color of law shall deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election . . . .

52 U.S.C. § 10101(a)(2)(B).

The Civil Rights Act does not define "material." "When a statute does not define a term, [courts] typically give the phrase its ordinary meaning." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 933 F.3d 1088, 1093 (9th Cir. 2019) (internal quotation marks omitted) (quoting *FCC v. AT&T, Inc.*, 562 U.S. 397, 403 (2011)). "To determine the ordinary meaning of a word, 'consulting common dictionary definitions is the usual course.'" *Id.* (quoting *Cal. All. of Child & Family Servs. v. Allenby*, 589 F.3d 1017, 1021 (9th Cir. 2009)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012) ("Words must be given the meaning they had when the text was adopted.").

Contemporary dictionaries defined "material" as "essential," *Webster's New World Dictionary of the American Language* 335 (1958), "highly important," *The New Merriam-Webster Pocket Dictionary* 308 (1964), and "[o]f serious or

substantial import; of much consequence," 6 *The Oxford English Dictionary* 230

(1961); *see also Webster's Seventh New Collegiate Dictionary* 521 (1963)

("having real importance or great consequence"); 2 *The World Book Encyclopedia*

*Dictionary* 1196 (1963) ("that matters greatly; important").  Each of these

definitions denotes a level of importance that is greater than mere relevance or

relatedness.

These definitions of materiality are consistent with materiality standards in a

host of other contexts.  "[T]hat which is material has probative weight and

consequence for the decision in question, beyond mere relevance."  Justin Levitt,

*Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. &

Mary L. Rev. 83, 106 (2012).  Indeed, this understanding of materiality has been

deeply embedded in the law since well before the enactment of the Civil Rights

Act.  As the D.C. Circuit explained in a 1956 opinion, "'Material' when used in

respect to evidence is often confused with 'relevant', but the two terms have

wholly different meanings.  To be 'relevant' means to relate to the issue.  To be

'material' means to have probative weight, i.e., reasonably likely to influence the

tribunal in making a determination required to be made."  *Weinstock v. United*

*States*, 231 F.2d 699, 701 (D.C. Cir. 1956).  Under long settled law, then,

"materiality distinguishes actions or information that reasonably call a given

decision into substantial question from those that do not."  Levitt, *supra*, at 107.

In sum, under the Materiality Provision, an error or omission cannot be the basis of the denial of the right to vote if it is "not material"—that is, not probative or significant—in "determining whether such individual is qualified under State law to vote in such election."  52 U.S.C. § 10101(a)(2)(B).

**B.**  Looking beyond the Materiality Provision's plain text, State Appellants ask this Court to impose certain "principles" onto the term "material."  State Appellants Br. 42.  Specifically, State Appellants assert that when determining whether an error or omission is material this Court should "give weight" to the state's justification for imposing the requirement.  *See id.* at 43; *see also Vote.org*, 89 F.4th at 485 (adopting this approach).  According to State Appellants, states should "have some leeway in deciding whether information is significant enough that it is worth requiring on a state registration form."  State Appellants Br. 42. This is wrong.  Under the Materiality Provision, if an error or omission in election-related paperwork is not probative or important to determining a voter's qualifications to vote in the state, that is the end of the inquiry.  Whether the state might have some other legitimate interest in seeking the information is simply irrelevant.

Significantly, Congress enacted the Provision's prophylactic rule because it was deeply concerned about states' persistent efforts to deny Black citizens the right to vote through myriad mechanisms and inventive tactics.  *See* 110 Cong.

21

Rec. 1593 ("State and county officials have reached higher levels of ingenuity in devising techniques to stymie Negro registration."); *see also id.* at 1600 ("Of course, many of our Southern States put forth the following argument: 'We do not deny a person the right to vote because of his color.  Nay, all we seek to do is insure that only those who are qualified are allowed to vote.' . . .  Nevertheless, when we examine the actual practices of the southern counties and parishes, we see how the qualification criterion can serve as a façade to mask acts of racial discrimination.").  Given that the Materiality Provision was adopted to address concern about state abuses of election machinery, it would make no sense to "give weight" to state judgments about whether omissions or errors in paperwork are indeed material.  Instead, the Materiality Provision empowers courts to determine whether any such errors are material, and if they are not, to prohibit states from denying the franchise on such grounds.  *See id.* at 1547 ("the Federal judge of the district in which the case is filed . . . has the right to make the determination of whether or not this is a material error or whether it is immaterial").

In *Vote.org*, the Fifth Circuit concluded otherwise only by improperly relying on jurisprudence under Section 2 of the Voting Rights Act and the First and Fourteenth Amendments.  *See* 89 F.4th at 480-81; *id.* at 482-84.  But the standards courts use under those provisions should have no bearing on how courts apply the Materiality Provision.  In applying Section 2's prohibition on state practices that

22

result in the denial or abridgement of the right to vote based on race, *see* 52 U.S.C. § 10301(a), and the Constitution's prohibition on state laws that unduly burden the right to vote, courts take into account a state's interests in promulgating a given voting regulation. *See, e.g.*, *Brnovich*, 594 U.S. at 670; *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The Materiality Provision, however, is different because it does not contemplate any kind of balancing analysis or giving any weight to a state's justifications for having certain requirements. It simply asks the question whether the error or omission is significant or probative in determining an individual's qualifications to vote, irrespective of the state's motives for requiring that information. Here, therefore, the question is whether birthplace is material— that is, significant—to Arizona's determination of voter qualifications. It plainly is not. *See infra* at 25-27.

