No. 24-3188, 24-3559 & 24-4029

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

—————————————

MI FAMILIA VOTA, et al.,
*Plaintiffs-Appellees*,

v.

ADRIAN FONTES, et al.,
*Defendants-Appellees*,

REPUBLICAN NATIONAL COMMITTEE, et al.,
*Intervenor-Defendants-Appellants/Cross-Appellees*

—————————————

**On Appeal from the United States District Court
for the District of Arizona**
No. 2:22-cv-00509-SRB  (consolidated)
Hon. Susan R. Bolton

—————————————

**BRIEF *AMICUS CURIAE* OF PROFESSOR JUSTIN LEVITT
IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

—————————————

Justin Levitt
LMU LOYOLA LAW SCHOOL[*]
919 Albany St.
Los Angeles, CA  90015
(213) 736-7417
justin.levitt@lls.edu

[*] Institutional affiliation for
purpose of identification only

*Counsel and Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* is an individual, not a corporate entity, and therefore no

corporate disclosure is made under Rule 26.1 of the Federal Rules of Appellate

Procedure.

DATED: August 19, 2024        By:   */s/ Justin Levitt*         

                                 JUSTIN LEVITT
                                 Counsel and *Amicus Curiae*

# TABLE OF CONTENTS

**Page**

Interest of *Amicus Curiae* ........................................................................1

Summary of Argument ...........................................................................2

Argument .............................................................................................. 3

I. The district court correctly determined that the Materiality Provision precludes disenfranchising voters based on immaterial errors or omissions in the citizenship checkbox or place-of-birth portions of the voter registration form. .......................................................................... 3

    A. The Materiality Provision protects against disenfranchisement for immaterial errors or omissions. ............................................. 4

    B. In this context, immaterial errors or omissions are errors or omissions that would not, given the other information available, create a significant likelihood of driving a reasonable decisionmaker's conclusion with respect to an individual's substantive qualifications under state law. ...... 5

        1. The Materiality Provision focuses on the materiality of the error or omission, not the underlying topic. .................................. 7
        2. Errors or omissions are "material" to determining qualifications when they create a significant likelihood of driving a reasonable decisionmaker's conclusion. .............................. 8
        3. When the Materiality Provision refers to determining qualifications under state law, it means substantive state constitutional qualifications like age, citizenship, and residency............................. 12
        4. Whether an error or omission is "material" depends on the other information available. ....................................................17

    C. In this case, the district court's assessments of materiality under the federal statute were correct....................................................... 18

        1. The district court's assessment was correct with respect to the citizenship checkbox. ........................................................ 19
        2. The district court's assessment was correct with respect to the place-of-birth information. ................................................ 20

Certificate of Compliance ........................................................................27

Certificate of Service ............................................................................28

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Bruton v. Massanari*, 268 F.3d 824 (9th Cir. 2001) ............................................. 10

*Cone v. Bell*, 556 U.S. 449 (2009) ........................................................................ 10

*Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006) ...............................................4

*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970) ............................................... 9

*Pulsifer v. United States*, 601 U.S. 124 (2024) ..................................................... 16

*Republic of Sudan v. Harrison*, 587 U.S. 1 (2019) ................................................ 16

*TSC Industries, Inc., v. Northway, Inc.*, 426 U.S. 438 (1976) ........................... 9, 17

*Vote.org v. Callanen*, 89 F.4th 459 (5th Cir. 2023) ....................................... 2, 6, 18


**Federal Statutes**

Civil Rights Act of 1964, 78 Stat. 241, *codified at* 52 U.S.C. § 10101............*passim*


**Federal Legislative and Executive Materials**

110 Cong. Rec. 6715 (1964) ................................................................................... 14

Hearings on S. 1731 and 1750 Before the S. Comm. on the Judiciary,
    88th Cong. 93 (1963) ................................................................................... 13

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (Aug. 19, 1999) ....... 9

U.S. Comm'n on Civil Rights, *Voting: 1961 Commission on Civil Rights
    Report* 56-57 (1961) ................................................................................... 14

**State Constitutional Provisions and Statutes**

Ariz. Const. art. VII, § 2 ....................................................... 12

Ariz. Rev. Stat. § 16-121.01 ............................................... 3, 19

La. Const. of 1921, art. VIII, § 1 .......................................... 14

**Other State Materials**

Ariz. Sec'y of State, Arizona Voter Registration Form,
     https://azsos.gov/sites/default/files/docs/az_voter_registration_
     form_standard_20240613.pdf...............................................15, 20

**Other Authorities**

Sharad Goel *et al.*, *One Person, One Vote: Estimating the Prevalence of
     Double Voting in U.S. Presidential Elections*, 114 Amer. Pol. Sci.
     Rev. 456 (2020) ........................................................... 24

