Case No. 24-3188 (consolidated with 24-3559 and 24-4029)

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MI FAMILIA VOTA; et al.,

*Plaintiffs-Appellees,*

*v.*

ADRIAN FONTES, Arizona Secretary of State; et al.,

*Defendants-Appellees,*

WARREN PETERSEN, Arizona Senate President; et al.,

*Intervenor-Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Arizona

No. 2:22-cv-00509-SRB (and consolidated cases)

STATE OF ARIZONA AND ARIZONA ATTORNEY GENERAL'S
THIRD BRIEF ON CROSS-APPEAL

Joshua D. Bendor (AZ Bar No. 031908)
Joshua.Bendor@azag.gov
Hayleigh S. Crawford (AZ Bar No. 032326)
Hayleigh.Crawford@azag.gov
Joshua M. Whitaker (AZ Bar No. 032724)
Joshua.Whitaker@azag.gov
Kathryn E. Boughton (AZ Bar No. 036105)
Kathryn.Boughton@azag.gov
ACL@azag.gov

OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333

*Counsel for State of Arizona and
Arizona Attorney General
Kristin K. Mayes*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................ i

TABLE OF AUTHORITIES ................................................................... v

INTRODUCTION ................................................................................1

I.     Birthplace ...............................................................................1

II.    Lack of discriminatory purpose ..............................................1

PART 1: REPLY IN SUPPORT OF BIRTHPLACE PROVISION....................3

I.     This Court should review do novo the district court's application of the Materiality Provision to Arizona's birthplace provision. ........................................................3

II.    The Materiality Provision applies to errors or omissions that are insignificant in voter registration. ......................................6

      A.    The proper focus is whether information is significant in determining voter qualifications, not whether it is essential. ......................................................................6

      B.    Historical and common practice can support a materiality finding, but are not required. ....................................9

      C.    Federal courts should give weight to State legislative judgments about significance. .........................................13

      D.    States may presume that an omission of basic biographical information is intentional if there is a cure process. ............................................................16

III.   Birthplace is material in determining identity. ......................20

    A.   An applicant who skips birthplace when expressly required raises doubt about identity, given Arizona's cure process. ......................................................................21

    B.   Birthplace is significant in identifying duplicate registrations. ...................................................................27

    C.   Birthplace is significant in determining identity in other ways, both during and after registration. ....................32

IV.   Birthplace is material in determining citizenship. ................36

PART 2:   RESPONSE TO DISCRIMINATORY PURPOSE CLAIM ..............42

CROSS-APPEAL STATEMENT OF JURISDICTION .....................................42

CROSS-APPEAL STATEMENT OF THE ISSUES ...........................................43

CROSS-APPEAL STATEMENT OF THE CASE ...............................................43

I.   Arizona has a longstanding interest in requiring proof of citizenship to vote. .......................................................................43

II.   Arizona enacted bills to address the possibility of non-citizen voting. .................................................................................................44

    A.   The history of House Bill 2492 shows concern about voters who do not provide proof of citizenship. .........................45

    B.   The history of House Bill 2243 shows similar concern about voters who never provided proof of citizenship. .............46

III.   The district court considered evidence of *Arlington Heights* factors, then found a lack of discriminatory purpose behind House Bill 2243. .....................................................................................48

    A.   The court found evidence of the law's "impact" unpersuasive. ........................................................................49

B.    The court found evidence of "historical background" unpersuasive. .................................................51

C.    The court found evidence of the legislative "sequence of events," as well as "legislative history," unpersuasive. ....................................................52

D.    The court found evidence of "substantive and procedural departures" unpersuasive. .........................54

E.    The court concluded that Plaintiffs failed to carry their burden. ...........................................................55

CROSS-APPEAL STANDARD OF REVIEW ....................................55

CROSS-APPEAL SUMMARY OF ARGUMENT...............................56

CROSS-APPEAL ARGUMENT ........................................................56

I.     Promise lacked standing for its discriminatory purpose claim.................................................................56

II.    The district court applied the correct legal standard for evaluating discriminatory purpose............................58

III.   The district court did not clearly err in finding that Promise failed to carry its burden...............................60

A.    The district court's inferences from legislative history were justified. .....................................................60

B.    The district court's inferences about legislative sequence of events, including departures from norms, were justified.....................................................65

C.    The district court's inferences about historical background were justified. ............................................67

D.    The district court's inferences about the impact of H.B. 2243 were justified..........................................68

iii

IV.    The district court did not abuse discretion in evidentiary
       rulings. ............................................................................................72

CERTIFICATE OF COMPLIANCE ...............................................................766

CERTIFICATE OF SERVICE ..........................................................................777

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018) ................................................................ 51, 54, 65

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ....................................................................... 7, 29

*Arce v. Douglas,*
    793 F.3d 968 (9th Cir. 2015) ........................................... 49, 59, 60, 65

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
    570 U.S. 1 (2013) ................................................................... 12, 39, 43

*Ave. 6E Invs., LLC v. City of Yuma,*
    818 F.3d 493 (9th Cir. 2016) ...................................................... 52, 61

*Barranco v. 3D Sys. Corp.,*
    952 F.3d 1122 (9th Cir. 2020) ........................................................ 55

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021) ................................................................... passim

*Chism v. Washington State,*
    661 F.3d 380 (9th Cir. 2011) ........................................................... 4

*Doe I v. Landry,*
    909 F.3d 99 (5th Cir. 2018) ............................................................ 15

*Fla. State Conf. of N.A.A.C.P. v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) ................................................ passim

*Food & Drug Admin. v. All. for Hippocratic,*
    Med., 602 U.S. 367 (2024) ............................................................. 57

*Garza v. Cnty. of Los Angeles,*
    918 F.2d 763 (9th Cir. 1990) .......................................................... 62

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ........................................................................57

*In re Worcester*,
    811 F.2d 1224 (9th Cir. 1987) .........................................................4

*League of Women Voters of Arkansas v. Thurston*,
    No. 5:20-CV-05174, 2023 WL 6446015 (W.D. Ark. Sept. 29, 2023) .............34

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
    66 F.4th 905 (11th Cir. 2023) ........................................... 51, 54, 64, 67

*McCleskey v. Kemp*,
    481 U.S. 279 (1987) ................................................................ 51, 67

*McKinney-Drobnis v. Oreshack*,
    16 F.4th 594 (9th Cir. 2021) ...........................................................4

*MetroPCS Cal., LLC v. Picker*,
    970 F.3d 1106 (9th Cir. 2020) ........................................................16

*N. C. State Conf. of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ..................................................... 66, 68

*Nat'l Council of La Raza v. Cegavske*,
    800 F.3d 1032 (9th Cir. 2015) ........................................................58

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
    802 F.3d 1049 (9th Cir. 2015) ........................................................55

*Penn. State Conf. of NAACP Branches v. Sec'y Commonwealth of Penn.*,
    97 F.4th 120 (3d Cir. 2024) ....................................................... 6, 13

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) .....................................................................59

*Protectmarriage.com-Yes on 8 v. Bowen*,
    752 F.3d 827 (9th Cir. 2014) ..........................................................58

*Rilling v. Burlington N. R. Co.*,
    909 F.2d 399 (9th Cir. 1990) ...........................................................5

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) ............................................................8

*TSC Indus. v. Northway, Inc.*,
    426 U.S. 438 (1976) ................................................ 7, 11, 31, 38

*United States v. Alvarez*,
    358 F.3d 1194 (9th Cir. 2004) ........................................................16

*United States v. Carrillo-Lopez*,
    68 F.4th 1133 (9th Cir. 2023) ........................................ 50, 51, 59, 71

*United States v. O'Brien*,
    391 U.S. 367 (1968) ................................................................ 53, 64

*United States v. Otuonye*,
    995 F.3d 1191 (10th Cir. 2021) ......................................................74

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ................................................................ 48, 58

*Vote.Org v. Callanen ("Vote.Org II")*,
    89 F.4th 459 (5th Cir. 2023) ...................................................passim

**Statutes**

8 U.S.C. § 1401 ................................................................................36

8 U.S.C. § 1421 ................................................................................36

8 U.S.C. § 1427 ................................................................................36

8 U.S.C. § 1481 ................................................................................36

52 U.S.C. § 10101(a)(2)(B) ...................................................... 33, 34

52 U.S.C. § 21083(a)(5) ...................................................................23

A.R.S. § 16-121.01 ................................................... 40, 41, 45

A.R.S. § 16-134(B) ..........................................................................17

A.R.S. § 16-165 ................................................................ 41, 47, 70, 71

A.R.S. § 16-166 .................................................................. 38, 43, 71

A.R.S. § 16-542(A).................................................................34

A.R.S. § 41-193(A)(3) ...........................................................26

U.S. Const. amend. XIV, § I....................................................36

**Rules**

Fed. R. Evid. 403 ..................................................................74

**Regulations**

59 Fed. Reg. 32,311 (June 23, 1994) ...........................passim

**Other Authorities**

2022 Ariz. Laws ch. 99, §§ 4–5.............................................45

2022 Ariz. Laws ch. 370 § 2 ..................................................47

Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. & Mary L. Rev. 83 (2012) ............................................ 9, 18

# INTRODUCTION

## I. Birthplace

Arizona reasonably decided:  If a prospective voter skips an expressly required "State or Country of Birth" field on a registration form, and then is notified of the omission and fails to cure, that omission is material (i.e. significant) in determining (1) identity and (2) citizenship.  Each rationale suffices under the Materiality Provision.  Each independently requires reversal.

The United States' criticisms of Arizona's birthplace provision fail as a matter of law.  Dkt. 142 ("U.S. Br.").  So do the criticisms of the Mi Familia Vota plaintiffs (collectively "MFV").  Dkt. 154 ("MFV Br.").

Part 1 of this brief (pgs. 3–42) rebuts those criticisms.  This Court should correct the district court's overly strict reading of the Materiality Provision.

## II. Lack of discriminatory purpose

The cross-appeal attacks a different statute.  The birthplace provision was part of House Bill 2492, but Promise Arizona and Southwest Voter Registration Education Project (collectively "Promise") attack House Bill

2243, saying it was motivated by a discriminatory purpose. Dkt. 150 ("Promise Br.").

Unlike the question of whether a law is preempted by the Materiality Provision, the question of whether a law was motivated by discriminatory purpose is (everyone agrees) factual. The district found, as a matter of fact, that H.B. 2243 was not motivated by a discriminatory purpose. Arizona's Legislature was motivated by concerns about *non-citizens* voting, not *naturalized citizens* or *Latinos* voting.

Part 2 of this brief (pgs. 42–74) explains: Promise never had standing to challenge H.B. 2243, so this Court should dismiss the cross-appeal for lack of jurisdiction. If jurisdiction exists, this Court should affirm the district court's finding on discriminatory purpose. Most of the cross-appeal asks this Court to re-weigh evidence, which is not this Court's role. Part of the cross-appeal argues that the district court applied the wrong legal standard, which is not true. And one part of the cross-appeal argues that the district court wrongly excluded evidence, which is also untrue, and Promise fails to show prejudice anyway.

## PART 1: REPLY IN SUPPORT OF BIRTHPLACE PROVISION

This Court should apply de novo review to the district court's application of the Materiality Provision (Arg. § I) and should announce legal principles for future courts to follow (Arg. § II). This Court should hold that Arizona's birthplace provision is not preempted by the Materiality Provision, because Arizona reasonably deemed birthplace significant in determining identity (Arg. § III) and citizenship (Arg. § IV).

