**Nos. 24-3188, 24-3559 & 24-4029**

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

MI FAMILIA VOTA, et al.,

*Plaintiffs-Appellees*,

vs.

ADRIAN FONTES, et al.,

*Defendants-Appellees*,

and

REPUBLICAN NATIONAL COMMITTEE, et al.,

*Intervenor-Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Arizona
Hon. Susan R. Bolton
Case No. 2:22-cv-00509-SRB (Consolidated)

---

THIRD BRIEF OF APPELLANTS
THE REPUBLICAN NATIONAL COMMITTEE,
WARREN PETERSEN, AND BEN TOMA

---

Kory Langhofer
Thomas Basile
STATECRAFT PLLC
649 North Fourth Ave., First Floor
Phoenix, Arizona 85003
(602) 382-4078
kory@statecraftlaw.com
tom@statecraftlaw.com

*Counsel for Appellants RNC, Warren*
  *Petersen, and Ben Toma*

August 26, 2024

Tyler R. Green
Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tyler@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Appellant RNC*

# TABLE OF CONTENTS

Table of Authorities................................................................iii

Summary of the Argument ....................................................1

Argument................................................................................2

   I.   Each Appellant has standing to appeal ............................2

      A. Arizona law authorizes the Legislative Leaders to seek redress of sovereign and institutional injuries ...........2

      B. The RNC has standing to seek review of judgments that injure its electoral prospects...............................5

   II.  Arizona's documentary-proof-of-citizenship and residency requirements for voter registration do not violate the NVRA ...............8

      A. The NVRA is a registration statute, not a mail-voting statute ...............8

      B. The NVRA cannot constitutionally apply to presidential elections. ....10

      C. The *LULAC* Consent Decree cannot prospectively abrogate the Legislature's authority to regulate voter registration.............................13

      D. Proof of citizenship and residency are necessary to enable verification of eligibility and administer voter registration ........................16

   III. Proof of citizenship and residency requirements for state form registrants do not violate the Equal Protection Clause.......................22

      A. Requiring documentary proof of citizenship and residency on the state form does not unduly burden the right to vote......................................22

      B. Uniform statewide requirements do not implicate *Bush v. Gore* ............25

   IV. The state form's birthplace and citizenship checkbox requirements are material to determining registrants' eligibility to vote......................................28

      A. Applicants who fail to check a box indicating whether they are a citizen have shown at least a "possibility" that they are not a citizen.31

      B. Birthplaces need not be dispositive to be "material" in the voter-registration process. ......................33

      C. The materiality provision does not displace state registration rules. ....37

   V.  The county recorders' use of the SAVE system when there is reason to believe a voter is a non-citizen is not discriminatory under the Civil Rights Act or the NVRA ........................41

A. The "reason to believe" provision prescribes a statewide, non-discriminatory eligibility verification procedure in compliance with the Civil Rights Act ..................................................................42

B. The "reason to believe" provision is a uniform and non-discriminatory list maintenance program under section 8(b) of the NVRA ...............45

VI.   The NVRA's 90-day blackout period does not tie States' hands in removing noncitizens from the voting rolls ........................................................47

VII.  The district court did not clearly err in finding that the Legislature did not act with a discriminatory purpose ....................................................49

A. H.B. 2243 was enacted against the backdrop of debates about election integrity and security ................................................................51

B. H.B. 2243 was debated and adopted through usual legislative procedures and is substantively similar to preexisting laws ................53

C. H.B. 2243's legislative history does not reflect racial animus ...............54

D. H.B. 2243 does not have a disparate impact on naturalized citizens....59

VIII. The district court abused its discretion in compelling discovery from the legislative leaders ................................................................................61

A. The Legislative Leaders did not waive privilege .....................................61

B. Legislative motive evidence is not relevant .............................................64

Conclusion .........................................................................................................66

Certificate of Service .........................................................................................68

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
  585 U.S. 579 (2018) ........................................................................... passim

*Agostini v. Felton*,
  521 U.S. 203 (1997) ..................................................................................12

*Allen v. Louisiana*,
  14 F.4th 366 (5th Cir. 2021) ...................................................................15

*Am. Ass'n of People With Disabilities v. Herrera*,
  580 F.Supp.2d 1195 (D.N.M. 2008) ..............................................17, 18, 20

*Am. Trucking Ass'ns, Inc. v. Alviti*,
  14 F.4th 76 (1st Cir. 2021) .....................................................................62

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ................................................................................25

*Arcia v. Fla. Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) ................................................................48

*Ariz. Democratic Party v. Hobbs*,
  18 F.4th 1179 (9th Cir. 2021) ............................................................21, 25

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015) .............................................................................3, 15

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013) ............................................................................. passim

*Arlington Heights v. Metro. Housing Dev. Corp.*,
  429 U.S. 252 (1977) ..........................................................................50, 63

*Assoc. Gen. Contractors of Am. v. City of Columbus*,
  172 F.3d 411 (6th Cir. 1999) ...................................................................14

*Ave. 6E Invs., LLC v. City of Yuma*,
  818 F.3d 493 (9th Cir. 2016) ...................................................................51

*Avilez v. Garland*,
  69 F.4th 525 (9th Cir. 2023) ...................................................................54

*Bd. of Nat. Res. of State of Wash. v. Brown*,
  992 F.2d 937 (9th Cir. 1993) .....................................................................1

*Becker v. FEC*,
  230 F.3d 381 (1st Cir. 2000) .....................................................................6

*Bell v. Marinko,*
    367 F.3d 588 (6th Cir. 2004) ........................................................................ 47

*Berger v. N.C. State Conference of the NAACP,*
    597 U.S. 179 (2022) ...................................................................................... 2

*Biodiversity Assocs. v. Cables,*
    357 F.3d 1152 (10th Cir. 2004) .................................................................. 13

*Brnovich v. DNC,*
    594 U.S. 647 (2021) .............................................................................. passim

*Brown & Williamson Tobacco Corp. v. Williams,*
    62 F.3d 408 (D.C. Cir. 1995) ...................................................................... 61

*Burroughs v. United States,*
    290 U.S. 534 (1934) ...................................................................................... 10

*Bush v. Gore,*
    531 U.S. 98 (2000) ........................................................................... 24, 25, 26

*Cameron v. EMW Women's Surgical Ctr.,*
    595 U.S. 267 (2022) ........................................................................................ 1

*Carson v. Simon,*
    978 F.3d 1051 (8th Cir. 2020) ...................................................................... 3

*Chrisman v. Sisters of St. Joseph of Peace,*
    506 F.2d 308 (9th Cir. 1974) ...................................................................... 39

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ...................................................................................... 12

*City of Las Vegas v. Foley,*
    747 F.2d 1294 (9th Cir. 1984) .................................................................... 62

*City of S. Miami v. Governor,*
    65 F.4th 631 (11th Cir. 2023) ...................................................................... 55

*Cleveland Cnty. Ass'n. for Gov't. by the People v. Cleveland Cnty. Bd. of Com'rs,*
    142 F.3d 468 (D.C. Cir. 1998) .................................................................... 15

*Coal. on Homelessness v. City & Cnty. of San Francisco,*
    90 F.4th 975 (9th Cir. 2024) ...................................................................... 63

*Common Cause Fla. v. Byrd,*
    2024 WL 1308119 (N.D. Fla. Mar. 27, 2024) .......................................... 55

*Common Cause v. Thomsen,*
    574 F.Supp.3d 634 (W.D. Wis. 2021) ...................................................... 40

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) ................................................................22

*Diaz v. Cobb*,
    435 F.Supp.2d 1206 (S.D. Fla. 2006) ............................. 30, 31

*DNC v. Bostelmann*,
    949 N.W.2d 423 (Wis. 2020) .................................................2, 3

*DNC v. Reagan*,
    329 F.Supp.3d 824 (D. Ariz. 2018) ........................................ 5

*Drake v. Obama*,
    664 F.3d 774 (9th Cir. 2011) ................................................... 7

*Dudum v. Arntz*,
    640 F.3d 1098 (9th Cir. 2011) ......................................... 24, 25

*Earp v. Davis*,
    881 F.3d 1135 (9th Cir. 2018) ...............................................52

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975) ................................................................63

*Election Integrity Project Cal., Inc. v. Weber*,
    __ F.4th __, 2024 WL 3819948 (9th Cir. Aug. 15, 2024) ................21, 26, 27

*FEC v. Cruz*,
    596 U.S. 289 (2022) .................................................................7

*Feldman v. Ariz. Sec'y of State's Office*,
    840 F.3d 1057 (9th Cir. 2016) ...............................................24

*Fish v. Kobach*,
    840 F.3d 710 (10th Cir. 2016) ...............................................16

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) .................................... passim

*Fletcher v. Peck*,
    10 U.S. 87 (1810) ....................................................................63

*Frazier v. Callicutt*,
    383 F.Supp. 15 (N.D. Miss. 1974) .................................. 42, 44

*Fusilier v. Landry*,
    963 F.3d 447 (5th Cir. 2020) .................................................56

*Gonzalez v. Arizona*,
    2008 WL 11395512 (D. Ariz. Aug. 20, 2008) ................. 22, 54

*Gonzalez v. Arizona,*
    435 F.Supp.2d 997 (D. Ariz. 2006) .................................................................18

*Gonzalez v. Arizona,*
    485 F.3d 1041 (9th Cir. 2007) .............................................................17, 19, 20

*Gonzalez v. Arizona,*
    624 F.3d 1162 (9th Cir. 2010) ...................................................................... 22

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.,*
    992 F.3d 1299 (11th Cir. 2023) ..................................................................... 51

*Hall v. City of Los Angeles,*
    697 F.3d 1059 (9th Cir. 2012) ...................................................................... 37

*Husted v. A. Philip Randolph Institute,*
    584 U.S. 756 (2018) ...................................................................................... 47

*In re Ga. Senate Bill 202,*
    2023 WL 6628601 (N.D. Ga. Oct. 11, 2023) ......................................... 50, 51

*In re N.D. Legis. Assembly,*
    70 F.4th 460 (8th Cir. 2023) ......................................................................... 61

*In re Toma,*
    2023 WL 8167206 (9th Cir. Nov. 24, 2023) ................................................ 64

*In re U.S. Dep't of Educ.,*
    25 F.4th 692 (9th Cir. 2022) ......................................................................... 64

*Isaacson v. Mayes,*
    2023 WL 2403519 (D. Ariz. Mar. 8, 2023) ................................................... 2

*Jones v. Jessup,*
    615 S.E.2d 529 (Ga. 2005) ........................................................................... 40

*Kamen v. Kemper Fin. Servs., Inc.,*
    500 U.S. 90 (1991) ........................................................................................ 62

*Kobach v. U.S. Election Assistance Comm'n,*
    772 F.3d 1183 (10th Cir. 2014) .................................................................... 17

*La Unión del Pueblo Entero v. Abbott,*
    604 F.Supp.3d 512 (W.D. Tex. 2022) .......................................................... 28

*La Unión Del Pueblo Entero v. Abbott,*
    68 F.4th 228 (5th Cir. 2023) ......................................................................... 60

*League of Residential Neighborhood Advocs. v. City of Los Angeles,*
    498 F.3d 1052 (9th Cir. 2007) ...................................................................... 13

*League of Women Voters of Ark. v. Thurston,*
 2023 WL 6446015 (W.D. Ark. Sept. 29, 2023) ............................................... 31

*League of Women Voters of Fla. v. Browning,*
 863 F.Supp.2d 1155 (N.D. Fla. 2012) ............................................................. 20

*League of Women Voters of Ind., Inc. v. Sullivan,*
 5 F.4th 714 (7th Cir. 2021) ............................................................................. 16

*League of Women Voters v. Fla. Sec'y of State,*
 66 F.4th 905 (11th Cir. 2023) .................................................................... 50, 51

*Lee v. City of Los Angeles,*
 908 F.3d 1175 (9th Cir. 2018) .................................................................... 62, 63

*Lemons v. Bradbury,*
 538 F.3d 1098 (9th Cir. 2008) .................................................................... 25, 26

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
 591 U.S. 657 (2020) .......................................................................................... 4

*Martin v. Crittenden,*
 347 F.Supp.3d 1302 (N.D. Ga. 2018) ........................................................ 39, 40

*Martin v. Wilks,*
 490 U.S. 755 (1989) ................................................................................... 14, 15

*Marx v. Gen. Revenue Corp.,*
 568 U.S. 371 (2013) .......................................................................................... 8

*McKay v. Altobello,*
 1996 WL 635987 (E.D. La. Oct. 31, 1996) ......................................... 31, 37, 38

*McPherson v. Blacker,*
 146 U.S. 1 (1892) ............................................................................................ 11

*Mecinas v. Hobbs,*
 30 F.4th 890 (9th Cir. 2022) .......................................................................... 4, 7

*Migliori v. Cohen,*
 36 F.4th 153 (3d Cir. 2022) ............................................................................ 30

*Miller v. French,*
 530 U.S. 327 (2000) ........................................................................................ 12

*Mitchell v. Wall,*
 808 F.3d 1174 (7th Cir. 2015) ........................................................................ 64

*Mohawk Indus., Inc. v. Carpenter,*
 558 U.S. 100 (2009) ........................................................................................ 64

*Moore v. Harper,*
  600 U.S. 1 (2023) ..................................................................... 3

*Munro v. Socialist Workers Party,*
  479 U.S. 189 (1986) ............................................................... 19

*Musgrave v. Warner,*
  104 F.4th 355 (D.C. Cir. 2024) .............................................. 62

*N.C. State Conference of the NAACP v. Raymond,*
  981 F.3d 295 (4th Cir. 2020) ................................................. 56

*Ne. Ohio Coal. for Homeless v. Husted,*
  696 F.3d 580 (6th Cir. 2012) ................................................. 14

*New Orleans Water Works Co. v. City of New Orleans,*
  164 U.S. 471 (1896) ............................................................... 14

*Obama for Am. v. Husted,*
  697 F.3d 423 (6th Cir. 2012) ................................................. 22

*Ohio A. Philip Randolph Inst. v. Obhof,*
  802 F. App'x 185 (6th Cir. 2020) .......................................... 65

*Owen v. Mulligan,*
  640 F.2d 1130 (9th Cir. 1981) ............................................ 4, 6

*Paher v. Cegavske,*
  457 F.Supp.3d 919 (D. Nev. 2020) ....................................... 26

*Paralyzed Veterans of Am. v. McPherson,*
  2008 WL 4183981 (N.D. Cal. Sept. 9, 2008) ....................... 25

*Penn. State Conf. of NAACP Branches v. Sec'y Commonwealth of Penn.,*
  97 F.4th 120 (3d Cir. 2024) ......................................... passim

*Pernell v. Fla. Bd. of Governors of State Univ.,*
  84 F.4th 1339 (11th Cir. 2023) .............................................. 60

*Pierce v. N.C. State Bd. of Elections,*
  97 F.4th 194 (4th Cir. 2024) .................................................. 52

*Plaut v. Spendthrift Farm, Inc.,*
  514 U.S. 211 (1995) ............................................................... 13

*Powell v. Ridge,*
  247 F.3d 520 (3d Cir. 2001) ............................................ 62, 63

*Printz v. United States,*
  521 U.S. 898 (1997) ............................................................... 10

*Priorities USA v. Nessel*,
  860 Fed. App'x 419 (6th Cir. 2021) ...................................................... 3

*Priorities USA v. Nessel*,
  978 F.3d 976 (6th Cir. 2020) ................................................................ 3

*Quihuis v. State Farm Mut. Auto. Ins.*,
  748 F.3d 911 (9th Cir. 2014) ............................................................... 3

*Ritter v. Migliori*,
  143 S.Ct. 297 (2022) ........................................................................... 30

*RNC v. Common Cause R.I.*,
  141 S.Ct. 206 (2020) ............................................................................ 6

