**Nos. 24-3188, 24-3559 & 24-4029**

---

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

**MI FAMILIA VOTA**, *et al.*,
*Plaintiffs–Appellees,*

v.

**ADRIAN FONTES**, *et al.*,
*Defendants-Appellees,*

and

**WARREN PETERSEN**, *et al.*,
*Intervenor-Defendants-Appellants*

---

On Appeal from the United States District Court
For the District of Arizona
Hon. Susan R. Bolton
Case No. 2:22-cv-00509 (Consolidated)

---

**REPLY BRIEF OF PROMISE ARIZONA
CROSS-APPELLANTS-APPELLEES**

---

Ernest Herrera
Denise Hulett
Erika Cervantes
Mexican American Legal
Defense and Educational Fund
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
(213) 629-2512

Daniel R. Ortega Jr.
Ortega Law Firm
361 East Coronado Road, Suite 101
Phoenix, AZ 85004-1525
(602) 386-4455

*Counsel for Cross-Appellants Promise Arizona
and Southwest Voter Registration Education Projec*

## TABLE OF CONTENTS

**Page**

INTRODUCTION …………………………………..…………………………………1

ARGUMENT………………………………………………………………....2

I.    Defendants And Intervenors Ignore Evidence Of Discriminatory Intent That Conflicts With Their Selective Narrative. ……………………............2

a. The Role Of AZ FEC And Legislators' Statements Cannot Be Ignored……………………………………………………….2

    i. Arizona Free Enterprise Club's Instrumental Role In The Law's Passage Went Beyond Drafting The Legislation……………………..3

    ii. Defendants Cannot Separate Arizona Free Enterprise Club's Role In The Passage of The Voting Laws From Its Coded Appeals to Race…………………………………………………………………….4

    iii. Defendants and Intervenors Ignore Evidence Regarding Intent and Incorrectly Require A Higher Arlington Heights Test, Repeating The Error Of The District Court…………………………………………..9

b. Legislators' Statements Are Not Random Instances Of Coded Remarks, But Related Precisely To The Voting Laws' Subject Matter……………………………………………………………..13

c.  Defendants' And Intervenors' Portrayal Of H.B. 2243's Justification

Does Not Change The Actual Events Immediately Preceding The Voting

Laws' Passage.……………………………………………………………14

d. The Arizona Legislature's Passage of H.B. 2243 Involved Departures

from Normal Procedure.………………………………………………16

II.    Defendants And Intervenors Misapprehend The Impact Of H.B. 2243 On

Latino Voters.……………………………………………………..……17

III.    Defendants' Arguments Regarding The District Court's Exclusion Of

Deposition Testimony And Exhibits Are Unavailing…………………..22

IV.    This Court Has Jurisdiction Over Promise Arizona Plaintiffs' Cross-

Appeal…………………………………………………………………..24

a.  Promise Arizona Plaintiffs Have Direct Standing…………………..24

b.  Promise Arizona Has Representational Standing…………………...28

CONCLUSION…………………………………………………………………..30

# TABLE OF AUTHORITIES

Page(s)

Cases

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ................................................................. 12, 13, 15

*Arcia v. Florida Secretary of State*,
772 F.3d 1335 (11th Cir. 2014) ................................................................. 26

*Ash v. Tyson Foods, Inc.*,
546 U.S. 454 (2006) ................................................................. 10

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.*,
818 F.3d 493 (9th Cir. 2016) ................................................................. 7, 10

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) ................................................................. 8, 9, 14, 24

*Castro-Espinosa v. Ashcroft*,
257 F.3d 1130 (9th Cir. 2001) ................................................................. 10

*Cont'l Can Co., Inc. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund*,
916 F.2d 1154 (7th Cir. 1990) ................................................................. 21

*Democratic Nat'l Comm. v. Hobbs*,
948 F.3d 989 (9th Cir. 2020) ................................................................. 14

*Democratic Nat'l Comm. v. Reagan*,
329 F.Supp.3d 824 (D. Ariz. 2018) ................................................................. 8, 9

*Florida State Conf. of N.A.A.C.P. v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ................................................................. 26, 29, 30

*Food & Drug Admin. v. All. for Hippocratic*,
602 U.S. 367 (2024) ................................................................. 25, 26, 27

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 ................................................................. 25, 26

*National Council of La Raza v. Cegavske*,
800 F.3d 1032 (9th Cir. 2015*)* ................................................................. 29

*Pierce v. Underwood*,
487 U.S. 552 (1988) ................................................................. 22

*Protectmarriage.com-Yes on 8 v. Bowen*,
752 F.3d 827 (9th Cir. 2014) ................................................................. 28, 29

*Smith v. Town of Clarkton, N.C.*,
682 F.2d 1055 (4th Cir. 1982) ................................................................. 12

iii

*Summers v. Earth Island Institute,*
    555 U.S. 488 (2009) ...................................................................... 29
*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ...................................................... 28
*Village of Arlington v. Metropolitan Housing Development Corp.,*
    429 U.S. 252 (1977) ................................................................ 15, 16

## Statutes

8 U.S.C. § 1326 ............................................................................... 10
A.R.S. § 16-165 ........................................................................ 19, 21
A.R.S. § 16-166(J) ................................................................... 19, 20
A.R.S. § 16-165(A)(10) .................................................................. 19
A.R.S. § 16-165(J) .......................................................................... 18
A.R.S. § 16-165(K) ........................................................................ 19

## Other Authorities

H.B. 2243 ............................................................................... Passim
H.B. 2492 ....................................................................... 1, 3, 5, 16
H.B. 2617 ..................................................................................... 3, 17

iv

# INTRODUCTION

The district court clearly erred by not finding discriminatory intent in the passage of House Bill 2243 because it did not evaluate its own findings and other evidence as required by *Arlington Heights*. In their responsive briefing, Defendants State of Arizona and Attorney General of Arizona ("Defendants") and Legislative and Republican National Committee Intervenors ("Intervenors") commit the same error.

