**Case No. 24-3188 (consolidated with 24-3559 and 24-4029)**

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

MI FAMILIA VOTA; et al.,

*Plaintiffs-Appellees,*

*v.*

ADRIAN FONTES, Arizona Secretary of State; et al.,

*Defendants-Appellees,*

WARREN PETERSEN, Arizona Senate President; et al.,

*Intervenor-Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Arizona

No. 2:22-cv-00509-SRB (and consolidated cases)

---

## STATE OF ARIZONA AND ARIZONA ATTORNEY GENERAL'S
## PETITION FOR REHEARING *EN BANC*

---

Joshua D. Bendor (AZ Bar No. 031908)
Joshua.Bendor@azag.gov
Hayleigh S. Crawford (AZ Bar No. 032326)
Hayleigh.Crawford@azag.gov
Joshua M. Whitaker (AZ Bar No. 032724)
Joshua.Whitaker@azag.gov
Kathryn E. Boughton (AZ Bar No. 036105)
Kathryn.Boughton@azag.gov
ACL@azag.gov

OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333

*Counsel for State of Arizona and
Arizona Attorney General
Kristin K. Mayes*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................................i

TABLE OF AUTHORITIES........................................................................iii

I.      RULE 40(B) STATEMENT AND SUMMARY .........................................1

     A.     Birthplace provision............................................................1

     B.     List maintenance.................................................................3

II.     BACKGROUND.............................................................................6

     A.     Birthplace provision............................................................6

          1.     Arizona has long requested birthplace information, but the request has been optional for decades..............................................................6

          2.     Arizona decided to require applicants to provide birthplace to help confirm identity and citizenship. ..................................................8

          3.     Despite the usefulness of birthplace, the panel held that Arizona cannot require it. ....................................9

     B.     Voter list maintenance law.............................................12

          1.     History shows Arizona's desire to ensure that only U.S. citizens vote. ........................................12

          2.     The district court found that Promise Arizona had standing and found a lack of discriminatory purpose. ...................................................14

          3.     The panel held that the district court clearly erred in applying *Arlington Heights*. ...............................16

III.    REASONS TO GRANT REVIEW ...........................................................17

     A.    The panel's interpretation of the Materiality Provision is exceptionally important and conflicts with this Court's decisions on materiality. ..................................................18

     B.    The panel's decision on Arizona's list maintenance law conflicts with Supreme Court decisions on standing and appellate review and is exceptionally important. ..............20

IV.    CONCLUSION...................................................................................23

CERTIFICATE OF COMPLIANCE ................................................................25

CERTIFICATE OF SERVICE .........................................................................26

ii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
  570 U.S. 1 (2013)..................................................................................13
*Brnovich v. Democratic Nat'l Comm.,*
  594 U.S. 647 (2021).................................................................. 5, 17, 23
*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008)........................................................................passim
*FDA v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024)..............................................................................14
*Lake v. Fontes,*
  83 F.4th 1199 (9th Cir. 2023)...............................................................21
law.  Op. 33.................................................................................................4
*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)..............................................................................20
*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009)................................................................... 4, 17, 21
*United States v. Carrillo-Lopez,*
  68 F.4th 1133 (9th Cir. 2023)..................................................... 5, 17, 23
*United States v. Patnaik,*
  125 F.4th 1223 (9th Cir. 2025)................................................... 2, 17, 19
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977)................................................................................5
*Vote.Org. v. Callanen,*
  89 F.4th 459 (5th Cir. 2023).............................................................3, 18

## Statutes

A.R.S. § 16-542(A).................................................................................10
A.R.S. § 16-134(B) ..................................................................................8

## Rules

Fed. R. App. P. 40(b)(2)(A), (B), (D)......................................................17

**Other Authorities**

1913 Revised Statutes of Ariz. § 2885 ................................................................6

1993 Ariz. Laws ch. 98, § 10 ................................................................6, 7

1993 Ariz. Laws ch. 98, § 12 ................................................................7

1994 Ariz. Laws ch. 378, § 2 ................................................................7

2003 Ariz. Laws ch. 260, § 1 ................................................................7

2004 Ariz. Laws ch. 184, § 1 ................................................................7

2022 Ariz. Laws ch. 99, § 4 ................................................................8

2022 Ariz. Laws ch. 370, § 2 ................................................................8, 14

## I.     RULE 40(B) STATEMENT AND SUMMARY

This case involves pre-enforcement challenges to two Arizona laws enacted in 2022.  Both laws aim to secure elections by ensuring that only people who meet eligibility requirements, such as U.S. citizenship, can vote.

