**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MI FAMILIA VOTA; et al., | No. 24-3188 |
| *Plaintiffs - Appellees*, | D.C. No. 2:22-cv-00509-SRB |
| v. | District of Arizona, Phoenix |
| ADRIAN FONTES, in his official capacity as Arizona Secretary of State; et al., | |
| *Defendants - Appellees*, | ORDER |
| WARREN PETERSEN, President of the Arizona Senate; et al., | |
| *Intervenor-Defendants - Appellants*. | |

| | |
|---|---|
| MI FAMILIA VOTA; et al., | No. 24-3559 |
| | D.C. No. 2:22-cv-00509-SRB |
| *Plaintiffs - Appellees*, | District of Arizona, Phoenix |
| v. | |
| KRIS MAYES and STATE OF ARIZONA, | |
| *Defendants - Appellants*. | |

PROMISE ARIZONA and
SOUTHWEST VOTER
REGISTRATION EDUCATION
PROJECT,

       *Plaintiffs - Appellants*,

and
MI FAMILIA VOTA; et al.,

       *Plaintiffs*,

  v.

ADRIAN FONTES; et al.,

       *Defendants*,

and
KRIS MAYES and STATE OF
ARIZONA,

       *Defendants - Appellees*,

WARREN PETERSEN and
REPUBLICAN NATIONAL
COMMITTEE,

       *Intervenor-Defendants -
Appellees*,

and
STEVE MONTENEGRO, Speaker of
the Arizona House of
Representatives,

       *Intervenor-Defendant -
Appellant*.

No. 24-4029
D.C. No.
2:22-cv-00509-
SRB
District of
Arizona,
Phoenix

Filed September 22, 2025

Before: Kim M. Wardlaw, Ronald M. Gould, and Patrick J. Bumatay, Circuit Judges.

Order;

Dissent by Ryan D. Nelson, joined by Consuelo M. Callahan, Mark J. Bennett, Kenneth K. Lee, Patrick J. Bumatay, and Lawrence VanDyke, Circuit Judges, and with whom Sandra S. Ikuta, Circuit Judge, concurs as to Part II;

Dissent by Daniel P. Collins, Circuit Judge;

Dissent by Daniel A. Bress, Circuit Judge, joined by Bridget S. Bade, Danielle J. Forrest, Circuit Judges

## **SUMMARY**[*]

### **Voting Rights**

The panel denied petitions for panel rehearing and for rehearing en banc in a case in which the panel affirmed in part and vacated in part the district court's rulings pertaining to two Arizona laws regulating voter registration that require, among other things, heightened proof of citizenship.

Dissenting from the denial of rehearing en banc, Judge R. Nelson, joined by Judges Callahan, Bennett, Lee, Bumatay, and VanDyke, and with whom Judge Ikuta

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

4          MI FAMILIA VOTA V. PETERSEN

concurs as to Part II, wrote that the panel majority opinion will prevent states from deterring voter fraud. In Part II, Judge R. Nelson stated that the panel ignored both Supreme Court and Ninth Circuit precedent when it upheld the district court's injunction enjoining Arizona's documentary proof of citizenship (DPOC) requirement for voters registering using Arizona's state form, despite the Supreme Court's indication that Arizona's requirement was lawful in this case. In Part III of his dissent, Judge R. Nelson wrote that the panel majority erred by holding that the National Voter Registration Act preempted Arizona's DPOC requirement to vote by mail and to vote for presidential elections. In Part IV of his dissent, Judge R. Nelson stated that the panel majority created a circuit split with the Sixth Circuit.

Dissenting from the denial of rehearing en banc, Judge Collins stated that, as to the issues on which rehearing en banc had been sought in the petitions, his views are in general accord with those expressed in Judge Bumatay's panel dissent.

Dissenting from the denial of rehearing en banc, Judge Bress, joined by Judges Bade and Forrest, wrote that, at a minimum, the court should have reevaluated the panel majority's incorrect and consequential decision upholding the injunction of Arizona's documentary proof of citizenship requirement for state-form applicants, the portion of the injunction that the Supreme Court already stayed.

## COUNSEL

Jonathan L. Backer (argued), Bonnie Robin-Vergeer, Matthew N. Drecun, Andrew G. Braniff, Christopher C. Wang, Jason Lee, and Margaret Turner, Attorneys, Civil Rights Division, Appellate Section; Michael E. Gates and Jesus A. Osete, Deputy Assistant Attorneys General; Kristin Clarke and Harmeet K. Dhillon, Assistant Attorneys General; United States Department of Justice, Washington, D.C.; Danielle M. Lang (argued), R. Brent Ferguson, Kathryn L. Huddleston, and Jonathan Diaz, Campaign Legal Center, Washington, D.C.; James E. Barton II, Barton Mendez Soto PLLC, Tempe, Arizona; Alexander B. Ritchie, Attorney; Chase A. Velasquez, Assistant Attorney General; Department of Justice San Carlos Apache Tribe, Office of the Attorney General, San Carlos, Arizona; Courtney Hostetler, Free Speech For People, Sharon, Massachusetts; John C. Bonifaz, Free Speech For People, Amherst, Massachusetts; Lee H. Rubin, Mayer Brown LLP, Palo Alto, California; Rachel J. Lamorte, Mayer Brown LLP, Washington, D.C.; Gary A. Isaac, Daniel T. Fenske, Anastasiya K. Lobacheva, and William J. McElhaney III, Mayer Brown LLP, Chicago, Illinois; Ernest I. Herrera (argued), Denise Hulett, and Erika Cervantes, Mexican American Legal Defense and Educational Fund, Los Angeles, California; Daniel R. Ortega Jr., Ortega Law Firm PC, Phoenix, Arizona; Daniel A. Arellano, Roy Herrara, and Jillian L. Andrews, Herrera Arellano LLP, Phoenix, Arizona; Marc E. Elias, Elisabeth C. Frost, Christopher D. Dodge, Daniela Lorenzo, and Qizhou Ge, Elias Law Group LLP, Washington,D.C.; Daniel J. Adelman, Arizona Center For Law In The Public Interest, Phoenix, Arizona; John A. Freedman, Jeremy Karpatkin, Erica McCabe, and Leah Motzkin, Arnold & Porter Kaye Scholer LLP, Washington,