**C.** For their part, RNC and Legislative Appellants assert that the Materiality Provision does not preempt the Birthplace Requirement because it "does not apply to errors or omissions that state law determines are material." RNC & Legislative Appellants Br. 27. According to them, when the Provision was enacted, it "applied only to *ad hoc* requirements by state officials that were not mandated 'under State law.'" *Id.* (quoting 52 U.S.C. § 10101(a)(2)(B)). Under this logic, if a state creates a requirement for voter registration, that requirement must be material and therefore is not covered by the Materiality Provision.

This argument cannot be squared with the Materiality Provision's expansive protection against denials of the right to vote based on immaterial errors or omissions in voting-related paperwork, which necessarily goes beyond *ad hoc* discriminatory practices by registration officials.  "The text of [the Provision], and not the historically motivating examples of intentional and overt racial discrimination, is . . .  the appropriate starting point of inquiry in discerning congressional intent." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008).  With the Materiality Provision, Congress chose a sweeping prohibition against denials of the right to vote based on immaterial errors and omissions.  Congress did so because it understood that rectifying state's rampant discrimination required federal action to target "specific practices by means of which voting officials have denied Negroes the right to register and vote," 110 Cong. Rec. 1642, including the common tactic of making "immaterial errors in an application . . . fatal" to a Black citizen's attempt to vote, *id.* at 1694.  The notion that states could get around the Provision by merely enshrining registration officials' discriminatory tactics into statutory law cannot be squared with the Materiality Provision's text and Congress's goal to stamp out once and for all state's persistent disenfranchisement of Black voters.

Indeed, in *Vote.org*, the Fifth Circuit addressed this exact argument that "States may circumvent the Materiality Provision by defining all manner of

24

requirements, no matter how trivial, as being a qualification to vote and therefore 'material,'" and that court rejected it. 89 F.4th at 487. The Fifth Circuit correctly observed that "[t]he Materiality Provision is a standard that a State's voter registration requirements must satisfy." *Id.* And the Birthplace Requirement does not meet that standard.

**D.** As the district court correctly held, birthplace is not significant in determining whether an Arizonan is qualified to vote. Indeed, it is not relevant at all. "To vote in Arizona, a person must be a United States citizen, a resident of Arizona, and at least eighteen years of age, who has not been adjudicated incapacitated or convicted of a felony." 1-ER-77. Simply put, U.S. adult citizens residing in Arizona may register to vote; their place of birth is irrelevant.

In Arizona, "[c]ounty recorders do not use birthplace information to determine an applicant's eligibility to vote, nor do county recorders need birthplace to verify an applicant's identity." 1-ER-26. Critically, "[a]n individual's birthplace cannot be used to directly verify that individual's citizenship or place of residence," 1-ER-77, and, in practice, "birthplace alone is generally not sufficient to distinguish between voters for identify verifications," 1-ER-28. This makes sense, as Arizona does not standardize how voters input their birthplace information, and "county recorders are unable to confirm the accuracy of an applicant's birthplace." 1-ER-28-29. "If the substance of the [birthplace field]

25

does not matter, then it is hard to understand how one could claim that this requirement has any use in determining a voter's qualifications." 1-ER-77 (alteration in original) (quoting *Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir.), *vacated as moot*, *Ritter v. Migliori*, 143 S. Ct. 297 (2022)).

Appellants' assertions to the contrary are unpersuasive. State Appellants claim that birthplace "can be useful" to determine a voter's identity during or after the registration process, State Appellants Br. 52; *id.* at 54, and "can be used to directly verify citizenship." *Id.* at 66; *see also* RNC & Legislative Appellants Br. 26 ("birthplace data can assist recorders in confirming [voters'] citizenship"). But the standard is not whether birthplace is potentially useful to election officials; instead, birthplace must be material to Arizona's determination of voter qualifications. *See supra* at 19-20. And as the district court found, birthplace plays essentially no role in confirming a voter's citizenship or identity, and certainly not a significant one. *See* 1-ER-78; *cf. Kungys v. United States*, 485 U.S. 759, 774 (1988) (plurality opinion) (concluding that a defendant's "misrepresentation of the date and place of his birth in his naturalization petition" was not material because "[t]here has been no suggestion that those facts were themselves relevant to his qualifications for citizenship" and there was no basis to believe that "the true date and place of birth would predictably have disclosed other facts relevant to his qualifications"). Because birthplace is not significant to

26

Arizona's determination of voter qualifications, its omission on a voter registration form cannot be the basis for the denial of the right to vote under the Materiality Provision.

* * *

As the Materiality Provision's text and history make clear, states may not deny the right to vote based on errors or omissions in registration forms that are insignificant in the state's determination of a voter's qualifications. Here, the district court correctly found that Arizona does not meaningfully use birthplace to determine a voter's qualifications. Accordingly, the Birthplace Requirement violates the Materiality Provision.

## CONCLUSION

For the foregoing reasons, the district court's final judgment permanently enjoining the Birthplace Requirement should be affirmed.

Respectfully submitted,

*/s/ Elizabeth B. Wydra*
Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
Anna K. Jessurun
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: August 19, 2024

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,497 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Executed this 19th day of August, 2024.

*/s/ Elizabeth B. Wydra*
Elizabeth B. Wydra

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 19, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 19th day of August, 2024.

*/s/ Elizabeth B. Wydra*
Elizabeth B. Wydra

*Counsel for Amicus Curiae*