Joan MacLeod Heminway, *Materiality Guidance in the Context of Insider
     Trading: A Call for Action*, 52 Am. U. L. Rev. 1131 (2003) ..................... 17

Justin Levitt, *Resolving Election Error: The Dynamic Assessment of
     Materiality*, 54 Wm. & Mary L. Rev. 83 (2012)................. 6, 7, 9, 12, 17, 20

Justin Levitt & Michael McDonald, *Seeing Double Voting: An Extension of
     the Birthday Problem*, 7 Election L.J. 111 (2008) ....................... 24

Eli Wald, *Taking Attorney-Client Communications (and Therefore Clients)
     Seriously,* 42 U.S.F. L. Rev. 747, 791 (2008) ............................. 17

## INTEREST OF AMICUS CURIAE[1]

Amicus Justin Levitt is a professor of constitutional law, legislation and regulation, and the law of democracy at LMU Loyola Law School, and a nationally recognized expert on election law.  Professor Levitt has published more than 30 monographs, book chapters, and academic articles; on the basis of that and other research, he has been invited to testify before committees of the U.S. Senate and House, the U.S. Civil Rights Commission, multiple state legislative bodies and redistricting commissions, and both federal and state courts.  He has filed *amicus* briefs on matters relating to election law in the past, as counsel and as *amicus*, in various state and federal courts including the U.S. Court of Appeals for the Ninth Circuit.  Professor Levitt has advised, represented, and sued officials of both major political parties and neither, and those whose partisan preference he does not know.

Professor Levitt offers this brief, pursuant to Fed. R. App. P. 29(a)(3), to assist the Court in evaluating the parties' claims and district court's decision with respect to the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. §

---

[1] No party or party's counsel has authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief.  No person has contributed money that was intended to fund preparing or submitting the brief, except that Loyola Law School contributed to the expenses involved in filing any requested paper copies of this brief.

10101(a)(2)(B) (hereinafter "Materiality Provision"). In 2012, long before the events underlying the instant litigation, Professor Levitt explored the concept of materiality in academic research, in what the Fifth Circuit recognized as "one of the few scholarly articles on the Materiality Provision." *Vote.org v. Callanen*, 89 F.4th 459, 486 (5th Cir. 2023). And for several years, long before the events underlying the instant litigation, Professor Levitt served in the Civil Rights Division of the Department of Justice, supporting and supervising the enforcement of federal statutes including the Materiality Provision. Professor Levitt hopes that this analysis and experience may be useful in the Court's resolution of this appeal.

## SUMMARY OF ARGUMENT

The Materiality Provision of the Civil Rights Act of 1964 prohibits election officials from denying the right to vote in any election to any individual because of an error or omission on a registration form, "if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). Materiality is a familiar concept across many different substantive legal contexts. It focuses on the capacity of a fact, error, omission, or misrepresentation to affect — to change or insulate from change — a decisionmaker's conclusion in light of the other information available. Congress adopted that standard in the electoral setting

2

because it faced a lengthy record of state procedures disenfranchising voters for technical but inconsequential mistakes — mistakes that, in context, did not reasonably call the voters' eligibility into question. And Congress sensibly resolved to prevent disenfranchisement on the bases of mistakes that did not matter.

Here, the district court correctly determined that errors or omissions in the place of birth or citizenship checkbox of a voter registration form would not likely drive any reasonable official's determination of an applicant's qualifications in the face of far more reliable evidence of identity and citizenship. As such, the district court correctly found those errors and omissions immaterial for purposes of the Materiality Provision, and correctly enjoined the state from disenfranchising voters on that basis.

## ARGUMENT

**I.    The district court correctly determined that the Materiality Provision precludes disenfranchising voters based on immaterial errors or omissions in the citizenship checkbox or place-of-birth portions of the voter registration form.**

Arizona law purports to prevent an eligible applicant from registering and voting if she fails on a form to mark a checkbox attesting to her citizenship, Ariz. Rev. Stat. § 16-121.01(A), even if that applicant's citizenship is otherwise conclusively verified by documentary proof, *id.* at § 16-121.01(C), or reliable

government records, *id.* at § 16-121.01(D).  Similarly, Arizona law purports to prevent an eligible applicant from registering and voting if she fails to accurately list her place of birth on a form, *id.* at § 16-121.01(A), even if that individual's substantive qualification — including identity or citizenship — is not otherwise in doubt and not placed in doubt by the error.  The district court properly determined that the application of these two provisions to disenfranchise voters where there is no reasonable question about their substantive eligibility violates the Materiality Provision of the Civil Rights Act of 1964.

### A. The Materiality Provision protects against disenfranchisement for immaterial errors or omissions.

The Materiality Provision, enacted in 1964 and amended in 1965, provides that "No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."  52 U.S.C. § 10101(a)(2)(B).