### I. This Court should review do novo the district court's application of the Materiality Provision to Arizona's birthplace provision.

Whether Arizona's birthplace provision violates the Materiality Provision is, at bottom, a question of law. *See, e.g.*, *Vote.Org v. Callanen ("Vote.Org II")*, 89 F.4th 459, 467, 489, 491 (5th Cir. 2023) (concluding that Texas law did not violate Materiality Provision, reversing district court's contrary summary judgment ruling, and rendering judgment for Texas); *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1155, 1175 (11th Cir. 2008) (concluding that Florida law was "not preempted" by Materiality Provision and reversing district court's contrary preliminary injunction). De novo review is therefore appropriate.

3

De novo review is also sensible given the specific question being asked: If a prospective voter skips an expressly required "State or Country of Birth" field on a registration form, and is then notified and fails to cure, is the omission "material to determining the eligibility of the applicant"? *Browning*, 522 F.3d at 1175. That is a legal question. *Accord, e.g.*, *Chism v. Washington State*, 661 F.3d 380, 389 (9th Cir. 2011) (applying de novo review to whether "false statements and omissions were material" because it is a "purely legal question"); *In re Worcester*, 811 F.2d 1224, 1229 (9th Cir. 1987) (applying de novo review to whether irregularity in a sale "is material" because it is a "question of law").

Even if the district court's application of the Materiality Provision involves a mixed question of law and fact, the United States acknowledges that "when applying the law involves developing auxiliary legal principles of use in other cases, appellate courts should use *de novo* review." U.S. Br. 17 (quoting *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 604 (9th Cir. 2021) (cleaned up)). Here, applying the Materiality Provision involves developing auxiliary legal principles of use in other cases. Indeed, the Ninth Circuit has never announced legal principles for interpreting the Materiality Provision.

The United States implicitly acknowledges that materiality is a legal question by analogizing to other contexts in which it is well-established that materiality is a legal question. *Compare, e.g.*, U.S. Br. 37 (analogizing to materiality in summary judgment context), *with Rilling v. Burlington N. R. Co.*, 909 F.2d 399, 400 (9th Cir. 1990) (applying de novo review to whether genuine issue of material fact exists at summary judgment).

In contrast, MFV argues that materiality in this context is an "issue of fact." MFV Br. 32 (quoting district court's summary judgment ruling). That is incorrect. Indeed, much of the district court's reasoning about the birthplace provision was in a section that even the court labeled "Conclusions of Law." 1-ER-0059, -0076–0078. While there may be facts *related* to the question of whether the Materiality Provision prohibits Arizona's birthplace provision, that does not make the question itself factual.

5

II.    **The Materiality Provision applies to errors or omissions that are insignificant in voter registration.**

Because the Ninth Circuit has not yet analyzed the Materiality Provision, the State suggests interpretive principles. State Br. 41–48. Some parties (and amici) object to these principles, but no objection is persuasive.[1]

A.    **The proper focus is whether information is significant in determining voter qualifications, not whether it is essential.**

This Court should adopt the Fifth Circuit's interpretation of "material," which uses words such as "significant" and "important" but rejects the word "essential." *Vote.Org II*, 89 F.4th at 478. This interpretation serves the purpose of the Materiality Provision, which is to prevent voting denials based on "insignificant, hyper-technical errors." *Penn. State Conf. of NAACP Branches v. Sec'y Commonwealth of Penn.*, 97 F.4th 120, 126 (3d Cir. 2024).

**U.S. position:** The United States does not dispute this definition. *See* U.S. Br. 43–45. Rather, the United States clarifies that an error or omission is material if it has "some probability" of affecting a voter eligibility determination. *Id.* 43. The United States cites similar definitions in other

---

[1] Amici who urge affirmance include the Constitutional Accountability Center (Dkt. 173, "CAC Br.") and Professor Levitt (Dkt, 178, "Levitt Br.").

6

contexts. For example, in the summary judgment context, a fact is material if it "might affect" the outcome. *Id.* 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And in the securities context, an omission is material if there is a substantial likelihood that a "reasonable shareholder would consider it important" in her decision. *Id.* (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

The State does not quibble with these glosses on the Fifth Circuit's definition. Under any of these definitions, Arizona's birthplace provision passes scrutiny. The main point is: States can require information that is *significant* (i.e. important) to voter eligibility determinations, even if not *essential*.

That said, the United States overreaches a bit in two ways. *First*, the United States cites Black's Law Dictionary from 1968, which defines "Material" as "Important; *more or less necessary*; having influence or effect." U.S. Br. 37 n.4 (emphasis added). This Court should reject "necessary" just as the Fifth Circuit rejected "essential." Otherwise that definition is sound. *Second*, at times the United States wrongly states that an error or omission, to be material, must have not only "some probability" of affecting a voter eligibility determination, but a *more than 50%* probability of doing so. *E.g.*,

7

*id.* (wrongly stating that the Fifth Circuit defined "material" as "important *and likely to affect* the decision" (emphasis added)). This definition strays too close to "essential." Under the Materiality Provision, errors or omissions must be significant (i.e. important) to a voter eligibility determination, but need not be outcome-determinative in any specific percentage of cases.

**MFV position:** In contrast to the United States, MFV argues that if information is "unnecessary" to a voter eligibility determination, the Materiality Provision prohibits States from requiring it. MFV Br. 26–27 (quoting *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003)). That argument goes too far and misconstrues *Schwier*. The *Schwier* court specified that the Materiality Provision prohibits States from requiring "information *irrelevant* to determining" eligibility. 340 F.3d at 1294 (emphasis added).

**Amici positions:** One amicus agrees that the Materiality Provision is aimed at errors or omissions "insignificant in the state's determination of a voter's qualifications." CEC Br. 27. This definition is sound.[2]

---

[2] This amicus also cites dictionary definitions of "material," one of which uses the word "essential." *Id.* 19–20. Again, that goes too far.

Another amicus argues that information is "material" if it has a "significant realistic propensity to affect . . . a reasonable decisionmaker's conclusion." Levitt Br. 9. This definition is probably sound, as long as it is not limited to information *likely to change* a decision. As Professor Levitt's article explains, an error or omission is material if "a reasonable decision maker would have a ***significant question*** about the would-be voter's substantive qualifications." Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. & Mary L. Rev. 83, 117 (2012) (hereafter "Levitt article") (emphasis added).

### B. Historical and common practice can support a materiality finding, but are not required.

This Court should also follow a common-sense principle: When evaluating whether information is material, the fact that other decision makers have sought the same kind of information for similar decisions indicates materiality. But the absence of such evidence does not render the information immaterial. State Br. 44.

**U.S. position:** The United States never outright disputes this principle, but instead quietly ignores that its arguments contradict it. And inexplicably, the United States cites the Federal Election Commission's

9

deliberations about birthplace—which confirm that reasonable minds differed on the issue and thus *supports* a materiality finding. 59 Fed. Reg. 32,311, 32,316 (June 23, 1994) (discussing "Place of Birth").

First, the United States tries to weaponize Arizona's history of *requesting* birthplace during voter registration, by arguing that it shows a birthplace *requirement* is "a solution in search of a problem." U.S. Br. 46. But that view of materiality is too strict. Under that view, if there is ever a time during which a State does not require certain information when registering voters, the State cannot require it in the future. This one-way ratchet effect lacks support in statutory text or case law. The Materiality Provision "does not establish a least-restrictive-alternative test." *Browning*, 522 F.3d at 1175.

Similarly, the United States tries to weaponize the practice of nine other States who *request* birthplace during voter registration, by describing as "doubtful" whether those States *require* the information. U.S. Br. 51–52. Even setting aside that one State is Nevada, Arizona's neighbor in the Ninth

Circuit,[3] the fact that other States *request* this information during voter registration is, itself, evidence of significance (i.e. importance). By analogy: In securities, an omission is material if a "reasonable" shareholder would "consider it important" in her decision. U.S. Br. 37 (quoting *TSC Indus.*, 426 U.S. at 449). Here, the fact that nine other States request birthplace during voter registration—regardless of whether they require it—indicates that Arizona is "reasonable" to "consider it important."

Astoundingly, the United States also tries to weaponize the fact that the Federal Election Commission ultimately decided not to require birthplace on the federal form. U.S. Br. 51 (citing 59 Fed. Reg. at 32,316). But the Commission's *full* explanation for its decision makes clear that reasonable minds can, and did, disagree on whether to require birthplace.

The Commission explained that comments on whether to require birthplace "were divided." 59 Fed. Reg. at 32,316. The "central argument" for including birthplace was its "usefulness as a vehicle for ***distinguishing***

---

[3] A decision by this Court may affect Nevada. Nevada's registration form is shown at D. Ariz. 2:22-cv-00509-SRB, Dkt. #365-1 at 147–48, and is publicly available at https://www.nvsos.gov/sosvoterregform/. The top of the form says "All fields are required unless marked Optional." The field "Place of Birth (State or Country)" is not marked Optional.

*duplicate registrations*." *Id.* (emphasis added). One commenter noted that his State had "a Constitutional requirement" to include birthplace on registration forms. *Id.* Another commenter noted that birthplace "is often used as a starting point *to 'investigate' citizenship* as it pertains to voting eligibility." *Id.* (emphasis added).

Tellingly, the Commission never identified a consensus that birthplace is immaterial. Quite the opposite: The Commission weakly noted that "[s]eventeen states currently function *without requiring* place of birth." *Id.* (emphasis added).

In sum, the Commission's full explanation confirms that birthplace has been commonly used in voter registration. Only after deliberation did the Commission chart its own course and decide not to require birthplace on the federal form. This history supports a finding of materiality. The fact that the United States now views this history as suggesting *immateriality* reveals how strict its interpretation of the Materiality Provision is. Requiring birthplace for voter registration is not a new idea, but even if it were, the Materiality Provision does not forbid States from trying new ideas—especially those that differ from the United States' view. *Accord Arizona v.*

12

*Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 12 (2013) ("state-developed forms may require information the Federal Form does not").

**MFV position:** MFV raises similar arguments, MFV 40–41, then argues that considering historical and common practice is "baseless" and unsupported by the "text or history" of the Materiality Provision, *id.* 50–51. This position goes too far. The history of the Materiality Provision shows a purpose of preventing vote denials based on "insignificant, hyper-technical errors." *Penn. State Conf. of NAACP Branches*, 97 F.4th at 126. When evaluating materiality of information, the fact that similarly situated decision makers have sought the same information suggests that it is not "insignificant" and "hyper-technical."

### C. Federal courts should give weight to State legislative judgments about significance.

This Court should also follow the Fifth Circuit and "give weight" to a State's own judgment about what information is significant for voter registration. *Vote.Org, II*, 89 F.4th at 485. This principle recognizes that significance is a matter of degree, may include policy considerations, and is a matter on which reasonable minds may differ. State Br. 43.

13

**U.S. position:** The United States opposes this principle, on strange grounds. *First*, the United States points out that the Materiality Provision "already defers" to States by allowing States to decide voter qualifications. U.S. Br. 45. That is a non-response. Everyone agrees that States set voter qualifications. The question is whether States *also* deserve leeway in deciding which information is significant in voter qualification decisions.