*RNC v. Mi Familia Vota*, Slip op.,
  No. 24A164, 603 U.S. ___ (Aug. 22, 2024) .......................................... 1

*Rufo v. Inmates of Suffolk Cnty. Jail*,
  502 U.S. 367 (1992) ............................................................................ 13

*Rumsfeld v. FAIR*,
  547 U.S. 47 (2006) .............................................................................. 27

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
  856 F.3d 1080 (D.C. Cir. 2017) .......................................................... 61

*Shays v. FEC*,
  414 F.3d 76 (D.C. Cir. 2005) ............................................................... 5

*Shelby Cnty. v. Holder*,
  570 U.S. 529 (2013) ........................................................................... 12

*Shivelhood v. Davis*,
  336 F.Supp.1111 (D. Vt. 1971) ........................................................... 43

*Short v. Brown*,
  893 F.3d 671 (9th Cir. 2018) ........................................................ 22, 23

*Sierra Club v. EPA*,
  699 F.3d 530 (D.C. Cir. 2012) ............................................................. 7

*Singleton v. Merrill*,
  576 F.Supp.3d 931 (N.D. Ala. 2021) ................................................. 63

*Soltysik v. Padilla*,
  910 F.3d 438 (9th Cir. 2018) .............................................................. 22

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ........................ 11, 12

*St. Charles Tower, Inc. v. Kurtz,*
   643 F.3d 264 (8th Cir. 2011) ...................................................................13

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
   600 U.S. 181 (2023) ...................................................................................5

*Supreme Ct. of Va. v. Consumers Union of U.S., Inc.,*
   446 U.S. 719 (1980) .................................................................................60

*Sys. Fed'n No. 91 v. Wright,*
   364 U.S. 642 (1961) ........................................................................... 13, 15

*Territory of Guam v. United States,*
   593 U.S. 310 (2021) .................................................................................46

*Tex. Democratic Party v. Benkiser,*
   459 F.3d 582 (5th Cir. 2006) ....................................................................5

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ..................................................................54

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) .................................................................................44

*Turtle Mountain Band v. N.D. Legis. Assembly,*
   2024 WL 3259672 (U.S. July 2, 2024).....................................................61

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,*
   513 U.S. 18 (1994) ...................................................................................64

*United States v. Amador-Bonilla,*
   102 F.4th 1110 (10th Cir. 2024) ....................................................... 54, 56

*United States v. Carrillo-Lopez,*
   68 F.4th 1133 (9th Cir. 2023)...........................................................passim

*United States v. Florida,*
   870 F.Supp.2d 1346 (N.D. Fla. 2012)......................................................45

*United States v. Hinkson,*
   585 F.3d 1247 (9th Cir. 2009) ................................................................42

*United States v. Ibarra-Pino,*
   657 F.3d 1000 (9th Cir. 2011) ................................................................57

*United States v. O'Brien,*
   391 U.S. 367 (1968) .................................................................................63

*United States v. Salerno,*
   481 U.S. 739 (1987) .................................................................................11

*Virginia House of Delegates v. Bethune-Hill,*
    587 U.S. 658 (2019) ................................................................... 4

*Vote Choice, Inc. v. DiStefano,*
    4 F.3d 26 (1st Cir. 1993) ............................................................ 5

*Vote.Org v. Callanen,*
    89 F.4th 459 (5th Cir. 2023) ............................................... passim

*Voting Rts. Coal. v. Wilson,*
    60 F.3d 1411 (9th Cir. 1990) ............................................. 10, 11

*Voto Latino v. Hirsch,*
    2024 WL 230931 (M.D.N.C. Jan. 21, 2024) ............................... 43

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ................................................................... 1

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................................... 9

*Williams v. United States,*
    341 U.S. 97 (1951) ................................................................... 39

*Wolf v. Life Ins. Co. of N. Am.,*
    46 F.4th 979 (9th Cir. 2022) ............................................... 37, 48

*Yee v. City of Escondido,*
    503 U.S. 519 (1992) ................................................................. 62

## Statutes

28 U.S.C. §2106 ......................................................................... 65

52 U.S.C. §10101 ............................................................... passim

52 U.S.C. §10504 ....................................................................... 42

52 U.S.C. §20503 ......................................................................... 8

52 U.S.C. §20505 ............................................................... 8, 9, 16

52 U.S.C. §20506 ....................................................................... 21

52 U.S.C. §20507 .................................................................. 47, 48

52 U.S.C. §20508 ....................................................................... 16

A.R.S. §12-1841 .................................................................. 1, 2, 3

A.R.S. §16-121 ................................................................... passim

A.R.S. §16-163 ......................................................................... 54

xi

A.R.S. §16-165 ................................................................................... passim

A.R.S. §16-166 ........................................................................................ 54

A.R.S. §41-193 .......................................................................................... 1

## Other Authorities

Comm'n on Civil Rights, *Voting: 1961 Commission on Civil Rights Report* (1961) ............ 37

State of Arizona, *Rules of the Ariz. House of Representatives*, 56th Legislature 2023-2024 ................................................................ 4

State of Arizona, *Senate Rules*, 56th Legislature 2023-2024 ................................. 4

Webster's Legal Dictionary (1996) ............................................... 31, 33

Wright & Miller, 21A Fed. Proc., L. Ed. §51 (2024) ...................................... 15

## Constitutional Provisions

U.S. Const. art. I, §4 ................................................................................. 9, 10

U.S. Const. art. II, §1 ................................................................................... 10

## SUMMARY OF THE ARGUMENT

Appellants focus this summary of the argument on the cross-appeal issues.

**I.** The Legislative Leaders and the RNC have standing. Arizona has empowered state legislators to represent the State's interests in federal court. That different state officials disagree on the merits does not deprive this Court of jurisdiction to resolve this appeal. Meanwhile, the RNC suffers competitive injuries from the district court's judgment. Any Appellant's standing is sufficient to satisfy this Court's jurisdiction.

**III.** The proof-of-citizenship and residency requirements for state-form registrants do not violate the Equal Protection Clause. Under the proper *Anderson-Burdick* standard, the district court did not clearly err in finding that the proof-of-citizenship and residency requirements do not unduly burden the right to vote. And the court properly held that *Bush v. Gore* does not apply.

**V.** The county recorders' use of the SAVE system when there is reason to believe a voter is a non-citizen is not discriminatory under the Civil Rights Act or the NVRA. The district court did not clearly err in finding that the record does not show that this neutral and non-discriminatory voter list-maintenance protocol has been or will be applied arbitrarily or invidiously.

**VII.** The district court did not clearly err in finding that the Legislature did not act with a discriminatory purpose. The Legislature enacted H.B. 2243 to advance election integrity and security, which are legitimate state interests. The law went through the usual legislative procedures, the legislative record does not reflect racial animus, and the law does not have a disparate impact on naturalized citizens.

# ARGUMENT

## I. Each Appellant has standing to appeal

Courts have rejected arguments that state officials and political parties lack standing to appeal judgments enjoining state election laws. Were there any doubt about those decisions, the Supreme Court removed it last week when it partially stayed the district court's judgment in this case on the application of the RNC and Legislative Leaders. *See RNC v. Mi Familia Vota*, Slip op., No. 24A164, 603 U.S. ___ (Aug. 22, 2024); *see also Bd. of Nat. Res. of State of Wash. v. Brown*, 992 F.2d 937, 942 (9th Cir. 1993) ("Although standing was not discussed, the [Supreme] Court reached the merits of the claim and thus implicitly found" standing). Multiple Appellants suffer injury "fairly traceable to the *judgment below*," and "a favorable ruling from the appellate court would redress [that] injury." *West Virginia v. EPA*, 597 U.S. 697, 718 (2022) (cleaned up). Each of those injuries is sufficient to deny Plaintiffs' argument, since "[a]ll that is needed to entertain an appeal of that issue is one party with standing." *Brnovich v. DNC*, 594 U.S. 647, 648 (2021).

### A. Arizona law authorizes the Legislative Leaders to seek redress of sovereign and institutional injuries

A federal court's interdiction of a state statute's implementation injures the State. *See Abbott v. Perez*, 585 U.S. 579, 602 & n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State."). The issue is *who* may seek appellate remedies for that harm. No one disputes that the Arizona Attorney General can. *See* A.R.S. §§41-193(A), 12-1841. But Arizona has "empower[ed] multiple officials to defend its sovereign interests," *Cameron v. EMW Women's Surgical Ctr.*, 595 U.S. 267, 277 (2022), and hence its executive branch does not "hold[] a constitutional monopoly

2

on representing [the State]'s practical interests in court," *Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179, 194 (2022). Like the North Carolina statute featured in *Berger*, A.R.S. §12-1841 authorizes the legislative leaders to "intervene," "file briefs," and otherwise "be heard" in "***any*** proceeding in which a state statute …. is alleged to be unconstitutional." (emphasis added); *see also Isaacson v. Mayes*, 2023 WL 2403519, at *2 (D. Ariz. Mar. 8, 2023).

The LUCHA Plaintiffs fixate on §12-1841's notice requirement, which, they reason, cannot be enforced in federal proceedings. *See* LUCHA.Br.23-24. But that misses the point. It may well be true that the Federal Rules of Civil Procedure and Appellate Procedure render §12-1841's notice provision non-binding in federal courts. But the lodestar in this context is "a State's chosen means of diffusing its sovereign powers among various branches and officials." *Berger*, 597 U.S. at 191. The Arizona Legislature expressed its choice unambiguously: the Legislative Leaders are entitled to receive notice of, and participate in, "any proceeding in which a state statute … is alleged to be unconstitutional." A.R.S. §12-1841(A). While superseding procedural rules may excuse litigants from providing the requisite notice in federal cases, the statute itself manifests the Legislature's intent to "reserve[] to itself some authority to defend state law on behalf of the State." *Berger*, 597 U.S. at 194; *see also DNC v. Bostelmann*, 949 N.W.2d 423, 428 (Wis. 2020) (construing similar statute to mean "the Legislature does have the authority to represent the State of Wisconsin's interest in the validity of state laws").

If the Court is not persuaded that §12-1841 empowers the Legislative Leaders to defend the State's sovereign interests in this appeal, however, it should certify the question to the Arizona Supreme Court. *See Quihuis v. State Farm Mut. Auto. Ins.*, 748 F.3d

911, 914 (9th Cir. 2014) (certification appropriate when "Arizona cases are unclear on the answer to the specific question at issue here"); *DNC*, 949 N.W.2d at 424 (answering Seventh Circuit's certified question regarding legislative standing).

Even if §12-1841 were inapplicable, an extrinsic constraint on a legislative body's lawmaking functions causes an institutional injury. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015). The district court's injunction, under the auspices of the NVRA and 52 U.S.C. §10101(a)(2), infringes the Legislature's federal and state constitutional authority to structure voter registration and other facets of elections within its borders. *See Carson v. Simon*, 978 F.3d 1051, 1060 (8th Cir. 2020) (holding that "only the [state] Legislature … has plenary authority to establish the manner of conducting the presidential election in the state").[1] The LUCHA Plaintiffs contend that the injunction "does not prevent the legislature from enacting laws" in the election sphere, LUCHA.Br.28, but of course no federal court could ever enjoin a legislative vote. Rather, the injury inheres in the inability to effectuate legislative determinations in enforceable laws. *See Priorities USA v. Nessel*, 978 F.3d 976, 981-82 (6th Cir. 2020) (when an election law is enjoined, "[t]he legislature has lost the ability to regulate that election in a particular way").[2]

Finally, the LUCHA Plaintiffs object that the Arizona Legislature is not a party to the case, but each chamber has authorized its presiding officer to act on that

---

[1] The LUCHA Plaintiffs argue that *Moore v. Harper*, 600 U.S. 1 (2023), implicitly abrogated *Carson*'s understanding of legislative power. But that reasoning flouts the rule not to conflate standing with the merits. *See Ariz. State Legislature*, 576 U.S. at 800.

[2] Contrary to the LUCHA Plaintiffs' claim, LUCHA.Br.28, a later merits panel opinion affirmed that it was "bound by [its] earlier, published order." *Priorities USA v. Nessel*, 860 Fed. App'x 419 (6th Cir. 2021).

chamber's behalf for "any claim or right arising out of any injury to [their houses'] powers or duties under the Constitution or Laws of this state." State of Arizona, *Senate Rules*, 56th Legislature 2023-2024, Rule 2(N), bit.ly/3WXFLDv; State of Arizona, *Rules of the Ariz. House of Representatives*, 56th Legislature 2023-2024, Rule 4(K), bit.ly/3HuL9bz.[3]

## B.  The RNC has standing to seek review of judgments that injure its electoral prospects.

The RNC also has appellate standing. As an initial matter, because the RNC seeks the same relief in this appeal as the Legislative Leaders, the Court would "err[] by inquiring into [their] independent Article III standing." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 & n.6 (2020). In any event, the RNC has independent grounds for appealing the district court's judgment. "Competitive standing recognizes the injury that results from being forced to participate in an 'illegally structure[d] competitive environment.'" *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (citation omitted); *see also Owen v. Mulligan*, 640 F.2d 1130, 1132 (9th Cir. 1981) (holding that "the potential loss of an election" due to allegedly unlawful attributes of the electoral system is an injury).

"Voluminous" authority shows that political parties suffer injury when their "chances of victory would be reduced." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 & n.4 (5th Cir. 2006) (collecting cases). That's because elections, like college admissions, "are zero-sum," meaning "[a] benefit provided to [one] but not to others

---

[3] Moreover, in *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658 (2019), the Supreme Court held that "a single chamber of a bicameral legislature" lacked standing to assert an institutional injury. Here, both chambers of the Arizona Legislature are represented in the proceedings.

necessarily advantages the former ... at the expense of the latter." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 218-29 (2023). "Because a head-to-head election has a single victor, any benefit conferred on one candidate is the effective equivalent of a penalty imposed on all other aspirants for the same office." *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 38 (1st Cir. 1993); *see also*; *DNC v. Reagan*, 329 F.Supp.3d 824, 841 (D. Ariz. 2018) (finding Democratic Party had standing because the challenged laws affected voters "who tend to vote disproportionately for Democratic candidates"), *rev'd and remanded on other grounds*, *Brnovich*, 594 U.S. 647.

The RNC is "'at the very least harmed by having to anticipate other actors taking advantage of the regulations to engage in activities that otherwise would be barred.'" *Shays v. FEC*, 414 F.3d 76, 87 (D.C. Cir. 2005). The DNC argued it had standing in this case because allowing the laws to go into effect "would harm the DNC's ... chances of electing Democrats." FER-8. The district court agreed, finding that the laws "would impact the ability of Democratic candidates to successfully compete in Arizona elections." 1-ER-0058. If the DNC has standing to challenge the laws on that basis, it necessarily follows that the RNC has standing to appeal those challenges on the same grounds. That is because Arizona's election rules "necessarily affect the way these politicians will run their campaigns." *Shays*, 414 F.3d at 87 (cleaned up). It is therefore sufficient that the judgment forces a party to work "to prevent their opponent from gaining an unfair advantage in the election process." *Owen*, 640 F.2d at 1133. To be sure, whether the district court's judgment favors Republicans or Democrats is irrelevant to the *merits*. But the fact that both major political parties agree that the judgment favors

Democrats is sufficient to show that the RNC will suffer a competitive injury absent reversal of the district court's judgment.

Other record evidence supports the RNC's competitive injuries. For example, according to the Plaintiffs' own expert, only 14.3% of federal-only voters are registered as members of the Republican Party, while Republicans comprise 34.5% of the total active registered voter population in Arizona. *See* LUCHA-SER-316. Courts don't engage in predictive vote-guessing, and instead defer to "a candidate's reasonable assessment of his own campaign." *Becker v. FEC*, 230 F.3d 381, 387 (1st Cir. 2000).