Defendants and Intervenors ignore evidence of discriminatory intent that conflicts with their selective narrative of the events preceding the passage of House Bill 2492 ("H.B. 2492") and House Bill 2243 ("H.B. 2243") (collectively, "the Voting Laws"). Most prominently, they ignore evidence of Arizona Free Enterprise Club's involvement in the passage of the Voting Laws. Defendants and Intervenors replicate the district court's error by isolating and dissecting coded appeals to race outside of their context. They fail therefore to refute the fact that legislators' statements related directly to the subject matter of the Voting Laws.

Defendants and Intervenors add to the district court's erroneous findings regarding impact by glossing over implementation issues that the new Election Procedures Manual does not resolve.

Defendants incorrectly argue that Promise Arizona and Southwest Voter Registration and Education Project do not have standing to bring their claims and

therefore this cross-appeal. Defendants also misconstrue the Supreme Court's holding in a recent case regarding organizational standing. Promise Arizona Plaintiffs have established standing.

## ARGUMENT

### I. Defendants And Intervenors Ignore Evidence Of Discriminatory Intent That Conflicts With Their Selective Narrative.

#### a. The Role Of AZ FEC And Legislators' Statements Cannot Be Ignored.

Defendants and Intervenors ignore various facts relevant to discriminatory intent, including those detailing Arizona Free Enterprise Club's involvement in the Voting Laws. In doing so, Defendants and Intervenors commit the same analytical error as did the district court. Defendants incorrectly argue that the district court examined evidence that it appears to have ignored. *See* State of Arizona Third Br. at 62–63, ECF No. 195.1. Also, Defendants argue that Plaintiffs did not prove that the Arizona Legislature relied on the Arizona Free Enterprise Club's coded appeals to racial animus. *See* State of Arizona Third Br. at 62–63, ECF No. 195.1. However, this argument ignores how closely legislators worked with Arizona Free Enterprise Club. Intervenors also argue that Plaintiffs failed to present evidence of statements "carrying a racial or ethnic valence" in the communications between Arizona Free Enterprise Club and legislators, but that argument sidesteps the coded nature of the language used by Arizona Free Enterprise Club in legislative hearings and in

communications with legislators.  RNC Intervenors Third Br. at 56, ECF No. 200.1.

> i. *Arizona Free Enterprise Club's Instrumental Role In The Law's Passage Went Beyond Drafting The Legislation.*

Defendants and Intervenors attempt to gloss over the extent of the Arizona Free Enterprise Club's involvement in the passage of the Voting Laws. They ignore the totality of the evidence regarding Arizona Free Enterprise Club's involvement and rely on this erroneously selective view of the facts.

Arizona Free Enterprise Club, as the organization put it, was "instrumental" in the passage of the Voting Laws. *See* Amicus Br. for Arizona Free Enterprise Club at 1, ECF No. 123.2.  Promise Arizona Plaintiffs recounted the various facts showing that Arizona Free Enterprise Club's involvement went beyond "help[ing] draft" the bills.  *See* Promise Arizona Principal Br. at 4–7, 10–15, ECF No. 150.1.  As Promise Arizona Plaintiffs indicated in their principal brief, legislative hearings transcripts, deposition testimony, and other documentary evidence showed that Arizona Free Enterprise Club gave testimony at hearings on the legal rationale for the H.B. 2492 and later pushed forward the vetoed H.B. 2617 in the form of H.B. 2243. *See* Promise Arizona Principal Br. at 36–39, ECF No. 150.1.

Indeed, the Voting Laws' primary proponents treated the Arizona Free Enterprise Club as experts on the subject matter.  To reiterate an example, House Bill 2492's sponsor, Representative Jake Hoffman, told the Arizona House Government and Elections Committee on February 16, 2022, that "I've been

working with the Free Enterprise Club on this bill, and they've spent hundreds of hours digging into this." 5-PromiseSER-857–858. Representative Hoffman referred to the organization in this way after a question from a state senator during the February 16 hearing, deferring to one of its lobbyists, Greg Blackie, for the answer to a question. *See id.* By contrast, legislators did not heed concerns about the potentially negative consequences of the bills that the Arizona Association of Counties and constituents raised. *See* 2-PromiseSER-176–178; 2-PromiseSER-205–206; 2-PromiseSER-210–214; 6-ER-1442–1461. The Arizona Association of Counties raised those concerns on behalf of county recorders, the county-level officials charged with administering elections and voter registration in Arizona. 2-PromiseSER-210–212; 6-ER-1455–1459.

> ii. *Defendants Cannot Separate Arizona Free Enterprise Club's Role In The Passage Of The Voting Laws From Its Coded Appeals to Race.*

Defendants cannot parse Arizona Free Enterprise Club's coded appeals to race from its role in the passage of the Voting Laws. Defendants argue that "the [district] court found no persuasive evidence that the Legislature specifically relied on the Club's alleged 'coded appeals' to racial animus." State of Arizona Third Br. at 62–63. In so doing, Defendants seek to separate the comments of the organization from its role in the laws' passage, and therefore from the legislature's intent. Defendants, in essence, argue incorrectly that direct, rather than circumstantial, evidence is

required under *Arlington Heights*.