The first law, House Bill 2492, modifies Arizona's voter registration process, including by eliciting birthplace information from applicants.  For decades, Arizona's voter registration form has asked applicants to write their "State or Country of Birth."  Under House Bill 2492, this question would become required:  If an applicant refuses to answer, the applicant would not be registered.

The second law, House Bill 2243, expands how Arizona verifies eligibility of currently-registered voters—a process known as list maintenance.  Under this law, election officials would compare voters with certain databases, including birth certificate data.  If election officials *confirm* that a specific voter is *not* a U.S. citizen, that voter would need to provide proof of citizenship to remain registered.

### A.     Birthplace provision

In a divided opinion, a panel of this Court held that the birthplace provision of House Bill 2492, if implemented, would violate the Materiality

1

Provision of the Civil Rights Act of 1964. That statute prohibits denying an individual's right to vote "because of an error or omission . . . *not material* in determining whether such individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B) (emphasis added).

But the majority used an overly strict definition of "materiality." In the majority's view, an omission on a registration form is "material" only if it has "*probable impact* on eligibility to vote." Op. 56 (emphasis added).[1] This strict view conflicts with this Court's more typical definition: a statement or omission is "material" if it "*could have* affected or influenced" an official decision. Dissent 131 (quoting *United States v. Patnaik*, 125 F.4th 1223, 1227 (9th Cir. 2025)) (emphasis added).

The majority's strict interpretation of the Materiality Provision is exceptionally important because it severely restricts States' judgment in deciding what information to require for registering voters. States have a strong interest in "carefully identifying all voters." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196–97 (2008) (plurality opinion). For this reason,

---

[1] Citations to "Op." refer to pages 1 through 79 of the panel majority opinion issued on February 25, 2025, while "Dissent" refers to Judge Bumatay's dissent on pages 79 through 156 (Doc. 242).

2

the Fifth Circuit has explained: "When we evaluate the materiality of a measure, we must give weight to the State's justification." *Vote.Org. v. Callanen*, 89 F.4th 459, 485 (5th Cir. 2023).

Here, the majority disregarded Arizona's justifications. Arizona explained how birthplace information can be useful in confirming an applicant's identity and citizenship. *See, e.g.*, Doc. 104 at 48–55, 61–64.[2] The majority ignored these explanations, instead faulting Arizona for previously *allowing* people to vote without providing birthplace—a fact that, according to the majority, "strongly indicates that birthplace has *no probable impact* in determining eligibility." Op. 58–59 (emphasis added). This cramped view creates a dangerous one-way ratchet effect, preventing States from ever requiring more information from prospective voters to ensure eligibility.

**B.    List maintenance**

Private organizations argued that Arizona's list maintenance law was motivated by a discriminatory purpose. The district court held a trial and found an absence of discriminatory purpose.

---

[2] Citations to "Doc." refer to docket entries in 9th Cir. No. 24-3188, while "Dkt." refers to docket entries in D. Ariz. No. 2:22-cv-00509-SRB, unless otherwise specified. Citations to "ER" refer to Excerpts of Record filed on July 29, 2024 (Doc. 102).

3

Two nonprofits cross-appealed this finding.  But neither organization established standing to challenge the law.

In a divided opinion, the panel concluded that one nonprofit—Promise Arizona—had representational (i.e. associational) standing because "one or more" members "*may be* adversely affected" by the law.  Op. 33 (emphasis added).  This was because an unknown number of unidentified members "may be subject to a citizenship check" and "may have their voter registrations cancelled."  Op. 31–32.

This speculative theory conflicts with Supreme Court precedent: Standing cannot rest on "a statistical probability that some of [an organization's] members are threatened with concrete injury."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009).  Even if it is "certainly possible—perhaps even likely—that one individual" member will be injured, that "does not suffice."  *Id.* at 499.  Here, injury was *not* even likely, as the dissent explained.  *See* Dissent 145–47.

The majority compounded its error by vacating the district court's finding of absence of discriminatory purpose.  The majority asserted that the district court "clearly erred" by failing to use "the *Arlington Heights* test

4

analyzing the 'totality of circumstances.'" Op. 64–65.[3] But the district court carefully examined each *Arlington Heights* factor, including in totality.