D.C.; Leah R. Novak and Andrew Hirschel, Arnold & Porter Kaye Scholer LLP New York, New York; Nina G. Beck, Emily Davis, Jonathan Sherman, Beauregard Patterson, and Michelle K. Cohen, Fair Elections Center, Washington, D.C.; Christopher E. Babbitt, Daniel S. Volchok, Seth P. Waxman, Britany Riley-Swanbeck, and Joseph M. Meyer, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Bruce Samuels, Jennifer Lee-Cota, Papetti Samuels Weiss McKirgan LLP, Scottsdale, Arizona; Sadik H. Huseny, Amit Makker, Evan Omi, and Catherine A. Rizzoni, Latham & Watkins LLP, San Francisco, California; Niyati Shah, Terry A. Minnis, and Noah Baron, Asian Americans Advancing Justice, Washington, D.C.; Andrew M. Federhar, Spencer Fane LLP, Phoenix, Arizona; David B. Rosenbaum, Joshua J. Messer, Osborn Maledon PA, Phoenix, Arizona; Ezra D. Rosenberg, American Civil Liberties Union of New Jersey, Newark, New Jersey; Matthew L. Campbell, Michael S. Carter, Allison A. Neswood, and Jacqueline D. DeLeon, Native American Rights Fund, Boulder, Colorado; Samantha B. Kelty, Native American Rights Fund, Washington D.C.; Marissa L. Sites, Assistant Attorney General; Howard M. Shanker, Attorney General, Tohono O'Odham Nation, Office of the Attorney General, Sells, Arizona; Javier G. Ramos, Senior Counsel, Gila River Indian Community, Prima Maricopa Tribe Law Office, Sacaton, Arizona; for Plaintiffs-Appellees.

Kory A. Langhofer (argued) and Thomas J. Basile, Statecraft PLLC, Phoenix, Arizona; Tyler R. Green, Gilbert C. Dickey, and Conor D. Woodfin, Consovoy McCarthy PLLC, Arlington, Virginia; for Intervenor-Defendants-Appellants.

Joshua M. Whitaker (argued) Joshua D. Bendor, Hayleigh S. Crawford, Attorneys; Kathryn E. Boughton and Timothy E. Durkin Horley, Assistant Attorneys General; Kristin K.

Mayes, Arizona Attorney General; Office of the Arizona
Attorney General, Phoenix, Arizona; Craig Morgan, Taft
Stettinius & Hollister LLP, Phoenix, Arizona; Celeste
Robertson, Attorney, Apache County Attorney's Office, St.
Johns, Arizona; Christine J. Roberts, Deputy Chief Counsel,
Pinal County Attorney's Office, Florence, Arizona; Rose M.
Winkeler, Deputy County Attorney, Flagstaff Law Group
PLLC, Flagstaff, Arizona; Jefferson R. Dalton, Counsel,
Gila County Attorney's Office, Globe, Arizona; Gary
Griffith, County Attorney, Greenlee County Attorney's
Office, Clifton, Arizona; Jason W. Mitchell, Trial Attorney,
La Paz County Attorney's Office, Parker, Arizona; Ryan N.
Dooley, Attorney, City of St. George, St. George, Utah; Sean
M. Moore, Joseph E. La Rue, Jack L. O'Connor III, and
Anna Griffin Critz, Deputy County Attorneys; Maricopa
County Attorney's Office, Civil Services Division, Phoenix,
Arizona; Ryan H. Esplin, Attorney; William B. Davis,
Deputy County Attorney; Mohave County Attorney's Office,
Kingman, Arizona; Jason S. Moore, Deputy Assistant
Attorney General, Navajo County Attorney's Office,
Holbrook, Arizona; Daniel S. Jurkowitz, Pima County
Attorney's Office, Tucson, Arizona; William J. Kerekes and
Jessica L. Holzer, Deputy County Attorney's, Office of the
Yuma County Attorney, Yuma, Arizona; Craig Cameron,
Deputy County Attorney, Pinal County Attorney's Office,
Florence, Arizona; Jean A. Roof, Graham County Attorney's
Office, Safford, Arizona; Thomas M. Stoxen, Attorney,
Yavapai County Attorney's Office, Prescott, Arizona;
Christina E. Werther and Justin S. Pierce, Pierce Coleman
PLLC, Scottsdale, Arizona; for Defendants-Appellees.

Dominic E. Draye, Greenberg Traurig LLP, Phoenix,
Arizona; Nick Peterson, Greenberg Traurig LLP, Salt Lake
City, Utah; for Amicus Curiae Arizona Free Enterprise Club.

Christopher J. Hajec, Immigration Reform Law Institute, Washington, D.C.; Lawrence J. Joseph, Law Office of Lawrence J. Joseph, Washington, D.C.; for Amicus Curiae Immigration Reform Law Institute.

Jonathon P. Hauenschild, Center for Election Confidence, Arlington, Virginia, for Amicus Curiae Center for Election Confidence.

Michael A. Columbo, Mark P. Meuser, and Harmeet Dhillon, Dhillon Law Group Inc., San Francisco, California; Andrew Gould, Holtzman Vogel Baran Torchinsky & Josefiak PLLC, Phoenix Arizona; for Amicus Curiae Republican Party of Arizona.

Elizabeth B. Wydra, Brianne J. Gorod, David H. Gans, and Anna K. Jessurun, Constitutional Accountability Center, Washington, D.C, for Amicus Curiae Constitutional Accountability Center.