Nothing in this provision prevents Arizona from *requesting* information that it may find informative or helpful in administering the election process.  *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1211 n.3 (S.D. Fla. 2006).  For example, Arizona has apparently requested a voter registrant's place of birth for many years — with substantial numbers of eligible voters declining or neglecting to provide the

information, and substantial variance in the quality and uniformity of the information provided by the remainder. *See* 1-ER-0026 - 0029. The Materiality Provision does not interfere in any way with Arizona's decision to continue requesting this information on a voter registration form.

But if there is an error or omission on the form, the plain text of the federal statute prevents Arizona from rejecting a voter registration based on that error or omission, and therefore denying the applicant's right to vote in a coming election, if the "error or omission is not material in determining whether such individual is qualified under State law." 52 U.S.C. § 10101(a)(2)(B).

> **B. In this context, immaterial errors or omissions are errors or omissions that would not, given the other information available, create a significant likelihood of driving a reasonable decisionmaker's conclusion with respect to an individual's substantive qualifications under state law.**

The resolution of the Materiality Provision claim depends on determining whether neglecting to check a box affirming citizenship or failing to provide birthplace information deemed "accurate" is "material in determining whether [an] individual is qualified under State law," *id*. The determination of materiality can be thorny, and the parties offer differing assessments of what materiality means in this context. Indeed, on occasion, the goalposts for assessing materiality seem to move even within the span of a single brief.

For example, the RNC Intervenor-Defendants, citing legal dictionaries in search of the common public understanding of the term, assert that something is "material" when it "matters," RNC Br. at 22. Similarly, Arizona and *amicus* Center for Election Confidence, citing the Fifth Circuit's similar canvassing of legal dictionaries, both maintain that something is "material" when it is "[o]f such a nature that knowledge of the item would affect a person's decision-making: significant; essential" and "[o]f serious or substantial import; significant, important, of consequence." Ariz. Br. at 42 (*quoting Vote.org v. Callanen*, 89 F.4th 459, 478 (5th Cir. 2023)); Center for Election Confidence Brief at 9 (same). But all three briefs then proceed to argue for an understanding of "materiality" that departs substantially from that baseline, with a much lower threshold of impact akin to a minimal relevance standard. Ariz. Br. at 15, 51-54, 62; RNC Br. at 22, 24-26; Ctr. for Election Confidence Br. at 6-8.

"Materiality" is an important concept in many different areas of the law, with some common elements wherever it is deployed. In 2012, long before the events underlying the instant litigation, undersigned Amicus canvassed the articulation of "materiality" in the law across these different substantive fields, to understand how those other applications should inform understanding of the Materiality Provision in the election context. Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. & Mary L. Rev. 83

(2012). The application of the Materiality Provision most consistent with the understanding of materiality across different fields would find an error or omission to be material only when it has a significant likelihood of changing a reasonable decisionmaker's conclusions about an individual's substantive qualifications under state law.

      1.  The Materiality Provision focuses on the materiality of the error or omission, not the underlying topic.

Some of the parties in this matter seem to conflate the materiality of an error or omission on the form with the materiality of the underlying information to which the error is relevant.  Defendants assert that the checkbox is material, for example, because it is related to establishing citizenship, and that the birthplace information is material because it may be related to establishing citizenship and/or identity, and has long been requested.  Ariz. Br. at 19-26, 55; RNC Br. at 22-26.  It is undisputed that both the identity and citizenship of an applicant for voter registration are essential to determining whether the applicant is qualified.  But that is only the first portion of the analysis required by the Materiality Provision. Levitt, *supra*, at 110.

The plain text of the Materiality Provision makes clear that the inquiry does not stop at the materiality of a topic or subject like identity or citizenship.  Instead, the statutory text turns on whether a particular "error or omission" is material to determining the applicant's qualifications.  52 U.S.C. § 10101(a)(2)(B).  Consider

7

a determination whether an applicant is of voting age.  An error or omission that <u>is</u>

material in determining whether the applicant is of voting age — like someone

born on 8/19/1974 but mistakenly offering the current date (8/19/2024) on an

application — lies outside of the Materiality Provision.[2]  An error or omission that

is <u>not</u> material in determining whether the applicant is of voting age— like

someone born on 8/19/1974 who mistakenly writes 8/9/1974 on the application —

is subject to the Materiality Provision.  The significance of the *error or omission*

— not the significance of the date of birth topic or of age more generally — is the

touchstone of the statute.

> 2.  Errors or omissions are "material" to determining qualifications when
>     they create a significant likelihood of driving a reasonable
>     decisionmaker's conclusion.