*Second*, the United States says that deferring to States would "negate" the Materiality Provision, which limits States' discretion. U.S. Br. 45. That argument attacks a straw man. The State is not seeking *complete* deference. Rather, the State is asking for courts to give "some weight" to its own judgment, which is "not controlling perhaps but at least meaningful to some degree." *Vote.Org II*, 89 F.4th at 478.

A deferential standard of judicial review is especially appropriate because the question of whether information is significant enough to be required during voter registration may involve policy considerations. This is clear from the Federal Election Commission's deliberations about whether to require birthplace on the federal form, described above. *See* 59 Fed. Reg. at 32,316. And, as the Fifth Circuit observed, States traditionally have "considerable discretion in establishing rules for their own elections."

14

*Vote.Org II*, 89 F.4th at 480. Accordingly, courts should be wary of stepping into the shoes of State policymakers here.

*Third*, the United States argues that the State "does not demonstrate that it deserves deference" here, because legislative history on Arizona's birthplace provision is scant. U.S. Br. 46. But the State is not required to "demonstrate" that it deserves deference, and certainly not through legislative history. *E.g.*, *Doe I v. Landry*, 909 F.3d 99, 107 (5th Cir. 2018) ("legislative history is not required to support a content-neutral purpose"). Rather, this Court should "accept what [Arizona] is arguing now" in identifying "a reasonable understanding of the legislative judgment" as to purposes of the birthplace provision. *Vote.Org II*, 89 F.4th at 488–89.

**MFV position:** MFV opposes this principle on similar grounds, and adds that the Fifth Circuit was wrong to rely on *constitutional* case law when giving weight to a State's legislative judgment. MFV Br. 49–50. But the Fifth Circuit acknowledged that a Materiality Provision claim is "not a constitutional claim"; it simply drew from constitutional case law the basic point that States have "considerable discretion in establishing rules for their own elections." *Vote.Org II*, 89 F.4th at 480.

15

In any event, there are many *other* reasons for giving weight to State judgments under the Materiality Provision, including that (1) whether information is significant is a matter of degree and often a matter of policy, (2) reasonable minds may differ on the matter, and (3) courts often apply a "presumption against preemption" when there is a historic presence of state law. *MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1118 (9th Cir. 2020).

**Amicus positions:** One amicus argues that giving weight to State judgments "would make no sense" because the Materiality Provision was enacted "to address concern about state abuses." CEC Br. 22. But the word "abuses" is revealing. Ordinarily, when a rule is made to prevent abuses of discretion, potential violations are judged by an *abuse-of-discretion* standard. *Cf., e.g.*, *United States v. Alvarez*, 358 F.3d 1194, 1205 (9th Cir. 2004) (reviewing trial judge's relevance determination for abuse of discretion). By analogy, courts should afford States some discretion in deciding which information is material (i.e. significant) in voter eligibility determinations.

## D. States may presume that an omission of basic biographical information is intentional if there is a cure process.

This Court should also adopt a principle to explain "the effect of a simple means to cure" inadvertent omissions on voter registration forms.

16

*Vote.Org II*, 89 F.4th at 487. The Fifth Circuit grappled with this issue but ultimately left it "open for a later case." *Id.*

The principle is simple: States may presume that an omission of basic biographical information (if expressly required on a voter registration form) is intentional if there is a process for notifying applicants of and curing inadvertent omissions. *See* State Br. 44–48.

**U.S. position:** The United States opposes this principle—or rather, a straw-man version of it. *First*, the United States accuses the State of assuming that all applicants who omit birthplace "are intentionally deceiving election officials." U.S. Br. 52. But that misunderstands the State's position. The State is simply presuming intentionality when (1) an applicant skips a field on a registration form that seeks basic biographical information and is expressly required, and (2) the State notifies the applicant as required by A.R.S. § 16-134(B) and the applicant *still* does not provide the information.

*Second*, the United States argues that this presumption of intentionality renders the Materiality Provision a "dead letter." U.S. Br. 52. Not so. The presumption of intentionality would *not* apply to applicants who (for example) write "Californi" as their state of birth but omit the "a," or who type a Phoenix address as their residence but omit that it is in "AZ," or who

17

misspell their birth date as "Febuary 1, 2000." None of those situations involves omission of expressly required basic biographical information. The intent of the applicant is clear in those situations, and the Materiality Provision would prevent rejection based on those errors.

*Third*, the United States argues that a presumption of intentionality is "unfounded" and rests on a "misreading" of *Browning*. U.S. Br. 52. But the presumption is founded in common sense. The Materiality Provision allows States to reject registration forms when "a reasonable decision maker would have a significant question about the would-be voter's substantive qualifications." Levitt article, *supra*, at 117. And whether a "significant question" exists depends in part on whether a notice and cure process exists. This is because an omission that is "material at time t" (e.g., failure to write birthplace) may "become immaterial at time t + 1" when the voter provides more information (e.g., via a cure process). *Id.* at 113–14.

The State's presumption recognizes this simple reality. If an applicant skips an expressly required field seeking basic biographical information and then fails to provide the information after being asked again, a reasonable decision maker would have a significant question about identity. This presumption is supported by *Browning*, in which the Eleventh Circuit

18

rejected the idea that States must assume all errors and omissions are "typo[s]." 522 F.3d at 1174–75.

*Fourth*, the United States argues that a presumption of intentionality would "call into question" currently registered voters in Arizona who skipped the birthplace field because it was optional. U.S. Br. 53. But the presumption does not apply to currently registered voters, precisely because the birthplace field has been optional. An applicant who skips an *optional* request for basic biographical information does not raise the same doubt as one who skips *an expressly required* field.

*Fifth*, the United States asserts that an "uncured" omission of basic biographical information "may signify only that prospective voters are busy." U.S. Br. 53. True enough. But the Materiality Provision does not *require* States to interpret uncured omissions as the result of applicants being busy rather than unqualified.

*Sixth*, the United States argues that a notice and cure process does not fully "insulate" States from Materiality Provision review. U.S. Br. 53–54. But the State is not seeking full insulation. The State is simply proposing a presumption of intentionality when an applicant skips expressly required basic biographical information, is notified, and fails to cure the omission.

19

**MFV position:** MFV opposes this presumption of intentionality on grounds similar to the United States, which fail for the same reasons. MFV Br. 51–53.

**Amicus positions:** Professor Levitt's view supports the presumption of intentionality, though he does not say so. He argues that "as further evidence arrives, the materiality of one piece of information can change." Levitt Br. 17. That is, in essence, what a notice and cure process does. When an applicant not only skips an expressly required field for basic biographical information, but then is notified and does not cure, the significance of the omission changes—it becomes greater.

## III. Birthplace is material in determining identity.

Everyone agrees that voter qualifications include identity. People who submit voter registration forms must be who they say they are, not someone else. *Vote.Org II*, 89 F.4th at 489 (describing identity as "the most basic qualification").

The State has explained three ways in which birthplace is material (i.e. significant) in determining identity. ***First***, a registration form that omits birthplace when expressly required raises doubt as to whether the applicant is who she says she is, given Arizona's cure process. State Br. 49–52. ***Second***,

20

birthplace is significant in determining whether an applicant differs from existing registrants with the same name and birth date. *Id.* 52–53. **Third**, birthplace is significant in determining voter identity in various other ways, during and after registration. *Id.* 54.

Each justification is an independent basis for concluding that birthplace is material. The district court's contrary conclusion, as well as arguments of the United States and MFV, rest on a legally mistaken view of the Materiality Provision.[4]

### A. An applicant who skips birthplace when expressly required raises doubt about identity, given Arizona's cure process.

One reason the U.S. State Department requires passport applicants to provide birthplace is that it "helps identify claimants attempting to use another person's identity." 3-ER-0614.

Here, no one disputes that birthplace is basic biographical information that, as one election official testified, "presumably only the voter would know." 3-ER-0756:17–0757:5.

---

[4] Amici do not raise arguments beyond those raised by the United States and MFV. *See* CAC Br. 25–27; Levitt Br. 20–26.

And no one disputes the possibility that people may try to register to vote as someone else. Election officials specifically recalled receiving registration forms purporting to be from voters "who had been *deceased for quite some time*," 4-ER-0819:8–0820:2 (emphasis added), as well as suspicious registration forms from third-party groups containing voter information similar to existing registrants but slightly altered, 3-ER-0744:19–0745:24; 4-ER-0817:7–0818:23; 4-ER-0837:6–0839:5.

Thus, if birthplace becomes expressly required on Arizona's registration form, someone who submits a form that lacks the information—and then declines to cure it—would reasonably raise a "significant question" about identity. Levitt article, *supra*, at 117.

This justification suffices to explains how birthplace is material and requires reversal. The objections of the district court, the United States, and MFV fail as a matter of law.

**Objection #1: Hypothetical concern.** One objection is that the State's concern about people trying to register as someone else is "hypothetical." U.S. Br. 53; *see also* 1-ER-0029 (faulting the defense for not providing specific examples in which election officials "encountered challenges" in determining voter eligibility without birthplace).

22

But as a matter of fact, trial revealed specific examples. *E.g.*, 4-ER-0819:8–0820:2. And as a matter of law, specific examples are not needed. The Materiality Provision allows Arizona to reject registration forms that reasonably raise a "significant question" about identity. Levitt article, *supra*, at 117. Arizona may presume that an applicant who skips an expressly required birthplace field, then refuses to cure the omission, does so intentionally. Arg. § II.D above.

**Objection #2: Other ways to check identity.** Another objection is that the State can already check identity through a "HAVA check," which does not use birthplace. *E.g.*, 1-ER-0078; U.S. Br. 40; MFV Br. 42. But the Materiality Provision does not require Arizona to accept as *sufficient* a check the federal government deems a *minimum baseline*.

Under HAVA, Arizona must compare an applicant's name and birth date, as well as driver license number or SSN digits (if the applicant has one), with motor vehicle records. *See* 52 U.S.C. § 21083(a)(5). But Arizona need not ignore the possibility that someone seeking to register as another person may know enough about the person to pass a HAVA check, including name and birth date, but not where the person was born. *See, e.g.*, 4-ER-0894–0895 (instructing that applicants who submit voter registration forms without

23

driver license number or SSN digits are "nonetheless permitted to register"); 4-ER-0900 (instructing that registration forms without driver license number or SSN digits can still "match[] against AZMVD or SSA data" for identity confirmation); 4-ER-0799:25–0800:11 (expert testifying that thousands of Arizona voter records lack driver license number and SSN digits); 7-ER-1597 (showing that registration form in Arizona can "soft match" an MVD record based on name and birth date only, and can "hard match" an MVD record based on name, birth date, and license number only).[5]

Arizona "is allowed to have doubts," *Vote.Org II*, 89 F.4th at 489, that an applicant who skips an expressly required birthplace field, and then is notified and fails to cure the omission, is truly who she claims—even if the form passes the HAVA check.