The LUCHA Plaintiffs begin by comparing this case to a one-paragraph emergency order denying an application for a stay. *See* LUCHA.Br.29. But unlike that case, in which "no state official … expressed opposition" to the challenged consent decree, *RNC v. Common Cause Rhode Island*, 141 S.Ct. 206 (2020), the RNC is accompanied on this appeal by state officials who *do* challenge the district court's judgment. And even if those state officials hadn't appealed, the RNC suffers an independent competitive injury here, which was not at issue in *Common Cause*.

Next, the LUCHA Plaintiffs confuse the merits with standing. They suggest that the judgment is insulated from appellate review because it results in "a more inclusive voter pool," and that no one has an interest in "keeping eligible Americans from voting." LUCHA.Br.30. But if the district court erred, reversing its judgment would not keep any "eligible Americans from voting." *Id.* And "[f]or standing purposes," courts must "accept as valid the merits" of the "legal claims" by the party whose standing is challenged. *FEC v. Cruz*, 596 U.S. 289, 298 (2022). So "[i]f correct on the merits, as [the court] *must assume* for standing purposes," Appellants' challenge to the judgment

"presents a clearly redressable injury." *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012) (emphasis added).

Finally, the LUCHA Plaintiffs create a facial-favoritism requirement that the law of competitive standing has never recognized. The RNC has competitive standing "[i]f an allegedly unlawful election regulation makes the competitive landscape worse for a candidate or that candidate's party than it would otherwise be if the regulation were declared unlawful." *Mecinas*, 30 F.4th at 898. In other words, competitive injury turns on *results*, not on any facial preferences in the law itself. *See id.* at 895 (DNC had standing to challenge facially neutral ballot-order statute that allegedly *resulted in* benefit "to their rival candidates"); *see also Drake v. Obama*, 664 F.3d 774, 784 (9th Cir. 2011) (holding that "Plaintiffs' competitive interest in running against a qualified candidate had lapsed" once the election had concluded).

## II. Arizona's documentary-proof-of-citizenship and residency requirements for voter registration do not violate the NVRA

### A. The NVRA is a registration statute, not a mail-voting statute

The National Voter Registration Act directs States to "accept and use" the federal registration form "for *the registration of voters*." 52 U.S.C. §20505(a)(1) (emphasis added). This limitation reflects that the NVRA governs only "procedures to register to vote in elections." *Id.* §20503(a). HB 2492's requirement that registrants provide documentary proof of citizenship ("DPOC") for the privilege of mail voting does not violate the NVRA since Arizona will still accept and use the federal form to register voters.

Plaintiffs repeat the district court's error of ignoring the statutory text. The United States argues that the NVRA requires Arizona to accept and use the federal

form as sufficient to qualify for mail voting. U.S.Br.33-34. And the DNC Plaintiffs argue that requiring DPOC for mail voting means that Arizona is not treating federal forms as complete and sufficient. DNC.Br.15. But the NVRA explains the purpose for which Arizona must accept and use the federal form as complete and sufficient—"for the registration of voters." 52 U.S.C. §20505(a)(1). *ITCA* supports this conclusion. *ITCA* instructed that States must treat the federal form as sufficient "for the requirement it is meant to satisfy"; that requirement is voter registration, which is why a State must accept the form as a "complete and sufficient registration application." *Arizona v. Inter Tribal Council of Ariz., Inc. (ITCA)*, 570 U.S. 1, 9-10 (2013). Arizona fulfills this requirement by registering federal form registrants to vote. But the NVRA does not dictate mail-voting rules.

Plaintiffs next argue that the NVRA's express allowance of some mail-voting restrictions supports an inference that all other mail-voting restrictions are prohibited. But that negative inference works only if "it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (cleaned up). And here, there is every reason to think that Congress *did not* consider other limits on mail voting. States have long exercised primary authority over mail-voting. U.S. Const. art. I, §4. When Congress enacted the NVRA, no-excuse mail voting was still rare. Against this background, Congress probably did not envision eliminating almost all restrictions on mail-voting in a statute that governs voter registration. Nothing in Congress's recognition that States "may" require a person who registered to vote in a jurisdiction by mail and "has not previously voted in that jurisdiction" to vote in person suggests otherwise. 52 U.S.C. §20505(c)(1).

9

This reading of the statute does not "prove[] too much." U.S.Br.34. A State is required to "accept and use" the federal form "for the registration of voters." 52 U.S.C. §20505(a)(1). That requirement means that States must *register* qualified persons submitting the federal form to vote. *See ITCA*, 570 U.S. at 9-10. But there is no reason to think that Congress hid a ban on ordinary regulations of mail voting in a statute governing voter registration. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes.").

The DNC Plaintiffs repeat the district court's assertion that requiring DPOC for mail voting might be an obstacle to a broadly construed purpose of the NVRA. But they don't dispute that the correct preemption test is whether state law "is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form." *ITCA*, 570 U.S. at 15. State legislation is preempted under this test when it conflicts with the NVRA's "fairest reading." *Id.* It is not an invitation for courts to displace a State's traditional authority in service of one of the purposes of complicated legislation.

## B. The NVRA cannot constitutionally apply to presidential elections.

Plaintiffs do not dispute that the NVRA regulates the "manner" of presidential elections. But the Elections Clause's grant of power to regulate the "Manner" of elections extends only to congressional elections. U.S. Const. art. I, §4. For presidential elections, state legislatures control the "Manner" of appointment. *Id.* art. II, §1. Congress has only the power to "determine the Time of chusing the Electors." *Id.*

Despite this constitutional allocation of authority, Plaintiffs argue that judicial gloss permits Congress to regulate presidential elections under "the last best hope of those who defend ultra vires congressional action, the Necessary and Proper Clause."

*Printz v. United States*, 521 U.S. 898, 923 (1997). But they fail to identify a controlling precedent supporting that view. *Burroughs v. United States* upheld application of the Federal Corrupt Practices Act to national political committees because it did not "interfere with the power of a state to appoint electors or the manner in which their appointment shall be made." 290 U.S. 534, 544 (1934). This context confirms that the broad language relied on by Plaintiffs cannot be read to displace the state authority over the manner of presidential elections. U.S.Br.21-22; DNC.Br.17. *Burroughs* recognized a congressional authority to "protect" presidential elections "from corruption" to ensure the survival of the government. 290 U.S. at 547. But displacing states from their constitutional role setting the manner of presidential elections cannot be described as preserving the constitutional system by preventing corruption.

Plaintiffs' reliance on *Buckley v. Valeo* fares even worse. U.S.Br.23-24; DNC.Br.18. *Buckley* upheld a public-financing scheme under Congress's power to spend money for the general welfare. 424 U.S. 1, 90-91. But no one has argued that power could support extension of the NVRA to presidential elections.

Nor does *Voting Rights Coalition v. Wilson* hold that Congress has authority to extend the NVRA to presidential elections. 60 F.3d 1411 (9th Cir. 1990). *Wilson* rejected a facial challenge to the NVRA. This Court found that the NVRA was a valid exercise of Congress's power to regulate congressional elections under the Elections Clause. *Id.* at 1413-14. Thus, the Court's passing statement that Congress's power under the Elections Clause "has been extended to presidential elections" was dicta. The United States' insistence that this Court must have upheld the NVRA's application to presidential elections because it was a "wholesale challenge," U.S.Br.26, inverts the ordinary rules

for a facial challenge, *United States v. Salerno*, 481 U.S. 739, 745 (1987) (facial challenge must show "no set of circumstances exists" were law "would be valid").

Without a constitutional power to displace state regulations of presidential elections, Plaintiffs argue that state authority over the "Manner" of presidential election appointment does not extend to voter registration. U.S.Br.24-25; DNC.Br.18-19. That result would be surprising since no one disputes that Congress's authority over congressional elections includes voter registration. And Plaintiffs offer no support for the argument. They argue that *McPherson v. Blacker* held that state authority over the "Manner" of elector appointment "refers only to 'define the *method*' of choosing presidential electors." U.S.Br.24 (quoting *McPherson v. Blacker*, 146 U.S. 1, 27 (1892)); *see also* DNC.Br.18-19. But *McPherson* merely confirmed that state authority over the manner of appointment includes the power "exclusively to define the method." *McPherson*, 146 U.S. at 27. It never suggested that the Electors Clause confers only the power to define the method.

Finally, the Reconstruction Amendments cannot save the NVRA because Congress did not develop evidence of discrimination in the congressional record. *South Carolina v. Katzenbach* proves that the NVRA doesn't come close to the legislative findings necessary to enact remedial legislation. 383 U.S. 301, 308 (1966). There, the Supreme Court upheld the 1965 Voting Rights Act (VRA), "explaining that it was justified to address 'voting discrimination where it persists on a pervasive scale.'" *Shelby Cnty. v. Holder*, 570 U.S. 529, 538 (2013) (quoting *Katzenbach*, 383 U.S. at 308). After months of hearings and volumes of findings, Congress tailored the VRA to apply "where Congress found 'evidence of actual voting discrimination.'" *Id.* at 546. "Multiple decisions since

have reaffirmed the [VRA]'s 'extraordinary' nature." *Id.* at 555. That record contrasts with the United States' citation to a handful of pages in the congressional reports as "sound basis" for the NVRA. U.S.Br.30-32. That bare evidence is orders of magnitude less than what supported the Religious Freedom Restoration Act, which suffered from a fatal "lack of support in the legislative record." *City of Boerne v. Flores*, 521 U.S. 507, 531 (1997). The RNC's observation that Congress "could have" invoked this power but "did not" lay an adequate record did not concede this issue. DE-SER-70.

## C. The *LULAC* Consent Decree cannot prospectively abrogate the Legislature's authority to regulate voter registration

The LULAC Consent Decree must yield to A.R.S. §16-121.01(C), which requires county recorders to reject state forms that lack DPOC. The Supreme Court indicated its agreement when it stayed the district court's injunction prohibiting A.R.S. §16-121.01(C)'s enforcement. When a legislative body "changes the law underlying a judgment awarding prospective relief, that relief is no longer enforceable to the extent it is inconsistent with the new law." *Miller v. French*, 530 U.S. 327, 347 (2000); *see also Agostini v. Felton*, 521 U.S. 203, 215 (1997) ("A court errs when it refuses to modify an injunction or consent decree in light of [legal] changes.").

This Court's prior observation that "a state legislature may [not] nullify a final judgment entered by an Article III court," ECF.116.1 at 11, conflates a retrospective revocation of vested remedies with a cessation of prospective application. If §16-121.01(C) had rescinded voter registrations accepted under the LULAC Consent Decree, it may well have evoked constitutional concerns. *See Plaut v. Spendthrift Farm, Inc.*,

514 U.S. 211, 219 (1995) (legislatures cannot "retroactively command[] the federal courts to reopen final judgments").

But legislative bodies certainly can "alter[] the prospective effect of injunctions entered by Article III courts." *Id.* at 232; *see also Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 379-80 (1992). A change in the underlying federal or state statutes renders a consent decree prospectively unenforceable to the extent of any inconsistency. *See Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1169-70 (10th Cir. 2004) (a consent decree "does not freeze the provisions of the statute into place. If the statute changes, the parties' rights change, and enforcement of their agreement must also change. Any other conclusion would allow the parties, by exchange of consideration, to bind not only themselves but Congress and the courts as well"); *St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 268 (8th Cir. 2011) (similar). The Arizona Legislature extinguished a key statutory predicate for the LULAC Consent Decree when it enacted §16-121.01(C). *See League of Residential Neighborhood Advocs. v. City of Los Angeles*, 498 F.3d 1052, 1055 (9th Cir. 2007) (consent decree cannot be used to "evade state law" based on a potential violation of federal law). The district court erred in allowing that judgment to retain prospective effect. *See Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 650 (1961) (it would be "abuse of discretion to deny a modification" of a consent decree after a change in the substantive law).

Appellants, as non-parties to the LULAC Consent Decree, can vindicate §16-121.01(C)'s validity and enforceability in these proceedings; they need not seek relief under Rule 60 in the *LULAC* action. Even if the Secretary of State or Maricopa County Recorder cannot collaterally attack the LULAC Consent Decree, "[a] judgment or

decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." *Martin v. Wilks*, 490 U.S. 755, 762 (1989); *see also Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 600-01 & n.12 (6th Cir. 2012) (challenges to consent decree by non-parties do not implicate Rule 60).

This Court brushed aside *Martin* on the rationale that "[n]o party has sought to bind Intervenors-Defendants-Appellants to [the *LULAC*] judgment." ECF.116.1 at 12 n.3.[4] To the contrary, the district court has purported to bind the Arizona Legislature to the LULAC Consent Decree. The Court noted that the Legislature is free to "change voting registration law prospectively"—but held that those statutes are, to the extent they conflict with the LULAC Consent Decree, unenforceable. ECF.116.1 at 11. That distinction is illusory. A federal court could never enjoin a legislative body from adopting a law. *See Assoc. Gen. Contractors of Am. v. City of Columbus*, 172 F.3d 411, 415 (6th Cir. 1999). Rather, the irreducible crux of the legislative power is to translate parchment proposals into enforceable statutes. *See Ariz. State Legislature*, 576 U.S. at 803. Thus, if the LULAC Consent Decree does divest §16-121.01(C) of legal force, it effectively binds the legislative branch of Arizona's government, and the Legislative Leaders can collaterally challenge in this proceeding the LULAC Consent Decree's continued application. *See Martin*, 490 U.S. at 762-63.

---

[4] This Court stated that the Legislature can imbue §16-121.01(C) with effect only by seeking to modify the judgment. *See* ECF.116.1 at 12. But "the general rule is that only a party to the action has standing to seek relief from a judgment" under Rule 60. Wright & Miller, 21A FED. PROC., L. ED. §51:170 (2024). The Legislature hence would be relegated to a procedural twilight zone: it can challenge the LULAC Consent Decree only through Rule 60, but the consent decree's supposed inapplicability to the Legislature forecloses that path.

In any event, *Martin* does not require a non-party collaterally challenging a judgment to be formally "bound" by the judgment; it is sufficient that the judgment "affect[s] his legal rights." 490 U.S. at 763 (cleaned up); *see also Cleveland Cnty. Ass'n. for Gov't. by the People v. Cleveland Cnty. Bd. of Com'rs*, 142 F.3d 468, 472-74 (D.C. Cir. 1998) (association of voters could collaterally challenge prior consent decree's changes to structure of county elections).[5] The LULAC Consent Decree—if it in fact purports to preemptively nullify future statutes—"affects" the Arizona Legislature's sovereign rights.

The parties to the LULAC Consent Decree "cannot, by giving each other consideration, purchase from a court of equity a continuing injunction." *Sys. Fed'n No. 91*, 364 U.S. at 651. Changes to the substantive law underlying the LULAC Consent Decree, including to §16-121.01(C), preclude its continuing, prospective enforcement.

### D. Proof of citizenship and residency are necessary to enable verification of eligibility and administer voter registration

Arizona may require applicants using its state form to provide DPOC and DPOR. Section 6 of the NVRA provides that, when registering individuals to vote in federal elections, the States must "accept and use" either the federal form or a state form that complies with Section 9. 52 U.S.C. §20505(a). Section 9 permits States to mandate the disclosure of any information "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* §20508(b)(1).

---

[5] Even if comity permitted the district court judge in this action to defer to the *LULAC* district court judge on certain matters, there is no jurisdictional bar to litigating the LULAC Consent Decree's continued enforceability in this proceeding. *See Allen v. Louisiana*, 14 F.4th 366, 374 (5th Cir. 2021).