It is impossible to separate Arizona Free Enterprise Club's coded appeals from its role in the passage of the Voting Laws because they were central to the Club's justifications for the laws. Arizona Free Enterprise Club echoed President Trump's baseless comment that there were 36,000 non-citizen voters in the 2020 presidential election in Arizona by emailing to legislators that "there are more than 36,000 individuals registered to vote who have never proven their citizenship status," an assertion that Defendants and Intervenors fail to discuss. 5-PromiseSER-959–961. The email containing that assertion about "36,000 individuals" specifically promoted the passage of H.B. 2492, discussing the LULAC consent decree and federal-only voters. *See id.* In an earlier email, the Arizona Free Enterprise Club promoted the same bill with the heading, "How More Illegals Started Voting in AZ Elections and How House Bill 2492 is Going to Fix It." 5-PromiseSER- 955–957. That email also discussed federal-only voters. The use of the 36,000 number and the "illegals" heading show that Arizona Free Enterprise Club conveyed to legislators, as a central justification for the laws, the same false premise that individuals who are federal-only voters are non-citizens who are voting illegally. Defendants dismiss the email heading containing the term "illegals" as "a poorly phrased desire to prevent non-citizens from voting." State of Arizona Third Br. at 63, ECF No. 195.1. The fact that the emails said not just that some voters had not

yet shown documentary proof of citizenship but that such voters were, definitively, non-citizen voters proves that Arizona Free Enterprise Club intentionally lied and pushed laws that imposed additional burdens on naturalized citizen voters. Plaintiffs did not need to show, as Defendants argue, that such comments specifically contained reference to race. State of Arizona Third Br. at 62–63, ECF No. 195.1. Plaintiffs met their burden by showing that the Legislature adopted the rationale and purpose of the Arizona Free Enterprise Club to create additional burdens on naturalized citizen voters, who are disproportionately Latino and predominantly ethnic minorities.

Defendants' attempt to parse Arizona Free Enterprise Club's "poorly phrased" statements from its role in the enactment of the Voting Laws is part of their argument that the Arizona Legislature did not rely on the coded appeals. This argument fails, and the district court similarly errs, because the record indicates that legislators either repeated the Club's false information or deferred heavily to the Club's "expertise," and because the argument depends on a misreading of the Supreme Court's holding in *Brnovich*.

As described above and detailed in Promise Arizona Plaintiffs' principal brief, legislators deferred to the testimony and "expertise" of the Arizona Free Enterprise Club. *See* Promise Arizona Principal Br. at 36–39, ECF No. 150.1. Speaker Toma, in his deposition, called H.B. 2243 "their" bill, meaning the Free Enterprise Club's

bill. 2-PromiseSER-217–220; 5-PromiseSER-950.  The district court found that the Arizona Free Enterprise Club drafted the substance of the bills.  Also, legislators' comments paralleled those that Arizona Free Enterprise Club wrote in its emails, and legislators.  Senator Petersen said in a March 10, 2022, Arizona Senate Judiciary Committee hearing that there are "36,000 people in Arizona who are registered to vote, who have not proven their citizenship status."  6-ER-1480–1481.  Senator Petersen testified in his deposition that, even though he did not think he got that figure from the Arizona Free Enterprise Club, he received the Arizona Free Enterprise Club email containing the 36,000 figure and he believed that the Club's information was "accurate."  2-PromiseSER-172–175.

This evidence of legislators' reliance on Arizona Free Enterprise Club's testimony, information, drafting, and legislative efforts related to the Voting Laws, in some cases mirroring the Club's coded appeals to race, is strong evidence that they had the same intent as the Club.  That is, this evidence indicates that legislators who supported the Voting Laws were accusing 36,000 registered voters of being "illegals," and on that basis were erecting barriers for naturalized citizen voters that would not apply to native-born citizen voters.  Such facts, when viewed together with demographic facts about how naturalized citizen voters are disproportionately Latino and the substantive departures from normal procedure, evince animus toward Latino and other minority voters.  *See Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818

7

F.3d 493, 507 (9th Cir. 2016) (finding motivation "in part by animus" when viewing coded appeals to race together with other circumstances).

Defendants also draw a false analogy between the facts in this case and those in *Brnovich* in their attempt to separate Arizona Free Enterprise Club's statements from its role in the Voting Laws' passage. *See* State of Arizona Third Br. at 63, ECF No. 195.1 (citing *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689–90 (2021)). In *Brnovich*, the Supreme Court affirmed the district court's finding that the Arizona Legislature did not pass a law regarding mail ballot collection with discriminatory intent. *See Brnovich.*, 594 U.S. at 689–90. In that case, despite the findings that a former state senator's accusations about fraudulent mail ballot collection and a "racially-tinged" video sparked the debate that led to the challenged law, the Supreme Court affirmed the district court's finding that the legislature as a whole was not imbued with racial motive. *See id*. at 689. In *Brnovich*, a Republican Party county chairman shared a video, which purported to depict a Hispanic man illegally collecting mail ballots, online and at political meetings . *See Democratic Nat'l Comm. v. Reagan*, 329 F.Supp.3d 824, 876 (D. Ariz. 2018), *aff'd*, 904 F.3d 686 (9th Cir. 2018), *on reh'g en banc sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020), *rev'd and remanded sub nom. Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021), and *rev'd and remanded sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020), *and rev'd and remanded sub nom.*

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021), and *aff'd sub nom. Democratic Nat'l Comm. v. Hobbs*, 9 F.4th 1218 (9th Cir. 2021). A former state senator also made allegations regarding conduct during his election and spearheaded efforts in past legislative sessions to limit mail ballot collection. *Id*. at 880–881.

Here, unlike in *Brnovich*, the entity positing false accusations and coded appeals—the Arizona Free Enterprise Club—did so not in the form of a video or a partisan message, but rather by drafting, testifying in favor of, and promoting the challenged bills. *See id*. at 879-881; *see also* Promise Arizona Principal Br. at 36–39, ECF No. 150.1. In this case, there were also instances of legislators who echoed coded appeals or had similar ones of their own, such as the comments of Senator Borrelli. Therefore, the *Brnovich* findings are not analogous to the *Arlington Heights* evidence in this case.