The majority's hypercritical approach conflicts with Supreme Court instructions for appellate review of discriminatory purpose claims. An appellate court must "not reverse even if it is convinced that it would have weighed the evidence differently" and instead must affirm when the "District Court's finding on the question of discriminatory intent had ample support in the record." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687–88 (2021). Here, the district court's finding had ample support in the record. *See* Dissent 147–55. Nothing further was needed.

The majority's overly critical review was not just wrong, but exceptionally important. States have a strong interest in "counting only the votes of eligible voters," *Crawford*, 553 U.S. at 196–97, and State legislation is entitled to a "strong presumption of good faith," *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1140 (9th Cir. 2023) (cleaned up). The majority's

---

[3] *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

5

approach, however, "essentially flips the strong presumption of good faith" to which Arizona is entitled.  Dissent 155.

## II.    BACKGROUND

The State of Arizona and its Attorney General (collectively "the State") seek en banc review of three issues:

(1) whether Arizona's birthplace provision violates the Materiality Provision,

(2) whether the cross-appealing nonprofits had standing to challenge Arizona's list maintenance law, and

(3) whether the district court clearly erred in finding an absence of discriminatory purpose behind Arizona's list maintenance law.

### A.    Birthplace provision

#### 1.    Arizona has long requested birthplace information, but the request has been optional for decades.

Since statehood, Arizona has asked prospective voters to identify birthplace.  *See, e.g.*, 1913 Revised Statutes of Ariz. § 2885 (requiring election officials to record each applicant's "country of nativity").

In 1993, Arizona designated the "state or country of birth" space on its registration form optional.  *See* 1993 Ariz. Laws ch. 98, § 10 (adopting A.R.S.

6

§ 16-121.01).  This was done by designating certain items as necessary for registration, but not birthplace.  *See id.*, §§ 10, 12 (citing A.R.S. § 16-152(A)).

Later, Arizona designated more items on the form as necessary for registration, including:

- The applicant's birth date.  *See* 1994 Ariz. Laws ch. 378, § 2 (amending A.R.S. § 16-121.01).

- The applicant's Arizona driver license number, last four digits of social security number ("SSN"), or affirmation that the applicant lacks both of these.  *See* 2003 Ariz. Laws ch. 260, § 1 (amending A.R.S. § 16-121.01); 2004 Ariz. Laws ch. 184, § 1 (same).

- Documentary proof of U.S. citizenship such as a driver license number, birth certificate, or naturalization document.  *See* 1-ER-0009–10 (quoting A.R.S. § 16-166(F)).[4]

By 2022, Arizona's voter registration form contained several questions that were expressly required, plus some that were optional such as "state or country of birth."  6-ER-1410 (state registration form).

---

[4] Recently, this citizenship proof requirement has been enforced for state registration forms with respect to state elections.

7

### 2. Arizona decided to require applicants to provide birthplace to help confirm identity and citizenship.

House Bill 2492 designates "place of birth" among the items necessary for registration. *See* 2022 Ariz. Laws ch. 99, § 4 (amending A.R.S. § 16-121.01(A)). If Arizona is allowed to implement this law, an applicant who skips the "state or country of birth" question will be notified that registration cannot be completed until it is answered. A.R.S. § 16-134(B).

In addition, House Bill 2492 (and House Bill 2243) direct election officials to use databases to check citizenship of voters who do not provide citizenship proof. These databases include a vital records database managed by the National Association for Public Health Statistics and Information Systems (NAPHSIS) and a federal database with naturalization information known as Systematic Alien Verification for Entitlements (SAVE). *See* 2022 Ariz. Laws ch. 99, § 4 (adding A.R.S. § 16-121.01(C)–(E)); 2022 Ariz. Laws ch. 370, § 2 (adding A.R.S. §§ 16-165(H), (I)).

At a legislative hearing, a proponent of the laws explained that birthplace is "useful in identifying in some of these databases" because "you can sometimes get a better match of who the individual is, which will help us find proof of citizenship." 6-ER-1465:9-20.

8

### 3. Despite the usefulness of birthplace, the panel held that Arizona cannot require it.

The United States and private parties sued, asserting that the Materiality Provision prohibits Arizona from requiring birthplace information. D. Ariz. No. 2:22-cv-01124-SRB, Dkt. #1, ¶ 67; *see also, e.g.*, Dkt. #65, ¶ 103. Due to these lawsuits, the birthplace provision "was never implemented." Doc. 142 at 17.