Justin Levitt, LMU Loyola Law School, Los Angeles, California, for Amicus Curiae Professor Justin Levitt.

Patricia J. Yan and Sarah E. Brannon, American Civil Liberties Union Foundation, Washington, D.C.; Sophia L. Lakin, American Civil Liberties Union Foundation, New York, New York; R. Adam Lauridsen, Ian Kanig, Imara McMillan, Sara R. Fitzpatrick, and Courtney J. Liss, Keker Van Nest & Peters LLP, San Francisco, California; Jasleen Singh and Sara Carter, Brennan Center for Justice at NYU School of Law, New York, New York; Phi Nguyen and Roni Druks, Demos, New York, New York; for Amici Curiae League of Women Voters, League of Women Voters of Arizona, Secure Families Initiative, and Modern Military Association of America..

## **ORDER**

Judge Wardlaw and Judge Gould voted to deny both the petitions for rehearing *en banc*. Judge Bumatay voted to grant both the petitions for rehearing *en banc.* A judge of the court requested a vote on whether to rehear the matter *en banc*. The matter failed to receive a majority of the votes of the active judges in favor of *en banc* consideration. Fed. R. App. P. 35. Judge Desai did not participate in the deliberations or vote in this case. The petitions for rehearing *en banc*, Dkt. Nos. 261 and 262, are **DENIED**.

---

R. NELSON, Circuit Judge, with whom CALLAHAN, BENNETT, LEE, BUMATAY, VANDYKE, Circuit Judges, join, and with whom IKUTA, Circuit Judge, concurs as to Part II, dissenting from the denial of rehearing en banc

Republican government serves as the keystone of the Constitution. *See* U.S. Const. art. IV, § 4. In such a government a majority of citizens who lawfully vote determines who represents us in the White House, Congress, and state legislatures. Courts must therefore defend the franchise—both by protecting the right of all citizens to vote, and by ensuring non-citizens do not vote. Arizona passed laws to protect the franchise. The panel majority upheld an injunction on those laws. Sadly, the panel majority opinion undermines republican government, shreds federalism and the separation of powers, and imperils free and fair elections. We should have reheard this case en banc to correct these errors.

Most egregiously, the panel majority ignored both Supreme Court and Ninth Circuit precedent when it upheld the district court's injunction enjoining Arizona's documentary proof of citizenship (DPOC) requirement for voters registering through Arizona's state form. It reversed a motions panel before it even heard the merits of the case. And it upheld the district court's injunction despite the Supreme Court's indication that Arizona's requirement was lawful in this very case. *See Republican Nat'l Comm. v. Mi Familia Vota*, 145 S. Ct. 108 (2024) ("*RNC*"). And the Supreme Court has cited Arizona's prior citizenship documentation requirement in dicta as the example of a permissible state form requirement. *See Arizona v. Inter Tribal Council of Az., Inc.*, 570 U.S. 1, 12 (2013) ("*ITCA*"). These are bold judicial moves by the majority and warrant a high burden to justify such departures. The majority failed this test and got fundamental legal principles wrong.

The majority opinion mangles our circuit's analysis of National Voter Registration Act (NVRA) preemption issues. In enacting the NVRA, "Congress only sought to regulate the times, places, and manner of electing Representatives and Senators" in a limited capacity. *Voting Rts. Coal. v. Wilson*, 60 F.3d 1411, 1415 (9th Cir. 1995). Congress could not completely abrogate the "considerable freedom" states have "to design their own election laws." *Bennett v. Yoshina*, 140 F.3d 1218, 1225 (9th Cir. 1998) (citing *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). The majority misinterprets the NVRA to preempt state law when it either could not do so (i.e., in Presidential elections), *see* U.S. Const. art. II, § 1, cl. 2, 4, or does not do so (i.e., in Congressional elections), *see* U.S. Const. art. I, § 4, cl. 1.

Finally, the majority opinion creates a circuit split with the Sixth Circuit, which correctly held that the NVRA does

not "bar the removal of names from the official [state voter rolls] of persons who were ineligible and improperly registered to vote in the first place." *Bell v. Marinko*, 367 F.3d 588, 591–92 (6th Cir. 2004). The majority interprets 52 U.S.C. § 20507 to protect such individuals, placing us on the wrong side of a circuit split. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 714–17 (9th Cir. 2025).

The majority opinion will prevent states from deterring voter fraud. In doing so, it undermines the fundamental right of citizen voters to cast our ballots to elect a "government of the people, by the people, for the people." President Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863). I dissent.

I

A

This case arises from pre-enforcement challenges to two Arizona laws enacted in 2022—House Bills 2492 and 2243 (Voting Laws). The Arizona legislature implemented modest changes to Arizona's voting rules. H.B. 2492 made these changes: (1) if an Arizonan registering using the federal registration form[1] did so without DPOC (such as a passport), that voter could still be registered but could not vote in the Presidential election, or vote by mail; (2) state form applications without DPOC were to be rejected; and (3) state form applicants were to disclose their birthplace and provide documentary proof of residence in Arizona. *See*

---

[1] Arizona uses a dual-track voter registration system. A voter can register either through the federal form created by the Election Assistance Commission, 52 U.S.C. § 20508(a)(2), or the state form prescribed by Arizona law.

Ariz. Rev. Stat. Ann. §§ 16-121.01(D)–(E), 16-127(A), 16-121.01(C), 16-121.01(A), 16-123.

H.B. 2243 made these changes: (1) Arizona county recorders, each month, would conduct routine checks to ensure registered voters were in fact citizens; (2) those recorders would provide notice to flagged individuals by mail asking them to confirm their eligibility to vote in the county, and (3) those recorders would only cancel registrations for persons who do not respond after thirty-five days. *See id.* § 16-165(A)(10), (G)–(K).