Materiality is a vital concept well beyond election law; it appears in doctrine

related to the law of contract (in the alteration of contractual terms, assessments of

breach, and misrepresentation), bankruptcy (assessments of default and conflicts of

interest), tortious and criminal fraud (misrepresentation), statements to government

(misrepresentation), securities transactions (misrepresentations and disclosure

obligations), welfare benefits (incorporation of new evidence after an initial

decision), prosecutorial conduct (disclosure obligations), legal ethics (disclosure

---

[2] As explained in section I.B.4, *infra*, this error is only material if no other
information reliably establishes the applicant's age.  If other information reliably
establishes the applicant's age, this error would no longer be material.

obligations), employment discrimination (threshold determinations of actionable

harm), and civil procedure (standards for summary judgment, including those used

at earlier points in this case), among others.  *See* Levitt*, supra*, at 104-05 & nn. 77-

87, 107 & nn. 95-99 (collecting citations).

Courts and scholars express the relevant standard in ways that vary slightly

from context to context, but an examination of the concept across substantive silos

reveals a rough consensus.  A piece of information is "material" if it has probative

weight beyond mere pertinence or relevance, with a significant realistic propensity

to affect — that is, change or insulate against change — a reasonable

decisionmaker's conclusion.[3]  Levitt, *supra*, at 106-107.  *See also*, *e.g.*, *TSC*

*Industries, Inc., v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (information is

material in the securities context if it would "have a significant [p]ropensity to

affect the voting [or investment] process.") (*quoting Mills v. Electric Auto-Lite*

*Co.*, 396 U.S. 375, 384 (1970)); SEC Staff Accounting Bulletin No. 99, 64 Fed.

---

[3] In some contexts involving the impact of particular facts on *private*
decisionmakers, there is some debate about the degree to which determinations of
materiality should account for individual decisionmakers' particular
characteristics, or whether they should instead be determined based on an average
reasonable decisionmaker.  *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53, 75, 78-79 (2006) (Alito, J., concurring in the judgment) (describing
the discussion in the context of materially adverse employment action under Title
VII).  In the electoral context, because the relevant decisionmaker for the
Materiality Provision is a *government* official, and because the law tends to avoid
ascribing legal significance to idiosyncratic variations among government
decisionmakers, the determination should be objective.

Reg. 45,150, 45,151 (Aug. 19, 1999) ("The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."); *Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (information relating to a criminal defendant's guilt or punishment is constitutionally material when "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."); *Bruton v. Massanari*, 268 F.3d 824, 827 (9th Cir. 2001) (new information about a benefits application is material if there is a "reasonabl[e] possibility that the new evidence would have changed the outcome of the . . . determination.") (alterations in original and internal citation omitted). The information (or error, or omission) in question need neither be *certain* to drive a decisionmaker's decision nor more likely than not to drive that decision, but there must be a significant likelihood — and not just a remote hypothetical possibility — that the information or error or omission would, to a reasonable person, make a difference.

The district court calibrated its approach in line with this consensus. *See* 1-ER-0141 ("Congress intended materiality to require some probability of actually impacting an election official's eligibility determination."). Defendants and *amicus* Center for Election Confidence also agree with this consensus view, for

10

example, when they argue that something is material when it "matters," or when it is of "serious or substantial import; significant, important, of consequence."  Ariz. Br. at 42; RNC Br. at 21-22; Center for Election Confidence Brief at 9.

However, elsewhere in their briefs, Defendants and *amicus* shift their approach, claiming that mere utility or relevance to the investigative process, or attenuated hypothetical possibility of altering a decisionmaker's particular determination, suffices to render information material under the statute.  Ariz. Br. at 15, 51-54, 62; RNC Br. at 22, 24-26; Ctr. for Election Confidence Br. at 6-8.  If Congress had wanted a standard of "relevance" and not "materiality," it knew how to convey that desire; indeed, it did precisely that in the neighboring statutory subsection.  *Compare* Civil Rights Act of 1964, § 101(a), 78 Stat. 241 (1964) (establishing the Materiality Provision), *with id.* § 101(b), 78 Stat. 241-42 (establishing relevance as the appropriate threshold for a different determination). Defendants' proffered relevance standard departs substantially from the materiality consensus noted above, in ways that undermine the significance that materiality conveys.  A typo or elided digit in a phone number listed in a financial prospectus or a contractual counteroffer is not "material" to determining whether the prospectus is misleading or the counteroffer changes the deal — even if a phone call might potentially turn up other meaningful information.  That is, the possibility that a piece of information (or the absence of a piece of information) might lead to

11

*other* facts down the road that might (or might not) change someone's mind does not make the initial piece of information "material" to a given conclusion in any context beyond election law. And it should not make that piece of information material here.

> 3. When the Materiality Provision refers to determining qualifications under state law, it means substantive state constitutional qualifications like age, citizenship, and residency.