**Objection #3: No verification of birthplace.** Another objection is that election officials cannot verify the accuracy of an applicant's birthplace answer. *E.g.*, 1-ER-0077; MFV Br. 35, 40. But that does not make birthplace

---

[5] Notably, someone who views another person's Arizona driver license can see the person's name, birth date, and license number—but not birthplace. *See* https://azdot.gov/mvd/services/driver-services/driver-license-information/license-features.

an *insignificant* field. Requiring applicants to provide basic biographical information that only the true applicant would know "may dissuade improper individuals from registering." *Vote.Org II*, 89 F.4th at 490. And in any event, no verification is needed to *compare* birthplace on a registration form to other sources, such as information submitted by existing registrants and the NAPHSIS database, as discussed below. Arg. §§ III.B, III.C, IV.

**Objection #4: Limited historic use of birthplace.** Other objections are about how Arizona election officials have used birthplace historically. Some point to the low frequency with which election officials use such information. *E.g.*, 1-ER-0026 (citing evidence that election officials "do not use" birthplace to determine eligibility); 1-ER-0029 (finding that election officials "can sometimes use birthplace in Arizona's voter registration process"); U.S. Br. 19–20 (stating that election officials "rarely rely" on birthplace). Similarly, some objections point out that Arizona has already registered voters who did not provide birthplace, and has not instructed voters to write birthplace in a standard way. *E.g.*, 1-ER-0077; U.S. Br. 40–41.

These objections are answered by the fact that Arizona has *not yet implemented* the birthplace provision. *E.g.*, U.S. Br. 7 (acknowledging the law "was never implemented"). Indeed, in recent years, Arizona's registration

25

form has told applicants that birthplace is *not* required.  6-ER-1410.  Thus, one would not expect election officials to regularly use birthplace, nor would one expect applicants to consistently provide it.

More fundamentally, even if Arizona had *never* used (or even requested) birthplace, that would not prohibit Arizona from requiring prospective voters to provide it going forward.  *See Vote.Org II*, 89 F.4th at 489 (upholding Texas' original signature requirement despite plaintiffs' assertion that "original signatures are, in practice, not used to verify anyone's identity").  The fact that Arizona has registered voters without requiring birthplace may indicate it is not *essential*, but the Materiality Provision does not limit States to essential information.  Arg. §§ II.A, II.C above.  Indeed, the fact that Arizona historically has requested birthplace for voter registration *supports* materiality.  Arg. § II.B above.

**Objection #5:  Election officials' views of materiality.**  The United States and MFV also point out that Arizona's Secretary of State took the position that birthplace is not material.  U.S. Br. 39; MFV Br. 33.  But the Secretary does not speak for Arizona here; the Attorney General does.  A.R.S. § 41-193(A)(3).

In any event, legal views of election officials do not end the inquiry. For example, despite facing evidence that "some of the county defendants conceded" a point, the Fifth Circuit analyzed for itself whether the Texas requirement "meaningfully, even if quite imperfectly, corresponds to the substantial State interest in assuring that those applying to vote are who they say they are." *Vote.Org II*, 89 F.4th at 489.

## B. Birthplace is significant in identifying duplicate registrations.

Another reason the U.S. State Department requires passport applicants to provide birthplace is that it "distinguishes that individual from other persons with similar names and/or dates of birth." 3-ER-0614.

Indeed, when the Federal Election Commission considered whether to require birthplace on the federal form, the "central argument" for doing so was its "usefulness as a vehicle for distinguishing duplicate registrations." 59 Fed. Reg. at 32,316.

Here, it is undisputed that election officials in Arizona try to match voter registration forms with "existing" registrants. 4-ER-0899. And birthplace information is material (i.e. significant) for this purpose. For example, if only the name and birth date match, this is a "soft match," and birthplace is useful for determining a true match. 7-ER-1596; *see, e.g.*, 3-ER-

27

0739:12–0740:8; 4-ER-0805:7–0806:6, 4-ER-0806:16–0807:2; 4-ER-0824:5-20; 4-ER-0833:5-12.

Indeed, trial revealed multiple pairs of voter records in Arizona that contained the same name, the same birth date, *and* the same driver license number or SSN digits, yet unambiguously *different* birth states. 4-ER-0772:17–0773:8, 4-ER-0779:7-15, 4-ER-0783:20–0784:17, 4-ER-0796:14-20, 4-ER-0797:24–0798:15; 7-ER-1547, 7-ER-1551; 7-ER-1598. And this estimate is conservative because one third of Arizona voter records have no birthplace. 4-ER-0776:23-25. Moreover, this estimate does not address the thousands of voter records with *no* driver license number or SSN digits. 4-ER-0799:25–0800:11.

Even the district court acknowledged that election officials "could use birthplace to identify duplicate registrations . . . if an applicant has the same name and other identifying information as an existing registered voter." 1-ER-0027.

This justification is another independent basis for concluding that birthplace is material. Here, too, the objections of the district court, the United States, and MFV fail as a matter of law. Most of these objections have been addressed already, but three warrant further discussion.

28

**Objection #1: Low chance of being outcome-dispositive.** One objection is that, though trial revealed multiple pairs of voter records where birthplace was uniquely distinguishing, that is just a tiny percentage of overall records. *E.g.*, 1-ER-0029 (stating that "birthplace is of little utility in *nearly all* cases") (emphasis added); U.S. Br. 42; MFV Br. 43.

This objection rests on the false premise that the Materiality Provision limits States to requiring information with a *high likelihood* of changing an election official's decision. But information can be material (i.e. significant) even if it has a *low likelihood* of ultimately changing the result. Indeed, as the United States acknowledges, a fact is "material" at summary judgment if it "might" affect the outcome. U.S. Br. 37 (quoting *Anderson*, 477 U.S. at 248).

By analogy: Suppose the U.S. State Department learns that 99% of passport applicants are *not* attempting to use another person's identity and do *not* share the same name and birth date combination as anyone else. Would the Department still be justified in requiring passport applicants to provide birthplace? Yes, because preventing even *a tiny number* of identity misappropriations or mix-ups is worthwhile. Likewise, Arizona is justified in requiring prospective voters to provide birthplace, because preventing even *a tiny number* of misappropriations or mix-ups is worthwhile. A

29

contrary reading of the Materiality Provision would define "material" too strictly and improperly second-guess Arizona's judgment.  Arg. §§ II.A, II.D above.

**Objection #2:  Other ways to distinguish voters.**  Another objection is that there are better ways to distinguish voters than birthplace.  *E.g.*, U.S. Br. 41–42 (arguing that birthplace is a "weak differentiator" and there are "other, better identifiers").[6]  This objection rests on the same misreading of the Materiality Provision.  The Materiality Provision does not confine Arizona to the strongest differentiators.  Again, the statute "does not establish a least-restrictive-alternative test."  *Browning*, 522 F.3d at 1175.

Moreover, there are policy reasons for requiring birthplace as opposed to other information.  Birthplace is something that (1) everyone has, (2) virtually everyone knows about themselves, and (3) is not readily

---

[6] The United States overstates the record when it says, without citation, that "most" Arizona voters who provide birthplace say "Arizona, Mexico, or the United States."  U.S. Br. 3, 20, 50.  It is true that "Arizona" and "Mexico" are common answers.  But the record does not show these are the majority of answers.  And "United States" is an uncommon answer—fewer than 5% of records say that.  *Compare* 1-ER-0029 (estimating "4.7 million" voter records) *with* 1-ER-0028 (estimating "200,000" voter records that answered "United States").

surmised about someone else by observation. In contrast, the United States proposes requiring applicants to provide a driver license number or SSN instead. U.S. Br. 42. But not everyone has, or knows, that information about themselves. *E.g.*, 4-ER-0799:25–0800:11 (estimating thousands of voter records that lack driver license number or SSN digits). And besides, that proposal fails to address the abovementioned pairs of voter records where the name, birth date, and driver license number or SSN digits are the *same*, yet birthplace is *different.*[7]

At minimum, to paraphrase the United States, it is "reasonable" for Arizona to consider birthplace "important" in voter registration. U.S. Br. 37 (quoting *TSC Indus.*, 426 U.S. at 449). Courts should not tell Arizona that, even though it is undisputed that birthplace is *uniquely* distinguishing for multiple pairs of existing voter records (despite birthplace having been optional), that number is too small for Arizona to deem birthplace significant

---

[7] Astonishingly, the United States tries to brush aside these pairs of voter records by asserting that election officials "would conclude they are duplicates." U.S. Br. 42. But the Materiality Provision does not require Arizona to reach that conclusion. Arizona may instead do what the United States' own expert suggested: "figure out well, why has this happened?" 4-ER-0798:19–0799:8.

under the Materiality Provision. Courts should be wary of stepping into the shoes of State policymakers here. Arg. § II.D above.

**Objection #3: Birthplace can be useful even if not required.** A final objection is especially strange. The United States argues that, even if birthplace is useful, it "need not be mandatory" to be useful. U.S. Br. 47. This argument fails for an obvious reason: If the State does not *require* birthplace, many voters will not provide it. Indeed, one third of registered voters have not provided it. 4-ER-0776:23-25.

## C. Birthplace is significant in determining identity in other ways, both during and after registration.

The above-described reasons suffice to compel reversal here. But the record shows *more* ways in which birthplace is significant in determining voter identity in Arizona—even though it has been optional. This includes when election officials:

a. Evaluate a birth certificate submitted by an applicant that shows a different last name,

b. Seek more information from an applicant to process a registration form,

32

    c.      Try to determine whether a registered voter has died based on a death notice,

    d.      Verify the identity of a registered voter by phone, and

    e.      Verify the identity of a registered voter who submits a mail-in ballot request.

State Br. 54 (collecting record citations). Here again, the objections of the district court, the United States, and MFV fail as a matter of law. Most of these objections are addressed above, but two warrant further discussion.

**Objection #1: Post-registration uses of birthplace.** One objection is that the Materiality Provision does not allow States to require information *during* registration, for use in *post*-registration identity verification. *E.g.*, 1-ER-0078; U.S. Br. 49–50; MFV Br. 39, 42.

This argument is largely non-responsive. It ignores the fact that two of the above-described uses of birthplace—namely *a* and *b*—are for confirming voter identity *during* registration.

In any event, the Materiality Provision does *not* distinguish between pre-registration and post-registration identity verification. Rather, the statute allows States to require information that is material "in determining whether such individual is qualified under State law to vote." 52 U.S.C.

§ 10101(a)(2)(B). Post-registration verifications are important in determining whether people claiming to be voters are truly who they say they are—and thus qualified to vote.

For example, consider *e* in the list above. By statute, voters who submit mail-in ballot requests must include their "state or country of birth" or "other information" that if compared to the voter record "would confirm the identity." A.R.S. § 16-542(A); *see also* 4-ER-0925. So when an election official reviews a mail-in ballot request, the official is deciding whether the requestor is truly the voter in question—i.e., whether the requestor "is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B). The fact that this decision occurs after registration does not make it unrelated to determining voter qualifications. Indeed, another way of describing the situation is that the official is deciding whether registration *happened* for the person requesting the mail-in ballot. Accordingly, the Materiality Provision does not prohibit States from requiring information during registration that will be used to verify identity "at multiple points in the voting process." *League of Women Voters of Arkansas v. Thurston*, No. 5:20-CV-05174, 2023 WL 6446015, at *17 (W.D. Ark. Sept. 29, 2023).