The LUCHA Plaintiffs invert the burden of proof. It is the **Plaintiffs'** burden to demonstrate that Arizona's state form, as amended by H.B. 2492, does **not** comply with federal law; the State need not prove anything. The LUCHA Plaintiffs' inventive attempt to upend the burden-of-proof framework that has always governed preemption claims is premised on two errors. First, they cite *ITCA*'s holding that there is no "presumption against pre-emption" in the NVRA context. 570 U.S. at 13. But that means simply that the court must assume "that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id.* at 14. This modest statutory-construction maxim does not relieve NVRA plaintiffs of their obligation to prove any **facts** necessary to establish that a challenged state form is inconsistent with Section 9.[6] *See League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 730 (7th Cir. 2021).

Second, the LUCHA Plaintiffs rely on cases rejecting challenges to the Election Assistance Commission's administrative decision not to add a DPOC field to the federal form. But that argument confounds divergent procedural postures and substantive statutes. Review of an EAC decision under the Administrative Procedure Act "is 'very deferential' to the agency's determination, and a presumption of validity attaches to the agency action such that the burden of proof rests with the party challenging it." *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1190 (10th Cir. 2014) (cleaned up).

---

[6] *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016), which involved a "stricter" NVRA provision, *id.* at 733, is the only case that appears to adopt anything like the Plaintiffs' inverted-burden theory. The LUCHA Plaintiffs insist that courts in other cases "made factual findings that the information was reasonably necessary to election administration." LUCHA.Br.46 n.18. But in those cases the government defendants were not required to prove the efficacy of the mandated information. *See League of Women Voters of Fla. v. Browning*, 863 F.Supp.2d 1155, 1166 (N.D. Fla. 2012); *Am. Ass'n of People With Disabilities v. Herrera*, 580 F.Supp.2d 1195, 1243 (D.N.M. 2008).

This rubric is inapplicable to a state legislature's decision to add a mandatory informational field to its own form under Section 9. More fundamentally, the LUCHA Plaintiffs' position collides with *ITCA*. While holding that the EAC is exclusively empowered to prescribe the content of the federal form (subject to administrative processes), the court emphasized that "States retain the flexibility to design and use their own registration forms," which "may require information the Federal Form does not." *ITCA*, 570 U.S. at 12. Although the EAC's determinations can bind the States with respect to the federal form, they have no bearing on the States' authority under Section 9 to formulate their own bespoke forms.

Properly assessed through this lens, H.B. 2492's DPOC and DPOR mandates conform to Section 9.

1. This Court already held that Section 9 "plainly allow[s] states, at least to some extent, to require their citizens to present evidence of citizenship when registering to vote." *Gonzalez v. Arizona*, 485 F.3d 1041, 1050-51 (9th Cir. 2007). In doing so, it affirmed the district court's conclusion that Section 9's "plain meaning is if the state deems some information necessary to identify the applicant, the information can be required," and that "[d]etermining whether an individual is a United States citizen is of paramount importance when determining his or her eligibility to vote." *Gonzalez v. Arizona*, 435 F.Supp.2d 997, 1002 (D. Ariz. 2006).

Struggling to avert *Gonzalez*'s dispositive force, the LUCHA Plaintiffs claim that the "court's reasoning was directly overruled by *ITCA*." LUCHA.Br.42. To the contrary, *ITCA* **endorsed** the principle that, under Section 9, "state-developed forms may require information that Federal Form does not," and expressly cited Arizona's DPOC

18

requirement as an illustrative example. 570 U.S. at 12. *Gonzalez* is "precedent" in this Circuit, ECF.116.1 at 17 (Bumatay, J., dissenting), and settled the question of the DPOC requirement's compliance with Section 9.

Further, Plaintiffs have offered no evidence that would warrant overruling *Gonzalez*. And even indulging their effort to foist the burden of proof onto the defense, the record in this case validates *Gonzalez*'s reasoning. There is no dispute that county recorders do, in fact, use DPOC included in registration forms. The documentation or identification numbers furnished by applicants enable the county recorder to verify—either from the face of the document (*e.g.*, birth certificate) or through searches of databases—the individual's citizenship status, and hence eligibility to register to vote in Arizona. *See* 2-ER-0213-224; 3-ER-0709-713; LUCHA-SER-121-123; *see also Herrera*, 580 F.Supp.2d at 1243 (mandatory ID field satisfied Section 9 because "the state uses the numbers to prevent voter registration fraud"). The DPOC requirement allows most applicants to establish, and the State to confirm, their citizenship.

The LUCHA Plaintiffs assert that "non-citizen registration and voting in Arizona, if it occurs at all, is extremely rare." LUCHA.Br.41. But that argument just vindicates Arizona's nearly 20-year old DPOC mandate. More to the point, Section 9 does not compel a State to "sustain some level of damage before the legislature [can] take corrective action." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986). Indeed, the DPOC requirement has been effective in flagging potential non-citizen registrations, although some gaps remain. Expert analyses of voter registration data revealed approximately 6,800 registrations that were suspended or canceled for indicia of potential non-citizenship that the voter was unable or unwilling to resolve. FER-182. And there are

1,779 active full-ballot voters who, either on or after their registration date, presented to the Arizona Department of Transportation ("ADOT") evidence of non-citizenship, such as a green card. *See* FER-163-164, -185. To be sure, it does not follow that all or even most of these individuals are, in fact, non-citizens. But DPOC enables county recorders to verify most applicants' citizenship status and allows the State to winnow potentially invalid registrations on its rolls. Accordingly, as this Court agreed, Section 9 "plainly allows" Arizona to require DPOC on its state form. *Gonzalez*, 485 F.3d at 1050-51.

2.      The DPOR requirement advances the same objective; it enables county recorders to verify an eligibility criterion (*i.e.*, Arizona residency) during the registration process. While Arizona may not be plagued by large-scale non-resident voting, the district court cited more than three dozen prosecutions in Arizona for illegal voting (with "most" of them relating to double voting in multiple jurisdictions in the same election) since 2010. 1-ER-0102. And as the district court observed, "voter fraud can be difficult to detect." 1-ER-0035. A State hence "may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich*, 594 U.S. at 686.

More fundamentally, the LUCHA Plaintiffs superimpose onto Section 9 evidentiary and tailoring concepts that are absent from the statutory text and case law. As discussed *supra*, if Plaintiffs believed that Section 9's application hinges on extrinsic facts, they were obligated to adduce those facts and prove their preemption claim. They did not do so. Indeed, the district court did not make factual findings concerning the DPOR requirement at all; it grounded its holding merely in an observation of an

20

undisputed legal proposition—namely, that Arizona law does not demand DPOR when confirming existing registrants' current residence status during the course of list maintenance activities. *See* 1-ER-0081.

Section 9 encompasses a simple inquiry: do elections officials actually use the mandated item of information to verify applicants' eligibility and administer the voter registration process? If so, it satisfies Section 9. *See, e.g., Gonzalez,* 485 F.3d at 1050-51; *Herrera,* 580 F.Supp.2d at 1283; *League of Women Voters of Fla. v. Browning,* 863 F.Supp.2d 1155, 1166 (N.D. Fla. 2012) (observing that "identifying the organization that submits an application is sufficiently 'necessary' to the sound administration of the voter-registration process to pass muster" under Section 9). The elaborate evidentiary displays and stringent tailoring protocols envisioned by the LUCHA Plaintiffs are foreign to Section 9 jurisprudence.

3.      Finally, the state form remains "equivalent" to the federal form for purposes of Section 7 of the NVRA, which governs the availability of registration forms at public assistance agencies. *See* 52 U.S.C. §20506(a)(6)(A)(ii). As Judge Bumatay recognized, "it is likely that 'equivalent' is synonymous with a compliant State Form" under Section 9. ECF.116.1 at 16 (Bumatay, J., dissenting). The LUCHA Plaintiffs deride this commonsense proposition as "nonsensical," LUCHA.Br.47. But it is their proposed construction, which spawns a ***third*** species of NVRA-prescribed registration forms— namely, a federal form, a Section 9-compliant state form, and a new, intermediate, federal form "equivalent" that complies with Section 7 but not necessarily with Section 9—that wanders far afield from the statutory structure.

### III. Proof of citizenship and residency requirements for state form registrants do not violate the Equal Protection Clause

#### A. Requiring documentary proof of citizenship and residency on the state form does not unduly burden the right to vote

H.B. 2492's DPOC and DPOR requirements are neutral, non-discriminatory voter registration regulations that are justified by Arizona's undeniably important interests in limiting participation in its elections only to eligible individuals and maintaining confidence in the integrity of elections. "[N]ot all election rules or practices impose constitutionally suspect burdens on the right to vote." *Election Integrity Project Cal., Inc. v. Weber*, __ F.4th __, 2024 WL 3819948, at *6 (9th Cir. Aug. 15, 2024). Heeding the States' prerogative to regulate their elections, "the Supreme Court has developed a 'flexible standard' for assessing constitutional challenges to election rules." *Id.* Non-severe burdens "trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1187 (9th Cir. 2021) (cleaned up). While a State is expected to "put forward" "interests," *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008), that are more than "merely 'speculative,'" *Soltysik v. Padilla*, 910 F.3d 438, 449 (9th Cir. 2018), the *Anderson-Burdick* framework does not entail any shifting of the burden of proof. *See Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018) (crediting state's "general interest in increasing voter turnout and specific interest in incremental election-system experimentation").

The district court expressly found that the DPOC requirement for state form registrants does not severely burden voting rights. As the LUCHA Plaintiffs concede, the district court's factual findings in an *Anderson-Burdick* analysis "receive significant

deference on review under the clear-error standard." LUCHA.Br.54; *see also Obama for Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012). And the district court here found that "Plaintiffs offered no witness testimony or other 'concrete evidence' to corroborate that the Voting Laws' DPOC Requirements will in fact impede any qualified voter from registering to vote or staying on the voter rolls." 1-ER-0098.

The LUCHA Plaintiffs allude to an increasing number of federal-only voters, *see* LUCHA.Br.53, but they have never established "the number of these voters that wholly *lack* DPOC." 1-ER-0098. Further, the record evidence showed that, while obtaining DPOC can entail costs, "this burden is nevertheless slight in the context of all Arizonan[s]' overall ability to vote." 1-ER-0099. The LUCHA Plaintiffs offer little to counter these well-considered findings, let alone rebut them as clearly erroneous. *See also Gonzalez v. Arizona*, 2008 WL 11395512, at *17-18 (D. Ariz. Aug. 20, 2008) (finding that neither voters generally nor naturalized citizens specifically "suffer an excessive burden due to" the DPOC requirement), *aff'd in part, rev'd in part on other grounds*, 624 F.3d 1162 (9th Cir. 2010).

The Plaintiffs in the trial court similarly failed to prove that the DPOR requirement burdens voting rights. The LUCHA Plaintiffs offer a generic statement that residents of Tribal reservations or rural areas may have difficulty supplying DPOR. *See* LUCHA.Br.56. But early in the litigation, the parties stipulated to a clarifying construction of the DPOR requirement that ensured flexibility for voters with non-standard residential addresses. *See* 1-ER-0148-49. The LUCHA Plaintiffs have presented no evidence that, so construed, the DPOR requirement will impede any qualified individual from registering to vote.

The LUCHA Plaintiffs also fault the DPOC and DPOR mandates for devising an allegedly "arbitrary" distinction between federal form registrants and state form registrants. Preliminarily, one's choice of registration form does not correspond to a suspect classification that triggers heightened constitutional scrutiny. *Cf. Short*, 893 F.3d at 679 ("County of residence is not a suspect classification warranting heightened scrutiny" or a "proxy for some other form of discrimination"). More to the point, any differential treatment of federal-form and state-form applications is compelled by the NVRA—not Arizona law. While the federal form offers a uniform, nationwide "backstop," "state-developed forms may require information the Federal Form does not." *ITCA*, 570 U.S. at 12. An inevitable corollary is that individuals who choose to register with the state form may have to provide information or documentation not contemplated by the federal form. That is a policy outcome that Congress, not Arizona, has ordained.

Finally, as the district court recognized, whatever incidental "burdens" the DPOC and DPOR requirements produce are justified by Arizona's important interests in "preventing non-citizens from voting and promoting voter confidence in Arizona's elections." 1-ER-0101. The LUCHA Plaintiffs assert that non-citizen voting is rare, but "[t]he Arizona Legislature was not obligated to wait," *Brnovich*, 594 U.S. at 686, for potential vulnerabilities in its existing citizenship verification laws to percolate. Further, as even the plaintiffs' expert admitted, voter fraud can be difficult to detect. FER-178-180. And election-crime statistics do not necessarily capture illegal votes or registrations that resulted from an individual's innocent mistake or carelessness. FER-179-181. States thus have substantial latitude to enact "prophylactic measures" that fortify election

24

security. *Brnovich*, 594 U.S. at 664. The LUCHA Plaintiffs also fault Appellants for not quantifying the DPOC requirement's effect on voter-confidence levels. *See* LU-CHA.Br.54. But "it is 'practically self-evidently true' that implementing a measure designed to prevent voter fraud would instill public confidence." *Feldman v. Ariz. Sec'y of State's Office*, 840 F.3d 1057, 1082 (9th Cir. 2016) (citations omitted).[7] More fundamentally, "there is no requirement that the rule is the only or the best way to further the [State's] proffered interests," *Dudum v. Arntz*, 640 F.3d 1098, 1114 (9th Cir. 2011), and the district court's appraisal of the state interests advanced by H.B. 2492 finds ample support in the record.

### B.    Uniform statewide requirements do not implicate *Bush v. Gore*

The LUCHA Plaintiffs try to buttress their *Anderson-Burdick* claims with another equal-protection theory. They argue that the DPOC and DPOR requirements run afoul of *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam). *See* LUCHA.Br.49-50. But that case was "limited … to the present circumstances," *Bush*, 531 U.S. at 109, and cannot support the Plaintiffs' attacks on uniform state election laws. The district court thus properly rejected the Plaintiffs' *Bush v. Gore* claim. *See* 1-ER-103-105. For at least five reasons, this Court should reject it, too.

First, the *Anderson-Burdick* test, not *Bush v. Gore*, applies to equal-protection challenges to state law. "The Supreme Court has addressed [Equal Protection] claims" against state election laws "using a single analytic framework." *Dudum*, 640 F.3d at 1106 n.15 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 787 n.7 (1983)). Courts in this Circuit

---

[7] In any event, expert evidence indicates that public awareness of election-integrity laws can enhance public confidence. FER-168-171.

thus analyze equal-protection challenges under the *Anderson-Burdick* framework, not under *Bush v. Gore*. *E.g.*, *Ariz. Democratic Party*, 18 F.4th at 1195 ("The Supreme Court repeatedly has assessed challenges to election laws" under "the *Anderson/Burdick* framework."). In fact, "the *Burdick* standard had been almost universally recognized by the federal courts as the appropriate test for equal protection challenges to state election laws, particularly those dealing with the 'mechanics of elections.'" *Paralyzed Veterans of Am. v. McPherson*, 2008 WL 4183981, at *18 (N.D. Cal. Sept. 9, 2008).

Second, this Court has questioned whether *Bush v. Gore* is "applicable to more than the one election to which the Court appears to have limited it." *Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th Cir. 2008). And that makes sense: the specific-standards test in *Bush v. Gore* was "applicable only because it was a court-ordered recount" that was at issue. *Id.*; *see also Bush*, 531 U.S. at 109 (noting "the special instance of a statewide recount under the authority of a single state judicial officer"). Where the plaintiffs challenge "state-enacted election law," as here, the proper test is "the *Anderson-Burdick* balancing test." *Paher v. Cegavske*, 457 F.Supp.3d 919, 928 (D. Nev. 2020). "[N]o case" holds otherwise. *Id.*

Third, even if *Bush v. Gore* applied beyond the 2000 election, this case is nothing like *Bush v. Gore*. There, the Florida Supreme Court considered a statewide recount in the 2000 election. *Bush*, 531 U.S. at 100. But it provided election officials with no standards by which to determine voter "intent" when examining ambiguously marked ballots, resulting in disparate treatment of similarly situated voters across counties. *Id.* at 105-06. The Plaintiffs here challenge pre-election registration rules, not post-election ballot-counting rules. They challenge state law, not court-ordered recounts. They

challenge disparities in voters' choices, not disparities across the State. And they challenge requirements of voters, not election officials' unbounded discretion to infer voter intent. The LUCHA Plaintiffs' out-of-context quotes do not explain how *Bush v. Gore* applies here.