### iii. *Defendants And Intervenors Ignore Evidence Regarding Intent And Incorrectly Require A Higher Arlington Heights Test, Repeating The Error Of The District Court.*

Unable to ignore the statements made by legislators and the Arizona Free Enterprise Club, Defendants and Intervenors are left trying to justify the use of the term "illegal" as free of any discriminatory intent. *See* State of Arizona Third Br. at 53, 62–63, ECF No. 195.1; *see* RNC Intervenors Third Br. at 55–57, ECF No. 200.1. They cannot. This Court has instructed that under *Arlington Heights* analysis, "[w]hether a code word evidences racial animus may depend upon factors including

local custom and historical usage." *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 506 (9th Cir. 2016) (citing *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006)).

The district court also recognized that Arizona Free Enterprise Club's use of the term "illegals" was a coded appeal to race and that the term "can evince racial animus for members of the Latino community in Arizona." 1-ER-0109. The court found that the coded appeal was some evidence of community animus. *Id.* Promise Arizona Plaintiffs detailed why the term "illegal" is racially coded in Arizona. *See* Promise Arizona Principal Brief at 42–44, ECF No. 150.1. Arizona is a state bordering Mexico, and Latinos are a significant minority in the state, making up 32.5% of the state's population. *See id.* at 21. In addition, individuals whose country of origin is Mexico, Cuba, Guatemala, or Colombia made up approximately 40-50% of Arizona residents who naturalized as U.S. citizens every year from 2013 to 2022. *See id.* at 21–22.

Furthermore, the term "illegals" is different from the terms "alien," "illegal immigrant," or even "illegal alien." *See* Immigration and Nationality Act § 276, 8 U.S.C. § 1326 (defining the term "alien"); *see also Castro-Espinosa v. Ashcroft*, 257 F.3d 1130, 1131 (9th Cir. 2001) (discussing "illegal alien" in the context of alien harboring criminal statute). Contrary to what Intervenors argue regarding "illegal" simply referring to immigration status, the term "illegals" is not used as a legal term

either in the Immigration and National Act or elsewhere to refer to someone's immigration status. *See* RNC Intervenors Third Br. at 55, ECF No. 200.1. The Arizona Free Enterprise Club claims that "variations" of the term appear in legislation and a federal court opinion, but neither contains the term "illegals." *See* Amicus Br. for Arizona Free Enterprise Club at 13 & nn.2-3, ECF No. 123.2. The organization also refers to a news article about President Biden's 2024 state of the union address, but that same article quoted Latinos who found his use of the term objectionable. *See* Amicus Br. for Arizona Free Enterprise Club at 13 n.4, ECF No. 123.2 (citing Adriana Gomez Locon, *Biden's reference to 'an illegal' rankles some Democrats who argue he's still preferable to Trump*, APNews (Mar. 8, 2024), https://apnews.com/article/illegal-biden-backlash-laken-riley-41819b01c3942435f0f862789cd1d0f0 (statement of U.S. Rep. Joaquin Castro)("The rhetoric President Biden used tonight was dangerously close to language from Donald Trump that puts a target on the backs of Latinos everywhere.")).

Furthermore, in the context of this case, the implication by those using the term "illegals" is that certain types of people either are or are more likely to be committing an illegal act. Based on the outcome of the laws—that certain burdens were placed only on naturalized versus native-born citizens—the term takes on a racial and derogatory meaning.

Former Senator Quezada also testified as to why the term "illegal" is offensive to him as a Latino person. *See* Promise Arizona Principal Brief at 42, ECF No. 150.1. Mr. Quezada explained how the term "takes away the humanity" of immigrants and "is used to scare people and to imply criminality." *See* 5-PromiseSER-750–752. Arizona Free Enterprise Club did not write the heading in its email as "How Non-Citizens Are Voting In Arizona Elections," and in fact, the organization still defends its use of the term "illegals" before this Court. *See* Amicus Br. for Arizona Free Enterprise Club at 13, ECF No. 123.2.

Because there is evidence that the term has racial implications, *Arlington Heights* does not require that the "illegal(s)" comments be explicitly directed at Latinos or that the legislature "relied" on it. Contrary to Defendants' argument that Promise Arizona Plaintiffs only relied on *Ave 6E*, which reversed the dismissal of a discriminatory intent claim, Promise Arizona Plaintiffs also cited to *Arce*, a case reversing summary judgment of a discriminatory intent claim. *See Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015) ("[G]iven that 'officials . . .seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority,' we look to whether they have 'camouflaged' their intent.") (quoting *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1064, 1066 (4th Cir. 1982).

In *Arce*, this Court held that there was a plausible inference of discriminatory

intent, despite the government's argument that specific instances of discriminatory statements were "scattered," after the Court viewed the statements together with evidence from the other *Arlington Heights* factors. *See id*. at 978–79.

### b. Legislators' Statements Are Not Random Instances Of Coded Remarks, But Related Precisely To The Voting Laws' Subject Matter.

Defendants and Intervenors wish to cast aside statements made by legislators, including use of the term "illegals," repetition of the spurious 36,000-illegal-voter claim, and Senator Borrelli's comments to former Senator Quezada. They focus on Senator Borrelli's comments, seeking to treat the comments in isolation from other evidence. *See* State of Arizona Third Br. at 63–64, ECF No. 195.1. ; *see also* RNC Intervenors Third Br. at 57, ECF No. 200.1. Their argument can be distilled to two elements: 1) the statements and accompanying intent of Senator Borrelli cannot be imputed to the entire legislature; and 2) that Promise Arizona Plaintiffs rely on a "cat's paw" theory. *See* RNC Intervenors Third Br. at 57, ECF No. 200.1.