Trial illustrated how birthplace can be useful in confirming both identity and citizenship. *See, e.g.*, Doc. 104 at 23–40, 56–61, 69–71 (summarizing evidence). Below are five examples:

1. An applicant who *cannot* provide birthplace raises doubt about whether she is truly who she says. This is because birthplace is basic biographical information that, as an election official testified, "presumably only the voter would know." 3-ER-0756:17–0757:5.[5]

2. Birthplace helps *distinguish* voters with similar information. Election officials try to "match" registration forms with existing records to determine whether the applicant is a new or existing voter. 4-ER-0899. For

---

[5] The risk of false registration forms is not hypothetical. For example, an election official recalled receiving forms purporting to be from voters who "had been deceased for quite some time." 4-ER-0819:8–0820:2.

9

example, if only the first name, last name, and birth date match, this is just a "soft match." 7-ER-1596; 4-ER-0805:7–0806:6. Birthplace can be useful distinguishing data in this process. *See, e.g.*, 3-ER-0739:12–0740:8; 4-ER-0824:5-20, -0833:5-12. Indeed, trial revealed twelve pairs of voter records with the same name, same birth date, *and* the same driver license number or SSN digits, yet *different* birthplaces. 4-ER-0772:17–0773:8, -0783:20–0784:4, -0796:14-20, -0797:24–0798:15; 7-ER-1547, -1551, -1598.[6]

3. Birthplace helps confirm the identity of voters who request mail-in ballots. 4-ER-0924-25; *see, e.g.*, 3-ER-0742:25–0743:7. Indeed, by statute, voters who request mail-in ballots must provide their "state or country of birth" or "other information" that, if compared to the voter record, "would confirm the identity." A.R.S. § 16-542(A).

4. Birthplace generally determines a person's basis for claiming citizenship (e.g., birthright vs. naturalized citizenship) and thus determines which type of citizenship proof is relevant. *See, e.g.*, 4-ER-0881–0883 (describing options of U.S. birth certificate and naturalization documents).

---

[6] This estimate was conservative because one third of Arizona voter records lack birthplace, and thousands lack a driver license number or SSN digits. 4-ER-0776:23-25, -0799:25–0800:11.

5.     If a U.S.-born applicant specifies her State of birth, that information can help find her birth certificate through NAPHSIS.  1-ER-0019–20; *see, e.g.*, 4-ER-0811:16-25, -0812:21–0813:4, -0843:1-15, -0844:1–0847:17, -0848:15–0849:7, -0857:7-18.  Conversely, if an applicant says she was born in another country, then election officials know SAVE is the more useful database.  *See* 1-ER-0017–19.

The district court acknowledged that election officials "can sometimes use birthplace in Arizona's voter registration process," but deemed birthplace "of little utility" in "nearly all" cases.  1-ER-0029.  The court held that the Materiality Provision prohibits Arizona from requiring birthplace because, in its view, information is "material" only if it is "*more than useful or minimally relevant.*"  1-ER-0077 (emphasis added).

Similarly, the panel majority interpreted the Materiality Provision as prohibiting States from requiring information unless it has "*probable impact* on eligibility to vote."  Op. 56 (emphasis added).  Having thus framed the inquiry, the majority omitted the district court's finding that election officials "can sometimes use birthplace" in voter registration.  Instead the majority observed that, in the status quo (when birthplace is optional), election officials generally "do not use birthplace information to determine an

11

applicant's eligibility to vote" and do not "need" it. Op. 58 (quoting 1-ER-0027). According to the majority, Arizona's history of *allowing* people to vote without requiring birthplace "strongly indicates that birthplace has *no probable impact* in determining eligibility to vote." Op. 58–59 (emphasis added).

Judge Bumatay dissented. He would define materiality how this Court defines it in other cases, to include information that "*could have* affected or influenced" an official decision. Dissent 131 (emphasis added). He also emphasized that this lawsuit is a "pre-enforcement" and "facial" challenge, so judicial review should focus on whether Arizona *could* implement a birthplace requirement consistent with the Materiality Provision. Dissent 133, 135. He also offered examples of how birthplace can help verify identity, illustrating that it is "material." Dissent 134–36.