The district court consolidated eight pre-enforcement challenges against the Voting Laws and held a bench trial. *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 947 (D. Ariz. 2024) ("*Fontes*"). The district court enjoined several elements of H.B. 2492, holding that the NVRA preempted restrictions on registration in presidential elections. *See id.* at 951 n. 12; 52 U.S.C. § 20505. It enjoined H.B. 2492's mandate to reject state forms without accompanying DPOC, citing a preexisting consent decree in *League of United Latin Am. Citizens of Ariz. v. Reagan*, No. 2:17-cv-4102 (D. Ariz. 2018), Dkt. No. 37 (the LULAC consent decree). *See Fontes*, 719 F. Supp. 3d at 1015. It held that H.B. 2492's checkbox provision, and its requirement that individuals who register to vote using the Arizona state form disclose their birthplace violated the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B). *See id.* at 1018. The district court also enjoined H.B. 2492's proof-of-location-of-residence requirement as violating the NVRA. *See id.* at 996–97.

The district court also enjoined one element of H.B. 2243. It held that providing for the investigation and removal of noncitizen voters from Arizona's registration

system violated the NVRA, 52 U.S.C. § 20507(b). *See id.* at 999.

A motions panel partially stayed the district court's injunction. *Mi Familia Vota v. Fontes*, No. 24-3188, 2024 WL 3629418, at \*1 (9th Cir. July 18, 2024) (Motions Panel Order). The Motions Panel Order stayed the district court's injunction barring enforcement of Arizona Revised Statues § 16-121.01(C), which required voters using the Arizona state form to provide DPOC. *Id.* Two weeks later, a merits panel reversed the motions panel over a dissent by Judge Bumatay. *Mi Familia Vota v. Fontes*, 111 F.4th 976, 980 (9th Cir. 2024).

The Supreme Court reversed the merits panel and stayed the district court's injunction barring enforcement of § 16-121.01(C). *RNC*, 145 S. Ct. at 108–09. Three Justices—Thomas, Alito, and Gorsuch—would have stayed the district court's injunction in full. *Id.*

B

On the merits, the majority affirmed vast swaths of the district court's injunction. First, the majority upheld the district court's ruling on the LULAC consent decree—despite the Supreme Court staying that portion of the district court's injunction. *Mi Familia Vota*, 129 F.4th at 717–20.

Second, the majority upheld the district court's analysis of the NVRA claims. The majority focused on Sections 6, 7, 8, and 9 of the NVRA. *See Mi Familia Vota*, 129 F.4th at 710–17. Section 6 states that each "State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission." 52 U.S.C. § 20505(a)(1). Section 9 permits states to also use their own state forms to register voters for federal elections, but such

forms    "may    require    only    such    identifying
information . . . and other information . . . as is necessary to
enable the appropriate State election official to assess the
eligibility of the applicant and to administer voter
registration and other parts of the election process." *Id.*
§ 20508(b)(1).  Section 7 explains that any voter registration
agency "that provides service or assistance" in "conducting
voter registration" shall distribute the federal voter
registration form or its "equivalent" state form.    *Id.*
§ 20506(a)(6)(A)(i)–(ii).

The majority held that Arizona's requirement to provide
DPOC to vote by mail conflicted with Section 6 because
doing so meant Arizona was not "accept[ing] and us[ing]"
the federal form as sufficient. *Mi Familia Vota*, 129 F.4th at
710; *see* 52 U.S.C. § 20508(a)(1).  The majority also held
that Section 6 preempted Arizona's requirement for DPOC
in presidential elections. *Mi Familia Vota*, 129 F.4th at 711–
12.

Finally, the majority held Arizona's periodic removals of
ineligible individuals from the voter rolls unlawful.    It
construed 52 U.S.C. § 20507(c)(2)(A) to protect applicants
who were never eligible to register in the first place. *Mi
Familia Vota*, 129 F.4th at 714–17; *see* Ariz. Rev. Stat. Ann.
§ 16–165(A)(10), (G)–(K).**2**

---

[2] Several other holdings by the panel majority are troubling, including its
conclusions on the Materiality Provisions of the Civil Rights Act, its
holding on the proof of residency requirement under H.B. 2492, its
analysis of the Voting Laws' list maintenance provisions, its analysis of
organizational and associational standing for certain non-profit
Appellees, and its decision to vacate the district court's factual finding
that the Voting Laws were not motivated by discriminatory intent. *See
Mi Familia Vota*, 129 F.4th at 732–770 (Bumatay, J., dissenting).

Judge Bumatay dissented.  He noted that the majority erred because: (1) Arizona's state form requirement could not be limited by the LULAC consent decree; (2) the DPOC requirement to vote by mail was a restriction on voting rather than on registering to vote; (3) the NVRA does not cover Presidential elections; and (4) the periodic removal provisions were lawful as 52 U.S.C. § 20507(c)(2)(A) only protects applicants who were initially eligible to vote.  *See Mi Familia Vota*, 129 F.4th at 745–50, 741–45, 733–41, 752–57 (Bumatay, J., dissenting).

II

Despite the Supreme Court's stay, the majority upheld the injunction on Arizona's requirement for DPOC with its state form.  The majority erred by holding: (1) the LULAC consent decree independently invalidated the requirement; and (2) the requirement was preempted by the NVRA.

A

Our government is "strictly republican," for it "is evident that no other form would be reconcilable with the genius of the people of America."  The Federalist No. 39 (James Madison).  Consent decrees subvert republican government.

The majority wrongly held that Arizona could not enact Arizona Revised Statutes § 16-121.01(C) because it violated the LULAC consent decree.  *Mi Familia Vota*, 129 F.4th at 717–20.  Section 16-121.01(C) mandates that individuals registering with the state form provide DPOC.  The majority invalidated that requirement because the LULAC consent decree was a "binding final judgment[] that remain[s] in force permanently."  *Mi Familia Vota*, 129 F.4th at 718.