The Materiality Provision not only sets a threshold of materiality, but directs that the object of that inquiry should be "determining whether [an] individual is qualified under state law." 52 U.S.C. § 10101(a)(2)(B). That is, the state's disposition of an error or omission on a form is subject to the Materiality Provision when that error does not yield a significant likelihood of driving a reasonable decisionmaker's conclusion that an individual is qualified or not qualified to vote. In deciding what it means for a would-be voter to be "qualified under state law," the most natural construction of the text refers to a jurisdiction's substantive qualifications: conditions like citizenship, age, residency, and the like.[4] *See* Ariz. Const., art. VII, § 2(A); *see also* Levitt, *supra*, at 147 n.208.

---

[4] The RNC and the Center for Election Confidence suggest that this reading would deprive a state of authority to set eligibility standards. RNC Br. at 27, Center for Election Confidence Brief at 14. But no part of this construction deprives a state of any ability to establish, within constitutional limits, substantive qualification standards for electors.

Defendant RNC argues, instead, that whether an individual is qualified under state law for purposes of the Materiality Provision includes not merely a state's substantive qualifications, but all statutory and administrative procedural prerequisites. As a result, the RNC argues that the Materiality Provision addresses only ad hoc *departures* from state law, and not applications of state procedures no matter how inconsequential. RNC Br. at 27-29; *see also* Ctr. for Election Confidence Br. at 5. Under this reading, an elector decisively *known* to be an adult citizen resident not disenfranchised by conviction is not "qualified under state law" for purposes of the Materiality Provision if the paperwork yields a trivial mistake contrary to the letter of state procedural regulations. There are three distinct reasons why this reading of the federal statute is flawed.

First, this reading would yield results profoundly at odds with Congressional intent. The Materiality Provision was part of the Civil Rights Act of 1964, a landmark statute replete with bold protections for citizens' fundamental rights. The legislative record illustrating the ills that the law was intended to combat contains plentiful examples of voters denied the franchise not just because of irrelevant factors or invented ad hoc requirements, but also because of "the most technical or imperceptible errors" to admittedly relevant questions, where the errors did not call voters' substantive eligibility into question. Hearings on S. 1731 and 1750 Before the S. Comm. on the Judiciary, 88th Cong. 93, 100 (1963)

13

(statement of Robert F. Kennedy, U.S. Att'y Gen.).  For example, testimony emphasized that one woman "made an inconsequential error in a date and was rejected."  *Id.*  Another misspelled her state as "Louiseana."  *Id.* at 101.  Another "was rejected because she omitted a date in one question—even though she gave the same information elsewhere on the form."  *Id.* at 102.

These were not merely ad hoc rejections at odds with state law.  For example, Congressional debate drew attention to the disenfranchisement of several Louisiana voters for minor, inconsequential errors in computing their age in years, months, and days.  *Id.* at 101; 110 Cong. Rec. 6715 (1964) (statement of Sen. Kenneth B. Keating).  The RNC cites this example as a "paradigmatic" violation of the Materiality Provision.  RNC Br. at 28.  But this particular requirement to compute age in the "proper" number of years, months, and days was no unauthorized local invention: it was expressly specified by the Louisiana Constitution.  *See* La. Const. of 1921, art. VIII, § 1(c).  And that fact was noted in the very same U.S. Civil Rights Commission report correctly cited by the RNC as essential legislative history.  *See* U.S. Comm'n on Civil Rights, *Voting: 1961 Commission on Civil Rights Report* 56-57 (1961); RNC Br. at 27.  The objection to allowing these errors to be dispositive was not that they revealed local registrars' ad hoc deviation from state law requirements to note dates, or states, or ages in certain ways or places: the state constitution specifically required both precision

14

and the form predictably yielding mistakes. Instead, the objection to allowing

these errors to be dispositive was that the state-law requirement did not *matter* in

screening substantively eligible voters from substantively ineligible voters.

Second, a reading privileging procedure above substantive eligibility would

yield absurd results. The Arizona state registration form presently commands that

applicants "use a blue or black pen" to complete the form. Ariz. Sec'y of State,

Arizona Voter Registration Form, https://azsos.gov/sites/default/files/docs/az_

voter_registration_form_standard_20240613.pdf (last checked Aug. 15, 2024).

State law does not currently disenfranchise a voter who mistakenly uses a perfectly

legible purple pen to complete the form, and presumably, all parties agree that a

would-be voter completing the form in legible purple ink would be protected by

the Materiality Provision against a local registrar's ad hoc rejection for that error.

But it defies logic to suggest that the same mistaken choice of ink color would be

"material in determining whether *such individual is qualified* under State law," 52

U.S.C. § 10101(a)(2)(B) (emphasis added), and thereby proper grounds for

disenfranchisement, if Arizona embraced the "blue or black pen" command as a

statutory requirement.