34

**Objection #2: Other ways to verify identity.** Another objection is that election officials can use information besides birthplace to verify voter identity if needed. *E.g.*, 1-ER-0078 (stating that election officials "can" verify voter identity "without birthplace when necessary"); MFV Br. 40 (arguing that birthplace is "unnecessary" for post-registration verifications); *id.* 43 (similar). But as explained, the Materiality Provision does not limit States to information that is *essential*. Arg. § II.A.

And again, there are policy reasons for requiring birthplace as opposed to other biographical information. For example, MFV mentions "eye color" or "height," but these characteristics are readily surmised about someone else by observation—unlike birthplace. MFV Br. 42. MFV also mentions "ancestry," such as father's name or mother's maiden name, but some voters may have grown up in an environment where they did not know their father or mother—generally unlike birthplace. *Id.*[8]

---

[8] Also, Arizona does not require voters to provide eye color, height, father's name, or mother's maiden name. *See* 6-ER-1410.

In sum: Arizona reasonably deemed birthplace information significant in determining voter identity, and the district court's contrary conclusion should be reversed.

## IV. Birthplace is material in determining citizenship.

Everyone agrees that U.S. citizenship is a voter qualification. And birthplace relates to citizenship, because people born in the United States are thereby citizens (with rare exceptions), and people born outside the United States can become citizens through naturalization. *See, e.g.*, U.S. Const. amend. XIV, § I; 8 U.S.C. §§ 1401, 1421, 1427, 1481. Accordingly, birthplace generally determines a person's basis for claiming citizenship, which determines the types of proof that are relevant. *E.g.*, 4-ER-0881–0883.

This is not a new concept. Indeed, when the Federal Election Commission considered whether to require birthplace on the federal form, one commenter observed that "place of birth is often used as a starting point to 'investigate' citizenship as it pertains to voting eligibility." 59 Fed. Reg. at 32,316. A similar connection between birthplace and citizenship is clear from Arizona's own history of voter registration. *See* State Br. 4–5.

More specifically, if a U.S.-born prospective voter specifies her State of birth, that information can be used to locate her birth certificate through

NAPHSIS. *See* 1-ER-0019–20. This is because NAPHSIS collects vital record data, including birth certificate data, from across the United States. 4-ER-0811:16-25, 4-ER-0812:21–0813:4; 4-ER-0843:1-15, 4-ER-0844:1–0845:17. And a prospective voter's personal information, including birthplace, can be used to match birth certificate data. 4-ER-0844:16-20, 4-ER-0845:18–0846:19, 4-ER-0846:20–0847:17, 4-ER-0848:15–0849:7, 4-ER-0857:7-18.

Conversely, if a non-U.S. born prospective voter specifies that she was born in another country, then it is clear that the more useful database is SAVE. *See* 1-ER-0017–0019. SAVE is a federal program that retrieves immigration and citizenship information from federal agencies. 3-ER-0692, ¶¶ 116–18. Although election officials cannot enter birthplace information into SAVE, the program helps verify citizenship by matching other personal information (such as name, birth date, and an immigration-related number) to a federal record. 3-ER-0692-93, ¶¶ 119–22, 128, 131–32; *see also* 6-ER-1495.

For these reasons, birthplace is material (i.e. significant) in determining not only voter identity, but also citizenship. This is another independent basis for reversing the district court. Here, too, the objections of the district court, the United States, and MFV rest on a legally mistaken view of the Materiality Provision as explained below.

37

**Objection #1: Birthplace is not dispositive of citizenship.** One objection is that birthplace is not always "dispositive of citizenship status." 1-ER-0026; *see also* U.S. Br. 38, 54–55; MFV Br. 35. This criticism fails for a simple reason: The Materiality Provision does not limit States to requiring information *dispositive* of a voter qualification. Arg. § II.A above.

No one disputes that birthplace in the United States is at least strongly correlated with citizenship. *E.g.*, MFV Br. 35 (arguing merely that U.S.-born applicants are "not always" citizens). Thus, to paraphrase the United States, it is "reasonable" for Arizona to consider birthplace "important" in determining whether a prospective voter is a U.S. citizen. U.S. Br. 37 (quoting *TSC Indus.*, 426 U.S. at 449).

**Objection #2: Other ways to confirm citizenship.** Another objection is that Arizona does not need birthplace information to determine citizenship because Arizona uses more direct ways to confirm citizenship, namely by requiring prospective voters to provide proof of citizenship. *E.g.*, U.S. Br. 38–39, 55; MFV Br. 33–34. This argument fails for two reasons.

First, it is untrue. Although Arizona *tried* to require all prospective voters to provide proof of citizenship, *see* A.R.S. § 16-166(F), that attempt was blocked. The Supreme Court deemed the proof of citizenship requirement

38

unenforceable, for applicants who use the *federal* mail registration form to register for *federal* elections. *Inter Tribal*, 570 U.S. at 20. Then a consent decree further reduced enforcement, for applicants who use the *state* registration form. *See* 1-ER-0010–0011 (summarizing LULAC Consent Decree). Although parts of House Bill 2492 were intended to partially restore the proof of citizenship requirement, the district court declared several such provisions unenforceable before trial. *See* 1-ER-0148–0149.

So, at the time of trial, prospective voters in Arizona could register for federal elections despite not providing proof of citizenship. This was true for both federal-form users and state-form users. *E.g.*, 4-ER-0880 (instructing that a prospective voter who "does not submit" proof of citizenship and whose citizenship cannot be verified is "registered as a 'federal-only' voter"). Arizona's registration form explained this clearly: "If you do not submit proof of citizenship and we cannot acquire your proof of citizenship . . . you will receive a 'federal-only' ballot." 6-ER-1412. Thus, the argument that birthplace is unnecessary because Arizona requires all voters to provide proof of citizenship is false.[9]

---

[9] Moreover, the district court has enjoined Arizona from requiring birthplace information from *any* prospective voter. 1-ER-0004. So, as things

Second, the argument that birthplace is "unnecessary" due to proof of citizenship requirements is misguided for a more basic reason. The Materiality Provision does not ask whether birthplace is "necessary" for determining voter qualifications; it asks whether birthplace is "significant" or "important" for such determinations. Arg. § II.A above.

**Objection #3: Limits on NAPHSIS and SAVE.** MFV also argues that birthplace cannot be used to match birth certificate data in NAPHSIS, because election officials in Arizona did not have access to NAPHSIS at the time of trial. MFV Br. 36–37. But the Arizona statutes at issue *direct* election officials to use NAPHSIS for citizenship verification purposes if accessible. *See* A.R.S. §§ 16-121.01(D)(4), 16-165(J). And the district court found that "the evidence indicates Arizona could request access to the NAPHSIS database with relative ease." 1-ER-0019–0020; *see also* State Br. 27 (citing evidence on this point). Contrary to MFV's rhetoric (at 37), this is not "rank speculation" by the State; it is a fact found by the district court.

---

stand, even if a prospective voter does not provide proof of citizenship, Arizona cannot require birthplace information.

In any event, MFV cites no authority suggesting that information is immaterial just because it can be used in a database that election officials, though directed by statute to use, had not accessed by the time of trial.

Pivoting, MFV says that the Arizona statutes at issue "only" direct election officials to use NAPHSIS to confirm citizenship for "Federal Form applicants," and the Federal Form does not require birthplace. MFV Br. 37 (citing A.R.S. § 16-121.01(D)). The United States makes a similar argument. U.S. Br. 55–56. These arguments are wrong: The Arizona statutes at issue *also* instruct election officials to use NAPHSIS to confirm citizenship for currently-registered voters who never provided proof of citizenship, regardless of whether such voters used a federal or state form. A.R.S. § 16-165(J); *see also* State Br. 64 (citing both laws).[10]

Pivoting again, MFV points out that election officials in Arizona cannot use birthplace to "query the SAVE system" to find proof of citizenship for non-U.S.-born citizens. MFV Br. 38. This is true, but misses the point. If a prospective voter specifies that she was born in another country, that

---

[10] MFV tries to downplay this fact by burying it in a footnote. MFV Br. 38 n.13. And the United States tries to downplay it by calling it "irrelevant." U.S. Br. 56.

41

information signifies that SAVE (not NAPHSIS) is the more relevant database for citizenship verification—even if birthplace is not itself a queried field. *See* 59 Fed. Reg. at 32,316 (commenter noting that birthplace "is often used as a starting point to 'investigate' citizenship as it pertains to voting eligibility").

In sum: Arizona reasonably deemed birthplace information significant in determining citizenship, and this is an independent reason why the district court's conclusion should be reversed.

## PART 2: RESPONSE TO DISCRIMINATORY PURPOSE CLAIM

Unlike the question of whether Arizona's birthplace provision violates the Materiality Provision, the question of whether House Bill 2243 was motivated by discriminatory purpose is a quintessential question of fact. The cross-appellants never had standing to challenge H.B. 2243, so this Court should dismiss the cross-appeal. But if jurisdiction exists, this Court should affirm because the district court applied the correct legal standard, did not clearly err in finding a lack of discriminatory purpose, and did not abuse its discretion in evidentiary rulings.

## CROSS-APPEAL STATEMENT OF JURISDICTION

The State agrees with Promise's statement of jurisdiction.

42

## CROSS-APPEAL STATEMENT OF THE ISSUES

1.     Did Promise have standing to challenge House Bill 2243?

2.     The district court found that Arizona's Legislature enacted House Bill 2243 to address concerns about voters who had not provided proof of citizenship, and was not motivated by a discriminatory purpose. Did the district court clearly err in finding that Promise failed to show the Legislature was motivated by a discriminatory purpose?

## CROSS-APPEAL STATEMENT OF THE CASE

### I.     Arizona has a longstanding interest in requiring proof of citizenship to vote.

In 2004, Arizona voters approved Proposition 200, which required applicants seeking to register to vote to provide documentary proof of citizenship.  *See* 1-ER-0009–0010; A.R.S. § 16-166(F).

In 2013, the Supreme Court held that the National Voter Registration Act partially preempted Arizona's proof of citizenship requirement, such that applicants who submit a *federal* mail registration form without proof of citizenship must be allowed to vote in *federal* elections.  *See Inter Tribal*, 570 U.S. at 20.[11]

---

[11] In Arizona, voters who can vote only in federal elections are called "federal-only voters."

Later, two organizations sued Arizona's Secretary of State, alleging that state registration forms were being processed differently from federal forms. Specifically, applicants who submitted a *state* form without proof of citizenship were not registered for any election, whereas applicants who submitted a *federal* form without proof of citizenship were compared with data from Arizona's motor vehicle division ("MVD") and, depending on what the data showed, were registered for (1) no election, (2) all elections, or (3) only federal elections. *See* 1-ER-0010–0011; 7-ER-1599–1600. The Secretary denied that this different treatment was unlawful but nevertheless agreed to revise policies in the LULAC Consent Decree. 7-ER-1600–1614.

Following the LULAC Consent Decree, the Secretary directed county recorders as follows: If an applicant submits a voter registration form (whether a state or federal form) without proof of citizenship, and if proof cannot be acquired (e.g. through MVD), the applicant can still vote in federal elections as a "federal-only voter." 4-ER-0885.