Fourth, even if this case resembled *Bush v. Gore*, the standards for evaluating DPOC and DPOR are "sufficiently uniform and specific to ensure equal treatment of voters." *Lemons*, 538 F.3d at 1106; *Election Integrity Project*, 2024 WL 3819948, at *13 (*Bush* applied "merely the 'minimal' standard of non-arbitrary state action"). The district court found that the challenged state laws "are not tainted by 'varying' or complete 'absence of specific standards' that the Supreme Court found problematic with Florida's recount." 1-ER-105 (quoting *Bush*, 531 U.S. at 106-07). That finding is not erroneous, and the LUCHA Plaintiffs don't argue otherwise. Nor could they. The county recorders apply clear standards: they can reject a voter registration "only after matching that registrant to evidence of non-citizenship from the Voting Laws' list of databases." 1-ER-105 (citing A.R.S. §16-121.01(D), (E)). That binary process "leaves no guesswork to county recorders." 1-ER-105. Finally, the district court found that "Plaintiffs adduced no evidence that county recorders will act arbitrarily when confirming an individual's non-citizenship." 1-ER-105. These findings were not clearly erroneous, and Plaintiffs don't even try to argue otherwise.

Fifth, the Plaintiffs' equal-protection theory pits the Constitution against itself. The Constitution sets different rules for state and federal elections. The Plaintiffs' theory would destroy the Constitution's "allocation of authority" between federal and state governments. *ITCA*, 570 U.S. at 16-17. In our federal system, "States retain the

flexibility to design and use their own registration forms," and "[t]hese state-developed forms may require information the Federal Form does not." *Id.* at 12. "State-by-state … variation in the administration of elections is a feature—not a bug—of our federal system." *Election Integrity Project*, 2024 WL 3819948, at *13.

## IV. The state form's birthplace and citizenship checkbox requirements are material to determining registrants' eligibility to vote

The materiality provision does not prohibit States from requiring basic voter information. Both the United States and the MFV Plaintiffs rely on the "Secretary of State's view that the Checkbox Requirement 'conflict[s] with federal law,'" MFV.Br.19, and that "'a voter's place of birth is immaterial to their qualifications to register and vote,'" *id.* at 8; *see also* U.S.Br.39, 57. But courts do not "accept an interpretation of a statute simply because it is agreed to by the parties." *Rumsfeld v. FAIR*, 547 U.S. 47, 56 (2006). The Secretary's opinions do not dictate the meaning of the Civil Rights Act, particularly where both the Republican Appellants and the Attorney General offer more reasonable interpretations of the law.

The materiality provision adopts a low relevance standard. The United States tries to save the district court's cramped view by arguing that it is "comparable" to the Fifth Circuit's well-reasoned understanding of "material." U.S.Br.37 n.8. But the district court didn't understand its own decision that way; the court "d[id] not accept" the argument "that information must only meet such a low bar to be material." 1-ER-0141. Instead, the district court ruled that "Congress intended materiality to require some probability of actually impacting an election official's eligibility determination." 1-ER-0141. And in support, the court relied on a Texas district court that "interpreted

'material' to mean something akin to necessary." 1-ER-0141 n.16 (citing *La Unión del Pueblo Entero v. Abbott*, 604 F.Supp.3d 512, 542 (W.D. Tex. 2022)). The Fifth Circuit has since "reject[ed]" outcome-determinative definitions such as "'essential' as a reasonable meaning." *Vote.Org v. Callanen*, 89 F.4th 459, 478 (5th Cir. 2023). This Court should reverse the district court's adoption of that unreasonable standard.

The United States also glosses over other circuit decisions that undercut its outcome-determinative standard. The Third Circuit noted that the words "in determining" "describe a process" of "determining whether an individual is qualified to vote." *Penn. State Conf. of NAACP Branches v. Sec'y Commonwealth of Penn.*, 97 F.4th 120, 131 (3d Cir. 2024). That is, registration requirements must be material "in" that process, not "to" a given qualification. The United States responds that the Third Circuit decided "whether mail-ballot envelopes" are "papers subject to the Materiality Provision." U.S.Br.45. But that factual difference says nothing about the Third Circuit's textual observation that Congress "uses the words 'in determining,' and that choice must mean something." *State Conf. of NAACP Branches*, 97 F.4th at 131. The United States' refusal to engage with the Third Circuit's legal reasoning confirms they have no response.

The Eleventh Circuit likewise observed that "minimal relevance" means that an error is material if it "tends to make it more likely that the applicant is not a qualified voter than" in the absence of the error. *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008). The court reserved judgment on which was the correct standard, but later courts rejected "outcome-determinative" definitions. *Id.*; *see, e.g.*, *Vote.Org*, 89 F.4th at 478.

The MFV Plaintiffs try to avoid the issue altogether, arguing that it's "unnecessary" for this Court to define "material," the key term in the statute, because the birthplace and citizenship information "violate any of [those] definitions." MFV.Br.31 (emphasis omitted). But elsewhere they concede "the possible utility of birthplace to 'the back-end process' of verifying the citizenship," MFV.Br.56, and that "birthplace information might help distinguish possibly duplicative records," MFV.Br.42. They try to shore up those concessions by arguing those situations are "irrelevant," MFV.Br.56, and occur in "few instances," MFV.Br.42. But under a proper standard of "minimal relevance," which the MFV Plaintiffs don't seriously contest, those concessions give up the issue. *Browning*, 522 F.3d at 1173.

Finally, the MFV Plaintiffs rely on vacated and rejected caselaw. Citing *Migliori*, the MFV Plaintiffs argue that "[w]here a requirement has 'nothing to do with determining one's qualifications to vote,' the Materiality Provision bars enforcing it to disenfranchise otherwise 'qualified voters.'" MFV.Br.28-29 (quoting *Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir. 2022)). But the Supreme Court vacated that decision. *Ritter v. Migliori*, 143 S.Ct. 297 (2022). And when the Third Circuit reconsidered the issues, it reversed course, holding that the materiality provision doesn't reach "how a State regulates its vote-casting process." *State Conf. of NAACP Branches*, 97 F.4th at 127-28, 139. Moreover, "vote-casting" rules aren't even at issue here. *Id.* This Court thus has every reason to reject Plaintiffs' reading of the statute.

### A. Applicants who fail to check a box indicating whether they are a citizen have shown at least a "possibility" that they are not a citizen

"No party disputes that citizenship itself is material to a voter's eligibility to vote." 1-ER-0139. And "the United States concedes that the Checkbox Requirement on the State Form is permissible in the absence of DPOC." 1-ER-0143. Plaintiffs nevertheless argue that the checkbox is *situationally* immaterial for certain voters who also provide DPOC. But if an applicant fails to check that she is a U.S. citizen, that is at least "of consequence," in determining whether she is qualified to vote. *Material*, Webster's Legal Dictionary (1996). In other words, even if the applicant provides DPOC, the absence of a check in the citizenship box "tends to make it more likely that the applicant is not a qualified voter than" if the voter had checked the box. *Browning*, 522 F.3d at 1173. That is all that "materiality" requires.

Plaintiffs' argument has nothing to do with material information and everything to do with additional information. But the materiality provision doesn't prohibit requiring additional information. *Diaz v. Cobb*, 435 F.Supp.2d 1206, 1213 (S.D. Fla. 2006); *League of Women Voters of Ark. v. Thurston*, 2023 WL 6446015, at *17 (W.D. Ark. Sept. 29, 2023). The United States doesn't contest the holding of those cases in principle. Instead, it argues that the "strength of documentary proof" of citizenship makes this case different. U.S.Br.58. But that attempt at line-drawing fails. The "plain text" of the materiality provision "does not establish a least-restrictive-alternative test for voter registration applications." *Browning*, 522 F.3d at 1175. Neither does it establish a best-evidence standard. *Diaz* "[left] aside the hypothetical issue" of whether a "failure to re-answer a question that is asked twice in the same way" would be an immaterial omission.

31

*Diaz*, 435 F.Supp.2d at 1213. While the United States relies on that hypothetical to distinguish *Diaz*, the MFV Plaintiffs brush it aside as dicta. *See* MFV.Br.46 n.15. Setting aside Plaintiffs' disagreement about that passage, the United States' reliance on it proves too much: DPOC does not require the same information "in the same way" as the checkbox. *Id.* The former is an official document prepared by the government, while the latter is an affirmation provided by the voter. They serve different purposes and communicate different information, even if at a high level of generality they both concern the applicant's citizenship.

Finally, the United States speculates that the "likely explanation for the blank checkbox is simple mistake." U.S.Br.57. It cites no record evidence for that guess. And caselaw explains why it can't: the materiality provision "addresses errors and accidental omissions in registration, not the intentional refusal to provide required information." *McKay v. Altobello*, 1996 WL 635987, at *1 (E.D. La. Oct. 31, 1996). In other words, "facially non-compliant mistakes that render a [document] defective under state law might be 'defects,'" but they are not an "an error or omission" under the statute. *State Conf. of NAACP Branches*, 97 F.4th at 131 n.6 (citation omitted). The United States finds it difficult to conceive of any "reason why a blank checkbox would countermand an applicant's proof of citizenship." U.S.Br.58. But an empty checkbox indicates on its face that the applicant is not a U.S. citizen, which renders the registration "facially non-compliant." *State Conf. of NAACP Branches*, 97 F.4th at 131 n.6.

In sum, one important purpose of voter registration is to prove to election officials that the applicant is qualified to vote. But no matter the quality or quantity of evidence an applicant submits, it is at most *evidence* that the voter is qualified. Election

officials must form judgments about whether the evidence is sufficient to conclude that the voter is qualified. State law guides that process in part by expanding the scope and type of evidence required. Plaintiffs draw the line at DPOC—any more evidence is immaterial, they say. But the materiality provision draws no lines about the quality or quantity of evidence that state law can require. "States have considerable discretion in establishing rules for their own elections," *Vote.Org*, 89 F.4th at 480, and the materiality provision does not prohibit States from requiring better evidence or more evidence, from checkboxes to documentary proof. The citizenship checkbox is "of consequence" in determining citizenship, *Material*, Webster's Legal Dictionary, *supra*, which is all the materiality provision requires.

## B. Birthplaces need not be dispositive to be "material" in the voter-registration process.

The district court's finding that an applicant's birthplace is useful in some circumstances means that it is "material" in the voter registration process. The district court "[found] that while county recorders can sometimes use birthplace in Arizona's voter registration process, birthplace is of little utility in nearly all cases." 1-ER-0029. Plaintiffs don't contest that finding. *See* U.S.Br.16. Instead, like the district court, they suggest that birthplace isn't used *enough* to justify its burden on voters. But the materiality provision does not prohibit requirements that Plaintiffs find "unjustifiably burdensome on the applicant." *Browning*, 522 F.3d at 1175. It "does not establish a least-restrictive-alternative test," *id.*, nor does it prohibit burdens or "hurdle[s]" in the registration process, *Vote.Org*, 89 F.4th at 487.

33

The district court imposed an unreasonably high materiality threshold. The court found that "[a]n individual's place of birth is not *dispositive* of citizenship status." 1-ER-0026 (emphasis added). It found that "birthplace alone is generally not sufficient to distinguish between voters for identity verification." 1-ER-0028. It found that "birthplace cannot be used to *directly* verify that individual's citizenship." 1-ER-0077 (emphasis added). And it found that "county recorders can … reliably verify the identity of registered voters without birthplace when necessary." 1-ER-0078. The district court reached these conclusions in part after arbitrarily freezing the legitimate reach of the birthplace requirement because it "is not retroactive." 1-ER-0077. More importantly, all of those qualifiers about the utility of an applicant's birthplace turn the materiality provision into a "least-restrictive-alternative test for voter registration applications." *Browning*, 522 F.3d at 1175. Every circuit to confront that option has rejected it. *See id.*; *Vote.Org*, 89 F.4th at 487. This Court should, too.

The district court also erred by converting "materiality" into a freestanding usefulness test. The court's reliance on expert testimony confirms as much. But outside opinions about "the efficacy of birthplace information to uniquely identify voters" measure "efficacy," not "materiality." 1-ER-0028. The materiality provision does not set a national requirement about the degree of "efficacy" or "accuracy" of requested information. 1-ER-0028-29. It does not require that information be "standardized," nor does it prohibit gathering information merely because other information can "uniquely identif[y]" voters. 1-ER-0029. Not one of those requirements finds a basis in the text of the materiality provision.

Plaintiffs attempt to diminish the usefulness of the birthplace requirement to the point of vanishing, but the district court's factual findings foreclose their arguments. For example, the district court found that in some circumstances where a registrant submits a birth certificate as DPOC, "the 2023 [Election Procedures Manual] instructs county recorders to accept the birth certificate as DPOC if the registrant's first and middle names, birthplace, date of birth, and parents' names match that on the voter registration." 1-ER-0027. Plaintiffs argue that "the 2019 edition of Arizona's Election Procedures Manual" isn't relevant because "in 2019, birthplace was optional on the State Form." U.S.Br.47-48; *see also* MFV.Br.16-17. But the district court's findings about the usefulness of the birthplace requirement were about the 2023 manual, not the 2019 manual. The United States has no response to that finding. The United States' fallback is that "birthplace need not be mandatory on the State Form for the State to use it in these ways." U.S.Br.47. But whether a requirement is "mandatory" is irrelevant to whether it's "material." Making an entry on the registration form *optional* does not make the information any less *material* to registrars trying to determine whether the applicant is qualified to vote.

The district court also found that Maricopa County sends notices requesting additional information to identify the applicants' registration forms, "including the applicant's birthplace, occupation, phone number, and father's name or mother's maiden name." 1-ER-0027. Plaintiffs don't dispute that finding, either. Instead, they argue against a strawman. The MFV Plaintiffs point out that Maricopa County doesn't "'use birthplace information to verify someone's eligibility to vote,' including to determine whether they are a U.S. citizen for registration purposes." MFV.Br.9 (quoting 4-MFV-

SER-0598-99). But the district court found that Maricopa and several other counties "use birthplace alongside additional personal identifying information … to verify a voter's identity," not to determine citizenship status. *See* 1-ER-0027. And there can be no dispute that verifying identity is a legitimate function.

Finally, no party disputes that birthplace has been used to catch duplicative registrations. The MFV Plaintiffs even begrudge the "limited usefulness" of birthplace "in maintaining voter registration files." MFV.Br.17. They suggest those duplicative registrations were just "erroneous piece[s] of data," MFV.Br.14, but they don't explain why that makes the birthplace's utility illegitimate. *Cf. Vote.Org*, 89 F.4th at 481 ("'[A] 'State indisputably has a compelling interest in preserving the integrity of its election process.'"). The MFV Plaintiffs, like the district court, suggest that "such an administrative use … has no bearing on 'whether such individual is qualified under State law to vote.'" MFV.Br.42 (quoting 52 U.S.C. §10101(a)(2)(B)). But a duplicate registration is an *invalid* registration. No voter is "qualified under State law to vote" twice or to hold multiple registrations. The materiality provision does not tie States' hands in preventing such scenarios.

Likewise, Plaintiffs' attacks on the utility of NAPHSIS are just disagreements over the *degree* of its utility, not the fact of its utility. NAPHSIS aggregates various vital records, and birthplace data can assist recorders in confirming citizenship on those records. The MFV Plaintiffs argue that NAPHSIS data "is not completely uniform" and that a birthplace is not "'particularly useful' with respect to naturalized citizens." MFV.Br.11 (quoting 4-MFV-SER-0745). That some witnesses weren't familiar with

36

NAPHSIS also says nothing about its utility in confirming citizenship. *Cf.* MFV.Br.10-11. Nor does the funding source of the program. *Cf.* MFV.Br.11.