A finding of discriminatory intent does not require that Senator Borrelli's statement and the intent behind them be imputed to the entire legislature. Rather, these statements must be "coupled with" the other statements legislators made, the statements by Arizona Free Enterprise Club, the Arizona Legislature's departures from normal procedure, and the climate that immediately preceded the 2022 legislative session. *See Arce*, 793 F.3d at 979.

An application of the cat's paw theory is also not required here, and it is not what Promise Arizona Plaintiffs argue in their principal brief. "A 'cat's paw' is a 'dupe' who is 'used by another to accomplish his purposes.'" *Brnovich*, 594 U.S. at 689 (citing Webster's New International Dictionary 425 (2d ed. 1934)). In *Brnovich*, the Supreme Court discussed the Ninth Circuit's use of the cat's paw theory. *See id*. The Court stated, in reference to the Republican Party county chairman's video and former senator's accusations, that "well meaning legislators were used as 'cat's paws'" by the party county chairman and former senator. *See Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1041 (9th Cir. 2020), *rev'd and remanded sub nom. Brnovich v. Democratic Nat'l Comm*., 594 U.S. 647 (2021). Here, by contrast, Senator Borrelli, the Senate Republican Whip, was not an outside actor. *See* 5-PromiseSER-757–759; 5-PromiseSER-784. Rather, he was sitting on a senate committee considering one of the Voting Laws, and he made his comments to Mr. Quezada in that context. *See id*. He was neither the cat nor one of its paws. The logic of his comments—that despite all evidence, certain groups of people must be voting illegally—can be found in other legislators' and the Arizona Free Enterprise Club's comments.

> **c. Defendants' And Intervenors' Portrayal Of H.B. 2243's Justification Does Not Change The Actual Events Immediately Preceding The Voting Laws' Passage.**

14

Defendants and Intervenors' description of a race-neutral, non-discriminatory reason to pass the Voting Laws does not erase what happened in the months before the 2022 Legislative Session. *See* State of Arizona Third Br. at 43–46, ECF No. 195.1; *see* RNC Intervenors Third Br. at 51–53, ECF No. 200.1. Defendants detail the history of Proposition 200, the Supreme Court's decision in *Inter Tribal Council of Arizona*, and the LULAC Consent Decree as events preceding the Voting Laws' enactment. *See* State of Arizona Third Br. at 43–44, ECF 195.1. However, these events do not change the other events that immediately preceded H.B. 2243—the 2020 election, President Donald Trump's accusations of fraud, specifically in Arizona, and the audit committee formed by the Arizona Legislature. *See* Promise Arizona Principal Br. at 2–3, ECF No. 150.1. Following these events, Arizona Free Enterprise Club did of course refer to the *Inter Tribal* decision and LULAC Consent Decree, but in the same communications would say "illegals" or raise the specter of 36,000 non-citizen voters. 5-PromiseSER-955–961. Legislators then echoed the statements of the Club. *See* Promise Arizona Principal Br. at 4–6, ECF No. 150.1.

Even if some legislators also believed that their legislation was a continuation of the efforts of Proposition 200's supporters, "[a] plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a 'motivating factor.'" *Arce*, 793 F.3d at 977 (quoting *Village of Arlington v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977)).

15

The arguments raised by Defendants and Legislators also do not negate the facts that existing law and legislative, administrative, and law enforcement efforts in Arizona after Prop 200 were sufficient to address voter fraud, including non-citizen voting. The parties stipulated that, prior to H.B. 2492 and H.B. 2243, Arizona had policies, laws, and procedures in place designed to prevent noncitizens from voting or registering. *See* 3-ER-0695. Witnesses from the Arizona Attorney General's Office who worked or previously worked on enforcing voter eligibility laws testified that before the Voting Laws, they prosecuted voter fraud cases. 2-LUCHA-SER-231–242; 2-LUCHA-SER-269–270. One of those officials testified that voter fraud with non-citizens in Arizona is extremely rare. 2-LUCHA-SER-238. The district court found that non-citizen voter fraud was rare. 1-ER-0036.

### d. The Arizona Legislature's Passage of H.B. 2243 Involved Departures from Normal Procedure.

Intervenors' arguments that procedural or substantive departures must evoke racial undertones to weigh in favor of an intent finding miss the point of this *Arlington Heights* factor. RNC Intervenors Third Br. at 53–54, ECF No. 200.1. A court examines departures from the normal procedure and substantive departures because they "might afford evidence that improper purposes are playing a role." *Vill. of Arlington Heights*, 429 U.S. at 267.

Intervenors inaccurately argue that there was nothing unusual in not reexamining the bill, but the final-day amendment made some significant changes.

16

*See* Promise Arizona Principal Br. at 12–16, ECF. 150.1. Testimony revealed that bill amendments that change everything that was in a prior version of a bill, such as Petersen's amendment that changed H.B. 2617's notice period, were much less commonly proposed so late in the legislative process. 5-PromiseSER-765.

## II.     Defendants And Intervenors Misapprehend The Impact Of H.B. 2243 On Latino Voters.

Defendants and Intervenors rely heavily on their arguments regarding impact. However, the district court found that both the Systematic Alien Verification for Aliens ("SAVE") "reason to believe" provisions and the Motor Vehicle Division ("MVD") database comparison provisions of H.B. 2243 only affect naturalized citizen voters.