### B. Voter list maintenance law

#### 1. History shows Arizona's desire to ensure that only U.S. citizens vote.

Arizona began requiring prospective voters to provide documentary proof of U.S. citizenship in 2004. *See* 1-ER-0009–10 (quoting A.R.S. § 16-166(F)). In 2013, the Supreme Court held that this requirement cannot apply

12

to the *federal* mail registration form for *federal* elections.  *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 20 (2013).  In 2018, Arizona's Secretary of State entered into a related consent decree, allowing certain voters who submit a *state* registration form without documentary proof of citizenship to vote in *federal* elections.  *See* 1-ER-0010–11.  As a result, today there are thousands of voters in Arizona who vote only in federal elections, known as "federal-only voters" because they have not provided documentary proof of citizenship.  1-ER-0008.

In January 2022, House Bill 2492 was introduced.  1-ER-0040.  The "legislative history indicates that the legislators in favor of the bill were concerned specifically with the increase of Federal-Only Voters in Arizona who had not provided [documentary proof of citizenship]."  1-ER-0041.

That same month, House Bill 2617 (the precursor to House Bill 2243) was introduced.  1-ER-0041.  An amended version became House Bill 2243.  1-ER-0042–43.  Among other things, House Bill 2243 requires election officials to check NAPHSIS and SAVE for voters who never provided documentary proof of citizenship, and if an election official "confirms" that a voter is "not a United States citizen," the voter must provide proof to

13

remain registered. 2022 Ariz. Laws ch. 370, § 2 (adding A.R.S. §§ 16-165(A)(10), (H), (I)).

"Nothing in the legislative history of H.B. 2492 or H.B. 2243 reflects an intent to suppress voter registrations of members of minority groups or naturalized citizens." 1-ER-0043.

### 2. The district court found that Promise Arizona had standing and found a lack of discriminatory purpose.

Promise Arizona and a related nonprofit challenged House Bill 2243 before implementation, claiming it was motivated by a discriminatory purpose. *See* D. Ariz. No. 2:22-cv01602-SRB, Dkt. #1, ¶¶ 105–50.

After trial, the district court summarized evidence. 1-ER-0008–26, 0030–47. The court found that Promise Arizona had standing, on dubious grounds. 1-ER-0066–67. The court stated, in conclusory fashion, that Promise Arizona had "direct standing" because the law "frustrates" its mission and "will require it to divert resources to counteract its effects." 1-ER-0066.[7] The court also stated that Promise Arizona had "representational standing" because of the law's "database checks" and stated, again in

---

[7] The Supreme Court has since rejected this broad standing theory. *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 393–96 (2024).

14

conclusory fashion, that Promise Arizona's claims "do not require the participation of its members in this litigation." 1-ER-0065–66.

On the merits, the court considered the *Arlington Heights* factors to determine whether House Bill 2243 was "motivated by a discriminatory purpose." 1-ER-0106–07. These factors were:

(1) the impact of the law and whether it bears more heavily on one race than another;

(2) the historical background of the law;

(3) the specific sequence of events leading to the law;

(4) Arizona's departures from normal procedures or substantive conclusions; and

(5) legislative history.

1-ER-0107 (cleaned up). For each factor, the court carefully weighed evidence presented, including circumstantial evidence. 1-ER-0107–13. The court also considered "the totality" of factors. 1-ER-0113. The court found that "Plaintiffs failed to show that the Voting Laws were enacted with a discriminatory purpose." 1-ER-0113–14.

15

### 3.  The panel held that the district court clearly erred in applying *Arlington Heights*.

The panel majority decided that Promise Arizona had representational standing to challenge the law because "one or more" members "*may be* adversely affected."  Op. 33 (emphasis added).  This was because an unknown number of unidentified members "may be subject to a citizenship check" and "may have their voter registrations cancelled."  Op. 31–32.

On the merits, the majority held that the district court "clearly erred" by failing to use "the *Arlington Heights* test analyzing the 'totality of circumstances.'"  Op. 64–65.  The majority then analyzed each *Arlington Heights* factor itself, describing how the district court could have (or should have) drawn different inferences.  Op. 65–74.

Judge Bumatay explained how the majority's standing theory rests on "a long chain of hypothetical contingencies."  Dissent 144–47 (cleaned up). He also explained that the district court's finding of absence of discriminatory purpose "had ample support in the record," and the majority's reweighing of evidence was "inconsistent with the law and the facts."  Dissent 147–55.