The majority opinion misses the point.  True, the LULAC consent decree remains in force as resolving that

specific litigation. But the decree cannot bind future legislative action that contradicts the decree. And a consent decree cannot forcefully prevent Arizona's executive branch officials from executing duly passed laws subsequently enacted by the Arizona legislature.

While many consent decrees pose no problems under Ninth Circuit caselaw, "a narrow but important class of consent decrees, if judicially enforced, would violate the structural provisions of the Constitution by denying future executive [and legislative] officials the policymaking authority vested in them by the Constitution and laws." Michael W. McConnell, *Why Hold Elections? Using Consent Decrees to Insulate Policies from Political Change*, 1987 U. CHI. LEGAL F. 295, 298. Consent decrees that "bind state and local officials to the policy preferences of their predecessors" may "'improperly deprive future officials of their designated legislative and executive powers.'" *Horne v. Flores*, 557 U.S. 433, 449 (2009) (quoting *Frew v. Hawkins*, 540 U.S. 431, 441 (2004)).

Applying consent decrees to future legislative action poses serious constitutional concerns. Consent decrees draw their force from "the agreement of the parties, rather than the force of the law upon which [a] complaint was originally based." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522 (1986). Courts do not determine whether "the plaintiff established his factual claims and legal theories in litigation." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971). "Thus, a court may enter a consent decree against a government defendant without finding that a statutory or constitutional violation has occurred, inquiring into the precise legal rights of the parties, or reaching and resolving the merits of the claims or controversy." Michael T. Morley, *Consent of the Governed*

*or Consent of the Government? The Problems with Consent Decrees in Government-Defendant Cases*, 16 U. Pa. J. Const. L. 637, 647–48 (2014) (quotation omitted) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 389 (1992); *Armour & Co.*, 402 U.S. at 682–83) (cleaned up).

Given these concerns, we have created a common-sense rule to determine when consent decrees that limit government defendants can bind subsequent state legislatures and executives. Neither the district court nor the panel majority can "supersede [Arizona's] law," by citing a consent decree "unless [Arizona's law] conflicts with any federal law." *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997). The majority erred in concluding that the consent decree alone could nullify any portion of the subsequently enacted Voting Laws. That holding conflicts with *Volpe*, which correctly holds that a violation of a consent decree is not an independent basis to bar subsequent state law.

*Volpe*'s holding is based on fundamental principles. Applying government defendant consent decrees beyond the case in which they are entered violates the strictures of Article III and raises grave separation of powers concerns. The judicial power only extends to "Cases" and "Controversies." U.S. Const. art III, § 2, cl. 1. While "[i]t is emphatically the province and duty of the judicial department to say what the law is," we do so only "to particular cases." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Without a case or controversy, we are powerless to decide questions of law under the Constitution. *Id.*

This principle has stood firm since the inception of our Republic. In 1793, in the wake of hostilities between England and France, President Washington issued a

18          MI FAMILIA VOTA V. PETERSEN

Proclamation of Neutrality between the warring powers. *See* President George Washington, *Neutrality Proclamation* (Apr. 22, 1793), *in* Founders Online, https://founders.archiv es.gov/documents/Washington/05-12-02-0371. Months later, Secretary of State Jefferson sent a letter to the Supreme Court, requesting the Justices to provide legal advice on twenty-nine questions relating to the United States' legal obligations about the ongoing conflict. *See* RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 50–52 (7TH ED. 2015) (reproducing the letter).

Breaking from pre-constitutional practice, the Supreme Court declined to entertain Secretary Jefferson's questions. *Id.* Chief Justice John Jay wrote to President Washington:

> The lines of separation drawn by the Constitution between the three departments of the government—their being in certain respects checks upon each other—and our being judges of a court in the last resort—are considerations which afford strong arguments against the propriety of our extrajudicially deciding the questions alluded to; especially as the power given by the Constitution to the President of calling on the heads of departments for opinions, seems to have been *purposely* as well as expressly limited to the *executive* departments.

*Id.* (reproducing the letter). So when federal courts declare law outside a particular case, they act "extrajudicially" (i.e., outside the judicial power) and erode "[t]he lines of

separation drawn by the Constitution between the three departments of the government." *Id.*

The Supreme Court has thus constructed modern justiciability doctrines to ensure the judiciary acts within its constitutional authority. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–61 (1992). In applying those doctrines, judges must also consider whether they are properly exercising the judicial power as originally understood, expounding on the law only through defined cases or controversies. *Marbury*, 5 U.S. (1 Cranch) at 177.

Applying consent decrees to future cases falls outside the judicial power. When entering consent decrees, federal courts do "not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy." *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (citation omitted). When a government defendant and a litigant form a consent decree, they are not adverse. And the "judicial power, as we have seen, is the right to determine actual controversies arising *between adverse litigants*." *Muskrat v. United States*, 219 U.S. 346, 361 (1911) (emphasis added). When "both litigants desire precisely the same result," as with consent decrees, there is "no case or controversy within the meaning of Art. III of the Constitution." *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971). Such decrees encourage the government to collude with friendly actors and achieve legal results they would be unable to reach normally. *See, e.g.*, *Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1189–91 (10th Cir. 2008).

And unlike settlement agreements which are private contracts courts can lawfully enforce, *see, e.g., U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 21–22, 28–

29 (1994), the enforcement mechanism of consent decrees demonstrates their constitutional limits. While violation of a settlement agreement is remedied through a separate breach-of-contract suit, "noncompliance with a consent decree is enforceable by citation for contempt of court." *Local No. 93*, 478 U.S. at 518. We treat the violation of a consent decree as if the violator has broken the law, even though that "law" was not decided in the context of a case or controversy as the judicial power requires. *See id.*; *Marbury*, 5 U.S. (1 Cranch) at 177.