Third, this reading would effectively render the Materiality Provision a

nullity. The RNC claims that 52 U.S.C. § 10101(a)(2)(B) addresses only ad hoc

departures from state law, and not state law requirements which themselves

disenfranchise for inconsequential mistakes.  RNC Br. at 27-29.  But ad hoc

departures from state law are already prohibited by the neighboring provision of

the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(A), which prohibits the application

of any standard, practice, or procedure to determine one individual's qualifications

different from that applied under state law to other individuals in the same

jurisdiction.  Because § 10101(a)(2)(A) already covers renegade ad hoc

requirements, under the RNC's reading, the Materiality Provision would be left

with no meaningful work.  Standard canons of statutory construction disfavor such

an approach.  *See, e.g.*, *Pulsifer v. United States*, 601 U.S. 124, 142-43 (2024)

("When a statutory construction thus render[s] an entire subparagraph meaningless,

this Court has noted, the canon against surplusage applies with special force.")

(citation and internal quotation marks omitted); *Republic of Sudan v. Harrison*, 587

U.S. 1, 12 (2019) ("[W]e are hesitant to adopt an interpretation of a congressional

enactment which renders superfluous another portion of that same law.") (citation

and quotation omitted).  The better reading is that the Materiality Provision refers

to *substantive* state qualifications when it precludes disenfranchisement because of

errors or omissions that are not material to a determination of a would-be voter's

qualifications.

4.  Whether an error or omission is "material" depends on the other information available.

Across different legal arenas, courts have consistently emphasized that determinations of materiality are fact- and context-dependent.  Levitt, *supra*, at 105, 107-08.  Whether a particular fact, error, misrepresentation, or omission is material to a particular conclusion depends on the other information available to the decisionmaker.  *See TSC Industries, Inc., v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  A slip may seem material in isolation but immaterial in light of a mountain of evidence leaning a different direction.  And as further evidence arrives, the materiality of one piece of information can change, *see* Levitt, *supra*, at 113-18, 152, 154.  In evaluating legal malpractice or wrongdoing related to financial securities, for example, a mistake that at first seems immaterial may be recognized as material given the other information that is then available or later becomes available — or vice versa.  *See* Eli Wald, *Taking Attorney-Client Communications (and Therefore Clients) Seriously,* 42 U.S.F. L. Rev. 747, 791 (2008); Joan MacLeod Heminway, *Materiality Guidance in the Context of Insider Trading: A Call for Action*, 52 Am. U. L. Rev. 1131, 1206-08 (2003).

As the district court recognized, the same is true in the electoral context.  *See* 1-ER-0142.  Whether any individual piece of information has a significant likelihood of changing a decisionmaker's conclusions about an applicant's qualifications depends on the other information available about that applicant's

qualifications.  The materiality of a fact, an error, or an omission does not depend on whether it "can" help confirm or refute an applicant's qualifications in isolation or in the abstract, Ariz. Br. at 2, 22, 32, 52, but rather on whether it *does* do so in light of the other information available, and does so to such an extent that the answer could reasonably be different if the fact, error, or omission were changed.[5] Evaluating the materiality of an error in the context of the information already available does not "add" anything to the materiality inquiry, RNC Br. at 23; to the contrary, evaluation in the context of the other available facts is exactly what any materiality evaluation requires.

### C. In this case, the district court's assessments of materiality under the federal statute were correct.

Here, the district court correctly understood the basic contours of the Materiality Provision, as it evaluated whether a failure to check a box affirming citizenship, and an error or omission in providing a place of birth, had a significant

---

[5] So, for example, Arizona's mistaken pincite in its citation of the Fifth Circuit's *Vote.org* opinion, *see* Ariz. Br. at 42, could well undermine its argument *if there were no other means to locate that argument's support*.  But since the erroneous pincite follows a block quote, it is easy to find the supporting quote at p. 478, and to recognize that the pincite of "579" is an inconsequential mistake.  In the abstract, an incorrect pincite could potentially be significant, but in light of the other information available in practice, the mistake is readily identified as immaterial, and therefore of no moment.  (And note that the question here is not whether *pincites* are material to identifying support for a proposition in the abstract — or how long pincites have been required or requested — but whether a particular *error* in a pincite is material in a particular instance.)

18

likelihood of changing or insulating against change a reasonable decisionmaker's assessment of an applicant's qualifications given the other information available. This Court should affirm the district court's ultimate conclusions as correct (and well supported by the evidence) on both counts.

1. The district court's assessment was correct with respect to the citizenship checkbox.

First, the district court addressed an applicant's failure to check a box affirming the applicant's citizenship. If the affirmation communicated by way of the checkbox were the only specific evidence of citizenship available to an election official, an applicant's failure to check that box would indeed be material to determining the applicant's citizenship — as the district court recognized. 1-ER-0142 - 0144. In Arizona, however, applicants using the state voter registration form are required to submit documentary proof of their citizenship with their application to be eligible for most elections. Ariz. Rev. Stat. § 16-121.01(C). For applicants using the federal voter registration form who do not submit sufficient documentary proof of citizenship, officials will attempt to confirm through other government systems reliable proof of the applicant's citizenship. *Id.* at § 16-121.01(D).