## II. Arizona enacted bills to address the possibility of non-citizen voting.

In 2022, Arizona's Legislature passed two bills to modify voter registration and maintenance laws: House Bills 2492 and 2243. 1-ER-0040–

44

0043.  Although the cross-appeal attacks only H.B. 2243, the history of H.B.
2492 is briefly recounted here too.

### A. The history of House Bill 2492 shows concern about voters who do not provide proof of citizenship.

In January 2022, H.B. 2492 was introduced in the Legislature.  1-ER-0040.  The bill, which the Arizona Free Enterprise Club helped draft, generally (1) prevents voters who do not provide proof of citizenship from voting in presidential elections or by mail, (2) directs county recorders to reject state registration forms that lack proof of citizenship, and (3) directs county recorders to try to verify citizenship for applicants who submit federal registration forms without proof of citizenship.  *See* 2022 Ariz. Laws ch. 99, §§ 4–5 (amending A.R.S. §§ 16-121.01 and -127).

The bill's sponsor explained that the bill was in response to thousands of applicants being registered to vote in federal elections without proof of citizenship after the LULAC Consent Decree, and that the bill was "in keeping with the will of the voters passed in 2004, Proposition 200, that satisfactory evidence of United States citizenship shall be requested."  1-ER-0040–0041.

The "legislative history indicates that the legislators in favor of the bill were concerned specifically with the increase of Federal-Only Voters in Arizona who had not provided DPOC [documentary proof of citizenship]." 1-ER-0041.

## B. The history of House Bill 2243 shows similar concern about voters who never provided proof of citizenship.

Also in January 2022, H.B. 2617 (the precursor to H.B. 2243) was introduced. This bill, which the Arizona Free Enterprise Club helped draft, "expanded upon or superseded H.B. 2492 in certain respects." 1-ER-0013. For example, it directed county recorders to cancel a voter's registration if (1) the county recorder "confirms" the voter is a non-citizen, and (2) the voter then fails to provide "satisfactory evidence that the [voter] is qualified" within 90 days of being asked. 5-PromiseSER-0840–0841. It also directed the Secretary of State and county recorders to review state and federal databases, such as MVD data, NAPHSIS, and the federal SAVE program, to try to verify citizenship of registered voters. 5-PromiseSER-0842–0843.

H.B. 2617 was vetoed due to concerns that the bill was "vague" and lacked sufficient "guidance" for county recorders to determine whether a voter is "qualified." 1-ER-0042. After the veto, the bill's sponsor and the

46

House Speaker moved to replace the text of then-existing H.B. 2243 with an amended version of H.B. 2617. *Id.* This was done through a "strike all" floor amendment, which struck the existing text of H.B. 2243 and replaced it with a modified version of what was H.B. 2617. *Id.*; 5-PromiseSER-0764:14–0765:07. This practice is "used quite often." 5-PromiseSER-0765:1

The new H.B. 2243 differed somewhat from H.B. 2617. For example, as to voters whom county recorders "confirm" to be non-citizens, such voters must provide "satisfactory evidence of United States citizenship pursuant to section 16-166" (not just any evidence that they are qualified) within 35 days of being asked (not 90). *See* 2022 Ariz. Laws ch. 370 § 2 (amending A.R.S. § 16-165(A)(10)).

Senate President Petersen described the bill as essentially "identical" to House Bill 2617 with some "additional notice requirements." 1-ER-0042. He did not highlight specific changes between H.B. 2617 and H.B. 2243, nor is there a specific explanation for changes in the legislative record. 1-ER-0042–0043.

### III. The district court considered evidence of *Arlington Heights* factors, then found a lack of discriminatory purpose behind House Bill 2243.

Shortly after H.B. 2243 was enacted, Promise sued, claiming the law was motivated by a discriminatory purpose. *See* Promise Complaint ¶¶ 105–50, D. Ariz. No. 2:22-cv-01602-SRB, Dkt. #1 (Sept. 20, 2022).

The district court held a bench trial. *See* 3-ER-0658. In its ruling, the court summarized evidence. 1-ER-0008–0026, 0030–0047. Because H.B. 2243 is "facially neutral," the court considered non-exhaustive factors known as *Arlington Heights* factors[12] to determine whether the law was "motivated by a discriminatory purpose." 1-ER-0106–0107. The factors were:

"(1) the impact of the official action and whether it bears more heavily on one race than another;

(2) the historical background of the decision;

(3) the specific sequence of events leading to the challenged action;

(4) the defendant's departures from normal procedures or substantive conclusions; and

(5) the relevant legislative or administrative history."

---

[12] *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

1-ER-0107 (quoting *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015)).

**A.   The court found evidence of the law's "impact" unpersuasive.**

H.B. 2243 asks nothing of voters unless a county recorder obtains information *and confirms* that an already-registered voter is not a U.S. citizen. 1-ER-0044.   Even then, the voter need only provide proof of citizenship within 35 days of being asked, to avoid having registration cancelled.  *Id.*

The district court found that Plaintiffs failed to show "any significant discriminatory impact based on naturalization status, race, or ethnicity."  1-ER-0110–0111; *see also, e.g.*, ER-0044–0047 (summarizing evidence).

To begin, the total number of federal-only voters (i.e. voters who never provided proof of citizenship) is "small in absolute terms."  1-ER-0111.  And, while it is "possible" for databases such as MVD to "return outdated citizenship information for a small number of naturalized citizens" (i.e., flag as a non-citizen a voter who has since naturalized), any such effect is limited for at least two reasons: (1) the flagged voter may have "already provided" proof of citizenship to election officials who can then ignore the outdated flag, and (2) even if the flagged voter has not yet provided proof of citizenship to election officials, evidence indicates that the number of

naturalized citizens likely to be flagged this way (by MVD) is 65—"just 0.001% of all voters." *Id.*

Moreover, even for the tiny number of naturalized-citizen voters who may be flagged as non-citizens by an outdated database *and* who have not yet provided proof of citizenship to election officials, Plaintiffs did not show that any such voter could not simply *provide* proof of citizenship to election officials when asked. That is, Plaintiffs offered "no quantifiable evidence" of "naturalized citizens who lack both their naturalization certificate *and* their immigration number." *Id.*

In addition, the court deemed it "common sense" that a database such as MVD is more likely to flag as a non-citizen someone who *was* a non-citizen when she interacted with MVD (and has since naturalized), as opposed to a U.S.-born citizen. The fact that naturalized citizens are more likely than U.S.-born citizens to *have been* non-citizens during their lives does not mean the Legislature enacted H.B. 2243 "*because of* any impact on minority voters or naturalized citizens." *Id.* (citing *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1153 (9th Cir. 2023)).

Finally, even if Plaintiffs could show a legislative "failure to adequately consider" disparate impact, such a failure is "insufficient to show a discriminatory motive." 1-ER-0112 (citing *Carrillo-Lopez*, 68 F.4th at 1139).

## B. The court found evidence of "historical background" unpersuasive.

The district court acknowledged that Arizona has "a long history of discriminating against people of color," but reasoned that historical evidence must be "reasonably contemporaneous with" H.B. 2243 to have significant "probative value." 1-ER-0107 (quoting, in part, *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987)); *see also, e.g.*, 1-ER-0037–0040 (summarizing evidence).

Accordingly, the court concluded that Plaintiffs' "examples of past discrimination" did not overcome the presumption of "good faith" afforded to legislatures. *Id.* (citing *Abbott v. Perez*, 585 U.S. 579, 603 (2018)). In particular, Plaintiffs failed to identify a "persuasive nexus" between "Arizona's history of animosity" and "the Legislature's enactment" of H.B. 2243. *Id.* (citing *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023)).

### C. The court found evidence of the legislative "sequence of events," as well as "legislative history," unpersuasive.

Combining the third and fifth *Arlington Heights* factors, the district court acknowledged that H.B. 2243 was enacted "on the heels of unsubstantiated voter fraud claims" after Arizona voted for President Biden in 2000. 1-ER-0108; *see also, e.g.*, 1-ER-0040 (summarizing evidence).

But, after carefully reviewing legislative history, the court concluded that "[n]othing in the legislative hearings evince a motive to discriminate against voters based on race or national origin." 1-ER-0108; *see also, e.g.*, 1-ER-0040–0043 (summarizing evidence). Rather, legislative history shows that H.B. 2492 and H.B. 2243 are "in many ways the progeny of Arizona's prior effort to require DPOC [documentary proof of citizenship] for all Arizona voters through Proposition 200." 1-ER-0108.

The court acknowledged the "public sentiment" in Arizona that "non-citizens were able to vote by falsely attesting to U.S. citizenship," but found that this sentiment did not amount to "community animus" as might impute a discriminatory motive to lawmakers. 1-ER-0109 (citing *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016)).

The court also acknowledged that the Arizona Free Enterprise Club "helped draft" both H.B. 2492 and the precursor to H.B. 2243. 1-ER-0040, -0042. The court further acknowledged that the Club emailed legislators, claiming that H.B. 2492 would prevent "illegals" from voting in Arizona. 1-ER-0040 n.34, -0109. Indeed, the court deemed this fact to be "some evidence of community animus" because the term "illegals" might be a coded appeal to racial animus. 1-ER-0109. However, the court ultimately assigned these facts little weight because Plaintiffs presented "no persuasive evidence" that the Legislature relied specifically on a "coded appeal" to racial animus, nor that the Legislature intended to "prevent anyone other than non-citizens from voting." 1-ER-0109–0110.

The court also acknowledged testimony from Senator Quezada (an opponent of the bill), accusing Senator Borrelli (a legislator who voted for the bill) of making "derogatory comments about Latino voters." 1-ER-0110. But the court reasoned that, even "assuming" Senator Borrelli made those remarks, the court would not "impute" them to the Legislature as a whole. *Id.* (citing primarily *United States v. O'Brien*, 391 U.S. 367, 383–84 (1968)). Moreover, although Senator Quezada expressed concern with the bills, the

court deemed statements of a bill's opponent "not reliable evidence of legislative intent." *Id.* (quoting *League of Women Voters of Fla.*, 66 F.4th at 940).

### D. The court found evidence of "substantive and procedural departures" unpersuasive.

Regarding the fourth *Arlington Heights* factor, the district court found "no persuasive evidence" of procedural departures during enactment of H.B. 2492. 1-ER-0112; *see also, e.g.*, 1-ER-0040–0041 (summarizing evidence).

As for H.B. 2243, the court acknowledged that a similar bill (H.B. 2617) had been vetoed and much of its content was reintroduced as an amendment to then-existing H.B. 2243 near the end of a legislative session. 1-ER-0113; *see also, e.g.*, 1-ER-0041–0043 (summarizing evidence). But the court noted that "amendments to existing bills are common at the close of a legislative session." 1-ER-0113. The court also deemed the "speed" with which the Legislature passed H.B. 2243 to be "not so abrupt as to infer an improper motive." *Id.* (citing *Abbott*, 585 U.S. at 610 & n.23).

More generally, the court observed that Arizona has attempted to require proof of citizenship since 2005, and H.B. 2243 "supplement[s] this requirement to ensure that non-citizens do not . . . remain on the voter rolls." 1-ER-0113. Notably, election officials in Arizona had already been using

54

databases such as MVD and SAVE to verify citizenship during voter registration, so H.B. 2243 was "expanding" that use to identify "existing registered non-citizens." *Id.* In addition, the fact that H.B. 2243 gives voters who are confirmed to be non-citizens 35 days to prove citizenship (rather than 90 days) is "not a departure from prior Arizona law," because election officials had already been following a similar policy in Arizona's 2019 Elections Procedures Manual. *Id.*

### E. The court concluded that Plaintiffs failed to carry their burden.

Ultimately, the district court "considered the totality" of the factors and concluded that Plaintiffs "failed to show" that H.B. 2243 was "enacted with a discriminatory purpose." 1-ER-0113–0114.