In sum, the district court's own findings show that birthplaces are material in the registration process. Plaintiffs don't contest the court's finding that birthplaces are useful in some circumstances. Instead, they dispute the relative degree of their utility and whether other information is comparably better. But the fact that birthplaces *are used* to help evaluate identity and citizenship means that as a matter of law they are "material" in the registration process. *See Browning*, 522 F.3d at 1175.

### C.    The materiality provision does not displace state registration rules.

Text, history, and precedent show that the materiality provision is not a preemption statute. The MFV Plaintiffs largely acknowledge the history, MFV.Br.26-28, although they hide from the mountain of evidence showing that the materiality provision prohibited "discriminatory practices on the part of registrars" that were "aimed at reducing Negro registration," Comm'n on Civil Rights, *Voting: 1961 Commission on Civil Rights Report* 43 (1961), perma.cc/WA4A-QEYK. And none of the Plaintiffs can explain why for decades after the material provision's enactment, courts uniformly agreed that it "is an anti-discrimination statute designed to eliminate the discriminatory practices of registrars through arbitrary enforcement of registration requirements." *McKay*, 1996 WL 635987, at *1. Without citing that caselaw, the MFV Plaintiffs disparage that decades-old uniformity as "radical attack on civil rights laws." MFV.Br.56.

Instead, the MFV Plaintiffs try to avoid the argument by claiming it was forfeited. They assert that "no party … ever raised this argument below." MFV.Br.54. But the argument was raised well enough that they and the other plaintiffs responded to it. *See*

FER-87-91, -105. As the United States explains, "the State has since abandoned" the argument, U.S.Br.60, but the Republican Appellants have not. Earlier in this litigation, the Attorney General argued that "[t]he materiality statute governs *ad hoc* executive actions that exceed state law, without dictating the substance of state law itself." FER-145-146. Appellants joined that argument, FER-68, the MFV Plaintiffs responded to it, FER-105, and the district court rejected it, FER-63. The Intervenors now carry it forward on appeal. The district court's "earlier non-final orders merge with the judgment," so "all of the district court's subordinate orders [are] within the jurisdiction of [this] court." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1070 (9th Cir. 2012).

Even if the parties hadn't argued the issue below, this Court considers statutory-interpretation arguments for the first time on appeal when "'the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court.'" *Wolf v. Life Ins. Co. of N. Am.*, 46 F.4th 979, 985 (9th Cir. 2022) (citation omitted). The argument raises a "purely legal issue" that this Court reviews *de novo*. *Id.* And no party claims that it would suffer prejudice from having to argue the issue on appeal. Any late claims of prejudice in reply would be difficult to believe, moreover, since the MFV Plaintiffs' arguments below just incorporated the briefing of the other Plaintiffs. *See* FER-105.

Both the United States and the MFV Plaintiffs don't dispute that their preemption theory is novel. They ignore the cases recognizing that the materiality provision "is an anti-discrimination statute designed to eliminate the discriminatory practices of registrars through arbitrary enforcement of registration requirements." *McKay*, 1996 WL 635987, at *1. The United States claims that rejecting its novel preemption theory

38

"would leave no function for the Materiality Provision." U.S.Br.60. But decades of enforcement—mostly by the United States—prove that the materiality provision has functioned just as Congress intended. That is why, "[u]ntil recently, the Materiality Provision received little attention from federal appellate courts." *State Conf. of NAACP Branches*, 97 F.4th at 127.

The United States argues that "under State law" modifies "qualified," not "material." U.S.Br.60. But that argument backs into the same issue: State law sets qualifications. And under Arizona law, a person is a "qualified elector" only if she "is qualified to register to vote," "is properly registered to vote," "is at least eighteen years of age on or before the date of the election," and "has provided satisfactory evidence of citizenship as prescribed." A.R.S. §16-121(A). That is, following the rules to "properly register[]" and "provide[] satisfactory evidence of citizenship" are themselves qualifications under State law. *Id.* In fact, "qualified under State law" is a defined term in the Civil Rights Act: "the words 'qualified under State law' shall mean qualified according to the laws, customs, or usages of the State." 52 U.S.C. §10101(e).

The MFV Plaintiffs read the text differently: they argue that the phrase "under color of law" authorizes their preemption theory. MFV.Br.55. But their best argument is that "acting 'under color of law' *includes* 'pursuant' to 'a State law [or] statute.'" MFV.Br.55 (emphasis added) (quoting *Chrisman v. Sisters of St. Joseph of Peace*, 506 F.2d 308, 313 (9th Cir. 1974)). But that doesn't rebut the argument that the materiality provision reaches only arbitrary action by state officials. A registrar who disqualifies an applicant who failed to list the exact number of months and days in his age is still acting "pursuant" to "a State law [or] statute." *Chrisman*, 506 F.2d at 313. That statute gives

the registrar authority to approve or reject the voter's registration. It is the "[m]isuse of [that] power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law," that the "action [is] taken 'under color of' state law." *Williams v. United States*, 341 U.S. 97, 99 (1951).

Plaintiffs overlook other textual features that confirm the materiality provision does not preempt state law. The provision reaches only state action denying applications for "errors or omissions," not for wholesale failures to comply with state law. As the Third Circuit noted, "facially non-compliant mistakes that render a ballot defective under state law might be 'defects'" but not an "an error or omission" under the statute. *State Conf. of NAACP Branches*, 97 F.4th at 131 n.6 (citation omitted). When "the *statute* imposes a duty on the voter" and "the requirement is mandatory," the failure to follow those rules renders an application noncompliant. *Id.* (emphasis added). In contrast, "errors or omissions" result in "imperfectly compliant" applications "where electors have facially met statutory requirements but have done so imperfectly." *Id.*

Other courts have concluded that whether a registration requirement was material depended upon whether it was required by state law. *See Martin v. Crittenden*, 347 F.Supp.3d 1302, 1308-09 (N.D. Ga. 2018). Contrary to Plaintiffs' suggestions, U.S.Br.49; MFV.Br.30-31, the court in *Martin* held that the birthdate requirement for absentee ballots was immaterial because under state law a deficient birthdate on an absentee ballot was "a ground for rejection," but no state law mandated "the automatic rejection of any absentee ballot lacking the elector's place and/or date of birth." *Jones v. Jessup*, 615 S.E.2d 529, 531 n.5 (Ga. 2005); *see also Common Cause v. Thomsen*, 574

F.Supp.3d 634, 636 (W.D. Wis. 2021) (noting that "the court [in *Martin*] held that the county's decision was *inconsistent* with state law"); *Martin*, 347 F.Supp.3d at 1308-09.

Finally, Plaintiffs rely on the Eleventh Circuit's cases in *Browning* and *Schwier*. U.S.Br.60; MFV.Br.55-56. But neither case addressed whether a requirement is material because state law imposes it. In *Browning*, the Eleventh Circuit held that information must be material if federal law requires it. *Browning*, 522 F.3d at 1172-75. And in *Schwier*, the Eleventh Circuit addressed the "mirror image," holding that information *cannot be* material if federal law prohibits it. *Id.* at 1174 n.22. Both cases suggest that *the law* is the measure of materiality, not freestanding judicial inquiries about whether state could employ "stronger" or "weaker means" of requesting information. U.S.Br.59. Where federal law spoke to the requirement, they used federal law as a proxy to measure materiality. But the materiality provision itself permits—indeed, requires—a more direct measure: "State law." 52 U.S.C. §10101(a)(2)(B). What state law requires, the materiality provision doesn't prohibit.

## V. The county recorders' use of the SAVE system when there is reason to believe a voter is a non-citizen is not discriminatory under the Civil Rights Act or the NVRA

A county recorder must search the SAVE system maintained by the U.S. Citizenship and Immigration Services if the recorder has "reason to believe" a registrant is not a United States citizen. A.R.S. §16-165(I). This neutral and non-discriminatory voter list-maintenance protocol—which the district court did not find has been or will be applied arbitrarily or invidiously—is consistent with the Civil Rights Act and Section 8(b) of the NVRA.

41

A.    The "reason to believe" provision prescribes a statewide, non-discriminatory eligibility verification procedure in compliance with the Civil Rights Act

A basic database search to confirm eligibility to vote, which entails no action (or even awareness) by the voter, does not violate the Civil Right Act. 52 U.S.C. §10101(a)(2)(A) prohibits an election official from applying to some individuals "any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote." Each component of A.R.S. §16-165(I)—namely, the "reason to believe" trigger and the use of SAVE—illuminates the infirmity in the Poder Plaintiffs' attack on the statute.

First, the Poder Plaintiffs' declaration that the "reason to believe" threshold is "inherently arbitrary and subjective," Poder.Br.36, finds refutation in the district court's recognition that "the 'reason to believe' standard … is not 'so indefinite as to allow arbitrary and discriminatory enforcement,' but is common in statutory drafting." 1-ER-0146 n.20 (cleaned up); *see also* 52 U.S.C. §10504 (allowing Attorney General to initiate civil action if he "has reason to believe that a State or political subdivision" has engaged in certain vote denial or abridgment). Notwithstanding its ultimate invalidation of the "reason to believe" provision, the district court found in its post-trial rulings that "Plaintiffs adduced no evidence that the county recorders will act arbitrarily when confirming an individual's non-citizenship." 1-ER-0105.

Citing the county recorders' differing answers to hypothetical questions lobbed at them during depositions and trial, the Poder Plaintiffs conjecture that county

42

recorders will act arbitrarily in applying the "reason to believe" standard. But as Appellants' expert testified, these hypothetical questions were "vague" and understandably likely to elicit "a confused and perhaps confusing set of answers." FER-161-162. More fundamentally, there is no record evidence that, when actually confronted with specific, real-world facts, the county recorders wield SAVE checks to target voters in an arbitrary or discriminatory manner. This Court should not make factual findings that the district court eschewed. *See United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) ("[O]ur review of a factual finding may *not* look to what we would have done had we been in the trial court's place in the first instance….").

Second, the use of SAVE to verify eligibility is not a discriminatory device. The database check is neutral on its face and applies uniformly statewide. The Civil Rights Act prohibits local officials from applying to some individuals standards, practices or procedures that are different from those "applied ***under such law or laws*** to other individuals." 52 U.S.C. §10101(a)(2)(A) (emphasis added). In other words, the Civil Rights Act is violated only if an elections official imposes on certain persons additional hurdles to registration ***relative to state law***. For that reason, the cases on which the Poder Plaintiffs rely featured local officials who applied to some registrants protocols that either exceeded or contravened a controlling state statute. *See Frazier v. Callicutt*, 383 F.Supp. 15, 19, 20 (N.D. Miss. 1974) (registrar used statutory discretion to disapprove student registrations at disproportionately high rate and violated state law by approving white students' applications that did not comply with statutory standards); *Shivelhood v. Davis*, 336 F.Supp.1111, 1115 (D. Vt. 1971) (in applying statutory residency standard, local election board required only students to complete additional questionnaire); *contrast*

43

*Voto Latino v. Hirsch*, 2024 WL 230931, at \*14 (M.D.N.C. Jan. 21, 2024) (plaintiffs were not likely to succeed on claim that different statutory address verification procedures for same-day registrants violated the Civil Rights Act). Indeed, neither the district court nor the Poder Plaintiffs cited any case in which a court invalidated a state statute (as distinguished from a political subdivision's own standard, practice or procedure) under §10101(a)(2)(A). The proposition advanced by the Poder Plaintiffs —namely, that a bright-line state statutory standard violates §10101(a)(2)(A), absent any factual findings of its selective implementation or misuse by specific elections officials—defies §10101(a)(2)(A)'s plain text and the caselaw.

Further, SAVE's internal informational limitations neither saddle any eligible voter with additional steps to maintaining her registration nor result in the disenfranchisement of eligible applicants. The district court expressly found that the Plaintiffs had "failed to adduce evidence that SAVE is unreliable or contains severely inaccurate or outdated citizenship information." 1-ER-0018. And as discussed in Appellants' principal brief, a county recorder would possess an individual's alien registration or other immigration number—which is a mandatory search field in SAVE—only if he had previously provided it as a form of DPOC when registering to vote. It follows that any such registrant necessarily either (a) has already verified his citizenship, and there is no record evidence that SAVE ever erroneously "backslides" into redesignating a naturalized citizen as a non-citizen, or (b) has federal-only status, and thus already is the subject of SAVE checks that the district court found permissible. *See* 1-ER-0114.

Perhaps recognizing that no eligible, naturalized citizen voter will be tasked with providing additional information or documentation in response to a SAVE inquiry

under the "reason to believe" clause, the Poder Plaintiffs deflect by insisting that the Civil Rights Act does not "include a burden-weighing requirement." Poder.Br.40. That is true, but irrelevant. The mere act of having one's name checked against a database is not—absent any attendant adverse repercussions—a cognizable harm under *any* law. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021). And while it may not incorporate any particular balancing test, §10101(a)(2)(A) is implicated only when an arbitrary or discriminatory registration practice actually impedes eligible individuals from registering to vote. *See Frazier*, 383 F.Supp. at 20 (finding violation where "registrar imposed an additional burden of prosecuting an appeal to the board of election commissioners on some applicants by summarily disapproving the applications").

In sum, the district court never found, and the record does not suggest, that county recorders will apply A.R.S. §16-165(I)'s facially neutral and uniform "reason to believe" trigger in an arbitrary or discriminatory fashion. This extinguishes Plaintiffs' §10101(a)(2)(A) claim, which requires a showing that specific officials have devised local standards, practices, or procedures that exceed or violate *state* law. Finally, there is no evidence that SAVE checks premised on a "reason to believe" finding will adversely affect any eligible individual's ability to maintain her voter registration.

**B.    The "reason to believe" provision is a uniform and non-discriminatory list maintenance program under section 8(b) of the NVRA**

Because A.R.S. §16-165(I) encapsulates a neutral and generally applicable criterion tailored to a qualification for voting (*i.e.*, U.S. citizenship), it is a uniform and non-discriminatory list-maintenance "program or activity" under Section 8(b) of the NVRA. The Poder Plaintiffs rely primarily on a carefully cropped sentence from *United States v.*

45

*Florida*, 870 F.Supp.2d 1346 (N.D. Fla. 2012), but they omit critical context. That court's invalidation of the challenged list maintenance program pivoted on its finding that "the Secretary's program identified many properly registered citizens as potential noncitizens." *Id.* at 1350. The court added that a "program that accurately identifies noncitizens who are registered to vote without unnecessarily challenging citizens could meet the requirement of uniformity and nondiscrimination." *Id.* at 1351. In other words, it was the program's propensity to generate erroneous indicators of potential non-citizenship—which, in turn, burdened naturalized citizens with additional tasks to verify their eligibility—that ran afoul of Section 8(b).

As discussed *supra*, Plaintiffs failed to adduce evidence that SAVE searches conducted under A.R.S. §16-165(I) will likely yield erroneous determinations of non-citizenship. To the contrary, the district court expressly found that SAVE is generally reliable. *See* 1-ER-0018.

The district court correctly noted elsewhere in its rulings that a list-maintenance program or activity complies with Section 8(b) if "the 'trigger' for county recorders to investigate the citizenship status of applicants is uniform and non-discriminatory." 1-ER-0086. That same reasoning validates §16-165(I); it prescribes a single criterion that applies statewide, and the Plaintiffs have not shown that the SAVE searches it authorizes will erroneously identify naturalized citizens as non-citizens. It accordingly is consistent with Section 8(b) of the NVRA.