For the "reason to believe provision," Defendants offer several retorts that incorrectly characterize the totality of the evidence. *See* State of Arizona Third Br. at 69–70, ECF No. 195.1.[1]  Plaintiffs *did* show that the SAVE provision would involve individuals being run through SAVE based on arbitrary reasons due to a lack

---

[1] Promise Arizona Plaintiffs incorporate herein and join the arguments raised by Plaintiffs-Appellees Poder Latinx, et al. in their Responsive Brief, ECF No. 139.1. Promise Arizona Plaintiffs also join the Response Brief of the Democratic National Committee Plaintiffs and Arizona Asian American Native Hawaiian and Pacific Islander For Equity Coalition Addressing NVRA Claims and the Legislators' Discovery Challenge, ECF No. 144.1

of guidance provided in the statute, and that only naturalized citizens would be subjected to the SAVE provision. *See* Poder Latinx Resp. Br. at 10–12, ECF No. 139.1; *see also* 1-ER-0078–0080; 1-ER-0085. Therefore, it does not matter that the district court found that SAVE itself is reliable. Defendants argue that someone flagged as a non-citizen falsely could simply provide proof of citizenship, but this means that Defendants are willing to subject certain voters to additional burdens to vote to which native-born citizens are not subject and it ignores the district court's findings that certain voters would suffer more compliance and psychological costs. *See* 1-ER-0047. Finally, Defendants' reference to the NAPHSIS database is inapposite—that separate provision of H.B. 2243 was not found to target naturalized citizens and is supposed to be used after someone has not provided proof of citizenship, not after a county recorder has formed a "reason to believe" that a voter is not a citizen. *See* A.R.S. § 16-165(J); 5-PromiseSER-837.

Defendants argue that county recorders would not send a notice to voters who might be flagged under the MVD provision because they would be required to first "confirm" that they are not a citizen. *See* State of Arizona Third Br. at 71, ECF No. 195.1. However, this argument fails to undermine the evidence of impact on naturalized citizens, and therefore minority voters, because Defendants seek to inject the statute with language that it does not contain. Their argument refers to the 2023 Elections Procedures Manual, issued after the laws' passage by the Secretary of State

and after the trial in this case, and to a separate statutory provision that the "confirm" language does not cite. *See id*. at 71-72. (citing A.R.S. §16-166(J)).

First, the "confirm" language in H.B. 2243 (amending A.R.S. §16-165) does not clearly instruct county recorders to refer to the voter information mentioned in §16-166(J). The statutory language reads, in part, that "the county recorder shall cancel a registration[...]":

> When the county recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen, including when the county recorder receives a summary report from the jury commissioner or jury manager pursuant to section 21-314 indicating that a person who is registered to vote has stated that the person is not a United States citizen.

A.R.S. §16-165(A)(10); 5-PromiseSER-831–838. The sentence containing "confirms" in this section does not refer to the voter registration database or A.R.S. §16-166(J), as Defendants wish that it did. A later subsection—§ 16-165(K)—says "confirm" in it, but does not mention the state voter registration database and begins with "[t]o the extent practicable." A.R.S. §16-165; 5-PromiseSER-831–838.

Second, regarding the proposition that county recorders will check if voters provided documentary proof of citizenship ("DPOC"), it is not clear that county recorders would necessarily find that a voter submitted DPOC in the statewide voter registration database, even if the voter once did. The provision of Arizona Revised Statutes that Defendants cite says that "[a]fter two years the county recorder may

19

destroy all documents that were submitted as evidence of citizenship." A.R.S. § 16-166(J); Add. of Statutory Provisions at 91, ECF No. 104.2. Also, the district court made various findings regarding how HAVA checks function that involve the MVD database and the statewide voter registration database ("AVID"). *See* 1-ER-0023. Currently, if a HAVA Check done at the point of registration "matches the applicant with MVD records indicating that the applicant has a foreign-type credential, AVID will automatically mark the 'no' box under the 'citizenship verified' field. County recorders must then manually override the citizenship field for voters who provide a different form of DPOC." *Id.* Even though the new EPM requires county recorders to "confirm" if a voter is not a citizen before sending a notice, 2-ER-0253, the EPM provides no guidance on overriding the "citizenship verified" field value to "yes" despite a MVD record database check indicating a non-citizen MVD credential under H.B. 2243. *See* 2-ER-0223–0224 (noting that "Results of Database Checks" does not give guidance on overrides); *see also* 2-ER-0253.

Therefore, even the new guidance in the 2023 EPM does not resolve the confusion introduced by H.B. 2243 if a voter is incorrectly flagged as a non-citizen in a MVD database comparison. This matters because, if county recorders do not and are not able to check if a falsely flagged voter previously provided DPOC due to a failure to override AVID's "citizenship verified" value manually, then the impact that Dr. McDonald described for more than 6,000 naturalized citizen voters

is real and imminent. Even if the "loop" effect does not occur due to post-enactment guidance, then naturalized citizen voters who have outdated citizenship data in the MVD database will still incur a burden that native-born citizen voters do not.

Third, a post-legislative action by a government actor cannot save an unconstitutional enactment, especially if such an actor is not the legislature itself. The language of A.R.S. § 16-165 itself does not provide guidance on first checking for DPOC when a voter is flagged as having a non-citizen credential in a MVD database comparison. The EPM can be changed at the discretion of the Secretary of State. The Secretary of State was elected by a slim margin (slightly more than 20,000 votes out of 2,521,030), and if that office changed hands, that purportedly ameliorative EPM guidance could be erased.[2] As shown by litigation by Legislative Intervenors in a separate case and Legislative Intervenors' comments on the EPM, the EPM guidance is a matter of some controversy in Arizona. *See* 2-PromiseSER-5–54; 5-PromiseSER-844–853. Furthermore, the guidance written by the Secretary of State in 2023 does not provide insight into the intent of the legislators who passed H.B. 2243 in 2022. *See Cont'l Can Co., Inc. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund*, 916 F.2d 1154, 1157 (7th Cir. 1990) ("the legislative history of a bill is valuable only to the extent it shows genesis

---

[2] *2022 General Election Statewide Canvass*, https://azsos.gov/elections/results-data/election-information/2022-election-information/2022-general-election-canvass (last visited September 2, 2024).

and evolution, making 'subsequent legislative history' an oxymoron") (citing *Pierce v. Underwood*, 487 U.S. 552, 566-68 (1988).