16

## III.    REASONS TO GRANT REVIEW

The panel's strict interpretation of the Materiality Provision is exceptionally important because it severely limits States' judgment in "carefully identifying all voters." *Crawford*, 553 U.S. at 196–97. The panel's interpretation also conflicts with this Court's traditional understanding of materiality. *E.g.*, *Patnaik*, 125 F.4th at 1227.

Moreover, the panel's conclusion that Promise Arizona had standing conflicts with Supreme Court requirements. *Summers*, 555 U.S. at 497–98. And the panel's decision to vacate the district court's finding about discriminatory purpose conflicts with Supreme Court instructions on appellate review, *Brnovich*, 594 U.S. at 687–88, and is exceptionally important because it violates the "strong presumption of good faith" to which States are entitled, *Carrillo-Lopez*, 68 F.4th at 1140.

For each of these reasons, en banc review is critical. Fed. R. App. P. 40(b)(2)(A), (B), (D).

17

### A. The panel's interpretation of the Materiality Provision is exceptionally important and conflicts with this Court's decisions on materiality.

States have a strong interest in "carefully identifying all voters." *Crawford*, 553 U.S. at 196–97. Thus, the Materiality Provision must allow for reasonable State judgments about what information to require. As the Fifth Circuit explains: "When we evaluate the materiality of a measure, we must give weight to the State's justification." *Vote.Org*, 89 F.4th at 485.

Here, Arizona explained how birthplace can be useful in confirming an applicant's identity and citizenship. *See* Background § A. By analogy, the U.S. State Department in its Foreign Affairs Manual has long required passport applicants to provide birthplace because it is "an integral part of establishing an individual's identity": namely, it "*distinguishes* that individual from other persons with similar names and/or dates of birth" and "*helps identify* claimants attempting to use another person's identity." 3-ER-0614 (emphasis added).

The majority rejected Arizona's explanations by using an overly strict definition of materiality: an omission is material only if it has "*probable impact* on eligibility to vote.*" Op. 56 (emphasis added). But requiring *probable* impact is too much. Consider: the U.S. State Department requires birthplace

18

for passport applicants even if most applicants are uniquely identifiable by full name and birth date and do not commit identity fraud. Birthplace is still useful because it *sometimes* distinguishes applicants or prevents fraud. The purpose is to address problematic situations that are infrequent. Same here. Election officials "*can sometimes use* birthplace in Arizona's voter registration process." 1-ER-0029 (emphasis added).

A more sensible definition of materiality is: an omission is "material" if it "*could have* affected or influenced" an official decision. Dissent 131 (emphasis added). Indeed, this Court uses that broader definition when interpreting federal criminal liability. *See Patnaik*, 125 F.4th at 1227. This Court should not define materiality broadly when evaluating whether someone committed a crime, yet strictly when evaluating how a State decides to identify voters.

Worse, the majority determined that Arizona's history of *allowing* people to vote without providing birthplace "strongly indicates" that birthplace "has no probable impact in determining eligibility." Op. 58–59. By that logic, State policy would be frozen in time to its least restrictive practice. Indeed, the majority could have made the same criticism in 1994

19

when Arizona decided to begin requiring birth *date*.  *See* Background § A.  The Materiality Provision is not a straitjacket.

The majority also observed that, in the status quo (when birthplace is optional), election officials generally "do not use" birthplace to determine eligibility, and some voters who voluntarily provide birthplace do so in a "non-uniform" or "unclear" way.  Op. 58–59.  But as Judge Bumatay stressed, "Arizona hasn't been allowed to implement" the birthplace requirement, so judicial review should focus on how Arizona *could* implement the requirement.  Dissent 133, 135.  The fact that birthplace has been optional—and thus not used optimally—does not mean the Materiality Provision categorically prohibits Arizona from requiring it.

### B.    The panel's decision on Arizona's list maintenance law conflicts with Supreme Court decisions on standing and appellate review and is exceptionally important.

States also have a strong interest in "counting only the votes of eligible voters."  *Crawford*, 553 U.S. at 196–97.  That is why Arizona enacted its list maintenance law.  *See* Background § B.