By giving consent decrees the force of law, we act extrajudicially, doing greater damage to the separation of powers than by rendering advisory opinions. At least when Secretary Jefferson requested an advisory opinion, he expected the Supreme Court to say "what the law is." *Compare* Fallon, Jr. et al., *supra*, at 50–52 *with Marbury*, 5 U.S. (1 Cranch) at 177. When entering consent decrees, the parties tell a court what they want the law to be, and the court rubber stamps their fancies with the imprimatur of law. *Armour & Co.*, 402 U.S. at 682.

By independently relying on the LULAC Consent Decree, the majority exceeds the judicial power assigned to it by the Constitution, defacing the carefully constructed separation of powers designed by our eminent forebears.

B

The majority separately held that the NVRA preempts Arizona's DPOC requirement for state form applicants in federal elections. *Mi Familia Vota*, 129 F.4th at 719. But the NVRA does not conflict with Arizona's requirement. And by extension, no federal law nor the LULAC consent decree prevents Arizona from enforcing the requirement.

Under the NVRA each "State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission pursuant to section 20508(a)(2) of this title for the registration of voters in elections for Federal office." 52 U.S.C. § 20505(a)(1). The Act also states, however, that "[i]n addition to accepting and using the form described in paragraph (1), a State may develop and use a mail voter registration form that meets all of the criteria stated in section 20508(b) of this title for the registration of voters in elections for Federal office." *Id.* § 20505(a)(2).

Under § 20508(b) a registration form "may require only such identifying information . . . and other information . . . as is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* § 20508(b)(1) (emphasis added). Further, such forms "shall include a statement that—(A) specifies each eligibility requirement (including citizenship); (B) contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the applicant, under penalty of perjury." *Id.* § 20508(b)(2).

The key question then is whether Arizona's DPOC requirement is "necessary" to allow state officials to assess the eligibility of applicants and administer voter registration. The majority concluded that the requirement was not "necessary" because "necessary" in § 20508(b)(1) means "essential." *Mi Familia Vota*, 129 F.4th at 719. And any DPOC requirement cannot be essential because the state form's checkbox requirement supplies proof of citizenship by attestation. *Id.* The majority gets it wrong.

While "necessary" can mean "essential," the majority ignores that "necessary" also has another more common meaning. In many statutory and constitutional contexts, "necessary" means "needful." *See Necessary*, Merriam-Webster Unabridged Dictionary, https://unabridged.merria m-webster.com/unabridged/necessary; *Needful*, Merriam-Webster Unabridged Dictionary, https://unabridged.merria m-webster.com/unabridged/needful; *see also* Merriam-Webster's Collegiate Dictionary, 829 (11th ed. 2005) (defining "needful" as "necessary"). In interpreting the Necessary and Proper Clause, for example, the Supreme Court has rejected reading "necessary" to mean essential. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 414–20 (1819).

And between these two meanings, the NVRA is better read as authorizing states to create state forms that collect information needful "to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1). In "ordinary speech, the term [necessary] is often used more loosely to refer to something that is merely important or strongly desired" rather than "[i]n the strictest sense of the term" where "something is 'necessary' only if it is essential." *Ayestas v. Davis*, 584 U.S. 28, 44 (2018). Between the two readings, courts are better off leaning towards "necessary" meaning "needful" rather than "essential," especially when analyzing statutes granting powers to the states or the federal government (unless the statutory text demands the stricter meaning).

The NVRA's statutory scheme strongly suggests that "necessary" in § 20508(b)(1) carries the more lenient meaning. The relevant text allows states to require

identifying information "*necessary to enable*" a state election official to assess the eligibility of an application. 52 U.S.C. § 20508(b)(1) (emphasis added). Under the principle of *noscitur a sociis*, "a word is known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543 (2015). And "necessary" appears just before "to enable" in the text.

This provision of the NVRA actively empowers states to create forms that enable state election officials to determine voter registration eligibility by giving them information necessary to that endeavor. Under the majority's reading of "necessary" (i.e., "essential"), the statute would not "enable" state election officials. Rather than read the provision as a statutory grant, the majority's reading of "necessary" actively *disables* states and state election officials. If states must keep second guessing if any information they collect is truly essential, then the statute turns from a provision enabling them to collect useful information, into a manacle that subjects state forms to onerous litigation second guessing information unequivocally useful in determining voter registration eligibility.

Taken to its logical extreme, states could never collect *any* information under (b)(1) because (b)(2) mandates that state forms include provisions in which applicants attest that they are eligible. An attestation under (b)(2) theoretically covers all eligibility information, rendering any information collected under (b)(1) inessential.

By giving "necessary" in the NVRA this meaning, the majority reads out § 20508(b)(1). But "[t]hese words cannot be meaningless, else they would not have been used." *United States v. Butler*, 297 U.S. 1, 65 (1936). The only reading of "necessary" in § 20508(b)(1) that does not mangle § 20508 is to conclude that "necessary" means

"needful." And no one can dispute that DPOC is needful "to enable" a "State election official to assess the eligibility of [an] applicant" to register to vote. 52 U.S.C. § 20508(b)(1).

The majority then posits that Section 7 of the NVRA also prevents a state from requiring DPOC with its state form. *Mi Familia Vota*, 129 F.4th at 720. But this argument also lacks merit.

The majority points to § 20506(a)(6)(A)(ii), providing that a state form can register voters only "if it is equivalent to the form described in section 20508(a)(2) of this title." That provision states that the "Election Assistance Commission—in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office." 52 U.S.C. § 20508(a)(2).

The majority misconstrued these two provisions. Under § 20506(a)(6)(A)(ii), the state form had to be "equivalent" to the federal form. *Mi Familia Vota*, 129 F.4th at 720. The majority concluded that "the state form is not equivalent to the federal form because the state form has unnecessary additional requirements of DPOC, [documentary proof of residence], and birthplace." *Id.* But "equivalent" in § 20506(a)(6)(A)(ii) is better read to mean similar in function or effect rather than identical. *Mi Familia Vota*, 129 F.4th at 750–51 (Bumatay, J., dissenting). Under that reading, Arizona's state form passes muster.