Under *those* circumstances, when other records reliably confirm that the applicant is a citizen, the fact that an applicant may have overlooked a box or bubble no larger than one-eighth of an inch wide on a jam-packed full-page form,

Ariz. Sec'y of State, Arizona Voter Registration Form, https://azsos.gov/sites/
default/files/docs/az_voter_registration_form_standard_20240613.pdf (last
checked Aug. 15, 2024), is not information sufficiently momentous to change the
mind of any reasonable decisionmaker.  Put differently, no reasonable
decisionmaker with direct access to an individual's U.S. birth certificate or
naturalization paperwork would notice an applicant's failure to check the tiny box
on the form and believe that the omitted checkbox refutes the documentary proof
staring her in the face.  In that circumstance, the omission on the form is not
material to determining the applicant's qualifications — and, as such, cannot under
the Materiality Provision provide the basis for disenfranchising the applicant.[6]

> 2. The district court's assessment was correct with respect to the place-
> of-birth information.

Second, the district court addressed an applicant's failure to list a place of

birth on the state voter registration form, or listing of a place of birth deemed an

"error."[7]  As above, if the other information available meant that an error in listing

---

[6] This remains true even if the proof of citizenship is not contemporaneous with the
voter registration form: at the moment the reliable proof arrives, it renders
immaterial an error or omission with respect to the checkbox, and precludes
disenfranchisement based on the error or omission.  Levitt, *supra*, at 154.

[7] The district court apparently found that Arizona law requires the rejection of an
application that *omits* place of birth information, but not an application where the
place of birth information is erroneous.  *See* 1-ER-0077.  If true, the fact that the
content of the field is irrelevant — that a voter would be registered if she wrote
"Anytown" or "Qwertyuiop" — necessarily means that an error or omission in the
information offered must be immaterial to determining a voter's qualifications.

20

the applicant's place of birth created a significant likelihood that a reasonable election official would change his or her mind about the applicant's qualifications — that the error would drive the official to conclude that the applicant were a noncitizen or were masquerading under a false identity — then this error or omission might be material for purposes of 52 U.S.C. § 10101(a)(2)(B). But the place of birth information is of such limited quality and such limited utility that there will *always* be better information at the decisionmaker's disposal to confirm or refute the applicant's qualifications, rendering any place-of-birth error immaterial, even if "uncured."

With respect to citizenship, an error on the form indicating a U.S. place of birth would not offer an official any cause to reject the application. And given both naturalization rates and the incidence of derived citizenship, an error on the form indicating a foreign place of birth — or omitting the place of birth entirely, permitting a potential inference of a foreign place of birth — is of extremely low value in determining whether the applicant is a citizen at the time of the application. Again, the state form is the form containing the request for place-of-birth information. Against a signal so noisy that it is difficult to call it a signal at all, all otherwise successful applicants using that form are required to: submit documentary proof of citizenship, have citizenship information verified by matching against existing reliable government records, check a specific box

21

attesting to their present citizenship, or some combination of the three.[8]  In the face

of that affirmative evidence of citizenship, no reasonable official would find the

place-of-birth information sufficiently meaningful to conclude that the applicant

was, because of an erroneous listing or omission of their place of birth, a

noncitizen.

In concluding that the place of birth information was immaterial to an

applicant's qualifications, the district court even considered hypothetical black-

swan scenarios in the current election procedures manual (EPM) under which place

of birth might — possibly maybe — make a difference.  "If a registrant submits a

birth certificate as [documentary proof of citizenship (DPOC)] that lists a different

name than the registrant's current legal name but cannot provide supporting

documentation verifying the different last name, the 2023 EPM instructs county

recorders to accept the birth certificate as DPOC if the registrant's first and middle

names, birthplace, date of birth, and parents' names match that on the voter

registration." *See* 1-ER-0027.  So if an applicant has documentation of citizenship

that the applicant cannot otherwise trace back to herself, a place of birth matching

_____

[8] Most applicants using the state form will submit documentary proof of citizenship
or have citizenship verified by matching information against other government
records.  The district court enjoined the state from refusing to register applicants,
for Federal elections only, who use the state form but fail to submit this proof. *See*
1-ER-0010 – 0011 & n.10.  Such applicants will have to check the box attesting to
their current citizenship. *Id.*

22

the place of birth on the documentation might conceivably help to confirm the applicant's citizenship.