## CROSS-APPEAL STANDARD OF REVIEW

"We review the district court's findings of fact after the bench trial for clear error and review the district court's conclusions of law de novo." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1061 (9th Cir. 2015). Evidentiary rulings are reviewed for abuse of discretion and reversed only if "erroneous *and* prejudicial." *Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1127 (9th Cir. 2020) (citation omitted).

## CROSS-APPEAL SUMMARY OF ARGUMENT

Promise lacked standing for its discriminatory purpose claim. Arg. § I. In any event, the district court did not err in articulating the legal standard. Arg. § II. Nor did the court err (clearly or otherwise) in finding that Promise failed to prove that H.B. 2243 was motivated by a discriminatory purpose. Arg. § III. Nor did the court abuse its discretion regarding evidentiary rulings. Arg. § IV.

## CROSS-APPEAL ARGUMENT

### I. Promise lacked standing for its discriminatory purpose claim.

This Court should dismiss the cross-appeal for lack of Article III jurisdiction.

Promise Arizona is a nonprofit organization that seeks to increase participation of Latino communities in the electoral process. 1-ER-0050–0051. Its members include naturalized-citizen voters. 1-ER-0051. Its activities include registering and educating voters. *Id.*

Southwest Voter Registration Education Project is a nonprofit organization committed to empowering Latino communities through their vote. 1-ER-0050. Its activities include educating and registering voters. *Id.*

56

The district court wrongly concluded that Promise Arizona had "direct standing" to challenge H.B. 2243 on the ground that the law posed a "substantial threat of injury," which "frustrates Promise Arizona's mission and will require it to divert resources to counteract its effects." 1-ER-0066. This conclusion rested on a misunderstanding of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and its progeny. The Supreme Court has since clarified that *Havens* "was an unusual case" and does not support standing just because "an organization diverts its resources in response to a defendant's actions." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393–96 (2024). Rather, for an organization to have standing under *Havens*, the defendant's action must have "directly affected and interfered with" the organization's "core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* at 395. Promise did not make that showing. *See* 1-ER-0051 (summarizing evidence).[13]

---

[13] The district court also wrongly concluded that Southwest Voter Registration Education Project had standing for the same reason. 1-ER-0067.

57

In addition, the court wrongly concluded that Promise Arizona had "representational standing" to challenge H.B. 2243. 1-ER-0066–0067. Contrary to the court's conclusion, Promise Arizona never proved that any member faced a "realistic danger of sustaining a direct injury" from H.B. 2243. 1-ER-0066 (quoting *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014)). For example, there was no evidence that any member would be falsely identified as a non-citizen under H.B. 2243, nor that any such member could not provide proof of citizenship. Similarly, the court was wrong in excusing Promise Arizona from needing to identify members on the ground that it was "relatively clear" that "one or more members have been or will be adversely affected" by H.B. 2243. 1-ER-0067 (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015)).

But if this Court does not dismiss the cross-appeal for lack of jurisdiction, the Court should affirm as explained below.

## II.    The district court applied the correct legal standard for evaluating discriminatory purpose.

Promise was required to prove that "a discriminatory purpose [was] a motivating factor" in the Legislature's enactment of H.B. 2243. *Vill. of Arlington Heights*, 429 U.S. at 265–66. A discriminatory purpose means that

the decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

The discriminatory purpose must belong to the Legislature as a whole. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021) (determining the district court was correct in requiring "evidence that the legislature as a whole was imbued with racial motives"). And evidence must be considered in light of the "strong presumption of good faith" afforded legislators. *Carrillo-Lopez*, 68 F.4th at 1139 (cleaned up).

Here, the district court correctly identified the *Arlington Heights* factors in deciding whether H.B. 2243 was "motivated by a discriminatory purpose." 1-ER-0106–0107 (quoting *Arce*, 793 F.3d at 977).

Promise says the court applied the wrong standard because it "insist[ed] that every piece of evidence in each of the four [sic] *Arlington Heights* categories must directly and explicitly link to the expressed motive of legislators." Promise Br. 27.

But that is not what the court did. The court considered a variety of evidence, including circumstantial evidence. *See generally* 1-ER-0106–0113. Indeed, the court expressly considered whether legislators "camouflaged" a

discriminatory intent. 1-ER-0108 (quoting *Arce*, 793 F.3d at 978). Promise's real gripe is with how the court weighed evidence, as discussed below.

## III. The district court did not clearly err in finding that Promise failed to carry its burden.

The district court did not clearly err in weighing evidence under the *Arlington Heights* factors.

### A. The district court's inferences from legislative history were justified.

Promise argues that the district court "[d]isregarded" and "[d]evalued" evidence of discriminatory intent in legislative history. Promise Br. 29 (Heading A). The court did no such thing.

*First*, Promise insists that Arizona had a "climate of stereotyping of and false accusations against Latinos and naturalized U.S. citizen voters" after the 2020 election. Promise Br. 29 (Subheading i). But the district court considered evidence along these lines and justifiably found that it did not prove a discriminatory purpose.

For example, the court acknowledged that (1) there were "unsubstantiated voter fraud claims" after the 2020 election, (2) the Arizona Free Enterprise Club sent an email to legislators advocating preventing "illegals" from voting, and (3) one of the opponents of H.B. 2243 (Senator

Quezada) accused another legislator of making "derogatory comments about Latino voters." 1-ER-0108–0110.

But the court also weighed countervailing considerations, such as the fact that (1) legislative hearings never evinced "a motive to discriminate against voters based on race or national origin" but instead confirmed that the laws were "the progeny of Arizona's prior effort to require" documentary proof of citizenship for all voters, (2) there was no persuasive evidence that the Legislature relied on a coded appeal to racial animus, and (3) Senator Quezada's accusation against another legislator, even if credited, did not impugn the Legislature as a whole. *Id.* Accordingly, the court did not err (much less clearly err) in finding that the "climate" did not prove discriminatory purpose behind H.B. 2243.

Promise relies (at 30) on this Court's decision in *Avenue 6E Investments, LLC*, but the procedural posture makes it inapposite. That case involved whether plaintiffs made "sufficient allegations" of animus to "state a plausible claim for relief." 818 F.3d at 503–04. That dismissal-stage case does not support reversal of post-trial findings here.

Promise also argues that discriminatory purpose can exist even when the decisionmaker does not harbor "personal feelings toward minorities."

61

Promise Br. 35 (quoting *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring)). But the district court never said otherwise. So that legal premise, even if true, changes nothing.[14]

**Second**, Promise says the district court "ignored the Legislature's reliance on the Arizona Free Enterprise Club" in passing H.B. 2243. Promise Br. 36 (Subheading ii). Not so. The court knew of the Club's role. 1-ER-0042 (noting that the Club "helped draft" H.B. 2617, the precursor to H.B. 2243); *see also* 1-ER-0040 (noting that the Club "helped draft" H.B. 2492).

The court never found that legislators did not rely on the Arizona Free Enterprise Club *at all*. Rather, the court found no persuasive evidence that the Legislature specifically relied on the Club's alleged "coded appeals" to racial animus. 1-ER-0109–0110. In other words, *even if* the Club's self-professed goal of preventing "illegals" from voting indicates racial animus

---

[14] Promise criticizes the district court's statement, when summarizing evidence, that "Plaintiffs did not adduce evidence challenging the sincerity of some Arizonans' belief that non-citizens had voted in the 2020 election." 1-ER-0043. But the court did not state that Plaintiffs were *required* to prove insincerity. And regardless, the sincerity of lawmakers' beliefs is plainly relevant. *E.g.*, *Brnovich*, 594 U.S. at 689 (crediting district court's "assessment of the sincerity of [a law's] proponents").

(as opposed to a poorly phrased desire to prevent non-citizens from voting), the court declined to impute any such animus to the Legislature.

This decision was clearly justified, if not compelled, by case law. "Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools." *Brnovich*, 594 U.S. at 689–90.[15]

***Third***, Promise insists that legislators' statements about voters' "immigration or citizenship status" were the "driving force" behind H.B. 2243. Promise Br. 40 (Subheading iii). But the district court was justified in drawing a different inference: "Nothing in the legislative history of H.B. 2492 or H.B. 2243 reflects an intent to suppress voter registrations of members of minority groups or naturalized citizens," and instead the Legislature was trying to restore and extend "Arizona's prior effort to require" proof of citizenship. 1-ER-0043, -0108.

Promise relies heavily on testimony of Senator Quezada, who opposed H.B. 2243. Promise Br. 41–42. He said that Senator Borrelli commented to

---

[15] Promise also asserts that the district court "excluded" relevant evidence regarding the Arizona Free Enterprise Club. Promise Br. 37. This assertion is address in Arg. § IV below.

him that bills were brought forward because "[i]t's your people over there in your neighborhood that are doing this." 5-PromiseSER-758:2-19.[16] Even assuming this account is accurate, the court justifiably declined to "impute" such comments to the Legislature, 1-ER-0110, on the "basis of what fewer than a handful of [legislators] said," *O'Brien*, 391 U.S. at 383–84. Moreover, the account is appropriately viewed with skepticism, 1-ER-0110, because statements of "political opponents during the legislative process are not reliable evidence of legislative intent," *League of Women Voters of Fla.*, 66 F.4th at 940.

Pivoting, Promise resorts to scattered statements by two other legislators: (1) Senate President Petersen, who (according to Promise) said he "probably" has used the word "illegals" at some point, and (2) Representative Hoffman, who used the word "documented" once in the context of H.B. 2492 (not H.B. 2243) and used the word "illegals" in an unrelated post-enactment confirmation hearing. Promise Br. 44. The connection between these statements and the enactment of H.B. 2243 is

_____

[16] The record does not specify whether this alleged exchange took place in the context of H.B. 2243.

tenuous at best. Even if these statements could raise "a plausible inference" of racial animus, *Arce*, 793 F.3d at 979, the district court's contrary inference was "permissible," *Brnovich*, 594 U.S. at 689.

> **B.** **The district court's inferences about legislative sequence of events, including departures from norms, were justified.**

Promise argues that the district court "ignored" evidence of departures from legislative norms in the enactment of H.B. 2243. Promise Br. 48 (Heading B). But the court did not ignore evidence; it just found the evidence not "persuasive" of discriminatory purpose. *E.g.*, 1-ER-0112–0113.

Promise asserts that the enactment of H.B. 2243 was "hurried" and "at the end of the legislative session," was done via an "irregular" amendment, and did not give opponents time to "thoroughly read" the bill. Promise Br. 48–49. But the court weighed these facts against countervailing facts, including that (1) "amendments to existing bills are common at the close of a legislative session" and (2) the precursor to H.B. 2243 (namely H.B. 2617) had already passed "through the ordinary legislative process." 1-ER-0113. Thus, the court justifiably declined to "infer an improper motive." *Id.* (citing *Abbott*, 585 U.S. at 610 & n.23).