46

## VI. The NVRA's 90-day blackout period does not tie States' hands in removing noncitizens from the voting rolls

The NVRA's 90-day blackout period does not apply to the removal of noncitizens from the voting rolls. The NVRA provides for the registration "any eligible applicant." 52 U.S.C. §20507(a)(1). It then lists a handful changes that permit the removal of a "registrant"—"the request of the registration," "by reason of criminal conviction or mental incapacity," "death," and "a change of residence." *Id.* §20507(a)(3)-(4). It directs the States to "conduct a general program" to remove registrants who have died or moved. *Id.* §20507(a)(4). But "any program" to "to systematically remove the names of ineligible voters" must be completed before the 90-day blackout period. *Id.* §20507(c)(2). Read together, these provisions establish rules for the registration and removal of once-eligible voters, and they govern programs for the removal of these voters when they have moved or died. They do not set limits on programs to remove noncitizens.

Ignoring this contextual reading, the DNC Plaintiffs argue that a program to remove noncitizens must be covered because the NVRA refers to "any program." DNC.Br.34, 38. But "statutes must be read as a whole," and the phrase "any program" "does not exist in a vacuum." *Territory of Guam v. United States*, 593 U.S. 310, 316 (2021) (cleaned up). The DNC Plaintiffs' narrow focus ignores the "interlocking language and structure of the relevant text." *Id.* at 317. It would also produce absurd results. Since the NVRA directs that registrants "may not be removed … except" for listed reasons, States would be barred from ever removing noncitizens even though they never should have been registered in the first place. 52 U.S.C. §20507(a)(3). The better reading is that

47

the NVRA "protects only 'eligible' voters from unauthorized removal." *Bell v. Marinko*, 367 F.3d 588, 592 (6th Cir. 2004).

The DNC Plaintiffs' only attempt to engage with the statutory context commits an error that the Supreme Court recently rejected. The NVRA provides that the 90-day blackout period "shall not be construed to preclude the removal of names" at the request of the registrant, for criminal convictions or mental incapacity, or because of the death of the registrant. 52 U.S.C. §20507(c)(2)(B). The DNC Plaintiffs argue that this provision sets out express exceptions, and should be read to bar additional exceptions. DNC.Br.35. This argument "distorts" the language of the NVRA. *Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 771 (2018). As *Husted* explained about a similar provision of the NVRA, this provision "does not create an exception to a general rule." *Id.* It sets out a "rule of interpretation" that "clarifies what the language means." *Id.* Here, the clarification that "any program" does not include a program targeted at grounds for removal identified in the NVRA confirms that the 90-day blackout period bears a far narrower meaning than the DNC Plaintiffs contend. This rule of construction establishing that the 90-day blackout period is narrower than the reach of the NVRA is especially powerful for something like the removal of noncitizens, which is not captured by the NVRA in the first place.

But even if the NVRA protected noncitizens from removal, the 90-day blackout applies only to programs "to systematically remove" ineligible voters. 52 U.S.C. §20507(c)(2)(A). No Plaintiff disputes that this provision excludes "individualized" removals "based on individual correspondence or rigorous individualized inquiry." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). The DNC Plaintiffs dispute

that Arizona's program is individualized. DNC.Br.39-40. But it requires a county recorder to not only "obtain[] information" about an individual registration but also "confirm[] that the person registered is not a United States citizen" before sending an individual notice to which the registrant may respond. A.R.S. §16-165. If a system that requires confirmation that a voter is ineligible before extending notice and an opportunity to respond is not individualized, it is unclear what would ever qualify. This limit on the reach of the term "statutorily removed" is not the kind of argument that this Court treats as forfeited if not specifically raised to the district court. *Wolf*, 46 F.4th at 985.

## VII. The district court did not clearly err in finding that the Legislature did not act with a discriminatory purpose

H.B. 2243 prescribes several racially neutral list-maintenance procedures. First, if a county recorder receives self-reports on juror questionnaires or data from ADOT indicating that a voter is not a citizen or not an Arizona resident, the recorder must contact the voter to confirm her citizenship. If the voter does not respond within a certain period of time, the registration will be canceled. *See* A.R.S. §§16-165(A)(9)-(10), (F). Second, the county recorders must conduct periodic checks of available databases—including ADOT, the Social Security Administration, SAVE, and NAPHSIS—and attempt to verify the citizenship status of voters who have not provided DPOC. *See id.* §16-165(G)-(K). Finally, the county recorder must search SAVE if she has "reason to believe" a registered voter is not a U.S. citizen. *See id.* §16-165(I).

To secure this Court's invalidation of H.B. 2243, the Cross-Appellants not only must overcome "the presumption of legislative good faith," *Abbott*, 585 U.S. at 603, but

they must also prove that the district court clearly erred in finding that H.B. 2243 is not the product of racial animus, *Brnovich*, 594 U.S. at 687.

They do not come close on either count. Propelling their theory largely on rhetorical histrionics rather than articulable facts, the Cross-Appellants disparage the State of Arizona and its citizens as awash in a "climate of xenophobic and racist commentary," PromiseAZ.Br.34, and indiscriminately impute "animus of both the public and legislators toward Latino and naturalized U.S. citizen voters," PromiseAZ.Br.40. As the district court recognized, though, these conclusory and inflammatory assertions rest on a brittle factual foundation that consists of little more than a single lobbyist's use of a word ("illegal") that the Cross-Appellants find objectionable, and one legislator's dubious account of a private conversation he allegedly had with a fellow member. At the very least, "the district's court's view of the evidence is plausible in light of the entire record," and so this Court "may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance." *Brnovich*, 594 U.S. at 687.

Because HB 2243 is facially neutral, the Cross-Appellants must prove that "a discriminatory purpose was a motivating factor for the legislation." *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023). A discernment of discriminatory purpose entails considering (1) "the historical background and sequence of events leading to" H.B. 2243's passage, (2) "any departures from the normal legislative process," (3) "relevant legislative history," and (4) "the law's impact on different racial groups." *Brnovich*, 594 U.S. at 687-88 (citing *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977)). The district court deemed Plaintiffs' evidence lacking with respect to each factor. It did not clearly err in doing so.

50

### A. H.B. 2243 was enacted against the backdrop of debates about election integrity and security

The Legislature adopted H.B. 2243 in the aftermath of a close and contentious election suffuse with concerns that Arizona's election system is vulnerable to illegal votes cast by ineligible individuals, including noncitizens and non-residents. The Cross-Appellants' strained exertions to recast a debate over election-integrity procedures as a racially charged dispute are constructed on peremptory assertions, not concrete evidence. As the trial court recognized, "[n]othing in the legislative hearings evidence a motive to discriminate against voters based on race or national origin." 1-ER-0108. Disagreement over whether Arizona has sufficient safeguards against various forms of illegal voting does not manifest discriminatory animus. *See Brnovich*, 594 U.S. at 689 ("partisan motives are not the same as racial motives"); *League of Women Voters v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023) (lack of evidence of extant voter fraud did not mean that legislators' professed anti-fraud motivation was suspect); *In re Ga. Senate Bill 202*, 2023 WL 6628601, at *16 (N.D. Ga. Oct. 11, 2023).

Scattered references by various national or out-of-state figures to alleged noncitizen voting in the context of broader arguments about the accuracy of election results carry no racial connotation on their own terms, and certainly do not evidence local "community animus," *in Arizona. Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016). The recurrent rhetorical and conceptual underpinnings of H.B. 2243's debate and passage in the Arizona Legislature were concerns about the security of Arizona elections, not race, ethnicity or naturalization status. *See League of Women Voters*, 66 F.4th at 926 (emphasizing that "[t]he bill's sponsors, legislative leaders, and the

Governor all presented a consistent message about the need for election security"); *In re Ga. Senate Bill 202*, 2023 WL 6628601, at *15 (similar).

The Cross-Appellants' thinly sourced allusions to alleged "voting-related historical discrimination in Arizona," PromiseAZ.Br.50, contribute little to their case. Some correspondence issued decades ago during the now-defunct preclearance process illuminates little about the collective intentions of Arizona legislators in 2022. *See Abbott*, 585 U.S. at 603 ("Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." (cleaned up)). The only putative example of contemporary legislative racial animus that the Cross-Appellants can muster, *see* PromiseAZ.Br.52, is a racially charged statement made in 2018 by an individual who was later expelled from the Legislature and was not in office when H.B. 2243 was adopted. *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1323 (11th Cir. 2023) (former legislator's statements had little probative value where he "was not a sponsor of this legislation and, in fact, was not a member of the Alabama legislature in 2011 when the voter ID law was passed").

Plaintiffs' effort in the district court to mount a more comprehensive historical narrative likewise fell flat. Plaintiffs presented two putative expert witnesses on the subject of historical discrimination in Arizona. The district court "question[ed] the reliability of some of [one of the expert witness's] testimony regarding Arizona history," and observed that he "lacked strong understanding of existing Arizona election law." 1-ER-0037. The district court afforded the second expert's opinions "little weight." 1-ER-0038. More importantly, it found that neither expert "identified a persuasive nexus between Arizona's history of animosity toward marginalized communities and the

Legislature's enactment of" H.B. 2243. 1-ER-0107. This Court "cannot substitute [its] own judgment of the credibility of a witness of that of the fact-finder," *Earp v. Davis*, 881 F.3d 1135, 1145 (9th Cir. 2018), and Cross-Appellants unsurprisingly make little effort to resurrect their flawed historical expert evidence now, *see Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 221 (4th Cir. 2024) (district court did not clearly err in "calling [plaintiffs'] evidence of historical discrimination 'outdated" and giving it 'little weight.'").

### B. H.B. 2243 was debated and adopted through usual legislative procedures and is substantively similar to preexisting laws

The drafting, debate, and adoption of H.B. 2243 were not marred by any procedural or substantive anomalies. Cross-Appellants' theory of irregularity posits that H.B. 2243 was a redux of a predecessor vetoed bill and was approved quickly in the waning days of the 2022 legislative session. These circumstances are unremarkable and do not evoke any racial or ethnic undertones. H.B. 2243 was among the last tranche of bills considered by the Fifty-Fifth Legislature just before its final adjournment, but "the brevity of the legislative process" does not "give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith." *Abbott*, 585 U.S. at 610. And, as the district court agreed after weighing the evidence, "amendments to existing bills are common at the close of a legislative session." 1-ER-0113. Finally, as Cross-Appellants themselves emphasize, the Legislature had previously evaluated many of H.B. 2243's components when deliberating over H.B. 2617, and hence its consideration of H.B. 2243 "did not require a prolonged process." *Abbott*, 585 U.S. at 611.

Similarly, nothing nefarious inheres in H.B. 2243's substantive revisions to aspects of the previously vetoed H.B. 2617. Cross-Appellants object principally to an amendment that reduced from 90 days to 35 days the time to respond to county recorders' citizenship-confirmation requests. But as the district court noted, "this is not a departure from prior Arizona law." 1-ER-0113. In addition to the 2019 EPM provision cited by the district court in connection with jurors' self-reports of non-citizenship, thirty-five days is the customary notice period found in several Arizona list maintenance statutes, including provisions that pre-date H.B. 2243 and that are unrelated to verifying citizenship status. *See, e.g.*, A.R.S. §§16-166(A), (E), 16-163(C). Finally, the county recorders have for years used SAVE to confirm citizenship whenever a new registrant provides an alien number as DPOC. *See* 3-ER-0711; 4-ER-0886-88. H.B. 2243 merely extends it use to routine, post-registration list maintenance protocols.

### C.    H.B. 2243's legislative history does not reflect racial animus

The drafting, debate, and enactment of H.B. 2243 evince no racial animus by the Fifty-Fifth Arizona Legislature. Cross-Appellants hang this facet of their *Arlington Heights* argument on the precarious thread of two isolated alleged statements.

First, Cross-Appellants fixate on use of the word "illegal" in a mass email from a lobbyist for the Arizona Free Enterprise Club. *See* 5-PromiseSER-955. Preliminarily, that email pertained to a different bill—H.B. 2492—not H.B. 2243. *See Carrillo-Lopez*, 68 F.4th at 1149 n.13 (commenting that "individual lawmakers' [racially derogatory] name for a separate bill is not sufficient evidence" that legislative body acted with racial animus in connection with the challenged statute); *United States v. Amador-Bonilla*, 102 F.4th 1110, 1118 (10th Cir. 2024) (finding that "evidence concerning Congressional

actions that took place around the same time as the passage of the [challenged statute] is insufficient to show Congress intentionally reenacted the [challenged statute] *because of* its disproportionate impact on Latinos").

While the term "illegal" is controversial, it is not a racial slur. A person's unlawful immigration status is an objective legal fact irrespective of race or ethnicity; it is not an immutable characteristic. *See Texas v. United States*, 809 F.3d 134, 148 n.14 (5th Cir. 2015) ("*Illegal alien* is not an opprobrious epithet; it describes one present in a country in violation of the immigration laws (hence 'illegal')"); *Avilez v. Garland*, 69 F.4th 525, 544 (9th Cir. 2023) (Bea, J., concurring) ("This word 'alien' is not a pejorative nor an insult"). Because citizenship is a substantive qualification for voting, the prevalence of illegal immigration is a logical and legitimate component of a policy debate concerning election integrity laws. *See Gonzalez*, 2008 WL 11395512, at *20 (rejecting argument that law establishing the DPOC requirement was intentionally discriminatory, noting that the measure's "findings and declaration shows a concern with illegal immigrants, not with naturalized citizens").[8] Even if the illegal-immigrant population skews towards certain ethnic compositions, that does not render the topic itself a proxy for race-based classifications. *See Carrillo-Lopez*, 68 F.4th at 1153 (pointing to the "clear geographic reason"

---

[8] Cross-Appellants declare that "[t]he term 'illegals' is distinctly indicative of discriminatory intent here because it was used in the post-2020 climate of unfounded accusations against naturalized citizens." PromiseAZ.Br.43. But there is no evidence of anyone, let alone an Arizona legislator, accusing "naturalized citizens" of illegal voting. Even if there were, a "sincere, though mistaken, non-race-based belief that there had been fraud in third-party ballot collection" does not establish discriminatory intent. *Brnovich*, 594 U.S. at 689 (cleaned up).

for the correlation between illegal immigration and Mexico and Central American countries).

Even if the word "illegal" were a racial term, an isolated statement by a lobbyist cannot plausibly be ascribed to ***any*** legislator, let alone the entire body. *See City of S. Miami v. Governor*, 65 F.4th 631, 647 (11th Cir. 2023) (Mizelle, J., concurring) (noting that "the district court assumed that the data was suspect solely because of the alleged views of [outside groups]. Then, the district court concluded that use of the data was proof of racial animus by the Florida Legislature as a whole. Such ad-hominem reasoning and compounding of attenuated inferences is error."); *Common Cause Fla. v. Byrd*, 2024 WL 1308119, at *32 (N.D. Fla. Mar. 27, 2024) ("[N]ot one legislator said or did anything to suggest, much less support an inference, that *any* legislator voted for the Enacted Map *because* they shared or intended to effectuate any racially discriminatory motive on the Governor's part.").

Cross-Appellants emphasize what they characterize as the Arizona Free Enterprise Club's significant involvement in H.B. 2243's drafting and the organization's frequent communications with key legislators. But even if the district court had abused its discretion by largely disregarding it, this evidence only undermines Cross-Appellants' accusations of racial animus. In none of the extensive and putatively private conversations between legislators and Arizona Free Enterprise Club representatives about H.B. 2243 can Cross-Appellants identify even a single instance in which any of those individuals made any statement carrying a racial or ethnic valence. If, as Cross-Appellants contend, H.B. 2243's demographic implications were a preoccupation of those

advocating it, such sentiments undoubtedly would have manifested themselves in at least some of their communications.