Because the district court and Defendants erroneously cast aside evidence of H.B. 2243's discriminatory effects on naturalized citizens and therefore mostly minority voters, impact evidence should weigh more heavily in favor of a discriminatory intent finding.

### III.    Defendants' Arguments Regarding The District Court's Exclusion Of Deposition Testimony And Exhibits Are Unavailing.

Defendants fail to rebut Promise Arizona Plaintiffs' arguments that the district court abused its discretion by arbitrarily excluding deposition testimony and exhibits. *See* State of Arizona Third Br. at 72–73, ECF No. 195.1.

Promise Arizona Plaintiffs did not argue, as Defendants imply, that the district court excluded all deposition excerpts submitted from the depositions of Ben Toma and Warren Petersen or that the district court failed to cite to any of the excerpts. *Id*. Rather, Plaintiffs argued that by function of the district court's order containing its findings of fact and conclusions of law and its order dated March 7, 2024, the district court excluded any deposition testimony to which it did not cite from the deposition designations.  *See* 1-ER-0007–0115; 1-PromiseSER-2–3.  The district court, in its March 7 order, "grant[ed] Plaintiffs Motion to Overrule Defendants' Objections to Deposition Designations" and "overrules Defendants' global objections to

Plaintiffs' use of deposition testimony to the extent that the Court relied on such testimony in its Findings of Fact and Conclusions of Law [...] (*See* Doc. 624)" and "denie[d] Plaintiffs' Motion to Overrule Defendants' Specific Objections to Deposition Designations as moot. (*See* Doc. 638)."1-PromiseSER-2–3. Plaintiffs moved to overrule Defendants' specific objections to an earlier set of deposition designations and then updated that motion with a notice of filing of an updated chart (referring to Doc. 624) containing Defendants' and Intervenors' specific objections and Plaintiff responses after trial and after the depositions of Senator Petersen and Speaker Toma. 3-PromiseSER-306–315; 3-PromiseSER-229–305. Therefore, to the extent the district court did not cite certain deposition designations in its findings of fact and conclusions of law, it excluded such testimony from evidence without any evidentiary explanation. 1-ER-0007–0115.

Promise Arizona Plaintiffs referred to various excerpts from the deposition designations of Speaker Toma and Senator Petersen that the district court effectively excluded from evidence. *See* Promise Arizona Principal Br. at 37–39, ECF. 150.1

The district court also excluded exhibits from the legislator depositions, with the exception of Plaintiffs' Exhibit (PX) 602, in its March 7 order. That order said simply, "the Court grants Plaintiffs' Motion to Admit Certain Deposition Exhibits from Legislator Defendants' Depositions as to Exhibit number 602. (*See* Doc. 675)." 1-PromiseSER-2–3. As docket number 675 showed, Plaintiffs had moved for

admission of other exhibits from those depositions over the objections of Defendants and Intervenors. *See* 3-PromiseSER-316–325. The district court did not give any basis for including PX 602 or excluding the other exhibits. *See* 1-PromiseSER-2– 3.Defendants argue that for excluded exhibits, "the court did not deem them worth citing." State of Arizona Third Br. at 73, ECF No. 195.1 That is not an evidentiary basis for exclusion when there were specific objections and responses.

Finally, Promise Arizona Plaintiffs *did* show prejudice, contrary to Defendants' argument that such evidence would not have shown discriminatory animus because "Lawmakers are presumed to 'exercise their judgment.'" State of Arizona Third Br. at 74, ECF No. 195.1 (citing *Brnovich*, 594 U.S. at 689–90.) Because some of the excluded cooperation evidence between the Legislature and the Arizona Free Enterprise Club showed that legislators in some cases completely relied on the organization's legal arguments and factual assertions without checking if they were true, then the evidence shows that lawmakers in fact did not exercise their judgment and agreed with an organization making racist statements. *See* Promise Arizona Principal Br. at 37–39, ECF No. 150.1.

## IV. This Court Has Jurisdiction Over Promise Arizona Plaintiffs' Cross-Appeal.

### a. Promise Arizona Plaintiffs Have Direct Standing.

Defendants concede that the District Court articulated the correct legal

standard for Article III jurisdiction. 1-ER-0061–0063. The District Court properly found that Plaintiffs have demonstrated both direct and representational Article III standing. "[O]rganizations may have standing 'to sue on their own behalf for injuries they have sustained.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n.19).

Arizona distorts Plaintiffs' factual basis for standing by reducing it to a spending spree. This approach is incorrect. As acknowledged by the lower court, Promise Arizona Plaintiffs are non-profit organizations whose purpose is to empower Latino communities through their vote and increase their participation in the electoral process. 1-ER-0050–0051. To implement their missions, Plaintiffs provide voter registration, voter education, and turning out the vote services. *See id.* When H.B. 2243 passed, both organizations sued because the legislation would impair their ability to carry out their mission and services, including voter registration.

For example, H.B. 2243 requires election officials to consult state and federal databases on a monthly basis to identify potential non-citizens for registration cancellation. 5-PromiseSER-831–838. This practice, in effect, has created the systematic cancellation of registrations within 90 days of federal elections. 1-ER-0131. These type of "programs can cause inaccurate removal and '[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the

State's errors in time to vote.'" 1-ER-0132 (quoting *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1346 (11th Cir. 2014)). Accordingly, Arizona has "perceptibly impaired" Plaintiffs' "ability to provide" their services as H.B. 2243 operates to undermine and undo their work by erroneously canceling eligible registrants, including Latino registrants with whom they have personally worked with. *All. for Hippocratic Med.*, 602 U.S. at 395 (citing *Havens,* 455 U.S. at 379); *see also Florida State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1164-1166 (11th Cir. 2008) (recognizing that plaintiff organizations had injury as they "averred that their actual ability to conduct specific projects. . .will be frustrated by" Florida voter registration statute); *see also* 1-ER-0051 (testifying that H.B. 2243 will undo a lot of the work that Promise Arizona has done over the past decade).