Promise Arizona and a related nonprofit challenged the law but never demonstrated standing, including injury that is "concrete and

20

particularized" and "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

The panel majority found standing by holding that "one or more" of Promise Arizona's members "*may be* adversely affected" by the law, since they "*may* be subject to a citizenship check" and "*may* have their voter registrations cancelled." Op. 31–33 (emphasis added). But this injury theory is nowhere close to "concrete and particularized" or "actual or imminent."[8]

Moreover, representational standing cannot rest on "a statistical probability that some of [an organization's] members are threatened with concrete injury." *Summers*, 555 U.S. at 497–98. Even when it is "certainly possible—perhaps even likely—that one individual" member will be injured, "that speculation does not suffice." *Id.* at 499. Here, injury was *not even likely*. Rather, the majority's theory rested on a "long chain of hypothetical contingencies," including that (1) an unknown number of unidentified members of Promise Arizona will undergo a citizenship check,

---

[8] The majority asserted that "the State does not contend" that Promise Arizona's members needed to participate in the litigation. Op. 33. This is incorrect. The State contended that the district court "was wrong in excusing Promise Arizona from needing to identify members." Doc. 195 at 67.

(2) the check will erroneously flag them as *non*-U.S. citizens, and (3) election officials will miss the error.  Dissent 145–47 (quoting *Lake v. Fontes*, 83 F.4th 1199, 1204 (9th Cir. 2023)).  "This is the kind of speculation that stretches the concept of imminence of harm beyond recognition." *Id.* 147.

The majority fared even worse when reviewing the district court's findings about discriminatory purpose.  According to the majority, the district court "clearly erred" by not using "the *Arlington Heights* test analyzing the 'totality of circumstances'" and by instead "insisting" that challengers "directly link the motive of the Legislature to every piece of evidence." Op. 64–65.  But that is not what the court did.

The district court organized its analysis around *Arlington Heights* factors and carefully evaluated evidence.  1-ER-0105–13.  The court made clear that *Arlington Heights* factors are "non-exhaustive." 1-ER-0106–07 (cleaned up).  The court also considered circumstantial evidence, recognizing that discriminatory purpose may be "camouflaged." 1-ER-0108 (cleaned up).  The court even clarified that it "considered the totality" of factors.  1-ER-0113–14.

Unsatisfied with this balanced analysis, the majority did its own *Arlington Heights* analysis, emphasizing facts that it deemed suggestive of

22

discriminatory purpose and describing how the district court could have (or should have) drawn different inferences. Op. 65–74. This approach overstepped an appellate court's role, which is to "not reverse even if it is convinced that it would have weighed the evidence differently" and instead to affirm when the "District Court's finding on the question of discriminatory intent had ample support in the record." *Brnovich*, 594 U.S. at 687–88. Here, the district court's finding had ample support in the record, as Judge Bumatay explained. *See* Dissent 149–55.

Worse, by selectively focusing on facts that it deemed suggestive of discriminatory purpose, the majority effectively abandoned the "strong presumption of good faith" to which Arizona was entitled. *Carrillo-Lopez*, 68 F.4th at 1140. Indeed, "the majority essentially flip[ped] the strong presumption of good faith" and "require[d] the State to *disprove* any discriminatory motive." Dissent at 155. This hypercritical second-guessing of a State legislative decision by the federal judiciary violates basic federalism and separation of powers principles.

## IV. CONCLUSION

This Court should grant rehearing en banc.

23

Respectfully submitted this 11th day of April, 2025.

KRISTIN K. MAYES
  ARIZONA ATTORNEY GENERAL

By */s/ Joshua M. Whitaker*

Joshua D. Bendor (AZ Bar No. 031908)
Hayleigh S. Crawford (AZ Bar No. 032326)
Joshua M. Whitaker (AZ Bar No. 032724)
Kathryn E. Boughton (AZ Bar No. 036105)
OFFICE OF THE ARIZONA
    ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Hayleigh.Crawford@azag.gov
Joshua.Whitaker@azag.gov
Kathryn.Boughton@azag.gov
ACL@azag.gov

  *Counsel for State of Arizona and*
  *Arizona Attorney General Kristin K. Mayes*

24

# CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s):**  24-3188 (consolidated with 24-3559 and 24-4029)

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

[X] Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:**

      4,192      **.**

*(Petitions and responses must not exceed 4,200 words)*

**OR**

[  ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.


**Signature** s/Joshua M. Whitaker           **Date** April 11, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

25

## CERTIFICATE OF SERVICE

I certify that I presented the above and foregoing for filing and uploading to the ACMS system which will send electronic notification of such filing to all counsel of record.

Dated this 11th day of April, 2025.

*/s/ Joshua M. Whitaker*