The majority's reading, which implies that state forms need to match federal forms or be rendered not "equivalent" under § 20506(a)(6)(A)(ii), does not track Supreme Court precedent. In *ITCA*, the Supreme Court explained what the NVRA permits and proscribes. 570 U.S. at 12, 20. The Supreme Court explained that states could not mandate

DPOC above what the federal form required to register federal form applicants. *Id.* at 20. But "state–developed forms may require information the Federal Form does not." *Id.* at 12. And the example the Court gave of such additional information was that "Arizona's registration form includes . . . proof-of-citizenship" documentation as information it collects. *Id.*

*ITCA* thus shows that states can require DPOC with state registration forms without breaching the NVRA. *Id.* Such a requirement does not render a state form nonequivalent to the federal form. *Id.* Although *ITCA* dealt with whether DPOC was allowed with federal form registration, the colloquy about the state form issue was "considered dicta of the Supreme Court," entitled to "greater weight and deference" than the majority gave it. *Valladolid v. Pac. Operations Offshore*, *LLP*, 604 F.3d 1126, 1131 (9th Cir. 2010).

Our caselaw also confirms that states may require DPOC with state forms. The NVRA does not have "a proscription against states requiring documentary proof of citizenship." *Gonzalez v. Arizona*, 485 F.3d 1041, 1050 (9th Cir. 2007). But the majority shrugged off *Gonzalez*. *Mi Familia Vota*, 129 F.4th at 719. Because *Gonzalez* was decided at the preliminary injunction stage, the majority felt it was not bound by the case. *Id.*

But this conclusion misstates the law. A published opinion, even at the preliminary injunction stage, *does* bind future panels if its conclusions are on pure issues of law. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 682–83 (9th Cir. 2021) (Fernandez, J., concurring); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007).

So the majority not only ignored Supreme Court precedent, but binding circuit precedent as well. *See RNC*, 145 S. Ct. 108.

### III

The majority held that the NVRA preempted the Voting Laws in two critical ways. It held that Arizona's DPOC requirement to vote by mail was preempted. *Mi Familia Vota*, 129 F.4th at 710–11. It also held that Arizona's DPOC requirement for presidential elections was preempted. *Id.* at 711–12. Both holdings are wrong.

### A

The majority upheld the district court's injunction on the portion of H.B. 2492 that required citizenship documentation to vote by mail. Citing conflict preemption, it concluded that the requirement flouted 52 U.S.C. § 20505(a)(1)'s requirement that states "accept and use" the federal form. *Mi Familia Vota*, 129 F.4th at 710. But this conclusion runs headlong into Supreme Court precedent.

In *ITCA* the Supreme Court held that the requirement that states "accept and use" the federal form meant that requiring DPOC to *register* a federal form voter was impermissible. 570 U.S. at 19–20; *see* 52 U.S.C. § 20508(b)(1). But registering to vote and casting a vote by mail differ. Once Arizona *registers* people to vote, it can require them to present identification before they *do vote*.

For example, the Supreme Court has upheld a state law that requires a citizen voting on election day to present photo identification before casting a ballot. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 185–86, 203–04 (2008). In *Crawford*, the Court recognized that states had to "reexamine their election procedures" to comport with the

NVRA and still upheld a state law requiring photo identification to vote. *Id.* at 192, 203–04. Instead, the Supreme Court explained that such regulations must simply withstand scrutiny under the *Anderson-Burdick* balancing test. *See id.* at 190; *see also Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick*, 504 U.S. 428. Under that test, the same state interest in "deterring and detecting voter fraud," that led the Supreme Court to uphold DPOC requirements for in-person voting, also counsels upholding Arizona's DPOC requirement for mail-in voters using the federal form. *Crawford*, 553 U.S. at 191, 203–04. Since determining voter eligibility aims to deter voter fraud, Arizona can lawfully require DPOC for mail-in ballots as with voting in person. *Id.* at 185–86, 191, 203–04.**[3]**

### B

Next, the majority held that requiring DPOC in presidential elections is preempted by the NVRA. *Mi Familia Vota*, 129 F.4th at 711. According to the majority, 52 U.S.C. § 20505(a)(1)'s "accept and use" language preempts Arizona Revised Statutes § 16-127(A)(1)'s proof of citizenship requirement. But regulating who may vote in presidential elections falls solely to the states.

The Elections Clause of Article I empowers Congress to legislate on federal elections by regulating the "Times, Places, and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. The Clause applies only to the election of Senators and Representatives. For presidential elections, the Electors Clause explains that

---

[3] The logic underlying *Crawford* also demonstrates why the majority's analysis of obstacle preemption fails since Voter ID laws deterring voter fraud do not impede the NVRA's underlying purposes. *See Mi Familia Vota*, 129 F.4th at 711.

"[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors." U.S. Const. art. II, § 1, cl. 2. Congress's only role in the process comes from the Chusing Clause which does not govern voter eligibility requirements. *See* U.S. Const. art. II, § 1, cl. 4.

The majority concludes that the Supreme Court has given Congress broad authority to regulate presidential elections. *Mi Familia Vota*, 129 F.4th at 712. But the majority overreads *Burroughs v. United States*, 290 U.S. 534, 544 (1934). *Burroughs* involved an indictment where the petitioners argued that the Federal Corrupt Practices Act (FCPA) contravened "section 1, art. 2, of the Federal Constitution, providing for the appointment by each state of electors." 290 U.S. at 541–42. The Court upheld the FCPA, but did so narrowly since it "in no sense invades any exclusive state power." *Id.* at 545. The Court explained that "[w]hile presidential electors are not officers or agents of the federal government, they exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States." *Id.* (cleaned up). Thus, Congress had the "power to pass appropriate legislation to safeguard [a presidential election] from the improper use of money to influence the result." *Id.*

*Burroughs* can be read to mean that Congress can legislate in some cases to ensure presidential elections aren't improperly corrupted through bribes or violence. *Id.* at 544–48. It does not suggest, as the majority concludes, that Congress, rather than the states, can regulate who gets to vote to choose electors. *Mi Familia Vota*, 129 F.4th at 712. Under both the text of the Electors Clause and *Burrough*s, it is the "power of a state to appoint electors [and to determine] the manner in which their appointment shall be made." 290 U.S. at 544. Requiring proof of citizenship to vote falls

squarely within that power. Unlike in *Burroughs*, the majority's application of the NVRA to invalidate H.B. 2492's requirement of DPOC "invades" Arizona's "exclusive state power" to regulate the manner of choosing electors. *Id.* at 545.