Even in this scenario, however, an error or omission in the place of birth information on the form is not likely to change any reasonable decisionmaker's mind. It is wildly improbable that an individual would *possess* a document proving citizenship that accurately reflects their first and middle (but not last) name, date of birth, and parents' names — but is not a document showing their own citizenship.[9] The simple fact that an applicant has possession of a document with so many matching parts is itself evidentiary. In this scenario, there is no significant likelihood that a reasonable decisionmaker with free rein to evaluate an applicant's qualifications would accept the documentary proof if place of birth matched, but reject the proof if there were a place-of-birth error or omission. The place-of-birth error or omission would be immaterial to a determination of citizenship were it not for state procedural hoops. And *that* means that the Materiality Provision prohibits disenfranchisement in the event of a place-of-birth error or omission.

The same is true with respect to establishing an applicant's identity. The only way in which place-of-birth information might matter in confirming or

---

[9] Even setting aside the incapacity for plausible forgery, there is absolutely no incentive to forge such a document with a nonmatching place of birth, which is the only scenario in which an error or omission in place of birth could be material.

23

disproving an applicant's identity at the time a registration form is accepted or rejected is by comparing that information to another source of ground truth. Arizona has no procedure for making this comparison, which should be the end of the matter.

Arizona finds utility in the place-of-birth information in comparing an applicant's information to other registration records. But even aside from the wide variation in how an applicant might convey their place of birth (yielding a mismatch even without any inaccuracy), the information in the place of birth field never establishes that a registration form has been submitted by an applicant who is not who she claims to be, which is in this context the only relevant inquiry for the Materiality Provision. If the applicant's information seems to approximate a record already in the system without a unique identifier in common — for example, by matching the name and date of birth[10] of applicants without unique ID numbers — then a matching place of birth might further the conclusion that the applicant is the same individual already in the system (and eligible), but a non-

_____

[10] Statistical analysis confirms that matching names and dates of birth — even when performed perfectly — is not always sufficient to show that two records with the same name and date of birth refer to the same person. In any large pool of records, it is virtually certain that some people with the same name will share the same date of birth. *See* Justin Levitt & Michael McDonald, *Seeing Double Voting: An Extension of the Birthday Problem*, 7 Election L.J. 111 (2008); Sharad Goel *et al.*, *One Person, One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections*, 114 Amer. Pol. Sci. Rev. 456 (2020).

matching place of birth would only yield the conclusion that the applicant is someone different (but no less eligible). *See* Ariz. Br. at 17-19; *cf.* MFV-SER-0672 (noting *zero* actual Arizona voters, out of 4.7 million, in the latter category). If the applicant's information seems to approximate a record already in the system that <u>does</u> share a unique identifier in common — then in the event of an inconsistent place of birth, it is far more natural to conclude that there is an error in either the unique identifier or in the place of birth than to conclude that the applicant is pretending to be someone else. *See, e.g.,* MFV-SER-0668-0670. Either way, the additional information is not sufficiently useful to affect a determination of the voter's qualifications. Moreover, given the multiple other means that Arizona uses to verify an applicant's identity, 1-ER-0019, 0021, 0026 - 0028, there is no significant likelihood that a reasonable official would find the inconsistency in place of birth information to be reason to change their conclusion.

All of this explains why, in reality, Arizona "[c]ounty recorders do not use birthplace information to determine an applicant's eligibility to vote." *See* 1-ER-0027. Arizona officials do not use this information to determine eligibility because, as the district court found as a factual matter, it "is of little utility in nearly all cases," 1-ER-0029, and hence not meaningful in determining an applicant's eligibility. And so an error or omission in this information must, a fortiori, lack meaningful significance in determining an applicant's eligibility. An

error or omission in this information is immaterial for purposes of the Materiality Provision.

For the reasons above, the judgment of the district court should be affirmed.

DATED: August 19, 2024                Respectfully submitted,

*/s/ Justin Levitt*

Justin Levitt
LMU LOYOLA LAW SCHOOL[*]
919 Albany St.
Los Angeles, CA 90015
(213) 736-7417
justin.levitt@lls.edu

[*] Institutional affiliation for purpose of identification only

Counsel and *Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 24-3188, 24-3559 & 24-4029

I am the attorney or self-represented party.

**This brief contains** | 6,145 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Justin Levitt | **Date** | 8/19/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2024, I electronically filed the foregoing

Brief *Amicus Curiae*, as an exhibit to the accompanying motion for leave to file,

with the Clerk of the Court for the United States Court of Appeals for the Ninth

Circuit by using the Court's ACMS system, thereby serving all counsel of record.

DATED:  August 19, 2024          By:  */s/ Justin Levitt*

Justin Levitt
LMU LOYOLA LAW SCHOOL[*]
919 Albany St.
Los Angeles, CA  90015
(213) 736-7417
justin.levitt@lls.edu

[*] Institutional affiliation for
purpose of identification only

Counsel and *Amicus Curiae*

28