Promise also points out that H.B. 2243, as compared with H.B. 2267, "reduced the notice period" in which people who are confirmed to be non-citizens must provide proof of citizenship to avoid registration cancellation. Promise Br. 49. Here too, the court justifiably declined to infer improper motive, pointing out that election officials had already been giving 35-day notices to voters who attested to non-citizenship on a juror questionnaire. 1-ER-0113 (citing Arizona's 2019 Elections Procedures Manual).

Promise relies (at 48) on a Fourth Circuit decision, but that case involved very different facts. *N. C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 227–29 (4th Cir. 2016). In that case, "immediately after" the Supreme Court declared part of the Voting Rights Act unconstitutional, North Carolina's legislature "vastly expanded" an existing bill from 16 pages to 57 pages, then "rushed through the legislative process the most restrictive voting legislation seen in North Carolina since enactment of the Voting Rights Act of 1965." *Id.* at 227. Here, in contrast, a precursor to H.B. 2243 had already been passed by Arizona's Legislature. *Compare* 5-PromiseSER-0839–0843 *with* 5-PromiseSER-0831–0838. The district court did not clearly err in declining to infer improper motive here.

C.     **The district court's inferences about historical background were justified.**

Promise argues that Arizona's "[m]ore [r]ecent [t]reatment" of Latino and immigrant voters shows that H.B. 2243 was enacted with discriminatory intent.  Promise Br. 50 (Heading C).  But again, the district court did not clearly err in finding otherwise.  *E.g.*, 1-ER-0107–0108.

The court correctly reasoned that "unless historical evidence is reasonably contemporaneous with [H.B. 2243], it has little probative value." 1-ER-0107 (quoting *McCleskey*, 481 U.S. at 298 n.20).  And the court justifiably found that Plaintiffs showed no "persuasive nexus" between historical discrimination and H.B. 2243.  *Id.* (citing *League of Women Voters of Fla.*, 66 F.4th at 923).

Promise's meager effort to identify contemporaneous evidence of discrimination confirms the lack of a nexus.  Promise cites (1) the position of the United States regarding certain proposed election changes in Arizona in the 1980s and 1990s, (2) general "statements of President Trump," (3) a context-free comment by a former legislator that there are not "enough white

kids to go around,"[17] and (4) instances in 1997 and 2010 that Promise characterizes as "law enforcement and legislative efforts targeting immigrants and people of color."[18] Promise Br. 51–53. None of this relates to H.B. 2243, and the district court did not clearly err in so finding.

Again, Promise's reliance (at 48) on *North Carolina State Conference of NAACP* is misplaced. There, the Fourth Circuit considered pre-1965 history because the North Carolina law at issue "came into being literally within days of North Carolina's release from the preclearance requirements of the Voting Rights Act" of 1965. 831 F.3d at 223. Not so here.

### D. The district court's inferences about the impact of H.B. 2243 were justified.

Promise argues that the "[p]robable [i]mpact" of H.B. 2243 on voters proves discriminatory intent. Promise Br. 53 (Heading D). But again, the district court did not clearly err in finding otherwise. *E.g.*, 1-ER-0110–0112.

---

[17] Promise says this comment was made in 2018, but the record does not specify. 5-PromiseSER-0800–0806.

[18] These instances were characterized by Plaintiffs' expert, Professor Orville Burton. 5-PromiseSER-0800–0806. The district court expressly "question[ed] the reliability" of some of Professor Burton's "testimony regarding Arizona history." 1-ER-0037 n.31.

Promise launches three criticisms. **First**, Promise asserts that "[o]nly naturalized citizens would be subject to" a SAVE check. Promise Br. 55–56 (quoting 1-ER-0085). But this assertion is not quite accurate. It is true that SAVE "contains no information on native-born citizens." 1-ER-0018. But that just means the information is limited to people who came to the United States from another country. Some may be citizens (having naturalized); some may not be. 4-ER-0886–0887 (explaining status categories that SAVE can identify); 6-ER-1497 (example of how SAVE can identify person as Lawful Permanent Resident). So a more accurate assertion is: If a person is subjected to a SAVE check, SAVE can return information only if the person came from another country—which may include naturalized citizens and non-citizens, but not U.S.-born citizens.

In any event, the court justifiably found no "significant discriminatory impact" from SAVE checks under H.B. 2243, for three reasons:

a.    Plaintiffs did not show that SAVE will falsely flag *any* naturalized-citizen voter as a non-citizen. Plaintiffs "failed to adduce

69

evidence that SAVE is unreliable or contains severely inaccurate or outdated citizenship information." 1-ER-0018.[19]

b.     Even if SAVE falsely flags a naturalized-citizen voter as a non-citizen, Plaintiffs failed to show that the voter could not simply *provide* proof of citizenship when asked. Plaintiffs offered "no quantifiable evidence" of "naturalized citizens who lack" proof of citizenship. 1-ER-0111.

c.     Although SAVE information is limited to people born <u>outside</u> the United States, H.B. 2243 also directs county recorders to use a database for people born <u>in</u> the United States: NAPHSIS. *See* A.R.S. § 16-165(J); 1-ER-0019–0020. This confirms the Legislature was concerned about *non-citizens* voting, not *naturalized citizens* voting.

**Second**, Promise asserts that the district court improperly "requir[ed] direct evidence of legislative intent," thus ignoring circumstantial evidence. Promise Br. 56–57. Not so.

---

[19] And even if SAVE contains outdated citizenship information, it is "common sense" that such a database is more likely to flag as a non-citizen someone who *was* a non-citizen at the time she interacted with SAVE (and has since naturalized), as opposed to a U.S.-born citizen. *See* 1-ER-0111.

70

The district court merely stated that disparate impact is "generally insufficient alone" to infer discriminatory motive. 1-ER-0110. The court acknowledged there may be "rare cases" where disparate impact indicates discriminatory motive. *Id.* (quoting *Carrillo-Lopez*, 68 F.4th at 1141). The court simply found that this is not such a case. 1-ER-0110–0112.

***Third***, Promise cites a professor who predicted that, under H.B. 2243, more than 6,000 naturalized-citizen voters will "become stuck in a 'loop' where MVD will flag the voter as a non-citizen after each monthly check," requiring them to "repeatedly provide" proof of citizenship each month. Promise Br. 57 (quoting 1-ER-0032–0033). This unfounded prediction misreads the statute. Under H.B. 2243, county recorders do not request proof of citizenship unless they "confirm" a voter is not a citizen. A.R.S. § 16-165(A). So once a voter provides proof of citizenship, the county recorder can no longer "confirm" non-citizenship. *See* A.R.S. § 16-166(J) (requiring county recorders to indicate in a voter's "permanent voter file" when the voter has provided proof of citizenship); § 16-165(K) (requiring county recorders to review databases to which they have access).

The court was justified in rejecting the professor's unfounded "loop" theory. *See* 1-ER-0032–0033. The fact that Arizona's 2023 Elections

71

Procedures Manual, issued after trial, confirms the professor was wrong (*see* 2-ER-0252–0253) did not somehow require the court to accept the "loop" theory when evaluating discriminatory purpose.

## IV. The district court did not abuse discretion in evidentiary rulings.

Finally, Promise argues that the district court abused its discretion by "[e]xcluding" certain testimony and exhibits. Promise Br. 44 (Subheading iv). Promise focuses on deposition testimony from House Speaker Toma and Senate President Petersen and exhibits from those depositions. Promise Br. 47. This argument fails for three reasons.

***First***, as far as the State can tell, the district court *did not exclude* this evidence. For depositions: Plaintiffs submitted excerpts of Speaker Toma and President Petersen's depositions (2-PromiseSER-224–227; *see also* 2-PromiseSER-158–223), as well as a chart showing Defendants' objections (3-PromiseSER-306–315; *see also* 3-PromiseSER-229–305). Far from excluding this evidence, the district court repeatedly *cited it* in its post-trial ruling. *See, e.g.*, 1-ER-0040, -0042, -0112, -0113 (citing "Toma Dep." and "Petersen Dep."). Promise cites nothing showing that the court excluded the depositions from its own consideration.

Similarly, for exhibits: Plaintiffs submitted eight exhibits from Speaker Toma and President Petersen's depositions (3-PromiseSER-319–325; *see also* 5-PromiseSER-923–973), as well as a chart showing Defendants' objections (3-PromiseSER-316–318). Again, far from excluding this evidence, the district court cited one of the exhibits (Exhibit 602) in its post-trial ruling. 1-ER-0040 n.34, -0109. Then, a week *after* its post-trial ruling, the court expressly admitted that exhibit. 1-PromiseSER-0002–0003. There was no need to expressly admit the other exhibits, as the court had already issued its ruling—thus revealing that the court did not deem them worth citing. Again, Promise cites nothing showing that the court excluded those seven exhibits from its own consideration.[20]

***Second***, even assuming the district court silently excluded from its own consideration certain deposition excerpts or exhibits, Promise fails to show that the decision was an abuse of discretion. Promise says the evidence would have shown "the Legislature's and Free Enterprise Club's cooperation" on H.B. 2243, but that fact was already clear to the court. *E.g.,*

---

[20] Promise also never sought clarification from the district court on this point.

1-ER-0042 (stating that the "Arizona Free Enterprise Club helped draft" the precursor to H.B. 2243 and citing Senate President Petersen's deposition).  At best, adding the deposition excerpts and exhibits would have been cumulative.  Fed. R. Evid. 403; *see also, e.g.*, *United States v. Otuonye*, 995 F.3d 1191, 1208 (10th Cir. 2021) (explaining that trial judge has wide discretion on "whether to exclude evidence as cumulative").

*Third*, Promise has not shown prejudice.  Even assuming the district court excluded evidence that would have shown more "cooperation" between the Legislature and the Arizona Free Enterprise Club, nothing suggests that the Legislature relied specifically on the Club's alleged "coded appeal" to discriminatory animus.  1-ER-0109–0110.  Lawmakers are presumed to "exercise their judgment," not just agree with everything their constituents say.  *Brnovich*, 594 U.S. at 689–90.

This Court should dismiss the cross-appeal for lack of jurisdiction or affirm the district court's finding on discriminatory purpose.

Respectfully submitted this 26th day of August, 2024.

KRISTIN K. MAYES
  ARIZONA ATTORNEY GENERAL

By */s/ Joshua M. Whitaker*

Joshua D. Bendor (AZ Bar No. 031908)
Hayleigh S. Crawford (AZ Bar No. 032326)
Joshua M. Whitaker (AZ Bar No. 032724)
Kathryn E. Boughton (AZ Bar No. 036105)
OFFICE OF THE ARIZONA
    ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Hayleigh.Crawford@azag.gov
Joshua.Whitaker@azag.gov
Kathryn.Boughton@azag.gov
ACL@azag.gov

*Counsel for State of Arizona and*
*Arizona Attorney General Kristin K. Mayes*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Circuit Rule 28.1-1(b) and 32-1(a) because it contains <u>13,996</u> words according to the word-processing system used to prepare the brief.

2.  This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Book Antiqua type style.

Dated this 26th day of August, 2024.


By <u>*/s/ Joshua M. Whitaker*</u>

## CERTIFICATE OF SERVICE

I certify that I presented the above and foregoing for filing and uploading to the ACMS system which will send electronic notification of such filing to all counsel of record.

Dated this 26th day of August, 2024.

*/s/ Joshua M. Whitaker*