Second, Cross-Appellants rely on racially disparaging remarks that Senator Borelli allegedly made to then-Senator Quezada during private conversations. The district court declined to accord any weight to Senator Quezada's testimony because it recognized its purpose for what it was: a quintessential "cat's paw" theory. Even indulging the notion that Senator Borelli supported H.B. 2243 as a pretextual vehicle for advancing a certain racial worldview, "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Brnovich*, 594 U.S. at 689. It would have been clear error for the district court to superimpose Senator Borelli's alleged views on fellow legislators who, to all appearances, were not even aware of them. *See also Carrillo-Lopez*, 68 F.4th at 1140 ("[A] court must be aware that the statements of a handful of lawmakers may not be probative of the intent of the legislature as a whole"); *N.C. State Conference of the NAACP v. Raymond*, 981 F.3d 295, 307 (4th Cir. 2020) (holding that that district court's "findings impermissibly stemmed from the comments of a few individual legislators"); *Amador-Bonilla*, 102 F.4th at 1118 (a congressman's "deeply offensive" racial comments during debate on a bill "cannot be imputed to every other member of Congress"); *Fusilier v. Landry*, 963 F.3d 447, 464 (5th Cir. 2020) ("The Supreme Court has repeatedly cautioned against overemphasizing statements from individual legislators, which are not necessarily 'what motivates others' to act" (citation omitted)).

The questionable reliability of Senator Quezada's testimony supplies a justifiable alternative rationale for the district court's disregard of it. *See United States v. Ibarra-Pino*, 657 F.3d 1000, 1005 (9th Cir. 2011) ("We may affirm the district court's evidentiary

ruling on any grounds supported by the record."). Under cross-examination, Senator Quezada was unable to specify the words allegedly spoken by Senator Borrelli, *see* PromiseAZ-SER-781-782, PromiseAZ-SER-787; where or when they were allegedly spoken, PromiseAZ-SER-783-785; the bill(s) under consideration at the time, *id.* Promise AZ-SER-783, Promise AZ-SER-789; or whether the alleged comment was made in the context of a hearing on H.B. 2243 or more generally during the session but concerning voting rights more broadly, PromiseAZ-SER-785.

Moreover, Senator Quezada produced no notes, emails, or text messages contemporaneously documenting the alleged incident, *see* PromiseSER-792. Although he stated on the record all his reasons for opposing the challenged laws, Senator Quezada never raised the alleged comment contemporaneously on the record, *see* PromiseAZ-SER-792-793. Senator Quezada did not disclose the alleged comment to the Plaintiffs for more than a year, waiting until after the prime sponsor of the challenged laws presided over a confirmation hearing that ultimately recommended against Senator Quezada's confirmation to statewide office, leading to Senator Quezada's withdrawal from consideration. PromiseAZ-SER-767-775, PromiseAZ-SER-794-795. Senator Quezada's failed nomination was based at least in part on his history of accusing colleagues of racism, *see* PromiseAZ-SER-1045-1056, PromiseAZ-SER-1106-1107; and indeed, Senator Quezada has a history of making comments that invite such an interpretation, *see* PromiseAZ-SER-773-776; FER-185. Given the totality of these circumstances, the district court did not clearly err in choosing not to afford weight to Senator Quezada's testimony.

**D.      H.B. 2243 does not have a disparate impact on naturalized citizens**

H.B. 2243 does not, on its face or in its practical implementation, disproportion-
ately burden the voting rights of eligible naturalized citizens. While a law's alleged dis-
parate impact is a relevant factor under *Arlington Heights*, "it is generally not dispositive,
and there must be other evidence of a discriminatory purpose." *Carrillo-Lopez*, 68 F.4th
at 1141. And "it is not enough to show that lawmakers had an 'awareness of the conse-
quences' of the legislation for the affected group … or that the legislature acted 'with
indifference to' the effect on that group. Rather, the lawmaking body must have 'se-
lected or reaffirmed a particular course of action at least in part 'because of,' not merely
'in spite of,' its adverse effects upon an identifiable group." *Id.* at 1139 (cleaned up).

The district court correctly found Plaintiffs' evidence of alleged disparate impact
lacking. Cross-Appellants' argument otherwise compounds a selective disregard of cer-
tain provisions with objectively inaccurate characterizations of the law's operation.
First, Cross-Appellants fixate on H.B. 2243's requirement that the county recorders
search the SAVE system if a voter has not provided DPOC or if the recorder has "rea-
son to believe" she is not a citizen. *See* A.R.S. §16-165(I). But this myopic characteriza-
tion obscures that H.B. 2243 requires the county recorders to use a multitude of repos-
itories, including ADOT records, the Social Security Administration system, and the
NAPHSIS database. *See id.* §16-165(F), (G), (H), (J), (K). Notably, the latter, which con-
sists of birth certificates and other domestic vital records, generally can be used to re-
search **only** U.S.-born citizens. *See* FER-158-160. As one defense expert testified, this
multi-database list maintenance regime enables the county recorders' access to more
recent and extensive information. By unearthing evidence of citizenship for voters who

59

haven't provided it, these checks may actually allow current federal-only voters to upgrade to full ballot status. 4-ER-0842; FER-165-167.

In addition, Cross-Appellants postulate that recently naturalized citizens whom ADOT previously recorded as non-naturalized immigrants will be repeatedly flagged as non-citizens during monthly checks of ADOT data. According to Cross-Appellants, this phenomenon will result in a so-called "loop," whereby those individuals are repeatedly called upon to re-confirm their citizenship. PromiseAZ.Br.57. Not only is such a bizarre exercise in redundancy not mandated by H.B. 2243's text, the record evidence affirmatively establishes that this will not occur. Recorders of the two largest counties confirmed that they notate in their voter registration databases when a voter has provided DPOC other than an ADOT-issued driver's license or state ID number. *See* 3-ER-0710 (Maricopa); FER-153-157 (Pima). This data, in turn, serves as an internal confirmation of citizenship during the recorders' monthly checks of ADOT records, and "Plaintiffs have not adduced evidence that county recorders would ignore a voter's DPOC on file." 1-ER-0088.

Finally, the unrebutted evidence reveals that, even among naturalized citizens, "only 65 Federal-Only Voters, or *one-third of a percent* of the 19,439 Federal-Only Voters[,] possess a foreign-type credential" on file with ADOT, and hence would be at risk of falling into the Cross-Appellants' hypothetical "loop." 1-ER-0092. "A policy that appears to work for 98% or more of voters to whom it applies—minority and non-

minority alike" simply does not bespeak an impermissible racially disparate impact. *Brnovich*, 594 U.S. at 680.[9]

*　　*　　*

In sum, the district court properly found that H.B. 2243 bears no indicia of a discriminatory purpose. On this record, the district court's findings were, at the very least, "plausible," and this Court accordingly must leave them undisturbed, "even if it is convinced that it would have weighed the evidence differently in the first instance." *Brnovich*, 594 U.S. at 687.

## VIII. The district court abused its discretion in compelling discovery from the legislative leaders

### A.    The Legislative Leaders did not waive privilege

The DNC Plaintiffs attempt to avoid the "explicit and unequivocal renunciation" waiver standard by claiming two criminal cases provide state legislators a "much more limited, qualified privilege" than federal legislators.[10] DNC.Br.45. But in civil actions, state and federal legislators enjoy the same legislative privilege. *Supreme Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733 (1980). Indeed, the legislative privilege "is insurmountable in private civil actions under section 1983." *Pernell v. Fla. Bd. of Governors of State Univ.*, 84 F.4th 1339, 1344 (11th Cir. 2023).

---

[9] Using Arizona's total population as the benchmark, the predicted demographic composition of federal-only voters is approximately proportionate to minority groups' representation in the population, and white individuals comprise an absolute majority of federal-only voters. *See* FER-172-177, -182-184.

[10] The DNC Plaintiffs' reliance on a third case is "misplaced" because it "provides no support for the idea that state legislators can be compelled to produce documents concerning the legislative process and a legislator's subjective thoughts and motives." *La Unión Del Pueblo Entero v. Abbott*, 68 F.4th 228, 240 (5th Cir. 2023).

Plaintiffs unsurprisingly do not dispute that the "explicit and unequivocal renunciation" standard applies in civil cases. *See Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1087 (D.C. Cir. 2017); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 421 n.11 (D.C. Cir. 1995). "In civil litigation, there is no reason to conclude that state legislators and their aides are 'entitled to lesser protection than their peers in Washington.'" *In re N.D. Legis. Assembly*, 70 F.4th 460, 463 (8th Cir. 2023) (citation omitted), *vacated as moot sub nom. Turtle Mountain Band v. N.D. Legis. Assembly*, 2024 WL 3259672 (U.S. July 2, 2024). The same waiver standard thus applies to state legislators.

Plaintiffs never contend that any Legislative Leader action was an "explicit and unequivocal renunciation" of the legislative privilege. *See* DNC.Br.45. They hyperbolize that no one has done "anything remotely comparable," *id.*, but acting as a party does not waive an evidentiary privilege. A Senate subcommittee voluntarily filed a lawsuit, submitted briefs, and fought an appeal, but that "did not thereby necessarily invite the courts' interference with constitutionally protected legislative activity." *Ferrer*, 856 F.3d at 1084, 1087. Moreover, the Legislative Leaders produced more than 90,000 pages of documents and responded to written discovery requests before Plaintiffs' motion to compel. *See* DE-SER-59. Just like a party may assert attorney-client, First Amendment, or executive privileges over specific information, the Legislative Leaders appropriately raised the legislative privilege to protect specific information.

Although Plaintiffs characterize the "explicit and unequivocal renunciation" discussion as "new," DNC.Br.44, they rightly never assert it has been forfeited. The Legislative Leaders always have argued they did not waive their legislative privilege. "Once a federal claim is properly presented, a party can make any argument in support of that

claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). The district court also was not "limited to the particular legal theories advanced by the parties, but rather retain[ed] the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Sevs., Inc.*, 500 U.S. 90, 99 (1991).

The DNC Plaintiffs decry (at 46) creating a circuit split, but their position would cause this split. In six cases involving state legislators before the First, Fifth, Eighth, and Eleventh Circuits, the material sought by Plaintiffs would be privileged from discovery. *See* First Br. at 43 (citing cases); *Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 87 (1st Cir. 2021). Plaintiffs discuss none of these cases. The D.C. Circuit, likewise, has blocked discovery sought from federal legislators or legislative committees on at least six occasions in analogous contexts. *See Musgrave v. Warner*, 104 F.4th 355, 361 (D.C. Cir. 2024) (collecting cases). And this Court has twice protected legislators from discovery. *Lee v. City of Los Angeles*, 908 F.3d 1175, 1187-88 (9th Cir. 2018); *City of Las Vegas v. Foley*, 747 F.2d 1294, 1296, 1299 (9th Cir. 1984).

In the face of that precedent, Plaintiffs and the district court offered only one circuit-level case: *Powell v. Ridge*, 247 F.3d 520 (3d Cir. 2001). But *Powell* was not a waiver case; it held that the denial of legislative immunity does not give rise to immediate appeal under the collateral-order doctrine. *See id.* at 522. *Powell* reasoned that "the Legislative Leaders build from scratch a privilege"—complete immunity from discovery

during active litigation—that "does not exist." *Id.* at 525.[11] Moreover, while the legislators in *Powell* intervened to provide their "unique perspective[s]" to the court, *id.* at 522, no state law appears to have authorized intervention. Reading *Powell* broadly squarely conflicts with the precedents described above.

### B.    Legislative motive evidence is not relevant

The Legislative Leaders raised relevance objections to Plaintiffs (DE-SER-31-32) and the district court (DE-SER-67-68). Plaintiffs, too, briefed relevance. FER-25. Even if they had not, "the rule of waiver is a discretionary one." *Coal. on Homelessness v. City & Cnty. of San Francisco*, 90 F.4th 975, 999 (9th Cir.) (Bumatay, J., dissenting) (citation omitted), *opinion withdrawn,* 106 F.4th 931 (9th Cir. 2024).

"Our cases make clear that in determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 508 (1975) (citations omitted); *Fletcher v. Peck*, 10 U.S. 87, 131 (1810) (rejecting judicial inquiry into legislative motives). It does not matter that this case involves an Equal Protection challenge. "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). Contrary to the DNC Plaintiffs' claims (at 49-50), courts have explicitly rejected discovery of legislative motives in cases with Equal Protection claims. *See Lee*, 908 F.3d at 1188; *Arlington Heights*, 429 U.S. at 268 n.18.

---

[11] Likewise, in Plaintiffs' other case, state legislators asserted complete immunity from discovery, rather than a targeted privilege. *Singleton v. Merrill*, 576 F.Supp.3d 931, 934-37 (N.D. Ala. 2021).

### C.    Vacatur is an appropriate alternative remedy.

In the alternative, vacatur is warranted. Plaintiffs are wrong that the Legislative Leaders needed to raise vacatur below. "The statute that supplies the power of vacatur," *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 21 (1994), applies only to appellate courts, 28 U.S.C. §2106. The DNC Plaintiffs present no support for their contrary argument; their lone case became moot "[w]hile the appeal was pending." *Mitchell v. Wall*, 808 F.3d 1174, 1175 (7th Cir. 2015).

Citing *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009), the DNC Plaintiffs contend that by complying with the district court's order to compel, the Legislative Leaders intentionally mooted the discovery dispute, thereby rendering *Munsingwear* vacatur unavailable. But that argument conflates two entirely different propositions. *Mohawk* discusses how a party can pursue direct appellate review of an adverse privilege ruling, which may include a finding of contempt. By contrast, the exemption to *Munsingwear* vacatur applies when the party seeking relief "caused the mootness by **voluntary** action." *U.S. Bancorp*, 513 U.S. at 24 (emphasis added). Submission to a binding court order is, by definition, not a "voluntary" action, and the DNC Plaintiffs tellingly offer no authority to the contrary. Having unsuccessfully sought mandamus, *In re Toma*, 2023 WL 8167206, at *1 (9th Cir. Nov. 24, 2023), the Legislative Leaders were not required to also face contempt charges. "[S]erious repercussions for the relationship between different branches of government could result if an official was required to place him or herself in contempt to seek immediate review." *In re U.S. Dep't of Educ.*, 25 F.4th 692, 705 (9th Cir. 2022) (cleaned up). These are important public-interest considerations, a factor Plaintiffs never contest.

Because the Legislative Leaders already sought appellate relief, the equitable principles underlying vacatur "apply with extra force." *Ohio A. Philip Randolph Inst. v. Obhof*, 802 F. App'x 185, 187 (6th Cir. 2020). Like the Legislative Leaders, Randolph Institute provided deposition testimony and documents after it unsuccessfully sought a writ of mandamus to block the discovery on privilege grounds. *Id.* With the public availability of the deposition transcripts and documents mooting the appeal, the Sixth Circuit vacated the discovery orders. *Id.* As an alternative remedy, this Court likewise should vacate the discovery order.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court enjoining Arizona's laws and denying legislative privilege, and affirm the district court's finding that 2022 Ariz. Laws ch.370 (H.B. 2243) was not motivated by discriminatory purpose.

Dated this 26th day of August, 2024

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Appellant Republican National
Committee*

Respectfully submitted,

/s/ *Thomas Basile*

Kory Langhofer
Thomas Basile
STATECRAFT PLLC
649 North Fourth Ave., First Floor
Phoenix, Arizona 85003
(602) 382-4078
kory@statecraftlaw.com
tom@statecraftlaw.com

*Counsel for Appellants Republican National
Committee, Warren Petersen, and Ben Toma*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing brief on August 26, 2024, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

*/s/ Thomas Basile*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-3188, 24-3559 & 24-4029

I am the attorney or self-represented party.

**This brief contains** | 18,408 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
　☐ it is a joint brief submitted by separately represented parties.
　☐ a party or parties are filing a single brief in response to multiple briefs.
　☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

⦿ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Thomas Basile | **Date** | August 26, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*