Moreover, the resource expenditures made by Promise Arizona Plaintiffs also support their standing. For example, Plaintiffs anticipate that more resources will be needed to effectively register voters (and keep them registered) under H.B. 2243. 1-ER-0050 ("SVREP anticipates reallocating funding and staff time from its voter registration, voter education, and voter turnout efforts to help voters who receive the 35-day notice letter obtain DPOC and assist voters who are removed from the voter rolls pursuant to H.B. 2243."); 1-ER-0051 ("Promise Arizona also anticipates redirecting the use of its staff members and volunteers to assist registrants who receive a notice to provide DPOC under H.B. 2243.") Unlike the Plaintiffs in

*Alliance for Hippocratic Medicine*, Plaintiffs are not attempting to "spend its way into standing simply by expending money to gather information and advocate against the defendant's action" *All. for Hippocratic Med.*, 602 U.S. at 394. Rather, H.B. 2243 interfered with Plaintiffs' core business activities by making it more expensive and time-consuming to carry out their voter registration activities.

As unregulated parties, Plaintiffs can nonetheless establish standing when third-party behavior predictably causes their injury, including voter behavior. *Id.* at 383. Under H.B. 2243, when a county recorder obtains information and "confirms" that the person registered is not a United States citizen, the county recorder must send the person notice that their registration will be canceled in thirty-five days unless the person provides valid evidence of U.S. citizenship. If the person fails to do so, the county recorder is directed to cancel their registration and notify the county attorney and attorney general for possible investigation. 1-ER-0013–0014. As noted by the lower court, evidence showed that Latino voters could be deterred from pursuing voter registration due to fears of investigation. 1-ER-0047. Because of this predicted fear, Plaintiffs' voter registration efforts will be limited and will fail to have the same reach as it did before H.B. 2243, effectively injuring Plaintiffs' ability to fully engage its services.

Simply put, Arizona's actions directly affect and interfere with Plaintiffs' core business activities. *All. for Hippocratic Med.*, 602 U.S. at 395. Thus, Cross-

Appellants continue to have direct standing.

### b. Promise Arizona Has Representational Standing.

The lower court correctly concluded that Promise Arizona had representational standing to challenge H.B. 2243. In part, representational standing requires that organizations show that "its members would otherwise have standing to sue in their own right." 1-ER-0062–0063. In reviewing injury in fact as a question of standing, courts consider "whether the plaintiff[ ] face[s] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement … or whether the alleged injury is too imaginary or speculative to support jurisdiction." *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014) (citing *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000)). Because H.B. 2243 is set to be enforced pending this appeal[3], Promise Arizona members face the risk of experiencing discriminatory impact and exclusion from the voter rolls.

In its briefing, Arizona devalues an important fact that the District Court properly found—the composition of Promise Arizona members. Promise Arizona's members include voters who are *naturalized citizens*. 1-ER-0051. Under H.B. 2243,

---

[3] Emergency Mot. for Partial Stay, June 25, 2024, ECF No. 50.1; Supreme Court Order in Pending Case, Aug. 22, 2024, ECF No. 193.1.

the law requires that county recorders conduct monthly SAVE checks on registered voters "who the county recorder has reason to believe are not United States citizens." 1-ER-0013. Because SAVE requires an immigration number, the "Reason to Believe" provision will have the discriminatory impact of *only* subjecting naturalized citizens to county recorder predilections and subsequent database checks, not native-born citizens. 1-ER-0078–0085. Considering that Arizona officials testified that they *will* implement H.B. 2243, there can be no doubt that Promise Arizona members, i.e. naturalized citizens, face "a realistic danger of sustaining a direct injury" of discrimination upon enforcement. *Bowen*, 752 F.3d at 839. On top of that, Promise Arizona members run the risk of being excluded from the voter rolls due to H.B. 2243's inaccurate systematic cancellation program and the corresponding fears of being investigated. Thus, Promise members have standing to sue in their own right.

Further, Arizona continues to argue that Promise Arizona was required to identify members to sustain standing. This conclusory argument is misplaced. Through its reading *Summers v. Earth Island Institute,* 555 U.S. 488 (2009), this Court clarified that such identification is not necessary to establish Article III standing. *National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015*); see also Florida State Conf. of N.A.A.C.P*, 522 F.3d at 1160 ("When the alleged harm is prospective, we have not required that the organizational plaintiffs

name names because every member faces a probability of harm in the near and definite future.") Because H.B. 2243's targeted provisions are expected to be implemented pending this appeal, Article III standing remains intact. As implicated above, it is "relatively clear, rather than merely speculative, that one or more" Promise Arizona "members . . . will be adversely affected by" the state law and Arizona "need not know the identity of a particular member to understand and respond to" the "organization's claim of injury." *Id.* Accordingly, Promise Arizona continues to have representational standing.

## CONCLUSION

For the foregoing reasons and those contained in their principal brief, Promise Arizona Plaintiffs respectfully request that this Court reverse the district court's finding that H.B. 2243's citizenship-related provisions were not enacted with discriminatory intent.

Dated: September 3, 2024

Respectfully submitted,

Ernest I. Herrera
Denise Hulett
Erika Cervantes
Mexican American Legal
Defense And Educational Fund

By: /s/ Ernest I. Herrera
Ernest I. Herrera

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-3188, 24-3559, and 24-4029

I am the attorney or self-represented party.

**This brief contains** | 6964 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

⦿ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Ernest Herrera | **Date** | 9/3/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*