Supreme Court precedent confirms this conclusion. "[I]n choosing Presidential electors, the Clause leaves it to the legislature exclusively to define the method of effecting the object." *Moore v. Harper*, 600 U.S. 1, 27 (2023) (cleaned up). Both "the appointment and mode of appointment of electors belong exclusively to the states under the constitution of the United States." *McPherson v. Blacker*, 146 U.S. 1, 35 (1892). Arizona can both choose to select its electors through popular elections and determine who is eligible to vote in them. *Id.*

## IV

Finally, the majority created a circuit split with the Sixth Circuit in *Bell*, 367 F.3d at 591–92 by upholding the district court's injunction on Arizona Revised Statutes § 16–165(A)(10), (G)–(K), the provisions of H.B. 2243 that task county recorders with periodically conducting citizenship checks and removing ineligible applicants from the rolls.

The majority found that the periodic removal provisions conflicted with 52 U.S.C. § 20507(c)(2)(A). *Mi Familia Vota*, 129 F.4th at 714–17. That portion of the NVRA states that a "State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C § 20507(c)(2)(A). And since, in the majority's view, Arizona's periodic cancellation does not rely on "individualized information or investigation, but

rather comparisons to databases," "[i]t is a systematic removal program [that] violates the 90-day Provision because it permits systematic cancellation of registrations within 90 days preceding a federal election." *Mi Familia Vota*, 129 F.4th at 716 (cleaned up).

But § 20507(c)(2)(A) covers "ineligible voters," not ineligible applicants. *See Mi Familia Vota*, 129 F.4th at 752–57 (Bumatay, J., dissenting). Section 20507(c)(2)(A) refers to three sets of people. In the pre-registration process it refers to applicants, then once eligible applicants are registered, they are known as registrants, and finally the statute calls on states to remove ineligible voters (i.e., a subset of registrants) from the rolls. *See* 52 U.S.C. §§ 20507(a)(1)(A)–(D), 20507(a)(3), 20507(a)(4). "Ineligible voters" in § 20507(c)(2)(A) comprise individuals eligible to vote at the time of their registration who become ineligible to vote subsequently. *Id.* They are not individuals who were never eligible at all, the target of H.B. 2243.

And the majority opinion conflicts with the Sixth Circuit's holding in *Bell*, 367 F.3d at 591–92. When analyzing the voter removal provisions of the NVRA, the Sixth Circuit held that "[i]n creating a list of justifications for removal, Congress did not intend to bar the removal of names" for "persons who were ineligible and improperly registered to vote in the first place." *Id*. If the NVRA were read that way then "we would effectively grant, and then protect, the franchise of persons not eligible to vote." *Id.* at 592. The NVRA, enacted to help states "protect the integrity of the electoral process," does not mandate such a result. 52 U.S.C. § 20507(b). The Sixth Circuit got it right, and the panel majority did not.

Moreover, given that Appellees brought a facial pre-enforcement challenge (and no as applied challenge), they needed to show "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The removals are valid against anyone who was ineligible at registration. And they are valid for removals done prior to 90 days before an election. *See* 52 U.S.C. § 20507(c)(2)(A) (applying only to removals within the 90-day window). Those applications alone undermine the facial pre-enforcement challenge.

V

The majority opinion is profoundly wrong; it ignores Supreme Court precedent and our own. Much worse, it skirted Supreme Court direction in this case and again in a case with nearly identical issues. And the opinion makes our elections less safe—our country less free.

The rule of law is vital to the American experiment. It requires us as inferior courts to respect the Court that the Constitution hails as Supreme. U.S. Const. art. III § 1, cl. 1. Each time this court shirks the Supreme Court with wrong legal analysis we erode the rule of law, inviting "anarchy" into our jurisprudence. *Nat'l Inst. of Health v. Am. Pub. Health Ass'n*, No. 25A103, 2025 WL 2415669, at *3 (U.S. Aug. 21, 2025) (Gorsuch, J., concurring in part). And if it continues, "law in time will sign its epitaph." *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *3 (4th Cir. Apr. 17, 2025). Today our court does a grave injustice to republican government. And so, I must dissent.

COLLINS, Circuit Judge, dissenting from the denial of rehearing en banc:

As to the issues on which rehearing en banc has been sought in the pending petitions, my views are in general accord with those expressed in Judge Bumatay's panel dissent, which details the panel majority's many errors. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 732 (9th Cir. 2025) (Bumatay, J. dissenting).  We should have reconsidered en banc the panel majority's egregiously flawed decision in this important case, and I dissent from our failure to do so.

---

BRESS, Circuit Judge, with whom BADE and FORREST, Circuit Judges, join, dissenting from the denial of rehearing en banc:

I respectfully dissent from the denial of rehearing en banc.  At a minimum, we should have reevaluated the panel majority's incorrect and consequential decision upholding the injunction of Arizona's documentary proof of citizenship requirement for state-form applicants, Ariz. Rev. Stat. Ann. § 16-121.01(C)—the portion of the injunction that the Supreme Court already stayed. *Republican Nat'l Comm. v. Mi Familia Vota*, 145 S. Ct. 108 (2024).